IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION

| | | |
|---|---|---|
| DANIEL TAYLOR., | ) | |
| | ) | |
| Plaintiff, | ) | No. 14 C 737 |
| | ) | |
| v. | ) | Judge John Z. Lee |
| | ) | |
| CITY OF CHICAGO, *et al.*, | ) | JURY TRIAL DEMANDED |
| | ) | |
| Defendants. | ) | |

**PLAINTIFF'S RESPONSE TO DEFENDANTS' MOTION TO COMPEL**

NOW COMES Plaintiff, DANIEL TAYLOR, by and through his attorneys, in response and opposition to Defendants' motion to compel (Dkt. 193), and states as follows:

**INTRODUCTION**

This action alleges that the Defendants are liable for Plaintiff's 20-plus years of wrongful incarceration for a double homicide that he did not commit. Plaintiff alleges that he could not have committed this crime because, when it occurred, he was in the 23rd District Chicago Police Department lock-up, having been arrested on a misdemeanor charge earlier that day. (Dkt. 1, at ¶ 2). Among other misconduct, Plaintiff alleges that the Defendants violated his due process rights by withholding exculpatory evidence and information during the course of Plaintiff's criminal prosecution. *See* (Dkt. 1, at ¶¶74-78); *Brady v. Maryland*, 373 U.S. 83 (1963). Plaintiff's *Brady* claims concern the Defendants having concealed evidence relative to the fact that Plaintiff was at the 23rd District at the time of the crimes, as well as other exculpatory information the Defendant Officers, acting pursuant to CPD policy, buried in "street files" that were never turned over to Plaintiff or his defense attorney, Nathan Diamond-Falk.

1

Of course, to succeed in proving his *Brady* claims, Plaintiff must demonstrate that the Defendants actually suppressed or withheld evidence or information. *United States v. O'Hara*, 301 F.3d 563, 569 (7th Cir. 2002). Naturally, discovery on this issue might involve determining whether Plaintiff or his defense attorneys had *knowledge* of the allegedly suppressed material. *See Jackson v. City of Chicago*, 2006 WL 2224052, at *8 (N.D. Ill. July 31, 2006). However, while the Defendants may inquire about Plaintiff and defense counsel's *knowledge*, nothing about that discovery puts at issue Plaintiff's *communications* with defense counsel during his criminal prosecution. *Id*. at *7-8. Those communications remain privileged and are therefore not discoverable. FED. R. CIV. P. 26(b); *Upjohn Co. v. United States*, 449 U.S. 383, 389 (1981). Indeed, to the extent they were asked, Plaintiff and Mr. Diamond-Falk both fully answered questions regarding what they knew about the allegedly suppressed material. *See generally* Exhibit 1 (Testimony of Nathan Diamond-Falk); Exhibit 2 (Deposition Testimony of Plaintiff).

In short, as another Court in this District has already held, alleging a *Brady* claim in a civil rights action does not put attorney-client communications "at issue" and thereby waive privilege. *Jackson*, 2006 WL 2224052, at *7. The same holds true for Mr. Diamond-Falk's attorney work product. *Id.* at *3-5. The Defendants motion to compel should be denied.

## BACKGROUND

Three areas are relevant here: (1) Plaintiff's *Brady* allegations; (2) general discovery with respect to those allegations; and (3) Plaintiff and Mr. Diamond-Falk's testimony.

### A. Plaintiff's *Brady* Allegations Do Not Turn Upon Communications With Plaintiff and His Criminal Defense Attorney or Attorney Work Product

Plaintiff alleges that the Defendant Officers "hid exculpatory evidence" and "withheld exculpatory information" that would have proven his innocence, Dkt. 1, at ¶¶ 2 & 32; see *also id*. at ¶¶ 73-78 (describing Plaintiff's *Brady* claims). For example, Plaintiff alleges:

2

- that, after coercing several of Plaintiff's codefendants into making false statements implicating Plaintiff in the murders the Defendant Officers never disclosed their misconduct, *id.* at ¶¶ 26-27;

- that the Defendant Officers created a "fraudulent police report," but never "disclosed to the prosecutor, the court or plaintiff the" origins of this report, *id.* at ¶ 33;

- that the Defendant Officers withheld evidence corroborating Plaintiff was in police custody at the time of the murders, and prepared a police report regarding that evidence but buried the evidence in a "street file," *id.* at ¶ 36; and

- that the City of Chicago's "street files" practice was a policy of the department that involved the systemic suppression of *Brady* material by CPD officers, including the Defendant Officers, *id.* at ¶¶ 43-50.

