# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | |
|---|---|
| DANIEL TAYLOR, | ) |
| Plaintiff, | ) ) ) |
| v. | ) No. 14 C 737 |
| CITY OF CHICAGO, et al., | ) Judge John Z. Lee ) Magistrate Judge Finnegan |
| Defendants. | ) ) |

## MEMORANDUM OPINION AND ORDER

Plaintiff Daniel Taylor served more than 20 years in prison for two murders before obtaining a Certificate of Innocence in January 2014. He has filed a lawsuit under 42 U.S.C. § 1983 alleging that the City of Chicago (the "City"), several Chicago police officers, and unidentified City employees violated his Fifth and Fourteenth Amendment rights, in part by coercing him into making a false confession to the murders, and by hiding exculpatory evidence proving his innocence in violation of *Brady v. Maryland*, 373 U.S. 83 (1963).[1] In the motion to compel currently before the Court, Defendants argue that Taylor and his former criminal defense attorney, Nathan Diamond-Falk, improperly asserted the attorney-client privilege and work-product doctrine in declining to answer certain deposition questions and to produce certain documents in discovery.

Defendants first contend that Taylor has impliedly waived any privilege with respect to conversations he had with Diamond-Falk that bear on two *Brady* allegations:

---

[1] Taylor has also charged the officers (Anthony Villardita, Thomas Johnson, Brian Killacky, Terry O'Connor, Rick Abreu, Robert Delaney, Sean Glinski and Michael Berti) (collectively, the "Defendant Officers") with malicious prosecution, failure to intervene, and conspiracy, and has asserted a *Monell* claim against the City.

(1) failure to produce evidence that Taylor was beaten into confessing to the murders; and (2) failure to produce evidence that Defendants identified an alibi witness who allegedly confirmed Taylor could not have committed the murders.[2] Defendants also insist that Taylor has expressly waived any privilege with respect to conversations he had with Kathleen T. Zellner of the MacArthur Justice Center, his attorney during the post-conviction proceedings, regarding his whereabouts on the night of the murders. In addition to seeking further testimony from Taylor and Diamond-Falk on these issues, Defendants want the Court to conduct an *in camera* review of all the documents listed on the MacArthur Justice Center's 41-page privilege log to determine whether Taylor is withholding any that pertain to the cited *Brady* claims.

As explained below, the motion to compel is granted in part and denied in part.

## **BACKGROUND**

The facts giving rise to this case date back to late 1992 and early 1993, when the Defendant Officers arrested and charged eight young men, including then-17-year-old Daniel Taylor, with murdering Jeffrey Lassiter and Sharon Haugabook at approximately 8:45 p.m. on November 16, 1992. The prime suspect in the murders was a man named Dennis "Goldie" Mixon, a drug dealer who was seen leaving Lassiter's building shortly after the shooting along with three other unidentified individuals. However, the Defendant Officers were initially unable to locate Mixon for questioning.

### A. Taylor's Arrest and Conviction

A few weeks after the shooting, the Defendant Officers arrested a 15-year-old named Lewis Gardner on unrelated charges, and allegedly coerced him into falsely implicating himself, Taylor, and five others (Akia Phillips, Paul Phillips, Joseph Brown,

---

[2] Taylor alleges other *Brady* violations not at issue here.

2

Deon Patrick, and Rodney Matthews) in the Lassiter and Haugabook murders. As it happens, police records show, and Taylor alleges, that he was in custody in the 23rd District lockup on an unrelated disorderly conduct charge at the time of the murders so could not have been involved. He even received a bond slip showing that he had been released on bond at 10:00 p.m. on November 16, 1992. The Defendant Officers arrested Taylor and allegedly coerced a confession from him, and from the five other young men, using physical and psychological abuse. They also allegedly withheld exculpatory evidence corroborating Taylor's alibi (that Taylor's cellmate at the 23rd District lockup, James Anderson, allegedly was interviewed and confirmed that Taylor was with him in police custody at the time of the murders).

