# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | |
|---|---|
| DANIEL TAYLOR, | ) |
| Plaintiff, | ) ) ) |
| v. | ) No. 14 C 737 |
| CITY OF CHICAGO, et al., | ) ) Judge John Z. Lee ) Magistrate Judge Finnegan |
| Defendants. | ) ) |

## MEMORANDUM OPINION AND ORDER

The facts giving rise to this case date back to late 1992 and early 1993 when several current and former Chicago police officers (the "Defendant Officers") arrested eight men, including then 17-year-old Daniel Taylor ("Plaintiff") for murdering Jeffrey Lassiter and Sharon Haugabook on the evening of November 16, 1992. Plaintiff was convicted in September 1995. After serving more than 20 years in prison, the conviction was vacated and Plaintiff obtained a Certificate of Innocence. In 2014, he sued the City of Chicago and the Defendant Officers, alleging that he was wrongfully convicted in part because the officers coerced a confession from him and withheld exculpatory evidence. During discovery in this lawsuit, Plaintiff sought production of the Chicago Police Department's files generated during the homicide investigation in the 1990s. He wanted to "compare the original versions" with the "set of documents that made their way to the prosecutors and the criminal defendant" and look for "undisclosed gaps." (Doc. 102, at 1). When the City reported that the files could not be located, Plaintiff served discovery regarding the missing police files. While Plaintiff obtained

some information, the City objected to certain of the discovery requests and Plaintiff then filed the pending motion to compel.

## BACKGROUND

**A.      Police Files**

Plaintiff's discovery requests identified and requested what the motion to compel describes as the "three original [Lassiter homicide police] files: a Permanent Retention file, which is stored and retained permanently in the Records Division warehouse; an investigative file that is created and stored initially at the detective Area where the investigation occurs and then sent to Records; and a 'street file' or 'working file' that is used by the detectives during the investigation but is neither retained nor stored by the Records Division."  (Doc. 102, at 3).

According to the City, the Permanent Retention File is supposed to be maintained at all times by the Police Department's Records Division and stored in that division's warehouse at 39th and Michigan Avenue in Chicago.  The Permanent Retention File contains all of the homicide investigation case reports and supplementary reports with each page stamped "Permanent Retention File."

Of course, many additional police records are made and kept during an investigation beyond case reports and supplementary reports.  In 1982, a class action was filed to require the Police Department to preserve such records and to take other measures to ensure that exculpatory materials obtained during an investigation would be available for production to criminal defendants.  *Palmer v. City of Chicago*, 562 F. Supp. 1067 (N.D. Ill. 1983), *rev'd in part*, 755 F.2d 560 (7th Cir. 1985).  In 1983, the *Palmer* court granted a preliminary injunction after finding that detectives had a practice

2

of creating and maintaining "unofficial reports" that were variously called "street files," "working files" or "running files." These files contained "documents usually prepared contemporaneously with the obtaining of the information (such as detectives' notes, typed witness statements or interviews, and major crime incident worksheets, normally prepared at the initiation of an investigation) and documents that convey information to or request assistance from another shift of detectives working on the same investigation...." *Id.* at 1069-70. According to the court, the Police Department lacked any "directives or guidelines as to the extent to which Official Reports [comprising standardized incident, opening, supplementary and closing reports] had to embody material obtained in the course of investigations and reflected in Unofficial Reports." *Id.* at 1070. Since the record-keeping practices in area police stations varied considerably, the court found that potentially exculpatory information from the investigative materials was not necessarily included in the Official Reports that were marked and transmitted from the Area detective facility to the Records Division for storage. *Id.*

