**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| **DANIEL TAYLOR,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **No. 14 C 737** |
| | ) | |
| **CITY OF CHICAGO, et al.,** | ) | **Judge John Z. Lee** |
| | ) | **Magistrate Judge Finnegan** |
| | ) | |
| **Defendants.** | ) | |

## MEMORANDUM OPINION AND ORDER

In 1992, Plaintiff Daniel Taylor confessed to a double murder for which he was convicted after a jury trial in 1995. He was later sentenced to a term of natural life without parole. In 2001, the *Chicago Tribune* began conducting a reinvestigation of the case after receiving a letter from Plaintiff. *Tribune* journalist Steve Mills interviewed Plaintiff multiple times, as well as certain key witnesses from the criminal trial, two of whom recanted their prior testimony when speaking with him. Mills also identified and interviewed new witnesses to the events whose recollections, he wrote, bolstered the alibi Plaintiff had offered at trial. In a series of stories published between December 2001 and August 2013, Mills reported on the findings of the *Tribune*'s reinvestigation and explained how they cast doubt on the jury's verdict.

After serving twenty-three years in prison, Plaintiff's conviction was vacated in 2013 and he received a Certificate of Innocence. In 2014, Plaintiff filed this civil rights lawsuit under 42 U.S.C. § 1983 against certain current and retired Chicago Police Officers ("Defendant Officers") and the City of Chicago. The lawsuit alleges that the Defendant Officers knew that Plaintiff could not have committed the murders since he

was in a police lock-up at the time. Plaintiff contends that the Defendant Officers coerced him into giving a false confession (using physical and psychological abuse) and concealed exculpatory evidence that would have proven his innocence.[1]

On September 4, 2014, Plaintiff was deposed in this case. According to Defendant Officers, he gave crucial testimony to support his coerced confession claim that in a number of respects is inconsistent with his prior statements as reported in the *Tribune* stories. Now before the Court is the Defendant Officers' motion to compel Mills to provide deposition testimony regarding his interviews of Plaintiff about the events alleged in the lawsuit, as well as about interviews with certain other witnesses who may testify at trial.[2] They also seek to compel the *Tribune* to produce handwritten notes that Mills made of his interviews with Plaintiff. (Doc. 126.) In support of the motion, Defendants argue that Plaintiff's version of events is a fabrication, and his credibility and the soundness of his account of the confession and events surrounding the murders are crucial pieces of evidence. Because Plaintiff and other key witnesses have made statements in recent depositions that are inconsistent with what they reportedly told Mills when interviewed, Defendants contend that third-party discovery is "indescribably important" to vindicate themselves and to protect themselves "from literal financial ruin for the rest of their lives." (*Id.* at 2.)

Also before the Court is a cross motion to quash the subpoenas filed by the *Chicago Tribune* and Mills ("Respondents"). (Doc. 138.) Relying on Federal Rule of

---

[1]     Taylor has also charged the Defendant Officers (Anthony Villardita, Thomas Johnson, Brian Killacky, Terry O'Connor, Rick Abreu, Robert Delaney, Sean Glinski and Michael Berti) with malicious prosecution, failure to intervene, and conspiracy. He has asserted a *Monell* claim against the City.

[2]     While the motion to compel is brought only by Defendant Officers (not the City), for simplicity this Opinion will refer to the arguments of "Defendants."

Civil Procedure 45, they urge that requiring them to produce the discovery would be unduly burdensome. They contend that the discovery is "wholly unnecessary and unwarranted" and amounts to a "careless fishing expedition—and worse, a dangerous pretext to harass and chill one of the City's leading reporters on police misconduct and wrongful convictions." (Doc. 140, at 5, 6.) They therefore argue that the subpoenas' burdens vastly outweigh the benefits, which they deem to be "slim to nil on the record before this Court." (*Id.* at 5.) Alternatively, Respondents argue that the Court should recognize a qualified reporter's privilege under federal common law and prohibit the discovery on that basis.

For the reasons discussed at length below, the Defendant Officers are entitled to some but not all of the discovery that they seek. Therefore, the Court grants the motion to compel in part and denies the motion to quash.

## DISCUSSION

### I.      Objection Based on Reporter's Qualified Privilege

Respondents argue that the Court should find a qualified reporter's privilege under federal common law and quash the subpoenas on that basis. Their position requires little discussion. In *McKevitt v. Pallasch*, 339 F.3d 530 (7th Cir. 2003), the Seventh Circuit held that the First Amendment offers no protection to news gatherers by which they may refuse to comply with otherwise applicable discovery requests, at least in the context of nonconfidential sources. *Id.* at 532-33. Although recognizing *McKevitt's* applicability, Respondents nevertheless argue that the case left open the possibility of a privilege rooted in the federal common law, which in turn is informed by state law privileges. Since Illinois has enacted a qualified reporter's privilege (the Illinois

Reporter's Privilege statute, 735 ILCS 5/8-901 *et seq.*), they argue that this Court should recognize such a privilege under federal common law.

This Court declines to do so for the same reasons articulated by other courts in this district that have addressed the issue. In *Wilson v. O'Brien,* No. 07 C 3994, 2009 WL 763785 (N.D. Ill. Mar. 20, 2009), the court found the *Tribune's* argument in support of a privilege unavailing, for "after sifting through the jurisprudential remains of *Branzburg* [*v. Hayes*, 408 U.S. 665 (1972)] and its progeny, [the court] cannot locate any legal artifacts indicating the existence of the federal reporter's privilege independent of the First Amendment[.]" *Id.* at *5. Similarly, in *Mosely v. City of Chicago,* 252 F.R.D. 421 (N.D. Ill. 2008), the court declined to find a reporter's privilege under federal common law because *McKevitt's* strong language called into question the purported basis for such a privilege. *Id.* at 437. The *Mosely* court stated:

> Surveying the cases that recognized a common law reporter's privilege in the wake of *Branzburg v. Hayes*, Judge Posner's panel opinion in *McKevitt* concluded that those courts that had recognized the privilege had done so "rather surprisingly" in light of *Branzburg*. Some, he pointedly said, have "audaciously" declared that *Branzburg* even created a privilege—and that they "essentially ignore[d] *Branzburg*," and could "certainly be questioned." He concluded that "the cases that extend the [reporter's] privilege to non-confidential sources that express concern with harassment, burden, using the press as an investigative arm of government, and so forth" may be "skating on thin ice" since these considerations were rejected by *Branzburg* even in the context of a confidential source.

*Id.* at 425 (citing and discussing *McKevitt*, 339 F.3d at 533) (internal citations omitted); *see also Thayer v. Chiczewski*, 257 F.R.D. 466, 468-69 (N.D. Ill. 2009) ("disagree[ing]" with the argument that *McKevitt* "did not foreclose the potential existence of a journalistic privilege based upon federal common law or state law"); *U.S. Dep't of Educ.*

*v. NCAA*, 481 F.3d 936, 938 (7th Cir. 2007) (citing *McKevitt* and other cases when stating in dictum that "[t]here isn't even a reporter's privilege in federal cases").

Since this Court declines to quash the subpoenas on the ground that they seek information protected by a qualified reporter's privilege, it now turns to whether the subpoenas should be quashed under Federal Rule of Civil Procedure 45.

## II.     Objection Based on Undue Burden Under Rule 45

### A.     Standard

As the Seventh Circuit observed in *McKevitt*, courts should ensure that a third-party subpoena "directed to the media, like any other subpoena duces tecum, is reasonable in the circumstances, which is the general criterion for judicial review of subpoenas." 339 F.3d at 533. Rule 45 commands that those issuing third-party subpoenas "must take reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena." Fed. R. Civ. P. 45(d)(1). Upon the filing of a timely motion, the Rule also provides that courts "must quash or modify a subpoena that: . . . subjects a person to undue burden." Fed. R. Civ. P. 45(d)(3)(A)(iv); *see also* Advisory Committee Notes to the 1991 Amendment to Rule 45 (counseling that a subpoena should be quashed "unless the party serving the subpoena shows a substantial need . . ." for the requested discovery).

Not surprisingly, whether a subpoena is "reasonable in the circumstances" or imposes an "undue burden" turns on a number of case-specific factors, including (1) the likelihood that compliance will result in production of the information, (2) whether the discovery is unreasonably cumulative or duplicative, (3) whether the information sought is readily obtainable from another, more convenient, less burdensome (but equally

reliable) source, and (4) whether the burden of the proposed discovery outweighs its likely benefit. *Mosely*, 252 F.R.D. at 427 (citing *Nw. Mem. Hosp. v. Ashcroft*, 362 F.3d 923, 927 (7th Cir. 2004); *Watts v. SEC*, 482 F.3d 501, 509 (D.C. Cir. 2007); *Exxon Shipping Co. v. U.S. Dep't of Interior*, 34 F.3d 774, 780 (9th Cir. 1994)). Regarding burden, courts must assess more than mere "administrative hardships" and, instead, should consider the myriad interests that production might compromise or injure. *Patterson v. Burge*, No. 03 C 4433, 2005 WL 43240, at *1 (citing *Nw. Mem. Hosp.*, 362 F.3d at 928-29); *Thayer*, 257 F.R.D. at 470.

