**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **DANIEL TAYLOR,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **No. 14 C 737** |
| | ) | |
| **CITY OF CHICAGO, et al.,** | ) | **Judge John Z. Lee** |
| | ) | **Magistrate Judge Finnegan** |
| | ) | |
| **Defendants.** | ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff Daniel Taylor served more than 20 years in prison for two murders before obtaining a Certificate of Innocence in January 2014. He has filed a lawsuit under 42 U.S.C. § 1983 alleging that the City of Chicago (the "City"), several Chicago police officers, and unidentified City employees violated his Fifth and Fourteenth Amendment rights, in part by coercing him into making a false confession to the murders, and by hiding exculpatory evidence proving his innocence in violation of *Brady v. Maryland*, 373 U.S. 83 (1963). He also asserts claims for failure to intervene, conspiracy and malicious prosecution, as well as a *Monell* claim against the City.

Currently before the Court is Defendants' motion to compel Plaintiff's psychiatric records from Yellowstone Treatment Centers ("Yellowstone") in Billings, Montana. Plaintiff was a patient at Yellowstone from September 17 to 23, 1992, returning to Chicago just a few months before the arrest giving rise to this lawsuit. Plaintiff produced the records in heavily redacted form, asserting that the withheld information is protected from disclosure by the psychotherapist-patient privilege. Defendants argue that Plaintiff has expressly waived the privilege by disclosing the Yellowstone and other

psychotherapy records to third parties and providing discovery responses and deposition testimony about his mental treatment history. Defendants also contend that Plaintiff impliedly waived the privilege by seeking to recover damages for severe emotional distress, which has placed his psychological state at issue in the case.

Plaintiff denies that he did anything to expressly waive the privilege. He also contends that he has not impliedly waived the privilege since he "seeks redress for the obvious and intrinsic damages that flow from Plaintiff's 20 years of undue imprisonment[,]" but has not sought to introduce "any evidence of his psychological treatment, conditions, or symptoms...." (Doc. 272, at 1). Plaintiff states that he "has offered to stipulate to that fact, thereby limiting his damages to those that naturally flow from the misconduct alleged in the Complaint—so-called 'garden variety' damages." (*Id.*).

As explained below, this Court finds that Plaintiff has not expressly waived the privilege over the Yellowstone records, but by seeking emotional distress damages, the waiver is implied. Nonetheless, only the relevant portions of the Yellowstone records must be produced. As discussed later, the relevancy determination will be made after hearing argument from the parties.

## BACKGROUND

### A.     Plaintiff's Allegations of Emotional Distress

Plaintiff has at all times alleged that he suffered "substantial" emotional pain by "losing 20 years in the prime of his life." (Doc. 1 ¶ 62). He claims that during his incarceration, he was "stripped of the various pleasures of basic human experience . . . which all free people enjoy as a matter of right," including "the ability to share holidays,

births, funerals and other life events with loved ones, the opportunity to fall in love and marry and to pursue a career, and the fundamental freedom to live one's life as an autonomous human being." (*Id.* ¶ 63). As a result of being "forced into a world of isolation in which he lost all contact with his friends and family in the outside world," Plaintiff alleges that he has "suffered tremendous damage, including . . . emotional damages, all proximately caused by Defendants' misconduct." (*Id.* ¶¶ 64, 65).

In response to an interrogatory asking whether he is "claiming any physical, medical, psychiatric, psychological and/or emotional injuries," Plaintiff answered "Yes. Plaintiff claims that he has suffered severe and lasting emotional trauma and pain and suffering as a result of the false conviction and imprisonment described in the complaint." (Doc. 264-1, at 9).[1] Another interrogatory asked Plaintiff to identify any doctor, psychologist, therapist, counselor or other health care professional who "treated, counseled, diagnosed, examined or otherwise provided assistance for any medical, mental, psychological, emotional, or physical condition between November 1992 and the present." Plaintiff stated that "[f]ollowing his conviction and sentence to prison, while he was confined at the Joliet Correctional Center, Plaintiff attempted suicide and was placed on suicide watch. At that time, Plaintiff was counseled by a mental health professional." (*Id.* at 9-10). Plaintiff also disclosed that he lived at several psychiatric facilities prior to his arrest, including the St. Joseph Center, the Illinois State Psychiatric Institute, and the Yellowstone Treatment Centers. (*Id.* at 8).

