IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| DANIEL TAYLOR, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | No.: 14 cv 737 |
| | ) | |
| CITY OF CHICAGO, ANTHONY | ) | |
| VILLARDITA #20849, THOMAS JOHNSON | ) | |
| #20820, BRIAN KILLACKY#20748, TERRY | ) | |
| O'CONNOR #20831, RICK ABREU #20796, | ) | |
| ROBERT DELANEY #20383, SEAN GLINSKI | ) | |
| #3122, MICHAEL BERTI #12881, AND | ) | |
| UNIDENTIFIED EMPLOYEES OF THE | ) | |
| CITY OF CHICAGO, | ) | |
| | ) | |
| Defendants. | ) | |

**DEFENDANTS' ANTHONY VILLARDITA, THOMAS JOHNSON, BRIAN KILLACKY,
ROBERT DELANEY, RICK ABREU, TERRY O'CONNOR,  SEAN GLINSKI,
MICHAEL BERTI, AND CITY OF CHICAGO COMBINED MOTION FOR
SANCTIONS AND TO DISMISS**

NOW COME Defendants, ANTHONY VILLARDITA, THOMAS JOHNSON, RICK

ABREU, TERRY O'CONNOR, BRIAN KILLACKY, ROBERT DELANEY, SEAN GLINSKI

and MICHAEL BERTI, by and through their attorneys, BORKAN & SCAHILL, LTD., and THE

CITY OF CHICAGO, by and through its attorneys, DYKEMA GOSSETT PLLC (collectively

"Defendants"), and seeking for judgment and/or other relief in their favor pursuant Fed. R. Civ. P.

37(c) and the inherent powers of this Court under *Chambers v. NASCO, Inc.*, 111 S. Ct. 2123 (1991).

**INTRODUCTION**

Plaintiff, DANIEL TAYLOR ("Plaintiff"), has pursued this case for years against

Defendants on a key factual theory that has now been revealed to be an intentional fraud

perpetrated by Plaintiff. Despite propping up this fraud by repeated instances of perjury during both

1

written and oral discovery in this case, Plaintiff recently admitted to his intentional lies while testifying as a key witness in a parallel civil trial against these same Defendants on the same underlying facts that proceeded to trial in March through April 12, 2017 before the Honorable Judge Ronald Guzman (*Deon Patrick v. City of Chicago*, 14 CV 3658).

While actual prejudice is not required for this Court to take action in response to Plaintiff's serious misconduct, Defendants have suffered unremediable prejudice as a direct result of Plaintiff's perjury. Specifically, in addition to expending countless hours over the past four (4) years defending against Plaintiff's (now admittedly false) allegations during the course of discovery, Defendants were forced to address these startling revelations toward the end of the six-week *Patrick* trial (which itself focused heavily upon Plaintiff and his alleged experiences with these Defendants). The *Patrick* trial resulted in a verdict against all moving Defendants (except Defendant Killacky who was found "not guilty" on all counts) and included assessments of punitive damages against such Defendants.

Moreover, earlier revelation of these issues would have markedly changed the manner in which this case was explored in discovery, markedly changed the manner in which in the *Patrick* case (as well as the other parallel case(s) currently pending in the Northern District of Illinois arising from the same occurrence as the present case, (*Paul Phillips and Lewis Gardner v. City of Chicago*, et al., 14 CV 9372) were explored in discovery, and markedly changed the manner in which the *Patrick* case was tried. Sanctions are required by this Court in response to Plaintiff's egregious misconduct.

## RELEVANT FACTUAL BACKGROUND

Plaintiff filed this suit on February 3, 2014. *See* Dckt. No. 1. Plaintiff alleges he was framed by Defendants for involvement in a double murder occurring on November 16, 1992 in an apartment located at 910 W. Agatite in Chicago, Illinois. *Id.* at ¶¶ 2, 10-39. One of the central issues in this case is Plaintiff's contention that he was in a police lock-up during the time in which those

murders occurred. *Id.* at ¶¶ 2, 12-16, 31-33, 36. On this point, one of the key factual theories pursued by Plaintiff is that the Defendant Officers discovered Plaintiff's "lock-up alibi" shortly after his arrest and then attempted to create false evidence in order to cast doubt upon the validity of such alibi. *Id.* at ¶¶ 31-34. Namely, Plaintiff alleged that "[b]ecause the official police records placed Plaintiff in custody at the time of the murder" the Defendants responded by "fabricat[ing] an encounter" between Plaintiff and Defendants Berti and Glinski on the night of the murders and that "[t]his false encounter was memorialized in a fraudulent police report weeks after the encounter (and well after the Defendant Officers learned that the Plaintiff was in custody at the time of the murder)." *Id.* at ¶ 33.

