IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION

| | |
|---|---|
| DANIEL TAYLOR, ) | |
| ) | |
| Plaintiff, ) | |
| ) | No. 14-cv-0737 |
| vs. ) | |
| ) | The Hon. John Z. Lee |
| ) | |
| CITY OF CHICAGO, et al., ) | The Hon. Sheila M. Finnegan |
| ) | |
| Defendants. ) | |

**PLAINTIFF'S SUPPLEMENTAL MEMORANDUM
REGARDING AN APPROPRIATE SANCTION**

Now comes Plaintiff, Daniel Taylor, by undersigned counsel, and responds to the Court's order of January 26, 2018, as follows.

**INTRODUCTION**

This memorandum responds to the Court's direction (*see* Doc. No. 426) that the parties submit their positions as to an appropriate sanction of Plaintiff in this matter short of dismissal of the case. The Court's January 29, 2018 Order also directed Plaintiff's counsel to provide a declaration regarding the circumstances under which Plaintiff's counsel first learned of Plaintiff's acknowledgement of the encounter with Officers Berti and Glinski and the reasons why counsel in this case were not informed of Plaintiff's acknowledgement of the encounter prior to Plaintiff's testimony in the *Patrick* trial. The declaration and an explanation of the propriety of counsel's conduct in relation to the disclosure are being provided in a separate submission. This Memorandum supplements that submission, and is intended to be read second.

**LEGAL STANDARD**

In assessing whether and to what extent to sanction a litigant "the touchstone is proportionality." *Bolt v. Loy*, 227 F.3d 854, 856 (7th Cir. 2000); *see also, e.g., Johnson v. Chicago Bd. of Educ.*, 718 F.3d 731, 732–33 (7th Cir. 2013) ("we have held repeatedly that sanctions should fit the misconduct"); *Allen v. Chicago Transit Auth.*, 317 F.3d 696 703 (7th Cir. 2003) (same). As a corollary, the Court's focus in fashioning any sanction must be on remedying the harm caused by the offending party's misconduct. *See, e.g., In re Sept. 11th Liab. Ins. Coverage Cases*, 243 F.R.D. 114, 131–32 (S.D.N.Y. 2007) ("the court should endeavor to impose a sanction that will restore the parties to the position they would have occupied but for the breach of discovery obligations and deter future misconduct"); *Ropak Corp. v. Plastican, Inc.*, No. 04 C 5422, 2006 WL 2385297, at *3 (N.D. Ill.Aug. 15, 2006) (noting that trial courts issue sanctions "to remedy the harms of discovery violations (citing *Maynard v. Nygren*, 332 F.3d 462, 470 (7th Cir. 2003)).

Sanctions are not supposed to provide a windfall to the opposing party. *See, e.g., Sun v. Bd. of Trustees of Univ. of IL,* 473 F.3d 799, 811–12 (7th Cir. 2007) (affirming district court's sanction that refused to give a windfall to the opposing party); *Extreme Networks, Inc. v. Enterasys Networks, Inc.,* No. 07-CV-229-BBC, 2012 WL 12862828, at *5 (W.D. Wis. July 11, 2012) (refusing to impose sanctions that would be "a windfall"); *Flagg v. City of Detroit,* No. 05-74253, 2011 WL 4634249, at *15 (E.D. Mich. Aug. 3, 2011), report and recommendation adopted, No. 05-74253, 2011 WL 4634245 (E.D. Mich. Oct. 5, 2011), aff'd, 715 F.3d 165 (6th Cir. 2013) (lesser sanctions "are more appropriate" to avoid giving the opposing party "an undeserved windfall").

**DISCUSSION**

Under this case law, any sanction must be crafted in the context of the facts and circumstances at issue. In addition to the other brief being filed in connection with this Court's order, Plaintiff has discussed those facts and circumstances in prior pleadings, and that discussion is incorporated herein. *See* Dkt. 381-1 (Plaintiff's Response to the Defendants' Motion for Sanctions and to Dismiss).

