IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

DANIEL TAYLOR,                            )
                                          )
Plaintiff,                                )
                                          )
vs.                                       )          No.: 14 cv 737
                                          )
CITY OF CHICAGO, ANTHONY                  )
VILLARDITA #20849, THOMAS JOHNSON         )
#20820, BRIAN KILLACKY#20748, TERRY       )
O'CONNOR #20831, RICK ABREU #20796,       )
ROBERT DELANEY #20383, SEAN GLINSKI       )
#3122, MICHAEL BERTI #12881, AND          )
UNIDENTIFIED EMPLOYEES OF THE             )
CITY OF CHICAGO,                          )
                                          )
Defendants.                               )

DEFENDANTS' COMBINED RESPONSE TO
PLAINTIFF'S FILINGS IN DCKT. NOS. 432, 433, AND 440 RELATING TO
DEFENDANTS MOTION FOR SANCTIONS AND TO DISMISSS

NOW COME Defendants, ANTHONY VILLARDITA, THOMAS JOHNSON, RICK

ABREU, TERRY O'CONNOR, BRIAN KILLACKY, ROBERT DELANEY, SEAN GLINSKI

and MICHAEL BERTI, by and through their attorneys, BORKAN & SCAHILL, LTD., and for their

Response To Plaintiff's Filings in Dckt. No.'s 432, 433, and 440, state as follows:

INTRODUCTION

Plaintiff and Plaintiff's counsel have filed three (3) separate briefs addressing the remaining

issues pending before this Court relating to Defendants' Motion To Dismiss and for Sanctions. *See*

Dckt. Nos. 432, 433, 440. The purpose of these supplemental filings was twofold. First, Plaintiff's

counsel was to provide a specific explanation (and accompanying declarations) addressing: (1) "when

plaintiff's counsel, date and time, first learned that the plaintiff himself is acknowledging that after his

release from the lockup at approximately 10:00 PM he…did have an encounter with Officers Berti

and Glinski" and to provide a full explanation for "why plaintiff's counsel did not correct the plaintiff's prior false discovery response before he testified in Patrick's trial." Tr. at 17-18. Second, this Court directed the parties to address potential sanctions to be imposed by this Court. *Id.* at 19.

Throughout Plaintiff's and Plaintiff's counsel's three filings, it is apparent that Plaintiff's self-described "team of attorneys" cannot themselves agree on the correct answer(s) to the first inquiry. Indeed, Plaintiff (though this "team of attorneys") has somehow managed to stake out nearly every conceivable factual position (including ones that appear to be diametrically opposed to each other on their face). They collectively claim at various points that:

- Plaintiff's perjury was known to all parties since 2014 *while also* claiming that this was "new information" that was "learned for the first time" on March 29, 2017;

- Plaintiff's perjury was not disclosed to Defendants because it was "privileged" *while also* claiming that Plaintiff's counsel specifically directed Plaintiff (and he agreed) to disclose this allegedly privileged information in open court;

- Plaintiff's decision not to disclose this information to defense counsel was not "strategic" *while also* admitting that it was not disclosed prior to Plaintiff hitting the witness stand in *Patrick* because "a greater level of disclosure" to Defendants' counsel "such as an email or a phone call" would be "adverse to [Plaintiff]."

With respect to the sanctions to be imposed, Plaintiff adds little new to this issue and, indeed, has somehow managed to make an extremely unfortunate incident *even worse* by engaging in absurd mental gymnastics that attempt to blame *Defendants' counsel* for *Plaintiff's* eleventh hour revelation of perjury. Beyond that, Plaintiff again suggests that this Court essentially do nothing in response to Plaintiff's repeated, undisputed, and intentional perjury in this case.

## **ARGUMENT**

I.   **Plaintiff Has Provided Irreconcilably Inconsistent Explanations For His Failure To Timely Apprise Defendants Of His Perjured Testimony.**

This Court's Order to Plaintiff's counsel was clear and specific: specifically state when Plaintiff's counsel "first learned" that Plaintiff had provided false testimony regarding his encounter with Defendants Berti and Glinski and provide an explanation for why this information was not provided to Defendants prior to Plaintiff taking the stand as a witness in the *Patrick* trial. In Plaintiff's three briefs addressing this topic, Plaintiff, through his various attorneys, appears unable or unwilling to provide a consistent explanation.

## A. Plaintiff's Team Of Attorneys Appear To Disagree On When They First Learned Of Plaintiff's Perjury.

First, Plaintiff's "team of attorneys" cannot even seem to agree on when they first learned of Plaintiff's perjury. Indeed, respective members of this team appear to be pursuing completely opposite factual positions on this topic.

