IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| DANIEL TAYLOR, | ) | |
| | ) | |
| | ) | 14 C 737 |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Hon. John Z. Lee |
| | ) | |
| CITY OF CHICAGO, ANTHONY VILLARDITA | ) | |
| #20849, THOMAS JOHNSON #20820, BRIAN | ) | |
| KILLACKY #20748, TERRY O'CONNOR #20831, | ) | |
| RICK ABREU #20796, ROBERT DELANEY | ) | |
| #20383, SEAN GLINSKI #3122, MICHAEL | ) | |
| BERTI #12881, and UNIDENTIFIED | ) | JURY DEMAND |
| EMPLOYEES OF THE CITY OF CHICAGO, | ) | |
| | ) | |
| Defendants. | ) | |

## FIRST AMENDED COMPLAINT

Plaintiff DANIEL TAYLOR, by his undersigned attorneys, complains of Defendants, the CITY OF CHICAGO, ANTHONY VILLARDITA #20849, THOMAS JOHNSON #20820, BRIAN KILLACKY #20748, TERRY O'CONNOR #20831, RICK ABREU #20796, ROBERT DELANEY #20383, SEAN GLINSKI #3122, MICHAEL BERTI #12881, and UNIDENTIFIED EMPLOYEES of the CITY OF CHICAGO, acting pursuant to the City's policies and practices (collectively, "Defendant Officers"), as follows:

### INTRODUCTION

1. Daniel Taylor was convicted of a brutal double homicide that he did not commit. Arrested at age 17, Plaintiff spent more than 20 years in prison before he was ultimately exonerated.

2.   Plaintiff was in police custody on a disorderly conduct charge at the time of the murders and did not bond out until well after the crimes were committed.  Nonetheless, determined to close the murder cases, the Defendant Officers coerced false confessions from Plaintiff and his co-defendants, and hid exculpatory evidence that would have conclusively proven Plaintiff's innocence.

3.   Unfortunately, the misconduct that caused Plaintiff's wrongful conviction was not an isolated incident.  To the contrary, the Chicago Police Department ("Department"), including officers working within the Department "Area" where this investigation occurred, engaged in a pattern of unlawfully coercing confessions over a period of years, frequently preying on young African-American men in order to close unsolved cases through overzealous methods of interrogation.  Likewise, the City of Chicago also has a pattern and practice of withholding exculpatory evidence in Department "street files" from the courts, prosecutors and defendants, just as was done here.

4.   Although Plaintiff has won back his freedom, he will never regain the decades lost in his life.  This lawsuit seeks redress for those injuries.

## JURISDICTION AND VENUE

5.   This action is brought pursuant to 42 U.S.C. § 1983 to redress the deprivation under color of law of Plaintiff's rights

as secured by the United States Constitution.

6.   This court has jurisdiction pursuant to 28 U.S.C. §§ 1331, 1367.  Venue is proper under 28 U.S.C. § 1391(b).  The parties reside in this judicial district, and the events giving rise to the claims asserted herein occurred here as well.

**THE PARTIES**

7.   Plaintiff Daniel Taylor is a 38 year-old resident of Evanston, Illinois.

8.   At all times relevant hereto, Defendants Anthony Villardita, Thomas Johnson, Brian Killacky, Terry O'Connor, Rick Abreu, Robert Delaney, Sean Glinski and Michael Berti were police officers in the Chicago Police Department.  All are sued in their individual capacities, and acted under color of law and within the scope of their employment during the investigation of the murders at issue.

9.   Defendant City of Chicago is an Illinois municipal corporation.  The City of Chicago is or was the employer of each of the Defendant Officers.

**THE CRIME**

10.  On November 16, 1992, Jeffrey Lassiter and Sharon Haugabook were shot and killed in Mr. Lassiter's apartment at 910 W. Agatite in Chicago, Illinois.

11.  An upstairs neighbor, who was also the property manager, called 911 at 8:43 p.m. right after he heard the

3

gunshots.  Police arrived at the scene three minutes later.

