# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

DANIEL TAYLOR,                                  )
                                                )
      **Plaintiff,**                              )
                                                )    **Case No. 14 C 737**
      **v.**                                     )
                                                )    **Judge John Z. Lee**
CITY OF CHICAGO, CHICAGO POLICE                 )
OFFICERS ANTHONY VILLARDITA,                    )
THOMAS JOHNSON, BRIAN KILLACKY,                 )
TERRY O'CONNOR, RICK ABREU,                     )
ROBERT DELANEY, SEAN GLINSKI,                   )
MICHAEL BERTI, and UNIDENTIFIED                 )
EMPLOYEES OF THE CITY OF CHICAGO,               )
                                                )
      **Defendant.**                              )

## MEMORANDUM OPINION AND ORDER

Plaintiff Daniel Taylor was convicted of murder and spent more than 20 years in prison before his conviction was vacated. He filed this lawsuit against the City of Chicago ("the City") and Chicago police officers Anthony Villardita, Thomas Johnson, Brian Killacky, Terry O'Connor, Rick Abreu, Robert Delaney, Sean Glinski, and Michael Berti (collectively, "the Officer Defendants"), pursuant to 42 U.S.C. § 1983. Taylor alleges that the Officer Defendants coerced him to give a false confession and concealed exculpatory evidence. The Officer Defendants and the City seek summary judgment on Taylor's claims. For the reasons stated herein, the Officer Defendants' motion [485] is granted in part and denied in part, and the City's motion [488] is denied.

**Background**

I.     **The November 16, 1992 Murders and Subsequent Arrests**

This case involves relatively few undisputed facts. At approximately 8:43 p.m. on November 16, 1992, Jeffrey Lassiter and Sharon Haugabook were shot and killed in Lassiter's apartment at 910 W. Agatite Avenue in Chicago. Officer Defs.' LR 56.1 Stmt. ("Defs.' SOF") ¶ 10, ECF No. 486.[1] Within minutes, police officers arrived on the scene. *Id.* ¶ 11. Detectives Villardita and Johnson of the Chicago Police Department ("CPD") were assigned to lead the investigation. *Id.* ¶ 12.

At the scene, the detectives spoke with Faye McCoy, who lived in Lassiter's apartment complex. *Id.* ¶ 13. McCoy told the detectives that she had seen four African-American men leaving the building shortly after the shootings. *Id.* Two days later, after viewing a photo lineup, she identified one of the men as Dennis Mixon, a/k/a "Goldie." *Id.*, Ex. 7, Villardita Dep. Vol. I at 121:8–122:7, 133:10–134:7, ECF No. 484-8; *Id.*, Ex. 8, Johnson Dep. Vol. I at 119:10–14, 149:5–9, ECF No. 484-10; Pl.'s LR 56.1 Stmt. Add'l Facts ("Pl.'s SOF") ¶ 3, ECF No. 496. Mixon was also mentioned in an information report prepared by CPD officer Renard Foote ("the Foote information report") on November 17. Pl.'s SOF ¶ 4. The report indicates that, in the weeks leading up to the murders, Lassiter and Mixon were involved in a dispute over drugs and property. *Id.* Further investigation revealed that Mixon's brother, Larry Mixon, along with several other individuals, had recently been arrested for trespassing near the murder scene. *Id.* ¶ 5.

Several weeks passed with little development in the case, until December 2, when CPD officers arrested Lewis Gardner, Paul Phillips, and Akia Phillips. *Id.* ¶ 12. Although the three teenagers were brought in for drug possession, Gardner eventually provided a transcribed

---

[1]     The City also submitted a Local Rule 56.1 statement, *see* ECF No. 489, but it does not contain any material facts that contradict the Officer Defendants' statement of facts.

statement implicating himself in the murders of Lassiter and Haugabook. *Id.* ¶ 20; Defs.' SOF ¶ 17. Gardner also implicated Paul and Akia Phillips, as well as Taylor, Mixon, Deon Patrick, Joseph Brown, and Rodney Matthews, who also were arrested and eventually confessed to their involvement in the murders. Defs.' SOF ¶ 21.

The circumstances surrounding these confessions, however, are hotly disputed—as are the events surrounding the criminal case that followed. The Court will summarize each side's version of the facts and will address the material disputes as necessary.

## II. Taylor's Confession and Subsequent Investigation

### A. The Officer Defendants' Version

According to the Officer Defendants, Taylor and his co-defendants voluntarily confessed to the crimes. *Id.* ¶¶ 17–18, 20–21. On the day that Taylor was arrested—December 3, 1992— Faye McCoy, the eyewitness from the murder scene, viewed a lineup consisting of Taylor, Paul Phillips, Patrick, Matthews, and two other individuals. *Id.* ¶ 22. Detectives O'Connor and Villardita stayed with McCoy while she viewed the lineup, while Detectives Delaney and Killacky were inside the room with the lineup participants. *Id.* ¶ 23. Afterward, Villardita and O'Connor told Delaney and Killacky that McCoy said she knew Taylor and his co-defendants and had previously seen them in the neighborhood. *Id.* ¶ 24. Delaney and Killacky documented this information in a supplementary report ("the lineup supplementary report"). *Id.*

Meanwhile, at some point while Taylor was in custody, he told Villardita and Johnson that he had been "locked up" in the 23rd District on the night of the murders. *Id.* ¶¶ 19, 25. Villardita and Johnson examined Taylor's criminal history report, but found no mention of an arrest on November 16, so Villardita asked Officer Steve Caluris to see if there were any arrest reports for Taylor in the 23rd District that day. *Id.* ¶¶ 26–27. On December 6, Caluris informed Villardita

that he had located an arrest report for a "Daniel Taylor,"[2] indicating that Taylor had been arrested on November 16. *Id.* ¶ 28. Villardita and Johnson went to the 23rd District station and located a copy of Taylor's arrest report and bond slip, which showed that Taylor had been arrested for disorderly conduct at 6:45 p.m. on November 16 and had been released from custody at 10:00 p.m., when he bonded out in the presence of Officer James Gillespie. *Id.* ¶¶ 29–31.

Villardita and Johnson recognized that these documents appeared to show that Taylor had been in custody at the time of the murders, which conflicted with his confession. *Id.* ¶ 32. They checked to see if Taylor had been photographed or fingerprinted upon arrival at the 23rd District, but he had not been. *Id.* ¶ 33. And they looked at a "personnel roster" for the 23rd District, which listed the names and assignments of personnel working at the station on November 16. *Id.* ¶ 34.

The next day, while Taylor remained in custody, Villardita and Johnson met with Cook County Assistant State's Attorneys ("ASAs") David Styler and Garritt Howard and informed them of the conflict between Taylor's confession and the arrest report and bond slip. *Id.* ¶ 36. It was decided that Styler would interview the 23rd District personnel working on the night in question, while Villardita and Johnson would attempt to locate any witnesses who may have seen Taylor and his co-defendants prior to the murders. *Id.* ¶¶ 37–38.

On December 18, ASA Styler sent grand jury subpoenas to 23rd District personnel who worked at the station on November 16, based on the names that appeared on the arrest report and personnel roster. *Id.* ¶ 44. He interviewed various officers on December 22 and 23 and took notes of these interviews, identifying which officers and civilian aides were on duty during the third

---

[2]  The parties appear to dispute whether the person who was arrested on November 16, 1992, was in fact Taylor. Drawing all reasonable inferences in Taylor's favor, the Court concludes that a reasonable jury could find that Taylor was the person in custody that evening. Moreover, this dispute is not material to the Court's analysis. Accordingly, for the purposes of this opinion, the Court will refer to this person as "Taylor."

watch of November 16 and the first watch on November 17. *Id.* ¶¶ 45–46. Styler also noted the importance of tracking down James Anderson, who had shared a cell with Taylor that night. *Id.* ¶¶ 47–48. Additionally, he made reference in his notes to a "log book," and stated that there were no individuals in the lockup at 7:15 p.m., while there were five in the lockup at 8:30 p.m. *Id.* ¶ 49.

