# EXHIBIT B

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

DANIEL TAYLOR, )
Plaintiff, )
v. ) Case No. 14 CV 737
CITY OF CHICAGO, et al., ) The Hon. John Z. Lee
Defendants.

The video deposition of ERICH J. SPECKIN, called for examination pursuant to the Rules of Civil Procedure for the United States District Courts pertaining to the taking of depositions, taken before Tracy Jones, a Certified Shorthand Reporter within and for the County of Cook and State of Illinois, at 375 East Chicago Avenue, Chicago, Illinois, on May 22, 2018, at the hour of 11:38 a.m.

Reported by: Tracy Jones, CSR, RPR, CLR
License No.: 084-004553

**was also an important component of becoming an expert in the field. What kind of education are you referring to?**

A. Well, typically, I mean, it helps to have a relevant scientific basis. I know plenty of people that are very good experts that didn't have degrees or still don't or had degrees in something. My father has a degree in German. It doesn't mean that you can't be an expert. If you have a degree in physics or chemistry or biology, it might help in some cases; it might not make a difference. But the education that would be the most significant is learning from what other people have said and by reading textbooks, relevant journals, papers, workshops, things like that.

**Q. So is it fair to say that's an ongoing learning process throughout your career?**

A. I would say it's always ongoing, yes.

**Q. If we could turn back to your CV, if you still have it. And if you wouldn't mind passing one more copy down.**

**Could you please describe your education, starting with high school.**

A.  So I went to high school.  I dropped out, went to college, graduated from Michigan State. And that's kind of -- I don't know how detailed you want the answer.  I know you already know the history from the previous deposition.  We had about 40 pages of it.  But I didn't know how detailed you wanted me to get.

**Q.  Okay.  Well, I'll ask some follow-up questions.**

**Did you ever receive a high school degree?**

A.  Diploma?

**Q.  Yes.**

A.  No.

**Q.  Did you ever receive a high school equivalency diploma, like a GED?**

A.  No.

**Q.  All right.  And from your testimony in Deon Patrick, I understand that you went to Perdue, and you went to Albion College but did not receive degrees from those universities, correct?**

A.  That's correct.

**Q.  Okay.  But you did receive a chemistry degree from Michigan State; is that correct?**

A. Correct.
**Q. And was that a B.A. or a B.S.?**
A. B.A.
**Q. And was there a particular focus to that degree, or was it just a general chemistry degree?**
A. I'm not aware of any other focus, on a bachelor's level, than chemistry. To me, that seemed pretty focused. It is a degree in chemistry from the College of Natural Science, and it's a Bachelor of Arts degree with a major in chemistry.
**Q. Did you receive any education at Michigan State pertinent to handwriting analysis?**
A. No.
**Q. What about document examination?**
A. No.
**Q. Michigan State has a forensic science master's program, correct?**
A. Currently, I couldn't answer. But I know until a few years ago, they did. I don't know the answer as of today. I suspect they still do, but I don't know.
**Q. And you did not attend that program, correct?**

A. Not as a student. As an instructor or lecturer, I did, but not as a student.
**Q. And when did you serve as an instructor at that program?**
A. Well, as a lecturer for several classes probably in the, I'd say, early 2000s would be my -- I don't know for sure. That was a long -- It was a while ago.
**Q. Do you recall what the topics of your instruction were in those classes?**
A. Document examination.
**Q. Were you, like, a guest lecturer?**
A. I would say so. I mean, I wasn't on staff. I think that would be the term. I don't know what the term was. I didn't ask. But that would be what I would say.
**Q. Turning to training, you did a two-year residency with Leonard Speckin, which is your father, correct?**
A. Yes.
**Q. And it was at his lab, correct?**
A. That's right.
**Q. And did that residency focus just on forensic document analysis?**

**Q. By what certifying body?**
A. The American Board of Forensic Document Examiners.
**Q. And is that ABFDE for short?**
A. Yes.
**Q. Then you completed the residency while you were also in college at the time, correct?**
A. Yes.
**Q. And -- But it was a full-time residency?**
A. Yes.
**Q. Can you describe the schedule of that residency, in general terms?**
A. It was flexible, to work around my class schedule when I did have classes. But it was from early in the morning till late in the evening with time off to go to classes if I needed it.
**Q. Five days a week?**
A. At least. Typically, it was six. I think most Saturdays, we worked. We typically did not on Sunday.
**Q. Have you received any formal training on handwriting analysis from a lab not associated with the Speckin family?**
A. No.

