# EXHIBIT C

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS.
EASTERN DIVISION

| | | |
|---|---|---|
| DEON PATRICK, Plaintiff, | ) | |
| -vs- | ) | No. 14 CV 3658 |
| CITY OF CHICAGO, et al., Defendants. | ) | |
| DANIEL TAYLOR, Plaintiff, | ) | |
| -vs- | ) | No. 14 CV 737 |
| CITY OF CHICAGO, et al., Defendants | ) | |

The videotaped deposition of PETER A. SMERICK, taken in the above-entitled cause, before Marybeth Lynch Farrell, a Certified Shorthand Reporter in the State of Illinois, on the 22nd day of September, 2015, at the hour of 10:00 a.m. at 20 South Clark Street, Chicago, Illinois, pursuant to subpoena and notice.

providing your second report in this case?

A. Yes.

Q. Are you familiar with Erich, E-r-i-c-h, Speckin?

09:24:43 A. Our company is familiar with his firm. I'm a member of The Academy Group, a behavioral forensic science consulting firm in Manassas, Virginia.

And if we have any cases involving ink 09:24:59 dating matters, we have in the past referred our clients to that firm, but not for any handwriting analysis.

Q. When did you first start referring clients to Mr. Speckin's firm?

09:25:14 A. I can't even recall.

Q. Have you personally had any one on one dealings with Erich Speckin?

A. No.

Q. Are you familiar with Mr. Speckin's 09:25:29 reputation in the forensic document examiner industry?

A. In reading his resume I had the impression that basically he was a chemist and his specialty was ink dating.

I was mildly surprised that he also claims to be a handwriting expert or document examiner.

09:25:52 Q. Were you surprised because that was something you just didn't know?

A. Well, I didn't know until I read his resume. What surprised me is that his training appeared to have been provided by either his father or some other family member, when in my

09:26:06 experience most handwriting experts and question document examiners come from the law enforcement laboratory perspective, either U.S. Postal Service, Secret Service, FBI, Chicago Police Department, Crime Lab, people of that nature.

09:26:23 Q. As to Ms. Schuetzner are you familiar with Ms. Schuetzner prior to reading her report?

A. No.

Q. You never heard of her?

A. No.

09:26:32 Q. So is it safe to say you have no opinions one way or the other about her reputation in the industry?

A. No.

Q. When were you first retained as an

identification, yes.

Q. What percentage of your work deals with expert work?

A. Well, it depends on what you refer to

09:32:48 as expert work. In the Academy Group I'm the handwriting expert and I'm also one of the experts in the field of what we call forensic linguistics or authorship identification. That combined is probably about 10 percent of the

09:33:03 work that I do for the company.

A good portion of the expert work that I do is in the field of premises liability where a person is assaulted or raped or killed in an apartment complex or in a shopping mall and they

09:33:19 turn around and sue the property owner for lack of security.

And what I bring to the table is analyzing the behavior of the criminal to make a determination as to what security measures, if

09:33:31 any, would have prevented that man from committing that crime.

So the lion's share of the work that I do for the Academy Group is in premises liability.

and somewhat in photo cases, also.

09:36:30 In retirement I do not advertise my services as a handwriting expert. It is something that is word of mouth through the law firms that I come in contact with.

And so a small percentage of my salary is generated through handwriting examinations.

Q. Why don't you advertise your handwriting expertise?

09:36:46 A. Well, because quite frankly, I have a full life right now. I like the balance of what I'm doing in my life as far as the legal work and premises liability matters. I enjoy police training immensely.

09:37:00 I also work cases with police departments on unsolved homicides pro bono, so that takes up a portion of my time.

09:37:14 And then handwriting I like to continue working in the field just to keep up my expertise as someone who has been doing this for some 35 years.

Q. You said that you do some pro bono work for some police departments?

A. From time to time when I teach. In

profession.

Last year I was invited by The International Association of Criminal Psychologists to put on a presentation on 09:40:06 violent criminal behavior and a couple of years before that I did the same thing in Dubai.

So I have a wonderful mixture of work that I perform and my colleagues are in the same boat.

09:40:18 Q. How many current employees does the Academy Group, Inc. have?

A. We have eight of us who are retired law enforcement people and one man who is the business manager for the company and we have a 09:40:32 legal -- we have a secretary.

