# EXHIBIT F

2002 WL 1341762 (CFI), [2002] HKEC 1424

RE ESTATE OF WANG TEH HUEI

21 November 2002

Court of First Instance
CFI
Companies (Winding-up) Proceedings No. 830 of 2002

**Judge name:**
Yam J

**Counsel In The Case:**
Mr Edward Chan, SC, leading Mr Albert Tsang and Mr Victor Luk, instructed by Messrs K.M. Chan & Co., for the Plaintiff

Mr Martin Lee, SC, leading Mr Ramesh Sujanani and Mr Erik Shum (in respect of the issue of handwriting and other issues), and

Mr Clive Grossman, SC, leading Mr Ramesh Sujanani and Ms Alice Lee (in respect of the issue of ink-dating), instructed by Messrs Johnson, Stokes & Master, for the Defendant

**Phrases:**
Civil procedure and evidence - Civil evidence - forgery - handwriting - burden of proof - standard of proof - admissibility of opinion evidence - expert witnesses

Wills, probate and succession - validity of will - family dispute - "Nina Wang" case - whether signature genuine - "suspicious circumstances"

**Details of Judgment:**

**"Man is a mere phantom as he goes to and fro:**
He bustles about, but only in vain;

he heaps up wealth, not knowing who will get it."

Psalm 39:6, (NIV)

Contents

Volume 1

Section I - The Wangs Family

List of Abbreviations

Chapter 1 - Prologue

Matters Not In Dispute

The Plaintiff's Case

The Defendant's Case

The Issues

Chapter 2 - The Wangs Family From 1911 To 1960

The Early Years

Impact of the Korean War

Teddy and Nina

The Plastic Business

The 1960 Will

Chapter 3 - The Period Between 1960 To 1970

CIL and Christoban

The Credibility of Yih on Happenings During This Period

The U.S.A. Connection

The Taiwan Connection

The Defendant's Adulterous Affair in 1968

The Evidence of Mr Donald Cheung

The Safe Deposit Box and the Discovery of the 1968 Will

The Retrieval of the 1968 Will

 © 2020 Thomson Reuters. 

Yih Lee Kong Leaving Chinachem

Nina's Accusation Against Yih

Nina's Accusations Against Her Father-In-Law

The Credibility of Wang Sr

Chapter 4 - The Post-1970 Period

Provisions for Nina by Teddy

The Aborted Trust Arrangement Right Up to Shortly Before Teddy's Kidnap

The Credibility of Teresa

Chapter 5 - Suspicious Circumstances

Suspicious Circumstances I - No Reason to Change Intention

Suspicious Circumstances II - Why a Home-made Will?

Suspicious Circumstances III - The Opportunity to Draw Up the Will and By Whom and Where?

Suspicious Circumstances IV - Other Instances Out of Character of Wang

Suspicious Circumstances V - Convoluted Expression and Unreasonable and Untrue Contents

Suspicious Circumstances VI - Lack of Revocation Clause

Suspicious Circumstances VII - Tse as a Witness and His Statement

The Content of Tse's statement

Tse and Mrs Wang

The Credibility of Alex Lam

Suspicious Circumstances VIII - The Defendant's Prior Knowledge of the Contents of the 1990 Documents When She was not Supposed to Know the Same

Suspicious Circumstances IX - The Defendant's Behaviour in Propounding the 1990 Will

Final Conclusion on All the Suspicious Circumstances

SECTION I THE WANGS FAMILY

"Better a meal of vegetables

where there is love

than a fattened calf with hatred."

- Proverbs 15:17 (NIV)

(Chinese text)

Section I Wangs Family

List of Abbreviations

Chime Chime Corporation Limited

CIL Chinachem Investment Company Limited

CUC China United Chemical Company

CUCCL China United Chemical Corporation Limited

Dr. Kung Dr. Kung Yan Sum

HSBC The Hong Kong and Shanghai Banking Corporation

Lam Mr Alex Lam

Madam Ruen Ms Ruen Yu Chin

Mr Chao Mr Cecil Chao

Mr Cheung Mr Donald Cheung

Mr Cheng Mr Patrick Cheng Yau Sang

Mr Koo Mr Koo Lam Hing

Mr Kwan Mr Alan Kwan

 © 2020 Thomson Reuters. 

Mr Lee Mr Lee Kin Sang

Mr Leung Mr Allan Leung

Mr Mau Mr Mau Kai Chee

Mr Poon Mr Joseph W.K. Poon

Mr Tai Mr Tai Ching Ping

Mr Tse Mr Tse Ping Yim

Mrs Wang/Nina Mrs Nina Wang also known as Madam Nina Kung Ru Xin

Wang/Teddy Mr Teddy Wang Teh Huei

Wang Sr Mr Wang Din Shin

Wu Mr Wu Cheong To

Yih Yih Lee Kong

Chapter 1 - Prologue

1.1 Mr Teddy Wang Teh Huei ("Wang") ("Chinese text"), the deceased, was kidnapped on 10 April 1990. He did not appear again. On 22 September 1999, this court granted leave to his father, Mr Wang Din Shin ("Wang Sr"), the plaintiff herein, for him to swear to the death of the deceased to have occurred on or since 10 April 1990.1

1.2 The deceased originally made a will in 1960 (prepared by Messrs P.C. Woo and Co.) and bequeathed all his estate to both the plaintiff and his wife Mrs Nina Wang also known as Madam Nina Kung Ru Xin ("Chinese text"), the defendant herein. By this 1960 Will, it was further provided that: "if there are children by my said wife [i.e. Mrs Wang] living at the date of my death my said wife shall hold half share or part of the share so bequeathed to her UPON TRUST for my said children as tenants in common in equal shares".2 The intention of the deceased there and then was clearly that the children's share should come out from the wife's half share rather than the father's half share.

1.3 Eight years later the deceased however made another will dated 15 March 1968, revoking his earlier will and bequeathing all his estate to the plaintiff only ("the 1968 Will"). The 1968 Will was prepared by Mr Donald Cheung ("Mr Cheung"), solicitor who also acted as one of the two attesting witnesses. The other attesting witness was Mr F. Zimmern, the other partner of his solicitors' firm. Mr Cheung gave evidence by video link from Vancouver in this trial. He described how he was instructed by the deceased and how the 1968 Will was prepared and executed. His evidence was not challenged on cross-examination. Consequently, the plaintiff has proven the due execution of this 1968 Will.

1.4 The plaintiff instituted the present proceedings on 24 September 1999 seeking a grant of probate in solemn form in respect of the 1968 Will.

1.5 The defendant filed a defence and counterclaim. The defendant alleges that there is in existence a later will in Chinese dated 12 March 1990. There are four documents3 ("the 1990 Documents/ 1990 Will"). The defendant is the sole beneficiary under this 1990 Will. She therefore counterclaims for a declaration in solemn form in favour of the 1990 Will and against the validity of 1968 Will.

MATTERS NOT IN DISPUTE

1.6 It is common ground between the parties' handwriting experts that the body of the questioned 1990 Documents A, B and C are not written by the deceased. It is also common ground that the author of the body of Document A is not the same as the author of Documents B and C, whereas the author of Documents B and C is probably the same person.

THE PLAINTIFF'S CASE

1.7 The plaintiff's case is that the 1968 Will is the last valid will of the deceased and that the 1990 Will was not signed by the deceased. In particular, the plaintiff alleged that neither the deceased nor the purported witness Mr Tse Ping Yim ("Mr Tse") signed the 1990 Will (Mr Tse was a domestic servant of the deceased and the defendant). The plaintiff alleged that their two signatures were forged.

1.8 The plaintiff's two handwriting experts (Mr Gus Lesnevich and Mr David Tsui) both opined that the signatures of both the deceased and the purported witness Mr Tse on the 1990 Will were forged. The plaintiff further called the Government Chemist Mr Patrick Cheng Yau Sang

who is a handwriting expert in the document section of the Government Laboratory. He opined that the purported signatures of Mr Tse were forged and that the purported signatures of the deceased on the 1990 Will "might not have been written by him".

1.9 The plaintiff's ink-dating expert Mr Erich J. Speckin opined that the 1990 Documents A and C were not written on or near the purported date in 1990 but at a later time "at least in 1996 or later".

THE DEFENDANT'S CASE

1.10 The defendant's three handwriting experts from the Mainland, who compiled one report, opined that both the signatures of the deceased and the witness Mr Tse on the 1990 documents were all genuine.

1.11 The defendant did not ask her expert to perform any ink-dating examination on the 1990 documents. However her two experts both asserted that the ink-dating methods performed by the plaintiff's expert were not reliable. One of the defendant's experts also expressed the view that the samples extracted from the questioned documents were contaminated during the process of examination.

1.12 In respect of Mr Tse's signatures, the defendant produced a statutory declaration of Mr Tse dated 6 September 1999 and his affirmation dated 9 September 1999 to the effect that he was asked by the deceased to sign his name on certain documents in the evening on 12 March 1990 inside the deceased's office. Since then Mr Tse passed away on 6 December 1999.

THE ISSUES

1.13 The first issue for the plaintiff as regards the 1968 Will is whether the 1968 Will was validly executed. At the trial this was not disputed by the defendant as appeared in no cross-examination of Mr Donald Cheung on this issue. Thus the remaining issue is whether this 1968 Will has been validly revoked by the 1990 Will.

1.14 As regards the 1990 Will, the main issues are:

(a) whether the signatures of the deceased on the 1990 documents were signed by the deceased;

(b) whether the signatures of the witness Mr Tse were genuine. This issue would not per se affect the validity of Documents A, B or C as a Will, but it would have some important bearings on the previous issue (a); and

(c) whether the defendant could dispel all the suspicious circumstances surrounding the 1990 Will, including its execution and surfacing, and her subsequent conduct in propounding the 1990 Will.

1.15 In deciding the aforesaid issues, the court would have to decide the evidence given by all handwriting experts and the ink-dating experts. Before that, I shall consider the background of the plaintiff's business and the business of the deceased leading up to his disappearance in April 1990 in the next chapter.

1 See Appendix 5 for the Judgment thereof

2 p.1, F1

3 Appendix 2

Chapter 2 - The Wangs Family From 1911 To 1960

THE EARLY YEARS

2.1 Wang Sr was born in Wenzhou ("Chinese text") in Zhejiang Province ("Chinese text") in the Mainland on 15 October 1911 (i.e. just five days after the establishment of the Nationalist China). His father is Wang Chun Ah ("Chinese text"), who was running a company called Yeh Wah Feng Dyeing Company ("Chinese text") in Wenzhou. At that time, the company was a dealer of the British ICI in respect of dyestuff. Wang Sr started working in his father's company at the age of about 17 in 1928. In 1930, he took over his father's company after his death.

2.2 He married his wife Ms Ruen Yu Chin ("Chinese text") in 1932 when he was 21. His eldest son Teddy Wang Teh Huei1 was born in 1934. Three sons and two daughters were born by Madam Ruen, namely:

(1) Teddy Wang Teh Huei ("Chinese text"), the first son, (1934);

 © 2020 Thomson Reuters. 

(2) Teresa Tak-Shyan Sun ("Chinese text") (formerly Wang Teh Hsien), the 1st daughter, (1941);

(3) Wang Teh Hwa ("Chinese text"), the 2nd daughter, (1944);

(4) Wong Tak Miu ("Chinese text"), the 2nd son, (1946); and

(5) Wong Tak Tzai ("Chinese text"), the 3rd son, (1947).

2.3 When Wang Sr was 26 (1937), his wife and Teddy followed him to live in Shanghai where he was working. Later they were unable to return to Wenzhou due to chaos caused by the Japanese war and were held up in Shanghai. In 1941 he started a new company: Wing Wah Industrial Dyestuff Company ("Chinese text "). Further, in 1946 he set up another trading company called China United Chemical Company ("CUC") which engaged in import business. The Chinese name for CUC was Wah Mou Company ("Chinese text") and this name Wah Mou ("Chinese text") was first used by Wang Sr as evidenced by a photograph produced by him showing a social gathering between CUC and an American Cyanamid representative at D2-322. This photograph was taken in a restaurant also called Shanghai Wah Mou Restaurant ("Chinese text") in 1946. This probably is the origin of the Chinese name Wah Mou ("Chinese text") which has been used up to today.

2.4 Between 1937 and 1940, he often travelled to Shanghai to purchase goods for reselling in Wenzhou. It was about this period of time Wang Sr came to know Nina's father, who was a staff member of ICI, a company doing business with his company. Nina was born in 1936. She was about three at the time when Wang Sr met her during her father's visit to his home. Thereafter, Nina's mother often brought her to the Wangs house to play. It was through these visits that Teddy and Nina came to know each other in their early childhood.

2.5 After the defeat of the Japanese in World War II, in or about November 1945, Wang Sr came to Hong Kong to do business. Later in 1946, he started a branch of Wing Wah Industrial Dyestuff Company in Hong Kong to carry on the business of importing industrial raw materials and western medicine. In 1947, he also set up a branch of CUC in Hong Kong.

2.6 It was at this time in 1947 that Teddy came from Shanghai to Hong Kong to further his study. He was about 14 years old. In September 1948, Teddy was enrolled as a boarding student at St. Stephen's College in Stanley. In the same year, Wang Sr arranged for his wife and his other children, Teresa, Tak Miu, and Tak Tzai to come to Hong Kong. His youngest daughter, Tak Hwa, stayed behind in China for a while and she was later also brought to Hong Kong by her mother.

IMPACT OF THE KOREAN WAR

2.7 Up to the time of the Korean War, Wang Sr's business in Hong Kong was good. Initially, he had rented two flats in Happy Valley to be used as quarters for his employees. He and his family were living in North Point where most Shanghainese were staying in Hong Kong at that time. When his nephew, "Yih" Lee Kwong ("Chinese text") came to Hong Kong in 1951, he was allowed by Wang Sr to stay in one of those flats in Happy Valley. Yih's mother is the elder sister of Wang Sr. Yih started working in Wang Sr's company in Hong Kong shortly afterwards.

2.8 However the business of CUC in Hong Kong was seriously affected by the Korean War in 1950 because of the US embargo on goods importing into Mainland China. A princely sum of about US$40,000 belonging to CUC was frozen by the US government and was not released to him until about 1954 or 1955.

2.9 Consequently, Wang Sr had to reduce his living and business expenditure. Some of the staff were dismissed and repatriated back to the Mainland. One of the flats in Happy Valley was surrendered back to the landlord. In or about 1952 his family moved to stay in the remaining flat in Happy Valley where Yih had earlier been permitted to stay with other staff. They had also ceased using chauffeur. From then on, Yih stayed with the family until Teddy's marriage in 1955. In fact, he shared a room with Teddy. Yih's relationship with Teddy had always been good as Yih was the elder cousin and had worked in the Wang's company before Teddy. Thus, Teddy used to consult Yih before Yih left the Wangs company in 1970.

2.10 However, it could not be said that Wang Sr was in financial difficulties, though his business was not as good as before. His family still engaged the service of two domestic servants. Teddy was still studying in St. Stephen's College as a boarder. His school fees and boarding fees were duly paid. There was certainly no evidence to suggest that he could not

afford the education of his children whether in Hong Kong or elsewhere. In fact, in reply to an inquiry in July 1952 from Drew University in the States as to, inter alia, whether Teddy was financially able to undertake his study in the U.S., the principal of St. Stephen's College said:

"Financially I imagine he is 'sound' though I knew very little of his family circumstances, certainly he has never been in our debt."2

2.11 Further, Wang Sr was keeping a close interest in Teddy's study and activities in school. He certainly supported Teddy's wish to study in the US.3

2.12 In order to combat the US embargo, China United Chemical Corporation Limited ("Chinese text") ("CUCCL") was incorporated as a limited company in Hong Kong in 1952. The idea was to sever this company from the Wing Wah Company in the Mainland. It can be seen from the old letterhead at the aforesaid F6-1448 letter to St. Stephen's College that Wang Sr's company was originally called China United Chemical Corporation Hong Kong Branch ("Chinese text") at 506 Chung Tin Building, No.5 Des Voeux Road Central, Hong Kong. It was then changed to China United Chemical Corporation with the Chinese name ("Chinese text") as evidenced in the new letterhead used at F6-1447 without any description that it was a Hong Kong branch only (presumably of a Headquarter and here it was in Shanghai) but with exactly the same address as aforesaid. Shortly afterwards, this Hong Kong company was incorporated as a limited company.

2.13 CUCCL had a paid up capital of $600,000. There was no doubt that Teddy was the favourite child of Wang Sr, being the eldest son in a Chinese family. Even during the time when Teddy was still at school in March 1952, he was allotted with 1,000 out of 6,000 issued shares of CUCCL when none of the other children was given any share.4 Yih was employed as the accountant of this new company which took over the assets and debts of the old business in Hong Kong. These debts were owed to banks but were secured by the goods of the company.5

2.14 Thus, although the business was not as good as before, the financial situation of Wang Sr could not be said to be poor at all. Although Yih was only the company accountant and therefore would not have known about the personal debts of Wang Sr, there was no reason for Wang Sr not to have recourse to the resources from the company if he was heavily in debts and in turn Yih should have known about it.6 However, according to the evidence of Yih, he was not aware of any such personal debt.

2.15 Teddy was expelled from St. Stephen's College in September 1952 because the school discovered that he had forged his school report when he applied to Drew University for admission. What happened was Teddy put in the marks for an examination in school, which he had not yet taken and sent the same to Drew University in his application.

2.16 The termination of his schooling was a well-kept secret even among family members. Apparently it was only known to his father and Teddy. Even Yih, and apparently Nina did not know the true reason why Teddy ceased schooling in 1952 until this trial. Wang Sr has kept the family shame for all these years.7 Even in an interview with a reporter from a magazine in 1999,8 Wang Sr had not revealed the true reason therefor, leaving the reporter with the impression that it was due to poor business of the company that Teddy was forced to cease his study. That might even have misled Nina.

2.17 The truth was only revealed during the course of Wang Sr's evidence when he sought to answer the allegation in Nina's witness statement. She said that Teddy told her that he was forced to terminate his study because of the business failure of his father. Therefore she said in her statement that Teddy in fact disliked or hated his father for that and this was put to Wang Sr.9 In fact, based on the magazine, Counsel for the defence mounted a very strong attack on Wang Sr in respect of the reason for Teddy's termination of his schooling. It might well be true that Teddy had told Nina that lie and Nina believed that for all these years. However there was no evidence from Nina at all that Teddy in fact told her that he disliked or hated his father. In any event that was not the evidence before me from the plaintiff's witnesses at all. The truth was actually verified from the file produced by the Principal of St. Stephen's College in respect of Teddy's schooling.

2.18 After Teddy was expelled from school in September 1952, he then started working in his father's companies. By then his elder cousin Yih had already been working in the companies for quite a few years. The two of them became very close. They worked in the same office in the daytime and

 © 2020 Thomson Reuters. 

shared the same room at home after work. Wang Sr himself thought very highly of his nephew, Yih. He considered that Yih was a good businessman and had a very intelligent brain. There were many things that Wang Sr himself would have to consult him and certainly Teddy "always consulted" him and "had to ask him everything".10 According to Yih, Teddy asked him very detailed things about his past including how he made money in Shanghai and other things. However, Teddy himself was not a person who would like to tell people much about himself. He certainly had not told Yih the reason why he ceased his schooling.

TEDDY AND NINA

2.19 In about the middle of 1955, Nina came to Hong Kong alone from Shanghai and lived with the Wangs family. She and Teddy got married on 29 September 1955,11 i.e. shortly after her arrival in Hong Kong. Before her marriage while she was in Hong Kong, she shared a room with Teresa who then took care of her and gave her assistance in going around because Nina was then not familiar with Hong Kong.

2.20 The date of the marriage was also the 19th birthday of Nina. Teresa said it was Nina who chose that date for her marriage and the Wangs family was prepared to accommodate her. The marriage took place in the Marriage Registry located at what was the Supreme Court Building in Statute Square at that time and the Legco Building today.

2.21 Initially when Wang Sr was being shown the marriage certificate of them, he denied that he had attended their ceremony in the morning because he did not see his signature on the certificate as a witness.12 However, eventually when pictures taken of him before the then Supreme Court Building was shown to him, he agreed that he must have attended the ceremony with his wife. This lapse of memory is understandable as Nina herself also made a mistake in thinking that her marriage took place in the City Hall. (The present City Hall where the Marriage Registry is, was not built there and then until 1961.)

2.22 After the marriage, the relationship between Nina and her father-in-law, Wang Sr, appeared to be good. When Wang Sr went to Taiwan for business, Nina sent photo of herself and Teddy to him.13 Some of the photos were taken by Yih at that time. The whole Wangs family stayed together under the same roof until some time after 1960 when Teddy and Nina moved out of the flat.

2.23 Likewise the relationship between Yih and the Wangs family including Nina was also very good. Apart from working together with Teddy in the same company, Yih went out with the couple and took pictures for them, some of which were produced in court.

THE PLASTIC BUSINESS

2.24 Some time around 1958, Yih suggested to Wang Sr and Teddy to get into plastic business.14 In Hong Kong in the late-50s and early-60s, the plastic business was very prosperous after hard plastic was invented in the States and became material for making a number of household wares. The most prosperous business was the suppliers of plastic material which was on the rise nearly everyday in those days. In order to be an agent for the American suppliers, one would have to have considerable capital together with connections with them. It would be ideal for Wang Sr's company which dealt with chemicals imported from America with capital and connections.

2.25 Yih was invited by Wang Sr to participate in this business. As a result, an agreement was entered into which was reduced into writing in a document which became DPH668 in this trial. Yih's participation and a receipt of his payments to the Wangs and their company was drawn up (DPH 669). This document recorded his contribution and withdrawal from the plastic business by both Yih himself and Teddy.

2.26 In the financial year of 1959-1960, Wang Sr's business was doing "rather good" with a profit of $706,257.82.15 In the following year, the profit was even better and it was about $1,000,000. In fact, the account which Yih subsequently drew up in 1960 relating to the plastic business showed that in fact handsome profit was made from the plastic business alone.16

2.27 In or about 1960, Teddy suggested to his father to go into the property development business. By then, Teddy was about 27 years of age only. With the capital from CUCCL, Wang Sr set up a new company called Chinachem Investment Company Limited ("CIL") ("Chinese text"). That was in 1960 and Wang Sr let Teddy engage in property development himself. This was the beginning of the Chinachem group. It

also explains why the Chinachem group contained the word "chem" in its name when its property business has little to do with chemicals thereafter.

2.28 In the meantime, in the second half of the 1950s, Wang Sr often went to Taiwan for business and Madam Ruen also went to join him on one occasion. However, she had to come back early because she received a letter from Teresa complaining to her that while she was away with Nina taking care and control of the household, Nina had ill-treated the younger brothers and sisters of Teddy. That apparently was the beginning of troubles within the Wangs family, some of which Nina was not responsible at all as will be apparent later herein.

2.29 However, the business lines of the family became better and better. The branching out into plastic business in 1958 and the participation of the Wangs family in the real property market in 1960 were all at the right times in Hong Kong. Thus Yih must be right in saying, as the accountant of the company, that since their establishment of the Hong Kong company, the business had always been good. At first, the company was basically run by Wang Sr and Yih. After Teddy joined the company in 1952, he started to learn from both of them, particularly from his senior cousin Yih. Gradually, Teddy assumed more decision-making power over the years with the affectionate approval and consent from his father. This would be more so in the late 1950s when Wang Sr was often away to Taiwan.

2.30 Wang Sr testified that his relationship with Teddy was "very good", like "one heart, one soul", and that Teddy was "a very filial son". Even after Wang Sr had retired from the business, Teddy still consulted him on important matters. That probably is true and I have no reason to doubt his evidence.

2.31 On the other hand, Yih said that before 1960, Nina had hardly any role to play in the business of the Wangs family. No doubt during that period, she had visited the office and gave general assistance to Teddy. She did simple work such as typing out L/C applications. She was never given any specific job or task. Counsel for the defence mounted a very lengthy cross-examination on Yih about Nina's ability to do various things, such as taking shorthand and typing and her ability in art. However, there was nothing specifically put or suggested to Yih as to what exactly was her role in the business there and then. The evidence of Yih is that until the time he left Chinachem in 1970, Nina never received any salary or payment from Chinachem while even Teddy was paid a salary. This was never challenged by the defence. I can however accept that Nina's participation in the company had gradually increased throughout these years up to 1990, and her attendance to various classes from secretarial training to dancing gradually decreased and some of them ceased altogether. Obviously, after Teddy's disappearance in 1990, she became eventually the only one in charge in the whole Chinachem group. In short, Yih and the defence were talking about two different periods of time.

THE 1960 WILL

2.32 Teddy made a will dated 23 April 1960 ("the 1960 Will") and appointed both Wang Sr and Nina as joint executors and trustees. They were also beneficiaries in equal shares to his estate.17 This 1960 Will was formally prepared and executed in a solicitors' firm, Messrs P.C. Woo & Co. After making the Will, Teddy gave it to Wang Sr for safe-keeping. He told his father the contents of the Will but in the meantime asked him not to tell Nina because he did not want anyone to know about it.18 This Will was thus kept by his father and produced to court in this action. The fact that Teddy told his father not to reveal the same to Nina is tell-tale of his secretive character in keeping everything to himself to the exclusion of all the others including even his own wife.

2.33 Further, the fact that the Will did not contain any usual revocation clause indicated that Teddy probably had told his solicitor that this was his first will. The Will was made within a matter of only five years from the date of marriage. By then Teddy and Nina probably did not know that they could not have any children. Thus Teddy's then wishes were to give half of his estate to his father and half of his estate to his wife but should they have children, then Nina would have to hold half of her own shares in trust for her children in equal shares.

2.34 During the period in 1950s, it is clear from the evidence of Teresa that the Wangs family was very much united. They lived under the same roof in Happy Valley. Teddy took an active interest in the affairs of his younger siblings. Soon after he worked in the family business, Teddy bought a car.19 He took his siblings out for movies and also bought them food. He played football with his younger brothers.

2.35 During school holidays, Teresa and her younger brothers and sister also went to the office to help in some small ways,

e.g. in the case of Teresa doing some typing.20 Teresa also gave evidence that after Nina's marriage, for a while she had fallen ill and Teresa was told that she had contracted tuberculosis. In spite of that and the warning of her mother, Teresa took care of Nina.

2.36 During the free time, Teresa, Nina and other siblings including Teddy practised calligraphy together using "calligraphy samples" ("Chinese text ").21 She also gave evidence that Nina had tried to imitate the writing of Teddy. The defence in the lengthy cross-examination of Teresa for 12 1/2 days challenged only the following pieces of evidence as being untrue at all, namely:

(a) the evidence of Nina practising calligraphy using "calligraphy samples" ("Chinese text");

(b) Nina was practising Teddy's signatures both in English and in Chinese; and

(c) the fact that she had shown the same to Teresa on a piece of paper with her imitation of Teddy's signature.22

There was certainly no suggestion that Teddy did not practise calligraphy with his siblings. I accept that Teddy and his siblings were very close in their relationship, particularly in their early childhood as he spent a lot of time with them. Further, Teresa was the closest sibling to Teddy, being closer in age to him. Teddy used to instruct Teresa to do certain odd jobs, like purchasing tickets for movies for everybody. In those days this was a delightful task which every child would like to do.

2.37 However, on the other hand, the relationship between Nina and Teddy's siblings was not that close. In fact, it had deteriorated later. Although Nina would join the activities of Teddy and his siblings, such as going to movies, yet according to Teresa she often bought her own food and did not share it with them.23 It appeared that for a while after their marriage, Teddy's mother was still in charge of the household. When she left for Taiwan to join her husband, she handed it to Nina. Usually such an important position would be undertaken by the most senior woman in the family and she happened to be the daughter-in-law of the family, Nina.

2.38 However, Nina's treatment of the siblings was not as good as their mother. This resulted in a complaint letter written by Teresa to her mother who then felt concern enough to return to Hong Kong leaving her husband behind in Taiwan. As I have said, this is the beginning of internal troubles for the Wangs family which ended this period of early years up to 1960, although on the business side, the Wangs family was prospering.

2.39 In general, I think it is fair to say that the evidence of Teresa was that Nina was somewhat jealous of the good and close relationship between Teddy and his siblings and also his senior cousin Yih.24 However, Teddy did not take much heed of Nina's negative attitude and apparently he had done nothing to alleviate the situation. Building human relationship is of course a much more difficult matter to tackle than building up a business. Teddy did not realize that a lot of efforts have to be made in building up a marital relationship.25 On the contrary, from the evidence before me, it is quite clear that Teddy behaved in a chauvinistic way. He probably thought this new marital relationship should be just like his siblings relationship. If his wife were to behave like his other younger siblings (respecting him and obeying his command), all's well would end well. In the end I must say that Teddy was responsible for a number of things that had happened in the next period. In other words, if he had taken heed of those indications of troubles, certain happenings in "Act II" of this sad story might not have happened. This is the most critical period in the relationship between Teddy and Nina in the next decade leading up to 1970 which I shall consider in the next chapter.

1 The pinyin spelling of his name should be Wang Di Hui but his name in English was actually spelt in Shanghainese.

2 pp.1454-1455, F6. All references here are Trial Bundles Numbers for easy reference of the parties only and not for general readers, e.g. here: the 6th Box File in Bundle F.

The Trial Bundles are numbered as follows:

A: Pleadings

B: Affirmations

C: Exhibits produced to the affirmations in Bundle B

D: Witnesses Statements and Documents referred to by them

E: Experts Reports

F: Plaintiff's Documents

G: Defendant's Documents

H: Computer Images Capture

General readers can therefore understand from the Bundle Number as to whose documents they are, e.g. here Bundle F6 is of course documents of the plaintiff herein.

3 See the file produced by St. Stephen's College at pp.1437-1463, F6, especially p.1447 and p.1448

4 p.344, F1

5 T112:30:8. In this Judgment, T112:30:8 means Transcript of the Hearing Day 112, page 30, line 8

6 T112:30:19-21

7 T14:52:19

8 p.1627, G5

9 T14:52 and 57

10 T4:54:7-14

11 p.431, F1

12 T5:8:1-5

13 T5:9:5

14 T4:57:21

15 T4:60:23

16 pp.428-429, F1

17 p.1,F1

18 T5:26

19 T135:44:11

20 T135:60:2-15

21 T135:47:1-19

22 T149:8:6-12

23 T135:18:18-25

24 T135:18-24

25 For example, see the Research Paper by Dr. Ago B§rki-Fillenz: "Ich bin nicht mehr die-Frau, die du geheiratet hast" translated by Sarah Yasson Chang in the book: "I Am No Longer The Woman You Married" (published by Breakthrough Limited)

Chapter 3 - The Period Between 1960 To 1970

CIL AND CHRISTOBAN

3.1 The new company Chinachem Investment Company Limited ("CIL") ("Chinese text") was set up to conduct property development business. It was incorporated on 7 September 1960. The founders or subscribers to the memorandum were Wang Sr, Teddy and Yih. The capital for the property business came from the profit of the plastic business in which Yih had a share.1

3.2 The return of allotment in 1961 indicated that Yih was also allotted with 10% shares of CIL. The rest of the shares were allotted to Wang Sr and his children as well as Nina, with Teddy being the largest shareholder.2 Between 1962 and 1964, there was some increase in capital and Yih had not made a proportional subscription for the new shares. His shareholding in CIL therefore was reduced to 8%.3

3.3 Wang Sr had gradually faded out of the family business. In the second half of the 1950s he often went to Taiwan for business. He became ill in about 1964 or 1965. In this period of time, at the suggestion of Teddy that it was beneficial for tax purposes, Wang Sr on 31 December 1964 transferred all but one of his shares in CUCCL and CIL to a Panamanian company, "Christoban" Enterprise SA. He had also asked all his other children to transfer all their shares to Christoban. They all did so save for Teresa who was then studying in the States. Teddy and Nina also transferred all but one of their

shares to Christoban.4 The fact that one share left registered in the name of Wang Sr, Teddy, and Nina, was probably because of the requirement of director shareholding.

3.4 The first property project of CIL was a joint venture with a customer of CUCCL in Kwun Tong. Thereafter CIL began developing real property on its own. During this period of time there could be little doubt that Yih was the right-hand man of Teddy. Apart from taking care of the accounts of the whole Chinachem group of companies, he also helped Teddy in the conduct of the real estate business. Yih attended every land auction with Teddy and assisted him therein by drawing up tables in respect of amortised land cost per square foot of constructed area at different bidding prices for Teddy's quick and easy reference. He also assisted in the design stage of the building, liaising with architects and signing contracts with contractors. At a later stage, he was also responsible for fixing the selling prices, designing and drawing the sale brochures etc. In short, he was really involved at all stages except the construction work of the building, which was dealt with by Teddy himself.5 He was also responsible for purchasing wooden doors, window frames and sanitary equipment to be used in the building. Teddy trusted Yih so much that Yih could say that there had never been an occasion when his decision was overruled by Teddy.6 The defence was unable to put to Yih any single instance which would suggest that he was untruthful.

THE CREDIBILITY OF YIH ON HAPPENINGS DURING THIS PERIOD

3.5 However, the defence mounted a very strong attack on Yih in cross-examination on his role and also his account of Nina's role in the property development business. I am afraid I have to say that after this lengthy cross-examination nothing has been achieved except that Yih's evidence was fortified. I accept the plaintiff's submission that Yih is a wise, able and honest man. Despite the lengthy cross-examination designed with surprised documents used to confront him like hat-trick rabbits, he gave his evidence in a fair, composed, and humble manner. He is a credible and reliable witness. I am actually quite impressed that he could still have a clear memory in a number of details at his advanced age. He is now retired in Canada and he has no interest in this action at all. He even paid his own travelling expenses to come to give evidence for Wang Sr. He gave me the impression that he did not want to burden Wang Sr but he did not want to boast about it. It can be seen that he has a deep respect for him out of inter alia gratitude to the Wangs family for taking care of him at his tender age. No doubt he had contributed a lot in laying a firm foundation for the plastic business and later the property business from which Chinachem had since then grown into a big empire. Thus despite Nina's desire to paint the picture of her own importance and deep involvement in the business during that period, she was unable to point out a single incident whereby a decision made by Yih was overruled by Teddy or herself. However, inevitably I have to deal with some futile cross-examination to illustrate his accuracy and honesty.

3.6 The defence mounted a very long attack on Yih in cross-examination concerning his role and also his account of Nina's role in the property development business. In respect of one development of Chinachem in the name of Charmain Heights which Nina through her Counsel suggested that she was the person who designed it and not Yih, she was not even able to suggest specifically what Yih said in evidence as to what had been done or performed by him in respect of this brochure, was not done by him but someone else.

3.7 The cross-examination on Yih on the preparation of the brochure fully revealed and highlighted the irresponsible and opportunist approach of the defence. First on Day 116, it was suggested that Nina had studied a course in Hong Kong University in 1961 or 1962 on interior design. Yih in evidence said he did not know about it.7 It was also suggested that she studied design courses in the U.S. The purpose no doubt was to seek to lay a foundation that Nina had the talent, skill or speciality to make the brochure with the view of challenging Yih's evidence on his role in the real estate business of Chinachem. Thus, apart from the issue of Yih's credibility, the defence was trying to paint a picture that even from the earlier period in the 1960s, Nina had been treasured by Teddy as his helpful assistant. It was put to Yih that Nina had the right skill but he had not, to which Yih disagreed.8 The obvious implication from the suggestion was that since Nina had the skill it must be she and not Yih who did the brochure.9

3.8 However this claim of her special knowledge or her attending classes in Hong Kong was never substantiated. No document or certificate or her attendance of the class was disclosed. Bearing in mind that Nina was able to produce the certificate of her attendance of commercial classes at Maryknoll School in 1956, it would be more than surprising

 © 2020 Thomson Reuters. 

that she would not be able to produce any certificate or documentary evidence of her attendance of these courses in 1961 or 1962.

3.9 Further her attempt to give credence to the suggestion that she had acquired skill through taking courses in the U.S. did not meet with much success either. Although Yih knew that she had studied in the U.S. for a few months, he was not aware of what courses she took.10 Again she had not substantiated her claim of expertise and certainly no document was disclosed to show what courses she in fact had taken in the U.S.

3.10 Later in the cross-examination, it became clear from Yih's evidence that the preparation of the brochure would include putting a lot of ideas and words.11 It was then suggested to him that, with Nina's knowledge, she could contribute more than Yih in relation to the artistic side of the brochure.12 Of course the truth was that Nina never actually did anything about the brochures during the time of Yih, other than producing two photographs relating to a bedroom and a living room at Yih's request.

3.11 Yih was able to say from memory that the art work and design in those days were done by two printing companies: Lai Do and Lai Shing.13 He would only give very little comment and contribution himself in respect of the layout and "artistic" works.14 It is noticeable that while the brochures were in Nina's possession by this stage of the evidence, Nina had not produced any brochure to Yih in cross-examination yet. The four brochures subsequently produced by Nina to cross-examine him proved that he was right. At this further stage of cross-examination, Nina through her Counsel then resorted to asking whether Yih could rule out that Nina could have given her ideas to the companies that did the design.15 This turned out to be a fishing expedition because if indeed Nina had given any idea to the printers, she must be able to give instructions to her Counsel about that, including the names of the printers and also what her ideas and contribution were and the particular brochures involved. However, none of such matter was forthcoming.

3.12 On Day 120, the issue on the brochure was again explored in cross-examination. The brochure of Charmain Heights was shown to Yih. Previously Yih was cross-examined in detail on three brochures relating to the three phrases of Shui Ning House ("Chinese text") which was a project in Kwun Tong and the flats there were small and cheaper. It was suggested to him that if one looked at the brochure of Charmain Heights, the quality was so good that it could only be done by professional people like architects.16 This was denied. In fact Yih was able to give rather detailed evidence on his contribution to the making of this brochure. Again the suggestion that the front page was done by an architect was never substantiated either by evidence or by document.

3.13 In fact, probably Nina never had much to do with this brochure, otherwise she would have realized that there was a clear statement in the brochure that it was designed by Lai Do like other brochures of Shui Ning House.17 This would certainly negative her earlier allegation that the front page was designed by an architect or that the whole brochure was designed by her.18

3.14 Further, in connection with Charmain Heights, it was suggested that the Chinese name must be given by Nina and that Yih was lying when he said he chose the Chinese name for Charmain Heights simply because "Ch" sound in Charmain should be pronounced as "Sh" in French. The suggestion was quite outrageous. First as Yih pointed out, whether "Charmain" was pronounced with "Ch" or "Sh" sound, it could still be a good Romanised name for the Chinese name ("Chinese text"), i.e. the Chinese name is neither "Ch" nor "Sh" but "h" in Cantonese or "x" in Mandarin. Secondly there was really no evidence to show that Nina was more conversant with French pronunciation. Again this piece of cross-examination illustrated the fishing approach of the defence trying to fish for and appropriate any opportunity to get something as a basis for suggesting that she had a great contribution to the real estate business of Chinachem at this crucial period.

3.15 On the other hand, for the work done by Yih relating to the land auction, his works on the tables drawn up by him were marked on the land auction brochures which were kept in the files of each of the development projects where brochures and the price lists of the sale of the flats of the projects were kept. This was his evidence. These files were certainly still available to Nina who was able to pull out the brochures for the sale of the flats in order to cross-examine Yih.19 But, of course, all the records for each and every file were not produced. The defence only used a few which they thought

 © 2020 Thomson Reuters. 

would suit their purpose in the cross-examination. No doubt her Counsel were only given those tables but not the others.

3.16 The records of Chinachem for all these projects were certainly very well kept as this was evidenced by the fact that the defence was able to pull out correspondences, like rabbits in the hat-trick, between The Hong Kong Building and Loan Agency Ltd and CIL in 196720 and other land acquisition papers21 to cross-examine Yih when she thought that it would assist her case to do so. However, there was really no document which Nina was able to produce to contradict Yih's evidence as to his job and what he had in fact done. In the circumstances where clearly the full record was available to the defence, the Court may draw the inference that in fact the full record of Chinachem would have supported Yih's evidence.

3.17 I am afraid I must say that some of this cross-examination is just a waste of time. The defendant tried hard to clinch on anything to suggest that during this period she played an important role in the business of Chinachem. However, there was simply no evidence that would justify any such suggestion. Not only did she not give any evidence of these matters, she was unable to call any evidence from anyone to show that she had made any real and important contribution during this period of time. It was vaguely suggested that she contributed by conducting negotiations with bankers and Government departments. However, there was no document whatsoever produced to show that she was in fact in charge of these matters during this period of time.

3.18 The documentation on the correspondence with The Hong Kong Building and Loan Agency Ltd did not show she was in any way involved in the negotiation. There was no suggestion that she signed the letter at G11-3350 the signature on which appeared to be more consistent with the letter being signed by Mr Simonson, the expatriate secretary employed by Chinachem at that time. While the defence might like to take the convenience of appropriating to Nina whatever work or contribution that Yih was not able to say who should be responsible for, the reality of the situation was that during the 20 days of cross-examination of Yih, the defence Counsel was unable to specify or specifically put to Yih even one single banking transaction or bank mortgage that Nina had negotiated during this period. Further the defence could not produce any one single piece of correspondence or document which would suggest that she was responsible for in respect of any discussion with any banking officials.

3.19 Even the belated hearsay statement from Lord Sandberg formerly Chairman of the Hong Kong and Shanghai Banking Corporation ("HSBC") could not assist the defence. On the face of the statement, he met the Wangs couple while he was in the Inward Bills Department of the HSBC's main branch. He said that he frequently dealt with Nina and he spent considerable time in negotiating the terms of letters of credit for their business. The business he spoke of clearly would not be the property development business. In the normal course of the business, the bank would grant a certain amount of banking facilities to its customers including L/C facilities. Such facilities would be reviewed periodically, normally annually. The scope for any negotiation of the terms of the opening of L/C would be pretty small and the question of negotiating on L/C facility terms would usually be just a routine affair.22

3.20 At any rate, his statement did not say that the person with whom he negotiated was Nina or Nina only. In this respect, it is notable that his statement was deliberately vague as to the context in which he "frequently dealt" with Nina. In terms of the time frame, it was more likely that he was speaking mainly of the pre-1960 period when the main business of Chinachem was dealing with medicines, chemicals and plastics which would involve L/C facility and not property development. In those early days, it is clear from Yih's evidence that Nina did help in the preparation of the typing of L/C by referring to L/C precedent forms at the instructions of Teddy.23 It might well be that she was also asked to deliver the application to Mr Sandberg (as he then was) at that time.24 Certainly, he could not have and had not spoken of any financing of property development business with Nina.

3.21 In the end it does not even matter whether Nina had played a stronger role or anything at all because the undisputed fact was Teddy had changed his 1960 Will and made another one in 1968 for his father only. This will be considered fully hereinbelow. Suffice it for me to say here that Yih was demonstrated by the cross-examination that he is an entirely honest and truthful witness.

THE U.S.A. CONNECTION

 © 2020 Thomson Reuters. 

3.22 In the ensuing period of time, there were many unhappy incidents in the relationship between Nina and Teddy. It is reasonably certain that during this period of time, Nina had left Hong Kong for the U.S. for some time. As aforesaid, it was suggested that she went to the U.S. to attend certain courses on design but there was nothing to substantiate that suggestion by her Counsel. Even from her own affirmation,25 she only said that in the mid-1960s, she left Teddy for approximately one year for the U.S. and this was in the context of her having some difficulties in her marriage with Teddy. Hence, the situation was certainly not one of a loving couple with one of them trying to better herself for the business and with the support of the other. This was further supported by the evidence of Teresa who told the Court that the mother of Nina claimed credit for persuading Nina to return to Teddy in Hong Kong from the U.S. Again Nina could produce no evidence to rebut this piece of evidence from Teresa at all. That was in or about 1963/1964.

THE TAIWAN CONNECTION

3.23 From the evidence of Yih, it is also clear that during the riots in Hong Kong in 1967, Teddy intended to invest in Taiwan. Taiwan was not new to him because in or about 1964 after Teddy had his operation, Yih and Teddy had visited Taiwan for pleasure. Chinachem had always had business dealings with one Mr Wu Cheong To ("Chinese text") in Taiwan in relation to the plastic business. In 1967, Yih and Teddy went to Taiwan and stayed there for about three months to set up some joint venture business with Mr Wu in Taiwan in connection with the real estate development. Wu in fact at first refused to have any dealings in real estate development with Teddy but Yih eventually persuaded Wu to do so with Yih's personal guarantee on Teddy's credibility and performance. Since this visit, either Teddy or Yih would go to Taiwan in relation to the joint venture. The business venture in Taiwan with Wu was a business of Teddy personally and not Chinachem.

3.24 In fact, this joint venture proved to be disastrous for everyone involved. According to Yih, it was Teddy who insisted on changing the approved plans by changing each unit into two units for one whole floor of many units. Eventually they were sued by purchasers and the whole project was in a big muddle. From Wu's correspondence, it is clear that he was desirous to get some help from Yih and Teddy but they were both heavily engaged in Hong Kong. Later Yih heard that Wu was apparently imprisoned because of this development project.

3.25 During this period of time around 1967, Teddy at least had one intimate girl friend in Taiwan and this is quite apparent from the two affectionate and intimate letters written by her to him.26 Certainly up to the time of his death, Teddy still retained a large number of photographs of three certain ladies in his safe deposit box in the Bank of Canton to which Yih was the only other person apart from Teddy himself, authorized to have access but not Nina.

3.26 From the first letter of Teddy's girl friend in Taiwan, apparently she had received a phone call which she suspected was Teddy's wife checking on her. She even stated in this letter the full telephone conversation with that lady inquisitor whom she thought was Nina. The telephone number given by that inquisitor belonged to Teddy's company. Thus, apparently Nina was already apprehensive of Teddy's extra marital affairs and was in the course of tracking down his girl friend.

THE DEFENDANT'S ADULTEROUS AFFAIR IN 1968

3.27 On the other hand, shortly thereafter in or about early 1968, Wang Sr was on his way to Taiwan again. At the airport, he saw Nina behaving intimately with a man. When he came back to Hong Kong he told Teddy about it. Teddy asked him to engage a private investigator to look into the matter. Whereupon Wang Sr engaged the Sino-Western Private Detective Agency27 to investigate the matter.

3.28 The private detective succeeded in taking some photographs showing Nina and a man walking together intimately.28 That was 1968 and not the year 2002. That man turned out to be a businessman dealing with Chinachem and not a close friend of Teddy or the Wangs family. Wang Sr gave the photographs to Teddy.

3.29 According to Wang Sr, Teddy was "so furious that he said he had to beat up this man to death".29 One week later, Teddy told Wang Sr that there was no need to investigate any more because Nina "had already admitted" the affair to him. Wang Sr's evidence of this 1968 affair was subsequently corroborated by the evidence of Yih and Teresa.

3.30 Apparently since 1964 Teddy must have realized that he was infertile because of the Mayo Clinic Report. This Clinic is

 © 2020 Thomson Reuters. 

in Minnesota. However he found some pills in the possession of Nina. He gave one of them to Yih and asked him to find out what this pill was. Yih was unable to get an answer from the drug store. But on the next day, Teddy gave him a row of pills, out of which was the one given to him the day before, and told him that they were contraceptive pills. This was found out by Teddy himself. Teddy then told Yih about what Wang Sr saw and the engagement of the private detective to investigate about the affairs of Nina.30 (In other word Yih had nothing to do with the private detective at all and I just put a note here for the further development of the problem because Teddy told Nina later on that it was Yih's idea to engage a private detective which caused the deterioration of the relationship between Nina and Yih.)

3.31 The relationship between Teddy and Nina thereafter deteriorated. In fact shortly afterwards, Yih saw bruises on the face of Nina, as if she had been violently (but of course unlawfully) treated by Teddy. Teddy told Wang Sr that he "wanted to divorce her" but both Wang Sr and Yih had persuaded him not to do so.31

3.32 In the following months, Teddy carried out a series of actions. On 12 February 1968, Teddy rented a safe deposit box in his own name in the Bank of Canton, making only Yih as his deputy authorized to open the box.32 On 15 March 1968 Teddy made a new will, i.e. the aforesaid 1968 Will, naming Wang Sr as the sole executor, trustee and beneficiary. This 1968 Will expressly revoked all his former wills and testamentary dispositions. This was prepared by his solicitor, Mr Donald Cheung and was executed in the presence of two partners of Messrs F. Zimmern & Co. as aforesaid in Chapter 1 herein.

3.33 According to Wang Sr, Teddy also asked Nina to "give back all the money, everything, assets, etc. and he said he did not want Kung to take away any of his property".33 Thereupon Nina duly advised the Hong Kong and Shanghai Bank to close her account and transfer the balance to the account of Teddy.34 Nina also transferred to Teddy her share in a property at 410 Bellevue Apartments35 and her shares in the American Investors Fund, Inc.36 between June and August 1968. On 19 October 1968, Teddy informed HSBC that the sum of US$4,686.10 issued by American Investors Fund Inc. should be deposited into his account and not Nina's account, as just the day before, the bank was informed by a Mr C.S. Lo of Chinachem that the aforesaid sum should be deposited into Nina's account.

3.34 Further on 22 August 1968 Teddy executed a Power of Attorney in favour of Yih. Teddy then revoked the Power of Attorney he had previously issued to Nina and he informed the Hong Kong & Shanghai Bank by a letter dated 7 July 1969.37 According to Teddy's aforesaid letter, it was sent when Nina was not in Hong Kong. It is noteworthy that the 1968 Will and the correspondences relating to the aforesaid acts were all kept by Teddy inside the safe deposit box of the Bank of Canton, to which Nina had no access. Some of the documents in the box were not known to Nina for these years unless she had been informed of the same like the revocation of the Power of Attorney which Teddy had previously issued to her.

3.35 The evidence before me supported the finding that Nina probably had committed adultery and that was the main reason for Teddy changing his 1960 Will by executing a new one in 1968 removing Nina as one of the beneficiaries of his estate. In this regard, there was never any statement of denial made on oath by Nina of her extramarital relationship with someone at that time. (It is also fair to point out here that Nina's affair was after Teddy's affairs.)38

3.36 In any event, whether Nina had actually committed adultery or not, clearly Teddy believed that she did and that was the reason for him to change his will and started taking everything back from Nina by a series of actions. In other words even if, for the purpose of argument, the evidence before me is not sufficient to support a case of adultery in the circumstances, it does not matter at all in respect of the explanation as to why Teddy had taken this series of actions. Certainly he firmly believed that had happened.

THE EVIDENCE OF MR DONALD CHEUNG

3.37 Mr Donald Cheung, the solicitor who prepared the 1968 Will, is now residing in Vancouver, Canada, and he gave evidence through videolink on Day 13 of the trial.

3.38 Although Nina has not admitted the 1968 Will in her defence, Mr Cheung was not cross-examined on the authenticity or due execution of the 1968 Will at all. Indeed his evidence on the circumstances of how the 1968 Will

 © 2020 Thomson Reuters. 

came into existence was never challenged during cross-examination.

3.39 He described in detail the circumstances of how the 1968 Will came into existence including how Teddy instructed him and how he drafted and testified thereto together with the late Mr Frederick Zimmern, the two of them were the only two partners of Messrs F. Zimmern & Co. there and then.

3.40 Mr Cheung said that on 15 March 1968, Teddy, who was a regular client of his firm, came up to his office in the morning and gave him "testamentary instructions", as follows39:

"A. He asked me to prepare a will for him. He would like to bequeath his estate to his father and appoint him the sole executor and trustee of the will ... I asked him to repeat his instructions, just in case I had misheard, and he confirmed it."

The fact that Mr Cheung asked Teddy to repeat what he said indicated that the instructions given by him, though very clear, was nonetheless a surprise to Mr Cheung.

3.41 Mr Cheung immediately "hand-drafted his will" and instructed his secretary to engross it. It took him only 10 to 15 minutes to hand-draft this simple will.40 The engrossment was then shown to Teddy who read and confirmed "that those were his instructions". (I just want to digress a bit here and point out that Yih also testified that Teddy used to read legal documents meticulously. In respect of an agreement to purchase land in Taiwan when some wordings were not clear, he took the document home to read it before signing it the next day.)41

3.42 Mr Cheung described that Teddy was "really serious" and he had "no doubt whatsoever" that Teddy understood the contents of the will. He then took Teddy to the late Mr Frederick Zimmern's room. Mr Zimmern read through the engrossment and confirmed with Teddy that those were his instructions. Teddy then signed the will in the presence of Mr Cheung and Mr Zimmern. This standard procedure adopted by solicitors was so simple and yet solemn and clear in order to ensure that Teddy understood the content before they attested to his signature thereto. This also shows that when Teddy wanted to make a new will he would go to a solicitor who should be bound by professional confidentiality and that solicitor would be his usual solicitor known to him. This will have a lot of bearing when I consider the suggested or alleged circumstances when the 1990 Documents were allegedly executed by Teddy.

3.43 Under cross-examination, Mr Cheung described that Teddy and Nina were a "loving twin couple; they were like twins". However when it came to decision-making, Teddy always made "the ultimate decision". The following testimony is very telling42:

"Q. But when it comes to decision-making, is it your understanding that it is always their joint decision, maybe after some disagreement in the beginning?

A. I think it is Teddy's decision, the ultimate decision. I mean, he was the kingpin, so to speak, and he was the one. I think I am right in saying that he was the one who made the decisions. Of course, he always consulted his wife, et cetera, et cetera, but that is my understanding."

3.44 Further in re-examination, Mr Cheung added the following, namely43:

"Q. Mr. Cheung, you described in fact Teddy as being a kingpin in the context of it always being his decision. Could you tell us what Teddy's character is? Is he really someone who always wants to make decisions, when you used the word "kingpin" to describe him?

A. From my knowledge and the long association we had, Teddy was the person who ultimately made the decision. I know he will consult with his wife and others, but, at the end of the day, he would be the one to make the final decision."

3.45 I would also like to add here that Mr Cheung's involvement with the Wangs couple had gone deeper into the 1980s when he unfortunately had a dispute with them. Thus this description of them was not restricted to the sixties. Further under re-examination, Mr Cheung stressed that Teddy and Nina were "very, very private people". He added: "They do not discuss their personal matters with me, or, to the best of my knowledge, with my former wife."44 This kind of character of Teddy is in line with what Yih said that Teddy would ask him a lot of things but he would never tell Yih personal things of himself. That is why Yih did not know why Teddy ceased this schooling at St. Stephen's College and definitely he had never been told by Teddy

 © 2020 Thomson Reuters. 

that he was being expelled from school. The character of Teddy will be considered later under the heading of suspicious circumstances concerning the 1990 Documents allegedly signed by Teddy.

THE SAFE DEPOSIT BOX AND THE DISCOVERY OF THE 1968 WILL

3.46 I will digress here and consider this safe deposit box and the discovery of the 1968 Will therein in the year 1997. As aforesaid the whole arrangement made by Teddy in opening a new safe deposit box making Yih his deputy and making a new will in 1968 was clearly aiming at revoking the 1960 Will and cutting Nina away from having any benefit from his estate. The whole circumstances in 1968 certainly would suggest that Teddy would not want Nina to know about his action therein.

3.47 Furthermore Teddy opened the new safe deposit box on 12 February 1968 and only made Yih a deputy as aforesaid. The Bank of Canton was not Teddy's or Chinachem's usual bank. However it was just round the corner from Holland House along Ice House Street where Chinachem Headquarter was there and then and so was the office of Messrs F. Zimmern & Co. The location was very convenience for both of them, i.e. Teddy and Yih. When Yih was asked by Teddy to go to the Bank to sign the necessary document to become a deputy for the operation of the safe deposit box, Yih could not remember now whether Teddy had already had the box with the Bank or not. From the document kept by the Bank[45] the overwhelming probabilities were that it was a situation when both Teddy and Yih went to open the account for the safe deposit box because there was only one date on the agreement and the specimen signature card with their signatures when Yih was made a deputy. There and then he was also told by Teddy that if Wang Sr asked him to open the box, he should just open it for him.[46]

3.48 From the events that subsequently happened, namely the making of the 1968 Will and the placing of the will in the deposit box, it is quite clear that by 12 February 1968, Teddy must have contemplated making a new will in favour of Wang Sr cutting away the interest of Nina. It was not until one month later, on 15 March 1968, that Teddy went to the solicitors' office to make his new will. Hence, it is quite clear that the making of a will was a very solemn and serious matter to Teddy and he was not one of those persons who would lightly make a rush decision to change his previous will. Angry though he must be with Nina and her behaviour, the 1968 Will was made after due consideration and was not a decision made at the spur of the moment.

3.49 There could be no dispute that Teddy did tell Wang Sr about his new will, and also the fact that Wang Sr could ask Yih to retrieve the will from the safe deposit box. Apart from the fact that Yih had testified that he was told by Wang Sr some time in 1968 about this,[47] the fact that eventually the box was opened at the instigation of Wang Sr must mean that he was informed of the existence of the will in the box by Teddy.

3.50 Further, although Yih's evidence was that he was not able to remember whether he was given any key to the box by Teddy at the time he was made a deputy or at any time thereafter, yet if he had been given one, he must have lost it. It is clear that between Wang Sr and Yih, one of them must have been given the key to the box by Teddy, otherwise the arrangement of asking Yih to open the box for Wang Sr would be defeated. The Bank confirmed that two keys were issued, although Nina could only find one from the belongings of Teddy. That probably was the one issued to the box holder, i.e. Teddy. When Wang Sr had given his evidence and thereafter Yih was giving his evidence, I got the impression that it might well be Teddy's meticulous arrangement that Wang Sr was given the key whereas Yih was made a deputy without having the key. The impression I got was a logical deduction from the following facts:

(a) Yih has always been a meticulous and careful person and he was dealing with the accounts of the whole Chinachem group up to 1970. If he was given the key he must have noted it down or otherwise kept it safely like the two important documents DPH 668 and 669. In that case he must have brought it along with him when he left Chinachem. He even kept 668 and 669 long after all the events stated therein had happened.

(b) Wang Sr was more senior in age by the time he wanted Yih's help to open the safe deposit box in 1996. (He was 85 years old.) If he was given the key he might have lost it and could not even remember whether or not he was given the key by Teddy in the first place.

(c) Teddy was a meticulous person and this probably was a premeditated arrangement of Teddy in that when Wang Sr was given the key he could not open the safe deposit box because he was not a deputy. On the other hand, although Yih was a deputy, he was not given the key and therefore he could not gain access to the box either. Thus the arrangement was, if anything should happen to Teddy, Wang Sr could go to Yih with the key and Yih could open the box as a deputy for and on behalf of Wang Sr with the key given to him by Wang Sr. In other words neither of them could open the safe deposit box when Teddy was alive. If either one of them wanted to open the box in the life time of Teddy, it would have alerted the other one who would certainly tell Teddy. On the other hand a joint effort between the two for a specific purpose of retrieving the 1968 Will would be required if anything should have happened to Teddy.

However when asked whether this could possibly be the arrangement of Teddy, Yih could not say whether that was the case because he could not even remember when he was asked to sign his name as a deputy, whether it was at the opening of the box or thereafter. He could not remember whether he was given the key or not at all. Wang Sr could not remember anything more than Yih either. However that might well be the arrangement made by Teddy, though it does not matter one way or the other in this case. The fact remains that neither of them had opened the box during the lifetime of Teddy.

3.51 In any event, the correspondence address registered with the Bank for this box was P.O. Box 6752 which was the P.O. Box address of one Ping Hing Hong ("Chinese text"). This was a separate company operated by Wang Sr himself only. It was only on 12 February 1968, i.e. the very same day of the opening of the account with the Bank of Canton for the box, that Teddy acquired all of his father's interests in this company at the consideration of $50,000.48 In the circumstances the choice of the P.O. Box address of a company previously not belonging to the Chinachem group is a further indication that Teddy did not want Nina to become aware of this new box and its contents. Teddy even went all the way to acquire all his father's interests in this company at a considerable consideration. This further supported the premeditated and detailed plan of Teddy in his series of actions.

3.52 However, in the previous Probate Action HCAP 6/1997, Nina claimed in an affirmation made on 24 April 1998 that she was always aware of the existence of this box and was even responsible for arranging its rental payments.49 She also claimed that she was shown the key to the box by Teddy and knew where it was kept. By then it was more than eight years since the disappearance of Teddy and it would not be surprising that she was able to locate and produce the key among the belongings of Teddy. She further alleged that when Chinachem group had moved to the Far East Finance Centre in Central, Teddy had asked her to empty the box and transfer the contents to another box to be opened at the Bank of Tokyo50 but she said that later on both she and Teddy had forgotten about it because they were both busy. However, I accept the plaintiff's submission that it was just a bald assertion on her part and it was not true because:

(a) the transfer never took place;

(b) she was never a signatory for the operation of the box in the Bank of Canton and Teddy must be aware of that; and

(c) it would make no sense for Teddy to ask her to empty the box and to relocate its contents when Nina was not even a signatory not to mention that by then the box must have contained a lot of photographs of other ladies.

3.53 Further the documents found in the box included the 1968 Will and other documents such as those concerned with the revocation of Nina's Power of Attorney and the appointment of Yih in her place. All these were sensitive documents which Teddy was trying to keep from Nina by placing them in this box to which she had no access.

3.54 Hence I accept the plaintiff's submission that her claim that she was asked to empty the box and to relocate its content is just another untrue statement made by Nina under oath at the time when she was not aware that apart from the 1968 Will, there were other things in the box which Teddy would definitely not want her to know about.

3.55 Further in order to support Nina's allegation that she was aware of the existence of this box, she said she was even responsible for the payment of the rental and she exhibited certain ledger of CIL showing two payments for the rental for this box in January 1975 and April 198151 but there was no other voucher or payment record. The payment on each of the two occasions was only for one year. If indeed she was responsible for the payment of the rental through one of the companies of CIL, there must be an entry for each of

 © 2020 Thomson Reuters. 

the payments in every year and not just two years since it is difficult to imagine that payment would be missed for the years in between given the fact that there must be a number of staff in the accounts department of CIL to attend to this matter.

3.56 In any event, Nina's production of the ledger could not in fact show that she was responsible for or even aware of the payment there and then. She had chosen not to produce the vouchers supporting the entries in the ledgers which would have shown who in fact had authorized the payment. The payment could in fact be authorized by Teddy but Nina simply found these entries in the ledger after litigation in 1997 had commenced and conveniently made use of the two ledgers to make her claim. It is true that the payment for the rental of this box was made out of the money of CIL was quite unusual because it was clearly a box opened in the name of Teddy for his personal usage only and not CIL.

3.57 Further at the time of her affirmation in April 1998, she was probably not aware that payments were made for every year up to February 1981.52 However because of some communication problems with the box holder, the payment of the rental had not been made for a number of years since then and the arrears were subsequently made up afterwards between the year 1982 and 1991, i.e. a payment was made on 16 July 1990 in one go for nine years after Teddy had disappeared according to the record of the Bank.53 If Nina were in fact responsible for the rental payment as alleged, she had certainly not given any explanation for why neither she nor CIL had made any payment for these nine years.

3.58 In relation to the P.O. Box being used as the correspondence address for this safe deposit box, Nina also claimed that the P.O. Box had been used by Teddy and her for many years. It was not made clear by her as to when she would claim that she had started to use the box.54 There is no evidence that she had used this P.O. Box before. The P.O. Box was located at Mongkok near the place where Wang Sr lived and was no where close to the office of Chinachem or where Nina resided in 1968 up to 1992.

3.59 The only evidence was two ledgers of CIL for the years 1976 and 1981 (produced by Nina in cross-examination of the plaintiff's witness), showing that the rental for the P.O. Box had been paid by CIL.55 The defence claimed that it was evidence to support the fact that the P.O. Box was opened in the name of a Chinachem company and not Teddy. However, bearing in mind that in the case of the safe deposit box which was plainly opened in the name of Teddy and yet similarly CIL's ledger recorded that its rental had been paid by CIL in or about the same two years, the mere production of the ledgers of CIL showing that certain sums of money had been paid by CIL for the rental for this post office box, is neither here nor there. Again as she had chosen not to produce other more pertinent documents, such as the vouchers supporting the two entries in the ledger, the two entries would not assist Nina's assertion. The vouchers would show who had actually authorized the payment. Other documentary evidence, such as the demand note or receipt of the payment of the rental, would also show the identity of the person who rented the post office box. If those supporting vouchers were to be produced, it might well show that it was authorized by Teddy himself by mistake or one of his subordinates who was told by Teddy, again mistakenly, to make those two payments.

3.60 Further after Teddy had disappeared, as I have said nine years rental was paid for the safe deposit box on 16 July 1990 in one go between the period of 12 February 1982 and 11 February 1991. It was one cash payment. Apparently the annual demand notes between 1981 and 1990 or 1991 could not reach Teddy. In the next year on 2 March 1992, again there was a cash payment for the rental deposit of the box up to 11 February 1993.56 By then in 1992, Wang Teh Huei's name in the receipt was stated to be of 97, Mongkok Road, Flat D4, Kowloon where Wang Sr and/or Teddy's mother was/were residing (instead of no address stated as in the previous receipt of 16 July 1990). By then of course Bank of Canton had changed its name to Security Pacific Asian Bank Limited, which fact would have some bearing to be considered later.

3.61 Thus I accept the plaintiff's submission that the claim by Nina of her being informed of the 1968 Will because of her knowledge of the existence of the safe deposit box and the post office box is simply untrue. She might well have become (at a later stage) aware of the existence of a 1968 Will of Teddy through the letter of Deacons dated 11 February 198557 informing Messrs Ip, Ku & Stoppa, the then solicitors acting for Teddy and Nina of the fact that Messrs F. Zimmern & Co. had in their custody "a copy will of T.H. Wang dated the 15th March 1968".

3.62 However this inference (that she was aware of it shortly after the 1985 letter) was not necessarily an irresistible inference because at the time, Teddy was still alive, and

he might not have allowed this information to be passed onto Nina. She merely got hold of the letter only after the disappearance of Teddy and started to make up stories which she dared not confirm in Court in these proceedings. It is also notable that Messrs Ip, Ku & Stoppa did not ask for or demand the return of the copy will until 1991 well after the disappearance of Teddy in April 1990.

3.63 Nina in one of her affirmations alleged that when Messrs Ip, Ku & Stoppa asked Messrs F. Zimmern & Co. for the return of the wills and testamentary disposition of their clients earlier, Deacons on behalf of Messrs F. Zimmern & Co. replied by letter dated 11 February 1985.58 She alleged that Teddy was furious with the suggestion in the reply letter of Deacons that there should be a meeting for the handing over of the wills, and Teddy refused to have the meeting and instructed "the solicitor" to simply cancel the meeting.59 However the alleged reaction of Teddy was wholly unbelievable.

3.64 In the first place Deacons' letter was drafted in the most amiable manner. It is clear that their client, Messrs F. Zimmern & Co., was willing to deliver the envelopes containing the copy will of Teddy and the will of Nina in their "present condition". The letter merely suggested that in order to avoid any unhappy episode in the future, it would be in the interest of both parties to have the envelopes opened and the contents identified in the presence of both parties' solicitors and possibly also in the presence of an independant solicitor, say a solicitor from Messrs Johnson, Stokes & Master, who was there and then disinterested in the matter. There was nothing in the letter to suggest that if it were the wish of Teddy and/or Nina that they simply wanted the envelopes back, they would not be given back to them in the same state as they were then being held by Messrs F. Zimmern & Co. The letter of Deacons was actually written in a very amiable and thoughtful manner, which is not that common between disputing solicitors nowadays.

3.65 Further, if indeed, the suggestion did not meet the approval of Teddy, one would expect that there would be a letter from Messrs Ip, Ku & Stoppa to inform Deacons of the refusal of the proposal and to ask for the return of the envelopes in their present condition as indicated in the letter of Deacons. There was simply no such correspondence at all. Deacons' proposal was never put as a condition for the return of the copy will.

3.66 In any event, if indeed it was Nina's case that that was the real situation, then it would be open to her to call her then solicitors to give evidence to support her allegations even though she was not prepared to back up what she said in the affirmation by giving evidence in the trial. No such evidence was ever called by the Defence.

3.67 Thus I accept the plaintiff's submission that the more likely reason for Teddy not asking for the return of the copy will was that he did not want Nina to become aware of its contents and hence he did not give instructions to Messrs Ip, Ku & Stoppa to ask for its return. The allegation that Teddy was furious with Deacons' suggestion is not true. It was not until 1991 after the disappearance of Teddy that Nina's solicitors asked for and obtained the delivery of the copy will60 and it is doubtful whether this firm of solicitors had ever had any direct instructions from Teddy to ask for the return of the copy will in 1991 when Teddy had already disappeared.

3.68 From the record kept by the Bank of Canton, before the occasion of 26 February 1997 when the box was opened by arrangement made with the solicitors of the Bank, the record only showed that the box was last opened on 22 October 1975 after the box was opened by Teddy on 12 February 1968. Was it the only occasion when the box was ever opened by Teddy between 12 February 1968 and 26 February 1997? If so it would be the only occasion (i.e. 22 October 1975) when Teddy had ever opened the safe deposit box and put the 1968 Will into it, as Mr Stephen Wong, the Bank's solicitor, said that when the box was next opened in his presence on 26 February 1997, the 1968 Will was already inside the box.

3.69 Thus the plaintiff submitted that the box was only opened on one occasion on 22 October 1975 and everything inside were put there on that occasion only. The documents and the photographs only came into existence after the box was first opened in February 1968. Further it must be Teddy himself who put them in because Yih had never exercised his power as deputy to open the box prior to 1997 at all and Yih could not have the original 1968 Will or other documents to be put into the box. Even the photographs developed by "Stereo Company" were apparently developed in "3.68" and "4.68" for two sets of photographs of one lady, and "7.69" and "8.69" for another two sets of photographs for another lady. One separate photograph of her was dated "1969.7.14". Another

 © 2020 Thomson Reuters. 

photograph of a third lady was not dated at all. In other words between 1968 and 1975 Teddy must have kept all these documents and photographs somewhere else.

3.70 It is true that Ms Cyan Chan called by the plaintiff did say that the Bank had kept a record of all occasions when anyone had access to the safe deposit box.61 Then she produced the record which impliedly meant all the records kept by her Bank. However there is one thing which has apparently escaped the attention of at least the plaintiff's Counsel and that is at page 195 of F1 which is supposed to be the record of all occasions of access. It was stated at the bottom right that it was a form of Security Pacific Asian Bank Limited. That was the name of the Bank sometime afterwards. The form was stated at the left bottom as form 804 (12/88) which can possibly mean a form of this Bank in 1988. It is also therefore possible that either there was no access record before October 22, 75 as stated in this form and/or the handwritten date of "OCT 22,75" was copied manually from an old record into the new form of the Bank in its new name. Further by 1997 this Bank had already changed its name further to Bank of America (Asia) Limited. By that time the Bank had been keeping access card of persons opening the box in the form at page 196(a) of F1. No access card was produced in respect of the opening on 22 October 1975 and possibly there was no such access card by then or the same had been lost with other record of access to the box. It is also possible (and I cannot put it higher than that) either the copying into the form at page 195 was done manually by copying only the last entry in the old form but not the previous occasion or occasions of access. Alternatively before that new form was introduced, there was simply no record of access (which is less likely). In other words there is possibly an old record which either has been destroyed or still kept in the microfilms archive of this Bank in the names of its predecessors. No one has asked Ms Cyan Chan these questions.

3.71 Judging from the character of Teddy and his carefully premeditated plan of opening the safe deposit box together with acquiring a Post Office box for the former's address of correspondence, before the 1968 Will was executed, I do not quite believe that he would not have walked from Holland House where Messrs F. Zimmern & Co. was to the Bank of Canton around the corner along Ice House Street immediately or shortly after he had executed the 1968 Will. Ms Cyan Chan, PW1, only worked in the Bank since 1984 and of course she could not personally tell us what had happened to the Bank practice before that nor even how the first entry at page 195 was made out. If the other possibility, i.e. Teddy only put all the documents and photographs into this box on one occasion in 1975, then it would also fortify the plaintiff's submission that he intended to keep this 1968 Will secretly even seven years later and should be aware of its existence by refreshing his memory when he put the same into this box. This also could support the plaintiff's submission that there was there and then still the continued trust of Teddy on Yih even after he left Chinachem in 1970. On the other hand this would negative the allegation made by Nina against Yih on the circumstances of how he left Chinachem and also on any suggestion that the relationship between Teddy and Nina had completely made up and reconciled by October 1975. On the other hand, there is still the possibility that those items found in the box could have been put by Teddy into it on divers dates between 15 March 1968 and 22 October 1975. But that would not destroy the plaintiff's submission of Teddy's continual trust on Yih.

THE RETRIEVAL OF THE 1968 WILL

3.72 Towards the end of 1996, Wang Sr asked Yih for assistance to open the safe deposit box with the Bank which by then had changed its name to Bank of America (Asia) Limited. It would appear that initially Wang Sr would like to find out whether Teddy was still keeping the 1968 Will in that safe deposit box because after a lapse of many years, Teddy might have taken away the will.62 Yih agreed to Wang Sr's request for help but he could not find the key. He could not even be sure as to whether he was ever given the key as aforesaid.

3.73 Thus the plaintiff's solicitors, who also acted for Yih at that time, on his instructions asked the Bank on the procedure for opening the box in such circumstances. They were advised that the written consent of Teddy, being the box holder, would be necessary and only Teddy could authorize Yih to force open the box.63 Through subsequent negotiations between the solicitors and the Bank and its legal advisers, an agreement was reached whereby the box might be opened on 26 February 1997.64 Eventually the box was opened on 26 February 1997 in the presence of a bank officer, Ms Lisa Chan, the Bank's solicitor, Mr Stephen Wong, Mr Lam Wah Chung, a clerk of the Yih's solicitors and also Mr Yih. When the box was opened the 1968 Will was found amongst the contents inside. Unfortunately there was a dispute which became a quarrel

between Mr Lam and Mr Wong resulting in the closing of the box without drawing up a list of the contents.65

3.74 There was a grave misunderstanding between Yih's solicitors and the Bank's solicitors. Mr Wong for the Bank naturally thought that since he was a professional solicitor acting for the Bank only, he would have a very independant position and he would be the best suited person to take out the documents and make an inventory thereof. However before he could ascertain what was in the box first, Mr Lam used unnecessary and rude words against him. Mr Lam asked Mr Wong not even to touch anything inside the box because he said "they worth a big fortune which Mr Wong could not even make up with all the monies he could earn in a few life's time". This was insulting, irrelevant, and unnecessary. If Mr Wong could not be allowed to touch those documents how could he make an inventory of all the items therein.

3.75 On the contrary Mr Lam probably thought that the Bank was only responsible there and then to force open the box and all persons from the Bank including its solicitor should exeunt from the vault and let Mr Yih and his solicitor or solicitor's clerk to inspect the box. In fact Mr Yih at that time was not inside the vault but was outside and he was represented by presumably Mr Lam. However naturally the Bank would be very concerned that nothing should be taken out from the box without their knowledge and also nothing should be put into the box. If its representatives were not to be present, how could the Bank ensure that these two things would not happen. Since Mr Lam would not allow Mr Wong to touch the document and apparently intended to inspect the contents of the box without the presence of the Bank's representative, Mr Wong, as a prudent solicitor, therefore advised the Bank to close the Box immediately so that no one at all could gain access to those contents inside. This is in the context that Yih, though a deputy of the box holder Teddy, had not got the key and the Bank's practice of allowing a box to be force opened would require the authorization of the box holder himself but not the deputy only. There simply was not any modus operandi agreed beforehand between the two parties resulting in this unhappy misunderstanding.

3.76 Subsequently the box was opened again on 22 April 1997 in the presence of two representatives of the Inland Revenue Department66 and an inventory of the contents in the box was drawn up.67 This was done in accordance with the general practice of the Inland Revenue68 and accordingly the plaintiff's solicitors were allowed to take away the 1968 Will found inside the box after copies had been made and the Will was produced in this action.

YIH LEE KONG LEAVING CHINACHEM

3.77 Coming back to the last period of this chapter and that is after the 1968 Will was executed. That could be little doubt that the relationship between Teddy and Nina must have deteriorated. It also appeared that he might even have beaten up Nina.69 By that time in 1968, Teddy's investment in Taiwan would also require someone to look after from time to time. Apart from sending Yih to go there, at the suggestion of Yih, Teddy also sent Nina to Taiwan so that they could have a cooling off period instead of getting a divorce and she would have something to do in Taiwan.70 Nina did go to Taiwan and returned on 27 March 196871. The relationship between the couple had certainly improved gradually in the later days.

3.78 However since the incident in 1968, Nina treated Yih very badly. She accused Yih for having told Teddy of her personal affairs and having instructed investigators to investigate her personal affairs.72 In short she thought that Yih had deliberately driven a wedge between her and Teddy to sabotage their relationship. That was furthest from the truth. Yih, instead of denying at the outset of Nina's allegation, he asked Teddy first about it as he apparently had sensed something wrong in what Teddy had told Nina. It then transpired that Teddy deliberately attributed everything to Yih because he thought that if he had told Nina of his father's role in instructing the private detective, Nina would hate Wang Sr and their relationship would be bad. Nina might even bully Wang Sr. Teddy's way of thinking at that time would appear to be that he did not want to have any quarrel within his family. Yih said that Teddy thought Yih had a strong say in the company and he was really just next to Teddy, he did not think that Nina could and would do much to embarrass Yih.73

3.79 However the strongest reasons for Teddy to tell Nina that lie that it was Yih who was responsible were because:

(a) out of his love and affection of Wang Sr and Teddy did not want him to be embarrassed; and

(b) Nina would definitely believe what he said bearing in mind the very close relationship between Teddy and Yih at that time.

 © 2020 Thomson Reuters. 

What Teddy had not anticipated or could not care so much in the circumstances, was the strong reaction of Nina and the consequence that Nina became really hostile to Yih and the working atmosphere in the office became very poor.

3.80 In fact Nina expressly told Yih afterwards one day in 1969 that if Yih should stay in the office, the relationship between her and Teddy would never be a good one.74 This would put Yih into a very difficult position. He was responsible actually for persuading Teddy not to divorce Nina so clearly he did not want to see his cousin having a broken marital relationship with Nina. However if he should insist on staying in Chinachem and complained to Teddy of the hostile attitude of Nina, that would definitely make the situation worse. Furthermore at the time the pressure of work on Yih in Chinachem was very, very heavy.

3.81 Yih was in charge of the accounts of the Chinachem group in Hong Kong and he also had to take care of Teddy's property joint venture investment in Taiwan. On top of being the accountant, he was also heavily involved in the real estate business of Chinachem.75 Further Yih's health was not good at that time. The property investment in Taiwan had come to a very critical stage and Mr Wu had incessantly asked either Yih or Teddy to come over to solve the critical problems of the disgruntle purchasers.

3.82 Thus Yih understood at that time that it was time for him to go. He told Wang Sr and Teddy of his intention to resign and to sell his interests in Chinachem back to the Wangs. Neither of them wanted him to leave. The initial reaction of Wang Sr was that Yih should not raise any idea of leaving the company at all and that no matter what had happened, things could be resolved without Yih's departure.76 Teddy's initial attitude was that the problem with the attitude of Nina could be resolved by divorce. However Yih's reaction to that suggestion was that if Teddy were to divorce Nina, he had better waited until Yih had left Chinachem because Yih did not want to be seen to be the person responsible for their divorce.77

3.83 There were also discussions between Yih and Teddy on Yih's selling back his interests in Chinachem to the Wangs. Yih suggested the price of $1 million, and the initial remark of Teddy was that it was too low.78 Yih said that that was the first time he heard Teddy saying a price was too low when people were trying to sell him something. Yih's estimate was that at that time the asset worth of the Chinachem group was about $100 million.79 He named the much lower price without reference to the actual asset worth because he realised that Teddy always considered money to be a very big thing.80 He asked for $1 million because if he had asked for more, Teddy would in all probabilities not agree to pay and it would have taken a very long time to get an agreement and payment. Things would become very uncertain.81 There was again no question of his selling his shares while remaining as an employee and there was again no question of his quitting as an employee without selling his shares. The former would obviously defeat his reason for raising his resignation and the latter would not be acceptable to Yih either because he would have no capital to start his own business. In other words Yih quoted this low figure because he intended to make an offer to the Wangs which they could not refuse as far as the price is concerned.

3.84 Teddy initially refused in a negotiate with Yih not because he would like to encourage Yih to ask for a higher price for his shares. He was actually trying to dissuade Yih to sell his shares and leave the company by giving him the idea that it was not a wise move to sell the share at $1 million. Later Teddy must have had a careful consideration the actual worth of Yih's shares as he even asked for copies of the initial 1958 agreement to see how much was Yih's actual entitlement from the plastic business as the capital for the real estate business came from the plastic business. Yih was entitled to the two businesses of Chinachem and in fact by 1965 he had been allotted some shares in CUCCL as well.82 After some discussions on this matter, by January 1970 Yih knew that Teddy was eventually willing to buy out his interests. Teddy even represented to Yih that the amount of $1 million was the price given to him for the time being and there would be some calculation of the price in the future.83

3.85 However Yih did not want to take any risk of any change of mind on the part of the Wangs, so he prepared the agreement and at the wish of Teddy, Wang Sr signed the agreement with Yih to acquire his shares in Chinachem. This agreement was dated 31 January 1970.84 Yih was paid a personal cheque in the sum of $1 million post-dated to 30 June 1970 for his shares. Later on he was asked to exchange that cheque for two, one dated 30 June 1970 for $750,000 and the other dated 28 July 1970 for the balance $250,000.85 After the agreement was signed, Yih physically left Chinachem.

3.86 However the Wangs still wanted to see if he could be persuaded to change his mind. While staying at home during the few months after the agreement was signed, Teddy still sent someone to bring his salary to him every month until the end of July.86 It must be the case that even after Yih received the $1 million, Teddy would still hope that Yih could change his mind to cancel the sale and come back to Chinachem to work for him. In fact during this period of time, Yih had still worked on the brochures for six Chinachem projects87 and together with Teddy he had also attended a very private and confidential meeting with other persons in the property business at the Miramar Hotel.88

3.87 The clear intention of the parties must be that Yih would leave Chinachem and would relinquish all his interests in all Chinachem companies. The agreement set out the number of shares in the companies registered in the name of Yih. But in fact the list was not exhaustive as there were some shares in one company within the group that Yih had forgotten about and hence he had omitted to list them out. The defence then made use of those documents provided by Nina, in order to cross-examine Yih on his credibility and memory because there was one company which he had left out in the list stipulated in the agreement.

3.88 That company which was left out in the list was On Lee which CIL had acquired an interest on 19 May 1969, i.e. shortly before Yih had left Chinachem group. However as Yih had said, he would not be foolish enough to leave that company out if he could remember it and he would not leave the matter for a long time until his cross-examination in 2001 and had not claimed any interest for those shares which he actually owned. In other words, he would not deny to have owned those shares when it is very apparent that he was still a shareholder and director thereof when he drafted and signed the agreement on 31 January 1970.

3.89 The documents shown to Yih in cross-examination clearly shows that Teddy made Yih as well as one of the aforesaid Mr Simonson, the expatriate secretary, directors of On Lee and each of them were allotted two shares so as to meet the director share qualification. On Lee used to be a company wholly owned by a Mr Hsu. When Teddy decided to have a joint venture with Hsu, shares were allotted to CIL and its nominees. On Lee, under the control of Mr Hsu, bought land for $1,422,500 on 16 May 1969. Three days later, on 19 May 1969, shares were allotted to CIL, thus indicating that around that time, there must have been an agreement for a joint venture between CIL and Mr Hsu for the development of the land.

3.90 Usually, in the case of joint venture, each joint venture partner would be responsible for his share of the building costs.89 On Lee, however, took out a building mortgage on 9 October 1969 to finance his development.90 This of course did not necessarily mean that Chinachem would not have enough ready cash to finance its share of the construction costs, as it could well be the case that Mr Hsu would like to finance his share of the construction costs by having On Lee to take out a building mortgage instead of relying on financing from CIL who would usually charge higher interest rate than that on a bank's building mortgage.91 By then, CIL had never taken any building mortgage itself. Chinachem was quite famous and known to more informed people in Hong Kong that it was the only big building developer which was still running its business on cash basis. Yih had previously testified that CIL did not have any building mortgage during his time with Chinachem. This building mortgage was therefore used to discredit Yih and the defence was, so to speak, trying to make a song and dance around it.

3.91 However, Yih's involvement with this company was very minimal and short. He said he really had had no recollection of any money being drawn out from CIL to acquire interests in On Lee. This was not surprising because the initial payment could well be made by Teddy first as loan to CIL or even no payment had ever been made until after January 1970 and the books of CIL would then be made up to reflect the position at the end of the accounting year92 which would be the end of March 1970. By then Yih had already left the company.93 In such circumstances, no money would be drawn from the accounts of CIL and Yih would not have known of the investment. Likewise, if the books of On Lee were continued to be handled by Hsu's side for sometime after CIL joined in, again Yih would not have much impression of this company. According to Yih, he had never come across the situation of Chinachem drawing down on a building mortgage.94 I believe him. In fact, even if there was any draw-down on the On Lee building mortgage, it might not have taken place before Yih's departure from Chinachem as the first draw-down could not have taken place until the building had reached the 4th floor level95 and On Lee had just acquired the land on 16 May 1969.

 © 2020 Thomson Reuters. 

3.92 In fact notwithstanding that On Lee shares were not included in the list of shares to be sold in the agreement, the two shares of Yih in this company were registered as having been transferred back to Wang Sr on 1 December 197096 apparently, without Yih's execution of any instrument of transfer since the defence could not produce any. Even if there was an instrument of transfer signed by Yih, Yih must have genuinely forgotten about this and his previous signature on a document to accept the two shares in the first place.

3.93 In the end, I find that the incident concerning On Lee could not cast any doubt on Yih's credibility at all. After all, these events took place over 30 years ago and he was never given any opportunity to refresh his memory with reference to any or all the documents. On Lee left no impression on his mind as evidenced by the fact when he drew up the agreement for the sale of his interests in Chinachem to Wang Sr, he had left out On Lee. If the On Lee investment was of any significance to him at that time, there was surely no reason for him to have left it out. If he deliberately left that out, there is no reason why he did not claim anything on top of the $1 million consideration for On Lee shares.

3.94 Further, that was the time when he was squeezed in the middle, first between Teddy and Nina on purely personal level and, secondly, between Teddy and Mr Wu of Taiwan on the joint venture land development project as the aforesaid. On top of that, he had the very busy daily routine of a large group of companies to handle. He must be very tired indeed when he said he was "sick" at that time. He just wanted to get out of all these unfortunate happenings not created by him but by Teddy and Nina themselves.

NINA'S ACCUSATION AGAINST YIH

3.95 The defence mounted very irresponsible, vicious and hostile attack on the evidence of Yih, particularly on the circumstances of his departure from Chinachem. In summary, the defence case, which was no doubt at the instructions of Nina herself, was that Yih was driven away from Chinachem because of his "misconduct". It was suggested that since his last return from Taiwan, Teddy suspected that Yih had stolen money from him and had orally alleged that Yih had stabbed him at his back.97 This was flatly denied by Yih.

3.96 However, the defence through the cross-examination had failed to point to any specific instance which would suggest that Yih had stolen anything. She then sought to show that Yih was in charge of the accounts of the Taiwan joint venture company and insinuated that there was thus the opportunity for Yih to steal and to cover his theft. The reality was that the joint venture company employed someone to be the book-keeper and accountant. Although the system was devised by Yih, the entries were done by the employed staff. Yih, as one of the directors of the joint venture company, did look at the accounts of the company and did draw on a trial balance on one occasion as a kind of audit of a part of the accounts when he was sent to Taiwan. It further transpired that the accounts or ledgers of the joint venture company were drawn up by the employee in Taiwan and sent to Hong Kong every month. This had been under the charge of a Mr Tai Ching Ping in the Chinachem office in Hong Kong, and Mr Tai later on also succeeded Yih as the accountant of the Chinachem group when he left the company.98 Thus Mr Tai could have discovered Yih's "misconduct" in the accounts if he had one.

3.97 Furthermore, in September 1999, Nina had already said in one of her affirmations that she was aware that Mr Tai Ching Ping, the accountant succeeding Yih and Mr Lee Yue Ching, a former clerk responsible for the sale of Chinachem flats in Hong Kong had important and relevant information on the circumstances in which Teddy had come to lose confidence in Yih. She said that owing to the pressure of time there and then, she was unable to file such evidence available from Messrs Tai and Lee.99 However, two and a half years later when Yih was cross-examined in March 2002, there was still not one single specific instance which Nina was able to put to Yih through her Counsel for his alleged misconduct, cheating, or stealing from Teddy or Chinachem.

3.98 The cross-examination of Yih, who was 76 at the time of giving evidence, was extremely long, excessively thorough and vigorous, if not downright oppressive. He was asked in meticulous details including how much money he brought to Hong Kong in 1951 and how he made his money in Shanghai in those days,100 as well as how much assets he had when he left Chinachem in 1970. He was then cross-examined in meticulous details on how he made his money in his investment in property at Fung Wong Terrace after he left Chinachem in 1970.101 Documents of some 30 years old relating to the activities in Taiwan were thrown at him without any warning or prior discovery.102 The explanation

 © 2020 Thomson Reuters. 

for no discovery was that those documents were only relevant to credibility. This amounted to a direct admission that those documents were not directly relevant to any issue in this case. However Yih was able to give a clear account of his explanation on the documents and the underlying transactions relating to them.

3.99 Again, brochures were extracted from files of projects to cross-examine him and again, Yih was able to give a detailed account of his role in the matter, although initially he could not recall the role of the Hong Kong Building and Loan Agency as he was not involved in any negotiation with them. Clearly, Yih was a truthful and able person and he put his heart into his work when he was with Chinachem and that explained his deep impression on things he handled. His memory is extremely fantastic, bearing in mind he is already 76.

3.100 On the contrary, Nina who claimed that she was responsible for assisting in the closing down of the Taiwan investment because it was suffering from heavy losses, and therefore must have gone through the accounts of the business, had failed to produce any evidence on any alleged misdeed on the part of Yih and certainly had not even come forward to support her own wild allegations against Yih after all these unfounded allegations were put (not even suggested) to Yih, nor could she call any witness to support her allegations.

3.101 Furthermore, the accusations of Nina against him were vague and ever shifting. In her affirmation in September 1999, Nina said103:

"In about December 1970 he [Yih] was directed by my husband to resign all his directorships as well as give up all his shares in the said companies [CUCCL & CIL and other Chinachem companies] as my husband no longer trusted him and had lost all faith and confidence in him"

Thus the suggestion there and then was that the resignation was directed by Teddy and the shares were simply taken away from Yih.

3.102 However, it must be due to the fact that the discovery in this action revealed the agreement to sell the shares to Wang Sr was properly made, Nina then realized that she could no longer make the accusation that the transfer of the shares was ordered or directed by Teddy. She then changed her version and started making the accusation that Teddy suspected that Yih had stolen money from him and suggested to Yih that he brought up the issue of resignation because he was afraid that his "misdeed" in Taiwan would be discovered. She further made the insinuation that Yih had enriched himself so much from his theft and dishonesty, and consequently he could sustain a lavish life without doing much work since he left Chinachem.104 The question was put to Yih on Day 124 which was after days of cross-examination on the Taiwan activities when it had become clear that the accusation of theft was not made out. The case was put to Yih in the following terms105:

"Q. I put it to you that you first --- you brought up the question of resigning from the company and selling your shares in the Chinachem group to Teddy or his father, because you knew that your misdeeds in Taiwan would catch up with you. Do you agree or disagree? In other words, they would soon find out about your misdeeds?

A. I disagree."

3.103 By then the accusation that Teddy suspected Yih had stolen from him obviously did not make any sense in the light of the fact that Teddy was willing to pay for the shares. This was in any event at a gross undervalue and there has not been any evidence to contradict him in spite of the fact that Nina could easily disprove the same with the books of Chinachem even without giving evidence herself.

3.104 Further, the shares in Chinachem did not actually have a market because they were shares in private companies and could not be transferred without the consent of the board. Furthermore, the long practice of Chinachem had always been that no dividend was declared and unless the companies were wound up, there was not much practical benefit in holding the shares.

3.105 The further suggestion by the defence that because of the suspicion on theft, Teddy had delayed in paying the $1,000,000 to Yih was even more ridiculous. As Yih had pointed out, if indeed Teddy had reason to suspect that he had stolen money from him, he would not simply delay in making payment of the price as Teddy had the record of taking his employee to the police station even that employee had only stolen $7.106

3.106 The suggestion that Teddy hated Yih so much that he did not even want to see him and hence Teddy asked Wang Sr to deal with Yih107 was again ridiculous. If there was any truth in Teddy's having reasons to believe that Yih had stolen or had been dishonest, there was really no reason for him not to report the matter to the police even though they were cousins. Furthermore, if he hated Yih so much, he could simply refuse to buy his shares and Yih's investment would simply be locked in the companies. Further still, those companies never paid any dividend and there was no obligation on the part of Teddy to continue to use those companies in which Yih had any shares for any profitable future trading or development projects after Yih had left. At least, Teddy could negotiate a even cheaper price for his shares, say, $100,000 only which no doubt Teddy would have been able to do so if he suspected Yih of having stolen any money from him or otherwise had been dishonest, and the same should also be known to Yih himself.

3.107 The suggestion was made that since Yih's last return from Taiwan, Teddy ceased to trust him. The several days of cross-examination on the affairs in Taiwan did not reveal anything which indicated that Yih had stolen anything or had done anything improper. In the end the suggestion was that since he was in charge of the accounts in Taiwan, he was in a position to steal as aforesaid.108 It was also put to Yih that Teddy "made the accusation" against Yih because both the Max Factor joint venture business and the plastic raw materials business were profitable but there was never any profit given to Teddy.109 As for the Max Factor business, the position was that the only involvement of Yih was that at the request of Teddy, he tried to ask Mr Wu if he was prepared to admit Teddy as a partner but Yih was not successful. Thus Teddy's participation therein must be sometimes later. In any event it also transpired that it was not even suggested that any profit of Max Factor business had been paid to Yih and a complaint was eventually reduced to the suggestion that Yih had stood on the side of Wu and Yih had told Teddy that there was no profit.110

3.108 In fact Teddy had never asked Yih anything about the profit of Max Factor investment,111 and before he left Chinachem, he had never heard of any dispute relating to the Max Factor business.112 While there was litigation between Teddy and Mr Wu over the profit from the Max Factor business, that was only much later in 1975.113 In this respect, Nina ought to have documents to verify the timing of the Max Factor litigation but she was unable to produce any document to show that the recollection of Yih was wrong.

3.109 In respect of the plastic business, Mr Wu no longer needed to purchase the plastic materials from Chinachem in Hong Kong or from Chinachem's supplier in the U.S. as the supplier itself had set up an operation in Taiwan. Again, no document was produced from Chinachem to contradict Yih. Finally, there was yet another new invented case on the allegation of suspected theft and cheating. The defence new case was put in the following way114:

"Q. ... I am putting to you that part of the reasons why Teddy accused you of cheating and stealing from him was that he thought that he was cheated, because when the partnership bought land in Taiwan, some of the partners already made a profit, when the partnership purchased the lands from those partners?

A. Absolutely not true, because in relation to the land/s Teddy only took out US$40,000 odd and Ng115 (Wu) Cheong Tao tried all means to get the benefit from the US$40,000 odd, but part of that had to be distributed to me[?!] Would he really do so with his capacity [his standing in society]?

...

Q. There were other pieces of land, too?

A. Other pieces of land [?], I have no knowledge at all."

3.110 In the end, Nina again had not been able to point out those other pieces of land out of which Teddy had suspected that Yih had made a profit or had cheated him or stolen from him through Wu. Yet if there was any truth in such an accusation, there was no reason why the defence would not be in a position to contradict Yih by documents or a witness. In fact, as aforesaid, Teddy had put Yih in an extremely embarrassing position in respect of the Taiwan investment as Yih had "guaranteed" for Teddy to Wu, Teddy's insistence on changing the approved plan to make the project more profitable had the dire consequence, as Yih had heard later, that Wu eventually ended up in jail.

3.111 Apart from the aforesaid solid evidence from Yih, the other solid facts which completely negative Nina's accusation were the acts of Teddy himself. Since Yih's visit to Taiwan,

 © 2020 Thomson Reuters. 

in August 1968, he gave Yih an unfettered power of attorney which had never been revoked until Teddy's disappearance in 1990. This would only be revoked by operation of law upon Teddy's unfortunate death. Instead, Teddy carefully put the power of attorney together with his 1968 Will and other important documents into the safe deposit box, to which only he and Yih had access but not Nina. The accusation and suggestion that Teddy had lost all his trusts on Yih was simply an untruthful invention of the defence.

3.112 In conclusion, I must say that Nina's accusations against Yih were not only groundless but were shifting all the times. Even when Nina did not give evidence, those accusations illustrated that her credibility was poor and she constantly made things up in order to suit her convenience. All this cross-examination was just a waste of time, which no doubt was undertaken at the instructions of Nina.

3.113 On the contrary, the whole episode of the cross-examination of Yih did also confirm his evidence on, inter alia, one of the main reasons for his leaving Chinachem, namely, that Nina was very hostile to him, so much so that even after 30 years Nina was still making up irresponsible accusations against Yih to damage his reputation. However, Nina's hostility was also contributed by the information she received from Teddy who deliberately misinformed her of Yih's involvement in the discovery of her misbehaviour and had advised him on employing a private detective to investigate her. Unfortunately for a long time, Nina thought it was true. The bare truth is not only that it is not true, but on the contrary Yih had always been a faithful and honest cousin and employee and co-shareholder not only to Teddy but also to Nina. These are the last words I would like to use to end this sad period of the 1960s concerning the Wangs and Yih which was ended by Yih's departure from the Chinachem group.

3.114 In the next chapter concerning the period after 1970, I shall start with the role of Nina since then. But before I do, I think it is convenient to consider here also those serious allegations of Nina against her father-in-law and in turn his credibility before I end this chapter on the 1960s.

NINA'S ACCUSATIONS AGAINST HER FATHER-IN-LAW

3.115 Nina made a number of allegations against her father-in-law, some of them were put or suggested to Wang Sr through her Counsel and some of them were made in her affirmations before the Court. Nearly none of them were substantiated by direct viva voce evidence either from her or from her witnesses. These allegations were intended to show that Teddy would not have made any testamentary disposition in favour of his father.

3.116 Nina alleged that Teddy "hated" his father and a number of reasons were given therefor. First, it was suggested that Wang Sr was reckless in the conduct of the business resulting in the loss of a lot of money and Teddy was forced to terminate his study in order to conduct the family business. It was also suggested that Wang Sr had borrowed a lot of money and Teddy would have to repay his debts.

3.117 In an attempt to substantiate these points, Nina introduced the evidence in respect of the dealing between Wang Sr and his old time partner, Mr Mau Kai Chee ("Chinese text") with a view of showing that Wang Sr still owed Mr Mau a lot of money and Mr Mau was chasing after him. Wang Sr's attitude was that although he had not fully paid Mr Mau the money for the acquisition of his shares, the IOU note dated 26 January 1952116 produced by the defence was forged. The defence however had never been able to prove the note nor had Nina adduced any evidence as to the source of the note. Certainly the debt would have been statute-barred and was unenforceable either by 1958 or six years after one week of the date of demand by notice in accordance with the stipulation in the note, and demand had been made either in 1961 or some time later. Therefore the six-year period would have expired long before the date of the trial herein. Hence there would not have been any question of his legal obligation to pay the alleged debt since then.

3.118 At any rate, there was never any suggestion that any of the debts of Wang Sr had been paid by Chinachem. Nina was not able to question Wang Sr on any specific instance where it was suggested that any debt of Wang Sr was paid by Chinachem or by Teddy personally himself.

3.119 Of course Wang Sr denied that he owed people any money that would have required Teddy or Chinachem to pay on his behalf. Certainly during the time when Yih was the accountant for the Chinachem group, there was neither instance of any such payment nor instances where people went to the office of Chinachem to ask for payment of Wang Sr's debts.

3.120 It is not clear whether there was any arrangement between Wang Sr and Mr Mau similar to the arrangement between Wang Sr and Mr Koo Lam Hing ("Chinese text"). In or about the same period of time when Wang Sr was travelling between Hong Kong and Shanghai before the Korean War, the supervision of the Hong Kong Branch of Wing Wah was entrusted by him to Mr Koo who had a small share of Wing Wah in Hong Kong. Apparently Wang Sr gave the ownership of the Hong Kong branch of Wing Wah to Mr Koo in exchange of his shares of Wing Wah in China. That should be in 1948. Was there a reverse arrangement between Wang Sr and Mr Mau as he was apparently complaining also that he was left behind in the Mainland and therefore had to shoulder the debts of the headquarter company over there? However Wang Sr did not say there was such an arrangement.

3.121 Further the situation of this IOU note might well be similar to the situation in the case of The Estate of Yang Sen-hui & Others v. Pao Yuen Tung Hsing Yieh Co. Ltd.117 The debt in the IOU pursued by Mr Mau would in any event be barred by laches as decided in the aforesaid case in which Leading Counsel for the defence was also involved and therefore should be familiar with the facts therein.

3.122 The defence categorically said that this IOU note was only concerned with the credibility of Wang Sr. In other words, it was not directly relevant in this case except as to the credibility of the plaintiff only. In the end, I find the whole line of cross-examination is just a waste of time.

3.123 The defence also relied on the report in one of the issues of the Next Magazine118 as supporting her allegation that Teddy was forced to terminate his study because of the poor financial position of his father's business. This is of course untrue as aforesaid. There was no reason or justification for Teddy to hate his father for his expulsion from St. Stephen's College earlier in September 1952. In fact his father was kind enough to cover this dark side of Teddy for many years, which was not even known to Nina herself. Thereafter he had accommodated Teddy by offering a job for him in his own company. The position of Wang Sr was such that, had Teddy been qualified to study abroad, he could definitely support him to further his study in the States. In fact Teddy was trying hard or just too hard to get admitted into Drew University in the States. Should he succeed in his scheme, he would have been admitted to the University over there.

3.124 This episode of the reason for Teddy's leaving school revealed that Nina was trying to make up stories without realizing that there was strong documentary evidence to show her up since she did not know the true reason for Teddy's cessation of schooling in St. Stephen's College. However Teddy might or might not have told Nina that he ceased studying because the Korean War had affected his father's business and he was forced to leave school also because his father had lost money in his business. There is, however, no justification for her to suggest that Teddy hated his father.

3.125 Further it might well be that Nina thought that she could get away from such wild suggestion as Teddy would not be here to contradict her and she might feel secured in making such allegation by relying on the report in the magazine which appeared to be based on an interview with Wang Sr. However, what she would not have anticipated was that Teddy had committed forgery and St. Stephen's College had kept a good record on its students for a long time. She probably did not realize that the depth of love between Wang Sr and Teddy was such that even in 1999, in an interview with the press after the death of Teddy, Wang Sr had not even revealed the infamous but true reason for Teddy's termination of his schooling in order to protect the reputation of his son. Wang Sr was not under oath at the time of the interview. Consequently the report in the magazine that Nina thought was a trump card she was holding in making this accusation, also fell apart.

3.126 The second alleged reason for Teddy's hatred of his father was said to be Wang Sr's affairs with a Madam Cheung. It was said that Teddy loved his mother a lot and hence when he found out that Wang Sr had lived with Madam Cheung he felt offended and hated his father for having another woman.

3.127 However the affairs between Wang Sr and Madam Cheung started before 1959 when Teresa was still living with the family in Hong Kong. It was the time when Teddy's mother, Madam Ruen, had seen fit to make a trip to Taiwan to look for her husband but she came back because of the letter of Teresa complaining about Nina. The existence of Madam Cheung as the girlfriend, mistress or concubine of Wang Sr could not have been unknown to Teddy by late 1950s. At any rate, by about 1965 in the next period he must have known that Wang Sr was living together with Madam Cheung as according to the evidence of Yih, there was an occasion around that time when Yih visited Wang Sr and

 © 2020 Thomson Reuters. 

Madam Cheung at their place and saw Teddy and Nina there. They had a meal together. There was nothing strained or wrong in the relationship between Teddy and Wang Sr.

3.128 Furthermore, during the time when Nina went to Taiwan during 1968 and 1969, Madam Cheung went to Teddy's place to tidy the place and to walk his dog.119 In fact this aspect of the evidence of Yih was not challenged in the 20-days' cross-examination of him.

3.129 Teresa also testified that in 1973 she saw the photograph of Madam Cheung on the desk of Teddy who showed the photograph to her telling her that she was the concubine of their father. Teddy was not offended and confirmed to her that he had met Madam Cheung and had been to her place for meals before.120

3.130 Apart from the solid evidence from Wang Sr, Yih and later Teresa, there is still the most telling piece of evidence from Teddy to show that all these allegations by Nina were false and were simply made up by her. If indeed Teddy disliked or hated Wang Sr for whatever reasons, why should Teddy make the 1960 Will in those terms giving half of his estate to his father and handling over the will to him for safe-keeping? Surely by 1960 if there was any truth in the suggestion that Teddy had resented his father for having had to make him to cease his study and to come out to work to pay off his debts, one would expect that he would feel most resentful in the first few years of his tender age for having to cease schooling right after the start of his academic term in September 1952.

3.131 Yet further in 1968, when he made his second will, the 1968 Will, he gave all his estate to his father. It is also important to note that in either of the two wills, Teddy had not made any provision for his mother. Thus in the end I find all these allegations against Wang Sr were not true or otherwise unsubstantiated at all.

THE CREDIBILITY OF WANG SR

3.132 Even at an advance age of over 90, Wang Sr gave evidence to support his case and presented himself for cross-examination which lasted for some seven full days. The area covered by cross-examination was wide and inquisitive including questions as to whether he had ever told a lie121 and whether he had ever owed any people money. His evidence covered his relationship with his son Teddy and the circumstances leading to the 1968 Will as well.

3.133 In the cross-examination by the defence, all sorts of allegations were made against him, such as his being in debt, imprudence in business and womanizing, etc. Although he did make some mistakes in his evidence, those were due to his confusion on the events or the questions asked of him, or his advanced age. He readily apologized to Nina for taking an unfair view of her, such as in accusing her of opposing to his application for maintenance whilst in fact her solicitors did not actually take part in the proceedings and the letters written were merely by way of observations only. His apology was genuine and prompt even when Counsel for the defence used strong words and accent in the question trying to get an apology from him.

3.134 His Counsel submitted that despite his clumsiness at times in giving evidence, he is a credible witness. I however consider that his clumsiness is, on one hand, much better than most people of his advanced age. On the other hand, this kind of "clumsiness" is a sign of his honesty instead. Some memory really failed him but he was not trying to make up anything. He was actually trying very hard indeed to recall the event and answer the question as honest as he could as in the case of the IOU note in favour of Mr Mau. But he really could not remember what had actually happened in those days. I consider him to be a credible witness.

3.135 The period of the 1960s also ended with a sad note of Yih leaving the Chinchem group. I shall now consider the next period in 1970 leading up to 1990.

1 T110:34:19-24

2 pp.381-382, F1

3 T110:37:5-9

4 p.351 and p.360, F1

5 T110:45:9-14

6 T115:31:2

7 T116:21:24 to 22:4

 © 2020 Thomson Reuters. 

8 T116:22:25

9 T116:24:6-10

10 T116:30:14

11 T116:32:18

12 T116:33:5

13 T116:37:11-14

14 T116:49:13-15

15 T116:49:18

16 T120:56:1-4

17 T120:56:25-57:9

18 T120:59:16

19 pp.3313-3336 and pp.3342-3347, G11

20 pp.3348-3350, G11

21 pp.3351-3369, G11

22 T132:64:9-15

23 T110:47:11

24 T132:63:24

25 para.28, p.288, F26

26 p.1796 and p.1799, G5

27 p.190, F1

28 pp.190-192, F1

29 T5:16:6

30 T110:60-62

31 T110:64:23-65:4

32 p.194, F1

33 T5:21:10

34 pp.29-36, F1

35 p.37, F1

36 p.38, F1

37 p.15, F1

38 In this lengthy judgment, finding of facts would not be made unless it is relevant and necessary. Here these findings of facts are certainly relevant and necessary to explain the 1968 and subsequent acts of Teddy and the consideration of whether the four questioned documents are genuine or forged, including Document D where it was stated "One life one love".

39 T13:6:16-18 and 20-22, all emphasis in all the quotations in this judgment are mine unless otherwise stated.

40 T13:7:15

41 T119:12:5-10 and 19-20, T130:36:17-25

42 T13:30:12-20

43 T13:46:13-22

44 T13:41:3-6

45 pp.193-194, F1

46 T124:20:12-16 and T132:50:9

47 T132:51:16-25

48 p.17, F1

49 para.33, p.289, F26

50 para.35, p.290, F26

51 p.290, p.299 and p.301, F26

52 p.194a, F1

53 p.198, F1 - the lower receipt

54 para.37, p.290, F26

55 p.304 and p.306, F26

56 p.198, F1, the upper receipt.

57 p.295, F26

58 p.296, F26

59 paras.20 and 21, pp.296-297, F26

60 p.63, F1

61 T2:21:19-25

62 T124:17:14-18:6

63 p.157, F1

64 pp.158-168, F1

65 pp.169-170, F1

66 pp.173-177, F1

67 pp.135-137, F1

68 p.135a, F1

69 T111:1:5-2:24

70 T111:19:18-21

71 p.3370, G11

72 T110:65:12 and 66

73 T110:67:23-68:7

74 T111:3:19-22

75 T111:4:15-23

76 T111:6:4-12

77 T111:8:4-12

78 T111:7:15

79 T132:41:8-13

80 T122:36:23

81 T122:40:22-41:15

82 p.356, F1

83 T111:10:11

84 p.430, F1

85 T111:11:6 and T121:67:1-10

86 T122:63:11-15

87 T116:24:16

88 T122:89:16-93

89 T132:22:8

90 p.3257, G11

91 T132:31:5-14

92 T132:30

93 T118:58:10

94 T132:14:10

95 p.3266, G11

96 p.2141, F8

97 T122:50:23-51:4

98 T126:18:2-19:21 and 31:5-35:13

99 p.2113, F7

100 T111:47:16 and at ET at C SEQ

101 T124:24:15-64:16

102 pp.3370-3460, G11

103 p.2113, F7

104 T127:25:25

105 T124:15:22

106 T122:58:4-15

107 T122:60:23-25

108 T126:40:9

109 T126:40:17

110 T127:23:24-24:17 and 47:17-53:20

111 T127:27:7

112 T127:9:19

113 T127:10:19

114 T130:39:23-40:9

115 Ng is the Cantonese pronunciation of Mr Wu's surname ("Chinese text")

116 p.1587, G5

117 [1983] HKLR 124, the facts of this case will not be listed here due to the length of this judgment.

118 p.1627, G5

119 T111:19:2-7

120 T133:59:8-18

121 T8:37:21

Chapter 4 - The Post-1970 Period

4.1 The post-1970 period began after the departure of Yih from the Chinachem in January 1970. It can also be called "the post-Yih period in Chinachem". It is not disputed that Nina thereafter assumed a much more important role in the affairs of Chinachem. It is also not disputed that the relationship between her and Teddy had improved from those incidents which happened in the last decade. However the allegation of her involvement in Chinachem in the 1960s was a deliberate confusion with the important role of Nina in Chinachem only after Yih had left. This can be seen from the line up of witnesses in this trial.

4.2 On the plaintiff's side, there were Wang Sr, Yih and Teresa. All of them in particular Yih said that Nina did not have an active role or specific job description in the Chinachem group. Yih's evidence was only concerned with Nina's role in Chinachem after her marriage in 1955 up to the time Yih had left in January 1970. No one has ever said that Nina did not play any or any important role in Chinachem up to 1990.

4.3 On the defence side, there are the following witnesses, namely:

(a) Mr Donald Cheung who was involved with the Wangs couple before and after the 1968 Will up to the time he himself had a dispute with them in respect of another matter in 1984. His description of this "loving couple" cum business partners was also in the so-called post-Yih period.

(b) Mr Cecil Chao who had business dealings with Chinachem in about 1970 only after Yih had left because he had no recollection of knowing this person, up to mid-1980s.

(c) Mr Alan Kwan who worked for Chinachem between 1972 to mid-1974.

(d) Mr Edwin Cheung who worked for Chinachem between October 1978 and December 1984.

(e) Mr Anthony Cheung, the son of Mr Donald Cheung, is also the godson of the Wangs couple but he was born on 7 February 1961. He was 18 only by 1979. He had said that

there was something between his godparents, which he would not have known because he was still young.

(f) Mr James Ng who worked for the Chase Manhattan Bank in Hong Kong between 1972 and 1986. He was involved in real estate financing and therefore knew the Wangs couple initially through business and later socially for some years. Between 1986 and 1991, he was the CEO of United Savings Bank in California and therefore he had much less contact with them. However from 1991 onwards, he came back to Hong Kong and worked as the Managing Director of First Pacific Bank and since then had more contact with Mrs Wang. In 1993 she in fact became one of the directors of his Bank's holding company. On 1 April 2001, he has become a director of the Chinachem group and also the CEO of e-New Media Company Limited in which Mrs Wang has 34.6% interest up till now.

4.4 Accordingly, all these witnesses called by the defence confirmed my impression that the good and loving relationship between the Wangs couple was only observed by those defence witnesses in the post-Yih period. They were outsiders and not members of the Wangs family.

4.5 The position of Teddy and Nina in the post-Yih period is best sum up by the observation of Mr Cecil Chao called by the defence1:

"Teddy never trusts anybody, but I think if he does not trust Nina, he does not seem to have anybody to trust with, so I think apparently they are working as partners, they trust each other."

4.6 Mr Chao's company Wah Kwong had many joint venture projects with Chinachem until at least the mid-1980s. The Wangs couple gave him the impression that overall both of them were in charge of Chinachem.2 But then he said that Teddy adopted the tactics of saying things like "I would go back to consult my spouse " so as to enable them to have a second thought.3

4.7 Mr Chao did not have the impression of Mr Alan Kwan but he got the impression of Mr Edwin Cheung in Chinachem. It is not surprising because Mr Alan Kwan only worked for a much shorter period in the early 1970s for Chinachem. Mr Kwan might not have more chances of meeting joint venture partners of Chinachem in his short stay in the company, at least not as much as Mr Edwin Cheung who had worked for the company for six solid years. During this longer period, Mr Cheung could have developed a more closer relationship with the Wangs couple and therefore had more exposure to other joint venture partners, like Mr Chao.

4.8 As aforesaid, Mr Donald Cheung said in 1968 there were some problems in the marital relationship of the Wangs couple, and Nina went to San Francisco thereafter. In the later period, they were often together after Nina had returned from San Francisco.

4.9 Mr D. Cheung said, as it has been pointed out hereinbefore, when it came to decision-making, it was ultimately Teddy to make the decision although he would consult his wife and others.4

4.10 Mr Chao also said in evidence-in-chief to the effect that Teddy also liked to attend meeting and meetings were an important part of his life. In fact Teddy attended more meetings with him and Nina only attended some of the meetings.5

4.11 It is fair, therefore, to say that Teddy would not shy away from attending any meetings. He would obviously attend important meetings with his business partners when major decisions would have to be made. As Mr Donald Cheung observed, the kingpin was still Teddy who made the ultimate decision. This view was also supported by Mr Edwin Cheung.

4.12 In respect of the relationship between Teddy and Nina, Mr Edwin Cheung said6:

"I believe if Mrs. Wang was doing something, Mr. Wang would be somewhat monitoring her."

His observation of the ranking between Teddy and Nina must be correct as he was a highly trusted and close employee of Chinachem in this period, save and except Yih in the previous period.

4.13 The next question which both sides in this case would like the Court to consider is whether Teddy had complete and unreserved trust in Nina. I am afraid in dealing with marital relationship, sometimes the position is not as clear as black and white, i.e. whether the answer is positive or negative or even to what degree of trust. Sometimes for some couples,

 © 2020 Thomson Reuters. 

the position is changeable like a weather-cock in the wind in English or in Chinese like the price of fresh seafood which will change everyday.

4.14 The crucial question is whether the trust of Teddy in Nina was so unreserved and complete that when it came to making a will to deal with his properties after his death, the only rational decision he could make was to give all his estate to his wife. Even if he had that intention or desire, for the purposes of argument only, the further question is: whether he had successfully done so before his death when he was having such an intention.

4.15 All witnesses called by the defence are only "outsiders" of this family and to them it might well be that, from their observation, the trust between the two of them was almost total.7 I can accept that to many outsiders, their relationship can be described as good. They appeared to be back to a normal loving couple again.

4.16 However it should be recalled that throughout 1968 and possibly in 1969, he had sent Nina to Taiwan and entrusted her to take care of his investment over there. From the letter of Yih dated 28 March 1968,8 it was clear that Nina had come back from Taiwan the day before. Teddy must have trusted her to represent his interest when she was sent by him to Taiwan. However unknown to outsiders or it might well include Nina also, the solid truth is that, just a few days before that, on 15 March 1968, he had made his 1968 Will depriving Nina of all her inheritance under the 1960 Will. Thus, it supported the contention that, as submitted by the plaintiff's side, the fact that Teddy would entrust Nina to participate in his business or even to act as his deputy in business and live as a loving couple with her, did not mean that he would be prepared to give her his property upon his death. Further, it will be seen later herein, Teddy had instead made a lot of provisions for her throughout his life up to 1990.

4.17 Furthermore, even after Yih had left Chinachem, according to Yih, Teddy was still concerned with some alleged or suspected improper conduct of Nina way back in the years between 1966 to 1968 when he and Nina were living at Yau Yat Lau in Yau Yat Chuen. Yih said in 1974, Teddy still arranged to meet him at a coffee shop in Central with a view of asking Yih to investigate into something he heard from his mother which would suggest that Nina might have some improper relationship with a Mr A when their matrimonial home was at Yau Yat Lau.9 Yih in fact told Teddy that he should not be asking for trouble himself and that Yih did not want to get involved in these matters. This is indicative of the different characters of Yih, being kind and peace-making with that of Teddy who was suspicious and inquisitive to say the least. Meanwhile of course to all outsiders, the Wangs couple had appeared to be an extremely loving couple working and doing business together.

4.18 Further Teddy must have visited the safe deposit box, at least on 22 October 1975 and he must have realized or refreshed his memory that he had the 1968 Will in the box. But he had chosen not to disturb the 1968 Will, although he had ample opportunity to revoke this Will, or to make alteration or an amending codicil to his testamentary disposition. He did not do any of these things even after the apparent improvement of their relationship. To other outsiders, Nina closely assisted him in his business including the high profile appearance in the Diary Farm take-over battle.

PROVISIONS FOR NINA BY TEDDY

4.19 From the various companies searches together with other documents and bank accounts, it is quite clear that Teddy had been providing Nina with either inter vivos gifts or they had agreed, expressly or by necessary implication, on how the assets should be divided or held by each of them. There are a number of matters which are still in litigation between Nina and the administrators and/or Wang Sr himself. However, no matter what view one would take, whether Nina on one side was right in respect of her contention of ownership of certain properties or the administrators and/or Wang Sr on the other side, Nina had been adequately provided with enormous assets either by way of gifts or by way of reward for what she had done in this empire which Teddy and she, and later on she alone had built. I shall state shortly hereinbelow those items of assets.

4.20 On the negative side, in the aforesaid series of actions taken by Teddy in 1968, he had removed Nina as one of the beneficiaries of his estate. He had also caused funds to be cut off from Nina. This was apparent from the other documents he kept in the safe deposit box:

(1) On 19 October 1968, he would not even allow a fund of US$4,686.10 to be paid into Nina's account and had taken the

 © 2020 Thomson Reuters. 

trouble to make sure that the sum would not be paid into her account.10

(2) On 19 February 1968, he stopped payment of two cheques in the sum of US $30,000 and US$47,000 payable to his family.11 In the circumstances of this case and in view of the documents placed amongst the documents relating to the property of Nina in the safe deposit box, it is quite clear that the cheques to his family must mean to her wife.

(3) On 25 June 1968, Nina instructed Hong Kong Bank to close her account in their New York office and to transfer the balance to Teddy.12 This probably was done pursuant to Teddy's request.

(4) On 2 July 1968, Teddy also instructed Messrs F. Zimmern & Co. that Nina's share in the Bellevue Apartment project should be transferred to him.13

(5) On 7 July 1969, Teddy as aforesaid withdrew the authority he had previously given to Nina under the Power of Attorney in her favour and informed Hong Kong Bank of the same.14 There was no evidence that Teddy had ever tried to reactivate her Power of Attorney for and on behalf of Teddy even up to 1990.

(6) On 22 August 1968, Nina also instructed her investment fund company to dispose of her shares and pay the proceeds to Teddy,15 probably at the latter's request.

(7) On top of all these, Teddy also asked Nina for the return of US$10,000 and he endorsed that cheque to Wang Sr instead.16

4.21 However in the later period, Teddy started to make provision to Nina but not by way of testamentary gifts. During this period between 1970 to 1990, Teddy had made generous inter vivos provisions for Nina. In or about 1970 the flagship company of Teddy was CIL. Since about 1965, the majority shareholder of CIL and also CUCCL had always been Christoban. The other shareholders (except Teresa and Yih) merely held shares to be qualified as directors. Of course as a result of the sale of the shares by Yih in 1970, 160 shares in CIL and 100 shares in CUCCL had been transferred to Wang Sr. As for Teresa, she continued to hold 400 shares in CUCCL and 50 shares in CIL. Apparently at the time when Wang Sr asked all his children to transfer the shares to Christoban, Teresa was abroad. At the moment, there is a dispute as to who actually beneficially owned Christoban and this issue is not the subject matter of the present proceedings. Nina contended that Christoban at all times belonged to her beneficially.17

4.22 It is clear from the evidence of Mr Edwin Cheung that since the second half of 1970s, CIL was faded out as a flagship company in the group and instead one Chime Corporation Limited ("Chime") was used as the flagship company. Thus by the 1980s, CIL and CUCCL were no longer the major asset holders within the group. Chime was incorporated on 14 February 1973 with Wang Sr and a Mr Foyn (the expatriate secretary) as the subscribers therefor.18

4.23 A few months afterwards, on 20 July 1973 Mr Foyn transferred his subscriber shares to Teddy.19 Sometime in 1976 or before, the capital in Chime was re-organized by dividing the share capital into A shares and B shares. The issued capital of Chime was then 20,000 A shares of $100 each and 30,000 B shares of $1 each. Chime issued 19,998 A shares to Mr Tai Ching Ping but no B shares were issued. Hence on the face of the record, since at least from 31 December 1976, Chime was owned as to:

(1) 1/20,000 by Wang Sr;

(2) 1/20,000 by Teddy; and

(3) 19,998/20,000 by Tai Ching Ping who was only the accountant of the group.20

4.24 No one suggested that Mr Tai would be holding the majority shares of 19,998 in his own right. In fact it was not maintained by anyone that he held the shares beneficially at all. There is a dispute between the administrators and Nina as to whether Mr Tai held those shares for Teddy or for Nina and again this matter is not a subject issue in these proceedings.

4.25 Nina became a director of Chime in 1977,21 but even by then she did not hold any shares, and subject to the disputed beneficial ownership in the 19,998 A shares held in the name of Mr Tai, she had no interest in the flagship company at all. But of course, if she were right in her contention that all those A shares held by Tai were held for her, then apart from the nominal 1 share, Teddy would have no interest in the flagship company at all at that stage.

4.26 On 27 October 1980 there was another movement in the capital structure of Chime. This time, it has a lot to do with Nina's brother coming to Hong Kong and Teddy wanted to assist him in his immigration by putting assets in his name. On that day Wang Sr's 1 share was transferred to Teddy, but by then Wang Sr had already ceased to be a director of Chime for some time. Teddy and Nina were each allotted 2,000 A shares and 12,000 B shares. Nina's brother Mr Gong Xian Xin ("Chinese text") and his wife were each allotted 3,000 A shares and 3,000 B shares. At the same time, Gong Xian Xin and his wife and also Tai were also made directors.22 Mr Gong is one and the same person as Dr Kung Yan Sum ("Chinese text"). The Shanghainese pronunciation of ("Chinese text") is ("yin ") which is somewhat similar to the Cantonese pronunciation of ("Chinese text "). He changed his name after he came to Hong Kong and passed the licentiate examination for medical practitioner. Again there is an issue as to whether Gong Xian Xin and his wife held their shares in Chime in trust for Teddy or Nina, which is also the subject matter of other proceedings only.

4.27 As to the 19,998 A shares held in the name of Tai Ching Ping, there were some disputes as to whether it had been transferred to Teddy or Nina in 1989. On Nina's case, at the direction of Teddy, those shares were transferred to her by Tai,23 although in an annual return for the year ending 31 December 1989 signed by Teddy and filed in the Company Registry on 30 January 1990, those shares of Tai had became registered in the name of Teddy and not Nina.24

4.28 Sometime in August and September 1990, by three further allotments, Nina was allotted with a further 15,000,000 of B shares in Chime.25 This allotment was challenged by Wang Sr and also the administrators as being a wrongful allotment to dilute Teddy's shareholding. Nina's justification for the act was that Chime owed Chritoban $1.48 billion interest-free loan. The bankers of Chime had expressed concern over the indebtedness of Chime to Christoban because of Chime's small capital. So there was a need to increase the capital of Chime by the issuance of 15,000,000 B shares which she took up at a total premium of $1.5 billion.26 Her explanation had not been accepted by the administrators and there is again currently litigation between Nina and the administrators on this issue.

4.29 In any event on the basis of Nina's version on the various ownership of the shares under dispute in Chime and Christoban (which Wang Sr would not accept as true), it is more than clear that Teddy had in his life time made more than generous provisions for her. This would be so especially if those 19,998 A shares registered in the name of Tai Ching Ping were held in trust for her and Christoban was owned beneficially by her. This would effectively mean that between at least 1976 to 1980, the flagship companies of the group were virtually owned and controlled by Nina according to her version, and Teddy had in fact virtually given her everything and if Teddy were to die there and then, there would be very little left in the estate.

4.30 On Wang Sr's contention of the true position of the beneficial ownership of the shares, then even assuming that Nina is to be found to have no interest at all in Christoban, that would not significantly affect the provision to her because by late 1970s the flagship of the group had already been changed to Chime. Since 1980 on the assumption that Tai's shares and the shares held by Nina's brother and sister-in-law were all held for Teddy, Nina would still have been given 6.67% of the A shares and 40% of the B shares. In terms of voting rights, she would be holding 23.33% of the voting rights in the flagship company.

4.31 It is important to note here that by the 1970s, the Wangs couple must have become seasoned, experienced and sophisticated businessman and businesswoman. They must have known the principles of companies being controlled by the shareholders and directors, although it appeared that they chose to run the companies in a traditional Chinese way.27 It is also important to bear in mind that according to a conservative estimate of Mr Edwin Cheung, by 1980 Chime's worth was already one thousand million or one billion.28

4.32 On top of the equity in the assets held by companies controlled by the flagship company, there are many other companies holding valuable assets to which Nina and Teddy were holding equal shares. The long list of such companies in five pages was made out and produced by the defence.29

4.33 Furthermore on top of the aforesaid valuable assets, there were numerous joint accounts opened by Teddy and Nina where Nina would have a right of survivorship. Nina had disclosed only some of them.30 According to Mr Edwin Cheung, the main deposits were in their joint accounts, and

 © 2020 Thomson Reuters. 

they held such accounts in the Bank of Canton, Continental Illinois Bank, West LB Asia Ltd, and Chase Manhattan Bank.31

4.34 On the first occasion of the kidnap in 1983, there was no difficulty in drawing out $75 million from their joint accounts and facilities by Nina.32 Again in 1990 when Teddy was kidnapped for the second time, Nina had no difficulty whatsoever in raising the princely ransom monies. The Chinachem group as aforesaid was well known to be cash rich in those days and the only major property developer doing its business on cash basis.

4.35 From the schedule of properties that the administrators were able to ascertain there was only one bank account with the Bank of Canton in Teddy's name, thus indicating that most of the bank accounts of Teddy in Hong Kong were joint accounts so that the balance would be subject to the law of survivorship and would not form part of the estate.33 This would also mean that the other account holder being Nina, Nina would have all the monies therein by operation of law.

4.36 Accordingly during the lifetime of Teddy, he had already made adequate provisions for Nina. Upon his sudden death, there could be no great problem for Nina to continue with the business as she had been made directors and shareholders of the major companies. Consequently, it can be safely inferred that Teddy would probably feel that even if all the shares of him were left to Wang Sr, as the latter got older, it would be increasingly unlikely that he would physically interfere with the running of the companies which he had not done for many years since about 1965. The brothers and sisters of Teddy had shown no interest in the business of Chinachem whatsoever. Teddy had also put Nina into a comfortable position so far as cash is concerned.

4.37 Further it is not the case that Teddy could have forgotten about this 1968 Will. First, as it had been pointed out earlier, he must have been reminded of it in October 1975 when he went to open the safe deposit box. Then the occasion in 1985 when on behalf of Messrs F. Zimmern & Co., Deacons offered to return his copy Will, by a letter addressed to his solicitors Messrs Ip, Ku & Stoppa. Thus he must be reminded of the 1968 Will again by them. The inter vivos provisions for Nina and also the fact that Teddy had left his 1968 Will unchanged for so many years are strong factors indicating that his good relationship with Nina did not mean that he would have made any further testamentary provision for her. Even if he had that intention, it does not mean that he had successfully done so. Of course whether he had successfully done so in the context of this case must be meticulously scrutinized. In the end, it is fair to conclude that the improved good relationship and generous inter vivos provisions would only indicate that Teddy would like to benefit Nina by inter vivos provisions only and not by testamentary provisions.

THE ABORTED TRUST ARRANGEMENT RIGHT UP TO SHORTLY BEFORE TEDDY'S KIDNAP

4.38 Nina had given discovery of some documents relating to some tax avoidance arrangements involving the use of trust. There was no evidence adduced to show how exactly these documents fitted into the financial arrangements of Teddy and certainly no relevant evidence was adduced to show any relationship between those documents and the testamentary intention of Teddy.

4.39 The plaintiff's stance is that the defence in this action had not given full discovery of all the relevant documents. In fact in her various lists of documents up to and including her 12th list of documents filed on 16 April 2002, Nina had deliberately left out the standard paragraph 5 designed to state that the list disclosed is exhaustive. The form of the list and the wordings are prescribed by Order 24, rule 5 and there could hardly be any excuse for excising these all-important paragraphs from the lists.

4.40 When this irregularity was discovered and pointed out, the excuse put forward by her was that when the earlier lists were filed, things were done in a hurry and the defendant's solicitors could not feel that they could advise their client to include the statutory paragraph 5 into the list and subsequently the lists filed were based on the same format.34

4.41 However, the explanation was both lame and disingenuous. When Nina took the liberty of filling up to the 6th list on Day 5 of the hearing, the plaintiff applied for an order that the defendant should verify her list and in particular that the list was exhaustive.35

4.42 The defendant did not oppose to this application and the Court made an order for the lists to be verified as well as an explanation to be given for the late discovery. The defendant then asked for an extra day over and above the

 © 2020 Thomson Reuters. 

weekend to prepare the affidavit in order to deal with the matter properly.36 The form and content of an affidavit to verify the lists are again prescribed by Order 24, rule 5, Form 27 and in relation to paragraph 5 of the list, it would require the deponent to state that the statement in paragraph 5 of the list was made to the best of the deponent's knowledge, information and belief. It is thus clear that in making the affidavit in purported compliance with the Court's order, the defendant must have been made aware that the all-important paragraph 5 of the list was missing.

4.43 However, to fudge the issue, the defendant took the unusual course of just following the statutory form of the affidavit in relation to paragraphs 1 to 4 only again.37 Thereafter, the defendant filed the 7th to 12th lists all in the same form without stating that the list was exhaustive. Eventually when the irregularity was discovered, the defendant had filed an affirmation rectifying the defect. However, in the circumstances of this case, the affirmation could not be taken on its face value. Moreover, throughout this trial there were many instances of the defendant's deliberately withholding discovery of the relevant materials and only producing documents which she thought would advance her case but not those which would support the case of the plaintiff. Some of the documents were only produced in cross-examination of the plaintiff's witnesses. Since the defendant did not give evidence, there was no opportunity for the plaintiff to cross-examine her on her discovery at all.

4.44 Even assuming those documents disclosed by Nina in respect of their intended trust arrangement were exhaustive, it could be seen that the documents fell into two periods. The first related to the year of 1987 between July and August.38 This related to some discussions with one Mr William Lam relating to the use of a Canadian Trust Corporation to hold assets. There was nothing in any of the documents to record any intention on testamentary disposition on the part of anyone, let alone Teddy. The document at G1-151 expressly stated that "estate duty aspect is also to be considered" but there was nothing to indicate that this was ever considered. It appeared that apart from Nina and this Mr William Lam, Nina's then solicitor, Mr Fred Kan was also actively involved. Even if Nina decided not to give evidence herself for whatever reason, there is no reason why she could not call Mr Fred Kan to explain the arrangements then.

4.45 The second batch of documents spread from 7 August 1989 to March 1990.39 This period coincided with the time after 4 June 1989, i.e. the Tiananmen Square incident which had affected severely the confidence of the Hong Kong people most at that time. As one can see the enthusiasm dropped very quickly. Apart from a statement in the letter of 7 August 1989 where Mr Trace of Private Capital (Asia) Ltd recorded his first reaction in a meeting with the Wangs, there was absolutely nothing in these documents to touch on any inheritance or testamentary disposition of anyone at all. The only relevant statement in the letter of 7 August 1989, was that apparently the Wangs were concerned that there were no family dependants to inherit their wealth. Their concern was not anything like testamentary disposition or making provision for the saving of estate duty. This concern was where to put away their assets in other jurisdiction in order to get the best tax advantage. Assuming that Teddy had told Mr Trace that he had no family dependants to inherit his estate, Teddy might well have been asking Mr Trace to design a scheme in the future and Teddy would probably anticipate that by the time when the scheme was implemented, Wang Sr being his old father would have pre-deceased him.

4.46 These documents dealt with inter vivos arrangement of ownership of assets. It was stated in the basic assumption that the ultimate beneficial owners of the property subject to the arrangement would be Teddy and Nina themselves.40 The arrangement is therefore wholly irrelevant to the issues in the present case. The assets which could be put to the arrangement were assets belonging to Teddy and Nina. What it meant was that there was not to be any trust in favour of anyone else. This had nothing to do with the testamentary disposition made by Teddy to Nina or vice versa. Furthermore, the scheme being suggested would appear to be flexible enough to enable a trust to be set up by Teddy to benefit Nina and others and vice versa. The only limitation for each trust was that the settler should not benefit from the trust he/she had set up.41 In any event, all these ideas of having some sort of tax arrangements do not even begin to show that there was any change of the testamentary intention on the part of Teddy. These 1989 documents do also show that Teddy was a cautious person and he was not slow at all in employing the service of his lawyers. Hence, even though he was being advised by professional people in the area of tax avoidance, he still sought advice from his own solicitors when the idea was really at a very preliminary stage.

 © 2020 Thomson Reuters. 

4.47 Even if, for the purpose of argument, it could be said that the various contacts with the tax advisers would indicate that Teddy had contemplated leaving his estate to Nina rather than to Wang Sr, it seems that Teddy thought there was still really no hurry for him to do so. He must have realized that as time went by since the making of his will in 1968, the chances of his father being directly benefited under his will would be getting increasingly smaller as Wang Sr was going into an advanced age, whilst he himself was still in good health regularly doing exercise. The natural thing to do was either to go on with the discussion with the tax advisers to work out a scheme or to go to a solicitor firm to have a properly drawn-up will.

4.48 In any event, there was no explanation as to why Nina suddenly called off all further actions of their professional advisers by a letter dated 15 February 1990, just shortly before the date on the 1990 Documents.42 Instead Nina alleged that Teddy had made a homemade will in 1990 which, by implication, must have revoked the 1968 Will. Would Teddy have done that after all these world-class and world-wide professional advisers were consulted? Would he have opted to make a homemade will instead with the assistance of the two mysterious Mr X and Mr Y (as it will be apparent in Section II herein that Document A was written by one person and Documents B and C by another person), and his domestic servant was asked to witness his signature instead of having a proper will drafted by a solicitor and witnessed by two solicitors who would be bound by their professional ethics of confidentiality? There are other suspicious circumstances which I will consider in the next chapter surrounding the 1990 documents. But before I do it is convenient to sum up the credibility of one key witness who has testified on those facts which had happened in this period. I have already done so for the plaintiff Wang Sr and Yih in the previous chapter. I shall deal with the credibility of Teresa Wang here.

THE CREDIBILITY OF TERESA

4.49 Teresa lived with Teddy in Hong Kong until she departed to the States for her studies in 1959. Thus she was not in Hong Kong in the crucial period of the 1960s, 1970s and 1980s. Being the eldest among all the younger siblings of Teddy, she was closest to Teddy. It is very clear from her evidence or the way she gave evidence that she has a strong siblings relationship with her elder brother, for whom she has very high respect and regard. She testified on the good relationship between Teddy and his siblings when they were young. Certainly the good relationship between her and Teddy was maintained even after her departure to the States. She met Teddy on holidays and at least on two occasions when her husband was not with her for the holidays, she stayed with Teddy and Nina in the same hotel room. This piece of evidence was led to show that Teddy was not a romantic person.

4.50 She also testified on the good relationship between Teddy and his parents and rebutted the allegation that Teddy hated his father because of his relation with Madam Cheung.

4.51 Although she did not stay together with Teddy for a long period of time since her departure in 1959, she came back to Hong Kong every now and then to visit her parents and she saw Teddy and Nina whilst they were in the States for holiday and/or for Teddy's regular medical checkup over there. Thus she was in a position to make a good observation on the character and disposition of Teddy and the relationship between Teddy and Nina. Many of her observation were in fact supported by other evidence. Based on her observation of the character and disposition of Teddy, she considered that it would be unlikely that Teddy would have made a will in the form of the four questioned documents. However, such piece of evidence could not be just taken on its face value. Whether the four questioned documents were made by Teddy should be considered carefully in light of other pieces of evidence beside the handwriting and ink-dating evidence. Thus this Court will not just accept her opinion unless it was also supported by other strong and cogent facts which will be discussed in more detail in the next chapter concerning suspicious circumstances.

4.52 However, her relationship with Nina obviously had gone worse since the disappearance of Teddy in 1990, and she was certainly very upset with the treatment which her parents, especially her mother received from Nina. Consequently she had strong and sometimes impulsive temper in respect of her comment about Nina. Suffice it for me to say that her views about Nina were tainted with one of the figures of speech and that is exaggeration. This case could not be decided on whether those negative criticisms of Nina by her were true or not. However certainly on the most important aspect of her evidence, namely the character and disposition of Teddy, her evidence was well supported by other witnesses or documents.

4.53 Further her evidence on Nina's writing was again unchallenged in that it was never put or suggested to her that it was not the handwriting of Nina. That was in relation to the sample handwriting of Nina. Although she had been cross-examined on those documents, it is clear that the two samples provided by her, namely the copy draft authorisation letter which contained Nina's handwriting in her letter addressed to Teresa and the Fotomax photo holder which contained also Nina's letter addressed also to her.43 In this respect, it should be noted that despite the long cross-examination of 14 days, it has never been suggested to her that those two items were not sent to her in the circumstances she said in her evidence, nor had it been suggested to her that those two items did not bear Nina's handwriting.

4.54 I consider Teresa a credible witness in those areas concerning the Wangs family in the early years and the character and disposition of Teddy. I do not intend to decide on the other areas in particular her opinion about Nina as to what kind of woman she is.

4.55 This period also ended with a sad note and that was the disappearance of Teddy on 10 April 1990. However one outstanding question remains and that is: did Teddy sign on the four questioned documents on 12 March 1990 or at all before he disappeared? I shall consider this question by referring to all the suspicious circumstances in the next chapter.

1 T158:21:15

2 T158:20:19

3 T158:8:17-22

4 T13:46:18

5 T158:16:1-18

6 T159:34:1-22

7 per Mr Alan Kwan at T164:27:24-28:11

8 p.3370, G11

9 T123:29:24-31:17, T132:74:6-80:12 and 82:16-20 (in camera)

10 pp.12-14, F1

11 pp.18-23, F1

12 p.29, F1

13 para.1, p.35 and p.37, F1

14 p.15, F1

15 p.38, F1

16 pp.188-189, F1

17 para.18, p.317, F26

18 p.391, F1

19 p.397, F1

20 pp.400-402 and p.404, F1

21 p.407, F1

22 pp.410 and 411, F1

23 para.38, p.322, F26

24 pp.417-420, F26A(2)

25 p.422, F26A(2)

26 pp.316-321, F26

27 T159:76:2

28 T160:11:13-21

29 pp.1894-1898, G6

30 pp.1608-1623, G5

31 T159:35:3-9

32 T159:36:19-23

33 p.2241, F8

34 T133:13:2-25

35 T5:74:5

36 T5:83:8-15

37 para.2, p.37, B

38 pp.151-155, G1

39 pp.181-224, G1

40 p.184, G1

41 para.5, p.212, G1

42 p.217, G1

43 DPH 671 and 673

Chapter 5 - Suspicious Circumstances

5.1 In respect of "suspicious circumstances" raised by the plaintiff, there were severe, lengthy and voluminous arguments made in the submissions of Counsel on both sides. They concerned with pleading as to whether lack of knowledge and approval of Wang in respect of the 1990 Will was ever pleaded pursuant to Order 76, rule 9 and burden of proof.

5.2 I consider that all these arguments were unnecessary in this case including the argument on burden of proof. The case before me is simply this: The defendant in her counterclaim relied on the 1990 Documents as the last will of Wang. The plaintiff on the contrary pleaded that these documents were nothing but forged documents. In other words it is not a case of just lack of knowledge and approval of the testator in signing the documents which happened to be a testamentary document. It is an outright attack on the Documents that they were not the testator's testamentary documents at all and ex hypothesi the testator certainly would have no knowledge and approval of the Documents in question. Thus all these suspicious circumstances, to my mind, were raised to support the plaintiff's contention that the 1990 Documents were all forged.

5.3 In the course of the arguments on the last day of the hearing for Counsel's oral speeches on 15 October 2002, Counsel for the defence would accept such an analysis of the pleadings and the way the plaintiff's case was conducted, whereas the plaintiff's Counsel did not accept such an analysis and submitted that these points of suspicious circumstances would support a separate and distinct case of lack of knowledge and approval over and above or at least collateral with the plaintiff's allegation of forgery. I think Counsel for the plaintiff are wrong.

5.4 In other words, after defendant counterclaimed on the ground of 1990 Will of Wang, and propounded the same to be admitted in probate, the plaintiff pleaded in his Reply and Defence to Counterclaim and contended that these documents were not made by Wang and the purported signatures of him and Tse were forged. Assuming neither the plaintiff nor the defendant has any evidence in handwriting and/or ink dating concerning those four questioned documents, the question is: Has the defendant discharged the burden of dispelling all the suspicions aroused in the Court that the 1990 Documents were the testamentary script of the deceased?

5.5 Even if I am wrong in the burden of dispelling the suspicions on the defendant herein, the question still is: Has the plaintiff discharged the burden of proving that the 1990 Documents were forged documents by reason of those suspicious circumstances aroused in the Court?

5.6 I do not intend to consider all the voluminous authorities cited to me. I shall restrict myself to two cases cited. The first is Fuller v. Strum [2002] 2 All ER 87.

5.7 In that case the court was concerned with the additional sentences handwritten at the end of the will of the testator as follows:

"... I HAVE BEEN THINKING OF LEAVING THE RESIDUE OF MY ESTATE TO CHARITY, AND NOT TO MY ADOPTED SON GEOFFREY [I.E. THE DEFENDANT THEREIN]. IN ALL THE YEARS I NURSED MY WIFE, HIS MOTHER, HE NEVER ONCE RAISED A FINGER TO HELP ME. I WILL NEVER FORGET OR FORGIVE THAT ON LEAVING THE HOSPITAL WHERE HIS

MOTHER HAD JUST DIED, HE SAID TO ME, 'MUM SAID YOU SHOULD SELL THE HOUSE AND GIVE ME HALF THE MONEY.' I HATE HIM LIKE POISON, THAT IRISH BASTARD. HOWEVER, ON REFLECTION I DO GIVE AND BEQUEATH, AFTER PAYMENT OF ALL TESTAMENTARY EXPENSES AND ALL TAXES, THE RESIDUE OF MY ESTATE UNTO GEOFFREY STRUM, ALBEIT VERY GRUDGINGLY."

5.8 Deputy Judge Jules Sher QC pronounced only for the validity of part of the will and not the aforesaid part to Geoffrey the defendant, because of the "doctrine" called "righteousness of the transaction". However the Court of Appeal reversed the Deputy Judge's decision. It was held in the Court of Appeal that:

"Where a will had been duly executed by a deceased of testamentary capacity who knew that he was making a will and was shown to have known and approved of a specific part of that will, the court had to consider how real was the possibility that the deceased had not known and approved of the remainder of the will. That required a careful examination of all the circumstances, including the directions and dispositions of the will, but the circumstances in which it would be proper to find such a curate's egg of a will were likely to be rare. It would certainly not be proper for the court to pronounce against part of a will as a means of expressing its disapproval of the propounder. Although the doctrine of 'the righteousness of the transaction' was a salutary one, the phrase itself, redolent of morality, was unfortunate. It was not to be taken by the court as a licence to refuse probate to a document of which it disapproved, whether the disapproval stemmed from the circumstances in which the document had been executed or from its contents. There was no overriding requirement morality. What was involved was simply the satisfaction of the test of knowledge and approval, but the court insisted that, given the suspicion aroused, it had to be the more clearly shown that the deceased knew and approved the contents of the will so that the suspicion was dispelled. Suspicion could be aroused in varying degrees, depending on the circumstances, and what was needed to dispel the suspicion would vary accordingly. The standard of proof, however, was always the normal civil standard, ie satisfaction on the preponderance or balance of probability. In the instant case, the level of suspicion aroused was at the lower end of the scale, and it was simply incredible that the testator had never at any time read the will or understood its contents. It followed that F [being the executor named in the aforesaid will and the plaintiff therein] had discharged the burden of dispelling the suspicion aroused in the court, and accordingly his appeal would be allowed."

5.9 The second case cited is In The Estate of Fuld, Decd (No.3), Hartley v. Fuld [1968] PD 675. The case was tried for about 92 days and judgment was passed by one of the great jurists in England, Scarman J (as he then was) three months later. The facts of the case are quite different from the case before me involving German, English and Canadian connections. I do not intend to repeat them here. However, some of the observations and decisions of Scarman J therein are very useful. He decided that the phrase of "knowledge and approval" was not part of the substantive law and that was only a rule of evidence. He said at page 697D-698B:

" The English rule of knowledge and approval has been considered most recently by the House of Lords in Wintle v Nye. The headnote in the report is instructive because it suggests two significant features of the rule: (1) That there are circumstances, e.g., a professional relationship, in which English law places an exceptionally heavy burden on a party to establish knowledge and approval; (2) In cases where the burden is imposed the court is to be vigilant and jealous in scrutinising all the circumstances. The headnote therefore lends colour to the view that the rule is part of the law of evidence.

In my opinion, the whole point of the rule is evidential; it is concerned with the approach required of the court to the evidence submitted for its consideration. In the ordinary case proof of testamentary capacity and due execution suffices to establish knowledge and approval, but in certain circumstances the court is to require further affirmative evidence. The character of the rule as evidential emerges clearly from the speeches of Lord Simonds and Lord Reid. Both their Lordships relied strongly on the classical statement of the rule to be found in the judgment of Parke B. in Barry v Butlin.

I shall deal under the heading of the second codicil with the scope of the rule to be found in Barry v Butlin and Wintle v Nye. It is sufficient now to indicate that it is a rule which in certain cases requires of the court vigilant care and circumspection in investigating the facts of a case. It is a rule which calls upon the court not to grant probate without full

 © 2020 Thomson Reuters. 

and entire satisfaction that the instrument did express the real intentions of the deceased."

Further at page 712D-F, he further said:

" ... I would have expected the law to require the court to exercise the scrutiny whenever a case revealed reasonable grounds for suspicion. But fortunately, there is authority. In Tyrrell v. Painton, the Court of Appeal held that the rule throwing upon the party propounding a will the burden of showing that it expresses the true will of the deceased is not confined to cases where the will is prepared by a person taking a benefit under it. The weight of the burden will, I readily accept, vary with the weight of the suspicion to be dispelled: but in a matter as vital as this the law wears no cramping strait-jacket. The court's vigilance is called for whenever circumstances reasonably excite suspicion."

5.10 At page 714E, Scarman J said:

"The truth, however, as to the mother's part in the creation of the second codicil eludes me: I cannot trust Dr. Tarnesby, and the mother has not given evidence. When all is dark, it is dangerous for a court to claim that it can see the light. The mystery remains, and the positive case against her fails."

and at page 716 B-C:

"... The court must not allow itself to be led to conclusions upon the strength of presumptions - in blinkers, as it were. When circumstances put it upon the inquiry, as they assuredly do here, the judicial conscience must be satisfied before the instrument can be admitted to probate: Tyrrell v. Painton. In my judgment Dr. Tarnesby has failed to prove that the third codicil was a true last testament of a free and capable testator."

5.11 In light of the aforesaid two cases, and applying those legal principles as therein decided, the first question in this case is:

What are the suspicious circumstances which I find to be suspicious basing on those facts I found to be true.

The second question is therefore:

With all these suspicious circumstances whether I am satisfied that the defendant has dispelled all these suspicious circumstances hovering over the 1990 Documents before they were admitted to probate.

Alternatively, whether those suspicious circumstances would enable me to say that it is highly probable that the 1990 Documents are just forged documents. I shall consider those suspicious circumstances one by one hereinbelow.

SUSPICIOUS CIRCUMSTANCES I - NO REASON TO CHANGE INTENTION

5.12 From the evidence in support of those facts which I found to be true in the early years in Chapter 2 herein, there is no doubt that Teddy made his fortune because of the business he took over from his father. He was first conducting the business of CUCCL that concerned with importing chemicals and medicine, which then branched into the plastic business. From the profit of the plastic business, CIL was set up to conduct property development business and thereafter he made his fortune from the Chinachem group which has grown into a big empire since then.

5.13 In his previous two Wills of 1960 and 1968, his father was at first made a major beneficiary and thereafter the sole beneficiary respectively. In neither of these two Wills did he provide anything for his mother at all. It does not mean that he did not love his mother. He must have thought that his mother would be well taken care of by his father and when he was old, her children. He proved to be right in that there is evidence to suggest that his father did take care of his mother in spite of the fact that since the 1960s he lived with another woman, Madam Cheung. Thereafter, Wang Sr became quite old and required the care of Madam Cheung instead. His mother has since then been taken care of by her children and their spouses. Basically it was Tak Hwa or mainly her husband, i.e. the son-in-law of Madam Ruen, who has retired some time ago. Teresa said they eventually did not even ask Chinachem to foot Madam Ruen's medical bills because they found it to be very troublesome bordering on refusal. However, I think it is fair to add here that when Madam Ruen was admitted to hospital, a senior officer of Chinachem had made sure that she would be admitted to the first class ward. No doubt that was at the instructions of Nina. Teresa herself also came back to Hong Kong more often than before in order to take care of her mother.

 © 2020 Thomson Reuters. 

5.14 The evidence also supported the fact that Teddy always had a deep gratitude and respect for his father for what he had provided to him especially at his tender age.

5.15 Further as aforesaid, his father had protected him by keeping the secret of his expulsion from St. Stephen's College in 1952 for a long time even within the Wangs family. On the other hand, 16 years later in 1968 Teddy shifted the responsibility of probing into the affairs of Nina from his father to his cousin Yih. There are other instances of the thoughtful arrangement made by Teddy when Wang Sr travelled to the U.S. Usually these are nearly nothing for a tycoon but not for Teddy. Teddy himself was very fugal that he always travelled in economy class himself. When he once travelled in the business class, he expressed his joyful experience to his godson Anthony. All these illustrated the very close and loving relationship between the father and the son and also the fact that he was extremely careful with his money.

5.16 Further Teddy could not have forgotten about his 1968 Will since he made it, because as aforesaid, at least in 1975 and 1985, he was reminded of it.

5.17 It is significant to note that even in 1983 when he was first kidnapped and released with the effort of Nina, he did not think it fit to change this Will to make testamentary provision for her there and then. Thus, I cannot accept the submission from the defence that the incident of his fall from the horse on 10 March 1990 will trigger off a series of actions for Teddy to change his 1968 Will.

5.18 In any event, I find Dr Kung's evidence suggesting that the fall was very serious, is not true. I do not however find Anthony to be lying deliberately when he said that even by 1 April 1990 when he met Teddy for meal, Teddy was still having a bandage on his head and showed to various people a blood stained shirt.1 I prefer the evidence of Mr Edwin Cheung who said that Teddy attended the land auction on 23 March 1990 and succeeded in bidding a piece of land in conjunction with the Sino group. This was supported by documents.2 When he met Teddy in the auction, he could observe nothing wrong with him and certainly Teddy did not wear any bandage.3 Teresa's long distance telephone conversation with Teddy shortly after his discharge from the hospital also revealed that there was nothing serious.

5.19 Further, it was not the first time Teddy fell from a horse and he had definitely fallen before, according to Anthony. Anthony also said that Teddy was keen to convince people that his fall was really a minor thing.4 Thus my impression is Anthony was probably confused or otherwise could not remember clearly the condition of Teddy in this incident which happened 12 years ago. Further, Teddy was examined by doctors in the Queen Mary Hospital and later by Dr Wu in the St. Paul's Hospital. Neither of the two teams of doctor had found anything wrong or serious with him. I find that it could not be a case that he became suddenly worried about his life so as to make him to change his previous will hastily. Further or alternatively, even if he became suddenly worried about his life, he would not have changed his will just because of that which was much less traumatic as the kidnap in 1983. Besides Nina had been adequately and substantially provided for throughout all these years as pointed out in the last chapter. These provisions represented one substantial part of the earnings from the Chinachem group. Why in 1990 should Teddy suddenly change his will to give the remaining part representing his estate also to Nina instead of his father?

SUSPICIOUS CIRCUMSTANCES II - WHY A HOME-MADE WILL?

5.20 Both the 1960 and 1968 Wills were properly drawn up and witnessed by solicitors. Teddy was never slow in using services of solicitors and they were never slow in serving him. He was physically surrounded by firms of solicitors in his own headquarter, the Chinachem Building. They were his usual solicitors.

5.21 For instance, even in the very preliminary stage of some discussion on some tax planning scheme when he was being advised by experts, he would also, as a matter of prudence, use the service of his own solicitors, Messrs Woo, Kwan, Lee & Lo. There was really no reason whatsoever for him not to use the service of his solicitors when making his will. This will would have a very drastic effect because he would have revoked the beneficial interest of his father and everything would be given to his wife instead.

5.22 On the other hand, all the provisions of his 1990 "Will" are very simple. He must have realized from his experience of his 1968 Will that it would only take a few minutes for such a will to be drawn up and with the assistance of computer or word processor in 1990, the document could

 © 2020 Thomson Reuters. 

be engrossed even much faster. He had his usual firm of solicitors, Messrs Ip, Ku & Stoppa at that time just on the floor below.5 The then modern word processing power of computer or word processor could turn up precedents for adaptations at a much quicker speed and neater in presentation if his solicitors were instructed than to have someone writing out the four questioned documents. In fact the suggestion that he would not use his solicitors in such circumstances is totally out of his character. Mr Cecil Chao described Teddy as a good, sharp, prudent, and very careful businessman. When Mr Chao was asked whether Teddy was a careful person over documentations he said that he thought he should be, since he had all the lawyers working for him he would be very careful with all documents.6 Yih also said that Teddy would ask lawyers to be the attesting witnesses. Even witnesses called by the defence on Teddy's general attitude and requirement on documentations, none of them had the audacity to suggest that he believed that Teddy would fancy a home-made will, such as the four questioned documents in this case.

5.23 It has already been pointed out earlier that one of the most unexplainable questions is why Teddy asked two persons whose identity was unknown, Mr X and Mr Y, to write out Documents A, and then B and C. As a businessman he must realize the importance of making clear provisions and instructions in order to ensure that there should be no dispute in the future. Yih explained that Teddy "attached great importance to legal requirements" and would not have asked two laymen to be the attesting witnesses to his will.7 I accept that must be true for Teddy. Even assuming that he did change his mind over who should benefit from his estate, surely he would also want to make sure that there could be no dispute as to his intention to benefit his wife.

5.24 By adopting the home-made will while all his previous wills were made solemnly and formally in solicitor firms, he must have realized that it would really be asking for troubles which he could easily avoid. If he had made his 1990 Will in a solicitor's firm, or otherwise through the assistance of solicitors with their attestation to his signature, at least this litigation before me could be avoided. I must say that this act of having a home-made will would be totally out of character for Teddy.

5.25 In this respect, Dr Kung was called to support the notion that Teddy had made some home-made wills before. He testified that on two occasions at about Chinese New Year time in 1984 and 1985 when Teddy and Nina went on holidays to the U.S taking North West Airlines, he was given sealed envelopes. It was said that those envelopes probably contained the wills of Teddy and/or Nina. He said that either one of them told him, while he was driving the Wangs couple to the airport, to the effect that there was a will and key inside the envelope. If any of the two of them did not come back after the trip (meaning if something untoward happened to them) he should open the envelope. Inside the envelope it was written as to what he should do and he should do this and that. He could not say whether there was one will or two wills inside the envelope.8

5.26 However he further testified that, in the second half of 1997, he spoke to Nina about some reporting in the newspaper that it was reported that Teddy had no will. Dr Kung then reminded Nina that there were at least two occasions that he was given a will and she could have this will propounded.9 It is important to note that Dr Kung agreed that even on this occasion, Nina did not tell him that she was also in possession of an envelope which was given to her a month before Teddy's disappearance in 1990.10 His evidence was that since the blackmail case which was reported in the newspaper in about April 2001, he saw the contents of the 1990 Will published for the first time.11 He then spoke to Nina again and mentioned about the two envelopes he was given on the aforesaid two occasions in 1984 and 1985 and he asked Nina where they were.12 He said that Nina's answer was that they were torn.

5.27 In Dr Kung's first witness statement on 9 January 2001, there was no mention about the holiday wills. He said that by then he was still unaware of Nina's contention that there was supposed to be a 1990 Will. He then made a second statement on 28 July 2001 mentioning about being handed the envelope containing the holiday will on at least two occasions without any year or time frame. He claimed in cross-examination that the person taking the statement from him did not ask him about the time when this was supposed to happen.13 This is again incredible. It is also significant to note that Dr Kung said the two of them were probably going to the States for Teddy's check-up. Although Teddy used to have his check-up there, he just did not go there in 1985 (but only in 1984 and 1986) as revealed only later on after Dr Kung's evidence by Mayo Clinic's letter dated 2 July 2002.

5.28 When Nina made her affirmation on 16 January 1998 as her affirmation of Testamentary Scripts in HCAP No.6

 © 2020 Thomson Reuters. 

of 1997, she made no mention about the will supposedly handed to Dr Kung in 1984 and 1985. By then she should have been reminded by Dr Kung already in the latter part of 1997 concerning the two home-made wills of 1984 and 1985.

5.29 Even in the affirmation of Testamentary Scripts filed on 18 November 199914 herein, Nina did not mention about the home-made wills given to Dr Kung in 1984 and 1985. Instead she mentioned about the home-made wills allegedly given to Ng Shung Mo between about 1985 and 1989 and a will given to Andrew Wong in or about 1988 or 1989 before Teddy went on holiday. Thus the original version in effect was from 1984 right up to 1989, Teddy had been in the habit of making home-made wills right up to 1989, i.e. the very year before 1990 in which the questioned home-made will was made.

5.30 Neither Andrew Wong nor Ng Shung Mo was called to give evidence in this respect in this case at all. There is no explanation for this material discrepancy in that Nina never mentioned anything about the home-made will given to Dr Kung on these two occasions.

5.31 Andrew Wong was a member of the auditor firm acting for Chinachem group.15 Ng Shung Mo was and still is an employee of the defendant. There could be no difficulty in calling either of them.

5.32 In the end, I find this whole business of Teddy having made a "will" which was put in a sealed envelope and left with someone while he went on holiday is a complete fabrication by Nina and Dr Kung and also those who were prepared to collaborate with her.

5.33 In any event, Dr Kung has never seen those alleged holiday wills. Whether there was one or two such "wills" on each occasion is not known, and whether they were proper wills containing testamentary disposition again no one knows. But the circumstances as described by him would suggest that both Teddy and Nina would have known the contents thereof or at least its existence as this conversation was said by either one of them in the presence of the other. Yet Nina did not say earlier about Dr Kung's version of the holiday wills at all not to mention the contents thereof.

5.34 In the end, I accept the plaintiff's submission that this whole episode of holiday wills in the evidence of Dr Kung is a complete fabrication and should be ignored. But the suspicion still lingers on and that is: Why would Teddy suddenly make a home-made will and with the assistance of at least four persons: Mr X, Mr Y, Mr Tse, and Mr K.S. Lee? Who are these Mr X and Mr Y? Why should Teddy ask two different persons to write out all these contents for him when he was perfectly capable of writing them himself?

5.35 Teddy was such a secretive person and he did not want other people to know his personal affairs. Why should he allow or request two strangers to write out his will who were not solicitors who would otherwise have advised him to make a proper will in English? Why should Teddy allow two persons, whose identity are still unknown, to know the contents of his last will which was highly confidential and sensitive when he did not even allow Nina, the intended beneficiary, to know the contents when, according to Nina, she was only given the sealed envelope and she did not even know the contents thereof? As described by Mr Yih,16 Teddy would not allow other persons to know about his personal matter. In the words of Yih, it would be impossible that Teddy would want two persons to know the contents of his will.

5.36 The contents of these three documents at least also disclosed his personal sentiment for Nina, and against the Wangs and Kungs family why would Teddy allow other persons to know his strong sentiments as contained in the 1990 Documents? Further why should Teddy ask his butler in his house and cum messenger in his company to be the witness? Why Teddy did not ask the two writers of his will to attest to his signature or other more senior and trusted staff in Chinachem who should have been the more suitable candidate? After all, Teddy should have known that if there should be any dispute on whether Teddy had signed the documents, the witness could come forward to verify his signature.

5.37 Furthermore why would Teddy make a home-made will on 12 March 1990 when just before that he had consulted a number of world-class and world-wide professional advisers in respect of all his assets with global and long-term objectives?17 This was not a short period. The contemplation for a trust corporation to hold all his assets (for the purposes of tax or inheritance as aforesaid in the last chapter) had been going on between July 1987 and 15 February 1990 i.e. right before the purported date of the home-made will. Why should he suddenly opted to ask the two mysterious Mr X and Mr Y to write out a home-made will for him and express his strong

 © 2020 Thomson Reuters. 

sentiments through them after all these long consultation, meetings and correspondences with his professional advisers?

SUSPICIOUS CIRCUMSTANCES III - THE OPPORTUNITY TO DRAW UP THE WILL AND BY WHOM AND WHERE?

5.38 Teddy was hospitalized on 10 and 11 March 1990. He was discharged on 12 March and he was then taken back to his home by Dr Kung first and then he went to his office later on that day. According to the statement of Tse Ping Yim he gave to Mr Allan Leung on 9 September 1999, he was asked by Mr Wang on the same day of 12 March 1990 at about 6 p.m. to come into his office and to witness him signing on all four documents now propounded by Mrs Wang as the last will of him. Tse was very vague on the time of the day in his handwritten statement, though he gave a number of other details which are not directly relevant to the incident of attesting to Mr Wang's signatures. It is not in dispute that Teddy did not write any of the first three Documents A, B and C. Document A was written by Mr X whereas Documents B & C were written by Mr Y. When the documents were written by these two other persons, why Teddy did not ask them to witness his signature when they would have known the contents thereof anyway? This leads me to another set of questions: where would the documents be drawn up? Further according to the evidence of a staff, Li Kwok Kee, the partition for Teddy's room in the office was a glass partition so that anyone could see what was happening inside. It is surprising that the defence was unable to call anyone to support the allegation that Tse had gone into Teddy's room to witness his signature at about 6 p.m. that day, which according to the statement of Tse, it was a rare once and for all occasion for him unless incidentally no one was around. To my mind, all these are unanswerable and/or unexplainable questions unless the documents were forged. Further where did he find these two mysterious persons?

5.39 I accept the plaintiff's submission that these four questioned documents could not have been drawn up:

(a) at the Jockey Club in Beas River after his fall on 10 March 1990;

(b) in either of the hospitals, i.e. Queen Mary Hospital or St. Paul's Hospital on 10, 11 and 12 March 1990;

(c) at his home shortly after his discharge but before he went out again to his own office, as the time was quite short. Although there was no actual evidence on how long did he stay at his home yet Dr Kung and Mrs Kung were with Teddy and no one said he did or would have drawn up the 1990 documents there and then and it would be unlikely he could find two mysterious persons to assist him at his home.

5.40 Mr Tse said that he accompanied Mr Wang in the Hospital until 3 a.m. on 11 March 1990. He did not say that he saw Mr Wang asking one or two other persons to write out some documents or the "wills" for him. Nina was also at St. Paul's Hospital and she stayed as much as she could until Teddy insisted that she should go back to the office.18 However that would leave the Chinachem office as the only possible venue. If these documents were prepared in Chinachem office on the very day Teddy was discharged from hospital, why Teddy did not ask any of his solicitors, who would be readily available in his building or thereabout to prepare the documents but asked this Mr X and Mr Y to write out the same as aforesaid?

5.41 Where did Teddy got these three pieces of thin paper and one piece of thicker paper to write out his "wills"? Furthermore, in the office of Chinachem, there must be some more appropriate stationery than the four pieces of paper which contained the markings of "One life one love" in two versions thereon to be used for writing his will. Why should Teddy choose three pieces of very thin paper and a bit thicker one if that was not for the purposes of producing forged signatures of Tse by superimposition tracing? Thus even the opportunity for Teddy to cause the 1990 Documents to be drawn up by two mysterious persons at any time or place after his fall on 10 March 1990 but before what Tse said about his attestation to his employer's signatures at 6 p.m. two days later would be very slim.

5.42 Perhaps the answer to all these questions might well be this: Teddy did not write out the documents himself or caused the same to be written for him because he could not do so after he had disappeared in 1990 or that he was already dead.

SUSPICIOUS CIRCUMSTANCES IV - OTHER INSTANCES OUT OF CHARACTER OF WANG

5.43 The 1990 Documents were rather sloppily prepared. This is especially so for Document A, and yet Document A was

the document which expressly said that it was a will and that on the face of it, it bore two witnesses' signatures purportedly in due compliance with the usual requirement of the Wills Ordinance in respect of all kinds of wills.

5.44 Yet the document contained alterations in some of the characters on it including the characters: "Chinese text", "Chinese text", "Chinese text", "Chinese text". These characters were plainly over-written upon as if the original writing was written with a defective ball pen otherwise the same was running out of ink.

5.45 In respect of Document B, although there was no over-writing on characters, it is also clear that for some of the characters, the ink colour was faint.

5.46 From any point of view that a will is a solemn document and Teddy who had made two wills before, could not be unaware of that. There is really no reason for Teddy to accept these two documents, especially Document A as his last will which would revoke his 1968 Will with drastic effect and to sign thereon. This is particularly so when the evidence given would suggest that Teddy was a good businessman and there is strong evidence to suggest that he had a very high and strict requirement on form and documentation.

5.47 In this respect the defence called evidence from Mr Edwin Cheung and Mr Alan Kwan to contradict Teresa's evidence to the effect that when she was young, if she made a mistake, Teddy would ask her to type the whole thing all over again.19 However Mr Edwin Cheung's evidence in cross-examination was that he had no recollection of the specific instances of mistakes or alterations of documentation, and he gave his views only based on what he understood to be the sense of priority of Teddy, i.e. that Teddy would treat business as the first priority and the timing was important for business and business was more important than formality.20 Whether Teddy would require something to be redone because of the mistake would depend on how big was the mistake and whether the time was available, as he would not waste time on doing work that would worth nothing.

5.48 Mr Alan Kwan's evidence was that Teddy did not like drafting letters himself. He would get the expatriate secretary Mr Foyn to draft letters for him and for official replies to government, Mr Foyn would do the drafting for Teddy.21 Even if there were any typo, Teddy probably would not have noticed it because he read them so quickly. I do not find any severe conflict among the witnesses. I found that Teddy would size the situation, taking into account the importance of the document and the time available for making amendment. Further, his requirement in the 1960s might well be different from his requirement in the 1980s where word processor would then be available. I do not think any witness would say that Teddy would never require any retyping of letters if mistakes were found therein even for important letters written to the government.

5.49 The defence further tendered two copy letters in the course of the cross-examination of Teresa alleging that they were the original copy documents kept and taken from the files of Chinachem.22 The plaintiff side did not accept the authenticity of these two documents. They are both photocopy and not original carbon copy of the letters the original of which have been sent to the bank.

5.50 In the first place the first letter was apparently drafted by Mr Foyn and typed by Nina herself as it contained the initials "NTHW:F". It was dated June 6, 1972 which is an American way of typing the date. No doubt Nina had been in America in the 1960s as aforesaid. The second letter was dated 8 January, 1987 which was signed by Nina herself. The signatories were stated to be TH Wang and/or Nina TH Wang. That is why apparently Teddy corrected the penultimate line in the letter from "in favour of Mr and Mrs TH Wang" into "Mr and/or Mrs TH Wang" and affixed his initial there. Similarly in the previous letter it was corrected to state more clearly that the shares to be placed with the Bank of Canton was placed in their custody "as security" and again Teddy also affixed his initial. This letter was signed by Teddy and Nina together. Apparently it also bore Nina's initial or signature. If they were corrections of Teddy before the letters were sent out, it at least supported the fact that he was a very meticulous man.

5.51 However it is not clear whether the corrections were done by Teddy only after the letters were sent out, and someone including Teddy spotted the necessity for the two corrections or, alternatively it might well be the case that, as submitted by the plaintiff, the bank itself had spotted the necessity for the corrections and therefore sent back the letters for Teddy's initial. This might well explain why instead of keeping the original carbon copy, CIL kept a photocopy of each letter with the original signatures on them (usually one does not sign the

carbon copy as well) together with the corrections and initials of Teddy in their respective files.

5.52 The defence relied on the standard printed form of Power of Attorney provided by the S.C.M.P in support of a contention that the Teddy would not be careful on documentation and would not care much about the formalities of document is neither here nor there either and I will not like to go into detail here. I would just like to say that this would only support the general contention of Yih that Teddy was very fugal boardering on misery. He only used a printed form provided by S.C.M.P. instead of asking his solicitors to make an important Power of Attorney for Nina in order to avoid solicitors charges thereof. It is only understandable that he made a mistake in filling in the name of Nina instead of his own name when very probably he did not know the mistake himself.

5.53 Thus, in all probabilities, Teddy would not have accepted the sloppy writings on his solemn and drastic will with all these corrections and over-writings written by a defective ball pen running out of ink. Why should he sign on it nonetheless?

5.54 Further why should he choose these two kinds of paper for Documents A, B and C on one hand and Document D on the other hand. Apparently Document D is a better piece of paper for fountain pen with which the writing of "One life one love" was used. This fountain pen is not the calligraphic pen used to sign Wang's four signatures. As evidenced by the condition of the Wang's signatures now on the four pieces of paper, crackings now occur severely especially for Documents A, B and C in Wang's signature when compared with the earlier photocopies taken therefrom. Why Teddy did not use the usual A4 bond paper which must be readily available in the Chinachem office? A solicitor would use very thick piece of paper for solemn documents like deeds and wills. Could the thin 1990 documents be chosen by the writer just because they were thin and therefore easier to forge Tse's signature by superimposition?

5.55 Further why should Teddy use three pieces of paper with these faint words ("One life one love") on or if these faint words were put onto the paper afterwards, why should he allow such words to be put on his wills? After all there was already the fourth sheet which said "One life one love". Was it his intention that all four pieces of paper should contain the faint writing of "One life one love" in two versions in the background as a romantic person? However after all, from all the evidence before this Court, Teddy was not a romantic person, but apparently Nina is.

5.56 Furthermore why should Teddy use Chinese in his will instead of English. After all he seldom signed in Chinese unless the documents were in Chinese as appeared in all his sample signatures in Chinese. In all other instances when he had business dealings, including giving power of attorney to others, he did so with documents in English and he signed in English except those Taiwanese Power of Attorney which printed form was in Chinese. Hence in the present case, it would be unlikely that Teddy would suddenly find it necessary or desirable to get someone to draft his will in Chinese for him. After all even though Wang Sr did not know much English and yet in both the 1960 and 1968 Wills where provisions were made for him, they were written in English.

SUSPICIOUS CIRCUMSTANCES V - CONVOLUTED EXPRESSION AND UNREASONABLE AND UNTRUE CONTENTS

5.57 The four documents must have been drafted at more or less the same time so that Teddy would have all four documents in a small pile before he asked Tse to come into his room to witness his signature, according to Tse's statement and Mr Alex Lam. Apparently, Teddy would have put them into separate envelopes, sealed them and put all four white envelopes into a brown envelope and then gave the brown envelope to Nina later. First of all, it is surprising and strange that Teddy would have found it necessary to have document D to be witnessed by Tse as well. This document was not testamentary in nature. Furthermore as it will be more apparent in Section II that it would be more natural for him to sign this document in English and not Chinese at the right-hand bottom column of the paper.

5.58 Why should Teddy not ask one person to write out his whole will in one go albeit on three sheets of paper? Furthermore since Documents B and C were written out by the same person, Mr Y, why should that person write two separate documents and not combine the contents into one? Further Documents B and C were in fact in slight conflict. The sentiment expressed in Document B was that Teddy was very concerned with his parents and his sick sister and he would insist Nina must take care of them. However in the next document, Document C, he prohibited Nina from giving any

 © 2020 Thomson Reuters. 

money, benefit or property to other members of the Wangs family. How could Nina take care of his younger sister in accordance with the strong sentiments expressed by Teddy for her without giving her any money or benefit from the estate? Why would Teddy give a direction to Nina to take care of his younger sister in Document B and at the same time prohibit her from benefiting her with his assets in Document C? Does it mean that Nina can only take care of her with Nina's own money and if so why?

5.59 In both Documents B and C, there was an expression that Teddy's parents and the other members of the Wangs were disappointing and that is, disappointing to everybody including Teddy ("Chinese text"). However during the whole course of this trial, there was really nothing that could suggest that Teddy was disappointed with his parents and certainly there was nothing to show that any expression of disappointment on his parents was justified. It has been repeated many times that he was actually grateful and respectful to his father as aforesaid. He had been very concerned with his father's health especially when he did not come back to the office. There was nothing to suggest that he had any expectation on his parents which his parents could not deliver. His relationship with his parents had always been good.

5.60 In any event assuming that he was disappointed with his father for whatever reason, why should Teddy be disappointed with his mother? Even on the defence case, Teddy was very fond of and in good terms with his mother. Why should he make sure that she would not be benefited by his estate?

5.61 As far as his siblings, the other Wangs are concerned, they all have very high achievements in life including Teresa. In fact, Teddy's two younger sisters and brothers all had much higher academic achievements than Teddy as Teddy had not even finished secondary school. Teresa got a Masters Degree and she is a computer programmer in a reputable computer company in the States.

5.62 Wang Tak Miu always ranked first in class every year when he was studying in Hong Kong. In the Hong Kong Certificate Examination, he got 10As. At that time, there was some sort of ranking in Hong Kong and he ranked the third in the whole of Hong Kong in that public examination. Then he made an application to study in Stanford University and he got his four years' scholarship. He pursued his masters degree and PhD degree all free of charge because he got scholarship therefor.

5.63 Wang Teh Hwa is a qualified chartered accountant by profession. For some time she had her own accountancy firm and Teddy had given her a lot of business.

5.64 As for the youngest brother Wang Tak Tzai, he graduated from the University of Michigan in Pharmacy and he got a Doctor of Pharmacy degree. The evidence can only support the conclusion that the other siblings of Teddy are all fulfilled intellectuals even though Teddy had not finished secondary school. There is absolutely nothing to suggest any one of them could have disappointed Teddy. In fact Teddy should be and was very proud of them. He was very fond of their children as well as he had no children himself. For example, when Teresa's younger daughter got admitted into a medical school in the States, Teddy was overjoyed and he gave her a princely sum of money in order to encourage her.

5.65 In short the expression that his parents were disappointing and all members of the Wangs family were disappointing in Documents B and C could not be the expressions of Teddy himself.

5.66 On the other hand, the expression in Document C that everyone of the Kungs family were disgusting ("Chinese text") is also a very surprising expression. On the evidence of the defence case, Teddy was injured in a riding accident and he went to Dr Kung for help first. Dr Kung had kindly treated his superficial wounds and took him to Queen Mary Hospital. At Teddy's request he arranged to have him taken to St. Paul's Hospital so that he could be treated and examined by an expert. Dr Kung and his mother Madam Kung Sr had accompanied Teddy for some time and later took Teddy out of the Hospital to his home upon his discharge. There was nothing from Dr Kung's evidence to show that he could be in anyway disgusting. In fact Teddy should be grateful to Dr Kung and Mrs Kung.

5.67 Why should he on the same day of his discharge execute a document to say that they were so disgusting that he would prohibit his wife from giving any part (i.e. not even one cent) of his enormous estate to anyone of them? Moreover, even apart from the assistance given to him between 10 and 12 March 1990, the evidence disclosed that Teddy had always been rather friendly and generous to his brother-in-law, Dr

 © 2020 Thomson Reuters. 

Kung. He allotted shares in Chime, his flagship company to him and made him and his wife directors. Even though they were holding their shares in Chime as nominees only, there was really no obligation on his part to do so and this was done to enable Dr Kung to come to Hong Kong. He even allowed Dr Kung's family to stay at University Heights (owned by Chinachem) at a nominal rent of $1 per month. He visited Dr Kung's clinic from time to time to have some massage treatment. When he was released from his kidnap in 1983, he went directly to the clinic of Dr Kung. Why should he suddenly feel that all members of the Kung family were so disgusting to him? Hence again the expression that "everyone of the Kungs family was disgusting" is so puzzling that it could not be the expression of Teddy himself either.

5.68 If one were to choose between Teddy and Nina, I find that Nina herself might well have found the Wangs family disappointing and the Kungs disgusting. Wang Sr, before and after 1997, i.e. the seven years' period after the disappearance of Teddy, had tried to retrieve the 1968 Will and thereupon started litigation with Nina. It caused her a lot of troubles since then. Nina has not been on good terms with Teddy's siblings and particularly with Teresa in recent years after Teddy's kidnap in 1990 for a number of reasons as aforesaid.

5.69 On the other hand, according to Teresa, Mrs Kung boastfully said that it was her who had persuaded Nina to come back from the States and stay with Teddy as aforesaid. She might find her mother's incessant persuasion too nagging. In conclusion, if one has to choose between Teddy and Nina, I think the expression that the Wangs family members were disappointing and the Kungs family was disgusting suited the sentiments of Nina much better than Teddy. Could it be an expression of Nina instead of Teddy in these questioned documents? Could this be a case of "projection" of Nina in psychology onto Teddy which was eventually found in Teddy's purported "will"? Would Nina add those words into the will also for the purposes of making it more convenient for her to refuse the Wangs and Kungs when they should ask her for any payment from the enormous estate of Teddy?

5.70 Further, there was also strong and solid evidence from Yih that Teddy was a decisive person and if he decided to give Nina anything, it would not be his character to mention things like his parents disappointed him and they should not be given any benefit by her.23 Moreover it is quite clear that it would not be the character of Teddy to seek to justify his decision of making gifts or provisions. When he made his 1968 Will, which was a very drastic revocation of the 1960 Will, he was giving everything to his father instead and leaving no provision for his wife whatsoever under his estate, he did not even think fit to give any reason for changing his previous will or to justify the deprivation of Nina from his estate or the fact of giving his whole estate to his father. Why should Teddy find it necessary to explain here as to why he was giving all his estate to his own lawful wife?

5.71 Furthermore the clear evidence from Yih and Teresa was that Teddy was not a romantic person. It would be out of his character for him to say words like "One life one love" amongst his will. Consequently the expression used in Document B, such as "I love my wife. After my death, all of my property, real estate and my body shall belong to my beloved wife" ("Chinese text"), was probably not the expression of Teddy.

SUSPICIOUS CIRCUMSTANCES VI - LACK OF REVOCATION CLAUSE

5.72 Teddy had the experience of making two previous wills. He ought to have known that it was usual to have a revocation clause in the second will, and in fact many more knowledgeable laymen might have known that too. None of the four 1990 Documents contained any revocation clause when Teddy well knew there was a previous will for his father.

5.73 If he had asked someone to write the Documents for him, then the overwhelming probabilities would be that he would have at least told one of them to write an express provision to revoke his previous wills. After all, these Chinese "Wills" were verbose and certainly were less concise than his two previous English wills prepared by solicitors. Thus one would expect Teddy should include an express revocation clause if Teddy had ever had the idea of revoking the previous 1968 Will and making Nina the sole beneficiary under his estate.

5.74 On the other hand, if these four documents were not actually drafted under the instructions of Teddy, then of course, the forger might not even know whether Teddy had any previous wills. Even if she did know the existence of a previous will, she might not have seen or known the content and therefore did not know its exact provisions. If it should turn out that he did not actually have any previous will, the provision of revocation might bring another kind of suspicion

to the documents. Would this be a reason why there was no revocation clause in the 1990 Documents?

SUSPICIOUS CIRCUMSTANCES VII - TSE AS A WITNESS AND HIS STATEMENT

5.75 Tse Ping Yim was in fact the defendant's main witness. His death on 6 December 1999 means that he is unable to give evidence. Before his death he had made two statements, the first one was made on 6 September 1999 before Mr Alex Lam, a solicitor who was supposed to be present when Tse wrote out his statement, giving an account of his witnessing the execution of the four documents by Teddy. The other statement was taken from Tse on 9 September 1999 by another solicitor Mr Allan Leung.

5.76 From his statements, it would appear that Tse was very careful in drawing a distinction between Mr Wang and Mrs Wang. It is quite obvious that he felt that he was much better treated by Mrs Wang.

5.77 From his earlier statements to the police during the investigation of the kidnap in 1990 (from which the specimen signature samples of Tse were taken in the contemporaneous period), he first started working for Chinachem in 1972 and left in 1974. He rejoined Chinachem in August 1982 as a cleaner of the Chinachem buildings which were let to tenants. After the kidnap of Mr Wang in 1983, he was asked by Mrs Wang to work in their home as a butler. Hence he got his job of butler because of Mrs Wang. However in 1989, he was asked by Mr Wang also to take on the duties of being a messenger of Chinachem office. He had to go to the company everyday to deliver documents and sometimes it was even on his way to the office in the morning. His extra duties were imposed upon him by Mr Wang. As I have said he became the butler cum purchaser of food cum cook cum messenger for Mr and Mrs Wang and also the Chinachem group.

5.78 There is no doubt that he was trusted by Mr and Mrs Wang, otherwise he would not be allowed to work and stay in their house. However, this does not mean that he was highly thought of by Mr Wang or liked by him. Very little was known about him, in respect of his character and Mr Wang's feeling of him. There must be a lot of people working in the office who would be able to testify as to Mr Wang's feelings and opinion on Tse, but the defence had not called any evidence on this at all.

5.79 However from Teresa's evidence, it would appear that Tse was a very talkative person and he liked to please his employers and their relatives. When Teresa returned to Hong Kong in 1984, she stayed in Teddy's house for a few days. One day Tse walked her to the Peak Tram Station and on the way he told her a lot of things like himself and his family24 and also about Mr Wang and his treatment of his father. He told Teresa things like "your elder brother is playing games with figures"25 and "whenever he [Mr Wang] found that his father was not at work, he would often ask someone to make a call to see why he did not go to work".26 That means that Teddy was very concerned with his father's health so that if he did not see him going back to the office, he would at once try to find out why.

5.80 Tse plainly knew the relationship between Teddy and Teresa, and it must be quite obvious to him that Teddy was quite fond of Teresa, otherwise he would not have asked her to come to stay in the house. While he had just been working as the butler in the house for less than two years and must have just met Teresa for the first time, his chat with Teresa and the topic of the chat would clearly indicate that he was a very talkative person, eager to please his employer and for that reason also his beloved sister.

5.81 However, it is also equally clear that Teddy's character was such that he did not like this kind of talkative employee, chatting about other people's affairs. From the evidence of Teresa, Teddy certainly did not like talking about other people.27 In fact from the observation of Teresa, Teddy was not particularly polite to Tse. He called him "old chap" and did not talk to him directly. When he was complaining about the food cooked by Tse, he made his complaint to his wife in order that Nina could tell the "old chap" to make better food.28

5.82 Teresa's evidence was supported by the evidence of Mr Edwin Cheung called by the defence. In respect of Teddy's character, he said that he was the sort of person who did not like unnecessary chat with people or chitchatting was not really his style. In fact he would like employees to be succinct, to be concise and to deliver the work, rather than a talkative employee. Generally speaking, he did not like talkative people as his employees. Those who kept quiet and simply delivered goods to him at the right time would be best with his heart as employees.29 Thus given the talkative nature of Mr Tse, it was unlikely that he would be able to win the

 © 2020 Thomson Reuters. 

heart of Teddy. It was thus very unlikely that Teddy would confide in Tse anything if at all and certainly it was more than unlikely that Teddy would ask him to be a witness to his will which would have given him an opportunity to know what was in his will by a quick glance. Due to the talkative nature of Tse, it would mean he would not keep the secret of what he saw or read. Tse said that he did not read the content of the documents, yet before Teddy asked him to be his witness Teddy would not know whether Tse could glance through it quickly.

5.83 Further could Tse possibly miss or otherwise did not notice the two big characters of ("Chinese text") meaning Will in Chinese in Document A when he signed his name thereunder and beside the two characters of ("Chinese text ") meaning witness? If he had noticed that, why did he not say it in this statement? Further, in that case, why did he not tell Mrs Wang about it for all these nine years between 1990 and 1999?

THE CONTENT OF TSE'S STATEMENT

5.84 Why would Teddy select Tse to be his witness on this important document involving all his estate and two persons who were dear and near to him?

5.85 From the account of Mr Alex Lam, the solicitor, it would appear that Tse was very well rehearsed in writing out his statement. According to Lam's evidence, Tse's statement taken on 6 September was all written out by Tse himself. Before he started writing the statement, Lam had merely asked him four questions, viz.30:

(a) when did he start working in Chinachem?

(b) what was his responsibility?

(c) how these four questioned documents came about? and

(d) how his signatures came to be written on the documents?

5.86 However with these four brief questions to guide him before he started writing out the statement, Tse wrote out the statement completely by himself in one go without making any draft and in fact with little correction. The only possible correction, if it was a correction at all, would be in line 5 the third last Chinese character: "Chinese text". The character "Chinese text " only had a slight over-writing on it, otherwise the whole statement was impeccably written like a piece of composition. It was written in a neat and orderly manner.31

5.87 Further his statement showed that he went into details on the loving relationship between Mr and Mrs Wang, the riding accident of Mr Wang and his hospitalization. It is quite obvious that he must have been told to put all these information in to assist his lady boss to enable her to run a case that the riding accident triggered off Mr Wang to make a new will. Who would have told him that? His reference to the loving relationship between Mr and Mrs Wang was obviously the result of some coaching so as to assist Mrs Wang's case to show some reason for Mr Wang's intention or motivation to give all his estate to her. Otherwise it would be unlikely for him to include all these things in addition to the description of the basic facts of how he came to be the witness to the signature of Mr Wang in these four questioned documents. Who would have coached him on that?

5.88 Accordingly it is more probable that his statement now produced before the Court was already prepared or written by him before Lam's arrival at Chinachem's office on 6 September 1999. According to Lam, Tse took out a sheet of paper and started writing it on the conference table. The original statement of Tse indicated that there was deep writing indent at the back of the paper indicating that when the document was written, it was written on a soft surface. Hence it would be unlikely that it was written on a sheet of paper on the hard conference table as indicated by Lam. By contrast the signature of Lam on the same paper did not appear to have the same obvious indent mark on the paper. The contrast further supports the conclusion that the paper now produced as his statement taken on 6 September 1999 was pre-prepared by Tse and not written out on the conference table as Lam had told the Court.32 The defence might submit that the strength of the pen movement of Tse might well be heavier than Lam's. But then it still could not explain why Tse could create such an indent on the hard surface conference table. Would Tse's statement be a pre-prepared statement?

5.89 Of course, having at least had one occasion of writing out a statement on the incident, there would be no difficulty for Tse to attend the interview with another solicitor Mr Allan Leung and give a substantially similar statement. The interview before Mr Leung and the statement taken thereof will be considered later after Mr Lam's evidence was considered.

 © 2020 Thomson Reuters. 

TSE AND MRS WANG

5.90 It is also clear that since the disappearance of Mr Wang, Mrs Wang had been treating Tse extremely well. In 1992, Tse's wife, Ms Tong Kwai King became one of the two shareholders of Global Cheers Ltd.33 According to Li Kwok Kee (the head of the cashier department who was called by the defence to give evidence on , inter alia, exhibit G1-100 and G1-101), this is a company which holds the very lucrative business of cleaning contracts of buildings developed by Chinachem, bearing in mind there are hundreds of development of Chinachem and there are a number of buildings within one development and in turn a number of units or flats in each building. Of course, Li Kwok Kee himself subsequently was also made a director. Having obtained consent of Mrs Wang (which actually took place during his cross-examination)34 to disclose the information, he subsequently told the court that he was merely a nominee for Mrs Wang. Li Kwok Kee certainly considered that such an arrangement for him to be a nominee was incriminating probably because that would involve the concealment from the incorporated owners of many buildings of the fact that Mrs Wang was behind the company.

5.91 If Tse's wife was an actual beneficial owner of the share she held, then she must have been given a great opportunity of making a lot of money from the lucrative cleaning contracts held by Global Cheers Ltd. Although it was only Tse's wife who became the shareholder, it is inconceivable that this was not done with the consent, or through the arrangement, or simply because of Tse. The big question is: Why?

5.92 It may be the case that like Li Kwok Kee, Tse's wife was similarly a nominee only as there is no evidence at all on that. However, even though she was a nominee, it clearly indicated that Tse's wife would be prepared to go a long way to give assistance to Mrs Wang to conceal her beneficial ownership in Global Cheers Ltd in order to get the cleaning contracts from the Incorporated Owners of the buildings. Why should she be the nominee and not other persons and why should it be in 1992 after the disappearance of Mr Wang but before Mrs Wang lodged the Testamentary Script into court under an Unless Order?

5.93 Furthermore, the circumstances of Tse's departure from Hong Kong on 24 September 1999, the day immediately after the plaintiff had obtained leave from the Court to report forgery to the police are more than a coincident.35 He must be one of the key witnesses that the police would very much like to interview on the allegation of forgery.

5.94 Furthermore, it would seem that he was entitled to holidays of an indefinite period or length as there was no indication on his employment record as to the number of days of leave he had applied for or been granted with and who was responsible for the approval therefor. The defence had certainly not called any evidence to explain his leave arrangement. Furthermore, his employment record36 simply indicated that he took leave from 14 September 1999, i.e. well before he departed from Hong Kong on 24 September 1999, and that was shortly after he had given two statements to two solicitors of Mrs Wang on 6 and 9 September 1999, i.e. he started his holiday leave on a Tuesday after the weekend on 11 and 12 September that year. The employment record also recorded that he would not be given any pay in November because he was sick. The exact entry is as follows:

"Chinese text"

Li Kwok Kee explained that Ah Chung ("Chinese text") here is Mr Ng Chung Mo, a senior employee of the Chinachem group who has been working in Chinachem for a long time. He was one of the potential witnesses, who had given a witness statement, but he was never called to give evidence.

5.95 It would seem that Tse was being paid while he was well to stay in the Mainland but as soon as he was sick and became indisposed, he was not paid whilst he was also in the Mainland. There was no innocent explanation given for this strange arrangement. One might think that he might have reported from Guangzhou or anywhere to the Chinachem group that he was sick and therefore he could not come back to report for duties. However, there is still no explanation given at all to the question why he could not be given sick leave? The employment record apparently only shows that he started to take his holiday from 14 September 1999 and had not reported for duties for the whole October. Was he still on holiday in October? He had taken a pleasure trip to Thailand on 28 October 1999 but he did not fly through Hong Kong. Instead he flied directly to Thailand for his holiday and went back to Guangzhou on 2 November 1999, again directly without going through Hong Kong.37 Was he still employed by Chinachem or was he given an indefinite period

 © 2020 Thomson Reuters. 

of holiday and if so, why? Why was he not given sick leave, say when he was admitted to Shenzhen's People's Hospital on 14 November 1999 but instead no salary was paid to him by Chinachem according to the decision of Ng Chung Mo?

5.96 By reasons of the aforesaid matters, I accept the plaintiff's submission that the statement of Tse was highly suspicious and I cannot accept what he said in the statement concerning the circumstances of the execution of the four questioned documents.

THE CREDIBILITY OF ALEX LAM

5.97 I shall now consider the credibility of Mr Alex Lam. Lam was called to explain the circumstances of the making of the statement of Tse in the evening of 6 September. He gave his evidence in a very soft and inaudible voice. He has been reminded repeatedly that the microphone in front of him was only for digital recording and not for an amplifying system. The recording cannot pick up a person's nodding his head. He appeared to be very nervious and timid. I must say that he was hesitant and evasive and was not a credible witness. Whilst it is not in dispute that Tse did make the statement which was dated 6 September 1999, it is wholly uncertain as to whether the statement was made in the circumstances as alleged by him or whether it was already a pre-prepared statement.

5.98 Apparently he had something to hide when it came to the issue of whether his firm was already in possession of the copies of the questioned documents even before the envelope was opened in Court on 6 September 1999 in the afternoon. His explanation for his inability to produce and show to the Court the copy questioned documents which were shown to him by his employer, Mr Joseph W.K. Poon, on 6 September 1999 before he was asked to go over to the office of Chinachem to take the statement from Tse, was that it was due to a burglary or moving office some time later. This was unacceptable and incredible.

5.99 His evidence was that he did not take along a copy of the questioned documents when he went to the office of Chinachem to take the statement from Tse. I do not find it likely to be true. From his evasive attitude, there might well be something in the copy questioned documents kept in the file of his firm which he would not like to show to the Court or simply there was no such copy questioned documents kept. In other words, Tse could produce copies of the four questioned documents by himself when he gave his statement dated 6 September 1999 to Lam. Further he was not even able to produce his attendance note or even the bill for his service. Apparently there might well be something in the attendance note or the bill to show that the account he gave on what he did in the office of Chinachem was not true. Without the attendance note, one cannot even check the date and the time spent on his taking statement from Tse. What was Lam trying to hide?

5.100 Further Lam appeared to be instructed late after work by his employer Mr Joseph W.K. Poon and went to Chinachem Headquarter in Tsimshatsui East to take a statement from Tse. By the time he had finished, it was very late in the evening already. The matter was of course important and it had to be done expeditiously but why was it as urgent as that? If, it was really that urgent, why Tse was not asked by either Mr Poon or Mrs Wang immediately after the Court had adjourned that day to go to Mr Poon's office in Central to give a statement to Lam instead of Lam going to Mrs Wang's building? After all, Tse went to Mr Allan Leung's office to give a statement at Mr Leung's office three days later.

5.101 Furthermore why Lam did not ask a solicitor of another firm to attest to Tse's statutory declaration but drafted and attested to the same solely by himself which he admitted, was contrary to proper practice and conduct.

SUSPICIOUS CIRCUMSTANCES VIII - THE DEFENDANT'S PRIOR KNOWLEDGE OF THE CONTENTS OF THE 1990 DOCUMENTS WHEN SHE WAS NOT SUPPOSED TO KNOW THE SAME

5.102 I shall consider the evidence of Mr Allan Leung first. The second statement of Tse was taken by Mr Allan Leung. He was the solicitor of the defendant present at the hearing on 6 September 1999. His firm acted for her in that hearing and also in the subsequent hearing of the plaintiff's application for leave to swear death. Mr Leung's evidence was that during the hearing on 6 September 1999, after the envelope was opened and the contents were shown, he had a telephone conversation with the defendant. The Court had given each party a set of copies of the four questioned documents. He recalled that he had given copies of one set of questioned documents to Mr Joseph W.K. Poon, who was the solicitor acting as an adviser and a confidant of the defendant and he was also present at the hearing.38 (I must say that both Mr and Mrs Wang had

 © 2020 Thomson Reuters. 

never run out of solicitors acting for them.) This could only be done after his return to his office as there would not be any photocopying facilities available in the Court after the Court adjourned late in the afternoon. As soon as possible after his return to his office at Cheung Kong Centre, he made another telephone call to the defendant.39

5.103 There were just two telephone conversations between him and his client on that day40 and he did not have any other meeting with her since he attended Court that day.41 Hence, anything he learned from his client on that day relating to the contents of the questioned documents would be either from the telephone conversation during the brief Court adjournment or the one he had with his client after he went back to his office.

5.104 Further it was Mr Leung's evidence that even when he spoke to the defendant after Court on 6 September 1999, his impression was that she would not have copies of the questioned documents before her.42 In the conversation he had with the defendant after Court, he advised her to identify the witnesses43, to identify the writing on the document and to engage an expert on handwriting and also to take a statement from the witnesses as soon as possible.44 Either during the short Court adjournment or during the conversation after Court, he must have told the defendant the names of the witnesses on the document.45 Tse's name was plain and obvious from the documents and hence Mr Leung would not have any difficulty in reading his name and identifying him.

5.105 However, in relation to Document A, all Mr Leung could say is that the other witness was surnamed Lee46 and he had told the defendant that this other witness was Mr Lee.47 The Court of course during that afternoon hearing stated that the other signature appeared to be "K.S. Lee". However Mr Leung might not have picked that up. Mr Leung would say that probably in one of the two conversations with the defendant on 6 September 1999, the defendant had told him that Lee, the other witness on Document A had already died.48 Thus from the evidence of Mr Leung, on 6 September 1999, even without the questioned documents before her, the defendant was able to say that the other purported witness to Document A was dead. It was not suggested by her nor was there any evidence to suggest that someone had told her independently before that that one of the witnesses to one document inside the envelope she got from Teddy signed his name as Lee Kin Sang.

5.106 Lee Kin Sang happened to be a contractor or employee of Chinachem who had died on 21 June 1996.49 This piece of evidence would strongly indicate that the suggestion that the 1990 Documents were placed in a sealed envelope and given to Nina in 1990 by Teddy and Nina had never opened the envelope was not true. In fact if she had told her solicitor on 6 September 1999 that the other witness Mr Lee on Document A was dead, this would be a strong indication that she had already known that this "Lee something" was Lee Kin Sang and he had already died. She could not have known that unless she had already seen Document A or otherwise was a party to the forgery of Document A.

5.107 In order to salvage this situation, Counsel for the defendant showed Mr Leung a transcript of a hearing on 23 September 1999 whereby Mr Warren Chan for the plaintiff was recorded to have said50: "if he is one Mr Lee Kin Sang, my instructions are he is dead already, which is why I say for obvious reasons the earlier the police investigation the better." Then Mr Leung was asked in re-examination as to whether he was sure that before Mr Warren Chan said that to the Court, he already knew that a Mr Lee Kin Sang had already died. To that Mr Leung said he could not really remember.51 Mr Leung also could not say from the document that the signature of the other witness is Lee Kin Sang. Then Mr Leung said "It is possible that that was the first time I learned about that"52 meaning when Mr Warran Chan said to the Court "Lee something" was indeed Lee Kin Sang and that he was dead. Eventually Mr Leung said the impression he had earlier about the details of this person could have come from the hearing on 23 September 1999.

5.108 The piece of re-examination would at most make the evidence of Mr Leung less certain as to when he knew that other witness Lee was dead, whether it was on 6 September 1999 or on 23 September 1999.

5.109 However, there were other pieces of uncontroversial evidence which would show that Mr Leung must have been told of the death of the witness "Lee something" on 6 September 1999. From the evidence of Mr Leung, after the conversation with Mrs Wang, he also wrote a letter of advice to his client on 9 September 1999 recording the advice given to her on 8 and 9 September 1999. One of the matters recorded was the need to take a statement from Tse. The relevant part of the letter said53:

"We need to interview Mr. Tse Bing Yim "Chinese text" as a matter of urgency to take a statement for or even prepare an affirmation for him in relation to the circumstances in which he witnessed Mr. Wang's Chinese will. You will recall that we raised this with you on Monday 6 September 1999. Although a statement has already been obtained from Mr. Tse with Joseph Poon's existence [sic probably assistance], we still need to take a full statement from him which can then be turned into an affirmation."

5.110 There could be no doubt that leading Counsel had been advising that it would be important to obtain urgently a statement from the witnesses to the 1990 Will and Mr Leung had advised Mrs Wang to identify those witnesses and to take a statement from them.54 However the letter of advice of 9 September 1999 only mentioned about taking a statement from Mr Tse and not anything like finding out the identity of this "Lee something" and/or taking a statement from him. Likewise in taking the statement from Tse on 9 September 1999, Mr Leung did not ask Tse any question about the signature of "Lee something" at all.

5.111 One may argue that since the letter was written on 9 September 1999, by then the defendant would have the opportunity of seeing a copy of Document A and would have advised Mr Leung that the signature of this "Lee something" would appear to be like that of Mr Lee Kin Sang who had already died and hence there was no point in making any pursuit of taking a statement from him. However that was not the case put in the re-examination. The re-examination was conducted on the basis that Mr Leung only learned of the death of Mr Lee Kin Sing by 23 September 1999. Had it been the case that the defendant had told Leung of the death of Mr Lee and hence there was no point in pursuing to take any statement from him on 8 or 9 September 1999, then she must be in a position to instruct her Counsel to lead such evidence in re-examination or Leung would have said so anyway. There was no further communication disclosed between Leung and Mrs Wang apart from his last telephone conversation with her on 6 September and his letter of 9 September.

5.112 Hence notwithstanding the very specific re-examination question, it is clear the overwhelming probabilities were that by 9 September 1999, Mr Leung had already been made aware of the death of the other witness, Lee Kin Sang and hence nothing was mentioned about him in his advice letter of 9 September 1999. His knowledge could only have been acquired on 6 September 1999 as the other alternative that he learned of it on 23 September 1999 could not explain why his letter of 9 September 1999 made no mention of this Mr Lee. The defendant's case that she was given the sealed envelope and that she had never opened and looked at the contents was either false or at least very suspicious in light of her instructions to Mr Leung of the death of the other witness Lee on 6 September 1999. One would wonder why she had such a knowledge that the other witness is Lee Kin Sang and he had already died unless she had seen Document A already or she was a party to the forgery of the 1990 Will. This is another suspicious circumstances.

5.113 Consequently if on 6 September 1999, the defendant had already instructed Mr Leung that the other witness to Document A was dead, she could only have done so by taking the stance that the person involved was Lee Kin Sang. However in the hearing for interrogatories on 5 July 2001, the defendant's leading Counsel, in response to a specific question from the Court: "was it your instruction that she did not know this signature", told the court that "she does not know this signature" and later on after taking specific instructions told the Court that his understanding was correct.55 Then just before the commencement of the trial of this action, the defendant purported to give discovery of some documents signed by Lee Kin Sang, the contractor for Chinachem,56 and sought to justify the late discovery by her solicitors saying that the discovery had prompted searches made as a result of the exchange between her leading Counsel and the Bench on 5 July 2001.57 However some of the documents disclosed must have been deliberately obtained in January 2001 already and thus could not have been the result of the exchange on 5 July 2001.58 The letter of the defendant's solicitors also said that:

"... it is not asserted by our client that she is able to personally lead evidence that the Mr. Lee who executed the documents that have now been disclosed is definitely the Mr. Lee who was the witness to the 1990 will ..."

That would appear to be the position taken by the defendant there and then.

5.114 Furthermore throughout this very long trial in this action, the defendant appeared to conduct her case as though Document A had only one witness signature and that was the signature of Tse. There was no attempt to lead any

 © 2020 Thomson Reuters. 

evidence on the possible identity of the "Lee something" as the defence apparently was saying that she could not be certain who he was. The defendant also adduced no evidence on what effort she had spent on trying to ascertain the identity of the "Lee something" or seeking to show that the "Lee something" was or was not in fact Lee Kin Sang. Since "Lee something" was plainly one of the attesting witnesses, the party propounding the will should have endeavoured to call evidence from him on the execution of the will, and to explain why such evidence from him would not be available. This was never done in this case. Instead there is evidence that the defendant knew of the content of the will at a time when she was not supposed to know. Both "witnesses" happened to die after Teddy's disappearance, one before the Testamentary Script was lodged with the Court and one after that but before the trial. There was no attempt to dispel the suspicious circumstances herein.

SUSPICIOUS CIRCUMSTANCES IX - THE DEFENDANT'S BEHAVIOUR IN PROPOUNDING THE 1990 WILL

5.115 Since the commencement of the proceedings by the plaintiff in respect of the estate of Wang, first by application for leave to swear death and later by Probate Action No.6 of 1997, the defendant's attitude had always been dilatory. She had asked for extension of time on many occasions in respect of a number of matters. She has also tried to stay the trial of this action.59 The defendant had shown extreme reluctance to disclose to the plaintiff that she was in possession of the 1990 Documents which she knew were the "Wills" and testamentary directions of Wang. There was really no reason for the delay in the filing of the affirmation of Testamentary Scripts in Probate Action No.6 of 1997. Since according to her, she had always had the 1990 Will in her possession albeit it was in a sealed envelope, there should be no difficulty for her to prepare and file the affirmation. It certainly could not have taken her over six months to enquire, search and realise that in fact she had this envelope.

5.116 Eventually under the compulsion of the "unless order", after the defendant had filed her first affirmation of Testamentary Scripts, she still tried every means of preventing its contents from being revealed, even to the plaintiff because of two purported reasons:

(a) concern about the safety of Teddy; and

(b) respect of the wish of Teddy who told her that he did not wish the testamentary arrangement to be revealed in his lifetime.60

5.117 Both reasons are daft and illogical. In fact it is difficult to see why the defendant would not like to open the envelope because if upon the opening of the envelope, it was revealed that Teddy had made a perfectly proper will which revoked the 1968 Will and gave no interest whatsoever to his father, then plainly his father would not have any interest to maintain any proceedings regarding the estate, whether for application for leave to swear death or for probate of the 1968 Will. However the reluctance of the defendant to take such a course would more probably be due to:

(a) the defendant hoped that by delaying and hopefully stifling the plaintiff's action, there would never come the time when the envelope would have to be opened; and

(b) the defendant knew that the contents of the envelope could not be such that could put any person's mind to rest that it was a valid will and hence even if they were shown to the plaintiff, the plaintiff would surely not have accepted that the "Wills" therein were genuine and valid.

5.118 In the defendant's affirmation of Testamentary Scripts of 16 January 1998, the following things were purportedly said to her by Teddy when the envelope was handed to her61:

"A few days later he gave me a sealed envelope for safe-keeping and he told me that the envelope contained his will together with confidential instructions relating to his estate ... he told me that it should not be opened until after his death. I have never read the contents of the documents in the envelope ... "

From this account she gave in this affirmation, she would not have known anything about the contents of the will save that the envelope contained the will with confidential instructions relating to her husband's estate. She would not have known that:

(a) she was the beneficiary under the "Will";

(b) whether the "Will" inside was a completely new will; or

(c) whether it was in the nature of a codicil which did not revoke the existing will but merely made amendments to it.

5.119 However on the same day of this affirmation i.e. 16 January 1998, the defendant also filed a Defence in HCAP No.6 of 1997. By her Defence, she pleaded that the 1968 Will was "cancelled" ( without any particulars as to how) but she made no counterclaim to propound the 1990 Will as she could not when the envelope had not been opened.

5.120 After the plaintiff had discovered, inter alia, that the defendant's act in diluting Wang's interest in Chime, the plaintiff applied for the appointment of receiver or administrators. The defendant filed various affirmations resisting the application. In her affirmation of 14 July 1999, she said62:

" ... As I have stated in my previous affirmations in the Probate Action to which I crave leave to refer, the alleged 1968 will had been cancelled and furthermore I am the beneficiary of my husband's last will which supersedes the alleged 1968 will relied on by the Plaintiff."

Further, in her affirmation of 15 July 1999, she said63:

"Even if the Plaintiff succeeds in obtaining leave to swear to the alleged death of my husband I shall object to his application for a grant of Probate in respect of my husband's assets on the basis that his purported 1968 Will has been cancelled, and additionally that I believe that I am the beneficiary of his later Will which superseded and revoked the purported 1968 Will."

"If receivers are appointed without any security ..... and it then turns out that the Plaintiff cannot prove the alleged 1968 will as well as his entitlement to my husband's assets because the sealed envelope given to me by my husband contains a later will appointing me as the sole beneficiary of my husband's assets, what then? ... "

"In any event, it is my belief that I am the sole beneficiary to my husband's assets under the term of his last Will."

5.121 It is difficult to see if the defendant had never seen the contents of the envelope, how could she claim that she was the sole beneficiary of the later will which superseded and revoked the 1968 Will? What if the envelope only contained the directions to his father to make a specific lump sum gift to his mother or siblings or even to Nina, as in the nature of a codicil?

5.122 If on the other hand, Teddy had already on the occasion of handing over the envelope to her, told her about the contents of the will, then what was the point of Teddy asking her not to open the envelope until his death? Furthermore, if she was truthful in saying that she was told to keep the contents of the Will secret and would like to respect Teddy's wishes therefore, why should she reveal the contents of the 1990 Will in her affirmation of 15 July 1999? As Nina did not come forward to give evidence, we would not know what would be her answer to these two questions.

5.123 Furthermore, in her earlier affirmation of 16 January 199864, she said:

"I also believe [it] contains confidential instructions to me relating to the disposition of his estate after his death"

5.124 Thus what were hitherto instructions relating to the estate had become instructions to me relating to the disposition of the estate. Unless she in fact had seen the contents of the envelope, how could she say that the instructions concerning the estate were instructions given specifically to her? As it turned out the instructions were given to her not to allow either the Wangs or the Kungs to benefit from the estate.

5.125 Then came the hearing on 6 September 1999, the defendant suddenly changed her mind and instructed her Counsel to inform the Court that she no longer had any objection for the envelope to be opened. She did not inform the Court the reason for her sudden change of heart.65 I find that the plaintiff's submissions as to the most probable reason for this change of heart on 6 September 1999 were probably right, namely she realised that:

(a) She would have to create an occasion whereby she could legitimately become aware of the contents of the envelope and to take all legitimate actions therefor.

(b) Otherwise, she could not justify why she suddenly asked Tse to give a statement without apparently herself knowing that Tse was a witness to the documents inside the envelope but this matter became more and more urgent.

 © 2020 Thomson Reuters. 

(c) Tse happened to take a long holiday shortly after two statements were taken from him and he also died in the midst of his holiday before the police could manage to take a statement from him.

5.126 Taking all the aforesaid suspicious circumstances, it is more probable than not that the defendant had already been aware of the contents of the envelope even before it was opened by the Court, including the fact that one of the two witnesses was one Lee Kin Sang who had died on 21 June 1996. The question is how could she have known the contents before the envelope was opened by the Court?

FINAL CONCLUSION ON ALL THE SUSPICIOUS CIRCUMSTANCES

5.127 The defendant by her counterclaim propounded the 1990 Will by these four 1990 Documents. The burden is on her to prove that these were the last testamentary scripts of Wang, the deceased, and that they were genuine documents properly executed by the testator. I am afraid that the evidence before me is far from that. She has failed to dispel all these suspicious circumstances in order to prove the 1990 Will before it could be admitted to probate. Those suspicious circumstances together can only point to one irresistible conclusion and that is the 1990 Documents are nothing but forged documents.

5.128 If the burden is on the plaintiff to prove the 1990 Documents were forged documents as he has alleged forgery in his pleadings, I must say that he has discharged this burden by the evidence presented before me. All these pieces of evidence concerning suspicious circumstances alone are strong and cogent evidence. The only irresistible conclusion that one can draw from all the unanswered or unanswerable, or unexplained or unexplainable questions raised by the evidence presented by the plaintiff, is that the 1990 Documents are forged documents. In order words, even assuming that the plaintiff has no evidence whatsoever on handwriting to prove that the signatures were not written by Wang nor Tse respectively, all the suspicious circumstances raised by the plaintiff would by themselves sufficient to cast grave doubts on the authenticity of the 1990 Documents. I must say that from the evidence presented before me, I have no doubt by the suspicious circumstances alone, that the 1990 Documents are nothing but forged documents. This is just an independant assessment and conclusion on the suspicious circumstances only, i.e. independant of the handwriting evidence and therefore not affected by it at all at this stage.

5.129 I shall in the next section, Section II, consider the handwriting evidence concerning the signatures of Wang and then Tse and the handwriting in the body of Document A, one after the other. However, I would also emphasize here again that each issue of evidence will be considered independantly first and a conclusion will be drawn therefrom before the cumulative effect of the evidence will be considered later in the Final Conclusion.

1 T156:47:16, 48:3, T157:19:1-5 and 22:24

2 p.92 and p.72, F1

3 T160:91:17-25

4 T157:21:20-25 and 5:3-8

5 para.39(b), F26

6 T158:27:13 to 28:3

7 T111:30:19

8 T162:30:3-6

9 T161:53:2-5 and 55:1-6

10 T161:53:18-22

11 T161:60:17-19

12 T161:56:14-18

13 T162:15:17-23

14 para.7, p.6, B

15 ibid

16 T111:30:24

 © 2020 Thomson Reuters. 

17 p.211, G1: letter of Mr Peter Trace of Private Capital (Asia) Ltd dated 14.2.1990

18 T161:29:13 and 157:13:18-22

19 T135:60:2-14

20 T160:65:19-66:9

21 T164:47:14

22 pp.3770-3771, G13

23 T111:37:12-24

24 T133:79:12-14

25 T133:79:21

26 T133:79:23

27 T135:17:4-7

28 T135:50:13-17 and T143:69:22

29 T160:74:3-17

30 T150:100:10-19

31 p.29, D

32 T150:102:18-22

33 F8-2257 and T163:27:13

34 This will be considered in detail in Section II, Chapter 13

35 p.1839, G6

36 p.1492, G5

37 For detail see Chapter 12 under Tse's Background

38 T154:74:22

39 T154:77:17-19

40 T154:85:1

41 T154:85:2-5

42 T154:76:23-25

43 T154:77:20-21

44 T154:78:20-22

45 T154:78:23 to 79:1

46 T154:81:8-14

47 T154:80:17-19

48 T154:80:20 to 81:7

49 p.2041, G8

50 T154:139:3-5

51 T154:138-141

52 T154:140:24-25

53 p.3772, G13

54 T154:85:12-18

55 T1:39:11-47:3

56 pp.124-125, pp.128-129, G

57 T1:49:2-15

58 p.124, G and T1:79

59 See Appendix 6 for the Judgment thereof

60 paras.5 and 6, p.269, F26

61 para.8, p.269, F26

62 para.13, p.310, F26

63 para.8, p.314, F26

para.51(e), p.327, F26

para.51(n), p.329, F26

64 para.11, p.270, F26

65 T154:59:9

Volume 2

Section II - Handwriting

List of Abbreviations

Section IIA - General Consideration & The Questioned Signatures of Wang Teh Huei ("Chinese text")

Chapter 6 - Introduction and Legal Consideration

Introduction

Is Forgery the Only Issue?

Burden of Proof

Standard of Proof

Admissibility of Opinion Evidence on Handwriting and Signature Identification

Chapter 7 - Principles and Basis of Examining and Evaluating Handwriting and Signature Evidence

The Contentions and Agreement of the Defendant's Experts

Chapter 8 - Wang Teh Huei's Genuine or Sample Signatures

Two other "Written Names" of "Wang Teh Huei" ("Chinese text")

What Sample Signatures would the Defendant have?

Chapter 9 - The Questioned Signatures of Wang Teh Huei ("Chinese text") (I) - The Macro View

The Plaintiff's Allegation of Simulated Forgery

The Opinion of the Three Experts Called by the Plaintiff

The Defendant's Experts

The Macro Analysis

The Explanation of the Defence by Her Expert Prof. Jia

Chapter 10 - The Questioned Signatures of Wang Teh Huei ("Chinese text") (II) - The Micro Analysis

Similarities 78

(1) The character " Wang" "Chinese text"

(a) In 1A1

(b) In 1B1

(c) In 1C1

(d) In 1D1

(2) The character "Teh" "Chinese text"

(a) In 1A1

(b) In 1B1

(c) In 1C1

(d) In 1D1

(2) The character "Huei" "Chinese text"

(a) In 1A1

(b) In 1B1

(c) In 1C1

(d) In 1D1

Significant Differences

(1) The character "Chinese text"

 © 2020 Thomson Reuters. 

(2) The character "Chinese text"

(3) The character "Chinese text"

Further and Other Significant Differences

(1) The character "Chinese text" in 1A1

(a) The vertical stroke

(b) The eye-let of the lowest stroke

(2) The character "Chinese text" in 1A 1 in respect of radical "$_"

(3) The character "Chinese text" in 1B1 in respect of the lower left corner of radical "(Chinese text)"

(4) The character "Chinese text" in 1B1

(a) The "shelter" "(Chinese text)" radical

(b) The central vertical stroke

(5) The character "Chinese text" in 1C1

(a) The first slant of the "Chinese text" radical

(b) The compressed loop on the right

Tremors

Conclusion

Chapter 11 - The Questioned Signatures of Wang Teh Huei ("Chinese text ") (III) - The Presence of Tremors and the Medical Evidence thereof and the Overall Conclusion on Wang's Signatures

Tremors

Medical Evidence

(1) Dating and causation

(2) Head injury

Overall Conclusion on the Four Questioned Signatures of Wang

Section II Handwriting

List of Abbreviations

Cheng Cheng Yau Sang, Patrick

CI Certificate of Identity

CUCCL Hong Kong China United Chemical Corporation Ltd.

Dr Choa Dr Brian Choa

Dr Woo Dr Edmund Woo

GL Gus R. Lesnevich

HVP Home Visit Permit

Law Law Ming

Leung Allan Leung

Li Li Kwok Kee

Ng Ng Shung Mo

Nina Nina Kung Ru Xin, the defendant

Prof. Jia Professor Jia Yu-wen

Wang/Teddy Teddy Wang Teh Huei, the deceased

Teresa Teresa Tak Shyan Sun

Tse Tse Ping Yim

Tsui Tsui Chee Keung, David

Wang Sr Wang Din Shin, the plaintiff

Xu Xu Li-gen

 © 2020 Thomson Reuters. 

Yih Yih Lee Kong

Zhan Zhan Chu-cai

SECTION II HANDWRITING

"The conclusion that a writing is not genuine is only properly reached when it contains divergences in amount and quality beyond the range of variation in the standard writing that cannot reasonably be accounted for by changed conditions in the writer or surrounding the writer"

"In identifying a person, for example, scars, deformities, finger-prints, or a series of accurate measurements, must be depended upon and finally, if the conclusion of identity is reached, either in a person or a handwriting, there must not remain significant differences that cannot reasonably be explained. This ignoring of the differences, or the failure properly to account for them, is the cause of most of the errors in handwriting identification. The dishonest advocate and the dishonest witness sometimes make a labored and elaborate effort to 'explain away' differences that are as plain as the nose on a man's face."

- from the "bible" of handwriting examination:

Osborn on Questioned Documents 1947

Chapter 6 - Introduction And Legal Consideration

INTRODUCTION

6.1 In this Section II, I shall consider the main dispute between the parties, i.e. whether the 1990 Documents are forged documents. I shall assess the issue independently, i.e. independant of the previous issue of surrounding suspicious circumstances and I shall state what findings are proved to my satisfaction and to what standard of proof thereof. Further each four sets of signatures of Wang will be assessed independently first before the four sets of Tse's signatures in these four documents. Then they will be considered together but only thereafter.

6.2 Thereafter the handwriting in the body of the four documents will be considered separately. Further, under this issue, the experts' evidence will be considered deliberately first and independently before the evidence of Teresa's identification of the handwriting thereof. Then the two separate pieces of supporting evidence will be considered together.

6.3 The overall conclusion on handwriting and the two sets of signatures shall be considered together at the final conclusion at the end of this judgment after Section III on ink-dating. There shall be an overall consideration and synthesis of all the evidence before me.

6.4 As stated in Section I hereinbefore, Section III is written before Section II which in turn is written before Section I. Apart from the practical consideration of the order of submissions received from Counsel, it is also intended to achieve the independant assessment of each issue and in turn sub-issue before the synthesis of them in turn of one after the other and finally together.

IS FORGERY THE ONLY ISSUE?

6.5 Counsel for the defendant submitted that the only issue in this case is forgery since the plaintiff challenges the 1990 Will of Wang consisting of one or more of the four documents on the basis that it was not made by him and, in particular, that "the signatures of [Wang] and [Tse] on the 1990 Documents were forged".

6.6 On the other hand, Counsel for the plaintiff submitted that it is wrong to say that the only issue in this case is forgery and it is a misleading way of characterizing the issue. The issue is whether the defendant has satisfied the Court that the four questioned documents were duly executed by Wang as his last testamentary document. It was submitted that besides the examination of handwriting evidence, the suspicious circumstances in this case, particularly the conduct of the defendant in propounding the 1990 Will should be scrutinized in minute details by this Court.

6.7 It is quite clear as considered in Section I hereinbefore, there are other background circumstances which are relevant in my consideration, for example whether Wang would execute such documents as his last will shortly after his fall from a horse in the ways as alleged by the defence but, there and then unknown to him, also shortly before his fatal kidnap. Each issue shall be considered separately and independently first. The relevant legal consideration thereof is considered hereinbelow.

BURDEN OF PROOF

6.8 Counsel for the defence submitted that, although the defendant has the general burden to satisfy the Court that the 1990 Will should be propounded as the last will of Wang, it is common ground that in respect of the issue of forgery, the burden rests squarely on the plaintiff who asserts forgery. Thus it was submitted that the burden is on the plaintiff to satisfy the Court that each of the questioned signatures of both Wang and Tse on each of the four documents was forged.

6.9 On the other hand, Counsel for the plaintiff submitted that the defendant has to prove positively that there was no forgery and it is not up to the plaintiff to prove any forgery. The plaintiff's burden was only an evidential burden, which would mean that the plaintiff would have to adduce or point to some evidence which would be sufficient for the Court to leave the issue to the jury, in the case of a trial by jury, or to leave the issue to be considered by the Judge in the case such as the present, where the Judge sits as both Judge and jury. Counsel for the plaintiff admitted that there were some statements in some text book which appears to say that the burden of proving fraud, undue influence and forgery lies on those who allege it.1 It was submitted that the editors in William, Mortimer and Sunnucks must be referring to the evidential burden, as the editors went on to say that the burden of proof in many cases shifts during the course of the case.

6.10 I tend to accept the submissions of the defence with certain additional consideration. Since it is the plaintiff who alleges forgery the burden is on him to prove that these eight signatures and the documents thereof were forged. The question of burden of proof would only arise if the Court cannot decide whether those signatures were forged or the evidence was so evenly balanced and the one who has the legal burden of proof would fail, i.e. the plaintiff in this case would fail in his allegation of forgery. This situation will not arise here.

6.11 However, on the other hand since it is the defendant who propounded the 1990 Documents as the last testamentary documents of Wang, the burden rests squarely on the defendant to establish that the documents were indeed the last wills of Wang. It would be part and parcel of the defendant's legal burden of proving that the signatures of Wang and Tse were genuine in the course of propounding the 1990 Will. Even when the Court cannot decide whether these signatures were forged or in another case where no forgery is alleged, the defendant would still be required to prove that the Wills were signed by the testator with the necessary animus testandi. It is also part and parcel of the defendant's legal burden to clear up all the relevant suspicious circumstances in light of the plaintiff's allegation of forgery.

6.12 In this respect I would just stop here although Counsel on both sides submitted various scenario in the consideration of legal burden of proof. I do not blame them for doing so since they do not know what finding of facts I will make. This various possibilities would have no use apart from academic consideration. For example what is the legal position if I find Wang's signatures are genuine whereas Tse's signatures are forged or vice versa. In my finding these circumstances do not arise and anything I consider as the legal position would be obiter anyway in this long judgment. Thus I do not intend to prolong it any further. I would, as submitted by Counsel for the plaintiff, evaluate the handwriting experts' evidence by scrutinizing their reasoning, analysis and whether the conclusion reached was supported by cogent evidence.

STANDARD OF PROOF

6.13 Counsel for the defence submitted that it is well-established law that in a civil case where a serious allegation is made, like forgery or fraud, although the standard of proof is still on a balance of probabilities, the courts would not find such allegation established unless the evidence is strong and cogent.

6.14 In Re H and Others [1996] AC 563, at p.586 Lord Nicholls of Birkenhead said:

"The balance of probability standard means that a court is satisfied an event occurred if the court considers that, on the evidence, the occurrence of the event was more likely than not. When assessing the probabilities the court will have in mind as a factor, to whatever extent is appropriate in the particular case, that the more serious the allegation the less likely it is that the event occurred and, hence, the stronger should be the evidence before the court concludes that the allegation is established on the balance of probability. Fraud is usually less likely than negligence. Deliberate physical injury is usually less likely than accidental physical injury. ...... Built into the preponderance of probability standard is a generous

 © 2020 Thomson Reuters. 

degree of flexibility in respect of the seriousness of the allegation.

The more improbable the event, the stronger must be the evidence that it did occur before, on the balance of probability, its occurrence will be established. Ungoed-Thomas J. expressed this neatly in In re Dellow's Will Trusts [1964] 1 W.L.R. 451, 455: 'The more serious the allegation the more cogent is the evidence required to overcome the unlikelihood of what is alleged and thus to prove it.'

This substantially accords with the approach adopted in authorities such as the well known judgment of Morris L.J. in Hornal v. Neuberger Products Ltd. [1957] 1 Q.B. 247, 266. This approach also provides a means by which the balance of probability standard can accommodate one's instinctive feeling that even in civil proceedings a court should be more sure before finding serious allegations proved than when deciding less serious or trivial matters."

I accept the submission of the defence (in fact the plaintiff's Counsel did not submit otherwise) that this Court should require strong and convincing evidence before it would make a finding of forgery.2 For the benefit of the parties I shall state clearly in my findings herein what findings I will make and to what standard of proof I find the facts are proved, i.e. whether it is on a balance of probability, high degree of probability, strong cogent and convincing evidence, or beyond reasonable doubt.

ADMISSIBILITY OF OPINION EVIDENCE ON HANDWRITING AND SIGNATURE IDENTIFICATION

6.15 Both sides accepted that the Court may admit the evidence of the opinion from experts upon the genuineness of a disputed signature or handwriting, whether ancient or modern, after the experts have compared it with specimens proved to the satisfaction of the Court to be genuine. Even without making comparison, experts are also entitled to give general opinion from their general knowledge of the subject on whether the writing is in a feigned or natural hand.3

6.16 However, Counsel for the plaintiff submitted that opinion evidence on handwriting is not restricted to experts. The law is stated in Halsbury's Laws of England, 4th edn, Vol. 17, para.89 as follows:

"89. Handwriting in general. The proof of handwriting may require either lay or expert evidence, or both, depending upon the point at issue. A person's handwriting may be proved by the opinion of witnesses who are acquainted with it. The knowledge necessary for this purpose may have been acquired by the witness at any time having (1) seen the party write, or (2) received communication purporting to come from him in answer to those addressed to him by the witness, or (3) observed documents purporting to be in the party's handwriting in the ordinary course of business. Knowledge however, acquired before or during the trial by a non-expert witness for the express purpose of qualifying him to prove the party's handwriting at the trial will not suffice to make the evidence admissible ... "

6.17 Apart from the position at common law, the Court can also admit evidence from lay persons on handwriting under section 17 of the Evidence Ordinance which provides:

"Comparison of disputed with genuine writing

Comparison of a disputed writing with any writing proved to the satisfaction of the court to be genuine shall be permitted to be made by witnesses in any proceedings, and such writings, and the evidence of witnesses respecting the same, may be submitted to the court and to the jury, if any, as evidence of the genuineness or otherwise of the writing in dispute."

6.18 There could be occasions that the court is prepared to infer from the name in a signature itself as proof of the identity of the person signing. However, the cases falling within this category would all be cases where there was nothing to raise any doubt on the identity. For example in Roden v. Ryde (1843) 4 QB 626, 114 ER 1034 an action was brought against the defendant Evans for goods sold and delivered and also on a bill of exchange accepted by the defendant Ryde. It appeared that about five years before the action was brought, the defendant Evans had been a customer of the plaintiff and had written a letter acknowledging receipt of the goods. The witness who proved these facts did not know whether the defendant was the same Evans; nor was any further evidence given of the fact. In relation to the bills of exchange, there was evidence that the defendant Ryde had kept cash at the bank where the bills were made payable, and had drawn cheques which the cashier had paid. The cashier also swore that the acceptance was in the same writing as that on the cheques. However, he had not paid any cheque for some time and did

 © 2020 Thomson Reuters. 

not know the parties personally and could not identify the defendant Ryde.

6.19 The court held that in the circumstances before the court, there was sufficient prima facie evidence on the identity of the respective defendants and in the absence of any contrary evidence the identity was proved. In so ruling, the court took into account the fact that the names of the persons signing on the documents were not very common names, and the chances of persons with the same names signing on the documents were remote.

6.20 Also the court further held that the case in which the defendants could prove that the signatures were not theirs was the reason for throwing the burden on the defendants to prove the negative. Lord Denman CJ said (114 ER 1307):

"But where a person, in the course of the ordinary transactions of life, has signed his name to such an instrument as this, I do not think there is an instance in which evidence of identity has been required, except Jones v Jones (9 M & W 75). There the name was proved to be very common in the country: and I do not say that evidence of this kind may not be rendered necessary by particular circumstances, as for instance, length of time since the name was signed. But, in cases where no particular circumstance tends to raise a question as to party being the same, even identity of name is something from which an inference may be drawn. If the name were only John Smith, which is of very frequent occurrence, there might not be much ground for drawing the conclusion. But Henry Thomas Ryde are not so numerous; and from that and the circumstances generally there is every reason to believe that the acceptor and the defendant are identical. The dictum of Bolland B (3 Trywh. 558), has been already answered. Lord Lyndhurst C.B. asks (3 Tyrwh 543), why the onus of proving a negative in these cases should be thrown upon the defendant; the answer is, because the proof is so easy. He might come into Court and have the witness asked whether he was the man."

6.21 Since in this case this Court is sitting as both Judge and jury, the Court is entitled to take into consideration the opinion of lay persons on the comparison between the disputed handwritings and genuine handwritings, Counsel for the plaintiff submitted that the Judge is also entitled to make comparison himself between the disputed handwritings and signatures against those which had been proved to be genuine to his satisfaction and come to a decision as to whether the defendant had proved the disputed documents were the last wills of the deceased.

6.22 As the law permits opinion of lay persons on handwriting comparison to be given, Counsel for the plaintiff submitted that it must necessarily follow that the law would permit experts who are not acquainted with the language in which the writings or the signatures are made to give evidence on the authenticity of the writings or the signatures concerned. In the present case, the disputed writings are all in Chinese, but it would appear that at least to the extent that the writings are in the form of signatures, occidental handwriting expertise and methodology had been accepted by the Court to be equally applicable.

6.23 In Kung Wong Sau Hin v. Kung Kwok Sun and others, Probate No. 2 of 1982 (per Deputy Judge Nazareth QC, as he then was), the Court was concerned with the authenticity of a home made will said to be signed by the deceased propounded by the defendant. The signature was in Chinese. To support the will, the defendant called a highly qualified professor who had vast experience and knowledge on Chinese calligraphy and had given evidence on Chinese handwritings in courts before. His approach to the handwriting was that Chinese calligraphy was a living art and had much more in it than Latin script. With the trained eyes, one could recognise the "Qi" ("Chinese text ") (translated as rhythmic "vitality" by the expert) in the characters and through the recognition of this feature, the writing could be identified. The plaintiff called Mr Radley as expert who admittedly did not know Chinese. In the end, the court accepted the evidence of Mr Radley notwithstanding he did not know Chinese. The court accepted the evidence that the examination of ideographic writing should proceed in the same orderly scientific manner that is employed with more familiar script, and that it was possible for an occidental questioned document examiner to make meaningful examinations of documents written with ideographic characters. The court also accepted the evidence that a signature in Chinese was different from ordinary handwriting in Chinese in that the former did not necessarily represent convention handwriting, but had become so personalised as to be a mark produced almost by reflex action with very little conscious effort.

6.24 Kung Wong Sau Hin case also reaffirmed that even in cases where the allegation was whether the will sought to be propounded was forged, the issue was whether the party

 © 2020 Thomson Reuters. 

propounding the will had discharged the burden of showing on balance of probabilities that the will was executed by the deceased, and not as a separate issue of whether the allegation of forgery was proved (see pages 21, 32 and 37 of transcript of the Judgment). Deputy Judge Nazareth QC first considered whether on the general evidence called by the party propounding the will that they had satisfied him that the will was duly executed by the deceased. On coming to the view that the evidence was not sufficient to satisfy him that the will was executed by the deceased, he then went on to consider the expert evidence on handwriting led by that party to see if overall he was satisfied that the will was duly executed. The Judge was not so satisfied (see page 32). The Judge remarked that it would in fact not be necessary for him to go on to consider the evidence of the party opposing the document. Thus the plaintiff's Counsel herein submitted that had it been the case that the burden was on the party alleging forgery to have the legal burden of proving positively forgery, then it would be surprising that the Judge should not approach the opposing party's evidence on forgery first. At the end of the day, the Judge concluded his decision that the defendant before him failed to establish on balance of probability that the document propounded was duly executed by the deceased. In fact, the Judge did not make any express finding that the document propounded was a forgery, which would be required if the real issue was forgery.

6.25 I do not quite accept this submission according to what I have stated earlier in this chapter on the distinct and different burden of proof on each party and they are related in some respects as two sides of a coin.

6.26 Furthermore, the Kung Wong Sau Hin case also reaffirmed the true role and value of expert evidence. The Judge expressly affirmed the statement of the law in Phipson on Evidence, 13th ed., paras.27-34 that the duty of expert "is to furnish the judge or jury with the necessary scientific criteria for testing the accuracy of their conclusion, so as to enable the judge or jury to form their own independant judgment by their application of these criteria to the facts proved in evidence."

6.27 Thus Counsel for the plaintiff submitted that it is for this Court to decide on his own view whether the signatures of Wang were executed by him in the manner and circumstances as suggested by the defendant. It is not a question of the Judge's accepting the conclusion or the opinion of any particular expert in substitute for his own. However, in deciding on my own view, I must say that I shall accept any particular expert's evidence if I find, on reasoning and analysis, his view is correct and acceptable. I shall in the next chapter consider the basis and approach of assessing handwriting evidence.

1 William, Mortimer and Sunnucks: Executors, Administrators and Probate, para.39-11

2 See also Non-no Fashion Wholesale Ltd v. Chung Kam Wing and Shu Man Lee (unreported), HCA 20335 of 1998, judgment on 31 January 2001 of Cheung J, as he then was, at 24, 29, 30; confirmed by Court of Appeal on 8 August 2001 in CACV No. 168 of 2001

3 Phipson on Evidence 15th ed.paras.37-56 and 37-73

Chapter 7 - Principles And Basis Of Examining And Evaluating Handwriting And Signature Evidence

7.1 Both sides agree that in comparing handwriting and signature between the known and the questioned ones, one has to note both similarities and differences.

7.2 However the defence complained that the plaintiff's experts (Mr Gus R. Lesnevich - "GL", Mr Cheng Yau Sang, Patrick -"Cheng" and Mr Tsui Chee Keung, David - "Tsui") have over-emphasised on similarities in comparing handwritings and on differences when comparing signatures. The plaintiff, on the contrary, complained that experts for the defence ignored those significant similarities in comparing handwritings and those significant differences in comparing signatures.

7.3 Thus it is important to state at the outset what is a similarity and what is a difference and what constitutes a significant one. This will also include the consideration of what constitutes a set of variations within the known handwritings or signatures. But before that, one would also have to consider the principles and basis of making comparison between the known handwritings/signatures and the questioned ones. I shall start with what both sides have agreed as the bible of handwriting examination - Osborn on Questioned Documents 1947.1

7.4 Osborn said2:

 © 2020 Thomson Reuters. 

"The conclusion that a writing is not genuine is only properly reached when it contains divergences in amount and quality beyond the range of variation in the standard writing that cannot reasonably be accounted for by changed conditions in the writer or surrounding the writer"

"In identifying a person, for example, scars, deformities, finger-prints, or a series of accurate measurements, must be depended upon and finally, if the conclusion of identity is reached, either in a person or a handwriting, there must not remain significant differences that cannot reasonably be explained. This ignoring of the differences, or the failure properly to account for them, is the cause of most of the errors in handwriting identification. The dishonest advocate and the dishonest witness sometimes make a labored and elaborate effort to 'explain away' differences that are as plain as the nose on a man's face."

7.5 In respect of "natural variation" Osborn said3:

"Another indication of genuineness in a holographic document or a considerable amount of writing, or in two or more disputed signatures, are certain natural variations in the details of the writing. It is difficult for the inexperienced or unthinking examiner to understand that a certain extent of variation in a group of several signatures and variation in repeated words and letters in a continuous holographic document can be evidence of genuineness. The forger does not understand this necessity for natural variation and, as nearly as he can, makes words and letters just alike.

As is well known, one of the evidences of forgery in a tracing is its identity with a model or the damaging identity of several traced forgeries when compared with each other, or of several simulated signatures copied from one model or written from one mental design. As is easily demonstrated by experiment, when even two short signatures or any two words are written, there is possibility of slight divergence at any point in the line making up the words or signatures, and this is the genuine divergence which should appear in genuine signatures or in any continued genuine writing. The endings of repeated words in an extended writing are almost certain to show a natural variation and similar words in a simulation will usually show an unnatural similarity. It necessarily follows, therefore, that if the several lines of a disputed document, or several signatures under investigation, show these natural variations of writing of the same word or letter, all of course within the scope of variation of the genuine writing, this variation itself, surprising and paradoxical as it may appear, is as strong evidence of genuineness as the opposite condition is evidence of forgery."

7.6 It should be noted that the proposition made by Osborn was predicated on a forger copying from one single model. Plainly when this assumption is applicable, the forger could not have introduced into the questioned signatures the natural variations found within the genuine signatures of the true author. Hence, an inference of genuineness could be drawn from the presence of the same natural variations being present in both the questioned and the genuine signatures. However the strength of the inference of genuineness would also depend on the nature of the variations found. If those variation features are personal to the author, then the inference would be stronger. If the features of the variations are those normally found in writings of a large number of persons, then the inference would be a weak or very weak one.

7.7 On the other hand if the evidence would give rise to the possibility that the forger may be copying from say, two or three selected samples, then the presence of the same features of natural variations, and more significantly, accidental features, found only amongst the two or three samples and the questioned signatures might well be the result of the copying. This inference would be more strongly drawn if amongst the samples available, the variations found within the questioned signatures are only found within the two or three particular known samples and not found from the rest.4

7.8 The inference would even be stronger if the variations found in the known samples belonged to a much earlier period of the writer and not found in the later period at all, if the allegation of the party putting forward the documents as genuine documents, is that the questioned signatures were made in the later period.

7.9 The aforesaid principles can be better understood in light of the formation of one's characteristic handwriting or signature which has much to do with one's hand and eye co-ordination, form of perception and also the muscular movements. The general basis for handwriting identification was dealt with by one of the plaintiff's experts, GL and his

evidence in this respect has not been challenged. According to him, the basis and process of formation of one's habit of handwriting or signature are as follows5:

"It begins with understanding how a person begins to learn how to write. What will happen is that a person will place into the student's hand either a paintbrush or a pencil or a crayon, and the person will then try to take images they see and reproduce them either on paper or a chalk board.

When a student first begins this process of taking images and reproducing them, they develop what is called hand-eye co-ordination, co-ordination between your hands and your eyes. They also develop what has been known as form perception, how you can see a form and how you can reproduce that form.

Most importantly, what the person develops are the various muscle and nerve endings that go through the fingers, wrist, elbow and shoulder. These are the muscles and nerve endings that are used when a person writes.

Over a period of many years, the one piece of writing that is most consistent to someone is their signature. It is their mark; it is what stands for them. They use it over and over again.

Once a person reaches the stage at which they can pick up a writing instrument and without actually trying to think of how letters or characters are formed, they subconsciously automatically begin to write. When they do that, the signature becomes very naturally and spontaneously written; it becomes very unique to one individual.

Once that happens, then that signature is a mark of that person. If you have other known writings of the individual, you can then make a comparison between the questioned signature and the known signatures to determine whether or not there are unique similarities or whether or not there are dissimilarities, writing differences, that cannot be explained. That is the essence of how we start an investigation or an examination."

7.10 This general observation of GL is applicable to writings and signatures in whatever language, whether it be one formed with alphabets like English or ideograms like Chinese. Thus to a document examiner, generally speaking it makes little difference whether the signature is in Chinese or English and whether he knows the language in which the signature is written. Indeed very often the words or characters in the signature are not legible. It is just a mark or scribble of somebody. What the examiner is looking for is not what it says, but rather the muscular movements of the fingers and the wrist as the signature was written and the examiner would be comparing those writing movements with known writing movements of the individual to determine if they are similar, and more importantly whether or not there are any dissimilarities.6

7.11 However in some limited areas, an understanding of the language would help in the comparison in order to pick out the similarity or difference. For example Tsui in comparing the known handwriting of the defendant and Document A, he picked out the similarity between the radical "hi" ("Chinese text") in the character "wei" ("Chinese text") and the similar beginning of the character "wo" ("Chinese text") in the first slant of the character and came to the conclusion that the defendant has two ways of writing that slant as a kind of variation in her known writing. This point was not picked up by GL presumably because he did not know the two ways of writing the slant of the same radical in two different characters. Thus in this respect an understanding of the Chinese language when it was in the form of ideograms rather than alphabet would help the examiner. Similarly it is easier to compare a handwriting in the language with alphabets similar to the English alphabet when the examiner is only conversant with English, like Danish in those letters which have similar English equivalent in the alphabet but not in those Danish alphabet with no equivalent English alphabet. It will be more difficult in comparing handwriting of a language which is not totally or partially equivalent to the English alphabet like Arabian or Hebrew when it involves different ways of writing the same alphabet which will not be apparent to an examiner not conversant with that language. In this limited area it will be more difficult for an examiner not conversant with a language expressed in ideograms like Chinese or Korean.

7.12 In respect of a person's signature, it was said that a signature is the product of spontaneous reproduction of one's repeated or habitual muscular action. However the human hand is not a machine and therefore there is bound to be variation in the signatures produced. Thus when a person writes his signatures, there are bound to be differences amongst them and these differences are called natural variations.7

7.13 On the other hand, if a person is to forge someone else's signature, he would first have to disregard his own writing habits and would have to restrain his muscular movements and through practice, try to reproduce someone else's signature. One basic rule is this: one cannot write a simulated writing with better quality than one's own natural writing. When simulation is done, most likely there are going to be mistakes made in such reproduction, which resulted in features found in the signature so reproduced different from those of the original signature. These differences are called differences or dissimilarities. If one has a consistent dissimilarity, something that cannot be found within the known signatures, then one cannot identify the signature as being genuine. If one has a number of consistent dissimilarities, then one can conclude that the signature is a forged one from the aforesaid comparisons.8

7.14 Thus the divergence in the views of the experts would spring from their differences on whether a particular divergence should be considered as a variation on the one hand or dissimilarity or difference on the other.

7.15 "If the conclusion of identity is reached, either in a person or a handwriting, there must not remain significant differences that cannot reasonably be explained".9 One such unexplained but significant difference is sufficient to prevent the identification of the writing despite the wealth of similarities.10 Thus to identify a questioned signature as genuine, the guiding principles as set out in Osborn are11:

"Identity is proved when two handwritings both contain a sufficient number of significant characteristics, qualities and elements so that it is unreasonable to say that they would all accidentally coincide in two different handwritings.

Identity is not proved by the presence of only a few common or conventional forms.

Identity is not proved by the presence of only system or national qualities or characteristics.

Identity is not proved by the presence of a few common abbreviated or developed forms and qualities."

7.16 Although the defendant's experts (Professor Jia Yu-wen - "Prof. Jia", Mr Xu Li-gen - "Xu" and Mr Zhan Chu-cai - "Zhan") had not discussed the general principles on the identification of handwriting either in their reports or in the evidence of Prof. Jia, it would appear that their approach is much the same. In any event both Prof. Jia and Xu had written/edited a whole book each in this respect and their approach could be derived from each of their own textbook.12 In fact Counsel for the plaintiff have spent some time in the beginning of Prof. Jia's cross-examination to confirm whether he would agree with what he said in his own book and in Xu's book. For instance, in identifying that the questioned documents A, B and C were not in the writing of Wang, the defendant's experts referred to three dissimilarities between the corresponding characters in the questioned documents and the known writings and also remarked that "the differences represent characteristic features"13 ("Chinese text")14. Plainly they are of the view that if dissimilarities in the nature of characteristic features are found, then one can properly conclude that the questioned writing and the sample writings are not made by the same authors.

7.17 In the other parts of their report when making their conclusion on the detailed comparison between each character of the four questioned signatures with the known, the defendant's experts appeared to use the criterion of "fundamental differences"15 ("Chinese text")16 to refer to those divergences which would support an inference of different authorship.

7.18 While the concept of distinction between natural variations and dissimilarity (or difference) is drawn by all experts, there is no agreed formula amongst the experts as to what test one should apply in deciding what amounts to dissimilarity and what is mere variation. Certainly, the general view seems to be that if the differences would lie in those features which are personal to the writer, then such differences would be significant differences and not mere variations. But how can one tell that the feature is personal to the author? It appears that often different experts have different answers.

7.19 In this regard, I accept the evidence of GL as a kind of working guide even though that would not offer a comprehensive test in every case. He said17:

"You are looking for muscular dissimilarities. For instance, if a person always writes with a wrist movement that is like a V, if all of a sudden the questioned signature has an

 © 2020 Thomson Reuters. 

underhand movement, that is a different muscular movement in the writing and that would be a dissimilarity.

There are many forms - size could be an area of dissimilarity. Adding flourishes and embellishments and the lack of embellishments could be dissimilarities. The form of how letters are formed can be dissimilarities. Every case is a little different but it depends on what the evidence actually shows you."

7.20 According to the defendant's experts there are also some well-known telltale of forgeries. Those features would include pen halts and retouching, rigid and awkward strokes, slow writing apparent to be fast ("Chinese text "). In the evidence of GL, when describing the other usual features found in forgeries, he said18:

"It depends on the nature of a forgery. In many cases, the person trying to do a forgery cannot write as well as the signature that they are trying to reproduce. In doing so, you are going to have tremor, in the writing as the writer slows down to make a movement. There may be certain hesitations and stops in the signature as the person tries to correct a mistake. Those are some of the telltale signs that you would see in some forgeries".

7.21 However not every forgery must exhibit tremors, retouching or pen halts. There could be cases where the forger could in fact write better than the real author.19 This often happens in cases where because of old age or illness or just the deterioration of the quality of the writing of the author, the genuine signature of the author is of poor quality but the forger makes use of an earlier sample of the author as basis for the imitation to make the forgery.20 Thus there could be little doubt that when making comparison, those sample signatures contemporaneous to the supposed date of the questioned signatures and similar writing conditions would carry a lot more weight.

7.22 Further even one's signatures, which are usually more consistent than one's ordinary handwriting, would change over a period of time as a result of changes in one's habit of writing. While there would usually be some basic features in the signature which remain unchanged, there would usually be new features emerging from the signature. In fact these changed features would often be the clues to dating the approximate time of a signature.21

7.23 This is particularly so when the time gap is large and the writing ability of the person concerned might also have changed. So over the period of years his writing ability might have improved or deteriorated. If a person's ability has deteriorated, then plainly his signatures in the later years could not maintain the same good writing quality of his earlier signatures. Thus when a questioned signature exhibits writing quality better than that could be produced by the author at the purported date of the signature, then the signature could be forged.22

7.24 In respect of variations it should be noted that there are many kinds of variations. There are some variations which are very common amongst writers. Thus the presence of this kind of common variations (or national variations as previously pointed out by Osborn which was common amongst the nationals in a certain area or time) in the questioned signatures and also in the known signatures, would not have much significance in showing that the questioned signatures and the known signatures were written by the same person. This is because many people would have the same kind of variations in their writings. Thus it is not unusual that the same kind of variations is found in the writings of the genuine author and the forger.

7.25 There is also another kind of variations that is unique to the author. This is the kind of variations which is important and significant to tell whether two pieces of writings are by the same person.

7.26 For any given author there would be a range of variations (whether common or unique type) in his writing. If in a given questioned signature, the variations are outside this range, then usually that would become a difference and not just a range of variation. In determining what is the range of variation, one can only properly regard the known control samples. One cannot extend the range of variation found amongst the known by the range of variation found in the questioned signatures. Otherwise any difference no matter how material would at once become within the range of variation. For example, in writing the first vertical stroke of the radical "guang" ("Chinese text" ) in the character "huei" or "hui" ("Chinese text"), the stroke could come down vertically. It could also come down from the left or from the right. If amongst the known signatures, the stroke is either coming down vertically or from the left, then the range of variation

would be between coming down from the left and vertically down. If in a questioned signature it is found that the stroke should come down from the right, then that would be a difference as it is not within the range of variation of the stroke found within the control known signatures and would be an indication of forgery.

7.27 Likewise, if amongst the known, the vertical stroke although coming down from the left would only have a small angle of deviation from the vertical, of say not more than five degrees, then if in a questioned signature, although the stroke also comes down from the left, and if the angle of deviation from the vertical is significantly more, say 10 degrees, then again, it would be outside the range of variation and would be a point of difference indicating forgery.

THE CONTENTIONS AND AGREEMENT OF THE DEFENDANT'S EXPERTS

7.28 In order to save a lengthy analysis of principles and basis of evaluating handwriting/signature evidence, it may be useful to state what the defendant's experts have agreed in this respect. As aforesaid, both Prof. Jia and Xu are textbook writers and editors. Thus the following extracts from their teaching materials written or edited by them demonstrated that the methodology or theory in conducting the handwriting examination are substantially the same as the plaintiff's experts. I shall cite the relevant extracts hereinbelow. For the benefit of bilingual readers, the original Chinese version will be stated first with a translation to be added at the end of each extract. Further this Court is relying on the original writing of the two experts and the translation is provided for non-bilingual readers only.

7.29 "Chinese text"24......

Forensic Science and Technology in Criminal Matters

Editor-in-chief Jia Yu-wen

"Stability and Evolution of writing habits"

...inter alia changes in the physiological function and psychological state of an individual will lead gradually to the evolution of the writing habits of that person. This evolution is demonstrated by the gradual replacement of old features with new features, where differences in parts of or in individual handwriting features exist at different periods of handwriting. This is the result of the evolution of that person's writing habit itself. This kind of change differs from those changes in handwriting that occur under the influence of the psychological state of an individual or the external conditions at the time of writing, which changes are partial, temporary and reversible...

"Chinese text"25

"Simulated handwriting"

Simulated handwriting refers to handwriting produced by copying the handwriting design of another person. This includes handwriting produced by simulation, by projection tracing, by superimposition tracing and from memory. It is crucial to any examination of simulated handwriting that attention is paid to those features of simulated handwriting that are found and that it is not considered as if it were normal handwriting. In the examination process, one has to pay attention to similarities and differences in detailed features of the handwriting, and not just look at general and obvious features. If necessary, a comprehensive and consolidated comparison should be made between the handwriting suspected to have been simulated, together with the handwriting of the suspected forger, and the handwriting on the material evidence. Generally speaking, the result is that the simulated handwriting will be "the same in major features but different in minor features" to the handwriting that has been simulated, whereas it will be "the same in minor features but different in major features" to the handwriting of the forger.

"Chinese text"

"Erroneous way of writing"

Erroneous way of writing is a habitual way of writing formed due to mistakes in recognition of the form of certain characters in the process of individual learning, without knowing that mistakes have been made. Typically, that is manifested as an extra stroke or a missing stroke or a wrongly matched radical. This type of erroneous character cannot be found in dictionaries or lexicographical books. A person who habitually writes certain characters wrongly cannot write them in the correct way before rectifying them. Moreover, the features in erroneous characters have a relatively low

 © 2020 Thomson Reuters. 

frequency of occurrence in our handwriting, therefore, their value is much higher. Figure 7-1 illustrates features of various ways of writing.26

"Chinese text"27

"Characteristics of imitated handwriting"

Handwriting produced by copying the handwriting design of another person is called imitated handwriting. It can be categorized into imitation by simulation, superimposition tracing, projection tracing and imitation from memory (memorized imitation) according to the method of imitation. Imitated handwriting produced by each different method of imitation has its own individual characteristics. But generally speaking, imitated handwriting will exhibit inherent features as follows: connected pen movements exist but are executed with even pen pressure without variations; pen wielding movements show hesitations, apparently being written fast but in fact written slowly; pen movements exhibit hesitations, half-way stoppages; pen wielding movements show tremors; often exhibit signs of partial refining, retouching and confused connecting strokes. As this kind of handwriting is very similar to the handwriting being imitated, with just a lack of care, it could be mistaken for that of the person whose handwriting is being imitated. Therefore, one needs to have a thorough understanding of the facts of the case, to be adept in finding the features of imitation inherent in the handwriting on the material evidence, to conduct an in-depth and detailed comparative appraisal, and then make a judgment according to the general pattern that the handwriting on the material evidence is "the same in major features but different in minor features" to the handwriting being imitated, whereas it is "different in major features but the same in minor features" to the handwriting of the forger.

"Chinese text"28

"Chinese text"29

The Study of Technology in Material Evidence Editor-in-chief Xu Li-gen

"Handwriting features that reflect characteristics of writing habits and movements"

Erroneous way of writing: this refers to characters written erroneously because of the failure of the writer to master the correct structure of those characters, e.g. the character "wu" ("Chinese text") written as ", the character "zhan" ("Chinese text") written as "Chinese text", the complex form of the character "jia" ("Chinese text") written as "Chinese text" etc. Stable features of the erroneous way of writing will have a very significant effect in handwriting appraisal. However, attention has to be paid to the frequency of occurrence with which certain characters are written in that particular erroneous way by writers generally. The more peculiar the feature of the erroneous characters is, the higher its value will be in identifying them to be by the same hand. Of course, attention has also to be paid to whether the situation is that erroneous characters have been deliberately written by the writer as a disguise.

"Chinese text"30......

"The preparation of handwriting appraisal reports"

An appraisal expert should give a conclusion of his handwriting appraisal in the form of an appraisal report. Structurally an appraisal report should consist of four parts, namely the case in brief, the examination, the evaluation and the conclusion. It should be stated, in the case in brief which unit delivered the materials for appraisal, when they were delivered for appraisal, the description and quantity of the appraisal materials, the description and quantity of the handwriting samples, and the questions asked to be resolved. The examination part should cover the findings of the examination, including: the general circumstances pertaining to the handwriting on the appraisal materials and samples, as well as conformities and differences in handwriting features found in the examination. Comparison charts illustrating the features should be prepared as appendices. The evaluation part should set out the assessment of the conformities and differences, so as to form the basis of the appraisal conclusion. The conclusion part should state in clear words the answer of the appraisal experts to the questions asked to be resolved by the unit that delivered materials for appraisal ...

"Chinese text"31:

"Simulated handwriting"

 © 2020 Thomson Reuters. 

...Usually, handwriting will be determined to have been simulated when it has been concluded that the handwriting on the appraisal materials do not compare with the free samples of the person whose handwriting has been simulated. A determination that handwriting has been simulated is based on the following features:

"Chinese text"

(1) Handwriting on the appraisal materials is generally consistent with the samples of handwriting that has been simulated in its way of writing, its shape and form, in its arrangement and proportion as well as the shape of connecting strokes; yet many differences exist in minute features such as the way that movements start and end and that strokes turn and connect. In particular some quick pen movements executed at a relatively fast writing speed will, very often, exhibit unnaturalness and lack smoothness in pen wielding, and the strokes will be of uneven thickness. Under microscopic examination, ink dots from pen halts are found within strokes and some strokes exhibit refining and retouching, as well as tremors and bends. That all illustrates that by looking at the way in which the strokes are connected, the writing speed was apparently fast, but in fact, slow. This characteristic, where slow writing appears to have been fast, is a reliable basis for concluding that handwriting has been simulated with reference to the model.

"Chinese text"

(2) If handwriting is simulated from memory, although the pen wielding movements may be relatively natural and spontaneous and some pronounced handwriting features are generally similar, a lot of detailed features exhibit obvious differences from the handwriting that has been simulated. Due to inaccurate memory, some features in the manner of writing may be quite different.

"Chinese text"

(3) If handwriting is produced by superimposition tracing, very often, in the writing on the appraisal materials, form, shape and size are found to be discordant, the layout of the characters is irregular, regularly appearing characters are superimposable, and characters with complicated strokes have strokes missing. Some marks such as pressure marks and tracing marks formed during the process of superimposition tracing may also be found.

"Chinese text"32......

It should be pointed out that the degree of resemblance between the simulated handwriting and the writing which has been simulated, and the extent to which the forger has exposed his or her own features in the simulated handwriting are not only related to the mode of simulation and the number of characters, but are also related to the level of writing of the forger ...

"Chinese text"33

"Simulated handwriting"

(3) In the process of examining the handwriting on the appraisal materials, one should specifically identify what handwriting features are those of the person whose handwriting has been simulated, what handwriting features are those of the forger that are revealed during the simulation process, and what features are formed in the simulation movements themselves. When examining the appraisal materials alongside the samples of the alleged forger and the samples of the person whose writing has been simulated, it is necessary to be adept in both "finding differences amongst similarities" and "finding differences apart from similarities". This so-called "finding differences amongst similarities" means identifying from prominent and major points of similarity, features such as unnatural pen wielding movements that have been executed fast but in fact slowly (i.e. features that are formed in the simulation movements or features of what is called out-of-shape simulation). By identifying this type of features, it can be proved that the handwriting on the appraised materials is simulated handwriting that has not been written by the person whose handwriting has been simulated.

"Chinese text"34

"The general method of examining the time at which the document was made"

(1) Features in signatures reflect change over months and years. Each person's signature is executed with a relatively stable writing movement and habit, but after a lapse of several

 © 2020 Thomson Reuters. 

years, although basic characteristic features of the signature remain unchanged, some new characteristics with flourishes may appear. For some comparatively elderly people, due to physiological or pathological reasons, their handwriting may exhibit features such as rigid and awkward pen wielding movements and tremors. The longer the lapse of time, the more obvious the change may be. Of course, if the lapse of time is relatively short, it may not be possible to make use of this type of feature.

7.30 Further, Prof. Jia agreed with the following propositions regarding identification of forged signatures as submitted by Counsel for the plaintiff as follows:

"(a) Prof. Jia agreed in his testimony that if there is a simulated forgery, there will be similarities and also significant differences. One can judge whether a signature is a forgery by referring to the significant differences, which cannot be explained, even if there is only one significant difference.35

(b) If there is a difference which cannot be explained by saying it is either accidental or within the natural variations, one cannot identify the two groups as being from the same author.36

(c) Prof. Jia agreed that with the statement written by Osborn (cited above) that "in identifying a person, for example, scars, deformities, finger-prints, or a series of accurate measurements, must be depended upon, and finally, if the conclusion of identity is reached, either in a person or a handwriting, there must not remain significant differences that cannot reasonably be explained."37 Prof. Jia [also] agreed with the statement stated in the aforesaid book edited by Xu at F7-2061 was to the same effect as Osborn's statement38, which stated as follows: ("Chinese text") "It cannot be concluded that the handwriting on the appraisal materials and that on the samples are by the same hand if the differences found in comparative examination are of a fundamental nature and do not fall within the various causes set out above which explain those differences that are not fundamental."

(d) If a forger is to forge the same genuine signatures four times, he may be able to incorporate the special features successfully in one of his forgeries, but not be able to incorporate the same special features in another of his forgeries.39

(e) Logically, if a signature is forged, chances are that one will find some features in the forged signature which one cannot find in the genuine, known sample signatures.40

(f) The forger very often allowed his own personal habit to come out subconsciously.41

(g) It is very often that he did not pay enough attention to simple things, and hence he allowed the mistakes to be made.42

(h) Generally speaking, a forger would not have much knowledge or would not study much as to the characteristics of a signature or a piece of handwriting. He or she would only look at the face of it or just look at the outward appearance or shape.43

(i) The forger may omit to copy some features of importance, and allow his own personal habits to override the features of importance.44

(j) [sic as it is just a repetition of (a) above]

(k) Regarding the change of writing habit, Prof. Jia further agreed that:

(i) It is also normal for people either to get rid of certain features of their signatures, or to incorporate new features into their signatures, say over a period of years, five or ten years.45

(ii) One would also expect, say for instance, the external appearance of his signatures to be gradually simplified to get rid of the unnecessary embellishments.46

(l) Regarding the relevance of the language capability of the handwriting expert, Prof. Jia had the following to say:

(i) He did not know English as he cannot read or speak English47, but he had individual cases where he had to make certain assessment on English signature.48

(ii) In general, one would expect a person's signatures to be a lot more consistent than his handwriting.49

 © 2020 Thomson Reuters. 

(iii) No matter in what language a signature is written, he may be asked to give an opinion on signatures which are in fact illegible50, and that it will not deter a handwriting expert, like himself from making an attempt to make a comparison and, if possible, give an opinion.51"

7.31 By reason of the aforesaid matters, I cannot accept the submissions of Counsel for the defendant that there is a fundamental difference in approach between the defendant's experts and the plaintiff's experts.

7.32 Further I do not accept that when the plaintiff's experts were challenged in cross-examination on the significant similarities, some of which were striking even to the layman, they tried to sweep them away by saying that when a signature was forged, whether by simulation or by superimposition, there were bound to be similarities, because as Tsui put it, "it could well have been copied". For GL he did not count the number of dissimilarities against similarities.

7.33 The defence relied on Tsui's contention at T65:60:14-19. The transcript shows clearly that Tsui insisted that those were only superficial similarities. He only dealt with dissimilarities because of what Osborn said as agreed by Prof. Jia that significant dissimilarities can prove forgery even though there are similarities.52

7.34 As for Cheng he said under cross-examination that those features pointed out by Counsel for the defence are not identifying. They are only superficial features which could be observed by the forger.53

7.35 Further, in terms of methodology Tsui also made the same contention to the same effect when he said that in comparison of handwriting, similarities are controlling factors and in the comparison of signatures, differences are the controlling factors. It is due to the fact that, say in comparison of signatures, if the questioned signature either is a simulated forgery or traced signature, it is bound to have similarities when you compare it with the known. For some similar features, if the forger is skilful enough, he would simulate one or two of these features.54 Thus it is incorrect, as submitted by Counsel for the defendant, to say that these three experts even went so far as to say that there was no need to set out the similarities which they claimed to have observed on the ground that such an exercise would be meaningless since the conclusion was one of forgery - thus putting the cart before the horse. This is an incorrect way of describing their methodology.

7.36 The defence suggestion that Cheng had taken the general view that a normal forger would be able to incorporate the natural variation of the signatures of Wang. This suggestion is a misunderstanding of Cheng's evidence. Cheng was merely saying that the forger might have more than one signature as model. He would have to study and practise imitating them.55 If the so called variations amongst the genuine signatures were obvious features which were also found in the models used by the forger, then plainly it is not surprising that the work reproduced by the forger would also contain those features as variations.56 Furthermore, if the so called variations are the very common type of variations amongst writers, the existence of these variations in common between the control and the questioned signatures would not be of any great value in showing authenticity.57 Hence, much would have to depend on whether the features concerned were good points for comparison.58 Further he said that one could not come to a conclusion on genuineness based on just one point without regard to others.59

7.37 In the end I do not accept the defence suggestion that the experts called by the plaintiff did not keep an open mind in their comparison and in particular, when looking at the further samples available to them. Suffice it for me to say here that the further samples on Wang's signatures in 1984 and 1985 only served to strengthen the change in the writing of the signatures of Wang since 1958. Thus Cheng, who previously had made some reservations on his view because of, inter alia, the insufficient control signatures and the lack of contemporaneous controls, would find that he should express a stronger view on forgery in light of the new evidence. The further samples in 1984 and 1985, although not exactly contemporaneous with the alleged date of the 1990 Documents, were at least closer to this date of the questioned documents than the controls previously available.

7.38 The further new samples of Tse in 1999 again confirmed the sharp contrast between the more natural way of his writing of his signatures in 1990 and the much slower and painstaking way of writing in 1999.

7.39 On the other hand, no doubt in light of further samples, some of the features which hitherto would justify an inference of features of differences could no longer be maintained by

the experts. In this respect, Tsui had been very careful in his evidence in pointing out points set out in his original report that he would no longer rely on as points of difference in light of the new samples of 1999 he was later on given.

7.40 Furthermore, the fact that the expert would not agree with the views put forward by the defendant's Counsel could not be said to be stubborn or not keeping an open mind when the points put forward were not agreed by them. In contrast the attitude of Prof. Jia in his evidence and the way the defendant's experts presented their report will be considered later when the signatures of Wang and Tse, and the handwriting in Documents A, B and C are considered. It is therefore appropriate to end this chapter on principles and basis here and go straight to the application of those principles, especially those agreed by the defence experts, in the evaluation of the signatures of Wang and Tse, and the handwriting in Document A in the four questioned documents. I shall start with the known samples of Wang first.

1 G7-item 2

2 pp.205 and 245, G7-item 2

3 pp.368-369, G7-item 2

4 T67:22:12-25:9, the evidence of Tsui under cross-examination

5 T17:4:24-6:10

6 T17:6:14-22

7 T17:7:2

8 Osborn, supra and T17:7:10-17

9 Osborn p.245, G7-item 2

10 T19:41:15 per GL

11 Osborn p.388, G7-item 2

12 "Chinese text"

Forensic Science and Technology in Criminal Matters (2nd Edition),

Editor-in-chief Jia Yu-wen, People's Medical Publishing House, 2000.

"Chinese text"

The Study of Technology in Material Evidence (2nd Edition),

Editor-in-chief Xu Li-gen, China Renmin University Press, 1998.

13 p.629, E6

14 p.531, E6

15 p.640, E6

16 p.538, E6

17 T17:8:9-20

18 T17:9:1-7

19 This, of course, is different from the previous contention that "one cannot write a simulated writing with better quality than one's own natural writing".

20 T17:9:12-23, per Xu's textbook

21 p.2073, F7, per Xu's textbook

22 Supra

23 p.1977 onwards, F7

24 p.1992, F7

25 p.1993, F7

26 p.1995, F7, the Figure is not included here.

27 pp.2000-2001, F7

28 p.2003 onwards, F7

29 p.2050, F7

30 p.2062, F7

31 p.2068, F7

32 pp.2068-2069, F7

33 p.2069, F7

34 p.2073, F7

35 T100:38:7-13 and 19

36 T95:68:23-25 and 69:1-2

37 T94:50:1-8

38 T94:50:11-13

39 T100:27:10-14

40 T100:40:17-20

41 T100:42:11-14

42 T100:42:15-18

43 T100:43:7-11

44 T100:43:12-15

45 T94:57:6-9

46 T94:59:22-24

47 T94:47:25

48 T94:48:16-20

49 T94:49:7-9

50 T94:49:10-13

51 T94:49:14-17

52 T19:43:7-12

53 T31:28:20-29:23

54 T65:42:23-43:6 and T65:60:14-19

55 T30:26:13-29:14

56 T30:35:2-6 and 12

57 T30:32:8-13

58 T30:38:8-10

59 T30:40:15

Chapter 8 - Wang Teh Huei's Genuine Or Sample Signatures

8.1 There were 18 samples used by various experts for the purposes of the examination of Wang's signatures on the four questioned documents. All these signatures are set out in E6-654(37B). Those 18 signatures are found in documents set out hereinbelow. Most of them are signatures signed vertically (except Nos. 3, 4, 6, 7, and 11) as follows:

(1) DPH 668 (commonly called "668" in the trial) dated March 1958 - found in an agreement signed by Wang and Yih Lee Kong ("Yih") concerning the investment by Yih in the business of Hong Kong China United Chemical Corporation Ltd ("CUCCL ").1

(2) DPH 669 (commonly called "669" in the trial) made in about August 1958 - found in an acknowledgement of receipt of various payments by Yih, the last of which was made on 11 August 1958.2

(3) DPH 735 ("735") dated October 1967 - made in an application form to the Jockey Club.3

(4) DPH 675 ("675") dated 11 July 1975 - made in an application for membership to the Real Estate Developers Association.4 (Nos. 3 and 4 are both horizontal signatures.)

(5) DPH 695 ("695") dated 5 December 1980 - made in an application form for certification of personal seal for use in Taiwan.5 This is a photocopy document.

(6) DPH 672 ("672") dated 10 May 1983 - made in a form for the application for birth certificate.6 This is a horizontal signature and the document is a photocopy document.

(7) DPH 671 ("671") dated 19 July 1983 - made in an authorization letter in connection with the application for birth certificate.7 This is a horizontal signature. The document is a photocopy document.

(8) DPJ 6006 ("6006") dated 13 March 1984 - made in a Power of Attorney appointing solicitor, Mr Roderick Wu for recovery of money in Taiwan.8 The document was notarised.

(9) DPJ 6005 ("6005") dated 27 March 1984 - made in a Power of Attorney appointing Taiwan lawyer.9 The document was notarised.

(10) DPJ 5997 (2) ("5997 (2)") dated 17 October 1984 - made at the corner of a photograph in Wang's Taiwan passport.10

(11) DPJ 5997 (1) ("5997 (1)") dated 17 October 1984 - signature on Wang's passport.11 (This is a horizontal signature.)

(12) DPJ 5998 ("5998") dated 8 March 198512

(13) DPJ 5999 ("5999") dated 8 March 198513

(14) DPJ 6000 ("6000") dated 8 March 198514

(15) DPJ 6001 ("6001") dated 18 June 198515

(16) DPJ 6002 ("6002") dated 18 June 198516

(17) DPJ 6003 ("6003") dated 18 June 198517

(18) DPJ 6004 ("6004") dated 18 June 198518

Nos. 13 - 18 made in various Power of Attorney appointing lawyers in Taiwan

(Nos. 15 to 18 were made jointly with the defendant.)

8.2 Document Nos. 1, 2, 5, 6 and 7 originated from the plaintiff's witnesses and were discovered by the plaintiff. They were all disputed by the defendant. However, it appeared from the defendant's evidence, that in fact the defendant's experts heavily relied on the signatures on Document Nos. 1 and 2, i.e. 668 and 669. Thus if the signatures on the 1958 documents, i.e. 668 and 669, were not genuine, there was hardly any argument or point as put forward by the defendant's experts.

8.3 Document Nos. 3 and 4 were found with the effort of the Police and the defendant had not disputed the authenticity thereof and hence the authenticity of those two signatures are not in dispute.

8.4 In respect of Document No. 5, although initially the defendant disputed its authenticity, the defendant did not seek to challenge the further witness statement of the plaintiff dealing with the production of this document. Thus I accept that the signature on this document was a genuine photocopy of the signature of Wang.

8.5 Those two signatures of 1983 in Document Nos. 6 and 7 were produced by "Teresa" Tak Shyan Sun. The circumstances of her receipt of these two photocopy documents will be discussed under the chapter in respect of the comparison of handwriting for Document A hereinbelow. In view of the established circumstances surrounding the receipt of the photocopy documents by Teresa (which shall be considered hereinafter), I draw the inference that the original of the authorization letter as well as the application form were signed by Wang himself.

8.6 The rest of the documents, i.e. Nos. 8 to 18, were originally supplied by the defendant only to her experts Prof. Jia, Xu and Zhan for examination. That is why they bore a DPJ prefix instead of a DPH prefix of the Government Laboratory number. They were intended to be used for the cross-examination of Cheng by the defence. However in order to be fair to Cheng (and later on Tsui), they should be examined by each one of them first. The hearing was adjourned for one day on 6 September 2001 for Cheng to examine these additional sample signatures of Wang (and Tse as well). Cheng had admirably produced a full and written Further Report the next day with high efficiency and professionalism when the Court re-convened on 7 September 2001.19

8.7 668 and 669 were produced by Yih. His evidence was that sometime in or about 1957 he realised that there was great opportunity in plastic business. He suggested the same to Wang Din Shin ("Wang Sr") and Wang and they agreed to engage in this business. Wang Sr realised that Yih had some money and therefore invited him to invest in the plastic

business of Chinachem. The negotiation for the terms of his participation was conducted between him and Wang. However he did not have the necessary cash as his money had been invested with his friend in Taiwan.20 Hence he did not immediately sign an agreement with the Wangs.

8.8 Yih paid the Wangs by various installments after he had collected money from his friend since 28 September 1957 as stated in 669. Eventually when he felt confident enough to be able to obtain sufficient repayment from his friend, he then signed the agreement with Chinachem, i.e. 668.21 He drafted and wrote out the agreement with a carbon duplicate copy. In fact the original of 668 produced was the carbon copy thereof. However, both the original and a carbon copy were signed by him as well as by Wang. That was deliberate because the original copy was then kept by Wang and Yih kept the carbon copy which contained original signatures of the two of them.

8.9 Since the signing of the agreement in March 1958 as in 668, Yih made further payments to Chinachem as dated in 669. Eventually on 11 August 1958 he made the last payment and recorded the same in 669. This document 669 was also drafted by him with a carbon copy duplicate. Again Wang signed the original as well as the carbon copy to acknowledge the receipts of the various payments as set out therein. Wang kept the original and Yih kept the carbon copy which also contained Wang's original signature.

8.10 Subsequently there were withdrawals of money by Wang on three separate occasions in 1959 and each of the withdrawals were endorsed by him on this document 669 and signed in English by Wang. Yih himself made a withdrawal in 1961 and this was endorsed by him on the document as well and the endorsement was signed by him also in English.22

8.11 In respect of how Yih kept the two documents 668 and 669, he said that they were kept together with certain statements of account which he prepared in relation to the profit of the plastic business of Chinachem calculated in accordance with the formula agreed in 668 i.e. the March 1958 agreement, for the period of 1 April 1959 to 31 March 1961. The account documents were prepared on the instructions of Wang. When Chinachem embarked on real estate business in 1961 through the corporate vehicle of Chinachem Investment Company Ltd, Yih became one of the founders. He was alloted 10% of the shares of this company in 1961.23 His capital contribution was from his share of profit from the plastic business.24

8.12 In 1969, when he negotiated with Wang on the sale of his interest in the Chinachem group, Wang asked him to show him the 1958 document saying that he, Wang could not locate the document. Since Yih kept the document at home, so he suggested to make a photocopy for Wang which he did later on in respect of both 668 and 669.25 In fact Wang did not specify exactly which documents he wanted. But he was given the photocopies of the two 1958 documents as well as the account statements for the two years from 1 April 1959 to 31 March 1961.26 The photocopying was done by Mrs Yih in her own office.27

8.13 Yih was cross-examined in extreme detail on how he kept the documents. According to him, when 668 was drawn up, he folded it up and put it in an envelope in his office. Thereafter 669 was signed, he put the two documents together and folded them up and put them in an envelope in his office.28 On each of the three occasions of the withdrawal by Wang and one by him, he took out 669 and made the endorsement thereon. Thereafter he put the document back together with 668.

8.14 After the two account documents were made and the original given to Wang, he kept the carbon copy of these two pages together with 668 and 669 in the same envelope.29 He kept the envelope in the office for another year or so and then took them home. Those four sheets were then spread out and stapled together and then put in a clip file.30 When he moved to Canada, he took the file with him31 and when Wang Sr asked him for assistance as to the signature of Wang, he gave the two documents to the plaintiff's solicitors. He was asked to demonstrate how the folding was done, and he gave the demonstration on the basis of how he usually folded letters and papers of that size.32

8.15 Yih confirmed that he saw Wang signing the agreement in 668 and also 669 in August 1958. On each occasion Wang signed on both the original and also the carbon copy.33 Further, on each occasion, Wang signed in the same style and the signatures had similar appearance on both the original and also the carbon copy.34

8.16 Yih had been subject to an unduly long cross-examination and at the end of which, in my view his credibility was affirmed by the cross-examination than

 © 2020 Thomson Reuters. 

anything else. There is no doubt that the two sample signatures on 668 and 669 were the genuine signatures of Wang signed on those two occasions as deposed to by Yih. These two signatures had been heavily relied on by the defendant's experts themselves and in particular Prof. Jia in his evidence.

TWO OTHER "WRITTEN NAMES" OF "WANG TEH HUEI" ("Chinese text")

8.17 Apart from those 18 samples as set out hereinbefore, there were also two so-called "written names" of Wang being referred to. "Written name" "xie mmng" ("Chinese text") is a term used to describe the name of a person written by him himself but not as his signature. The first one is the name "Wang Teh Huei" ("Chinese text") written in the form found in DPH 735 (1967). This is only a photocopy document. This name was referred to by Prof. Jia when he tried to justify the apparent absurdity of comparing just the signatures of Wang with the characters "Wang" ("Chinese text"), "Teh" ("Chinese text"), and "Huei" ("Chinese text") in the body of the three questioned Documents A, B and C in order to see if Wang was one of the authors of the body of the three questioned documents or not. He claimed that in fact apart from looking at the signatures of Wang, he also had looked at this "xie mmng" ("Chinese text ") "Wang Teh Huei" on 735 to arrive at his conclusion.

8.18 By looking at this "written name", he found that there were fundamental differences existing between this "written name" and the signatures of Wang.35 If indeed he had ever made any reference to this "written name" when examining the writings in the three questioned documents to see if they were written by Wang, it is quite strange that there was no mention of this comparison at all in the joint report.36 Furthermore in the joint report it was expressly mentioned that the only comparison possible was to compare the three characters "Wang", "Teh" and "Huei" in the questioned documents with the signatures of Wang. Thus I accept the plaintiff's submission that this part of Prof. Jia's evidence was simply made up by him afterwards, after he realised that it was not right to make comparison between characters in signatures and in a context of a piece of writing. In fact Leading Counsel for the defendant had severely criticised GL for doing so. In any event, there was no independant identification evidence that this "written name" was in fact written by Wang himself.

8.19 The other "written name" of "Wang Teh Huei" appeared in the 1968 Will. There was clear evidence from Mr Donald Cheung that he was almost certain that these three characters were written by Wang himself. However, no expert had ever made reference to this "written name". It was notable that the character "Wang" was written, especially the loop in the middle37 was quite similar to the way that the same character was written in all post-1960 samples but different from the character "Wang" in the "written name" in 735 referred to by Prof. Jia. The other two characters however looked quite similar. There is simply no evidence to support the contention that the "written name" in 735 was written by Wang himself.

WHAT SAMPLE SIGNATURES WOULD THE DEFENDANT HAVE?

8.20 There was never any serious challenge to Yih's evidence that on the request of Wang, he gave a photocopy of the two 1958 documents to Wang. Hence by the time in about January 1998 when the envelope containing the disputed 1990 Documents was lodged with the Court, the defendant would have probably been in possession of and have access to the original versions of the two 1958 documents, or at least the photocopy thereof which had been supplied to Wang later in 1969 before Yih left Chinachem, if she could locate them amongst Wang's papers.

8.21 Further, from the nature of the documents, it is unlikely that the defendant would have the original or copies of the application forms to Jockey Club i.e. 735 (or item 3 hereinbefore) and the Real Estate Developer Association i.e. 675 (or item 4). On the other hand in respect of the various original Power of Attorney, they should be held by various Attorneys, and the defendant would have to take time to obtain them back from them. It is not clear as to when these Documents 8, 9, 12 to 18 were available to the defendant.

8.22 However, certainly these documents were not supplied by the defendant to the Police when the Police requested for samples of the signatures and writings of Wang. The only specimen signatures of Wang offered to the Police38 were all in English,39 when the defendant knew full well there and then that the Police was looking for Wang's Chinese signatures.

8.23 In respect of the passport of Wang (i.e. items 10 and 11), the defendant should have access to it at all material times because of her general access to all things in possession of Wang. She had not offered these signatures of Wang in Chinese on the passport to the Police. However in this respect there might be an innocent explanation. It might well be the case that it did not occur to her that this passport contained the signatures of Wang or somehow she could not locate the passport until sometime after February 2000 when they were given to her experts. But the fact remained that she did not give them to the plaintiff nor the police when it was available for signature examination.

8.24 After the establishment of those 18 signatures of Wang as being genuine, I will consider in the next chapter on the comparison of these 18 signatures with the four questioned signatures in more detail. I shall start in the next chapter on the overall view first which the plaintiff's Counsel described as the macro view and in the chapter following that in greater detail, i.e. the micro view.

1 p.293, E2

2 p.294, E2

3 p.302, E2

4 p.299, E2

5 p.300, E2

6 p.297, E2

7 p.296, E2

8 p.555, E6

9 p.557, E6

10 p.556, E6

11 p.556, E6

12 p.562, E6

13 p.564, E6

14 p.563, E6

15 p.559, E6

16 p.558, E6

17 p.560, E6

18 p.561, E6

19 p.35A(1)-(6), E1

20 T110:26:9-27:6

21 T110:29:21-24

22 T110:31-32

23 See p.397, D, the Company search record

24 T110:34:20

25 T111:24:1-6

26 T114:54:12

27 T114:57:2

28 T114:42-44:5

29 T114:50:11

30 T114:52:16-20 and 53:6

31 T111:24:6

32 T114:43:4

33 T114:47:15-25

34 T114:49:1-6

35 T94:6:1-4

36 p.530, E6

 © 2020 Thomson Reuters. 

37 Computer image H-F1 (3-4) 01.w01, all computer images are filed in Bundle H

38 p.1479A, G5

39 pp.1479F-1479I, G5

Chapter 9 - The Questioned Signatures Of Wang Teh Huei ("Chinese text") (I) - The Macro View

THE PLAINTIFF'S ALLEGATION OF SIMULATED FORGERY

9.1 The plaintiff's case is that the signatures of Wang on each of the four questioned 1990 Documents were simulated forgeries. There are basically two main ways of forging a signature. The first one is by way of simulation "Chinese text" (the other one is by way of superimposition tracing "Chinese text" (and the other kind of tracing is projection tracing "Chinese text ") which shall be considered when Tse's signatures are considered later on).

9.2 Simulation will involve the forger studying one or more genuine signatures of the person whose signature he wants to forge. He may then practise writing out the signature free hand until he is confident enough to produce the signature on the forged document. The forgery is produced by the forger writing out the signature free hand. At the time of writing, he may or may not have the model or reference signature(s) besides him for his easy reference.1 Further he may or may not have a model underneath the paper to help him and guide him through the simulations.2

9.3 The line quality of the forgery would depend on the skill of the forger and the degree of his familiarity with the genuine signatures. There are bound to be a number of pictorial similarities between the forgery and the samples he uses but the degree would normally not be as great as forgery produced by superimposition tracing. Since this kind of forgery is produced by free hand writing, it may not contain a lot of features associated with slow writing or drawing, such as tremors, retouching or unnatural stoppages. Further since the forgery would not be the natural writing of the forger, the writing quality of the forgery would not be as natural as the genuine writing.3

9.4 The pictorial similarity between the various forgeries produced by the forgers using simulation may not be very high and it is expected that there are bound to be some differences or variations amongst the signatures produced by simulation. I shall consider hereinbelow whether the plaintiff has discharged its legal burden of proof that these four questioned signatures of Wang are forgeries produced by simulation.

9.5 Counsel for the plaintiff submitted that the model(s) for the signatures was one or more signatures of Wang in or around the period of late 1950s with features similar to 668 and 669. It was also submitted that the models were probably either the signatures on the originals of the two 1958 Documents, and/or the photocopy of the carbon copy of these two documents produced by Yih as D-377 and 378, which were supplied by Yih to Wang in 1969 as described in the previous chapter.

9.6 The plaintiff's aforesaid submission is supported by all three experts called by the plaintiff. The two experts GL and Tsui were retained by the plaintiff. The Government Chemist, Cheng, was an independant expert who was not acting for any of the two parties. He had examined the signatures and had independently come to a view with varying degree of conviction that the four questioned signatures of Wang were forged. In fact the three of them had not had any discussion amongst themselves before producing their reports and giving evidence.

THE OPINION OF THE THREE EXPERTS CALLED BY THE PLAINTIFF

9.7 GL took a positive and definite view that the questioned signatures were forged in his report.4 He based his reasoning mainly on the quality of writing of the writer and the change in the writing ability of Wang as evidenced by his sample signatures over the years. His view was unchanged after he had examined those further 11 sample signatures of Wang made in 1984 and 1985,5 i.e. Documents Nos. 8 to 18 in the previous chapter.

9.8 Cheng, the Government Chemist, also supported the view that the four questioned signatures were forged signatures of Wang. However, his view was a qualified one. Initially when he only had seven samples, his view was that the

four questioned signatures "might not have been written by Wang".6 The reasons for his qualified opinion are:

(a) insufficient control samples;

(b) absence of contemporaneous control samples;

(c) different writing instruments being involved;

(d) some of the controls were not originals;

(e) different orientation of signatures, i.e. some horizontal and some vertical;

(f) different designs of the control samples; and

(g) variation of the control samples.

9.9 However, after he had the opportunity of studying the further 11 samples, he came to a more positive view about the forgery. His view was that the four questioned signatures were probably not written by Wang according to his further report at E1-35A(6). He came to this view mainly by relying on a detailed examination and analysis of the composition of the signatures and the way the various strokes were written in the questioned and in all the control signatures.

9.10 Tsui also supported the conclusion of forgery. His initial view was that it was likely that the four questioned signatures were not written by Wang and he produced a report to that effect at E3-317. In terms of his scale of minus ten to ten, with negative ten being a definite positive view of forgery and zero being neutral, he would say it was negative five or six in the scale. After he had examined the further 11 samples, his view on forgery had not changed.7 His methodology was somewhat similar to that of Cheng probably because he was previously trained in and was employed by the Government Laboratory as well.

THE DEFENDANT'S EXPERTS

9.11 The defendant had no less than six experts studying the questioned signatures. However, in the end the defendant only produced one joint appraisal report by three experts in the Mainland: Xu, Zhan and Prof. Jia at E6 with a brief report on only the further signatures of Tse in the three travel documents. Only Prof. Jia gave evidence. The report and Prof. Jia's evidence were to the effect that the four questioned signatures of Wang were genuine signatures of him although in his evidence, it appears that most of the points of similarity set out in the report had not been relied on. In fact, Counsel for the plaintiff submitted that none of these points of similarity set out in his report had been relied on. Prof. Jia gave me the impression that he was actually trying to alienate himself from that report of which he is one of the three authors. He kept on apologizing under cross-examination that the report was not accurate in choosing the sample signatures for comparison. It gave me the impression that the report was produced in haste which was filed and served at the last possible moment. That partly explains why it took Mr Lee, Leading Counsel for the defence, 17 days in the examination-in-chief of Prof. Jia instead of producing the two reports for the defence and tendering him for cross-examination. I shall say something about the length of this trial at the end of my judgment.

THE MACRO ANALYSIS

9.12 The four questioned signatures look more similar to 668 and 669 than all other sample signatures of Wang made after 1960. The overall proportion of the various characters, orientation, outlook and alignment of characters forming the signatures were certainly quite different from those samples made by Wang after 1960. A simple way to demonstrate this point is to refer to E6-654(37B) as mentioned in the previous chapter which contained the four questioned signatures and the 18 sample signatures in one spreadsheet.

9.13 In respect of each of the questioned and vertical control signatures, there was a box marking out the external bound of the signature with a vertical central dividing line. It can be seen at once that in the questioned signatures, the bulk of the signature was weighted to the left of the central line whereas for the control signatures, the two in 1958 were also weighted more to the left than the rest of the controls but not as much as the four questioned signatures. However, when comparing with the four questioned signatures, the extent of the weight of these two 1958 signatures being on the left is still less. In relation to the rest of the control signatures after 1960, it could be seen that the central line is more or less in the middle of the signature.

9.14 This clear difference in the general appearance, orientation and alignment of the characters in the signature is certainly supported by the evidence of Cheng. However,

Cheng presented his view with more reference to the more prominent slanting and cone shape appearance of the questioned signatures when compared with the controls especially those of the more recent years.8 This is also evidenced from the red lines drawn by Cheng on Albums 5A and 5B produced by him. Further the central division line would clearly reveal that the vertical stroke in the character "Wang" "Chinese text" and the long vertical stroke in the "two men" radical "Chinese text" in the character "Teh" "Chinese text" are slanting a lot more in the four questioned signatures, whilst in the case of the two 1958 samples, they are also slanting but to a much lesser degree, whereas for the rest of the control samples, they are quite vertical.

9.15 Prof. Jia for the defence tried to belittle this point on the alignment of the signature by relying on samples 669, 5997(2), 6003 and 6006.9 However the slanting in the alignment of the characters in the samples chosen by Prof. Jia is not to the same extent as the questioned signatures.

9.16 Further in relation to the cone shape appearance of the questioned signatures, Prof. Jia relied on the two samples of 668 and 669 and also 5998 and 6000.10 However the cone shape appearance is much less acute in the controls and this is especially so for controls other than the two in 1958.

9.17 Prof. Jia also sought to rely on the various samples set out in E6-654(104) to show similarity in the alignment of the signature as a whole. However, the vertical line of those lines drawn by him, is not in the middle of the signature for the four questioned signatures. Further, there is no logical reason for sometimes drawing the slanting line on the right of the vertical line by linking the turning point of the top right hand corner of the middle radical "Chinese text" in the character "Chinese text" with the top right of the top horizontal stroke on the right hand radical of "Chinese text" and sometimes by linking the top right corner of the radical "Chinese text" with the top right hand corner of the part "Chinese text" in the radical "Chinese text". This way of linking up various parts of the characters in an arbitrary manner by Prof. Jia would not serve to reveal the true nature of the orientation and alignment of the characters in the signature.

9.18 In the end I accept the plaintiff's submission that the marked difference in the overall orientation and alignment of the characters within the signatures is plain which can be seen from the simple boxes with the central division lines as drawn in E6-654(37B).

9.19 This general chart also served to demonstrate the change in the writing habit of Wang in executing his signature. It can be seen from the top line of the enclosed box that in the questioned signatures, the first and last horizontal strokes in the character "Chinese text" slanted upwards towards the right to a much greater extent than any of the control. Further amongst the controls, the upward tendency is more for the 1958 control signatures, i.e. 668 and 669. This is particularly so for the first horizontal stroke.

9.20 As to the last of the horizontal strokes, there was a tendency in the control signatures to slant downwards, and there was also such a tendency in relation to the first horizontal stroke. The same observation could be made in relation to the last horizontal stroke, being the major horizontal stroke in the character "Chinese text". In the four questioned signatures, this last horizontal stroke was slanting upwards at a large angle. However, amongst the controls, whilst 668 and 669 had also slanted upwards (but to a lesser extent than the questioned signatures), the tendency for the ones in the later years was that the stroke was written horizontally and sometimes slanted downwards instead.

9.21 There is also a definite change in the appearance of the signatures of Wang over the years. For 668 and 669, it is quite clear that the characters were written with much greater artistic style and embellishment than those of the later years. Tsui characterised the series of samples from 1958 to 1985 into three categories:

(a) Type I signatures consisting 668 and 669;

(b) Type III consisting of only one in 1983 (DPH 671) where the character "Chinese text" was written in a simplified form; and

(c) Type II signatures being the rest save for the one in 1980 (DPH 695) which he classified as a hybrid between Types I and II.

9.22 Type III could be treated as a different category of its own because the document from where the sample was obtained was a letter of authorization to someone in mainland China and the whole document would appear to be written very

 © 2020 Thomson Reuters. 

quickly and sometimes with simplified characters. Given the nature of the document and the way it was written, it is not at all surprising that the signature at the end consisted of a simplified form of the character "Teh".

9.23 The evidence of Tsui on the way he classified the signatures also supported the change in the appearance and style of the signature of Wang. The classification is of course only for the sake of convenience in grouping the characteristics of the signatures. The criteria for grouping the signatures include the gap between the first horizontal stroke and the first vertical stroke in the character "Chinese text" which is much wider in the case of the Type I signatures. Further for the radical "Chinese text" in the character "Chinese text" in the case of the Type I signatures, the last dot was separately written while in the case of the Type II signatures, the last two dots were linked up. For the character "Chinese text" the last horizontal stroke in the radical "Chinese text" tends to be much shorter in Type II signatures than Type I.11

9.24 Cheng also grouped the signatures in a similar manner, although in his case, he would group the hybrid signature 695, and also the samples 6004 and 6005 as the same type as the two 1958 signatures.12 In the case of Cheng, it would appear that he would consider that the characters "Chinese text" and "Chinese text" had undergone lesser change and the major difference lies in the character "Chinese text".13

9.25 It is not clear as to why Cheng would classify the two signatures 6004 and 6005 as the Type A signature alongside with the two in 1958. If one takes into account of all the features in the three characters, these two signatures would resemble more the Type B (or II of Tsui) signatures.

9.26 The change in the habit of executing the signature by Wang over the years between 1958 to 1985 is obvious and significant. While it may well be a matter of opinion as to whether the latter signatures would show a poorer quality and ability in writing (as deposed to by GL), it is clear that the later samples would show that Wang was writing with much less embellishment.

9.27 The opinion of GL was that the change reflected a degeneration of the writing ability on the part of Wang.14 In his view, the difference between the 1958 signatures and the subsequent ones reflected a difference in the writing skill and ability and not just style of writing.15 It was not a case that one had two different styles of signature and he would sign any one of the two styles at any time he wished (which was the scenario put to him by the defence). He explained in his evidence as follows16:

"No. If you are talking about the example in the book where the individual has a bank account where he uses a special signature for that account, he is still writing with the same skill level, but he is just using different formation of letters.

What I am referring to is that the writing ability, the ability to write, has slowly deteriorated. Unfortunately, since we have no signatures between the time period of 1961 and 1967, we cannot see how it deteriorated. Now, if he never signed in that time period, that is an example of why it deteriorated. But if you had a few signatures in that time period, you would probably be able to see the slow progression of the signatures getting poorer and poorer ...

What I am telling you is that you cannot automatically one day decide, 'I am going to write poorer starting tomorrow' and then start writing poorer because you cannot write as well any more. That is a style difference that you make a choice on."

9.28 GL is of the opinion that the later sample signatures sufficiently reflect the deterioration of the writing ability of Wang and that although it is not impossible for someone to regain his writing ability through a lot of practicing, there is no such evidence available in this case. Further, given the time difference of some 30 years between 1958 and 1990, even if Wang were to practise to write the same style and quality of his signature in 1958, it would be likely that he would incorporate some of the different designs of writing.17 It is quite apparent that Wang had signed more signatures in English than in Chinese between 1958 and 1990 in that 30 odd years when his real estate business had grown into a big empire. The great similarity between the four questioned signatures and the two 1958 samples and the marked dissimilarity between the four questioned signatures and the later samples, especially on the skill and quality of the writing led GL to come to the view that the four questioned signatures must be forged.

9.29 When GL was cross-examined, it was suggested to him that the evidence was at least consistent with Wang having changed his style of signature since 1958 rather than having

 © 2020 Thomson Reuters. 

a deterioration of his writing ability.18 Further the defence case was that there was no evidence that Wang had not practised enough to regain his writing ability to sign in an artistic way.19 However, other than what was reflected in the sample signatures themselves, there was really nothing else that any expert (particularly the defendant's experts who had not examined the sample handwritings of Wang when considering whether Wang was the author of Documents A, B and C) could draw on to decide whether there was any deterioration of his writing ability. Certainly there is nothing to suggest that in 1990 or at any time after 1967, Wang still maintained a style of signature similar to the ones he used in 1958 as one of his interchangeable styles of signature in Chinese which he could freely and spontaneously sign in one style or another.

9.30 Looking at the four questioned signatures and the samples, it is quite clear that the four questioned signatures not only have common features with the 1958 samples, but their overall appearance, orientation, alignment and proportion are quite different from the more recent samples before 1990. This can be demonstrated by the charts created by GL at E2-310-2 to 310-13, which are the enlarged charts for the comparison of the three characters "Chinese text", "Chinese text" and "Chinese text" in the four questioned signatures with the same characters in the samples picked by the defendant's experts in their report. It can be seen at once that if the characters from 668 or 669 are covered or blanked out, the difference between the characters in the questioned signatures and those picked out from the samples is such that any fair-minded person will have to conclude that they are different writings.

9.31 The defendant's experts also relied on the "variations" amongst the four questioned signatures with the view of showing that these four signatures were genuine. However, if the four questioned signatures are simulated forgeries, there are bound to be some variations amongst them and this would be especially so if the forger simulated not just from one model signature but from more than one model signature. The variations in the four questioned signatures put to Cheng were all set out in E6-654(36) and there were 15 of them. However it could be seen in the evidence of Cheng in re-examination20 that of these 15 variations, at least 12 of them could be found between the two 1958 samples, 668 and 669.

9.32 The other exceptions are as follows:

(a) Variation 11 which is the connection between the left and the right radical in the character "Chinese text". This was only found in 1D1 and not anywhere else.21

(b) Variation 14 where in the four questioned signatures, the long vertical stroke in the radical "Chinese text" was either straight vertically down or bending to the right, whilst in the case of 669 it was straight and vertically down and in the case of 668, it was bending to the left.22

(c) Variation 6 where in respect of the radical "Chinese text" in the character "Chinese text" of the four questioned signatures there were two pictorial variations, viz. in the case of 1C1, the two dots of the radical "Chinese text" were written as two clear dots whilst in the other three, the two dots would appear to be fused into one dot. In 669, the two dots in the same radical were clearly written whilst in 668, there was simply a smudge of ink which was in fact a closed loop.23

9.33 However, as it will be pointed out later, in respect of (a) the connection between the two radicals in the character "Chinese text" in 1D1, it is in fact a point of difference indicating forgery, and in respect of (b), the direction of the bending of the vertical stroke to the right, it is also a point of difference pointing to forgery.

9.34 In respect of (c) as the evidence from Prof. Jia revealed, in fact in all the four questioned signatures, the two dots in the radical "Chinese text" were written in a zigzag way and the only difference is the extent of the length of the second stroke in the zigzag.24 Hence, in fact the so-called variation on this part in the questioned signatures was simply a small difference in the length of the second stroke in the zigzag and is not any real variation in the pen movement.

9.35 It should also be mentioned that after Cheng's evidence was completed and the "variations" put were explained, the defence created a further chart (E6-654(125)) with a view to show some more variations within the four questioned signatures. Two further points of variations were raised. The first is in relation to the turn on the right of the radical "shelter" "Chinese text" in the radical "Chinese text". It was said that for 1A1 this turn took the form of a step, while for the rest, it is a smooth turn. The second new "variation" feature is the way that the part "Chinese text" is written in the radical "Chinese text".

 © 2020 Thomson Reuters. 

9.36 In my view these two variations are not of any significance. In the first case of the radical "shelter", it is likely that the writer of 1A1 would initially like to simulate the narrow "shelter", such as the one in 669 and yet found that the horizontal stroke at the top of the "shelter" was being written in too slanting manner. He then tried to correct the stroke and thus resulting in the shape of the shelter in 1A1.

9.37 Secondly, as to the way the middle part "Chinese text" was written, it should also be noted that in fact the "variations" marked in E6-654(125) were all the result of a very similar writing movement, consisting of a movement of the pen to the north-west and then turn back to the right and then made a wavy movement down towards to the south-west. In fact very similar variations are also found between 668 and 669.

9.38 However these "variations" are quite superficial and are such that a forger could easily have consciously or unconsciously copied.25 Further the fact that this sort of variation features found predominantly in common with the two 1958 models and scarcely in the rest of the more recent models, would strongly indicate instead that the questioned signatures were simulated forgeries based on the 1958 samples or some models closely similar to the two 1958 models.

9.39 Even if one were to assume that there was no deterioration in the writing ability of Wang over the years, yet in view of the definite change in the writing habit or style in his signature, it would be most unlikely and in fact quite impossible that when he signed naturally and spontaneously purportedly in 1990 for the four questioned signatures, he would have incorporated so closely the features, embellishments and habits of his 1958 signatures but not much of the new features and designs of his more recent signatures.

9.40 It is also important to note that the questioned signatures were written in ink using a broad nib pen or fountain pen. When these signatures were compared with those in the controls written in similar kind of ink and in fountain pen (albeit not broad nib ones), one can see the variation of pen pressure is much less in the questioned signatures than those control signatures written with fountain pen in ink, namely 668 and 669. The photographs in Album 5 produced by Cheng served the best illustration on this point. Those charts produced by the defence did not show this well because the tone of the colour was all adjusted to black in the copying process. This lack of variation in pen pressure is an indication of forgery. Control signatures using other kind of writing instruments, such as ball pen or liquid ink ball pen are not good comparison because variation in pen pressure is less noticeable in writing with these instruments.

9.41 With a view of showing that the four questioned signatures were not simulations of 668 and 669, the defendant's expert made out chart 5526 showing four features which are not found in 668 and 669 in 1958.27 These four features are as follows:

(a) The eyelet at the beginning of the lowest horizontal stroke of the character "Chinese text" in 1A1;

(b) The compressed loop of 1B1 and 1C1 at the top of the right radical of the character "Chinese text";

(c) The visible retracing up from the slant of the radical ("Chinese text") in the character "Chinese text" linking it to the beginning of the downward stroke in 1B1; and

(d) The connection between the left and right radicals for the character "Chinese text" in 1D1.

9.42 However, while these features were not found in 668 and 669, they were not found in any other control samples either.28 Hence, it could not be said that they were features of designs from the later genuine writings of Wang which had become incorporated in a genuine 1990 signature of Wang. Thus these features could not assist the defence to show that the four questioned signatures were not simulation of the 1958 samples.

9.43 In fact some of these features, such as (a) the eyelet, (b) the compressed loop and (d) the connection between the two radicals, are significant differences in support of the inference of forgery. For the feature as stated in (c), it is accepted by the plaintiff that since in the known, there was a tendency of the upward movement at the end of the slant to connect with the beginning of the downward hook in some of the samples, e.g. 668, it is a common form of variation that such a pseudo connection would be made visible in some cases to form an actual link, such as what is found in 1B1.

9.44 However, the same could not be said about the compressed loop as the connection between the end of the horizontal stroke and the beginning of the vertical stroke in the known samples (whether actual connection as in 6000 or pseudo connection as in 668)29 which would involve a different movement of the hand. The argument that they could not be considered as differences because the forger would not have been careless enough to incorporate these features into the questioned signatures was unsound. The logic of that argument is that the forger must in all cases get everything right and would not have left any trace of differences. This simply could not be right and, at the very least, contrary to the textbook writings of the two eminent defendant's experts, Prof. Xu and Jia themselves.

THE EXPLANATION OF THE DEFENCE BY HER EXPERT PROF. JIA

9.45 The clear change in the appearance of the signatures of Wang over the years is so glaringly apparent to anyone. Hence Prof. Jia should have realised that he could not support the authenticity of the questioned signatures which bears little resemblance with the more recent samples but a lot more resemblance with the two 1958 samples without any good explanation. Various explanations were put forward such as differences in speed, in the style of calligraphy, such as the characteristics of one style called clerical style, "ll shu" ("Chinese text").

9.46 At the end of the day, Prof. Jia even had to resort to saying that in fact there was no change of writing habit and would not even accept the rather basic premises that a genuine signature should be a reflection of the spontaneous writing habit of the individual, thereby suggesting that the questioned signatures could have been deliberately written in this particular manner by Wang although this way of writing was not his natural habit in 1990.30 Hence Prof. Jia would have to accept that the questioned signatures which were written more slowly and in neat and orderly manner ("Chinese text ") was no longer found in the later samples which were more cursively and quickly written. He could give no explanation as to why on this particular occasion of writing the questioned documents, Wang, if he was the author, should like to adopt this particular style, which was different from the more contemporary style of his signature.31 However from the answers given by Prof. Jia, he would consider that the ability to write out a signature with a particular appearance is one thing, and the habit of writing out a signature in a particular way is another. Logically this kind of distinction is acceptable. However if he would not accept that the change in the speed and appearance of the later samples is a reflection of Wang's change of writing habit, then logically the change in the speed and appearance of the later signatures could only be due to a deliberate writing out of signatures in that form. The question is why should Wang did so.

9.47 Furthermore, if the later samples, particularly those in 1984 and 1985 were not a true reflection of Wang's spontaneously written signatures, how could they be used as samples for comparison? Prof. Jia could not seriously suggest that the later samples were not written in full reflection of the writing habit of Wang there and then, but were simply written in such form as a reflection of his ability to write in that fast and cursive form only. Thus I accept the plaintiff's submission that plainly Prof. Jia must be wrong in his view (if in fact it was his bona fide view) that there was no change in Wang's writing habit as reflected by his later signatures.

9.48 Thereafter Prof. Jia agreed that one's habit of writing would change gradually bit by bit, and one's signature would be a spontaneous act of one's writing out one's name in accordance with the habit of writing one's name.32 Prof. Jia was plainly right in accepting that contention. Of course, a person may adopt a particular form of mark or design in so writing out his name. But the important point is that the signature is the natural and spontaneous act in accordance with the habit of the individual.

9.49 However Prof. Jia went on to say that though a person's signature would reflect his habit, it can also not be just restricted to one's habit. One can, according to the mood or the need, make use of the skills to write out the best signature one wants.33 Prof. Jia, in my view, realised that he was facing the insurmountable problem that the questioned signatures were not similar to any of the later sample signatures and hence it would be most difficult for him to argue that the questioned signatures were a reflection of Wang's habit of signing, when Prof. Jia had just accepted that the signature was a spontaneous act of one's writing out one's name in accordance with one's habit. Hence he was trying to give himself some leeway that the signature needs not necessarily be in accordance with one's habit. Clearly he was trying to invent some exceptions in order to justify what he thought he

had to say, namely that the four questioned signatures were genuine.

9.50 However he could not reconcile the two things, i.e. on one hand one's signature is a spontaneous act and not a deliberate act of displaying a piece of penmanship. Otherwise it would be the product of display of certain specific skills one possessed. Thus the unanswerable question is how can a signature, not in accordance with one's habit of writing his signature, be spontaneous. Prof. Jia could not give an explanation as to why Wang should have taken this unnatural course,34 and in that case how could he conclude that the questioned signatures are the genuine signatures of Wang?

9.51 Eventually Prof. Jia resorted to the explanation that if Wang was able to write seal script "zhu`n shu" ("Chinese text") as well, then he would not exclude the possibility that Wang would sign his signature in seal script even though he had not seen one signature of Wang ever being written in this style. However if one takes into account the probability, in particular, in the absence of any explanation as to why the person should suddenly want to write his signature in a different way, one should conclude that, based on the samples available, the signature in that novel style is not genuine or at least one cannot conclude that it is genuine.

9.52 Further when he was asked, as a document examiner, when faced with a questioned signature written in a style that is not found in the, say, samples or samples of the comparable period, should he ask himself why that style of writing occurred on a questioned document, all he could say was that the four questioned signatures, as far as the writing style was concerned, was better reflected in 668 and 669.35 Then he resorted to rely on Wang's ability to execute the signatures in such a manner. He said this36:

"As for the period after 1985, what would Mr. Wang's signatures look like? Well, we do not have a chance to see them. So, assuming that the signatures were executed in 1990, as to whether Mr. Wang was able to execute the signatures in such a manner, according to our analysis of the samples, in my opinion, Mr. Wang did possess that ability; he was able to write out the signatures in such a manner, and that is my reasoning."

9.53 However this answer and reasoning wholly based on his judgment on Wang's ability have completely ignored the fact that there was no evidence to suggest that this way of signing was the natural habit of Wang, and certainly the tendency of his way of signing as exhibited in the whole range of sample signatures available would suggest that his habit was moving away from the artistic style with features of the clerical style ("Chinese text"). In any event the assertion that after examining the samples Prof. Jia could fully determine and come to conclusion the questioned signatures were genuine because Wang could have retained that ability to write the artistic style is just a bold assertion on his part.

9.54 Eventually when faced with a questioned signature written in a style that was not found in the sample of the comparable period, he had to consider why should that style of writing occur in the questioned document.37 However when he was asked why he did not consider that to be an indication of a signature being signed by different persons, he resorted to other points of conformities.38 But the question is not whether there are conformities or similarities between the four questioned signatures and 668 and 669 but between the questioned signatures and other sample signatures in the comparable period in the same artistic and "ll shu" style. Prof. Jia has previously admitted that other than 668 and 669, the rest of the samples were more cursively and quickly written. It does not help to avoid this question by resorting to other so-called many conformities or similarities which justified his conclusion that the questioned signatures were genuine. The question of similarities will be considered in the next chapter. Prof. Jia just assumed that Wang was still able to write out a signature with the same artistic and "ll shu" feature in 1990 as those he wrote in 1958.39 He would however have admitted that he could not see samples with the "ll shu" style after 1958.

9.55 Be that as it may, even if Wang was physically able to reduce some writing of the characters "Chinese text" "Chinese text" and "Chinese text" with some "ll shu" features and style, the following questions remained unanswered by the defendant's experts, namely:

(a) Whether it was Wang's habit to do so in 1990?

(b) If it was his habit, where is the evidence that Wang had the habit of signing with such feature and style in 1990?

(c) If it was not his habit, why should Wang suddenly have departed from his habit and displayed his skill in writing with a style or feature that was not his habit to do so?

(d) Why should the questioned signatures contain or display even far more "ll shu" style or feature than the two old 1958 samples and did not incorporate the newly developed features of his more recent signatures, such as having a more flat first horizontal stroke and smaller gap between the first horizontal stroke and the vertical stroke in the character "Chinese text" and other features (which will be more particularly analysed in detail in the next chapter)?

9.56 The arguments of the defence on the change of speed in the writing of the names were demonstrated to be false by the written name of Wang on the 1968 Will in which three characters were written by him. Prof. Jia would have to accept that normally when a person signed, he would be writing his name more spontaneously and quickly than writing out the same characters in writing.40 The 1968 Will is a will, and must therefore be at least as solemn a document, if not more because it is a formal will, as the 1990 questioned documents. Yet when Wang wrote his name on this 1968 document in Chinese, he did so with speed considerably faster than the questioned signatures. This would demonstrate that plainly Wang would not, on account of the document being a testamentary document, deliberately write more slowly on the document (when he was 22 years younger), and thus any assertion that the questioned signatures were slowly written because Wang wanted to write slowly and formally on a testamentary document is not correct.

9.57 In conclusion, the macro analysis pointed towards forgery as contended by all three experts of the plaintiff rather than genuineness as argued illogically and evasively by the defendant's experts and in particular Prof. Jia. Their opinion and arguments, upon analysis, would only destroy their credibility and independence which will be seen to even more severe extent in the micro analysis in the next chapter.

1 T62:13:1-18 and T57:104:10-14, the evidence of Tsui

2 T22:5:11-16, the evidence of GL

3 T32:25:25-26:9, the evidence of Tsui

4 p.189, E2

5 p.822, E11

6 p.32, D1

7 T32:16:24-17:20

8 p.30, E1 and p.35A(6), E1

9 E6-654(42)

10 E6-654(51)

11 T32:46:8-48:16 and 49:19

12 T22:120:20, 122:9, 124:16 and T24:13:14

13 T22:124:8-16

14 p.189, E2

15 T21:105:16-18

16 T21:106:14-107:10

17 T21:130:23-132:1

18 T21:107:19-21

19 T21:131:17

20 T31:134:24-143:16

21 T31:141:11

22 T31:14.:1-11

23 T31:138:1-25

24 pp.2A, 5A, 8A, and 11A, F7A

25 Cheng: T31:144:7-11 and Tsui: T67:24:20-25:18

26 E6-654(126)

27 T78:10:8

28 T78:12:18-21

29 E6-654(89)

30 T99:51:20-57:21

31 Ibid

32 T99:53:9-25, 54:1-7

33 T99:54:8-16

34 T99:52:7

35 T99:56:19-23

36 T99:57:14-21

37 T99:57:22-25

38 T99:58:1-9

39 T99:59:2-18

40 T99:7:9-25

Chapter 10 - The Questioned Signatures Of Wang Teh Huei ("Chinese text") (II) - The Micro Analysis

10.1 There are 34 strokes in the three characters "Wang" "Chinese text" "Teh" "Chinese text" "Huei" "Chinese text". There are four questioned signatures making a total of 136 strokes. On the other hand there are 18 sample signatures. In the micro analysis each stroke of the questioned signature would be compared with the equivalent strokes in the samples. The defence also brought in a microscope into court when Prof. Jia was giving evidence and sometimes each stroke or a part or parts thereof was/were analysed and compared with the other equivalent strokes. This kind of detailed analysis partly explains the length of this trial. I shall in this chapter consider the relevant and significant analysis in detail.

10.2 All three experts called by the plaintiff pointed out a great number of significant features of difference between one or more of the questioned signatures and the control samples. Many of these differences involved different writing movements and are therefore not just ordinary variations in the natural writing habit of the author. Counsel for the plaintiff submitted that such difference in the writing movements could not be explained by saying only that there was a difference in the speed of the execution of the signature. Given that a signature is a spontaneous writing movement of one's name or mark representing him, Counsel for the plaintiff submitted that it is difficult to see why there should be any substantial change in one's speed in the execution of one's signature.

10.3 The defence set out a number of features in support of the conclusion that the four questioned signatures are genuine by relying on their similarities. The plaintiff in reply to that submitted that these features of similarities relied upon by the defendant's experts are superficial features and could not be used to support the conclusion of genuineness. I shall consider hereinbelow those similarities submitted by the defence and see whether they could support the conclusion that the four questioned signatures are genuine bearing in mind that the legal burden is of course on the plaintiff to prove that the four questioned signatures are forged. I shall thereafter consider whether those differences pointed out by the plaintiff would support a finding of forgery instead.

SIMILARITIES

10.4 Generally speaking the part of the report of the defendant's experts dealing with the general comparison in E6-532, sought to contend that the level of calligraphy between the questioned signatures and the controls are similar. In my view this is simply untrue if one were to compare the questioned signatures with those signatures after 1967, which is of course nearer to the purported date of the questioned signatures in 1990. Further when compared with the two samples of 1958, i.e. 668 and 669, the questioned signatures were obviously more unnaturally written with tremors which are not found in any of the control throughout the whole period. (The question of tremors will be considered separately in the next chapter). The report of the defendant's experts also contended that the layout of the characters, the locations of the signatures and their style between the questioned and the controls are the same. This again is untrue in respect of style, especially when one were to compare the questioned signatures with the controls of the later years. As regards the layout of the characters, the only point of similarity is that they were arranged vertically in the sequence of "Wang", "Teh" and "Huei" which is nothing unusual for a vertical signature at all. Otherwise the alignment and proportion are different from the controls.

10.5 The point about the location of the signature is rather daft or silly. The position of the signature in the control samples is dictated by the contents and format of the document. At any rate, the position of the signature on the three questioned Documents A, B and C is the most normal position when the document was written in a vertical manner and the contents occupied about the full page. As regards Document D, the position of the signature is very unnatural for an English document and there is no parallel in any of the documents containing the control samples. The usual position for Wang's signature should be on the right hand bottom corner after the word "love" and Wang should have signed horizontally for this particular document or even in English. Wang used to sign horizontally when it was dictated by the documents to do so as in samples 6, 7 and 11. The argument, if it is an argument at all, that Wang just signed vertically on the left hand corner after signing the first three documents sequentially would then negate the argument for the position of the signature to support the contention of genuineness.

10.6 The other point relied upon, namely that there is the similarity of the habit of signing only after the contents were written, simply does not have any probative value in showing common authorship.

(1) The character "Wang" ("Chinese text")

(a) In 1A1

10.7 The point of similarity relied on is that the first horizontal stroke of this character is the longest, which moves from the left to the right and then slightly upward, and the vertical stroke is connected with the second and third horizontal strokes. However, the length of the first horizontal stroke being the longest is a very obvious point and must be quite obvious to any one copying from a model of Wang. In any event this is a common way of writing the character "Wang" although the orthodox way is the first stroke should be shorter than the third horizontal stroke. The tilting upward of this stroke is again a common feature but the tendency to tilt more severely in this first stroke in all four questioned signatures is a difference which shall be considered later. The same is applicable for the connection between the vertical stroke and the second and third horizontal strokes. In fact if one looks at the four examples picked out by the defendant's experts at E6-534, there is hardly any characteristic similarity between the character "Wang" in 1A1 and any of the four samples "Wang" given.

(b) In 1B1

10.8 The two points of similarity relied on are again:

(a) the shape and direction of the first horizontal stroke; and

(b) the connection between the second and third strokes.

The two examples picked out are 669 and 6002 (made in 1985).

10.9 In fact, there is simply no characteristic similarity between the first horizontal stroke in 1B1 and the same stroke in any of the two examples given. The particular way of tilting of the stroke at the end is simply not found in the examples or any other samples. The connection between the second and third strokes by a loop is common and the experts had simply ignored the many differences between the loop shape in the middle of the character in 1B1 and the samples.

(c) In 1C1

10.10 The similarities relied on by the defendant's experts are:

(a) the specially lengthened first horizontal stroke and its direction;

(b) the linking up of the second and third strokes; and

(c) the sequence of the strokes.1

The examples picked out by the experts are 668 and again 6002.

10.11 It is quite obvious that the appearance and even the direction of the first horizontal stroke is different between 1C1 and these two samples, in that the angle of slanting up is certainly more steep for 1C1 which differs from that in 668 in its lack of the undulating movement and in 6002 where the first stroke is going downwards instead! Again the connection between the second and the third stroke by a loop has very little probative value. In any case, the details of how the two strokes were connected by way of the loop in the middle of the character are quite different between 1C1 and the two samples

 © 2020 Thomson Reuters. 

as aforesaid. Finally the usual sequence of the strokes for this simple character "?" cannot be a point of "similarity". It has no probative value at all. This simply cannot show that 1C1 and the two samples were written by the same person.

(d) In 1D1

10.12 The similarities relied on by the defence are2:

(a) the exceptionally lengthened first horizontal stroke and its direction;

(b) the linkage pen movement in writing the second and third horizontal strokes and the vertical stroke and also the characteristic in the sequence of the writing of the strokes.

The examples cited in support of the points of similarity are 668 and 5999 (made in 1985).

10.13 However, it is plain and obvious that the sequence of writing the strokes in the character "Wang", is not any special feature because this would be the most common way of writing the strokes in this sequence,3 as agreed by Prof. Jia himself. It is true that the length of the first horizontal stroke and its tilting up at the end is found in 668. However in 1D1, there was a lack of the undulating movement as found in 668 and also the general angle of inclination of all the way upwards is a lot more for 1D1 than even 668. There is no similarity between this stroke in 1D1 and 5999 at all where the stroke in the latter was again going downwards instead.

10.14 The details of the linkage movement are quite different between 1D1 and 5999, especially for this shape of the loop in the middle, and the length and direction of the last horizontal stroke are also different. In short, the points of similarity do not have much probative value in showing common authorship.

10.15 It is worth noting that in attempting to defend the similarity, the defendant's experts had relied heavily on the way that the vertical stroke commenced in the character "Chinese text" in the four questioned signatures. It was said that the way of commencement of writing this stroke would be of particular value. However in Wang's sample signatures, one can see that he sometimes commenced the writing of the vertical stroke from the right, sometimes from the left and sometimes vertically down. The fact that in the character "Chinese text" in the four questioned signatures, the vertical stroke started from the right is not of any significance as this was not a personal characteristic in the writing of Wang4 which apparently Prof. Jia also agreed or, at least, he said he could not base on this point to prove genuineness.

(2) The character "Teh"Chinese text"

(a) In 1A1

10.16 Six points of similarities are relied on by the defendant's experts and they are:

(a) The simplified way of writing the "two men" radical "Chinese text" in a way similar to the lateral radical "water" "Chinese text"represented by three dots.

(b) The connected pen movement in the first and second strokes on the right radical.

(c) The connected pen movement in the middle radical "Chinese text".

(d) The connected pen movement in the radical "Chinese text".

(e) The pen wielding movement and the proportion of the strokes in the radical "Chinese text".

The two examples used to illustrate the points of similarity are 668 and 6002.

10.17 However the points of similarity on the "Chinese text" radical is not a characteristic one. In any event, even if there is a similarity in terms of form only but there are differences in detail in terms of pen movement and pressure etc., this will become a difference instead and the similarity only in form will lose its probative value. (Differences in detail will be considered later in this chapter.)

10.18 As to the connected stroke movement in the first two strokes in the right radical in 1A1, it is at the most a pseudo connection. If the two strokes were to be linked up in 1A1 it would be in the form of a compressed loop with an overhand movement, and yet the connection of the same strokes would not be exactly in a form of a compressed loop. Further, the point of intersection is quite different.

10.19 The connected stroke movement within the radicals "Chinese text" and "Chinese text" is quite different between 1A1 and the two examples given. The proportion of the various strokes forming the radical "Chinese text" is also not similar between 1A1 and the two examples. In fact Prof. Jia, as one of the co-authors of the report, would have to admit under cross-examination that the examples given in the report illustrated points of difference more than similarities!5

(b) In 1B1

10.20 The points of similarity relied on are:

(a) again the simplified way of writing the "two men" radical "Chinese text";

(b) the connected first and second strokes in the right radical and the location of the interaction;

(c) the slanting direction of the two small strokes in the radical "Chinese text" and the pen wielding movement for these two strokes;

(d) the stroke arrangement and proportion of the radical "Chinese text";

The example relied on are 6002, 6003 and 6004 (all in 1985).

10.21 These similarities are very superficial. For the "two men" radical "Chinese text", the experts ignored the differences in the slanting or tilting direction, and the direction of the writing of the first dot or slant of this "Chinese text" radical. Likewise, the differences in the pen pressure between them was also overlooked.6

10.22 Further it is also clear that the connected movement and the intersection of the first two strokes in the right radical in 1B1 are in a very characteristic compressed loop form which is not found in any samples, let alone the three picked out samples. Furthermore the point of intersection is also different.

10.23 There is simply no similarity in the direction of the two short strokes in the middle of the radical "Chinese text" of 1B1 and any of the examples picked out and in particularly 6004.

10.24 Likewise the stroke arrangement and proportion of the radical "Chinese text" should be quite different in 1B1 from any of the three examples given.7

(c) In 1C1

10.25 Only two points of similarity are relied on and they are:

(a) again the simplified way of writing the "two men" radical "Chinese text"; and

(b) the characteristic way of writing the right radical in one stroke and also the direction of the pen movement.8

10.26 The defence relied on 6000 and 6002 as the examples to support this point of conformities or similarities.

10.27 However on the first point, the defence in fact referred to the two slants which represent the "Chinese text" radical but they do not have the typical shape or form and the second slant appeared to be thin and small, and the lower left of the slant was the beginning of the vertical stroke.9 Further in relying on this characteristic in the "Chinese text" radical, the defence simply ignores things like the direction of the writing movement for the two slants. Furthermore in both examples cited i.e. 6000 and 6002, the second slant was linked with the third stroke which was the vertical stroke of the "Chinese text" radical, but the second slant in 1C1 was not so linked. Even Prof. Jia would not say that in the case of 1C1, there was a pseudo connection between the second slant and the vertical stroke. He admitted that they were not written with a linkage and they were written out stroke by stroke.10 In the circumstances, the similarity of the "Chinese text" radical could hardly be said to be a point of similarity at all. In fact, on the contrary, it must be a difference instead.

10.28 Furthermore, the answer given by Prof. Jia in relying on the end of the second slant as the beginning of the third stroke as a point of conformity in the first place, and then not even able to say that whether in relation to 1C1, the slant and the vertical stroke had any pseudo connection, indicated that he was not reliable here. In fact one could not say that the lower left of the second slant was the beginning of the vertical stroke.

10.29 In respect of the right radical, the characteristic was said to be the one stroke completion movement of the radical.

 © 2020 Thomson Reuters. 

Even assuming that the last dot of the radical is intended to be excluded by the three experts in their report, it is by no means clear that the rest of the radical in 1C1 was in fact written in one stroke. Initially when Prof. Jia was asked to trace out how this character "Chinese text" was written, he first drew out the green lines in at least three strokes on F7A-8A and then one red line on F7A-8B to represent the continuous one stroke movement. But the latter red line is not entirely satisfactory.

10.30 In particular if he was right, then the part of the tip of the stroke where he had marked C in green on F7A-8A should have been retraced as would be the upper part of the same small stroke. Yet it is obvious that the part of the small stroke where he marked C in green was lighter in colour intensity, which would indicate that that part of the stroke had not been retraced, whilst the upper part of the same stroke, i.e. the part which represented the right small stroke in the middle radical "Chinese text" was written with a retracing movement, namely the first going up stroke from south-west to north-east, and then coming down to the end where it was marked C. In that case there would then be another separate writing movement starting from the lower horizontal stroke of the radical "Chinese text" to form the long slant representing the left dot of the radical "Chinese text". Thus I accept the plaintiff's submission that Prof. Jia's purported explanation on the lighter colour intensity on the lower part of the small stroke where he marked C was not satisfactory at all.11

10.31 Furthermore, it is difficult to accept the evidence of Prof. Jia that the relevant part of the radical was written in one stroke without reservation. This is because it had subsequently become apparent that in fact very often he could not be really sure as to whether the strokes representing the middle part of the radical "Chinese text" and the end of the "horizontal-angular-hook" stroke (meaning a horizontal stroke followed by an angular stroke ending in a hook) "hing zhi gou" ("Chinese text") or "Chinese text" on the bottom right of that radical were linked or not. Thus, for the same part of the radical in 1A1, 1B1 and 1D1, his opinion was that there was a separate start of a new stroke representing the middle part of the radical "Chinese text" after the "hing zhi gou" ("Chinese text") "Chinese text".12 However when it was pointed out to him that he had alleged that this part of the radical in 1A1, 1B1 and 1D1 was written not in one stroke in contrast to what he said for 1C1, he resiled from his firm position on how 1A1, 1B1 and 1C1 were written and said that in fact he could not be sure as to whether there was in fact any actual linkage or not.13 His ability and/or reliability to tell whether this kind of strokes was linked or not linked and how the different strokes were written, must be seriously doubted.

10.32 In any event, even if Prof. Jia were right in saying that that part of the radical was written in one stroke, it is by no means any personal characteristics of Wang. From the two examples cited by him, plainly even with the imagination and innovation of Prof. Jia, he could not say that the relevant part of the radical in 6002 was written in one stroke. Further, even for the other one 6000, the same part of the radical was not written in one stroke. Furthermore, he had plainly ignored the important differences on how the first two strokes in the right radical of the character "Teh" were written. In the case of 1C1, the two strokes were in a characteristic way of a compressed loop formed by one continuous stroke. In both 6000 and 6002, there was simply no actual loop and the two strokes were not even connected. The pseudo connection in both samples would not form a compressed loop either. There were also other important differences on the way that the middle two strokes of the radical "Chinese text" were written.14

(d) In 1D1

10.33 Again the defence relied on two points of similarity i.e.:

(a) "Chinese text" radical is written in simplified writing;

(b) the right hand radical was written in one stroke (but the direction of the pen wielding movement is not included).15

The two examples relied on to support these points of similarity are again 668 and 669.

10.34 The so-called similarities between the "Chinese text" radical in 1D1 and 668 (and not even 669) were that the "Chinese text" radical was both written in three strokes.16 One may also possibly include the point that the first one is short and the second one is even shorter and the third one is a long downward stroke. However the similarity simply stopped here. The more subtle details of the way of executing the stroke like the direction of the initiation of the stroke, whether the stroke is from right to left or vice versa were all different. In this respect, Prof. Jia adopted a double standard in his evidence in that, while attempting to show similarity in the vertical stroke in the character "Chinese text", he would say that direction of the commencement of writing movement of a

stroke was important to show similarity, whilst here he simply ignored the difference in the direction of the strokes. This would not only nullify his point on similarity in this character "Chinese text". This point would also serve to show certain degree of intellectual dishonesty of him and the fact that he is not a reliable expert witness. Eventually he conceded that in fact on this point on the "two men" radical "Chinese text", 1D1 and 668 were different.17

10.35 Likewise, it is clear that for the other sample picked out to support this point, i.e. 669, there are only two strokes in writing the "Chinese text" radical which is quite different from 1D1. Prof. Jia conceded that in writing 669, after the first dot was written, the author continued to write the vertical stroke.18 This must mean that the writer of 669 did not even bother to write the second slant of the "Chinese text" radical whilst in a case of 1D1, there was an obvious movement representing that second slant. Furthermore, the direction of the first stroke is also different.19 Hence even for 669, the point of the "Chinese text" radical was really a difference and if properly understood, it is a point of showing different authorship and cannot be used to support a conclusion of common authorship instead.

10.36 In respect of the point about the writing of the right radical in one stroke, Prof. Jia realized that when he reached a certain stage in cross-examination, what was in the right radical of 1D1 could not be said to be in one stroke (even if, as in a case of 1C1, one is to ignore the last dot in the radical "Chinese text"). Faced with this difficulty, Prof. Jia went on with the explanation that in fact what he meant in the report was the right radical was not written in one stroke but rather "when I said the right half portion was written out in one-stroke completion, I meant more than two strokes were written in one-stroke completion".20 This would probably mean that "for those part/parts written in one stroke, they are similar".21 However, even with this new dimension of looking at his report, the point of similarity is still not made out.

10.37 In the first place, Prof. Jia would confirm that when he referred to the parts written in one stroke, he would refer to two such parts, namely:

(a) The part that starts with the vertical stroke from the top, linking up with the vertical stroke of the radical "Chinese text" to the completion of the writing of the radical "Chinese text" and also the slants that represented the left hand side dot of the radical "Chinese text".22

(b) In the radical "Chinese text", the slanting hook stroke "xii gou" ("Chinese text") or "Chinese text" was linked with the dot in the middle and after it had been linked, a small loop was formed, which was closer to the right.23

10.38 As to point (a), in the first place even from the evidence of Prof. Jia, he could not really be sure as to whether the whole part described in (a) above in 1D1 was really in one stroke. When he gave evidence-in-chief with the benefit of the microscope, his evidence was that if one ignored the left radical and the last dot, the character "Chinese text" in 1D1 was written in four or five strokes,24 thereby suggesting that at least the top of the stroke representing the short stroke(s) in the middle of the radical "Chinese text" and mark "C" in red on F7A-11A was the beginning of a new stroke. However, when he was asked in cross-examination to trace out the execution of the various strokes on F7A-11A, he again marked out "C" in red to show that that was the beginning of a new stroke. In the later part of his evidence (Day 98), he changed his mind to say that in fact the part marked "C" in red was linked with the end of the "hing zhi gou" "Chinese text" and he corrected F7A-11A in green to reflect his new opinion.

10.39 Secondly, even with his amendment to F7A-11A in green, there was a separate starting of the bottom horizontal stroke of the radical "Chinese text" as marked by "C" in green by him. Thus the linking and writing as corrected and marked in green by him, was not what he eventually thought was the writing movement as revealed in point (a). This constant change of mind would indicate that he was prone to change his evidence or view to suit the point he was making and this would certainly not give anyone confidence on either his ability or reliability.

10.40 In any event, it is quite plain that point (a) above is neither similar to the corresponding part of the radical in 668 nor 669. There are many points of difference between how the relevant part was written in 668 and 1D1. For instance, in 668, the bottom horizontal stroke in the radical "Chinese text" was completely omitted, whilst there was a clear writing of this stroke in 1D1. Furthermore, even if one were to concentrate only on linking movement, the way of linking up the middle two short strokes of the radical "?" was done differently in 668. Again the last slant (representing the left dot of the

 © 2020 Thomson Reuters. 

radical "Chinese text") in 668 went on with a retracing to link up with the "xii gou" ("Chinese text") "Chinese text" of the radical "Chinese text". All these features must be major differences between 1D1 and 668.25

10.41 As to 669, the vertical stroke on the left of the radical "Chinese text" started from below the first horizontal stroke of the right radical and this is different from that in 1D1 which started from above the horizontal stroke. Likewise, the way that the middle part of the radical "Chinese text" was written was completely different. In fact, the only similarity was the movement of a stroke representing the middle two dots of the radical "Chinese text" which was marked "C" in red on F7A-11A.26 Even for this stroke, in the case of 669, it started as an independant stroke, whilst in the case of 1D1, on the last thinking or version of Prof. Jia, the beginning of this movement was linked with the end of the "hing zhi gou" "Chinese text" of the radical "Chinese text".

10.42 As to point (b) above, in both 668 and 669, the "xii gou" "Chinese text" was linked with the slant representing the left dot of the radical "Chinese text", and also the ending of the "xii gou" "Chinese text" and the shape of the loop formed are also completely different.27 In short, these points of so-called similarity relied upon by the defence could not support the conclusion of common authorship. Again those differences pointed out by the plaintiff supported forgery instead.

(3) The character "Huei" "Chinese text"

(a) In 1A1

10.43 The points of similarity relied on are the stroke arrangement and proportion of the character "Chinese text", the connected stroke movement of the radical "Chinese text", the feature of those connected strokes and direction of the radical "Chinese text", the non-connected last two horizontal and vertical strokes and their ending directions.28 The two examples chosen by the experts are 668 and 669 again. However, in relying on the similarity of the connected stroke movement of the radical "Chinese text", the defence experts ignored the differences between the way of connection of the strokes even between 668 and 669, not to mention the various differences between the various parts of the radical "Chinese text" in 1A1, such as the extent of the downward movement of the slant "Chinese text" and the narrow hook "Chinese text". Likewise, the connected stroke movement of the radical "Chinese text" is not exactly the same between what is found in 1A1 and 668 or 669. In any event the sequence of the writing of the strokes in this radical in 1A1 is rather common. The fact that the last horizontal and vertical strokes are not connected is not a special feature at all. Given the direction and position of the two strokes in the radical, it is more than normal that the two strokes were not connected together. The direction of the last vertical strokes is simply different between 1A1 (by pointing to the right downward) and any of the control samples (by pointing mostly to the left or just straight down).29

(b) In 1B1

10.44 The similarity relied on are:

(a) the connected pen wielding movement of the radical "Chinese text" and

(b) the connected pen wielding movement and the direction of the horizontal and vertical strokes of the radical "Chinese text".

The two examples chosen to illustrate the similarity are 6002 and 6004.

10.45 In fact, there is no similarity in the pen wielding movement of the radical "Chinese text" between that of 1B1 and that of 6002 and 6004 and, in particular, 6004. Further, the experts had ignored the differences in this radical of 1B1 and the rest of the samples, such as the slanting or tilting direction of the first small vertical stroke and the narrow V-shape hook.

10.46 In relation to the vertical "Chinese text", there is nothing special in the direction of the horizontal and vertical strokes (which Prof. Jia had clarified as referring only to the last long horizontal stroke and the long vertical stroke).30 As to the way that this radical was written, insofar as it relates to the basic way of writing the strokes, it is very common. As to the detailed way of writing the middle radical "Chinese text", the way that this part was written in 1B1 and the two examples 6002 and 6004 are quite different.31 As aforesaid, the long vertical stroke again pointed to the right in 1A1 and not to the left as in the two or even other samples.

(c) In 1C1

10.47 There are two points of similarity relied on by the experts of the defendant32:

(a) the connected stroke or pen movement in the radical "Chinese text"; and

(b) again, the characteristic way of the linkage in the pen movement in the radical "Chinese text".

The examples chosen for comparison to support these points are 6000 and 6003.

10.48 In fact, it was accepted by Prof. Jia33 that the connected stroke movement in the radical "Chinese text" in 1C1 is different from those in the two examples given by the three defendant's experts. As to the characteristic aspect of the linkage in the radical "Chinese text", Prof. Jia clarified in his evidence that the part he referred to was "the linkage between the vertical stroke and the "hing zhi gou" "Chinese text" of the radical "Chinese text" and the linkage between the radical "Chinese text" and the lower horizontal stroke ".34 However, the way of linkage of the vertical stroke and the "hing zhi gou" "Chinese text" is a very common way of linkage and it has virtually no probative value in showing common authorship. Further, the way as to how the vertical stroke begins in 1C1, is quite different from that in 6000 and 6003, and also in the detailed way of writing the middle part of the radical "Chinese text".

10.49 In relation to the "characteristic" linkage between the radical "Chinese text" and the lower horizontal stroke, even Prof. Jia would have to admit that there was no particular characteristic in the way of writing.35 Hence, there is nothing here to support the conclusion of common authorship at all.

(d) In 1D1

10.50 The three experts relied on three points of similarity,36 namely:

(a) the characteristic in the linking of the character "Chinese text";

(b) the characteristic of the sequence of the various strokes; and

(c) the direction of the lower horizontal stroke in the radical "Chinese text".

The examples chosen by the defendant's experts are 5999 and 6002.

10.51 However, none of these two examples chosen by the defendant's experts would support any similarity between them and 1D1 in relation to the direction of the lower horizontal stroke in the radical "Chinese text". In fact, Prof. Jia also admitted that the examples chosen were not good examples. In relation to the sequence of the strokes in how the character "Chinese text" was written, it was the most common way of writing this character and thus it has no probative value at all. Even Prof. Jia would have to admit that it was of a relatively lower probative value.37 This is an understatement.

10.52 In relation to the linkage of the character, Prof. Jia would agree that the great characteristic in the linkage in this character in 1D1 is the linking of the radical "Chinese text" and the radical "Chinese text".38 However, this characteristic is not present in either of the two examples chosen or in any other samples at all. This is the only signature among all the questioned and sample signatures, which was written with such a linkage.

10.53 Thus, all those similarities relied on by the defendant's three experts, when properly understood or analysed, could not support their conclusion that the questioned signature in 1D1 or any of the questioned signatures was written by Wang himself.

SIGNIFICANT DIFFERENCES

10.54 I shall set out hereinbelow all the differences which I accept as significant differences between the questioned signatures of Wang and the sample genuine signatures. I shall start with the character "Chinese text".

(1) The character "Chinese text"

10.55 There are eight significant differences as follows:

(1) The upper slant of the first horizontal strokes found in all four questioned signatures were quite different from the samples. Although in 668 (written in 1958), 735 (1967) and 5998 (1985), the tail end of the stroke was also facing

upwards, the overall angle of slant was certainly a lot more for the four questioned signatures. In fact, when compared with the later samples nearer to the year 1990, the overall direction of the stroke was either horizontal or sometimes even downwards in the sense that the end of the stroke was lower than the beginning of the stroke. Prof. Jia's introduction of the description of this stroke as "a silk worm head and a wild goose tail " ("Chinese text") would not help to explain this difference at all. The defendant's charts in E6-654(65) and (105) simply do not address to this point.

(2) There was a large or wider gap between the first horizontal stroke and the beginning of the vertical stroke in all four questioned signatures. Similar gaps were only found in the two 1958 samples. For the later samples, even if there was a gap, it was invariably very small. The sample 5997(2), i.e. the very small signature at the corner of the photograph could not be used as a good sample because of the very confined space and the very small size of the signature. The restriction in the available space would restrict the natural spontaneous writing of the signature. In any event even for this sample the gap is still smaller.39

(3) Further, the starting point of this vertical stroke was very much to the left of the central point of the first horizontal stroke in all four questioned signatures. This was so notwithstanding that the first horizontal stroke in these four questioned signatures were all rather long. In the case of the controls, the starting point of the vertical stroke was somewhat at the central point of the first horizontal stroke. Even in the case of 668 and 669, the starting point was still quite close to the central point.

(4) The length of the vertical stroke above the loop which represented the middle horizontal stroke of the character, was rather short in all four questioned signatures. The same vertical stroke was slightly longer for the two 1958 samples, but had been rather long since 1967. This was especially so in the 1984 and 1985 samples which, of course, were again closer to 1990 than to 1958.

(5) For 1A1, 1B1 and 1C1, the vertical stoke above the loop had a larger angle of inclination so that an imaginary marginal extension of this stroke would cut the other two characters at the left (as shown in Album 5B). The dotted lines at E6-654(39) for 1A1, 1B1 and 1C1 were simply not properly drawn by the defendant's experts. At any rate, the point of significance is in the overall appearance and alignment of the three characters and not just the exact position where these imaginary lines would cut the radicals in the other two characters.

(6) The middle loop was virtually closed in all questioned signatures (in the case of 1C1, there was just a very tiny white spot). However, in all the samples, except the very small signature at the corner of the photograph 5997(2) - it was explained above that the space therein is quite restrictive, there was usually a much larger loop.

(7) For the questioned signatures, the peak of the upward curve in the middle of the character forming the head of the numeral "2" was still on the rise when it cut the vertical stroke. However for the controls, the peak was reached before the intersection or, at the most, at the same level of the intersection.

(8) For all questioned signatures, the part of the writing before and connecting to the beginning of the last horizontal stroke was done by a writing movement which went down in the south-west direction and then retraced up and moved towards the right in an undulating fashion.40 In the case of 1A1, the movement is so exaggerated that an eyelet was formed at the beginning of the lowest horizontal stroke. However, there was no such similar movement in the case of the controls. Even for the two samples in 1958, the south-west direction movement was not so obvious. In the later samples, there was very little retracing along the left side of the last horizontal stroke and movement had become much more like a movement to the left and then an immediate turn back towards the right.

(2) The character "Chinese text"

10.56 There are six significant differences and they are as follows:

(1) In respect of 1A1, the vertical stroke in the left "Chinese text" radical extended to a very low position. This was probably the result of a mistake in the simulation process by the writer of 1A1. The defendant's chart at E6-654(71) made references to 5998, 5999, 6000 and 6005 trying to show that there are comparables. None of them is a good comparable and the length of this stroke in 1A1 is outside the range of variation, and as such, is an indication of forgery by way of difference.

(2) For 1A1, 1B1 and 1C1, the first horizontal stroke of the right radical has a different form of wavy movement from the known samples. The stroke went up and then down again towards the end and at the very end it curved up and turned sharply back to the left. In the case of 1B1 and 1C1, after the stroke turned back, it continued to form a compressed loop. This writing movement, being an overhand movement, is quite different from an underhand movement as in 675 or 6002.

(3) For all questioned signatures, the point of intersection between the first horizontal stroke and the first vertical stroke of the right radical is very much towards the left end of the horizontal stroke. This feature is only found in 669, but then for 669, the vertical stroke merely touches the horizontal stroke and there is no intersection.41

(4) For 1B1, the left dot of the radical "Chinese text" is a long dot in the shape of a slant and is very low reaching going way below the lowest part of the curve of the radical. Although there are some samples notable from the later years where the end of this dot is also below the lowest part of the curve, the dot in 1B1 is far lower than any of these samples42 and is way out of the range of variation.

(5) For 1B1, 1C1 and 1D1, the curve in the "xii gou" "Chinese text" in the radical "Chinese text" is an upright oval shape with the mouth entirely closed. Even in a case of 1A1 the curve is almost a closed circle. In none of the samples is the curve in this upright oval shape. For the samples later than 1958, the curve hardly exceeds a semi-circle. For 668, although the curve exceeds a semi-circle, it is not as closed a circle as even in 1A1.

(6) The last dot of the radical "Chinese text" is separately written in all the questioned signatures and is large and emphatic, especially for 1A1 and 1B1. The last dot in the samples where it is separately written is smaller and less emphatic (as in 668 and 669) and in many instances of the later samples, this dot is linked up with the middle dot.

(3) The character "Chinese text"

10.57 There are five significant differences and they are:

(1) The slant of the radical "Chinese text" in 1A1 is very low reaching when compared with the downward hook of the same radical on its right. While there are a few instances in the control that the slant is lower than the lowest part of the downward hook as chosen by the defendant in E6-654(76), none of the samples has reached the same exaggerated extent. This is a case where the questioned signature has gone outside the range of variation again.

(2) The downward hook of the radical "Chinese text" forms a very narrow V shape in all the questioned signatures, with 1B1 being the widest. However, in the control, the hook is usually much wider and many of them in the later years are in U shape. The narrowest appears to be 668 and 669 again but still they are wider than 1B1. Even if 1B1 is to be treated as within the range of variation, certainly the other three questioned signatures could not be within the range of variation.

(3) The first short vertical stroke of the radical "Chinese text" for 1B1 is coming down from right to left thus the stroke as a whole is tilting towards the upper right. For all the control samples, this stroke is either from left to right (e.g. 6000), or vertically down (e.g. 669). 668 is not actually tilting towards the right as a whole, although the commencement movement of the pen is from the right, but the stroke taken as a whole is still straight. In any event, the tilting direction of this stroke in 1B1 is way out of the range found in the samples.

(4) As aforesaid for 1D1, there was a connection between the left and right radicals. None of the control samples was so connected.

(5) For the four questioned signatures, the long vertical stroke in the radical "Chinese text" is either straight down or with its end going towards the lower right. The same strokes in the controls are either straight down or going towards the left.43 The explanation of the defence that the tilting in the wrong direction for the questioned signatures was due to an accident, is not acceptable. The wrong direction did not only occur once but twice, i.e. for both 1A1 and 1C1, although in the case of the third one in 1B1 the bending in the wrong direction is less obvious. The downward stroke in 1D1 just went straight down.

FURTHER AND OTHER SIGNIFICANT DIFFERENCES

 © 2020 Thomson Reuters. 

10.58 When Prof. Jia gave evidence in Court he merely confirmed the truth of the contents of the report made jointly by him with his other two colleagues. It is notable that he did not make any reference to sections V to IX of the report to support his conclusion. In fact none of those similarities or examples had been referred to by him. Instead he started giving his comments by referring to the image of these signatures examined under the microscope brought into court. However, the enlarged image of the various characters showed many features of unnatural writings which had not hitherto been raised by other experts, who carried the examinations of the questioned documents in 2000 in the Government laboratory. I shall start with this really microscopic examination with the character "Chinese text" first.

(1) The character "Chinese text" in 1A1

(a) The vertical stroke

10.59 The ink would indicate that the downward movement of the vertical stroke would appear to be on top of the upward stroke. This feature is best shown in F7A-1. Due to the special lighting effect, this feature is not as clear although it is still visible in the computer capture in A.01.w01 but is not shown in A.01.w04. This phenomenon would indicate that after the original downward and upward strokes were written (as one continuous stroke) there was some retouching of the downward stroke over the intersection point so that one can now see that the downward stroke covered the upward stroke. The purported explanation from Prof. Jia was that this phenomenon was caused by the fact that the ink in the downward stroke was rather heavy and thick and when the pen went on to write the horizontal stroke, the movement was relatively faster and the pen pressure was lighter, so the ink line for the upward (horizontal) stroke was light in colour and was faint.44 In fact when the difference in the colour tone between the downward stroke and the middle horizontal stroke on either side of the downward stroke was pointed out to Prof. Jia, he claimed that he could not see the difference in the colour tone!45 This is most surprising and it cannot be an honest answer as such difference in colour tone is obvious from F7A-1 (a photo taken before the cracking occurred or got more seriously in the original Document A).

(b) The eye-let of the lowest stroke

10.60 The ink at the turning of the eye-let of the lowest horizontal stroke showed that the movement from right to left and then another movement from bottom left up to the top right. The upward stroke obviously covers the side-way horizontal stroke. In fact the right edge of the upward stroke when it intersects with the side-way stroke shows a clear distinction of the two movements. One can actually see a clear distinction line in the colour tone of the two strokes. Despite the darker colour of the upward stroke, one can see the side-way stroke continues until it reaches the end of the left side of the upward stroke and with a very tiny protrusion. These features would indicate that there were two writing movements, whether there was any pen lift or not, and not a smooth curving up movement. Again this is quite apparent from F7A-1 and could also be seen in A.01.w02.

10.61 Prof. Jia's response was simply that he did not see this feature or any colour difference at this part of the character at all.46 This could hardly be a satisfactory explanation. The other explanation is that it was hard for someone to imagine that there could be such perfect linking up of the two movements.47 However, if there was no pen lifting but merely a short pause to start another movement, there is no reason why the linking must be broken. The response of Prof. Jia and particularly his refusal to admit that there was some colour difference, would also serve to show that he was at the least an unsatisfactory expert witness.

(2) The character "Chinese text" in 1A1 in respect of radical "Chinese text"

10.62 When Prof. Jia gave evidence-in-chief, he described how the lower part of the right radical was written. He said the left dot of the radical "Chinese text" should be the stroke between the "xii gou" "Chinese text" of that radical.48 At the time when he was giving evidence-in-chief he was looking at the character through the microscope. His evidence was that the stroke representing the middle part and the lower horizontal stroke of the radical "Chinese text" ended somewhere below the horizontal stroke to overlap with the "xii gou" "Chinese text" but he was not sure exactly where the ending was.49 Then there was the writing of the first dot of the radical "Chinese text" followed by the "xii gou" "Chinese text" which started with the bit of a triangle sticking out on the left side of the downward stroke underneath the radical "Chinese text". When he was asked to trace out the sequence of strokes in cross-examination, he marked out in green the

three strokes and the sequence thereof on F7A-2A, basically confirming the sequence he gave in chief.

10.63 However when he was further cross-examined on the way of writing of this part of the radical, he amended his evidence. His new version as represented by the red lines he drew thereon was that the stroke coming down from the radical "Chinese text" would not end within the "xii gou" "Chinese text" but overlapping the "Chinese text". This new version was that in fact that stroke went out of the "Chinese text" and went diagonally through the width of the left dot of the radical "Chinese text" and ended outside the dot. He gave this new version because he was being pressed for an explanation for the bulging out appearance on the left side of the dot. In effect he tried to explain that this bulging out appearance was because it was the end of the long stroke coming down after the author had finished writing the last horizontal stroke of the radical "Chinese text".50

10.64 I accept the plaintiff's submission that it is plain and obvious that there was a retouching of the left dot in the radical "Chinese text". Otherwise the bulging out of this dot on the left would be inexplicable. The purported explanation of Prof. Jia cannot be accepted. For an expert of his calibre being an eminent textbook writer on this subject himself, he should not have failed to spot the new version at first sight. Apart from the fact that his explanation would involve the changing of his evidence, it is difficult to see how the bulging out part could be the ending point of the slant that came down from the radical "Chinese text". The outline of the slant he drew in red on F7A-2B could not cover the whole part bulging out from the dot.51 An examination of the ink colour of the stroke on A.02.t03 would indicate that the slant he drew in red just did not exist. In fact what is in this computer capture would clearly show that the slant after the radical "Chinese text" would come down ending somewhere at the beginning of the left dot. There were then two strokes for the writing of the left dot. One is a smaller one, part of which is the bulging out part. The other one is as outlined by Prof. Jia in green on F7A-2B. From the colour shown on the computer capture, it is likely that the smaller one was written first and the writer of the signature later on added the dot as outlined by Prof. Jia in green. Thus this is a kind of retouching in this left dot and there is no explanation whatsoever for this retouching apart from being a sign of forgery.

10.65 Furthermore from F7A-2 and also from A.02.t05, it is apparent that the pen pressure in the writing of the slant after the completion of the radical "Chinese text" was heavier than the "xii gou" "Chinese text" (which was mis-stated in the plaintiff's submission as the vertical-hook stroke, meaning a vertical stroke ending in a hook "shy gou" ("Chinese text") "Chinese text "). In fact, it would appear that the slant was written on top of the "xii gou" "Chinese text". If this is so, then plainly there was some rewriting or retouching of this part of the radical as it would not be a natural writing to write the "Chinese text" first and then a slant diagonally through it. Prof. Jia did not of course agree that the "Chinese text" was written first before the slant.52

10.66 Even assuming for the purpose of argument only, that the "xii gou" "Chinese text" was not written before the slant, it is difficult to see why the author did not just make use of the downward slant to form the left dot of the radical as in the case of 1B1, 1C1 and 1D1 and indeed virtually all his known signatures save for 6002 (see also DPJ 6002.02.t02) and possibly also in his written name on the 1968 Will as appeared in F1(3-4).02.t02. However, in both of these instances where the dot might be said to be deliberately and separately written, it was a very distinct dot and the slant came down clearly and distinctly and there was no question of any merging with the dot. This would be a point of significant difference.

(3) The character "Chinese text" in 1B1 in respect of the lower left corner of radical "Chinese text"

10.67 From the enlarged computer image obtained from the microscope, it is found that there was a lump of ink at the bottom left corner of the radical "Chinese text". I accept the plaintiff's submission that this was formed by retouching of this part of the radical. The bulky appearance of this corner in this part of the radical "Chinese text" is in contrast with all other signatures of Wang and the other three questioned signatures. This feature in 1B1 is seen in the photograph F7A-5 as well as in the computer images in B.02.t01 and B.02.t02. While there is no dispute that the left vertical stroke of the radical "Chinese text" was retraced up to write the top horizontal stroke of the radical, the retracing could not explain the shape and ink intensity of this bulky patch in 1B1. The retracing up could only be one of the three possibilities, as follows:

(i) Retracing up along the same line;

(ii) Retracing up on or along the left of the original downward line; or

(iii) Retracing up on or along the right.

Prof. Jia's explanation was that it was a case of retracing with the line going along the left side of the original downward stroke only i.e. (ii) above.

10.68 However the top part of the corner of that downward stroke is much thinner than the bottom part and there is a sudden thickening of the stroke on both sides of the original downward stroke. Moreover, there is a clear change of colour intensity and tone along virtually a straight line so that the lower part of the stroke representing the corner was much darker in colour according to the aforesaid photograph and the computer images.

10.69 When the aforesaid was pointed out to Prof. Jia, he gave three explanations.53 The first one was that there was some breaking of the paper at the top part of the stroke thus giving people the wrong impression of a lighter colour at the lower part. The second explanation was that there was the retracing upward movement which absorbed part of the ink. The third and the last one was that there was some diffusion of ink from the bottom horizontal stroke of the radical "Chinese text".

10.70 I am afraid none of the reasons given by him could be a valid explanation of this phenomenon. In respect of the first one of the torn paper, it is noted that in F7A-5, that photograph was taken before the cracking of the paper so that what was seen as small patches of white on the downward stroke in B.02.t02 was simply not there and yet the difference in the colour intensity and the thickening of the stroke, and the almost straight division line in the colour intensity and the thickness of the stroke are also visible. Furthermore, the part immediately next to the colour division line had no cracking of paper at all.54

10.71 In respect of his second reason, it would not hold well either because there was likewise the same darker ink and thicker line on the right side of the stroke at the corner while the retracing was said to be in the clockwise direction going up on the left. When this was pointed out to him, Prof. Jia simply prevaricated and started looking into the microscope and evasively talking about the broken paper and ink line formed by the last horizontal stroke of the radical "Chinese text".55 However the photograph at F7A-5 did not show any torn paper. Thus his second explanation cannot be accepted.

10.72 In defending his third reason, Prof. Jia prevaricated again by raising issues of ink lines along the horizontal strokes. In the end, after some pressing, he was forced to admit that the only point of the relevance of the ink lines caused by the structure of the paper was that he said that might give rise to some deception to our eyes in terms of perception of colour tone.56 But plainly the darker patch at the corner of the radical "Chinese text" is not just an ink line. When he was pressed on the point of diffusion, his evidence was that it was possible that some of the ink of the lower horizontal stroke of the radical "Chinese text" might diffuse to form the patch at the corner. But looking at the writing movement of this horizontal stroke, even assuming that this stroke did invade into the vertical stroke on its left, the direction of the stroke was basically horizontally from right to left but with the right side at a higher position. In terms of direction, it might be said that this was from east north-east to west south-west. Granted that diffusion of ink might occur along the whole stroke, it is simply strange and incredible that the diffusion would result in the patch at that corner. In particular, the top part of the patch is triangular in shape with the tip at the right of the stroke.57

10.73 In the end I accept that there was a retouching at this corner and this could not be said to be natural writing.

(4) The character "Chinese text" in 1B1

(a) The "shelter" "Chinese text" radical

10.74 In F7A-6 and B.03.h03 the top horizontal stroke of the shelter at the top of the radical "Chinese text" should have been one stroke across. At about the middle of this horizontal stroke, there was the top part of the long central vertical stroke of the radical "Chinese text". The vertical stroke touched the horizontal stroke and possibly also invaded into the horizontal stroke somewhat, although it did not go through it. It is also clear that if the radical was to be written in a normal manner, the shelter of the radical would have been completed before the writing of that central vertical stroke which is normally written as the last stroke of the character.

10.75 However it should also be noted that while the upper part of the parameter of the top horizontal stroke of the shelter is a smooth line, the lower part is not. The part of the horizontal stroke to the left of the central vertical stroke was clearly narrower than the part of that stroke to the right of the central vertical stroke. As the character was written with a broad nib pen and as such the width of a stroke might vary especially when it came to some turning point, clearly if one were to link up the lower parameter of that horizontal stroke of the shelter between the left and right of the vertical stroke, one could not get a smooth lower line thus indicating that the lower parameter of that shelter was not written by an one-stroke motion.58

10.76 Furthermore, it is the defendant's case that the radical "Chinese text" in 1B1 was written without the short horizontal stroke below the shelter.59 Hence, what was seen at the right of the top part of the central vertical stroke could not be the short horizontal stroke below the shelter above the radical "Chinese text". Furthermore, the rather angular intersection between this lower outline of the stroke and the right side of the central vertical stroke makes it unlikely that this is part of the central vertical stroke.

10.77 In any event the stroke at the turning at the top right corner of the shelter is not smooth, especially at the lower (inside) outline.

10.78 In short, these two features strongly indicated that there was a retouching or rewriting of a second line at the top part of the shelter radical although Prof. Jia would not agree with such a suggestion.60

(b) The central vertical stroke

10.79 The central vertical stroke of this radical "Chinese text" had a very sharp twist to the downward right at about the position of the lower middle part of the radical "Chinese text" as appeared in photograph F7A-6. This was also a kind of unnatural writing indicating forgery.

(5) The character "Chinese text" in 1C1

(a) The first slant of the "Chinese text" radical

10.80 In photograph F7A-8 and computer images C.02.t04 and C.02.t10, the first slant of the "Chinese text" radical of this character was clearly rewritten or retouched. In fact even Prof. Jia would have to admit that this slant was not written out in one stroke.61 There was no suggestion that this slant was accidentally rewritten twice nor was there any suggestion that there was some accident in the writing process so that there was an extra stroke being put at that same place. There was simply no need to do so. Indeed, any such accidental explanation is not likely to be the case because the shape of the slant is rather smooth and well formed. Hence, it must be the result of some careful writing of the stroke and not a combination of some writing movement and an accidental stroke or an accidental touch of the nib on the paper.62 It was never suggested that Wang was in a habit of retouching his signatures and there was no suggestion that this or any similar kind of retouching had occurred in any of the sample signatures. There was actually no cause for Wang to make some retouching of his signature which was supposed to be spontaneous. When Prof. Jia was asked as to why a natural signature of Wang had such a retouching, his best answer was that "I think it cannot be regarded as a sign of forgery".63 However this must be a kind of so-called "refining or retouching" ("Chinese text") which are typical signs of forgery even according to the books written by Prof. Jia and Xu.64

10.81 Since both sides accepted that even one unexplained but significant material difference is sufficient to prevent a positive identification of a signature as genuine, the presence of this inexplicable sign of forgery would at least prevent the defendant's experts from identifying this signature in 1C1 as the genuine signature of Wang. This in my view is actually a positive significant sign of difference to support the allegation of forgery.

(b) The compressed loop on the right

10.82 This compressed loop could be found in photograph F7A-8, C.02.t05 and C.02.t10. The right tip of the compressed loop on the right radical has a very thick ink stroke having the appearance of a thick patch of ink. I have used a 37 mm yellow piece of paper or sticker (to imitate the width of the broad nib pen) to trace out the stroke on my monitor. This tip of the compressed loop could not have been formed without retouching using a pen with a nib having a similar width appropriate for the rest of the signature. In other words, the width of a 37 mm piece of paper would not be sufficient to ink out the tip of the compressed loop which will require a

 © 2020 Thomson Reuters. 

width of about 75 mm strip when one traced the stroke on the computer monitor. However, there is no where to be found in the signature any stroke which would have been written with a nib corresponding to this size of 75 mm strip.65

10.83 Prof. Jia would appear to have accepted at first that the appearance of this compressed loop tip was inexplicable when the inconsistency of the thickness of the lines was demonstrated to him.66 However in re-examination, he was asked to use a strip of paper of the width of the curved part of the "xii gou" "Chinese text" of the radical "Chinese text" (which was the widest stroke made) to run through the strokes on the monitor and claimed that a nib with that width size would be able to make out the compressed loop. In fact it would not and could not. His demonstration certainly did not show that the strip could cover the whole inked part of the tip of the loop in a natural movement.

10.84 In writing naturally, the curved part of the "xii gou" "Chinese text" was obviously written when pressure was applied. Prof. Jia admitted that when the pen came to a point where pressure was applied, the nip would fork out and would write out a stroke wider than its width.67 However, when writing the compressed loop, instead of the underhand movement of the writing of the "xii gou" "Chinese text", the turn at the right tip of the loop is an overhand movement, and the pressure would not be as great as in writing the "xii gou" "Chinese text" and the width of the nib would not be stretched to fork out to its limit.

10.85 Further in any event when Prof. Jia was demonstrating in re-examination, he was holding the strip of paper between the finger-print part of his right thumb and the second section of his index finger from the tip, i.e. the inner side of the second section of the index finger from the tip, and not between the tip of the thumb and the tip of the index finger as in the natural way a person would be holding a pen. As such he could demonstrate quickly in his movement by moving his wrist and forearm only in an anti-clockwise movement. However if one were to hold the strip of paper in the way as one would be holding a pen, this movement of trying to fill up the ink with the nib of the pen would have involved the wrist, the forearm and also the elbow thereof to go forward by raising the elbow and the arm forward. This would then be a very unnatural way of writing and is rare among people writing Chinese. Wang's cousin Yih confirmed that Wang did not have this kind of movement when he was writing or signing in Chinese. Wang just wrote in a common and natural way. In any event even such a writing movement could not possibly fill up all the ink as contained in this compressed loop. Thus, there was a definite retouching here in the compressed loop in 1C1.

TREMORS

10.86 After considering the so-called similarities and those significant differences which I accepted, there are also tremors appearing in the four questioned signatures of Wang. However the evidence concerning tremors is also related to the medical evidence given by two eminent doctors, which I propose to consider in the next chapter separately before the overall conclusion on the four questioned signatures of Wang.

CONCLUSION

10.87 By reason of the aforesaid matters in my micro analysis only, excluding the question of tremors which shall be considered in the next chapter, all these pieces of evidence presented before me are strong and cogent evidence to support my finding that the four questioned signatures of Wang are not genuine signatures of him but are forgeries. To say the least, in view of the many unexplained but significant differences and unexplainable indications of forgeries, it cannot be said that these four signatures are genuine signatures. I shall consider the question of tremors in the next chapter.

1 p.537, E6

2 p.538, E6

3 T100:60:23 and 61:6

4 T101:18:14-20:17

5 T101:36:12

6 T101:50:8

7 T101:47:12

8 p.537, E6 and T102:1:5

9 T101:67:10-16

10 T101:68:8-10

11 T102:10:13-15:4 and 34:9-38:22

12 pp.2A, 5A and 11A, F7A

13 T102:46:5-22

14 T102:54:24-55:13, and see also generally T102:47:4-63:12 for the more detailed points of the difference

15 T102:63:13-20 and 64:17-23

16 T102:65:6

17 T102:66:9-67:6

18 T102:67:25 and 68:2

19 T102:68:19

20 T103:14:12-15

21 T103:17:3-8

22 T103:17:14-20-18:3

23 T103:26:14-17

24 T75:37:9

25 T103:1:11-5:22

26 T103:20:5-15

27 T103:26:18-27:22

28 p.535, E6

29 T103:27:24-41:9

30 T103:59:1

31 T103:41:10-64:25

32 p.537, E6

33 T103:67:20

34 T103:68:2

35 T103:69:22

36 p.538, E6

37 T103:72:3

38 T103:72:11

39 E6-654(107) where the defendant had magnified this sample to a much larger magnification than the questioned signatures and yet the gap is not wider

40 p.224, E2

41 p.227, E2

42 E6-654(73)

43 E6-654(37B)

44 T96:66:10-15

45 T96:69:13

46 T96:73:3 and 22-25

47 T96:73:15

48 T74:49:24-50:25 and 51:16-18

49 T74:49:16-19

50 See capture at A.02.t03

51 T97:25:17-26:5

52 T97:29:7

53 T97:43:4-25

54 T97:53:10-23

55 T97:45:25-46:10 and 49:1-51:8

56 T97:56:18-57:6

57 T97:58:5-59:24 and see also B.02.t02

58 B.03.h03

59 E6-654(36)

60 T97:70:8

61 T98:31:5

62 C.02.t10

63 T98:32:12

64 p.2068, F7 and p.532, E6

65 T98:41:20-46:22 and C.02.t.10

66 T98:46:20-22

67 T109:30:5-13

Chapter 11 - The Questioned Signatures Of Wang Teh Huei "Chinese text" (III) - The Presence Of Tremors And The Medical Evidence Thereof And The Overall Conclusion On Wang's Signatures

TREMORS

11.1 There is no dispute that no tremors are found in any of the sample signatures of Wang right from 1958 all the way up to 1985. It is also common ground that in the four questioned signatures, there are tremors found at various places. Counsel for the plaintiff set out in a summary form those various places where tremors are said to be found by Cheng, Tsui and Prof. Jia in the four questioned signatures in Appendix 1 to Vol. 1 of their written submission.

11.2 Those tremors found in the strokes are very mild and minor tremors only, so that for some of them, even the experts could not be too sure, and certainly as one can see in the photograph, not every expert would agree that it was tremor. It is sufficient also to point out that even Prof. Jia agreed there are eight places of tremors found in these four questioned signatures.

11.3 The plaintiff's case is that the four questioned signatures were written more slowly than the samples and the tremors were the consequence of slow writing. Tremors, unless explained, are of course a well-known feature indicative of forgery, because it is often the case that when the forger has to take on board other people's writing habit, consequently he will have to write unnaturally since he must abandon his own habit. Thus Counsel for the plaintiff submitted that all these tremors are signs of forgery rather than anything else.

11.4 The defendant's experts likewise first considered whether the tremors were caused by forgery but they ruled against it because they considered that the strokes of the characters were normally written, and there were "no pauses in or rewriting of strokes, or rigid or awkward stroke movements".1 Thus according to them the possibility of simulated forgery could be eliminated.2 Further, Prof. Jia took the point that if there should be tremors associated with forgeries, the tremors should be found at the more difficult strokes and not on the easy strokes such as the long vertical or horizontal strokes.

11.5 The three defendant's experts also entrusted their instructing entity in the Mainland to make investigation as to why there were tremors in these four signatures. After investigation, they were told by their instructing entity that on 10 March 1990, Wang fell from a horseback, leading to injuries to various positions of his head and arm etc. It was also said that the instructing entity also sent them the hospital bill and also the photographs of the shirts and underwear stained with large patch of blood worn by Wang at the time of the injury. The three experts thus considered that there was a direct relationship between the tremors and the injury. For the same reason they also formed the opinion that the questioned signatures were written after Wang sustained his injury in March 1990.3 The question is whether their opinion is supported by the medical evidence which I shall consider hereinbelow.

MEDICAL EVIDENCE

(1) Dating and causation

11.6 On the point of the dating aspect of the signatures with reference to the date of the injury of Wang, it is clear that the opinion of the defendant's three experts in handwriting was

not supported by the evidence of the medical doctor, Dr Brian Choa ("Dr Choa") called also by the defence. The defence intended to call Dr Choa to prove the relationship between these tremors in the four questioned signatures of Wang and a stroke or a fall of him leading to injury. The relevant part of the evidence of Dr Choa under cross-examination is as follows4:

"Q So this is a situation of your opinion that you cannot work backwards from the handwriting into the cause?

A Right.

Q If one proceeds from the other direction, can you from the cause predict what would be the symptom? Say for instance, if I had a head injury and knocked myself against a wall heavily, would you be able to predict from my injury what degree of changes my handwriting is likely to have?

A No, no, I would not be able to.

Q So whether I suffered, say for instance, a bad injury or just a slight knock, it may or may not have any effect on the way I wrote?

A Correct.

Q So approaching this matter from a medical neurological point of view, you cannot work back from the handwriting into the cause; you cannot work from the cause to the handwriting?

A Yes, that is the correct way to put it, yes.

Q Putting it into the context of our case, if we know -and on the assumption that it is proved - that Mr. Wang actually fell from the horse and he may have, say for instance, previously had a stroke, we do not know for how long he had had the stroke?

A Right.

Q We would not know whether he had fully recovered?

A Yes.

Q So from the fact that he had had that stroke and that fall, one cannot actually predict or draw an inference as to how it would affect his writing?

A No, you could not.

Q Likewise, looking at his writing, you cannot say that this man's writing would signify or would help you to draw an inference that it is a man who had that stroke or that fall?

A Correct."

11.7 Thus even on the evidence of the defendant's medical expert, there could be no inference to be drawn between the stroke or the fall from the horse and the tremors in the handwriting of Wang. Prof. Jia and his colleagues were thus plainly wrong in their view that the tremors in the writing and the fall in March 1990 would indicate that the writing of the signatures should take place after the fall in March 1990.

11.8 Further the fact that this view was put forward without any sound basis would indicate that these three handwriting experts retained by the defendant were prepared to go out of the way of giving an opinion favourable to the defendant. I have no doubt as to the high credentials and ability of the three of them especially when Prof. Jia and Xu are both textbook writers. But regrettably I have to say that I doubt only their reliability and credibility. In my view they are very powerful "hired guns" which I shall consider more fully in Section III herein on ink-dating when I consider the role of an expert and the criteria of accepting or rejecting scientific evidence.

(2) Head injury

11.9 On the relationship between a head injury and tremors, the plaintiff's expert in neurology, Dr Edmund Woo ("Dr Woo") was of the view that while an injury to the head could result in tremor, such tremor was likely to be diffuse (involving more than one segment of the body instead of one hand only) and severe (affecting dexterity and the performance of the activities of daily living).5 Further, Dr Woo said "evidence available shows that post-traumatic tremor following a mild head injury (without CT changes) is most likely to be diffuse and severe. It is highly unusual for such tremor to be so mild and so selective as to minimally affect one's handwriting without any other associated clinical feature of a diffuse involvement".

 © 2020 Thomson Reuters. 

11.10 Dr Woo opined that if Wang had tremor in his hand on 12 March 1990 as a result of his head injury two days earlier, his tremor would have been rhythmically so severe that his signatures would have been much more illegible with greater distortion of the characters.6

11.11 Dr Woo was subjected to repeated cross-examination and it was suggested to him to the effect that severe head injury would cause severe tremors whereas mild head injury would cause mild tremors. He was asked whether that was possible. He said anything is possible under the sun but there is no pathological basis for such a contention and there are no clinical cases to support that. He said that if his colleague, Brian, could supply him with such clinical cases he would consider them but so far there was no published literature to contradict his opinion.

11.12 After Dr Woo had given evidence, Dr Choa produced his second report dated 16 April 2002.7 He quoted five instances of his own patients with a view of showing that sometimes, patients suffering from some mild head injury or some neurological disorder would still be able to write without tremors all over in all strokes although there was short term fluctuation in the steadiness of the strokes.8 It is also part of the purpose of showing the five cases to illustrate that such short-term fluctuation of the steadiness of the strokes in writing could be due to pathological cause.

11.13 Dr Choa said in his second report that:

"... There is no example in medicine where, when a severe insult results in a serious complication, a milder complication cannot occur either from a lesser insult of the same type, or in a less susceptible patient. Two examples will suffice to illustrate this point:

a) If a severe head injury can cause paralysis and dementia, milder forms of the same type of injury can lead to partial paralysis and mild cognitive dysfunction and an even milder one might just cause intermittent headache and impaired concentration.

b) If cigarette smoking can cause lung cancer in some patients, it is known also to cause lesser damage to the lungs, such as emphysema, chronic bronchitis, or even just a morning cough, or indeed nothing.

For the above reasons, far from disproving that mild head injuries might result in mild tremors, the Biary and Goetz papers would support such a connection."

11.14 In other words, Dr Choa's innovative extrapolation by analogy is that severe head injury will cause severe tremors and therefore mild head injury will cause milder form of tremors.

11.15 First of all, it is important to note that the writing exhibited by Dr Chao showed much worse tremors or loss of control in the writing movement than any of the four questioned signatures. Further, they are consistent with the view of Dr Woo that the place where there was a loss of control tended to occur when the patient was attempting to make the same type of writing movement.

11.16 On the question of tremors, Dr Choa also agreed that tremors would have to have some degree of continuity.9 However he considered that the consistency of an abnormality does not depend on the underlying abnormality being rhythmic as such. On the point of what those five cases cited by him would illustrate, Dr Choa said10:

"A ... I think what was interesting about these cases, I thought, was that divorce between the clinical picture and what you saw in the handwriting. As long as there is a mild degree of discontrol, you would have some irregular abnormality in the handwriting, which gave you no clue as to what the underlying pathology was."

11.17 Dr Choa would certainly agree that psychological anxiety itself could produce physiological tremor. However, this type of tremor is not the same as the type of pathological tremor, which is really a loss of control of one's dexterity.11 According to him, when one feels excited or anxious such as attending an examination, the degree of departure from the smoothness of the lines, if any, will be very, very minor.12

11.18 In the present case, those tremors found in the four questioned signatures are certainly minor. They did not occur in the same type of writing movement. The degree of severity of the tremors found is obviously different from even the mildest sort of pathological tremors exhibited in the writings of the patients of Dr Choa. On the other hand, the very minor nature of the tremors found in the strokes of the questioned

 © 2020 Thomson Reuters. 

signatures would tally with the kind of tremors caused by psychological cause, such as being anxious or exciting, which would probably be the sort of psychological condition only of either the forger or Wang himself. Consequently the medical evidence cannot support the contention that those tremors were caused by Wang only. Since I found for those reasons in the last chapter that the four questioned signatures are forged signatures of Wang, I would also find that probably the tremors were caused at least partly by the psychological condition of the forger rather than Wang himself. They are also tremors of the forger when he tried to slowly simulate the signature of Wang according to his two models.

11.19 In conclusion in respect of the medical evidence I would only say that Dr Chao's contention is innovative. However, unfortunately, the clinical evidence and the medical literature cannot support such a contention "since the subtlety of nature is greater much more than the subtlety of [his] argument ".13 In particular for example, no research so far has been done in respect of whether there is any threshold of pathological injury which will cause only tremors in the writing hand and such tremors would not occur rhythmically or in the same writing movement, and what is the pathological cause for such non-rhythmical tremors.

OVERALL CONCLUSION ON THE FOUR QUESTIONED SIGNATURES OF WANG

11.20 From only the handwriting evidence before me, I find that the four questioned signatures of Wang are highly probably not genuine but forged by reason of many unexplained but significant differences, and other features and indications of forgeries. The evidence to support such a finding is very strong and cogent. This is a finding on handwriting evidence alone and is independant of other factors such as suspicious circumstances considered in Section I hereinbefore, the finding in respect of the questioned signature of Tse, and/or the finding in respect of the handwriting in Document A, all of which I shall consider in turn in the following chapters.

1 p,647, E6

2 p.543, E6

3 p.545, E6

4 T155:54:5-55:14

5 p.979, E13

6 p.982, E13

7 p.1075, E18

8 p.1088, E18

9 T155:47:10

10 T155:83:18-23

11 T155:76:9-24

12 T155:77:15-25

13 See Section III Ink-Dating for this quotation

Volume 3

Section IIB - The Questioned Signatures of Tse Ping Yim ("Chinese text ") & Conclusion on Handwriting

Chapter 12 - The Signatures of Tse Ping Yim ("Chinese text")

(I) - General Consideration

The Plaintiff's Allegation

The Time Factor

Tse's Background

The Changes in Tse's Signatures

Chapter 13 - The Signatures of Tse Ping Yim "Chinese text"

(II) - The Samples

The Voucher Samples G1-100 and 101

The Signature on the Home Visit Permit

Chapter 14 - The Signatures of Tse Ping Yim "Chinese text"

(III) - Summary of the Opinion of the Experts

Mr Gus Lesnevich ("GL")

Mr Patrick Cheng Yau Sang ("Cheng")

Mr David Tsui Chee Keung ("Tsui")

Prof. Jia, Xu and Zhan

Preliminary Analysis

Chapter 15 - The Signatures of Tse Ping Yim "Chinese text"

(IV) - Micro Analysis

Tracing

(1) The transparencies

(2) The superimposability

(3) A horizontal model used for tracing

Significant Differences

(1) Unnaturalness

(2) The character "Chinese text" of 1A 1 - the radical "Chinese text"

(3) The character "Chinese text" of 1B 1 - the radical "Chinese text"

(4) The character "Chinese text" of 1C 1 - the radical "Chinese text"

(5) The character "Chinese text" of 1D 1 - the radical "Chinese text"

(6) The character "Chinese text" - the upper radical "Chinese text"

(7) The dot of the radical "Chinese text" in "Chinese text"

(8) The relative length of the first and third horizontal strokes for radical "Chinese text" in the character "Chinese text"

(9) The short slant at the lower part of the radical "Chinese text" in "Chinese text"

(10) The narrow gap between the two horizontal strokes in the radical "Chinese text" in the character "Chinese text" of 1A 1

(11) The linking dots of the upper radical "Chinese text" in the character "Chinese text"

(12) The width/height ratio of "Chinese text" and "Chinese text"

The Tremors

(1) The presence of tremors

(2) Counter samples

(a) Counter samples for "Chinese text"

(b) Counter samples for "Chinese text"

(c) No counter samples for "Chinese text"

(3) Significance of the tremors

Other Features Revealed During Prof. Jia's Evidence

(1) "Chinese text" in 1A 1

(2) "Chinese text" in 1A 1

(3) "Chinese text" in 1A 1

(4) "Chinese text" in 1D 1 - the top right corner turn of the radical "Chinese text"

(5) "Chinese text" in 1D 1 - the lower part of the radicals "Chinese text" and "Chinese text" and the tick

(6) "Chinese text" in 1D 1 - the upper radical "Chinese text"

Chapter 16 - The Conclusion on the Four Questioned Signatures of Tse Ping Yim ("Chinese text") and The Overall Conclusion on the Two Sets of Signatures of Wang and Tse

 © 2020 Thomson Reuters. 

Conclusion on Tse's Questioned Signatures

Overall Conclusion on the Four Sets of Questioned Signatures of Wang and Tse

Chapter 17- The Authorship and General Features of the Four Questioned Documents

Undisputed Opinion on Documents A, B and C

Document D

A Document "E"?

Other Indentation or the Lack of It

The Authorship of Document A

The Samples

The Identification of the Writing in Document A

(1) The defendant has no evidence, expert or otherwise

(2) The expert witnesses

(a) Gus Lesnevich ("GL")

(b) Patrick Cheng Yau Sang

(c) David Tsui Chee Keung

(3) Conclusion on Document A in light of the three experts' evidence only

(4) Teresa's identification

Chapter 12 - The Signatures Of Tse Ping Yim "Chinese text"

(I) - General Consideration

THE PLAINTIFF'S ALLEGATION

12.1 The plaintiff alleged that the four purported signatures of Tse Ping Yim ("Tse") are forgery reproduced by the other method, i.e. superimposition tracing "Chinese text" (As pointed out in the previous chapter on the Macro View of Wang's Signatures, there is another kind of tracing called projection tracing "Chinese text".) The basic technique of superimposition tracing is to copy the signature by following the lines or strokes of a genuine signature. There are various ways of doing this. In the present case the plaintiff alleged that in view of the very thin and close to transparent nature of the paper, it is most likely that if tracing should have taken place at all, the paper of the disputed documents was simply put on top of a genuine signature. The forged signature was then traced out on the questioned document.

12.2 These four signatures of Tse were in Chinese and all three characters of each of the signatures were distinctly written in the sense that there was no linkage between characters. If the forger did not have any vertically written signature, he could make use of a horizontally written signature as the model for tracing. He would then have to trace each character one after the other. If this happened then the spacing between the characters would unlikely be consistent and superimposable.1

12.3 Since tracing would involve following the strokes or lines of another person's signature, normally it would have to be done rather slowly and cautiously, and features associated with this slow motion in following someone else writing habit is normally found in traced forgery, e.g. tremors, hesitation (i.e. unnatural stoppages), or retouching. Again since the forgery is not the spontaneous natural writing of the forger, the writing will not be natural, and often, it will give others the impression that it is a kind of "drawing" rather than natural writing. Further forged signatures produced by tracing from the same model would exhibit a large degree of pictorial similarity amongst them. Hence they should be largely or highly superimposable.

12.4 Further one should not expect complete superimposability between two traced forgeries or end-products from the same model because each forged signature, although produced by tracing would not be exactly the same as the model. Hence the degree of superimposability between two traced forgeries would normally be even less than between one of the traced forgery and the model.2 This is particularly so when the two end-products were traced with deviations from the model in the opposite directions. The deviation in one might well be just minimal. However the deviation in the other in the opposite direction, though by itself would also be minimal, when compared by superimposition on the former end-product, the deviation

between them would be compounded and therefore more apart. Thus if two end-products were put together and were found to be highly superimposable, one could say that they were probably traced from one model when other features of tracing were also found in the two signatures as aforesaid.

THE TIME FACTOR

12.5 If the questioned documents were made in 1990 as alleged by the defendant as testamentary documents, then it is legally possible that they can take effect as wills without anyone witnessing the documents since they would be qualified as Chinese wills made by a Chinese under the old law before the 1995 amendment. Hence strictly speaking, it is not necessary for them to bear any witness signature. Thus technically it may be possible for the Court to pronounce in favour of the documents as long as they are the last wills of Wang with his genuine signatures even though the Court should take the view that the signatures of Tse on the documents were not his genuine signatures.

12.6 However the defendant's case is that all the questioned documents were in fact signed by Wang in the presence of Tse who attested Wang's signatures on the same occasion on 12 March 1990.3 If the Court should have any doubt on any one of the signatures of Tse and concluded that it was not executed by him on the occasion as alleged, then in the circumstances of this instant case, the Court could not be satisfied that even on the civil burden of proof that the defendant has succeeded in removing all suspicious circumstances. Then all the documents should not be admitted in probate as the last wills and testamentary scripts of Wang. The aforesaid contention is just a hypothetical testamentary consideration as it will be apparent that this will not be the finding of this Court. A fortiori if on a balance of probability the Court is not satisfied that the signatures of Tse were signed by him on the occasion as alleged, then the Court should not admit the documents in probate. Further still, should the Court positively find Tse's signatures were all forged, the documents could not be admitted in probate.

TSE'S BACKGROUND

12.7 Tse was born on 5 October 1930.4 Thus by the time in March 1990, he was nearly 60 years old. By the time he wrote the 1999 sample signatures, he was nearly 69. In between he had suffered serious illness. Between 27 June 1995 and 4 July 1995, he was admitted to Princess Margaret Hospital for treatment of cholangitis which required surgical treatment. He signed a consent form for the operation on 30 June 1995.5 Between 9 July 1995 to 22 July 1995 he was re-admitted for follow up treatment. He signed another consent form for surgery on 20 July 1995.6 Both two signatures were signed vertically. After his discharge he still attended the hospital for follow up treatments until September 1997.7

12.8 On 24 September 1999, the day immediately after the day when leave was granted to the plaintiff to report forgery to the Police, (since the plaintiff had been restrained by an order not to disclose the contents of the four questioned documents to anyone else), Tse left Hong Kong for the Mainland.8 He went to Thailand for a sight seeing tour directly from the Mainland without going through Hong Kong on 28 October 1999. He went back to the Mainland on 2 November 1999 directly from Thailand again without going through Hong Kong.9

12.9 After he came back from Thailand, he went for treatment at the Shenzhen People's Hospital on 14 November 1999 complaining of pain at the upper abdomen for over two weeks and also diffused pain.10 He was diagnosed to have, inter alia, diffused cancer of the liver. He was discharged on 4 December 1999 and was sent back to Hong Kong when he was actually in coma, through Huanggang Checkpoint. He was immediately admitted to Princess Margaret Hospital where he died two days later on 6 December 1999. The police had no chance of taking a statement from him although his name was on the alert list ever since the report of the plaintiff to the police on the allegation of forgery.

THE CHANGES IN TSE'S SIGNATURES

12.10 In view of the age and also the known medical history of Tse, it is not surprising that his handwriting had undergone a tremendous change between 1990 and 1999. An examination of the samples available indicated that the watershed change appeared to be in 1995, the year he received two surgical treatments.

12.11 A cursory view of the samples over the years would indicate that earlier samples (pre-1995) would show the signatures were made at faster speed and the flow of the strokes was free and spontaneous. There were a lot more variations amongst the known within this period. By contrast

those samples in 1999 were more slowly written and the line quality and general quality of the writing skill were poorer. This is in line with his age and his known medical history.

12.12 Furthermore, as he aged, there were other changes in the features and appearance of his signature. For instance in the character "Tse" "Chinese text"11, the third horizontal stroke of the radical "yin" "Chinese text", when compared with the first stroke, was evidently getting longer since 1990. The dot on the radical "Chinese text" also became shorter. Likewise, the top part of the radical "chuen" "Chinese text" had become lower so that instead of at the same or a higher level as the upper corner of the "hing zhi gou" ("Chinese text") "Chinese text" of the radical "san" "Chinese text", the 1999 samples usually had the top part at the level lower than that corner. Also the short slant at the lower part of the radical "Chinese text" became shorter.

12.13 In relation to the character "Ping" "Chinese text", there was the general tendency that the whole character had become narrower and taller in 1999.12 Also in relation to this character and the character "Yim" "Chinese text" there was a much greater tendency for the two dots to be linked up in the earlier samples than in the later 1990 ones.13

12.14 Further, not only did the speed of writing slow down as he aged, there were features of tremors regularly found in his signatures in the 1999 samples, whilst such tremors did not occur in his 1990 or pre-1995 signatures at all. Prof. Jia in fact said to the contrary but in my view he is wrong in the face of the sample signatures before the Court. There are of course other smaller features other than the aforesaid general and more prominent ones. They would be considered in the chapter on micro analysis.

12.15 In order to challenge the observation in relation to the radical "Chinese text", Prof. Jia referred to a sample signature, DPH "674(5)" of 1990. However, it is obvious that for this particular sample, the radical "Chinese text" had a mis-start in the first horizontal stroke and the radical was then rewritten. The start of the stroke was at a level lower than the original mis-start and this must have affected the overall shape and position of this radical. Hence for this purpose, this sample could not be considered to be a good example for comparison, or the exception is reasonably explained.

12.16 In order to justify his opinion, Prof. Jia said that the short stroke between the radicals "Chinese text" and "Chinese text" in 674(5) was not a mis-start, but instead he said that this stroke was written after the writer had completed writing the radical "Chinese text".14 He no doubt wanted to argue, desperately in my view, that the radical "Chinese text" in this sample was started and completed in the regular manner in order to justify the view that the top part of the radical in 1990 could be just at the same level as the upper corner of the "hing zhi gou" "Chinese text" in the radical "Chinese text". From the look of the signature, it is plain and obvious that the short strayed stroke must have been originally intended to be the short horizontal stroke of the radical "Chinese text". It is also obvious that after Tse put in that short horizontal stroke he discovered that it would be difficult to put in the vertical stroke of the radical "Chinese text" without compressing the last right hand radical onto the middle radical "Chinese text". Thus he started again and the second attempt in writing the horizontal stroke gave him enough space to put in the vertical stroke ending in a hook with a dot connected to it and the spacing was more or less the same as his other signatures between the second and the third radicals. There was really no reason for Tse to complete writing the whole character and then sought to put such strayed stroke at that place. Prof. Jia is plainly wrong. Further it would also affect Prof. Jia's independence and reliability when he contradicted such an obvious point, by saying that the strayed stroke was written after the completion of the whole character.

12.17 As a general defence to the differences found between the questioned signatures and the contemporaneous samples, the defendant's experts constantly resorted to the argument that they were of different speeds.15 This argument however in fact begs the question. For instance, in trying to explain the length of the third horizontal stroke in the radical "Chinese text" being longer in the later period,16 the defence sought to explain that when Tse wrote slowly he wrote that stroke longer. However, the slowness and also the length of the stroke were both features which were found in the later period but not in the earlier period. Unless one can have some convincing and logical reasons to say that a longer third horizontal stroke in the radical "Chinese text" must be the result of slow writing, by simply pointing to another feature, namely slowness exhibited in the writing of the later period, could not be a logical explanation of the difference.

12.18 In any case the association between slowness and the length of the stroke was demonstratively a bad one. One can just look at the samples like DPH 700 and DPH 1829 to discover that there was no relationship between speed and the length of the stroke. Indeed even if one also takes G1-100 and 101 and DPJ 5992 (the Home Visit Permit) as samples, (whether they should be used as samples will be discussed in the next chapter), the third stroke in these samples were likewise relatively shorter than the first one.

12.19 Furthermore, while it is true that often in the handwriting of individuals, one may write with faster speed on one occasion and with slower speed on the other, the same argument has more limited application in relation to signature in the sense that the variation in speed between a person's signatures at a given point of time is unlikely to be great. This is because the general nature of a signature is that it is the spontaneous and natural act of the person in the production of his name or his mark to signify himself, and not a conscious piece of drawing of one's name. Thus, if there is any significant change in one's speed from the norm in the writing of a signature, there should be a reason for so doing.

12.20 The defence also realised this and they purported to rely on the fact that on the occasion of Tse's signing the questioned documents, it was an occasion where he, as a humble employee, signed before his big boss.17 However, this explanation is not a good one because:

(a) For Chinachem there were only two tiers in the organization, i.e. the bosses (the Wangs) and the family employees "Ka Ting" ("Chinese text").18

(b) Tse was close to the defendant, much closer to the Wangs than most of the employees of Chinachem. He was their butler. He cooked for them and had been hand picked from the rank of cleaners to be their butler.19

(c) As stated by Tse in his statement dated 9 September 1999, his relationship with the Wangs was as if they were members of the same family ("Chinese text ").20

12.21 In order to justify the assertion that the questioned signatures were genuine despite the many differences, the defendant's experts would time and again rely on what they called samples 8 and 9 - i.e. the two vouchers in G1-100 and 101. It was said that they were the best samples in view of their purported dates and the style of the writing. However, this really begs the question. If these two documents were not authentic, then they would have no value in supporting the questioned signatures, as one could not use one of the questioned signatures to support the authenticity of another questioned signature. This will be discussed in the next chapter.

12.22 The other signature which the defendant's experts often had to resort to is the signature on the Home Visit Permit. However apart from the fact that it is not an acceptable sample for reasons which will be discussed in the next chapter, since this signature was written slowly because of the defective writing instrument,21 the plaintiff also submitted that the Court may still like to take judicial notice that where the signature appeared in the Home Visit Permit was on page two which was on the left hand side of the book,22 the book itself was in soft cover and was rather tightly bound together. Hence this was not at all easy to write or sign naturally on the left hand page especially when the book was still very new and the binding was tight. However I would consider that the defective pen is a major factor if this signature were signed by Tse himself. This is the main reason for the signature appearing there to be out of line with the rest of his contemporaneous signatures. I shall consider the sample signatures of Tse put before the Court in the next chapter before I analyse his signatures generally and later in detail.

1 T58:48:2-25, per Tsui

2 T32:103:3-104:3

3 p.29 and pp.70-71, D and T26:29:11-21

4 p.1493, G5

5 p.1706, F7

6 p.1748, F7

7 p.1606, F7

8 p.1839, G6

9 p.1864, G6, the CI of Tse, and pp.1839-1840, the Home Visit Permit of Tse

10 p.1629, F7

11 E6(654-18)

12 E6(654-19)

13 E6(654-20)

14 T97:22:7-11

15 T21:66:15-16 and 73:1-6, questions put to GL under cross-examination

16 T57:63:2

17 T21:43:16-20 - 73:1-6, T29:147:23-25, T60:74:3-6 and 9

18 Edwin Cheung's evidence at T160:27:17-24 and 26:3-7

19 p.29, D1

20 p.59, D1

21 T20:105:20 and T23:69:23

22 p.1030, E18

Chapter 13 - The Signatures Of Tse Ping Yim ("Chinese text")

(II) - The Samples

13.1 The sample signatures of Tse for comparison were taken mainly from his signatures on two witness statements taken from Tse by the police on 24 May 1990 and 9 July 1990 for the purpose of investigation after the kidnap of Wang in April 1990. Initially the police was unable to locate the original of the second statement of 9 July 1990. Consequently an examination of the signatures from that statement was conducted from a photocopy of that statement only. It was not until the time of Cheng's giving evidence that the original of 9 July 1990 statement could be located from the archive of the High Court files in a criminal case. Consequently GL, one of the plaintiff's experts on handwriting did not have the opportunity of looking at the original of the signatures on this statement even up to the time of the completion of his evidence.

13.2 The following are the undisputed samples of the signatures of Tse:

(1) DPJ 5994 - 1979 signature on Re-entry Permit.

(2) DPH 674(1) to (9) - 24 May 1990 found in the original Police statement.

(3) DPH 700 - 7 June 1990, found in a photocopy record kept by the Registration of Person in an application for renewal of Identity Card.

(4) DPH 736(1) to (7) - 9 July 1990 found in Police statement (original subsequently located as aforesaid).

(5) DPH 1829 - 27 November 1993 - a fax copy of signature card with a bank.

(6) DPJ 5993 - 5 August 1994 - found in original Certificate of Identity.

(7) DPJ 5995(1) to (6) - 6 September 1999 - (1) was the signature found in the statutory declaration made before Mr Alex Lam. (2) was the statement of 6 September 1999 annexed to the statutory declaration. (3) to (6) are the copy questioned documents with original signatures of Tse at the top of each of them being annexures to the statutory declaration. (N.B. DPJ 5995(3) to (6) were not used as samples by any experts other than Cheng who conducted his examination on the photocopy of these signatures only, although subsequently the Court was also supplied with an enlarged copy of the original signatures).

(8) DPJ 5996(1) to (10) - 9 September 1999. (1) and (2) were found in the main body of the affirmation. (3) to (10) were found in the Chinese statement exhibited to the affirmation.

5995(1) and (2) and 5996(1) to (10) were the 12 further samples for which I have granted leave to the defendant to have them examined by experts on both sides as further samples of Tse's signatures for comparison during the trial on 4 September 2001.

13.3 The following samples are disputed:

(9) G1-100 ("100") and G1-101 ("101") - being referred to by the defendant's experts as samples 8 and 9 and they were

the purported signatures of Tse on payment vouchers dated 10 March 1990 and 31 March 1990 respectively. (N.B. the plaintiff's two experts and Cheng had not examined these documents.)

(10) DPJ 5992 - found in the Home Visit Permit of Tse, purported to be made on 6 March 1992. This is the signature signed by a defective ball pen.

13.4 Items (1), (6) and (10) have been referred to as "the three travel documents" and they were the additional signatures permitted to be examined by Cheng and others on 4 September 2001. They had been used by the defence in the cross-examination of GL who in turn was re-examined thereon.

THE VOUCHER SAMPLES G1-100 AND 101

13.5 These two documents (100 and 101) first surfaced on 3 March 2000 when they were being offered by the defendant through her solicitors to the police in response to the police's request for the supply of sample signatures of Wang and Tse.1 The police declined to accept these two documents as samples of Tse's signature after taking legal advice. In May 1999, these two documents apparently were in the possession of Mr Radley, (a handwriting expert previously engaged by the defendant) during the time of examination of the signatures at the Government laboratory. He offered them to Tsui, who also declined to examine the signatures on the ground that their authenticity could not be verified.

13.6 When the defendant filed her list of documents on 14 November 20002, she did not include these two documents in her list.

13.7 The defendant had been informed in no uncertain terms that the plaintiff would dispute the authenticity of these documents by a letter on 19 December 2000.3

13.8 It was not until less than a month before the trial on 23 July 2001, the defendant gave discovery of these two documents by including them in her list of document.4 On 27 July 2001, the plaintiff gave formal notice to dispute the authenticity of these two documents.5

13.9 Two days after the commencement of the trial, on 8 August 2001, the defendant purported to give discovery of 171 payment vouchers of various dates between 1988 to 1999 all said to be bearing the signatures of Tse.6 On 20 August 2001, the plaintiff had given due notice to dispute the authenticity of, inter alia, these 171 vouchers.7

13.10 After six weeks from the commencement of the trial, on 20 September 2001, the defendant purported to give discovery of another 134 payment vouchers of various dates between May 1988 to October 1992 said to be signed by Tse.8 On 10 October 2001, the plaintiff also gave notice to dispute the authenticity of these 134 vouchers.9

13.11 On 27 September 2001 the defendant sought leave to file inter alia the witness statements of Li Kwok Kee ("Li"), Chan Tit Kwan, and Tang Yu Keung and also the supplemental statement of Ng Shung Mo ("Ng"). The plaintiff did not oppose to such application.10 It was quite apparent there and then that Li was intended to be called to prove the various payment vouchers and in particular 100 and 101.

13.12 Apart from Li, none of the witnesses called by the defendant was able to know anything about any payment vouchers in the Chinachem companies according to their witness statements. Mr Edwin Cheung who was the most trusted employee of Wang at his time with Chinachem between October 1978 to December 1984, said that he had never seen this kind of payment vouchers before, and that he could not recognise the initial of the person on the voucher at G5-1498 (dated 7 and 28 November 1992).11

13.13 From the witness statement of Li filed by the defence, it was quite clear there and then that he was being put up as having been working in the cashier department of the Chinachem group for over 25 years and had since 1996 been the head of the cashier department,12 thus giving others the impression that he must have personal knowledge from his handling of the two questioned vouchers of 100 and 101 purportedly made in 1990. It was also mentioned in the witness statement that the vouchers were kept in the cashier department,13 thus suggesting that he was the person in whose custody the vouchers were found and was thus the proper person to produce the documents.

13.14 Li was then called to give evidence. He testified as to the general system of the use of the payment vouchers and also the system of keeping and filing of them. It was clear from his evidence that these vouchers were submitted by the

 © 2020 Thomson Reuters. 

employees who wanted to claim reimbursement of expenses. After signing thereon and having them countersigned by their supervisor, these vouchers would be presented by the employees concerned to the cashier department to receive reimbursement. After paying and collecting some vouchers, the cashier department would consolidate these vouchers by making out a "cash payment voucher" which would contain information on the total amount of the various payments of the same category.14 Sometimes the break down of the each payment would also be set out.15 These consolidated "cash payment vouchers" would each have a number and they, together with the supporting payment vouchers (which have no number) attaching to them, would then be passed to the accounts department. The accounts department would then enter the amounts of the cash payment vouchers into the books of Chinachem with the voucher number and would also keep the cash payment vouchers together with all their attachments.

13.15 It is also clear from his evidence that in order to show that certain particular payment voucher must have existed, it would be possible to get out the cash payment voucher which covered the payment by that payment voucher, and to find out from the cash payment voucher whether the sums stated thereon represented the summation of all the payment vouchers attached to it. It may also be possible to find from the breakdown sums in the cash payment voucher concerning the payment covered by one particular payment voucher. Since the payment vouchers were attached to the cash payment voucher, there would be no difficulty in locating the cash payment voucher concerned, and the attached payment voucher thereto.16

13.16 Further, in order to verify the cash payment voucher, there should be corresponding entries in the books of Chinachem with matching amount and voucher number. The defendant simply had given no discovery of any cash payment voucher nor the corresponding entries in the books. If it is thought that it may be too onerous to give discovery of all cash payment vouchers relative to the 305 vouchers sought to be proved, at least the defendant should be able to produce the cash payment vouchers relating to the two payment vouchers 100 and 101. There was simply no such cash payment voucher produced, and no explanation was ever given as to why it was not available. Certainly no book was produced to show that the payments covered by the alleged payment vouchers 100 and 101 were in fact made. This certainly cast some doubts on the authenticity of 100 and 101.

13.17 There were two persons in Chinachem who would handle these payment vouchers. First there would be the person at the cashier department who paid against these vouchers, and who would make out the consolidated cash payment vouchers and would attach the payment vouchers to them. Then there would be the clerk at the accounts department who would make the book entries from the cash payment vouchers and would then keep the documents he handled. Notwithstanding what was set out in his witness statement, it is quite clear that in fact Li did not work in the cashier department at all until he became the head of the cashier department in 1996 and before that he worked as a clerk in the accounts department instead.17 Since Li only came to work in the cashier department in 1996 he could not have handled any payment vouchers in the cashier department before 1996. Although in his evidence-in-chief, it was vaguely suggested that before 1996, when he was in the accounts department, he was doing the work of handling the book, keeping entries of the cash payment vouchers and the keeping of the documents.18 But in fact he did not. His work in the accounts department did not involve his handling any of these vouchers at all,19 and this would or should be known to Ng Shung Mo if not also the defendant herself.20

13.18 In fact there was clear evidence from Li that in Chinachem, it was one Law Ming ("Law") in the accounts department who handled all the book entries and safe keeping of these vouchers. Law worked at the accounts department when Li joined Chinachem, and Law was always the person in the accounts department to deal with these vouchers.21 He is still working in Chinachem and is apparently in good health. There is absolutely no reason why Law could not be called to prove his role and his handling of the vouchers and also these two vouchers, if they are genuine. He could also produce the cash payment vouchers in serial number and the book entries thereof in relation to vouchers 100 and 101 which contained no number themselves.

13.19 Thus for any voucher before the time of Li becoming the head of the cashier department, in fact Li could not have any personal knowledge of them. His involvement could only be that in the middle of 2001 (i.e. after 100 and 101 had already surfaced on 3 March 2000 as aforesaid), he was asked by Ng to look for vouchers with Tse's signatures. He

 © 2020 Thomson Reuters. 

passed on the same instructions to Law. Law then located and gave Li a thick stack of about one foot thick cash payment vouchers with payment vouchers attached, some of which had the signatures of Tse. Li's only role was to put stickers on those vouchers bearing the signatures of Tse and then he gave the whole stack of papers he received with his stickers input to Ng. All these took place sometime in the middle of last year, i.e. 2001.22 In the circumstances apart from putting stickers on vouchers passed onto him in the stack, Li would have nothing to do with any of the pre-July 1996 vouchers at all.23

13.20 However, in respect of 100 and 101, Li could not even have put stickers on those vouchers. This is because these two documents had already surfaced by 3 March 2000 when the defendant's solicitors offered them to the police for examination. Thus, clearly they could not be within the pile of documents given to Li by Law. Thus, in fact Li has nothing to do with the two documents 100 and 101 at all and he could not tell how these two documents turned up either.24

13.21 In fact it is quite doubtful whether Li had identified all the 305 vouchers in G5 and G8 by putting stickers on them. He could not even say whether those vouchers shown to him (as contained in G5 and G8) were those he had put stickers on.25 That is of course understandable since his stickers presumably had already been removed. However a quick reference to his witness statement would indicate that there was nothing mentioned about his having found any of the vouchers in bundle G5 whilst in the case of G8 vouchers, he claimed in his witness statement that "I recently found additional payment vouchers submitted by Tse Ping Yim ..." i.e. the G8 vouchers.26

13.22 It is also of interest to note that, although initially when Li was being asked on the number of occasions of his being given vouchers by Law and of his giving of the vouchers with stickers on to Ng, he clearly and unequivocally said that there was only one occasion. However when his attention was drawn to the fact that there were two separate references to the vouchers in his statement, he then tried to change his evidence by suggesting that in fact it was not the case that he turned over the vouchers to Ng on one single occasion. He then said he had given stacks of vouchers to Ng a few times over the period of several days.27

13.23 I find that his answer is probably untrue and that he was trying to assist the defendant at the expense of the truth. In any event, his new answer would not assist the defendant's case in proving the vouchers because he said that he was asked to look for the vouchers about 10 days before he signed his witness statement on 26 September 2001.28 This would mean that he was instructed by Ng to look for the vouchers with Tse's signatures only on or about 16 September 2001. Since the 134 vouchers in G5 were discovered on 8 August 2001, it must necessarily follow that Li would have nothing to do with them in the sense that he could not be the one who obtained them from Law and identified the signatures of Tse by putting stickers on the vouchers.

13.24 In this respect it should be noted that although it was said to be the defendant's case that all the vouchers in G5 and G8 were retrieved by Li,29 clearly there was no evidence to support this and the defence had chosen not to call Law or Ng to support her case. Further in re-examination, Li was asked as to whether he did or did not recall when he was asked by Ng to locate the payment vouchers and he said he did not.30 However this answer is of no probative value particularly in the light of the fact that after this re-examination, it was found out from Li that he admittedly had spoken to the defendant on the evidence in the course of his giving evidence, under further cross-examination of him.31

13.25 Li purported to identify the signatures on all 305 vouchers and also 100 and 101 as being that of Tse. However this piece of evidence has no probative value in showing that the signatures on the vouchers, particularly those before July 1996, when he started to handle the payment vouchers, were Tse's signatures. Since all signatures on the vouchers are clearly legible and anyone can read the characters "Chinese text", "Chinese text" and "Chinese text" from the signatures to say that it is a signature of Tse Ping Yim.

13.26 The tendency of Li to simply claim something he saw on the face of a document as true and adopted it as his evidence is quite obvious. For instance, in the case of the work of Tse, he saw a purported record of Tse's employment with Chinachem32 which suggested that Tse was employed as a messenger in August 1982.33 He certainly would not query whether the form was in fact completed in 1982 or not, and would insist that Tse had made a mistake on his own age when the form was completed so that instead of stating his real age of 52, he must have mistakenly given his age as 62.34 His

 © 2020 Thomson Reuters. 

evidence based on the face value of the document is wrong and this piece of evidence of him could only be based on what he read from the document. He must have thought that since the document was supposed to be one which was to be completed at the time when the employee was first employed, it must be the case that Tse had mistaken his own age. It is in fact quite impossible for anyone to make a mistake of his own age by 10 years. Li's suggestion that Tse made a mistake in the calculation of the number is also absurd as hardly anyone needs to resort to any calculation to find out his own age. It is highly probable instead that G5-1492 was a document made up sometime in 1992 for the purposes of record, when Tse was 62 years old.

13.27 Furthermore, Li's evidence on the job nature of Tse is also a good reflection on Li's habit in simply going by something he saw on the document and adopted that as his evidence. Since he saw from G5-1492 that Tse was employed in 1982 as a messenger, he simply made up his evidence that Tse was employed as a messenger at the office at Mody Road in 1982 when he joined Chinachem and had always been a messenger.35 However this is clearly untrue because from the statement of Tse himself to the police36 made on 24 May 1990, it was clear that when Tse was re-employed by Chinachem in 1982, he was merely a cleaner cleaning buildings and since 1983, he worked as a butler instead for the Wangs and he only took over some messenger duties in 1989. By then he was a butler cum messenger cum cook for the Wangs.

13.28 It is also clear that Li did not know much about Tse.37 His only contact with Tse was when Tse came to him to present a voucher for reimbursement of expenses from July 1996 but not before. At any rate, the evidence is clear that on every occasion Tse would have presented the voucher for reimbursement in person. There was no suggestion that Tse would have signed the voucher in the presence of Li. Although it was said that Li would have to verify his signature, it was plainly not a case where there was any sample signature for Li to verify as would be the case of a bank teller having had to verify a customer's signature. All Li was required to do is to receive the payment voucher submitted by Tse himself bearing the signature of Tse Ping Yim. But of course, in the course of Li's duties for these several years, he must have seen a number of vouchers submitted by Tse in person with his signatures and the counter-signed initials of Ng. One can only say Li would never have to carry out any close examination or look at Tse's signature like a bank teller. But one can say Li probably could be said to be familiar with Tse's signature.

13.29 However Li would not have any opportunity to see or to recognise Tse's signatures before he became the head of the cashier department in 1996. Thus he could not say how Tse's signature would look like in 1990. To ask Li to identify a signature of Tse written in 1990 or before 1996 was in effect no more than asking him to give an opinion on handwriting without the benefit of any real study of Tse's sample signatures. In particular in this case there is a remarkable difference between Tse's signature in 1990 and those signatures he signed after 1995.

13.30 Even if Li would say that a certain signature was that of Tse based on his acquaintance of Tse's signature, his evidence would not have any probative value if the signature concerned purported to be a signature of Tse before July 1996, which was the time when he first had the opportunity of seeing Tse's signature. At any rate an identification of Tse's signature by Li is not evidence to show that the signature was signed by Tse on the date stated on the voucher if Li was not a person who could give evidence on the dating of the voucher concerned.

13.31 The defence has made a very lengthy submission on law and fact as to the admissibility of these two vouchers. However, this is not just a question of admissibility relating to whether or not Li can be said to be the person in proper custody of the documents and thus the person who may produce the documents. The main question is the doubtful circumstances surrounding these two documents as aforesaid which have cast serious doubts on the authenticity of them even if they were admitted. Therefore, due to the length of the Judgment I would not deal with the legal arguments submitted by both sides.

13.32 Furthermore, there are certainly other important aspects in the evidence to show that Li could not be a credible witness. Apart from the points raised above, it is plain that with a view of assisting his employer, the defendant, he was quite prepared to ignore the witness warning by seeking guidance from the defendant in the course of his evidence, on how he should answer questions put to him in cross-examination. The following is the further cross-examination of him by the leading Counsel for the plaintiff38:

 © 2020 Thomson Reuters. 

"Q ... is it not the case that you feel able to answer Mr. Lee's question essentially on whether you held the shares in Global Cheer as nominees or not because, between the time that I asked you the question and this morning, you had already obtained consent from Mrs. Wang to give an answer to the question?

A Yes.

.....

Q Did you tell her that it arose out of your evidence and how it arose, and the difficulty you face?

A Yes, briefly, the gist.

Q What did she say?

A She said: You DT to this company. This company is mine - well it does not matter ...

Q So is it the case that you understood her as telling you that if such a question was to be asked of you again, you can actually reveal everything about this company and about her?

A Her personal matters?

Q No, her interest in this company.

A Yes, I see, Yes, it can be done.

Q That was the message clearly given to you?

A Yes.

.....

Q So your mentality was that that was something that I asked you about in court, and you were having difficulties in answering, and then you went over to her, told her about the difficulty and how it arose and asked her for her consent; that was how it happened - is it not?

A That is right.

Q Mrs. Wang also knew how it arose because it arose out of your having difficulty in answering questions in court, and therefore you went to her for her guidance.

A Yes.

Q And she readily gave you guidance?

A Yes."

13.33 Further, Li had previously claimed privilege of self-incrimination when being asked question as to his beneficial ownership of shares in Global Cheers Ltd.39 Later on after getting guidance from the defendant by talking to her, he answered similar question put to him by the defence counsel and it transpired that he held his shares as nominees for the defendant, having given a declaration of trust in respect of the shares he held in favour of a company wholly owned by the defendant.40 The purpose of asking him to act as a nominee was apparently to conceal the real beneficial ownership of the company from the incorporated owners of the buildings developed by Chinachem so as to facilitate the defendant, through her company to get cleaning contracts from the incorporated owners.41 Whether this was in fact a criminal act or not is not the point of concern. What is important is that Li himself would consider it as a criminal act as he was concerned enough to claim the privilege of self-incrimination. This attitude adequately demonstrated that he was quite prepared to go to the extent of doing things which he considered to be criminal or at least improper in order to assist his employer, the defendant.

13.34 In all the circumstances, I cannot act on the evidence of Li to hold that the defendant had proven that the vouchers 100 and 101 borne the genuine signatures of Tse on or about the dates of the respective vouchers.

13.35 In this case this Court could not apply the general presumption of regularity to the two vouchers, which authenticity was expressly disputed. The custody and source for production of these vouchers were not known. Clearly they were not shown to be coming from the batch of vouchers kept by the accounts department of Chinachem. If these two vouchers were genuine vouchers of the dates they bore, the defendant must be in a position to call evidence to tell the Court as to the source of these two vouchers and from where these vouchers were retrieved. Since the persons involved

in the handling of the vouchers like Law and Ng are still employed and in good health, it would have been a very easy exercise for the defendant to prove these two documents if they were genuine documents handled by Chinachem in the same way as other vouchers. But they were not called as a witness.

13.36 Moreover, it is doubtful whether the defendant could be really giving real assistance to the police in their investigation of the authenticity of the four questioned documents. This is demonstrated by the fact that in the case of Wang, the defendant submitted samples of his English signatures where everyone must know that the signatures concerned were all in Chinese.

13.37 In the premises I accept the plaintiff's submission that the signatures on the two payment vouchers 100 and 101 have not been established to be the genuine signatures of Tse on 10 March 1990 and 31 March 1990, and thus could not be used as samples by the experts in giving their opinion on the authenticity of the four questioned signatures of Tse.

13.38 It was submitted by the defence in respect of the signatures of Tse on 100 and 101 that:

(a) they resemble the post-1995 signatures of Tse more than his signatures on the two police statements in 1990, and

(b) the two characters "Chinese text" are highly superimposable.

Since I cannot accept the two vouchers are genuine vouchers bearing the genuine signatures of Tse made in 1990, I cannot accept the submission of the defence.

13.39 Further the question before me is not whether Tse could sign two superimposable characters in his signatures out of hundreds of signatures signed by him on these vouchers. The question is why Tse could sign four sets of highly superimposable signatures in three corresponding Chinese characters on these four documents. This question of superimposability will be considered in another Chapter hereinafter.

THE SIGNATURE ON THE HOME VISIT PERMIT

13.40 The defendant did not give discovery of this document until 13 August 2001.42 The authenticity of the signature and handwriting of Tse in 1992 were disputed by Notice of 3 September 2001.43 The plaintiff in fact disputed that the signature on the document was not executed on 6 March 1992, the date of the Permit and put the defendant to prove that the signature was put there and then on or about that date.

13.41 The defence certainly realised that she had the burden of proving the document. The defendant's leading counsel went as far as saying that the defendant shall subpoena the relevant authority to prove the document.44 But to be fair to the defence, this was in the context of the argument as to whether the plaintiff was entitled to call a number of witnesses to prove that they went through the checkpoints of the Mainland without signing their Home Visit Permits. In response to that, the defence threatened to call 1,001 witnesses to prove that that was not possible and they would even call the person in the Chinese authority to support their contention. I ruled there and then it was irrelevant and superfluous. The only question is whether Tse could have passed through the Chinese checkpoint and in fact did so without signing his Home Visit Permit until much later. Unless each side can call the very officer who had examined Tse's Home Visit Permit at that very first entry or several entries thereafter and discovered that he had either signed his signature thereon or did not care whether he had signed his signatures, all the other witnesses would be just a waste of time. It would be difficult for the defendant to find such a witness and it would be even more difficult for the plaintiff to find such a witness who would be willing to testify as to his dereliction of duty. Eventually they could not.

13.42 The defendant would also appear to be relying on the presumption of regularity that it would appear the signature of Tse in this document was written by the same pen that was used to make the first entry in April 1992.45 This was actually suggested by the Court, and the defendant's attention was drawn to the first entry in April 1992. However upon closer examination it was pointed out by Prof. Jia, the defendant's own expert that the pen used for writing the entry in the Home Visit Permit in April was not the same pen used in the signing of the signature.46

13.43 Furthermore the presumption of regularity could only begin to arise if the document concerned was shown to be coming from the proper custody and for this reason, the

 © 2020 Thomson Reuters. 

defendant had sought and obtained leave to call Tse Wai Man, the son of Tse, on 27 September 2001. However Tse Wai Man was never called.

13.44 The fact that the signature was written also with a defective pen with ink colour close to that of the entry on the first day of the Permit being used, is in fact a suspicious circumstance. It would be more than a coincidence that there could be two ball pens both being defective and both being used by Tse at around the same time. The colours of the two were certainly very close so that even the defendant's counsel had mistaken that they were written by the same pen after it was pointed out to them by the bench. It was only because of Prof. Jia's evidence that the difference was pointed out by him to us. Hence it is probable that well after the Permit had been put to use, someone had sought to find a faulty pen of the same colour as the first entry inside to write the signature. However, owing to his insufficient expertise, he failed to get the right colour and thus exposed the discrepancy.

13.45 As both the source of the custody of the document and also the relevant entries are suspicious, and the defendant had elected not to call any evidence on them, this Court should not accept the signature on this Home Visit Permit as a 1992 sample. In any event and more importantly, it is dangerous to rely on this signature as a sample signature even if it was actually signed by Tse himself because the signature was signed with a defective ball pen and it is difficult and unsatisfactory to compare this signature with the questioned signatures in respect of certain aspects of a signature, e.g. the pen movement, the speed thereof, the pen pressure, and/or tremors. For the aforesaid reasons, I would not rely on this "sample" as a comparable sample for the questioned signatures.

13.46 In the next chapter I shall then summarise all the experts' opinion before I launch into detailed analysis of the four questioned signatures of Tse.

1 p.1489A, G5

2 p.62-67, A

3 p.483, F1

4 p.113, A

5 p.126, A

6 p.166, A

7 p.191, A

8 p.222, A

9 p.228, A

10 T36:82:1

11 T160:31:3 and 32:6-9

12 para.1, p.510, D

13 para.7, p.511, D

14 T165:7-9 and T166:34-41

15 T166:37:15-20

16 T166:42:3-14

17 T165:2:18-3:9

18 T165:17:4-7

19 T165:71:21-24

20 T165:72:1-14

21 T165:43:19-44:24

22 T165:66:3-69:25

23 T165:71:19

24 T166:57:12-60:15

25 T166:73:8-11

26 paras.4 and 5 of his statement at pp.510-511, D

27 T167:15:16-17:14

28 T167:27:7-11

 © 2020 Thomson Reuters. 

29 T167:40:10-14

30 T168:42:21

31 T168:59:19-62:21

32 p.1492, G5

33 T165:40:12

34 T165:41:6-19

35 T165:57:3-21 and 62:1

36 p.121, F1

37 T165:64:3

38 T168:59:9-61:21

39 T167:50:18-51:3

40 T168:46:17-49:2

41 T168:49:18-49:9

42 p.177, A

43 p.207, A

44 T23:88:12-16

45 T23:89:2-8

46 T84:57:18-25 and 58:1-2

Chapter 14 - The Signatures Of Tse Ping Yim "Chinese text"

(III) - Summary Of The Opinion Of The Experts

MR GUS LESNEVICH ("GL")

14.1 GL was of the firm view that the four questioned signatures of Tse Ping Yim were forged. His view was mainly based on his finding that the four questioned signatures were not naturally and spontaneously written and contained numerous dissimilar writing movements and writing habits when compared with the samples in 1990.1 The questioned signatures were more carefully drawn and all the characters were exactly the same size and there was no natural spontaneity of the writings.2 He thought that the questioned signatures might have been done by a form of tracing.3 He had also carried out a more detail examination of the questioned signatures and also the 1990 samples, 674 and 736 and found that there were dissimilar writing movements.

14.2 GL had also compared the two signatures on the vouchers, 100 and 101, with the known writings of Tse with a view of finding out if they were in agreement with the known writings. His view was that they were not and he found that they were dissimilar to the natural writings of Tse in the timeframe of the 1990 writings. Since he could not authenticate them as being genuine signatures and he had been told that there was a question as to the authenticity of the two signatures in 100 and 101, he did not include them in his examination as a couple of sample signatures.4

14.3 GL had also looked at the 1999 samples. He considered that they were not good samples for comparison for the purpose of determining whether the questioned signatures were genuine signatures of 1990. His view was that the 1999 samples were products of a person's carefully drawing his name and not the natural spontaneous act of writing his signature. He opined that "when someone carefully draws their writing, there is no way you can compare that to writing from an earlier time period that should have been naturally written".5

14.4 Further GL took the view that since Tse died of cancer within three months from the date of the 1999 samples, it was probable that by the time of his writing out the 1999 samples, Tse was ill or on medication or in pain. That was in September 1999. With that condition, the person would have lost his ability to write his name naturally.6 The best he could do was to try to draw his name carefully and take his time to make various characters. The products would not be natural or spontaneous.7

14.5 Whether or not GL was justified to go to the full extent of inferring that Tse was either on medication or in pain on 6 and 9 September 1999 (the dates of the 1999 samples), it is in any event clear that the general appearance of the 1999 samples was that they were slowly written and they did not

exhibit the naturalness and spontaneity found in the 1990 samples. Whether this phenomenon in his 1999 signatures was due to illness or otherwise is not important. It could also be due to other factors such as old age, or simply change of habit, or some change or deterioration in the power of writing. The important thing is that the 1999 samples were simply not good samples for the purpose of determining whether the questioned signatures were genuine 1990 signatures of Tse.

14.6 GL agreed that there might be some general similarity between the questioned signatures with the group of 1999 signatures, but since the 1999 signatures were themselves slowly written drawings and not natural and spontaneous signatures, such similarity would only mean that both the questioned signatures and the 1999 signatures were both drawings, and they could not be used to establish the questioned signatures as genuine 1990 signatures.8

14.7 In short, apart from the dissimilarity upon detailed comparison, GL also relied on the fact that the questioned signatures are in lack of the naturalness and spontaneity that are found in the signatures of Tse in 1990 as a major reason for his conclusion. The general similarity between the questioned signatures and the 1999 samples in their "drawing" characteristics would at least mean that these questioned signatures were not genuine signatures of Tse in 1990 given his habit in signing his signatures naturally there and then.

MR PATRICK CHENG YAU SANG ("CHENG")

14.8 Cheng also observed that the control signatures written in 1990 were naturally and fluently written in moderate speed with commendable line quality. On the other hand the questioned signatures were carefully, unnaturally, and slowly written with inferior line quality. There was also a large degree of superimposability in the corresponding characters of the four sets of questioned signatures.9 He has also carried out a more detailed comparison between the characters of the questioned and the known samples and came to the conclusion that the questioned signatures were not written by Tse.10 In this respect his conclusion on forgery in relation to the Tse signature is much stronger than his conclusion on the Wang signature.

14.9 After he had the opportunity of examining further samples, being the three travel documents of 1979, 1992 and 1994, and also the 1999 samples on the documents dated 6 and 9 September 1999, he observed that the signatures on the three travel documents conformed with the previous samples in characteristics and inherent features. However, for the 1999 samples, there were some deviations between features found in them and the earlier 1990 samples.11 He also concluded that between 1979 and 1999, Tse's signature had undergone natural changes with time, in such a way that those in 1999 showed some features which were not found in the earlier ones.12 The change in features between 1990 and 1999 was enormous, and as such the signatures in 1990 or around that time should be the most appropriate ones for comparison with the questioned signatures.

14.10 Having examined the new samples, his view that the questioned signatures were not written by Tse remained unchanged. He thought that because of the resemblance of some of the features in the questioned signatures with those in the 1999 signatures, it was probable that the forger had modelled his forgery on a sample contemporaneous to those of the 1999 signatures.13 Since in fact the questioned signatures must have come into existence by January 1998 (when the questioned documents were lodged with the Court, and Cheng was not aware of this), this would probably mean that the model used for the traced forgery would be a signature of Tse made closer in time to 1999 than 1990.

MR DAVID TSUI CHEE KEUNG ("TSUI")

14.11 Tsui also made the observation that the questioned signatures were slowly, cautiously and unnaturally written and the writing quality in them was inferior to the known signatures. He also made a more detailed comparison between the features of the questioned signatures with the samples he had written when he conducted the examination in the year 2000. He was of the view that the questioned signatures were not written by Tse.14 This would mean it was a maximum negative 10 in his scale.

14.12 After he had examined further samples of the three travel documents and the 1999 samples, his view remained unchanged, namely that the questioned signatures were not written by Tse.15 Again his opinion that the questioned Tse signature was a forgery is a stronger opinion than that relating to the questioned Wang signature.

14.13 He came to the view that the questioned signatures were probably made by tracing, using a horizontal signature

 © 2020 Thomson Reuters. 

as model and tracing character by character from a model made after 1994.16

PROF. JIA, XU AND ZHAN

14.14 The three experts were of the view that the four questioned signatures were genuine signatures written by Tse in 1990. After comparing the four questioned signatures with the known samples, which in their case they would have included the 1999 samples, they found:

(a) the level of writing is similar;

(b) they very rarely have linking between strokes; and

(c) the overall construction and appearance are in agreement.17

14.15 They also said that the writing in the four questioned signatures was neat and the pen movement was smooth with no features of imitation, such as pauses and rewriting of strokes, rigid and dull movements having been found. Hence, notwithstanding some tremors in the individual strokes, their opinion was that these tremors were not the result of forgery but instead they were the natural habit of Tse showing that the questioned signatures were personally written by Tse.18

14.16 The three experts also carried out some more detailed comparisons of the features between the questioned and the samples and observed that there were similarities. These features were, for instance, exhibited in the arrangement and proportion between the strokes ("Chinese text"), the points of intersection ("Chinese text"), the shape and form ("Chinese text"), the pen wielding movements ("Chinese text") and also the sequence in writing the strokes ("Chinese text").19

PRELIMINARY ANALYSIS

14.17 The samples of Tse signatures over the years can be found in Albums 4 and 4B and also E11-879(8) which were prepared by Cheng. From looking at the questioned signatures and those in the control samples, I cannot agree with the views expressed by the three defendant's experts that the questioned signatures were similar to the controls in terms of the level of writing, the rare occurrence of connected strokes and the overall appearance. The unnaturalness and the general inferiority in the writing and line quality in the questioned signatures are very obvious and this is particularly so when they are compared with the contemporaneous sample signatures before 1994. The 1990 samples were written only shortly after the purported date in March 1990 in the four questioned signatures. The assertions of the defendant's experts are simply unacceptable. Can the slowly, cautiously, and unnaturally written questioned signatures with high superimposability of one on the other for the four sets of questioned signatures, be explained in terms of difference in speed only by the same author as suggested by the three defendant's experts? I do not consider that they can do so. I shall examine these four questioned signatures in more detail in the micro analysis in the next chapter.

1 p.136, E2

2 T17:99:16

3 T18:168:9-12

4 T17:127:12-23

5 T17:126:8-11

6 T17:125:5

7 T17:125:7-10

8 T17:129:6-14

9 pp.23-24, E1

10 p.26, E1

11 p.35A(4), E1

12 para.5, p.35A(4), E1

13 p.35A(5), E1

14 p.317, para.4.1 and p.320, E3

15 T32:94:6

16 T32:96 and T33:74:23

17 p.539, E6

18 p.541 and p.644, E6

19 pp.540-541, E6

Chapter 15 - The Signatures Of Tse Ping Yim ("Chinese text")

(IV) - Micro Analysis

TRACING

15.1 The plaintiff's case is that Tse's four questioned signatures were superimposable. The signatures in Documents A, B, and C are highly superimposable on each other character by character. The three corresponding characters in Document D are also superimposable on the corresponding characters on Documents A, B, and C. The reason why the corresponding characters in Document D are not as superimposable as those in Documents A, B, and C is that Document D is a piece of much thicker paper and consequently, it would be more difficult to trace the signature.

(1) The transparencies

15.2 Both Cheng and Tsui had prepared transparencies of the questioned documents to demonstrate the superimposability of the questioned Tse's signatures. These transparencies gave a life size of the signatures. In order to make sure that the details would not be missed out in the photocopying process, Tsui adjusted the colour tone to a slightly darker (but not to the darkest) tone.1 One can certainly see that some of the details (such as the fainter crosses and the words "One life one love") which were missed out in Cheng's transparencies2 are also found in Tsui's transparencies. The defence took a very strong attack on Tsui's transparencies with this photocopying effect. It was suggested to him, based on the opinion and advice of the defendant's experts, that by adjusting the colour tone to darker than the original, he was thickening the lines so that the characters would become more superimposable. This point taken came close to an accusation of improper conduct in rigging the results. In my view the point taken by the defence is completely without any merits. In the first place, what Tsui did was to adjust the copier slightly, such that the details would not be missed. It was not a case of turning the colour tone to the darkest position. In fact, the so-called neutral position of the machine was nothing more than the adjustment in the photocopier, and if that adjustment would result in a loss of details, then plainly that is not the best or most neutral adjustment.

15.3 More importantly, although the defendant's counsel claimed that the defendant's experts would support the suggestion, the suggestion of the thickening of lines was never substantiated. In fact, two full days were spent in the course of Prof. Jia's examination-in-chief with a view to demonstrate that by adjusting the colour tone of a photocopier to a darker colour, it would result in a thicker line. When the machine from the High Court library was used to demonstrate the point and the defendant did not get the results she wanted, the defendant's Counsel simply claimed that that must be due to the operation procedure of that machine. Eventually the Court's photocopy machine was used but the defendant was again not happy with it. That resulted in the use of yet another machine in the Court building. The result of the exercise as demonstrated from the computer capture of E6-654(167) and (168) plainly demonstrated that the photocopy line was not made any significantly thicker even though the machine was adjusted to the darkest tone and the process was repeated for a number of times.

15.4 In the end, the two-day exercise only served to demonstrate that the accusation was misplaced. It further demonstrated that the views of the defendant's experts, although firmly given, are often without basis and are in fact wrong.

(2) The superimposability

15.5 The result of superimposing the signatures character by character would confirm that the corresponding characters are highly superimposable. The degree of superimposability is certainly much more than other sets of signatures, such as the four small signatures in DPJ 5995(3) to (6), (Tse's signatures in 1999) which the defendant had put to Cheng for his comments. Such deviation in the questioned signatures as it exists is relatively minor and if one goes by the original size of the writing, the deviation is indeed very small and often even narrower than the width of the tip of a ballpoint pen.

15.6 The defendant created a set of enlarged transparencies and the result of the superimposition of the enlarged characters was set out in E6-654(134) to (140). It is quite apparent that where the lines departed, they mainly occurred at strokes with tapering ends such as the ticks, the slants

and sabres. This is not surprising because these strokes with tapering ends could only be produced by a quick movement of the pen. Any forger would realise the need to produce a similar tapering end by quick movements and as he did so, he was liable to have larger departure from the image he was tracing.

15.7 Further, as aforesaid, when those departures or deviations from the model were made and when the deviations were in different directions, the superimposability of the two end products would be compounded or increased. Suffice it for me to say that on the whole, the characters were highly superimposable.

15.8 Another point to note from the result of the superimposition is that by and large the characters on 1D1 is least superimposable than the other three, especially for the characters "Chinese text" and "Chinese text", as aforesaid. This is again explainable because the paper of 1D1 is thicker than the other three as aforesaid and hence tracing on that piece of paper is more difficult. Indeed, this is a point indicating that the signatures were traced. If it is said that Tse possessed the special ability to write consistently is the explanation for the superimposability of four sets of signatures, the question is why is that there is this coincidence that he wrote less consistently on a thicker piece of paper? Further still, why did he not have this special ability when he was signing the two police statements in 1990? None of the 1990 sample signatures are superimposable on each other.

15.9 Of course high superimposability is a necessary ingredient in traced forgery. However depending on the writing habit and ability of the forger, a traced forgery would normally also exhibit common signs of forgery, such as tremors and unnaturalness and often some differences between the genuine signature and the products of the tracing as the forger may not be able to completely suppress his own writing habit.3 This view of Tsui is amply supported by Osborn at pages 328-332.4 But before I consider the significant differences and other signs of forgery, I shall deal with Tsui's opinion that the forger might have used a horizontal model for tracing a vertical signature.

(3) A horizontal model used for tracing

15.10 From the material available, it is obvious that Tse's preferred way of writing Chinese was to write horizontally. This is evidenced by the fact that on 6 September 1999 when he was asked to note on the copy questioned documents that contained his signature, he did so horizontally while he could well have done so vertically. Furthermore the rest of the documents (except 1D1) were written out in a vertical manner.5 He made a horizontal signature on 1D1 when he signed the document before a solicitor Mr Alex Lam. This document with the words "One life one love" was written horizontally, but Tse signed his signature vertically. Thus that was not dictated by the content of the document.

15.11 The only instance where his vertical signature was found was on the consent for surgical operation forms6 where the general outlay of the form was such that it would not be feasible for him to sign in a horizontal manner. While there appeared to be little doubt that the characters "Chinese text", "Chinese text", and "Chinese text" on these forms were written by him, it is notable that he did so under the column for "Name" and not the column for "Signature". There was a note next to that saying that it was the "patient's signature". Plainly these rare samples of Tse's signature in vertical form were not easily available and were not available even to the defendant. No vertical signature of Tse is available for the same period i.e. 1990.

15.12 Thus it is likely that someone who wanted to forge Tse's signature by tracing would not have any vertical signature available to him. Since the three characters in the signature of Tse were not linked to one another, there could be no impediment in producing a vertical signature by tracing from a horizontal model. When this was done, certainly the spacing between the characters of the various questioned signatures would not be superimposable or otherwise the same for the four signatures. Thus, the point put to Cheng during his cross-examination relating to the tracing that when one character was superimposed on top of the other on another document, the other character was not superimposable, is neither here nor there.

15.13 It is also important to realise that if all four questioned signatures were traced from one and the same model, (as to that there could be no evidence other than educated guess work based on the probable behaviour of the forger), the result of the tracings (i.e. the end-products) on each occasion would differ slightly from the model and a comparison of two different tracings (or end-products) would be compounding the deviations on each occasion as aforesaid when the

deviations were in opposite directions. Hence, it is not at all surprising that when two tracings were superimposed, there were some discrepancies in some minor aspects as we are superimposing two end-products instead of each end-product with the model. This is Tsui's evidence which I would readily accept. Thus when the end-products were highly superimposable, this would be very cogent evidence of forgery by tracing from one model signature. Here, the superimposability is of high degree even when the sizes of the characters were blown up many times.

15.14 It is also notable that whenever one signs a signature consisting of more than one character vertically or horizontally, there is some sort of consistency in the spacing between the characters so that the spacing between the characters would always be within a certain range. In the present case, the spacing between the characters in 1A1, 1B1 and 1C1 is rather consistent. However, the spacing between the characters in 1D1 is much wider. If a person were to sign a number of vertical signatures on the same occasion on similar documents as suggested by the defendant in this case, then one would expect the signatures to display consistent habit and one would not expect the spacing between the characters in one to be different and out of range with the others.7 The much wider spacing for 1D1 in the present case is suggestive that the signatures were created by tracing. The inconsistent spacing was probably because 1D1 was traced on a different occasion, or because 1D1 was a thicker piece of paper and was more difficult to trace and in conducting the tracing, the forger had not paid enough attention to the spacing.8 This feature is also suggestive that the model for tracing was not from the same vertical model and in all probabilities it was from a horizontal model.

15.15 This part of the evidence of Tsui has never been contradicted by any expert from the defence. At the time of Tsui's evidence, the vertical signatures of Tse on the hospital consent forms were not available. However, if one should look at the spacing of the characters on those two known vertical signatures,9 it would certainly show that the spacing of the characters in 1D1 was much wider than the spacing in the genuine signatures even after taking into account the proportional size of the characters. This is yet another indication that the questioned signatures were forgeries.

SIGNIFICANT DIFFERENCES

(1) Unnaturalness

15.16 To illustrate the point of unnatural writing in support of his conclusion that the questioned signatures were created by tracing in contradistinction from 5995(3)-(6), (the signatures made by Tse in 1999), Tsui had pointed out a number of features which could readily be seen from the chart then available at the time when he gave evidence (on Day 33) even without any large magnification. When Prof. Jia gave evidence using the microscope and the images of the characters were further enlarged, there were even more features of unnaturalness emerging. The more obvious signs of unnaturalness were pointed out by Tsui in his examination-in-chief.10

15.17 First and foremost, the counter-samples in 5995(3)-(6) relied upon by the defence were freely and naturally written. Notwithstanding that there were some traces of tremors in the long downward strokes, as one can see, the general flow of the pen is smooth and spontaneous.11

(2) The character "Chinese text" of 1A1 - the radical "Chinese text"

15.18 The horizontal stroke at the top came back as a retracing movement to write the first downward vertical stroke. It had some appearance of reducing the pressure as it reached the starting point of the vertical stroke. But in fact it did not link with the beginning of the next vertical stroke. The vertical stroke started somewhat above the end of this retraced stroke. This was not consistent with the swift movement of the pen by the linking appearance.12 This is an example of "Chinese text" (apparently fast but in fact slow), a term used by Prof. Jia in his textbook as a sign of forgery.

15.19 The defence relied on the radical "Chinese text" in 5996(5)13 as showing that this feature also existed in a known sample. However in 5996(5) the retraced stroke from the end of the horizontal stroke did not have any appearance of reduction of pen pressure and speed. Further the design of the whole character "Chinese text" in 5996(5) was such that the strokes were all connected together wherever possible. Thus, the sabre of the radical "Chinese text" was linked to the first horizontal stroke of the radical "Chinese text" by an obvious connection. There was no trace of the writer wanting to create a stroke movement which is "apparently fast but in fact slow" ("Chinese text "). By contrast what is found in the

 © 2020 Thomson Reuters. 

character "Chinese text" in 1A1 is such an unnatural stroke movement which is a typical example of "Chinese text".

(3) The character "Chinese text" of 1B1 - the radical "Chinese text"

15.20 There was a retracing movement up from the end of the left vertical stroke of the radical "Chinese text". However, when it reached 3/4 of the way up the vertical stroke, there was an abrupt change of direction and a sudden increase in pen pressure upon the change of direction so that there was an obvious sudden thickening of the line. This was an unnatural writing movement.14 There was an obvious triangular white spot at the change of direction point which could not be due to a crack or defect of the paper. In fact from photograph F7A-23, which was taken earlier, there was no obvious uninked section in the vertical stroke opposite to the change of direction point. The defendant's expert relied on a line which he called an "ink line" (and white line) that went up from the retraced stroke to the upper part as showing that there was one continuous movement up.15 However, this argument cannot be right because the so-called "ink line" did not follow the direction of the stroke movement. Then furthermore, if it is said that the "ink line" should be straight despite the change of direction of the stroke, then one can see that the bottom part of the same "ink line" opposite to the end of the last tick of the radical "Chinese text" is not in a straight line. Thus Prof. Jia was simply throwing his weight around in making assertions. The so-called "ink line" was not a striation line of the ball pen writing but was formed because of the texture or a very fine indent line of the paper.

(4) The character "Chinese text" of 1C1 - the radical "Chinese text"

15.21 There is an obvious change of direction of the downward long stroke in the radical "Chinese text" on the right after it has passed the position of the last horizontal stroke. This feature of unnaturalness and hesitation had been pointed out by Tsui in his report and evidence.16 This could be seen even from Album 4 and is also clearly seen from the photograph at F7A-25 and the computer image from the microscope at C.04.ts05. Even the defendant's experts would have to agree that there was a change of direction.

15.22 This is obviously not an ordinary tremor because there was no zigzag movement. It is also important to note that this change of direction was at the lower part of the long vertical stroke and there were also some tremors found at the upper part of the same stroke. Thus it is very unlikely that the sudden change of direction was due to an accidental movement. This change of direction was most likely the result of an act of tracing where the long downward stroke was not being traced perfectly when the forger had slowed down, though Prof. Jia said that this was not sufficient to support the contention of tracing.17

(5) The character "Chinese text" of 1D1 - the radical "Chinese text"

15.23 Tsui had pointed out that the end of the first horizontal stroke was wavy and was bending upward.18 The end of the stroke in fact was in an upward direction with the tip pointing up and this feature was not present in any of the other three questioned signatures nor was it shown in any of the known. This feature was rather like the wavy movement of the "a silk worm head and a wild goose tail" ("Chinese text") wavy movement in the Wang signatures but the tail was not tapering and instead it was blunt with some emphasis.19

15.24 Prof. Jia tried to justify this unusual feature by pointing to the signatures on the two vouchers 100 and 101 and also the 1992 (HVP) travel document DPJ 5992. Apart from the fact that these three samples are not acceptable samples as aforesaid, one can see that the end of the first horizontal stroke in the radical "Chinese text" is not pointing upward. This inconspicuous feature is of course an important feature showing inconsistency with the movement of the writing of Tse and is a good indication of forgery. In fact it is not just about the end of the stroke, the way that this stroke was written in this particular form of wavy way (in a way similar to the first horizontal stroke of the character "Chinese text" in 1B1) was only seen in 1D1 and no other samples.20 This was an admission of Prof. Jia including that it was in the shape of "a silk worm head and a wild goose tail" ("Chinese text").

15.25 Further, the vertical stroke on the left of the radical "Chinese text" started from a position below about 1/3 from the left of the top horizontal stroke. There would appear to be a long retracing of the horizontal stroke from right to left going to about 2/3 of the length of the stroke. The retracing was at the bottom part of the stroke. This is unnatural. Furthermore, the top part of this vertical stroke above the level of the horizontal stroke of the radical " was bent. This part of the

stroke was not a linkage from the top horizontal stroke of the radical "Chinese text". The bend indicated hesitation and unnatural execution of the vertical stroke.21

15.26 The defence relied on 100 and 101, DPH 674(8), (9) and DPJ 5996(10) as counter samples to show that the way of writing this part of the radical "Chinese text" was not a difference. However none of the samples relied on would show the same undulating movement of the top horizontal stroke. Further, none has any retracing along such a long part of the stroke. Furthermore, although these samples relied on by the defence all have the top part of the left vertical stroke of the radical "Chinese text" above the horizontal stroke, yet they were all different from 1D1. In these cases the stroke came down smoothly without any awkward angular turn as in the case of 1D1. Even in the case of 5993 written in 1999, although the retracing also appeared to be rather long, once the writer had started writing the vertical stroke, the stroke came straight down unlike the case of 1D1 where the initial part of the downward stroke was directed to the bottom left with a sudden change of direction above the horizontal stroke of the radical "Chinese text".22 It should be noted that this sudden change of direction in the radical "Chinese text" is only found in 1D1, where the document is thicker.

(6) The character "Chinese text" - the upper radical "Chinese text"

15.27 The sabres in the upper radical "Chinese text" in all the questioned signatures were written with uniform pen pressure and ended bluntly. This was particularly so for 1A1 and 1D1.23 This is an indication of very slow pen movement. It should be noted that in all the controls, particularly those in 1990, one can see a much quicker movement and also the sabre ended with some small movement of the pen towards the left or a tiny retracing movement up the left side. Even if one were to use 100 and 101 as samples, one could see that 100 had some variation of pen pressure in that the middle of the sabre was thicker and in both cases, the end of the sabre fell on the beginning of the right dot of the lower radical "Chinese text". One cannot discern whether there was any slight ending movement of the pen or not.

(7) The dot of the radical "Chinese text" in "Chinese text"

15.28 In the four questioned signatures, the first dot in this radical "Chinese text" is smaller than those in the pre-1994 samples. This observation was made by all three experts called by the plaintiff. This is particularly so for 1D1 where the dot is very small by proportion. In this respect DPH 674(4) is no exception as one should realise that the dot there did not end at the first horizontal stroke but it extended below that stroke. If that part below the horizontal stroke is also taken into account, certainly the size of the dot in 674(4) is consistent with the other 674 samples. The dot in 5992 (the 1992 Home Visit Permit) was quite short though, yet for the aforesaid reasons this is not a good sample. Even if it was written by Tse there and then, his speed and the length of the stroke must be limited by the defective pen. This is actually one of the reasons why 5992 should not be used as a sample signature for comparison. In any event the dot there would still be slightly larger than the one in 1D1.

15.29 Further the dot in all the samples whether in 1990 or otherwise would either touch the horizontal stroke or would at least be very close to it. The largest gap found amongst the known is 736(5). However this, being a fast written signature, the degree of variation would be more. Further, even for 736(5) the gap between the dot and the horizontal stroke is far closer (and the dot is much bigger) than 1D1.24 This is probably due to the forger's lack of sufficient attention in the tracing exercise to such meticulous detail, especially when the paper of 1D1 is thicker.

15.30 Furthermore the beginning part of the dot in 1A1 is unnatural with the bend.25 The enlarged image at A.04.ts02 would support Tsui's view that it was probable that there was a pen lift after the initial commencement of the stroke. In relation to the bending of the dot, the defence referred to DPJ 5996(8) as a counter sample to show that there was similar bending.26 Indeed, there was another one where bending is also found namely 5996(7). However in all pre-1994 samples, such bending feature did not occur. Indeed in purported reply to challenge the view of GL on the point about this dot, all the counter samples relied upon by the defence were 1999 signature samples.27 Furthermore, as one can see from the enlargement of the character at Album 4B and also E11-874 and 876, the initiation of the dot in both 5996(7) and (8) was smooth and different from that in 1A1.

(8) The relative length of the first and third horizontal strokes for radical "Chinese text" in the character "Chinese text"

15.31 As it has been observed, the length of the third horizontal stroke for the radical "Chinese text" has become longer since 1994. Notwithstanding the lengthening of this stroke in the 1999 samples, the length of the third stroke in 1A1 and 1D1 is still much longer than those in any of the known, including the 1999 samples. This is even more so for 1D1 where the third stroke was of equal length to the first stroke, which is a feature not found in any of the known at all.28

(9) The short slant at the lower part of the radical "Chinese text" in "Chinese text"

15.32 There is the general observation by all experts called by the plaintiff that this stroke in the questioned signatures is much shorter than any one of all the pre-1994 samples.29 For DPJ 5993 (1994) the slant although still within the enclosure of the tick, is in fact relatively long due to the larger angle of the tick. The defence sought to rely on counter samples set out in E6-654(4) and 654(57). However those short slants were really only found in the 1999 samples.

15.33 The length of this slant is not necessarily related to the speed in writing. Hence, the purported excuse that these short slants are found in writing of slower speed could not be a good explanation for the difference. Moreover the slowness in the speed for the questioned when compared with the known is itself a feature of difference.

(10) The narrow gap between the two horizontal strokes in the radical "Chinese text" in the character "Chinese text" of 1A1

15.34 In the radical "Chinese text" in 1A1, the two horizontal strokes were rather close together. This was originally pointed out by Tsui as a difference between 1A1 and the known signatures of Tse in 1990 available to him when he examined the signatures to prepare his first report. However, when the 1999 samples were made available later, there were some instances like DPJ 5995(4), 5996(1), (3) and (4) where the two strokes were also rather close together. For this reason, Tsui did not treat this as a difference. This would indicate that the questioned signatures were unlikely to be written in 1990.30 These counter samples are not comparable. In any event this point of Tsui is a point of difference when compared with the contemporaneous samples in 1990. Further it would fortify the contention that the model used was a signature of Tse closer to 1999 but in the post-1994 period.

(11) The linking dots of the upper radical "Chinese text" in the character "Chinese text"

15.35 There is of course a tendency that if one has to sign a series of signatures, one tends to write slightly quicker and hence the tendency of having connected strokes or pseudo-connected strokes would be greater.31 In the case of the four questioned signatures, on the defendant's case, they were executed one after another in series and were not single signatures signed on isolated occasions. That was what Tse said in his statement. However in the known samples of Tse, even for the 1999 samples where for one reason or another he signed more slowly, there were links between the two dots in the upper radical "Chinese text" in the character "Chinese text". Of course all the 1999 samples were also signed in series and were not isolated signatures. Of all his known signatures, there were only five where the two dots were not clearly and actually linked. These were: DPH 736(7) - (1990), DPH 1829 - (1993), DPJ 5992 - (the Home Visit Permit purportedly in 1992), and 100 and 101 (purportedly in March 1990).

15.36 For 736(7), it is clear that the left dot went across the slant and extended to very far up to the right although there was no actual connection with the beginning of the right dot. The tendency was there. It is clearly a pseudo connection and the writing motion is a connected one.

15.37 For 1829, it is a poor quality fax and cannot be relied on. For 5992, and 100 and 101, they cannot be used as good samples because their authenticity cannot be established as aforesaid. In any event, for 5992 there were special reasons for the writing instrument and also the position of signature on the Home Visit Permit which made the signature not a usual one, and this is an explanation for the non-connection. Furthermore, in none of these samples 1829, 5992, 100 and 101, was the signature signed in series. The nature of the documents suggested that they were all signed on isolated occasions. In any event, even for 101 the left dot had also passed through the middle slant and the intention to link was quite obvious.

(12) The width/height ratio of "Chinese text" and "Chinese text"

15.38 The significance of this ratio is to show the general tendency of the writing habit of Tse and also the dating of

 © 2020 Thomson Reuters. 

the questioned signatures. Given that it is probable that the signatures were forged from a genuine one, the width/height ratio of the questioned signatures is unlikely to be out of range from all the known.32 Tsui was not cross-examined on his measurement of the width/height ratio of the character "Chinese text" in the questioned signatures, being between 0.85 and 1.053.33 The range for the width/height ratio for those samples of 1990 available to him in his first report is between 1.053 and 1.842.34 The range for the width/height ratio for the 1999 samples is between 0.875 and 1.125.35

15.39 From the range, it is quite clear that the general tendency for the character "Chinese text" in Tse's signature is that it became taller and narrower in his later days. The range for the questioned signatures would certainly be much closer to the group of signatures of 1999 than 1990. Even if one were to use the figures set out in the defendant's chart E6-654(63), the range for the questioned signatures is between 0.9 and 1.108, the range is still much closer to those of 1999 than 1990.

15.40 In relation to the character "Chinese text", the range of the questioned signatures in terms of width/height ratio, is between 0.875 and 0.929.36 The range for the samples available to Tsui at the time of his first report is between 1.00 and 1.533. The range for the 1999 signatures is between 0.929 and 1.25. It is quite apparent that the habit of Tse in writing the character "Chinese text" has been changed to writing it taller and narrower in 1999 as in his character "Chinese text". Again the range of the questioned signatures sits much better with the group of 1999 signatures than the 1990 signatures. Even if one were to adopt the defendant's figures for the range between 0.875 and 0.981 for the questioned signatures,37 the range is still much closer to the 1999 range than the 1990.

15.41 Finally I would also point out that in the three master charts for comparison in E6-654(18 to 20), the defendant's experts had put the 1999 samples first, i.e. their samples 10-1 and 2, 11-1A to 5 but put all the 1990 samples at the back. The question is why they did not put the contemporaneous samples in 1990 at the outset, which should be the more useful samples for comparison, as suggested in their own eminent textbooks?

THE TREMORS

(1) The presence of tremors

15.42 There is no dispute between the parties and their experts that in the four questioned signatures of Tse, there were a lot of tremors found in the strokes. Counsel for the plaintiff set out a summary of the findings of tremors by the plaintiff's experts and Prof. Jia in Appendices 11(a) and 11(b) to their written submission (I). There are a number of overlapping points between experts on either side. In particular, tremors were agreed to be present in the two long vertical strokes in the character "Chinese text", the long vertical stroke on the right of the character "Chinese text" and the long slant in the character "Chinese text".

15.43 It is highly significant that there is no tremor found in the samples of 1990.38 DPH 700 is not considered as a good sample for deciding whether there is tremor because it is a poor photocopy.39 This is particularly so because it is not known how many times the document 700 had been copied. As it could be demonstrated from the computer capture of the lines drawn in the experiment done by the defendant,40 a perfectly smooth line would be rendered a broken and wavy line after a few photocopying process. Again in this respect, the top part of the slant in the radicals "Chinese text" in DPH 674(9) could not be properly considered to be tremulous although there was a slight change of direction of the stroke. The whole stroke was smoothly executed, unlike the long stroke on the right of the radical "Chinese text" in 1C1 where tremors and slow writing were found at the upper part and a change of direction was found at the lower part of the same stroke.

15.44 For the later sample DPJ 5992 (the HVP), said to be of 1992, is not a good sample for reasons already considered on account of its authenticity and also on account of its defective writing instrument and location on the Permit. DPH 1829 of 1993 is a fax copy. In relation to DPJ 5993 of 1994, the CI Document, there is only some unevenness in the downward stroke. But by and large the line quality of the strokes concerned is better than that of the questioned signatures. The two slants in the former were quite smoothly written.

15.45 In relation to the 1999 samples, there is no dispute that there were many tremors on all three characters.

(2) Counter samples

 © 2020 Thomson Reuters. 

(a) Counter samples for "Chinese text"

15.46 In order to justify the conclusion that the questioned signatures were natural, the defendant's expert was very keen in showing that the same sort of tremors were also found in the known signatures of Tse. Insofar as DPH 700 is concerned, for reason already said that it is only a photocopy record kept by the Registration of Person, it is not a good sample for showing tremors. In the chart at E6-654(58) prepared to contradict Tsui, the defendant's expert relied on DPH 736(4) and (6) of the 1990 samples, and DPJ 5996(2) and (8) of the 1999 samples in relation to the radical "Chinese text" in the character "Chinese text". It is plain and obvious that the 1990 samples relied on at the time were all photocopy samples because at the time, the original police statement from which the samples were drawn had not yet been located.

15.47 When the original of the police statement of 9 July 1990 (i.e. DPH 736) was located, the original signatures of Tse on that statement were then examined. These signatures41 clearly showed that there was no tremor in the radical "Chinese text" in 736(4) and (6) at all, although from the chart at E6-654(58) prepared by Prof. Jia, possibly out of many photocopying process, the downward stroke of the radical "Chinese text" had some tremor appearance. Indeed, when Prof. Jia gave evidence and he was asked to identify tremors, he had not identified any tremors in this stroke in 736(4) and (6) at all. Instead in his other chart at E6-654(151), he marked out a whole lot of what he considered to be tremors on the other samples of the character "Chinese text".

15.48 This attempt by the defendant's expert to rely on photocopy sample to tell tremors is unreliable. As an expert document examiner, it is inconceivable that Prof. Jia would have failed to appreciate the danger of making use of photocopy in such circumstances. His attempt to do so also indicated that he was not impartial and was desperate to clinch on anything to justify the opinion he wanted to give.

15.49 A long time later when Prof. Jia gave evidence, he said that there were tremors at the radicals "Chinese text" and "Chinese text" in 736(1) and also (3).42 These were new allegations which had not been made earlier in his earlier chart at E6-654(58). When the radicals of "Chinese text" and "Chinese text" in 736(1) and also (3) were properly examined, these strokes showed no tremor at all.

15.50 In order to justify the conclusion of genuineness, the defendant's expert was keen to show that there were also tremors in the earlier samples. For this, Prof. Jia in his chart at E6-654(151) also included 700, 1829 and 101 as showing tremors. However 1829 was taken from a fax and it was even more dangerous to rely on a photocopy of fax copy to show tremors than just a firsthand photocopy (as in 700). (If this 1829 in page 654(151) is accepted, then the whole character "Chinese text" is "trembling"!) As for 101, apart from its authenticity being in doubt, it should be noted that the line quality is smooth and is certainly quite different from those in the four questioned signatures. This is more clearly shown in the computer capture from the original through the microscope at G1-101.04.ts01 rather than from any of the charts prepared by the defence by way of photocopying. Even Prof. Jia would say that the "tremors" at the radicals "Chinese text" and "Chinese text" in 101 were only slight.43

(b) Counter samples for "Chinese text"

15.51 In the chart prepared for the cross-examination of Tsui on this point of tremor, the defendant's expert had prepared the chart at E6-654(60) relying on the samples of again 700 (1990), (a photocopy document of unknown number of times), 674(7) (1990), 5992 (1992), (written with a defective ball pen) and also 5996(3) of the 1999 samples. For the same reasons, samples 700 and 5992 are not good samples for the illustration of tremors in sample signatures.

15.52 In relation to 674(7), it is plain and obvious that there is no tremor (and not even unevenness) found at the right downward stroke of the radical "Chinese text". In fact a comparison of the copy from the original of this signature as seen from Album 4 produced by Cheng and this same character appearing in the chart produced by Prof. Jia,44 would indicate that there was a lot of loss of details and distortions in the character reproduced in the chart produced by Prof. Jia. Later on Prof. Jia produced further charts when he gave evidence. He marked out what he considered to be tremors on his new chart at E6-654(156). It is interesting to note that he no longer relied on 674(7) and 700 as showing tremors in the control samples as he did in his previous chart at E6-654(60). Instead of the photocopy sample 700, he relied on the fax copy 1829! Further instead of 674(7), he relied on 736(1), (2) and (7) and said that there were tremors on the right downward stroke of the radical "Chinese text". When giving evidence, he also said that there were tremors on the

same stroke at 736(6) too, although he had not identified this sample in his new chart in E6-654(156).

15.53 When the original signatures in 736 were examined, there was no tremor on these sample signatures (1), (2), (6) and (7) as alleged by Prof. Jia at all. This can be clearly seen even from the chart produced by Cheng from the originals at E11-879(8). They can also be clearly seen from the computer capture through the microscope at DPH 736(1).05.p01, DPH 736(2).05.p01 (which is slightly out of focus) and DPH 736(7).05.p01.

(c) No counter samples for "Chinese text"

15.54 When the character "Chinese text" in 1D1 is closely examined, there are some tremors found on the top part of the slant of the upper radical "Chinese text".45 Such feature was not found in any of the 1990 samples, and in fact the defendant's expert had provided no counter sample on the tremor at this point at all.

(3) Significance of the tremors

15.55 The presence of these tremors in the questioned signatures indicated that the writing was slow and unnatural. Their appearance had every indication of tremors created as a result of forgery, as an indication of efforts to follow an unfamiliar copy.46 Even if the tremors were the result of old age or weakness, the presence of these tremors in the questioned signatures when compared with the known writings of 1990 would clearly indicate that the questioned signatures could not have been signed by Tse in 1990 as alleged by him and the defendant.

OTHER FEATURES REVEALED DURING PROF. JIA'S EVIDENCE

15.56 When Prof. Jia put the questioned signatures under the microscope brought into Court, the various characters were closely examined for a longer time. Then it became more apparent that there were some other less conspicuous features indicating unnatural writing or forgery found in the questioned signatures, which were not hitherto picked up by the plaintiff's experts. This does not necessarily mean that the plaintiff's experts are incompetent because there were so many more prominent forgery features having been picked up already that any expert would be justified to think that he had found enough already to come to a comfortable conclusion. They simply do not have the luxury of examining the characters in detail under a microscope for a long time since their examination at the Government laboratory should only be made in the presence of the experts from both sides and the police who has been in possession of the questioned documents which have been stored in the safe of the Probate Registry whenever they were not used for examination. Some of these less conspicuous features are considered hereinbelow.

(1) "Chinese text" in 1A1

15.57 In the middle radical "Chinese text", the lowest horizontal stroke came into the vertical stroke at the right and then turned downwards rewriting on the lower part of that vertical stroke. This feature of the turning movement of that horizontal stroke can be seen in F7A-19 and also in the computer captures in A.04.ts01 and A.04.ts15. The latter computer capture is more obvious.

15.58 Prof. Jia denied that there was such turning and rewriting. His view was that the forger would be an idiot to have traced the signature by writing the lower part of the vertical stroke from the horizontal stroke. However, if one were to go along the right side of the parameter of the downward stroke, there was an obvious inward movement at the intersection of the stroke and the horizontal stroke indicating the turning movement of the horizontal stroke. Prof. Jia could not explain this other than saying that it was coincident.47 This explanation is not satisfactory. The argument of Prof. Jia that the vertical stroke came straight down was that there was an ink line that came right down.48 However, this ink line did not pass through the horizontal stroke and in fact it was clear that there were two ink lines, one above and one below the horizontal stroke intersection. The two white dots in the intersection should not be taken as the continuation of the white line by extrapolation. In any event the two white lines, one above and one below, did not match as suggested. Thus the downward movement of the horizontal stroke even if it did not go all the way down is unusual for Tse's signature.49

(2) "Chinese text" in 1A1

15.59 This point would be apparent from F7A-20, A.05.p01 and in particular A.05.p07. The horizontal stroke in the radical

"Chinese text" was written very unnaturally in that after the retracing up from the left vertical stroke, the first part of the horizontal stroke was diagonally up to near the slant of the radical "Chinese text" and then there was a sudden change of direction to write the rest of the horizontal stroke by a horizontal movement instead of an upward movement. Thus what should have been one continuous horizontal stroke was written with a sudden change of direction and the stroke was not a smooth stroke and the ink lines along the first part of the stroke certainly did not continue to the second part of the stroke.50 The writing movement was intended to give people a perception that it was a fast movement, i.e. the first part of the horizontal stroke following the retracing from the vertical stroke, but in fact the whole horizontal stroke was executed slowly with a sudden change of direction. This is an example of unnaturalness of pen movement which is "apparently fast but in fact slow" ("Chinese text"), although Prof. Jia would not admit the same.51

(3) "Chinese text" in 1A1

15.60 It is very apparent from F7A-21, A.06.y04, A.06.y05 and A.06.y07 that in both radicals "Chinese text", the slants were not smooth. For ordinary writing, one would expect the slant to be written at some speed and after the commencement of the stroke, pen pressure would increase and, towards the end of the stroke, would decrease to form a tapering end. However, for the upper radical, when the pen pressure of the slant increased after the commencement of the stroke with a slight curve down, then the pen pressure was maintained down until the pen reached the position just at the intersection with the left dot. The pen pressure again increased immediately after the dot to complete the rest of the slant. The same observation on the pen pressure could be made for the lower radical although it was less conspicuous in terms of pen pressure but much more obvious in terms of hesitation after the intersection as shown by an obvious hump. In fact hesitation was present in both slants. The thickness of the slants at the position both above and below the intersection with the left dot for both radicals was uneven with slight change of direction.

15.61 Prof. Jia accepted that there were some bends in the slants which were not obvious but denied that these slants were written very slowly or that there was hesitation.52 He would at least have to accept that the writing movement somehow slowed down with the change of direction although he would say not much.53 To justify that these features were not unnatural, Prof. Jia in fact pointed to the same features occurring at the slant of both the upper and lower radicals of the same questioned signature.54 His logic was obviously highly questionable. It is tantamount to saying that the more unnatural features were found in a questioned signature, the less would be the amount of naturalness.

15.62 Furthermore such similar features of change of direction were not found in known signatures, a fact which Prof. Jia had not suggested to the contrary. What he has failed to explain is why someone who did not have this special habit of writing the slant, would suddenly reduce his speed in the middle of the slant with some small change of direction in 1990 when he was younger and healthier? The more obvious inference to be drawn from this feature is that in tracing the slant, when the forger reached the point of the two dots where the image would of course be more complicated because of overlapping of several strokes, he had to slow down in the tracing exercise and in so doing he also unwittingly and/or unconsciously allowed his pen to have some minor change of direction after some pausing and hesitation. It is not surprising that Prof. Jia would not agree to this inference.55

(4) "Chinese text" in 1D1 - the top right corner turn of the radical "Chinese text"

15.63 This point is apparent from the photograph at F7A-28 and D.04.ts01, especially the aforesaid photograph. At the end of the top horizontal stroke of the radical "Chinese text" before the turn, the stroke was thick and dark. However when the stroke reached the turn, it suddenly became thin. At the turn of the corner the stroke became thinner and the colour tone was slightly less intense. After the turn the stroke became thicker again and the colour intensity increased to a similar level as before the turn.56 This phenomenon is the result of writing that part of the top horizontal stroke up to before the turn, and yet again that part immediately after the turn and hence this accounted for the thinner connected part between the horizontal stroke and the turning and the vertical stroke that followed. In short there is no smooth turning as in the samples, e.g. DPH 736(3).04.ts01.

15.64 Prof. Jia did not agree with this inference.57 However, even on Prof. Jia's explanation of the phenomenon, the "Chinese text" would have to be written slowly and there would be yet a further slowing down as the writer reached

 © 2020 Thomson Reuters. 

the turn.58 This would be entirely consistent with someone's tracing, when he had to do so slowly and when he reached the turn he would have to further slow down to follow the image of the turn he wanted to trace.59 Although all four questioned signatures were slowly written, the signature in 1D1 was written on a thicker piece of paper, and tracing with 1D1 paper would be more difficult. This explained why such similar phenomenon of more severe slowness and more unnaturalness did not occur in the other three questioned signatures, at least did not occur to that extent, because the forger could afford to write slightly faster in the other three thin documents than in the case of 1D1.

(5) "Chinese text" in 1D1 - the lower part of the radicals "Chinese text" and "Chinese text" and the tick

15.65 It is apparent from F7A-28 and D.04.ts05 that the downward stroke on the right of the radical "Chinese text" was written with great pen pressure. Consequently there were strong and clear striation marks seen all the way down to the end of the stroke. However, the striation marks just ended with the end of the stroke. There were no striation marks coming up from the end of the vertical stroke along the direction of the tick. Instead, there was a small triangular bulging out on the right near the end of the vertical stroke. This triangular part would appear to be the root of the tick or hook of the radical "Chinese text". But this was not so. One can see from the radical "Chinese text", the vertical stroke was also written with some pressure and therefore there were striation marks all along it down to the end. However, unlike the radical "Chinese text", there was a group of striation marks coming from the bottom part of the vertical stroke along the direction of the tick. In fact there was a straight one on the upper side of the tick and a curve one from the bottom all the way up to the upper side but below the former one. These similar striation marks were simply not found in the radical "Chinese text".

15.66 Here, one would expect that when the tick was written immediately after the pen had reached the bottom of the vertical stroke, another group of striation marks should start in the direction of the next movement i.e. the direction of the tick. Similar striation marks could also be found in the radicals "Chinese text" and "Chinese text" in 1C1, and also 1B1, and with less clarity also in 1A1.

15.67 By contrast, the tick of the radical "Chinese text" in 1D1 did not show this phenomenon. Prof. Jia agreed with all the observations of the striation marks and his explanation was not that sometimes the striation marks would continue towards the left tick and sometimes there would be a new set of striation marks.60 The reason for the difference between the striation marks at the radicals "Chinese text" and "Chinese text" of 1D1 is probably that in the case of the radical "Chinese text", the downward vertical stroke was written on top of another vertical stroke which incorporated the small triangular bulging at the bottom right and also the hook or tick as it appeared in the character. Since this over-written stroke did not continue on to write the hook at the end, there was no striation mark appearing along the direction of the tick starting from the bottom of the stroke. This is a retouching suggesting forgery.

15.68 Prof. Jia would not accept any suggestion of retouching or over-writing. His explanation for the contrast was that the ticks of the radicals "Chinese text" and "Chinese text" were in fact written by different kinds of movements. In the case of "Chinese text", the pen reached the bottom and then turned left to form the tick, but in the case of "Chinese text", when the pen reached the bottom, it paused with pressure applied to the lower right and the hook or tick would start from the right edge of the vertical stroke.61 Of course, Prof. Jia would have to accept that the way of writing a hook at the end of the long vertical stroke would be a reflection of the personal habit of the individual.62 Faced with the fact that the author of the four questioned signatures should have the same habit of writing the hook or tick of the radicals "Chinese text"and "Chinese text" in all instances save for this odd radical "Chinese text" in 1D1, Prof. Jia gave the explanation for the "difference" as being due to different conditions.63 However, this explanation is not convincing. It is difficult to conceive that if the four Tse's signatures were signed in the manner as alleged by the defence, there should be a material difference in the condition for writing the radical "Chinese text" in 1D1 from all the rest of the four signatures. The only different condition is that, again, 1D1 is a thicker piece of paper.

15.69 Thus, the true explanation for the special feature of the radical "Chinese text" is that there was over-writing. Even if there was no over-writing, the sudden change of habit of writing the tick would indicate that the writer was not writing naturally at the time and the way of writing the tick of the radical "Chinese text", even if it was done in a manner suggested by Prof. Jia. Thus it would be much more consistent

 © 2020 Thomson Reuters. 

with the writer trying to trace and write the strokes even more slowly with a pause when he had to ascertain whether he had reached the end or not for this long stroke through this thick piece of paper, before he started again with the hook. In that case he probably started again with the pen just bending towards the left for writing the hook with no pen lift after a momentary pause. This would at least explain why there was no striation marks coming from the right and bottom side of the end of the vertical stroke. This would be a deliberate (though slight) change of writing movement of writing a signature which should otherwise be spontaneous and natural, indicating forgery.

(6) "Chinese text" in 1D1 - the upper radical "Chinese text"

15.70 It is very apparent from F7A-30, D.06.y04, and D.06.y05 that there was a retouching at the top part of the slant of the upper radical, although Prof. Jia would not admit the same.64 The bulging on the left, a little bit after the beginning of the stroke, and the ink lines starting again evidencing the beginning of another stroke is very clear in particular in the computer capture through the microscope in D.06.y05.

15.71 The aforesaid six features of forgery as observed through the microscope are all indications of forgery. This conclude my micro analysis on the four questioned signatures of Tse and I shall conclude on Tse's questioned signatures in the next chapter where I shall also give an overall conclusion on the two sets of Wang and Tse signatures together thereafter.

1 pp.339-342, E3

2 E1, Ex-9a

3 T33:64:22-65:17

4 pp.1295-1299, F6

5 pp.42-45, D

6 pp.1706 and 1748, F7

7 T32:110:2-11

8 T32:106:20-109:17

9 pp.1706 and 1748, F7

10 T33:65:21-75:1

11 T33:66:5-10

12 T33:68:2-10

13 E6-654(154)

14 See also B.05.p02 and F7A-23

15 T106:61:12-65:20

16 T33:69:12-20

17 T106:69:20-71:3

18 T33:70:3-7, it is interesting to note that this wavy and bending upward movement is not found in any of the 1990 sample signatures of Tse but is found in the first horizontal stroke of the four questioned signatures in the character "Chinese text" when Wang himself did not have this obvious wavy and bending upward movement, and in particular not in those years nearer to 1990.

19 See Album 4 and photographs at F7A-29 and also D.05.p03-4 and D.05.p06

20 T107:26:4-31:8

21 T33:70:12-25

22 T33:73:2-9

23 T33:74:8-17

24 T32:119:1-14

25 T32:118:9-25

26 E6-654(53)

27 E6-654(1)

28 E6-654(55)

29 p.141 and p.167, E2, p.24, E1 and T33:4:24-5:17

 © 2020 Thomson Reuters. 

30 T33:31:23-32:3

31 T33:35:9

32 T33:39:16-24

33 p.319, E3 and T33:37:8-12

34 p.319, E3 and T33:37:16

35 T33:42:13

36 T33:42:20-23

37 E6-654(64)

38 T26:152:3-5 and T33:11:25

39 T33:12:11-13

40 E6-654(167a)-(167d)

41 E11-879(8)

42 E6-654(151)

43 T83:19:23-25 and 20:1-5, see also E6-654(142A)

44 E6-654(60)

45 T33:11:19

46 T33:25:18-21

47 T106:51:13, Why Prof. Jia could rule out that the forger is also, at least to a certain degree, an idiot is unknown.

48 T106:53:9

49 T106:50:6-12, per Prof. Jia's cross-examination

50 T106:56:16-24, per cross-examination of Prof. Jia

51 T106:58:1

52 T106:59:25-60:4

53 T106:60:13

54 T106:60:18-28

55 T106:61:11

56 T107:2:12 and 3:10

57 T107:11:8

58 T107:6:6-8:16

59 T107:8:21-9:1

60 T107:13:15-16:17

61 T107:18:11-20:3

62 T107:20:4-7

63 T107:20:7-16

64 T107:31:9-32:4

Chapter 16 - The Conclusion On The Four Questioned Signatures Of Tse Ping Yim ("Chinese text") And The Overall Conclusion On The Two Sets Of Signatures Of Wang And Tse

CONCLUSION ON TSE'S QUESTIONED SIGNATURES

16.1 In respect of the four questioned signatures of Tse, I shall now give my conclusion, purely on all the experts' evidence concerning his signatures and nothing else. In other words, it is an independant assessment of his signatures unaffected by other factors as aforesaid. In this respect I found that:

(a) there are many significant differences, though some of them are less conspicuous yet they are clearly revealed under the microscope;

(b) there are a number of strokes written unnaturally with pen pauses, tremors and retouching; and

(c) there is a very high degree of superimposability of all the four questioned signatures and in particular for 1A, 1B, and 1C whereas in 1D the signature was traced with a thicker piece

of paper and therefore not as superimposable as the other three signatures.

16.2 I accept the opinion of the three experts called by the plaintiff, who independently came to the same view that the questioned Tse's signatures were forgeries.

16.3 In view of the way that the forgery was created by tracing, and indeed by this very nature of forgery, there would be a number of similarities between the questioned signatures and the known. However these similarities were superficial and some of them were very common amongst the writing of many people.

16.4 Further the defendant's experts' justifications of the differences are contrived. They often involved an artificial introduction of some pre-conceived form of signatures of slow speed in 1990 when none of such sample signatures existed. They gave no consideration to the changing habit of writing of Tse between 1990 and 1999. Instead they made the bald assumption or unconvincing contention that there was no change in his signatures in the face of many remarkable differences found amongst the sample signatures over the years and in particular between those in 1990 and 1999. This would carry the opinion nowhere. By contrast, I accept Cheng's opinion that: "The change in features between 1990 and 1999 signatures are enormous".1

16.5 Further their first written report is, admittedly, full of mistakes. For reasons given at divers places hereinbefore already, it is plain that the defendant's experts are not impartial and their opinion is not reliable in spite of the fact that they are very able and learned. I simply cannot accept their opinion.

16.6 Further I also accept Cheng's contention in his second report dated 6 September 2001, in which he said that: "The findings that some of the features of the questioned signatures resemble those in the 1999 signatures are probably due to the forger modelling the forgery from Mr Tse's 1999 or contemporaneous signatures". Of course the word contemporaneous means more contemporaneous to the 1999 signatures and definitely before January 1998 when the questioned documents had already been lodged into Court but after 1994.

16.7 In other words, I do not find that Tse's signatures are genuine signatures but written by him in the later years after Wang was kidnapped in 1990.

16.8 I also find from the evidence adduced before me that the evidence in support of forgery in respect of Tse's signatures are very, very cogent and compelling. I can say that I have no doubt that these four signatures are forged signatures.

OVERALL CONCLUSION ON THE FOUR SETS OF QUESTIONED SIGNATURES OF WANG AND TSE

16.9 As pointed out hereinbefore, I analyze the questioned signatures of Wang and Tse separately and independently. In other words it is independant of the background and those suspicious circumstances surrounding these four documents. That is exactly why I consider the two sets of signatures first even before I consider the handwriting in the main body of the four documents and in particular Document A. In other words my findings are even independant of what I will find in respect of the handwriting in the main body of the four documents, not to say those suspicious circumstances. In fact this part of the judgment in section II is written before section I of the judgment in order that I can give an independant assessment of the evidence in respect of the signatures from the experts alone. If it is helpful, I would like to borrow a term from post-modernism, i.e. I just zero-in the four sets of signatures for each of the two persons in the light of the evidence given by all handwriting experts before me only.

16.10 I have already found that each set of the Wang and Tse's four questioned signatures are nothing but forgery. The cumulative effects of the experts' evidence which I have accepted in respect of these two sets of forged signatures in the name of Wang and Tse in these four documents are so compelling. Apart from being cogent and strong, they are to the extent that the only conclusion I can draw is that I have no doubt at all these eight signatures are nothing but forgeries.

16.11 I shall now consider the handwriting in the main body of the documents in the next chapter.

1 p.35A(4), E1

Chapter 17 - The Authorship And General Features Of The Four Questioned Documents1

 © 2020 Thomson Reuters. 

17.1 As I have said in the last chapter, I deliberately consider the authorship and general features of these four questioned documents only after I have considered the handwriting evidence of the four sets of questioned signatures of Wang and then Tse. In this chapter I shall be assessing the evidence independently again, i.e. whether I find any of the handwriting in the main body of the four documents were probably or probably not written by Teddy or Nina or any other person(s), it would not affect my previous findings in the last chapter and vice versa. Of course when the two sets of findings combined together, they will have cumulative effect. But before I consider their cumulative effect I will make a finding on each of the issue independently, i.e. as to what facts have been proven and to what standard of proof.

UNDISPUTED OPINION ON DOCUMENTS A, B, AND C

17.2 All handwriting experts in this case (except GL who had only examined Document A) have conducted an examination to determine whether the questioned Documents A, B and C were written by Wang. They all came to the same conclusion that Wang did not write those three documents, although they arrived at their conclusion not entirely from exactly the same route.

17.3 In the case of Cheng and Tsui, they examined a number of characters and radicals from the questioned documents and compared them with those found in the samples.2

17.4 In the case of the three defendant's experts, Prof. Jia, Xu and Zhan reached their conclusion based on the comparison of the way that the three characters "Chinese text" were written in the body of the questioned documents and the sample signatures of Wang.3

17.5 GL had only examined Document A as aforesaid. He also reached the conclusion that this document was not written by Wang. He also based his conclusion on the quality of the writing and the comparison between the three characters "Chinese text" in Document A with the sample signatures he had. He arrived at his conclusion based mainly on the skill level exhibited by the writer of Document A and the control signatures of Wang.4

17.6 Cheng and Tsui had examined the other two Documents B and C. Cheng and Tsui both found that the defendant could not be the author of Documents B and C.5 They were of the opinion that Document A was written by a different person from Documents B and C, and that Documents B and C were written by the same person.6

17.7 The three experts of the defence also made the same positive finding that Document A was written by one person and Documents B and C were written by a different person.7 Thus it is common ground between the plaintiff and the defendant that Documents B and C were in fact written by one person, and that person was neither Teddy nor Nina.

DOCUMENT D

17.8 Insofar as Document D is concerned, there was no examination by any expert on the writing (as opposed to the signatures) on it. The text of this document was written in English and therefore there could not be any meaningful comparison between the writing on this document and the other three in Chinese. There are also no available English sample writings of Teddy or Nina for the experts to make comparison. However it is common ground that on Document C there was the faint writing of "One life one love" which corresponded exactly with the same words on Document D, i.e. they are completely superimposable. This writing was written in steps form with one word for one step starting from the top left to the bottom right. Cheng in his report described this writing on Document C as "in black ink".8 Tsui thought that this writing was produced by some sort of carbon paper and not by liquid ink.9 In view of the fact that there does not appear to be heavy ink found at the back of Document D as it does not seem to be ink which has seeped through the paper of the Document D, Tsui's view is preferred. In any event whatever view I have accepted, it does show that when Document D was written, Document C had taken up the writing on Document D as Document C was below Document D. There is nothing to indicate or at least no evidence has been adduced to indicate whether by then, the contents of Document C were already written on the paper or not.

17.9 The defendant's experts had made a similar finding although there was no finding on what type of ink or instrument was used to write the words on the two documents.10

A DOCUMENT "E"?

17.10 The examination of the documents also revealed that on each of the Documents A and B there is a faint outline of the words in black "One life one love" on one single horizontal line. (That is different from the lay-out in Document D). There is also the word "Nina" on the right below the aforesaid single line, i.e. where one would usually put one's signature. These words of "One life one love" and "Nina" on the two documents are also completely superimposable.

17.11 The intensity of the colour of the writing was darker on Document B, and Cheng concluded that it would show that Document B was put on top of Document A when these words were written.11 This means the writing was somehow "printed" onto Document B and then A when it was written on, presumably, another piece of paper put on top of Document B. Tsui had a similar finding and in addition it was his opinion that the words would appear to be reproduced similarly by some form of carbon paper materials.12 Thus one can safely infer that there might be a Document E on which this line of "One life one love" and the "Nina" were written and when they were being written, this Document E was on top of Document B with Document A below it. I must point out that the existence of an additional document which I call Document "E" has not been explored in the trial. No doubt the plaintiff would say this must be the draft or practice document for the forger or the maker of Document D. The defence would say instead this was the same thing for Teddy or someone writing the same at his dictation.

17.12 However the words "One life one love" and "Nina" in the form they appeared on the Documents B and A would suggest that the statement of "One life one love" was probably made by a person by the name of Nina (as opposed to "for" or "to" Nina). Since there is no other person by the name of Nina other than the defendant herself, and in the absence of any suggestion that there could be any other person by the name of Nina who might have written the words on the paper (and it is not Nina's case that she wrote it at the dictation or direction of Teddy), the inference and conclusion that can be drawn is that these words were probably written by the defendant herself.13 Consequently Document D itself might well be written by her as well, when it has already been found by me both Wang and Tse's signatures thereon are, no doubt, forged signatures. Further the fact that the draft document ("E") probably written by Nina did not eventually find its way into the brown envelope but the Document D with the forged signatures of Teddy and Tse did, could also support the aforesaid two inferences, i.e. Document E and in turn D were written by Nina, the defendant.

OTHER INDENTATION OR THE LACK OF IT

17.13 It is also important to note that there is no indentation of either the Wang's or the Tse's signatures onto any of the four questioned documents. Yet it was the evidence of Mr Allan "Leung" (aided by demonstration of the plaintiff's Leading Counsel when he was asking the question) that from Leung's understanding of what he was told by Tse when he interviewed Tse on 9 September 1999, Tse saw Wang signing on a small pile of papers and after Wang had finished signing one, he took that one out for Tse to sign.14 If what Tse told Leung was right, then bearing in mind the thinness of the paper especially for A, B, and C, it is more than surprising that there was no indentation on the paper below.

17.14 The defence objected to this submission and described it as "ridiculous" and "misleading". Although that was exactly what Leung said under cross-examination as aforesaid, the defence submitted that the "impression" of Leung was clarified in re-examination to be nothing more than what Tse said in his statement to Leung. The defence submitted that the clarification in re-examination had made the evidence of Leung in his cross-examination equivocal.

17.15 However I do not accept the submission of the defence. Leung did say under cross-examination that that was the impression he got from Tse when he interviewed him, i.e. Wang signed with a small pile of papers one on top of the others. In re-examination he then said he could not remember and he jotted down what Tse said to him: "Chinese text" meaning "one small pile". In other words he changed his evidence from the impression he got from Tse was Wang signing on one document after another when they were a small pile of papers with one on top of the others to "he could not remember". That could not make his evidence equivocal. The questions put in cross-examination were very specific and his answers there and then were also unequivocal. Thus if Tse had ever told Leung during that interview or gave Leung the impression to the same effect, Tse must be wrong and unreliable. The change in evidence of Leung from cross-examination to re-examination also made Leung an unreliable witness which has already been fully considered in light of other parts of his evidence.

THE AUTHORSHIP OF DOCUMENT A

17.16 In all the affirmations filed by the defendant touching and concerning the four documents she propounded as the wills of the deceased, the defendant never mentioned anything about the authorship of the contents of any of the documents. Nor did she mention anything about the circumstances under which the documents were prepared. From her affirmations, she was merely given the sealed envelope and she had not read, seen, or even touched the contents of the envelope. In fact, since the opening of the envelope in Court on 6 September 1999, there was no occasion of her ever seeing the original of these four documents. On the other hand since then she must have been supplied with copies of the four documents, and through them she must have seen the shape and form of the contents of the four documents.

17.17 The authorship of a will is always an important matter in propounding a will especially when the person writing the will was the sole or a main beneficiary under the will. This would be one of the classic suspicious circumstances which the beneficiary or the person propounding the will would have to clear before the court would pronounce in favour of the will. This point has already been considered in the general issue and background in Section I of this judgment.

17.18 Thus if the defendant was not the author of Document A, she must be able to know that and she must be able to prove that she did not write it. She can at least supply her own writings to her experts. (Further that could include those five English words which somehow got into Documents B and C which would cover those four words on Document D, if she wanted an expert's opinion on them as well). It is quite surprising therefore that she had not instructed her three experts to give an opinion as to whether she was the author of Document A, upon which I will further elaborate later in the chapter herein. But before I do I must consider the samples used by the plaintiff's experts in the comparison of the handwriting of the defendant with Document A. For reasons which shall be apparent, this consideration shall be unavoidably lengthy.

THE SAMPLES

17.19 The text samples for the comparison of the handwriting of the defendant had been examined in great details in the hearing, particularly in the evidence of Teddy's sister, Ms Teresa Wang Tak Shyan ("Chinese text"). I am afraid I have to consider them in detail here. They consisted of a short note/letter allegedly written by Nina at the foot of a photocopy of an authorization letter written and signed by Teddy Wang15, and another short note/letter also allegedly written by Nina Wang on a Fotomax photo envelope.16 Both letters were addressed to "Chinese text" and received by her, i.e. Teresa and they were produced by Teresa to the Court.

17.20 From Teresa's evidence, she located evidence on Nina's handwriting because in about November 1999 she was asked by his father, Wang Sr the plaintiff herein, as to whether she had any handwriting of Teddy and her sister-in-law Nina.17

17.21 So far as the letter in the photocopy of another authorization letter is concerned, the letter came to Teresa's possession in the course of her assisting her elder brother Teddy in applying for immigration to the United States. She had made similar applications for her younger brothers before.

17.22 However after the 1980s the United States immigration authority would require her birth certificates and also that of Teddy to prove their relationship as siblings. She did not have such experience of obtaining birth certificate from China. Therefore she rang and spoke to both Teddy and Nina telling them that he had to get a birth certificate and she also had to get a birth certificate and a further certificate to prove their relationship as siblings.18 She would normally ask to speak to her elder brother Teddy but when he was not available, she would also speak to Nina. It was her impression that Nina was fully aware of the subject matter she was engaged in.19

17.23 Counsel for the defence submitted that Teresa could not say whether it was Teddy or Nina who had told her on the phone that in future when she received the application form, it should be filled in like the one Nina was sending her. It was submitted that that was why when she was asked who said that to her over the phone, she had to go back to her original "he/she". I do not consider this is a valid point at all. The citation relied on in the transcript by the defence was at T134:28:4-18:

"3 A. Yes.

4 Q. Did you know why you were sent this second document?

5 A. He/she was telling me that in the future when I received

6 the application form, it should be filled in like this.

7 HIS LORDSHIP: Who is 'he/she' telling you that?

8 A. Because these two sheets were sent to me at the same

9 time -- Kung Ru Xin sent them (to me). She talked to me

10 over the phone and told me how they should be dealt

11 with, I mean these two sheets.

12 MR CHAN: After you were in receipt of the two sheets and

13 after the many conversations you had with Kung Ru Xin

14 and also your brother, then what did you do?

15 A. I then wrote a power of attorney just like the first

16 document, as to the way that I was taught to write.

17 I sent it to the Chinachem office. Then I received an

18 application for birth certificate."

17.24 However the original version given in Cantonese according to the Court digital recording (which is the only official recording of the transcript) is as follows:

"Lines 5-6 A. "Chinese text"

Lines 8-11 A. "Chinese text"

Lines 15-18A. "Chinese text"

17.25 It can be seen from the Cantonese version when Teresa said "kui" ("Chinese text"), that would mean a person but this word is a neutral pronoun where there is no English equivalent. It can mean he and it can mean she. However when it is used, it is usually referred to a particular person and not he or she. In other words the gender of the pronoun has already been fixed or intended by the speaker unless it was said in the context that the speaker could not determine the gender of the other person i.e. the person referred to in terms of say, voice or appearance. For example Dr Kung said either Nina or Teddy spoke to him on their way to the Airport in 1984 and 1985 but he could not remember who now. In that case one can say it was, "Chinese text" meaning he/she. This is not the case here. Thus it is perfectly correct for the interpreter to translate the first answer as "he/she". When Teresa was asked who "he/she" was telling you that ("Chinese text"), that was just to clarify who that person was. It does not mean that Teresa was not even certain whether it was Teddy or Nina and therefore went back to her original "he/she" as submitted by the defence.

17.26 That is exactly why when the interpreter translated the second character "Chinese text" in the second answer in line 9, the interpreter did not use "he/she" again because in the context of that answer that person had already been identified as Kung Ru Xin, i.e. Nina and the translation for the Cantonese character "Chinese text" was: "she talked to me over the phone...."

17.27 All three Counsel for the defence in respect of the general issue know Cantonese and I think they should not make this kind of submission. There is no resorting to he/she here. When Teresa gave evidence, the Cantonese connotation was clearly that she had a particular person in mind, be it a man or a woman. That has to be ascertained and that is the job of Counsel and not the interpreter. Particularly in this very point, whether it was a "he" or a "she" is the very issue and is therefore a very sensitive matter, in which the interpreter should and therefore would not involve herself.

17.28 In the end I am fully satisfied that Teresa's unshaken impression was that it was Nina who talked to her over the phone before the letter was sent and thus Nina was fully aware of the subject matter she was engaged in. Thereafter Teresa received the form with adaptations together with a letter written to her by Nina, to complete the res gestae sequence.

17.29 In the meantime it would appear that Teddy had independently found out what should be done in order to obtain the certificates from China. It would also appear that Teddy had himself through one Cheung Lap Chung as agent, applied for a birth certificate. This would involve Teddy signing a form,20 and also writing a letter of authorization in favour of Cheung Lap Chung dated 19 July 1983, the upper part of the photocopy of the letter at E2-248. The application and documentation were of course only suitable for Teddy's application. Furthermore, by then Teddy's agent Cheung Lap

 © 2020 Thomson Reuters. 

Chung had already moved to Hong Kong and thus could not be the agent handling the application in Shanghai for him or her. Apparently Nina had decided to ask Teresa to request Nina's younger sister Kung Yan Sum ("Chinese text") to be her agent for her application for the birth certificate. The documentation would have to be adapted to be used by Teresa for her application. Apparently Nina herself had made alterations on the photocopy of the application and also the authorization letter of Teddy as a kind of precedent that Teresa might follow in making the application.21

17.30 At the foot of the photocopy of the letter of authorization was a short note written by Nina and addressed to Teresa. The content of the note was to the effect of asking Teresa to write a letter authorizing the writer's younger sister Kung Yan Sum to obtain an application form. This note was signed by a brief initial which Teresa was able to identify as that of Nina.22 This initial is very similar to the one after the other letter on the Fotomax photo envelope. Teresa was also able to recognize a writing on the note to be Nina's writing and she was also able to say that certain Chinese characters in the amendments to the photocopy part, namely "my elder brother Wang Teh Huei " ("Chinese text") were written by Nina.23

17.31 Teresa also gave a detailed account on how she sent by Federal Express the two documents24 to the plaintiff's solicitors.25 There was really no serious attempt to challenge her evidence here.

17.32 As to the Fotomax photo envelope, the evidence was that Teresa obtained that envelope containing the photographs taken during the holidays of her family and her brother Teddy and Nina in 1984 by the camera of Teddy and/or Nina. After the holidays when the film was developed and printed, Nina sent back to Teresa the photographs of her family members. The photographs26 produced by her adequately supported her evidence in this respect. Indeed one can see that the first photo at F8-2209 which had Teddy and Nina in the photograph was of a different print from the rest of the photos. This would clearly indicate that when the whole roll of film was first developed and printed, Nina or Teddy kept this photo since this photo also had them in it. What was sent to Teresa was a re-print of this first photo and hence the paper size of this re-print photo was not the same as the rest.27

17.33 According to Teresa, Fotomax photo envelope with the photographs contained in it was sent to her together with one or two T-shirts as well for her daughter.28 The envelope contained a note in manuscript. It was addressed to Teresa in the following words: "Teh Shyan (Teresa's Chinese name): Happy Easter, T-shirt will be sent again after it/they have been purchased. Would go out again to purchase those for Mui Mui". ("Chinese text": Happy Easter, T-shirt "Chinese text") There was also an initial which Teresa recognised that to be the initial of Nina. In fact Teresa was able to confirm that the writing of this note was Nina's writing because she could recognise it.29 The timing also agreed well with evidence from the defence that Teddy and Nina used to take their annual holiday during Chinese New Year and the photographs were sent one or two months after that.

17.34 The words "Mui Mui" meaning younger sister in Chinese, referred to in the note was the younger daughter of Teresa. Apart from Nina, there could hardly be anyone else that could have sent the photographs and the T-shirts to Teresa. Teddy certainly would not because from all other evidence it would be out of his character to do so.30 It has never been suggested to Teresa, in spite of very lengthy cross-examination, it was Teddy or anyone else who sent those photographs and T-shirt to her or Nina did not send those photographs and the T-shirt to her. Thus by reason of the following matters namely:

(a) the subject matter of the note,

(b) the initial recognized by Teresa to be Nina's initial, together with,

(c) the similarity of this initial with the one at E2-296,

(d) the fact that Nina did not give evidence, and

(e) it has never been put to Teresa that the writing thereon did not belong to Nina,

I find the evidence is more than sufficient to support the fact that this note was probably written by Nina. This is to say that even without Teresa's identification of the handwriting therein as Nina's handwriting, the evidence is sufficient by itself to support the conclusion that the writing in Document A was probably written by Nina.

By the same token, even without Teresa's identification of the handwriting in E2-296 the other pieces of evidence including:

(a) the fact that it was initialled or signed in very much the same way as in E2-298,

(b) it was written also in very much the same way and addressed to "Chinese text" (being Teresa),

(c) the subject matter of the letter, and

(d) the telephone conversation of Nina with Teresa before the documents were sent,

the aforesaid pieces of evidence before me would support the fact that the short letter written at the end of E2-296 was also written by Nina herself.

17.35 After Teresa got the photographs, she put them inside a box where other photographs were also kept.31 When she was asked by the plaintiff if she had samples of the writing of Nina and Teddy, she sent to the plaintiff's solicitors the letter and form relating to the immigration application first, and then later on when she was able to locate this Fotomax photo envelope as well, she sent this envelope back together with the photos and a newspaper cutting to the plaintiff's solicitors.

17.36 The two documents relating to the application for birth certificates32 together with the Fotomax photo envelope33 were required to be sent to the police for examination of handwriting. They were given by the plaintiff's solicitors to the police, who wanted a statutory declaration to verify the documents. The statutory declaration was prepared by Messrs K.M. Chan & Co., the plaintiff's solicitors, and was then sent over for Teresa's execution. Teresa did make the declaration before a notary public. However, due to some over-sight or unawareness of the requirements, the notary public did not sign on the exhibit pages. This had necessitated the statutory declaration to be sent back to her for rectification. Teresa then went back to the notary public for rectification by adding her signature to the exhibits and dating them on the day of her signature on those exhibits. She also sent back the rectified statutory declaration to the plaintiff's solicitors.34

17.37 The defendant disputed the authenticity of the statutory declaration of Teresa (F1-228 to 234) which dealt with the production of the original of E2-248, 249 and 297 which contained the samples for the handwriting of Nina. Further in the case of E2-248 and 297, they are photocopy samples of the handwriting and signature of Teddy.

17.38 The evidence of Teresa on the documents and also the chain of evidence on her sending back these documents to the plaintiff's solicitors had not been seriously challenged. The defendant did not give evidence to the effect that those wordings identified by Teresa as her handwriting was not her own handwriting. She realized clearly that the plaintiff's experts would say that probably the writing on Document A is her handwriting after she had read their reports. Obviously in a criminal case she has no duty to assist the prosecution if she is a suspect. However in a civil case the Court is free to comment on her silence including her ability to prove that she was not the author of the writings in Document A. She did not do so.

17.39 In the end by reason of the aforesaid matters I accept that the plaintiff has proven the authenticity of the three documents, namely E2-248, 249 and 297 and that the writing found on the two letters at E2-248 and E2-297 belonged to the defendant, Nina and they can be used as sample documents to compare with Document A. I just find the way the defence was conducting her case by putting the plaintiff to strict proof without saying whether it was the defence case that those writings were the defendant's or not, is a complete waste of the Court's time. I did not say "the plaintiff's time" because the defence would have to pay for it but unfortunately for the taxpayers in Hong Kong, not for the Court's time.

THE IDENTIFICATION OF THE WRITING IN DOCUMENT A

(1) The defendant has no evidence, expert or otherwise

17.40 As already indicated hereinbefore, there is one glaringly outstanding feature in this case. This feature is: although the defendant had gone to the extent of employing no less than seven leading handwriting experts all over the world, namely: Carney, Lindbolm, Giles, Radley, Xu, Zhan, and Prof. Jia, together with the fact that she must be fully aware that part of the exercise of the other experts for the plaintiff was to find out if she was the author of any one of the four documents propounded by her, yet she has not produced any evidence from any expert relating to the issue as to whether she was the author of any of the four documents.

 © 2020 Thomson Reuters. 

17.41 Further it would have been extremely easy for her to provide the necessary samples of her own writing to enable her experts to make a comparison. Indeed, the best sample for comparison of a piece of handwriting would have been a specimen provided by her on dictation of the same passages in the four documents. She gave no explanation as to why she did not provide any specimen sample or did not produce any expert evidence to show that she was not the author of any of the documents. (By the same token, she could have done the same thing in respect of the aforesaid sample letters written by her, if she were to dispute them.)

17.42 Of course this does not mean that she has not in fact obtained any expert report or view on whether she was the author of Document A, nor does it mean that she had one, oral or otherwise, which is against her. But if she did have some expert's opinion or reports supporting any conclusion that she was not the author of Document A, then it is difficult to see any reason for her not to produce it or rely on it.

17.43 The defendant has simply elected not to give any evidence and there was no evidence, expert or otherwise, adduced by the defendant on the authorship of Document A at all.

(2) The expert witnesses

(a) Gus Lesnevich ("GL")

17.44 GL has conducted a study on the writings on Document A. He obtained the assistance of Counsel, Mr Victor Luk for the plaintiff, who sent him a document identifying for him the common characters and radicals in the disputed and the sample writings.35 The defendant criticised the assistance so given by the plaintiff's Counsel. However it is important to note that although the defence had engaged no less than seven handwriting experts, there was no suggestion from the defence as to what other characters or radicals that GL ought to have studied and had he done so he should or would have come to a different conclusion.

17.45 Further if Carney, Lindbolm, Giles, and/or Radley were to be instructed by the defence, what kind of proper assistance the defence would be providing to them if they or anyone of them do not understand Chinese, other than those rendered by Mr Luk to GL. Furthermore, in the context of this case, it does not matter much when GL is not conversant with the Chinese language. Suffice it for me to say, he was fortified by Cheng and/or Tsui and was not nullified or contradicted by any one of them because they know the language. In the end, I can take the summation effects of all three experts here and I shall do it at the end of this issue.

17.46 The conclusion reached by GL was that in view of the similarity in the writing movements of the various characters and radicals set out in his charts, 36 (relating to the characters "Chinese text" in "Chinese text" (written in two versions), "Chinese text" in "Chinese text"), one is precluded from eliminating the defendant as the author of Document A. Further these similarities suggested that she might be the author of the contents of Document A. That is not any positive identification of the defendant being the author,37 but it would tilt just a tad to the side that she might have written it.38

17.47 Despite the severe attack made by the defence on the skill and ability of GL arising from his not knowing the Chinese language,39 the points raised by him based on the similarity of the writing movements identified in his charts are plainly valid ones. Of course in respect of each of the characters identified, there are variations in other parts of the writing. However when one looks at the characters as they appear on the charts, the so-called "differences" are plainly insignificant. For instance, the way that the "Chinese text" radical was written in the character "Chinese text" contained two movements in both of the two controls whereas in the questioned document the two strokes were linked. To anyone who knows Chinese, the way of linking the two strokes is so commonly done and it is also common for someone sometimes to link the two strokes and sometimes not to link the two strokes that this point raised by the defence is of little or no probative value. What is important is of course that the wrong way that the simplified version of the character "Chinese text" was written with the "Chinese text" radical on its left. This mistake had a very high value in the identification of the writer.40 This point can also be found in the two textbooks written by Prof. Jia41 and Xu42 (both experts called by the defence) on wrong way of writing.

(b) Patrick Cheng Yau Sang ("Cheng")

17.48 From the result of Cheng's examination, he could eliminate Nina as being the author of the contents of Documents B and C. But he could neither eliminate nor confirm that the defendant was the author of Document A.43

He reached this conclusion by taking into account of the differences and similarities between the sample documents and Document A.

17.49 In respect of differences he took into account the following differences in the ways that a number of radicals were written44:

(a) the character or radical "Chinese text", where he identified two ways of writing this character (page 3 of Album 3).

(b) the character "Chinese text", where he only identified one of the ways that this character was written (the other way is identified as character 6 on E2-247 and 254 by GL).

(c) the "Chinese text" radical on top in the character "Chinese text" in the control as a comparison with the same radical in the character "Chinese text" in Document A (page 7).

(d) the radical "Chinese text" in the character "Chinese text" in the control and the same radical in the character "Chinese text" (page 10).

(e) the radical "Chinese text" at the bottom in the character "Chinese text" in the control and the same radical in the character "Chinese text" and "Chinese text" in Document A (page 11).

(f) the character "Chinese text" (page 8)

(g) the character "Chinese text" (page 13).

(h) the character "Chinese text" in the control and the radical "Chinese text" in the character "Chinese text" (page 9)

17.50 In respect of similarities, he referred to the followings, namely:

(a) the radical "Chinese text" in "Chinese text" in the control and the same radical in "Chinese text" (page 1)

(b) the "Chinese text" radical in "Chinese text" in the control and the same radical in "Chinese text" and "Chinese text" (page 4)

(c) the character "Chinese text" (page 9)

(d) the character "Chinese text" (page 14)

(e) the character "Chinese text" (Cheng's evidence was that this character has both similarity and dissimilarity, page 8).45

17.51 I accept the submissions of Counsel for the plaintiff that the similarities pointed out by Cheng were all very personal in nature. For instance, the radical "Chinese text" within "Chinese text" was very characteristically written. The dimensions, the length and the width proportions and also the two slanting strokes inside are all the same.46 Furthermore, this way of writing the radical "Chinese text" occurred not just once, but also on a number of occasions in different characters, like in "Chinese text" and "Chinese text".

17.52 In respect of the two men radical "Chinese text", there are three variations within the letter of the defendant's at the bottom of E2-296, i.e. DPH 671:

(a) written as one man radical "Chinese text" as in the character "Chinese text" of "Chinese text";

(b) in the first character "Chinese text" in the first line of the letter, the two strokes are connected, whereas

(c) in the second character "Chinese text" in the same line the strokes are separated.

In respect of the continuous one zigzag stroke in the "Chinese text" radical for three separate strokes, it was also characteristically similar.47 This similarity occurred not only once but twice in Document A in both the characters "Chinese text" and "Chinese text".

17.53 In respect of the character "Chinese text", the way it was written was again in a personalised nature. The two slants, the unconventional way of writing the first short slant (i.e. from left to right instead of from top right to left bottom) on the left hand radical and also on the right hand radical "Chinese text".48 There is also the characteristic and unconventional way of writing what should be the long downward slant on the left radical in a rather short stroke.49 The linking movement of the last two strokes in the radical "Chinese text" is also very similar.50

17.54 Although the character "Chinese text" is said to have demonstrated both similarity and difference, the element

of similarity is, in my view, more personal. The similarity element consisted of the proportion of the upper and the lower part, the emphasis of the top part to a lesser extent, and the fact that the whole character was written with one stroke (which by itself however is common among Chinese writers). The difference pointed out by Cheng was on the fact that the loop formed by the tick and the horizontal stroke was narrower in the control and wider in Document A. The difference is very small and can be accounted for as natural variation. Further, often the space available might also have some effect on the size and shape of this character (i.e. less space in the sample 671 for a bit narrower loop and more space in Document A for a bit wider loop). One should not expect the writer to write them to a superimposable exactitude.

17.55 In respect of differences pointed out by Cheng, they are not very characteristic. For example, the character "Chinese text" was said to be different because of the difference in the pen movement, the more pointed first horizontal stroke in DPH 671 and the separate last horizontal stroke in Document A, and the small bulge for the middle horizontal stroke being one continuous stroke with the last horizontal stroke in DPH 671. The connection of the first horizontal stroke with the second vertical stroke on the right and the middle horizontal stroke followed continuously by the last horizontal stroke is similar between the first character "Chinese text" in DPH 671 and the radical "Chinese text" in the character "Chinese text" in Document A. However if one were to compare the two characters "Chinese text" in DPH 671 with the radical "Chinese text" in the characters "Chinese text" and "Chinese text" in Document A, the space and the general configuration of the characters would normally dictate that the radical would have to be written shorter and flatter. Further the "Chinese text" in the aforesaid two characters being a radical at the bottom would appear to be flatter than the same radical "Chinese text" in the character "Chinese text", being a left radical in order to form a better proportion.

17.56 The same consideration is also applicable to the so-called difference in the character "Chinese text" and the radical "Chinese text" in "Chinese text", where the way of writing the short slant and the first horizontal stroke, as well as the connection between the second and the last horizontal strokes is basically the same.

17.57 In relation to the character "Chinese text", Cheng would agree that the way that the lower right part of the character was written, was very characteristic.51 Thus this should be a cogent point of identification.

17.58 However, he was concerned with the way the upper part of the character was written. Cheng listed out the two ways of writing this character "Chinese text" in 1A1 at page 5 of his Album 3. However he only listed out one way of writing this character "Chinese text" in 671, the sample, which have the top part written from left to right for the slant and this is different from the conventional way of writing which we found for both characters "Chinese text" in 1A1. Here GL listed both characters "Chinese text" in the sample 671 being his 671-2 as opposed to 671-7, the one listed out by Cheng. In respect of 671-2, the pen movement of the right sabre and the right slant in the right side of the character as marked in red arrow 1 and 2 are very similar.

17.59 It is true to say that probably the pen movement for the first slant on the left is different between 671-2, being from left to right, whereas it was from top right to bottom left in 1A1-6 as listed out by GL in E2-254.

17.60 In respect of Cheng's concern, he was asked to comment on the way the defendant wrote the character "Chinese text" in 671. He agreed in respect of two characters "Chinese text" written in the second line and third line thereof, the first one was written in an unconventional way with the first stroke being written from left to right and was connected to the second stroke the slant and then the slant was written continuously from right to left before it was connected with the first horizontal stroke. The second character "Chinese text" in the third line was written in the conventional way with the slant from top right to bottom left and was connected to the horizontal stroke like the character "Chinese text" in 1A1-8 in E2-254. Cheng agreed that the two methods of composition of the first two strokes are natural variations of the writing of the defendant.52 These variations of the defendant would explain why the two characters "Chinese text" in Document A are different from the character "Chinese text" in the sample DPH 671. This was a point put forward by Tsui which he eventually gave evidence thereon later. In fact when the two variations are found in the control and the same two variations are also found in the questioned document, it is a point of significant similarity.

17.61 The difference in the way that the "Chinese text" radical was written must not be a very major one. In any case Cheng's

 © 2020 Thomson Reuters. 

point was that the two strokes in the radical "Chinese text" met very closely at the tip of the strokes in the character "Chinese text" in the control, whilst the same radical in the character "Chinese text" in Document A would show that the two strokes did not meet at the tip. However, it was pointed out by Tsui53 that there was an instance in the control in the character "Chinese text" where the way of meeting of the two strokes in the radical "Chinese text" is exactly the same as in the character "Chinese text" in Document A. Hence, this point of difference relied on by Cheng could not be of any significance. On the contrary, the way the radical "Chinese text" was written is similar in the character "Chinese text" in the control and the character "Chinese text" in Document A.

17.62 Further the difference in how the radical "Chinese text" was written concerned merely to the length of the protrusion of the two legs. This is not a very significant difference either. In fact the radical "Chinese text" as a left radical and in particular the way that its long horizontal stroke was connected with the right radical in the character "Chinese text" in Document A and in "Chinese text" in the control are very similar. Cheng did not list out the character "Chinese text" in Document A when compared with the character "Chinese text" in the control, (he used the character "Chinese text" in 1A1 and compared the two radicals "Chinese text" in the two characters "Chinese text" and the two characters "Chinese text" only). To my mind the radical "Chinese text" written in Document A in respect of the character "Chinese text" is very similar to the radical "Chinese text" in the character "Chinese text" in both DPH 671 and DPH 673, the two samples.54

17.63 In the end I find that the differences pointed out by Cheng are not significant. In light of the similarities pointed out by him and the additional similarities, I accept after re-evaluation of his evidence, particularly in respect of his omissions, such as the very personal characteristic variations in the way of writing the character "Chinese text" in the upper part, I would draw the conclusion that it is more likely than not that the defendant wrote Document A. This is not to say that Cheng has contradicted GL. It is just that his additional points after re-evaluation fortified GL's findings and conclusion. This is further fortified by Tsui's evidence hereinbelow.

(c) David Tsui Chee Keung ("Tsui")

17.64 Tsui, after examining the control and also Document A, came to the conclusion that Document A could well have been written by the defendant. In terms of his scale of evaluation, he would put it at plus 2 where 0 would represent absolutely neutral and plus 10 would represent absolutely certain that it is the writing or signature of the individual, and minus 10 would represent absolute certainty that the signature or writing is a forgery.55 He set out those characters and radicals which led him to come to his qualified opinion in his report.56

17.65 Some similarities picked up by him were in common as those picked up by GL and Cheng, e.g. the radicals "Chinese text" and "Chinese text" in the character "Chinese text", the characters "Chinese text" and the "Chinese text" radical in "Chinese text". On top of that he also pointed to the similarity in the character "Chinese text" and the radical "Chinese text" in the characters "Chinese text" and "Chinese text" which are in common with those picked out by GL.

17.66 He further analysed the way the character "Chinese text" was written in both the control and also in Document A. One characteristic similarity pointed out by him was the very long last horizontal stroke in the radical "Chinese text" in the top left part of the character "Chinese text". As a left radical, normally one would not have such a long stroke since one should leave sufficient space for the right radical. Further the pen movement in relation to the top right radical (i.e. the right radical of "Chinese text") was also very characteristic of that of the defendant in the known sample.57

17.67 Furthermore, in relation to this character "Chinese text", in both the control and in 1A1, the radical "Chinese text" was mistakenly written as the radical "Chinese text". This mistake is of great value in identification of writing.58 This is also the contention of both Prof. Jia and Xu in their textbooks as aforesaid. A fortiori common authorship can be further supported by the same way of writing the radical "Chinese text" as "Chinese text" in the character "Chinese text" of the control and the character "Chinese text" of the questioned Document A.

17.68 Similarly the way that the simplified version of the character "Chinese text" was written with mistake in the left radical "Chinese text" was also a reason for his conclusion.59 Furthermore Tsui also explained why in light of how the defendant could have written the first two strokes in the character "Chinese text" with two variations as evidenced by

 © 2020 Thomson Reuters. 

her pen movements in the similarly constituted strokes in the character "Chinese text", it is a good illustration of the similarities of the writing movements between the defendant and also the writer of Document A.60 It was pointed out previously when Cheng's opinion was analysed.

17.69 He also referred to the first dot of the character "Chinese text" being long and emphatic in both the questioned Document A and also the control. In fact the whole proportion and the pen movement and also the shape of the whole character "Chinese text" (which is the last characters of the defendant's name) were nearly identical in both the questioned and the control. One would expect the defendant to write this character very naturally and spontaneously.

17.70 On the whole, he felt that there was particular value in the similarities in the characters or radicals "Chinese text", "Chinese text" and "Chinese text" and they are quite unique.61

17.71 The reasons given by Tsui are very convincing. In fact there are only 44 characters in Document A, but there are some 11 characters or radicals which exhibited various degrees of uniqueness and similarity between the writing of the defendant and the writing in Document A. Hence the qualified opinion that the defendant could well have been the writer of the contents of Document A and a scale score of plus 2 is well justified.

(3) Conclusion on Document A in light of the three experts' evidence only

17.72 There are convincing identification evidence by way of similarities and uniqueness in various degrees between the writing of the defendant and the writing in Document A as testified by all three experts. There is no evidence or even suggestion to the contrary or those so-called differences are either explainable or insignificant. I therefore find on a balance of probabilities that the defendant is the author of the content in Document A.

17.73 This is the finding in light of the three experts' evidence alone as aforesaid. I shall now consider the other points independently and that is the identification of the defendant's handwriting by Teresa.

(4) Teresa's identification

17.74 Teresa positively identified the writing on Document A as that of the defendant.62 Although Counsel for the defendant reserved his position to object to her answer and her evidence was only given on de bene esse basis, there is in my view really no basis for any objection to the admissibility of such evidence from Teresa. Weight of such evidence is another matter. As pointed out previously, a non-expert may be allowed to give opinion evidence on authorship of handwriting. There is clear evidence that Teresa had observed the defendant's writing and had received written communication from her.63

17.75 In fact Teresa had given detailed evidence that, between 1954 to 1959 (when she left for the U.S.), she and Nina stayed in the same flat. During that time there were many occasions when she, her siblings including Teddy, and Nina practised writing together and she had opportunities of observing the defendant's writing. She also went on to describe a particular occasion when Nina had imitated the signatures of Teddy and had shown them to her and Teddy.

17.76 Apart from these occasions in the 1950s, she also gave evidence that when Nina and Teddy had holidays with her together in the U.S., they stayed in the hotel together and she also saw Nina writing shopping lists.64 There were other evidence given by Teresa on her ability to recognise the writing of Nina on the Fotomax photo envelope and also the note added on to the authorisation letter.65 This has been considered hereinbefore already.

17.77 There was no challenge in cross-examination on the evidence of Teresa on the defendant's writing on the Fotomax photo envelope and also on the note.66 It was never put nor suggested to Teresa that those writings were not the handwriting of the defendant. In relation to the evidence concerning the practising of writing in the 1950s, the whole of the challenge was contained in two long questions in cross-examination.67 Basically it was put to Teresa that there were no such occasions at all. After these two questions were put to Teresa, as opposed to just suggested to her, the defendant did not call any evidence nor give evidence herself to the contrary.

17.78 Further it was never put or suggested to her that she could not recognise the defendant's writing, or that she did not have the proper opportunity of observing the defendant's handwriting through out all these years. More importantly it

 © 2020 Thomson Reuters. 

was never suggested to her that she was wrong in saying that the writing of the contents of Document A was the defendant's writing. Although Teresa is not a handwriting expert, her opinion was also based on her experience in looking at the writing of the defendant on many occasions. It is often the case that non-expert could have come to an accurate view on the matter but at the same time could not articulate the exact reasons for her conclusion in terms of a handwriting expert.

17.79 I do accept Teresa's contention that the writing in Document A is the handwriting of the defendant herself. This piece of evidence by itself when there is no contrary evidence given from the defence (except that the defence apparently is only relying on those so-called "differences" as pointed out by various experts from the plaintiff's side) is sufficient evidence on a balance of probabilities. When compared with the evidence of the three experts which I have analysed and synthesized together, the evidence of Teresa is not as strong as the experts' opinion. It has some corroborative effect which can be added onto the experts' evidence. However I do find on the experts' evidence alone, the writing in Document A is probably the handwriting of the defendant herself.

17.80 I have come to the end of Section II in respect of identification of handwriting and signatures. An overall synthesis of all the evidence I find as facts will be considered in the overall conclusion after Section III concerning ink-dating in the next chapter.

1 See Appendix 2

2 p.18, E1 and p.321, E3

3 p.531, E6

4 T18:118:6-11, 112:18-12 and 113:15-20

5 p.23, E1 and p.323, E3

6 para.5.1, p.320, E3 and last para., p.12, E1

7 p.530, E6

8 p.33, E1

9 T34:8:22-23

10 p.529, E6

11 p.33, E1

12 T34:8:18-25

13 See Roden v. Ryde (1843) 4 QB 626, 114 ER 1034

14 T154:121:9-12

15 p.297, E2

16 p.298, E2

17 T134:37:8-12

18 T134:11-12

19 T134:23:4-8

20 E2-297 and DPH 672

21 T134:11-17

22 T134:16:17

23 T134:25:7-10

24 p.248 and p.297, E2

25 T134:37-42

26 pp.2209-2213, F8

27 T133:65-72 and T134:2-7

28 T133:72:23

29 T134:8:23

30 e.g. T134:9:6-15

31 T134:5:1-12

32 p.248 and p.297, E2

33 p.249, E2

 © 2020 Thomson Reuters. 

34 T134:44-54

35 T21:136:10-15 and 19, and pp.248 and 249, E2

36 pp.250-258, E2

37 T18:150:3 and T19:72:7-12

38 T19:73:4-6

39 T18:139-159

40 T21:139:4

41 para.(5), p.1995, F7

42 p.2050, F7, Prof. Jia and Xu's excerpts from their textbooks were quoted in chapter 7 on Principles and Bases of Examining and Evaluating Handwriting and Signature Evidence, supra

43 p.23, E1

44 See his Album 3

45 T22:69:2

46 T22:65:15-20

47 T22:68:9-13

48 T22:71-72:22

49 T22:73:19 and 74:7-12

50 T22:74:13-15

51 T22:81:3-6

52 T22:83:17-22

53 T33:109:7-110:6

54 pp.11-12, Album 3

55 T33:89:4

56 pp.322-323 and charts E3-336 and 337

57 T33:90:19-95:4

58 T34:4:18-24 and T64:48:2-8

59 T33:97:13-17

60 T33:100:24-103:15

61 T33:115:1

62 T135:46:18-20

63 pp.248-249 and p.297, E2

64 T135:47-48:17

65 T134:16:15-18

66 pp.248-249, E2

67 T149:8:6

Volume 4

Sections III & IV- Ink-dating & Final Conclusion

List of Abbreviations

Section III - Ink-dating

Chapter 18 - Ink-dating - The Analysis And Method

The Analysis

The Method

The Results

The Defence

Chapter 19 - The True Proficiency or Blind Test

Chapter 20 - The Law

 © 2020 Thomson Reuters. 

Chapter 21 - The Underlying Scientific Theory Of The Dye-Ratio Method

The First Hypothesis (Extractability)

The Second Hypothesis (Decomposition)

Conclusion

Chapter 22 - Scientific Validity

Validation Studies

Peer-review

Chapter 23 - Acceptance By The Scientific Community And The Court

Acceptance of the Techniques by Courts

Conclusion

Chapter 24 - Arbitrary Separation of Fused/Overlapped Chromatographic Peaks

Higher Resolution should be used

Conclusion

Chapter 25 - Illogical Results Of Dye-Ratio Method

Criticism 1

Criticism 2

Criticism 3

EJS's Defences

Conclusion

Chapter 26 - Mass Independence

What EJS could have done

EJS's Claim

Conclusion

Chapter 27 - One Standard Deviation

2 STDs (95%) or 3 STDs (99.7%) should be used

The Student's T-test

Conclusion

Chapter 28 - Procedure

VAM Procedures

Protocol

EJS's Laboratory Technique as shown on the Video

(1) Hygiene and Contamination

(2) Time-keeping

Ink Thickness

Conclusion

Chapter 29 - EJS's Qualification And Integrity

Qualifications

The Defence Experts

EJS's Integrity

Chapter 30 - Conclusion On Ink-dating

Section IV - Final Conclusion

Chapter 31 - Final Conclusion

Background

Suspicious Circumstances

Handwriting

Ink-dating

 © 2020 Thomson Reuters. 

The 1990 Documents

Orders

Chapter 32 - Epilogue

Appendices

Appendix 1 - Table on the Progress of Trial

Appendix 2 - The Four Questioned Documents and their Translations

Appendix 3 - Master Chart of Wang Teh Huei's signatures (E6-654(37B))

Appendix 4 - Master Charts of Tse Ping Yim's signatures (E6-654(18-20))

Appendix 5 - Judgment on the Application by the Plaintiff for Leave to Swear Death dated 22 September 1999 in HCEA79/1999

Appendix 6 - Judgment on the Application by the Defendant for Stay of Proceedings dated 20 August 2001 in HCAP8/1999

SECTION III INK-DATING

"It cannot be that axiom established on argumentation can suffice for the discovery of more new works, since the subtlety of nature is greater much more than the subtlety of the argument."

- Francis Bacon (1561-1626)

Lord Chancellor of England (1618-21)

Section III & IV Ink-Dating & Final Conclusion

List of abbreviations

ADR Alternative Disputes Resolution

ASTM American Society for Testing and Materials

Mr Brunelle Mr Richard L. Brunelle

Daubert Daubert v. Merrel Dow 509 US 579 (1993)

EJS Mr Erich J. Speckin

EJS 1 First Report of Mr Erich J. Speckin dated 15 November 2000

EJS 2 Second Report of Mr Erich J. Speckin dated 19 February 2001

EJS 3 Third Report of Mr Erich J. Speckin dated 3 August, 2001

Frye US v. Frye 293 F 1013 (1923)

JSM Messrs Johnson Stokes & Master

MAFS Mid-Western Association of Forensic Scientists

Mr Lee Mr Huy Lee

PVT Mr Peter Tytell

R-ratio The rate of extraction

SOFIA Society of Forensic Ink Analysts

STD Standard deviation

TLC Thin Layer Chromatography

VAM Valid Analytical Measurement Programme

VNA Dr Valery N. Aginsky

Chapter 18 - Ink-dating - The Analysis And Method

18.1 The plaintiff has instructed one Mr Erich J. Speckin ("EJS") from Michigan of the United States, who professed that he could identify whether a writing in ink was still in the drying process or was completely dry.

THE ANALYSIS

18.2 On 1 August 2001 a quantity of small microplugs was removed by EJS from designated characters in Documents A, B, C and D where there was ink-writing and they were separated into vials containing six plugs each.

18.3 Upon analysis, EJS found (which is not disputed by the defence) that Documents A and B were written by the same type of ink viz. Formulab ink, and Document C was written by ink of a different formulation viz. Papermate. The ink used for Documents A and B were manufactured in 1982. Both the Formulab ink and the Papermate ink used were commercially available in 1990.1 The Papermate ink is still available commercially today.2

18.4 I accept the plaintiff's submission that, although there is no direct evidence available on this point, if it is established that both Documents A and C were written sometime in or about 1996, then it is extremely unlikely that Document B would have been written in 1990 or before. In fact for the same reason it is probable that Documents A and B were written at or about the same time. This is because:

(a) On the defendant's case especially the suggestion that it was Tse Ping Yim who witnessed the deceased's signatures on all four documents at the same time in March 1990, the four documents should have come into existence at more or less the same time; and

(b) It is most likely that Documents A and B were written by the same pen at about the same time since:

(i) the ink on both documents was of the same made and the same year; and

(ii) the writing on both Documents A and B showed the same phenomenon that the flow of the ink in the pen was not smooth. This could be seen from the much lighter colour in the characters after the pen had been used for writing for a short while. Thus in Document A the characters "Chinese text" showed evidence of bad ink flow resulting in re-writing of certain strokes in the characters "Chinese text". In Document B, the same phenomenon is found in the characters "Chinese text".

18.5 EJS dissolved the ink from the plugs taken from each of the documents by using a strong solvent pyridine and the dissolved ink in the solvent from each of the documents were spotted on a TLC plate (TLC plate No. I). It was found that the ink on the plugs from Document D could not be extracted by the solvent and the conclusion of EJS was that the ink from Document D was probably either a gel ink or India ink.3 The TLC plate No. I was then developed in a TLC chamber and the bands of each of the spots of ink from Documents A, B and C were separated by chromatography. From the ink library kept by him, EJS was able to come up with possible matches.4

18.6 EJS further tried to identify the ink to find out if there was any date tag in the ink. He dissolved the ink on the plugs taken from the first three Documents in another solvent. The dissolved ink was then spotted onto a TLC plate (No. III) and chromatography was done to separate their components. The control for the four date tags was also run on the plate. The result showed that the ink from Documents A and B was separated in the same way.5 The result also showed that the ink in Documents A and B contained a date tag which identified the ink as being produced by Formulab in 1982.6

18.7 In order to identify the ink on Document C, another chromatography was done on TLC plate No. IV in relation to the ink and four known samples of ink from the ink library. The result showed that the ink was manufactured by Papermate which was one of the more common ink formulations which was available both in 1990 and also today.7 In fact this ink formulation has been in existence since about the 1950s.8

THE METHOD

18.8 In the procedure of finding out whether or not the ink was dry, EJS used the accelerated aging method. Acceleration was achieved by heating the vials in a laboratory oven at 100***o***C for approximately 30 minutes, uncapped, and was then allowed to cool down. Two of the vials were aged by accelerated aging method of heating whilst the other two were not.

18.9 The cooled vials would then be placed in a rack next to the corresponding unheated samples for the relative ink-age comparison tests. It was contended that the artificially aged sample would represent an ink that was approximately three years old. If a significant statistical difference was found between the aged and the unaged samples, it would be concluded that the ink was still in a drying process and would most likely be less than 3 years old.

 © 2020 Thomson Reuters. 

18.10 Three different methods were used to measure the relative dry levels of the heated and unheated samples: i.e. R-ratios, Percent Extraction, and Dye-ratio.

(a) The rate of extraction (i.e. R-ratios) would measure the rate at which the dyes in the ink were extracted in a weak solvent by taking samples at different time intervals.

(b) The percent of extraction would measure the ratio of the amount of ink that could be extracted in a weak solvent and the same would be compared to the total amount of ink on the paper which was extracted by using a strong solvent.

(c) The Dye-ratio would measure the relative concentration of each dye to one another.

18.11 EJS contended that if at least one of these tests showed a significant statistical difference between the heated and the unheated samples, it would be concluded that the ink was still in the drying process, i.e. less than 3 to 3 1/2 years old.

THE RESULTS

18.12 The data from the R-ratios, Percent Extraction and Dye-ratio were analysed statistically to determine if the differences were statistically significant or not. The standard threshold used was one standard deviation ("one STD"). EJS contended in his First Report ("EJS 1") dated 15 November 2000 that9:

"the data obtained for the rate of extraction, percent extraction and dye-ratio meets this threshold of analysis 'significant statistical difference', meaning in this case that the samples tested from documents A and C were not dry. Based on these differences it is my opinion, the question documents were not written on or near the purported dates but at a later time at least in 1996 or later."

18.13 EJS submitted a Second Report ("EJS 2") dated 19 February 2001 and a further Third Report ("EJS 3") dated 3 August 2001. I shall consider them hereinbelow when the validity of EJS's method and results are considered.

18.14 EJS contended that his conclusion was drawn upon results he obtained from the Dye-ratio method, which he claimed to be a well-established method having been in use worldwide (including law enforcement agencies in the United States) for many years, and accepted universally by the scientific community at large and numerous courts at various levels in the United States and in other countries.10 He said that the research has already been done to show the reliability of the relative ink-dating procedures using the Dye-ratio method of analysis,11 and that the data collection in this case was performed on accepted standards in the field of forensic ink analysis and in a manner that has been tested and proven reliable on many occasions in the past.12

18.15 He claimed that there are many publications that show the method utilized by him in this case is valid, reproducible, and reliable.13

18.16 He contended that he has personal knowledge of at least two cases in which the United States Secret Service has performed testing in the same manner as he performed in this case and it has used this technique between 1995 and today.

18.17 In the end, EJS also contended that his testing is based upon sound objective scientific testing and his opinion is based upon sound scientific principles.

THE DEFENCE

18.18 The defence contended otherwise. They said that the contrary is true, EJS was cross-examined in depth and the defence called two experts, Dr Valery N. Aginsky ("VNA") and one Mr Peter Tytell ("PVT"). They did not perform any tests on the documents but they have put in reports in contradiction to EJS's reports with their critical analysis.

18.19 Before I consider the validity of the methods and findings of EJS and their scientific theory and validity, I would like to approach the problem from a layman's point of view first which I think ordinary people would understand. This is what the defence called "the true proficiency or blind test".

1 p.409, E4-E5

2 p.409, E4-E5 and T35:62:9

3 p.409, E4-E5

4 T35:54-55

5 p.923, E13

 © 2020 Thomson Reuters. 

6 T35:58-61

7 T35:61:17-62:10

8 T35:62:18

9 p.413, EJS 1, E4-E5

10 para.5, p.909, EJS 3, E13

11 para.15, p.885, EJS 3, E13

12 para.42, p.897, EJS 3, E13

13 para.47, p.898, EJS 3, E13

Chapter 19 - The True Proficiency Or Blind Test

19.1 The defence solicitors JSM instructed a firm called fJ Cleveland, who is a patent agent. fJ Cleveland wrote to EJS and under the disguise that they had a certain problem in 12 documents, or 12 signatures in 12 documents, which they would like to date, i.e. whether they were made recently or some years ago. In short, this is, to put it crudely, a sort of "set-up" made by the defence in order to find out whether or not the method used by EJS for ink-dating is valid, reliable and accurate.

19.2 The test was conducted in January 2001. EJS used two out of the three relative aging methods, namely, R-ratio and Percent Extraction methods. There was no mention of the Dye-ratio method until much later after the examinations.

19.3 The results of EJS's "proficiency" tests are as follows1:

Samples EJS's Conclusion Date on Documents

(Not disclosed to EJS) Result

1 dry 12 October 1998 wrong

2 dry 10 January 1990 correct

3 dry 18 June 1998 wrong

4 dry 29 July 1994 correct

5 dry 2 August 1994 correct

6 dry 25 and 26 May 1989 correct

7 dry 5 July 1989 correct

8 dry 9 August 1990 correct

9 dry 11 December 1996 correct

10 dry 3 March 1999 wrong

11 not dry 5 June 1990 wrong

12 dry 13 November 1993 correct

There was no challenge by the plaintiff as to the dates of each and every document used by fJ Cleveland and they were sampled from letters of these various dates they have kept in their respective files. I accept the defence submission that Mr Cleff's affirmation (for fJ Cleveland) has established the dates of the aforesaid documents beyond any doubt. He was even offered to be cross-examined by Counsel for the plaintiff when his affirmation was already admissible because he was beyond the sea, but this offer was not taken up.2 Those appalling allegations against Mr Cleff and the solicitors handling the case from Messrs Johnson, Stokes & Master amounted to allegations of dishonesty, fraud, forgery, and/or attempting to pervert the course of justice, should not have been made by the plaintiff's side. They are made without a shred of proof at all.

19.4 EJS concluded that3:

"A relative ink aging examination was conducted on each ink found on each piece of paper within the 12 envelopes. Since most inks take approximately 3 to 3 1/2 years to dry completely on paper, if the writings were written within the last three years the ink should still be in the drying process and show differences dry or near dry. In this case, the [sic] all inks were found to be dry and showed no evidence of still being in the drying process except sample #11. Sample #11 showed some indication that it was still in the drying process, [sic] however due to the amount of overall evidence it cannot be concluded to any degree of certainty that this ink is still in the drying process. The difference in values obtained in the

WESTLAW © 2020 Thomson Reuters.

relative ink aging analysis between the heated and unheated samples (except for sample #11) showed no indication that the ink was still in the drying process.

Based on the above testing, it is my opinion that the writings were written at least 3 to 3 1/2 years ago." [emphasis added]

19.5 The defence contended that EJS was marked at 67% as the probability that he would wrongly date an ink is one out of three. However, in my view the matter is more serious than this. The result should be an accurate one and there should not be any mistake at all in order to be certain that the method is reliable. Otherwise when the dates of documents are not known, it would not be certain which result is reliable and which result is not. The result of this so-called "proficiency" test shows that the conclusion of EJS cannot even satisfy the civil standard of a balance of probability, i.e. it cannot be said that "all 12 signatures in these 12 documents were probably dry except Sample #11". The aforesaid contention containing two elements are both wrong! Thus, in my view, the defence is very lenient in their submission that EJS was marked at 67%. In fact when both elements in the aforesaid contention are wrong, EJS is 100% incorrect in his concluding statement.

19.6 Sample #11 is of particular importance and significance to this case. EJS said:

"The sample of ink in sample #11 is more likely than not, still in the drying process at the time the testing was performed, [sic] this means that the ink is less than three and one half years old."

and

"Based on this and the ink dating results that were obtained, the ink in sample #11 was not dry. Therefore, the conclusion is that the ink was not written eleven years ago, but was written sometime in the last three and one-half years."

19.7 The document from which Sample #11 was obtained was dated 5 June 1990, which was about three months after the stated date on the 1990 Will. EJS concluded that the ink on Sample #11 was still in the drying process and must therefore be less than three to three and half years of age. But in fact, the document and the signature thereon had been in existence for 11 years. I fully accept the defence submission that on the basis of this error alone, this court should be slow in accepting EJS's evidence in this case, in particular, his conclusion that the 1990 Will was not written on or near 10 April 1990 "but at a later time at least in 1996 or later".

19.8 Further, the ink-dating examinations were conducted under similar circumstances in both cases, in particular:

(a) no reference sample nor sample of known date was available; and

(b) the accelerated aging technique was allegedly used to mimic the natural aging of ink.

19.9 Further, the same statistical analysis was performed and the conclusions were both drawn at "one standard deviation" to determine if there was a "significance statistical difference".

19.10 EJS did not use the Dye-ratio method in his "proficiency" test. He never advised fJ Cleveland of its availability4 even when he was asked what additional examinations he could undertake to date ink on the documents. He expressed the following view of the Dye-ratio method only when fJ Cleveland explicitly asked of "the dye method", namely5:

"The dye ratio is another method of relative ink age analysis that can be used in conjunction with the rate and percent extraction that were used in this case. This would have added to the expense and is not typically the most discriminating test. It could have been run and could still be run. It is possible that this method would show differences that the other methods did not show in the other 11 samples. The primary reason for not performing this test is cost to benefit ratio."

19.11 However, in his cross-examination, he gave the following contrasting view6:

"Q. Before you started this test, or any test for that matter, do you know which of the three tests is likely to be more discriminating?

A. No.

Q. You do not?

A. No.

Q. You do not say, because of the age of the ink, this one is likely to be more discriminating than the other?

A. I would say if you have an ink that is very close to the end of the drying process that typically the dye-ratios would be, but not always. For instance, the Bic black example that I just gave - it would not be the dye-ratios. So you have an idea, but you cannot be certain that one would be more discriminating than others."

19.12 But in fJ Cleveland's first letter to EJS dated 3 October 2000, it was stated that7:

"The purpose of this preliminary enquiry is to ask whether your laboratory undertakes this type of work, and secondly, what the approximate costs are likely to be in examining 10 to 12 signature inks on various documents which are alleged to have been signed over a period of 12 years or so."

19.13 In short, EJS was or should be aware that he might be dealing with "old" inks. In other words, EJS would or should have examined the 12 samples with the Dye-ratio method or at least, advised fJ Cleveland of its availability and use, should he be concerned with the "cost to benefit ratio".

19.14 In EJS3, he said8:

"... each test (rate of extraction, percent extraction, and dye ratios) is independent of the others. The tests do measure different parameters of the ink."

In that case, that would be an additional reason for EJS to conduct the examinations with the Dye-ratio method, which he did not.

19.15 In EJS2, he said9:

"The data from all three methods was evaluated and the Dye-Ratio method is the method that leads to the conclusion that the documents were not written on the dates that they purport to have been written. It is common for only one method to show a significant statistical difference while the other two methods overlap."

19.16 However, in his evidence, he gave the following contrary views10:

"If the rate and per cent [sic] extraction do not show a difference, typically it is not. The only time it ever is found to be - or I should not say "the only time", but in general - is when you are dealing with an old ink, the rate of extraction and per cent [sic] extraction may be at the end of their curves and then it can be more discriminating. But typically, the rate or per cent [sic] would show a difference."

and11:

"Because I just said that, based on my experience, [the Dye-Ratio method] is not typically the most discriminating test. In some instances, it is. Typically, if you see a difference with the dye-ratios, you will see it with the rate or the per cent [sic] as well. You do not always, but typically that is the case."

19.17 There is no justification for these different and opposite approaches as submitted by the defence and, as EJS submitted, there is nothing atypical about this case.

19.18 Further, EJS admitted that it was possible that "the heat was unable to induce age in the ink by using the heating process".12 There is no evidence to substantiate EJS's claim that accelerated aging did mimic natural aging in this case. It is therefore uncertain whether or not heat did induce aging in this case, and as a consequence, EJS's opinion in this case cannot be accepted. In view of his failure in the "proficiency" test, EJS made four contentions thereto. First, he claimed that the conclusion was not strong to a reasonable degree of certainty.13 However, in EJS 3 when he adopted one standard deviation he said that the opinion stated was "to a reasonable degree of scientific certainty".14

19.19 Secondly, EJS blamed the fact that the instructions given to him were unclear. However, from the documents before me, it is quite clear that the instructions were clear or as clear as EJS stated: "That all these documents are questioned, and let us see if we can find anything about them".15

19.20 Thirdly, EJS blamed fJ Cleveland for not giving him "a relevant timeframe and information about the samples, as to what the sides are, how to interpret it."16 However, if the accelerated aging method is accurate and reliable and it can determine the age of the ink as alleged, in the absence of any

evidence of such prerequisite, it should not be necessary for the examiner to be given the "relevant timeframe ... as to what the sides are".

19.21 Lastly, EJS claimed that he was under the "misapprehension" that all 12 documents were prepared around the same time, which he claimed was the basis on which he drew his conclusion for his "proficiency" test.17 There was in fact no "misapprehension" in EJS's conclusion for his "proficiency" test, as it was stated by him that18:

"all inks were found to be dry and showed no evidence of still being in the drying process except sample #11."

19.22 The sequences of exchanges between the parties all show that EJS changed his opinion to his client's, or what he perceived to be his client's need as follows:

Re: Sample #11:

(a) EJS's initial conclusion was that19: despite the indication that it was still in the drying process, it could not be concluded that the ink on Sample #11 was still in the drying process due to the amount of the overall evidence.

(b) Letter from fJ Cleveland, dated 25 May 200120:

"... However, as you have probably gathered, the question is raised as to whether your tests can show that any of these documents are less than four years old. A finding that any of these documents were written within the time period you have indicated of 3 1/2 years would be of considerable significance.

Your finding that one signature is still drying is of particular interest, especially bearing in mind the nature of the document itself. Because of the particular nature of this document, we would like to pursue the matter as far as possible and as indicated in our earlier letter, it is agreed that the remainder of the signatures could, if necessary, be submitted for further study if that is likely to assist your analysis."

(c) Letter from EJS, dated 25 May 200121:

"3. The testing showed that one of these documents is still in the drying process.

...

... The sample of ink in sample #11 is more likely than not, still in the drying process at the time the testing was performed, this means that the ink is less than three and one half years old."

(d) Letter from fJ Cleveland, dated 8 June 200122:

"Point 3 - Hopefully the knowledge that this document is said to be eleven to twelve years old may assist further. ..."

(e) Letter from EJS, dated 12 June 200123:

"3. Based on this and the ink dating results that were obtained, the ink in sample #11 was not dry. Therefore, the conclusion is that the ink was not written eleven years ago, but was written sometime in the last three and one-half years."

19.23 Re: The 11 remaining results:

(a) EJS's initial conclusion on the remaining 11 samples was24:

"In this case, the [sic] all inks were found to be dry and showed no evidence of still being in the drying process except sample #11. ... The difference in values obtained in the relative ink aging analysis between the heated and unheated samples (except for sample #11) showed no indication that the ink was still in the drying process.

Based on the above testing, it is my opinion that the writings were written at least 3 to 3 1/2 years ago."

(b) Letter from fJ Cleveland, dated 27 April 200125:

"We are primarily interested in your conclusions [sic] and note that you indicate that all inks except sample 11 were found to be dry and therefore more than 3 - 3 1/2 years old.

We would however ask for further clarification in relation to sample 11 as this is of particular importance in this matter. We would therefore appreciate any further elaboration that you can make on this sample."

(c) Letter from fJ Cleveland, dated 25 May 200126:

 © 2020 Thomson Reuters. 

"The documents are all purported to be from various letters and related documents in support of patent files, many of which are said to be more than four years old, and indeed in some cases considerably more than four years old. However, as you have probably gathered, the question is raised as to whether your tests can show that any of these documents are less than four years old. A finding that any of these documents were written within the time period you have indicated of 3 1/2 years would be of considerable significance."

(d) Letter from EJS, dated 25 May 200127:

"4. However if you want an opinion based solely on the ink dating results and the results of each documents to stand alone and independent from the next sample, I would state the following:

...

... None of the other samples show any indication of being in the drying process; this does not prove that they were done more than three and one half years ago."

5. The inability, based on circumstance, for a complete examination of the documents does not allow for a conclusive opinion as to the date of the documents."

(e) Letter from fJ Cleveland, dated 8 June 200128:

"We also note that you state that 'none of the other samples show any indication of being in the drying process; this does not prove that they were done more than three and one half years ago.' We would request clarification on this point so that all parties fully understand the implications of what you are saying. In the fourth paragraph of page 2 of your report of 19 January 2001, you state:

'However, if the inks were not fully aged, then at least one of the relative ink age comparison methods that was used would show a significant statistical difference between the aged and unaged samples' [emphasis added].

Would you please clarify this further: if all the samples that we sent you are said to be more than 3 1/2 years old, and (excepting sample 11) you found that they were all "dry", does this not mean that they could not have been produced in the last 3 1/2 years, and that therefore your analysis has authenticated their alleged 'old age'?"

(f) Letter from EJS, dated 12 June 200129:

"4. With respect to the other eleven samples of ink analyzed, the inks showed no indications of being in the drying process. This does not confirm that they are completely dry. Three possibilities exist with this type of testing:

(a) The ink is completely dry.

(b) The testing did not discriminate a difference in age using the testing parameters chosen.

(c) The heat was unable to induce age in the ink by using the heating process."

19.24 In conclusion, in light of EJS's failure in the "proficiency" test, I accept the defendant's submissions that the court should reject EJS's opinion offered in this case for the following reasons, inter alia:

(a) EJS's method has proven to be unreliable in light of his failure in the "proficiency" test.

(b) EJS failed to date an ink on a letter which was written about three months after the date of the 1990 Will.

(c) The Dye-ratio method was not "typically discriminative", and there was no sound scientific justification as to why in this case, a conclusion drawn on the basis of this method should be received in favour of the overwhelming negative results obtained from the Dye-ratio method as well as the other four methods.

(d) Given that it was possible that the heat was unable to induce age in the ink by using the heating process,30 and there is no evidence that it did take place in this case, EJS's conclusion is unreliable.

19.25 Before I shall consider other aspects of EJS's method and its reliability and validity, I shall first of all consider the legal position of expert's evidence first in the next chapter.

1 pp.2327-2328, G9 and p.3075, G10, JMC-14

 © 2020 Thomson Reuters. 

2 T47:60:7-13

3 p.3075, G10, JMC-14

4 pp.3023-3024, 3028-3029 and 3033, G10, JMC-10

5 pp.3105-3107, G10, JMC-15

6 T38:23:6-20

7 p.3020, G10, JMC-10

8 para.46, p.898, EJS 3, E13

9 p.433, E4-E5, EJS 2

10 T47:44:13-20

11 T47:110:7-12

12 pp.3088-3108, G10 at p.3104 and confirmed on T47:87:17-22

13 T47:74:12-20

14 para.20, p.888, EJS 3, E13

15 T47:60:5-6

16 T47:79:15-17

17 T47:91:10-19

18 p.3075, G10, JMC-14

19 p.3075, G10, JMC-14

20 pp.3093-3094, G10, JMC-15 at p.3093

21 pp.3097-3098, G10, JMC-15

22 pp.3099-3101, JMC-15, G10

23 pp.3103-3104, JMC-15, G10

24 p.3075, JMC-14, G10

25 pp.3089-3090, JMC-15, G10

26 pp.3093-3094, JMC-15, G10

27 pp.3097-3098, JMC-15, G10

28 pp.3099-3101, JMC-15, G10

29 pp.3103-3104, JMC-15, G10

30 pp.3088-3108, G10 at p.3104 and confirmed on T47:85:5-87:22

Chapter 20 - The Law

20.1 In The Ikarian Reefer [1993] 2 Lloyd's Reports 68, at 81-82, Cresswell J formulated the duties of an expert and what is expected of him as follows:

"The duties and responsibilities of expert witnesses in civil cases include the following:

1. Expert evidence presented to the Court should be, and should be seen to be, the independent product of the expert uninfluenced as to form or content by the exigencies of litigation (Whitehouse v. Jordan, [1981] 1 W.L.R. 246 at p.256, per Lord Wilberforce).

2. An expert witness should provide independent assistance to the Court by way of objective unbiased opinion in relation to matters within his expertise (see Polivitte Ltd. v Commercial Union Assurance Co. Plc., [1987] 1 Lloyd's Rep. 379 at p.386 per Mr. Justice Garland and Re J, [1990] F.C.R. 193 per Mr. Justice Cazalet). An expert witness in the High Court should never assume the role of an advocate.

3. An expert witness should state the facts or assumptions upon which his opinion is based. He should not omit to consider material facts which could detract from his concluded opinion (Re J sup.).

4. An expert witness should make it clear when a particular question or issue falls outside his expertise.

5. If an expert's opinion is not properly researched because he considers that insufficient data is available, then this must be stated with an indication that the opinion is no more than a

 © 2020 Thomson Reuters. 

provisional one (Re J sup.). In cases where an expert witness who has prepared a report could not assert that the report contained the truth, the whole truth and nothing but the truth without some qualification, that qualification should be stated in the report (Derby & Co. Ltd. and Others v Weldon and Others, The Times, Nov. 9, 1990 per Lord Justice Staughton).

6. If, after exchange of reports, an expert witness changes his view on a material matter having read the other side's expert's report or for any other reason, such change of view should be communicated (through legal representatives) to the other side without delay and when appropriate to the Court.

7. Where expert evidence refers to photographs, plans, calculations, analyses, measurements, survey reports or other similar documents, these must be provided to the opposite party at the same time as the exchange of reports (see 15.5 of the Guide to Commercial Court Practice)."

20.2 The aforesaid observations had been adopted by the Court of Appeal in England in Stanton v. Callaghan [1998] 4 All ER 961, at 991a and, specifically, post-Woolf reforms, in Stevens v. Gullis [2000] 1 All ER 527. In the Chief Justice's Working Party on Civil Justice Reform, paragraphs 496 and 497, it was said:

"496. After the CPR came into operation, in the English Court of Appeal's decision in Stevens v Gullis [2000] 1 All ER 527, Lord Woolf pointed out that the duties in The Ikarian Refeer continue to be reflected in, and given emphasis by, the new rules.

497. Reforms adopted in various jurisdictions all begin with the same premise, namely, that the function of the expert is to help the court by providing independent and impartial advice - not to act as an advocate for his client. This is reflected in rules which emphasise that the expert's duty to the court overrides his duty to his client."

20.3 The Court's approach to the reception and evaluation of expert testimony was stated in Davie v. Magistrates of Edinburgh [1953] SC 34, at 40:

"Expert witnesses, however skilled or eminent, can give no more than evidence. They cannot usurp the functions of the jury or Judge sitting as a jury, any more than a technical assessor can substitute his advice for the judgment of the Court. Their duty is to furnish the Judge or jury with the necessary scientific criteria for testing the accuracy of their conclusions, so as to enable the Judge or jury to form their own independent judgment by the application of these criteria to the facts proved in evidence. The scientific opinion evidence, if intelligible, convincing and tested, becomes a factor (and often an important factor) for consideration along with the whole other evidence in the case, but the decision is for the Judge or jury." (my emphasis)

This authority was followed in Hong Kong in a case of R. v. Yeung Kwok Fai [1996] 1 HKC 754, at 757H-1 and also in Australia in:

(a) R. v. O'Callaghan [1976] VR 676, and

(b) R. v. Lucas [1992] 2 VR 109.

20.4 In the United States, two cases have been referred to in evidence as setting the standards for admissibility of scientific evidence in the United States:

(a) US v. Frye 293 F 1013 (1923) ("Frye"), and

(b) Daubert v. Merrell Dow 509 US 579 (1993) ("Daubert").

20.5 Frye was a case concerning the admissibility of polygraph or lie-detector tests. What is referred to as "the Frye test" is satisfied if the scientific theory advanced is established to have gained general acceptance in the particular field in which it belongs. Thus, the "general acceptance" theory is still the underlying basis for the admission of scientific theories in the United States. The Frye test has been stated to be in accord with the approach in England in the following cases:

(a) R. v. Gilfoyle, The Times, 13 Feb 2001 per Rose LJ, and

(b) R. v. Clarke [1995] 2 Cr. App. R 425.

20.6 Daubert, to some extent superseded Frye in the United States, because thereafter the Federal Rules of Evidence were promulgated which had some limiting effect. The US Supreme Court in Daubert held that the trial judge must ensure that any and all scientific testimony or evidence admitted is not only relevant but reliable. Proposed scientific testimony must be supported by appropriate validation, that is good grounds, based on what is known to science. The law

 © 2020 Thomson Reuters. 

requires that expert scientific testimony pertains to "scientific knowledge" and establishes a standard of evidentiary reliability, i.e. trustworthiness. Evidentiary reliability is based on scientific validity. Thus, in effect, Daubert added reliability to the requirement of general acceptance in Frye.

20.7 In the more recent case of Nelson v. American Sterilizer Co., 223 Mich. App. 485 (1997), the Court emphasised on the proposed testimony of an expert must be derived from "recognized scientific knowledge" and the inferences or assertions must be supported by appropriate objective and independant validation based on what is known in scientific and medical literature.

20.8 From the aforesaid authorities, I accept the submissions of the Counsel for the defendant, Mr Clive Grossman, SC, who appeared together with Ms Alice Lee (in this area of ink-dating only), that certain principles may be derived, and each and all of which must be fulfilled if the Court is to accept the evidence of a specific scientific theory, novel or not:

(a) The person propounding the scientific theory must have the necessary qualifications, expertise, experience and integrity to ensure that the Court can have confidence that his testimony is worthy of consideration.

(b) The theory must have a sound scientific basis, comprehensible to the Court.

(c) The theory should have gained widespread support amongst that sector of the scientific community which would be likely to utilise it or its results.

(d) The methods used to carry out the scientific test should be safe and reliable, and follow an established protocol, i.e. one that has been published, disseminated and acknowledged to be reproducible.

20.9 The defence submitted that EJS's evidence fails at every single hurdle. I shall consider in the next chapter whether that is the case and I shall start with the underlying scientific theory of the Dye-ratio method. But before I do, I should point out that Counsel for the plaintiff did not submit otherwise contrary to the defence submissions hereinbefore.

20.10 They only drew the Court's attention to the decision of the Court of Final Appeal in Aktieselskabet Dansk Skibsfinansiering v. Brothers & Others (2000) 3 HKCFAR 70, where the Court of Final Appeal reiterated the importance of putting to witnesses things which the Court is invited to make findings adversed to the opposite party. In that case, because the allegation was not sufficiently and clearly put to the party Mr Brothers, the Court of Final Appeal had taken the unusual course of reviewing concurrent findings of fact in the courts below and reversed it. Lord Hoffmann NPJ said, at p.91J:

" In addition to particularity in the pleadings, fairness requires that the adverse findings which the Judge will be invited to make should have been put squarely to the witness in cross-examination, so that he can have the opportunity to offer an explanation."

20.11 Lord Hoffmann NPJ in fact considered all other relevant pieces of evidence concerning the issue of whether Mr Brothers had dishonestly concealed the cash flow position of the borrower company. His Lordship said at p.92A that:

"The Court has examined in detail the relevant parts of the cross-examination of Mr Brothers and I cannot find any place in which the two allegations about his state of mind were adequately put to him."

20.12 His Lordship then examined in detail all the pieces of evidence (see pp.92-96) and came to the conclusion that the evidence to contradict Mr Brothers is insubstantial, and thus the lender company Aktieselskabet Dansk Skibsfinansiering had failed to discharge the burden of proof that Mr Brothers "deliberately withheld the cash flow and, notwithstanding his belief in support, he was dishonest in doing so".

20.13 The plaintiff relied on the case of ADS v. Brothers and submitted that some of the allegations against Mr Speckin have not been put to him. I shall examine the evidence in the following chapters the effects of such failure.

Chapter 21 - The Underlying Scientific Theory Of The Dye-ratio Method

21.1 The Dye-ratio method was developed by a Mr Richard Brunelle ("Mr Brunelle ") and a Mr Huy Lee ("Mr Lee"), who was then only a student. The scientific basis upon which the Dye-ratio method is founded can be found in "Determining the Relative Age of Ballpoint Ink Using a Single-Solvent Extraction, Mass Independent Approach".1

This paper appears to be the only paper which discussed the underlying theory of the Dye-ratio method.

21.2 At pages 746 and 748, Brunelle and Lee said:

"Methanol is a fairly strong solvent for extracting ballpoint inks, yet it still produced a good aging curve in Fig.10. It was this finding that led to the speculation that perhaps subtle dye deterioration or fading or both may also be a factor of aging.

.......

Therefore, the authors believe that extractability and subtle fading/decomposition of dyes are both aging factors ..."

21.3 Thus, the two hypotheses presented for the Dye-ratio method are:

(a) The ratio of dye-ratios changes as a consequence of changes in their extractability as the ink ages on paper (the "First Hypothesis"); and/or

(b) The ratio of dye components changes as a consequence of some of them decompose with age (the "Second Hypothesis").

In short, according to Brunelle and Lee, the Dye-ratio method purports to measure the extractability of dye components, or the decomposition of dye components, or both, with a view to determining the age of ink.

21.4 However, whilst no results were presented by Brunelle and Lee to verify the First Hypothesis, VNA pointed out2 that their experimental data presented in this paper did verify the Second Hypothesis. Each of the two Hypotheses are considered in turn hereinbelow.

THE FIRST HYPOTHESIS (EXTRACTABILITY)

21.5 VNA considered that the First Hypothesis should be rejected.3 He said that generally ballpoint inks consist of three main ingredients, namely:

(a) Dyes;

(b) Solvents (which are used to dissolve or disperse the dyes); and

(c) Resins (which are used to thicken the inks).

21.6 As soon as the ink is placed on paper, various processes of aging will start. These processes would include:

(a) gradual decomposition of some or all ink dyes;

(b) evaporation of solvents; and

(c) hardening of ink resins.

21.7 The ink will become harder to extract in weak solvents as it ages, as a consequence of the age-transforming process of the hardening of ink resins. VNA considered that only the solubility of ink resins changes (decreases) with time, whilst the solubility of dye components remains constant as the ink ages. The extractability of dye components also decreases with time, but this is only because the dye components become more difficult to be extracted from the hardening or hardened (depending on the age of the ink) "matrix"-ink resin.

21.8 Extraction of ink in weak solvents is a complex process. Dye components are sort of "trapped" in ink resins. Therefore, before the dye components may be extracted, the ink resin has to be dissolved. However, the solubility of ink resin differs by a number of factors including the type of ink resin, the age of the ink and the strength of the solvent used for extracting the ink. As the ink ages, its ink resin also hardens. It follows that the older the ink, the harder thus the longer it will take to dissolve the ink resin. But when the ink resin is gradually dissolved, the dye components start to come into contact with the extracting weak solvent. VNA described it as "layer by layer" by using a simplified example illustrated at G11, p.3229. The trouble is if the solubility of dye components in weak solvent:

(a) is not too weak to make it an irrelevant factor for consideration, and

(b) does not differ dramatically for different ink dye components (bearing in mind that solubility is a physical property which remains constant irrespective of the age of the ink),

the dye components will be dissolved very quickly.

21.9 In other words, as VNA explained in evidence, when an aging ballpoint ink is being extracted in a (weak) solvent, the main limiting factor for it to be extracted quickly is the dissolution of the hardening or hardened, if the ink has already ceased aging, ink resin. As far as the ink dye components are concerned, their rate of extraction or their extractability is a priori significantly larger than the rate of extraction of the hardening or hardened ink resin. For this reason, the rate of extraction of the ink dye components would depend only on the solubility of the ink resin in the weak solvent (provided, of course, the dyes are also soluble in the weak solvent), which in turn, depends on the age of the ink. In short, the extractability i.e. the rate of extraction of the ink dye components will practically be equal to the extractability or rate of extraction of the ink resin.

21.10 As VNA pointed out, the experimental results published in Brunelle and Lee's paper show that the Dye-ratio method was not measuring changes in the extractability of the dye components, but the decomposition of dye components, as the ink ages4 (i.e. the Second Hypothesis as explained hereinbelow). This is because the extractability of dye components is not an aging factor.5 These will be considered further below.

21.11 Thomas Andermann and Roderick Neri published a paper in which they said they also had difficulty in understanding why the extractability of a dye component, methyl violet homologues (which are used by Mr Brunelle in all his papers to demonstrate the validity of the Dye-ratio method) should change as the ink ages on paper, given that the methyl violet homologues are chemically closely-related substances, and therefore have almost identical physical and chemical properties, including their solubility in butanol and other solvents.6

21.12 By reason of the aforesaid matters, the First Hypothesis that the Dye-ratio method measures the difference in the extractability of dye components in ink on the premise that the extractability of dye components will change or decrease differently as the ink ages, must not be accepted. There is no scientifically sound explanation and it has not been supported by any published experimental data.

THE SECOND HYPOTHESIS (DECOMPOSITION)

21.13 The Second Hypothesis is that some ink dye components decompose as the ink ages, hence the change in ratios of dye components in an ink. Using this property of the dye components, EJS claimed that one can, therefore, determine the age of an ink by measuring the change in dye ratio due to the decomposition of dye components.

21.14 Thus, the Dye-ratio method measures the decomposition of ink dye components as follows7:

(a) VNA showed that all published experimental data related to the Dye-ratio method clearly indicate that what this method actually measures is changes in the relative content of ink dye components as a consequence of the gradual decomposition of some ink dyes as the ink ages.8

It is suggested therefore, that the Second Hypothesis can be accepted. However, whilst this is the case, the decomposition of dye components could not be used for the purpose of determining the age of an ink as this process continues indefinitely and does not depend on the age of the ink.

(b) The experimental data obtained by Brunelle and Lee verified the validity of the Second Hypothesis. They obtained the two dye-ratio aging curves for Formulab 587 black ballpoint ink as shown in Figure 11 at p.748 in E7-E10.

(c) The upper curve shows the dye-ratios using pyridine, a "strong" solvent, and the lower curve shows the dye-ratios using n-butanol, a "weak" solvent. Both curves show similar shape. It means that the strength of the extracting solvent has no effect on the relationship between the dye-ratio and the age of the ink. Therefore, the Dye-ratio method does not measure the extractability of dye components in ink, but their decomposition.

(d) In VNA's research paper: "A Microspectrophotometric Method for Dating Ballpoint Inks - A Feasibility Study".9 VNA's findings are in agreement with the results published in Brunelle and Lee's paper. VNA conducted the experiments which measured the ratios of ink dye components as a function of aging of ink as Brunelle and Lee did, using a different analytical method, i.e. microspectrophotometry. He found that whilst the ratio of comparatively unstable methyl violet and stable copper phthalocyanine dyes gradually decreases with age during a six-year period i.e. (up to six years old writings) made by a Parker blue ballpoint ink

were available in that study, no satisfactory correlation was established between the age of the ink analysed and the content of its dye components.

21.15 Even in the aforesaid paper of Brunelle and Lee, it also confirmed that ink takes more than five years to "dry".

21.16 VNA pointed out in his evidence that neither of the aging curves in the said Figure 11 show any indication of levelling off after a five-year period of time.10 This is a clear indication that the process of decomposition of ink dyes components will continue and does not stop (or in the case of Formulab 587, does not even slow down) after five years contrary to EJS's claim that this process will stop after three to three and a half years. This is also in agreement with VNA's own finding that the decomposition of dye components does not stop after six years.11 As VNA said12:

"But the problem is that this process does not stop after 3 years, 3 1/2 years, or 4 years that are used by Mr Speckin to draw a conclusion that the ink [on the document] is still in the aging process. This decomposition goes further and it does not stop after 5, 6, 10, 20 or 30 years; it is a process that we cannot even find out when it will stop."

21.17 In light of the continuing process of decomposition of dye components, which process has no means of determining its termination, it is not possible to obtain a reference (artificially aged) sample of an unknown ink (which has reached the end of its natural aging curve with the age of the ink known to us), to which samples under examination could be compared. Thus, although the Dye-ratio method does measure the decomposition of dye components, it could not measure the age of the ink or it cannot be certain whether certain ink is beyond five or other years of age and definitely could not determine whether the ink is or is not more than three or three and a half years old.

21.18 Further, the Dye-ratio method has other sources of error. They are as follows:

(a) Dye components in ink, as discussed above, decompose as the ink ages. However, such decomposition may be attributed to different factors, independently or collectively. Varying these factors would therefore vary the rate of decomposition of dye components. One of such factor is the thermal instability of some dye components. Some dyes decompose quicker when subject to increased temperature, whilst some dyes are less affected by the difference in temperature. Methyl violet is known to be a relatively unstable dye when it is subjected to increased temperature.

(b) It is common ground that ink on Documents A and C contain methyl violet dye, and that reference samples were prepared using the accelerated aging technique. When these samples were heated, the methyl violet components were further decomposed. We should, therefore, expect to receive a statistically significant difference between the heated and the unheated samples. Yet, it is not possible to conclude that the ink is, therefore, less than three, or five, or six years old, as we do not know how old the heated sample represents and cannot therefore draw any conclusion on the basis of such reference sample. Indeed, any statistically significant difference between the heated and unheated ink samples would likely be the result of, at least, the thermal instability of the methyl violet components in the ink.

(c) VNA gave an example in his evidence.13 Supposing two samples of ink-on-paper are taken from a 50-year old ballpoint ink entry on a document. The ink contains, inter alia, methyl violet. The samples are then examined using the accelerated aging techniques (i.e. one of the samples is heated to prepare an artificially aged reference sample) and the Dye-ratio method as EJS did in this case. At the end of the examination, we should expect to receive a statistically significant difference in the dye ratios between the two samples. This is because when the reference sample is being heated, some part of the methyl violet components will inevitably decompose further. One cannot, however, conclude that the ink on the document is not "dry" as, as we know, it is 50 years of age.

(d) Another source of error is the photo-instability of some dye components. According to the experiments conducted by Andermann and Neri14, there were significant changes in the mass ratio of three methyl violet homologues after the samples were exposed to light.

21.19 Thus in conclusion in respect of the Second Hypothesis, on one hand, the Dye-ratio method measures decomposition of dye components and this hypothesis can be accepted because its validity has been established and verified by the published experimental results obtained independently by Brunelle and Lee and by VNA. However, on the other hand,

WESTLAW © 2020 Thomson Reuters. 

the decomposition of dye components cannot be used as a reliable parameter for the purpose of determining the age of an ink because:

(a) The process of decomposition will not stop and does not even slow down as shown by Brunelle and Lee, and VNA after five or six years; and/or

(b) In light of the existence of the sources of errors as discussed above.

21.20 In reply, counsel for the plaintiff submitted that the allegation of the behaviour of the resin and the ink dye in solvent was not in VNA's Report nor was it fully put to EJS. Whilst I would accept that it is something less than what would be desired, the circumstances of this case is somewhat different from the case of ADS v. Brothers.

21.21 EJS was in Court whilst VNA was cross-examined. EJS's answer to VNA's allegation of the behaviour of resin can be put to him. (This was done in respect of other points not specifically or fully put to EJS by the defence.) In the end, it would depend on the soundness of the reason or the lack of it and not on the demeanor of the witness. Thus, in spite of the failure of the defence in putting fully this allegation to the plaintiff's expert, I find the contention of VNA has casted grave doubt on the scientific validity of the Dye-ratio method.

CONCLUSION

21.22 By reason of the aforesaid matters, I accept the submissions of the defence as follows:

(a) The Dye-ratio method does not measure the extractability of dye components. It measures changes in the relative content or ratio of ink dye components, which change is a result of the gradual decomposition of some ink dye components as the ink ages.

(b) The decomposition of ink dyes is a long-lasting process which does not stop even after scores of years of natural aging of ink. As the duration of this process cannot be determined, any attempt to prepare a reference sample by artificially aging a sample (which allegedly corresponds to an ink of certain age) would a priori be meaningless.

(c) Indeed, if an ink contains a dye which decomposes gradually during the natural aging of ink at normal temperatures, this dye would decompose at a significantly higher rate when a sample of it is being artificially aged using elevated temperatures. The extent to which this dye would decompose when the accelerated aging technique is applied does not however depend at all on the ink age but depends solely on the elevated temperature and the duration of heat applied to prepare the artificially aged sample.

(d) Thus, if an ink contains dyes capable of gradual decomposing with time like methyl violet as we have in this case, the Dye-ratio method coupled with the accelerated aging technique would almost certainly produce false evidence that the ink is still aging, irrespective of the actual age of the ink.

Therefore, a conclusion based on results obtained by the Dye-ratio method coupled with the accelerated aging technique, as we have in this case, cannot be accepted.

21.23 Further, the method is yet to be validated and accepted by the scientific community and the courts which I shall discuss in the next chapter.

1 pp.736-753, E7-E10

2 T57:20:11-22:24

3 T51:11:17-12:11

4 T54:28:7-31:15, T57:20:11-22:24

5 See Figure 11 at p.748, E7-E10 (VNA 2)

6 pp.781-797, E7-E10 (VNA 2)

7 T51:12:12-14:3

8 T54:28:7-31:15, T57:20:11-22:24

9 pp.693-697, E7-E10 (VNA 2)

10 T54:30:20-31:11

11 p.694, E7-E10, Figure 2 in VNA-4 (VNA 2), and T57:23:15-24

12 T51:12:25-13:6

13 T51:13:8-18

14 p.794, E7-E10 (VNA 2)

Chapter 22 - Scientific Validity

22.1 EJS concluded that the ink on Documents A and C was still in the drying process. This conclusion reached must be:

(a) adequately supported by reliable data;

(b) that the data was produced by a scientific method which has a sound underlying scientific theory;

(c) the method has been proven to be valid, reliable; and

(d) the same has generally been accepted by the scientific community.

22.2 I shall consider the aforesaid criteria one-by-one hereinbelow. However, it is worthy to look at the outset that the conclusion reached by EJS was based on "significant statistical difference" allegedly found in only five out of 18 results obtained between the heated and the unheated ink samples using the Dye-ratio method. There was no difference detected from the other two relative aging tests, namely the Percent Extraction method and the R-ratio method, which were performed on the same ink samples, before the Dye-ratio method.

VALIDATION STUDIES

22.3 Validation is a crucial step to demonstrate that a scientific method intended for forensic use will work as expected and will provide reliable results. Validation is a term pertaining to studies in ascertaining the validity, reliability and reproducibility of test results. It has been said that1:

"the purpose of validation is to establish limits within which we are confident of the results obtained. Validation also helps us to establish the variance inherent in the system as a whole, and to gain a further understanding of one kind of explainable difference. ... We learn how much variation may exist between tests, so that we may determine criteria within which we can either conclude that two different samples may share a common origin or exclude them as having a common origin. How sensitive is the system to the quantity of sample? What are the lowest and highest quantities that can reliably be analyzed? What artifacts begin to appear at the extreme ends of the spectrum and can we use them as diagnostics? What do mixtures of similar substances look like in a particular test system, and are there indicators that might alert us to the presence of a mixture? How might various environmental factors to which forensic samples are commonly subjected influence the ability to analyze the samples and to interpret the results obtained? These are the kinds of questions that validation studies attempt to answer."

22.4 The defence witness, PVT said that validating a new technique involves efforts of multiple laboratories, and broad and comprehensive testing using the same samples. The relevant scientific community can then rely on the resulting data which ideally will be peer-reviewed and published. When substantive changes are introduced, the protocol must be revalidated in order to understand the full impact of those changes. This has never been challenged by the plaintiff.

22.5 Falling short of validation, it should be demonstrated, at the very least, that the test methods are reproducible by the scientific community. In order to do so, sufficient experimental data obtained should have been published in peer-review journals. The underlying scientific basis of the methods, the procedure, and the data obtained from the test of different types of ink under different environmental conditions, on different types of paper and stored under different conditions, by using different heating parameters, should be set out to enable other practitioners to follow their experiments and verify their reproducibility.

22.6 The methods, accompanied by appropriate standard protocols, should be endorsed by a consensus of practitioners, with widely disparate backgrounds and interests, such as those from private and public laboratories all agreeing on what should be done and not simply (as in this case), members from a small and young association namely, SOFIA.2

22.7 Mr Larry Stewart and Ms Susan Fortunato, (both of the United States Secret Service), in their paper entitled: "Distinguishing between Relative Ink Age Determinations and the Accelerated Aging Technique" published in 1996, stressed the importance of the validation process before applying a new technique to casework. They expressed that3:

"Every forensic scientist should agree that before applying a new technique to casework, it is important to validate the work, procedures, limitations and to illustrate the soundness of the technique through the close scrutiny of your peers".

22.8 There is no doubt that the disputed methods used here have not undergone any validation studies.4

22.9 On the contrary, it appears that SOFIA, consisting of a very limited number of persons including Dr Lyter, Mr Robert Kuranz and Mr Brunelle, and of which EJS is the Vice President, has only just started to validate the other ink-dating procedures namely, the Percent Extraction method and the R-ratio method on comparison between known and questioned ink samples, not involving the use of artificial heating to create reference samples for comparison purposes.5 Their attempt in June 2001 inviting other laboratories, including government laboratories, to participate in the project had nothing to do with either the accelerated aging method or the Dye-ratio method. In short, there has never been any validation studies for the Dye-ratio method employed by EJS in this case.

PEER-REVIEW

22.10 EJS contended that the methods have been published in peer-review journals.6 Alternatively, he said that the process of validation does not require specific endorsement by any organization, so long as the methods have been accepted by the scientific community.7 However, simply by publishing a new technique in a peer-review journal (even with full experimental/research data) does not guarantee that the technique is reliable, reproducible, and is certainly not equivalent to it having been validated.

22.11 A method can only be said to have been peer-reviewed when it has been debated, and later agreed and accepted by the general scientific community that the method has a sound scientific basis, and that it is reliable and reproducible. Here on the contrary reservations have been expressed by other experts including Mr Joel Harris8 and Dr Giles9.

22.12 There has not been any or any sufficient research data on Dye-ratio method used in conjunction with the accelerated aging method published so far. The first paper on the Dye-ratio method, as stated hereinbefore, was published by Brunelle and Lee in 1989.10 Data obtained from initial experiments using the Dye-ratio method was published but the authors did not appear to know with any degree of certainty the underlying scientific basis of the Dye-ratio method. It was said at p.628 that:

"It was this finding that led to the speculation that perhaps subtle dye deterioration or fading or both may also be a factor of aging."

This was followed by the statement that:

"...the authors believe that extractability and subtle fading/ decomposition of dyes are both aging factors." (Emphasis added).

22.13 In 1995, Mr Brunelle published the article entitled: "A Sequential Multiple Approach to Determining the Relative Age of Writing Inks". Only procedures, but not experimental data, in respect of various ink-dating techniques were described. The procedure in respect of the accelerated aging technique was also described. However thereafter, doubts on the reproducibility and reliability of the methods were raised by leading members of the relevant scientific community. They included VNA, Ms Joanne Becker, Mr Larry Stewart and Ms Susan Fortunato, Dr Albert Lyter, Dr Thomas Andermann and Mr Rodric Neri.11

22.14 In particular, Mr Larry Stewart and Ms Susan Fortunato in a paper entitled: "Distinguishing between Relative Ink Age Determinations and the Accelerated Aging Technique", conducted a review of all the papers on the accelerated aging method, including those relied upon by EJS in support of his contention that the methods have been published and peer-reviewed. The authors found that there had been no consistent result that had led multiple examiners to utilize a given procedure and that no reported studies existed which examined the effects of various time and temperature parameters on numerous ink formulations. They contended that research of this type might determine not only the maximum time and temperatures that might be applied to inks without fear of degradation, but also the conditions necessary to ensure that the heated sample was then representative of itself at the end of its natural aging curve.

22.15 Further, they also found that the origins of time/ temperature combination were unclear. They felt that the

practice of using unverified heating parameters could lead to erroneous conclusions unless further studies were conducted. They concluded that there were many unanswered questions with respect to the impact and the effect of applying heat to an ink entry. The influence from paper type, the time and temperature parameter selections, heat degradation and significant differences were all in need of attention.12 These questions merit serious consideration and are as yet, unanswered.

22.16 Since then, the only paper that has been published on the subject is: "Technical Report with Case Studies on the Accelerated Aging of Ball-point Inks " by Brunelle and EJS in 199813, but it shed no further light on the aforesaid unanswered questions. At about the same time, a paper by VNA entitled: "Measuring Ink Extractability as a Function of Age" published in the same Journal, raised profound doubts as to the reproducibility of the Dye-ratio method. Before coming to that conclusion, VNA discussed the usability of the relative aging tests which included the other two methods namely, the R-ratio method and the Percent Extraction method.

22.17 The aforesaid paper published by Brunelle and EJS in 1998 did not, however, alleviate the concerns of the scientific community. In its abstract, it was acknowledged that "the data presented does not satisfy the requirements for [it] to be a research paper". Upon review of the same, it did nothing more than setting out results allegedly obtained from real caseworks over the years before EJS's time, some of which were from the use of the Dye-ratio method. In a letter dated 17 September 199714, which was addressed to Mr Joel Harris, the then editor of the Journal in response to a reviewer's request for additional research on the effects of comparing inks on old versus new paper, Mr Brunelle confirmed that "the paper was not intended to report the results of research ". He said "the recommended study may be the subject of another paper in the future". It goes without saying that it was recognized that further research on the various ink-dating techniques was required. However, no further research appears to have been conducted up to the present day. Furthermore, full data from the Dye-ratio method was absent from the report. The graphs in respect of the Dye-ratio method to be found in the said article contained data of one Dye-ratio only in order to "preserve space".15

22.18 Other literature cited in support of the claim that the methodology has been published widely and peer-reviewed are:

(a) "Chromatographic Analysis of Inks for Forensic Science Application " published in 1991 by Dr I.R. Tebbett; and

(b) "A Sketch of Analytical Methods for Document Dating - Part II, the Dynamic Approach" published in 1995 by Dr A.A. Cantu.

These are, however, no more than reviews of the technical papers published on the subject and are not to be taken as, nor do they purport to be, independant studies for the purpose of validating the methods. In the course of his review of the progress of ink-dating techniques, Dr Tebbett said: "the solution continues to elude researchers and document examiners alike".16 It is noted that when EJS testified in the case of Utica Square Shopping Centre v. Renberg's Inc in July 1998 he was dismissive of Dr Tebbett and did not consider him to be an authority on ink-dating.17

22.19 In the end, I must conclude, as submitted by the defence, that not only have the accelerated aging method and the Dye-ratio method not been validated, the procedures described in Mr Brunelle's paper published in 1995 in respect of the Dye-ratio method and the accelerated aging method were not followed by EJS18 and he admitted in his evidence that he had not followed the procedures "to the letter".19 This will be discussed further in Chapter 28 on Procedures. Before that, I shall deal with the question of "Acceptance by the Scientific Community" first in the next chapter.

1 Chapter 9, Good Laboratory Practice - Establishing Validity and Reliability, extracted from Principles and Practice of Criminalistics, pp.3130-3132, G11

2 See PVT, T49:44:6-59:19

3 p.773, E7-E10

4 T39:106:16-108:13

5 See SOFIA's Ink-dating Research Project, pp.2097-2112, G8

6 T35:37-40; T49:56:2-8

 © 2020 Thomson Reuters. 

7 T49:55:7-12

8 p.2094, G8

9 p.155, C

10 pp.619-635, F2-3; also pp.737-753, E7-E10

11 They are exhibited to VNA 2, respectively at pp.694-697, pp.761-768, pp.770-775, pp.777-780 and pp.782-797, E7-E10.

12 p.773, E7-E10

13 p.1386, G5

14 p.1537, F6

15 pp.1391-1394, 1396, and 1398, G5

16 p.614, F2-3

17 p.1012, F5; T44:19:3-25:25

18 Brunelle: "A Sequential Multiple Approach to Determining the Relative Age of Writing Inks", pp.603-607, F2-3

19 T37:79:23-80:2, T38:51:18-22

Chapter 23 - Acceptance By The Scientific Community And The Court

23.1 A further step in deciding whether the methods are reliable and whether they have been validated is to examine the extent of their acceptance by the scientific community. EJS no doubt is aware of the strictures of Frye/Daubert, by which the boundaries of the acceptance have been laid down as: "those who would be expected to be familiar with its use". Thus EJS himself also stressed the long-time and universal acceptance of his method. However, he confined those private ink chemists to those like-minded members of SOFIA only.

23.2 But then the methods/techniques used by EJS in this case have apparently not been used by a majority of chemists/scientists in private practice and government laboratories. Those chemists/scientists would include the following, namely:

(a) Bundeskriminalamt of Germany1 (The German police laboratory);

(b) Forensic Science Service of the United Kingdom2;

(c) Forensic Science Division of the Zurich Canton Police3;

(d) Dr Audrey Giles, United Kingdom4;

(e) Mr Robert Radley, United Kingdom5;

(f) The United States Secret Service.

23.3 As far as the accelerated aging method is concerned, none of the chemists/scientists in government laboratories use it and in fact, it is not even one of the methods endorsed by SOFIA itself, as at August 2001.6

23.4 EJS claimed that the United States Secret Service used the same techniques. However, this has been unequivocally refuted by Mr Larry Stewart and Ms Susan Fortunato.

23.5 In his letters dated 8 June 2001 and 17 September 2001,7 Mr Larry Stewart, the Laboratory Director of the United States Secret Service, clearly stated that the Secret Service Forensic Laboratory does not utilize the accelerated aging technique in the examination of questioned documents in actual casework because the technique has not undergone the rigours of validation/reproducibility studies and peer-review. Further, in an electronic mail dated 2 October 2001,8 Mr Stewart said he was of the view that there were still many questions left unanswered in relation to the reliability of the technique and remained adamant that there had as yet been insufficient research conducted to allow its use in caseworks. In a further letter dated 12 October 2001,9 Mr Stewart clarified that the in-house testing conducted by his laboratory and other leading laboratories showed that the accelerated aging technique was not reliable.

23.6 Indeed, Mr Stewart and Ms Fortunato expressed their concern about the reliability of the technique as early as 1996 in the aforesaid paper entitled: "Distinguishing Between Relative Ink Age Determinations and the Accelerated Aging Technique".10

 © 2020 Thomson Reuters. 

23.7 Before routine utilization of the accelerated aging technique, they requested "more data regarding the number of inks tested, the types of ink formulas tested, the reasoning for the temperature, humidity and time choices as well as the limitations of the conclusions".

23.8 Similarly, the National Forensic Laboratory of the Inland Revenue Service in the States does not use the accelerated aging technique as part of their ink-dating techniques.11

23.9 In a deposition in the very recent case of Murphy v. Murphy,12 even Dr Lyter (the President of SOFIA) said he did not think that the accelerated aging test was reliable and he did not perform it.13 He confirmed this view again in his letter dated 23 October 2001.14 Dr Lyter did not run the Dye-ratio method in that case at all.

23.10 When EJS was cross-examined on the true "blind" (or "proficiency") test given to him by fJ Cleveland, it transpired that the Dye-ratio method was conducted only occasionally (after "a cost to benefit" analysis) and then really only as a confirmatory test.15 He explained that this was because "typically", he would not expect to obtain "positive" results with the Dye-ratio method, if no positive result is obtained from the R-ratio method and the Percent Extraction method.16

"A: In the universe of cases that I see, if you see a difference with dye-ratios, typically you see it with rate and percent extraction as well. And if you do not see it with rate and percent extraction, typically you do not with dye-ratios."

23.11 Notwithstanding the claim in a letter dated 10 October 2001 by Mr Brunelle17 that the accelerated aging method in conjunction with the relative aging tests using the Percent Extraction method, the R-ratio method and the Dye-ratio method have been routinely accepted by courts throughout USA and other countries since 1988, and that he routinely used these methods in caseworks, the Dye-ratio method was not defined as one of the methods of the relative aging tests in determining ink age in this case in his advice to the plaintiff contained in a letter dated 21 February 2000.18 There was certainly no recommendation for the use of the Dye-ratio method in that letter. In the penultimate paragraph at p.87, Mr Brunelle said:

"Relative age comparison tests used to date inks tell you more than when the ink was first commercially available. These tests can estimate when an ink was actually written on a document. This is done by comparing the solubility characteristics of questioned ink with the same properties of known dated ink. The theory behind these techniques is based on the scientifically proven premise that as inks age on paper, changes in the solubility of the ink occur. By measuring the rate of extraction or percent of extraction of the questioned ink into a weak solvent and comparing this result with those of a known dated ink, it becomes possible to determine whether both inks were written at the same or different times. When enough known dated inks are available, it is possible to estimate the time of writing within about 6 months to 1 year."

23.12 In effect, EJS and Mr Brunelle appear to be the only proponents of the use of accelerated aging in conjunction with the Dye-ratio method and no one else. On the contrary, VNA was most critical of the Dye-ratio method. In his paper entitled: "Measuring Ink Extractability as a Function of Age" published in 1998,19 he found that the Dye-ratio method would give unreproducible results.20

23.13 In respect of Mr Brunelle, there was no evidence adduced to show that the conclusions, if accepted, made by him were based on results obtained from the Dye-ratio method alone.21 This Court cannot help but list out certain misgivings about Mr Brunelle, even he did not give evidence in this case, namely:

(a) In February 2000, it was stated in the affirmation of the plaintiff's solicitors that Mr Brunelle had been retained in this case and would be responsible for the analysis of data and compilation of the expert report, while EJS would be responsible for collecting the samples.22 This did not happen. The reason appears to be that Mr Brunelle has not done any cases since 1997 as contended by EJS.23 No explanation has been offered for the change of expert in evidence. Counsel for the plaintiff in their final submission submitted that Mr Speckin would not be in a position to know why. They suggested that cost factor or cost saving factor might well be an explanation. But this cannot explain why EJS said Mr Brunelle has not done any cases since 1997.

(b) However it appears from the list of cases submitted to the court by Mr Brunelle that he had done so.24 It is not clear whether Mr Brunelle had misled EJS or EJS had misled

the Court when trying to explain why Mr Brunelle had not changed his methodology by requiring fewer microplugs.

(c) As aforesaid Mr Brunelle stated that in relation to the time it takes for an ink to dry, it would vary from six years to five years and then four years and back to six years in 2000.25 In cross-examination, EJS rejected such statement and confirmed that there were no findings which said six years.26 In one of the letters presented to the Court towards the end of EJS's evidence,27 Mr Brunelle had reduced his claim to "approximately 3 years". This appears to be just a transparent attempt to bring his "evidence" or version in line with EJS who had (at least prior to his evidence in this case) been consistent in his claim that ink takes three to three and a half years to dry.

(d) Mr Brunelle chose not to offer himself as an expert and his late contentions in his letters, many of them are controversial but cannot be tested by cross-examination. Thus, the Court would not place any weight on Mr Brunelle's self-serving letters placed before the Court at the latter part of EJS's evidence.

(e) Mr Brunelle in his paper: "Ink Analysis", published in 2000,28 attempted to rationalise two conflicted statements, namely:

"It is important to know that depending on the ink formulation involved and the paper it is on, each of the methods described above may not all have equal ability to discriminate the age of the ink being analyzed. For example, it is not uncommon for one method to detect differences in age, when one or both of the other procedures fail to detect this difference. This fact does not negate the positive results of the one method. Only if the results of one method conflict with the results of another method are the overall results negated. " (Emphasis added)

(f) Mr Brunelle's claim that the courts in the United States have routinely accepted the methods29 is untrue, to his knowledge. This is revealed in the newsletter "Scientific Sleuthing" where it was pointed out that as recently as 1993, Longhi J in New Jersey had rejected Mr Brunelle's evidence in somewhat scathing terms.30

(g) In addition, Mr Brunelle's assertion that all advanced members of SOFIA had performed the ink-dating examinations (including accelerated aging and the Dye-ratio methods) for over 10 years31 is obviously untrue, at least with regard to EJS and Dr Lyter, which further reduced the number of practitioners using the methods.

23.14 In the end, this Court cannot accept that there has been acceptance by the scientific community in respect of this ink-dating method by using Dye-ratio method after accelerated aging.

ACCEPTANCE OF THE TECHNIQUES BY COURTS

23.15 It is at least an overstatement to claim that the methods that were used in this case have been in use for 15 years32 and routinely accepted by Courts in the United States and in other countries, since the Dye-ratio method was first published only in 1989 by Brunelle and Lee. Even in that paper, the authors cautioned that the method was not free of limitation and could only be used subject to certain conditions. (This statement is only true if it refers to the ink library technique.)

23.16 Of all the cases in which EJS testified and the transcripts of which are before this Court, either the Dye-ratio method was not used or the results obtained were not relied upon and accepted by the courts, let alone in conjunction with the accelerated aging method. None of the transcripts supplied by EJS, presumably to support his track record, and none of those obtained by the defendant, support his contention that the Dye-ratio method has been accepted by the Court.

23.17 In particular, in the case of Aptix Corp. and Meta Systems Inc. v. Quickturn Design Systems Inc.,33 the Court actually rejected the results obtained by EJS using the accelerated aging method. The Dye-ratio method was not used. According to EJS, as the reliability of the accelerated aging method was in dispute, Mr Brunelle was called to testify on it. Notwithstanding that the Court found that the problem was that "the test tries to draw large conclusions from tiny differences... In all cases, most of the differences at various durations were inconclusive and at most, only a few were conclusive. "34 It was held as follows35:

"(e) Relative-Ink-Date Testing.

88. The Court will not place any reliance on the results of Expert Speckin's 'relative-ink-date testing,' also known as 'accelerated aging.' The Court recognizes that the methodology is vouched for by both Experts Speckin and

 © 2020 Thomson Reuters. 

Brunelle, the latter especially preeminent in the field. The problem is that the test tries to draw large conclusions from tiny differences in leach rates and to do so after artificial 'accelerated aging' (i.e., heating in an oven) of part of the test sample (so as to provide a 'known' old sample for comparison). Each was tested at different durations of leaching to detect differences in the leach rates. In all cases, most of the differences at various durations were inconclusive and, at most, only a few were conclusive. The Court agrees that the tests tend to show that the sentence on Page 4 'A programmable system ...' was added recently and is 'still drying.' It is unnecessary, however, for the Court to rely on the test and the Court does not."

23.18 EJS conceded that, with the exception of Nartron v. GM Motors36 in which Mr Brunelle used the Dye-ratio method on some of the ink entries, none of the cases mentioned by him had anything to do with the Dye-ratio method. Even when the Dye-ratio method was performed in that case by Mr Brunelle37 in addition to the percent extraction method and the R-ratio method (by EJS), the Court relied upon the "reverse extraction" method as the basis of its conclusion. It follows that none of the cases cited by EJS had anything to do with the acceptance of the Dye-ratio method used in conjunction with the accelerated aging method by any court.

23.19 In People of the State of California v. Genaway, Mr Kuranz formed his opinion using a combination of the relative aging tests and the accelerated aging method.38 It is not clear, however whether or not the Dye-ratio method was used. Counsel for the plaintiff submitted that this case did not involve Dye-ratio method. In any event, the Court rejected the evidence of Mr Kuranz on the grounds that:

(a) the reliability of his technique had not been established;

(b) the technique had very limited publication and inadequate peer-review;

(c) its known or potential rate of error was not established; and

(d) it has not been generally accepted in the scientific community.

23.20 In Learning Curve Toys v. Playwood Toys Inc., the accelerated aging method was not used and the conclusion reached was based on the relative aging tests using the Percent Extraction method and the R-ratio method by Dr Lyter. The Court rejected Dr Lyter's evidence and concluded that he had failed to establish that the relative aging tests were based on methodology that had been subjected to peer-review and publication and generally accepted in the scientific community.39

23.21 Here, Dr Lyter appears to be inconsistent as to whether he has used the Dye-ratio method. In a letter adduced by the plaintiff from Dr Lyter,40 he said he "routinely" uses the Dye-ratio method to detect differences between ink entries. However, on 19 October 2001, when he testified in the case of Murphy v. Murphy,41 he confirmed42 that he did not use the Dye-ratio method in that case.

23.22 According to PVT,43 in any event, the four apparent "users" (Mr Brunelle, EJS, Dr Lyter and Mr Kuranz) of SOFIA do not use exactly the same technique. At the meeting held on 14 August 2000, Mr Brunelle said that each of them had modified the technique, each of them were using their own version of it, and each of them had their own personal habits or personal modifications to it. This evidence was not challenged by the plaintiff.

23.23 By reason of the aforesaid matter it cannot be said at all that the methods/techniques have been accepted by the Court.

CONCLUSION

23.24 There is no evidence before this Court that the methods/techniques upon which the conclusion was drawn by EJS in this case, have been in use for 15 years and routinely accepted by courts. This Court is only presented with a technique which may have been followed in general outline by two or three other people, which may have been accepted by some U.S. Courts and which is certainly not accepted by any law enforcement agencies in the United States and all over the world. I am not satisfied that the Dye-ratio method coupled with the accelerated aging method used by EJS in this case are valid, or reliable and from which a responsible conclusion could be drawn.

1 p.828, G3

2 pp.829-831, G3

3 p.832, G3

 © 2020 Thomson Reuters. 

4 pp.153-155, C

5 pp.156-160, C

6 pp.1447-1448, G5

7 pp.2090, 2096, G8

8 pp.2205-6, G8

9 p.2308, G8

10 pp.770-775, E7-E10

11 Letter from Mr James Davidson of 14 June 2001 p.2091, G8

12 pp.3154-3195, G11

13 p.3193, G11

14 p.1772, F7

15 T47:105:5-22

16 T47:109:7-14

17 pp.1577-1578, F6

18 pp.84-89, C

19 pp.705-721, E7-E10

20 p.710, E7-E10

21 pp.1496-1525, F6

22 p.11, para.4, B

23 T43:22:16-17

24 pp.1521-1525, F6

25 p.529, F2-3

26 T44:46:9

27 p.1597, F7

28 pp.528-9, F2-3

29 pp.1577-8, F6

30 p.2303, G8

31 p.1578, F6

32 para.5, p.909, EJS 3

33 pp.790-827, G3

34 p.813, G3

35 para.88, p.813, G3

36 Decision dated 2 January 2001, pp.967-977, F5 and Submissions at pp.1464-1491, F6

37 p.1483, F6

38 14 May, 1996, pp.340-343, G2

39 See Memorandum Opinion and Order 31 March 2000, pp.2085-2087, G8

40 p.1776, F7

41 pp.3154-3195, G11

42 p.3191, G11

43 T48:129:15-130:2

Chapter 24 - Arbitrary Separation Of Fused/Overlapped Chromatographic Peaks

24.1 The chromatographic peaks shown on EJS's densitochromatograms were not smooth and bell-shaped but they were like a "range of mountains". EJS did not know why they were so overlapped.1 Thus they required him to manipulate the integration marks between the poor separation of the dye components or chromatographic zones on the TLC plates he developed. VNA has the strongest

objection in this kind of manipulation. He considered that in no circumstances should EJS have manipulated with the raw data provided by the video densitometer by arbitrarily separating almost completely fused/overlapped peaks on the densitochromatograms. As a consequence of him doing so, the data upon which he conducted statistical analysis are subjective, possibly pre-determined and therefore utterly unreliable.

24.2 VNA is an acknowledged world expert in chromatography. He explained that the prerequisite of obtaining reliable data/results was that the chromatographic peaks have to be properly resolved to the baseline, if the purpose of their analysis is to obtain quantitative data. The very basis of chromatographic technique is to separate one substance from another. The dye components on the TLC plates should be well separated and the peaks on the densitochromatograms should be resolved to the baseline. VNA said his contention is borne out by all the articles and textbooks on chromatography, some of which were exhibited.2 The problem of analysing fused chromatographic peaks is summarised as follows3:

"The experimental errors in the determination of the area of fused non-Gaussian peaks are so large as to shed doubt on the usefulness of such methods for quantitative purposes."

24.3 Contrary to what EJS had argued, VNA said the same principles of evaluating the peaks would apply to both thin-layer and gas or liquid chromatography.4 Since EJS's densitochromatograms have the poor quality of fused/overlapped peaks, he had to manipulate the integration marks to "help" the computer to separate the unseparated peaks. This manipulation is subjective and are prone to produce erroneous results. The most important ones are those from the densitochromatograms of Vial 2 at the 30 seconds time frame. These are the worst resolved chromatograms.5 These are important chromatograms, because according to EJS, they gave a "significant statistical difference" upon which EJS relied heavily.

24.4 EJS's manipulation and subjective marking of the demarcation line would have the four following pitfalls. First, EJS claimed that the ink dye components separated on the TLC plate were "... scanned using white light and the amount of absorption was measured using a computer driven video densitometer with automatic integration".6 This was misleading and untrue. On the contrary, the integration marks were manipulated and arbitrarily placed by EJS. The data were used to calculate dye ratios and they were subjective, possibly pre-determined, and are therefore unreliable.

24.5 According to VNA, usually, the dye components applied closer to the sides of a TLC plate would travel somewhat further than the same dye components applied closer to the middle of the TLC plate. They would also have different shapes.7 This is because the solvent, an eluent used to do chromatographic separation, evaporates faster from the side than the middle of the TLC plate.8 When the chromatographic peaks are fused, it is impossible to know how each of them behaved within the area where they fused.9

24.6 EJS claimed that it does not matter where you put the vertical line as long as it is in the same on both the heated and unheated chromatograms,10 however, VNA's measurements (combined in Slide 29) show that the integration marks placed by EJS were not in the same place in both densitochromatograms. Consequently, EJS had to admit that the integration marks could only be placed at "... the same relative position with the peak" but not at identical position.11 He said he could only "... chose where the peaks were separated as best [he] could tell."12

24.7 Secondly, EJS claimed that he was comparing one peak to another. As considered hereinbefore, the area under each of the chromatographic peaks could not be ascertained. Any comparison of these peaks is, at best, guesswork. Thus it cannot be ascertained whether he was comparing one dye component to another dye component or a group of components to another dye components or a group of dye components to another group.

24.8 But more importantly, the concept of measuring a composition of dye components has never been published, or ever referred to or raised in any published paper. EJS himself was unable to refer to any support for his own method. The scientific basis of such a comparison is also unclear.

24.9 EJS further claimed that if Mr Brunelle were faced with the same problem of fused chromatographic peaks, he would also "lump them together".13 In fact, Mr Brunelle suggested the contrary. He considered that if the dye components were not separated adequately for accurate densitometer readings,

 © 2020 Thomson Reuters. 

the test should be repeated using another solvent.14 This is in line with the suggestion of VNA.

24.10 Thirdly, EJS claimed that if the integration marks were moved as he did in this case, no significant change occurs in the data or the results.15 This must be mathematically incorrect since he was comparing the values of each of the peaks by dividing them against each other. His manipulation would obviously affect the values of the area under the peaks, which were values used as numerators and denominators in his analysis.

24.11 Fourthly, EJS claimed that "... you could move it [i.e. the integration mark] one click one way or the other and it is not going to affect the data or the results."16 This, too, is untrue.

24.12 VNA demonstrated with the aid of Slides 27 to 29, G8A, that one click would drastically change the results of the Dye-ratio method. He demonstrated further the sensitivity of the placing of integration marks at 30 seconds for dye 2/dye 3 of Vial 2. In such circumstances, the ratio would overlap and therefore, show no statistically significant difference.17 Thus, the slightest shift of the integration marks will give a completely opposite conclusion.

24.13 Further, EJS took no account of the small peaks in the chromatograms which contained dirt and impurities collected from the solvent front, for example, the peak for dye 1 in Vial 2.18

HIGHER RESOLUTION SHOULD BE USED

24.14 In light of the poor quality of the chromatography, VNA considered that EJS should have, at least, scanned the TLC plates at the highest optical resolution possible. The difference of using high and low resolution can be found at p.3228, G11.19 However, EJS inexplicably only used the standard resolution of his video densitometer even when scanning at a higher resolution was available. Consequently, the amount of pixels inside each chromatographic zone was too low for the video densitometer to give good images. Although this point was not specifically and satisfactorily put to EJS, yet again VNA's contention could be refuted in cross-examination of VNA upon EJS's instructions. Similar incidents occurred in a few points raised by counsel for the plaintiff. Whilst this court is not encouraging the other party for not putting certain points to a witness, yet the special circumstances of this long case when each party is trying to improve his case in this kind of complicated matter, the other party's failure of putting certain matters have been carefully assessed in the scale before accepting the other party's contention. (This same point would not be repeated in similar situations hereinbelow). In the end, it was demonstrated that EJS was actually unfamiliar even with his own video densitometer by his ignorance as to the meaning of "Max" and "Wide" which appeared on the monitor next to "Area".20 He later admitted that he had no idea what their functions were or what they were used for.21

24.15 VNA suggested that EJS should re-do the chromatographic separation with another solvent and re-scan the TLC plates at high resolution until he obtained satisfactorily resolved chromatographic peaks by his video densitometer, subject to such video densitometer being properly calibrated. This view is actually shared by Mr Brunelle who developed the Dye-ratio method.22

CONCLUSION

24.16 In the circumstances, the data obtained from the video densitometer after EJS's admitted manipulation were subjective and unreliable. Any conclusion drawn on the basis of the dye-ratios calculated using these unreliable data cannot be accepted.

1 T42:29:10-32:9; T42:46:7-12

2 pp.2209-2241, G8

3 Quantitative Analysis using Chromatographic Techniques, E. Katz (Ed.) John Wiley & Sons, New York, 1987 - Slide 19, G8A

4 T51:66:1-8

5 Slides 26-1 and 27-1, G8A

6 p.412, EJS 1

7 T51:40:3-5

8 T51:40:6-41:24, Plates V and VI

9 T51:70:16-22, Slide 18, G8A

10 T42:25:16-19

11 T42:89:22-23

12 T44:124:5-6; T44:147:19-24

13 T44:29:6-17

14 p.526, F2-3

15 p.896, EJS 3, para.41, as illustrated in VNA-12 on p.755, E7-E10

16 T42:16:13-14

17 Slide 51, G8A

18 VNA's Slide 22-1, G8A and his contention at T51:60:15-61:24

19 See also VNA's explanation at T55:92:21-94:11

20 T40:38:4-12

21 T42:14:11-21

22 p.526, F2-3

Chapter 25 - Illogical Results Of Dye-ratio Method

25.1 The validity of the Dye-ratio method depends, inter alia, on obtaining reliable raw data after each of the ink dye components separated on the TLC plates were evaluated using the video densitometer. According to EJS, he would be measuring the extractability or the decomposition of the dye components of the ink samples obtained from Documents A and C, or both. It is just remarkable that the dye components extracted in the weak solvent (n-butanol) exhibited illogical behaviour, which is inexplicable.

25.2 I accept VNA's contention that half of the results EJS obtained from his examination conducted upon the heated and unheated samples of each of Documents A and C behaved illogically and unpredictably.1 There are three major criticism listed hereinbelow.

CRITICISM 1

25.3 If the tests were performed correctly, logic dictates that the values of measurements would increase with time, as the concentration of the substance being extracted in the solvent increases with time. It is analogous to one putting a teabag in a glass of hot water. It is just common sense and logic that the longer the teabag was left in the hot water, the darker the water would become as more tea was zipped into the hot water. Visual examinations on the TLC plates, Plates V and VI, would show that the intensity of the dye components increased logically from 30 seconds, 90 seconds to 180 seconds. However, contrary to what is shown on the TLC plates, the data EJS obtained from the video densitometers were illogical.

25.4 The measurements of the following dyes at 90 seconds/ 180 seconds are lower than those at 30 seconds, bearing in mind that, for each ink sample (heated, unheated) being extracted, the aliquots were taken successively from the same vial:

(a) Vial 2 - unheated 1

Dye 90 Seconds 30 Seconds

2 783 917

(b) Vial 2 - unheated 2

Dye 90 Seconds 30 Seconds

1 1156 1324

2 757 1043

3 452 569

(c) Vial 2 - heated 1

Dye 90 Seconds 30 Seconds

2 689 976

3 345 375

 © 2020 Thomson Reuters. 

(d) Vial 6 - heated 2

Dye 90 Seconds 30 Seconds

1 667 740

2 935 1158

3 1430 1437

(e) Vial 6 - unheated 2

Dye 180 Seconds 30 Seconds

1 652 701

25.5 VNA explained such illogical behaviour of the dye components extracted in the weak solvent with the aid of two sketch drawings.2 They borrowed from the example of fertilizer offered by EJS. VNA explained that it was only logical that the tree grows bigger after 90 days than 30 days. It would be illogical if, however, by using fertilizer, the tree shrunk from 30 days to 90 days, but after 180 days, it became taller than it was even after 30 days.

25.6 According to EJS's evidence, he did not know what to expect of his results:

(a) On one day, he said such illogical behaviour of his results was not what he would expect to typically see;3 yet

(b) on another, he said, "It is well recognised that from one sample to another, it can go down slightly".4

25.7 The results of dye 1 in unheated 2, Vial 6 (Document C) were as follows:

Dye 30 seconds 90 seconds 180 seconds

1 701 90 652

(108%) (90%) (100%)

In terms of percentages, we would have 108% at 30 seconds, 90% at 90 seconds and 100% at 180 seconds.5 A graphical representation of such results can be found in Slide 12, Bundle G8A (the dotted red line). These results are clearly illogical. There should be most concentration at 180 seconds, followed by that at 90 seconds, and least at 30 seconds, and not vice versa and certainly not the most at 30 seconds, followed by 180 seconds and the least at 90 seconds. These results are inexplicable.

CRITICISM 2

25.8 EJS said the Dye-ratio method could be measuring the extractability, or decomposition of dyes, or both. He said he did not know what parameters the R-ratio method, the Percent Extraction method and the Dye-ratio method were measuring.6 As considered hereinbefore, we can deduce from the experimental results published by Brunelle and Lee that the Dye-ratio method could only be measuring the decomposition of dye components, and not their respective extractability.

25.9 If the Dye-ratio method measures the extractability of the dye components, which was found otherwise hereinbefore, the rate of extraction is slower with old ink than with new ink. Then one would expect to see that the values of the measurements obtained from the heated sample (old) are less or lower than those from the unheated sample (new). Again, this is not what we see from EJS's data.

Vial 6 - 180 Seconds

Dye Heated 1 Unheated 1 Heated 2 Unheated 2

1 878 624 941 652

2 1221 1170 1361 1070

3 1653 1627 1934 1474

In the 180 seconds extraction for Vial 6 (which produced two allegedly "positive" results), all the value of the measurements of dyes 1, 2 and 3 in the heated samples are higher than those in the unheated samples.

25.10 Further at the same time frame, one dye shows higher value for the heated samples than for the unheated ones, whilst another dye has a lower value for the heated samples than the unheated samples, as follows:

Vial 2 - 180 Seconds

 © 2020 Thomson Reuters. 

Dye Heated 2 Unheated 2

1 2014 1790

2 1319 1117

3 690 725

25.11 In this case dyes 1 and 2 of heated 2 have higher values than those with unheated 2, whereas dye 3 shows the opposite circumstance, that is, the value of dye 3 of heated 2 is lower than that of unheated 2.

25.12 Still further what we see in these two samples is not, however, what we can expect to see in the other two samples taken from the same Vial 2, i.e. heated/unheated 1. All values at the same time frame of heated 1 are lower than those of unheated 1, which appears to be logical:

Vial 2 - 180 seconds

Dye Heated 1 Unheated 1

1 1722 2026

2 1005 1190

3 516 623

25.13 What also causes concern is the inconsistent behaviour of the dyes being extracted from the same sample, as well as the inconsistent behaviour of the dyes being extracted from the two samples of the same ink. As the examination was conducted in duplicates, in the absence of a scientifically sound explanation to these illogical data, there is no means of knowing which of these sets of data is correct, if at all. If one of them is wrong, then the Court would be left with a conclusion based on one sample only and of course, in that case, no statistical analysis could be conducted.

CRITICISM 3

25.14 There is the additional situation that there is very large difference in measurements obtained between duplicates samples taken from the same handwritten entry on Documents A and C, as follows:

(a) Vial 2 - 90 seconds, dye 1

The difference between heated 1 and heated 2 is 30%;7 and,

(b) Vial 6 - 30 seconds, dye 2

The difference between heated 1 and heated 2 is 31%.8

Sketches of graphical representations on such percentages can be found at pp.2270-1, and 2270-2, G8.

25.15 It is not clear from the evidence of EJS whether he claimed that such a large difference was acceptable or not.9 He classified this huge difference as a "variation". Whilst VNA agreed that variation exists in any analytical procedure, he stressed that it should be within a few percent, say 1% to 3%, certainly not 20% or 30%.10 Even in the case of Calloway v. Richter,11 EJS gave evidence that there should be about 1% to 2% error between duplicated samples, not a difference of up to 31% as we have in this case. Indeed, EJS did not use the Dye-ratio method in that case.12

EJS'S DEFENCES

25.16 When EJS was challenged with the above criticisms, he claimed that one cannot compare raw data against each other, as they are mass-dependant.13 The ratio of these raw data should be calculated and could then be compared against each other, as the ratios are mass independant.14 Further, he claimed that the behaviour of these ratios were predictable.

25.17 However, it is difficult to appreciate why the raw data could not be considered and compared, but only their ratios, given that the ratios were calculated from the raw data. EJS was unable to offer explanation to what appears to be an unreasonable and illogical claim.15

25.18 In any event, the ratios behaved unpredictably too and did not, therefore, assist EJS. VNA gave two examples on the unpredictably behaved ratios in VNA-5 and VNA-616 as follows:

(a) The ratios of dye 2/dye 3 in Vial 2 (VNA-5):

Vial 2 - Dye 2/Dye 3

30 Seconds 90 Seconds 180 Seconds

Heated 1 2.6 2.0 1.95

Heated 2 2.55 1.69 1.91

It is apparent that the two heated samples behaved in the opposite manner to each other, contrary to EJS's claim that the ratios are predictable. In heated 1, the ratios decreased with time whereas the ratio in heated 2 decreased from 30 seconds to 90 seconds only but it increased again at 180 seconds.

Vial 2 - Dye 2/Dye 3

30 Seconds 90 Seconds 180 Seconds

Unheated 1 1.83 1.49 1.91

Unheated 2 1.83 1.67 1.54

In relation to the two unheated samples, they behaved just as unpredictable as the heated samples.

25.19 The ratios of dye 1 to dye 3 in Vial 6, as illustrated in VNA-6, behaved as unpredictably as those of dye 2/dye 3 in Vial 2 (VNA-5) as pointed out hereinbefore.

25.20 Therefore, even if we were to restrict ourselves and consider only the ratios of the dyes as EJS suggested, they are also illogical and unpredictable. Again, if there were errors in only one of the two samples, in the absence of any scientifically sound explanation to these illogical data, there is no means of knowing which of the two samples is correct, if at all. Again, no statistical analysis could be conducted with one sample only.

25.21 When VNA was cross-examined,17 various graphs18 (presumably prepared by EJS) using different scale in the x-axis and y-axis were shown to him, in an attempt to show that the ratios given in EJS 2 behaved uniformly to each other or at least, not as drastically as they appear in VNA-5 and VNA-6.19 The difference between these graphs and VNA's illustrations are no more than difference in graphical presentations. However the graphs were misleading. As VNA explained,20 the graphs were plotted with one curve representing the average of the two ratios of the two sample runs. It is therefore impossible to tell by these graphs how each of the samples behaved. The two readings may be miles apart but because an average was taken, they would only be represented by one point on the graph. Indeed, it was never suggested by EJS, nor in any publication, that the average of duplicate runs should (or could) be considered.

25.22 The range of possible explanations offered by EJS were:

(a) It was as a consequence of "some interaction once the dye is extracting with the solvent to reduce the optical density of the dye".21

(b) "It could have some leaching back into the paper, or something like that ".22

(c) "...depending on the size of the difference, could just be a variation in the measurements".23

(d) This "variation" within samples had been "factored" into the calculations by applying 1 STD.24

25.23 In the end, none of the possible reasons offered by EJS were acceptable as pointed out by VNA. EJS should have at least investigated into the reasons of his examinations which gave him the illogical data or as VNA suggested, simply re-do the examination. As EJS did not conduct any scientific research with the view to evaluating the capabilities and limitations of the Dye-ratio method, he was therefore unable to offer any scientifically sound explanation as to why the method he used in this case produced such illogical results. For example, if he suggested boldly that there could have been some leaching back into the paper or something like that, there is no reason why, after the decease in the 90 seconds reading because the colour somehow leach back into the paper, the concentration increased again after 180 seconds. Even if that is so, how can any measurement be accurate if there is such a "leaching back" factor.

25.24 By reason of the aforesaid matters, I accept VNA's contention that the illogical data primarily attributed to EJS arbitrarily separating the badly resolved chromatographic peaks into dyes 1, 2 and 3. This is supported by the fact that before they were separated by thin-layer chromatography, the dyes behaved logically according to the visual examination of the TLC plates and the data obtained from the Percent Extraction and R-ratio methods.25

CONCLUSION

25.25 By reason of the aforesaid matters, the Court cannot and should not place any reliance whatsoever on the illogical and unreliable results obtained by EJS using the Dye-ratio method in this case. The conclusion drawn by him from these results cannot be accepted.

1 Slides 1 to 13, G8A, pp.2270-1 and 2270-2, G8, and in VNA-5 and VNA-6 of VNA 2

2 pp.2207-2208, G8

3 T40:88:17

4 T44:76:1-2

5 Slide 13, Bundle G8A

6 T38:20:24-22:1; T22:22-23:5

7 Slide 6, G8A

8 Slide 13, G8A

9 T44:77:2-11

10 T51:32:16-25

11 p.1073 (lines 4-8) and p.1089 (lines 3-14), F5

12 T44:57:1-12

13 T44:79:24-25

14 T44:77:8-19

15 T44:100:23-101:23

16 pp.699 and 701, E7-E10 (VNA 2) and T51:27:18-29:4

17 T56:12:10-18:5

18 pp.1929-1934, F7

19 pp.699 and 701, E7-E10 (VNA 2)

20 T56:17:9-17

21 T41:70:6-9; T48:71:21-23

22 T41:70:14-15

23 T41:70:15-17

24 T40:85:12-16

25 See illustrations at pp.2270-1 and 2, G8

Chapter 26 - Mass Independence

26.1 Both VNA and EJS agreed that to obtain Dye-ratios that would be independant of the amount of ink on the samples of microplugs taken from Documents A and C, (i.e. the mass of the ink) the data (optical signals) received by the video densitometer must be directly proportional to the concentration (contents) of the ink dyes in the corresponding chromatographic zones on the TLC plate. Such relationship is known in analytical chemistry as Beer's law.

26.2 In others, if two measurements are directly proportional to the amount of ink sampled, then their ratio is independant on the amount of ink sampled. Such ratios are therefore mass independant. There is no dispute that in order for the data obtained from the Dye-ratio method to be reliable, it must be mass independant.

26.3 If for each of the ink dyes, a graph is plotted with optical signal against content, the graph should be a straight line going through the origin (0,0).1

26.4 VNA and EJS however differed as to whether or not the data obtained from the Dye-ratio method and relied upon by EJS in arriving at his conclusion in this case, were mass independant. VNA disagreed with EJS's claim that they were.

26.5 VNA explained that Beer's law does not apply to thin-layer chromatography.2 The only theory that applies to TLC is the Kubelka-Munk theory. According to this Kubelka-Munk theory, the optical signal received by the video densitometer is inherently non-linear to the content of a substance applied on a TLC plate.3 This is due to the presence of the absorbent particles (silica gel) on the TLC plates which are strongly

 © 2020 Thomson Reuters. 

light scattering during the scanning process.4 Consequently, the signal received by the video densitometer would not be the total amount of light that passes through the TLC plate but only part of it, whilst the rest would be lost (scattered), with the loss being both unpredictable and unquantifiable. By simply dividing the data obtained from the video densitometer by each other and comparing their ratios, EJS claimed that the results derived therefrom became mass independant. According to VNA, that did not and could not eliminate the underlying uncertainty and did not make the results mass independant.

26.6 EJS disagreed. He relied on Brunelle and Lee's paper. By relying on Figure 4 therein5 where an artificial dotted line was projected through the origin (0,0), he claimed that Beer's law only operates within a certain range6 (which range he labelled as between 5 to 25 microplugs),7 and that the graph would not be linear at the lower and higher range.

26.7 According to VNA, it is apparent that the relationship between "signal-content" on the said Figure 4 does not obey Beer's law as the graph does not go through the origin (0,0).8 VNA considered that whilst it is possible to approximate the curve with a straight line within a short interval of concentration, e.g. as Brunelle and Lee did in the said Figure 4, it will never go through the origin. Instead, it will intercept the y-axis at some point higher than the origin which means that the relationship between the optical signal and content will not be a directly proportional one.

26.8 Further, as VNA pointed out,9 the dye ratio data obtained as EJS did in this case would always be mass-dependant, even if EJS were to work within the alleged working range of the video densitometer he used, as the relationship of signal-content would not obey Beer's law.

26.9 VNA was cross-examined in relation to a graph in Figure 3 therein,10 reproduced from Brunelle and Lee's paper. In an attempt to illustrate that the relationship between signal and mass was directly proportional, it was suggested to VNA (presumably on the instructions of EJS who was in Court) that the reading from the lines artificially plotted should be relied upon instead of the actual reading as illustrated by circles, triangles and squares.11 When this apparent mistake was pointed out by VNA, it was then conceded that the relationship was not directly proportional, and that there was in fact a 15% error.12

26.10 VNA's view is in conformity with all the books on analytical chemistry and all the leading authorities, e.g. Professors Poole13 and Sherma. In "Thin-layer Chromatography",14 Professor Sherma clearly stated that15:

"... Because of light scattering from the sorbent particles, a simple, well-defined mathematical relationship between the amount of the analyte and the light signal has not been found. Curves relating [to] absorption signal (peak height or area) and concentration or weight of standards on the layer are usually nonlinear, especially at higher concentrations and do not pass through the origin."

26.11 Further, even Dr Cantu, who developed the methodology that measures ink extractability as a function of age, recently acknowledged that in TLC, the relationship "detector response-concentration" does not obey Beer's law, i.e. this relationship is not directly proportional. In "A Sketch of Analytical Methods for Document Dating - Part II, the Dynamic Approach", Dr Cantu emphasized that16:

"... transforming a TLC density measurement into a parameter that is linear with concentration (Kubelka-Munk theory) is not as simple as transforming a transmission measurement into absorbance in solution spectroscopy (Beer's law)".

26.12 Thus the evidence of VNA should be accepted.

WHAT EJS COULD HAVE DONE

26.13 VNA considered17 that in order to obtain reliable data, it was necessary to calibrate the video densitometer for each analysis by applying "external standards with known concentrations of the dye components and to find out what is the relationship between the concentration of each of the dye components and the detector [or video densitometer] response". His view again was supported by the leading experts, Professors Poole and Sherma.

26.14 On the contrary, EJS admitted that he did not calibrate his video densitometer when he did his tests in this case.18 However the User's Manual of EJS's video densitometer detailed how it may be calibrated using external standards.19

EJS'S CLAIM

 © 2020 Thomson Reuters. 

26.15 EJS claimed that VNA's view that the presence of silica gel would distort the data was wrong.

26.16 First, he claimed that a presentation by himself and Dr Lyter in Orlando in 1999 had showed that "if the concentration was doubled the signal was doubled"20 notwithstanding apparently, the presence of silica gel. However despite this assertion, no data or paper in relation to this research has ever been published, nor was any evidence adduced in support of this claim.

26.17 Secondly, EJS seemed to have attributed this scenario to the capability of the densitometer used by him, which he said was different from the one used by Mr Brunelle.21 He claimed that the capability of the software used by his video densitometer took into account the presence of silica gel on the TLC plate.22

26.18 Such claim is however contrary to what is stated in the User's Manual of the video densitometer used by him. An option of "Include Origin" is provided.23 It states that:

"When Include Origin is activated the standard curve will be drawn such that the coordinate (0,0) is included in the curve. In a sense it represents a peak with zero area and hence zero amount."

26.19 If the data obtained by the video densitometer would result in a straight line passing through the origin (0,0), i.e. direct proportionality, it would be completely unnecessary both to detail how the video densitometer should be calibrated, or to have this option of artificially drawing the calibration curve to (0,0). Further, there was nothing in the User's Manual to support EJS's supposition.24

26.20 In "Accomplishments of SOFIA since incorporation in August 1997"25 it was claimed that:

"Completion of a study which determined that measurements made with the Shimadzu TLC Scanning Densitometer [the one used by Brunelle] and the Analtech Video Densitometer [the one used by EJS] are in fact linear and go through zero. (Again this is contrary to claims made by Valerie Aginsky)"

However, if there is any truth in the capability of EJS's video densitometer as he claimed, the type of video densitometer appears to have made no difference to the results obtained. Again, there is no evidence before the Court of such a study.

26.21 EJS argued in EJS 326 that if there is any difference in mass, it "is so minimal between samples that no significant change will be noticed". If EJS's evidence is accepted to the extent that the difference in mass might be one of the reasons for the illogical behaviour of the readings taken at different time intervals, the difference of up to 31 cannot be said to be "minimal and insignificant".

26.22 Further, EJS argued in EJS 328 that: "these differences, if any exist, are accounted for in the multiple sampling and statistical analysis". This statement demonstrated further that EJS did not realize that there was a possible source of error due to non-adherence to Beer's law in TLC. If he did not recognize that there might be an error which cannot be quantified for his failure to run external calibration, he could not therefore factor this unpredictable and unquantifiable error into his analysis of the data obtained. Further the so-called "Multiple sampling" in this case means two which is the minimum possible in any analytical chemistry testing and certainly if any substance is to be compared. "Statistical analysis" means the application of 1 STD in this case (which will be considered in the next section), and cannot be equated with the term "error analysis"

CONCLUSION

26.23 In light of EJS's failure to take step to calibrate the video densitometer using external standards, to eliminate the mass dependence of his dye ratio data, it renders the data unreliable and thus no responsible conclusion can be drawn, and such conclusion cannot be accepted by the Court.

1 Illustrations of such a relationship can be found on p.735, E7-E10 and Slide 33, G8A

2 Slides 31-34, G8A

3 pp.2221-2233, G8

4 See illustration on p.2271, G8

5 Slide 36, G8A

6 T45:64:22-65:10, 81:7-84:23

7 T43:25:5-7

8 T52:3:23-4:4

9 T53:111:12-112:1

10 Slide 37, G8A

11 T54:90:17-91:11

12 T54:92:17-20

13 pp.2242-2252, G8

14 pp.2253-2270, G8

15 p.2266, G8

16 pp.715-730, F2-3, at p.721

17 T52:16:22-17:13

18 T44:136:14-15

19 Slide 35, G8A, pp.2150-2186, G8 at p.2168, and explained by VNA at T52:11:17-13:22

20 p.893, para.29, EJS 3

21 p.893, para.29, EJS 3

22 T45:64:7-15

23 p.2170, G8

24 T45:65:24-66:7

25 p.1445, G5

26 p.892, para.29, EJS 3, E13

27 Slides 6 and 13, G8A

28 p.892, para.29, EJS 3, E13

Chapter 27 - One Standard Deviation

27.1 In R. v. Lucas [1992] 2 VR 109 at 114 (where in evidence concerning DNA, 3 STDs (or 99.7%) were proffered as the standard) the Court refused to accept the testimony of scientists because they were not expert statisticians.

27.2 EJS acknowledged that he was deficient in statistical theory.1 Thus, what degree of confidence did EJS have in his results?

27.3 EJS claimed that the use of one standard deviation approach gave him 68% level of confidence in his result or as he put it, "at least 68%".2 He even boldly claimed during cross-examination that everyone in the field adheres to 1 STD.3 However, no evidence was adduced to support this claim by any forensic expert including members of SOFIA. Indeed in "SOFIA Ink-dating Project" 2 STDs or 95% certainty was recommended as the basis on which to calculate the data obtained.4 This is in line with the basic tenets of analytical chemistry.

27.4 For two replicate measurements, as VNA pointed out, the confidence probability that a true mean is located within the range (confidence level) of "arithmetical mean 11 STD" is equal to approximately 60%.5 This is what EJS did in this case. VNA considered that6:

"... it is just a little bit higher than the probability of tossing a coin, equal to 50%. But it is far away from 95% which is an agreed upon standard in analytical chemistry. This 95% is not even a satisfied value, because for responsible analysis, it is advised - there is a recommendation to use a higher degree or level of confidence, like 99% or even 99.7%. That in simple terms is equal to 3 standard deviations."

27.5 Further, EJS's proposed use of the "one standard deviation" approach to compare two sets of data appears to have been completely abandoned in the cross-examination of VNA in favour of the Student's t-test, despite EJS "strongly" disagreeing with it in EJS 37 and when giving evidence in Court8 for an analysis having only two samples. The Student's t-test has been accepted in analytical chemistry for comparing two means calculated for samples of small size. This appears to be supported by the plaintiff's counsel.9

27.6 VNA was not cross-examined on the 1 STD. Apparently it appears that the plaintiff is not now relying on this theory. There is no justification for its use in analytical chemistry.

27.7 In EJS's reports, the weakness of the confidence level was concealed within such phrase as "to a reasonable degree of scientific certainty". The question is how confident EJS himself is in the results obtained and what weight should be attached to the opinion or conclusion of him.

27.8 The trouble is the criterion of 1 STD and its meaning, did not become apparent until VNA 2 dealt with EJS 2, and therefore it was only in EJS 3 that EJS attempted to justify the criterion of 1 STD.10 It might not be apparent to a reader to detect that his opinion was buried beneath the term "1 STD" or "to a reasonable degree of scientific certainty" but then the confidence level of the opinion or conclusion is only about 60% and not "beyond a reasonable doubt".11 EJS contented that 1 STD is still an acceptable statistical criterion upon which one can reach a conclusion. But such acceptance was only limited to some members of SOFIA.12 EJS claimed in EJS 313 that the 1 STD was arrived at by combining the experience of four examiners namely, Messrs Brunelle, Lyter, Kuranz and himself. However, in Ambassador Faith Whittlesey v. John Wilson Espy, Mr Brunelle testified that14:

"As far as standard deviations are concerned, I don't use standard deviations because quite frankly I don't know what they mean."

27.9 Further from the evidence, it appears that Mr Kuranz (one of the alleged supporters of 1 STD and the Vice President of SOFIA) did not adopt this standard in his own tests. He was criticized by EJS in a deposition dated 30 March 2001 in the case of Lizzack v. Markowitz on the basis that there was no statistical analysis in his report.15

27.10 The unilateral departure from the accepted norms of analytical chemistry has neither been published nor propagated. I accept the defence submission that this is a tenuous statistical basis.

2 STDS (95%) OR 3 STDS (99.7%) SHOULD BE USED

27.11 On the other hand, VNA considered that the 1 STD approach provided an irrelevant low level of confidence, had never been published, and was contrary to all books on analytical chemistry. He considered that the minimum level of confidence acceptable in analytical chemistry, upon which analytical data could be evaluated and a responsible conclusion could be drawn should be 95%. He suggested that an even higher level of confidence - 99.7% (or 3 STDs) - should be used for responsible analyses. His view is supported by all books on analytical chemistry.16 Ink-dating is simply one application of analytical chemistry. There is nothing that distinguishes it and takes it out of the scientific mainstream.

27.12 At a meeting held in August 2000, Dr Cantu, Mr Larry Stewart and others representing the US Government also indicated that 95% confidence level was acceptable for the type of work they did.17 This accords with all the suggestions in the books on analytical chemistry and paper entitled: "A Sketch of Analytical Methods for Document Dating - Part II, the Dynamic Approach " published by Dr Cantu.18

27.13 But whichever standard one chooses (whether between 2 STDs or 3 STDs), 1 STD fails to approach any way near being acceptable. The defence has also made reference to p.3 of an article titled Pesticide Analysis: Reliable Analytical Results in a Pesticide Residue Laboratory, where the following appears:

"The probabilities 95 per cent, 99 per cent and 99.9 per cent have been chosen because an American Chemical Society Committee (Rogers et al (1982)) dealing with scientific aspects of regulatory measurements noted the similarity of these scientific terms and the following lawyers' phrases:

preponderance of evidence

clear and convincing

beyond reasonable doubt"

27.14 EJS boldly stated that 1 STD has been accepted by courts all over the world.19 This overstatement "all over the world" was eventually confined to the United States, Mexico and maybe Malaysia.20 However later during his cross-examination, it transpired that he used "accepted" as being synonymous with "testified in".21 But EJS was unable to name a single case in which 1 STD was contested and eventually accepted.22

27.15 According to the authors of: "Principles and Practice of Criminalistics - The Profession of Forensic Science"23 the phrase "a reasonable scientific certainty" is a nonsequitor. The authors pointed out that the notion of scientific certainty does not exist and opined that scientific experts should refrain from resorting to that phraseology in expressing their opinions. The phrase does no more than concealing from the reader the inherent uncertainties in the results propounded.

27.16 If the Court accepted the results of the experiment based on 1 STD, this would amount to placing a higher degree of confidence in the results than any analytical chemist would do.

THE STUDENT'S T-TEST

27.17 A proper comparison of the data from two samples of small size (two in this case), assuming of course that it is reliable in the first place, must be the province of the Student's t-test as VNA said. He considered that the "one standard deviation" approach adopted by EJS was not appropriate to this case. This view was supported by textbooks on statistics and analytical chemistry as well as dictionaries on statistics.24 Although there are variations in the equation of Student's t-test, VNA adopted the more conservative one which slightly reduces the confidence probability by 7% to 10% that the means of two small samples would be considered statistically significantly different.25 At the end of the day, it matters not which the Student's t-test equation is adopted, because except for dye 2/dye 3 at 30 seconds in Vial 2,26 none of the results come anywhere near the 95% threshold. Thus even when some of the figures approach 80% or 90% confidence level, it is still ineffective since they fall so far short of a standard that is acceptable in the field of analytical chemistry.

27.18 One must also bear in mind that a 60% level confidence or an average of 80% or so confidence probability relates only to the ratio obtained from the five calculations which allegedly showed some difference between the heated and unheated samples. What the conclusion "to a reasonable degree of scientific certainty" completely ignores is the results obtained from all the other tests i.e. a total of 23 negative results and only five "positive" ones. Applying Student's t-test, none of these allegedly positive results obtained by EJS from his examination was able to reach 95% level of confidence, except one of them. That is, only one out of 18 results obtained from the Dye-ratio method, or one out of 28 results, if results of the other tests are also taken into account. Although EJS claimed to have taken the 23 negative results into account, this is patently not true. The combined concepts of "reasonable degree" and "certainty" must include a consideration of the negative as well as the positive results.

27.19 EJS admitted in evidence that the more samples that were run, the more accurate the results would be.27 However, only two samples were run in this case using the Dye-ratio method. EJS's explanation as to why he did not conduct the examinations on more samples say, run the Dye-ratio method in triplicates was inconsistent with the reasons offered by him.

27.20 If there is any error in one of the two samples, this Court is forced to consider a conclusion based on one sample only. It is impossible for the Court to know whether such result is reliable or not - although the plaintiff/EJS appears to claim (at one time) that it is possible to conduct statistical analysis with one sample.

CONCLUSION

27.21 The data obtained by EJS and the conclusion and opinion drawn by him thereon, is based on too weak a statistical foundation. The Court cannot accept them as being reliable.

1 T45:119:18-25; 132:17-22

2 This percentage of level of confidence in statistics should not be confused with the legal standard of balance of probabilities which sometimes was expressed (quite wrongly) in terms of percentage as well.

3 T40:58:24-59:1

4 p.2104, G8

5 Slides 38-49, G8A

6 T51:15:11-20

7 p.890, paras.24-25, E13-E17 (EJS 3)

8 T45:107:15-23

 © 2020 Thomson Reuters. 

9 T99:65:13-19; 68:6-7; 70:8-14

10 pp.888-891, paras.20-26, E13-E17 (EJS 3)

11 p.889, para.22, E13-E17 (EJS 3)

12 As discussed in para.2 above, SOFIA recommended the use of 2 STDs

13 p.888, para.20, E13-E17 (EJS 3)

14 pp.344-440 at p.372, G2

15 pp.1073, 1204-1205, G4

16 e.g. pp.2272-2289, G8

17 pp.2313-2320, G8, and PVT's evidence on this at T48:99:17-100:25

18 p.717, F2-3

19 p.433, E4-E5 (EJS 2)

20 T41:109:17-111:2

21 T41:111:7-17

22 T41:114:19 - 115:3

23 Extract at p.2292, G8

24 e.g. pp.722-726, E7-E10 (VNA 2) and pp.2113-2149, G8

25 T56:75:10-19

26 pp.1883-1894, F7

27 T37:87:7-17

Chapter 28 - Procedure

28.1 It is important that the laboratory procedures utilized by EJS should conform to publish criteria and norms deposed to in evidence in order to be reliable. Procedural matters concern with:

(a) The published industry criteria for laboratory techniques (i.e. the VAM procedures).1

(b) The published protocols such as they are, for conducting the accelerated aging and dye-ratio techniques; and

(c) EJS's actual methodology as seen on the video.

28.2 There are three points which should be noted at the outset, namely:

(a) EJS volunteered that his laboratory followed the VAM procedures. However, later in evidence, he said he had never consulted the document which he had borrowed from Michigan State University2 and he did not care if his laboratory complied with the principles.3

(b) During cross-examination, EJS conceded that he did not follow any set procedures for his experiment, but picked out "bits and pieces";4 and

(c) Many of the procedures allegedly followed as set out in EJS 15 are quite inaccurate.6

VAM PROCEDURES

28.3 Notwithstanding EJS volunteered that his laboratory utilised the VAM procedures, it emerged from his evidence that his laboratory did not have a copy of these procedures7 and he only had the vaguest familiarity with them. He did not follow what is set out under the following headings:

7.5 Confirmation: "If appropriate a confirmatory test should be employed to substantiate the conclusions from the primary test or tests".8

EJS accepted that he did not do any confirmatory tests. He gave the following reasons for this failure:

(a) In examination-in-chief, he said that there was not a confirmatory test available.9 However, under cross-examination, in answer to the question as to why R-ratio method was not a confirmatory test, EJS said they (meaning the R-ratio method, the Percent Extraction method and the Dye-ratio method) were not completely independant of one another ... "you could consider it a confirmatory test if all three showed a difference".10

(b) He did not test Document B contrary to the Court order of 12 April 2000. He could have tested Document B. No proper explanation was given. At one time the reason given was "based on my experience".11 In examination-in-chief, EJS said the reason that he did not test Document B was "it was the same ink with the same chemical date-tag as document A" and "I felt that it was likely that they were written at or about the same time".12 But under cross-examination, he denied that the reason why he did not test Document B was because A and B were of the same ink. He said he did not do it because they were written by two different people. If, he said, they happened to be of different ages, and if one showed the ink to be dry and the other one not, there is no confirmatory test.13

What EJS might fear was that there is the possibility that the ink on Document B might be shown to be dry. This is indicative of his lack of impartiality in that he seems to have been only interested in obtaining results that confirmed/supported his conclusion. Clearly he lacked confidence in his own results, otherwise this omission is inexplicable.14

(c) Indeed, he seemed to indicate that the Dye-ratio method was itself only a confirmatory test of the other two methods.15

(d) He could have redone the test the following day or obtained a sample of ink from his library for comparison purposes. He simply did not do so.

8.1 Environment: "An anti-contamination protocol should be established and adhered to and consideration should be given to the need for special clothing and/or the reservation of equipment for particular purposes".16

Whilst there may not be a need for EJS to wear special clothing, there was plainly no anti-contamination protocol established. Given the unhygienic condition of his hands as seen on the video and PVT's observations,17 an anti-contamination protocol appears to be essential, particularly so when EJS admitted that he used the underside of his finger to push the plugs from the edge of the vial into the vial.18 What EJS meant by "anti-contamination protocol" was simply ensuring that one plug did not get put into another vial.19

8.2 Equipment: "All equipment employed in analysis should be regularly serviced and maintained. A log should be kept for each instrument showing details of any permanent adjustments made; this should include who made the adjustments, when and for what reason".20

There was simply no log or any evidence that the equipment was properly maintained, adjusted, or calibrated.21 In the absence of the relevant logs as recommended, no one could trace what adjustments, if any, had been made and their reasons thereof, which was the very purpose of keeping logs.

8.3 Reagents: "The purity of all reagents employed in a method should be known, at least approximately, and all materials used should be tested to ensure they do not contain substances which would interfere in the analytical method".22

There was no evidence that this was ever done. His justification was that it was not necessary for this type of test.23 He claimed that the purity of the reagents was tested by the supplier before they were sent to his laboratory. The recommendation did not require that they have to be tested in the laboratory that uses them.24 EJS was either ignorant of the requirements or was simply trying to stretch the meaning of the words when he was criticized for not having done any reagent blank tests. The unsatisfactory reasons offered by him are illustrated in the following cross-examination:25

"Q: 'A blank test should be performed on all new batches of reagents (including solvents and carrier gases) to guard against the possibility of a false positive result being produced by an impurity'. Is that done in your laboratory?

A: It is very simple. It is a relative comparison, so yes.

Q: Is it done in your laboratory?

A: A comparison to ensure that it does not happen, yes.

Q: I just want to know if this is done: a blank test is performed on all new batches of reagents? Is that done or not?

A: I do not know if I would term it a blank test. It is done to guard against the possibility of a false positive, being the result of an impurity. I do not know if I would classify what we do as a blank test or not. But the principle is the same and what it is trying to determine is the same. Someone may call it a blank test, I do not know.

 © 2020 Thomson Reuters. 

Q: 'Reagent blanks should always be included with each batch of samples analyses; this will reveal any contamination or degradation of the reagent over time.' Do you do that?

A: No, it is not necessary in this type of test."

8.8 Independant Assessment: "There should be independent assessment of [the technical] performance [of the laboratory]".26

(a) EJS said at one stage that his laboratory has had an independant assessment done and went on to say that there were known dated standards run in many cases: "That is an independent assessment to see if you see differences between known standards and how you see them".27 However, when pressed further as to who assessed his laboratory independently, his response was "the tests were the independent assessment",28 this answer was completely out of context and misleading.

(b) It later emerged that what he meant by independant assessment was that in some casework, "other experts have tested the same documents and seen the same results - that would be an independent assessment or verification, or something like that".29

(c) His understanding of an independant assessment of the technical performance of the laboratory is misconceived. The ways in which laboratory performance are independently assessed according to the recommendations of the VAM principles, are either to participate in proficiency testing schemes, which permit inter-laboratory comparisons of their analytical performance, or to acquire accreditation to a third-party quality system such as ISO Guide 25.30 In cross-examination, EJS conceded that his laboratory has not been accredited to any such organization, and changed his evidence to say that "we have done the best we can", and "we are beginning an independent assessment by other laboratories, but it has not come yet".31 The suggestion of getting one's colleagues in the same commercial laboratory to check one's methods is unsatisfactory and is not in accordance with the VAM recommendation, because of its lack of independence. What is required is true independence of method checking to see if the results are reproducible. This is impossible, in any event, without a published protocol.

9. Interpretation of results: "The interpretation of observations or experimental data should provide a classification consistent with the available information".32

"Any variation from the established criteria should be recorded and the reasons for the variation noted. It is important that the thought processes that lead to reported conclusions are documented".33

Quite apart from the absence of any attempt to explain the negative results in this case, where significant results depend upon the subject decision of the chromatographer where to place the line between the peaks on the densitometer, i.e. introducing a purely subjective element, it is simply impossible to note the "reasons" for the thought processes.

PROTOCOL

28.4 It is apparent that there are no set procedures or protocol and even if there were, EJS's concession that he took "pieces from some and pieces from others"34 would have eliminated any suggestion that any kind of rigorous experimentation protocol was followed. This is contrary to EJS's claim in EJS 335 that he followed the protocols as written.36

28.5 The only "protocol" is to be found in the paper by Mr Brunelle published in 1995.37 However the recommendations stated therein have been departed from on a "hit or miss" basis as appears in various other publications and deposed to in various hearings. Certain specifications that could have been followed, were not followed by EJS in his procedures, as follows:

(a) Number of sample runs: two-sample runs were conducted as against Brunelle and Cantu (1987) and Lyter (1994) who took triplicate samples. EJS agreed that more samples run would give more accurate results. He put the blame on the size of the TLC plate38 for his failure to run triplicate samples. EJS could in fact have done triplicate or even quadruplicate measurements.39

(b) Number of plugs: six plugs were used in the relative aging tests (original report stated incorrectly to be eight plugs) as against:

(i) 20 microplugs used by Brunelle and Lee (1989); or

 © 2020 Thomson Reuters. 

(ii) 10 to 15 plugs by Brunelle (1995); or

(iii) 10 plugs by Lyter (1994); or

(iv) 10-15 plugs for R-ratio by Brunelle (2000).

EJS's justification in examination-in-chief was that six microplugs worked better40 notwithstanding that there has never been any publication in support of his claim. However, later in cross-examination, he first said that there was more solvent used by Brunelle and the densitometer was different.41 Later, he said that using fewer plugs did not necessarily work better for the procedure, which is also inconsistent with what he had said a few days earlier.42 In any event, EJS's explanations were unsatisfactory, in particular, when there were plenty of microplugs available.

(c) Time intervals: 30, 90 and 180 seconds intervals as against:

(i) Brunelle and Cantu (1987) - intervals of 1, 5 and 15 minutes were given; or

(ii) Brunelle (1995) - 0.5, 1.5, 5 and 15 minutes; or

(iii) even himself (1996) - 30 seconds, 90 seconds, 3 minutes and 10 minutes; and later

(iv) Brunelle (2000) - 0.5, 1.5, 3 and 10 minutes.

In EJS 1 it was originally stated that five spots were scanned,43 although in evidence he corrected it to say that there were only four spots. Had four measurements been taken, there would have been five spots, taking into account the spot taken from the strong solvent (pyridine) extraction. It seems therefore that the normal practice is to have four measurements given the fact that the written report appeared to be cast from a template.

EJS claimed that it made no significant difference that measurement of the 4th time interval had not been taken because 100% of the ink would have been extracted at 3 minutes44 and "just like if you use duplicate or triplicate sample runs ... it just affects the degree of certainty at the end ...".45 It is therefore reasonable to assume that an additional measurement gives more information for the purposes of interpreting the data in the final analysis. The question is why EJS chose not to do so contrary to what Mr Brunelle had recommended.

The sloppy time-keeping is also another factor which affected the result obtained by EJS which will be dealt with later hereinbelow.

(d) Application of heat: about 100:C for 30 minutes as against:

(i) Cantu and Prough (1987) - 100:C for 165 minutes; or

(ii) Cantu (1988) three days of aging at 100:C is equivalent to 68 years of natural aging at 20:C; or

(iii) Brunelle (1992) 100:C for 15 minutes; or

(iv) Kuranz (1993) 20 minutes at 100:C; or

(v) Lyter (1994) -100:C for 10 minutes; or

(vi) Brunelle (1995) 100:C for 20 minutes; or VNA (1996) 80: or 60: - 80:C; or

(vii) Brunelle and EJS (1998) - 100:C for 30 minutes

(A) There has not been any evidence or scientific basis given for the suggestion that heating the ink for 30 minutes at 100:C will bring it to the end of its natural aging curve, that is equivalent to three to four years.46 Even EJS himself had no idea what effect different lengths of time of exposure to heat would have on the results.47 EJS said: "I have never found one or seen one dye that degrades at 100 degrees Celsius. ...".48 This statement is diametrically opposite to one of the postulated underlying theories of the Dye-ratio method which is to measure the rate of decomposition of the dyes.

(B) Further, according to EJS, the unheated sample was heated once, the heated samples twice, and then when the spots were on the TLC plate, they were subjected to heat twice, the last time at 100:C for 30 minutes or more until the solvent had evaporated.49 Subjecting the TLC plate with ink spots on it to heat for 30 minutes or more at 100:C was clearly contrary to what other practitioners did and the American Society for Testing and Materials ("ASTM ") standards for ink identification where it was recommended that the TLC plate should be air-dried.50 Whilst claiming that it had no effect on the tests, EJS said he did not know whether it could have

 © 2020 Thomson Reuters. 

some theoretical effect.51 Whether there was any effect on the result therefore still remains an open question. It is notable that VNA said that if the samples were overheated and this would have had an effect on the decomposition of the methyl violet which would have distorted the results obtained in any event.52 It is his view that any consideration of temperature and its duration of use for accelerated aging is irrelevant as far as the Dye-ratio method is concerned.53

(e) Test on paper blanks: Brunelle in Ink Analysis (2000) said: "Be sure to analyse a sample of the paper with no ink as a control".54

In ASTM Standard Guide - E1422 it was stated: "Follow the same procedure for the corresponding paper (or other substrate) control (blank), to determine if there is any contribution from the substrate, e.g. tinting materials or optical brighteners."55

Contrary to the ASTM recommendations, EJS did not run a paper blank test. His justification for failing to do so was that he was not permitted to cut a piece of paper from the document according to the Court Order and in any event it was not necessary.56 He said if he had been given the option, he would have done a paper blank test at least for the ink identification.57 However, the advice on how to take samples was given by EJS58 before the Order was made. In fact, only microplugs taken from blank areas were needed, not a piece of paper cut from the documents.59 Indeed, PVT took a serious view of the need to run a paper blank in order to detect whether the paper had any dye components that might have affected the results obtained.60 Dr Lyter too, was obviously concerned about the effect of paper as is apparent from his report to Frank Branella dated 8 October 1997.61

EJS'S LABORATORY TECHNIQUE AS SHOWN ON THE VIDEO

(1) Hygiene and contamination

28.6 EJS did not use gloves. In view of the unsavoury state of his fingers, this should have been a must. The possibility of contamination from, for example, pushing the plugs into the vial with his fingers,62 wiping the tweezers, and the yellow writing pad,63 and blowing dry the spots on the TLC plate64 was obvious. Given the miniscule size of the plugs (equivalent to the size of the tip of a needle) and the small quantity of solvent (equivalent to a third of a drop of water), any possibility of contamination cannot be an unimportant factor in the result. PVT also conceded that the syringes could be contaminated.65

(2) Time-keeping

28.7 (a) There is no dispute that extreme care must be taken with the extraction times. Dr Cantu and Mr Brunelle in their paper entitled: "A Critical Evaluation of Current Ink-dating Techniques" (in respect of the R-ratio and Percent Extraction techniques)66 warned that failure to remove the aliquots at precisely the correct time intervals could produce large error in the final age estimate.67

(b) The timings were meticulously noted by PVT for both vials.68 PVT recorded the timings by reference to the contemporaneous notes that he made during the tests and he confirmed this by viewing the videotapes afterwards one frame at a time, frame by frame and noting down the times shown.69 No real challenge was mounted to this evidence in cross-examination.

(c) The time intervals (30, 90 and 180 seconds) consisted of two timeframes ranging from the beginning to the end of drawing of the aliquots, i.e. from the time when the pipette was inserted into the vial to remove the aliquots to the time when it was taken out of the vial.70 No matter which timeframe one looks at, there is no consistency in the time the samples were exposed to the solvent as EJS claimed. For example, the "Time from finish of insertion of weak solvent into vial" for the 180 seconds extraction time for Vial 6,71 the time taken to remove the aliquots ranged from:

(i) 190 to 200 seconds for heated 1;

(ii) 190 to 197 seconds for heated 2;

(iii) 198 to 209 seconds for unheated 1; and

(iv) 193 to 199 seconds for unheated 2.

One can see that there is a difference of eight to nine seconds between the extraction time for heated 1 and unheated 1. This is important since both "positive" results in Vial 6 were drawn from this 180 second extraction time.

(d) Whilst admitting that timing is an important aspect in the procedures, EJS sought to justify his sloppy time-keeping by claiming that as long as the samples are exposed to the same length of time, how long they are exposed to a solvent is not critical.72 He also argued that it was difficult to tell when the solvent was injected and when the aliquots were taken.73

(e) In cross-examination, it was suggested that there was a consistent increase of about three seconds in removing the aliquots at each time interval. The consistency was, using the range of times calculated by PVT, that EJS took six seconds (41-47) to remove the aliquots at the 30 seconds interval, nine seconds (100-109) at the 90 seconds interval and 12 seconds (197-209) at the 180 seconds interval. It was later accepted that the range was in fact 13 seconds in the last interval as the lowest figure of the range of times was 196 instead of 197.74 Nonetheless, this so-called "consistency" is a far cry from the consistency claimed by EJS i.e. that the samples were exposed for the same length of time.

(f) According to VNA, improper time-keeping must inevitably have distorted the data relied upon by EJS75 and logically this must be correct. Indeed, if the Dye-ratio method was measuring the extractability of the dye components as alleged (which is denied by the defence), the length of time to which the samples were exposed to the solvent would have an effect or implication to the results.

INK THICKNESS

28.8 VNA gave evidence concerning the necessity of ensuring that the microplugs were taken in such a way as to eliminate the possibility that samples were taken from crossed lines or intersections because this would mean that the ink at those points would be thicker than plugs taken from single lines.76 This view, which was the subject of a peer-review article by VNA is supported by the article by Dr Cantu: "A Sketch of Analytical Methods for Document Dating".77

28.9 VNA said he could see from the original Documents A and C that some plugs had been taken from intersecting or crossed lines.78 Counsel for the plaintiff submitted that "a viewing of the original documents clearly shows that the crossed lines were avoided in the sampling [of] Mr. Speckin". EJS can be said to have attempted to avoid the intersection. However a more careful examination revealed that microplugs were taken at some of the crossed lines, for example:

(a) in 1A1:

(i) in the character fai ("Chinese text") at the 2nd slant of the radical kwong ("Chinese text") and the 1st vertical stroke of the radical kwan ("Chinese text");

(ii) at the left hand tip of the 2nd horizontal stroke in the radical yeuk ("Chinese text") which was connected to the 3rd horizontal stroke, and the same which was in turn connected to the last horizontal stroke within the radical kwan ("Chinese text");

(b) in 1B1:

(i) in the character yee ("Chinese text"), the 2nd dot which was connected to the 1st horizontal stroke in the radical yee ("Chinese text");

(ii) in the character oi ("Chinese text"), the intersection between the last slant and the last sabre.

(c) in 1C1:

(i) in the character kung ("Chinese text"), the connection between the 2nd horizontal stroke and the 1st vertical stroke, and the same which was connected to the 1st horizontal stroke in the radical yau ("Chinese text").

28.10 In the end, it can be said that EJS was not careful in his sampling. However, EJS said it did not matter where microplugs were taken from as there was also a SOFIA claim that an inter-laboratory's study had shown that the thickness of the ink was irrelevant.79 The claim is unsupported and unverified and there is no reason on the evidence before the Court to doubt VNA's evidence which casts a further doubt on the reliability of the results obtained.

28.11 The defence has included in Appendix B a chapter on "Law of Expert Evidence" by Freckelton and Selby on the obtaining of reliable analytical results in a pesticide residue laboratory. The following general principles are also applicable and EJS has failed to observe these laboratory techniques, namely:

(a) To obtain reliable and analytical results in a residue laboratory we need an experienced and knowledgeable analyst in a clean (pesticide free) laboratory with good equipment, using valid methods on a properly collected sample.

(b) The importance of field sampling and subsequent subsampling in the laboratory cannot be over emphasized.

(c) The analyst must understand the purpose of each step in the analytical method and the importance of following the procedure as described. Some parts of the procedure will be absolutely critical to the reliability of the analysis; other parts will be more robust.

(d) Most analytical methods use a scientific instrument (e.g. gas, chromatograph, liquid chromatograph, spectrophotometer) in the final step for the measurement or determination of the residue. The analyst has to be thoroughly familiar with any scientific instrument being used and know its limitations and capabilities.

CONCLUSION

28.12 The procedures adopted by EJS conformed to no known protocol or method. Consequently, the results he obtained from the Dye-ratio method could not be considered as reliable and the conclusion drawn upon such unreliable data cannot be accepted by the Court. However, the method employed by EJS has more serious flaws which shall be considered one by one hereinbelow in the next chapter.

1 pp.1449-1472, G5

2 T42:116:22

3 T42:117:3-16

4 T44:28:2-5; T45:3:3-6

5 p.411-2, EJS 1

6 T39:168-185; T40:12:7-15:21

7 T42:116:22-117:2

8 p.808, F2-3

9 T37:104:7-10

10 T42:127:1-5

11 T39:137:21-22

12 T35:64:8-11

13 T42:130:19-23

14 T42:131:8-17

15 T47:105:5-22; T47:109:10-14

16 p.809, F2-3

17 pp.804-807, PVT2, E7-E10

18 T41:121:5-11

19 T42:134:4-23

20 p.810, F2-3

21 T42:134:24-136:2

22 p.810, F2-3

23 T42:138:7-11

24 T42:136:10-137:2

25 T42:137:14-138:11

26 p.812, F2-3

27 T42:102:10-13

28 T42:102:15

29 T42:102:7-103:23

30 pp.2042-2052, G8

31 T42:139:20-141:21

 © 2020 Thomson Reuters. 

32 p.813, F2-3

33 p.813, F2-3

34 T44:28:3-4; T45:3:3-6

35 p.916, para.20, E13

36 T37:79:24-80:10; T38:55:13-17

37 pp.602-607, F2-3

38 T37:87:7-17

39 T47:12:21-13:16

40 T37:81:6-7

41 T43:20:21-25

42 T43:22:18-20

43 p.412, EJS 1

44 T37:82:20-25

45 T43:34:24-25

46 T45:3:7-20

47 T39:164:9-19

48 T43:54:23-24

49 T43:69:14-24

50 p.826, F2-3

51 T43:72:14-16

52 T51:21:19-22:14; T54:36:5-8; paras.49-51, p.679, VNA 2

53 T57:27:4-15

54 p.526, F2-3

55 para.7.7.6.2, p.826, F2-3

56 T37:94:11-25

57 T43:82:16-23

58 p.72, C

59 T47:15:2-16:13

60 T48:130:5-132:25; T49:11:3-12:21

61 p.573, F3 and see also PVT's evidence, T49:32:4-33:14

62 T41:121:5-11

63 T42:3:3-4:18

64 T41:125:12-16

65 pp.804-809, PVT 2, E7-E10

66 pp.636-650, F2-3

67 p.640, F2-3

68 pp.3109-3114, G11

69 T48:90:14-91:3

70 T48:91:24-92:7

71 p.3113, G11

72 p.915, para.16, EJS 3, E13

73 T44:2:2-5

74 T50:84:19-86:19

75 p.682, para.58, VNA 2, E7-E10

76 T52:45:7-47:23

77 p.719, p.721(e), F2-3

78 T56:40:12-41:18

 © 2020 Thomson Reuters. 

79 pp.1445-1446, G5

Chapter 29 - EJS's Qualification And Integrity

QUALIFICATIONS

29.1 Mr Erich Speckin was born in 1972. He was only 27 when he performed the ink-dating analysis in 2000 and 29 when he gave evidence in this case. Under "education", he gave the following description:

(a) "Purdue University at age 15 to study engineering";

(b) "Albion College at age 17 to study biology and pre-medical"; and

(c) "Michigan State University graduated with a degree in Chemistry".1

29.2 In fact, he had only studied in Purdue University for two summers and he had not finished high school. Further he only has a BA degree in chemistry instead of a BSc degree. In other words, all three descriptions given by him were misleading. It certainly misled Ms Emily Will, the editor of the Journal of the National Association of Document Examiners2 in that she assumed EJS had a BSc degree.

29.3 Under forensic training, EJS gave the following description:

(a) "Two-year residency with Leonard A. Speckin [his father] in the examination of questioned documents"; and

(b) "One year residency with Brunelle Forensic Laboratories in the identification and dating of inks."

29.4 His alleged residency with his father, as he admitted, has no bearing to this case.3 His alleged residency with Mr Brunelle lasted about 50 days only over a period of one year, whilst during the same period, he was attending the Michigan State University, ran a number of businesses on the side as well as serving his residency with his father for two months. Further it appears that his residency did not include training in (at least) TLC and statistics, both of which are fundamental to mastering the Dye-ratio method.

29.5 He did not study statistics either in his BA degree and that is why he was not awarded a BSc degree. He is plainly deficient in his knowledge of statistics4 and chromatography5, disciplines one would have thought essential for an analytical chemist, essentially one who offers himself to the Court as an expert. It is even more so for one who claims to be one of the world's leading experts in one particular branch of analytical chemistry i.e. ink-analysis.

29.6 His limitations were illustrated by his inability to do other than guesswork in relation to the underlying scientific bases for so much of his proffered methods and results. He could not answer the following questions, which in my view is important as to the validity of the Dye-ratio method and the accelerated aging. They are as follows:

(1) Why did some dye-ratio tests show a significant difference but not Percent Extraction or R-ratio?6

(2) Why did the rate of extraction test not show a difference?7

(3) Which technique works best for which ink?8

(4) Why do dye-ratios change as a function of age?9

(5) Why do some dye-ratio tests show a difference while others do not?10

(6) Why do different inks behave differently?11

(7) In the Dye-ratio method what is being measured?12

(8) Why do some measurements reduce despite longer extraction time-intervals?13

(9) What is the cause of the dye leaching back into the paper? 14

(10) Why is reduction in optical density a possible reason for the measurement aberrations?15

(11) Why is error in sampling also a possibility?16

(12) Why are there differences (expressed in percentages) between the figures for the different extraction times?17

(13) Why was there poor resolution between the peaks?18

29.7 It is doubtless that EJS acquired some learning in his association with his father and Mr Brunelle, but given the absence of any formal curriculum19 and again given his penchant for exaggeration, this Court cannot really draw any conclusions as to the extent of his knowledge. In November 1996 Mr Brunelle in the case of Ambassador Faith Whittlesey,20 considered EJS as an inexperienced document examiner. At that time he only had 11 months of experience after the completion of his training in ink-dating.

29.8 He attempted to magnify his experience by claiming to have examined over 100,000 documents. When the sheer mathematical impossibility of this was pointed out to him (as it would have taken him 274 years to do it), he claimed that simply flicking over pages looking for something else, amounted to an "examination".21 Obviously he has examined many documents in his short experience, but there is no way that this Court can evaluate the extent or depth of that experience. This lack of experience may account for the reason why neither he himself nor his laboratory are included in ASTM's Directory of Scientific Technical Consultants and Expert Witnesses.22

29.9 Under the third column of "Scientific papers presented", he claimed to have had papers published in peer-review journals. The only published paper is: "Technical Report with Case Studies on the Accelerated Aging of Ball-point Inks",23 but then this one was ostensibly written with Mr Brunelle. The paper mostly related to work done by Mr Brunelle long before EJS joined him and EJS could not even remember which portion he wrote.24

29.10 His paper: "An Independent Assessment of Ink Age Determination by a Private Examiner" 1996, Nashville Tennessee, American Academy of Forensic Sciences Annual Meeting, was just his sketchy student essay. He was brazen enough to include this student essay under the rubric of peer-reviewed papers.25

29.11 His biodata published twice in Lawyers Weekly was inaccurate in nearly every respect.26 The same inaccurate biodata was later substantially repeated in the Michigan Bar Journal.27 The latter provision of biodata was made at a time when he knew that the information he had submitted or at least was attributed to him, had been published and was misleading. His attempts to cast the blame on the editors was disingenuous.28

29.12 EJS was not involved in any of the "famous cases" listed in his CV. Although they were handled by his laboratory, he had nothing to do with these cases. In fact, all these cases (except the Watergate Investigation, which was a case in 1972/1973, that is around the time when EJS was born) pre-dated him. What enabled him to make this misleading representation was the consequence of him having bought the laboratory from Mr Brunelle. This was admitted by EJS. He also admitted that none of these cases were relevant to this case29 and did not know why they were in his CV.30 Even the list of EJS's Court cases and depositions is exaggerated by duplications and a triplication.

29.13 It is an understatement to say that EJS's resume is inaccurate and misleading, to say the least.

THE DEFENCE EXPERTS

29.14 By contrast, VNA's experience and eminence in the field, set out in his CV,31 and as acknowledged by his peers,32 are impressive by any standards. Not only is he a true scientist but an expert who has had many articles published in peer-review journals on analytical chemistry in general, and the two major areas pertaining to this case: ink and chromatography. I accept the defence submission that VNA was an impressive, authoritative and fair witness, knowledgeable, helpful and quite prepared to concede a point.

29.15 The dismissive manner in which EJS treated any statement of VNA which did not accord with his own limited knowledge of the subject was plainly wrong. Further, his attempts to analyse and criticize VNA's publications33 were ineffective.

29.16 The cross-examination of VNA was largely limited to an attack on his paper "Measuring Ink Extractability as a Function of Age"34 in which VNA demonstrated the shortcomings of Mr Brunelle's methods. As far as the "attack" goes, it was completely unsuccessful and, if anything, simply enhanced VNA's testimony as it allowed him to explain his own theory and demonstrate in an informed, careful and measured manner the flaws and fallibility of Mr Brunelle's.

29.17 Whilst the "Speckin method" failed the proficiency test, the "Aginsky method" established its validity and efficiency via outside proficiency testing, when it was subjected to "blind" testing in the Division of Identification and Forensic Science, Israel Police HQ and found to be 100% accurate. Further, VNA's method is utilized by one important law enforcement agency, namely the Canadian Customs Laboratory.35

29.18 VNA made it clear at the outset that the ink (at least two years and seven months old at the time of EJS's examination) would have been dry. VNA maintained that inks age continuously and infinitely. As the ink age passes a certain threshold however, the difference becomes too small for it to be reliably measured by any scientific method.36 According to the extensive researches he conducted on a number of inks, generally speaking, he opined that the threshold was two years, and he considered that one could reliably date an ink up to two years only.

29.19 On the other hand PVT is also a well qualified and impressive and fair witness. He is admittedly not an ink-expert, but he is well qualified to testify about laboratory procedures in ink analysis. He is the Chairman of the Subcommittee on Questioned Documents of the ASTM which produced document E1422-01: "Standard Guide for Test Methods for Forensic Writing Test Comparison".37

29.20 PVT's narration of the incident concerning the panel of world-class scientists at the State University of New Jersey who dismissed EJS's report out of hand is particularly telling.38 At the disciplinary tribunal of The State University of New Jersey, a panel of chemists who were highly regarded by their fellow members of the profession, gave the following views of EJS's evidence39:

"The faculty member who had the problem had made a presentation about Mr. Speckin's technique, which was, if not in my view, then in the view of his faculty colleagues, extremely persuasive. Because Mr. Speckin had done the analysis which had originally resulted in the dropping of the patent suit, et cetera, et cetera, et cetera, he was asked to come in and to present his findings and the bases therefor, which he did, and he made, as he does, a very effective presentation.

He did say one thing, which I recall, about averaging the results from two different pages or two different runs, and I noted that one of the faculty members sort of cut him off, and I subsequently found out that they just wanted to stop him from saying something that would have hurt their delicate ears as chemists.

When Mr. Speckin left the room, [the panel of eminent chemists] all sort of looked at each other and said, 'Okay, now what do we do to prove whether or not this notebook is phony or not?' They just said, 'This is not going to get us anywhere. We cannot accept this evidence. We have to find something else.' And we did."

EJS'S INTEGRITY

29.21 In the Chief Justice's Working Party on Civil Justice Reform, it has been said40:

"Where experts are used as 'hired guns' the consequences are counter-productive and unacceptable. Far from helping the court to resolve expert issues, competing partisan experts tend to make resolution of such issues more difficult and confusing. The court may sometimes be compelled to try to evaluate to some degree the credibility of each expert - an exercise that should have no place in the assessment of expert evidence."

29.22 Here, apart from the methods used and the results obtained by EJS as discussed hereinbefore, the Court is compelled to try to evaluate to some degree the credibility of him as to whether he is a man whose word it can trust. An expert must be a man of integrity and indeed EJS himself accepted this readily.41 A Court should not doubt the integrity of an expert unless there is compelling evidence to the contrary with concrete basis. Regrettably, however EJS failed under this closest scrutiny.

29.23 It has already been pointed out that EJS's resume was deliberately framed in a misleading way. They covered his: education, forensic training, scientific papers presented, famous cases handled by members of his firm, peer-reviewed publications, and his court cases and depositions.

29.24 EJS's statement that he was "currently conducting research with the US Secret Service and IRS" was simply untrue. It was not just an exaggeration but untrue,42 and this incorrect claim continued to be made in evidence where he equated discussing the prospect of conducting research in a

meeting with Secret Service as being "in his opinion" the same as conducting research.43 He further attempted to persuade the Court that the US Secret Service uses the accelerated aging method when he knew perfectly well that they do not. When a letter was received from Larry Stewart44 stating unequivocally that this was not so and EJS knew it because he (Stewart) had told him specifically about it at the meeting in August 2000, EJS was reduced to claiming that he did not hear it.45 It was clear from the contemporaneous notes taken by PVT46 that the US Secret Service's reservations about accelerated aging (which was the very subject matter of the meeting) dominated the discussions.47

29.25 He aroused the wrath of the American Board of Forensic Document Examiners ("ABFDE")48 for stating that he was eligible for certification at a time when he did not even yet have a degree. That letter dated 4 May 199848 was written in the following strong words:

" It has been brought to the attention of the ABFDE Board of Directors that on several occasions you have cited as a qualification that you are 'eligible for certification by the American Board of Forensic Document Examiners' and 'expect to take the National Board Examinations in February, 1996.' Our records indicate that as of May 1, 1998 you are not in the process of nor have you applied for certification by the American Board of Forensic Document Examiners.

....

Therefore, it is the unanimous consensus of the ABFDE Board of Directors that your representation is, at the least, inaccurate, and at worst, could be viewed as a fraudulent misrepresentation. You are requested to cease and desist referring to yourself as 'eligible for certification' until you are authorized by the ABFDE to do so."

29.26 He was brazen enough to imply that the letter written to him accusing him of inaccuracy or fraudulent misrepresentation was motivated by the President of the Board's professional jealousy.49 His failure to grasp why lawyers had made "a big deal" out of the allegations of fraud says much about his indifference to attacks on his honesty.50

29.27 Perhaps the most illuminating aspect of all this is the manner in which EJS dealt with the letter from the American Board of Document Examiners, Inc. He threw it away.51 His "couldn't-care-less" attitude implied that the letter merited no acknowledgement, reply or explanation, exemplifies EJS's cavalier attitude to the truth. No worse fate can befall a person who values and who trades on his integrity than to be accused of fraud. He however took it nonchalantly in his stride.

29.28 Much the same offhand attitude categorises his dismissal of the letter from Rodgers J52 who had similar misgivings about EJS's attitude to the rigorous demands of the truth.53

29.29 Further in examination-in-chief, EJS slipped in54 that he was a member of the Questioned Document Section of the Mid-Western Association of Forensic Scientists ("MAFS") which was not mentioned in his CV. When the letter from the President of the MAFS pointed out that indeed EJS was not a member of the Questioned Documents Section, never had been and had never applied to be,55 EJS without a blush, simply said that he thought he was and had not realised that he needed to apply.56

29.30 EJS's unqualified claim that VNA himself used the Dye-ratio method and had published a paper about it, is illustrative of his readiness to state facts which are, at the least, misleading and probably uncheckable to most opponents. The falsity of his claim was exposed only when VNA's paper "Determination of the Age of Ball-point Pen Ink by Gas and Densitometric Thin-layer Chromatography" was produced.57 It would have been impossible to test this part of his evidence had this paper not been available to the defence.

29.31 A number of areas of EJS's reports are either exaggerated or blatantly untrue. They included the following examples:

(a) In EJS 1 under the heading "Statistical Analysis" he said: "The data obtained for the rate of extraction, percent extraction and dye ratio meets this threshold of analysis significant statistical difference ...".58 If this conjunction were true, and the unscientific and casual reader might well accept it at face value, the evidence of the documents still being in the drying process would be overwhelming. In fact the data for rate of extraction and percent extraction were negative. Only some of the dye-ratio data apparently show some positive results. The threshold of significant statistical difference is only 1 STD.

(b) In EJS 3 regarding dyes he said: "The method in this case was not comparing the three homologues to one another, but the overall methyl violet bands to a Victoria blue component and other dyes including another blue dye. "59 His evidence was completely different in that he said that he just lumped dyes together.60 His attempts to rationalise the conflict were unconvincing.61

(c) In EJS 3 regarding protocols he said: "The testing in this case was performed as the protocols are written and as generally performed by other examiners in the field". 62 When it was pointed out that there were no written protocols, he at first claimed that the procedures for the Dye-ratio method and the accelerated aging method were in his office and undertook to have them faxed over.63 The next day, when he was asked whether he had obtained a copy of the protocols, he said he checked and they did not have anything for the Dye-ratio method or the accelerated aging method.64 In answer to a question from the Court, EJS said what he meant by protocol in EJS 3 was there was no protocol to run reagent blanks.65 This answer is in any event in stark contrast to the answers that he had given the day before66:

(d) Another point which perhaps might reflect more on EJS's careless presentation of works than on his integrity, is the transformation of the ink being "consistent" with Papermate67 to having been "identified" as Papermate68 to "the ink was manufactured by Papermate".69

(e) The constant reiteration that the negative results of the percent extraction and R-ratio tests were considered and taken into account, is simply untrue.70 Similarly, the repeated references to "multiple sampling", was an attempt to disguise the fact that there were only two sample runs.

(f) EJS was caught out completely by the "proficiency" test given to him through fJ Cleveland. The suggestion that he had misunderstood the plain instructions given to him, that is he thought that the 12 samples were written at the same time,71 is so farfetched that, even had this stood alone, it would be enough to destroy his credibility. The suspicion that EJS tailored his results to suit his client's requirements must inevitably linger when the following questions remain unanswered:

(i) Why else did he not perform the dye-ratio tests when conveniently the Percent Extraction and R-ratio tests showed no positive result?72

(ii) Why else seek to obtain "background information" about the documents73 when the state of ink can be determined scientifically and objectively? and

(iii) Above all, as per his examinations for fJ Cleveland, why else give an unqualified and unrestricted opinion about the age of a document74 which happened to conform (he believed) to his client's interests?75

One cannot help but echoes the Chief Justice's Working Party on Civil Justice Reform in para.497 which says:

"Reforms adopted in various jurisdictions all begin with the same premise, namely, that the function of the expert is to help the court by providing independent and impartial advice - not to act as an advocate for his client. This is reflected in rules which emphasise that the expert's duty to the court overrides his duty to his client."

29.32 Accordingly, quite apart from and independant of the criticism of the shortcomings of the technique itself, its methods and procedure, EJS's credibility falls far short of the high standards of integrity which one would expect from an expert witness or indeed an witness who has taken the oath, and his evidence is thus devalued. His evidence cannot be accepted.

1 p.388, E4-E5

2 p.1527, F6

3 T38:84:3-85:14

4 e.g. T37:14:14-15; T45:119:18-25; T132:17-22

5 T42:31:24-32:9

6 T35:71; T38:20-23; T40:53; T41:75-76

7 T40:51-52; T44:105

8 T43:139

 © 2020 Thomson Reuters. 

9 T43:4-5

10 T40:55-56

11 T41:71; T48:72-73

12 T41:83-84, 86; T42:64

13 T40:82; T41:70, 72-73, 90-95, 97; T44:96, 110; T45:15-17

14 T46:104

15 T44:96-97; T46:87

16 T45:11-12

17 T44:103-104

18 T42:32

19 T46:17:8-18:15

20 pp.395-396, G2

21 T39:86:24-87:22

22 pp.1410-1411, G5

23 p.1386, G5

24 T44:54:7

25 pp.893-4, EJS 3, E13

26 pp.1363-1364, G4

27 p.1366, G4

28 p.2187, G8

29 T38:160:24-161:1

30 T38:161:2-8

31 pp.686-687, VNA 2, E7-E10

32 e.g. Dr Cantu in "A Sketch of Analytical Methods for Document Dating " p.715 at p.723 F2 - 3

33 pp.901-909, EJS3, E13

34 pp.705-721, E7-E10

35 Letter from Marc Gudreau p.3249, G11

36 It should be by any scientific method at the moment as no one can say whether in the future by any micro-analysis, the age of an ink may be identified correctly. There is no limit to any scientific discovery and invention. Just recently the University of Science and Technology has been successful in producing a conducting thread at 0.4nm.

37 pp.3133-3140, G11. His evidence on his work in this regard is at T48:85:15-87:3

38 T49:123:15-126:17; T133:7-11

39 T49:124:1-24

40 para.494

41 T38:42:2-9

42 pp.2091-2092, p.2197 and pp.2309-2311, G8

43 T38:115:8-9

44 pp.2197-8, G8

45 T39:81:3 - 84:11

46 p.2313, G8

47 pp.2313-20, G8

48 p.691, G3

49 T48:7:18-8:18

50 T38:117-118, 148-149

51 T38:119:24-120:24

 © 2020 Thomson Reuters. 

52 p.2088, G8

53 T38:147:4-149:11

54 T35:31:23-32:2

55 p.2201, G8

56 T39:90:8-24

57 pp.2294-2300, G8, T46:31:22-34:20

58 p.413, E4-E5

59 p.884, para.13

60 T40:21:17-23:8

61 T44:62:15-70:12

62 p.916, para.20

63 T38:51:18-53:23

64 T39:5:20-6:5

65 T39:7:23-8:15

66 T38:51:15-22

67 p.409, EJS 1

68 p.883, para.11, EJS 3

69 T35:62:3

70 e.g. p.898, para.44, EJS 3

71 T47:55:15-23; T47:62:7-64:12

72 pp.833-836, G3

73 p.3092, G10; T47:105:1-22; T47:114:12-24

74 p.3103, G10

75 T47:100:7-101:25

Chapter 30 - Conclusion On Ink-dating

30.1 The controversy over the ink-dating method practiced by EJS and a few other members of SOFIA by way of Dye-ratio method coupled with accelerated aging, together with the R-ratio and Percent Extraction method can be summarized in the words of Larry Stewart, the Laboratory Director of the United States Secret Service,1 in his e-mail dated 2 October 2001:

"... you asked, 'whether the approach of accelerated aging or this testing method has always been found to work by all scientists?' The correct answer is, No. Many scientists have been utilizing the approach when one or two of the techniques show some difference between the heated and unheated sample results. They typically use a combination of three methods to test the inks. If one of the approaches or two of the approaches show some difference, then they typically report that the ink is still in its aging phase and therefore must have been on the paper for less than a few years. There are many problems with this approach. First, why do some of the techniques work some of the time? Why don't all of the techniques work all of the time? Second, who chooses which technique to follow for which ink? If certain techniques are known to only work with certain formulas or formula types, then why isn't that information known so as to only utilize that useful approach when examining that ink formula? Third, what signifies a difference between the results of the heated and unheated samples? If they test 1% different, is that a significant difference, or must they be at least 20% different before it is reported as a difference? Do the examiners always perform their tests in triplicate and perform statistical analysis on the results to determine if the results are significantly different or within the range of deviation known to occur through the flaws of the technique, e.g. imperfect glass vials, imperfect pipets, imperfect timing of samples, etc?

You will find that these types of questions have never been answered in the published research, which goes back to my point in earlier responses wherein not enough research has been conducted in the field to allow its use in casework.

...

In conclusion, I would like to point out that a technique such as accelerated aging would, in some cases, be most beneficial to my agency and my reluctance to utilize it in our scheme of

 © 2020 Thomson Reuters. 

approaches should point out my concerns for the techniques reliability. Even if it is ever shown to be reliable, there will still be major concerns regarding the storage conditions of the questioned document. This is based on the knowledge that humidity and heat may affect the extraction rate of the ink which could in turn make it test either older or newer than the technique's result would suggest".

30.2 In other words, the Dye-ratio method (coupled with accelerated aging) has not been proven to be valid and reliable. The necessary scientific basis underlying such a method is also unclear and it has not been accepted by the scientific community in the field of ink-dating. There is no evidence that this method is being used by any government laboratory or scientist (except the alleged few mentioned hereinbefore). There is however evidence that the method was rejected by the courts.

30.3 EJS's technique and procedure are also full of flaws and the arbitrary separation of fused and/or overlapped chromatographic peaks would make the results even more unreliable when the raw data were subjectively manipulated by him. The data themselves might well be mass dependant.

30.4 Further, the results obtained by EJS in this case also exhibited illogical behaviour and any results deduced therefrom would also be illogical. Some of the negative results were ignored without clear and acceptable scientific explanation therefor. 28 tests were conducted using five methods namely, Ink Identification, Date Tag, R-ratio method, Percent Extraction method and Dye-ratio method. Only the Dye-ratio method purportedly gave five results of "significant statistical difference" between the heated and unheated samples.

30.5 In view of EJS's contention that2:

"In the universe of cases that I see, if you see a difference with dye-ratios, typically you see it with rate and per cent [sic] extraction as well. And if you do not see it with rate and per cent [sic] extraction, typically you do not with dye-ratios."

and according to EJS, that there is nothing atypical about this case,3 there is no justification to his statement that "... It is common for only one method to show a significant statistical difference while the other two methods overlap,"4 as he claimed in this case.

30.6 Furthermore, there is no justification that the five allegedly "positive" results from the Dye-ratio method should be conclusive that Documents A and C were "... not written on or near their purported dates but at a later time at least in 1996 or later."5

30.7 As VNA said: "No scientist can ignore facts, especially when they are statistically significant, which do not support his theory".6 The probability of the results being negative in this case, according to EJS's results from the Dye-ratio method, is 13 out of 18.

30.8 Consequently, in the absence of any scientifically sound explanation as to why the overwhelming negative results should be ignored in favour of the few allegedly "positive" results, there is no basis for EJS to draw the conclusion as he did in this case.

30.9 In any event, EJS's conclusion was based on the examination of two sample runs, and the probability of them being correct would be as low as 36%, i.e. when EJS based on statistical analysis of "one standard deviation", this standard is well below the minimum level of confidence of two standard deviations (or 95%) generally accepted by analytical chemists and the probability of his conclusion of being correct for two sample runs only would be between 36% and about 68% only.

30.10 Further or alternatively, EJS's failure in the "proficiency" test has demonstrated conclusively that either the method is invalid and/or EJS is incompetent in conducting the Dye-ratio method. The defence submitted that he was marked at 67%, erring in four out of 12 tests. It can also be said that he was 100% incorrect in his statement that: "In this case, ... all inks were found to be dried and showed no evidence of still being in the drying process except Sample #11. Sample #11 showed some indication that it was still in the drying process."7

30.11 In particular, EJS failed in the most critical test in a document which was in existence since 5 June 1990, i.e. just a few months after the purported date of the 1990 Will. He nevertheless concluded that the signature on the document "... was not written eleven years ago, but was written sometime in the last three and one-half years."8

 © 2020 Thomson Reuters. 

30.12 Further, for those reasons given hereinbefore, I do not consider that EJS is a credible expert and this Court cannot rely on his opinion offered in this case. Accordingly, his evidence is rejected. There is no evidence to suggest that the ink on the documents was not "dry" or that the ink was still in the drying process at the dates of EJS's examination in the year 2000.

30.13 However, it does not mean that the contrary is proved, i.e. that there is evidence that the ink was already dry and that the document must be written more than three and a half years before the date of EJS's examination in the year 2000. There is simply no evidence to prove one way or the other by way of his method of ink-dating.

1 pp.2205-2206, G8

2 T47:109:10-14

3 T47:110:13-21

4 p.433, E4-E5

5 p.413, E4-E5

6 p.678, E7-E10, para.44

7 p.3075, G10, JMC-14

8 pp.3088-3108, G10 at p.3103

SECTION IV FINAL CONCLUSION

"The last principle [of Res Judicata] finds expression in a maxim which English law took over from the Roman law: it is in the public interest that there should be some end to litigation."

- Edwards v. Edwards

[1967] 2 AER 1032 at 1033

per Sir Jocelyn Simon P

Chapter 31 - Final Conclusion

BACKGROUND

31.1 Wang Sr ("Chinese text"), the plaintiff herein, started working in his father's dyestuff company at the age of 17 in 1928. He inherited his father's company after his death in 1930. That was in Wenzhou in Zhejian Province in the Mainland. He set up a trading company called China United Chemical Company ("CUC") ("Chinese text") in Shanghai in the 1946 dealing with industrial raw materials and western medicine imported from the U.S.

31.2 In 1947 he set up a branch of CUC in Hong Kong and that was the same year when his son Teddy Wang Teh Huei ("Chinese text") (at the age of 14) came from Shanghai to Hong Kong to further his study. During the Korean War, Wang Sr started a new company called China United Chemical Corporation Limited ("CUCCL") ("Chinese text") in Hong Kong to combat against the American embargo which had affected his business.

31.3 In or about September 1952 Teddy started to work in his father's company in Hong Kong. That was immediately after Teddy had been expelled by St. Stephen's College because he forged his school report and not because Wang Sr had encountered financial difficulty and therefore could not afford to support his schooling as suggested by the defence.

31.4 Three years later, Nina Kung Ru Xin ("Chinese text") came to Hong Kong in mid-1955 and married Teddy in September 1955. If Nina had been informed by Teddy that he had to cease studying in St. Stephen's College because of his father's financial difficulty, Nina must have been misinformed by Teddy. There is no evidence to support the belief that Teddy hated his father because of the aforesaid reason or at all. The evidence before the Court actually supported to the contrary, i.e. Teddy had always been filial to and caring for his father even after late 50s when his father started to cohabit with another woman, Madam Cheung.

31.5 Teddy at the suggestion of his cousin Yih Lee Kong ("Chinese text "), started plastic business in late 50s with his father's companies. In or about 1960 Wang Sr and Teddy, agreed to start the real property business in Hong Kong, again at the suggestion of Yih. (Yih owned about 10% in the two new business). This new business was carried on through a new company Chinachem Investment Company Limited ("CIL") ("Chinese text"). The capital came from CUCCL of Wang Sr. Teddy was given most of the shares in this company

 © 2020 Thomson Reuters. 

by his father and the property development business was basically carried out by Teddy and Yih. Teddy's siblings and Nina started to have a small shareholdings in CIL at Wang Sr's discretion.

31.6 It was at this time after the establishment of CIL that Teddy executed his first will on 23 April 1960 at the office of a solicitor's firm, Messrs P.C. Woo and Co., and bequeathed all his estate to his father and Nina in equal shares.

31.7 After 1964 Teddy had the intention to invest in real property business in Taiwan and such an intention was carried out fully in 1967 when Hong Kong was experiencing the turmoil of riots in the amidst of the cultural revolution in the Mainland.

31.8 The evidence before the Court suggested that Teddy had an intimate girlfriend in Taiwan and according to one of the two letters of this lady, Nina was tracking on Teddy's extramarital affairs.

31.9 In 1968, the evidence before the Court supported the fact that Nina had an intimate boyfriend. Teddy firmly believed that Nina had an extramarital affair. Therefore on 15 March 1968, he executed his second Will before two solicitors of Messrs F. Zimmern & Co. revoking his first will in 1960. In the 1968 Will he bequeathed all his estate to his father only.

31.10 This will had been placed in a safe deposit box in the Bank of Canton, and the box was opened on 12 February 1968 shortly before the 1968 Will was executed. Yih was the only deputy authorized to have access to this box. Either Wang Sr or Yih had been given the second key thereto but the key holder lost it afterwards.

31.11 In January 1970 Yih resigned from the company and left the Chinachem group. The evidence clearly suggested that Yih left the company in order that Teddy and Nina could make up after a number of incidents happened in the 1960s as aforesaid including the disaster of Teddy's investment in Taiwan. Yih even had to shoulder the responsibility for probing into Nina's affairs which Nina believed to be the case after being informed by Teddy. Teddy deliberately misinformed Nina in order to protect his father who was actually responsible for the same.

31.12 Although Nina had been cut off from the estate of Teddy by his 1968 Will, Nina had been adequately or substantially provided for in the property developments of Chinachem in the 70s and the 80s. In the first place, Nina could be a substantial shareholder of the flagship company of the Chinachem group, i.e. Chime Corporation Limited (since there is a dispute between the administrators and Wang Sr on one side and Nina on the other side as to her shareholding in this company, which is the subject matter of another action).

31.13 Even if she was not a substantial shareholder of this company, Nina was substantially provided by Teddy in many of the developments of the Chinachem group in the past. The modus operandi of those developments was usually done with Teddy and Nina each having an equal share in a new company specifically incorporated for each of the developments. Further Nina had been holding a number of joint accounts with Teddy for very substantial sums of money. Nina became the sole owner of all these accounts by operation of law since Teddy's death.

31.14 In this Probate Action, Nina tried to propound a will on four questioned documents purportedly made by Teddy on 12 March 1990. The same was purportedly witnessed by Tse Ping Yim, the butler of the Wangs couple. One of the aforesaid Document A was purportedly witnessed by an additional person, probably in the name of Lee Kin Sang. Wang Sr disputed the authenticity of these four documents and alleged that they were forged. Many suspicious circumstances were raised by the plaintiff in respect of these four documents.

SUSPICIOUS CIRCUMSTANCES

31.15 In the first place there was no reason for Teddy to change his original intention as contained in the 1968 Will. There is no evidence to suggest that Teddy actually hated his father as aforesaid. In this respect the plaintiff asked rhetorically this question: why should Teddy change his will just after a minor injury of falling from the horse on 10 March 1990 when he did not do so even after the more serious incident of a kidnap in 1983? Why in 1990 should Teddy suddenly change his will and give his whole estate to Nina instead of his father when Nina had already been given a substantial part in the Chinachem group?

31.16 Secondly why should Teddy make a home-made will instead of making a proper will by solicitors as he had done

 © 2020 Thomson Reuters. 

before in 1960 and 1968? Further why would Teddy ask two persons, whose identity are still unknown now, to write out Document A, and then Documents B and C for him? They would have known Teddy's secret and the evidence before the Court clearly supported the fact that Teddy was a secretive person and he did not want other people to know his affairs. Besides these two persons would not be solicitors and they have no professional requirement of confidentiality.

31.17 Furthermore Nina's younger brother, Dr Kung's evidence was that Teddy had given him two home-made wills in an sealed envelope in 1984 and 1985. This was not true. The original further version of Teddy making a home-made will annually between 1985 and 1989, i.e. shortly a year before the alleged 1990 home-made will, was never proved by the defence. Thus, Teddy had never made a home-made will before.

31.18 Why should Teddy allow four persons to know the content of these very secretive home-made wills when he did not even allow Nina to open the sealed envelope so that she would not know the contents thereof until after his death? Why would Teddy suddenly make a home-made will in March 1990 when in the long period of nearly three years immediately before that, he and Nina had been consulting world-class and world-wide professional advisers in respect of having a trust corporation to hold their assets with global and long-term objectives?

31.19 Thirdly Teddy was discharged from St. Paul's Hospital on the very day of the alleged date of the 1990 Documents. Where could Teddy have drawn up these four documents or caused the same to be drawn up by two unknown persons? The evidence before the Court suggested that Teddy would hardly have the opportunity to cause these four documents to be drawn up by two persons at the Jockey Club in Fanling after his fall from the horse; at the Queen Mary Hospital or St. Paul's Hospital where he was admitted; at his home after his discharge but before he went out to his own office again, or even at the Chinachem's office. The opportunity of finding these two mysterious persons was also very slim. Where could the 1990 Documents be drawn up? Why should Teddy allow these persons to know the content of his last will which contained very strong sentiments expressed against the Wangs and Kungs family?

31.20 Fourthly the way these four documents were made is not in line with the known character of Teddy. The four documents were rather sloppily prepared. There were over-writings on a number of characters in Document A suggesting that it was written originally with a defective ball pen as it was running out of ink. Some of the characters in Document B also showed that the ink colour was faint suggesting that the pen used was again running out of ink. (The undisputed ink-dating technique found that Documents A and B were written with the same type of ink viz. Formulab. This suggested that both documents were probably written by the same defective ball pen, though they were written by two different persons.) The evidence before the Court suggested that Teddy was a person who was quite strict with legal documents. Why should he sign on these documents with those irregularities when the documents were supposed to be a very important legal documents affecting his whole enormous estate which he had earned in his lifetime? Why should Teddy sign on Documents A, B and C when these three pieces of paper contained the faint words of "One life one love"? Why should he allow such words to be put on his will? Why should Teddy make Document D with the words of "One life one love" when the evidence before the Court suggested that Teddy was not a romantic person at all?

31.21 Fifthly, the first three documents contained convoluted, unreasonable and untrue expressions. In Document B, it was said that no one should disagree with ("Chinese text") his giving all his property to his beloved wife. In Document C, it was said that no one should object to ("Chinese text") his giving all his property to his beloved wife. Why should Teddy repeatedly make such an expression? Was he anticipating objection from anyone objecting to his bequeathing his estate to his own lawful wife and if so why? Alternatively was it an expression of the forger instead?

31.22 Further, why should Teddy prohibit Nina to benefit the Wangs family by saying that his father and mother (in Document B) and any other family members of the Wangs (in Document C) had disappointed him ("Chinese text")? The evidence before the Court is completely to the contrary. Teddy loved his parents very much. Further Teddy must be very proud of his siblings. Teresa is a computer programmer with a Masters Degree. Wang Tak Miu ranked the third in the Hong Kong Certificate Examination among all Hong Kong candidates with 10 straight As. He studied in Stanford University with a scholarship and later on he also got his

 © 2020 Thomson Reuters. 

Masters and PhD degree all free of charge because he had obtained scholarship therefor. His younger sister Tak Hwa is a qualified chartered accountant by profession. His youngest brother Tak Tzai got a Doctor of Pharmacy Degree in the States and he is now working as a pharmacist.

31.23 Teddy must be very fond of his siblings including their children. He was also grateful as aforesaid to his father. Why should Teddy have this strong negative feelings against his own family members including his mother, whom, even the defence would not suggest otherwise, Teddy loved so much? Further, how could Nina follow Teddy's direction of taking care of his parents and younger sister (as in Document B) and at the same time, if she were prohibited from benefiting the latter with Teddy's estate (as directed in Document C)? Does it mean that Nina can only take care of his younger sister with Nina's own money and if so, why?

31.24 On the other hand why did Teddy say in Document C that everyone of the Kungs family were disgusting to him ("Chinese text")? Why should Teddy say something like that against the Kungs family members when on the same day and the days before, Dr Kung and Nina's mother had been accompanying Teddy in the hospital up to the time he was discharged from the hospital and went back home? Why should Teddy have such strong negative sentiments against Dr Kung himself, when Dr Kung had kindly treated his superficial wounds on 10 March 1990, accompanied him later to Queen Mary Hospital and St. Paul's Hospital, and eventually taken him home on 12 March 1990? Would it be an expression of Nina instead in order to enable her to explain in the future why she would not be giving any part of Teddy's estate to any member of the Wangs and Kungs family according to the alleged prohibition in these papers?

31.25 Sixthly, there was no revocation clause in the four questioned documents. Why should Teddy leave out the revocation clause if it was intended to revoke his 1968 Will in order to give all his estate to his wife? He surely would have known that there was such a revocation clause in 1968 Will, revoking his previous 1960 Will. Would it be more consistent with the fact that the forger of the 1990 Documents did not even know the existence of the previous 1968 Will or at least did not know the content thereof as it had always been placed in the personal safe deposit box of Teddy which only his close cousin Yih Lee Kong had access as a deputy?

31.26 Seventhly, the statement of Tse Ping Yim stating the circumstances of his witnessing Mr Wang's signatures also raised more suspicion than supporting the fact that the 1990 Documents were properly executed by Mr Wang and witnessed by him. In the first place, it is extremely doubtful whether the handwritten statement of Tse was produced in the way as described by Mr Alex Lam, the solicitor who took the statement from Tse on 6 September 1999. The evidence suggested that Tse very probably had already prepared his statement written in an entirely neat and orderly manner before this interview. Why should Tse state in the statement the close relationship between Mr and Mrs Wang, which was an explanation as to why Mr Wang made a will and gave all his estate to Mrs Wang, when, according to him, he did not even know the content or presumably the nature of the documents thereof?

31.27 Even if he had not paid attention to the main body of Document A, how could Tse possibly miss the two big Chinese characters ("Chinese text" - meaning Will) which are just 2 cm above his signature when he was signing his name slowly (as all handwriting experts had agreed that it was a signature executed slowly) and beside the two characters of ("Chinese text" - meaning witness)? If he had noticed these two characters of ("Chinese text"), why did he not say it in his statement? Further, in that case, why did he not tell Mrs Wang about it for all these nine years between 1990 and 1999?

31.28 On the other hand why should Teddy select Tse to be a witness at all on these important documents involving all his estate and the two most important persons in his life who were near and dear to him (i.e. his father and his wife), when he did not even let them know the content of the documents? Why did Teddy not ask the two mysterious persons who wrote out Documents A, B and C to witness his signatures instead? Why should he further ask a fourth person, apparently in the name of Lee Kin Sang, to witness his signature on Document A and Document A only?

31.29 Further why should Mrs Wang choose Tse's wife, Ms Tong Kwa King in 1992 to be one of the two shareholders of Global Cheers Limited, which has been involved in the very lucrative business of cleaning contracts of buildings developed by Chinachem? Why should Tse start his long holiday on 14 September 1999 after the two statements were taken from him by two different solicitors? Why was there no record of Tse's holiday as to his application, the length

thereof and the person responsible for approving it? Why was Tse not given his salary when he was sick in November while staying in Guangzhou? Tse unfortunately died of liver cancer on 6 December 1999 after he came back to Hong Kong in a coma on 4 December 1999 and before the police could take a statement from him. That was because he left Hong Kong the very next day on 24 September 1999 after the plaintiff got leave from the Court to report the allegation of forgery in respect of the four questioned documents to the police.

31.30 Eighthly, from the evidence before the Court the other solicitor Mr Allan Leung who took a statement from Tse on 9 September 1999, informed Mrs Wang that there was another witness of "Lee something" probably on 6 September 1999 and not later. There and then Mrs Wang could tell him that this was Lee Kin Sang who had already died. That was why in Mr Leung's letter of advice dated 9 September 1999, he did not mention about the importance of identifying the other signature of "Lee something" at all. The question is why would the defendant immediately know the other witness "Lee something" was Lee Kin Sang and he had already died. Lee Kin Sang actually died on 21 June 1996. In any event why the defendant through her Counsel on 5 July 2001, told the Court that his instructions were the defendant did not know this signature which apparently was signed as "Kin Sang Lee"?

31.31 Of course if this was a signature of Lee Kin Sang, as aforesaid why should Teddy ask this contractor for Chinachem to witness his signature on such an important document as aforesaid and why only on Document A but not the other three whilst Tse signed all four documents?

31.32 Finally in propounding the 1990 "Will", the defendant had repeatedly stated under oath on 14 July 1999 and 15 July 1999 that the 1968 Will had been cancelled and she was the beneficiary of her husband's last will. She believed that she was the sole beneficiary to her husband's asset under the term of his last will. Why should the defendant know the content of the documents in the envelope, which apparently before that she said she had never read the contents of those documents and the envelope was only opened by the Court on 6 September 1999? Why was she also able to say way back in her earlier affirmation on 16 January 1998 that she believed that the 1990 Documents contained confidential instructions to her relating to the disposition of her husband's estate after his death when she had not even seen the content thereof? Why should the documents turn out to contain the specific confidential "instructions" concerning members of the Wangs and the Kungs family as aforesaid? Why the defendant's case had developed from the earlier contention of the 1990 Will contained instructions relating to the estate to instructions to her relating to the disposition of the estate even before the envelope was opened?

31.33 The aforesaid suspicious circumstances are so compelling. The only irresistible conclusion that one can draw from all the unanswered or unanswerable, or unexplained or unexplainable questions raised by the evidence presented by the plaintiff, is that the 1990 Documents are forged documents. In other words these suspicious circumstances would by themselves sufficient to cast grave doubts on the authenticity of the 1990 Documents without any other evidence in handwriting.

31.34 In the end, I find that the defendant has failed to dispel all these suspicious circumstances in order to prove the 1990 Will to be admitted to probate.

31.35 In fact even if the burden is on the plaintiff to prove that the 1990 Documents were forged documents, I must say that from the evidence presented before me, I have no doubt by these suspicious circumstances alone, I would find the 1990 Documents are nothing but forged documents.

HANDWRITING

31.36 In respect of the questioned signatures of Wang, I find that all four questioned signatures in the 1990 Documents were forged by way of simulation ("Chinese text"). The four questioned signatures of Wang were probably produced by simulation by referring to two old signatures of Wang in 1958 as in 668 and 669. Wang was in possession of the original documents thereof and the photocopy of Yih's carbon copy with Wang's two original signatures, and the same in turn would be among Wang's documents in the possession of his wife after his death. However Wang's habits and ability of signing his name in Chinese had already been changed by 1990 by referring to those sample signatures he signed in Chinese in the 1980s.

31.37 All the similarities pointed out by the defendant's experts were only superficial similarities produced by simulation. There are many unexplained but significant

 © 2020 Thomson Reuters. 

differences. There are also other features including tremors, retouching and retracing, and different writing movements with the sample signatures of Wang. All these are features and indications of forgery. The evidence in support of such a finding of forgery is very strong and cogent.

31.38 Further, I find that those tremors present in the four questioned signatures of Wang were not the result of the minor injuries suffered by him as a result of his fall from the horse two days before on 10 March 1990. The tremors present in the four questioned signatures were not consistently present in the same writing movement but in different writing movements. I accept the evidence of Dr Edmond Woo that there was no pathological basis to suggest that severe head injury would cause severe tremors whereas mild head injury would cause mild tremors. Such a contention is not supported by clinical cases or published medical literature. In any event even Dr Brian Choa, called by the defence, agreed that it is not possible to prove medically the relationship between these tremors in the four questioned signatures of Wang and a stroke or fall of him leading to injury.

31.39 In respect of the four questioned signatures of Tse, I find that each of the corresponding character in the three signatures on Documents A, B and C are highly superimposable and the fourth signature on Document D is also superimposable but not to the extent as the other three. This is because Document D is a thicker piece of paper. As man is not a machine, it is virtually impossible for human beings to produce four signatures of three Chinese characters comprising 34 strokes and the corresponding characters turn out to be superimposable. The four questioned signatures of Tse were forged by way of superimposition tracing ("Chinese text").

31.40 Those similarities pointed out by the defendant's experts are only superficial similarities produced as a result of tracing by way of superimposition. However, there are many significant differences and some of them are less conspicuous though they are clearly revealed under the microscope. There are a number of strokes written unnaturally with tremors, pen halts, and retouching.

31.41 In contrast to the Wang's forged signatures on the 1990 Documents, the model used by the forger probably was Tse's later signatures made after Wang's disappearance in 1990. The sample signatures of Tse accepted by the Court in the later period were very different from his signatures signed earlier in 1990. In particular I accept Mr Cheng's opinion that, "The change in features between 1990 and 1999 signatures was enormous". Consequently, the four questioned signatures of Tse are very different from Tse's genuine signatures signed contemporaneously in 1990 which the forger had not noticed.

31.42 Accordingly, the four questioned signatures of Tse are nothing but forgeries. From the evidence adduced before me, I find that the evidence in support of forgery in respect of Tse's signatures are very, very cogent and compelling. I can say that I have no doubt that these four signatures are forged signatures.

31.43 The handwriting evidence in respect of these eight signatures of Wang and Tse are very strong and cogent. The cumulative effects of the experts' evidence before me which I have accepted, compelled me to say that I have no doubt at all these eight signatures are nothing but forgeries.

31.44 In respect of Document A, from the evidence of handwriting experts (and their evidence alone) which I have accepted, I came to the conclusion that Document A was probably written by the defendant herself. I can come to this conclusion even without Teresa Wang's opinion on the handwriting of Document A. However her evidence of opinion based on her knowledge in the past, is not as strong as the experts' opinion. It only has some corroborative effect which can be added onto the experts' evidence.

INK-DATING

31.45 I cannot accept the opinion of Mr Erich J. Speckin, called by the plaintiff, who opined that the ink samples tested from Documents A and C were not dry, and that it was his opinion that the questioned documents were not written on or near the purported dates but at a later time at least in 1996 or later.

31.46 I reject his opinion on the ground that his Dye-ratio method (coupled with accelerated aging) has not been proven to be scientifically valid and reliable. The necessary scientific basis underlying such a method is also unclear.

31.47 Further, it has not been accepted by the scientific community in the field of ink-dating. There is no evidence that this method is being used by any government laboratory or scientists (except the small community of which Mr Speckin

 © 2020 Thomson Reuters. 

is one of them). There is however evidence that this method had been rejected by the courts. Furthermore his technique and procedure are also full of flaws and the arbitrary separation of fused and/or overlapped chromatographic peaks would make the results even more unreliable when the raw data were subjectively manipulated by him. The data themselves might well be mass-dependant and not mass-independant as suggested by him.

31.48 Furthermore, his results also exhibited illogical behaviour and any results deduced therefrom would also be illogical and unreliable. In the end, the five allegedly positive results did not take into account of the overwhelming negative results which were ignored in favour of the positive results. His explanation for doing so is not convincing at all.

31.49 In any event his conclusion was based on statistical analysis of "one standard deviation" only which is well below the minimum level of confidence of two standard deviation or 95% generally accepted by analytical chemists. Consequently the probability of his conclusion of being correct for two sample runs would be between 36% and about 68% only.

31.50 Lastly but not the least, he had been requested by a firm, fJ Cleveland in England to conduct his ink-dating test on 12 signatures of different dates. There and then unknown to him, fJ Cleveland was instructed by the defendant's solicitors to do so. I accept that the defence has proven the various dates of these signatures. But he failed in this "proficiency" test which demonstrated conclusively that either his method was invalid and/or he was incompetent in conducting the Dye-ratio method. It can even be said he was 100% incorrect in his statement that "All inks were found to be dried and showed no evidence of still being in the drying process except sample #11. Sample #11 showed some indication that it was still in the drying process". I have no doubt that the defence has proven to my satisfaction that Sample #11 was a signature in a document which had been in existence since 5 June 1990, i.e. just a few months after the purported date of the 1990 Will.

31.51 In rejecting Mr Speckin's aforesaid opinion, it does not mean that the contrary is proved, i.e. that there is evidence that the ink was already dried and that the document must be written more than three and a half years before the date of his examination in the year 2000. There is simply no evidence to prove one way or the other by way of his method of ink-dating.

31.52 However on the other hand I accept his evidence that Documents A and B were written by the same type of ink viz. Formulab ink, and Document C was written by ink of a different formulation viz. Papermate. The Formulab ink used for Documents A and B was manufactured in 1980. Both the Formulab ink and the Papermate ink used were commercially available in 1990. In fact the Papermate ink is still available commercially today. There is no dispute by the defence on the aforesaid result, except apparently the defence did not accept that Documents A and B were therefore written by the same ball pen. However, I find that they were probably written by the same ball pen (but they were written by two different persons as agreed by all handwriting experts of the plaintiff and the defendant).

THE 1990 DOCUMENTS

31.53 Accordingly it goes without saying that, by reasons of those aforesaid suspicious circumstances and the handwriting evidence, I have no doubt that the questioned signatures of Wang and Tse are forged signatures and the 1990 Documents are forged documents.

ORDERS

(1) Judgment is given for the plaintiff herein and the Court do hereby grant the decree of probate for the said 1968 Will in solemn form of law.

(2) The defendant's counterclaim is dismissed.

(3) In respect of costs, it will be an order nisi any way. Thus I just made an order nisi for 85% of the costs to the plaintiff on the action and the counterclaim, to be taxed if not agreed, with a certificate for three Counsel. The plaintiff has lost on the issue of ink-dating which has taken about 14% of the time of the trial. On the other hand the defendant has defended this action and counterclaimed against the plaintiff on the strength of four forged documents. If both sides accept this nisi order of costs, this shall be made absolute in 14 days' time hereinafter. Otherwise the order in respect of costs will have to be argued by Counsel before me at a later date.

Chapter 32 - Epilogue

32.1 Eventually I have come to the end of this long judgment. There are 171 days of the hearing together with one further day of hearing oral submissions on 15 October 2002. The reason why the hearing of oral submissions could be shortened to one full day was only because counsel had already submitted about 13 boxes of submissions together with four boxes of authorities. At the hearing of oral submissions, there were four more boxes of submissions presented by the parties and thereafter four further bundles of submissions. In respect of trial bundles, documents submitted by the parties have increased day by day and they became many bundles under F and G, particularly the defendant's documents in those bundles under G which has grown up to Bundle G13 together with a Bundle H.

32.2 In this long trial of over a year, I must point out here that it is not possible to deal with every single point raised by the parties in their boxes of submissions without delaying the delivery of the judgment herein. It is by no means disrespectful to counsel appearing before me. I am in fact very grateful for their assistance. However if any point which has not been mentioned herein but at the same time not in line with any of the findings or decisions I made herein, it should be taken that the point has impliedly been rejected by the Court. In fact vice versa is also true.

32.3 I must first of all, thank my clerk, Miss Susanna Fong, for overseeing the clerking works of the whole proceedings. She has the unenviable task of diligently indexing and properly filing all exhibits, documents, books, authorities and written submissions which have increased day by day as aforesaid. She had made list after lists of each category of documents flying in like snow flakes in the hearing. This has assisted me tremendously throughout the trial. In the course of writing this judgment, she has smoothly managed and liaised with various parties, checked all drafts and corrections, and collated the necessary documents in the appendixes. This proved to be a very tedious and tiring job for which she often had to work overtime. She has always been ably assisted by my usher, Miss Jay Yu and my office assistant, Miss Lowell Chan.

32.4 I must also thank Ms Eva Chan, Senior Court Interpreter, for undertaking the interpretation works before, during and after this trial. She is fully conversant in Cantonese, Shanghainese, Putonghua and English. She had to prepare this trial by reading the trial papers and making a glossary of terms for me and the parties beforehand. She has the unenviable task of translating these dialects into English, when some witnesses do not speak the pure dialect, e.g. Wang Sr speaks Shanghainese with mixed accents whereas Mr Yih speaks Cantonese with Wenzhouese, and Shanghainese accents. Further, the parties and in particular the defence have been putting a number of Chinese documents and books to witnesses without English translation at all. This was done in spite of the fact that the defence has always insisted that this should be a trial in English or with English translation for everything as her instructing solicitor in-charge is not conversant with Chinese.

32.5 An illustration would demonstrate her difficulties in court. In the course of leading evidence, Mr Lee, leading counsel for the defence, suddenly introduced amongst various other technical terms on Chinese calligraphy, the term "can tsu y`n wei" in "ll shu", i.e. clerical style ("Chinese text") in evidence. Ms Chan then translated the same as "a silk worm head and a swallow tail" ("Chinese text"). Mr Lee seemed to be very agitated by the translation as he thought the Chinese meaning should be "a wild goose tail" ("Chinese text "). However Ms Chan then calmly advised that both the characters "Chinese text" and "Chinese text" are pronounced as "y`n" in Putonghua. Without prior warning, she did not know which was which, and besides, "Chinese text" (a silkworm head and a swallow tail) is also a feature of clerical style in Chinese calligraphy.1

32.6 Ms Eva Chan together with her colleague, Miss Mandy Tang, Court Interpreter I, have ably assisted me in many of the translations in the course of writing this judgment. They have also assisted in the checking works of my clerk, Miss Fong. Further Ms Eva Chan and Miss Mandy Tang have been translating this judgment into Chinese for those readers who are not conversant with English, and in particular the plaintiff herein. This will be released as soon as it is ready in the near future.

32.7 I must also thank Mrs Jeannie Mok and her team of stenographers, in particular Miss Alice Cheng, who have undertaken the most tedious task of typing of the judgment herein with high efficiency and skill. Many technical problems were not anticipated before because of the complexity involved in producing these 4 volumes of judgment, divided into 3 sections and 32 chapters, with a number of footnotes together with 6 appendixes hereto. They

 © 2020 Thomson Reuters. 

were solved one after the other and I am extremely grateful for their works.

32.8 I also want to thank counsel appearing before me. In respect of the team of three counsel for the plaintiff, Mr Edward Chan SC, Mr Albert Tsang and Mr Victor Luk, I must thank them for their expeditious way of leading evidence, effective and expeditious cross-examination of witnesses, and their precise and concise oral and written speeches and arguments on the disputed issues or points of law submitted in the course of this trial.

32.9 In respect of Mr Martin Lee SC, leading Mr Ramesh Sujanani and Mr Erik Shum for the defence on general issues and handwriting, I must first of all point out that counsel is bound by the professional practice of what is usually called by members of the Bar as the "cab-rank" principle. It has been clearly decided in the case of Rondel v. Worsley,2 that:

"... It has long been recognised that no counsel is entitled to refuse to act in a sphere in which he practises, and on being tendered a proper fee, for any person however unpopular or even offensive he or his opinions may be, and it is essential that that duty must continue: justice cannot be done and certainly cannot be seen to be done otherwise. If counsel is bound to act for such a person, no reasonable man could think the less of any counsel because of his association with such a client, but, if counsel could pick and choose, his reputation might suffer if he chose to act for such a client, and the client might have great difficulty in obtaining proper legal assistance.

Every counsel has a duty to his client fearlessly to raise every issue, advance every argument, and ask every question, however distasteful, which he thinks will help his client's case."

However,

"... in general, without detracting from his duty to his client, counsel can and should exercise in the interests of justice as a whole proper discretion so as not to prolong cases unnecessarily."3

In this respect Mr Erskine QC has always been cited by members of the Bar for his exemplary behaviour. But he was never praised for prolonging his client's case in the trial but for his admirable courage in representing a party who was considered even by the right thinking members of the general public in England in those days as condemnable for his unreasonable and groundless behaviour of defaming members of the Royal family. I am afraid some of the cross-examinations, as indicated in this judgment, turned out to be a fishing expedition that had been disguised under the heading of credibility, and in the end these kinds of cross-examination would only prolong the case.

32.10 Further as an illustration, the examination-in-chief of Prof. Jia for the defence has taken 17 days. More than 170 charts were created by his team of three experts in the course of cross-examination of the plaintiff's experts in handwriting. There should be no reason why they could not reduce their further opinion into writing before Prof. Jia took the witness stand. By then it would be futile and even more costly to adjourn the matter for his further written opinion. It had also been submitted that his further opinion and long examination-in-chief were because of the further opinion given by the plaintiff's experts during their cross-examination. This was eventually not supported by an meticulous examination of the contents of Prof. Jia's evidence-in-chief. On the contrary, this had rendered my various directions in a number of directions hearings before the trial nugatory.

32.11 In fact as aforesaid what happened was Prof. Jia did not rely on their first book of written opinion submitted by them and he himself had in fact tried to dissociate himself therefrom. Admittedly that book of written opinion contained many mistakes and in particular those examples of sample signatures chosen by them to support their various points of similarity were wrong. By then it would be fruitless to vet every single question of Mr Lee when he was leading his witness in-chief in order to find out whether each piece of evidence actually arose from the evidence of the plaintiff's experts during cross-examination or otherwise. In any event if such a course were taken, it would be more than 17 days. The aforesaid is also an illustration to point out that in some areas, the defence was not fully prepared.

32.12 In stark contrast, I find counsel for the defence handling the issue of ink-dating very efficient and helpful. Mr Clive Grossman SC, appeared with Mr Sujanani and Ms Alice Lee for this particular issue. Mr Sujanani did not attend all of the hearings on ink-dating as he was presumably otherwise engaged in some other matters. I find the defence

was fully prepared in the cross-examination of Mr Speckin. They have reduced those very difficult scientific concepts and procedures into some understandable concepts so that the picture presented could be grasped easily by those who are not quite conversant in chemistry and statistics. Mr Grossman has never dragged on a point in cross-examination and he firmly believed in the motto of "enough is enough". However he has not left any point unfinished or otherwise unnecessarily hurry or rushing in his coverage. He is a good example of this motto "festina lente" meaning "hurry up, slowly". I must thank him and his team of counsel for discharging that task admirably. Of course, I have not forgotten that they have a much stronger case in hand.

32.13 Lastly, I must also thank the Judiciary team in the area of information technology. On the technical side it was led by Mrs Juliet Cheng, Chief Judiciary Executive (IT) with her team of technical staff, namely Ms Winnie Lam, Senior Judiciary Executive (IT), Mr Edmond Chan, Judiciary Executive (IT) and Mr Gary Po, System Analyst. On the executive side, there are Mr Chu Woon Ming, Assistant Judiciary Administrator (Quality), Ms Frieda Leung, Senior Judiciary Executive (IT), Mr Tam Yuen Man, Senior Judiciary Executive (IT) and Mr Barry Lee, Judiciary Executive (IT). Throughout the trial, technical assistance was requested from the Judiciary Information Technology Management Section. They had promptly answered my incessant request for technical assistance.

32.14 For example in the course of Prof. Jia's evidence, a microscope was brought in to illustrate a certain part of a stroke with enormous magnification. Originally it was taken up through one of the two eye-pieces into a video system and projected onto a big screen in court. The video effect was unsatisfactory since the resolution and the lighting system in court could not produce a clear image. It then occurred to me that if the signal could be taken up through a video system, the same might well be taken up by a computer software system and could be displayed in a brighter and clearer monitor.

32.15 The Judiciary IT team of staff had promptly answered this question positively. In lightning speed, they installed the whole system in court with a number of monitors so that everyone can observe the image on a monitor in front of them without having to go to the microscope every now and then. This has greatly reduced the length of the hearing and assisted everyone to have a better understanding of the actual condition of the stroke under the microscope. All these computer images were stored in the computer files with nicely printed out copies and bundled together in Bundle H as aforesaid. I must thank all the staff of the Information Technology Management Section of our Judiciary for their prompt assistance throughout this trial when the same was urgently requested. No doubt they have to shoulder a number of other duties for the whole computer system in the Judiciary.

32.16 In the course of writing this judgment, the four teams of staff, comprising my staff, the interpreters, the stenographers, and the computer experts have assisted me throughout. In particular the first three mentioned teams have worked regularly beyond the usual regular hours and over the weekends especially in the past few weeks. Their concerted efforts and determination to assist me in finishing this judgment as early as possible so that tax-payers' money would not be further spent on this lengthy trial are highly appreciated. I am sure their admirable efforts will be appreciated even by the general public at large especially in the present financial crisis of the Hong Kong Government.

32.17 With all the assistance I received, it goes without saying that all mistakes herein are mine.

32.18 No doubt many tax-payers will be asking the question as to why should the Executive Government provide the judicial service free of charge to everyone when in some cases the parties should when they could pay for the resolution of disputes in the court. This is a rather complicated question. At present a plaintiff is only required to pay $1,0454 for the issuance of writ and nothing else. A defendant does not have to pay a cent to the Judiciary, i.e. everything else for both parties is free of charge. Further some may even ask why parties in a piece of litigation cannot be provided with or compelled to go through other Alternative Disputes Resolution, commonly called ADR, including mediation. This will no doubt shorten the judicial time and lower the expenses therefor. All the aforesaid questions, I am afraid, are the works of the Chief Justice's Working Party on Civil Justice Reform. No doubt certain drastic and innovative suggestions will be made in their final report.

32.19 There are only two outstanding matters which I would like to mention at the very end of this judgment. Throughout the trial, I have never forgotten the original cause for this piece of litigation and that is the unlawful kidnap of the deceased

 © 2020 Thomson Reuters. 

resulting in his death in or about April 1990. The plaintiff, Mr Wang Sr and the defendant, Mrs Nina Wang, both have lost the one near and dear to them, Wang Sr his son and Mrs Wang her husband. To both of them I want to extend my deep condolences.

32.20 Now I have come to the very end of this very long judgment. I would like to end it with what I have begun in this judgment, which represents a strong feeling I have every now and then throughout this trial and that is:

"Man is a mere phantom as he goes to and fro:

He bustles about, but only in vain;

he heaps up wealth, not knowing who will get it."

Psalm 39:6, (NIV)

1 "Chinese text"

See FAQs on Calligraphy by Min Xiang-de, Guangdong People's Publishing House 1985 p.42 "What is a silk worm head and a swallow tail?"

2 [1969] 1 AC 191 at 227, HL per Lord Reid

3 Halsbury's Law of England (4th ed.) Vol. 3(1) para.415 and R. v. Simmonds [1969] 1 QB 685, per Fenton Alkinson J

4 The recent request by the Executive Government to increase a little bit on the present scale of charges has been rejected by the Legco Finance Committee.

Appendix 1

Date Trial date Witness Evidence Progress

6 Aug., 2001 (Mon) Day 1 Plaintiff 's Opening

7 Aug., 2001 (Tue) Day 2 PW1- Chan Suk Ping, Cyan XIC (1136) (p.18 line 22)

Xxn (1443) (p.26 line15)

Re-xn (1520) (p.53 line 8)

PW2- Wong Pik Chui XIC (1532) (p.56 line 25)

Xxn (1545) (p.61 line 12)

No Re-xn (1640)

8 Aug., 2001 (Wed) Day 3 PW3- DSIP Cheung Siu Lun XIC (1025) (p.1 line 10)

Xxn (1215) (p.21 line 25)

Re-xn (1600) (p. 64 line 12)

9 Aug., 2001 (Thu) Day 4 PW4 - Cheung Yat Ming XIC (1025) (p.12 line 15)

No Xxn (1046)

PW5- Wang Din Shin XIC (1140- 1610) (p.32 line 6)

Total: 14 days

XIC: 5 days

Xxn: 8 days

Re-xn: 1 day

10 Aug., 2001 (Fri) Day 5 PW5 XIC cont'd (1007-1608) (p.1 line 3)

13 Aug., 2001 (Mon) Day 6 PW5 XIC(1008-1135) (p.1 line 3)

PW 6- Stephen Kwok Ki Wong XIC (1205-1230) (p.25 line 21)

Xxn (1230) (p.37 line 9)

Re-xn (1253) (p.51 line 12)

14 Aug., 2001 (Tue) Day 7 PW 5 XIC cont'd (1005-1150) (p.1 line 3)

15 Aug., 2001 (Wed) Day 8 PW 5 XIC cont'd (1005-1428) (p.1 line 3)

Xxn (1428-1630) (p.36 line 11)

 © 2020 Thomson Reuters. 

16 Aug., 2001 (Thu) Day 9 DW1- Roderick Bun Woo As DW1 said he did not

have any documents

mentioned in the subpoena,

no further questions were

put to the witness.

(p.2 line 2)

PW5 Xxn cont'd (1010-1205)

(p.4 line 4)

17 Aug., 2001 (Fri) Day 10 PW5 Xxn cont'd (1210- 1300)

(p.6 line 21)

20 Aug., 2001 (Mon) Day 11 PW5 Xxn cont'd (1007-1708)

(p.2 line 11)

21 Aug., 2001 (Tue) Day 12 PW5 Xxn cont'd (1005-1655)

(p.4 line 17)

22 Aug., 2001 (Wed) Day 13 PW7 - Donald Quintin Cheung Video Link

XIC (0928-1025) (p.4 line 4)

Xxn (1025-1050) (p.25 line 24)

Re-xn (1050-1300) (p.40 line 2)

PW5 Xxn cont'd (1556-1645) (p.51 line 21)

23 Aug., 2001 (Thu) Day 14 PW5 Xxn cont'd (1020-1645) (p.1 line 3)

24 Aug., 2001 (Fri) Day 15 PW5 Xxn cont'd (1008-1608) (p.1 line 3)

27 Aug., 2001 (Mon) Day 16 PW5 Xxn cont'd (1005-1215) (p.1 line 4)

Re-xn (1215- 1550) (p. 37 line 14)

28 Aug., 2001 (Tue) Day 17 PW8- Gus R. Lesnevich XIC (1007-1630) (p.1 line 4)

Total: 7 days

XIC: 1.5 days

Xxn: 3.5 days

Re-xn: 2 days

29 Aug., 2001 (Wed) Day 18 PW8 XIC cont'd (1010-1100) (p.1 line 3)

Xxn (1100-1625) (p.18 line 13)

30 Aug., 2001 (Thu) Day 19 PW8 Xxn cont'd (1005-1650) (p.1 line 3)

31 Aug., 2001 (Fri) Day 20 PW8 Xxn cont'd (1005-1615) (p. 1 line 3)

3 Sept., 2001 (Mon) Day 21 PW8 Xxn cont'd (1007-1600) (p.1 line 3)

Re-xn (1600-1645) (p.134 line 22)

4 Sept., 2001 (Tue) Day 22 PW8 Re-xn cont'd (1005-1023) (p.1 line 3)

PW9- Patrick Cheng Yau Sang XIC (1023-1625) (p. 8 line 21)

Total: 10 days

XIC: 3 days

Xxn: 6.5 days

Re-xn: 0.5 day

5 Sept., 2001 (Wed) Day 23 PW9 XIC cont'd (1015-1300) (p.1 line 3)

 © 2020 Thomson Reuters. 

6 Sept., 2001 (Thu) No Sitting For PW9 to study originals of known

signatures of Tse and Wang to make

further report

7 Sept., 2001 (Fri) Day 24 PW9 XIC cont'd (1025-1635) (p.1 line 3)

10 Sept., 2001 (Mon) Day 25 PW9 XIC cont'd (1000-1020) (p.1 line 3)

Xxn (1020-1630) (p.10 line 19)

11 Sept., 2001 (Tue) Day 26 PW9 Xxn cont'd (1000-1635) (p.1 line 8)

12 Sept., 2001 (Wed) Day 27 PW9 Xxn cont'd (1005-1630) (p.1 line 3)

13 Sept., 2001 (Thu) Day 28 PW9 Xxn cont'd (1005-1645) (p.1 line 3)

14 Sept., 2001 (Fri) Day 29 PW9 Xxn cont'd (1005-1637) (p.1 line 3)

17 Sept., 2001 (Mon) Day 30 PW9 Xxn cont'd (1005-1640) (p.1 line 3)

18 Sept., 2001 (Tue) Day 31 PW9 Xxn cont'd (1005-1210) (p.1 line 3)

Re-xn (1210-1630) (p. 63 line 4)

19 Sept., 2001 (Wed) Day 32 PW10- Tsui Chee Keung, David XIC (1007-1630) (p.1 line 5)

Total: 19 days

XIC: 3 days

Xxn: 14 days

Re-xn: 1 day

20 Sept., 2001 (Thu) Day 33 PW10 XIC cont'd (1005-1630) (p.1 line 3)

21 Sept., 2001 (Fri) Day 34 PW10 XIC cont'd (1013-1050) (p.1 line 3)

End of XIC

Mr. Lee's application to adjourn Xxn

of PW10 is allowed

24 & 25 Sept., 2001 (Mon-Tue) No Sitting Requested by Counsel for preparation

of Ink-dating evidence

26 Sept., 2001 (Wed) Day 35 PW11 - Erich J. Speckin XIC (1005-1638) (p.2 line 13)

Total: 12 days

XIC: 2 days

Xxn: 9 days

Re-xn: 1 day

27 Sept, 2001 (Thu) Day 36 PW 12 - Derek Woo Called to produce the school record of

Wang Teh Huei and released after

Producing the documents to court

(p.1 line 3)

PW13 - Dr. Edmund K.W. Woo XIC (1008-1050) (p.2 line 15)

Xxn (1123-1247) (p.27 line 6)

Re-xn (1247-1250) (p.78 line 17)

28 Sept., 2001 (Fri) Day 37 PW11 XIC cont'd (1005-1535) (p.1 line 3)

1-2 Oct., 2001 (Mon-Tue) No Sitting Public Holidays

 © 2020 Thomson Reuters. 

3 Oct., 2001 (Wed) Day 38 PW11 XIC cont'd (1005-1008) (p. 1 line 3)

Xxn (1008-1600) (p. 2 line 15)

4 Oct., 2001 (Thu) Day 39 PW11 Xxn (1010-1635) (p.1 line 3)

5 Oct., 2001 (Fri) Day 40 PW11 Xxn (1026-1300) (p.3 line 1)

PW11 wasn't feeling very well

And requested to take a rest

in the afternoon

8 Oct., 2001 (Mon) Day 41 PW11 Ruling on Deft's application to

compel PW11 to furnish the university

education record with court

Xxn cont'd (1220-1635) (p.26 line 14)

9 Oct., 2001 (Tue) Day 42 PW11 Xxn cont'd (1020-1600) (p.1 line 3)

10 Oct., 2001 (Wed) Day 43 PW11 Xxn cont'd (1005-1635) (p.1 line 3)

11 Oct., 2001 (Thu) Day 44 PW11 Xxn cont'd (1005-1630) (p.1 line 3)

12 Oct., 2001 (Fri) Day 45 PW11 Xxn cont'd (1010-1630) (p.2 line 4)

15 Oct., 2001 (Mon) Day 46 PW11 Xxn cont'd (1005-1300) (p.1 line 3)

Ruling on the release of Original

Tse Ping Yim statement to police and

the arrangement for the examination

of the statement by experts from both

sides

Xxn cont'd (1510-1625)

(p.103 line 17)

16 Oct., 2001 (Tue) Day 47 PW11 Xxn cont'd (1000-1600) (p. 1 line 3)

17 Oct., 2001 (Wed) Day 48 PW11 Xxn cont'd (1004-1006) (p.1 line 3)

Re-xn (1006-1450) (p.1 line 25)

DW2- Peter Tytell XIC (1500-1614) (p.83 line 18)

Total: 5 days Xxn (1614-1640) (p.119 line 20)

XIC: 1 day

Xxn: 3.5 days

Re-xn: 0.5 day

18 Oct., 2001 (Thu) Day 49 PW14- Dr. Li Siu Man Called to produce the medical report

Of Tse Ping Yim and released after

Producing the documents

(p.1 line 3)

DW2 Xxn cont'd (1014-1635)

(p.4 line 11)

19 Oct., 2001 (Fri) Day 50 DW2 Xxn cont'd (1005-1548) (p.1 line 3)

Re-xn (1548-1624) (p. 87 line 19)

22 Oct., 2001 (Mon) Day 51 DW3- Dr. Valeny N. Aginsky XIC (1010-1635) (p.2 line 13)

 © 2020 Thomson Reuters. 

Total: 6.5 days

XIC: 1.5 days

Xxn: 4.5 days

Re-xn: 0.5 day

23 Oct., 2001 (Tue) Day 52 DW3 XIC (1012-1435) (p. 1 line 3)

Xxn (1435-1630) (p.57 line 23)

24 Oct., 2001 (Wed) Day 53 DW3 Xxn cont'd (1005-1630) (p.1 line 3)

25 Oct.2001 (Thu) No Sitting Plf's Counsel had to sit in CFA

26 Oct., 2001 (Fri) Day 54 DW3 Xxn cont'd (1055-1635) (p.1 line 2)

29 Oct., 2001 (Mon) Day 55 DW3 Xxn cont'd (1030-1717)

(p. 13 line 18)

30 Oct., 2001 (Tue) Day 56 DW3 Xxn cont'd (1005-1615)

(p. 1 line 3)

31 Oct., 2001 (Wed) Day 57 DW3 Xxn cont'd (1006-1030) (p. 1 line 3)

Re-xn (1030-1250) (p.10 line 20)

PW10-Tsui Chee Keung, David XIC cont'd (1440-1630)

(p. 56 line 16)

Xxn (p. 68 line 1)

1 Nov., 2001 (Thu) Day 58 PW10 Xxn cont'd (1005-1630)

(p.1 line 3)

2 Nov., 2001 (Fri) Day 59 PW10 Xxn cont'd (1015-1630)

(p.1 line 3)

5 Nov., 2001 (Mon) Day 60 PW10 Xxn cont'd (0900-1650)

(p.1 line 3)

6 Nov., 2001 (Tue) Day 61 PW10 Xxn cont'd (1005-1630)

(p.1 line 3)

7 Nov., 2001 (Wed) Day 62 PW10 Xxn cont'd (1005-1545)

(p.1 line 3)

8 Nov., 2001 (Thu) Day 63 PW10 Xxn cont'd (1015-1630)

(p.2 line 14)

9 Nov., 2001 (Fri) Day 64 PW10 Xxn cont'd (1000-1640)

(p.1 line 3)

12-13 Nov., 01 (Mon-Tue) No Sitting Deft's Counsel had to appear at CFA

14 Nov., 2001 (Wed) Day 65 PW10 Xxn cont'd (1005-1635)

(p.1 line 3)

15 Nov., 2001 (Thu) Day 66 PW10 Xxn cont'd ( 1005-1635)

(p.1 line 3)

16 Nov., 2001 (Fri) Day 67 PW10 Xxn cont'd (1005-1635)

(p.1 line 3)

19 Nov., 2001 (Mon) Day 68 PW10 Xxn cont'd (1005-1625)

(p.1 line 3)

20 Nov., 2001 (Tue) Day 69 PW10 Xxn cont'd (1005-1635)

(p.1 line 3)

21 Nov., 2001 (Wed) Day 70 PW10 Xxn cont'd (1007-1635)

(p.1 line 3)

22 Nov., 2001 (Thu) Day 71 PW10 Xxn cont'd (1015-1145) (p.1 line 3)

End of Xxn

23 Nov., 2001 (Fri) Day 72 PW10 Re-xn (1010-1543) (p.1 line 3)

26 Nov., 2001 (Mon) Day 73 DW4 - Professor Jia yu-wen XIC (1005-1630) (p.1 line 15)

Total: 36 days

XIC: 17 days

Xxn: 17.5 days

Re-xn: 1.5 days

27 Nov., 2001 (Tue) Day 74 DW4 XIC (1005-1635) (p.1 line 3)

28 Nov., 2001 (Wed) Day 75 DW4 XIC (1005-1630) (p.1 line 3)

29 -30 Nov.,01 (Thu-Fri) No Sitting

3 Dec., 2001 (Mon) Day 76 DW4 XIC (1002-1635) (p.1 line 3)

4 Dec., 2001 (Tue) Day 77 DW4 XIC (1010-1630) (p.1 line 3)

5 Dec., 2001 (Wed) Day 78 DW4 XIC (1008-1635) (p.1 line 3)

6 Dec., 2001 (Thu) Day 79 DW4 XIC (1010-1630) (p.1 line 3)

7 Dec., 2001 (Fri) Day 80 DW4 XIC (1008-1635) (p.1 line 3)

10 Dec., 2001 (Mon) Day 81 DW4 XIC (1010-1630) (p.1 line 3)

11 Dec., 2001 (Tue) Day 82 DW4 XIC (1010-1630) (p.1 line 3)

12 Dec., 2001 (Wed) Day 83 DW4 XIC (1005-1635) (p.1 line 3)

13 Dec., 2001 (Thu) Day 84 DW4 XIC (1005-1630) (p.1 line 3)

14 Dec., 2001 (Fri) Day 85 DW4 XIC (1020-1635) (p.1 line 3)

17 Dec., 2001 (Mon) Day 86 DW4 XIC (1010-1635) (p.1 line 3)

18 Dec., 2001 (Tue) Day 87 DW4 XIC (1005-1626) (p.1 line 3)

19 Dec., 2001 (Wed) Day 88 DW4 XIC (1010-1625) (p.1 line 3)

20 Dec., 2991 (Thu) Day 89 DW4 XIC (1140-1507) (p.1 line 3)

End of XIC

21 Dec.,2001-(Fri)

11 Jan., 2002 (Fri) No Sitting

14 Jan., 2002 (Mon) Day 90 Deft's Counsel applied leave to take

Instructions from DW4 as to the

Measurement exercise put by the Plf's

Counsel

15 Jan., 2002 (Tue) Day 91 DW4 Xxn (1005-1635) (p.2 line 5)

16 Jan, 2002 (Wed) Day 92 DW4 Xxn cont'd (1010-1630) (p.1 line 3)

17 Jan., 2002 (Thu) Day 93 DW4 Xxn cont'd (1005-1645) (p.1 line 3)

18 Jan., 2002 (Fri) Day 94 DW4 Xxn cont'd (1010-1630) (p.1 line 3)

21 Jan., 2002 (Mon) Day 95 DW4 Xxn cont'd (1010-1640) (p.1 line 3)

22 Jan., 2002 (Tue) Day 96 DW4 Xxn cont'd (1005-1645) (p.1 line 3)

23 Jan., 2002 (Wed) Day 97 DW4 Xxn cont'd (1110-1705) (p.1 line 3)

24 Jan., 2002 (Thu) Day 98 DW4 Xxn cont'd (1015-1645) (p.1 line 3)

25 Jan., 2002 (Fri) Day 99 DW4 Xxn cont'd (1010-1710) (p.1 line 3)

28 Jan-15 Feb, 2002 No Sitting

18 Feb., 2002 (Mon) Day 100 DW4 Xxn cont'd (1005-1635) (p.1 line 3)

19 Feb., 2002 (Tue) Day 101 DW4 Xxn cont'd (1005-1630) (p.5 line 2)

20 Feb., 2002 (Wed) Day 102 DW4 Xxn cont'd (1008-1700) (p.1 line 3)

21 Feb., 2002 (Thu) Day 103 DW4 Xxn cont'd (1005-1655) (p.1 line 3)

22 Feb., 2002 (Fri) Day 104 DW4 Xxn cont'd (0950-1635) (p.1 line 3)

25 Feb., 2002 (Mon) Day 105 DW4 Xxn cont'd (1005-1730) (p.1 line 3)

26 Feb., 2002 (Tue) Day 106 DW4 Xxn cont'd (1015-1700) (p.1 line 3)

27 Feb., 2002 (Wed) Day 107 DW4 Xxn cont'd (1015-1640) (p.1 line 3)

28 Feb, 2002 (Thu) Day 108 DW4 Xxn cont'd (1100-1120) (p.2 line 9)

Re-xn (1205-1700) (p.27 line 15)

1 March, 2002 (Fri) Day 109 DW4 Re-xn (1005-1340) (p.1 line 3)

End of DW4 Evidence

4 March, 2002 (Mon) Day 110 PW15- Yih Lee Kong XIC (1035-1625) (p.12 line 3)

Total: 23.5 days

XIC: 1.5 days

Xxn: 20 days

Re-xn: 2 days

5 March, 2002 (Tue) Day 111 PW15 XIC cont'd (1010-1454) (p.1 line 3)

Xxn (1533-1635) (p.47 line 3)

6 March, 2002 (Wed) No Sitting Deft's Counsel had to attend budget

Date meeting

7 March, 2002 (Thu) Day 112 PW15 Xxn cont'd (1003-1630) (p.2 line 20)

8 March, 2002 (Fri) Day 113 PW15 Xxn cont'd (1015-1635) (p.2 line 8)

11 March, 2002 (Mon) Day 114 PW15 Xxn cont'd (1055-1640) (p.1 line 3)

12 March, 2002 (Tue) Day 115 PW15 Xxn cont'd (1036-1650) (p.14 line 2)

13 March, 2002 (Wed) Day 116 PW15 Xxn cont'd (1020-1630) (p.1 line14)

14 March, 2002 (Thu) Day 117 PW15 Xxn cont'd (1015-1630) (p.1 line 3)

15 March, 2002 (Fri) Day 118 PW15 Xxn cont'd (1005-1630) (p.1 line 3)

18 March, 2002 (Mon) Day 119 PW15 Xxn cont'd (1012-1635) (p.1 line 3)

19 March, 2002 (Tue) Day 120 PW15 Xxn cont'd (1005-1640) (p.1 line 3)

20 March, 2002 (Wed) Day 121 PW15 Xxn cont'd (1005-1635) (p.1 line 3)

21 March, 2002 (Thu) Day 122 PW15 Xxn cont'd (1005-1647) (p.1 line 3)

22 March, 2002 (Fri) Day 123 PW15 Xxn cont'd (1005-1630) (p.1 line 3)

25 March - 4 April, 2002 No Sitting

8 April, 2002 (Mon) Day 124 PW15 Xxn cont'd (1020-1630) (p.4 line 4)

9 April, 2002 (Tue) Day 125 PW15 Xxn cont'd (1005-1700) (p.1 line 3)

10 April, 2002 (Wed) Day 126 PW15 Xxn cont'd (1047-1635) (p.10 line 10)

11 April, 2002 (Thu) Day 127 PW15 Xxn cont'd (1010-1632) (p.1 line 3)

12 April, 2002 (Fri) Day 128 PW15 Application on discovery

Ruling delivered

Xxn cont'd (1450-1700) (p.67 line 8)

15 April, 2002 (Mon) Day 129 PW15 Xxn cont'd (1005-1640) (p.1 line 3)

16 April, 2002 (Tue) Day 130 PW15 Xxn cont'd (1035-1640) (p.1 line 3)

17 April, 2002 (Wed) Day 131 PW15 End of Xxn

Re-xn (1023-1640) (p.1 line 13)

18 April, 2002 (Thu) Day 132 PW15 Re-xn cont'd (1005-1706) (p.1 line 3)

End of Re-xn

End of PW15 evidence

19 April, 2002 (Fri) Day 133 PW16- Teresa Tak Shyan Sun XIC (1055-1630) (p.23 line 2)

Total: 16.5 days

XIC: 3.5 days

Xxn: 12.5 days

Re-xn: 0.5 days

22 April, 2002 (Mon) Day 134 PW16 XIC cont'd (1006-1645) (p.2 line 1)

23 April, 2002 (Tue) No Sitting Deft' s Counsel sick leave

24 April, 2002 (Wed) Day 135 PW16 XIC cont'd (1010-1647) (p.1 line 3)

25 April, 2002 (Thu) Day 136 PW16 XIC cont'd (1010-1110) (p.1 line 3)

26 April, 2002 (Fri) Day 137 PW16 Xxn (1010-1635) (p.1 line 3)

29 April, 2002 (Mon) Day 138 PW16 Xxn cont'd (1007-1630) (p.1 line 3)

30 April, 2002-

1 May, 2002

(Tue- Wed) No Sitting

2 May 2002 (Thu) Day 139 PW16 Xxn cont'd (1010-1640) (p.1 line 3)

3 May 2002 (Fri) Day 140 PW16 Xxn cont'd (1005-1640) (p.1 line 3)

6 May, 2002 (Mon) Day 141 PW16 Xxn cont'd (1010-1630) (p.1 line 3)

 © 2020 Thomson Reuters. 

7 May, 2002 (Tue) Day 142 PW16 Xxn cont'd (1012-1635) (p.1 line 3)

8 May, 2002 (Wed) Day 143 PW16 Xxn cont'd (1005-1635) (p.10 line 2)

9 May, 2002 (Thu) Day 144 PW16 Xxn cont'd (1004-1635) (p.1 line 3)

10 May, 2002 (Fri) Day 145 PW16 Xxn cont'd (1005-1630) (p.1 line 3)

13 May, 2002 (Mon) Day 146 PW16 Xxn cont'd (1005-1610) (p.1 line 3)

14 May, 2002 (Tue) Day 147 PW16 Xxn cont'd (1010-1635) (p.1 line 3)

15 May, 2002 (Wed) Day 148 PW16 Xxn cont'd (1005-1645) (p.1 line 3)

16 May, 2002 (Thu) Day 149 PW16 Xxn cont'd (1020-1045) (p.1 line 3)

Further Xxn (1512-1515) (p.44 line 7)

Re-xn (1130-1452) (p.10 line 2)

No Further Re-xn (1515) (p. 45 line 7)

17 May, 2002 (Fri) No Sitting Run out of witness and Plf's Counsel

had to take specific instructions

20 May, 2002 (Mon) No Sitting Public Holiday

21 May, 2002 (Tue) Day 150

Defence

Case

(except

experts) DW5 - Alex Lam Fong Vai XIC (1155-1436) (p.39 line 2)

Total: 3 days Xxn (1437-1635) (p.67 line 2)

XIC: 0.5 day

Xxn: 2 day

Re-xn: 0.5 day

22 May, 2002 (Wed) Day 151 DW5 Xxn cont'd (1010-1640) (p.1 line 3)

23 May, 2002 (Thu) Day 152 DW5 Xxn cont'd (1115-1305) (p.6 line 3)

24 May, 2002 (Fri) Day 153 DW5 Re-xn (1450-1516) (p.1 line 4)

10 June, 2002 (Mon) Day 154 DW6 - Allan Chun Yue Leung XIC (1010-1155) (p.1 line 6)

Xxn (1155-1625) (p.42 line 23)

Re-xn (1625-1650) (p. 131 line 6)

11 June, 2002 (Tue) Day 155 DW7- Dr. Brian Hormus

George Choa XIC (1220-1455) (p.13 line 3)

Xxn (1455-1640) (p.45 line 6)

No Re-xn

12 June, 2002 (Wed) Day 156 DW8- Anthony Quintin Cheung XIC (1410-1515) (p.1 line 5)

Xxn (1515-1700) (p.71 line 23)

13 June, 2002 (Thu) Day 157 DW8 Xxn cont'd (1010-1600) (p.2 line 8)

No Re-xn (1615) (p.127 line 6)

14 June, 2002 (Fri) Day 158 DW9- Cecil Chao Sze Tsung XIC (1045-1130) (p.3 line 12)

 © 2020 Thomson Reuters. 

Xxn (1207-1215) (p.25 line 1)

Re-xn (1215-1217) (p. 28 line 17)

DW10 - James C. Ng XIC (1430-1510) (p.30 line 3)

Xxn (1510-1540) (p.50 line 3)

No Re-xn (1540) (p.69 line 5)

17 June, 2002 (Mon) Day 159 DW11- Edwin Cheung XIC (1009-1557) (p.1 line 11)

Xxn (1557-1645) (p. 54 line 18)

18 June, 2002 (Tue) Day 160 DW11 Xxn cont'd (1010-1615) (p.1 line 6)

Re-xn (1615-1625) (p.109 line 23)

19 June, 2002 (Wed) Day 161 DW12 - Dr. Kung Yan Sum XIC (1010-1440) (p.1 line 7)

Xxn (1443-1556) (p.47 line 9)

20 June, 2002 (Thu) Day 162 DW12 Xxn cont'd (1010- 1645) (p.1 line 3)

21 June, 2002 (Fri) Day 163 DW12 Xxn cont'd (1010-1206) (p.1 line 3)

No Re-xn (1206) (p.27 line 7)

24 June, 2002 (Mon) Day 164 DW13- Alan Y. Kwan XIC (0945- 1157) (p.1 line 6)

Xxn (1210-1255) (p.54 line 2)

Re-xn (1435-1438) (p.81 line 10)

25 June (Tue) -

1 July, 2002 (Mon) No Sitting Court adjourned for Plf's Counsel

to attend a meeting in Scotland

Court was told by Deft's Counsel that

no witness was available in this period

2 July, 2002 (Tue) Day 165 DW14- Li Kwok Kee XIC (1010-1240) (p.1 line 21)

Total: 4 days Xxn (1438-1628) (p.39 line 13)

XIC: 0.5 day

Xxn: 2.5 days

Re-xn: 1 day

3 July, 2002 (Wed) Day 166 DW14 Xxn cont'd (1007-1650) (p.1 line 3)

4 July, 2002 (Thu) Day 167 DW14 Xxn cont'd (1005-1535) (p.1 line 3)

Re-xn (1535-1635) (p.57 line 23)

5 July, 2002 (Fri) Day 168 DW14 Re-xn cont'd (1015-1555) (p.1 line 3)

Further Xxn (1558-1650) (p.52 line 14)

No Further Re-xn (p.66 line 17)

8 July, 2002 (Mon) Day 169 Dr. Peter Wu's two

statements read in

court Plf agreed to their admissibility

Adjourned to 2:30 p.m. on 9th for

Deft to round up her case

9 July, 2002 (Tue) Day 170 Resumed at 2:30 p.m. Adjourned to 15 Oct., 2002 for final

Submission

7 Oct., 2002 (Mon) Day 171 For Directions

(heard in Chambers) 1025-1130

15 Oct., 2002 (Tue) Day 172 Closing Submissions 1015-1700

Court: C.A.V.

Appendix 2

"Image"

(Certified Translation of Document A)

WILL

Witness: Tse Ping Yim (signed)

Lee [illegible] Sg (signed)

12th day of March 1990, I, Wang Teh Huei, of 15 Bluff Path, The Peak, Hong Kong, solemnly make this will that after my death, all my property shall be bequeathed to my wife Nina Kung.

Wang Teh Huei (signed)

"Image"

(Certified Translation of Document B)

X Tse Ping Yim (signed) X

After the death of me Wang Teh Huei, all (my) property shall be left to my wife Nina Kung for her management and no one shall disagree with that. I love my wife. She is my dearest in the world. After my death, all of my property, real estate and my body shall all belong to my beloved wife. Although my father and mother disappoint me, I still insist that my wife must take care of them and also that ailing younger sister who can never possibly support herself.

Wang Teh Huei (signed)

"Image"

(Certified Translation of Document C)

Tse Ping Yim (signed)

After my death, all my property shall be left to my wife and no one shall object to that. My wife shall manage all the property, but shall never deliver or give any monetary benefit or property to any others of my Wang's family. They are all disappointing. But, neither shall (my) wife share out the property to anyone of your Kung's family, because everyone of your Kung's family is also disgusting.

Wang Teh Huei (signed)

"Image"

(Certified Translation of Document D)

Tse Ping Yim (signed)

One

life

one

love

Wang Teh Huei (signed)

Appendix 3

"Image"

Appendix 4

"Image"

Appendix 5

HCEA79/99

IN THE HIGH COURT OF THE

HONG KONG SPECIAL ADMINISTRATIVE REGION

COURT OF FIRST INSTANCE

HIGH COURT EX PARTE APPLICATION NO.79 OF 1999

------------

IN THE ESTATE OF WANG TEH HUEI ("Chinese text"), presumed deceased

------------

Coram: Hon Yam J in Chambers

Dates of Hearing: 8-10, 13, 14, 17 and 20 September 1999

Date of Delivery of Judgment: 22 September 1999

-------------------------------------------------------------------

J U D G M E N T

on application for leave to swear death

-------------------------------------------------------------------

The Application

This is an application for leave to swear death made by Mr Wang Din Shin ("Mr Wang Senior"). Mr Wang Senior is now 88 years of age. He is the father of Wang Teh Huei ("T.H. Wang"), who was kidnapped on 10 April 1990. Mr Wang Senior made the present application on the ground that Wang Teh Huei has not been seen or heard of for almost 9 1/2 years since his being kidnapped.

Madam Nina Kung opposed this application. She is the wife of T.H. Wang. She claims:-

i) to have spoken to T.H. Wang on 23 April 1990;

ii) to have been shown a photograph of him on 2 September 1996;

iii) to have spoken to him on 14 December 1996.

The Law

Before I shall deal with the evidence before this Court, I shall first of all deal with the law in respect of an application for leave to swear death.

Two passages in two leading textbooks were relied on by Mr Warren Chan, SC, for the Applicant. The law and practice is stated in Williams, Mortimer, Sunnucks on Executors, Administrators and Probate (17th ed) page 354 as follows:

"As the court decides the order of death of two or more persons in cases of doubt, so it decides whether a person's death is so far to be assumed as to allow the person who would be entitled to a grant to his estate if he died to swear as to belief that he died on or since a particular date.

This decision is made in cases where the applicant for a grant, whether or probate or administration, is unable to swear to the death of the presumed deceased because of lack of direct evidence. The court does not presume the missing person to be dead and should he prove to be alive, he may apply to a registrar or judge (according to who made the order) for its rescission and for revocation of the grant.

The principal circumstances in which the application is made are: (i) that the presumed deceased has not been heard of for a considerable period by those with whom he might be expected to communicate; or (ii) that he has disappeared in circumstances pointing to suicide or accidental death.

(i) Persons who have not been heard of for a long period

Where a person has not been heard of for a period of seven years and upwards there may be a presumption that he is dead, but the question is generally one of the inference to be drawn from the facts. Thus, while in ordinary cases a person might be expected to communicate with his friends and relatives, there may sometimes be good reasons for his not doing so."

Halsburys Laws of England (4th ed.) Vol. 17 para. 854 at 451-452 stated that:

"On an application for a grant of probate or administration where there is no direct evidence of death, for example where a person has disappeared and his body has not been found, an application must also be made for leave to swear to the death1 ...

1. The probate court does not find as a fact the death of the deceased; it merely gives the applicant leave to swear to death ..."

 © 2020 Thomson Reuters. 

Mr Denis Chang, SC, for Madam Kung relied on the aforesaid two citations and contended that an application for leave to swear death must be accompanied by an application for a probate action. Previously in the Court of Appeal, the probate action was struck out on the ground that there was no death proved for the purposes of Order 76. It was directed that the Applicant should renew the application for leave to swear death first before any probate action could be entertained by the Court. Now Mr Chang, SC, submitted that there is an application to swear death but no probate action.

Mr Chan, SC, however, submitted that the aforesaid citations were made in the context of non-contentious probate matter as follows:-

"(i) The passage in Mortimer (i.e. para 354) appears in Chapter 26, which is part of 'PART THREE: NON-CONTENTIOUS PRACTICE'.

(ii) The passage in Halsbury (i.e. para. 854) is under the heading of 'PROBATE IN COMMON FORM'. In other words, the reference to 'On an application for a grant of probate or administration' does not refer to a probate action."

Thus, Mr Chan, SC, submitted that the 'jurisdiction' argument of Mr Chang, SC, which was raised on instructions, is entirely misconceived. Further, in the alternative argument of Mr Chang, SC, he said that:-

"Your Lordship can give a direction as to the determination of the locus - any dispute over the two competing wills - without giving leave to swear death on the evidence at the moment."

This submission amounted to saying that I should give directions as to the determination of two competing wills before I can decide on the locus of the Applicant for leave to swear death and defer the application for leave to swear death after the aforesaid determination.

I agree with Mr Chan, SC, that this apparently is tantamount to inviting this Court to act contrary to the decision of the Court of Appeal which, of course, Mr Chang, SC, in his reply said he never had such an intention. All in all, I accept that the passages cited were only concerned with non-contentious probate application for a grant of probate or administration. In the end, I am bound by the decision of the Court of Appeal with which I respectfully agree, that I have to determine the application before me first before any contentious probate action.

The Basis of the Application

The basis of the present application of Mr Wang Senior is that T.H. Wang, having been kidnapped on 10 April 1990, has not been seen or heard of thereafter for almost 9 1/2 years.

In his first affirmation, Mr Wang Senior also relied on the statements and other materials relating to the trial of Lee Wai Kit and Tsang Heung Hung before Stuart-Moore J (as he then was) in October and November 1993. The two Defendants were convicted of the forcible detention and taking away of T.H. Wang with intent to procure a ransom and false imprisonment of T.H. Wang respectively. According to Mr Wang Senior, evidence was led in that case that over a short period of three days or so, T.H. Wang was kidnapped by violent criminals intent on obtaining a very large ransom for him, to an admitted encounter of boats out at sea and the passing of a man whose feet and hands were tied up from one boat to another and then to a third one, and thereafter (in a drugged condition and tied up with a weighted rope) into a sampan which returned without him. However, no one had seen or identified this man who was tied up and disappeared after the sampan returned. Mr Chan, SC, apparently did not rely on these pieces of 'evidence' to be direct and affirmative evidence that T.H. Wang was killed.

However, further and/or alternatively, in the absence of acceptable affirmative evidence that the propositus was alive at some time during a continuous period of seven years or more, apparently the Applicant relied on the fact that:

i) there are persons who would be likely to have heard from him over that period;

ii) those persons have not heard from him; and

iii) all due enquiries have been made appropriate to the circumstances.

Consequently there arises a rebuttable presumption of law that the propositus died some time within that period, and the party upon whom the burden falls of proving the death of the propositus may rely on that presumption, i.e. the Applicant

 © 2020 Thomson Reuters. 

herein. Of course the mere fact of absence for more than seven years does not raise a presumption that death has occurred. Where the problem is concerned with the exact date of the death of the propositus, the Court will decide the matter on all the evidence available at the date of the hearing. Where the presumption of death after seven years' absence applies, the Court will probably presume that the propositus had died by the end of that period. (See Re Estate of Yu Leung Fong [1991] 1 HKC 494 at p.496 and the cases cited therein.) It is more convenient at this stage to consider whether Madam Kung's objection and opposition is credible and reliable, or otherwise have rebutted the presumption of death.

The alleged telephone on 23 April 1990

Madam Kung alleged that in the evening of 23 April 1990, she received a telephone call at her home. She was allowed to speak to her husband. She said to him words to the effect: "Wang Teh Huei, how are you? Where are you?" She spoke in Shanghainese as they often spoke to each other in Shanghainese. He replied, saying that he had a 'serious headache'. He was not allowed to say anymore by the kidnappers but she distinctly recognized his voice.

Mr Chang, SC, submitted that Madam Kung's evidence finds significant support from the transcripts of the recordings of calls from the kidnappers to her brother's clinic. Having repeatedly demanded proof from the kidnappers that her husband was still alive in the calls on the 22nd and 23rd, Madam Kung began the call on 24th by indicating that now she believed them (having received direct proof that her husband was alive in the call to her home in the meantime in which he told her that he was suffering from a 'serious headache'). The contents of the calls on and after the 24th in which she expressed repeated concerns about her husband's health and demanded that the kidnappers provide him with the painkiller 'panadol' are consistent and supportive of her evidence about the facts and contents of the call from her husband.

However, I find the submissions of Mr Chan, SC, for the Applicant more convincing. If there was the alleged conversation, Madam Kung would no doubt have informed the police. She said that she must have told the police about this conversation shortly afterwards [Day 3, p.85]. (See also Day 4, pp.20-21 and p.41: "Yes I probably told the police. I should have told them - I should tell the police.") But there is no record of such an alleged conversation in the police files. The alleged conversation was only made known to the police almost nine years later in January 1999 when the police interviewed her.

This is consistent with the Summing-Ups and Summary of Facts in the criminal trial which proceeded on the basis that T.H. Wang has not been seen or heard of since 10 April 1990.

"Stuart-Moore J. in his summing up to the jury on 1/11/93 said:

'... on 10th April in 1990 ... Mr. Wong, was taken by force by a number of men who were armed, and he has never been seen or heard of since - at least by no one in the family or the circle of friends in which he lives ...' [B1-184]

In the Summary of Facts in the trial of Hui Siu-hung and Tse Kwok Keung in 10/91 it is stated:

'On the 10th day of April 1990, WANG Teh-huei a Hong Kong businessman left the Jockey Club alone driving his Mercedes Benz No.8887 at about 7:55 p.m. He was never seen or heard from again.' [B2-473]"

Further, there was no direct mentioning of the alleged conversation in the subsequent telephone conversations with the kidnappers on or after 24 April 1990.

In any event, even if Madam Kung did speak to T.H. Wang on 23 April 1990 (for reasons as aforesaid, I have rejected the same), the fact remains that thereafter he has not been seen or heard of for almost 9 1/2 years, subject of course to the other two incidents mentioned by Madam Kung which I shall deal with hereinbelow.

The alleged photo on 2 September 1996

Madam Kung alleged that she was shown a photograph of her husband which she believed was taken after the kidnapping. She was having early dinner in a restaurant in Nikko Hotel with officials from Cosco when a waiter came over to her and said there was a telephone call for her. After she had left the VIP Room, the waiter told her in fact there was someone waiting for her outside. She saw a man in his thirties wearing a suit and a tie, who turned away from her and walked to the nearby telephone area inside the Hotel. She followed him and

 © 2020 Thomson Reuters. 

he then took out that photograph and showed it to her. She offered to buy it but that man said that that would mean that she would lose the opportunity of contacting him. He took back the photograph and left immediately.

I accept the submissions of Mr Chan, SC, for the Applicant that there are a number of strange surrounding circumstances of this incident. First of all, the conduct of the waiter was very strange. Madam Kung agreed that the waiter must have known that it was actually somebody waiting for her outside instead of a telephone call. She was a multi-billionaire known to the waiter and a regular customer of that restaurant opposite to her office. She was having dinner in a VIP Room. Why would a waiter have (apparently pursuant to the request of a stranger) knowingly told Madam Kung an untruth, i.e. that there was a telephone call for her when there was none but actually someone was waiting for her outside?

The conduct of the alleged kidnapper was also strange. Why should he choose a public place to show the photograph and thus taking the risk of being caught with a photograph of the kidnapped victim.

The conduct of Madam Kung is also inconsistent with her story. It was more than six years after her husband had gone missing and she said she saw what she believed to be a genuine recent photograph of her husband, yet she continued on with the dinner. Thereafter, she went to London in the same evening as planned and later on in the same month, on or around 28 September 1996, she was in New York on a business trip. Her explanation was:

"That I had booked earlier, and I had to go there." [Day 3, p.38]

"A: He just saw me that evening, and also on that evening I went to London, so I did not expect that he would look for me that evening again so soon." [Day 3, p.64]

"A: What I thought is if he had waited, I would be very worried and very nervous, and in any event, they would be able to contact me, even if I left. " [Day 3, p.65]"

In the end there was no demand for ransom money thereafter coming from the kidnapper or kidnappers who showed her the photograph or caused this photograph to be shown to her.

She made the report to the police about this incident only after the commencement of the probate action on 14th January 1998. That was after she was ordered to file the affidavit of testamentary strips and two days before the filing of testamentary strips. Her explanation for not reporting the incident to the police until January 1998 was as follows:

"I waited for further news from him." [Day 3, p.36]

"Q: So although you have worked continually very hard to rescue your husband, it did not occur to your mind, did it, that you should report to the police in the evening of 2nd September 1996?

A: No, because at that time I thought I should not report it. That is why I did not report it."

Q: So it did occur to your mind whether you should or should not report to the police?

A: Anyway, I should wait for people to contact me again." [Day 3, p.62]

"Q: So expecting the kidnappers to contact you for ransom, you still did not report to the police?

A: That is right, because I was of the view that I should not report the matter to the police at that time." [Day 3, p.63]

"Q: Why did you report to the police on 14th January 1998?

A: Because at that time, my father-in-law had already started this action. I went to report - it should be the case that my lawyer asked me if I had received any other news about my husband. I said 'yes'. Then the lawyer asked me why I did not go to report to the police. I said that I was waiting for that person to contact me ... I was advised to make a report as soon as possible. He said that it would not be nice for me not to report it. I said 'okay'."" [Day 3, p.61]

This is also contrary to Madam Kung's declared attitude in her affirmations which she confirmed to be true in her oral evidence, as follows:-

"Since Mr. Wang's disappearance, I have continued to cooperate closely with the Hong Kong Police in their investigations." [B2-345]

 © 2020 Thomson Reuters. 

"I have worked continually very hard to rescue my husband for the last eight years. I have followed every available lead ..." [B2-361]

"In her oral evidence:

Q: ... During the past nine years you have done your best to find your husband; am I correct?

A: Correct." [Day 3, p.31]

For the aforesaid reasons, I do not find Madam Kung's contention that she had seen a recent photograph of her husband on 2 September 1996 credible at all.

Her evidence was purportedly supported by her employee Mr Joseph Leung who had accompanied her to the aforesaid dinner. Mr Leung deposed to the incident before and after Madam Kung left the VIP room for about eight to ten minutes. In the first place he did not accompany Madam Kung out to see the man with the photograph. He therefore had not seen the photograph himself.

He could recall in detail of not less than ten points of an event of almost three years ago. He had no notes to refresh his memory. In the end, I do not find Mr Leung's evidence credible either. In any event, he could not have supported Madam Kung in the material effect and that is, a photograph was shown to Madam Kung, which was recently taken of T.H. Wang.

The alleged telephone conversation on 14 December 1996

Madam Kung said on that day at about 4 p.m. she received a telephone call from a man who asked her to attend at the opposite side (which she presumed he meant the Nikko Hotel) as he had something to give to her. About 10 minutes later she went to the coffee shop on the 2nd Floor of Nikko Hotel with Wong Lai Chuen, Ringo, the Managing Director of Chinachem Entertainment Ltd. After waiting there for half an hour, she saw a fat man in his forties, nodding at her from outside the coffee shop. She left the coffee shop and followed the man down a corridor leading to the toilet, i.e. in the lobby of Nikko Hotel which was quite crowded in that Saturday afternoon. The man was dialing on a mobile phone. After he had spoken a few words into it, he handed the phone to her. She immediately say into the telephone in Shanghainese: "Little Darling, is that you?" A man's voice which she distinctly recognized as her husband's said in reply: "Don't pay money, Sojou." 'Sojou', meaning literally 'foolish piggy', was her husband's private nickname for her which he occasionally used in front of friends. The line then went dead and the man snatched the telephone away from her and immediately left the scene. She said she was sure that it was her husband whom she spoke to.

Here again I accept the submissions of Mr Chan, SC, for the Applicant that the conduct of the fat man was very strange. Why should he choose a public place to have Madam Kung speaking to T.H. Wang? The kidnappers could have telephoned Madam Kung at her office and let her speak to T.H. Wang. Here, instead, they have given advanced notice to Madam Kung who showed up 10 minutes later, leaving her with ample opportunity to prepare for anything untoward to happen.

Further, why should the kidnappers took the risk of being caught with a mobile phone. Madam Kung agreed that if he was caught, one could trace the number of the outgoing call and one might be able to trace the whereabouts of T.H. Wang [Day 3 p.75].

Again, she did not report the incident to the police until 14 January 1998 as aforesaid. Her explanation is inconsistent as evidenced by her evidence as follows:-

"Q: Are you saying it did not occur to your mind that you should report to the police because you were too anxious?

A: That is right." [Day 3, p.73]

"I would not have shouted to make people catch him, but I should have made a report to the police immediately so he would be tailed." [Day 3, p.74]

"I was hoping that they would come back and ask me for money." [Day 3, p.76]

"... Subconsciously I thought I did not want to report it to the police, I wanted to give the money so that Mr. Wang could come back. ..." [Day 3, p.76]

 © 2020 Thomson Reuters. 

"A: And I delayed making a report to the police." [Day 3, p.76]

Again no ransom money was demanded as a result of this incident. [Day 3 pp.66-68]

Mr Ringo Wong's evidence

Mr Ringo Wong has given evidence to support Madam Kung's evidence of this incident in December 1996. I also find his evidence unreliable and incredible. He can remember all the details of this incident which happened almost three years before when he cannot even remember the number of times he had been to the Organized and Serious Crime Bureau and/or whether he was legally represented when he went there in relation to the Ming Pao report in 1997. He cannot recall as to whether the question and answer as reported in Ming Pao was correct or not. His evidence is not satisfactory. Yet he could remember all these details about the incident in December 1996. In any event, he did not hear the telephone conversation over the mobile phone.

Other two witnesses

There are two witnesses who were called to rebut the evidence of the Applicant. The first one is Mr Ng Shung Mo, who is an employee of the Chinachem Group. His evidence was that Mr Wang Senior throughout 1990 to 1997 had "the utmost faith in Mr Wang's [i.e. T.H. Wang's] return" and he was sure of his return and remained most optimistic as to Mr Wang's eventual return. He based his belief on "Mr Wang Senior kept on asking me about information on Mr Wang Teh Huei. If he did not have such faith, he would not have asked me." It is not clear why he could draw one conclusion, and that is Mr Wang Senior was confident, and not the other conclusion that he was diffident and that was why he kept on asking him about the information on T.H. Wang. I find his evidence incredible. He has not rebutted the Applicant's belief that at least by 1997 he had given up all hope that his son would eventually return.

The second witness is Mr Fred Kan, the solicitor who had assisted Madam Kung up to June 1996 in her attempts to locate her husband. He based his belief in two events which happened in 1990: one is the alleged statement of Chan Kei Yuen, which I shall deal with in a moment. The other is a hearsay upon hearsay statement of Chung Chi Neng, who is serving prison sentence in Taipei. He is the son of Chung Wei Cheng, whom it is believed is the leader of the kidnapping gang. Mr Kan in his oral evidence also said that his belief was also based on a subjective belief because he had a dream that Mr Wang was still alive. I am afraid Mr Kan's evidence cannot take Madam Kung any further.

The other evidence

i) "Investigation Record" in Taipei in May 1990 [B2-424]

By this record, it was alleged that Chan Kei Yuen, a convicted kidnapper in Taipei, claimed that Chung Wei Cheng had told him that their plan was to keep T.H. Wang alive.

I accept the submissions of Mr Chan, SC, for the Applicant that this is not evidence of Chung Wei Cheng because he is not before this Court and he cannot be cross-examined. It is at the most hearsay upon hearsay of what Chan Kei Yuen claimed Chung Wei Cheng to have said. Even Chan Kei Yuen is not before this Court and he cannot be cross-examined. It is not evidence on oath in Taiwan and there had been no cross-examination in Taiwan as to what he alleged.

It would be against the interest of the kidnappers to claim that the plan of the kidnappers was to kill T.H. Wang or that he had been killed.

It is similar to what Madam Kung herself said in her affirmation in relation to the evidence of Tsang Heung Hung, the aforesaid kidnapper convicted in Hong Kong, that "the Applicant is therefore relying on the words of a convicted criminal's evidence whose evidence, I would suggest cannot and should not be believed by this Honourable Court." [A2-P28] It is therefore unrealistic to find that T.H. Wang was still alive on the basis of this "Investigation Record". However it should be noted here that Tsang's words amounted to a declaration against his own interests (i.e. that T.H. Wang would have been killed) whereas Chan Kei Yuen's words were to the contrary (i.e. T.H. Wang was not killed).

ii) Letter of Chan Kei Yuen dated 25 August 1999 [B2-590]

In this letter, Chan Kei Yuen again claimed that Chung Wei Cheng had told him that the plan was to keep T.H. Wang alive for seven years until the Court declared that he was legally dead.

 © 2020 Thomson Reuters. 

Again, this letter was written by one of the kidnappers who is now in jail. This is again hearsay upon hearsay statements. He said that he believed T.H. Wang was temporarily placed at a certain place, but he did not disclose the source of his alleged information and the basis of his alleged belief. His credibility is undermined by his own assertion when he claims: "I am a dedicated Buddhist disciple. I have never done anything which hurts other people during my life"?!

iii) The Christmas card posted on 25 November 1998 [B2-375]

This card was posted in Hong Kong and addressed to Mrs Wang. It stated that "Mr Wang is still living in this world. I can bring you to see him." Madam Kung said she received the Christmas card in late January 1999 but she only reported the same to the police on 8 March 1999. This, I am afraid, cannot be evidence that T.H. Wang is still alive.

iv) Telegram dated 26 May 1999 [B2-457]

This was sent from Inner Mongolia. It says: "News about Mr Wang Teh Huei. Call mainland's paging district code soonest...", then a district code number and a pager name and number were given. Madam Wang said she phoned up the number but there was no concrete result. She reported the same to the police and there was on-going investigation in this respect, but no further evidence could be produced to this Court. Again, I am afraid this cannot be evidence that Mr Wang is still alive.

v) Observation made by one Mr Wang Fon

It was contended by Mr Ringo Wong that on 30 October 1997, they met one Mr Wang Fon who was an ex-congress man and ex-minister of the National Security in the Mainland. At the end of the meeting, Mr Wang Fon contended that he had not dismissed the possibility that T.H. Wang was still being detained by some Taiwanese gangs. There was no basis given as to the alleged observation or belief of Mr Wang Fon and Mr Ringo Wong did not there and then, or thereafter, ask for the basis of that belief. Again, such an observation made by a retired ex-minister under such circumstances cannot be evidence that T.H. Wang is still alive.

Conclusion

In the end I find all the evidence produced by Madam Kung incredible and they would not be sufficient to prove that either T.H. Wang is still alive, or to rebut the Applicant's firm belief that T.H. Wang has died since his disappearance on 10 April 1990.

The end result of the hearing is that the legal presumption of death applies in this case in that there are persons who would be likely to have heard from T.H. Wang over that period of time and those persons have not heard from him. All due enquiries had been made appropriate to the circumstances of this case and there arises a rebuttable presumption of law that the propositus died sometime within that period and the party upon whom the burden falls of proving the death of the propositus may rely on that presumption, i.e. the Applicant herein. The presumption has not been rebutted by any credible evidence.

As the presumption of death after seven years' absence applies in this case, I would follow the case of Bullock v. Bullock [1960] 1 WLR 975 that the Court would presume that the propositus had died by the end of that period, i.e. 10 April 1997.

If, contrary to my decision, the legal presumption of death is not applicable in this case, I would also find as a matter of fact that T.H. Wang probably had died and that the Applicant has every reason to believe his son had died at least by the end of that period i.e. 10 April 1997. The evidence in the aforesaid trial of the criminals in Hong Kong suggested that T.H. Wang had probably been fatally dealt with and he has not been seen or heard of for a long period of time.

Upon further submissions of Counsel for the parties, they agreed between them and submitted to the Court that in the circumstances of this case and according to a number of authorities, the Court cannot and should not fix a date of death of the deceased within the aforesaid period. The formula adopted in 32 Atkin's Court Forms (2nd Edn. 1996 Issue) at p.241 is that the death of the deceased may be sworn to have occurred on or since a certain date, i.e. the date of the deceased's disappearance. Accordingly the Applicant is hereby granted leave to swear to the death of Mr Wang Teh Huei to have occurred on or since 10 April 1990.

After hearing Counsel on both sides as to the question of costs, it is further ordered that costs of these proceedings shall be to

the Applicant against the opposing party with a certificate for 3 Counsel to be taxed if not agreed.

(D. Yam)

Judge of the Court of First Instance

High Court

Mr Warren Chan, SC, Mr Albert Tsang and Mr Victor Luk, inst'd by M/s K.M. Chan & Co., for the Applicant

Mr Denis Chang, SC and Mr Adrian Huggins, SC, inst'd by M/s Lovell White Durrant, for the Respondent

Appendix 6

HCAP8/1999

IN THE HIGH COURT OF THE

HONG KONG SPECIAL ADMINISTRATIVE REGION

COURT OF FIRST INSTANCE

PROBATE ACTION NO.8 OF 1999

-------------------------

IN THE MATTER OF THE ESTATE OF WANG TEH HUEI, deceased

---------------------------

BETWEEN

WANG DIN SHIN Plaintiff

and

NINA KUNG alias NINA T.H. WANG Defendant

------------------------

Before: Hon Yam J in Chambers

Dates of Hearing: 19 and 20 June 2001

Date of Decision: 20 June 2001

Date of Handing Down Written Reasons for Decision: 20 August 2001

------------------------------------------------------------

R E A S O N S F O R D E C I S I O N

------------------------------------------------------------

Background

1. The defendant applied to stay the proceedings pending the determination and conclusion of the criminal investigation and any proceedings arising out of the criminal complaint of perjury and forgery lodged by the plaintiff herein against the defendant in or about October 1999. This application was by way of summons dated 30 March 2001.

2. Owing to the imminent hearing of the trial scheduled to commence on 6 August 2001, I had at the outset directed that the defendant's said summons be heard on the earliest date as soon as possible. The listing officer had the unenviable task of fixing a two days' hearing in my diary. The earliest available date then was in early August which would be immediately after my long vacation leave but also shortly before the trial. This would be highly unsatisfactory and eventually at my request the listing officer managed to fix two days of hearing on 19 and 20 June just prior to my long vacation leave from 21 June until the end of July.

3. After hearing arguments from leading counsel of both sides, I have decided to refuse the defendant's application to stay the proceedings and directed that the trial should commence on 6 August 2001 as originally scheduled. I also directed that the trial should be heard in camera. Owing to the time constraints before my leave, I was unable to reduce my reasoning into writing. In the meantime, the Court of Appeal had expeditiously disposed of the appeal on 11 July 2001 during my vacation leave. Thereafter, I was indisposed after my leave and during which time the Court of Final Appeal had on 2 August 2001 also disposed of the defendant's application for leave to appeal. However, I consider that it is still incumbent on me to give my own reasons for my decision which I shall do so herein below.

 © 2020 Thomson Reuters. 

The case

4. The plaintiff is the father-in-law of the defendant. In this probate action which was instituted on 24 September 1999, he is trying to propound a will purportedly witnessed by two solicitors on 15 March 1968. By this will he was appointed the sole executor and he was the sole beneficiary thereunder.

5. The defendant's defence and counterclaim was that the 1968 Will had been revoked by a document dated 12 March 1990 ("the 1990 Will") in Chinese together with three other undated testamentary documents in Chinese whereby the defendant was appointed by the deceased as his sole beneficiary and directed that the defendant should manage and administer all his estate and assets after his death.

6. The plaintiff in his reply dated 1 December 1999 denied that the 1990 Will and other undated testamentary documents were made by the deceased and further alleged that the purported signatures of the deceased on the 1990 documents were forged. In the amendment dated 16 November 2000, the plaintiff further alleged that the various signatures of one Tse Ping Yim on the 1990 documents were also forged. In the meantime, in October 1999 the plaintiff had reported this matter to the police against the defendant.

7. Since the commencement of the probate action herein, I have been handling this case as the trial judge in charge of a long case. Between December 1999 and June 2000, I have made four separate orders and directions concerning expert evidence in the areas of handwriting and ink dating. By 31 October 2000, I have set the case down for hearing in May 2001 with four weeks reserved. However, on 11 January 2001, I have refixed the hearing date to 6 August 2001 as aforesaid in order to accommodate the defendant's handwriting experts.

The defendant's present application

8. The present application of the plaintiff was only made by the end of March 2001. Mr Daniel Fung, SC, who appeared together with Mr Johnny Mok, submitted that the defendant relied on the following four grounds in this application, namely:

(1) If the civil proceedings are allowed to proceed, the compulsory disclosure of the defendant's case at trial of this action would likely impair or compromise the defendant's right of silence.

(2) The inherent structural conflict of the Government Chemist as expert witness for the plaintiff and as police expert will result in the defendant being compelled in the discovery process to give to the police and their expert advance notice of her case and her likely defence. This would have the consequence of undermining the defendant's right of silence and the presumption of innocence which are rights constitutionally protected under the Bill of Rights Ordinance, Cap.383, Article 11.

(3) The defendant's constitutional right to equality protection before the courts and to a fair hearing under Article 10 of the Bill of Rights Ordinance would also be infringed.

(4) The intense adverse publicity generated by the case might sensibly be expected to reach, and would likely to influence, persons who would or might be jurors in criminal proceedings and, hence, might lead to potential miscarriage of justice.

The Legal Principles

9. I shall, first of all, consider the legal principles and tests applicable in considering the question of staying proceedings in the present circumstances. I shall start with the Hong Kong cases. In SFC v. Nomura Ltd (1998) 2 HKC 503, Rogers JA, as he then was, at 522B-C said that:

"What is clear from those cases .... is that the courts will only interfere to prevent a serious injustice occurring only in very clear cases in which applicants show that there is a real danger - and not merely a notional danger - that continuation of the proceedings would cause a miscarriage of justice."

At 522F, he said:

"The fact is that in all the cases the courts have applied a very stringent test ...."

Liu JA, as he then was, at 512A-B also said to the similar effect:

".... a court may not intervene unless the prejudice arising from multiple litigation is so serious as would likely lead to

injustice. Thus, a probable cause for injustice is to be decided objectively on serious prejudice."

10. The case of R. v. Panel ex parte Fayed (1992) BCC 524 per Neill LJ was cited with approval by Liu JA and Rogers JA in SFC at 512B, and 522A. Liu JA at 512B said:

"But [the power to stay] is a power which has to be exercised with great care and only where there is a real risk of serious prejudice which may lead to injustice."

11. In exercising the discretion to stay or to refuse the stay, it has been said that it is necessary to consider and balance both the fairness and injustice applicable in both sets of proceedings, criminal and civil. In R. v. Institute of Chartered Accountants ex parte Brindle (1994) BCC 297, per Hirst LJ said at 310C-E that:

"... the power to intervene [to stay] should be exercised most sparingly, and it is only in exceptional cases that the disciplinary process ... should not be allowed to go ahead unhindered ... [but] there may be cases where the consideration of serious prejudice are so strong that they may prevail."

This case was cited by Liu JA in SFC at 512F.

12. Sir Roger Parker also said in the same case at 316G-H that:

"First, although he refers to possible injustice in the fair trial of other proceedings ..., it is necessary to consider the fairness or otherwise of the proceedings which it is sought to restrain ...."

This was quoted with approval by Liu JA in SFC at 512H and the same was cited by Rogers JA at 522A.

13. Liu JA in SFC at 513B quoted the decision of Dyson J in R. v. Executive Council ex parte Hipps (QBD, 12 June 1996, unreported) said:

"Dyson J referred to the initial stage as one for finding 'a real risk of serious prejudice which may lead to injustice', without which a stay had to be refused. That he said at 14 is the threshold test. At the stage following the finding of a real risk of serious prejudice which may lead to injustice, the court would have to balance that risk against the countervailing considerations including public interest. I need hardly repeat that the power to stay must be sparingly exercised." (Emphasis added)

14. In respect of the threshold test, Megaw LJ at Jefferson Ltd v. Bhetcha (1979) 2 All ER 1108 said at 1113J:

"The burden is on the defendant in the civil action to show that it is fair and convenient that the plaintiff's ordinary rights of having his claim processed and decided should be interfered with."

Further, he said at 1113H:

"It may be that if the criminal proceedings are to be heard in a very short time .... it would be fair and sensible to postpone the hearing of the civil action."

Megaw LJ at 1113F also considered that the possibility of interference with evidence or witnesses may also be relevant factors to be considered.

15. In respect of a defendant's right of silence, it had been said by Cons ACJ in a decision in 1989 in the case of Petroliam Berhad v. Tan Soon Gin (1990) 1 HKLR 4 that:

"There is no established principle of law that a defendant is entitled to be excused from taking any procedural step in the civil action ... which ... might result in disclosing .... what his defence is, or is likely to be, in the criminal proceedings." (see pages 5B, 8G, and 9E)

This case, however, should be noted that it was decided before the Bill of Rights Ordinance which came into effect on 8 June 1991.

16. The case of Prime Computer Ltd v. Sham (1992) 1 HKLR 115 was, however, decided in November 1991 i.e. after the Bill of Rights Ordinance. Bokhary J, as he then was, said at 117 lines 31-39 that:

"Certainly, it is clear that a strong factor in favour of a stay would arise if it were to appear that the civil proceedings, if not stayed, were likely to generate publicity which might sensibly be expected to reach potential jurors in the criminal proceedings and influence them. Also, it would be a strong factor in favour of a stay if the refusal of a stay would lead to a disclosure of the defence leading to a real risk that prosecution

witnesses would, on the strength of such disclosure, fabricate evidence or trim their testimony. Similarly, if interference with witnesses was something sensibly to be feared as a result of the disclosure of the defence in the course of the civil proceedings if not stayed, then that would be a strong factor in favour of a stay."

17. In respect of prevention of prejudice in the mind of a jury, it had been decided in HKSAR v. Lee Ming Tee, FACC No.8 of 2000 (per Ribeiro PJ at page 41) that:

"Reliance on the integrity of the jury and its ability to try the case fairly on the evidence, to put aside extraneous prejudice and to follow the direction of the judge is fundamental to the jury system itself. ....

There is good sense in regarding a jury, properly directed, as able to overcome prejudicial publicity in the vast majority of cases. First, with the passage of time, any recollection that a juror may have of adverse publicity can be expected to fade, lessening its prejudicial effect. ....

Secondly, the jury may sensibly be credited with the ability to overcome any pre-trial prejudice because of the nature and atmosphere of the trial process itself. Whatever impression of the case members of the jury may have gained beforehand, at the trial, they are given direct, first-hand access to the actual evidence in the case, presented systematically and in detail, with live witnesses tested by cross-examination and exhibits tendered for inspection. ...."

The threshold test and the balancing exercise

18. In considering the defendant's plea for a stay of the civil proceedings before me in light of the possible criminal proceedings, I have borne in mind that it is only likely that any criminal proceedings will take place in the near future. In fact, criminal investigation has not yet been completed. It is not certain whether the defendant will ever be charged. In the circumstances, I cannot say there is a real risk of serious prejudice which may lead to injustice. In other words, the defendant has not even passed the aforesaid threshold test.

19. In the balancing exercise, on the other hand, the plaintiff is entitled to his case heard and decided. If I accede to the request in the defendant's application, it may well be years and not just a few months that the civil proceedings could be tried. The plaintiff's deceased son has not been seen since April 1990. The plaintiff and his wife are both of old age (90 and 89 respectively) and are in weak health. The deceased's siblings (some of whom will be giving evidence) are not young either (one is about 60 years old). Many of the witnesses of both the plaintiff and the defendant are no longer young, e.g., a Mr Yih Lee Kong, a cousin of the deceased, is about 75 years old and he is one of the plaintiff's witnesses. Further, some of their witnesses will be coming from abroad.

20. The trial has been fixed for sometime since October 2000. Both parties should have well understood the importance of complying with the court's orders and directions in order that the trial should commence as scheduled, originally for May 2001 but later refixed for 6 August 2001. Accordingly, arrangements had been made for all witnesses from both sides to attend trial in August and September 2001. This included the experts of both the plaintiff and the defendant in handwriting and ink dating. I understand that all of them come from abroad except the Government Chemist who will be giving evidence for the plaintiff on his subpoena.

21. If the trial date is adjourned, material witnesses such as the plaintiff, the plaintiff's witnesses, or any of his experts may not be available to give evidence due to death or otherwise. The consequence could be very harsh for the plaintiff. Thus, I cannot say that it is fair and convenient that the plaintiff's ordinary rights of having his claim processed and decided should be interfered with.

22. When I say it will not be months but years for the civil proceedings to come to trial if they are stayed until after the criminal trial (which at present is not even certain), I have in mind the following factors:

(1) the investigation is not completed yet and may take some time;

(2) the evidence will then need to be collated and legal advice obtained, and charges preferred, if any;

(3) then there may be the equivalence of committal proceedings, possibly with evidence;

(4) followed by a trial date to be fixed;

 © 2020 Thomson Reuters. 

(5) followed perhaps by a stay or other interlocutory applications and possible appeal therefrom;

(6) followed by a trial lasting more than several weeks, and perhaps much longer; and

(7) followed by potential appeals.

23. By reasons of the aforesaid matters, I consider that I should not exercise my discretion to stay the civil proceedings and therefore the defendant's application is dismissed with costs to the plaintiff with certificate for three counsel.

Trial in camera

24. In the defendant's application, Mr Daniel Fung, S.C., has incessantly and earnestly submitted that the wide publicity in the media coverage concerning the defendant is entirely unprecedented. By way of example, the defendant's side could collate more than 300 pages of wide media coverage of the defendant from her hair-style to her life-style. Mr Fung submitted that the intense adverse publicity is the main reason in the present case for staying the trial in the civil proceedings (although other peculiar facts are also relevant). He submitted that the trial of these civil proceedings would likely to attract such extraordinarily high degree of publicity as "might sensibly be expected to reach, or to influence, persons who would or might be jurors in criminal proceedings" arising from the plaintiff's said complaint. Thus, it is submitted that such wide publicity might lead to a potential miscarriage of justice in the criminal proceedings.

25. Mr Fung also submitted that publicity of the kind envisaged in this case against the defendant, particularly in a small place like Hong Kong, would most likely to attract such publicity as might sensibly be expected to reach, or to influence (if not totally prejudice) persons who would or might be jurors. In addition, the often criticised attitude and sensationalism of Hong Kong media will also aggravate the problem of the plaintiff's complaint of jurors being influenced by the immense publicity and reporting of the trial of these proceedings. This will result, as submitted by Mr Fung, in irreversible prejudice to the defendant in the form of fierce adverse publicity in an extremely high profile case.

26. In light of the incessant and repeated plea of Mr Fung for the defendant, I have taken the exceptional course of ordering the trial in camera. As provided under Article 10 of the Bill of Rights Ordinance, this course should only be taken "when the interest of the private lives of the party so requires, or to the extent strictly necessary in the opinion of the court in special circumstances where publicity would prejudice the interests of justice". I had in mind the interests of justice in the possible criminal proceedings in future.

27. It was not made known to me that if I refused the application to stay the proceedings, the order of trial in camera was not something the defendant would have wanted. In fact, Mr Fung, as I understand later, submitted in the Court of Appeal that the order of trying the case in camera is wrong and thus the civil proceedings should be stayed since the trial in camera could not sufficiently safeguard the interests of the defendant. However, it is accepted that trial in camera would prevent, if not greatly reduce, any undue adverse publicity which may arise out of the case if it was heard in open court. Thus, any evidence given in court in a trial in camera will have the benefit of having all the pros and cons of the arguments relating to such evidence being fully considered by the court without the prior publication of the media. On the other hand I was conscious during the course of submissions of counsel that eventually "in a suit at law", the judgment1 should be made public pursuant to Article 10. Of course in a civil suit, the considerations of the burden of proof and the standard of proof are different from a criminal case, but the general public may not understand the distinction between the two. Thus, it could only be of some help to the defendant. But eventually it would not assist her too much.

28. In the end, if I had known then that the defendant was not requesting a civil trial in camera to protect her interest and the interest of justice in the possible criminal proceedings, I would not have made such an order. I also respectfully agree with the decision of the Court of Appeal that such power should be sparingly exercised in special circumstances only.

29. For the aforesaid reasons the application for the stay of the civil proceedings had been refused and the civil trial commenced on 6 August 2001 as scheduled.

1 t is not clear whether this word "judgment" means the formal sealed Judgment which only states the eventual order, i.e., the result of a suit, or the full reasoned Judgment delivered. (I understand for cases concerning the interest of juvenile persons or the guardianship of children, the formal sealed

 © 2020 Thomson Reuters. 

Judgment of the court would not be made public.) If it means the full reasoned Judgment, then the question of, say, protecting national security may arise and the provisions of Article 10 may not be fully observed. But in the event of this case, the consideration of the meaning of this word is not necessary and thus inappropriate.

(D. Yam)

Judge of the Court of First Instance

High Court

Mr John Griffiths, SC, leading Mr Albert Tsang and Mr Victor Luk, instructed by Messrs K.M. Chan & Co., for the Plaintiff

Mr Daniel R. Fung, S.C., leading Mr Johnny S.L. Mok, instructed by Messrs Johnson, Stokes & Master, for the Defendant

Mr Kevin Zervos, SADPP and Mr Christal Chan, SGC of Department of Justice for Secretary for Justice

Thomson Reuters Hong Kong Limited

[2002] HKEC 1424

End of Document © 2020 Thomson Reuters.