None of these allegations involves, in any way, a reference to communications Plaintiff had with Mr. Diamond-Falk or advice Mr. Diamond-Falk gave Plaintiff during his criminal prosecution.

### B. The Parties Have Already Conducted Significant Discovery Regarding Plaintiff's *Brady* Claims

Discovery relative to Plaintiff's *Brady* claim has included significant efforts, by all parties, to determine what precisely was turned over to Plaintiff's criminal defense team, and whether or not Mr. Diamond-Falk had, or should have had, knowledge of information that Plaintiff alleges was suppressed. For example, the gravamen of Plaintiff's motion to compel discovery regarding the original police files relative to the double homicide—all of which have gone completely missing—goes to this issue. *See* (Dkt. 102).

In this vein, many documents relative to Plaintiff's *Brady* claims have been produced in discovery, and the Defendants have had ample opportunity to question multiple witnesses— including Plaintiff, Mr. Diamond-Falk, and Plaintiff's post-conviction counsels, (Kathleen

3

Zellner and Karen Daniel)—about those documents and whether they were likely suppressed. And the Defendant Officers have testified extensively on issues relating to Plaintiff's *Brady* claims. For example, two separate police reports refer to a "street file" in the case, supporting Plaintiff's *Brady* allegations. *See* Exhibit 3. In response, the Defendant Officers have largely testified that they would have turned over all documents, and that a "street file" (to the extent one existed) was only a copy of the Investigative File and not a separate clandestine file full of exculpatory information not provided to Plaintiff. The authors of these reports, to the extent they are known, have also been deposed.

Discovery has also proceeded on the issue of one particular General Progress Report ("GPR"), which refers to another GPR that has never been produced to Plaintiff. *See* Exhibit 4. That missing GPR appears to concern James Anderson—an individual who has been deposed and who has both averred and testified that he was in the 23rd District lock-up with Plaintiff at the time of the double homicide. Mr. Anderson has further testified that he was interviewed by CPD officers relative to being locked up on November 16, 1992, and that he recalls the officers taking notes during that time. Like the missing GPR, no notes regarding a conversation with Anderson have ever been produced to Plaintiff. In addition to conducting the deposition of Mr. Anderson, the Defendant Officers, other CPD employees, and other third-parties have been deposed regarding Mr. Anderson.

Discovery adduced in this case also includes documents that the Attorney General's office determined, when they reviewed the case in 2012, had likely not been turned over to Plaintiff's defense team. *See* Exhibit 5 (Sheri Wong Ltr. To Karen Daniel). The likely withheld documents are notes by the Cook County Assistant State's Attorney from the time of the grand jury and pertain to interviews of police officers at the 23rd District lockup on November 16,

4

1992. In addition to the attorney from the Attorney General's office having been deposed, the ASA who took the notes is also due to be deposed in this matter.

Other important documents relative to Plaintiff's *Brady* claims come from the 23rd District lockup on November 16 and have been produced in this case. Exhibit 6. These records include a roster of people who were in the 23rd District on November 16 as well as the names of personnel who worked the 23rd District that evening. Mr. Diamond-Falk, at the time of trial, specifically sent a subpoena for this sort of information and neither the roster or personnel list are in his trial file today. *See* Exhibit 7 (Subpoena for 23rd District Records). The Defendants have been able to obtain discovery regarding these files. Moreover, the lock-up keepers who were working on November 16 have also been deposed.