Taylor was ultimately convicted of first-degree murder, armed robbery, and home invasion, and sentenced to life in prison plus two concurrent thirty-year prison terms, with no eligibility for parole.[3] Like Taylor, Deon Patrick, Paul Phillips, and Lewis Gardner were convicted and sent to prison. The cases against Akia Phillips and Joseph Brown were dismissed by the court before trial, and Rodney Matthews was acquitted.[4]

After serving more than 20 years of his sentence, Taylor's conviction was vacated on June 28, 2013, and the Circuit Court of Cook County granted him a Certificate of Innocence with respect to all charges on January 23, 2014. The following month, on February 14, 2014, Taylor filed this federal lawsuit.

**B. The Motion to Compel**

Defendants deposed Taylor on September 4, 2014 and sought to elicit testimony concerning his *Brady* allegations, as well as his whereabouts on the night of November

---

[3] Taylor was tried together with Mixon, who was also convicted and remains in prison.
[4] Though Taylor was not tried together with these other young men (except Mixon), this opinion sometimes refers to those individuals as Taylor's "co-defendants."

16, 1992 as documented in a June 16, 2003 memo that Zellner sent to Cook County Assistant State's Attorney ("ASA") Allison Perone. At his counsel's instruction, Taylor declined to answer any such questions to the extent it would divulge privileged conversations he had either with Diamond-Falk or Zellner. Diamond-Falk similarly invoked the attorney-client privilege in refusing to answer deposition questions relating to conversations he had with Taylor. Defendants believe this was improper and seek to compel the withheld testimony and any related documents.[5] (Doc. 193, at 10).[6]

## DISCUSSION

**I.   The Attorney-Client Privilege, Implied Waiver and *Brady***

It is well-established that "communications made in confidence by a client . . . to an attorney . . . for the purpose of obtaining legal advice" are protected from disclosure by the attorney-client privilege. *Sandra T.E. v. South Berwyn Sch. Dist. 100*, 600 F.3d 612, 618 (7th Cir. 2010). The privilege can be waived, however, for example when "the client's claim or defense puts the attorney's advice at issue." *Jackson v. City of Chicago*, No. 03 C 8289, 2006 WL 2224052, at *7 (N.D. Ill. July 31, 2006). *See also Pyramid Controls, Inc. v. Siemens Indus. Automations, Inc.*, 176 F.R.D. 269, 272 (N.D. Ill. 1997) ("Implied waiver of the attorney-client privilege can occur where a party voluntarily injects either a factual or legal issue into the case, the truthful resolution of which requires an examination of the confidential communications."). Here, Taylor has

---

[5]   Defendants also moved to compel Lewis Gardner to answer deposition questions about conversations he had with his criminal defense attorney. Since Gardner is now "willing to waive attorney-client privilege and answer the questions to which he previously claimed a privilege," (Doc. 201, at 1), Defendants' motion to compel relating to Gardner is denied as moot.

[6]   For ease of reference, unless otherwise specified, page numbers for all briefs and exhibits are drawn from the CM/ECF docket entries at the top of the filed document.

4

not placed Diamond-Falk's *advice* at issue, but by asserting *Brady* claims, he has placed the attorney's *knowledge* at issue.

To prove a *Brady* violation, Taylor must establish three elements: "(1) the evidence at issue is favorable to the accused, either being exculpatory or impeaching; (2) the evidence [was] suppressed by the government, either willfully or inadvertently; and (3) there is a reasonable probability that prejudice ensued – in other words, 'materiality.'" *Carvajal v. Dominguez*, 542 F.3d 561, 566-67 (7th Cir. 2008). For purposes of the second element, evidence is "suppressed" if "(1) the prosecution failed to disclose the evidence in time for the defendant to make use of it, and (2) the evidence was not otherwise available to the defendant through the exercise of reasonable diligence." *Id.* at 567 (citing *Ienco v. Angarone*, 429 F.3d 680, 683 (7th Cir. 2005)). There is no *Brady* violation if the defendant "knew or should have known about the essential facts contained in the allegedly exculpatory evidence." *United States v. Muoghalu*, No. 07 CR 750, 2010 WL 3184178, at *7 (N.D. Ill. Aug. 9, 2010), *aff'd*, 662 F.3d 908 (7th Cir. 2011). "The defendant does not have to know the specific details of the information, or exactly what it is, as long as he 'knew of and had access to the material that contained, or the witness who possessed, such information.'" *Id.* (quoting *Boss v. Pierce*, 263 F.3d 734, 746 (7th Cir. 2001) (Flaum, J., dissenting)). Though advancing a *Brady* claim does not "*per force* constitute[] a waiver of the attorney-client privilege," *Jackson*, 2006 WL 2224052, at *7, waiver may occur if the plaintiff places "the extent of [his] and his counsels' knowledge of information withheld during the initial criminal trial at issue." *Cannon v. Polk County/Polk County Sheriff*, No. 3:10-CV-224-HA, 2013 WL 1840343, at *3 (D. Or. Apr. 30, 2013).