While the *Palmer* case was pending, the Police Department created Special Order 83-1 (issued January 13, 1983) to "institutionalize the control of all violent crime field investigation documents and files, which previously may have been referred to as working files, running files or detective's personal files and notes." *Id.* at 1078. Special Order 83-1 was later replaced by Special Order 86-3 (effective date of May 29, 1986), (Doc. 220-1, at 6-8), which was eventually supplemented by the Detective Division's Standard Operating Procedures ("SOP") which was copyrighted in 1988 and has a chapter on "Investigative Files." (Doc. 115-9, at 1-7). These Orders and the SOP required the creation and maintenance of an "Investigative File" at the area station

3

conducting the homicide investigation to contain "official Department reports, notes, memoranda, and miscellaneous documents generated or received by a Division member during an investigation." (*Id.* at 2-3).[1]

A template form called a "General Progress Report" ("GPR") was also created by the Police Department about this time to "standardize[] the recording of handwritten notes and memoranda, including written inter-watch communications, witness or suspect interview notes, on scene canvass notes, and any other personal notes normally generated by Division members during an investigation." (*Id.* at 3). Under the new procedures, detectives were required to record and preserve all relevant information during their investigations, submitting "all hand written notes and investigation documents...to the unit supervisor for review and inclusion in the investigative file case folder." (*Id.* at 5). In addition, they were required to "transcribe relevant information which initially had been recorded upon [GPRs], major incident worksheets and other miscellaneous investigation documents onto a case report or a Supplementary Report following the proper format." (*Id.* at 4-5). It was the responsibility of the Detective Division supervisors to ensure that all submitted

---

[1] The SOP was rescinded in 2011 when it was replaced by Detective Division Special Order 11-01, which is still in effect. (Doc. 115-9, at 8-20). Plaintiff's First Set of Interrogatories to Defendant City of Chicago defined "Investigative File" as having the meaning given to it in Special Order 83-1 and/or Special Order 86-3. (Doc. 115-13, at 3). The definition of Investigative File found in these Special Orders and in the SOP is not materially different. Plaintiff's discovery requests defined "Street File" as documents pertaining to the investigation that are not given to the prosecutor or defendant and including records not sent to the Records Division for inclusion in the Permanent Retention File. (Doc. 115-13, at 3). Plaintiff also incorporated by reference the definition of "Street File" contained in the *Palmer* decision, and in the later case of *Jones v. City of Chicago*, 856 F.2d 985 (7th Cir. 1988). In *Jones*, the court said street files were "files that the police did not turn over to the state's attorney's office as they did with their regular investigative files. As a result, the street files were not available to defense counsel even if they contained exculpatory material." *Id.* at 989. The Jones court said the practice of keeping street files was "discontinued" without a "formal ruling on the lawfulness of the practice" following the *Palmer* class action suit filed to enjoin the practice. *Id.*

documents were reviewed, inserted into the Investigative File case folder, and logged onto the Investigative File Inventory sheet. (*Id.* at 4).

Finally, under the new policies, the Investigative File was required to be permanently retained, initially at the police station where the investigation was being conducted. Once a homicide case was cleared and a final court disposition of guilty was received, the Investigative File was to be sent from the area police station to the central Records Division for post-conviction retention. (Ch. 18.4.A of SOP, Doc. 102-6, at 6).

**B.    Discovery Regarding Missing Lassiter Homicide Files**

The police department's Records Division admittedly is unable to locate either the Permanent Retention File or the Investigative File for the Lassiter homicide investigation even though both of these files were required to be permanently retained under the police department's policies and procedures. While there was no requirement that any "Street File" be permanently maintained since at most such a file should have contained duplicates of documents in the Investigative File, no Street File has been located and produced for the Lassiter homicide.

Instead the City has produced what it states "upon information and belief" is a "copy" of the Permanent Retention File that the police department mailed to Plaintiff's then-criminal defense attorney Kathleen Zellner on or about April 11, 2002 during post-conviction proceedings. (Doc. 102-3). The City actually obtained this document from Plaintiff since it was still in the possession of Attorney Zellner during discovery in this civil lawsuit. The Zellner file consists of approximately 74 pages of reports and supplementary reports for the Lassiter homicide with each page stamped "Permanent

Retention File." The first page is a copy of the police department mailing envelope postmarked April 11, 2002 with a received stamp from Ms. Zellner's office dated April 13, 2002. (Doc. 115-7).