### B. Factual Background

#### 1. Plaintiff's Criminal Case

Before turning to the balancing analysis under Rule 45, some background about the underlying criminal case and the *Tribune* stories is helpful for context.[3] On November 16, 1992 at approximately 8:45 p.m., Jeffrey Lassiter and Sharon Haugabook were murdered by gunshots to the head while in Lassiter's apartment. The prime suspect was Dennis "Goldie" Mixon, a drug dealer who was seen leaving Lassiter's building shortly after the shootings along with three other unidentified individuals. The Defendant Officers were initially unable to locate Mixon for questioning. A few weeks after the murders, they instead arrested a 15-year-old named Lewis Gardner on unrelated charges, and allegedly coerced him into falsely implicating himself

---

[3] This Opinion contains considerable factual detail about the discovery that is sought, the deposition testimony of the witnesses, and the statements attributed to witnesses in the *Tribune* articles. This Part contains only a brief overview. The Court's careful attention to the underlying facts not only frames its analysis, but also recognizes the likelihood that the same issues will be dealt with by the district judge in the near term (if any party objects to this ruling) or in pretrial motions in the event that Mills is subpoenaed to testify at trial.

and others in the murders, namely, Plaintiff (then seventeen years old), Akia Phillips, Paul Phillips, Joseph Brown, Deon Patrick, and Rodney Matthews.

Plaintiff was brought to the police station for questioning on December 3, 1992 and gave a 27-page confession recorded by a stenographer. The others who were arrested also gave confessions that implicated themselves and each other, including Mixon, who was arrested a few months later. According to the police, following the confession, Plaintiff was placed in a line-up but was not identified by witness Faye McCoy. After the line-up, he was placed in the lock-up. Defendant Officers assert that it was not until this point that Plaintiff informed them, for the first time, that he recalled being in a police lock-up on the night of the murders. They then investigated this claim, locating an arrest report and signed bond slip that documented Plaintiff's arrest at 6:45 p.m. on November 16, 1992 and his release on bond at 10 p.m.

The arrest report and bond slip were produced to Plaintiff's criminal defense attorney, Nathan Diamond-Falk, and formed the basis for his alibi at trial: Plaintiff could not have committed the murders since he was in a police lock-up. The prosecution highlighted the confession and testimony from other witnesses, including Adrian Grimes, a drug dealer who said he saw Plaintiff in a park near Lassiter's apartment on the night of the murders at an hour when the police records placed Plaintiff in the lock-up. After a trial in September 1995, Plaintiff was found guilty, as was Mixon, who was tried simultaneously but to a separate jury.[4] The Illinois Appellate Court affirmed Plaintiff's conviction on October 15, 1998. At some point thereafter, Plaintiff wrote to the *Chicago Tribune* about his case. In 2001, Mills traveled to the prison where Plaintiff

---

[4] The trial was the last of those charged for the murders. Co-defendants Deon Patrick, Paul Phillips, and Lewis Gardner were convicted, while Rodney Matthews was acquitted. The cases against Akia Phillips and Joseph Brown were dismissed before trial.

was incarcerated and interviewed him a number of times.  Mills also interviewed many other witnesses and potential witnesses as part of the *Tribune's* reinvestigation of the case.

### 2.    *Chicago Tribune* Stories

On December 19, 2001, approximately nine years after Plaintiff's confession (and six years after his trial), the first in-depth story about the case appeared in the *Tribune*. Entitled "*When Jail Is No Alibi in Murders*, *New Evidence Undercuts State Case*" and written by Steve Mills, Maurice Possley, and Ken Armstrong, the story reported that "[a] Tribune investigation of Taylor's case has uncovered new evidence that supports Taylor's version of events and his contention that his confession was false."  (Doc. 126-3, at 7-8.)   The story went on to describe what was learned during interviews with Plaintiff, attorney Nathan Diamond-Falk, co-defendant Dennis Mixon and trial witness Adrian Grimes (both of whom recanted their prior statements to prosecutors), trial witness Faye McCoy, and two new witnesses located by the *Tribune*, Andrea Phillips and James Anderson.

The *Tribune's* second story about the case was published about a year later on January 2, 2003, and it similarly stated that "[t]he Tribune's re-investigation of the case in 2001 turned up new evidence that revealed problems with the evidence against Taylor[,]" and went on to describe those problems.  (*Id.* at 1.)   Most significantly, it reported that "[l]ast month" co-defendant "Dennis Mixon gave the Tribune a detailed account of the murders . . ." in which Mixon reportedly again said that Plaintiff (and the other co-defendants) were not involved.   But this time Mixon admitted his own

involvement and ability to identify the shooter.  (*Id.* at 1-5.)  He also said he had falsely implicated the others in response to police pressure.  (*Id.* at 4-5.)

Approximately nine years passed before the next story about the case was published in the *Tribune* on May 7, 2012.  Five more stories followed on February 16, 2013, June 29, 2013, June 30, 2013, July 27, 2013, and August 7, 2013.  These stories reported on (and criticized as inadequate) the Cook County State's Attorney's reinvestigation of the case, developments in post-conviction proceedings in state and federal courts, Plaintiff's eventual release from prison after the charges were dismissed, and the announcement by prosecutors that they would not seek to retry the case.  Like the earlier stories, these stories recounted the details of Plaintiff's underlying criminal case and how, for example, Plaintiff had not remembered being in the lock-up until after he confessed.  The only reference to a new interview appeared in the penultimate story on July 27, 2013, when Mills wrote that he had a "lengthy interview this week at Menard Correctional Center" with co-defendant Deon Patrick and reported on what Patrick said.

### 3. Subpoenas

#### a. Document subpoena to the *Chicago Tribune*

The document subpoena issued to the *Tribune* seeks audio and video recordings, interview notes, summaries, reports, memoranda, and emails "of conversations and/or interviews with Daniel Taylor made in connection with any articles relating to the Sharon Haugabook and Jeffrey Lassiter homicide and Daniel Taylor's arrest, prosecution, conviction, post conviction and habeas petition . . . ."  (Doc. 126-1, at 3.)  During a motion hearing, the *Tribune* informed the Court that it had searched its records and the only responsive documents are eighteen pages of handwritten notes

that Mills made of interviews with Plaintiff.[5] These notes have now been provided to the Court for *in camera* review. Defendants are interested only in portions that describe any statements made by Plaintiff and agree that Respondents may redact any other notes. Based on the Court's *in camera* review, and as described in greater detail below, several portions of the notes pertain to the events at issue in this case.

### b. Testimonial Subpoena to Mills

The subpoena to Mills commands him to appear and give testimony to be recorded by a court reporter and videographer, and does not specify the subject matter of this testimony. (Doc. 126-1, at 4.) Defendants have now identified three categories of questions for Mills. The first category concerns Plaintiff's statements to Mills or other *Tribune* reporters (that is, statements made in Mills' presence, whether or not he conducted the interviews) about the events at issue in this case, such as the details of how police coerced him to confess and when he remembered and first told police that he was in a lock-up on the night of the murders. The second category concerns discovery from Mills regarding interviews with other potential witnesses in this lawsuit, namely, co-defendants Mixon and Patrick, and potential witnesses Grimes, Andrea Phillips, and attorney Diamond-Falk.[6] Finally, Defendants seek discovery from Mills about his reported examination of certain case files that they believe will be helpful in

---

[5]     According to Respondents, Mills has a "small number of letters" from Plaintiff but none of these relate to his "experiences during his arrest, interrogation or prosecution and, therefore, are wholly irrelevant to the underlying litigation." (Doc. 140, at 17-18.) Defendants accepted this representation and are not seeking to compel their production. The *Tribune* subpoena that is the subject of this motion did not request notes or audio/video recordings from interviews that Mills conducted with others, such as Deon Patrick, Dennis Mixon, Adrian Grimes, and Andrea Phillips, though the parties alluded during the hearing to subsequent document subpoenas.

[6]     The *Tribune* stories do not identify the specific reporters who conducted the interviews, but Mills presumably either conducted or was present for each interview since counsel for Respondents did not oppose discovery on the basis that Mills was not involved.

defending against the *Brady* claims that they withheld exculpatory evidence.  This Court first considers the need for discovery of Plaintiff's statements before turning to discovery relating to the potential witnesses and then to the *Brady* claim.

## C.    Analysis of the Subpoenas Regarding Plaintiff's Statements to Mills

### 1.    Defendants' Demonstration of Need

Defendants believe the information that Mills possesses regarding Plaintiff's interview statements is critical to their defenses.  As they see it, Plaintiff's "theory is that his confession was the product of being beaten over a course of hours, being fed information by the police about the murders, being shown a confession of at least one co-defendant, and false claims of being allowed to 'go home' if he confessed."  (Doc. 126, at 5.)   They argue that "many of the 'facts' underlying this new theory are contradicted by statements attributed to [Plaintiff] by Mr. Mills as reported in his articles." (*Id.*)  The first such story, published on December 19, 2001, said Plaintiff gave "several interviews" to the *Tribune* while at Stateville Correctional Center.  (Doc. 126-3, at 8.) Based on the article, it appears that Plaintiff spoke with Mills at length about the very events at issue in this lawsuit.  The article states:

> Three hours after Taylor arrived at the now-closed Area 6 detective headquarters, he gave a 27-page court-reported confession.  Detective Brian Killacky would later testify that Taylor first denied that he knew anything about the murders.  Killacky said he then read Taylor his rights and, without any prompting, Taylor "almost immediately" admitted taking part in the murders.

> Taylor's account is dramatically different.  Killacky and Detective Anthony Villardita entered the room and, said Taylor, asked what he knew of the murders.  Taylor, who was handcuffed to a chair, denied knowing anything, he said.  The detectives told him Gardner and Phillips had already implicated him.  When Taylor persisted in his denials, the detectives hit him once in the side with a flashlight, he said, yelled at him and told him they would let him go if he confessed.

Finally, Taylor said, he decided to tell the detectives what they wanted to hear. He said he believed that resisting further was futile, and that the detectives would make good on their promise to release him. "They said, 'We don't want you. You're not the one. We really want Rodney Mathews and Deon Patrick,'" Taylor said in an interview.