After receiving these responses, Defendants issued a subpoena to the Illinois Department of Corrections ("IDOC") for Plaintiff's psychiatric records. Plaintiff initially

---

[1]    For ease of reference, unless otherwise specified, page numbers for all briefs and exhibits are drawn from the CM/ECF docket entries at the top of the filed document.

asked to have the documents returned to his counsel for a privilege review, (Doc. 272-2, at 1), but four days later he changed his mind and confirmed he had "no objections" to the records going directly to defense counsel. (Doc. 264-3, at 2). Those records revealed that Plaintiff had made a suicide attempt and had monthly appointments with a psychiatrist from November 3, 1995 through May 29, 1997.

During his September 4, 2014 deposition, Plaintiff testified that he started receiving psychiatric treatment as early as age 10 or 11, and said "there were times when I s[aw] counselors" for depression prior to the incidents at issue in this case.[2] (Doc. 264-4, at 2, Taylor Dep., at 379-81). With respect to the suicide attempt, Plaintiff explained that "I couldn't take waking up to some bars and a toilet for the rest of my life for something I didn't do. And I, in my mind, I figured I would rather be dead than sit in prison for the rest of my life for something I didn't do. And I thought that that was an out I could take, and I tried." (*Id.* at 2-3, Taylor Dep., at 381-82).

## B.    The Yellowstone Records

In May 2015, the parties started discussing a protocol for subpoenaing Plaintiff's Yellowstone treatment records. It quickly became clear that there was a disagreement as to whether those records are protected by a psychotherapist-patient privilege. Defendant took the position that Plaintiff waived any such privilege by seeking damages for severe emotional injury as described above. (Doc. 264-6, at 2) ("[T]here is no possible basis to assert a privilege over any of [Plaintiff's] mental health records" in light of his claim for psychological injuries). Plaintiff denied that any waiver occurred,

---

[2]    Plaintiff disclosed his history of behavioral problems, including a temper, to a *Chicago Tribune* reporter as early as December 2001. (Doc. 264-5, at 4). He also discussed his suicide attempt during a press conference on February 3, 2014. (*See* http://abc7chicago.com/archive/9418166/, last visited on April 19, 2016).

stressing that he does not intend to introduce evidence at trial that he received psychological treatment as a result of Defendants' alleged misconduct. (Doc. 264-8, at 2-3). He also agreed to "cabin" his damages in a manner he believes would remove any doubt that the privilege remains intact: "Plaintiff agrees not to introduce evidence of his suicide attempt or following psychiatric treatment at trial." (Doc. 277-2, at 2).

Ultimately, Plaintiff produced redacted copies of the documents along with a privilege log asserting the psychotherapist-patient privilege. (Docs. 264-7, 264-9, 264-11). The unredacted portions of those documents show that Plaintiff had a thorough psychiatric evaluation in mid-September 1992, less than three months before the events giving rise to this lawsuit (most of the contents of that 11-page report have been redacted). The records further reveal that Plaintiff was discharged on September 23, 1992 and transported to Youth Services Center detention facility back in Chicago. Copies of the 5-page Discharge Summary (also largely redacted) were sent to Barbara Andrews-Evans, his caseworker from the Department of Children and Family Services ("DCFS"), and John Howell from TASC/TAPP (Treatment Alternatives for Safe Communities/Teacher Academy for Preparation and Pedagogy – a contractual program with DCFS designed to achieve more appropriate and stable placements for harder to place youth).

## DISCUSSION

### I.      The Psychotherapist-Patient Privilege

The Supreme Court affirmatively recognized a psychotherapist-patient privilege in *Jaffee v. Redmond*, 518 U.S. 1 (1996), holding that as a matter of federal common law, "confidential communications between a licensed psychotherapist and her patients

in the course of diagnosis or treatment are protected from compelled disclosure under Rule 501 of the Federal Rules of Evidence." *Id.* at 15. The privilege is rooted in the premise that "[e]ffective psychotherapy . . . depends upon an atmosphere of confidence and trust in which the patient is willing to make a frank and complete disclosure of facts, emotions, memories, and fears." *Id.* at 10. Since "disclosure of confidential communications made during counseling sessions may cause embarrassment or disgrace," even the "mere possibility of disclosure may impede development of the confidential relationship necessary for successful treatment." *Id.* For this reason, the promise of confidentiality is not "contingent upon a trial judge's later evaluation of the relative importance of the patient's interest in privacy and the evidentiary need for disclosure," as such a balancing test would "eviscerate the effectiveness of the privilege." *Id.* at 17. At the same time, the psychotherapist-patient privilege is not absolute and can be waived. *Id.* at 15 n.14. The *Jaffee* Court left the precise contours of such waiver for the lower courts to flesh out on a case-by-case basis.