This allegedly "fabricated" report was completed by Defendants Berti and Glinski on December 14, 1992 pursuant to a request from Defendant Villardita and describes Defendants Berti and Glinski encountering Plaintiff around the location of the murders shortly after they occurred. *See* Ex. 1. According to this report, Defendants Berti and Glinski responded to the area pursuant to a "shots fired" call. *Id.* Upon arrival, these officers approached a young man standing nearby and this young man began running from the officers. *Id.* The officers gave chase into a nearby apartment located at 854 W. Agatite. *Id.* Upon entering this apartment, the officers witnessed drug activity therein and ended up making a narcotics arrest. *Id.* In the process of this drug investigation, the officers learned the purported owner of the drugs was an individual named Akia "Deon" Phillips (also known by the street name of "Baby T").[1] *Id.* Upon leaving the apartment, the officers encountered Plaintiff on the street at approximately 9:30 p.m.. *Id.* The officers knew Plaintiff from previous encounters and also knew that Plaintiff and Mr. Phillips were fellow gang members. *Id.* Thus, the officers stopped Plaintiff and asked if he knew where Mr. Phillips was located. *Id.*

According to the report, Plaintiff advised that he knew where Mr. Phillips was located and agreed to show the officers. *Id.* The officers then located Mr. Phillips with the help of Plaintiff. *Id.*

The alleged falsity of this report was not only used as a factual basis for the alleged "framing" of Plaintiff, but the non-disclosure of its putative falsity is also a basis for Plaintiff's *Brady* claim. Dckt. No. 1 at 33 ("The Defendant Officers never disclosed to the prosecutor, the court or Plaintiff the fact that they had fabricated the police report, in further violation of Plaintiff's constitutional rights."); *see also* Ex. 2 (Pl.'s Ans. Interrog. O'Connor/Abreu) at ¶ 8, p. 13. Moreover, insofar as the interaction with Defendants Berti and Glinski appears in Plaintiff's court reported confession and Plaintiff alleges the details of his confession were fabricated and "fed" to him by the police, this interaction also appears to form a basis for Plaintiff's Coerced Confession and Fabricated Evidence claims as well. *See* Dckt. No. 1 at ¶26; Ex. 2 at ¶ 6; Ex. 3 (Pl.'s Confession) at 23.

**Perjured Testimony**

On June 3, 2014, Plaintiff answered Interrogatories under oath which required that he:

> Describe in detail with specific references to time your movements and exact whereabouts between 8:00 a.m. on November 15, 1992 to 8:00 a.m. on November 17, 1992. In so doing, identify each and every person you spoke to or otherwise interacted with during such period of time (including persons with whom you were with at the time of your arrest), any addresses, businesses, or agencies at which you were present at any time during said period, the means or method by which you traveled during said period of time (vehicle, bus, elevated train, etc.), whether you were working during the above listed dates and times, including where and with whom you were working and what job you were performing for what pay, and your general activities during the above-listed time period. *See* Ex. 4 (Pl.'s Ans. Interrog. Villardita) at ¶ 22.

In his sworn answer to this Interrogatory and consistent with his putative theory of the "fabricated" nature of the entire Berti/Glinski encounter, Plaintiff failed to list any interaction or encounter with Defendants Berti and Glinski on the street (or any other police officer for that matter) whereby he

---

[1] "Deon Phillips" is also known as "Akia Phillips," with "Deon" being Mr. Phillips' middle name. For ease of reference, Defendants will simply refer to this individual as "Mr. Phillips."

agreed to show them where Mr. Phillips was located. *Id.* Instead, Plaintiff swore that, after supposedly being released from custody at 10:00 p.m., he went straight to the apartment of the Phillips family at 854 W. Agatite (where he was staying at the time), helped clean up this residence with Paul Phillips, and later left the house to go back to Maryville Group Home. *Id.* Plaintiff stated that, while walking to Maryville, a police officer stopped him and gave him a ride to Maryville. *Id.*

After submitting these sworn Interrogatories, Plaintiff sat for his deposition on September 4, 2014. *See* Ex. 5 (Deposition of Plaintiff). At his deposition, Plaintiff's testimony was largely consistent with his sworn Interrogatory Responses. Indeed, Plaintiff expressly re-affirmed the accuracy of his Interrogatory Responses. *Id.* at 32:2-32:16 ("Q. Did the information contained in [your Interrogatory Responses] – was the information true and accurate that was contained in them? A. Yes. Q. Is there anything that you saw in there that was inaccurate after you reviewed your interrogatory answers? A. No."). Specifically, Plaintiff testified that, after being released from custody at approximately 10:00 p.m. on the night of the murders, he made his way back to the vicinity of Hazel and Agatite (in the immediate vicinity of the murders). *Id.* at 185:2-185:8. According to this version of the events, Plaintiff then immediately made his way up to the Phillips' apartment at 854 W. Agatite. *Id.* at 189:13-189:20. Also according to this version, prior to going upstairs, he had no conversations or interactions with anyone on the street (police officers or otherwise). *Id.* at 189:21-190:4. While upstairs, Plaintiff purportedly assisted Paul Phillips in cleaning the apartment. *Id.* at 192:9-192:17. Plaintiff then left the apartment after 1 a.m. because Paul Phillips' mother called and told him to leave. *Id.* at 192:18-193:11. Plaintiff began walking to Maryville. *Id.* at 193:12-194:2. As Plaintiff made his way there, a police officer (who he does not recall) picked him up and took him to Maryville. *Id.* Other than this unidentified officer allegedly shuttling Plaintiff to Maryville, Plaintiff categorically denied having any other interactions with any other police officers

that evening. *Id.* at 194:3-194:6.