To recap, the Defendants were benefited, not harmed, during the *Patrick* trial from Plaintiff's admission that he had testified untruthfully in his deposition. *See id.* at 14-15. They will benefit again during the trial of this case. Setting aside their heated rhetoric and their unfounded speculation, the Defendants have failed to point to even a single particular in which they have been harmed. They have not shown that the course of discovery was altered by Plaintiff's inconsistencies or that they were in any degree diverted from their pursuit of necessary information. They have not pointed to any time wasted as a result of the inaccurate deposition testimony. They have not credibly suggested that additional discovery is needed because of Plaintiff's untruthfulness.

It is also worth emphasizing that Plaintiff's inaccurate testimony was on a point that, while certainly relevant, is not essential to any of Plaintiff's claims—even the claims against Defendants Berti and Glinski. Whether or not Mr. Taylor led the police to a witness in the case (Aika Phillips) arguably had more significance in the *Patrick* case (because Phillips implicated Mr. Patrick) but in this case, this particular encounter between Mr. Tayor and Berti/Glinski involving Mr. Phillips is on the periphery of what is actually at issue in this litigation. Defendants contend, in one way or another, that Daniel Taylor was not in the lock-up at the time of the murders. Plaintiff contends that—based upon the contemporaneously created

3

administrative records and authored by third-parties to this suit—show he was in the lock-up at the time of the crime. Under both accounts, the "encounter" with Berti and Glinski happened well *after* the murders, and was unrelated to his time in jail. The entire issue is largely a distraction.

Also, Plaintiff was not at all "cornered" and forced against his will to acknowledge his misstatement, and the defendants were not obliged to spend time and resources uncovering Plaintiff's untruthfulness. That stands in sharp contrast to Berti and Glinski's own dishonesty and inconsistencies in this litigation, which they refuse to even acknowledge and Plaintiff had to work hard to prove. Instead, Mr. Taylor voluntarily corrected the record and admitted that he had taken Berti and Glinski to Phillips. In fact, had Mr. Taylor not decided to be forthcoming, the Defendants would have no proof that he had been less than honest about this encounter; they would have merely had on the record that Taylor had described two versions of the same events, and been in a position to impeach him on that fact nonetheless.

Moreover, it should also matter that the reason why Mr. Taylor was originally dishonest was in no way calculated to gain advantage in litigation. Rather, he simply wanted to avoid being perceived by the other plaintiff's as having been complicit with the police. This was not, in other words, a situation where the dishonesty involved an attempt to try to prove a claim or establish liability (as is true with Berti and Glinski's inconsistent accounts).

One additional point bears mention, a point which has not heretofore received attention. Defendants have painted this Court a picture where Mr. Taylor supposedly said Version A at his deposition, and then admitted at the *Patrick* trial that Version B was the truth. That is not what actually happened. In reality, Mr. Taylor told both Version A and Version B at his deposition. As discussed at greater length in Mr. Bowman's accompanying filing, at first, Mr. Taylor did

4

deny having helped the two officers find Mr. Phillips that night, but later in the same deposition, Mr. Taylor essentially admitted to the accuracy of a Cook County State's Attorney's Office ("CCSAO") investigative report confirming his statement that he did take the officers to find Mr. Phillips. Exhibit 1, Daniel Taylor Deposition Excerpt, at 389-91. In addition, though Mr. Taylor did not testify about the document, Mr. Taylor was shown a different memorandum from his then-attorney Kathleen Zellner, and Defendants specifically pointed him to the mention of Glinski and Berti included in the memo, which stated: "Taylor has informed us that after being picked up by officers Glinski and Berti in front of Andrea Phillips' house at approximately 10:30-10:40 p.m. and the officers dropped him off about 15-20 minutes later." Ex. 1, at 196-97; *see also* Exhibit 2 (the Zellner memo).

What this means is at least two things. First, there can be no argument that Defendants were unaware at the very time of his deposition that Mr. Taylor had given two accounts of what had transpired. Second, and perhaps more significantly, Mr. Taylor did not deny Version A at his deposition as the Court had apparently previously been led to believe. More accurately, Mr. Taylor gave both Version A and Version B at his deposition. He was caught giving inconsistent statements.

And there was never any dispute that Version A and Version B could not both be true. Thus, when it came time for Plaintiff's testimony at the *Patrick* trial, Mr. Taylor was going to be impeached regardless of which version he went with. Notwithstanding their professed surprise, defense counsel were actually well aware that Mr. Taylor was necessarily going to say something that was inconsistent with prior deposition testimony. That much was guaranteed by their examination at the deposition.