### 1. The Position of Mr. Bowman and MJC.

On February 16, 2018, Plaintiff's attorneys Locke Bowman ("Mr. Bowman") and MacArthur Justice Center ("MJC") filed a Memorandum of Law (and several supporting declarations) responding to this Court's inquiry on this topic. *See* Dckt. No. 432. According to Mr. Bowman's February 16 Declaration attached thereto, Plaintiff's counsel "learned for the first time…[a]t about 7:30 p.m. on March 29, 2017" that Plaintiff would "state or acknowledge" his previous testimony was untrue and that "[t]he March 29 meeting was the first occasion upon which Plaintiff stated to me, or to anyone among the team of lawyers representing Plaintiff in the above-captioned matter." *See* Dckt. No. 432-2 at ¶¶ 4, 11. Indeed, Mr. Bowman followed up his February 16 Declaration with a Supplemental Declaration on February 27 and again characterized the revelation by Plaintiff as "new information about the encounter with officers Berti and Glinski." *See* Dckt. No. 440-1 at ¶ 2.

In this version of the events, Plaintiff's counsel insists that they acted promptly upon learning of this revelation to "remonstrate" with Plaintiff on his prior perjury and advise him to correct his previously false testimony within hours of its falsity being learned by Plaintiff's "team of attorneys." *See* Dckt. No. 432 at 1-2 ("The night of March 29, 2017 was the first time that Daniel Taylor ("Plaintiff") informed his counsel, Mr. Bowman, that [redacted in original]…Mr. Bowman acted immediately to remonstrate confidentially with his client to ensure that on the following morning, March 30, Plaintiff would truthfully acknowledge that [redacted in original]….. Meanwhile, in the above captioned lawsuit, in which the same defense counsel were representing the same defendants, nothing was scheduled to occur between the night of March 29 and the morning of March 30. Under these circumstances, no further disclosure, either to the Court or to defense counsel, was necessary under the rules, once Mr. Bowman acted on March 29 to ensure that any inaccurate deposition testimony Plaintiff gave earlier on the subject of the encounter with Berti and Glinski would be corrected promptly on March 30."); Dckt. No. 432 at 8 ("Plaintiff's counsel did not learn that Plaintiff would [redacted in original] until the night of March 29 during a privileged meeting with Messrs. Bowman and Chanen to prepare Plaintiff for his trial testimony in Patrick the next day…Mr. Bowman immediately remonstrated confidentially with his client, Plaintiff, and obtained Plaintiff's agreement to correct the earlier inaccurate deposition testimony the very next morning at the Patrick trial."). While, as set forth in further detail below, this is simply not a sufficient response under the circumstances, this version at least acknowledges that Plaintiff's revelation of perjury was new information as of March 29, 2017 and was required to be disclosed.

### 2. The Position of Mr. Loevy.

On the very same day that Mr. Bowman and MJC filed their Brief, Jon Loevy (another member of this same "team of lawyers") filed "Plaintiff's Supplemental Memorandum Regarding An

Appropriate Sanction" on behalf of Plaintiff. *See* Dckt. No. 433. Mr. Loevy has a much different take on the facts and he insists these have "not heretofore received attention." *Id.* at 4. Accordingly to Mr. Loevy, there was no "new information" in the first place about Plaintiff's revelation regarding his encounter with Defendants Berti and Glinski and, further, it is really *Defendants' fault* that Plaintiff did not reveal his perjury sooner. *See* Dckt. No. 433 at 4-7. According to this version, Plaintiff *both* lied *and* told the truth at his deposition so, the story goes, there was actually nothing "new" about Plaintiff's revelation at the *Patrick* trial in the first place. *See* Dckt. No. 433 at 4-5. Specifically, Mr. Loevy asserts:

> Defendants have painted this Court a picture where Mr. Taylor supposedly said Version A at his deposition, and then admitted at the Patrick trial that Version B was the truth. That is not what actually happened. In reality, Mr. Taylor told both Version A and Version B at his deposition….[T]here can be no argument that Defendants were unaware at the very time of his deposition that Mr. Taylor had given two accounts of what had transpired….[A]nd perhaps more significantly, Mr. Taylor did not deny Version A at his deposition as the Court had apparently previously been led to believe. More accurately, Mr. Taylor gave both Version A and Version B at his deposition. He was caught giving inconsistent statements.

> What all of this means is that the case for sanctions is somewhat different than had previously been presented by the Defendants to the Court. Mr. Taylor did not conceal the truth at his deposition, only to reveal it on the fly in a manner that sandbagged the defense. To the contrary, Mr. Taylor admitted the truth at his deposition too. *Id.* at 4-6.

This argument relies on the following: (1) Plaintiff's insistence that Plaintiff "essentially admitted to the accuracy of a Cook County State's Attorney's Office ("CCSAO") investigative report confirming his statement that he did take the officers to find Mr. Phillips" at his deposition (*see* Dckt. No. 433 at 3-4); and (2) that, at this same deposition, Plaintiff "was shown a different memorandum from his then-attorney Kathleen Zellner, and Defendants specifically pointed him to the mention of Glinski and Berti included in the memo, which stated: "Taylor has informed us that after being picked up by officers Glinski and Berti in front of Andrea Phillips' house at approximately 10:30-10:40 p.m. and the officers dropped him off about 15-20 minutes later" (*id.*).