## PLAINTIFF'S INNOCENCE

12.  Plaintiff had nothing to do with the Lassiter and Haugabook murders.  He is completely innocent.

13.  As it turned out, Plaintiff was in police custody on an unrelated offense at the time the murders were committed, and thus had an airtight alibi.  Specifically, at 6:45 p.m. on November 16, 1992, Chicago Police officers in the 23rd Police District arrested Plaintiff on a disorderly conduct charge.  Ten minutes later, Plaintiff was transported to the 23rd District for processing.

14.  According to the Department's own records, Plaintiff was received by the 23rd District lockup at 7:25 p.m.

15.  At 10:00 p.m., Plaintiff bonded out of the 23rd District – more than an hour after the murders of Mr. Lassiter and Ms. Haugabook were committed.

16.  Because he was in custody at the time of the murders, there was absolutely no way that Plaintiff could have participated in those murders.

## THE POLICE INVESTIGATION

17.  At the scene of the murders, the Defendant Officers learned that there was one witness, Faye McCoy, who saw four men leaving Mr. Lassiter's apartment building shortly after the shooting.  Ms. McCoy lived in the same apartment building

complex as Mr. Lassiter and was active in the community.  As a result of the latter, Ms. McCoy knew Plaintiff and many of the young men who would become Plaintiff's co-defendants who lived nearby.

18.  Ms. McCoy also knew that Plaintiff was not involved in the shooting nor were any of Plaintiff's co-defendants who lived in the same neighborhood.

19.  Right after the murder, Ms. McCoy told the Defendant Officers that the people she saw leaving Mr. Lassiter's apartment building were men from the West Side of Chicago who had recently been selling drugs in the community, including someone named "Goldie."  None of the persons she saw was Plaintiff or any of the other young men that she knew from the neighborhood.

20.  Following her initial identification, the Defendant Officers had Ms. McCoy look through an array of seven photographs of potential suspects.  Ms. McCoy identified the photograph of Dennis "Goldie" Mixon as one of the four men she saw leaving the murder scene on November 16.

21.  During the initial investigation, several other witnesses identified Mixon as a drug dealer who recently had a physical altercation with Mr. Lassiter.  The Defendant Officers also knew that prior to Mr. Lassiter's murder, Mixon had taken over Mr. Lassiter's apartment to sell crack.

22.  As a result of these witness statements and Ms. McCoy's identification, Mixon became the Defendant Officers' prime suspect in the killings.  The Defendant Officers, however, were unable to find "Goldie."  Therefore, the case went cold for several weeks, until then-15-year-old Lewis Gardner was arrested on unrelated charges.

23.  Lewis Gardner was a juvenile with an IQ of only 70. He lived with his family near the victim's apartment.

24.  The Defendant Officers coerced Mr. Gardner into falsely implicating himself, Plaintiff and five other innocent young men in the murders, including by keeping Mr. Gardner's mother out of the interrogation room, interrogating Mr. Gardner for over 15 hours, psychologically abusing Mr. Gardner, and telling him that he could go home if he gave a statement parroting back what the Defendant Officers told him.  Exhausted and scared, Mr. Gardner succumbed to the coercion, and agreed.

## THE COERCED CONFESSIONS

25.  Once the Defendant Officers had Mr. Gardner's false confession, they proceeded systematically to arrest and coerce Plaintiff, Akia Phillips, Paul Phillips, Joseph Brown, Deon Patrick and Rodney Matthews into making false confessions. Neither Plaintiff nor any of the others had any involvement whatsoever in the murders.  All were young and over half of them were teenagers.

26.   To coerce false confessions from Akia Phillips, Paul Phillips, Joseph Brown, Deon Patrick and Rodney Matthews, the Defendant Officers perpetrated one or more of the following acts of abuse (among other misconduct) against each of those young men: (a) they isolated the young men from parents, family and other advisors for extended periods of time; (b) they threatened the young men, including with a gun; (c) they committed acts of physical abuse; (d) they refused to let the young men use the restroom, forcing them to urinate on themselves; (e) they made false promises that the young men could go home if they confessed; and (f) they fed the young men information about the crime so that the "confessions" they involuntarily gave would appear consistent and reliable.  In this way, the Defendant Officers torturously overcame the young men's wills and secured their false confessions through improper means.