At some point, using the arrest report and bond slip, Villardita and Johnson drafted a timeline of Taylor's movements on November 16, which they put into a General Progress Report ("GPR") (the "timeline GPR"). *Id.* ¶ 39. They also requested that Detectives Robert Elmore and James Gildea obtain arrest reports and bond slips for other individuals who were in the lockup on November 16, as well as a copy of the list of people who were there that night ("the lockup roster"). *Id.* ¶ 40. Elmore and Gildea provided these documents to Villardita and Johnson on December 7. *Id.* Villardita and Johnson then turned over the documents to ASA Howard, and a copy of the lockup roster was also sent to the State's Attorney's Office ("SAO"). *Id.* ¶¶ 42–43. Meanwhile, Elmore and Gildea searched for Anderson and documented these efforts in a GPR. *Id.* ¶ 41.

While investigating Taylor's alibi, Villardita and Johnson documented an interview with Adrian Grimes, who said he had seen Taylor at a park on November 16, during the time that police records indicated that Taylor was in custody. *Id.* ¶ 50. They also spoke to Michael Seymore, who stated that he had seen Taylor on the street shortly after the murders. *Id.* ¶ 51. The detectives also followed up on Taylor's confession, in which he stated that on the night of the murders, he had gone with two officers to help them find Akia Phillips. *Id.* ¶ 53. These officers, who were discovered to be Berti and Glinski, drafted a supplementary report on December 14, in which they documented their interactions with Taylor on the night of the murders ("the Berti/Glinski supplementary report"). *Id.* ¶¶ 53–54.

The police also continued searching for Anderson, without success. *Id.* ¶ 55. On December 29, Sergeant Fred Bonke wrote a GPR instructing detectives to look for Anderson. *Id.* Two days later, Detective John Fitzsimmons wrote that "in regards to the [GPR from] 30 Dec[ember] 1992 from Villardita and Johnson," he had gone to the Salvation Army to look for Anderson, but had been unable to find him. *Id.* ¶ 56. But this was an error, as Fitzsimmons now states that he had actually been referring to Bonke's GPR of December 29. *Id.* ¶ 57.

### B. Taylor's Version

Taylor paints a very different picture of what transpired between Gardner's arrest and Taylor's eventual conviction for murder.[3] He states that, although Johnson and Villardita had identified Mixon as a suspect, they failed to follow up in any meaningful way, instead telling their colleagues to "clear [the] case" by December 2, when they returned from their time off. Pl.'s SOF ¶ 10. When the case was not "cleared," they pinned the murders on three teenagers who had been arrested for drug possession, along with several other youths including Taylor. *Id.* ¶¶ 12–28, 30–41. They did this even though Taylor and his co-defendants were innocent and, prior to December 2, nothing in the investigation had pointed to them. *Id.* ¶¶ 10–11.

Killacky and Delaney arrested Taylor at 2:15 a.m. on December 3. *Id.* ¶ 35. While on the way to the station, one of the officers punched Taylor in the chest. *Id.* ¶ 37. Upon arrival at the station, Taylor was placed in an interrogation room and handcuffed to a ring on the wall. *Id.* ¶ 38. The Officer Defendants then interrogated him about the murders of Lassiter and Haugabook. *Id.* When Taylor denied any knowledge of the crimes, the officers began acting "verbally and physically aggressive" toward him, including striking him with a flashlight and punching him, and

---

[3]   The Officer Defendants ask the Court to strike numerous paragraphs in Taylor's statement of facts that they contend are not properly supported by citations to admissible evidence. The Court declines the request to strike the paragraphs in their entirety but will disregard any portions that are not properly supported by the evidentiary record.

they threatened to continue doing so unless he confessed. *Id.* ¶¶ 38–40. Eventually, Taylor confessed to the murders (even though it was not true), and the Officer Defendants fed him false details of the crime to do so. *Id.*

Taylor also asserts that the Officer Defendants fabricated the lineup supplementary report after McCoy viewed the lineup on December 3. *Id.* ¶ 46. What actually transpired, he states, is that McCoy told the Officer Defendants that Taylor, Patrick, Matthews, and Paul Phillips were *not* the men she had seen on the night of the murders, and that they instead needed to track down Mixon. *Id.* ¶ 45. Despite this, Killacky and Delaney wrote in their report that McCoy had seen the four co-defendants in the neighborhood, omitting that she had not seen them on the night of the murders. *Id.* ¶ 46.

According to Taylor, he could not have committed the crimes, because he was in custody when they occurred. *Id.* ¶ 49. He told this to Villardita and Johnson on December 3, but they claimed that there was no record of him being in lockup that night. *Id.* ¶ 50. But on December 6, Villardita and Johnson obtained documentation confirming Taylor's alibi; namely, his arrest report, bond slip, the lockup roster, and the personnel roster from the 23rd District. *Id.* ¶¶ 51–53. They also learned that Anderson had shared a cell with Taylor, and they tried to locate Anderson, as documented in several GPRs. *Id.* ¶ 54. Contrary to the Officer Defendants' version of events, Taylor states that they successfully located and interviewed Anderson, who confirmed that he had seen Taylor in the lockup at the time of the murders. *Id.* ¶ 55.

Once the Officer Defendants learned of Taylor's alibi, he asserts, they went to great lengths to fabricate evidence, including creating several reports, to undercut it. *Id.* ¶ 64. For instance, on December 8, Villardita and Johnson falsified a GPR stating that they had met with Gillespie (the officer who had signed Taylor's bond slip), who told them that Taylor "could have been gone

already" when Gillespie signed the slip at 10:00 p.m. *Id.* ¶ 59. They also falsified a GPR stating that Gillespie had told them that people who were arrested for disorderly conduct were generally released in short order. *Id.* ¶ 60. The December 8 GPR also stated that Grimes had seen Taylor prior to the murders—but this statement was fabricated and was the product of coercion. *Id.* ¶ 61. Using physical force, threats, and promises of leniency on unrelated drug charges, the Officer Defendants pressured Grimes into identifying Taylor. *Id.* ¶ 62. Grimes would later testify at Taylor's criminal trial in a manner consistent with this report, but according to Taylor, that testimony, too, was false and coerced. *Id.* In addition, the Officer Defendants fabricated a report of an interview with Michael Seymore, who allegedly told them that he had seen Taylor on the night of the murders prior to 10:00 p.m. *Id.* ¶ 63.

What is more, Villardita and Johnson asked Berti and Glinski to fabricate a report of an encounter with Taylor prior to 10:00 p.m. on the night of the murders. *Id.* ¶ 65. When Berti and Glinski prepared the report, they knew that Taylor had actually been in custody at the time. *Id.* Since then, Glinski has repeatedly lied about the circumstances surrounding the report's creation. *Id.* ¶ 67. When he testified at Taylor's criminal trial, he acknowledged that, when he prepared the report, he was aware of Taylor's lockup alibi; but when he later testified at the civil trial of Taylor's co-defendant, Patrick,[4] he stated that he learned about Taylor's alibi *after* drafting the report. *Id.* ¶¶ 67, 70. In any event, the report is inaccurate, because while Taylor *did* encounter Berti and Glinski on the night of the murders, it was not until after he was released from lockup at 10:00 p.m. *Id.* ¶ 71.

---

[4] Patrick also filed a civil lawsuit against the City and the Officer Defendants. *See Patrick v. City of Chi.*, No. 14 C 3658 (N.D. Ill.).

## III. Discovery, Legal Representation, and the Criminal Trial

### A. The Officer Defendants' Version

ASA Thomas Needham was assigned to prosecute Taylor and his co-defendants and was made aware of the conflict between Taylor's confession and the arrest report and bond slip. Defs.' SOF ¶¶ 57–58. At some point, ASA Jeanne Bischoff was also assigned to the case, and was also made aware of Taylor's lockup alibi. *Id.* ¶¶ 66–68.

ASA Needham was responsible for providing discovery to Taylor's criminal defense counsel, including any exculpatory material. *Id.* ¶¶ 59–60. According to the Officer Defendants, all relevant GPRs and other documents were produced to the SAO, and on February 23, 1993, Needham tendered a "full set" of police reports, arrest reports, written statements, and other materials to Taylor's counsel. *Id.* ¶¶ 61–65. He also disclosed to defense counsel that the State might call McCoy, Grimes, and Seymore as witnesses, and provided their contact information. *Id.* ¶ 69.