three.
I also used the book by Brunelle on ink and paper examination. It seems like there was one more that I referred to frequently in my training, and it escapes me at the moment. But those are -- I covered the main ones. I believe there was one more. I just can't think of it off the top of my head. That was a little while ago.
**Q. Is there a syllabus from your residency that still exists?**
A. You would have to ask my father. I doubt it, but I don't know the answer.
**Q. Was there one at the time that you recall?**
A. I think so, but I'm not -- again, you'd have to ask him. I'm not sure.
**Q. Did you conduct any supervised casework while in the residency?**
A. Supervised casework would be after your residency is completed that you would do.
**Q. Did you do any supervised casework after your residency?**
A. Yes. Absolutely.
**Q. And who was the supervisor of that**

**casework?**
A. There were two, my father being the main one, and Robert Coleman.
**Q. And who is Robert Coleman?**
A. He is an examiner that worked at the Michigan State Police with my father and then started with our firm in early 1996.
**Q. And how many years of supervised casework did you perform?**
A. Well, I didn't -- My work was supervised; I didn't supervise the casework.
**Q. Right. That was poorly asked.**
**For how many years were you supervised in your casework following your residency?**
A. Probably around a year to two years, something like that.
**Q. And then you went out on your own?**
A. I still work for my father, and I wouldn't say that I was on my own, no.
**Q. I guess that was metaphorical.**
**You conducted after that point your casework without supervision?**
A. Correct, unless I asked for it, yes.
**Q. Were any other students in the residency**

**program while you were there?**
A. No.
**Q. Has your father taken at any time any other residency students?**
A. Yes.
**Q. How many, to your knowledge?**
A. I believe he trained eight other examiners when he was with the Michigan State Police and one other examiner after me in private practice.
**Q. Do you know what year that was, the private practice residency?**
A. It was right after mine. I think it was 1998 to 2000.
**Q. Did he have any relationship with that person prior to taking him on as a resident?**
A. He knew him from the Michigan State Police, and of course he became an employee of the laboratory.
**Q. He did?**
A. Yes.
**Q. Does he currently work at your organization?**
A. He still works. He retired as of

January 1st of last year, but he still does some consulting.

**Q. What's his name?**

A. Michael Sinke, S-I-N-K-E.

**Q. Did you take exams while in your residency?**

A. No exams that I can recall. I was tested on casework and actual cases; but I can't recall an exam, no.

**Q. Were there certain requirements you had to meet in order to graduate from the program?**

A. Yes.

**Q. And is there documentation of that still in existence?**

A. I have no idea. You would have to ask my father that question. I don't know of any.

**Q. Did you have it at the time that you were attending the residency?**

A. I never had anything like that. Whether it existed, I don't know the answer.

**Q. Did your father, to your knowledge, ever take a course in being an instructor in forensic document examination prior to overseeing your residency?**

MS. ITCHHAPORIA: Objection: Form; foundation.

THE WITNESS: I have no idea. He trained eight people before me. Whether he had a course before or during that, I really don't know.

BY MS. VAN BRUNT:

**Q. Were you paid to attend the residency?**

A. I was.

**Q. And was the program certified by a handwriting organization?**

A. I don't know that it was certified. It had been run past the people in different organizations, but I don't know the ins and outs of that interaction. It wasn't me that did it.

**Q. Do you know the names of any of those organizations you just referred to?**

A. As I sit here today, I don't recall, no.

**Q. And you also did a residency at Brunelle Forensic Labs, correct?**

A. Correct.

**Q. And that was on the identification and dating of inks?**

A. That's right.

THE WITNESS: Would this be okay, since we

just kind of changed topics, to take a quick, like, two-minute break? Or I can do it whenever.
MS. VAN BRUNT: Sure. Can I just ask one follow-up question, and then we can?
THE WITNESS: Sure.
BY MS. VAN BRUNT:
**Q. Did you receive any training at Brunelle that is relevant to the report you offered here today?**
A. No.
MS. VAN BRUNT: Sure. Let's take a break.
THE VIDEOGRAPHER: Going off the record. The time is 12:29 p.m.
(Whereupon, a short break was taken.)
THE VIDEOGRAPHER: We are back on the video record. The time is 12:39 p.m.
BY MS. VAN BRUNT:
**Q. Do you currently hold any professional certifications?**
A. No.
**Q. Have you ever held any professional certifications?**
A. Not as it relates to forensics, no.