Q. And are the eight retired law enforcement officers, are they all retired FBI agents?

A. Seven of us are. The eighth was a 09:40:44 lieutenant with the Virginia State Police that we had trained to be a violent crime analyst and criminal profiler for the State of Virginia.

And we liked his capabilities, so we brought him on board as a full member and

partner in the company.

09:41:08 So he is the only law enforcement officer that's a partner in the Academy Group. Now, we have a number of associates to the Academy Group, a retired supervisory agent in charge of the U.S. Secret Service, for instance, and he would do a lot of site surveys for our clients.

09:41:21 If they want to determine whether or not their home or their business is secure, he'll do sweeps of the property and make recommendations as far as how to beef up security.

09:41:31 And we have another gentleman who is a forensic psychiatrist and so he'll do some work for us especially in child molestation cases.

09:41:45 So besides the eight partners and our business manager, also, we probably have a stable of four or five other individuals that we rely upon for special skills.

Q. And those four or five individuals, you call them associates?

A. Associates, yes, they don't own stock in the company.

Q. Do you have a title in the company?
A. Executive vice president.
Q. Has that -- has your title ever changed since 1994?
09:42:05 A. Well, yes, when I first came in I was a vice president. Eventually I became president of the company. I've been president and CEO for approximately six years and it's been our philosophy that every six years or so the
09:42:19 president and CEO will step down to give a younger member of the firm to move into that role.
So I stepped down to executive vice president a number of years ago.
09:42:30 Q. What years were you the vice president?
MS. AUERBACH: Object to the form.
MR. BOWMAN: Join.
THE WITNESS: I'd have to go back and check my resume which I don't have a copy of in from
09:42:41 of me right now as far as the specific years.
BY MS. ITCHHAPORIA:
Q. Do you remember when you stepped down from being the president and CEO?
A. Once again, the exact date I don't

remember.

Q. What about the year?

A. Well, no, I believe it was maybe three or four years ago.

09:42:59 Q. Have you held any other positions in the Academy Group other than the ones you just told me about?

A. Just being on the board of directors, I mean I'm chairman of the board and I've held

09:43:09 that position for probably eight years now.

Q. Prior to the Patrick and Taylor case have you ever been retained to provide expert witness services in a civil rights case on behalf of a plaintiff?

09:43:36 A. You mean like this type of case?

Q. Any civil rights type of case.

A. I'm going to say no. Everything has been in premises liability.

Q. Have you ever had any cases other than

09:43:58 the Patrick and Taylor case in the Northern District of Illinois Federal Court here in Chicago?

A. I don't remember the exact courts, but I know I have had a number of premise liability

Naval Investigative Service?
A. For a little over two years.
Q. So '67 to about '69?
A. Yes.
09:52:29 Q. Okay.
A. Then in January 5th of 1970 is when I reported in to the FBI headquarters in Washington, D.C. to begin my 16 weeks training to become an FBI agent.
09:52:47 Q. Did any of the training that you underwent to become an FBI agent involve document examining?
A. No, not at that time.
Q. And you said your first assignment as
09:52:58 an FBI special agent was in --
A. Eugene, Oregon.
Q. Eugene, Oregon.
And that was for one year you concentrated on domestic terrorism cases?
09:53:08 A. Well, and criminal investigations. When you're in a small office like that you're responsible for all 185 violations of federal law.
And so I did everything from timber

crime. And New York was a great place to do it because you had the five major families of organized crime there.

09:57:04 We also had the greatest hotel in the world housing spies and we called it The United Nations because if you're not assigned to the United Nations, you're not a spy, so we had a great deal of surveillance work to do in New York regarding that.

09:57:16 And from there I had the opportunity of being promoted to the FBI laboratory as a supervising special agent.

Q. Did you have to take any tests for that position?

09:57:27 A. No, what it amounted to is like most of us in life we have certain goals and objectives and one of my goals was to get back to what was known as the special photographic unit of the FBI laboratory.

09:57:41 And the special photographic unit happened to be part of the questioned document section. And so when I was transferred back to the laboratory it was into the special photographic unit, but at the same time I then

underwent a two and a half year training program to become a document examiner and handwriting expert.

Q. So when you were transferred to the lab
09:58:04 was that in New York?

A. No, the laboratory would have been in Washington, D.C. I was transferred from New York.

Q. And from 1976 to 1978 you underwent
09:58:18 training for questioned photographic evidence examiner training?

A. And questioned document examiner training.

It was a unique experience from the
09:58:29 time because we had some 45 agents in the document section.