Last, as pertaining to what Plaintiff himself knew about the circumstances relative to his co-defendants' incriminating statements to law enforcement, the Defendants have had the opportunity to depose all but one of the co-defendants (one is deceased), and have conducted depositions of a number of the co-defendants' trial attorneys. In these proceedings, the Defendants have had substantial opportunity to inquire whether information Plaintiff alleges was suppressed was in fact provided or easily available to both his co-defendants and their attorneys.[1]

### C. Plaintiff and Mr. Diamond-Falk Have Already Answered Questions Regarding Their Knowledge of the Allegedly Suppressed Information

Both Plaintiff and Nathan Diamond-Falk have already been deposed in this matter. And, both have answered questions about what they knew of the allegedly suppressed *Brady* material.

Over the course of seven hours, Plaintiff answered myriad questions asked by the Defendants. To start, Plaintiff testified extensively about the circumstances of his confession

---

[1] Should the Court like excerpts of the relevant depositions (there are more than 10), Plaintiff will provide them upon request.

5

(which he alleges was coerced). *See* Ex. 2, at 237-96. In so doing, Plaintiff also testified specifically about conversations he had with Deon Patrick and Rodney Matthews (two of his co-defendants) regarding the circumstances behind their (false) confessions. Ex. 2, at 354-57. In addition, Plaintiff testified at length about his contention that he was in the police lockup at the time of the double homicide, *id.* at 127-78, and Plaintiff was specifically asked about James Anderson. *Id.* at 375. Plaintiff's brief invocation of privilege dealt with only what he told Mr. Diamond-Falk about his interrogation. *See id*. at 339-49. Notably, by agreement of the parties, Plaintiff is scheduled to sit for 3 hours of additional testimony. Should the Defendants desire more information about what plaintiff knew regarding the allegedly suppressed *Brady* material, they can question him on those issues at that time.

At his two-part deposition, Mr. Diamond-Falk also testified extensively regarding his knowledge of allegedly withheld *Brady* material, both as it pertained to what he actually knew and what the Defendants may contend he should have known. For example, Mr. Diamond-Falk testified that the first time he ever saw a lock-up roster, listing the people who were in the lock-up with Plaintiff at the time of the crimes, was a week before his deposition, and that he believed police reports regarding James Anderson were kept from him before trial. Ex. 1, at 34-36, 126-127. Mr. Diamond-Falk was shown police reports regarding James Anderson, attached hereto as Exhibit 8, and believed he had not received them before trial. *Id.* at 258.

Regarding the Defendants' possible argument that Mr. Diamond-Falk should have known about some of the allegedly suppressed information—*e.g*., the methods used to obtain confessions from Plaintiff's co-defendants, and the identity of James Anderson—Mr. Diamond-Falk testified at length. Specifically, Mr. Diamond-Falk stated that he had not received any information from the police or prosecutors regarding the procedures used to obtain statements

from Plaintiff's co-defendants. *Id.* at 359-63. Mr. Diamond-Falk also testified about his relationships with the attorneys who represented Plaintiff's co-defendants at their trials, including whether they communicated about motions to suppress, *id.* at 134-35, and whether they had a "joint defense agreement." *See id.* at 104-116 (questioning Mr. Diamond-Falk about knowing and working with attorneys John Theis, Richard Kling, Gary Cole, Andrew Berman, and Joan Hill-McClain); *id.* at 275 (testifying that could not recall asking the co-defendants' attorney's "whether they had information relating to the identity of Mr. Taylor's cellmate"); *id.* at 278-81 (testifying regarding his ability to ask other defense attorneys whether they had police reports he believed had not been produced). Indeed, Mr. Diamond-Falk was asked directly whether (1) he knew that "the police had obtained confessions of all the persons charged for the" double homicides, and (2) whether he took "any steps prior to the end of Daniel Taylor's criminal trial to find out the circumstances under which those confessions had been obtained." *Id.* at 301-02. Mr. Diamond-Falk fully testified with respect to these issues.