5

As noted, Taylor makes two *Brady* claims relevant to the instant motion. First, Taylor says that Defendants withheld evidence that the Defendant Officers had coerced him into confessing to the Lassiter and Haugabook murders. Second, Taylor claims that the Defendants failed to disclose that they identified Taylor's cellmate in the lockup, James Anderson, and allegedly learned from him that he remembered being in the lockup with Taylor on the night of November 16, 1992.[7] For these to be *Brady* violations, Taylor and Diamond-Falk cannot have known or reasonably discovered this exculpatory evidence. Defendants argue that since Taylor has placed at issue his and Diamond-Falk's knowledge of the *Brady* material, he has impliedly waived the attorney-client privilege as to conversations that may reveal the scope of that knowledge. The Court considers each *Brady* claim in turn.

### A. The Allegedly Coerced Confession

At his deposition, Taylor testified that the officers who arrested him in connection with the Lassiter and Haugabook murders hit him with a flashlight, punched him, and beat him until he got tired and confessed. (Doc. 202-2, at 19-21, 23, 30, Taylor Dep., at 246-48, 253-55, 262-65, 292). Taylor clearly stated that he told Diamond-Falk the confession was "untrue" and he "was beaten to confess into something I didn't do." In response to a question whether "Prior to October of 1994 [when Taylor testified during a suppression hearing that the police had beat him] had you ever made a claim in your criminal case that you had been beaten and that's why you confessed," Taylor stated "I told my attorney [Diamond-Falk]." But his counsel in this lawsuit instructed him not to say anything else about those conversations. (*Id.* at 32, Taylor Dep., at 334-36).

---

[7] Defendants contend that they were unable to locate Anderson so he was never interviewed.

When Defendants' counsel asked Diamond-Falk about his knowledge of the circumstances surrounding Taylor's confession, Taylor's attorney instructed him not to answer any deposition questions revealing "substantive conversations with Mr. Taylor" based on the attorney-client privilege. (Doc. 202-1, at 9, Diamond-Falk Dep., at 128-29). So, for example, Diamond-Falk refused to disclose whether Taylor "ever t[old] you that he was physically mistreated," or "that he was beaten by the police." (Doc. 193-7, at 6-7, Diamond-Falk Dep., at 215-16). Diamond-Falk similarly invoked the attorney-client privilege in declining to answer whether "Prior to you filing the motion to suppress [Taylor's confession], did Mr. Taylor ever tell you that he had visible bruises and marks on his body at the time that he was admitted to the Cook County jail?" (*Id.* at 7, Diamond-Falk Dep., at 216).

The Court agrees with Defendants that Taylor and Diamond-Falk should be required to answer questions about any conversations they had concerning the alleged coercion that led Taylor to confess to murder while in police custody. Taylor has charged Defendants with failing to disclose this *Brady* information during the criminal trial, and claims that Diamond-Falk did not know (and could not reasonably have discovered) that the abuse occurred. Yet Taylor certainly knew about his own beatings and injuries, and even confirmed at his deposition (before his attorney instructed him not to answer) that he affirmatively told Diamond-Falk about them. If this is true, it directly undermines Taylor's argument that Diamond-Falk lacked reasonable access to evidence indicating that the confession had been coerced.