The City has also produced a supplementary police report dated February 15, 2012 from Detective Kathleen Loughran. This report states that on January 10, 2012, Detective Loughran learned that Investigator Ron Yawger from the Illinois Attorney General's Office was seeking to obtain a copy of the file regarding the Lassiter homicide (recorded under T543021). Personnel in the Records Division were unable to find the file or a marker/indicator within the file system that the file had ever been in the Records Division. (Doc. 102-1, at 5). The area police station where the investigation was conducted was then contacted but it did not have a copy of the file either. Investigator Yawger reported that he recreated a portion of the missing file by obtaining records from the Cook County State's Attorney's Office. (*Id.*) Detective Loughran then obtained a copy of this recreated file and gave it to the Records Division for permanent retention. (*Id.* at 6).

Plaintiff served extensive written discovery to learn more about the circumstances surrounding the missing police files. In interrogatories served on May 21, 2014, (Doc. 115-13), Plaintiff sought to learn the following:

● For any lost document, the identity of the document, the approximate date it was lost, discarded or destroyed, and the circumstances and manner in which it was lost or destroyed, including the identity of all persons involved, the reasons for disposing of the document, the identity of any persons with knowledge of its content and the identity of the last person known to have seen it. (No. 2)

● The identity by bates number or otherwise of every document that was "associated with the RD File for RD # T-543-021: (a) as of the date of Plaintiff's first criminal trial; (b) as of today's date, (c) at any time in the past but has not been produced in this litigation." (No. 7)

6

- Whether the City contends that the Police Department had in place between 1985 and 1995 written policies and procedures requiring officers and detectives to (a) document and memorialize developments in an investigation in such a way that they would become part of the "Official File" and, if so, the identity by bates number of the policies and the identity of those who had authority for those policies. (No. 9)

- Description of every instance between 1985 and 1995 in which the policymaker identified in response to Interrogatory 9 undertook to review, investigate, analyze, uncover, prevent, or determine the prevalence of any misconduct, deficiency, shortcoming or other problem relating to any of the policies and procedures identified in Interrogatory 9 and what steps were taken in response and on what dates. (No. 10)

- Description of any and all changes made between 1985 and 1995 to the policies, practices, and training programs relating to any of the policies and procedures identified in Interrogatory 9, and for each change, how and when employees were made aware of the changes. (No. 11)

- Whether there was any policy or practice in place at the time of the Lassiter and Haugabook homicides that governed the contents and destruction of "Street Files" and whether detectives had to supply the contents of Street Files to criminal prosecutors and/or criminal defendants. (No. 12)

- Whether the City or Police Department is in possession of any Street Files or Area Files for homicide investigations conducted between 1985 and 1995 by Area 6, and if so, the current location of each such Street File, including a list of those who had responsibility for or custody/control of the document and the specific date range for which each individual had such responsibility, custody or control. Also, a description of each and every step taken to investigate the City's answer to this interrogatory so Plaintiff may serve a Rule 30(b)(6) notice. (No. 13)

- Description of whether Chicago police officers' or police detectives' policies or practices of creating and maintaining Street Files, to the extent that such policies or practices existed, was any different in 1992 or 1993 than it was in January 1982, how the policies or practices were different in 1992 or 1993 from those that prompted the issuance of injunctive relief in the *Palmer* case, and whether there were "substantive differences among each of the different Areas of the Chicago Police Department concerning the policies and practices for creating and maintaining Street Files." (No. 14)

On August 20, 2014, Plaintiff served additional interrogatories about the missing police files, (Doc. 102-3), two of which (interrogatories 2 and 6) are subject to the motion to compel.