Taylor said his confession was made up of details he picked up from the detectives' questions, from information he had heard on the street and from Akia Phillips' confession, which they gave him to read. "I just sort of put it all together," Taylor said.

\*         \*         \*

On the last page of Taylor's confession, Assistant State's Atty. Joe Magats noted the time: 5:52 a.m. Taylor was then put in a line-up where Faye McCoy, the woman who lived in the building and saw a group of men leaving after the shooting, was asked if she recognized him. McCoy said she had seen Taylor in the neighborhood before, but she was certain he was not one of the four men she saw after the murders.

\*         \*         \*

After the line-up, Taylor was jolted when he was told he was being held on murder charges. He said he searched his mind for where he was Nov. 16. He remembered a court date, Nov. 19, and worked backward to recall that he had been arrested the night Lassiter and Haugabook were slain and could not have been involved. He then blurted out that he had been in the lockup.

(*Id.* at 10-11.)

Defendants argue that the probative value of, and thus their need for, discovery from Mills is especially great because statements made to him during the interviews in 2001 (or later) appear to be flatly inconsistent with Plaintiff's September 2014 deposition testimony. During negotiations with Respondents before the pending motions were filed, Defendants identified as "examples" three such areas of inconsistency, namely, Plaintiff's deposition testimony regarding: (a) when he first remembered and told the police that he was in a lock-up on the night of the murder (was this before or after his confession); (b) the extent of the beatings inflicted by police before he confessed (one

blow or multiple blows); and (c) which co-defendant confession he was shown by police to feed him details of the murders (was it Akia Phillips or Lewis Gardner).  (Doc. 126-2, at 1-2.)  Each category is discussed below.

a.      **Plaintiff's Testimony Regarding Lock-Up**

Plaintiff was adamant during his deposition that *before* giving the confession to police, he told the detectives about being in the police lock-up on the night of the murders.  After informing the detectives, Plaintiff said they left but later returned and told him that they had checked the lock-up records and none indicated that he had been locked up that night.  (Doc. 126-4, at 1.)  Based upon the December 19, 2001 *Tribune* story, however, Plaintiff appears to have told Mills the exact opposite.  As subsequent *Tribune* stories reported this same sequence of the events—that is, that Plaintiff recollected his alibi only *after* confessing—it is possible that Plaintiff reiterated this version of events to Mills (with some variation) a number of times.  The chart below reflects the exact words of each story.

| STORY DATE | QUOTATION FROM STORY | CITATION |
|---|---|---|
| 12/19/2001 | "Just as he was going to be formally charged with two counts of murder, Taylor protested to detectives that he could not have committed the crimes because he had been in police custody when they occurred." <br> * * * <br> "After the line-up, Taylor was jolted when he was told he was being held on murder charges.  He said he searched his mind for where he was Nov. 16.  He remembered a court date, Nov. 19, and worked backward to recall that he had been arrested the night Lassiter and Haugabook were slain and could not have been involved.  He then blurted out that he had been in the lockup." | Steve Mills et al., *When Jail is No Alibi in Murders* (Doc. 126-3, at 7, 11.) |
|  |  |  |
| 1/2/2003 | "Taylor told detectives of his arrest, but not until after he confessed.  Then 17, he said he knew he was innocent but only belatedly recalled where he had been the night of the murders." | Steve Mills & Maurice Possley, *New Doubts Cast on Verdict* (Doc. 126-3, at 2-3.) |

13

| STORY DATE | QUOTATION FROM STORY | CITATION |
|---|---|---|
| 5/7/2012 | "After he was charged, Taylor remembered that he had been arrested the night of the slayings." | Steve Mills, *Was Alibi Ignored in Double Murder?* (Doc. 126-3, at 30.) |
| | | |
| 2/6/2013 | "After he was charged in the slayings, Taylor remembered that he had been arrested on the night they occurred and told the detectives who had been questioning him." | Steve Mills, *Still Imprisoned, Despite Jail Alibi* (Doc. 126-3, at 26.) |
| | | |
| 6/29/2013 | "The first hitch in the case emerged moments after Taylor's confession when he recalled for detectives that he had been arrested the night of the murders." | Steve Mills, *Shaky Murder Conviction Falls* (Doc. 126-3, at 33.) |
| | | |
| 6/30/2013 | "But after Taylor confessed, he told detectives that he thought he had been arrested on the night of the murders." | Steve Mills, *20 Years to Undo Wrongful Conviction* (Doc. 126-3, at 21.) |
| | | |
| 8/7/2013 | "After giving a 27-page formal confession, he remembered that on the night of the murders two weeks earlier he had been arrested and taken to the police lockup at Addison and Halsted streets." | Steve Mills, *"I'm a Work in Progress"* (Doc. 126-3, at 36.) |

Respondents argue that testimony from Mills on this topic is unnecessary because Plaintiff, when asked during his deposition whether he had ever told anyone that he informed the police about being in the lock-up only after confessing, stated that he believed he had described such a sequence to the "news reporter" and one of his lawyers. (Doc. 140, at 12.) However, Plaintiff went on to testify that any such statements to Mills and his attorney were not true. (Doc. 126-4, at 2.) When asked why he said it, Plaintiff explained:

> Because at the time that I was being questioned, everything—I don't remember everything at that one specific time when I'm being asked questions, so there's something I might forget to say, and you all have a

tendency to just go off what exactly what it is that I said, and I probably didn't remember at that time.

(*Id.*)

Respondents also argue there is no need for impeachment evidence from Mills about the alibi because Plaintiff acknowledged that he signed under penalty of perjury a petition for a certificate of innocence stating, "shortly after confessing to the murders[,] Taylor advised police that he was in police custody on the night of the murders[.]" (*Id.* at 2-3.) But after Plaintiff testified about the petition language, his attorney stated on the record that the acknowledgement was not impeaching. (*Id.* at 3.) Indeed, Plaintiff then testified: "I told [the detectives] before, and I told them after." (*Id.*) Still later in the deposition, Plaintiff appeared to retreat from some of his prior testimony about what he had said to Mills:

> Q.     Did you ever tell Steve Mills that you only told police that you were [sic] police lock up after you falsely confessed?
>
> A.     I don't believe we had that conversation in the terms how you're putting it.
>
> *          *          *
>
> Q.     Just so we're clear, did you tell Steve Mills that you only confessed to the murders after – did you ever tell Steve Mills that you only told police that you were in a police lock up after you had falsely confessed?
>
> A.     I can't recall.

(*Id.*) (internal objection by Plaintiff's counsel omitted).

In light of the deposition testimony, Defendants counter that the discovery from Mills on this topic is crucial. As they see it, "claims that [Plaintiff] was in a police lock-up at the time of the murders is the singularly central issue in this case. If, as Mr. Mills repeated [sic] wrote, Taylor admitted he did not recall this when he was interrogated by

the police, this testimony is monumentally important in establishing that Taylor's story is a fabrication." (Doc. 126, at 11.) Defendants also reason that "there is a vast difference between, on the one hand, pleading with the police that you were locked up when murders were committed and being beaten into saying the contrary (as [Plaintiff] now contends) and, on the other hand, not remembering your supposed alibi for a murder at all (which is what actually happened according to the police and Mr. Mills)." (*Id.* at 11-12.) Finally, Defendants argue that Mills' testimony would be valuable because it would "establish that [Plaintiff] lied under oath at his deposition which directly impacts upon his credibility as a witness in general." (*Id.* at 12.)

### b. Plaintiff's Testimony Regarding Akia Phillips' Confession

The second example of why discovery is needed concerning Plaintiff's interview with Mills is based on the following statement in the December 19, 2001 *Tribune* story: "Taylor said his confession was made up of details he picked up from the detectives' questions, from information he had heard on the street *and from Akia Phillips' confession, which they gave him to read*." (Doc. 126-3, at 10) (emphasis added). According to Defendants, this is a "physical impossibility because Akia Phillips [sic] confession was not taken until after [Plaintiff] had already confessed." (Doc. 126, at 12.) They therefore argue that Mills, if he were to testify that Plaintiff made the reported statement, "holds the key to impeaching [Plaintiff] on a key issue relating to the voluntariness of his confession." (*Id.*)

In addition, Defendants believe such testimony could be used to impeach Plaintiff's deposition testimony. While he initially testified that police showed him a typewritten statement, Plaintiff later said he got "mixed up" and it was handwritten police

paperwork that he saw.  (Doc. 126-6, at 1-2.)  Plaintiff was then asked if he "ever told anyone that [he] reviewed Akia Phillips' confession prior to giving [his] own confession[.]"  (*Id.* at 2.)  He responded: "It's possible that I may have said that, getting it mixed up with Popeye's[,]" who he identified as Lewis Gardner.  (*Id.*)  Next, Plaintiff responded as follows to questions about what he told Mills on this topic:

> Q:  Okay.  So did you tell Steve Mills from the Tribune that you reviewed Akia Phillips' confession before you gave your own?
>
> A:  I can't recall, but I did tell him that I did review a statement before my own was given.
>
> Q:  Of Akia Phillips?
>
> A:  Of one of the two.
>
> Q:  And that one was Akia Phillips, wasn't it?
>
> A:  It's possible.  I can't give you a definite answer on that.  That was many years ago.

(*Id.*)

In arguing that discovery from Mills is unnecessary "to verify [Plaintiff's] prior inconsistent statements[,]" Respondents direct the Court's attention to subsequent deposition testimony where Plaintiff admitted that in a sworn statement, he said that he read Phillips' confession before providing his own.  (Doc. 140, at 13.)