## II. Waiver of Privilege

There is no dispute that the Yellowstone records are subject to a psychotherapist-patient privilege. Defendants argue, however, that Plaintiff has expressly waived the privilege by disclosing the Yellowstone and other psychotherapy records to third parties and providing discovery responses and deposition testimony about his mental treatment history. They also argue that Plaintiff impliedly waived the privilege by seeking to recover damages for severe emotional distress, which has placed his psychological state at issue in the case. This Court examines each argument in turn.

A.      **Express Waiver**

Defendants contend that Plaintiff expressly waived the psychotherapist-patient privilege "through his conversations with Chicago Tribune reporters, answers to written interrogatories, deposition testimony, and dissemination of portions of the Yellowstone records to Barbara Andres-Evans with the Department of Children and Family Services, and John Howeel [sic] of TASC/TAPP." (Doc. 264, at 9). This Court disagrees. Plaintiff's interrogatory answers disclosed that he was a ward of DCFS and lived for a time at the Yellowstone Treatment Centers, but they said nothing about the nature or extent of any psychiatric treatment he received or his communications with therapists. *See Hucko v. City of Oak Forest*, 185 F.R.D. 526, 531 (N.D. Ill. 1999) ("[T]he fact of plaintiff's consultations with psychotherapists either before or after his arrest, and the dates of those consultations, is not privileged."). The same is true for Plaintiff's conversations with the *Tribune* reporter, which included a cursory review of his time as a ward of DCFS who "struggled with behavioral problems, particularly a temper." (Doc. 264-5, at 4).

Plaintiff did, however, waive the privilege as to his IDOC therapy records by voluntarily disclosing them to Defendants and testifying about his suicide attempt and related treatment. *Awalt v. Marketti*, 287 F.R.D. 409, 420 (N.D. Ill. 2012) (citing *Dellwood Farms, Inc. v. Cargill, Inc.*, 128 F.3d 1122, 1127 (7th Cir. 1997)) ("A person who discloses privileged information to a third-party waives the privilege in the absence of an agreement to keep the information confidential."). That disclosure of therapy starting in late 1995 (at the age of 20) does not suffice as an express waiver of *all* psychiatric records for the preceding 20 years of Plaintiff's life.

That leaves the disclosure of Plaintiff's Yellowstone records to Barbara Andres-Evans, Plaintiff's caseworker with DCFS, and John Howell of TASC/TAPP. Since Plaintiff was a minor at the time with no control over his mental health records, the Court declines to find an express waiver on this basis.

**B.      Implied Waiver**

Defendants argue that the Court should find that Plaintiff impliedly waived the psychotherapist-patient privilege by seeking damages for severe emotional distress. Since *Jaffee*, courts across the country have been united in finding that such an implied waiver occurs where a plaintiff places his mental condition at issue. *See Doe v. Oberweis Dairy*, 456 F.3d 704, 718 (7th Cir. 2006) ("If a plaintiff by seeking damages for emotional distress places his or her psychological state in issue, the defendant is entitled to discover any records of that state."); *Schoffstall v. Henderson*, 223 F.3d 818, 823 (8th Cir. 2000) (collecting cases). The theory behind this principle is that a party "cannot inject his or her psychological treatment, conditions, or symptoms into a case and expect to be able to prevent discovery of information relevant to those issues." *Santelli v. Electro-Motive*, 188 F.R.D. 306, 309 (N.D. Ill. 1999). The challenge is determining when exactly a plaintiff's allegations meet the "at issue" threshold.

The Seventh Circuit has not yet addressed this question, and there is a divergence of opinion among courts that have done so, leading to three general approaches – "narrow," "broad" and "middle" or "garden variety." As one commentator has noted, the three approaches "can be neatly delineated in theory, [but] the terms lose their clarity in court decisions. Broad rules are stated in cases involving garden variety damages; narrow rules are stated in cases where waiver could be denied under

the broad rule; and there is no consensus as to the genus or species of the garden variety damages." Helen A. Anderson, *The Psychotherapist Privilege: Privacy and "Garden Variety" Emotional Distress*, 21 GEO. MASON L. REV. 117, 129 (Fall 2013). With this caveat, the Court briefly describes the three approaches.

### 1. Narrow Approach

Courts that adopt a "narrow" approach analogize to the attorney-client privilege and find the privilege waived only where a patient "use[s] the substance of her communication, by calling her psychotherapist as a witness, for example, or by testifying to the substance of the communication herself." *Vanderbilt v. Town of Chilmark*, 174 F.R.D. 225, 230 (D. Mass. 1997). *See also Booker v. City of Boston*, Nos. 97-CV-12534-MEL, 97-CV-12675-MEL, 1999 WL 73644, at *1 (D. Mass Sept. 10, 1999) (psychotherapist-patient "privilege is not waived unless the plaintiff makes positive use of the privileged material in the prosecution of her case."). These courts reason that a broad approach to waiver does not give sufficient weight to the privacy interests underpinning the privilege. *Fitzgerald v. Cassil*, 216 F.R.D. 632, 636 (N.D. Cal. 2003) ("The theory behind the *Vanderbilt* line of cases is generally based upon the primacy of the privacy interests inherent in the privilege and *Jaffee*'s rejection of the balancing approach.").