On the subject of the encounter described in Defendant Berti and Glinski's report, Plaintiff

was absolutely unequivocal that such encounter **never occurred**:

> Q. You didn't speak to any police officers who asked you where you could find Baby-T?
> A. No, sir.
>
> Q. Did you know where Baby-T was?
> A. No, sir.
>
> Q. Do you know where Baby-T's girlfriend lived?
> A. Which one?
>
> Q. The one who lived at 5015 Kenmore?
> A. No.
>
> Q. Had you spoken to Akia Phillips about where he was going to be on the night of November 16th or the early morning hours of November 17th at any point?
> A. No.
>
> Q. Have you ever, prior to today's date, told anyone that you were picked up by Officers Berti and Glinski and taken to find Baby-T at his girlfriend's house?
> A. Since being locked up?
>
> Q. At any time before today, have you ever told anybody that you did do that?
> A. Yes.
>
> Q. Who did you tell that to?
> A. No, they told me.
>
> Q. I'm asking if you told anybody that?
> A. Oh, no
>
> ...
>
> Q. So, you're a hundred percent positive you never went with any police officers to find Akia Phillips and -- at his girlfriend's house?
> A. Yes. *Id.* at 194:7-195:17, 200:23-201:2.

Plaintiff was also confronted with a memorandum purporting to memorialize an interview

between Plaintiff and Cook County State's Attorneys in 2003 (taken in connection with an

investigation conducted in concert with Plaintiff's first post-conviction filings) which also ascribed

statements to Plaintiff regarding his activities on the night in question and purported to ascribe a

statement to Plaintiff that he had, in fact, encountered Berti and Glinski on the night in question. Ex. 5 at 197:19-201:22. Plaintiff testified that he would not have told them that because this was not true. *Id.* at 200:7-200:14. Thus, Plaintiff's testimony not only accused the *Defendants* in this case of fabricating information relating to this encounter but also implicitly accused members of the *Cook County State's Attorneys Office* of doing so as well. *Id.*[2]

## The Patrick Trial

On March 6, 2017, trial proceeded in the *Patrick* case before the Honorable Judge Ronald Guzman. Several weeks into the *Patrick* trial (on March 30, 2017), Plaintiff was called as a witness by Patrick's attorney. *See* Ex. 7 (Excerpts of Sworn Testimony of Daniel Taylor) at 2962. As Patrick's attorney walked Plaintiff through the events of the evening of the murders on direct examination (Ex. 7 at 2971:8-2973:8), Plaintiff abruptly changed his previous story regarding his interaction with Defendants Berti and Glinski on the evening in question and testified as follows:

> Q. When you left the District 23, where did you go, Mr. Taylor?
> A. To Agatite and Hazel.
>
> Q. And where were you heading when you left there?
> A. To 854 West Agatite.
>
> Q. Okay. To the Phillips' house?
> A. To the Phillips' house.
>
> Q. -- apartment?
> A. Yes, to the Phillips' house.
>
> Q. How did you get from the 23rd District to the Phillips' house?
> A. I ran and walked.

---

[2] Defendants' counsel also showed Plaintiff a copy of a memo sent by Plaintiff's former post-conviction attorney to the Cook County State's Attorney working on Plaintiff's post-conviction filings which implied that Plaintiff had, in fact, had this interaction with these officers. *Id.* at 195:18-197:17; *see also* Ex. 6 (Memorandum from Zellner to Perona). Despite the fact that this memo had not only been produced in discovery in this case but also was specifically directed to an Assistant States Attorney (thus, clearly waiving any possible privilege), Plaintiff's attorneys in this case improperly instructed Plaintiff not to answer Defendants' counsel's questions regarding the veracity of the information. *Id.*

Q. Okay. How much of the -- why did you run?

A. The 23rd -- Addison and Halsted is a police station; it's surrounded by rival gang members. And if you come over there, you can get hurt. So I chose to run until I felt I was in a safer area.

Q. And then after you -- and how far was it that you ran until you were in a safer area?

A. I ran hard for one block, and I walked fast for another block, and then I walked casually the rest of the way back to the Phillips' home.

Q. All right. As you approached the Phillips' home, what happened?

A. I was approached by an officer.

Q. Okay. Is this an officer that you knew personally?

A. No.

Q. Did this officer act as if he knew you personally?

A. Yes.

Q. What did the officer say to you?

A. He asked me if I knew where Akia Phillips was.

Q. All right. Did the officer -- police officer say anything else to you -- I'm sorry. How did you respond to, do you know where Akia Phillips was?

A. I told him I might.

Q. Okay. And then what else -- tell us more about your conversation with the officer.

A. Well, they asked -- the officer asked me if I could take them to where Akia Phillips was.

Q. And did you agree to do that?

A. Yes.

Q. Then what happened?

A. They put me in the back of a police car and we went to a female's house that I knew he was dating, Kim Winona.

Q. All right. And when you got to Kim Winona, did the officers get out of the car?

A. Yes.

Q. Did you stay in the car?

A. Yes. *Id.* at 2971:8-2973:8

Later in this direct examination, Patrick's attorney impeached Plaintiff with the above-described

deposition testimony. Ex. 7 at 2994:5-2996:23. Plaintiff's first response to being impeached was to *lie*

*again* and claim that his previous story at his deposition was simply a product of a faulty memory. *Id.* ("Q. Was it truthful at the deposition when you said to Mr. Scahill's question, did you have any interaction with any other police officers that night? A. I -- I couldn't remember at the time, but it came back to me."). However, upon being pressed further on the issue, Plaintiff admitted that his testimony at his 2014 deposition in this case was simply not "truthful" and was motivated by his belief that the incident with Berti and Glinski was "snitching" and that "where [Plaintiff] comes from…[t]hat's frowned upon." *Id.* ("Q. Why -- why weren't you truthful about those questions at your deposition? A. I was ashamed that I took police officers to look for a friend. That's snitching where I come from. And I didn't know how else to respond. That's frowned upon.").