5

In that light, any notion that Defendants were sandbagged or prejudiced by the fact that Mr. Taylor acknowledged the truth of Version B rather than Version A rings completely hollow. Crucially, if the Defendants had legitimate questions about which of Version A or Version B was accurate, then the Defendants were more than free to seek clarification about the inconsistency at Mr. Taylor's deposition. They could have also sent an interrogatory, or request to admit on these exact issues afterwards. They had every opportunity to discover what the problem was. Instead, defense counsel instead elected to steer clear of this glaring inconsistency at Mr. Taylor's deposition. Their choice, not totally irrational from a litigation perspective, was to *not allow* Mr. Taylor any fair chance to explain why he had given two different versions (as doing so would weaken the potential power of the impeachment at trial, their preferred remedy at the time).

Having made this election, Defendants subsequent decision to seek sanctions when Mr. Taylor subsequently chose Version B at the Patrick trial is ill advised. There is no dispute that Mr. Taylor could not give both versions on the witness stand in *Patrick.* To his credit, and against his litigation self-interest, he went with the truth, just as his counsel had advised he should.

What all of this means is that the case for sanctions is somewhat different than had previously been presented by the Defendants to the Court. Mr. Taylor did not conceal the truth at his deposition, only to reveal it on the fly in a manner that sandbagged the defense. To the contrary, Mr. Taylor admitted the truth at his deposition too.

Where Mr. Taylor undeniably went wrong was in also telling an untruth about the same event at the same deposition. But where does that leave the request for sanctions against Plaintiff's counsel? What exactly did he do wrong? Surely the defense is not suggesting that Plaintiff's counsel, after meeting with Mr. Tayor, had an obligation to telephone defense counsel

6

the night before Mr. Taylor testified to communicate words to the effect of: "You must have noticed that Mr. Taylor gave two different accounts of the Berti/Glinski encounter at his deposition, and I would like to advise you that he is going to testify to Version B rather than Version A." If the Defendants had genuine questions about why Mr. Taylor was going to give Version B instead of Version A, or even why there were two versions in the first place, those were questions that defense counsel could and would have asked at or after Mr. Taylor's deposition, but did not.

Had the Defendants properly apprised the Court that Mr. Taylor also gave Version A at his deposition and then was asked no questions about the discrepancy, the Court likely would have concluded that Mr. Taylor's inconsistent statements were just that: inconsistent statements. Not sanctionable misconduct.

None of this is to suggest that Plaintiff's untruthful testimony was either appropriate or inconsequential. He will certainly pay the standard price. That is, Plaintiff's claims in this case—the entirety of his testimony—will have to be evaluated in the light of his admission to untruthfulness. Plaintiff's character and his credibility will be tested by vigorous cross-examination, the best procedure ever devised for unmasking those who come to court determined to lie or shade the truth. If the jury concludes he is not worthy of belief, they will likely find for the defendants. To the extent that the purpose of sanctions is to deter future misconduct, there can be no doubt that cross examination will serve the purpose.

Notwithstanding the foregoing, Plaintiff submits that if the Court is going to award sanctions even after having been apprised of these additional circumstances, then only nominal additional sanctions could plausibly be argued to "fit the misconduct" that has occurred here. *See Johnson*, 718 F.3d at 732–33.

7

I.  **THE SANCTION THAT THE COURT IMPOSES SHOULD BE DESIGNED TO REMEDY ANY HARM THAT PLAINTIFF'S INACCURATE TESTIMONY HAS CAUSED, WHICH IS AT BEST MINIMAL**

There are two possible sanctions that could be argued to "fit the misconduct" in this case in the sense that they could be viewed as necessary to remedy a harm that Plaintiff may have caused and to solidify deterrence of future wrongdoing.

A.  **Adverse Jury Instruction.**

As in every case, the jury in Plaintiff's trial will be instructed that they may consider Plaintiff's prior inconsistent statements "in deciding what weight to give his testimony." Seventh Circuit Pattern Jury Instructions (Civil), 1.14.  In appropriate cases, the instruction may be modified so that the injury is informed: "In considering a prior inconsistent statement, you should consider whether it was simply an innocent error or an intentional falsehood and whether it concerns an important fact or an unimportant detail." *See id.*

The court suggested at the January 26 hearing that it would consider, as a sanction, a further modification of the jury instruction to inform the jury that, in assessing the weight to give Plaintiff's testimony, Plaintiff's deposition testimony that he did not encounter Defendants Berti and Glinski after leaving the lockup was "an intentional falsehood," which, by the way, Mr. Taylor will have to concede on the stand.