These arguments are wholly frivolous in every respect (both factually and legally). With respect to the 2003 CCSAO memorandum, Plaintiff absolutely did not "essentially admit[]" to the accuracy of this memorandum as it pertained to the encounter with Defendants Berti and Glinski. In fact, he did the exact opposite. While Plaintiff looked at the 2003 CCSAO memorandum and stated that it was "pretty much" accurate, he specifically denied that he would have ever told the CCSAO in 2003 that the encounter with Defendants Berti and Glinski occurred because this encounter "didn't happen." *See* Dckt. No. 358-5 at 197:19-200:14. Thus, Plaintiff did not "essentially admit[]" this particular incident with Defendants Berti and Glinski occurred; rather, he did the exact opposite and implicitly accused the CCSAO of fabricating these statements. *Id.* Indeed, this specific exchange regarding Plaintiff's interview by the CCSAO in 2003 ended with Plaintiff testifying that he was "a hundred percent positive" that this encounter never occurred. *Id.* at 200:23-201:2.

With respect to the Memorandum provided by Plaintiff's former post-conviction counsel, Kathleen Zellner, to Alison Perona of the CCSAO purporting to memorialize a statement made by Plaintiff, Plaintiff's arguments do not even pass the proverbial "red face test." On this point, Mr. Loevy is correct that Plaintiff was "shown" this memorandum at his deposition. Indeed, not only was Plaintiff "shown" this document but Defendants counsel specifically asked him about the content of this document as it pertained to his version of the events regarding Defendants Berti and Glinski. *See* Dckt. No. 358-5 at 196:12-197:17. Unfortunately, Plaintiff was not given an opportunity to admit or deny whether this was accurate or not *because Plaintiff's counsel specifically directed Plaintiff not to answer these questions. Id.* Thereafter, Plaintiff's attorneys fought "tooth and nail" to prevent Defendants from inquiring further into such communications. *See Taylor v. City of Chicago*, 2015 WL 5611192 (N.D. Ill. 2015).

It is anyone's guess what Plaintiff would have said at the time had Plaintiff's attorneys actually permitted him to answer this question (as this Court itself ultimately determined was required by law). However, given his repeated bouts of perjury to that point, professed loyalty to a violent criminal organization as explanation for his perjury, and demonstrable lack of compunction for accusing others of lying to conceal his own dishonesty, it seems highly unlikely that this question would have elicited the truth. This, of course, is all speculation because Plaintiff's counsels themselves intentionally obstructed access to this information at this deposition. Nonetheless, the idea that this non-answer should somehow be construed as an admission of the truth of the content of this memorandum is preposterous.

**B. Plaintiff's "Team of Attorneys" Have Provided Irreconcilably Conflicting Explanations For Their Failure To Disclose Plaintiff's Perjury, None Of Which Provide A Proper Legal Basis For Such Failure.**

Plaintiff's "team of attorneys" also cannot seem to agree on exactly *why* Defendants were not told of Plaintiff's perjury until he was literally on the witness stand as a key witness near the end of a six week trial. However, Plaintiff's varying explanations raise some extremely troubling inferences on this topic.

**1. Mr. Loevy's Explanation.**

Mr. Loevy's position on this topic is a rather spectacular display of chutzpah: it is Defendants fault, he says, because Defendants did not take more steps in discovery to force Plaintiff to admit his previous bouts of perjury prior to the *Patrick* trial. According to this line of attack, Plaintiff told two irreconcilably different versions of the facts and it was Defendants obligation to go further to make Plaintiff admit which one was true. To wit, Mr. Loevy argues:

> [I]f the Defendants had legitimate questions about which of Version A or Version B was accurate, then the Defendants were more than free to seek clarification about the inconsistency at Mr. Taylor's deposition. They could have also sent an interrogatory, or request to admit on

these exact issues afterwards. They had every opportunity to discover what the problem was. Instead, defense counsel instead elected to steer clear of this glaring inconsistency at Mr. Taylor's deposition. Their choice, not totally irrational from a litigation perspective, was to not allow Mr. Taylor any fair chance to explain why he had given two different versions (as doing so would weaken the potential power of the impeachment at trial, their preferred remedy at the time).

If the Defendants had genuine questions about why Mr. Taylor was going to give Version B instead of Version A, or even why there were two versions in the first place, those were questions that defense counsel could and would have asked at or after Mr. Taylor's deposition, but did not.

Had the Defendants properly apprised the Court that Mr. Taylor also gave Version A at his deposition and then was asked no questions about the discrepancy, the Court likely would have concluded that Mr. Taylor's inconsistent statements were just that: inconsistent statements. Not sanctionable misconduct. *Id.* at 6-7.

The initial problem with this new line of attack is that it is pure unadulterated falsehood.