27.   The Defendant Officers never disclosed any of this misconduct.

### PLAINTIFF'S ARREST

28.   Based on Mr. Gardner's false confession, Plaintiff, then only 17 years of age, was arrested while sleeping at the Maryville Shelter in the very early morning hours of December 3, 1992.  The police brought Plaintiff in for questioning at what was then Area 6 (and shortly thereafter was renamed Area 3).

29.   Plaintiff denied having any knowledge of the crime.

Unsatisfied with his protestations of innocence, the Defendant Officers hit Plaintiff with a flashlight and punched him on his body, all while Plaintiff was handcuffed to the wall and defenseless. The Defendant Officers threatened Plaintiff that if he did not give them information about the murders, they were going to keep beating him. Conversely, the Defendant Officers also told Plaintiff that if he confessed, they would allow him to go home. Alone, frightened and believing the Defendant Officers' statements that he would be released, Plaintiff falsely confessed to murders that he did not commit and could not have committed.

### FURTHER MISCONDUCT

30. While he was in their company, Plaintiff told the Defendant Officers that he could not have committed the murders because he was in police custody at the time of the shootings.

31. Within days, the Defendant Officers obtained written corroboration of Plaintiff's alibi, finding a copy of an arrest report that confirmed that Plaintiff was locked up for disorderly conduct at the time of the shootings. A copy of Plaintiff's bond slip likewise confirmed that he had not been released from the 23rd District lockup until 10 p.m. on the night of the murders.

32. Despite this evidence of Plaintiff's innocence, the Defendant Officers proceeded to frame Plaintiff for the murders

rather than search for the real killer. To do so, the Defendant Officers fabricated evidence, coerced witnesses and withheld exculpatory information, all in violation of Plaintiff's constitutional rights.

33. Because the official police records placed Plaintiff in custody at the time of the murder, the Defendant Officers fabricated information about an encounter between Department Officers and Plaintiff on the street near Mr. Lassiter's apartment as occurring at around 9:30 p.m. on November 16, 1992, when Plaintiff was actually in police custody. The false timing of this encounter was memorialized in a fraudulent police report weeks after the purported encounter (and well after the Defendant Officers learned that the Plaintiff was in custody at the time of the murder). The Defendant Officers never disclosed to the prosecutor, the court or Plaintiff the fact that they had fabricated crucial information within the police report, in further violation of Plaintiff's constitutional rights.

34. In addition, the Defendant Officers coerced a witness named Adrian Grimes into falsely stating that he remembered seeing Plaintiff at a park near Mr. Lassiter's apartment just prior to the murder. Mr. Grimes was coerced by means of threats and offers of leniency on his then-pending charges. The Defendant Officers never disclosed to the trial prosecutor or the defense the manner in which they unlawfully induced Mr.

Grimes to falsely assert that he had seen Plaintiff at a park on the evening of the murder. Mr. Grimes later recanted his false identification of Plaintiff.

35. The Defendant Officers also tried, unsuccessfully, to coerce Faye McCoy into falsely identifying Plaintiff from a lineup. When Ms. McCoy denied having seen Plaintiff or any of his co-defendants from the neighborhood on the night of the murders, the Defendant Officers prepared an incomplete, misleading and false report. The Defendant Officers also falsely testified that Ms. McCoy did in fact identify Plaintiff. The Defendant Officers never disclosed either their attempted coercion of Ms. McCoy or the falsity of the report to the prosecutors or to Plaintiff's defense team.

36. The Defendant Officers also withheld additional evidence corroborating the fact that Plaintiff was in police custody at the time of the murders. The Defendant Officers were able to identify Mr. Taylor's cellmate when Mr. Taylor was in the 23rd District lockup on November 16, 1992 – a man named James Anderson. The Defendant Officers interviewed Mr. Anderson, who confirmed that Plaintiff was in police custody during the shootings. Despite the obvious exculpatory value of that information, neither Mr. Anderson's identity nor the information he provided to the Defendant Officers was disclosed to the

10

prosecutor or the defense.  To the contrary, it was buried in the Defendant Officers' "street files."