Taylor was represented by Nathan Diamond-Falk, an experienced criminal defense attorney, and Ellen Rubin, who began working on the case after the pretrial phase. *Id.* ¶¶ 70, 83. Diamond-Falk was aware that Taylor claimed to have an alibi for the murders, and he had the November 16 arrest report and bond slip. *Id.* ¶¶ 92–93. Although Diamond-Falk knew the attorneys who were representing Taylor's co-defendants and could have asked them if their clients were claiming to have been coerced, he did not do so, because he did not believe such evidence would be admissible at trial. *Id.* ¶¶ 71–72, 77. Similarly, he did not ask to see the other attorneys' discovery materials. *Id.* ¶¶ 73–74.

In August 1993, Diamond-Falk sent a subpoena requesting "lock up records from the 23rd District from November 14, 1992 through November 17, 1992." *Id.* ¶ 75. When he did not receive

a response, he did not file a motion to compel, although he was aware that the CPD kept records of people who were arrested and detained. *Id.* ¶¶ 75–76. Rubin also made no attempt to obtain the documentation, despite her knowledge that the CPD kept such records. *Id.* ¶¶ 86, 88. She did not "do any investigation as it relates to [Taylor's] criminal case" because she believed Diamond-Falk had already done so. *Id.* ¶¶ 89–90. Diamond-Falk and Rubin also did not attempt to determine the identity of Taylor's cellmate in the 23rd District lockup. *Id.* ¶¶ 85, 87, 94–96. And, although they knew McCoy and Grimes had been disclosed as witnesses, they did not attempt to interview either of them. *Id.* ¶¶ 78–82.

Diamond-Falk and Rubin met with Taylor prior to his criminal trial and discussed his alibi defense. *Id.* ¶¶ 99–100. At that time, Diamond-Falk believed he had everything in his file that should have been there. *Id.* ¶ 101. The case proceeded to trial, and Rubin called the 23rd District lockup keeper, John Meindl, as a witness. *Id.* ¶ 102. Rubin asked Meindl how many people had been in lockup on the evening of November 16, 1992, and Meindl stated that he would need to "look at a lockup intake report" to give an accurate answer, but that he did not have the report with him that day. *Id.* ¶¶ 104–05. Yet, prior to the conclusion of the trial, Rubin and Diamond-Falk did not attempt to obtain the report Meindl had referenced. *Id.* ¶¶ 106–07.

McCoy also testified at Taylor's criminal trial. *Id.* ¶ 108. She stated that she had told the police that none of the people in the lineup were those she had seen leaving Lassiter's apartment on the night of the murders. *Id.* The trial concluded on September 7, 1995, and Taylor was convicted of murder, home invasion, and robbery. *Id.* ¶ 110.

### B.     Taylor's Version

According to Taylor, the Officer Defendants withheld significant evidence from his defense counsel, even though all material information relating to the investigation should have been placed in the CPD's investigative file.  Pl.'s SOF ¶ 72.  For instance, Villardita and Johnson suppressed evidence of Taylor's alibi, such as the lockup roster and the 23rd District personnel roster, and Diamond-Falk never received copies of those documents.  *Id.* ¶¶ 73–74.  The Officer Defendants also suppressed evidence of a logbook ("the visual check logbook") used by 23rd District officers to record "visual checks" of detainees.  *Id.* ¶ 75.  Moreover, they suppressed evidence relating to Anderson, Taylor's cellmate in the 23rd District lockup.  *Id.* ¶¶ 75–76, 78–79. As a result, Diamond-Falk did not learn of Anderson's identity until after Taylor's trial had already concluded.  *Id.* ¶ 78.  And Diamond-Falk never received a copy of the Foote information report, which explained Lassiter's relationship to Dennis Mixon.  *Id.* ¶ 93.

This evidence was also suppressed from the SAO.  *Id.* ¶¶ 80–88, 94.  To make matters worse, the State did not keep a record of discovery that was tendered to defense counsel, and the only place where ASA Needham may have kept notes about what was produced in discovery was his "blue-back"—a piece of blue cardboard attached to lined paper, the indictment, and the speedy trial calendar.  *Id.* ¶¶ 89–90.  But the SAO cannot locate the blue-back, which has apparently been missing since 2002.  *Id.* ¶ 91.  The SAO's original trial file for Taylor's criminal case is also missing.  *Id.* ¶ 92.

What is more, Taylor notes that, although Grimes and Seymore were both disclosed as witnesses, defense counsel was never made aware that Grimes had been manipulated into testifying against Taylor.  *Id.* ¶¶ 95–97.

In addition, although CPD regulations required the creation and retention of complete investigative files for homicides resulting in convictions, the files for Taylor's case "allegedly cannot [be] locate[d]." *Id.* ¶¶ 98–103. During the investigation, the CPD also maintained a "street file"—a file that is not turned over to the prosecution, even if it contains exculpatory information. *Id.* ¶¶ 106–07. This file contained criminal trespass incident reports for individuals with ties to Mixon and evidence pointing to other perpetrators, as well as evidence pertaining to Taylor's lockup alibi, Anderson's identity, and the Foote information report. *Id.* ¶¶ 109–10, 112.

Contrary to the Officer Defendants' version of events, Taylor states that Diamond-Falk diligently pursued this suppressed evidence. In 1993, he issued a formal discovery motion to the State; when he received a response that the State was not aware of any evidence or witnesses favorable to the defense, he believed he had the right to rely upon the State to fulfill its constitutional obligation. *Id.* ¶ 113. Nevertheless, he separately issued a subpoena to the CPD for lockup records from the 23rd District for November 14 through 17, 1992, but received no response. *Id.* ¶ 115. Furthermore, according to Taylor, his attorney could not have discussed the case with the co-defendants' attorneys without running afoul of his ethical obligations. *Id.* ¶ 117. Accordingly, Diamond-Falk and Rubin used what information they had at trial to attempt to corroborate Taylor's alibi. *Id.* ¶ 119. When Meindl made a "passing reference" to a "lockup intake report" at trial, Rubin did not know whether such a report actually existed, because it had not been produced during discovery. *Id.*

Taylor's criminal case proceeded to trial on September 1, 1995. *Id.* ¶ 121. Villardita, Johnson, Killacky, and Glinski testified against him. *Id.* Taylor was convicted on September 7, 1995, and sentenced to mandatory life without the possibility of parole on November 1, 1995. *Id.*

Eventually, after years of post-conviction proceedings and a reinvestigation of the case by the SAO, he was granted a Certificate of Innocence on January 23, 2014. *Id.* ¶¶ 122–24.

## IV.     This Lawsuit and Subsequent Events

The parties largely agree on what has happened since Taylor initiated this lawsuit in February 2014. In Taylor's original complaint, he stated that Berti and Glinksi had fabricated an encounter with him at 9:30 p.m. on the night of the murders. Defs.' SOF ¶ 111; Pl.'s Resp. Defs.' SOF ¶ 111, ECF No. 504. In June 2014, Taylor responded to interrogatories in this matter. Defs.' SOF ¶ 113. In response to an interrogatory asking him to describe his movements from November 15 to November 17, 1992, Taylor failed to mention any interaction with Berti and Glinski. *Id.* Instead, he stated that he was released from lockup at 10:00 p.m. and went straight to the Phillipses' apartment, then later went to a group home for the night. *Id.* He provided similar responses at his deposition on September 4, 2014, and was "unequivocal" that the encounter described in the Berti/Glinski supplementary report never occurred. *Id.* ¶¶ 114–15.

Then, Taylor was called as a witness in Patrick's civil trial in March 2017. *Id.* ¶ 116. At that time, he testified that, after he was released from lockup on November 16, he in fact encountered Berti and Glinski, who asked him if he knew the whereabouts of Akia Phillips. *Id.* Taylor further testified that he went with the officers to Akia Phillips's girlfriend's house. *Id.* Taylor was impeached with his prior deposition testimony. *Id.* ¶ 117. Although he initially stated that he had forgotten about the encounter but that it had "c[ome] back to [him]," he then admitted that he had not been truthful at his deposition, that he had been motivated by a desire not to "snitch[]," and that he was "ashamed" that he had helped police officers look for a friend. *Id.* He further admitted that his prior deposition testimony was an intentional lie. *Id.* ¶ 118.