**Q. Have you ever applied to be a member of any of the forensic document examination certifying bodies?**
A. No.
**Q. Do you believe there are any professional advantages to being a member of such a body?**
A. For some people, yes, there could be.
**Q. But not for you?**
A. I don't think for me there is, no.
**Q. Are there any licensing requirements to be a forensic document analyst in Florida?**
A. Not that I'm aware of.
**Q. Were there in Michigan?**
A. Possibly to become a private investigator, to maintain evidence. I don't know that it's required, but we did it out of an abundance of caution.
**Q. I believe you testified in the Patrick case that your organization undergoes proficiency testing?**
A. We opt for proficiency testing by a neutral third party as opposed to people that you know doing the testing in a certifying body.
**Q. And that neutral party is Collaborative**

BY MS. VAN BRUNT:
**Q. Do you recognize this document?**
A. I do.
**Q. And what is it?**
A. It was a letter from Howard Rile to me.
**Q. And who is Howard Rile?**
A. He's a document examiner. I think he's retired now, but he was in Los Angeles.
**Q. Okay. And was he writing on behalf of the Board of Forensic Document Examiners?**
A. Yes.
**Q. And is it fair to say that this letter dated May 4th, 1998, in this letter, you're being asked to cease and desist from representing yourself as eligible for certification by the ABFDE?**
A. It says "referring to yourself," not "representing"; but yes.
**Q. Did you take any action after receiving this letter?**
A. I think the only action was I threw it away. I don't think I did anything else.
**Q. Did you apply for certification with ABFDE?**

A. No.
**Q. And why not?**
A. Number one, it wasn't really needed. Number two, after this happened, the fact that it was in other people's, in competitors' hands before it was in mine kind of led me to the motive behind it. So it wasn't really anything I needed to be a part of.
**Q. What do you mean, it was competitors' hands?**
A. I believe, if I remember correctly, this document was presented to me at a deposition before I ever even had received it, if I remember correctly. The whole point that it's out there and in your hands is really just an effort to embarrass me, not to do anything constructive, of course.
**Q. Well, do you still maintain you're eligible for certification by this organization?**
A. I say if I'm asked, that I've completed the requirements, and I can begin the test, the certification process, yes. They have published requirements, and I have completed it.
**Q. So you have not changed your conduct**

**after receiving this letter; is that fair to say?**

MS. ITCHHAPORIA: Objection: Form; misstates his testimony, and foundation.

THE WITNESS: Have I changed my conduct? No. I answered the questions truthfully just as I did before and after.

BY MS. VAN BRUNT:

**Q. Next one, Exhibit 6.**

(Whereupon, Speckin Deposition Exhibit No. 6 was marked for identification.)

BY MS. VAN BRUNT:

**Q. Do you recognize this document -- Actually, I just gave you a working copy. Do you have one you can send back? Sorry.**

**Do you recognize this document, sir?**

A. I do.

**Q. What is it?**

A. It was a letter from Judge Rodgers to me.

**Q. And dated April 14th, 2000, about a case in which you had been retained, correct?**

A. Correct.

No, not correct. Appointed.

**Q. Appointed?**

A. I was not retained, I was appointed by the judge.

**Q. Okay. And one of the statements made by the judge in this letter, spanning the first page to the second, is that, "This is a clear indication to the Court and the jury that you countenanced an overblown statement of your credentials as it related to work with the IRS and the Secret Service."**

**Do you see that?**

A. I do.

**Q. And to what is he referring here?**

A. He was talking, if you read first paragraph, about my résumé, which did not have that. And I explained that in the response letter that I wrote to the judge.

**Q. When you said "did not have that," did not refer to your work with the IRS and the Secret Service?**

A. Correct. It was only in a Lawyer's Weekly article in an "About the Author" section that had that statement about the Secret Service and the IRS.

**Q. Do you maintain that that article in the**

**Lawyer's Weekly publication is inaccurate?**
A. No. I'm not saying it was inaccurate. I'd say it could be misleading. It's been twisted to death since 1995 by people. People could view it differently, yes. I mean, in '95, I had never even testified before. I had no idea the ridiculousness that would happen from that. If it happened today, of course I would have addressed it differently.
**Q. How would you have addressed it differently?**
A. I would never let anybody write an "About the Author" section about me without me doing it, number one.
**Q. And did you take any action after receiving this letter?**
A. Yes. I wrote a response to the judge.
**Q. And did the judge respond to that response?**
A. I don't recall. I don't know. It was 17 years ago, or 18 years ago, I guess. I don't really remember. Possibly, though. I don't know.