And what really caused a stir is that -- well, let me back up. The reason I was sent to the laboratory is that the Bureau
09:58:43 recognized that they had agents on the streets 80, 85 years old still carrying a gun and they didn't think that was a good idea.

So they rearranged the retirement program making a mandatory retirement at age 57

which meant a good one third of the laboratory was going to be retiring within a year or two.

And so I came in and had the opportunity of being trained by men with 20, 25 years of experience as document examiners, handwriting experts.

So the training I received was second to none. And what made it also unique is that it wasn't me sitting across the table from one man being trained. We knew document examiner trainees were rotated between examiners every couple of months.

So we had an idea of this man's philosophy on how he analyzes handwriting versus this other examiner, what does he look for.

So it was an incredible training program followed by moot courts that you had to go through for every segment.

So if there was a block of instruction on typewriter examinations, you had to present evidence during a moot court regarding typewriters or printing or paper or handwriting.

And 75 to 80 percent of the work we did in the document section was handwriting and hand

printing examinations.

So during the course of the approximate decade that I was assigned to the laboratory I've analyzed thousands of cases involving
10:00:16 handwriting and hand printing and probably tens of thousands of individual signatures, what have you.

So I have had a very, very thorough grounding in the skills needed to analyze
10:00:29 handwriting and hand printing.

Q. The training -- how long was the training for the document examiner?

A. Well, it was two and a half years.

Q. Two and a half years.

10:00:39 Was that training -- were you undergoing the training for the document examining at the same time that you were undergoing the training for the photographic evidence training?

10:00:48 A. Exactly, but since I had a strong background in photography already, the real training in a laboratory is what we call forensic photography, using photography to analyze physical evidence.

So if you have a hit and run accident and you have a fabric impression on a chrome bumper, how do you photograph that so that you're going to be able to see it and present it in a court of law.

10:01:11

In a questioned document field we would use infrared radiation and ultraviolet light in analyzing questioned documents to determine whether or not there have been alterations or distortions or erasures on a document.

10:01:22

And in fact, I still do the same thing in my home laboratory. I have the capability of analyzing documents to determine whether or not inks have been eradicated or different pens have been used to write certain items.

10:01:36

So that's what the nature of the forensic photography was all about, using photography, using different filters, using different films, using different wavelengths of light to analyze physical evidence.

10:01:48

Q. How many hours per week was spent training for the document examiner?

A. Well, it was a mixture of eight hours a day, but very, very quickly once we went through

the block of instruction regarding handwriting and hand printing examinations we began analyzing cases under the tutelage and guidance of a senior examiner because with so many guys 10:02:19 retiring the caseload was astronomical and so we brand-new document examiners had the opportunity of starting to work right off the bat in one specialized area of handwriting and hand printing.

10:02:32 So it was a combination of case work and attending classes and perhaps visiting a printing plant to see how the machinery works or going to Secret Service to see how money is produced because we would do an awful lot of 10:02:48 work in counterfeit cashier's checks, things of that nature.

So it was very intensive, but a continuous training program.

Q. Well, how was the training split up as 10:02:59 far as the forensic photography versus the document examiner?

A. Well, if a case came in that had unusual photographic needs, well, then I would be pulled out of the questioned documents

10:03:22 section, go into the photographic unit, and see what the technicians were doing with a specific piece of evidence to see what kind of results you're getting using infrared photography or ultraviolet light photography.

And sometimes that would take a couple of hours time, it might take a whole day depending upon the volume of evidence that has come in at a particular time.

10:03:32 So it was an ongoing training program.

Q. Was 50 percent of the training devoted to the forensic photography and then 50 percent was devoted to document examining?

10:03:45 A. No, 90 percent of it was for document training.

Q. And you said that the trainees would transfer to different examiners?

A. Yes.

10:04:00 Q. So you would -- there wasn't one particular examiner that trained you?

A. No, there were multiple examiners that trained me.

Q. And was there -- you said you also attended classes.

after 48 hours they started to believe that this was for real. So it became a real eye opener. So we got involved in those types of cases as well.

10:07:47 Q. So is it fair to say for the two and a half years when you were training as a document examiner there were times when you weren't doing any document examiner training, but you were doing other forensic photography training or
10:08:00 other work as an FBI agent?