As for Plaintiff's alibi, Mr. Diamond-Falk was specifically asked: "you knew that, at the time of Mr. Taylor's trial, you knew he was claiming that he was in lockup at the time the murders were committed," and answered "yes" to that question. *Id.* at 263. More generally, Mr. Diamond-Falk admitted that he had Plaintiff's bond slip and arrest reports from the November 16th arrest at the time of trial. *Id.* at 261; *see id.* at 264-65. Mr. Diamond-Falk also admitted that he found out about the alibi from the police reports in the case, *id.* at 116-17, and testified about how he likely received discovery in the case, *id.* at 117-124.

Regarding the 23rd District records—the roster of inmates and the personnel list from November 16, 1992—Mr. Diamond-Falk testified that he was not aware of the fact that police kept a roster of persons in their custody, *id.* at 270, and that he had not received either the roster

or personnel records at the time of Plaintiff's trial, *id.* at 368-71. Mr. Diamond-Falk also testified, without invoking privilege, about the subpoena he sent to the 23rd District, what the purpose of the subpoena was, and steps, if any, he recalls taking to ensure that subpoena satisfied. *Id*. at 290-97, 366-67. Mr. Diamond-Falk was shown the notes the Attorney General's office concluded had not been turned over and testified that he had not received them before Plaintiff's criminal trial. *Id.* at 375-77. Finally, Mr. Diamond-Falk testified that he became aware of the "street files" practice at some point, but could not recall if that was before Plaintiff's criminal trial. *Id.* at 137.

## ARGUMENT

**I.    Plaintiff's *Brady* Claims Have Not Put Privileged Material "At Issue"**

   *A.  Plaintiff Has Not Pointed to Mr. Diamond-Falk's Advice or Work Product*

The Defendants have already obtained substantial discovery relative to whether or not Mr. Diamond-Falk knew (or should have known) of the allegedly suppressed *Brady* material. Mr. Diamond-Falk testified extensively regarding his knowledge of the allegedly suppressed information, and scores of witnesses have testified about the exculpatory material and been asked about its availability. That is the extent of discovery to which the Defendants are entitled.

Plaintiff's communications with Mr. Diamond-Falk, as well his work product, are a different matter altogether. "The attorney–client privilege is the oldest of the privileges for confidential communications known to the common law," *Upjohn*, 449 U.S. at 389, and the "privilege belongs to the client," not the attorney. *Sandra T.E. v. South Berwyn Sch. Dist. 100*, 600 F.3d 612, 618 (7th Cir. 2009). A broader privilege, the work-product doctrine applies to protect "documents and tangible things … prepared in anticipation of litigation or for trial by or

for another party or by or for that other party's representative." FED. R. CIV. P. 26(b)(3). The Defendants are not entitled to compel discovery of such privileged information.

Plaintiff agrees privilege can deemed waived where the client "asserts claims or defenses that put his attorney's advice at issue in the litigation." *Garcia v. Zenith Electronics Corp.*, 58 F.3d 1171, 1175 n.1 (7th Cir. 1995) (citing *Rhone–Poulenc Rorer Inc. v. Home Indemnity Co.*, 32 F.3d 851 (3rd Cir.1994)).[2]

However, the Defendants' radical view of what it means to put something "at issue" is the source of disagreement between the parties. It is well-established that to constitute "at issue" waiver, a party "must affirmatively put at issue the specific communication, document or information to which the privilege attaches." *Dexia Credit Local v. Rogan*, 231 F.R.D. 268, 275 (N.D. Ill. 2004); *see Beneficial Fran. Co., Inc. v. Bank One*, 205 F.R.D. 212, 216-17 (N.D. Ill. 2001). This "affirmative step" rule "provide[s] certainty that the client's confidential communications will not be disclosed unless the client takes an affirmative step to waive the privilege." *Rhone–Poulenc*, 32 F.3d at 863. Such an affirmative act occurs when "the client asserts a claim or defense, *and attempts to prove that claim or defense by disclosing or describing an attorney client communication*." *Id.* (emphasis added).