In opposing the motion, Taylor stresses that he already testified about conversations he had with two of his co-defendants, Deon Patrick and Rodney

7

Matthews, about "the circumstances behind their (false) confessions." (Doc. 202, at 6). He also finds it significant that Diamond-Falk testified that "he had not received any information from the police or prosecutors regarding the procedures used to obtain statements from co-defendants." (*Id.* at 6-7). Of course, none of that testimony speaks to whether Diamond-Falk knew or could have known about the circumstances surrounding *Taylor's* confession.

Also unavailing is Taylor's assertion that he has not actually placed any attorney-client communications at issue because he does not intend to rely on conversations he had with Diamond-Falk in order to prove his *Brady* claims. (*Id.* at 9). By arguing that Diamond-Falk did not know his confession was coerced (because the police withheld this information), Taylor has affirmatively placed at issue whether he himself ever told Diamond-Falk about that abuse. Under such circumstances, Taylor's attempt to distinguish between Diamond-Falk's knowledge (which Taylor agrees is discoverable), and communications he had with Diamond-Falk that relate directly to that knowledge, must be rejected. (*Id.* at 2).

Contrary to Taylor's assertion, *Jackson v. City of Chicago* does not support a different conclusion. The plaintiff in *Jackson* filed a Section 1983 lawsuit alleging that she was tortured into confessing that she had stolen an officer's gun at the scene of a car accident, when all she had done was try to assist that officer's injured partner. 2006 WL 2224052, at *1. The plaintiff asserted a *Brady* claim, but it had nothing to do with her treatment while in police custody, instead concerning "exculpatory statements and accounts [the police] received from her and from several witnesses" to the car accident.

*Jackson v. City of Chicago*, No. 03 C 8289, Doc. 123, Slip op., at 4, 9 (N.D. Ill. Dec. 9, 2005), *aff'd* by *Jackson*, 2006 WL 2224052.

During a deposition of the plaintiff's former criminal defense attorney, the defendants tried to ask questions about conversations she had with her client concerning "the conditions of Plaintiff's confinement at the police station before she was brought to jail." *Jackson*, 2006 WL 2224052, at *6. These questions had nothing to do with the *Brady* claim. The court held that the plaintiff's mere act of "suing the defendants and alleging that they held her in violation of her constitutional rights" and tortured her into confessing to a crime she did not commit, did not place "'at issue' the conversations she may have had with her attorney about the conditions of her confinement at the police station." *Jackson*, Slip op., at 12; *Jackson*, 2006 WL 2224052, at *7.

Here, conversely, Taylor's *Brady* claim is based specifically on his treatment in police custody that allegedly resulted in a coerced confession and whether his attorney knew about the abuse. He has therefore placed at issue the conversations he and Diamond-Falk had relating to the allegedly coerced confession, and the attorney-client privilege does not shield them from answering questions on that topic. This ruling does not give Defendants license to "generally probe the content of attorney-client conversations with broadly worded, open-ended questions," but Taylor and Diamond-Falk must both respond to specific questions designed to discover whether Diamond-Falk knew or should have known about the alleged physical and psychological abuse. *Jackson*, 2006 WL 2224052, at *7. Defendants' motion to compel that testimony is granted.

9

### B. The Alibi Witness

For similar reasons, Defendants are also entitled to ask Taylor and Diamond-Falk specific questions about conversations that may reveal whether Diamond-Falk knew or should have known about the existence and identity of an alleged alibi witness, James Anderson, and his alleged statement that Taylor was in the cell with him on the night of the murders. Taylor testified at his deposition that there were "a few people" in the cell with him while he was in the 23rd District lockup on November 16, 1992, including "some black guys and some white guys." (Doc. 202-2, at 11, Taylor Dep., at 163-64). When counsel asked if Taylor knew whether Diamond-Falk "made any attempts to find out who the people you were locked up with on November 16, 1992, were," Taylor's attorney instructed him not to answer to the extent his knowledge was "based on conversations that you and the lawyer had." (*Id.* at 33, Taylor Dep., at 340). With that caveat, Taylor ultimately said he did not know what attempts Diamond-Falk had made to find his cellmates. (Doc. 193-8, at 4-5, Taylor Dep., at 341-42). Taylor also testified that he could not recall whether he gave Diamond-Falk "a description of the people that you were in the cell with," or whether he had asked the attorney "to try to locate the people that were in the cell." (Doc. 202-2, at 35, Taylor Dep., at 347-48).