● Identify by bates number all documents contained in the various police files for the Lassiter homicide. (No. 1)

● Identify with specificity each and every step taken by the City to locate the files since January 10, 2012 and since the filing of the lawsuit. (No. 2)

● Provide a detailed explanation for why as of January 10, 2012 there was no copy of any police file for this investigation in the police department's possession, as well as all of the ways in which the recreated portion of the file (produced by the City) differs from any original file and any documents missing from the recreated file. (No. 3)

● Describe the chain of custody for the police file for the Lassiter homicide beginning when it was first created and continuing up through and including the time that the City is no longer able to account for its whereabouts. In other words provide a description of the physical location for the file for all periods of time that the City is able to account for its whereabouts. Identify the last individual known to the City to have seen or possessed the file. (No. 4)

● Describe in detail the physical location where the police file should have been maintained from the date of creation until the present time and identify all persons responsible for maintaining it. (No. 5)

● State whether the City claims the fact that the "police file" for the Lassiter homicide is missing is a unique event, or whether the City is aware of other police files for other homicide investigations from the same time period that have also gone missing. If there are other files that have gone missing, identify all such files. (No. 6)

● Describe all policies, practices or measures taken by the police department to ensure that "permanent retention" police files for homicide investigations are maintained and preserved (as opposed to misplaced). (No. 7)

● Describe in detail all steps taken to recreate the police file for the Lassiter homicide, including the identities of all persons involved in the effort, the precise source of any documents that were used for the "recreation" process (in other words, exactly where those documents were drawn from) and all steps taken by the City to confirm or justify a belief that the "recreated" file is similar to the original file. (No. 8)

**C.    Dispute regarding Answers to Additional Interrogatories 2 and 6**

Plaintiff was unhappy with the responses to Interrogatories 2 and 6 above and sought to compel supplemental answers. (Doc. 102, at 7-13).

**1.    Interrogatory 2:** During a hearing on January 15, 2015, the motion to compel was withdrawn as to Interrogatory 2. (Doc. 147). This happened because, after

8

the motion to compel was filed, Plaintiff had an opportunity to depose Detective Anthony Wronkowski. Detective Wronkowski has handled the homicide files at the pertinent Area police station (Belmont and Western – now called Area North and previously known as Area 6 and Area 3) since March 2012. He personally conducted the search for the missing Lassiter homicide files in 2014 and answered in great detail the questions posed to him regarding exactly where and how he searched for the files. (Doc. 115-5). In addition, the City offered the deposition (or interview if Plaintiff preferred) of Detective Loughran concerning searches for the missing Lassiter homicide files that were conducted in 2012. Finally, the City agreed to incorporate by reference into the interrogatory response the information provided by Wronkowski and Loughran and state that this represented the totality of the steps that the City is aware of that were taken to search for the missing police files. (156-1, at 4).

**2. Interrogatory 6:** After hearing argument on January 15th, the Court determined that Interrogatory 6 did not need to be answered in its current form. Plaintiff argued that it is unheard of for a Permanent Retention File to go missing. But even if this is so, it is unclear how the City could state that what happened here is "unique" in that no other Permanent Retention File has ever gone missing. After all, until someone requests or subpoenas a Permanent Retention File, there is not even a search for the file and no way to know whether it is "missing." The Court directed the parties to confer regarding inquiries that reasonably could be made of current City employees working in the Records Division, some of whom have been assigned there for many years. These inquiries were to relate to the number of times Permanent Retention Files had been requested during their employment in the Records Division, the number of times they

9

had been unable to find such files, and whether any records are made when a file is discovered to be missing. After conferring about and making the inquiries, the City was required to prepare a written statement regarding the City's knowledge based on these inquiries. (Doc. 147). Since the Court has not heard of any issues related to this process, it assumes the City has gathered and produced the information to Plaintiff's satisfaction.