> Q:  Did you swear in an affidavit in support of Deon Patrick's post-conviction filings in 1998 that you had reviewed Akia Phillips's confession before you gave your own?
>
> A:  It's possible I may have made that mistake.

(Doc. 140-3, at 2-3.)  Plaintiff went on to testify that he reviewed only *one* typewritten statement before giving his own and that was Lewis Gardner's statement, but that he was also shown "Akia Phillips' paperwork."  (*Id.* at 3.)  In Respondents' view, Plaintiff's

sworn affidavit is "better evidence than Mills' verification of statements attributed to Taylor thirteen years ago." (Doc. 140, at 13.)

Since Plaintiff may well testify (based on his deposition) that he got it wrong when he signed the affidavit in 1998, Defendants believe evidence of Plaintiff making the same statement three years later during an interview with Mills would be quite useful. A jury might find it plausible that Plaintiff made a mistake by not carefully reading the words that someone else wrote in an affidavit for him to sign. But if Plaintiff later provided the same information to Mills in his own words during an interview (or multiple interviews), a jury would likely be less willing to accept the notion that a mistake was made – twice.

Respondents argue that Defendants "failed to lay the foundation for impeachment by showing [Plaintiff] the article and statement at his deposition to refresh his recollection when he said he didn't recall." (*Id.*) Since this was a discovery deposition, there was no requirement to lay a foundation, as there is at trial before offering a prior inconsistent statement to impeach a witness. In addition, Plaintiff is not only a witness but also a party in the lawsuit, so his prior statement to Mills (that police showed him the Akia Phillips confession) is likely admissible as a statement of a party opponent without regard to whether the statement is impeaching. Fed. R. Evid. 801(d)(2). In any event, it became quite clear during the hearing (when the Court inquired as to possible stipulations) that Plaintiff would *not* have remembered making the reported statements to Mills had he been asked to review the *Tribune* story to refresh his recollection.

### c. Plaintiff's Deposition Testimony Regarding the Extent of Beatings

The final example offered by Defendants to show the need for discovery of Plaintiff's statements to Mills is based on the December 19, 2001 *Tribune* story's report that "[w]hen Taylor persisted in his denials [about his involvement in the murders], the detectives hit him once in the side with a flashlight, he said, . . . ." (Doc. 126-3, at 10.) During his deposition, Plaintiff said the same thing. (Doc. 126-5, at 1.) But he went on to say that, after being struck with the flashlight, another detective punched him in the back a few times with his fist. (*Id.*) Plaintiff then testified that the detectives left for a while. (*Id.*) When they returned, the questioning resumed and one detective struck him by fist more than a few times and remarked that he loved striking Plaintiff because Plaintiff had the "perfect skin tone." (*Id.* at 2-3.) It was after this second round of beatings that, Plaintiff said, he "finally got tired of the beatings and gave in to their wishes to tell them what they wanted to hear." (*Id.* at 5.)

Defendants anticipate that discovery from Mills will result in evidence that Plaintiff only told Mills about being struck one time with a flashlight, and did not tell him about the other alleged beatings. Defendants' theory is that, had Plaintiff told Mills of these other beatings, Mills would have described them in the story (rather than reporting only a single strike with the flashlight). Hence, they believe the third-party discovery will result in crucial evidence that could be used to impeach Plaintiff by omission:

> [Plaintiff] alleges that the sole reason he confessed to the murders was because he was beaten by the police and wanted the beatings to stop. If, as Mr. Mills wrote, [Plaintiff] said he was only hit one time by the police (rather than the numerous times over a course of hours), this also directly impacts whether [Plaintiff's] confession was the product of physical coercion (as [Plaintiff] asserts) or, rather, the product of simply being guilty of the crimes and being caught (as the defendant officers assert).

(Doc. 126, at 12.)  Respondents counter that the statement Mills attributed to Plaintiff is not impeaching, as Mills did not report that the flashlight beating was the "only" one Plaintiff received.  (Doc. 140, at 12.)  Further, they note that it is speculative whether Mills would or even could provide information to impeach Plaintiff on this issue.  (*Id.*)

Since the discovery has not yet occurred, it is always somewhat speculative whether the resulting information will provide a basis to impeach a witness or otherwise be valuable.  This Court is satisfied, however, based on the three examples identified by Defendants, and the totality of the circumstances here, that there is a substantial need to discover what Plaintiff said to Mills concerning the events at issue in this lawsuit, including the extent of any beatings.  As the court found in *Mosely*, when a reporter interviews a plaintiff regarding the "events that are at the epicenter of his complaint . . . the criticality of [the plaintiff's] statements to [the reporter] on these issues is beyond debate."  252 F.R.D. at 430 (citing *McKevitt*, 339 F.3d at 531).

## 2.    Respondents' Burden

Turning to the issue of undue burden, Respondents argue that the "burdens imposed by the Subpoenas vastly outweigh any possible relevance" which they describe as "slim to nil."  (*Id.* at 5.)  They believe compliance with the subpoenas will result in "very real harm not only to Mills and *Chicago Tribune*, but to the public's interest in a robust press."  (*Id.*)  In this regard, they reason that:

> It is critical for journalists to establish and maintain the trust and cooperation of sources, both confidential sources and non-confidential sources, who may be willing to be interviewed.  If Mills is forced to be deposed and interrogated on information he has obtained from interviews, it would impair his integrity as a journalist and turn him into an unwilling investigator for the litigants.

(*Id.* at 16.)

While the Court certainly considers and gives weight to the potential and unique harms that may result when members of the press are required to comply with third-party subpoenas, it must also be mindful of the Seventh Circuit's directive in *McKevitt* that subpoenas to the press be treated like any other third-party subpoena. 339 F.3d at 533 ("We do not see why there need to be special criteria merely because the possessor of the documents or other evidence sought is a journalist."). Indeed, as the *Mosely* court reasoned, "[p]reoccupation with the kinds of speculative harm . . ." often identified by the press "tends to divert attention from the central inquiry, which is reasonableness 'in the circumstances.'" 252 F.R.D. at 436 (quoting *McKevitt*, 339 F.3d at 533).

Since Respondents initiated the reinvestigation in 2001 and completed it long before this lawsuit was filed, the Court does not understand how requiring Mills to provide information turns him into an investigator for the civil litigants. *Id.* at 431-32 (rejecting this argument because "[j]ournalists alone determine the contours and content of their interviews, unaided and uninfluenced by lawyers in cases still in the womb of time and that may never be born.") As for jeopardizing the ability to establish sources and conduct investigations, Respondents offer nothing more than speculative arguments without evidentiary support. For example, absent from the record is an affidavit from Mills describing whether and how many times he has been deposed about interviews, or how many times he has been required to produce his interview notes. More importantly, assuming such discovery has occurred, the Court does not know whether in Mills' belief or in fact such discovery has negatively impacted his ability to

gather information from sources, take notes, and write probing and accurate stories about the important issues of the day. Thus, in effect, Respondents' articulated burden appears to be an alternate route to a reporters' privilege, one that relies upon the same rationales that courts in this circuit have rejected. *E.g. Mosely*, 252 F.R.D. at 431-32 (rejecting a journalist's assertion of these harms as "speculative," "illogical," and "not comport[ing] with the kind of specific and particularized demonstration courts have required to establish burden or 'good cause.'"); *Thayer*, 257 F.R.D. at 470 & n.5 (finding unpersuasive a journalist's "work product" and "loss of 'street cred'" arguments (regarding his future access to sources) for their absence of evidentiary support and a "showing of actual burden").

### 3.    Balancing

Given the showing of substantial need for the discovery of Plaintiff's statements to Mills, this Court is not persuaded that the subpoenas must be quashed to avoid the broad and speculative harms identified by Respondents. In reaching this conclusion, the Court has reviewed *McKevitt* and the handful of lower court cases in this district cited by the parties. Interestingly, both Defendants and Respondents believe these cases support their respective positions, and their briefing and oral arguments spent considerable time explaining why. In the Court's view, none of the cases is particularly helpful since each turned on the peculiar facts that were presented. While the claimed burdens to the press were the same in each of these cases, the facts on the "need" side of the equation varied considerably, thus leading to diverging outcomes.

●    *Hobley v. Burge*, 223 F.R.D. 499, 505 (N.D. Ill. 2004) (Brown, M.J.): Journalist met with the plaintiff (making two pages of notes) but never published the information, as he had agreed not to disclose it absent authorization. Journalist eventually wrote two articles about the plaintiff without referring to his

conversations with the plaintiff or to the letters received from him. According to journalist's affidavit, he later had a phone call with plaintiff and took notes (137 words), but they did not discuss the events at issue. The only other note was undated (24 words) from a phone call "about" the plaintiff, but the journalist could not remember with whom he was speaking when he made the note. Court required production of the plaintiff's letters to the journalist but not the notes because their "only value" was the "possibility that they *might* reflect something that [the plaintiff] said to [the journalist] that might be helpful to the Defendants." On that basis, the court concluded that the defendants had not shown a "substantial need" for the notes and that the subpoena was a "classic fishing expedition[.]"

● *Patterson v. Burge,* No. 03 C 4433, 2005 WL 43240, at *2 (N.D. Ill. Jan. 6, 2005) (Gottschall, J.): Court quashed subpoena where the justifications for it were "meager, to say the least," and relevance was shown in its "broadest and weakest sense." During the pendency of this civil rights action (concerning earlier state convictions for which the plaintiff was pardoned), the plaintiff was arrested for unrelated federal drug and weapons charges. He made numerous public statements to several journalists about the arrest that were highly publicized. The news organizations already had produced all video and audio that was broadcast of these statements. Court concluded that there was no reason to believe that the plaintiff told the reporters anything in private that he had not said publicly, and so quashed the subpoena for all video and audio footage, including outtakes.