If the narrow approach were applied to the case at hand, Plaintiff would not have impliedly waived the privilege since he is not relying on testimony from any psychotherapists or his communications with therapists. But this Court declines to adopt the narrow approach as it potentially will "allow the privilege holder to thwart the truth seeking process by using the privilege as both a shield and a sword." *See Santelli*,

188 F.R.D. at 308; *Lanning v. Southeastern Pennsylvania Transp. Auth. (SEPTA),* No. Civ. A. 97-1161, 1997 WL 597905, at *2 (E.D. Pa. Sept. 17, 1997) ("If a plaintiff seeks damages for alleged emotional or psychological injuries, the defendant's case ought not be limited by the plaintiff's decision not to introduce available medical or psychological testimony that bears directly on the truth of the claim.") (internal quotations omitted).

## 2. Broad Approach

Courts following the "broad" approach generally find waiver whenever emotional distress damages of any kind are sought, holding that a plaintiff who has elected to seek emotional distress damages cannot fairly prevent discovery into evidence relating to this element of the claim. *Doe v. City of Chula Vista*, 196 F.R.D. 562, 569 (S.D. Cal. 1999) ("[T]o insure a fair trial, particularly on the element of causation, the court concludes that defendants should have access to evidence that Doe's emotional state was caused by something else. Defendants must be free to test the truth of Doe's contention that she is emotionally upset because of the defendants' conduct."); *Doverspike v. Chang O'Hara's Bistro, Inc.*, No. CIV. 03-5601 ADM/AJB, 2004 WL 5852443, at *3 and n.1 (D. Minn. July 13, 2004) ("Defendants have a right to determine whether [Plaintiffs] have relevant medical history that indicates their emotional distress was caused in part by events and circumstances independent of defendants' conduct."; "As between the two approaches, the cases finding that even garden variety distress claims waive applicable privileges are better reasoned . . . emotional distress is either part of the case or it is not.").[3]

---

[3] Some courts have interpreted the Seventh Circuit's decision in *Oberweis Dairy* as holding or at least suggesting that waiver occurs whenever a claim for emotional distress is made. *Flowers v. Owens,* 274 F.R.D. 218, 224 (N.D. Ill. 2011) (citing *Beltran v. County of Santa*

It is important to note that a finding of implied waiver under the broad approach does not necessarily mean therapy records are produced. As in any case, production turns on the relevancy of the records. *See, e.g., Langenfeld v. Armstrong World Indus., Inc.*, 299 F.R.D. 547, 554 (S.D. Ohio 2014) (rejecting concern that a finding of implied waiver would needlessly expose the plaintiff's old and private mental health treatment records since discovery requests must be limited on relevance grounds); *Doe v. City of Chula Vista*, 196 F.R.D. at 569 (criticizing the parties' "all or nothing approach" and directing the magistrate judge to review the mental health records *in camera* "to determine if, and to what extent, the evidence is relevant to Doe's claim for emotional distress damages."); *Sidor v. Reno*, No. 95 Civ. 9588(KMW), 1998 WL 164823, at *3 (S.D.N.Y. Apr. 7, 1998) ("[W]e recognized, as has the Weinstein treatise, that the records must be 'relevant' in time and subject matter … which is why we undertook to review Dr. Kolod's records in camera.").

Deferring the relevancy determination until after waiver has been found ensures that the waiver finding does not impermissibly turn on the evidentiary value of the therapy records. *Cf. Jaffee*, 518 U.S. at 17 (confidentiality is not "contingent upon a trial judge's later evaluation of the relative importance of the patient's interest in privacy and the evidentiary need for disclosure."). If a court conflates the waiver and relevancy analysis, then the waiver finding may vary depending on the content of the therapy records at issue rather than turn on whether the plaintiff has put her mental state at issue.[4] Applying the broad approach to the case at hand, the Plaintiff impliedly waived

---

Clara, No. C 03-3767, 2009 WL 248207, at *2 (N.D. Cal. Jan. 30, 2009); *Koch v. Cox*, 489 F.3d 384, 390 (D.C. Cir. 2007)).

[4]     Consider, for example, a plaintiff who seeks damages for emotional distress but intends to offer as evidence only her own testimony that she felt "down" and "depressed" for a few

the privilege since he put his mental state at issue by seeking damages for emotional distress. Whether the Yellowstone records must be produced, however, turns on their relevancy.