Indeed, Plaintiff went even further on cross-examination by Defendants' counsel and admitted that his deposition testimony was both: (1) an intentional lie; and (2) specifically motivated by Plaintiff placing loyalty to his street gang over his sworn oath to tell the truth in this proceeding. Ex.7 at 2999:24-3000:7, 3001:11-3001:22. To wit:

> Q. Did I not just hear you tell Mr. Chanen that you intentionally lied about taking the police to go find Akia Phillips?
> A. Yes.
>
> Q. Okay. You knew that wasn't true when you said it, right?
> A. Correct.
>
> Q. So you intentionally lied under oath at your deposition in this case, isn't that true, Mr. Taylor?
> A. Yes.
>
> Q. Now, when we were talking about your -- when Mr. Chanen was asking you about you lying under oath at your deposition, you said that you were ashamed because that was snitching, right?
> A. Correct.
>
> Q. And Akia Phillips was also a member of the Traveling Vice Lords, right?
> A. Correct.
>
> Q. Did you put your loyalty to the Vice Lord organization over the oaths that you take in a

court of law, Mr. Taylor?
A. No, sir.

Q. But you did do that in 2014, didn't you?
A. Yes.

...

Q. You put your -- you put the loyalty that you have to that same street gang as that man sitting right here [referring to Patrick] over your obligations in this courtroom to tell the truth, don't you, Mr. Taylor?...
A. No...

Q. It was just at your dep, right?
A. Correct. Ex.7 at 2999:24-3000:7, 3001:11-3001:22

Defendants' counsel later addressed this incident with Judge Guzman and inquired as to whether Patrick's counsel had been previously advised that Plaintiff would be admitting that he intentionally lied at his deposition in this case. Ex. 8 at 3105:24-3106:25. Patrick's counsel admitted they had been advised of this fact the evening prior to Plaintiff's testimony. *Id.* Defendants' counsel were never so advised.

In this regard, Plaintiff's counsel was present at the *Patrick* trial during Plaintiff's testimony. After the court day had ended, Defendants' counsels addressed the issue of Plaintiff's dishonesty with Plaintiff's counsel, Locke Bowman (who was in attendance as an observer at the court proceedings). Plaintiff's counsel admitted that Plaintiff's counsels had informed only *Patrick*'s counsel that Plaintiff intended to admit to his previous false testimony but offered no explanation for this selective disclosure. Rather, Plaintiff's counsel articulated that he did not feel that any part of the issue regarding this false testimony was a big deal. When pressed further on this issue, Plaintiff's counsel essentially refused to discuss the matter further. Thus, Defendants' attempted to address these issues with Plaintiff's counsel prior to the filing of the present motion and Plaintiff's counsel failed to do so in any meaningful respect. Accordingly, Defendants' counsel were obviously unable to resolve their differences through no fault of their own despite attempting to do so in good faith.

## LEGAL STANDARD

A district court has inherent power to sanction a party who "has willfully abused the judicial process or otherwise conducted litigation in bad faith." *Secrease v. Western & Southern Life Ins. Co.*, 800 F.3d 397 (7th Cir. 2015); *Salmeron v. Enterprise Recovery Systems, Inc.*, 579 F.3d 787, 793 (7th Cir.2009); *see Chambers v. NASCO, Inc.*, 501 U.S. 32, 48-49 (1991); *Greviskes v. Universities Research Ass'n*, 417 F.3d 752, 758-59 (7th Cir.2005). A district court may also dismiss a case for discovery violations, lying in a deposition or other egregious conduct in litigation under Federal Rule of Civil Procedure 37 or under the inherent authority of the district court. *See Ramirez v. T&H Lemont, Inc.,* 845 F.3d 772, 776 (7th Cir. 2016)("We have construed the sanctioning power conveyed by Rule 37 to extend to instances of a party hiding evidence and lying in his deposition."); *Greviskes*, 417 F.3d at 758-59; *White v. Williams*, 423 Fed.Appx. 645 (7th Cir. 2011)("Dismissal may be appropriate when a party has shown a lack of respect for the court or proceedings."). Under Rule 37, the District Court may also impose a wide range of remedies including dismissal and awarding of attorney's fees. *See* Fed. R. Civ. P. 37(b)(2) and (c). Other potential remedies include "directing that...designated facts be taken as established for purposes of the action, as the prevailing party claims" and/or "prohibiting the disobedient party from supporting or opposing designated claims or defenses, or from introducing designated matters in evidence." *Id.*

Although Rule 37 requires violation of a judicial order before a court imposes sanctions, "[c]ourts can broadly interpret what constitutes an order for purposes of imposing sanctions" and a formal order is not required. *Quela v. Payco-General Amer. Credits, Inc.*, 2000 WL 656681, at *6 (N.D.Ill. 2000)(collecting cases).

As explained by Chief Judge Castillo in *Quela*:

In this case, although there has been no specific court order, we believe such an order is not required to provide notice that parties must not engage in such abusive litigation practices as

11

…lying to the court, and tampering with the integrity of the judicial system. Because all litigants are presumed to know that contumacious conduct of this sort is absolutely unacceptable, we can properly consider the sanctions available under Rule 37. *Quela*, 2000 WL 656681 at \*6 (citations omitted).