Defendants will no doubt object to the purported inadequacy of relying solely an adverse jury instruction that informs the jury that they may consider Mr. Tayor's untruthfulness as probative of his claims and credibility.  But Plaintiff's whole point—as implicitly accepted by the fact that the suggestion is mentioned in the comment itself—is that a jury instruction is the perfectly appropriate, standard, and conventional way to handle untruthful statements.  Witnesses sometimes say things at trials that are untrue.  They are impeached by their prior sworn

8

statements. The jury will be informed about how to evaluate those inconsistencies. In virtually every situation, that instruction suffices. Courts of course presume that juries follow the instructions given. *Cf. Francis v. Franklin*, 471 U.S. 307, 325 n. 9 (1985) ("[W]e must assume that juries for the most part understand and faithfully follow instructions." (internal quotations and citations omitted)). There are simply no aggravating circumstances whatsoever associated with the present scenario that legitimately justify any additional remedial measures beyond modifying the standard instruction.[1]

### B. Additional Deposition Time at Plaintiff's Expense.

The Defendants contended in their motion that they should be permitted to reopen a number of depositions so that they may inquire of other witnesses with past Vice Lords affiliations whether, as Plaintiff acknowledged at the *Patrick* trial, "snitching" was frowned upon within that group. *See* Doc. No. 358 18; *see also* Doc. No. 393, at 11.

The argument reeks of pretext. The Defendants obviously want nothing more than to talk about gangs, but nothing about the dispute before the Court justifies taking the case in that direction. *First*, Plaintiff's inaccurate deposition testimony did not impede or interfere with the defendants' ability to have pursued this line of questioning in any deposition in this case and the defense counsel could have freely chosen to do so. Any failure to have pursued that line of discovery with any of the deposed witnesses is the fault of defense counsel, not Plaintiff. Defendants' counsel cannot claim to have been unaware of this line of defense before Plaintiff made his admissions in his *Patrick* trial testimony. Before Plaintiff testified in *Patrick*, these counsel had delivered an opening statement in which they confidently asserted that "the number

---

[1] As explained in prior briefing, Berti and Glinski have a far more damning, and far more material, Version A/Version B problem, and they too will be covered by this jury instruction.

one rule of the Vice Lord organization [was] you don't snitch." Doc. No. 381-9 at 3. Whatever they have failed to do to bolster their evidence of this is no fault of Plaintiff.

*Second,* despite their protestations of needing additional discovery, the defendants took no steps during the fact discovery period in this case to obtain testimony bearing on the Vice Lords or on Plaintiff's encounter with Berti and Glinski—and in fact pushed to end the fact discovery period in this case without ever mentioning the need for such testimony.

Indeed, if anyone was sandbagged it was this very Court as well as Plaintiff. On October 2, 2017, well after the *Patrick* trial, the parties appeared before this Court, Defendants said nothing. *See* Doc. No. 354; Doc. No. 355. Then, on August 11, 2017, by order of this Court, the parties submitted a *joint* status report detailing the outstanding discovery issues. Again, Defendants were completely silent. They never claimed they needed to conduct scores of depositions or even informed the Court that while they were publically setting out a proposed expert discovery schedule they were secretly lying in wait to file a motion just 10 days later seeking dismissal of the entire lawsuit, severe sanctions against Plaintiff, and leave to reopen discovery to conduct a scores of depositions to remedy the severe prejudice they now claim to have suffered.  That silence is telling; actions speak louder than words.  There is no basis to invite the defendants to further prolong this litigation with additional depositions or re-opened depositions.  If defendants had a genuine  need for such discovery, nothing impeded them from asking for it, yet they made no such request.

*Third,* the Defendants already took Mr. Taylor's deposition, during which Mr. Taylor gave both Version A and Version B.  They had every opportunity to explore the motivations for that inconsistency, and any "gang-related" angle.  Defendants chose not ask those questions at

the time the inconsistency arose. Nothing about the fact that Mr. Taylor testified to Version B in *Patrick* changes anything.