Contrary to these false accusations, Plaintiff was provided no less than *five (5) opportunities* to provide any testimony he wished on this issue. In response to each opportunity, he either lied or was directed not to answer at Plaintiff's attorney's instruction. Again, the record is as follows:

1. Plaintiff was specifically asked in his answers to interrogatories to provide a detailed chronological recounting of his activities and interactions on November 16, 1992. See Dckt. No. 358-5 at 32:2-32:16. Plaintiff was asked at the very outset of his deposition whether these answers were correct. *Id.* He lied and said they were when he knew they were not. *Id.*

2. Plaintiff was later directly asked to provide a chronological timeline of his activities on November 16, 1992. *See* Dckt. No. 358-5 at 184:6-195:12. He was specifically asked whether he had any interaction with any police officer after arriving in the area of Hazel and Agatite. *Id.* at 189:21-190:4. Once again, he lied. *Id.*

3. Plaintiff was asked whether he had ever at any time given a version of the events to anyone where he had such an encounter with Defendants Berti and Glinski. *Id.* at 194:22-195:17. Once again, he lied. *Id.*

4. Plaintiff was specifically asked whether he told the CCSAO in 2003 that he did, in fact, encounter Defendants Berti and Glinski on the night of the murders. *Id.* at 197:19-200:14. Once again, he lied and, even worse, implicitly accused the CCSAO of fabricating this statement. *Id.*

5. Plaintiff was confronted with the memorandum prepared by his former attorney attributing a statement to him admitting his encounter with Defendants Berti and Glinski. *See* Dckt. No. 358-5 at 196:12-197:17. Plaintiff refused to answer at the direction of his attorney and Plaintiff's attorneys vociferously opposed Defendants later attempts to compel Plaintiff to provide answers on this topic. *Id.*

On this record, the idea that Defendants counsel "elected to steer clear of this glaring inconsistency at Mr. Taylor's deposition," elected "to not allow Mr. Taylor any fair chance to explain why he had given two different versions," that there were questions about Plaintiff's alleged discrepant testimony that "defense counsel could and would have asked at or after Mr. Taylor's deposition, but did not," or that Defendants' counsel "asked no questions about the discrepancy" is wholly frivolous in every respect. Frankly, short of bringing a polygraph machine to this deposition, it is difficult to imagine what additional ways Plaintiff could have been confronted about this topic to get him to actually tell the truth. Defendants addressed this issue in every way possible and Plaintiff lied or obstructed every single time.

Putting to the side that the underlying accusations of a failure to challenge Plaintiff are simply made up, this would be irrelevant even if this characterization were true. According to Plaintiff, Defendants are really to blame for all of this because, after the deposition, "[t]hey could have also sent an interrogatory, or request to admit on these exact issues afterwards." *See* Dckt. No. 433 at 6-7. In other words, Mr. Loevy apparently believes that a lying litigant should suffer no consequences for prior perjury unless his opponent sends follow-up discovery thereafter inquiring whether he really, truly meant what he said under oath. *Id.*

Fortunately, this is not the law. Indeed, the law is the exact opposite. Plaintiff was asked in unambiguous terms *prior to his deposition* to provide sworn answers addressing his specific whereabouts, movements, interactions, communications, etc. *See* Dckt. No. 358-4 at ¶ 22. Plaintiff provided a specific version of the events that falsely stated he had no interaction with Defendants Berti and

Glinski on the night in question. *Id.* Even were Plaintiff's deposition to support a sequence of events where Plaintiff provide two diametrically opposed sets of facts, the Federal Rules of Civil Procedure put the onus *on Plaintiff and his attorneys* to correct or supplement this information once it was learned to be untrue. *See* Fed. R. Civ. P. 26(e).

In this regard, Mr. Loevy's position that "everyone knew Plaintiff had told two stories at his deposition" is even more troubling because it suggests that Plaintiff's counsels *actually considered* that Plaintiff had lied about this topic at the time and yet took absolutely no steps to correct this information for nearly two and a half years. To this end, Plaintiff's strange attempt to blame Defendants for not following up on this alleged inconsistency must be put to Plaintiff's counsels themselves: After hearing Plaintiff provided irreconcilably false testimony at his deposition, why didn't you confront your client to determine what the actual truth was? Why didn't you ask your client whether Version A was the truth or Version B was the truth? Why didn't you immediately supplement or correct Plaintiff's false Interrogatory Response after determining that Version A was supposedly false and Version B was supposedly the truth?

On this point, it bears reminding this Court that Plaintiff's counsels have already admitted to the Court that they have no recollection of *ever* actually addressing this issue with Plaintiff at any point after his September 2014 deposition until the night before Plaintiff was scheduled to testify in the *Patrick* case. *See* Letter to Judge Finnegan (December 18, 2017) at pp. 2 and privilege log. Indeed, Plaintiff's privilege log lists no communications whatsoever between Plaintiff and his attorneys between the date of his deposition on September 4, 2014 and the meeting occurring on March 29, 2017. *Id.* Thus, taking Mr. Loevy's justification at face value, Plaintiff's counsels knew that their client had testified falsely and did nothing to remedy Plaintiff's previously false discovery responses.