### PLAINTIFF'S WRONGFUL CONVICTION

37.  As a result of the Defendant Officers' misconduct, Plaintiff was wrongfully convicted of first-degree murder, armed robbery and home invasion, and sentenced to a natural life prison term and two concurrent 30-year prison terms.  Plaintiff was not eligible for parole and faced spending his entire life behind bars.

38.  There was no physical evidence tying Plaintiff to the crime:  the fingerprints developed from the crime scene did not match Plaintiff or his co-defendants and there was no DNA evidence recovered.  Rather, the only evidence against Plaintiff at trial was his coerced confession and the coerced and false testimony of Adrian Grimes.

39.  Without the Defendants misconduct, Plaintiff would not have been prosecuted or convicted.

### PLAINTIFF'S EXONERATION

40.  Never giving up on proving his innocence, in 2013, Mr. Taylor's conviction was finally vacated.

41.  The State dismissed the charges against Plaintiff, and he was released after spending more than 20 years in prison for crimes that he did not commit.

42.   On January 23, 2014, Plaintiff was granted a
Certificate of Innocence by the Circuit Court of Cook County.
The Court found that Plaintiff was innocent of all of the
offenses for which he was wrongfully incarcerated.

### CHICAGO'S "STREET FILES" PRACTICE

43.   The constitutional violations that caused Plaintiff's
wrongful conviction were not isolated events.  To the contrary,
they were the result of the City of Chicago's policies and
practices of pursuing wrongful convictions through reliance on
profoundly flawed investigations and coerced confessions.

44.   In particular, the unconstitutional withholding of
exculpatory information from Plaintiff's defense in this case
was undertaken pursuant to, and proximately caused by, a policy
and practice on the part of the Department.

45.   Specifically, at all times relevant hereto, members of
the Chicago Police Department, including the Defendant Officers
in this action, systematically suppressed *Brady* material by
intentionally secreting discoverable information in so-called
"street files."

46.   Based on information and belief, there are a set of
"street files" that are maintained in the basement of Areas One
and Three and at Chicago Police Department Headquarters.  These
files are not inventoried and are instead kept in a file cabinet
that purportedly contains "open" police investigations.

47.  As a matter of widespread custom and practice, these clandestine street files were routinely withheld from the Cook County State's Attorney's Office and from criminal defendants, and some of these files may have been subsequently destroyed.

48.  Consistent with the municipal policy and practice described in the preceding paragraphs, Defendants in this case concealed exculpatory evidence, including evidence relating to Mr. Anderson, in street files, which were never disclosed to Plaintiff's criminal defense team.

49.  The street files practice described in the preceding paragraphs was consciously approved at the highest policy-making level for decisions involving the Department, and was a proximate cause of the injuries suffered here by Plaintiff.

50.  The street files practice described in the preceding paragraphs was enjoined by court order and supposedly discontinued prior to the investigation of Mr. Lassiter's and Ms. Haugabook's murders.  Contrary to the Department's public pronouncements, however, the street files practice continued through and including the investigation into Mr. Lassiter's and Ms. Haugabook's murders, directly causing a violation of Plaintiff's rights.

### CHICAGO'S PATTERN OF COERCING FALSE CONFESSIONS

51.  The Defendant Officers' coercion of false statements from Plaintiff and his co-defendants was also undertaken

13

pursuant to, and proximately caused by, a policy and practice on the part of the Department.

52.   In an article examining thousands of murder cases in Chicago from 1991 through 2000, which featured Plaintiff's criminal case, *The Chicago Tribune* found that Chicago police detectives had been involved in a wide range of cases that ultimately collapsed even though the detectives had obtained confessions.

53.   The Chicago Police Department has a long history of using physically and psychologically coercive interrogation tactics in order to elicit statements from suspects in criminal cases, which has caused false confessions and led to wrongful convictions.