In May 2018, Taylor appeared for a continuation of his deposition in this case and testified that he had always remembered the interaction with the officers, and that there had never been a period of time in which he had forgotten about it. *Id.* ¶ 119. He stated that he had lied at his 2014 deposition out of fear. *Id.* ¶ 120.

Taylor filed an amended complaint here in October 2018. *Id.* ¶ 121. In the amended complaint, Taylor specifically states that the Officer Defendants fabricated the *timing* of the encounter—as opposed to fabricating the entire encounter. *Id.* Defendants assert that this is the "first time" Taylor has made this allegation. *Id.* In response, Taylor maintains that throughout this litigation, he has claimed that Berti and Glinski "falsified the timing of their encounter with [him] on November 16 in order to undermine [his] alibi." Pl.'s SOF ¶ 126.

## Legal Standard

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). To survive summary judgment, the nonmoving party must "do more than simply show that there is some metaphysical doubt as to the material facts," *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986), and instead must "establish some genuine issue for trial such that a reasonable jury could return a verdict in her favor." *Gordon v. FedEx Freight, Inc.*, 674 F.3d 769, 772–73 (7th Cir. 2012).

In reviewing a motion for summary judgment, the Court gives the nonmoving party "the benefit of conflicts in the evidence and reasonable inferences that could be drawn from it." *Grochocinski v. Mayer Brown Rowe & Maw, LLP*, 719 F.3d 785, 794 (7th Cir. 2013). The Court must not make credibility determinations or weigh conflicting evidence. *McCann v. Iroquois Mem'l Hosp.*, 622 F.3d 745, 752 (7th Cir. 2010).

<u>**Analysis**</u>

In the First Amended Complaint, Taylor asserts the following claims: violation of his Fifth and Fourteenth Amendment rights (Count I); violation of his due process rights (Count II); violation of his Fourth Amendment rights (Count III); failure to intervene (Count IV); conspiracy to deprive him of his constitutional rights (Count V); a claim against the City under *Monell v. Dep't of Soc. Servs. of the City of N.Y.*, 436 U.S. 658 (1978) (Count VI); malicious prosecution (Count VII); intentional infliction of emotional distress (Count VIII); civil conspiracy (Count IX); *respondeat superior* liability (Count X); and indemnification (Count XI).

## I.     Taylor's Perjury

As an initial matter, the Officer Defendants argue that Taylor has "pursued this case for years against Defendants on a key factual theory that has been revealed to be an intentional fraud perpetrated by [Taylor]." Officers' Mem. Supp. Mot. Summ. J. ("Officers' Mem. Supp.") at 8, ECF No. 487. They contend that his "repeated perjury, disregard for the rules of this Court, and gamesmanship . . . should not be tolerated," and that the Court "should dismiss [his] claims with prejudice." *Id.* at 9. They incorporate by reference and adopt the arguments raised in their prior motion for sanctions.[5]

For the reasons explained in the Court's order overruling the parties' objections to Magistrate Judge Finnegan's report and recommendation, *see* Order of 9/23/19, ECF No. 522, the Court denies Defendants' request to dismiss Taylor's claims based on his testimony at his 2014 deposition.

---

[5]     *See* Mot. Sanctions, ECF No. 358. This motion was referred to Magistrate Judge Sheila Finnegan, who issued a report and recommendation in September 2018. *See* R&R, ECF No. 472. Magistrate Judge Finnegan recommended imposing a sanction in the form of a jury instruction, but denying the other proposed sanctions, including dismissal of this lawsuit.

## II. *Brady* Claim (Count II)

In Count II, Taylor alleges that the Officer Defendants violated his due process rights by withholding exculpatory evidence in violation of *Brady v. Maryland*, 373 U.S. 83, 87 (1963). The Officer Defendants seek summary judgment on this claim.

In *Brady*, the Supreme Court held that "suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." 373 U.S. at 87. This disclosure obligation has been expanded to include impeachment as well as exculpatory evidence. *See Youngblood v. West Virginia*, 547 U.S. 867, 869–70 (2006). A police officer can be held liable under *Brady* if he fails to disclose such evidence to the prosecutor. *Beaman v. Freesmeyer*, 776 F.3d 500, 512 (7th Cir. 2015).

A *Brady* claim encompasses three basic elements: (1) the evidence at issue must be "favorable to the accused" because it is either exculpatory or impeaching; (2) "the evidence must have been suppressed by the government, either willfully or inadvertently"; and (3) there must be a "reasonable probability that prejudice ensued"—in other words, the evidence must be material. *Carvajal v. Dominguez*, 542 F.3d 561, 566–67 (7th Cir. 2008). Here, the Officer Defendants do not contest that the evidence at issue was favorable to Taylor, so the Court will proceed to the question of whether evidence was suppressed, before addressing materiality.

### A. Whether Evidence was Suppressed

Taylor identifies several categories[6] of evidence that he claims was suppressed:

---

[6]  The Officer Defendants' motion addresses other evidence, including evidence of their alleged misconduct relating to Taylor's co-defendants or in fabricating the Berti/Glinski supplementary report; the alleged coercion of McCoy; their alleged perjured testimony; the alleged coercion of Seymore; and the alleged deficiencies in the murder investigation. Taylor clarifies that the *Brady* claim is not based on these items, but explains that they "remain[] relevant" because they are "additional evidence from which a jury

(1)     "clandestine street files that are withheld from the defense and prosecutors" and maintained by the City;

(2)     "23rd District evidence of [Taylor's] being in police custody at the time of the crime";

(3)     "Defendants['] own documents concerning Anderson";

(4)     "[e]vidence related to the fabrication of reports and testimony of Grimes";

(5)     "[t]he Renard Foote Information Report"; and

(6)     "[e]vidence hidden in the Lassiter-Haugabook Street File."

Pl.'s Resp. Opp. at 11. The Officer Defendants contend that this evidence was not suppressed because it (1) was produced to the SAO, thereby discharging the officers' *Brady* obligations; or (2) was known to Taylor or could have been obtained through the exercise of reasonable diligence. Moreover, they argue that Taylor cannot maintain a *Brady* claim based on speculation about a street file. The Court will begin with the "street file."

### 1.      The Street File and Its Contents

Taylor contends that the Officer Defendants suppressed evidence of the City's "practice and custom[] . . . [of] maintaining clandestine street files that are withheld from the defense and prosecutors," as well as certain evidence contained in the "street file" for the Lassiter/Haugabook murder investigation. Pl.'s Resp. Opp. at 11. And, he argues, summary judgment is "uniquely inappropriate" because the City has been unable to locate the original investigative file and permanent retention files for the murder investigation. *Id.* at 13.

There is no doubt that the practice of "retaining records in clandestine files deliberately concealed from prosecutors and defense counsel cannot be tolerated." *Jones v. City of Chi.*, 856 F.2d 985, 996 (7th Cir. 1988). And in this case, it is undisputed that the Officer Defendants

---

can infer [that] Defendants[] suppressed" other material. Pl.'s Resp. Opp. Officers' Mot. Summ. J. ("Pl.'s Resp. Opp.") at 11 n.4., ECF No. 505.

maintained a "street" or "working" file—indeed, the Officer Defendants' own documents reference such a file. *See* Defs.' Resp. Pl.'s SOF ¶ 105, ECF No. 515. But because no such file has been produced in this case, Taylor's position that the file would contain *Brady* material is purely speculative. And mere speculation that exculpatory evidence may have existed cannot support a *Brady* claim. *See United States v. Roberts*, 534 F.3d 560, 572 (7th Cir. 2008); *United States v. Parks*, 100 F.3d 1300, 1307 (7th Cir. 1996); *United States v. Morris*, 957 F.2d 1391, 1402–03 (7th Cir. 1992); *Hill v. City of Chi.*, No. 06 C 6772, 2009 WL 174994, at *4 (N.D. Ill. Jan. 26, 2009) (finding that the plaintiff's "mere speculation that [certain reports] may have existed" in a street file "cannot be the basis for his *Brady* claim"); *cf. Fields v. City of Chi.*, No. 10 C 1168, 2014 WL 477394, at *6–7 (N.D. Ill. Feb. 6, 2014) (denying summary judgment where the "street file" at issue was located during discovery). Accordingly, Taylor cannot proceed on a *Brady* claim based on the mere existence of a "street file."