A. Absolutely, sure. But once again the majority of the time was dealt with the training and handling handwriting and hand printing cases.

10:08:08 The examples I've given you are just a few and far between. It wasn't even like once a month. It may be six months before something really big develops and then we would be sent out on an assignment.

10:08:18 Q. Then at the end of the two and a half years of training did you get a certificate or something like that --

A. Yes.

Q. -- for document examining?

A. Yes.

Q. And once you got the certificate what does that mean, that you could then start analyzing cases on your own?

10:08:33 A. Yes, then if you completed the training, if you completed all of the moot court successfully, then you would get your own regular case load.

But even then, if you would go out and
10:08:46 testify for the first six months, another examiner would go out with you to see whether or not you can handle cross examination in a court of law.

So the training continued even after
10:08:58 getting certified for a period of time. But once they felt that you could handle the pressure and the stress, well, then you were on your own.

Q. So after you stayed with the lab -- I'm
10:09:18 sorry, you stayed with the lab from 1976 until 1985; is that correct?

A. That's correct.

Q. So after the two and a half years of training, so we're looking at some point in 1979

you?
A. No, but if she is not with the National Academy and if she is a questioned document examiner, to me it would be logical that she
10:15:07 probably went back to that type of a school. But once again, I don't know for a fact.
Q. So you were an instructor for the forensic science at the FBI from 1985 to 1988, three years?
10:15:18 A. Yes.
Q. And how often was the one week school for handwriting?
A. Maybe once or twice a year and the two week school maybe once or twice a year depending
10:15:28 on the demand.
Q. Let me just get this right. So once or twice a year there was a one week school?
A. Yes, perhaps.
Q. And then two or three times a year
10:15:37 there was a two-week training?
A. Once or twice a year there would have been a two-week school. Now, at that time I no longer conducted handwriting examinations on physical evidence because now I'm an instructor

10:15:57 10:16:08 10:16:19 10:16:32

down at the FBI Academy.

Q. So when there was the one week training for the handwriting were you the instructor for that entire one week?

A. No, there was another agent who also came from the document section who had previously had been a forensic science instructor at Quantico.

So he and I would team teach because we're still teaching courses at the FBI Academy for the National Academy and for new agents, so we had to squeeze in our times so it doesn't conflict with our other training.

Q. And then the two week training that was sometimes offered once or twice a year, the handwriting, would you and the other document examiner teach that together?

A. Together, but we would also bring down experienced guys from the laboratory in Washington, D.C.

Q. And that training, it wasn't just limited to FBI agents, it was to anybody?

A. Well, you had to be in the law enforcement community either in a forensic crime

lab or a police department. So it was not for, quote, civilians.

Q. And how did someone -- they just applied to attend the training?

10:16:57 A. Well, two things would happen. Sometimes requests would come into the document section and the section chief, you know, would say, we really have a need for this type of training and if we start getting enough requests

10:17:09 coming in, then the section chief would come to the unit chief, the unit chief would come to us and say, hey, can you put on a program for these individuals.

And if we could squeeze it in based

10:17:19 upon our own schedules, we would try to do it.

Q. Were you certifying any of the individuals that underwent the one week or two week training --

A. No, no, we were --

10:17:27 Q. Let me get the question out.

-- (continuing) the one week or two week training for handwriting?

A. No, we did not certify anybody because our concern was you can have someone who is a

10:17:43 fledgling document examiner for a police department and after a two week training course feel that they're now qualified to testify as a handwriting expert.

And it took me two and a half years of training to finally attain that certification. So we gave out certificates of attendance is what they were.

Q. So after you were -- and you were an

10:17:58 instructor for full time for three years?

A. About two, two and a half years I believe. I think it was in 1988 is when I became a violent crime analyst and criminal profiler for the National Center for the

10:18:10 Analysis of Violent Crime.

Q. Where was that?

A. That's at the FBI Academy, also.

So I left the FBI laboratory and just joined the training division now.

10:18:21 Q. And you did that -- according to your c.v. you did that from 1988 to 1994?

A. Yes.

Q. And your title at that point was senior violent crime analyst and criminal profiler?

A. Right, I still had the overall title of supervising special agent, so it was not a promotion to a higher grade, so yes, that is correct.