As the record indicates, Plaintiff has not placed any attorney-client communications at issue here. Plaintiff has never attempted to prove his *Brady* claims by pointing to any communications between himself and Mr. Diamond Falk, or by relying upon work product. The Defendants have not cited one instance—because there are none—where Plaintiff has attempted to prove his *Brady* claims by reference to a conversation that Plaintiff had with his defense

---

[2] For the work product privilege, the requesting party must also demonstrate "that it has substantial need for the materials to prepare its case and cannot, without undue hardship, obtain their substantial equivalent by other means." Fed. R. Civ. P. 26(B)(3)(A)(ii).

9

counsel, or by pointing to Mr. Diamond-Falk's notes or memoranda. Thus, these communications and documents are not "at issue" here and the privilege remains. *Id.*; *see also, e.g.*, *Dexia Credit Local*, 231 F.R.D. at 275 (holding "the at-issue waiver doctrine does not apply here, as [the plaintiff] has not sought to use any of the documents for which it asserts privilege").

Examples are perhaps illustrative. In *Rhone-Poulenic*—a case cited favorably by the Seventh Circuit and the Defendants—the Third Circuit "used the example of a patent case in which a defendant denies the charge of willful infringement." *Beneficial Franchise Co. Inc. v. Bank One, N.A.*, 2015 F.R.D. 212, 216 (N.D. Ill. May 8, 2001) (citing *Rhone-Poulenic*, 32 F.3d at 863). "The Court explained that while the advice of the alleged infringer's lawyer may be '*relevant* to the question of whether the infringer acted with a willful state of mind, ... the advice of the infringer's counsel is not placed in issue, and the privilege is not waived, unless the infringer seeks to limit its liability by describing that advice and by asserting that he relied on that advice.'" *Id.* (emphasis added) Here, for example, Plaintiff could have put "at issue" the attorney-client communications by attempting to prove up his coerced confession claim by introducing evidence that he told Mr. Diamond-Falk he was beaten by the police, and by providing testimony regarding Mr. Diamond-Falk's advice to Plaintiff during the suppression hearing. In so doing, Plaintiff would have put "at issue" those protected communications. Plaintiff has done no such thing. Or, as concerns the work product doctrine, if Plaintiff were to have attempted to use Mr. Diamond-Falk's notes as evidence that Mr. Diamond-Falk did not receive the James Anderson GPRs, those notes might be "at issue" in the litigation. Again, Plaintiff has done no such thing.

B. *This Court Should Follow* Jackson v. City of Chicago

Tellingly, the Defendants do not even attempt to contend with or distinguish *Jackson v. City of Chicago*, a case in this district and directly on point. There, the plaintiff brought a civil-rights action following her acquittal, alleging that she was wrongfully detained while awaiting trial. 2006 WL 2224052, at *1. As here, the plaintiff advanced claims related to the voluntariness of her confession and alleging exculpatory evidence had been suppressed in violation of *Brady*. As here, the *Jackson* plaintiff invoked attorney-client privilege for communications with her attorney, and work product privilege over the attorney's notes. *Id.* at *2. The magistrate Judge denied the motion. *Id.* at *2-3. In affirming, *Jackson* held that a civil-rights plaintiff's assertion of a *Brady* claim does not categorically waive work product or attorney-client privileges, *id.* at *5-8, and did not do there because the privileged materials did not "relate to the heart of Plaintiff's … *Brady* claim." *Id.* at *7. *Id.*

For the attorney-client privilege issue, the Court held:

Even if Defendant is correct that Plaintiff, by virtue of Count II of the Amended Complaint, has put her and her attorneys' *knowledge* concerning exculpatory *Brady* evidence "at issue," she did not put attorney-client communications at issue. At best, Defendants have demonstrated that they were entitled to ask specific questions about [the attorney's] knowledge of exculpatory information, not that they may generally probe the content of attorney-client conversations with broadly worded, open-ended questions. Furthermore, Plaintiff has not placed communications 'at issue,' as defined by precedent, because her claims do not address any advice she received from her attorney.