Diamond-Falk's testimony regarding James Anderson was more extensive. For example, Diamond-Falk was asked about the following documents referencing Anderson at the time of the criminal trial: (1) a December 7, 1992 General Progress Report ("GPR") indicating that detectives had found the arrest reports and bond slips for individuals listed as being in custody at the 23rd District lockup on November 16, 1992, but could not locate James Anderson (Doc. 202-8, at 2); (2) a December 29, 1992 GPR

10

expressing a "[n]eed to locate James Anderson concerning the Lassiter Homicide. ANDERSON was locked-up in 023 District with . . . (TAYLOR)." (Doc. 193-10, at 2); (3) a December 31, 1992 GPR (which references a missing December 30, 1992 GPR) stating that an officer had made an unsuccessful attempt to locate Anderson (Doc. 202-4); (4) a list of personnel working at the 23rd District lockup on November 16, 1992 (Doc. 202-6, at 1-2); and (5) a roster of individuals who were in jail at the 23rd District lockup on November 16 and 17, 1992 (including both Taylor and Anderson). (*Id.* at 3-4). (*See also* Doc. 202-1, at 2, 9, 12, Diamond-Falk Dep., at 34-36, 126-27, 258). Diamond-Falk testified that he did not recall seeing any of those documents, and said "there were documents that were kept from me in this case" by the police and prosecution. (Doc. 202-1, at 9, Diamond-Falk Dep., at 126).

At the same time, Diamond-Falk acknowledged during the deposition that he knew about Taylor's alibi (being in lockup at the time of the murders), and there is evidence that he subpoenaed documents from the CPD in that regard. (*Id.* at 9, Diamond-Falk Dep., at 128). (*See also* Doc. 202-7) (an August 1993 subpoena for "[a]ny and all lock-up records from the 23rd District for November 14, 1992 through November 17, 1992; any and all booking records . . . ; and any and all fingerprint records."). In response to a question whether he knew "how many other people were in the cell with Mr. Taylor during the time he said that he was in police custody on November 16, 1992," Diamond-Falk said "I don't know." When counsel tried to ask whether he "inquire[d] of Mr. Taylor that information," Taylor's counsel instructed him not to answer. (Doc. 202-1, at 13, Diamond-Falk Dep., at 265).

11

Diamond-Falk also invoked the attorney-client privilege in refusing to answer whether Taylor told him "prior to you filing your motion to suppress . . . that he [Taylor] had told the police of his alibi in the lockup prior to him confessing." (Doc. 193-7, at 8, Diamond-Falk Dep., at 217). Later, however, Diamond-Falk affirmatively stated that he did not know prior to the criminal trial that Taylor was in the lockup with any other people, and did not take any steps to try and find that information. By way of explanation, Diamond-Falk said "I didn't think I needed to" take any steps because "I thought the information that I had regarding the bond slip [showing that Taylor was released on bond at 10:00 p.m. on November 16, 1992] . . . was pretty conclusive." (Doc. 202-1, at 12, 16, Diamond-Falk Dep., at 261, 278).

It is not clear that Taylor and Diamond-Falk have significant additional information to provide regarding their knowledge of an alibi witness. As Taylor notes, in addition to the foregoing testimony, Diamond-Falk answered questions about his relationships with the criminal defense attorneys who represented Taylor's co-defendants (four of whom apparently had the GPRs identifying Anderson as a potential witness), (Doc. 193, at 10-11; Doc. 202, at 5), and the "[v]ery limited" conversations he had with them about the case.[8] (Doc. 202-1, at 3, Diamond-Falk Dep., at 104-16). Diamond-Falk also testified that despite being friends with some of those attorneys, and sharing an office with one, he never asked any of them whether they had information relating to the identity of Taylor's cellmate. (*Id.* at 3, 15, Diamond-Falk Dep., at 104, 275). Finally, there is evidence indicating that when Zellner sent Diamond-Falk a letter

---

[8] In their motion, Defendants state that the criminal defense attorneys for Patrick, Mixon, Brown and Gardner "possessed the Anderson GPRs at the time of the criminal trials," while the files belonging to the criminal defense attorneys for Akia Phillips, Paul Phillips, and Rodney Matthews no longer exist. (Doc. 193, at 10-11 and n.3). As noted later, Diamond-Falk was unable to find and produce any documents from the criminal case.