D.     **Request for Rule 30(b)(6) Deposition**

The only remaining dispute at issue in the motion to compel concerns a notice of Rule 30(b)(6) deposition served after the two sets of interrogatories, seeking testimony regarding the "chain of custody" for the Permanent Retention File, the Investigative File, and the Street File for the Lassiter homicide. The notice stated that the request sought testimony about the "physical locations these files were kept, any movement of the files from any given location, and the Person(s) who was/were the custodian(s) most responsible for the custody of these files." (Doc. 102-2). The City objected to providing a Rule 30(b)(6) witness, noting that the Police Department maintains a chain of custody on physical evidence but not volumes of paper, and that the witness could only speculate about the designated topics since the City did not know where the files were or when they went missing. The City offered to stipulate that the files were lost. (Doc. 102-4, at 3). Plaintiff declined this offer and continues to demand the Rule 30(b)(6) deposition.

## **DISCUSSION**

As with all discovery motions, district courts have broad discretion in deciding motions to compel. *See James v. Hyatt Regency Chicago*, 707 F.3d 775, 784 (7th Cir.

10

2013). A district court may grant or deny a motion to compel in whole or in part and, "similar to ruling on a request for a protective order under Rule 26(c), the district court may fashion a ruling appropriate for the circumstances of the case." *Gile v. United Airlines, Inc.*, 95 F.3d 492, 496 (7th Cir. 1996).

In this case the parties already have engaged in extensive discovery regarding the missing police files, including through depositions, numerous interrogatories and even requests to admit. One of the interrogatories identified earlier (No. 4, *supra* p. 8) specifically asked for the chain of custody of these missing files. The City said it was unable to determine the chain of custody, even for the missing Investigative File and Permanent Retention File that the Police Department was required to permanently keep, admitting that it has no idea where the files are or when they went missing.

Nonetheless, the City provided the following information about the location and physical movement of the Investigative File over the years. The City stated that the file would have been located at the police station at Belmont and Western during the investigation of the homicides and, "upon information and belief," a copy was provided to the Cook County State's Attorney's Office during that time frame.[2] The City then referred to Chapter 18.4.A of the SOP which required the original Investigative File to be sent to the Records Division for post-conviction retention following receipt of a final court disposition of guilty. The City stated that, because the SOP required a review of homicide files during the first police period of each year to determine which ones to send to the Records Division, and because Plaintiff and Dennis Mixon (his co-

---

[2] The City argues in its response to the motion to compel that, based on the contents of the State's Attorney's file, the Attorney General's file, and the Plaintiff's lawyer's file, it is "uncontroverted" that copies of documents from the Investigative File were produced during the criminal case, such as multiple General Progress Reports and a copy of the Inventory of the Investigative File. (Doc. 115, at 6; Doc. 115-10).

11

defendant) were the last of the eight charged criminal defendants to be tried and they were convicted in September 1995, the Investigative File should have been sent to the Records Division in 1996 but it was "unknown if that occurred." (Doc. 115-6, at 4).

As for the Permanent Retention File, the City responded to Interrogatory 4 by stating that this file was to be maintained by the Records Division at all times and, "upon information and belief was maintained at the records storage warehouse at 39th and Michigan as of April 11, 2002, at which time a copy was mailed by the Records Division to Daniel Taylor's then-criminal defense attorney Kathleen Zellner (see documents Bates-numbered DT-012925 to DT-012999). It is unknown when the original Investigative File and original Permanent Retention file went missing." (Doc. 115-6, at 5).

In an effort to understand what specific additional information about the "chain of custody" and physical location and movement of the Lassiter homicide files Plaintiff hoped to gain from a Rule 30(b)(6) deposition, the Court requested a proffer of proposed questions for the witness. In the proffer that was filed, Plaintiff focused solely on the "Permanent Retention File," stating that he "would very much like to compare the Permanent Retention File to the documents made available to his criminal defense[,]" and needs to find the missing Permanent Retention File to prove that certain GPR reports were never produced prior to the criminal trial. (Doc. 153, at 1). Plaintiff further observed that since he did not have the Permanent Retention File, all that he could do at trial was establish that it was "unprecedented to 'lose' a Permanent Retention File" and "make as much of a record as possible as to its chain of custody prior to its apparent disappearance, the result of which might yet perhaps lead to its discovery."