● *Mosely v. City of Chicago,* 252 F.R.D. 421, 430 (N.D. Ill. 2008) (Cole, M.J.): Reporter had conversations with the plaintiff about his arrest and coerced confession, both of which were at the "epicenter" of the civil lawsuit. Court granted discovery of tapes and notes of these interviews. It denied without prejudice the request to depose the reporter "at the close of discovery," noting that a lot could happen in the interim that might make the deposition unnecessary.[7]

● *Wilson v. O'Brien*, No. 07 C 3994, 2009 WL 763785, at *9 (N.D. Ill. Mar. 20, 2009) (Ashman, M.J.): Journalist was ordered to sit for deposition about his interview of a victim who recanted her identification of the plaintiff as her attacker

---

[7] Respondents state that the *Mosely* court ultimately did not order any of the notes to be produced. (Doc. 154, at 11.) While true, it has no bearing on the holding in the case. After the opinion issued, the third parties sought reconsideration, supplying the court with affidavits that they had no tapes of the interviews and that none of the journalist's notes related to the events at issue. They also informed the court of an agreement with the subpoenaing party that the notes would be produced to the extent that the court determined from an *in camera* review that they pertained to the events at issue. 252 F.R.D. 445, 448 (N.D. Ill. 2008). In granting the motion to reconsider, the court emphasized that this "should not be construed as in any way reversing the conclusion in the [prior opinion] that under the circumstances of this case it was a proper exercise of discretion to order the notes to be produced to the defense." *Id.*

after the journalist informed the witness of a court decision exonerating the plaintiff and of various facts about the case. Court held that the discovery was more than "merely relevant" since the interviews with the witness and her reactions to the journalist's statements were "crucial" and would likely be used by the defendants in "crafting their defenses" to malicious prosecution and other claims.

● *Fairley v. Andrews,* No. 03 C 5207 (Aug. 25, 2005) (Castillo, J.): Respondents provided a transcript from this case, which consists of eight pages of argument and an oral ruling on a renewed motion for leave to serve a subpoena on journalists. (Doc. 140-1.) The facts are not entirely clear given the skeletal record. However, counsel for the journalists reminded the court that "the last time we appeared," defendants were told to "come up with some concrete evidence as to why this is really truly necessary and not far afield. Given that opportunity, they didn't do so, that they're raising it generically now." The court then denied the motion, stating: "Well, I totally agree with that. I think this is of marginal relevance, [and] has not been shown to be necessary for purposes of this litigation." The court added that the discovery process had been "difficult" and "we are now at the outer edges of any kind of relevance under Rule 26."

● *Evans v. City of Chicago*, No. 04 C 3570 (May 11, 2005) (Schenkier, M.J.): Respondents provided a transcript from this case, which contains fourteen pages of argument over whether the defendants should be permitted to depose two reporters. (Doc. 140-2.) The defendants began the hearing by saying there would be "no issue" and they would not seek discovery if the plaintiffs would not call the reporters to testify at trial. The court found it was highly unlikely that the reporters would ultimately testify and noted that the reporters would be moving to quash any trial subpoena if served. Also, the parties agreed that, were the trial judge to deny the motion to quash, it would be fair to allow the defendants to take a deposition mid-trial before the reporter testified. But given the "imponderables," the court said "at this point the burden of requiring the reporters to sit for deposition would outweigh the benefit of having the depositions since that benefit is, at this point, grossly speculative." The court also said this "doesn't mean that the equation might not shift at a later time depending on how events develop."[8]

This Court agrees with Defendants that the case at hand presents a more compelling basis for requiring compliance with the subpoenas than any of the above cases. First, not only will Plaintiff undoubtedly testify at his own trial, but his testimony will be on the very same topics that he described to Mills during multiple in-depth

---

[8] This Court was informed by Plaintiff's counsel that one of the reporters ultimately testified at the trial but did so very briefly and simply affirmed that the witness made the statement that was reported.

interviews.  Second, the interviews appear to have first taken place in 2001 – much closer in time to the events at issue than Plaintiff's deposition in 2014.  By the time of trial, even more time will have passed.  Third, as Defendants observe, the parties to the lawsuit "tell very different stories," and Plaintiff's credibility will thus be of central importance.  Defendants will seek to attack his credibility, and he will seek to attack theirs.  Anything Plaintiff said to Mills about what happened on the day of his arrest could be offered into evidence by Defendants as an admission of a party opponent without regard to whether the evidence impeached Plaintiff's testimony at trial.  Fed. R. Evid. 801(d)(2).  It also appears likely from the three examples highlighted by Defendants that testimony from Mills could be used to impeach Plaintiff's testimony under oath at his deposition (and the same testimony at trial if he repeats it) by offering evidence of inconsistent statements made thirteen years earlier and much closer to the events in question.

It is also worth noting that the information sought is not only necessary but also unavailable from anyone but Respondents.  Mills is a unique source of the discovery since he appears to be the only other person who can testify to what Plaintiff said about his coerced confession, alibi, and other matters during the multiple *Tribune* interviews.  Plaintiff did not give interviews to other newspapers or journalists.  Nor are there audio or video recordings of the interviews that might be offered into evidence with an appropriate foundation.  The *Tribune* stories themselves are hearsay within hearsay, so they cannot be offered into evidence for any purpose.  *See* Fed. R. Evid. 801(c); *Mayor of Philadelphia v. Educ. Equality League*, 415 U.S. 605, 617-18 & n. 15 (1974)

(describing as "double hearsay" a party's statement that was reported by a newspaper article).

Even if the stories were admissible, they do not (like recorded interviews) necessarily capture all of the statements Plaintiff made about what happened. In addition, Mills may be able to provide important information about how many times he interviewed Plaintiff about the details of the coerced confession, when he did so, how long the interviews lasted and their format, and what Plaintiff said during each interview (whether reported in a story or not). While it is possible that Mills will be unable to recall the details given the passage of time, he took detailed notes of the interviews, so he may be able to use the notes and the *Tribune* stories to refresh his recollection. Even if Mills can do no more than testify that Plaintiff made the statements attributed to him in the original story on December 19, 2001, this will provide relevant evidence of significant use to Defendants.

Finally, this Court explored whether Plaintiff would enter into stipulations that might obviate the need for discovery from Respondents. For example, Plaintiff's counsel was asked whether his client would stipulate that he did not tell the police about being in the lock-up until *after* he confessed, as Mills reported. Plaintiff declined such a stipulation. At most he was willing to stipulate that he *could not recall* what he told Mills, so did not dispute making statements that Mills attributed to him in the stories. Defendants declined this more limited stipulation for obvious reasons. If Plaintiff testifies at trial consistently with his deposition, they want to offer evidence from Mills concerning how many times (and when) Plaintiff made the inconsistent statements and the specific words that he spoke. Defendants also want to elicit evidence that the

statements were made in a situation where Plaintiff was under no pressure, had access to his case files, and was given an opportunity to give narrative answers without time limitations.

For all of these reasons, this Court finds that Defendants have compelling arguments for obtaining discovery of the statements that Plaintiff made to Mills about the events at dispute in this lawsuit. There is no basis for finding that the subpoena is not "reasonable in the circumstances" here if Respondents are subjected to the same criteria as other third parties. Were the Court to deny the requested discovery, it would effectively be applying a privilege that does not exist. Thus, the Court denies the motion to quash. At the same time, Defendants will not be permitted to have unrestricted discovery. As discussed below, the Court will impose limitations to ensure that the burden on Respondents is not greater than is necessary.

### 4. Limitations on Mills' Deposition

Respondents rightly point out that the subpoena to Mills "contains no subject limitations" and Defendants may seek to interrogate" him for hours not only about the interviews, but more generally about his reporting of alleged police misconduct. (Doc. 140, at 16.) Given Mills' profession and past work (both in this case and others like it), there is certainly more danger here than in a typical third-party deposition that the questioning could veer off in irrelevant directions and become harassing. For example, in the proposed written questions for Mills that Defendants drafted at the Court's request, there are a number of "why" questions.[9] These "why" questions ask that, if

---

[9] These questions were prepared because the Court was considering proceeding by way of a deposition on written questions. The parties disagreed about what questions should be asked and the wording of specific questions, necessitating argument. Upon further reflection, this written method is not a practical approach since, depending upon how Mills responds to any

Plaintiff made certain statements to Mills that were not reported, Mills "provide a full description of why not." (Doc. 172, at 3-4.) In the Court's view, the "why" questions are highly unlikely to lead to any relevant evidence and are particularly burdensome in that they would require Mills to divulge editorial judgments that he made.

To reduce the burden imposed on Respondents here, the Court will not allow any "why" questions to be posed to Mills. In addition, the Court will impose several other restrictions on Mills' deposition to curtail the risk that he will be subjected to an "unrestrained deposition to probe his newsgathering and articles[,]" and inquire about his editorial judgment. (Doc. 140, at 5; Doc. 154, at 4.) First, the deposition will take place in this Court's jury room so that the Court may quickly resolve any disputes, thereby relieving Mills of the need to return for another session. Second, counsel for Mills will be permitted to object and Mills may refuse to answer all questions that are beyond the scope of the deposition as defined in this Opinion.