### 3. Middle Ground: "Garden Variety" Emotional Distress

Many courts have attempted to find a middle ground between the narrow and broad approaches, where waiver does not occur automatically because a plaintiff is seeking emotional distress damages, but neither can a plaintiff seek to recover for severe emotional distress while shielding therapy records by relying on other evidence of his mental condition. As noted below, this middle ground approach has frequently been applied by courts in this district, and so the parties have each analyzed the waiver issue under this approach. In Illinois, the "middle ground" approach has its roots in *Santelli*, a Title VII case where the plaintiff voluntarily agreed to limit the scope of her emotional distress claim to "compensation for humiliation, embarrassment, and other similar emotions." 188 F.R.D. at 309. As a result of this self-imposed restriction, the plaintiff sufficiently narrowed her claim to avoid waiving the privilege:

> She will be precluded at trial from introducing the fact or details of her treatment; she may not offer evidence through any witness about symptoms or conditions that she suffered (*e.g.*, sleeplessness, nervousness, depression); and she will not be permitted to offer any

months after an alleged discriminatory termination. Under the broad approach, the privilege would be waived regardless of the content of the therapy records since the plaintiff sought emotional distress damages and thereby put her mental state at issue. After finding waiver, the court would examine the records for relevancy. If the therapy records were probative (e.g., they revealed that the plaintiff was treated during the same period as the alleged emotional distress but for depression stemming from the death of a close friend, and she said nothing to her therapist about problems at work), the records would be produced. Conversely, if the therapy records were irrelevant (e.g., they disclosed treatment that ended five years before the discriminatory termination), the court would not require production of these private records. If the plaintiff opted to entirely withdraw the request for emotional distress damages, the records would be protected from disclosure even if they bore directly on the issues in the case (e.g., the plaintiff provided a detailed description to the therapist of each of the events alleged in the lawsuit which contradicted the plaintiff's later deposition testimony in material ways).

evidence regarding a medical or psychological diagnosis. Rather, she will be permitted to testify only that she felt humiliated, embarrassed, angry or upset because of the alleged discrimination.

*Id*.

Following *Santelli*, courts in this district have found that waiver of the psychotherapist-patient privilege occurs only where a party claims more than mere "garden variety" emotional damages. *Flowers v. Owens*, 274 F.R.D. 218, 225 (N.D. Ill. 2011). The concept of garden variety distress has been applied most frequently in the employment context, where it is not hard to imagine a person feeling a general sense of embarrassment and humiliation after an allegedly discriminatory termination. *See, e.g., Santos v. The Boeing Co.*, No. 02 C 9310, 2003 WL 23162439, at *2 (N.D. Ill. Oct. 21, 2003) (in employment discrimination case, plaintiff did not waive privilege by alleging garden variety emotional distress); *Noe v. R.R. Donnelley & Sons*, No. 10 C 2018, 2011 WL 1376968 (N.D. Ill. Apr. 12, 2011); *EEOC v. DHL Exp.*, No. 10 C 6139, 2011 WL 6825497 (N.D. Ill. Dec. 27, 2011); *Nolan v. Int'l Bhd. of Teamsters Health & Welfare and Pension Funds, Local 705*, 199 F.R.D. 272 (N.D. Ill. 2001); *Doe v. Oberweis Dairy*, No. 03 C 4774, 2004 WL 1146712 (N.D. Ill. May 21, 2004); *E.E.O.C. v. Area Erectors, Inc.*, 247 F.R.D. 549 (N.D. Ill. 2007); *Kronenberg v. Baker & McKenzie LLP*, 747 F. Supp. 2d 983, 994 (N.D. Ill. 2010); *Taylor v. ABT Electronics, Inc.*, No. 05 C 576, 2007 WL 1455842, at *2 (N.D. Ill. May 14, 2007); *Santelli*, 188 F.R.D. 306,

A few courts have applied the garden variety analysis in Section 1983 cases as well. In *Flowers*, for example, the plaintiff alleged that he was beaten while in custody at a county correctional facility on May 2, 2007, and suffered resulting emotional distress. 274 F.R.D. at 220. The court held that the plaintiff could avoid waiving the

psychotherapist-patient privilege by testifying solely about the "ordinary and usual emotions that one in [his] position would feel" as a result of the "events of May 2nd." *Id.* at 227. This included general testimony about his "humiliation, embarrassment, anger, and feeling depressed, anxious and dejected as a result of his encounter with the defendants." *Id. See also Awalt*, 287 F.R.D. at 420 (no waiver of privilege where plaintiff in wrongful death case against jail personnel sought only garden variety emotional damages for her husband's loss); *Hucko*, 185 F.R.D. 526 (plaintiff alleging misconduct during the course of his arrest did not waive privilege by seeking damages for "humiliation, emotional distress, [and] pain and suffering.").