The reason for this broad interpretation of Rule 37 is that all offending parties are presumed to know that tampering with the integrity of the judicial system, lying to the court, or engaging in other deceptive or abusive practices are absolutely unacceptable regardless of the absence of a specific court order to the contrary. *Id.*; *see also Hal Commodity Cycles Management v. Kirsh*, 825 F.2d 1136, 1139 (7th Cir.1987; *Lightspeed Media Corp. v. Smith*, 2015 WL 3545253, \*5 (S.D. Ill. 2015; *JFB Hart Coatings, Inc. v. AM Gen. LLC*, 764 F. Supp. 2d 974, 981-82 (N.D. Ill. 2011).

No order of any sort is required to dismiss a case or take other actions based on the inherent authority of this Court. These inherent powers "are governed not by rule or statute but by the control necessarily vested in courts to manage their own affairs so as to achieve the orderly and expeditious disposition of cases." *Chambers*, 501 U.S. at 43. Under these powers, courts can impose sanctions including entering judgment and shifting attorney's fees. *See id.* at 44-45.

In deciding what measure of sanctions to impose, the district court should consider the egregiousness of the conduct in question "in relation to all aspects of the judicial process." *Greviskes*, 417 F.3d at 758-59. The "contumacious" conduct required for dismissal of a case with prejudice occurs "where a party has displayed fault, bad faith, or willfulness." *Id. citing Downs v. Westphal*, 78 F.3d 1252, 1257 (7th Cir.1996). Willfulness and bad faith are associated with conduct that is either "intentional or reckless[.]" *Long v. Steepro*, 213 F.3d 983, 987 (7th Cir.2000); *see also Maynard v. Nygren*, 332 F.3d 462, 467-68 (7th Cir. 2003). District Courts are not required to impose lesser sanctions to remedy misconduct if the misconduct is sufficiently serious. *See Patterson by Patterson v. Coca-Cola Bottling Co. Cairo-Sikeston, Inc.*, 852 F.2d 280, 284-85 (7th Cir.1988).

Finally, in assessing whether dismissal is an appropriate sanction under the inherent powers

of the Court, the Court need not find party's misconduct caused its opponent any prejudice. *See e.g. Barnhill v. United States*, 11 F.3d 1360, 1368 (7th Cir. 1993); *Raziev v. Compass Truck Sales, LLC*, 2016 WL 1449933, at *9 (N.D. Ill. Apr. 13, 2016)("The Seventh Circuit has not imposed a requirement of prejudice on a court's ability to dismiss or enter judgment as a sanction under its inherent power."); *Fuery v. City of Chicago*, 2016 WL 5719442, at *11 (N.D. Ill. Sept. 29, 2016)(the "Court may still impose sanctions even where there is no prejudice but the actions of the party exhibit such flagrant contempt for the court and its processes that to allow the offending party to continue to invoke the judicial mechanism for its own benefit would raise concerns about the integrity and credibility of the civil justice system that transcend the interests of the parties immediately before the court.").

## ARGUMENT

### SANCTIONS (UP TO AND INCLUDING DISMISSAL WITH PREJUDICE) ARE MERITED BASED UPON PLAINTIFF'S PERJURY AND SEVERE DISCOVERY VIOLATIONS

It is undisputed that Plaintiff intentionally and repeatedly committed perjury in this case. The only question remaining is the appropriate remedy for such serious misconduct. While, as explained in further detail below, Defendants did suffer prejudice as a result of this misconduct, dismissal would be the appropriate sanction for this misconduct even if this were not the case. Courts have a strong interest in both punishing a party's dishonesty and deterring similar misconduct. *See Secrease,* 800 F.3d at 402; *Greviskes*, 417 F.3d at 759. Lying cannot be condoned in any formal proceeding, including depositions and discovery. *See ABF Freight System, Inc. v. N.L.R.B.*, 510 U.S. 317, 323 (1994)("False testimony in a formal proceeding is intolerable."). "Our legal system is dependent on the willingness of the litigants to allow an honest and true airing of the real facts." *Quela* , 2000 WL 656681 at *7. Thus, "[p]arties who wish to use the judicial system to settle disputes have certain obligations and responsibilities" and "[o]ne of those responsibilities is to tell the truth" *Id. quoting Rodriguez v. M & M/Mars*, 1997 WL 349989, *2 (N.D. Ill. June 23, 1997)(dismissing

plaintiff's case for lying about her prior criminal record in a deposition). "[P]erjury strikes at the heart of the integrity of the judicial system...." *United States v. Stokes*, 211 F.3d 1039, 1046 (7th Cir.2000). It "undermines the function and province of the law and threatens the integrity of judgments." *United States v. Alvarez*, 132 S.Ct. 2537, 2540 (2012). It "poisons the life blood of the administration of justice." *United States v. DiStefano*, 464 F.2d 845, 854 (2nd Cir.1972).