## II. THE SANCTIONS THE DEFENDANTS HAVE PROPOSED CANNOT BE JUSTIFIED.

In Plaintiff's view, what is most telling about this dispute is just how badly the Defendants have overreached in proposing possible sanctions. Specifically, Defendants ask the Court to direct a finding that the allegations in the falsified police report must be accepted by the jury as true (thereby defeating Plaintiff's claim that he was in jail at the time of the crime), or even outright dismissal of the case. And they make those requests despite the total lack of any rational relationship between those proposed sanctions and the alleged misconduct.[2]

Plaintiff's prior filings have previously characterized Defendants' overreach as a desperate "Hail Mary," an attempt to try to avoid liability in a case for which there is otherwise no credible defense (and a case the City has already lost badly against a co-Plaintiff). Plaintiff stands by that characterization. Defendants are pursuing this issue to the maximum because they have no other grounds to defend the case. That approach should not be rewarded.

As to attorneys' fees, the defendants are not entitled to a windfall for pursuing costly and unnecessary motion practice. The court has indicated that it will not dismiss this case, rejecting the argument that was the centerpiece of the defendants' motion. The defendants have asked to

---

[2] Plaintiff has already explained that the proposed sanction of accepting the fraudulent Berti/Glinski report as true is completely without merit. *See* Doc. No. 353 at pp. 16-18. Plaintiff incorporates that explanation here. The defendants have cited no basis in the rules for such a sanction, as Plaintiff demonstrated in his original response brief. More important, as Plaintiff also demonstrated, such a sanction would be wildly disproportionate, essentially handing the defendants a finding that Plaintiff was indeed out of the lockup much earlier than police records reflect—and all that based upon a *report about which Glinski has lied and which, on its face, bears multiple indicia of fraud, no less.* Such a sanction obviously cannot be justified.

pierce the attorney client privilege, a request that the court also denied (after further briefing that required Plaintiff to expend resources and attorneys' fees on Defendants' losing quest).

The defendants other proposed sanctions have all been shown to be without basis. Taxing Plaintiff with the costs of a motion that was largely without merit would be unfair and disproportionate. The defendants should not receive an award of fees.

### III.    Plaintiff's Request for Reciprocal Relief

As is undoubtedly clear, Plaintiff strongly believes that there is no justification for any sanctions against any party. However, in the event the Court disagrees and decides that sanctions are appropriate against Plaintiff's side, the law provides that they must be tailored to remedy any prejudice suffered, which obviously involves evaluating matters in their totality. On that score, the Court should factor in that the Defendant-movants themselves have given inconsistent accounts on material facts in this case, only one of which can be true. *See* Dckt. 407, at 2-4. Plaintiff is not going to repeat that discussion here, and incorporates it herein by reference. To make the record complete, however, Plaintiff wishes to be clear that he too requests that in the event that the Court decides that Plaintiff's untruthful statements merit sanctions rather than impeachment, it also award sanctions against the Defendants for their untruthful statements for the reasons set forth in the prior pleadings. If sanctions are going to be ordered, it would be inequitable for those sanctions to run one-way rather than both ways.

### CONCLUSION

As discussed above, there are new facts on the table that had not previously been provided to the Court. In that light, Plaintiff respectfully asks that this Court decide to award no sanctions or, alternatively, award only the nominal sanctions discussed herein and to sanction the Defendants for their own dishonest statements in the manner described above.

Respectfully submitted,

**DANIEL TAYLOR**

By**:**  Jon Loevy
    *One of his Attorneys*

| | |
|---|---|
| Arthur Loevy | Locke E. Bowman |
| Jon Loevy | Alexa Van Brunt |
| David B. Owens | RODERICK AND SOLANGE MACARTHUR |
| LOEVY & LOEVY | JUSTICE CENTER |
| 312 N. May St., Ste. 100 | Northwestern University School of Law |
| Chicago, IL 60607 | 375 E. Chicago Avenue |
| (312) 243-5900 | Chicago, Illinois 60611 |
| | (312) 503-0844 |

**CERTIFICATE OF SERVICE**

The undersigned, an attorney, certifies that on February 16, 2018 he caused the foregoing document to be served via the court's CM/ECF system, which automatically sent copies to all counsel of record.

                                                            /s/   Jon Loevy