**2. Mr. Bowman and MJC's Explanation For Non-Disclosure.**

The explanations provided by Mr. Bowman and MJC are similarly troubling (albeit for different reasons) but no less legally invalid. As noted above, unlike Mr. Loevy, Mr. Bowman's and MJC's version of the facts is that Plaintiff's revelation of perjury was, indeed, "new information" and "learned for the first time" on the evening of March 29, 2017. However, the various explanations given for the failure to immediately contact Defendants to disclose this information are many and, often, internally contradictory.

Specifically, Mr. Bowman and MJC appear to invoke the following as reasons for failing to disclose this information: (1) "a relatively hectic period of [Mr. Bowman's] schedule" during which he had "no recollection of considering or analyzing whether [he] had an obligation to supplement or amend" Plaintiff's previous false discovery responses )(the "I was too busy" defense)(*see* Dckt. No. 440-1 at ¶¶ 2-3); (2) a claim that Plaintiff's acknowledgement of perjury was "protected from disclosure by the attorney-client privilege, and the communications among Plaintiff, [Plaintiff's counsel] and Mr. Chanen to be protected from disclosure by a common-interest privilege" for which Plaintiff was not required to make a "disclosure adverse to his client, such as an email or a phone call to defense counsel" (the "privilege defense")(*see* Dckt. Nos. 432-2 at ¶ 5; 432 at 9-12); and (3) a claim that, because Plaintiff was not a party to the *Patrick* case, disclosure was not necessary under Fed. R. Civ. P. 26(e) prior to Plaintiff testifying in the *Patrick* case because Plaintiff was not a party in the *Patrick* case (the "not my problem" defense)(*see* Dckt. No. 440 at 3-4). These proffered explanations are not meritorious and, indeed, are internally contradictory.

### a. The "I Was Too Busy" Defense.

With respect to the "I got too busy and forgot" defense, this justification is belied by Mr. Bowman's admission that there was a specific decision made *not to disclose* this information to the defense beforehand and to simply let the defense hear it the following day in open court. *See* Dckt.

No. 432 at 8 ("Mr. Bowman immediately remonstrated confidentially with his client, Plaintiff, and obtained Plaintiff's agreement to correct the earlier inaccurate deposition testimony the very next morning at the Patrick trial…"); Dckt. No. 432 at 4 ("Both Messrs. Bowman and Chanen left that meeting with an understanding that Plaintiff would acknowledge the encounter on the stand in Patrick on March 30."); Dckt. No. 432 at 7 ("Mr. Bowman immediately and confidentially remonstrated with his client and ensured that the very next morning, Plaintiff's inaccurate deposition testimony would be corrected"). Despite his lamentations about being busy, it is clear that Mr. Bowman actually did not forget to disclose this information (or even fail to consider the obligation to do so) because of his busy schedule; rather, he admits that he fully appreciated this obligation to disclose and, to this end, *specifically directed* his client to disclose this information the very next day in furtherance of this obligation. *Id.*

### a. The "Privilege" Defense.

With respect to Plaintiff's "privilege defense," Plaintiff's claim that this information was "privileged" and not subject to disclosure is absurd. Indeed, Plaintiff cannot even hold firm on that position for an entire paragraph before contradicting himself. Specifically, Mr. Bowman and MJC claim that "Mr. Bowman knew that his March 29 meeting was privileged and confidential" but immediately follows up this claim of privilege by explaining that he *specifically directed his client* to disclose this exact same allegedly privileged information in court the very next day and that his client agreed to do so. *See* Dckt. No. 432 at 11-12 ("He knew that once Plaintiff agreed to his instructions to [redacted in original], the truth would come out on March 30, as it did come out. Remonstrating immediately with Plaintiff on March 29 (in the same meeting in which Mr. Bowman learned that contrary to the deposition testimony, Plaintiff would [redacted in original], to ensure that he would testify truthfully on March 30 was a wholly reasonable remedial measure directed at rectifying the deposition testimony….Having obtained Plaintiff's agreement on March 29 to testify truthfully on March 30

about [redacted in original], Mr. Bowman had every reason to believe that his corrective effort would be successful, and that therefore no advance disclosure to defense counsel or the tribunal was required."). While it is highly dubious to suggest that Plaintiff's admission of perjury of March 29 was privileged in the first place, there can be no credible argument that any such information remains privileged once the decision has been made to actually disclose this information at trial. *See United States v. White*, 970 F.2d 328, 334 (7th Cir. 1992); *United States v. Lawless*, 709 F.2d 485, 487 (7th Cir. 1983)("When information is transmitted to an attorney with the intent that the information will be transmitted to a third party…such information is not confidential.").