54.   The wrongful convictions of innocent persons who gave coerced and false confessions include numerous cases in which Department detectives used the very same tactics that the Defendants employed against Plaintiff and his co-defendants in this case.   These tactics include: (a) physical abuse; (b) psychological intimidation and manipulation; (c) fabrication of confessions; (d) misleading of parents and denial of parents' access to their children during interrogations; (e) concealment of exculpatory information; (f) false promises of leniency in exchange for "cooperation" in the form of a confession; and (g) use of other unlawful tactics to secure the arrest, prosecution,

and conviction of persons, including juveniles and teenagers, without regard to their actual guilt.

55.  At the time of the events leading to Plaintiff's coerced confession and wrongful conviction, members of the Department systematically promoted the improper prosecutions of teenagers and other vulnerable individuals by using abusive and coercive interrogation tactics to force them to confess to crimes they did not commit.

56.  Consistent with the municipal policy and practice described in the preceding paragraph, members of the Department, including but not limited to the Defendant Officers, systematically suppressed evidence pertaining to these fabricated and coerced confessions, both from the Cook County State's Attorney's Office and from criminal defendants.

57.  As a matter of both policy and practice, municipal policy makers and department supervisors condoned and facilitated a code of silence within the Chicago Police Department.  In accordance with this code, Department Detectives refused to report and otherwise lied about misconduct committed by their colleagues, including the misconduct at issue in this case.

58.  As a result of the City of Chicago's established practice of not tracking and identifying police officers who are repeatedly accused of the same kinds of serious misconduct;

failing to investigate cases in which the police are implicated in obtaining coerced and false confessions, as well as wrongful charges and convictions; failing to discipline officers accused of this unlawful conduct; and facilitating a code of silence within the Department, Chicago police officers (including the Defendant Officers here) have come to believe that they may violate the civil rights of members of the public and cause innocent persons to be charged with serious crimes without fear of adverse consequences.

59. The City's failure to train, supervise, and discipline its officers effectively condones, ratifies, and sanctions the kind of misconduct that the Defendant Officers committed against Plaintiff in this case. Constitutional violations such as occurred in this case are encouraged and facilitated as a result of the City's practices and *de facto* policies, as alleged above.

60. The City of Chicago and officials within the Department failed to act to remedy the abuses described in the preceding paragraphs, despite actual knowledge of the pattern of misconduct. They thereby perpetuated the unlawful practices and ensured that no action would be taken (independent of the judicial process) to remedy Plaintiff's ongoing injuries.

61. The policies and practices described in the foregoing paragraphs were consciously approved by City of Chicago

16

policymakers who were deliberately indifferent to the violations of constitutional rights described herein.

## PLAINTIFF'S DAMAGES

62.  Plaintiff spent over 20 years in prison for crimes that he did not commit.  Plaintiff must now attempt to make a life for himself outside of prison without the benefit of two decades of life experiences, which normally equip adults for that task.

63.  Additionally, the emotional pain and suffering caused by losing 20 years in the prime of his life has been substantial.  During his wrongful incarceration, Plaintiff was stripped of the various pleasures of basic human experience, from the simplest to the most important, which all free people enjoy as a matter of right.  He missed out on the ability to share holidays, births, funerals and other life events with loved ones, the opportunity to fall in love and marry and to pursue a career, and the fundamental freedom to live one's life as an autonomous human being.

64.  Plaintiff's two decades of wrongful incarceration forced him into a world of isolation in which he lost all contact with his friends and family in the outside world.

65.  As a result of the foregoing, Plaintiff has suffered tremendous damage, including physical sickness and injury and

emotional damages, all proximately caused by Defendants'
misconduct.

**COUNT I – 42 U.S.C. § 1983**
**Fifth and Fourteenth Amendments**

66. Each paragraph of this Complaint is incorporated as if
restated fully herein.

67. In the manner described more fully above, the
Defendant Officers, individually, jointly, and in conspiracy
with one another, as well as under color of law and within the
scope of their employment, forced Plaintiff to incriminate
himself falsely and against his will, in violation of his rights
secured by the Fifth and Fourteenth Amendments.