In his response to the Officer Defendants' motion, however, Taylor also lists items that he contends were "hidden" in the file. Pl.'s Resp. Opp. at 11. The majority of these items are discussed below in Sections II.A.2 and II.A.3. But, in addition, Taylor lists the following:

(1)     "the Elmore GPR regarding narcotics transactions";

(2)     "arrest reports regarding narcotics transactions";

(3)     "a trespassing report related to Lassiter just before he was murdered";

(4)     "the officer's handwritten notes"; and

(5)     "criminal backgrounds of suspects and alternative perpetrators, etc."

*Id.*

As an initial matter, Taylor's response brief contains no substantive argument as to this allegedly suppressed evidence, and in some cases, it is not clear to which documents he is referring.

Accordingly, he has waived any argument as to these issues. *See United States v. Berkowitz*, 927 F.2d 1376, 1384 (7th Cir. 1991) ("We have repeatedly made clear that perfunctory and undeveloped arguments . . . are waived[.]"). In any event, Taylor points to no evidence from which a reasonable jury could conclude that these documents were suppressed. First, assuming that the "Elmore GPR" refers to a November 23, 1992 supplementary report, *see* Pl.'s SOF, Ex. 12, ECF No. 496-12, Taylor does not assert in his statement of facts or elsewhere that this report was withheld. *See* Pl.'s SOF ¶ 109. As for the "arrest reports," which appear to be those referenced in a November 18, 1992, GPR, *see* Pl.'s Ex. 12, Taylor has not pointed to any evidence that those arrest reports were not produced to the SAO. Instead, he merely cites to Diamond-Falk's trial file and asserts that it does not contain copies of those reports. *See* Pl.'s SOF ¶ 111. The same is true with respect to the "trespassing report" and the "criminal backgrounds of suspects and alternative perpetrators." But the mere absence of these reports in Diamond-Falk's file does not support a reasonable inference that the documents were suppressed. Taylor points to no testimony by the ASAs as to whether they received these documents, nor does he cite any testimony by Diamond-Falk that he did not receive them. Accordingly, because Taylor has produced no evidence from which a reasonable jury could find that these documents were suppressed, the Officer Defendants' motion is granted insofar as Taylor's *Brady* claim is based on a "street file" that has not been produced and evidence that Taylor speculates was contained in that file.

### 2. Whether Evidence was Produced to the SAO

A police officer's *Brady* obligations are discharged if the evidence in question is produced to the prosecutor. *See Beaman*, 776 F.3d at 512. But on the issue of whether the evidence at issue here in fact was produced to the SAO, the record is not as clear as the Officer Defendants suggest.

Factual disputes persist as to whether the "23rd District evidence"—the lockup roster, personnel roster, and arrest reports for individuals who bonded out around the same time as Taylor—was turned over to the SAO. Villardita and Johnson both testified that the SAO obtained the lockup and personnel rosters, *see* Defs.' SOF, Ex. 7, Villardita Dep. Vol. II at 318:6–12, 409:9–17, 411:3–9, ECF No. 484-9; *id.*, Ex. 8, Johnson Dep. Vol. II at 307:11–12, 312:4–6, ECF No. 484-11, and Villardita also explained that he provided the arrest reports to the SAO. Villardita Dep. Vol. II at 331:1–3.

But neither ASA Styler—who presented the criminal case to a grand jury—nor ASA Needham—who prosecuted Taylor at his criminal trial—could remember receiving any of these documents. *See* Defs.' SOF, Ex. 23, Styler Dep. at 50:12–51:13, 88:11–89:22, 142:1–146:23, ECF No. 484-26; *id.*, Ex. 3, Needham Dep. at 123:20–125:3, 153:10–154:6, 155:12–21, 160:6–20, ECF No. 484-3. Needham also testified that, if he *had* been in possession of the rosters, he would have turned them over to Taylor's counsel. Needham Dep. at 154:1–4, 160:15–20. Yet, according to Diamond-Falk, he did not receive these documents prior to the conclusion of Taylor's criminal trial. *See* Defs.' SOF, Ex. 5, Diamond-Falk Dep. Vol. II at 370:4–23, 379:24–380:11, ECF No. 484-6. A reasonable jury could credit the ASAs' and Diamond-Falk's testimony and conclude that Diamond-Falk did not receive the 23rd District evidence because it was never produced to the SAO. Therefore, summary judgment must be denied on this point.

A similar factual dispute exists regarding GPRs[7] pertaining to attempts to locate Anderson. The Officer Defendants point to the testimony of ASA Needham and two of the attorneys who

---

[7]      In addition to the GPRs that have been produced in this case, Taylor claims that the Officer Defendants suppressed an additional GPR dated December 30, 1992, which has *not* been produced. The parties dispute the existence of this document. The dispute stems from a *December 31* GPR in which a detective wrote that "in regards to the [GPR] of 30 Dec 1992 from Villardita and Johnson," he went to the Salvation Army to look for Anderson, but could not find him. Defs.' SOF ¶ 56. According to the Officer Defendants, this was a simple mistake, and the detective actually was referring to a *December 29* GPR from

represented Taylor's co-defendants.  *See* Defs.' Resp. Pl.'s SOF ¶ 79.  One attorney, Andrew Berman, testified that he had received the GPRs at some point, although he was unsure of when this occurred.  Defs.' SOF, Ex. 54, Berman Dep. at 50:13–52:8, ECF No. 514-4.  The other, John Theis, testified that, although he did not recall seeing the GPRs, "[I]f the[y] were obtained from [his] file, [he] certainly would have seen them back then."  *Id.*, Ex. 71, Theis Dep. at 163:6–22, ECF No. 514-23.  And Needham explained that "[i]f other defense attorneys had these, they got them from me.  And so I would have had those before Taylor went to trial[.]"  Needham Dep. at 120:16–122:24.  But in contrast to their testimony, Diamond-Falk testified that he never received the GPRs and never learned Anderson's name prior to Taylor's trial.  Diamond-Falk Dep. at 379:11–15, 382:4–384:3.  A reasonable jury could credit Diamond-Falk's testimony and conclude that he did not receive such reports because they were not produced to the SAO.  Accordingly, summary judgment must be denied on this point.

In addition, Taylor contends that the Officer Defendants suppressed the Foote information report.  On this point, the Court agrees with the Officer Defendants that no reasonable jury could conclude that this report was suppressed, because the record establishes that it was produced to the SAO.  Although ASA Needham testified that he did not remember receiving the report, *see* Needham Dep. at 114:3–115:13, Defendants have provided a transcript from Matthews's and Paul Phillips's criminal trial.  *See* Defs.' SOF, Ex. 62, 514-13.  The transcript reflects that a Sergeant Lombardo had been subpoenaed and directed to bring with him all reports or documents that he had in his possession pertaining to the case.  *Id.* at 3:6–19.  In open court, Needham described a report authored by Foote and stated that it "summariz[es] investigation conducted by Officer Foote on the 17th of November, . . . where he spoke to numerous citizens from the area" and found out

Sergeant Bonke.  *Id.* ¶ 57.  But given the contradiction between the officer's testimony and the document, a reasonable jury could find that an additional December 30 GPR did exist.

that Mixon had "some dispute" with Lassiter. *Id.* at 3:22–4:8. This exchange occurred in March 1995, six months prior to Taylor's trial. Given Needham's in-court acknowledgment of having received the report and explanation of its contents, no reasonable jury could conclude that the SAO was not in possession of the Foote information report. Accordingly, summary judgment is granted to the extent that Taylor's *Brady* claim is based on that report.

Furthermore, the Court notes that Taylor also claims that the Officer Defendants suppressed a visual check logbook containing records of inspections of detainees in the 23rd District lockup. Taylor points to evidence that lockup keepers conducted these checks as a matter of CPD policy; that the lockup keeper on November 16, 1992, believed he had conducted such checks that evening; and that these checks were recorded in logbooks. *See* Pl.'s SOF ¶ 75. But this evidence goes to whether the visual check logbook *existed*, not whether the Officer Defendants *suppressed* it—indeed, nothing in the record supports that they ever obtained it. Accordingly, summary judgment is granted to the extent that Taylor's *Brady* claim is based on the suppression of the visual check logbook.