10:18:42 Q. And when you were a senior violent crime analysis and criminal profiler what type of cases did you work on?

A. Everything from serial killers to individual killers, serial rapists to individual

10:18:57 rapists, extortionists, kidnappers, anything dealing with crime.

And so if any case came in that involved handwriting, I would get that case.

Q. How many cases did you deal with that

10:19:12 involved handwriting from 1988 to 1994 when you were a senior violent crime analyst?

A. I can't even recall. I never kept any statistics as far as the breakdown as far as how many cases fell into each category, but I can

10:19:26 tell you it was on a continuous basis that I was still analyzing handwriting.

Q. One of the cases that you indicate in your c.v. that you worked on was where you identified the victim's husband as the author of

A. No.
Q. On Pages 11 through 12 you list some of the special organizations that you've been affiliated with. Is that not current as of today's date?
10:39:43 A. Yes.
Q. So starting with the American College of Forensic Examiners it indicates here that you're a diplomate?
10:39:54 A. Yes.
Q. What is that?
A. That's apparently the highest level you can have within an organization like this. I think below that is fellow and then it's a
10:40:02 member and what have you.
Q. How does one become a diplomate within the American College of Forensic Examiners?
A. Well, basically they review what your resume is all about.
10:40:15 They look at your experiences that you've had, what are you doing in the field of forensics. And then quite frankly, for any organization it's a money making thing.
And so having this title of diplomate

meetings.

And quite frankly, I have a full life right now and I have no interest in producing any papers.

10:42:23 Q. Have you ever been a full member of the American Academy of Forensic Scientists?

A. Well, yes, when I was with the FBI in the questioned document section as a questioned document examiner.

10:42:36 Q. So when you were in the FBI you were in the questioned document section within the American Academy Of Forensic Scientists?

A. Yes.

Q. How long were you in the questioned document section for?

10:42:45

A. Probably as long as I was an agent in the FBI laboratory.

Once I became certified as an expert in questioned document exams by the Bureau then I would be eligible to become an expert for the American Academy of Forensic Scientists.

10:43:01

Q. So I guess when did you stop being a member of the questioned document section?

A. Well, I've never stopped being a

member. I'm just an affiliate member now because I'm not a full-blown questioned document examiner. I'm a handwriting, hand printing expert.

10:43:18 Q. So when did you go from being a full-blown member to an affiliate member of the questioned document section of the American Academy of Forensic Scientists?

A. I don't recall, but I think they 10:43:27 probably made that determination based upon my lack of participation in, you know, the annual meeting.

Q. When was the last time you attended a meeting for the American Academy of Forensic 10:43:39 Scientists?

A. My God, it could have been back in the '80s sometime.

Q. So currently all you have to do to maintain your affiliate membership with the 10:43:48 American Academy of Forensic Scientists is just pay some dues?

A. You pay your dues, but what you also receive is the quarterly journal from the American Academy in which they publish papers

and articles from people not only in the questioned document field, but in chemistry, psychiatry, et cetera, and so I'll able to keep current with current trends in the questioned document field based upon the papers that have been submitted and accepted by the American Academy.

So I have a reference library back at home of dozens and dozens of articles dealing with everything from handwriting to hand printing to photocopies to you name it.

Q. And then it also indicates here that you're a member of ASTM International?

A. Yes.

Q. What's your affiliation with that organization?

A. I'm a full member in that organization in their E30 forensic science branch.

And so, for instance, a number of years ago when we were collectively attempting to come up with standardized language and terminology in the questioned document field I would participate in their surveys providing my input and experience of having done this type of work

Examiners?

MS. AUERBACH: Object to the form, misstates the prior testimony. You can answer.

THE WITNESS: It adds nothing to my
10:51:21 credibility. As I've indicated, being trained by the FBI as far as I'm concerned is the highest level you can attain and we're the ones who train people in these other organizations.

BY MS. ITCHHAPORIA:

10:51:32 Q. What was that book that you said that you have back on your shelf from 1982?

A. It's probably Scientific Examination of Questioned Documents.

Q. And do you know who was the author of
10:51:42 that book?

A. I think that was Ordway Hilton who is also one of the pioneers in this field.

Q. Have you ever applied to be a member of the American Board of Forensic Document
10:51:56 Examiners?

A. No.

Q. And you're not a member of the American Society of Questioned Document Examiners?

A. No.