*Id.* at *7 (citing *Garcia*, 58 F.3d at 1175 & n. 1; *Rhone-Poulenc*, 32 F.3d at 863, and *Southwire Co. v. Essex Group, Inc.*, 570 F. Supp. 643, 650 (N.D. Ill. 1983)). *Jackson* also concluded that "none of Plaintiff's claims places 'at issue' the conversations she may have had with her attorney about the conditions of her confinement at the police station." *Id.*

11

Turning to the work product issue, *Jackson* remains on point. There, the defendants sought information regarding the content of the defense attorney's notes from the trial file, and the Court rejected this effort as seeking material "which the work product doctrine is designed to protect." *Jackson*, 2006 WL 224052 at *5. In denying the motion, the Court explained that the defendants were able to "ask Plaintiff [and] other putative providers of exculpatory information if they were aware of the various allegedly exculpatory information at trial." *Id.* Indeed, in rejecting any notion of "undue hardship," the Court explained that "Defendants also may be able to elicit much of this same information from [the defense attorney], as she will have no attorney-client privilege concerning her communications with putative defense witnesses." *Id.*

In sum, Plaintiff has afforded the Defendants substantial discovery regarding Mr. Diamond-Falk's "knowledge of exculpatory information." As described above, Mr. Diamond-Falk testified extensively about what he believes he knew and received from the state before trial. Moreover, as in *Jackson*, Plaintiff's *Brady* claims "do not address any advice" he received from Mr. Diamond-Falk, and Plaintiff has not pointed to these communications in support of his *Brady claims*, meaning they are not "at issue" here. In addition, pertaining to work product, Plaintiff, as in *Jackson* has not pointed to work product in proving his *Brady*, meaning it is not "at issue" in the case. And, the Defendants have had the same opportunities (which they have taken) as were available in *Jackson* to "ask other putative providers of exculpatory information" about that information. They should not be permitted to examine work product for that reason.

C. *The Cases Cited By the Defendants Either Support Plaintiff or Are Distinguishable*

Finally, unlike *Jackson*, the cases the Defendants cite in support of their position are largely distinguishable—most do not involve *Brady* claims. And, in large part the decisions support Plaintiff's position. For example, the Defendants cite *Trustmark Ins. Co. v. Gen. &*

*Cologne Life Re of Am.*, 2000 WL 1898518 (N.D. Ill. Dec. 20, 2000), *Chamberlain Grp. v. Interlogix, Inc.*, No. 01 C 6157, 2002 WL 467153 (N.D. Ill. Mar. 27, 2002), and *Pyramid Controls, Inc. v. Siemens Indus. Automations, Inc.*, 176 F.R.D. 269 (N.D. Ill. 1997) in their papers. None of these cases involves a *Brady* claim.

And, the reasoning of each is consistent with Plaintiff's position here. In *Trustmark*, the court held that the "at-issue" waiver did not apply when the defendants sought to obtain protected documents from the plaintiff's privilege log that were undoubtedly relevant to what Plaintiff was required to prove at trial. 2000 WL 1898518, at *8. Nonetheless, the Court held that the plaintiff had "not placed, or affirmatively relied on, advice of counsel or counsel's work product to establish any element of its case in chief," meaning at issue waiver did not apply. *Id.*. Likewise, in *Chamberlain Grp. v. Interlogix, Inc.*, 2002 WL 467153 (N.D. Ill. Mar. 27, 2002), a party asserted "equitable estoppel and laches" as a defense in a patent dispute and specifically relied on advice of counsel as a defense to the claims, directly placing attorney communications at issue. In *Pyramid*, the plaintiff's claims directly concerned "information…[the plaintiff] conveyed to counsel and what advice" was given to the plaintiff. 176 F.R.D. at 274. Unsurprisingly, the court found at-issue waiver because the legal claims involved "the discussions between [the plaintiff] and its attorney and the advice [the plaintiff] received based on these discussions." *Id.* As is clear, this Plaintiff's case is like *Trustmark* because, unlike *Chamberlain* and *Pyramid*, Plaintiff has not in any way put his attorney's advice at issue by advancing his *Brady* claims.