12

in March 2002 asking him to prepare an affidavit confirming that he had not seen the GPRs, Diamond-Falk waited nearly 10 years before supplying that affidavit, even though Zellner's letter stated: "If I do not receive an affidavit, I will assume you did in fact have these police reports." (Doc. 193-11).

Nevertheless, Taylor's *Brady* claim has placed at issue the conversations he and Diamond-Falk had relating to an alibi witness. Taylor once again misses the mark by stressing that he does not intend to rely on the advice he received from Diamond-Falk to prove his *Brady* allegations. (Doc. 202, at 9-10). By claiming that he and Diamond-Falk neither knew nor could have known certain facts pertaining to an alleged alibi witness, Taylor has placed at issue whether he and Diamond-Falk ever had discussions relating to that witness. Under such circumstances, the attorney-client privilege does not shield Taylor and Diamond-Falk from answering questions on that topic.[9]

Taylor suggests that Defendants do not need to know the substance of any attorney-client communications because Diamond-Falk has already testified extensively about all the documents he never received from the prosecution. As Defendants note, however, this only addresses the first element necessary to show that evidence was "suppressed" under *Brady*, namely, that the prosecution "failed to disclose the evidence in time for the defendant to make use of it." *Carvajal*, 542 F.3d at 567. Diamond-Falk's testimony about not receiving documents says nothing about the second element of the test, whether he knew or should have known about the evidence "through the exercise

---

[9] Consider, for example, a hypothetical situation where Taylor told Diamond-Falk that while he was in the 23rd District lockup, he played chess with an individual named James Anderson who lived in his neighborhood. It cannot be the case that Taylor would be allowed to elicit testimony from Diamond-Falk that he knew nothing about Anderson (because the police withheld this information), while simultaneously asserting the attorney-client privilege to prevent Defendants from eliciting testimony about the related (and contradictory) conversation he had with Taylor.

13

of reasonable diligence." *Id*. Taylor cannot affirmatively use Diamond-Falk's testimony to establish the first element, and then invoke the attorney-client privilege as a shield to prevent Defendants from discovering evidence relevant to the second element.

The *Jackson* case is again distinguishable because the alleged *Brady* material there came from three independent witnesses to the car accident who all "sat for deposition [in the criminal case], and one or more of these witnesses even testified at [the criminal] trial." Slip op., at 10. As the court noted, "[t]he very nature of the evidence alleged to have been withheld [that the plaintiff was trying to help one of the injured officers and engaged in no wrongdoing] makes it difficult to imagine that it would not have come out in any statement or testimony these witnesses may have provided." *Id.* at 9, 10. The court held that since the defendants "had other readily and reasonably available avenues by which to learn whether and what exculpatory information had been presented to Plaintiff's attorneys by witnesses," they failed to demonstrate that they needed access to attorney-client communications or attorney work-product on those issues. *Jackson*, 2006 WL 2224052, at *8. Here, Taylor himself knew he had a cellmate in the lockup, and only he and Diamond-Falk can testify as to what, if anything, Taylor revealed to Diamond-Falk in this regard.

As noted earlier, this ruling does not give Defendants license to "generally probe the content of attorney-client conversations with broadly worded, open-ended questions." *Jackson*, 2006 WL 2224052, at *7. However, Taylor and Diamond-Falk must respond to specific questions designed to discover whether Diamond-Falk knew or should have known about the alleged alibi witness, including questions that reveal communications they had regarding any cellmates.