(*Id.* at 2). Plaintiff then proffered a sampling of 44 proposed questions all of which relate to the Permanent Retention File and the Police Department's handling of such files.

Based on its review of Plaintiff's proffer, this Court is not persuaded that there is justification for additional discovery in the form of a Rule 30(b)(6) deposition regarding the chain of custody of the Lassiter homicide Permanent Retention File. First, no person has followed that file around since 1993 so there is no means for a Rule 30(b)(6) witness to state with more specificity the locations and movement of the file over the past 22 years. Instead the witness could only testify about where the file *should* have been located and moved pursuant to the Police Department policies and procedures. But Plaintiff already has this information from the previous discovery.

Furthermore, one new consideration in assessing the need for the Rule 30(b)(6) deposition is that the City recently received a response to a subpoena issued to Geary Kull, the former criminal defense attorney for another of the men charged in the Lassiter homicide, Joseph Brown. Unlike Mr. Diamond-Falk, who defended Plaintiff at trial and who does not have (or cannot find) any files that he possessed during the criminal case, Mr. Kull (now Judge Kull, sitting in the Circuit Court of Cook County) retained the Permanent Retention File that he received from the police department in 1994 (prior to Plaintiff's trial). Judge Kull has produced that file to the City in the original envelope in which he received it in 1994 in response to a subpoena. (Doc. 115-2). When this Permanent Retention File is compared to the one that Ms. Zellner received in 2002 for post-conviction proceedings involving Plaintiff, the pages are identical except for a single page (a ballistics report at page 80). (Docs. 115-7; 156-2; 115-5, at 8).

13

Plaintiff not only speculates that taking a Rule 30(b)(6) deposition on the chain of custody of the Permanent Retention File may lead to the discovery of that missing file, but also that the original file (unlike the file sent to Judge Kull in 1994 and Ms. Zellner in 2002) may contain GPRs with exculpatory information that allegedly were withheld from Mr. Diamond-Falk. This Court is not persuaded on either point. Extensive discovery has already taken place concerning the missing files, including a thorough deposition of Detective Wronkowski and a deposition or interview of Detective Loughran, and the files have not turned up. Moreover, as the City points out, under the Police Department procedures, GPRs are not normally even kept in the Permanent Retention File but rather are maintained in the Investigative File. (Doc. 115-9). This is borne out by the recreated Investigative File Inventory in this case that lists numerous GPRs. (Doc. 115-10).

In sum, under all the circumstances presented here, the Court finds that it would amount to beating a dead horse to require the City to present a Rule 30(b)(6) witness to testify on the chain of custody of the Permanent Retention File at this juncture. Plaintiff has the available information about the physical location and movement of that missing file. Many of the proposed new questions from the sampling of 44 provided in the proffer already have been covered in the existing discovery. The ones that have not are beyond the scope of the notice (relating to general procedures/practices rather than the location and movement of the Lassiter homicide Permanent Retention File), of dubious relevance at this point (given the comparison of the files produced by Judge Kull and Ms. Zellner and the fact that GPRs are stored in the Investigative File), and cannot

readily be answered by the City given the span of 22 years that the questions cover. For all of these reasons, the motion to compel a deposition is denied.

## **CONCLUSION**

Plaintiff's Motion to Compel Discovery Relating to the Missing Police Files (Doc. 102) is denied. Plaintiff withdrew the motion to compel a supplemental answer to Interrogatory 2 from his Second Set of Interrogatories, and the motion is denied as to Interrogatory No. 6. Plaintiff's motion to compel a Rule 30(b)(6) deposition is also denied.

ENTER:

Dated: September 24, 2015

_____
Sheila Finnegan
United States Magistrate Judge