What the Court will *not* do, however, is limit the deposition to questions that simply ask Mills to confirm Plaintiff's utterance of the three categories of statements that Defendants have identified as inconsistent with his deposition testimony. Respondents referred repeatedly during the motion hearings to a "slippery slope" and the need to limit discovery, at most, to asking Mills to confirm that a specific published statement was made. This Court does not read *McKevitt* and the lower court cases that have applied it as imposing such a rule. Based upon the facts and need presented in this case, the Court will allow Defendants to learn everything that Plaintiff said to Mills (including

---

given question, there may be a need for clarification or follow-up. This in turn would lead to another and time-consuming round of drafting questions, making objections, and seeking a ruling from the Court. Nevertheless, Defendants' drafting and submission of questions was a useful exercise to understand the specific information that Defendants seek to learn from Mills.

statements made in Mills' presence) about Plaintiff's coerced confession and the other subjects at issue. They may also ask questions to learn the duration of each interview, where it was done, who was present, how it was conducted, and whether Plaintiff showed or gave Mills any documents relating to the events in question.

### 5. Handwritten Notes of Interviews with Plaintiff

With respect to the handwritten notes made by Mills during the interviews, the Court has determined from its *in camera* review that the notes reflect in large part statements made by Plaintiff about the events at issue in this lawsuit. The notes on pages 3-6, 12-13 and 16 appear to reflect statements made by Plaintiff regarding the circumstances of his arrest, confession (including what police said and did to him to allegedly coerce the confession), and how and when he first informed police that he had been in a police lock-up on the night of the murders. In addition, pages 9-12 appear to reflect statements by Plaintiff about his whereabouts on the night of the murders, including what he was doing before and after he was placed in a police lock-up. Given the long passage of time since Plaintiff's initial interviews in 2001, the notes will likely prove quite useful, particularly those where Plaintiff's statements are shown in quotation marks. Since the Court is requiring Mills to sit for a deposition, the incremental burden of requiring Respondents to produce the relevant portions of the notes and for Mills to read them during his deposition is minimal.

Respondents also argue that requiring the production of notes discourages journalists from taking notes and may potentially compromise the accuracy of their reporting and service to the public. (Doc. 140, at 19.) Not only does the Court lack any particularized showing of this possibility (such as an affidavit from Mills), a speculative

harm does not justify denying discovery upon a showing of substantial need. In addition, Respondents may redact those portions of the notes that do not reflect Plaintiff's statements concerning the events at issue since these are unnecessary.[10]

Finally, Respondents ask that the notes be protected from disclosure as "confidential work product." (Doc. 140, at 17-18.) The Court declines to do so since only the portions of the notes reflecting statements of Plaintiff are being produced. *See Mosely*, 252 F.R.D. at 436 (distinguishing journalist's notes of what interviewee said which must be produced from notes of journalist's own "mental impressions, research endeavors, strategies, or anything else that may fairly be called work-product"); *see also Thayer*, 257 F.R.D. at 470 (rejecting a claim of "work product," in absence of a burden for producing documentary evidence that effectively resulted in a "backdoor attempt to impose a privilege").

### D. Analysis of Deposition Subpoena Regarding Statements of Other Potential Witnesses

The Court now turns to Defendants' request to depose Mills regarding his interviews of four individuals who are potential witnesses in the upcoming trial: Deon Patrick, Dennis Mixon, Adrian Grimes, and Andrea Phillips.

### 1. Deon Patrick

In the *Tribune* story about the case published on July 27, 2013, Mills wrote that he had a "lengthy interview this week at Menard Correctional Center" with co-defendant Deon Patrick. (Doc. 126-3, at 39.) The story described Patrick's recollection of how his

---

[10]    Respondents are to conduct their own review and, consistent with this Opinion, provide for *in camera* review another copy of the interview notes, highlighting those portions that they intend to produce. This should be submitted to the Court by November 9, 2015.

confession had been coerced. Mills attributed the following statements (among others) to Patrick:

> Patrick said he could not offer police an alibi after his arrest two weeks following the murders because he could not recall where he was that night. Later, though, he said he remembered he had been at the home of a friend's sister watching a football game on TV.

(Doc. 126-3, at 41.) During his deposition, Patrick said he not only remembered his alibi on the day of his arrest, but also told police early into his interrogation the specific location where he was on the night of the murders.

Q.      So just – just so I'm clear, when you were arrested by the police and talking to the police –

A.      Yes.

Q.      – you remembered where you were and what you did on November 16th of 1992?

A.      I remembered where I was at – at that particular moment, I remembered where I was at at [sic] the time this stuff happened. I knew I wasn't on Hazel and Agatite and I remembered I was with Rodney Matthews at his sister's house, and when I told them that, the next thing I heard was him screaming in the room, why was he in the room.

Q.      So you – you're – are you telling me that when the police talked to you, you remembered where you were that night on November 16, 1992?

A.      Yes.

                    *            *            *

Q:      So just so we're clear, when you're in police custody after you're arrested on December 2, 1992, at any point did you tell the police that you were at Rodney Matthews' sister's house at the time of the murders?

A.      Yes.

Q.      Okay. Did you tell them that you were watching the football game at Rodney Matthews' sister's house?

A.      I don't know if the conversation went that far.

Q.      Okay.  Did you tell – give them the name of Rodney Matthews' sister?

A.      Yes, and I also gave them her address.

Q.      At the time – we're talking about when – when the police were talking to you in December of 1992.

A.      Yes.

Q.      Okay.  You gave them Audrey Matthews' – did you give them Audrey Matthews' name?

A.      Yes.

Q.      Okay.  And you told them her address?

A.      They asked me where she lived, and I said on the corner of Foster and Wentworth.

                        *               *               *

Q.      All right.  But you're sure that you told the police that at the time of the murders that you were at Rodney Matthews' sister's house with Audrey Matthews and Rodney Matthews?

A.      Yes.

Q.      Okay.  At what point during your interrogation by the police did you tell them that?

A.      I can't think of a precise point, but it was early in the interrogation when they asked me where was I that day.

Q.      And you remembered at the early parts of the interrogation by the police where you were on November 16, 1992?

A.      Yes.

Q.      Okay.  You had no problems remembering your alibi immediately when the police started interviewing you?

A.      I was with Rodney Matthews every day, so that was like a gimme. That's who I was with, so...

Q.     No – you had no problem remembering that?

A.     No.

(Doc. 126-8, at 1-2; Doc. 148-3.)  When Patrick was asked whether he told Mills what was reported in the story, Patrick said he was unable to recall.  (Doc. 126-8, at 2.)

Defendants say the statements reported by Mills in the *Tribune* story are contrary to Patrick's deposition testimony.  (Doc. 126, at 7; Doc. 148, at 11-14.)  Consequently, they want discovery from Mills to gain impeachment evidence for use if Patrick is permitted to testify at trial over their objection.  They believe Plaintiff will offer evidence from Patrick since the complaint alleges that the Defendant Officers coerced confessions from the co-defendants using the same tactics that they used against Plaintiff.  (Doc. 1, at 6-7; Compl. ¶¶ 24-26.)

Based on the totality of Patrick's deposition testimony, this Court is satisfied that the deposition testimony is inconsistent with the statements attributed to Patrick in the August 7, 2013 *Tribune* story.  The Court also agrees that Defendants would have a need for the discovery *if* Patrick were to testify at trial about when he recalled his alibi. As Defendants argue, Patrick would not be a peripheral witness since Plaintiff's claims are based, in part, upon the experiences of his co-arrestees, including Patrick.  Patrick's credibility (like Plaintiff's) will be very important.  At the same time, it is still unclear at this point whether Plaintiff will call Patrick as a witness.  Even if he does, Defendants intend to seek to bar his testimony.  In the event Patrick *does* testify at trial, Mills could only be called to testify if it becomes necessary to impeach Patrick.  If Patrick acknowledges on the stand his apparent statement to Mills (or the parties stipulate to his statements), there will be no need for Mills to testify at all.  Finally, even were Mills to

be called as a witness, his testimony would be quite limited: he would merely confirm (or not) that Patrick made the statement about not recalling his whereabouts until after the confession.

In other words, although Defendants have a need for the discovery and the questions of (and thus, burden on) Mills are quite limited, the purpose of impeachment alone on this single point is far less a counterbalance to the burden of a deposition. Nevertheless, the Court will allow limited questions about Patrick because Mills will already be sitting for a deposition about his interviews of Plaintiff. There is little additional burden in requiring him to affirm (or not) the statements attributed to Patrick in the August 7, 2013 *Tribune* story. Accordingly, Mills must answer confirmatory question(s) about Patrick's statement and also respond to straightforward questions seeking to learn: (1) the dates of interviews/conversations with Patrick about the events at issue; and (2) whether there are any notes or recordings of these interviews and, if so, where they are now. At this juncture, Defendants have not established a need for discovery in excess of these limits.

## 2. Grimes, Mixon, and Phillips

Defendants also seek discovery from Mills regarding his interviews of Adrian Grimes, Dennis Mixon, and Andrea Phillips. At the motion hearings, Respondents argued that the Court should deny this request out of hand because Defendants failed to address this discovery in their motion to compel. While Defendants took issue with this, the Defendants mention of Grimes and Mixon was only in the context of rebutting Respondents' argument that *Wilson v. O'Brien* is distinguishable from this case. (*See* Doc. 148, at 17-19.) Otherwise, nowhere in their motion or responsive brief did

Defendants state that they required discovery from Mills about his interviews of these three individuals, and why. Instead, the motion to compel included a catchall statement that the discovery that *was* explicitly discussed (that is, Mills' interviews of Plaintiff and Deon Patrick and his investigation of the *Brady* claims) represented "only a few examples of critical information retained by the Tribune and Mr. Mills" and that "Mr. Mills interviewed numerous other key witnesses in this case and may have additional important impeachment evidence as a result." (Doc. 126, at 13.)