But the *Flowers* court ruled that many other topics remained off limits under the garden variety formulation. The plaintiff could not maintain the privilege if he testified about his symptoms or conditions such as persistent fear of retaliation, his fear of leaving his home, or the fact that he relives the events of May 2nd whenever he sees a Will County police officer. *Id.* As the court noted, some of these reactions were suggestive of diagnosable conditions like PTSD and agoraphobia even if the plaintiff did not use those labels. *Id.* at 227-28.

### 4. Problems with Middle Ground "Garden Variety" Approach

The problem that has emerged from the "garden variety" approach is that the phrase is inherently imprecise, leading to "'very different notions of what could grow in the garden.'" *Caine v. Burge*, No. 11 C 8996, 2012 WL 6720597, at *4 (N.D. Ill. Dec. 27, 2012) (quoting *Flowers*, 274 F.R.D. at 220); *Langenfeld, Inc.*, 299 F.R.D. at 552 ("[D]ifferent courts have used the term 'garden variety' damages to mean different things...."). As a result, courts face a difficult task in trying to "carefully evaluat[e] the

kind of emotional distress claimed before concluding whether the privilege has been waived or not." *Awalt*, 287 F.R.D. at 418.  Not surprisingly, this has led to variation in how courts define "garden variety" emotional distress so as to encompass the particular facts in the cases before them.

Some courts hold that emotional distress falls into the garden variety category when limited to "the negative emotions that [plaintiff] experienced essentially as the intrinsic result of the defendant's alleged conduct," but not the "resulting symptoms or conditions that she might have suffered."  *Flowers*, 274 F.R.D. at 220, 225 (quoting *Santelli*, 188 F.R.D. at 309 and collecting additional cases).  *See also Awalt*, 287 F.R.D. at 418 ("garden variety" damages are those "limited to the typical negative emotional impact on the plaintiff that obviously flow from the defendant's alleged misconduct.").  Of course, this raises the question of what qualifies as a "symptom."  In *Flowers*, for example, the plaintiff was precluded from testifying that he relived the excessive force experience whenever he saw a Will County police officer, yet was allowed to testify that seeing a Will County police officer in a restaurant made him feel "uncomfortable" such that he could not enjoy the dinner.  *Id*. at 227-28.

Other courts define emotional distress to be garden variety where a plaintiff "neither alleges a separate tort for the distress, any specific psychiatric injury or disorder, or unusually severe distress."  *Awalt*, 287 F.R.D. at 417 (quoting *Koch v. Cox*, 489 F.3d 384, 390 (D.C. Cir. 2007)).  What qualifies as unusually severe distress is again subject to interpretation, and of course it is ultimately the jury that must decide the severity of the distress (and the appropriate award) based on the evidence at trial, which cannot always be predicted with certainty.  Still other courts consider the duration

of the distress to be significant, holding that garden variety emotional distress is limited to short-term negative emotions. *See Langenfeld*, 299 F.R.D. at 552-53 (collecting cases) ("The rule that emerges from the above-referenced case law is that, when a plaintiff limits his or her damages claim to short-term negative emotions that would typically flow from an adverse employment action—i.e., what the parties refer to as 'garden variety' damages—he or she does not put his/her mental state 'at issue' so as to waive the psychotherapist-patient privilege."). Again what qualifies as "short term" is unclear.

The difficulty of defining garden variety emotional distress and the resulting unpredictability of this approach has led some courts to criticize the approach and decline to apply it. *See Jones-McNamara v. Holzer Health Sys.*, No. 2:13-CV-616, 2015 WL 196415, at *1 (S.D. Ohio Jan. 15, 2015) (criticizing the "attempt[] to parse a line between . . . 'garden variety' emotional distress damages and more serious, ongoing emotional distress damages[,]" and finding "such a fine distinction unworkable where, as here, the record suggests that other stressors may inform a plaintiff's emotional state and her related damages claims."); *Fitzgerald*, 216 F.R.D. at 636-37 ("[T]he use of a test for waiver that hinges on an after-the-fact judicial assessment of numerous qualitative factors introduces a risk of uncertainty that the Supreme Court in *Jaffee* sought to avoid.").

### 5.    Plaintiff's Emotional Distress is not Garden Variety

The flaws with the garden variety approach to determining implied waiver are even more apparent when considered in the context of this case. On the one hand, Plaintiff has not alleged a separate tort for emotional distress, and is not calling an

expert to testify to his distress or offering any treatment records into evidence. While he attempted suicide due to depression shortly after his incarceration, he states that he will not offer evidence of the suicide attempt, the subsequent psychiatric treatment he received, or his diagnosis. (Doc. 272, at 6, 10).