Because of its seriousness, perjury in the course of discovery may warrant the sanction of dismissal. *Jackson v. Murphy*, 468 Fed.Appx. 616, 619-620 (7th Cir.2012); *Ridge Chrysler Jeep, LLC v. Daimler Chrysler Services North Am., LLC*, 2006 WL 2808158, *8 (N.D. Ill. 2006)(dismissing case as a sanction: "When discovery non-compliance [ ] is coupled with lies to both an adversary and the Court in order to gain an advantage in the litigation, the Court must step in and impose the ultimate sanction in order to preserve the integrity of the federal judicial system."); *Thomas v. General Motors Acceptance Corp.*, 288 F.3d 305, 306, 308 (7th Cir.2002)(court did not abuse discretion in dismissing suit with prejudice where plaintiff knowingly filed false application to proceed in forma pauperis).

Judge Castillo explained the duties upon the Court when faced with deliberate perjury:

Lying cannot be condoned in any formal proceeding. This Court, too, has a responsibility: where we find deliberate falsehoods told in proceedings, we cannot allow such conduct to go unchecked. Turning a blind eye to false testimony erodes the public's confidence in the outcome of judicial decisions, calls into question the legitimacy of courts, and threatens the entire civil justice system. Our entire civil justice system is dependent on accurate and truthful discovery. Every day, litigants make settlement decisions on the basis of information obtained during the discovery process. Across the country, our fellow judges enter summary judgment in numerous cases on the basis of undisputed facts determined during the discovery process. Ultimately, the discovery process aids parties, who need to proceed all the way through trial to resolve a case, ensure that the trial is based on objective facts and not the parties' selective and subjective recollections about their respective positions. Therefore, the importance of accurate and truthful discovery to the civil justice system cannot be overstated. *Quela* at *7-8.

Regardless of any potential merit of a plaintiff's underlying claim and regardless of whether the perjury involves matters material to the litigation at bar, dismissal for perjury remains

appropriate in order to protect the integrity of the civil judicial system. In *Dotson v. Bravo*, 202 F.R.D. 559, 572 (N.D. Ill. 2001), *aff'd*, 321 F.3d 663 (7th Cir. 2003), a plaintiff was convicted of criminal offenses relating to his alleged discharge of a firearm at a police officer. *Id.* at 665-66. The defendant officer, Bravo, had testified against plaintiff at this criminal trial that plaintiff was the person who had shot at him. *Id.* However, audio recordings later surfaced which appeared to directly contradict the veracity of the defendant officer's account. *Id.* Plaintiff was immediately released from prison as a result. *Id.* A lawsuit followed. *Id.* Plaintiff's problems began, however, when it was revealed that he had misrepresented his identity in concert with the underlying criminal court proceedings. *Id.*

Despite the fact that these misrepresentations had nothing to do with the veracity of the plaintiff's underlying version of the relevant events, the District Court dismissed plaintiff's suit as a sanction for his dishonesty. *See Dotson*, 202 F.R.D. at 572. In so doing, the Court held as follows:

> Credibility and veracity issues are among the ultimate factually disputed issues in a trial, and are not to be resolved beforehand or otherwise be used as a basis for a sanction. Admitted perjury, however, is quite another matter. The fact is that whether or not [the defendant's] testimony under oath in prior state court proceedings or in these proceedings is inconsistent, contradictory, or in any way false remains to be determined by a trier of fact. [Plaintiff] has to prove before a jury of his peers that [defendant] is a prevaricator. [Plaintiff], on the other hand, is an admitted perjurer...Defendants need prove nothing with respect to this matter. No jury need make any factual determination regarding the matter. The only issue is whether [Plaintiff] will be permitted to profit from his deceit.

In affirming the dismissal of plaintiff's claim, the Seventh Circuit stated that the potential merit of Plaintiff's claim did not preclude dismissal of this claim based on the acts of dishonesty:

> Given the evidence that supported his acquittal from all criminal charges, we note that [Plaintiff's] civil rights case may well have had some merit. But, we cannot allow a plaintiff to so abuse the court system in order to avoid criminal justice, yet obtain civil reward. If [Plaintiff] sought to expose the "truth" of what occurred on January 1, 1998, he should not have begun the lie that now leads to the dismissal of his case. *Id.,* 321 F. 3d at 669.

These sentiments were also recently echoed again by the Seventh Circuit in *Ramirez. Id.*, 845 F. 3d at 782 ("The court considered the possibility—indeed, it expressly assumed—that Ramirez may have

had a meritorious case.., and that dismissal would foreclose Ramirez from pursuing relief for that injury....Dismissing the case with prejudice is an entirely reasonable response to such a deliberate attempt to deceive the court.").

As explained in *Rhodes v. LaSalle Bank, N.A.*, 2005 WL 281221, *3 (N.D. Ill. 2005), "[t]he decisions in these cases are premised on the fact that a litigant cannot be permitted to say 'oops, you've caught me,' and thereafter be 'allowed to continue to play the game.'" *Id.* "Not to dismiss a case for such blatant disregard of the judicial process would 'erode the public's confidence in the outcome of judicial decision, call into question the legitimacy of courts, and threaten the entire judicial system.'" *Id.*