In this regard, Mr. Bowman and MJC essentially admit that the failure to immediately apprise Defendants' counsel of this non-privileged information was, in fact, specifically motivated by strategic concerns. Specifically, despite their admission that Plaintiff had expressly acceded to disclosing his prior perjury the following day, Mr. Bowman and MJC expressly admit that they *still elected* not to disclose this then-unprivileged information to Defendants' counsel because they believed that "a greater level of disclosure" beyond simply allowing Defendants' counsel to find out the next day while Plaintiff was on the stand would be "adverse to his client." *See* Dckt. No. 432 at 12.

In fact, it is undisputed that the *entire purpose* for the March 29 meeting was to prepare Plaintiff to testify at the *Patrick* trial with Plaintiff's counsel and Mr. Patrick's counsel, Mr. Chanen, in accord with Plaintiff's contractually binding Joint Prosecution Agreement. The entire reason that Mr. Chanen was permitted to attend this meeting was because of the existence of a Joint Prosecution Agreement between Plaintiff and Mr. Patrick that expressly provided, among other things, "a mutuality of interest in prosecuting the claims that they have asserted" as well as "sharing documents, factual material, mental impressions, memoranda, interview reports, legal theories, strategies, and other information, including statements by the Parties and their confidences" in furtherance of the "the mutual interests

of the respective Parties." *See* Dckt. No. 405-1 (Joint Prosecution Agreement). In other words, the revelation to Mr. Patrick's counsel of Plaintiff's perjury was done expressly out of strategic motives embodied in an actual signed document.

In this regard, in attempting to justify this selective strategic disclosure, Mr. Bowman and MJC rely almost entirely on arguments that their non-disclosure was in compliance with the Rules of Professional Conduct. *See* Dckt. No. 432 at 1-16. This, of course, is not remotely the point (even were it true). Defendants have brought this Motion alleging that *Plaintiff* himself committed perjury (repeatedly) and that *Plaintiff* failed to timely disclose such information in accord with the Federal Rules of Civil Procedure and otherwise applicable federal law in order to maximize damage and prejudice to these Defendants in the *Patrick* case. Whether Plaintiff's attorneys acted in accordance with the Rules of Professional Conduct in dealing with their client's criminal behavior is for determination by another tribunal and Defendants take no position on the matter. However, Plaintiff, as a litigant, had the obligation under the Federal Rules of Civil Procedure to disclose his perjury long before he came anywhere near the witness stand in the *Patrick* case.

### b. The "Not My Problem" Defense.

With respect to Plaintiff's "not my problem" defense, Mr. Bowman's and MJC's contention that the failure to provide notice to Defendant's counsel prior to Plaintiff testifying in the *Patrick* case was compliant with Fed. R. Civ. P. 26(e) is equally unavailing. In a nutshell, they claim that "Rule 26 did not impose upon Mr. Bowman any discovery obligations in connection with events in the Patrick case because he was not counsel of record in the Patrick case" and that they are not required to consider "the effect those discovery responses may have on events occurring in a case in which they are not counsel of record." *See* Dckt. No. 440 at 3-4. Further, Mr. Bowman and MJC claim that "Rule 26(e)(1)(A) requires 'timely' supplementation of an incomplete or erroneous interrogatory answer"

and that "the Rule did not require amendment of the interrogatories in the Taylor case during the narrow window of time before Plaintiff testified in a different case the following morning." *Id.* There are a multitude of problems with this analysis.

First, Mr. Bowman and MJC entirely misunderstand the application of Rule 26(e) to this case. Again, Defendants' Motion for Sanctions is specifically directed to *Plaintiff himself. See* Dckt. No. 358. Rule 26(e) requires that "[a] *party* who has…responded to an interrogatory…must supplement or correct its disclosure or response…in a timely manner if the party learns that in some material respect the disclosure or response is incomplete or incorrect." *See* Fed. R. Civ. P. 26(e). This Rule specifically imposes the obligation for ensuring the timely supplementation on the "party" himself (not just the attorney). *Id.*; *see also Rojas v. Town of Cicero*, 2015 WL 5611697, at *3 (N.D. Ill. Sept. 22, 2015) *citing* Fed.R.Civ.P. 26, advisory comm. notes, 1993 amendment ("The duty to supplement, "while imposed on a 'party,' applies whether the corrective information is learned by the client or by the attorney.").

In this regard, the relevant time period in determining whether a supplementation is "timely" is not between Plaintiff's revelation to his attorney of his perjury on March 29 and his testimony on March 30; rather, the relevant time period is measured from when Plaintiff *himself* "learns that in some material respect the disclosure or response is incomplete or incorrect." *See* Fed. R. Civ. P. 26(e). Plaintiff himself, of course, did not "learn[] that in some material respect the disclosure or response is incomplete or incorrect" on March 29; **he _always_ knew it was a lie**. He knew it was lie when he answered his Interrogatories on June 3, 2014. He knew it was a lie when he gave his deposition on September 4, 2014. He knew it was a lie at all other times over this two and a half years stretch between September 4, 2014 and March 29, 2017. Plaintiff himself is the subject of the request for sanctions in this case. There can be no question whatsoever that Plaintiff personally failed to timely disclose a false interrogatory answer for *several years* in violation of Fed. R. Civ. P. 26(e).