68. As described more fully above, the Defendant Officers
conducted an unconstitutional interrogation of Plaintiff, which
caused Plaintiff to make involuntary statements implicating
himself in the murders of Jeffrey Lassiter and Sharon Haugabook.

69. The false statements written and coerced by the
Defendant Officers and attributed to Plaintiff were used against
Plaintiff to his detriment in a criminal case. These statements
were the only reason that Plaintiff was prosecuted and convicted
of the murders of Jeffrey Lassiter and Sharon Haugabook.

70. The misconduct described in this Count was objectively
unreasonable and was undertaken intentionally, with malice, with

18

reckless indifference to the rights of others, and in total disregard of the truth and Plaintiff's clear innocence.

71. As a result of Defendants' misconduct described in this Count, Plaintiff suffered injuries, including but not limited to physical injury and sickness, loss of liberty, and emotional distress.

### COUNT II – 42 U.S.C. § 1983
### Violation of Due Process

72. Each paragraph of this Complaint is incorporated as if restated fully herein.

73. As described more fully above, all of the Defendant Officers, while acting individually, jointly, and/or in conspiracy, as well as under color of law and within the scope of their employment, deprived Plaintiff of his constitutional right to a fair trial.

74. In the manner described more fully above, the Defendant Officers, individually, jointly, and/or in concert and in conspiracy, fabricated false reports and other evidence, and/or deliberately withheld exculpatory evidence. In doing so, the Defendants violated their clearly established duty to report all material exculpatory and impeachment information to prosecutors.

75.    Absent Defendants' misconduct, the prosecution of Plaintiff could not and would not have been pursued, and Plaintiff would not have been convicted.

76.    The Defendants' misconduct directly and proximately resulted in the unjust and wrongful criminal conviction of Plaintiff and his continuing wrongful imprisonment, thereby denying him his constitutional right to a fair trial, in violation of the Due Process Clause of the Fourteenth Amendment to the United States Constitution.

77.    As a direct and proximate result of this violation of his constitutional right to a fair trial, Plaintiff suffered injuries, including but not limited to loss of liberty, physical sickness, and emotional distress.

78.    The misconduct described in this Count was objectively unreasonable and was undertaken intentionally, with malice and willful indifference to Plaintiff's clearly established constitutional rights.

## Count III- 42 U.S.C. § 1983

### Fourth Amendment

79.    Each paragraph of this Complaint is incorporated as if restated fully herein.

80.    As described more fully above, all of the Defendant Officers, while acting individually, jointly, and/or in conspiracy, as well as under color of law and within the scope

20

of their employment, deprived Plaintiff of his constitutional
rights.

81.  In the manner described more fully above, the
Defendant Officers, individually, jointly, and/or in concert and
in conspiracy, caused Plaintiff to be continuously detained and
wrongfully imprisoned in state custody from the date of his
arrest in 1992 until his exoneration and release in June of
2013.

82.  In so doing, Defendants caused Plaintiff to be
unreasonably seized, due to the fact that there was no probable
cause for his detention.

83.  Absent Defendants' misconduct, the detention and
prosecution of Plaintiff could not and would not have been
pursued, and Plaintiff would not have been convicted.

84.  The Defendants' misconduct directly and proximately
resulted in the unjust and wrongful detention and wrongful
imprisonment of Plaintiff in the absence of probable cause, in
violation of the Fourth Amendment to the United States
Constitution.

85.  As a direct and proximate result of this violation of
his constitutional right  not to be detained or imprisoned
without probable cause, Plaintiff suffered injuries, including
but not limited to loss of liberty, physical sickness, and
emotional distress.

21

86.   The misconduct described in this Count was objectively unreasonable and was undertaken intentionally and with indifference to Plaintiff's clearly established constitutional rights.

### COUNT IV – 42 U.S.C. § 1983
### Failure to Intervene

87.   Each paragraph of this Complaint is incorporated as if restated fully herein.

88.   In the manner described above, by their conduct and under color of law, during the constitutional violations described herein, one or more of the Defendants stood by without intervening to prevent the violation of Plaintiff's constitutional rights, even though they had the opportunity to do so.