### 3. Reasonable Diligence

The Officer Defendants further contend that they are entitled to summary judgment on Taylor's *Brady* claim because the evidence at issue could have been discovered through the exercise of reasonable diligence. Evidence that was "otherwise available to the defendant through the exercise of reasonable diligence" is not suppressed under *Brady*. *Boss v. Pierce*, 263 F.3d 734, 740 (7th Cir. 2001). The Officer Defendants argue that, because Taylor was aware of his own alibi defense, the evidence at issue could not have been suppressed because it was "already know[n]" to him. Officers' Reply Supp. Mot. Summ. J. ("Officers' Reply") at 3, ECF No. 517.

### a.    23rd District Evidence

Of course, Taylor and his attorneys were aware of his alibi defense. After all, they had received his arrest report and bond slip from the 23rd District. But mere knowledge of the fact that Taylor was in police custody on the night of the murders is no substitute "for the [allegedly] withheld arrest reports, GPRs, and police paperwork" at issue here. *Rivera v. Guevara*, 319 F. Supp. 3d 1004, 1047 (N.D. Ill. 2018). Apparently recognizing this, Taylor's counsel made multiple attempts to obtain any records pertaining to the lockup alibi. First, in March 1993, Diamond-Falk[8] sent a discovery motion to the SAO, requesting the disclosure of all evidence and witnesses that "might be or would be favorable to the defense." Pl.'s SOF, Ex. 102, at DT-030617, ECF No. 500-1. The SAO responded that it was not aware of any such evidence or witnesses. Pl.'s SOF ¶ 113. Taylor was entitled to treat that representation as truthful. *See Banks v. Dretke*, 540 U.S. 668, 693–96, 698 (2004). The Supreme Court has recognized that its "decisions lend no support to the notion that defendants must scavenge for hints of undisclosed *Brady* material when the prosecution represents that all such material has been disclosed." *Id.* at 695.

Nonetheless, Diamond-Falk went one step further—in August 1993, he subpoenaed the CPD for "[a]ny and all lock-up records from the 23rd District for November 14, 1992 through November 17, 1992." Pl.'s SOF, Ex. 101, ECF No. 499-25. But, according to Diamond-Falk, he received no response. Diamond-Falk Dep. at 294:2–5.[9] At that point, the Officer Defendants

---

[8]    The parties' arguments center on Diamond-Falk, presumably because Rubin did not enter the case until it was already in a trial posture. Pl.'s SOF ¶ 118. It is undisputed that Rubin made no "strategic decisions" about the case, "conducted no investigation," and did not "oversee compliance with defense subpoenas." *Id.*

[9]    Diamond-Falk further testified that he did not receive a "no records statement" from the CPD, because that practice that was not in place in 1993. Diamond-Falk Dep. at 294:7–24. Instead, he stated, the practice was to "ask the judge if there's a return on the subpoena, and if there's no return . . . it's left at that." *Id.* at 294:10–13. He "believe[d]" he asked the court whether there had been a return on his subpoena. *Id.* at 294:14–17.

contend, he should have taken additional action by filing a motion to compel. But this argument rests on an overly broad understanding of "reasonable diligence," which the Seventh Circuit has rejected. In *Goudy v. Cummings*, the plaintiff sought the production of certain video evidence, but received nothing. 922 F.3d 834, 840 (7th Cir. 2019). The defendant argued that counsel had not acted with reasonable diligence because he could have taken additional steps to try and obtain the evidence, such as "go[ing] back to the police property room himself or ask[ing] the court to grant him access[.]" *Id.* The Seventh Circuit rejected this argument, stating: "While we have rejected a *Brady* claim where counsel knew of evidence and failed to subpoena a witness for it, . . . [the defendant] points to no case in which we have required defense counsel to take extra steps to insure against police concealment or bad faith representations *after* seeking production of the relevant evidence." *Id.* (emphasis added).

Indeed, even the cases upon which the Officer Defendants rely do not support their position that "reasonable diligence" required Diamond-Falk to take further action after he repeatedly sought the production of this evidence, to no avail. *See Harris v. Kuba*, 486 F.3d 1010, 1015 (7th Cir. 2007) (finding no *Brady* violation where the government did not "disclose" to the plaintiff that he had an alibi, because the plaintiff was aware of his own whereabouts); *Ienco v. Angarone*, 429 F.3d 680, 683 (7th Cir. 2005) (finding no *Brady* violation based on alleged suppression of a report that could have been subpoenaed and that contained information about which the plaintiff could have testified); *United States v. Gonzalez*, 319 F.3d 291, 297 (7th Cir. 2003) (finding no *Brady* violation where defense counsel failed to inspect the evidence); *United States v. Rodriguez-Andrade*, 62 F.3d 948, 952 (7th Cir. 1995) (finding no *Brady* violation where the defendant could have obtained the evidence by issuing a subpoena); *United States v. White*, 970 F.2d 328, 337 (7th Cir. 1992) (finding no *Brady* violation where the defendants had access to the files containing the

evidence); *Starks v. City of Waukegan*, 123 F. Supp. 3d 1036, 1045 (N.D. Ill. 2015) (granting summary judgment on *Brady* claim where "suppressed" evidence that the plaintiff's bag was stolen and that he had scratches on his body was "known to him" and "formed part of his alibi").

By contrast, here, the allegedly suppressed evidence was not in Taylor's possession or control, and the Officer Defendants point to no evidence that he or his attorneys knew that it existed. And, despite issuing a subpoena to the CPD, Taylor's counsel received nothing. On this record, a reasonable jury could find that Taylor and his counsel were unable to obtain the evidence at issue despite exercising reasonable diligence.[10]

The decisions in *Patrick v. City of Chicago*, 213 F. Supp. 3d 1033 (N.D. Ill. 2016), and *Phillips v. City of Chicago*, No. 14 C 9372, 2018 WL 1309881 (N.D. Ill. Mar. 13, 2018), do not require a different result. In those cases, the courts granted summary judgment to the defendants on Taylor's co-defendants' *Brady* claims, which were based on some of the same evidence at issue here. *See Patrick*, 213 F. Supp. 3d at 1052–53; *Phillips*, 2018 WL 1309881, at *22–23. The courts reasoned that evidence pertaining to Taylor's alibi could have been discovered, had his co-defendants' attorneys taken steps to pursue it. *See Patrick*, 213 F. Supp. 3d at 1052–53; *Phillips*, 2018 WL 1309881, at *22–23. Although the cases are similar in a number of ways, as to this issue, they are not. Here, unlike in *Patrick* and *Phillips*, Taylor's defense counsel *did* try to obtain the evidence at issue, but was nonetheless thwarted from doing so. Thus, Taylor's counsel did not

---

[10] The fact that Meindl referenced a "lockup intake report" in his testimony on the final day of Taylor's criminal trial does not change this conclusion. *See* Defs.' SOF ¶¶ 104–05. The Officer Defendants contend that, despite the "disclosure" of this document, "[Taylor's] attorneys fail[ed] to take any affirmative steps to obtain [it]." Officers' Mem. Supp. at 18. But the parties dispute the meaning of Meindl's statement, *see* Pl.'s Resp. Defs.' SOF ¶ 105, and the Court cannot conclude from his testimony that the report to which he referred was, in fact, the lockup roster in question. Furthermore, given that this "disclosure" occurred on the last day of the trial, it is not clear that Taylor's counsel had an opportunity to make use of the information.

"simply ch[oose] not to pursue" evidence of the lockup alibi, *Patrick*, 213 F. Supp. 3d at 1053; to the contrary, he made multiple attempts to do just that.