Last, the Defendants cite *Cannon v. Polk County*, 2013 WL 1840343 (D. Or. Apr. 30, 2012), a non-binding, out of circuit authority. Notably, *Cannon* is not entirely inconsistent with Plaintiff's position. There, the court determined that, given the plaintiff's *Brady* claim, the

13

defendants should be allowed to get discovery pertaining to what the plaintiff and his counsel knew regarding the allegedly suppressed information. *Id.* at *4. Consistent with *Cannon*, the Defendants here have already ample discovery on the "knowledge issue." However, *Cannon* is unpersuasive and contrary to the law of this district, to the extent (which itself is unclear) the court compelled attorney-client advice and work product where the plaintiff had not affirmatively relied upon that advice or work product in support of her *Brady* claims. *See Garcia*, 58 F.3d at 1175 n.1; *Dexia,* 231 F.R.D. at 275. *Cannon* is likewise appears not to have considered the distinction between *knowledge* of exculpatory information and an attorney's *advice* to her client, which was properly recognized in *Jackson*.

One final point bears mentioning. Contrary to the Defendants' allegation, Plaintiff has not attempted to use privilege as "both a sword and a shield." Mot., Dkt. 193, at 10. In support of this claim, the Defendants point to GPRs that Mr. Diamond-Falk testified he did not receive before trial. However, had those GPRs been in Mr. Diamond-Falk's trial file, they would have been produced in discovery in this case because they do not constitute work product. Nothing about Mr. Diamond-Falk's work product has been used to block any type of discovery in this case.[3] Indeed, Plaintiff concedes that had he attempted to use communications or work product as a "sword"—by claiming those communications or notes support his *Brady* claims—the privilege would likely have been waived.

---

[3] The Defendants suggest that Mr. Diamond-Falk's testimony that he abstracted police reports may reveal that he had GPRs related to James Anderson, justifying their motion. Not so. First, Plaintiff has not pointed to those notes in support of any of his *Brady* claims, meaning they are not "at issue" here even if relevant. *Rhone–Poulenc Rorer*, 32 F.3d 851; *Trustmark*, 2000 WL 1898518, at *8. Second, the Defendants motion seeks "all the documents from Diamond-Falk's file," not just the abstracts. Mot., Dkt. 193, at 11. Finally, as the Defendants know from the privilege log, those abstracts cannot be found.

14

## II. Plaintiff has not Waived Privilege With Respect to His Communications With Post-Conviction Counsel

It is undisputed that Plaintiff holds the attorney-client privilege, and it is his prerogative to waive such privilege. *Paters v. United States*, 159 F.3d 1043, 1060 n.6 (7th Cir. 1998); *see also United States v. White*, 970 F.2d 328, 334 (7th Cir. 1992) (communications protected at client's "insistence"). Indeed, *only* Plaintiff can waive this privilege. *See Southwire Co. v. Essex Group Inc.*, 570 F. Supp. 643, 645 (N.D. Ill. 1983) ("only the party that holds the attorney-client privilege may waive it").

It is also undisputed that when asked at his deposition about communications with Kathleen Zellner, his post-conviction, counsel that Plaintiff invoked the privilege. Ex. 2, at 196. As a consequence, Ms. Zellner—either by sending a letter to a member of the Cook County State's Attorney's Office or improperly testifying at a deposition—cannot unilaterally waive Plaintiff's privilege. For these reasons, the Plaintiff should not be compelled to answer questions about his communications with Ms. Zellner.

WHEREFORE, Plaintiff requests that this Court deny the Defendants' motion to compel.

Respectfully submitted,

_____

| | |
|---|---|
| Jon Loevy | Locke E. Bowman |
| Gayle Horn | Alexa Van Brunt |
| David B. Owens | RODERICK AND SOLANGE MACARTHUR |
| LOEVY & LOEVY | JUSTICE CENTER |
| 312 N. May St., Ste. 100 | Northwestern University School of Law |
| Chicago, IL 60607 | 375 E. Chicago Avenue |
| (312) 243-5900 | Chicago, Illinois 60611 |
| | (312) 503-0844 |

15

## **CERTIFICATE OF SERVICE**

I, David B. Owens, an attorney, hereby certify that on June 30, 2015, I filed the foregoing Response to the Defendants Motion to Compel using the Court's CM/ECF system, which effected service on all counsel of record.

_____