14

## II. The Attorney-Client Privilege, Express Waiver

Defendants argue that Taylor has also expressly waived the attorney-client privilege concerning conversations he had with Kathleen Zellner regarding his whereabouts on the night of the murders. (Doc. 193, at 11). Defendants first claim the waiver occurred on June 16, 2003, when Zellner sent ASA Allison Perone a memorandum disclosing that Taylor had told her and his other post-conviction counsel the following:

> Taylor has informed us that after being picked up by [O]fficers Glinski and Berti in front of Andrea Phillips' house at approximately 10:30-10:40 p.m. [on November 16, 1992,] the officers dropped him off about 15-20 minutes later. He then returned to Andrea Phillips' house. He stayed at Phillips' house until Phillips called from jail and told him to leave. When he left Phillips' house and started to walk towards Maryville [a child care organization in Chicago], Taylor stated that a different set of uniformed police officers, not Glinski and Berti, picked him up in their squad car and took him to Maryville.

(Doc. 193-13).

Alternatively, Defendants argue that Taylor waived the privilege when his counsel allowed Zellner to testify at her deposition, without objection, about those same statements. (Doc. 193, at 11-12; Doc. 208, at 9-10). For example, Zellner agreed that the first sentence of the cited paragraph about Taylor being picked up by Officers Glinski and Berti was "information that he [Taylor] provided. I do remember though that he told us he did not actually check back into Maryville until almost 3:00 in the morning." (Doc. 193-12, at 3-4, Zellner Dep., at 17-18). When Defendants' counsel asked Zellner whether Taylor ever told her "that he actually was not picked up by any Chicago police officers on the night of the murders," Zellner said she didn't "have an independent recollection of it" but did know "in my interview with him [Taylor] that he was very

15

consistent about when he got back to Maryville and very consistent about being locked up, up until 10:00 o'clock [sic]." (*Id.* at 5, Zellner Dep., at 19).

Taylor stresses that the attorney-client privilege belongs to the client, and not the attorney, and says that "it is his prerogative to waive such privilege." (Doc. 202, at 15) (citing *Paters v. United States*, 159 F.3d 1043, 1047 n.6 (7th Cir. 1998) ("[T]he attorney-client privilege is petitioner's to waive.")). In Taylor's view, Zellner "cannot unilaterally waive Plaintiff's privilege," be it by "sending a letter to a member of the Cook County State's Attorney's Office or improperly testifying at a deposition." (Doc. 202, at 15).

Defendants respond that "[a] client waives the attorney-client privilege . . . by failing to assert it when confidential information is sought in legal proceedings." (Doc. 208, at 9) (quoting *Nguyen v. Excel Corp.*, 197 F.3d 200, 206 (5th Cir. 1999)). As one court explained, "[t]hat the attorney is called as a witness and discloses confidential communications does not abrogate the privilege *so long as* the client objects to the disclosure of any confidential communications." *Abbott Labs. v. Airco, Inc.*, No. 82 C 3292, 1985 WL 3596, at *8 (N.D. Ill. Nov. 4, 1985) (emphasis added) (citing *Newton v. Meissner*, 76 Ill. App. 3d 479, 498, 394 N.E.2d 1241, 1255 (1st Dist. 1979) (since the privilege belongs to the client, "it is immaterial that an attorney called as a witness is willing to disclose privileged communications.")).

Here, there is no evidence that Taylor objected to Zellner sending the June 2003 memo to ASA Perone, and his counsel raised no objections when Zellner testified about the memo at her deposition. Under such circumstances, the Court agrees that Taylor has waived the attorney-client privilege as to conversations he had with Zellner concerning his whereabouts between approximately 10:00 p.m. and the time he

16

returned to Maryville on the evening of November 16-17, 1992.  *Appleton Papers, Inc. v. E.P.A.*, 702 F.3d 1018, 1024 (7th Cir. 2012) ("Generally, a party that voluntarily discloses part of a conversation covered by the attorney-client privilege waives the privilege as to the portion disclosed and to all other communications relating to the same subject matter.").  The waiver does not extend to conversations concerning any other time period, since that was not discussed in the memo or at the deposition.  *See, e.g., Goldman, Sachs & Co. v. Blondis*, 412 F. Supp. 286, 289 (N.D. Ill. 1976) (where client testified at his deposition about a telephone call he placed to counsel, waiver of attorney-client privilege was "limited to that specific subject during that particular conversation.").