During a hearing on February 13, 2015, the Court said it would not allow an "open ended" deposition of Mills and required Defendants to specifically identify the people and topics about which they wanted to question him. At the tail end of that hearing, Defendants first raised the issue of discovery concerning the interviews of Grimes and Mixon, but there was insufficient time to take up the topic. During the next hearing, on March 9, 2015, the Court informed the parties that it was considering allowing discovery by deposition on written questions (as earlier noted), and thus the Court directed Defendants to draft proposed questions for Respondents and the Court to review. Defendants offered to provide more information on why they needed discovery concerning the interviews of Grimes, Mixon, and Phillips and did so at that time. Respondents then objected to discovery from these new and non-party witnesses that had not been subject to briefing. After hearing argument, the Court took the issue under advisement, and instructed Defendants to include proposed written questions for Mills regarding these persons while the Court considered the issue. The Court also requested a copy of the deposition of Grimes.[11] During the final hearing, on April 13,

---

[11]     Defendants later filed excerpts of Grimes' deposition on October 22, 2015 (Doc. 243).

2015, the Court heard Respondents' objections to the proposed written questions on all topics, including the questions relating to Grimes, Mixon, and Phillips.

Based on the facts of this case and the record before it, the Court is not persuaded that it should completely deny all discovery as to these three witnesses. However, as discussed below, the Court will strictly limit the discovery for now due to the lack of briefing on these matters as well as the possibility that more extensive and burdensome discovery will ultimately prove to be unnecessary.

### a.    Recantation of Adrian Grimes

Adrian Grimes testified at the 1995 criminal trial that he saw Plaintiff in a neighborhood park around 7:30 p.m. on the night of the murders, about 45 minutes after police records show he was arrested and taken into custody and a little more than an hour before the murders at 8:43 p.m.  Prosecutors relied on Grimes' testimony to rebut Plaintiff's alibi that he was in a police lock-up when the murders were committed. Approximately six years after the trial, Mills interviewed Grimes and heard him recant his testimony.  Defendants are not speculating that this happened; indeed, as reported in the December 19, 2001 story:

> Adrian Grimes, a prosecution witness, told the Tribune that he lied when he testified before a grand jury and at trial that Taylor was at the park a short time before the murders occurred.  He said that while the trial was under way, he was picked up on a felony narcotics charge that had been dismissed for a lack of evidence earlier that year.  But prosecutors re-indicted him and an arrest warrant was issued that allowed police to take him into custody.  Grimes said two police officers, whose names he could not recall, threatened to keep him locked up if he did not cooperate in the Taylor case.

> "I wasn't even at the park," Grimes said in an interview in Logan Correctional Center in Lincoln, where he is serving time for drug possession.  "But [the police] kept saying, 'If you testify this guy right here

was at the park, we'll let you go.'  They told me, 'Won't nobody care about him.  He ain't got no family.  It won't be nobody's loss.'"

*   *   *

Grimes said he now regrets his part in Taylor's trial.  "My intention wasn't to hurt no one.  Only thing they wanted me to do is point him out and say he was at the park," Grimes said.  "But they used me to destroy a perfectly good young man's life."

(Doc. 126-3, at 13-14.)

About thirteen years after the interview was reported in the *Tribune* story, Defendants deposed Grimes in this lawsuit.  They sought to learn the circumstances surrounding his recantation.  Grimes testified that two male reporters (he did not recall their names) showed up unexpectedly at the prison and said they wanted to talk to him about the Daniel Taylor case.  He did not remember exactly what they said but gave his best recollection, as follows.[12]

Q:  Tell me your best recollection.

A:  Just asked me questions.  That's when I found out that he was locked up when this murder had supposed to have taken place.  He was already in custody.

Q:  [The *Tribune* reporters were] the ones who told you that?

A:  Yes.  And they said, So how could he even had something to do with it if he was locked up in custody?  Because they showed different dates when he was locked up and different dates when the murder had took place, saying how could it be.

*   *   *

Q:  Then what happened?

A:  They said this man is innocent.

Q:  And then what did you say?

---

[12] Grimes said he was sure the reporters had a tape recorder.  Respondents have informed the Court that they do not have any tapes of this interview and the subpoena to the *Tribune* did not request them in any event.

A:      I said, Yes, he is.

Q:      And then what did they say?

A:      Could you talk to us about the case, what's going on?  I mean what actually really happened?  I'm like, I can't remember certain things about it.

(Doc. 243, at 7.)  Counsel proceeded to ask whether the reporters had told Grimes that Plaintiff was innocent *before* he recanted his testimony.  Grimes responded: "No.  I can't recall that.  They was just telling me the information about what was going on."  (*Id.*)

Regarding their need to depose Mills, Defendants do not claim that his testimony will necessarily impeach Grimes.  Instead they argued during the hearing that they need the discovery from Mills to learn what led to the recantation.   In their view, it is highly unlikely that Grimes would sit down with a reporter and suddenly recant, and so they suspect that there is more to it.  They want to learn from Mills the timing and sequence of what happened: whether Grimes initially stood by his testimony and denied giving false testimony (and for how long), and whether Mills then informed Grimes of any "new evidence" suggesting that Plaintiff was not involved in the murders.  If so, they want to know what Mills said to Grimes or showed him about the new evidence – whether, for example, Grimes was told before recanting that Plaintiff was innocent or that he was in a police lock-up on the night of the murders.  Respondents counter that Defendants have no need to depose Mills since they already have learned what happened from Grimes.  They believe Defendants' true purpose is to harass Mills because they don't like the fact that Grimes recanted his testimony.

It is unclear at this juncture whether Grimes will be called as a witness at trial. Given this fact and the lack of briefing, the Court is limiting the discovery to the following

questions: (1) when Grimes was interviewed and who was present; (2) whether Grimes made the statements attributed to him in the *Tribune* story; (3) whether anything was shown to Grimes during the interview and, if so, what; and (4) whether any notes or tapes were made of the interview with Grimes and, if so, whether these still exist (to Mills' knowledge).  After a trial date is set and if it becomes clear that Grimes will indeed be called to testify, then Mills should be required to provide more detailed information along the lines of what Defendants have identified.  The jury will need to decide whether to believe Grimes' original testimony (as Defendants may well argue, depending on what they learn from additional discovery) or his recantation of that testimony (as Plaintiff will undoubtedly contend).  Since Grimes appears to have first recanted his trial testimony during an interview with Mills, it is reasonable for Defendants to seek discovery from Mills to try to learn how quickly Grimes recanted and what was said (or shown) before he did so.

In reaching this conclusion, the Court is persuaded by the similar circumstances of *Wilson v. O'Brien*, in which the court allowed a deposition of a *Tribune* journalist who informed a key witness of new facts and thereby garnered a recantation of her earlier testimony.  2009 WL 763785, at *2, 9.  The witness (an attack victim) had identified the plaintiff in an earlier criminal case as the offender, and she recanted her earlier testimony upon learning from the journalist of various case facts and a court's exoneration of the plaintiff.  The court found that the journalist's interviews with the witness and her reactions to his statements about the case were "crucial" and would likely be used by the defendants in "crafting their defenses" to malicious prosecution and other claims.  *Id.* at *9.

Since no one else was present when Grimes recanted other than the Mills (and perhaps another *Tribune* reporter), there is no other source for this information other than Grimes that will assist Defendants in learning whether there is a basis for challenging his recantation. The difficulty here is that the interview apparently was thirteen years ago, so it is possible that Mills has no recollection of what was said. If he also lacks notes of the interview, he may have nothing to refresh his recollection except the stories themselves. In this sense, it is somewhat speculative whether Mills will be able to provide useful information. But if he cannot, then there is no burden in saying so and he may even prefer to do so in the upcoming deposition to avoid a future (and fruitless) deposition closer to trial (in the event that Grimes is going to testify).

**b.      Recantation of Dennis Mixon**

Unlike Grimes, co-defendant Mixon did not testify at Plaintiff's criminal trial. He did, however, give a statement in 1993 (recorded by a stenographer) implicating Plaintiff and the other co-defendants in the murders. Defendants do not need to speculate as to whether Mills has relevant information. They know from two *Tribune* stories that Mixon was interviewed at least twice about the events in this case. The December 19, 2001 *Tribune* story reported:

> In an interview at Stateville Correctional Center, Mixon acknowledged he was in the building courtyard around the time of the murders. But he denied that he was involved. He insisted that Taylor and the six other defendants were wrongly charged.

> "The guys they had in this case with me, they never set foot in that apartment," Mixon said. "Daniel Taylor, he wasn't even there."

(126-3, at 13.)

Approximately one year later, the January 2, 2003 *Tribune* story reported another interview with Mixon in which he admitted to his own involvement in the murders and explained why he had falsely implicated Plaintiff and his other co-defendants but now wanted to tell the truth:

> Last month, Dennis Mixon gave the Tribune a detailed account of the murders that included his admission that he was involved and the name of a man that Mixon says fired the fatal shots.
>
> \*    \*    \*
>
> In the interview, Mixon said that Taylor, Gardner, Patrick and Phillips were not connected in any way with the crime.  "I had never seen those guys before," Mixon, now 41, said of his co-defendants, most of whom were a decade younger.  "I met them in jail."
>
> \*    \*    \*
>
> Mixon said that when he was arrested, he was carrying some drugs, which he swallowed to avoid detection.  The drugs, he said, made him sick and vulnerable to detectives pressuring him to confess and to implicate the seven other suspects.  He said that police told him that they would help him if he told them what they wanted to hear.  He said he believed them because his father was a Chicago police officer and he thought the other officers might even let him go as a professional courtesy.  "We struggled back and forth and I finally said, 'OK.  Let's go.  I'll give you what you want,'" Mixon said.
>
> \*    \*    \*
>
> He said detectives, and later a prosecutor, rehearsed the statement with him, and that he then repeated it to a court reporter who transcribed it.
>
> \*    \*    \*
>
> Mixon told the Tribune that he is now telling the truth in the hope of having a chance at someday being free, although his account leaves him liable for murder under the state's accountability laws.  Mixon said he would cooperate with Cook County prosecutors and give them the name of the man whom he believes committed the murders.  Mixon said he hopes his admissions will lead to justice for the defendants in the case.  "I can sleep better," he said.