On the other hand, the allegations of mental distress here go much further than those set forth in the other Section 1983 cases, as Plaintiff is seeking emotional damages for "substantial" emotional pain by "losing 20 years in the prime of his life" through his wrongful incarceration. (Doc. 1 ¶ 62). He alleges "tremendous" and "severe" emotional damages with "lasting emotional trauma and pain and suffering." (Doc. 1 ¶¶ 63, 65; Doc. 264-1 at 9). He alleges that during his incarceration, he was "stripped of the various pleasures of basic human experience . . . which all free people enjoy as a matter of right," including "the ability to share holidays, births, funerals and other life events with loved ones, the opportunity to fall in love and marry and to pursue a career, and the fundamental freedom to live one's life as an autonomous human being." (*Id.* ¶ 63). As a result of being "forced into a world of isolation in which he lost all contact with his friends and family in the outside world," Plaintiff alleges that he has "suffered tremendous damage, including . . . emotional damages, all proximately caused by Defendants' misconduct." (*Id.* ¶¶ 64, 65).

Following his release, Plaintiff told a *Chicago Tribune* reporter that he would not leave his apartment for days at a time, he would constantly carry proof of innocence, he was unsure of himself in crowds, he had trouble falling asleep, and he would lock his bedroom door at night because he feared that if his niece woke him up he might react in anger. (Doc. 275, at 4; Doc. 275-2, at 3-4). As in *Flowers*, these statements arguably

reflect "emotional reactions [that] are strikingly similar to diagnostic criteria for medical issues" such as PTSD, agoraphobia or other anxiety disorders. (*Id.*).

In this Court's view, these allegations of severe and long-lasting emotional distress cannot fairly be characterized as simple garden variety distress. *Compare Kim v. Interdent Inc.*, No. C 08-5565, 2010 WL 1996607, at *1 (N.D. Cal. May 18, 2010) (garden variety damages do not include those for "ongoing emotional distress."). This finding is consistent with *Caine v. Burge*, the only case that has considered the concept of garden variety emotional distress in the context of a lengthy wrongful incarceration claim. The plaintiff in *Caine* served 25 years in prison for a murder conviction that was later vacated. 2012 WL 6720597, at *1. He filed suit alleging that he was tortured into confessing to the murder causing "physical, mental, and emotional injury stemming from both his treatment at the hands of Defendants prior, and as a result of his lengthy period of incarceration." *Id.* A dispute arose as to whether the plaintiff had put his mental status at issue in the case and thus waived the psychotherapist-patient privilege. The court found waiver based on the following allegations: "severe emotional distress and anguish," "immense" emotional damages including "several mental breakdowns stemming from his wrongful incarceration" that led him to seek psychiatric care "at least twice," and "feelings of paranoia, anxiety and sleeplessness." *Id.* at *3. According to the *Caine* court, such severe damages could not be described as garden variety. *Id.*

Plaintiff's allegations in this case are similar. Yet he insists there is no implied waiver because he seeks to recover only "for the obvious and intrinsic damages that flow from Plaintiff's 20 years of undue imprisonment[,] . . . largely in a maximum security facility, for a crime he did not commit." (Doc. 272, at 1-2). As he describes it, his

"straightforward claim of 'emotional distress' includes the sort of things that would naturally flow from being wrongfully imprisoned for 20 years: the difficulty of trying to make a life for oneself without the benefit of the prior 20 years of experience, 'the emotional pain and suffering caused by losing 20 years in the prime of his life' which 'has been substantial'; the isolation from family during 20 years of incarceration, and 'tremendous' emotional damages." (*Id.* at 10-11) (quoting Doc. 1 ¶¶ 62-64). This may be, but it highlights the difficulty in trying to apply a concept that developed in the employment context to the facts of this case. Where, as here, the consequences arising from Defendants' alleged misconduct are inherently severe and extreme, it is difficult to conceive of how a jury could conclude that the emotional distress flowing from the misconduct could ever be "garden variety."