Countless courts addressing perjured testimony by litigants have found dismissal is necessary to protect the integrity of the judicial process. *See Dye v. Wargo*, 253 F.3d 296, 298 (7th Cir. 2001)(affirming entry of judgment against plaintiff based on perjured testimony; "Some of the statements that [Plaintiff] has made under oath in this litigation are inconsistent with statements he made under oath in state court…One or the other of [Plaintiff's] stories is perjury. His lawyer contends that [Plaintiff] was entitled to lie in state court to ensure that the judge accepted the favorable plea bargain, and that we should therefore disregard his earlier sworn statements. That is not a position any judicial system can, or does, tolerate."); *Jackson*, 468 Fed. Appx. at 619–620 (affirming dismissal of Section 1983 case based upon Plaintiff's perjured testimony); *Allen*, 317 F.3d at 703 ("it is arguable that a litigant who defrauds the court should not be permitted to continue to press his case"); *Secrease*, 800 F.3d at 401 ("Dismissal can be appropriate when the plaintiff has abused the judicial process by seeking relief based on information that the plaintiff knows is false."); *Fuery*, 2016 WL 5719442, at *2 (vacating jury verdict in favor of Plaintiff based upon Plaintiff's trial misconduct and misrepresentation); *Ridge Chrysler Jeep, LLC*, 2006 WL 2808158 at *8 (dismissing case as a sanction); *Thomas*, 288 F.3d at 308 (court did not abuse discretion in dismissing suit where

16

plaintiff knowingly filed false document); *Brady v. United States*, 877 F.Supp. 444, 453 (C.D.Ill. 1994)("Permitting this lawsuit to proceed would be an open invitation to abuse the judicial process. Litigants would infer they have everything to gain, and nothing to lose, if manufactured evidence is merely excluded while their lawsuit continues. Litigants must know that the courts are not open to persons who would seek justice by fraudulent means."); *Rodriguez*, 1997 WL 349989 at *2 ("False testimony in a formal proceeding is intolerable. This court is aware that the law favors a trial on the merits. That right to a trial, however, is not absolute…In the instant case, plaintiff sought to conceal relevant information bearing directly upon her credibility both as a witness and a litigant…This court cannot and will not allow a litigant to so abuse the judicial process.").

As indicated by the above authorities, Plaintiff's repeated perjury warrants dismissal. In this case, Plaintiff's perjury touched on the most crucial factual theory in this case, specifically, the validity of Plaintiff's purported "lock- up alibi" and pervasive theory that these Defendants created "fabricated" evidence in order to rebut this alibi. Thus, even if this perjury were evaluated in the narrowest sense, dismissal would still be merited under governing law.

However, the import of Plaintiff's perjury transcends even these specific factual issues. As noted above, the rationale that Plaintiff provided for his perjury was essentially that he intentionally lied at his deposition because that constituted "snitching where [Plaintiff] comes from" and "[t]hat's frowned upon." Ex. 7 at 2994:5-2996:23. Plaintiff later clarified that he was referring to his allegiance with the Vice Lord street gang when he was talking about "snitching" being "frowned upon." *Id.* at 2999:24-3000:7, 3001:11-3001:22. Every one of the eight (8) individuals charged in these murders was a member of the Vice Lords Street gang (i.e. Deon Patrick, Rodney Matthews, Lewis Gardner, Paul Phillips, Dennis Mixon, Akia Phillips, and Plaintiff). According to Plaintiff, he ceased being a member of the Vice Lords in 2007. Ex. 5 at 220:9-220:15. Despite (allegedly) extricating himself from this gang, Plaintiff still placed his loyalties to this gang over his oath to tell

the truth *in 2014* in the very case he himself filed seeking compensation. Had this information been known in 2014, discovery in this case would have taken a very different route and would have required numerous depositions of persons affiliated with the Vice Lords (of which there were many) regarding their knowledge and practices of untruthfulness as part and parcel of their membership in the Vice Lord street gang. There have been dozens upon dozens of depositions taken in this case. Even were one to look past the inherent seriousness of perjured deposition testimony, remedying this omission would require the re-taking of scores of depositions. It is simply too late for this to effectively occur in this case.

Moreover, this theory of an admitted culture of dishonesty within the Vice Lord organization that transcended active membership (and included a willingness to commit criminal perjury about events that happened decades previous) would have been pursued aggressively within the context of the *Patrick* trial. Defendants would have made this a centerpiece of their strategy of defense from the very first day. Instead, Defendants were not provided this stunning admission until the *Patrick* trial was close to completion and many witnesses (including Patrick himself) had already rendered testimony. In the course of the *Patrick* trial, the opposing sides argued that the case presented essentially a battle of credibility where one side was lying and the other telling the truth. Had Defendants been armed with this admission of a deeply ingrained culture of dishonesty that permeated the entire Vice Lord organization, Defendants would likely have been able to strategize to more effectively chip away at the credibility of every single Vice Lord-affiliated witness in the *Patrick* trial (of which there were many).

Defendants have suffered extreme prejudice by being deprived of the ability to explore these issues during discovery over the past three years as well as being deprived of this information for effective use in the parallel *Patrick* trial. It is unclear what specific event prompted Plaintiff to finally

come clean and admit committing perjury. It is also unclear what specifically prompted Plaintiff (or, more likely, his attorneys) to selectively disclose Plaintiff's perjury to Patrick's counsel and not Defendants' counsel. However, the testimony of Patrick himself at his trial (and Patrick's specific trial strategy) certainly provides some potential insight. Specifically, during Patrick's trial testimony, Patrick testified that he was present during the drug raid effected by Defendants Berti and Glinski (and others) at the Phillips' residence and taken into police custody at this time. According to Patrick, he was placed in a squad car outside this residence. Ex. 9 at 1529:6-1530:9. Patrick testified that, while sitting in this squad car outside the Phillips apartment, he saw Plaintiff standing on the corner. *Id.* at 1530:10-1530:14. Patrick testified that he witnessed Plaintiff speaking to Defendants Berti and Glinski on the corner. *Id.* at 1530:15-1531:5. Patrick testified that he looked away and looked back and then all three persons were gone. *Id.* at 1531:6-1531:10.