Second, even were the clock for "timeliness" to start on Plaintiff's revelation on March 29, the outcome would be the same. Whether supplementation is "timely" is "measured against all the circumstances." *Colyer v. City of Chicago, Gildardo Sierra*, 2016 WL 25710, *15 (N.D. Ill. 2016). "But where trial preparation is concerned, timely can mean immediate or nearly so." *Id. quoting Fusco v. Gen. Motors Corp.*, 11 F.3d 259, 266 (1st Cir. 1993)(affirming sanction even though document was disclosed promptly after it was created and before trial because the disclosure was so close to trial as to "compromise[][the opposing party's] pretrial preparations"); *see also Labadie Coal Co. v. Black*, 672 F.2d 92, 95 (D.C. Cir. 1982).

"All of the circumstances" to be considered in this case point to an obligation of disclosure by Plaintiff, at the very latest, immediately after his decision to follow his attorneys advice and cop to his prior perjury. Plaintiff's attempt to distance himself from his personal stake in the *Patrick* case on this point does not hold up to any degree of scrutiny. ). Indeed, this Court itself recognized this very issue during the January 26 hearing. Tr. at 19:2-19:15 ("So here we have Mr. Patrick, it's his trial, not plaintiff's trial, but, you know, the reality is, we've got the exact same facts coming out, we've got the same defendants, defense counsel, and the reality, and everybody knows, whatever he says at this trial is going -- is being recorded, and it can be an admission and offered at his own trial. So, you know, it seems to me that, I was surprised that you wouldn't have, you know, in some fashion, whether it's an e-mail saying, heads up, you know, you received an answer to this interrogatory, you know, there was an encounter with Berti and Glinski at 10:30. And that way they're not hearing it for the first time when your client hits the stand.").

Plaintiff was not a stranger to the Patrick case and his self-serving revelation was not serendipitous to the timing of the *Patrick* trial. It was not mere happenstance that the revelation of Plaintiff's perjury coincided with Plaintiff's testimony in the *Patrick* case; rather, the *entire purpose* of the

meeting on March 29 was to prepare Plaintiff to give testimony in the *Patrick* trial the very next day. This meeting was not only conducted with Plaintiff's own attorney but with the attorney *for Mr. Patrick*. In fact, there was no reason for Plaintiff to meet with hbis own attorney other than the provide testimony in the *Patrick* trial. Most importantly, this meeting was specifically conducted under the auspices of a Joint Prosecution Agreement between Plaintiff and Mr. Patrick which expressly provided, among other things, "a mutuality of interest in prosecuting the claims that they have asserted" as well as "sharing documents, factual material, mental impressions, memoranda, interview reports, legal theories, strategies, and other information, including statements by the Parties and their confidences" in furtherance of "the mutual interests of the respective Parties." *See* Dckt. No. 405-1.

As previously set forth before this Court, Plaintiff's decision to "come clean" in the *Patrick* case was not coincidence either. Contrary to Plaintiff's ludicrous insinuation that he was "not at all 'cornered' and forced against his will to acknowledge his misstatement" (*see* Dckt. No. 433 at 4), this revelation was specifically designed to assist Mr. Patrick in his suit against these same defendants. Again, Plaintiff and Mr. Patrick had a contract to provide strategic assistance to each other. *See* Dckt. No. 405-1. Mr. Patrick's case was the first to proceed to trial. In connection with the *Patrick* case, Mr. Patrick had already provided testimony in this trial that directly contradicted Plaintiff's previous denial of any encounter with Defendant Berti and Glinski. Indeed, Mr. Patrick specifically testified that he personally witnessed Plaintiff speaking to Defendants Berti and Glinski on the scene. Thus, the revelation of this perjury was clearly designed to avoid Plaintiff being used as a basis to further impeach the veracity of the testimony of Mr. Patrick in his own trial. Under these circumstances, immediate disclosure was required and the failure to do so violated the law.

## II. Plaintiff Again Insists That This Court Impose No Sanctions For His Repeated Acts Of Intentional Criminal Perjury.

Plaintiff's "Supplemental Memorandum Regarding An Appropriate Sanction" is little more than an attempt to re-litigate the propriety of sanctions in the first place followed by yet another plea that this Court do absolutely nothing at all in response to a party repeatedly and intentionally perjuring himself at his own deposition in his own lawsuit motivated by an avowed loyalty to a violent criminal organization. *See* Dckt. 433 at 1-16. Indeed, as noted above, the primary thrust of this filing is Plaintiff's frivolous suggestion that Defendants are really to blame for this whole affair because: (1) they should have asked Plaintiff more than five times whether he was lying or telling the truth at his deposition; and (2) followed up with additional discovery after this deposition to ask again whether he really meant what he said. *Id.*

The factual bases for sanctions have already been litigated at length by the parties in numerous briefs before this Court and Defendants would defer on this topic to the matters they have already set forth before this Court. Despite announcing that he would be focusing on matters that have "has not heretofore received attention," Plaintiff adds very little new to this determination and largely re-hashes a number of previous arguments that truly merit no additional response. That said, several arguments bear additional response because, once again, they rely on blatant misrepresentations of the record.