89.   As a direct and proximate result of the Defendants' failure to intervene to prevent the violation of Plaintiff's constitutional rights, Plaintiff suffered injuries, including but not limited to loss of liberty, physical harm, and emotional distress. These Defendants had a reasonable opportunity to prevent this harm, but failed to do so.

90.   The misconduct described in this Count was objectively unreasonable and was undertaken intentionally, with malice and willful indifference to Plaintiff's clearly established constitutional rights.

## COUNT V – 42 U.S.C. § 1983
### Conspiracy to Deprive Constitutional Rights

91.   Each paragraph of this Complaint is incorporated as if restated fully herein.

92.   After the murders of Jeffrey Lassiter and Sharon Haugabook, the Defendant Officers, acting within the scope of their employment and under color of law, agreed among themselves and with other individuals to act in concert in order to deprive Plaintiff of his constitutional rights, including his rights to due process and to a fair trial, all as described in the various paragraphs of this Complaint.

93.   Additionally, before and after Plaintiff's conviction, the Defendant Officers further conspired to deprive Plaintiff of exculpatory information to which he was lawfully entitled and which would have led either to his not being charged, his acquittal, or his more timely exoneration.

94.   In this manner, the Defendant Officers, acting in concert with other unknown co-conspirators, conspired by concerted action to accomplish an unlawful purpose by unlawful means.

95.   In furtherance of the conspiracy, each of the co-conspirators engaged in and facilitated numerous overt acts, including but not limited to those set forth above – such as fabricating evidence, withholding exculpatory evidence, coercing

false confessions, committing perjury during hearings and trials – and was an otherwise willful participant in joint activity.

96.    As a direct and proximate result of the illicit prior agreement and actions in furtherance of the conspiracy referenced above, Plaintiff's rights were violated, and he suffered injuries, including but not limited to loss of liberty, physical sickness, and emotional distress.

97.    The misconduct described in this Count was objectively unreasonable and was undertaken intentionally, with malice, willfulness, and deliberate indifference to Plaintiff's rights.

### COUNT VI – 42 U.S.C. § 1983
### *Monell* Policy Claims

98.    Each paragraph of this Complaint is incorporated as if restated fully herein.

99.    The actions of all the individual Defendant Officers were undertaken pursuant to policies and practices of the Department, described above, which were ratified by policymakers for the City of Chicago with final policymaking authority. These policies and practices included the failure to adequately train, supervise, and discipline officers who engaged in the alleged constitutional violations, as set forth in greater detail above.

24

100. The policies and practices described in this Count were maintained and implemented by the City of Chicago with deliberate indifference to Plaintiff's constitutional rights.

101. As a direct and proximate result of the City's actions, Plaintiff's constitutional rights were violated and he suffered injuries and damages, as set forth in this Complaint.

102. The City of Chicago is therefore liable for the misconduct committed by the Defendant Officers.

**COUNT VII – State Law Claim**
**Malicious Prosecution**

103. Each paragraph of this Complaint is incorporated as if restated fully herein.

104. The Defendant Officers accused Plaintiff of criminal activity knowing those accusations to be without genuine probable cause, and they made statements to prosecutors with the intent of exerting influence and to institute and continue the judicial proceedings.

105. The Defendant Officers caused Plaintiff to be improperly subjected to judicial proceedings for which there was no probable cause.  These judicial proceedings were instituted and continued maliciously, resulting in injury.

106. Statements of the Defendant Officers regarding Plaintiff's alleged culpability were made with knowledge that said statements were false and perjured.  The Defendant Officers

also fabricated evidence by coercing false inculpatory testimony from co-defendants and withholding exculpatory evidence that would have demonstrated Plaintiff's absolute innocence.  The Defendants were aware that, as described more fully above, no true or reliable evidence implicated Plaintiff in the Lassiter and Haugabook murders because Plaintiff was in police custody at the time the murders occurred.

107. The Defendant Officers intentionally withheld from and misrepresented to prosecutors facts that further vitiated probable cause against Plaintiff, as set forth above, and failed to investigate evidence which would have led to the actual perpetrator.  The Defendant Officers withheld the facts of their manipulation and the resulting fabrications from Plaintiff.