### b. Anderson

This analysis applies with equal force to the evidence pertaining to Anderson, the individual who supposedly was locked up with Taylor on the evening of the murders. The Officer Defendants contend that Taylor and his attorneys "could have determined Anderson's identity" through the exercise of reasonable diligence, but made "a strategic decision" not to do so. Officers' Mem. Supp. at 15. To be sure, Diamond-Falk testified that he "didn't think [it] was necessary" to determine the identities of Taylor's fellow detainees and that he had concerns about their ability to identify Taylor. Diamond-Falk Dep. at 268:22–269:6. But he also explained that the "fundamental" reason he did not track down Anderson was that he simply did not know Anderson existed. *Id.* at 381:4–24. As explained above, Diamond-Falk made several attempts to obtain records pertaining to Taylor's time in lockup, which would have mentioned Anderson, but he received nothing. Accordingly, a reasonable jury could conclude that Diamond-Falk's failure to identify Anderson was due to the suppression of documents related to him, rather than a strategic decision about what kind of witness he would make.

### c. Grimes

The Officer Defendants also contend that they are entitled to summary judgment on Taylor's *Brady* claim as it relates to Grimes. Taylor claims that the Officer Defendants coerced Grimes into falsely identifying Taylor as someone he had seen at a park prior to the murders; to that end, Taylor alleges, the officers physically abused and threatened Grimes, and promised him leniency on unrelated drug charges.[11] Pl.'s SOF ¶¶ 61–62. The Officer Defendants again argue

---

[11] In their opening brief, the Officer Defendants argue that Taylor cannot proceed on a *Brady* claim based on the Officer Defendants' "fail[ure] to disclose that they allegedly coerced" Grimes into falsely

that Taylor's attorneys failed to act with reasonable diligence in seeking evidence from Grimes, because they "made no attempts whatsoever to interview Grimes prior to trial even though [they] were aware that Grimes was disclosed by a witness by the prosecution." Officers' Reply at 10. Taylor does not dispute this, but argues that "[t]he evidence in this case does not support the notion that Grimes would have revealed the [Officer] Defendants' misconduct that motivated his testimony," and indeed, "it is reasonable to assume Grimes would have lied when faced with such questioning by the defense[.]" Pl.'s Resp. Opp. at 36.

Given the fact that Grimes testified at Taylor's criminal trial in a manner consistent with his statement to the police, the Court cannot conclude that Taylor's counsel could have, through the exercise of reasonable diligence, learned from interviewing Grimes that he allegedly had been coerced by the Officer Defendants. The Seventh Circuit "regard[s] as untenable a broad rule that any information possessed by a defense witness must be considered available . . . for *Brady* purposes," *Boss*, 263 F.3d at 740, because it is "simply not true that a reasonably diligent defense counsel will always be able to extract all the favorable evidence a defense witness possesses," *id*. The concerns that a witness may be uncooperative or reluctant, or may inadvertently omit important information, "have even more weight in a case . . . involving information possessed by a *prosecution* witness." *Hampton v. City of Chi.*, No. 12-cv-5650, 2017 WL 2985743, at *22 (N.D. Ill. July 13, 2017).

As another court in this district recognized in *Jimenez v. City of Chicago*, 830 F. Supp. 2d 432, 444–45 (N.D. Ill. 2011), "[the Officer] Defendants' argument seems to assume the existence

---

identifying Taylor. Officers' Mem. Supp. at 21. But the Seventh Circuit explained in *Avery v. City of Milwaukee* that, in a case involving allegedly coerced testimony, a plaintiff's due process rights are implicated where there has been a "violation of the *Brady* duty to disclose facts about the coercive tactics used to obtain it." 847 F.3d 433, 439 (7th Cir. 2017); *see also Anderson v. City of Rockford*, 932 F.3d 494, 507 (7th Cir. 2019) (explaining that "due process required disclosure to the plaintiffs of the coercive tactics used to obtain [the witness's] statement") (citing *Avery*, 847 F.3d at 439).

of a . . . world in which prosecution witnesses readily give up impeaching information when interviewed or questioned by defense counsel.  Real life does not work that way[.]"  Drawing all reasonable inferences in Taylor's favor, as the Court must on summary judgment, a reasonable jury could find that he could not have obtained information about the Officer Defendants' alleged coercion of Grimes through reasonable diligence.  Taylor points to evidence that Grimes was pressured into testifying against him through physical abuse, threats, and promises of leniency on unrelated drug charges.  *See* Pl.'s SOF ¶¶ 61–62.  A reasonable jury could find that he would not have said anything different if Taylor's attorneys had interviewed him before trial.  Accordingly, summary judgment on this issue is denied.

### B.      Materiality

Suppression, however, is not all that is needed to establish a *Brady* claim.  The evidence must also be "material."  Under *Brady*, "[e]vidence qualifies as material when there is any reasonable likelihood it could have affected the judgment of the jury."  *Wearry v. Cain*, 136 S. Ct. 1002, 1006 (2016) (quotation marks omitted).  A plaintiff "need not show that he more likely than not would have been acquitted had the new evidence been admitted.  He must only show that the new evidence is sufficient to undermine confidence in the verdict."  *Id.* (quotation marks and citations omitted).  The materiality of the evidence must be viewed cumulatively.  *Id.* at 1007.

Here, the Officer Defendants contend, none of the evidence at issue was material because "[Taylor] had documents relating to his alibi (bond slip and arrest report) and none of the alleged suppressed documents independently corroborated that [Taylor] was in (or out of) lockup at the time of the murder[s]."  Officers' Mem. Supp. at 23.  The Court disagrees and concludes that a reasonable jury could find that the evidence at issue is sufficient to undermine confidence in the verdict from Taylor's criminal trial.

The case against Taylor centered on his confession, which he now claims was falsified and coerced. Taylor's defense was that he had an alibi for the crimes to which he had confessed. All of the evidence at issue here would have provided support for that defense or undercut the State's version of events. For instance, defense counsel could have used the lockup roster to show that Taylor was "carried over" from one shift to the next at 9:30 p.m., after the murders occurred. The personnel roster would have provided counsel the names of additional witnesses who could have testified that Taylor had been in lockup that night. The arrest reports and bond slips for Anderson and Fisher could have been used to rebut the State's evidence that detainees arrested for disorderly conduct would have been quickly released, because those men were also arrested on that charge and "carried over" from one watch to the next. And all of these documents could have been used to contradict Glinski's report of an encounter with Taylor at 9:30 p.m. on the night of the murders.

The same is true of the allegedly suppressed evidence relating to Anderson. Counsel could have called Anderson at trial and confirmed that he had seen Taylor in police custody on the night of the murders. And as for Grimes, had counsel been made aware of the Officer Defendants' allegedly coercive tactics, he could have used this information to impeach Grimes, thereby calling his identification of Taylor into question. A reasonable jury could find that, if the jury in Taylor's criminal trial had been presented with this evidence, the result would have been different.

For these reasons, the Officer Defendants' motion is denied as to Taylor's *Brady* claim, except insofar as the claim is based on the visual check logbook and the Foote information report.

### III.    Fabrication Claim (Count II)

Taylor also alleges in Count II that the Officer Defendants violated his due process rights by fabricating evidence against him. The Officer Defendants seek summary judgment to the extent this claim is based on (1) the confessions of Taylor's co-defendants, (2) the lineup supplementary

report, and (3) the Berti/Glinski supplementary report, because "none of this . . . evidence was ever introduced against [Taylor] at his criminal trial[.]"[12]  Officers' Mem. Supp. at 23.  But this argument is foreclosed by Seventh Circuit precedent.

The Seventh Circuit has acknowledged that "if an officer . . . fabricates evidence and puts that fabricated evidence in a drawer, making no further use of it, then the officer has not violated due process" because "the action did not cause an infringement of anyone's liberty interest." *Whitlock v. Brueggemann*, 682 F.3d 567, 582 (7th Cir. 2012).  But a due process claim need not be based on fabricated evidence that was introduced at trial.  *Id.* at 580 ("[A] police officer who manufactures false evidence against a criminal defendant violates due process if that evidence is later used to deprive the defendant of [his] liberty *in some way*.") (emphasis added); *see also Hurt v. Wise*, 880 F.3d 831, 844 (7th Cir. 2018), *overruled on other grounds by Lewis v. City of Chi.*, 914 F.3d 472 (7th Cir. 2019) (stating that it is sufficient to "show that the fabricated [evidence] furthered the prosecution"); *Fields v. Wharrie*, 740 F.3d 1107, 1112 (7th Cir. 2014) ("[T]he fabrication of evidence harmed the defendant before and not just during the trial, because it was used to help indict him."); *Patrick v. City of Chi.*, No. 14 C 3658, 2018 WL 3438942, at *8 (N.D. Ill. July 17, 2018) (finding "Defendants' contention that the fabricated evidence must be used at trial in order to establish a constitutional violation . . . unpersuasive").