## III.    *In Camera* Review

Defendants finally ask the Court to conduct an *in camera* review of all documents listed on the MacArthur Justice Center's 41-page privilege log to determine whether any relate to Taylor's claim that Diamond-Falk neither knew nor could have known that Taylor's confession was coerced and that James Anderson allegedly could provide an alibi for him on the night of the murders.  *See Kerr v. U.S. Dist. Ct. for N. Dist. of Cal.*, 426 U.S. 394, 405 (1976) ("[A]n in camera review of the documents is a relatively costless and eminently worthwhile method to insure that the balance between petitioners' claims of . . . privilege and plaintiffs' asserted need for the documents is correctly struck.").  Defendants claim that the attorney-client privilege has been waived for the reasons already stated, and also argue that Taylor has waived any claim of work-product protection.  (Doc. 193, at 9-10).

Though most of the documents on the MacArthur Justice Center's privilege log were drafted by Taylor's post-conviction counsel between 2008 and 2014, long after his criminal trial, Defendants argue that an *in camera* review of the entire log is necessary "[b]ecause defendants are unable to ascertain whether anything pertaining to plaintiff's *Brady* claim is being withheld as privileged or work product from Diamond-Falk's file." (Doc. 193, at 10). This argument is based on the fact that there is some confusion as to whether Diamond-Falk gave his criminal file to Zellner for the post-conviction proceedings. Diamond-Falk testified that he did; Zellner testified that he did not. (Doc. 193-7, at 14, Diamond-Falk Dep., at 332; Doc. 193-12, at 7-8, Zellner Dep., at 29-30). The MacArthur Justice Center's privilege log does contain some documents and notes identified as having been drafted by Diamond-Falk, but it is unlikely these represent his entire file. (Doc. 193-9, at 7, 13, 14, 17-18). Diamond-Falk testified, for example, that he did not give Zellner handwritten notes of his interviews with Taylor because he thought they were protected by the work-product doctrine. (Doc. 193-7, at 2-3, 4, Diamond-Falk Dep., at 84-85, 89). Those notes cannot be located. Also missing are the abstracts Diamond-Falk prepared of police reports. (Doc. 193, at 11).

For the few documents on the log that were authored by Diamond-Falk, (found at Doc. 193-9, at 7, 13, 14, 17-18), the Court will review these *in camera* to determine whether any bear on Taylor's *Brady* claims and, if so, whether they should be produced. As to the remaining documents drafted by post-conviction counsel between 2008 and 2014, it is unlikely that any will shed light on Diamond-Falk's knowledge of *Brady* material in 1995. For this reason, the Court declines to conduct a full *in camera* review of all documents identified on the privilege log. Instead, Taylor's counsel must examine

the documents and produce to the Court for *in camera* review any that arguably contain information relating to Diamond-Falk's knowledge of exculpatory evidence as detailed in this opinion. If no such responsive documents exist, Taylor must confirm that in writing.

## **CONCLUSION**

For the reasons stated above, Defendants' Motion to Compel Responses to Certain Discovery (Doc. 193) is granted in part and denied in part. Taylor and his criminal defense attorney, Nathan Diamond-Falk, must answer deposition questions regarding conversations they had about Taylor's allegedly coerced confession, and about the existence and identity of an alleged alibi witness. Taylor must also answer deposition questions regarding conversations he had with attorney Kathleen Zellner relating to his whereabouts between 10:00 p.m. and the time he returned to Maryville on the night of November 16-17, 1992. With respect to documents set forth on the MacArthur Justice Center's privilege log, Taylor will (1) produce to the Court for *in camera* review, no later than October 2, 2015, copies of documents authored by Diamond-Falk, and (2) produce to the Court for *in camera* review, no later than October 2, 2015, any additional documents from the log that may be relevant to Diamond-Falk's knowledge of Taylor's *Brady* claims as set forth in this opinion, or confirm in writing that no such documents exist. The motion to compel deposition testimony from Lewis Gardner is denied as moot.

ENTER:

*Sheila Finnegan*

Sheila Finnegan

Dated: September 22, 2015