(*Id.* at 1-2, 4-5.)

As with Grimes, Defendants argue that they need to depose Mills to learn the circumstances leading to Mixon's recantation. It is also possible that Mixon could be permitted to testify about how Defendant Officers pressured him to implicate Plaintiff in the murders. But given the lack of briefing and the uncertainty over whether Mixon will even be a witness at trial, the Court is limiting discovery at present to the following: (1) when Mixon was interviewed and who was present; (2) whether Mixon made the statements attributed to him in the *Tribune* stories; (3) whether anything was shown to Mixon during his interviews and, if so, what; and (4) whether any notes or tapes were made of the interview with Mixon and if so, whether these still exist. Again, after a trial date is set and if it becomes clear that Mixon will testify, then Mills should be required to provide more detailed information about the Mixon interviews to the extent that he is able to do so. As the first *Tribune* story noted, Mixon's testimony could be significant since his "confession is the only one that was made after police learned of the lockup records that gave Taylor an alibi. It also is the only confession to work Taylor's time in police custody into the narrative of the murders, providing details that would bolster the police account of what happened that night." (*Id.* at 11.)

### c. Andrea Phillips

Andrea Phillips is the mother of co-defendants Akia Phillips and Paul Phillips.[13] She did not testify at Plaintiff's criminal trial. According to the December 19, 2001 *Tribune* story, on the night of the murders, two police officers went to Ms. Phillips' apartment looking for a youth they said they spotted in an alley near the murder scene but who fled into the apartment building. While in Ms. Phillips' apartment, they found a

---

[13] As noted earlier, Paul Phillips was convicted but later granted a Certificate of Innocence. He has filed his own civil lawsuit against Defendants. *Phillips v. City of Chicago*, No. 14 C 0372. The criminal case against Akia Phillips was dismissed before trial.

small amount of cocaine and arrested her. At Plaintiff's criminal trial, the officers testified that when they left her apartment at about 9:30 p.m., they saw Plaintiff on the street and asked him to help them find one of Phillips' sons. They then drove around with Plaintiff for ten or fifteen minutes to look for him before dropping Plaintiff at a shelter at 10 p.m. Prosecutors used this evidence to contradict police records showing that Plaintiff was in a police lock-up until 10 p.m. that evening. According to the *Tribune* story, when Ms. Phillips was interviewed by reporters (six years after the criminal trial), she said the officers did not leave her apartment until after 10 p.m. She recalled that they remained in the apartment until then because they were watching a TV news report about police officers with criminal records that aired at 10 p.m. that night.[14] (Doc. 126-3, at 12-14.)

Defendants argue that they should be permitted to depose Mills about the interview with Ms. Phillips because they expect her to be a witness and may discover potentially inconsistent statements. Despite having deposed Ms. Phillips, Defendants have identified no specific reason to think that she said anything to Mills during her interview that might be used to impeach her testimony. Under these circumstances, the Court agrees with Respondents that there is no need at this juncture to depose Mills about the interview of Ms. Phillips. At most, if Ms. Phillips were to testify at trial and if she were to say something inconsistent with what she reportedly said to Mills, and if she were then to be confronted with the prior inconsistent statement and deny making it, Mills could be called to testify for the limited purpose of affirming that she indeed made the inconsistent statement to him. This very limited discovery can wait until closer to

---

[14] A report on that subject was, in fact, the lead story broadcast on WMAQ-Ch. 5 news the night of the murders.

trial if Defendants are able to show a need for it.  As for the written deposition questions drafted by Defendants, the Court is not in the least persuaded that there is a need to learn from Mills whether, prior to interviewing Ms. Phillips, he attempted to determine the contents of any segments that aired on the local news that night and to describe the nature of "any and all such attempts (i.e., who you contacted, the manner in which said request was made, etc.), the date each such attempt was made, and the result of any such attempts."  (Doc. 172, at 7-8.)  Similarly, there is no need for Mills to "[d]escribe in detail the manner in which you obtained the information that '[a] report [about police officers with criminal records] was, in fact, the lead story broadcast on WMAQ-Ch. 5 news the night of the murders.'"  (*Id.* at 8.)

### E.    Discovery Regarding *Brady* Claims

The final proposed area of discovery that Defendants seek (one that was briefed by the parties) relates to Plaintiff's *Brady* claim that the police suppressed evidence of the existence and whereabouts of James Anderson, who police records show was in the same lock-up cell as Plaintiff on the night of the murders.  (Compl. ¶ 36.)  The *Tribune* story stated:

> The Tribune also discovered police reports in the files prosecutors turned over to one of Taylor's co-defendants that Taylor's lawyer said he never received.
>
> One report, dated December 29, reads: "Need to locate James Anderson concerning the Lassiter Homicide.  Anderson was locked up in 023 District with [Taylor] . . . ."  A report two days after that indicates that the police were still looking for Anderson.
>
> *          *          *
>
> In an interview with the Tribune at the Champaign County Jail, where he was being held on a bad-check charge, Anderson said that the police did find him.  He recalled that he had been arrested on the day of the murders on a warrant for retail theft.

                \*            \*            \*

> Diamond-Falk said the reports could have been used to find Anderson and bolster Taylor's alibi.  "Why didn't I get this? Why?" he asked, looking at the papers.  "I should have gotten this."

                \*            \*            \*

> [Diamond-Falk] said he never tried to track down any of the prisoners who might have been in the lockup with Taylor.  "I'm a . . . moron," he said, shaking his head.

(Doc. 126-3, at 14-15.)

Based on this story, Defendants believe Mills will be able to provide testimony that Mills "was, in fact, able to locate the allegedly withheld reports [about Anderson] in the 'prosecutor's files' and locate [Anderson]."  (Doc. 126, at 6.)  But the story did not say that the reporter examined *prosecutor's files*; it said that the *Tribune* examined files that prosecutors "turned over to one of Taylor's co-defendants."  (Doc. 126-3, at 14.)  Moreover, this examination by the reporter appears to have occurred in 2001 – six years after the trial.  The fact that a co-defendant's file contained these reports in 2001 does not mean the file produced to Diamond-Falk prior to trial in 1995 contained the reports.

Even if such testimony from Mills were admissible, Defendants have not explained why they need it when there appear to be other and more direct sources of evidence on this subject.  For example, Defendants have not explained why they cannot obtain the co-defendant files from their criminal defense attorneys and offer the files into evidence for the jury to examine.  In addition, rather than having a reporter testify to what a co-defendant's file from the prosecutor contained when the reporter viewed it in 2001, Defendants presumably can obtain testimony from both the criminal defense attorneys and the prosecutors about what was in these files during the relevant time

period prior to the trials in the early 1990s. This Court is aware from other motion practice in this case that Defendants have obtained some helpful evidence from criminal defense attorneys who retained their case files and who presumably have been or will be deposed.

Defendants further posit that the *Tribune's* "successful attempts to locate and interview Mr. Anderson are also directly and uniquely relevant to plaintiff's *Brady* claim insofar as they reveal that Mr. Anderson could be easily located with the exercise of reasonable diligence." (Doc. 148, at 9.) Again, this Court is not persuaded. The fact that Mills apparently was able to track down Anderson in 2001 at a time when he was incarcerated is not probative of whether he was easily located six years earlier at the time of trial. Indeed, if the testimony of Defendant Officers is to be believed, even the police were unable to locate Anderson at that time. Were it relevant that Anderson could be located in 2001, Defendants still have failed to demonstrate that they have a substantial need to obtain this evidence from Mills in particular. In sum, there is no reason to require Mills to disclose his techniques for tracking down potential witnesses until and unless Defendants demonstrate a substantial need and inability to gather this evidence elsewhere.

Finally, Defendants seek testimony from Mills regarding the statements in the *Tribune* story attributed to attorney Diamond-Falk. They believe evidence that Diamond-Falk did not look for lock-up cellmate Anderson is "directly relevant to [Plaintiff's] prima facie element on his *Brady* claim of reasonable diligence to obtain the evidence he alleges was suppressed." (Doc. 126, at 13.) This may be true, but Mills cannot testify to Diamond-Falk's hearsay statement in 2001. At most, Mills can be

called for impeachment if Diamond-Falk denies telling Mills that he failed to search for prisoners who were in the lock-up with Plaintiff. At this point, it is unclear whether this impeachment testimony is necessary. This Court has not been given deposition testimony from Diamond-Falk stating that he *did* search for the cellmates in the lock-up or denying that he said the opposite to Mills.

For all of these reasons, Defendants have failed to demonstrate a need for discovery from Mills regarding the *Brady* claims so shall not question him on this topic at his deposition.

## CONCLUSION

For the reasons stated above, Defendants' Motion to Compel (Doc. 126) is granted in part and denied in part, and Respondents' Motion to Quash (Doc. 138) is denied.

ENTER:

Dated: October 29, 2015

_____
SHEILA FINNEGAN
United States Magistrate Judge