Plaintiff's offer to "cabin" his testimony and the other evidence such as the suicide to create the appearance that his emotional distress was garden variety is insufficient. The *Caine* court did present this as an option, stating that it would "not permit Caine to introduce testimony about the specifics of emotional damages, or argue in any way that they [are] uncommon, or severe, and also continue to maintain the psychotherapist-patient privilege or any mental health records." 2012 WL 6720597, at *4. But the court also anticipated disputes as to the scope of the permissible testimony, indicating that the magistrate judge would resolve them.[5] *Id.*

Under the circumstances presented in this case, this Court finds that it is simply not possible to transform the alleged emotional distress into garden variety distress by

---

[5]     Following the court's ruling, the parties submitted an Agreed Motion for Entry of a Confidential Matter Protective Order covering the mental health records (Case No. 11 C 8996, Doc. 141), but did not pursue the privilege issue further prior to settling the case. (*Id.*, Doc. 220).

altering or excluding some of the evidence.  Even omitting evidence of Plaintiff's suicide attempt and psychiatric treatment, there is no way to "cabin" the other evidence the jury will hear: that Plaintiff allegedly was imprisoned in a maximum security prison for 20 years – isolated from his family and friends and unable to enjoy the prime years of his life – for a crime he did not commit.  Undoubtedly a jury could and likely would conclude that Plaintiff suffered severe and ongoing emotional distress from such extreme conditions.  While a judge might label the distress "garden variety," the jury would not be limited in the potential damage award based on this label.  It is also unclear how Plaintiff realistically could "cabin" his testimony about the emotional distress and symptoms that he experienced when he was first incarcerated and over the 20 years that followed, apart from omitting mention of his suicide attempt and psychiatric treatment.[6]

For all of these reasons, this Court finds that even under the middle ground "garden variety" approach, Plaintiff has impliedly waived the privilege for psychotherapy records by seeking damages for mental distress and thereby putting his mental state at issue.  Here the emotional distress for which he seeks damages is not garden variety given the severity and long duration of the distress.  That said, the Court finds the broad approach to determining implied waiver to be a preferable one, provided it is followed by a proper relevancy determination to avoid the unnecessary invasion of privacy resulting from production of irrelevant therapy records.  This approach "not only allays concerns of fairness and justice impacting both parties to a lawsuit," but also "provides sufficient

---

[6]     One commentator has questioned whether a plaintiff's attempts to curb his testimony to avoid waiving the privilege could back fire: "One wonders how these limitations on testimony might affect a plaintiff's credibility and demeanor as the witness struggles to stay within the garden boundaries."  Anderson, *supra*, 21 GEO. MASON L. REV. at 129.

predictability to a plaintiff who has asserted – or intends to assert – a claim for emotional distress." *Jackson v. Chubb Corp.*, 193 F.R.D. 216, 225 (D.N.J. 2000).[7]

## C.     Relevance

If Plaintiff were to withdraw his request for emotional distress damages, none of the Yellowstone records would be subject to production regardless of their relevancy to any claim or defense in the case. FED. R. CIV. P. 26(b)(1) ("Parties may obtain discovery regarding any *nonprivileged* matter that is relevant to any party's claim or defense.") (emphasis added). Since this Court assumes Plaintiff will not choose to withdraw the request for such damages, it now turns to the relevancy issue.

Certain portions of the Yellowstone records relating to events during Plaintiff's infancy are plainly irrelevant and so the motion to compel these portions of the records is denied. While those portions describing the results of medical tests are clearly irrelevant, Plaintiff voluntarily disclosed the test results so is not claiming these are privileged. As to the remainder of the records, relevancy is a closer question. This is not a situation where treatment began and ended many years before the events at issue. Here Plaintiff was at Yellowstone from September 17 to 23, 1992 which was just a few months before his arrest and prosecution for the murders. Moreover, the records provide extensive information relating to Plaintiff's mental state at that time and in previous years. They also provide information about his familial relationships or lack thereof, which could be relevant depending upon Plaintiff's testimony regarding his

---

[7]     Defendants also argue that Plaintiff waived the privilege by "asserting claims of psychological coercion" leading to a false confession. (Doc. 264, at 8). Absent any claim that Plaintiff's mental state made him particularly susceptible to coercion, these allegations do not suffice as an independent basis for finding that Plaintiff has placed his mental condition at issue in the case.

emotional distress. Still other information in the records arguably would be relevant depending upon the defenses that are raised.

Since the Court is not as familiar as the parties are with the testimony and defenses in the case, it will hear argument from counsel before ruling on the relevancy of the Yellowstone records described above. Preliminarily, the Court will allow defense counsel to examine the 16 pages of unredacted records in the courtroom on an attorneys' eyes only basis. Immediately afterwards, the Court will hear argument and then provide its rulings. To the extent that the Court finds any portion of the records to be relevant, Plaintiff will be ordered to provide a copy to Defendants.

## CONCLUSION

For the reasons stated above, Defendants' Motion to Compel Psychiatric Records (Doc. 264) is denied in part and taken under advisement in part.

ENTER:

Dated: May 2, 2016

Sheila Finnegan
United States Magistrate Judge