While Plaintiff's counsel can best explain to this Court the specific circumstances underlying these revelations, the circumstantial evidence certainly appears to indicate that such revelations were specifically timed in order to assist Patrick in the prosecution of his case so that Patrick's version of the events was not subject to contradiction at trial by a key witness. Patrick's case has always been heavily dependent upon Plaintiff's "lock-up alibi" and remained focused on this throughout the entirety of the *Patrick* trial. *See* Ex. 10 (Complaint of Deon Patrick) at ¶¶ 34-44; Ex. 11 (Opening Statement of Deon Patrick); Ex. 12 (Closing Argument of Deon Patrick). Indeed, Patrick's case often seemed focused almost more closely on the experience of Plaintiff than the experience of Patrick himself. *Id.* In this regard, the timing of these revelations (and failure to apprise Defendants of these revelations prior to Plaintiff hitting the witness stand) also appeared to be timed to deprive Defendants from being able to strategize how to best utilize this information prior to trial and,

instead, force Defendants to simply react to an explosive allegation weeks into a high profile trial.[4] Permitting this case to proceed forward in the face of this misconduct would be an affront to our judicial system and would make a mockery of the federal discovery rules. Dismissal is the only truly just remedy under these circumstances.

At minimum, given the nature of Plaintiff's perjury, Plaintiff must be barred from contesting the veracity of any aspect of the encounter between himself and Defendants Berti and Glinski on the evening of November 16, 1992 as reflected in their Supplemental Report attached hereto as Exhibit 1. Pursuant to Fed. R. Civ. P. 37(c)(2)(A)(i)-(ii), this Court may enter an order "directing that...designated facts be taken as established for purposes of the action, as the prevailing party claims" and/or "prohibiting the disobedient party from supporting or opposing designated claims or defenses, or from introducing designated matters in evidence." *Id.* In this regard, while Plaintiff has now admitted that his claims that Defendants Berti and Glinski fabricated the entire encounter with him were false, Plaintiff has attempted to stake out a middle ground to attempt to salvage his "lock-up alibi." Specifically, Plaintiff now claims that, while he did have this encounter as described by these officers, the encounter simply took place at a *later* time than stated in the report.

This gamesmanship cannot be tolerated. Plaintiff cannot be permitted to commit perjury on a set of facts and then attempt to salvage some benefit of this perjury on the very same facts. Permitting such a farce to occur would further be an affront to the rules of this Court and would be highly unjust to these Defendants. This relief has repeatedly been found appropriate for even discovery *failures*; thus, this relief would clearly be the minimum appropriate sanction for Plaintiff's *intentional perjury* during discovery on these subjects. *See Davidson v. Evergreen Park Cmty. High Sch. Dist. 231*, 2016 WL 6892882, *4 (N.D. Ill. 2016); *Price v. Wrencher*, 2014 WL 4269079, *3 (N.D. Ill.

---

[4] Patrick also admitted intentionally committing perjury at his own deposition taken in this case. *See Patrick v. City*, 14 CV 3658, Dckt. No. 405. A motion seeking like sanctions is currently pending. *Id.*

2014)(prohibiting plaintiff from asserting or defending a claim was the appropriate sanction for her failure to comply with a court order compelling discovery); *Ari Officer v. Duran*, 2014 WL 51330, *3 (N.D. Ill. 2014); *Craftwood Lumber Co. v. Interline Brands, Inc.*, 2013 WL 4598490, *14 (N.D. Ill. 2013)(preclusion of defendant's two defenses and introduction of certain evidence was tailored to defendant's violation "because the main thrust of the outstanding discovery it refused to produce and repeatedly failed to substantively address" was related to those defenses).

WHEREFORE Defendants pray this Court dismiss Plaintiff's claims with prejudice and enter judgment in favor of Defendants pursuant to Fed. R. Civ. P. 37(c) and the inherent powers of this Court under *Chambers v. NASCO, Inc.*, 111 S. Ct. 2123 (1991), and award attorneys' fees and costs, or, in the alternative:

1) Bar Plaintiff from contesting the veracity of any aspect of the encounter between himself and Defendants Berti and Glinski on the evening of November 16, 1992 (as set forth in the Supplemental Report described hereinabove);

2) Allow Defendants to conduct discovery, including, but not limited to, the depositions of Plaintiff's attorneys, re-deposing those witnesses (including Plaintiff) as necessary, and conduct necessary written discovery;

3) Award attorneys' fees and costs as to be determined in subsequent filings; and

4) For whatever other relief this Court deems fit.

Respectfully submitted,

BORKAN & SCAHILL, LTD.                          DYKEMA GOSSETT PLLC

By:  s/Timothy P. Scahill                        By:  s/ Daniel N. Noland
     Timothy P. Scahill                               Daniel N. Noland

Steven B. Borkan                                 Daniel M. Noland
Timothy P. Scahill                               Dykema Gossett PLLC
BORKAN & SCAHILL, LTD.                           10 S. Wacker Drive Suite 2300
20 South Clark Street, Suite 1700                Chicago, Illinois 60603
Chicago, IL 60606                                (312) 876-1700
(312) 580-1030