First, according to Mr. Loevy, Plaintiff's repeated perjury about his encounter with Defendants Berti and Glinski is "largely a distraction" and "on the periphery of what is actually at issue in this litigation" because:

> Defendants contend, in one way or another, that Daniel Taylor was not in the lock-up at the time of the murders. Plaintiff contends that—based upon the contemporaneously created administrative records and authored by third-parties to this suit—show he was in the lock-up at the time of the crime. Under both accounts, the "encounter" with Berti and Glinski happened well after the murders, and was unrelated to his time in jail. *See* Dckt. No. 433.

Calling this a misrepresentation of the record would be a vast understatement. This characterization is only true if this Court: (1) ignores Plaintiff's 2014-2017 admitted perjury; (2) accepts as 100% true Plaintiff's 2017 change in testimony; and (3) completely ignores the testimony of Defendants in every respect.  There is literally nothing true about Mr. Loevy's averment that "[u]nder both accounts" this encounter "was unrelated to his time in jail." Defendants Berti and Glinski have always said that this encounter occurred during the time that Plaintiff contends he was in jail on the night of the murders. This encounter had everything to do with Plaintiff's alleged "time in jail" and Plaintiff's "time in jail" on the night of the murders forms the basis for every single claim asserted by Plaintiff in this case.

Second, Mr. Loevy also insists that "the reason why Mr. Taylor was originally dishonest was in no way calculated to gain advantage in litigation" but "[r]ather, he simply wanted to avoid being perceived by the other plaintiffs as having been complicit with the police." *See* Dckt. No. 433 at 4. In this telling, "[t]his was not…a situation where the dishonesty involved an attempt to try to prove a claim or establish liability.." *Id.* Once again, this argument not only would require this Court to simply take the word of a repeated perjurer on the very same topic as his perjury but also would require this Court to ignore the circumstances surrounding Plaintiff's actual testimony.

Plaintiff's instance of perjury regarding his encounter with Defendants Berti and Glinski occurred *in 2014*. This was not committed when Plaintiff was a naïve teenager. This was committed by a nearly 40 year old man in his own civil rights lawsuit at which he was prepared and represented by a whole team of attorneys.  This perjury was not committed because "he simply wanted to avoid being perceived by the other plaintiffs as having been complicit with the police," it was committed because of Plaintiff's continued loyalty to a violent criminal organization that he claimed to have dissociated from year before this deposition.

Similarly, the idea that the subject of this perjury was not "an attempt to try to prove a claim or establish liability" is ludicrous. The substance of this perjury had *everything* with the very heart of all of Plaintiff's claims. This interaction directly contradicted his lock-up alibi and it directly supports Defendants' claims that Plaintiff had no compunction about snitching on his fellow gang members to the police. This interaction one of the single most probative pieces of evidence in this entire case.

Defendants urge this Court to respond firmly to the rare and shocking set of circumstances in this case. Failing to do so would not only be inappropriate under governing law considering the facts of this case but would also set an extremely dangerous precedent in this courthouse (and others) for other litigants (like Plaintiff) who demonstrate little respect for the oath to tell the truth, the rules of discovery, and the authority of this court. If there is no real consequence for a person intentionally and repeatedly lying under oath at his own deposition in his own lawsuit out of loyalty to a violent criminal organization, what message is being sent to other like-minded litigants? What possible deterrent could there ever be to lie as a matter of course, hope you do not get caught, but, if you do, be no worse for the wear?

Defendants, once again, urge this Court to enter dismissal as sanction in this case. As set forth in great detail in prior briefing, this relief has been found appropriate under far less aggravated circumstances than present in this case. Anything short of that would insufficiently remedy this grave misconduct and would provide little deterrent effect to future perjurers in this courthouse. However, short of that, Defendants suggest that the remedies proposed in Defendants' Supplement Brief In Support Of Combined Motion for Sanctions and to Dismiss. *See* Dckt. No. 431 at 1-23.

WHEREFORE, Defendants pray this Court dismiss Plaintiff's claims with prejudice and enter judgment in favor of Defendants pursuant to Fed. R. Civ. P. 37 and the inherent powers of this Court under Chambers v. NASCO, Inc., 111 S. Ct. 2123 (1991), award attorney's fees and costs, and for whatever other relief this Court deems fit.

Respectfully submitted,

BORKAN & SCAHILL, LTD.

By:   s/Timothy P. Scahill

Steven B. Borkan
Timothy P. Scahill
BORKAN & SCAHILL, LTD.
20 South Clark Street, Suite 1700
Chicago, Illinois 60603