108. The misconduct described in this Count was undertaken intentionally, with malice, willfulness, and reckless indifference to the rights of others.

109. On June 28, 2013, the prosecution terminated in Plaintiff's favor when his conviction was vacated.

110. As a direct and proximate result of this misconduct, Plaintiff sustained, and continues to sustain, injuries as set forth above, including physical sickness and emotional distress.

**COUNT VIII – State Law Claim**
**Intentional Infliction of Emotional Distress**

111. Each paragraph of this Complaint is incorporated as if restated fully herein.

112. The acts and conduct of the Defendant Officers as set forth above were extreme and outrageous. The Defendants' actions were rooted in an abuse of power or authority, and they were undertaken with intent to cause, or were in reckless disregard of the probability that their conduct would cause, severe emotional distress to Plaintiff, as is more fully alleged above.

113. As a direct and proximate result of the Defendant Officers' actions, Plaintiff suffered and continues to suffer physical sickness and severe emotional distress.

## COUNT IX – State Law Claim
## Civil Conspiracy

114. Each paragraph of this Complaint is incorporated as if restated fully herein.

115. As described more fully in the preceding paragraphs, the Defendant Officers, acting in concert with other known and unknown co-conspirators, conspired by concerted action to accomplish an unlawful purpose by unlawful means.

116. In furtherance of the conspiracy, the Defendant Officers committed overt acts and were otherwise willful participants in joint activity including but not limited to the malicious prosecution of Plaintiff and the intentional infliction of emotional distress upon him.

117. The misconduct described in this Count was undertaken intentionally, with malice, willfulness, and reckless indifference to the rights of others.

118. As a direct and proximate result of the Defendants' conspiracy, Plaintiff suffered damages, including physical sickness and severe emotional distress, as is more fully alleged above.

## COUNT X – State Law Claim
## Respondeat Superior

119. Each paragraph of this Complaint is incorporated as if restated fully herein.

120. In committing the acts alleged in the preceding paragraphs, each of the Defendant Officers were members of, and agents of, the Department, acting at all relevant times within the scope of their employment and under color of law.

121. Defendant City of Chicago is liable as principals for all torts committed by its agents.

## COUNT XI – State Law Claim
## Indemnification

122. Each paragraph of this Complaint is incorporated as if restated fully herein.

123. Illinois law provides that public entities are directed to pay any tort judgment for compensatory damages for which employees are liable within the scope of their employment activities.

124. The Defendant Officers are or were employees of the Chicago Police Department, who acted within the scope of their employment in committing the misconduct described herein.

WHEREFORE, Plaintiff, DANIEL TAYLOR, respectfully requests that this Court enter judgment in his favor and against Defendants, CITY OF CHICAGO, ANTHONY VILLARDITA #20849, THOMAS JOHNSON #20820, BRIAN KILLACKY #20748, TERRY O'CONNOR #20831, RICK ABREU #20796, ROBERT DELANEY #20383, SEAN GLINSKI #3122, MICHAEL BERTI #12881, and UNIDENTIFIED EMPLOYEES of the CITY OF CHICAGO, awarding compensatory damages, attorneys' fees, and costs against each Defendant, and punitive damages against each of the individual Defendants, as well as any other relief this Court deems appropriate.

**JURY DEMAND**

Plaintiff, DANIEL TAYLOR, hereby demands a trial by jury pursuant to Federal Rule of Civil Procedure 38(b) on all issues so triable.

Respectfully submitted,

**DANIEL TAYLOR**

By: /s/David B. Owens
One of his attorneys

Locke E. Bowman
Alexa Van Brunt
RODERICK AND SOLANGE
MACARTHUR JUSTICE CENTER
Northwestern University School of Law

Jon Loevy
David B. Owens
LOEVY & LOEVY
311 North Aberdeen
Street, 3FL

375 East Chicago Avenue
Chicago, Illinois 60611
(312) 503-0844

Chicago, Illinois 60607
(312) 243-5900