Here, a reasonable jury could conclude that the allegedly fabricated confessions and supplementary reports furthered the prosecution.  The co-defendants' confessions led directly to

---

[12]     In their reply brief, the Officer Defendants contend that they are entitled to summary judgment to the extent that Taylor's fabrication claim is based on four other police reports relating to Gillespie, Grimes, and Seymore, because "[Taylor], for the first time in his response brief, claims that" these reports were fabricated. Officers' Reply at 14. This is incorrect. Taylor's statement of facts clearly states that "Villardita and Johnson authored at least four false reports relating to Gillespie, Seymore, and Grimes, for the purpose of undercutting [Taylor's] alibi," and identifies those reports. Pl.'s SOF ¶ 64. The Officer Defendants failed to address these reports in their opening brief, so the Court will not consider the arguments in their reply brief pertaining to them. *See Sublett v. John Wiley & Sons, Inc.*, 463 F.3d 731, 736 (7th Cir. 2006).

Taylor's arrest and indictment. *See* Pl.'s SOF ¶¶ 33, 35, 38, 40, 120; *id.*, Ex. 45, ECF No. 497-19 ("[Taylor] was arrested after being named as an offender in this murder by co offenders Lewis Gardner and Akia D. Phillips."). And the content of the reports at issue was used at Taylor's trial, even if the actual documents were not entered into evidence. Glinski was asked about the Glinski/Berti supplementary report on cross-examination and redirect, and he testified as to its accuracy. *See* Defs.' SOF, Ex. 72 at 138:24–139:5, 140:6–145:3, 150:11–151:12, ECF No. 514-24. And when McCoy testified that Taylor was not one of the men she had seen on the night of the murders, ASA Needham impeached her with her prior statement to the officers. Pl.'s SOF, Ex. 6 at 124:12–126:8, ECF No. 496-6. Later, Villardita testified that he "asked [McCoy] to identify anybody that she saw . . . coming out of Mr. Lassiter's apartment . . . on the night of the crime[, and] [s]he identified [Taylor.]" Pl.'s SOF, Ex. 95 at 238:17–240:17, ECF No. 499-19. From this, a reasonable jury could conclude that the prosecution was furthered—and Taylor was deprived of his liberty—by this evidence.

For these reasons, the Officer Defendants' motion is denied as to the fabrication claim.

## IV.  Fourth Amendment Claim (Count III)

Finally, the Officer Defendants seek summary judgment on Taylor's Fourth Amendment claim (Count III). Taylor alleges that the Officer Defendants violated his Fourth Amendment rights by detaining and wrongfully imprisoning him from December 1992 to June 2013.

The parties dispute at what point Taylor's Fourth Amendment claim accrued. The Officer Defendants contend that the claim accrued at the conclusion of his trial on September 7, 1995, when his "pretrial" detention ended. Taylor, on the other hand, contends that the claim did not accrue until he was released from custody and was entitled to sue, which occurred in 2013.

In *Manuel v. City of Joliet*, 903 F.3d 667 (7th Cir. 2018) (*Manuel II*), the Seventh Circuit held that a Fourth Amendment wrongful detention claim accrues when the period of detention ends. *Id.* at 670. Taylor was not released from custody until 2013. Nevertheless, the Officer Defendants argue, his claim accrued on the date of his conviction—September 7, 1995—because "once a trial has occurred, the Fourth Amendment drops out: A person challenging the sufficiency of the evidence to support both a conviction and any ensuing incarceration does so under the Due Process Clause of the Fourteenth Amendment." *Manuel v. City of Joliet*, 137 S. Ct. 911, 920 n.8 (2017) (*Manuel*).

But Taylor could not have brought his Fourth Amendment claim at any point prior to his release in 2013. It is well-established that "§ 1983 cannot be used to contest ongoing custody that has been properly authorized." *Manuel II*, 903 F.3d at 670. Had Taylor attempted to bring this claim while still in custody that had been authorized by the judicial process, it would have been barred by *Heck v. Humphrey*, 512 U.S. 477 (1993). That is because success on the claim would have "necessarily impl[ied]" that his conviction was invalid. *Id.* at 487. Taylor alleges that he was wrongfully detained based on fabricated evidence—the same evidence that was used to convict him at trial. Under these circumstances, "[t]he wrong of detention without probable cause continues for the duration of the detention. That's the principal reason why the claim accrues when the detention ends." *Manuel II*, 903 F.3d at 670. Accordingly, Taylor could not have challenged his detention after his conviction until 2013, when he was released. *See Roldan v. Town of Cicero*, No. 17-cv-3707, 2019 WL 1382101, at *3 (N.D. Ill. Mar. 27, 2019).

The Officer Defendants argue, however, that even if Taylor's Fourth Amendment claim accrued in 2013, it is still untimely because it was not brought in this Court until he amended his complaint in October 2018, which exceeds the two-year limitations period. *See Gekas v.*

*Vasiliades*, 814 F.3d 890, 894 (7th Cir. 2016) (stating that in Illinois, the statute of limitations for a § 1983 claim is two years). This argument is a non-starter, though, because the claim plainly relates back to the date this action was filed in 2014—well before the expiration of the statute of limitations. Under Federal Rule of Civil Procedure 15(c)(1)(B), "[a]n amendment to a pleading relates back to the date of the original pleading when . . . the amendment asserts a claim or defense that arose out of the conduct, transaction, or occurrence set out . . . in the original pleading." In evaluating whether a pleading relates back, the "central inquiry . . . is whether the original complaint gave the defendant enough notice of the nature and scope of the plaintiff's claim that he shouldn't have been surprised by the amplification of the allegations of the original complaint in the amended one." *Supreme Auto Transp., LLC v. Arcelor Mittal USA, Inc.*, 902 F.3d 735, 741 (7th Cir. 2018) (quotation marks omitted).

Here, the original pleading gave the Officer Defendants sufficient notice of Taylor's Fourth Amendment claim. The claim arises out of the same events set out in the original complaint—Taylor's arrest, prosecution, and conviction for murder—and the allegations supporting the Fourth Amendment claim largely track those underlying his state-law malicious prosecution claim. Accordingly, the claim relates back and is timely.

## V.     The City's Motion

Separately, the City seeks summary judgment on Count X (*respondeat superior*) and Count XI (indemnification). "To the extent summary judgment is entered in favor of [the Officer Defendants] on any of [Taylor's] claims," the City contends, "there would be no remaining basis to impose vicarious liability on the City." City's Mot. Summ. J. at 2–3, ECF No. 488. As discussed above, however, Taylor's claims against the Officer Defendants largely survive summary judgment. Accordingly, the City could still be liable on a *respondeat superior* theory and could

still be obligated to indemnify the Officer Defendants. Therefore, summary judgment is denied in this regard.

The City also argues that the "unidentified employees" listed in Taylor's complaint must now be dismissed because Taylor has failed to identify these employees during discovery. *Id.* at 3. It is true that a plaintiff must identify unnamed defendants in discovery, and that failure to do so warrants dismissal of the unnamed defendants. *See Williams v. Rodriguez*, 509 F.3d 392, 402 (7th Cir. 2007). But as Taylor points out, the parties have not yet conducted discovery on his *Monell* claim, leaving open the possibility that additional defendants who were responsible for carrying out the City's policies may be identified. Whether claims against those defendants would be time-barred is a question for another day; for now, the Court concludes that dismissal of the unnamed defendants is premature given the need for additional *Monell* discovery.

## Conclusion

For the reasons stated herein, the Officer Defendants' motion for summary judgment is granted to the extent that Taylor's *Brady* claim (Count II) is based on the existence of a "street file" and evidence that may have been contained therein. Furthermore, the motion is granted insofar as the *Brady* claim is based on the alleged suppression of the Foote information report or the visual check logbook. In all other respects, the motion is denied. The City's motion for summary judgment is also denied.

IT IS SO ORDERED.                                    ENTERED:  9/23/19

_____
**JOHN Z. LEE**
**United States District Judge**