**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| DANIEL TAYLOR, | ) | |
| | ) | No. 14-cv-0737 |
| Plaintiff, | ) | |
| | ) | The Hon. John Z. Lee |
| v. | ) | Judge Presiding |
| | ) | |
| CITY OF CHICAGO, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |

**PLAINTIFF'S MOTION TO BAR
<u>PROPOSED DEFENSE EXPERT MICHAEL WELNER</u>**

## TABLE OF CONTENTS

Table of Authorities ............................................................................................................ ii

LEGAL STANDARD ............................................................................................................ 1

ARGUMENT ........................................................................................................................ 3

    I.    DR. WELNER LACKS THE QUALIFICATIONS TO TESTIFY REGARDING THE STUDY OF FALSE CONFESSIONS. ............................................................ 3

    II.    DR. WELNER'S OPINIONS THAT THE STUDY OF FALSE CONFESSIONS AND ITS METHODOLOGIES ARE UNRELIABLE SHOULD BE EXCLUDED BECAUSE THEY ARE FOR THIS COURT TO RESOLVE PURSUANT TO *DAUBERT* AND RULE 702 .................................................................................. 11

    III.    DR. WELNER SHOULD NOT BE PERMITTED TO OFFER PSYCHIATRIC OPINIONS THAT EXCEED THE SCOPE OF HIS WORK IN THIS CASE. ... 12

    IV.    DR. WELNER SHOULD BE BARRED FROM PROVIDING TESTIMONY THAT DISTORTS THE RECORD, PRESUMES THE TRUTH OF MATTERS THAT ARE IN DISPUTE, OPINES AS TO THE CREDIBILITY OF WITNESSES, OR CONSTITUTES ARGUMENT RATHER THAN EXPERT OPINION. ...................................................................................................... 17

        A.    Dr. Welner Should Not Be Permitted to Testify as to Matters for Which There Is No Record Support or to Assert the Truth of Matters That Are in Dispute. ................................................................................................... 17

        B.    Dr. Welner Should Not Be Permitted to Testify as to the Credibility of Witnesses and Parties. .................................................................................. 20

    V.    DR. WELNER SHOULD BE BARRED BECAUSE HIS PROPOSED TESTIMONY IS UNDULY PREJUDICIAL. ....................................................... 21

CONCLUSION ................................................................................................................... 24

## **TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*Andersen v. City of Chicago*,
  No. 16 C 1963, 2020 WL 1848081 (N.D. Ill. Apr. 13, 2020)...................................................5

*Brown v. Burlington N. Santa Fe Ry. Co.*,
  765 F.3d 765 (7th Cir. 2014) ..................................................................................................2

*Caine v. Burge*,
  2013 WL 1966381 (N. D. Ill. May 10, 2013) ..........................................................................5

*Chatman v. City of Chicago*,
  No. 14 C 02945, ECF 719 (N.D. Ill. Oct. 30, 2018).........................................................12, 20

*Daubert v. Merrell Dow Pharm., Inc.*,
  509 U.S. 579 (1993).........................................................................................2, 9, 10, 12

*Edmonds v. State*,
  955 So.2d 787 (Miss. 2007) (Diaz, J., concurring)..............................................................8, 9

*Edmunds v. State*,
  No. 2004-CT-02081-SCT (Cir. Ct. Oktibbeha Cty., Miss.) ....................................................14

*Essex Ins. Co. v. Structural Shop*,
  No. 15 C 2806, 2017 U.S. Dist. LEXIS 77490 (N.D. Ill. May 22, 2017)................................20

*Fitzpatrick v. City of Fort Wayne*,
  259 F.R.D. 357 (N.D. Ind. 2009) ...........................................................................................23

*Gayton v. McCoy*,
  593 F.3d 610 (7th Cir. 2010) ...................................................................................................3

*Gen. Elec. Co. v. Joiner*,
  522 U.S. 136 (1997)...........................................................................................................2, 10

*Giuffre v. Jefferson*,
  No. 14 C 3692, 2017 WL 951239 (N.D. Ill. Mar. 10, 2017) ..................................................20

*Goodwin v. MTD Prods.*,
  232 F.3d 600 (7th Cir. 2000) ..................................................................................................21

*Harris v. City of Chicago*,
  2017 WL 2436316 (N.D. Ill. June 5, 2017) ....................................................................5, 8, 12

*Hurt v. Vantlin*,
    2019 WL 8267074 (S.D. Ind. Sept. 26, 2019) .........................................................5

*Jones v. Markham*,
    No. 00 L 5608 (Cir. Ct. Ck. Cty) ...............................................................14, 15, 16

*Klein v. Vanek*,
    86 F. Supp. 2d 812 (N.D. Ill. 2000) ...........................................................16

*Kluppelberg v. Burge*,
    2016 WL 6821138 (N.D. Ill. Sept. 16, 2016) ...........................................................5

*Kumho Tire Co., Ltd. v. Carmichael*,
    526 U.S. 137 (1999).....................................................................2, 12

*Lewis v. CITGO Petroleum Corp.*,
    561 F.3d 698 (7th Cir. 2009) ...........................................................2

*Livers v. Schenck*,
    2013 WL 5676881 (D. Neb. Oct. 18, 2013) ...........................................................5

*People v. Oliver*,
    991 N.Y.S.2d 260, 269 (Sup. Ct. 2014) ...........................................................19

*People v. Simon*,
    415 Ill. Dec. 145, 82 N.E.3d 90 (2017) ...........................................................19

*Rudy v. People*,
    368 Ill. Dec. 594, 984 N.E.2d 540 (2013)...........................................................19

*Sacchetti v. Gallaudet Univ.*,
    344 F. Supp. 3d 233 (D. D.C. 2018) ...........................................................11

*Schmude v. Tricam Indus.*,
    556 F.3d 624 (7th Cir. 2009) ...........................................................22, 23

*Scott v. City of Chicago*,
    2010 WL 3034254 (N.D. Ill. Aug. 3, 2010) ...........................................................5

*Smith v. Ford Motor Co.*,
    215 F.3d 713 (7th Cir. 2000) ...........................................................2, 12

*Sommerfield v. City of Chicago*,
    254 F.R.D. 317 (N.D. Ill. 2008)...........................................................18

*Swift v. City of Chicago*,
    No. 12 L 12995 (Ill. Cir. Ct. Nov. 4, 2016) ...........................................................7

*Taylor v. City of Chicago*,
    14-cv-0737 (N.D. Ill) .............................................................................................3

*Tchatat v. City of New York*,
    315 F.R.D. 441 (S.D. N.Y. 2016) ......................................................................16

*United States v. Hall*,
    974 F. Supp. 1198 (C.D. Ill. 1997), *aff'd*, 165 F.3d 1095 (7th Cir. 1999)...............5

*United States v. Hayat*,
    2017 WL 6728639 (E.D. Cal. Dec. 27, 2017) .......................................................5

*United States v. Mamah*,
    332 F.3d 475 (7th Cir. 2003) .............................................................................10

*United States v. Sampson*,
    No. 1:01-10384-LTS, ECF 2459 (D. Mass. Sept. 2, 2016) .............................10, 11

*United States v. Vest*,
    116 F.3d 1179 (7th Cir. 1997) ...........................................................................18

*United States v. Whittle*,
    2016 WL 4433685 (W.D. Kentucky Aug. 18, 2016)...............................................5

*Zenith Elecs. Corp. v. WH-TV Broad. Corp.*,
    395 F.3d 416 (7th Cir. 2005) .............................................................................10

**Statutes**

735 ILCS 5/2-702 ....................................................................................................19

**Rules**

Fed. R. Civ. P. 35(a)(2)............................................................................................13

Fed. R. Civ. P. 403 .........................................................................................1, 22, 23

Fed. R. Civ. P. 702 ......................................................................................... *passim*

Fed. R. Civ. P. 703 ....................................................................................................2

**Other Authorities**

American Academy of Psychiatry and Law (AAPL), *Ethics Guidelines for the
    Practice of Forensic Psychiatry* (adopted May, 2005)..........................................13

Gisli H. Gudjonsson, *The Psychology of Interrogations and Confessions:* A
    Handbook (Chichester: John Wiley & Sons, 2003)..............................................17

iv

M. Guyll, et al., *Innocence and Resisting Confession During Interrogation: Effects on Physiologic Activity*, 37 LAW & HUM. BEHAV. 366 (2013) ....................................7

Maria Hartwig et al., *Strategic Use of Evidence During Police Interviews*: *When Training to Detect Deception Works*, 30 LAW & HUM. BEHAV. 603 (2006) ...........................7

Saul M. Kassin, et al,, *On the General Acceptance of Confessions Research: Opinions of the Scientific Community*, 73 AM. PSYCHOLOGIST 63 (2018) ..............................4

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| DANIEL TAYLOR, | ) | |
| | ) | No. 14-cv-0737 |
| Plaintiff, | ) | |
| | ) | The Hon. John Z. Lee |
| v. | ) | Judge Presiding |
| | ) | |
| CITY OF CHICAGO, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |

## PLAINTIFF'S MOTION TO BAR
## <u>PROPOSED DEFENSE EXPERT MICHAEL WELNER</u>

The defendants propose to call Dr. Michael Welner, a forensic psychiatrist by training and experience, to testify regarding a litany of "opinions" as to how events unfolded in this case, the motivations and credibility of various witnesses and parties, and the character and susceptibility to coercive interrogation of Daniel Taylor in 1992. Dr. Welner's proposed testimony lies far beyond the bounds of Rule 702. Dr. Welner should be barred from testifying as to each and every one of the eight opinions that he proposes in his 69 page, single-spaced report. *See* Welner Report Ex. A, at 4, Mar. 1, 2018.

The true purpose of Dr. Welner's proposed testimony is to place before the jury information about Plaintiff's troubled childhood that would be otherwise inadmissible in order to inflame the jury against Plaintiff. Dr. Welner's testimony should also be barred under Rule 403 because it is unduly prejudicial.

## LEGAL STANDARD

The admissibility of expert testimony is governed by Federal Rule of Evidence ("Rule") 702, which provides:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case.

Rule 702 requires the Court to ensure that expert evidence "is not only relevant, but reliable." *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 589 (1993). The reliability requirement serves to distinguish a well-grounded expert opinion, which is admissible, from "subjective belief," which is not. *Id.* at 590. The purpose of this gatekeeping is "to make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 152 (1999). "'[N]othing . . . requires a district court to admit opinion evidence'" that rests solely on "'the *ipse dixit* of the expert.'" *Id.* at 157 (quoting *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997)).

The Court has "considerable leeway in deciding in a particular case how to go about determining whether particular expert testimony is reliable." *Id.* at 152. Courts consider the proposed expert's full range of experience and training in the subject area, as well as the methodology used to arrive at a particular conclusion. *Smith v. Ford Motor Co.*, 215 F.3d 713, 718 (7th Cir. 2000). In addition to being reliable, expert testimony must "assist the trier of fact to understand the evidence or determine a fact at issue." *Lewis v. CITGO Petroleum Corp.*, 561 F.3d 698, 705 (7th Cir. 2009). Furthermore, "Rule 703 requires the expert to rely on 'facts or data,' as opposed to subjective impressions." *Brown v. Burlington N. Santa Fe Ry. Co.*, 765 F.3d 765, 772 (7th Cir. 2014). The burden of establishing that the requirements of Rule 702 and *Daubert* have been satisfied rests with the proponent of the expert testimony. *Id.*

2

**ARGUMENT**

I. **DR. WELNER LACKS THE QUALIFICATIONS TO TESTIFY REGARDING THE STUDY OF FALSE CONFESSIONS.**

Dr. Welner holds himself out, among other things, as an expert in the field of social science that focuses on the phenomenon of false confessions—how prevalent they are, whether there are police interrogation techniques that create undue risk of false confession and whether there are personal characteristics that make particular individuals more susceptible to confessing falsely. Dr. Welner is not qualified by training or experience to testify in this area. *See generally Gayton v. McCoy*, 593 F.3d 610, 616 (7th Cir. 2010) ("'Whether a witness is qualified as an expert can only be determined by comparing the area in which the witness has superior knowledge, skill, experience, or education with the subject matter of the witness's testimony.'") (quoting *Carroll v. Otis Elevator Co.*, 896 F.2d 210, 212 (7th Cir. 1990)).

The area in which Dr. Welner possesses expertise is forensic psychiatry, a discipline that involves the application of the diagnostic tools of psychiatry to questions such as a criminal defendant's competency to stand trial, the applicability of the insanity defense and a criminal defendant's ability to knowingly waive *Miranda*. *See* Welner Dep. 110–12, *Taylor v. City of Chicago*, 14-cv-0737 (N.D. Ill) Ex. B, May, 17, 2018. Standard practice in forensic psychiatry is to conduct an interview of a particular subject and, based on clinical observations in that interview, to offer an assessment of the subject, applying the clinical observations to the legal question in issue. *Id.* at 111–14. The study of false confessions, which has involved, among other things, evaluation of police interrogation methods and the organization and analysis of the available data about false confessions from hundreds of case files—is an entirely different discipline. Prof. Richard Leo, Plaintiff's expert in false confessions, describes this area of study at length in his report in this case. *See* Leo Report Ex. C, at 4–17.

3

The first four of Dr. Welner's proposed opinions might be appropriate for consideration by someone—not Dr. Welner—who possesses qualifications in the study of false confessions: how do suspects come to confess and how does this relate to Plaintiff's statement? (Opinion 1); what behavioral qualities and personal history of Plaintiff reflect a risk of false confession? (Opinion 2); on what basis does Plaintiff's confession qualify as a proven false? (Opinion 3); and does Plaintiff's case conform to the data set of confirmed false confessions? (Opinion 4).

The next three proposed Dr. Welner opinions critique the opinions of Prof. Richard Leo, Plaintiff's proposed false confessions expert (a research scholar with the training and experience that Dr. Welner lacks): how does the relevant body of scientific knowledge on false confessions relate to Prof. Leo's assertions about what is generally accepted and what informs this area? (Opinion 5); has Prof. Leo employed a reliable scientific methodology? (Opinion 6); and did Prof. Leo correctly analyze this case, in particular by pointing to the fit between Plaintiff's account of his confession and the documented false confession cases as well as the inadequacies of the police officers' account? (Opinion 7).[1]

It is beyond dispute that the study of false confessions is well-established as an area of expertise within the social sciences. *See generally* Saul M. Kassin, et al., *On the General Acceptance of Confessions Research: Opinions of the Scientific Community*, 73 AM. PSYCHOLOGIST 63 (2018), Ex. D (the high rate of agreement among 87 surveyed experts on the psychology of false confessions as to 30 propositions, indicates that those propositions "are sufficiently reliable to present in court"). Courts around the country and in this district have repeatedly allowed false confessions experts, including Prof. Leo in particular, to offer opinions

---

[1] Dr. Welner's final opinion (Opinion 8) is essentially an argument against Plaintiff's credibility bottomed on the contention that Plaintiff and the other wrongfully accused boys from the Agatite neighborhood embellished their accounts of the police wrongdoing over time.

4

on the phenomenon of false confessions, the susceptibility of persons with particular characteristics to confessing falsely, and the types of interrogation conduct that can lead to false confessions. *See, e.g., United States v. Hall*, 974 F. Supp. 1198, 1205 (C.D. Ill. 1997), *aff'd*, 165 F.3d 1095 (7th Cir. 1999) ("[T]he science of social psychology, and specifically the field involving the use of coercion in interrogations, is sufficiently developed in its methods to constitute a reliable body of specialized knowledge under Rule 702."); *Andersen v. City of Chicago*, No. 16 C 1963, 2020 WL 1848081, at *3 (N.D. Ill. Apr. 13, 2020) (admitting testimony of Saul Kassin, a false confession expert like Leo); *Harris v. City of Chicago*, 2017 WL 2436316, at *9 (N.D. Ill. June 5, 2017) (approving Prof. Leo's methodology as "sound, accepted and reliable" and permitting Prof. Leo to testify on matters related to the reliability of the plaintiff's confession); *Caine v. Burge*, 2013 WL 1966381, at *3 (N. D. Ill. May 10, 2013) (denying the defense motion to bar Prof. Leo); *Kluppelberg v. Burge*, 2016 WL 6821138 (N.D. Ill. Sept. 16, 2016) (denying in substantial part a motion to bar Prof. Richard Ofshe, regarded by many as the father of this area of study); *Scott v. City of Chicago*, 2010 WL 3034254 (N.D. Ill. Aug. 3, 2010); *Hurt v. Vantlin*, 2019 WL 8267074, at *5 (S.D. Ind. Sept. 26, 2019) (admitting false confessions expert); *United States v. Hayat*, 2017 WL 6728639, at *10–11 (E.D. Cal. Dec. 27, 2017) (admitting Dr. Leo's testimony); *United States v. Whittle*, 2016 WL 4433685, at *2 (W.D. Kentucky Aug. 18, 2016) (admitting false confessions expert); *Livers v. Schenck*, 2013 WL 5676881, at *5 (D. Neb. Oct. 18, 2013).

Unlike Dr. Welner, Prof. Richard Leo is a leading researcher and scholar in this area. Prof. Leo has extensively studied the interrogation process, among other ways, by personally observing over 120 police interrogations. Richard Leo CV, Ex. E. He has analyzed the causes and risk factors for false confessions in numerous peer-reviewed articles in scientific and legal

journals. *Id.* Prof. Leo is the author of several books on these subjects, including POLICE INTERROGATION AND AMERICAN JUSTICE (Harvard, 2008) and CONFESSIONS OF GUILT: FROM TORTURE TO MIRANDA AND BEYOND (Oxford, 2012). He is the recipient of a long and impressive list of awards and honors for this research and writing. *See* Leo Report Ex. C, at 2–4. Prof. Leo's work has repeatedly been cited by the United States Supreme Court and other courts. *Id.* at 4. Prof. Leo has qualified as an expert witness in hundreds of cases; the citations in the paragraph above are but a small sample. *See id.*

Dr. Welner, in contrast, though he is a medical doctor and a psychiatrist, does not have the training, the expertise, or the skill set to offer opinions in the area of false confessions research. Dr. Welner is not a social psychologist; he is not an expert in the area of social psychology. Welner Dep. Ex. B, at 46; *See* Michael Welner CV, Ex. F ("Welner CV"). His CV reveals that he does not have a doctorate—or, indeed, any academic degree—in the social sciences. He has never published in a peer-reviewed journal in the area of false or disputed confessions. Welner Dep. Ex. B, at 19.

The sum total of Dr. Welner's research into false confessions and their causes is his claim to have conducted a single research study of false confessions that occurred in 2004 and 2005. The study consisted of a partial analysis of the confession cases listed on the website of the Innocence Project to assess which of the listed exonerees was innocent. *Id.* at 26, 29–31. Dr. Welner did not complete the study; he did not publish the results of his study; and he freely acknowledged in his deposition that the study was "half baked." *Id.* at 26, 28. Indeed, in a deposition in another case, Dr. Welner demonstrated that he is ignorant of basic social scientific terms and concepts that inform scholarship in the social sciences study of false confessions and that he is wholly unfamiliar with the work of leading scholars in the field. *See* Welner Dep. 132–

6

134, 141–43, 149–50, *Swift v. City of Chicago*, No. 12 L 12995 (Ill. Cir. Ct. Nov. 4, 2016) Ex. G, Nov. 4, 2016.[2]

Dr. Welner is also not an expert in conducting interrogations or in the area of police interrogation generally.  Welner Dep. Ex. B, at 47–48.  He is not an expert in the area of police training.  *Id.*

And, finally, though Dr. Welner's report is rife with commentary about the attributes of gang members and gang culture, (*see, e.g.,* Welner Report Ex. A, at 28 (as a gang member Plaintiff was directly aligned against cooperating with law enforcement)), Dr. Welner's CV reveals that he has no background in ethnography.  Dr. Welner has never conducted a study of gangs or gang culture.  Welner Dep. Ex. B, at 56–57.  He has never published in a peer-reviewed journal on the subject of gangs or gang culture.  *Id.*  He has never practiced as a forensic psychiatrist in Chicago; he has no familiarity with the Traveling Vice Lords gang in Chicago; no information about relations between the Traveling Vice Lords and the Chicago Police; and no knowledge about relations among the various factions of the Vice Lords.  *Id.* at 62–63.

Those, like Dr. Leo, who have systematically studied false confessions, have an established methodology that draws upon more than a century of scholarship regarding police interrogation.  In broad terms, Dr. Leo and others have identified a universe of hundreds of cases

---

[2] In the *Swift* deposition, Dr. Welner was unable to define basic social psychology terms employed regularly in that literature, including: "illusion of transparency" and its relevance to suspects in an interrogation, "fundamental attribution error" and its relevance to the perception of confessions, "social impact theory," "secondary confession" as used in the research literature, "dependent corroboration" in the Reid technique of interrogation, "diagnosticity," and "Othello error" as used in research on deception detection in police interrogations.  Dr. Welner was also wholly unfamiliar with the work of prominent social psychologists who conduct social science research related to false confessions and police interrogations, such as Par Granhag (*see, e.g.*, Maria Hartwig et al., *Strategic Use of Evidence During Police Interviews*: *When Training to Detect Deception Works*, 30 LAW & HUM. BEHAV. 603 (2006)) and Kyle Scherr (*see, e.g.*, M. Guyll, et al., *Innocence and Resisting Confession During Interrogation: Effects on Physiologic Activity*, 37 LAW & HUM. BEHAV. 366 (2013)).  It is evident that Dr. Welner has in fact little – if any – familiarity with the scientific research conducted in the field.

in which it can be established, using defined criteria, that a confession given to police was false. Then, the nature of the interrogation, the circumstances in which it was conducted and the attributes of the person confessing are carefully and systematically catalogued. From this research, it is possible to generalize about the features of interrogations that have led to false confessions, the characteristics of those who have confessed falsely, the circumstances that have allowed false confessions to go undetected, and the similarities between other known cases and the one at hand. Dr. Leo details this method and the widely accepted findings of scholarship in this area in his report in this case. *See* Leo Report, Ex. C at 4–17. In *Harris v. City of Chicago,* after conducting a hearing, carefully evaluating Dr. Leo's scholarship and methodology, and reviewing some of the many cases admitting Dr. Leo's testimony, Judge St. Eve categorically concluded that "Dr. Leo's opinions are based on a sound, accepted and reliable methodology." 2017 WL 314755, at *6–*9.

Not so for Dr. Welner. All of Dr. Welner's opinions regarding Plaintiff's confession—the interrogation factors that motivate suspects to move from denial to confession (Opinion 1); the personal characteristics of those who confess falsely (and whether Plaintiff possesses those characteristics) (Opinion 2); the research assessment that Plaintiff's confession would qualify as a confirmed false confession (Opinion 3); and the fit between Plaintiff's account of his interrogation and confession and the universe of false confession cases (Opinion 4)—suffer from the same fundamental defect. Dr. Welner simply is not an expert in the study of false confessions. He has no training in the relevant research techniques. He has not contributed to the literature—indeed, he is not familiar with it. *See Edmonds v. State*, 955 So.2d 787, 801 (Miss. 2007) (Diaz, J., concurring) (stating that Dr. Welner would not qualify as an expert in the

8

field of false confessions and observing, "Dr. Welner testified at the *Daubert* hearing that he has never published a peer-reviewed article on false confessions.").

With no training and no scientific methodology to guide and circumscribe his analysis, Dr. Welner fills much of his 69 single-spaced pages with *ipse dixit* assertions about false confessions and how they come about that, though he may be trained as a forensic psychiatrist, Dr. Welner is not qualified to provide because he lacks expertise in the study of false confessions. By way of example:

- Suspects under interrogation confess because they have a perception of proof and face internal or external pressures. Among the former is guilt of the offense. The "only plausible explanation" for Plaintiff's confession is that he confessed because of his perception of the proof against him. *See* Welner Report Ex. A, at 24–28.

- Plaintiff "had no personal qualities of those known to falsely confess to police." *Id.* at 29.

- "[A]mong cases of confirmed false confession, elaborate scripting of suspects' confessions to murder are largely left to the imagination and do not originate from scientific quarters that rely upon fully transparent evidence and reliable accounts." *Id.* at 40 [*sic*].

- "[T]he scenarios of suspects brought into the other suspect's room for cameos and otherwise supposedly facilitating confessions is just nonsense." This has "the movement and timing of British farce." *Id.* at 42.

- "Gangs' brutality to others and to one another insulates gang conscripts from confessing under conditions of police abuse." *Id.*

- "The plaintiff's proposition that a Traveling Vice Lord confesses to murder because he was hit with a flashlight or a phone book does not … find any foundation or historical support from case histories of proven false confessions." *Id.* at 43.

Each of these propositions is one that the social science study of false confessions is uniquely suited to confirm or refute, using the methodologies Dr. Leo describes in his report and the body of literature that informs the study of interrogation and confession. Whether, for

example, Plaintiff does or does not "possess personal qualities of those known to falsely confess to police," is a question Dr. Welner's training and experience does not equip him to answer; he lacks basic familiarity with the data as to the personal characteristics of those who have been determined to have confessed falsely.

The mere fact that Dr. Welner possesses *some* expertise—he is undoubtedly qualified as a forensic psychiatrist—does not entitle him to offer the opinions bulleted above (and other similar opinions), which fall outside the limits of his specialized knowledge. "[N]othing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence which is connecting to existing data only by the *ipse dixit* of the expert." *Joiner*, 522 U.S. at 146. "The court is not obligated to admit testimony just because it is given by an expert." *United States v. Mamah*, 332 F.3d 475, 478 (7th Cir. 2003); *Zenith Elecs. Corp. v. WH-TV Broad. Corp.*, 395 F.3d 416, 419 (7th Cir. 2005) ("As we so often reiterate: 'An expert who supplies nothing but a bottom line supplies nothing of value to the judicial process.'") (quoting *Mid-State Fertilizer Co. v. Exchange National Bank*, 877 F.2d 1333, 1339 (7th Cir. 1989).

In line with these principles, at least one court has chastised Dr. Welner for offering expert testimony that exceeded the "'boundaries of [his] professional contribution and scientific integrity.'" *See* Sealed Mem. Order Rule 12.2 Motions 32–33, *United States v. Sampson*, No. 1:01-10384-LTS, ECF 2459 (D. Mass. Sept. 2, 2016), Ex. H. As the court explained:

> Put simply, *Daubert* protects against exactly what Dr. Welner has done
> here. It confines opinion testimony by witnesses with specialized
> knowledge to the areas within which their experience and training has
> endowed them with expertise. Dr. Welner is not an expert in all things.
> No expert witness is. His testimony in this proceeding – as in any other –
> must be confined to those topics on which a forensic psychiatrist is
> qualified to opine. For example, he may not, consistent with *Daubert* and
> Rule 702, offer opinions on the evidentiary standards governing these
> proceedings or on how to resolve purely factual questions at issue here.

*Id.* at 33. *Cf. Sacchetti v. Gallaudet Univ.*, 344 F. Supp. 3d 233 (D. D.C. 2018) (excluding Dr.

Welner's opinions regarding risk factors for suicide in part because Dr. Welner failed to offer

factual support or foundation for his conclusions).

Therefore, all of Dr. Welner's opinions must be excluded to the extent that they purport

to connect the data from this case to the scientific study of false confessions—an area in which

Dr. Welner is not qualified to opine.

## II.    DR. WELNER'S OPINIONS THAT THE STUDY OF FALSE CONFESSIONS AND ITS METHODOLOGIES ARE UNRELIABLE SHOULD BE EXCLUDED BECAUSE THEY ARE FOR THIS COURT TO RESOLVE PURSUANT TO *DAUBERT* AND RULE 702.

Three of Dr. Welner's opinions (Opinions 5, 6 and 7) are offered as rebuttal to Dr. Leo's

analysis. Dr. Welner believes that the social science research on which Dr. Leo's work and

opinions are bottomed does not use sound and reliable methodology and that any findings from

that research are baseless.  Dr. Welner expresses this view with remarkably intemperate

language:

- Dr. Leo and his colleagues who study false confessions are "credentialed zealots." Welner Report, Ex. A at 47.

- The social scientists who study false confessions are guilty of "perfidy." *Id.* at 50.

- Dr. Leo is a "veteran anti-police polemicist." *Id.* at 68.

- The research findings of social science are the "shallow" work of "authors [who] push around the deck chairs while dreaming of ice bergs to run into." *Id.* at 47.

- Dr. Leo and other social scientists who have conducted systemic studies of false confessions and their causes are a "coterie of authors who control the academic dialogue." *Id.* at 50.

Dr. Welner may intensely feel his exclusion from the social scientific discussion about

false confessions.  But it is undeniable that he lacks the qualifications to participate.  Dr. Welner

has never published in a peer-reviewed journal in this area.  He has never completed a research

11

study. He lacks basic knowledge of social scientific literature and the concepts associated with the analysis of confessions and interrogation. Thus, for all the reasons expressed in the preceding section, Dr. Welner is not qualified to present these opinions.

But, even if Dr. Welner had the necessary qualifications, his opinions to the effect that Dr. Leo's research methodology is unreliable stray into the realm of legal argument. Whether there is sufficient foundation or reliable methodology for Prof. Leo's opinions is for the court to decide pursuant to its *Daubert* gate-keeping function. *See Daubert*, 509 U.S. at 595; *Kumho*, 526 U.S. at 147 (1999); *Smith*, 215 F.3d at 718. Judge St. Eve affirmed this proposition in the *Harris* case, ruling in a closely analogous situation that an expert's "opinion concerning the science upon which Dr. Leo relied is not only a legal conclusion for the Court's resolution pursuant to *Daubert* and Rule 702, but the Court soundly rejected [the defendants'] argument that Dr. Leo's opinion was not based on reliable science … as have other courts in this district." 2017 WL 3142755 at *5.

In *Chatman v. City of Chicago*, addressing a report of Dr. Welner's offering opinions about the reliability of false confessions research similar to those Dr. Welner offers here, this court followed Judge St. Eve's reasoning in *Harris* and barred the opinions, noting that it had already found the social science research sufficiently reliable to pass muster under *Daubert*. Order 8–9, *Chatman v. City of Chicago*, No. 14 C 02945, ECF 719 (N.D. Ill. Oct. 30, 2018), Ex. I. The same reasoning applies here. Welner Opinions 5, 6 and 7 should be barred on this additional ground.

## III. DR. WELNER SHOULD NOT BE PERMITTED TO OFFER PSYCHIATRIC OPINIONS THAT EXCEED THE SCOPE OF HIS WORK IN THIS CASE.

Dr. Welner is undoubtedly qualified in the area of forensic psychiatry, the area for which he is trained and in which he practices. Dr. Welner would therefore be qualified to make a

12

forensic psychiatric assessment of Plaintiff. But, for any such assessment, a personal interview would be imperative unless it is impossible to conduct such an interview. *See* Welner Dep. Ex. B, at 111–14. The ethical guidelines issued by the American Academy of Psychiatry and the Law reflect this: "Honesty, objectivity and the adequacy of the clinical evaluation may be called into question when an expert opinion is offered without personal examination." *See* American Academy of Psychiatry and the Law (AAPL), *Ethics Guidelines for the Practice of Forensic Psychiatry* (adopted May, 2005), Ex. J, at 3.

Despite the centrality of a personal interview to the forensic psychiatric practice—Dr. Welner's one area of legitimate expertise—Plaintiff is a man Dr. Welner has never met, much less evaluated via a one-on-one interview. Counsel for the defendants informally approached counsel for Plaintiff with a request that he be voluntarily made available for an interview by Dr. Welner. Pursuant to a meet-and-confer under Local Rule 37.2, Plaintiff objected. For reasons unknown, Defendants never filed a motion pursuant to Rule 35 seeking a formal examination, as the rules require, and did not ever present to the Court the "place, manner, conditions, and scope of the examination" as Rule 35 requires. *See* Fed. R. Civ. P. 35(a)(2). No forensic interview took place. Nonetheless, Dr. Welner proceeded to produce his lengthy report, with its sweeping judgments about Plaintiff and his character.

In lieu of an interview, Dr. Welner conducted a review of the records of several psychiatric evaluations of Plaintiff. The records were collected by the Yellowstone Treatment Center in Billings, Montana, where Plaintiff spent a week in September 1992—nearly three decades ago. They consist of a compilation of reports and assessments, a brief summary of Plaintiff's short time at Yellowstone and a history of his childhood and mental health diagnoses. It is impossible to tell how much of the information came from Plaintiff himself and what is from

13

the authors' file review.[3]  Plaintiff was questioned about the accuracy of the records at his May 31, 2018 deposition and disputed several of the assertions in them.  *See* Daniel Taylor Dep. Ex. K, at 122–36, May 31, 2018.  Based on the outdated records alone, Dr. Welner makes sweeping judgments about Plaintiff, his character, and how Plaintiff *must have* responded under police interrogation.

For Dr. Welner to pronounce regarding Plaintiff's character and susceptibility to false confession in 1992—and to make those judgments without qualification on the basis of old, incomplete medical records—deviates not only from the *Ethics Guidelines* but from Dr. Welner's own standard of practice as a forensic psychiatrist. In *People v. Oliver*, the court excluded testimony from another false confession expert, citing Dr. Welner's own opinion that "it is only through 'rigorous psychological and psychiatric examinations' that a professional can determine whether a person is susceptible to confessing to a crime he did not commit." 991 N.Y.S.2d 260, 269 (Sup. Ct. 2014).  In *Edmunds v. State*, testifying as an expert witness, Dr. Welner declared it impossible to ascertain a person's vulnerabilities in the police interrogation context unless you interviewed them: "shallow research and case reports is [sic] so illegitimate because how do you know people don't have vulnerabilities if you don't talk to them? How do you really know what a person's vulnerabilities are as they related to a disputed confession, if they haven't been examined?"  Welner Tr. 835, *Edmunds v. State*, No. 2004-CT-02081-SCT (Cir. Ct. Oktibbeha Cty., Miss.), Ex. L. In *Jones v. Markham*, a civil false confession case in the Cook County Circuit Court, Dr. Welner was still more emphatic, stating without qualification that an expert forensic opinion about a confession that takes into account only the conduct of the

---

[3] Plaintiff is separately moving in limine to bar introduction of these records or reference to their contents at the trial.  That motion (Plaintiff's Motion in Limine No. 3 to Bar Reference to Plaintiff's Juvenile Mental Health Records) attaches a copy of the records and contains a fuller description of them.

police without examining "the individual for the specific vulnerabilities," does not "rise to the standard of any kind of forensic examination." *See* Welner Dep. 19, *Jones v. Markham*, No. 00 L 5608 (Cir. Ct. Ck. Cty), Ex. M.

It might perhaps have been appropriate, in the absence of an interview, for Dr. Welner to author a report explaining the diagnoses that are contained in Plaintiff's old mental health records and to opine regarding how a person suffering from those conditions might respond in a stressful situation such as a police interrogation—all with the caveat that every person is different and Dr. Welner in fact has no personal knowledge of Plaintiff himself. But this is not how Dr. Welner plans to testify.

Instead, Dr. Welner's opinions go much further. The Report asserts without any qualification that:

- For Plaintiff to have confessed in the face of abuse and threat is "silly and without basis in the history of this examinee." Welner Report Ex. A, at 27.[4]

- Plaintiff was "not compliant." *Id.* at 28.

- Plaintiff "relat[ed] to authority with oppositional behavior." *Id.*

- Plaintiff "was comfortable bringing violence to others[.]" *Id.* at 29.

- Plaintiff "has no personal qualities of those known to falsely confess to police." *Id.*

- "[G]ang members' vigilance, and [Plaintiff's] guardedness, does not conform to the vulnerabilities of those who internalize confessions." *Id.* at 43.

- Naivete, suggestibility, and compliance have not been demonstrated in Plaintiff. *Id.*

Dr. Welner has no scientific basis to divine that Plaintiff personally was somehow psychologically immune from falsely confessing in response to the combined effect of threats,

---

[4] Plaintiff, of course, is not Dr. Welner's "examinee." Dr. Welner has never examined him.

15

physical abuse and assurances of leniency.  *See id.* at 27. This is not legitimate expert opinion.  It is no more than *ipse dixit*, since Dr. Welner lacks the cornerstone basis for forensic psychological assessment—a face-to-face interview to assess Plaintiff's mental functioning.  In the absence of any grounding in the core methodology of forensic psychiatry, Dr. Welner's assertion must be seen for what it is—nothing more than inadmissible argument.  Dr. Welner's bulleted opinions above (and others like them) should be excluded because they are not supported by a reliable methodology.

The jury may accept the defendants' contention that Plaintiff was a hardened gang member who would resist threats and abuse.  But Dr. Welner's proposed testimony would add nothing to their consideration of that question and should therefore be excluded.  *See Klein v. Vanek*, 86 F. Supp. 2d 812 (N.D. Ill. 2000) (excluding the testimony of a forensic psychiatrist who did not personally interview the plaintiff because the proposed testimony did not have scientific support, would not be helpful to the jury and would be unfairly prejudicial to the plaintiff); *Tchatat v. City of New York*, 315 F.R.D. 441, 446 (S.D. N.Y. 2016) (excluding the opinion of a forensic psychiatrist who failed to examine the subject of his analysis: "Neither Dr. Raines nor any other expert has provided any admissible evidence to this Court that a review exclusively of written records is an accepted method for making a psychiatric diagnosis of the kind Dr. Raines made here.").

In particular, Dr. Welner should be barred from testifying that Plaintiff is not "suggestible" or "compliant."  *See* Welner Report Ex. A, at 43.  These concepts were introduced into the study of false confessions by the world-renowned psychologist Dr. Gisli Gudjonsson. Dr. Gudjonsson developed suggestibility and compliance scales, a psychological assessment tool that is widely credited with pioneering the empirical measurement of susceptibility to

16

interrogation and described in his widely cited textbook. *See* Gisli H. Gudjonsson, *The Psychology of Interrogations and Confessions*: A Handbook (Chichester: John Wiley & Sons, 2003). Dr. Welner did not employ the Gudjonsson scales or any other scientific assessment to reach his conclusions. Dr. Welner's opinions as to Plaintiff's "naivete, suggestibility, and compliance" are purely subjective, are not underpinned by any reliable methodology and must be excluded.

## IV. DR. WELNER SHOULD BE BARRED FROM PROVIDING TESTIMONY THAT DISTORTS THE RECORD, PRESUMES THE TRUTH OF MATTERS THAT ARE IN DISPUTE, OPINES AS TO THE CREDIBILITY OF WITNESSES, OR CONSTITUTES ARGUMENT RATHER THAN EXPERT OPINION.

Dr. Welner's lengthy report is littered with assertions about the record in this case that are untrue. Dr. Welner assumes the truth of propositions that are false and argues ones that are disputed. He liberally opines on the credibility of parties and witnesses. Dr. Welner's Opinion 8 is merely argument as to the credibility of the accounts that Plaintiff and his co-defendants have given of their interrogations over the course of post-conviction and civil rights litigation. All of these assertions and opinions are well beyond the range of legitimate expert analysis. They should be excluded.

### A. Dr. Welner Should Not Be Permitted to Testify as to Matters for Which There Is No Record Support or to Assert the Truth of Matters That Are in Dispute.

Dr. Welner's report includes a litany of declarations about the record of this case that are either disputed or without support. Rather than qualifying his assertions as disputed or speculative, Dr. Welner presents them as if they were established facts. There are dozens of such instances. By way of example:

- Plaintiff's exoneration came about as a result of "advocacy" on the part of the Chicago Tribune. Welner Report Ex. A, at 1, 68. There is nothing in the record

that affords a basis for Dr. Welner to determine what motivated the Cook County State's Attorney to exonerate Plaintiff.

- Lemuel Hardy (who at one point was suspected by post-conviction counsel of being a participant with Mixon in the murders) was being "set up" as "the next Alstory Simon"[5] by former Chicago Tribune reporter Steve Mills and the "Northwestern Innocence Project." *Id.* at 34–35. The contention that Mr. Mills, an award-winning journalist, or that anyone affiliated with Northwestern's Center on Wrongful Convictions, set out to frame Lemuel Hardy has no support in the record.

- There was "no opportunity" for physical abuse to have occurred during Plaintiff's interrogation. *Id.* at 27. To the contrary, case records reflect that Plaintiff was arrested by Defendants and brought to Belmont and Western by car at approximately 2:15 a.m. on December 3, 1992. Plaintiff's court reported statement was commenced at 5:23 a.m. There is, thus, not a basis to conclude that there was "no opportunity" for physical abuse to have occurred within a window of over three hours.

- Plaintiff confessed shortly after being taken into custody in an interview that was 20 minutes or less. *Id.* at 64. This is the defendants' version. Plaintiff, in his deposition, provided an account of multiple interrogation sessions, initial resistance to confessing and his will being overborn over the course of time. *See* Daniel Taylor Dep. Ex. N, at 238–244; 284–287; 293–294, Sept. 4, 2014. So, while it is of course permissible for an expert to assume a certain factual scenario in the face of a dispute, *United States v. Vest*, 116 F.3d 1179, 1184 (7th Cir. 1997); *Sommerfield v. City of Chicago*, 254 F.R.D. 317, 320–21 (N.D. Ill. 2008), an expert may not resolve such disputes. Welner repeatedly crosses this line.

- "For [Plaintiff] to make claims of officers beating him into a confession rather than offering an alibi as his best defense is logically untrue if he believed the alibi to be legitimate." Welner Report Ex. A, at 64. This assertion is baseless since Plaintiff has always insisted *both* that he was coerced into confessing *and* that he was confined in a police lockup at the time of the murders. Regardless, what is "logically untrue" is a jury question.

- Lewis Gardner initiated an exchange with a Chicago Police officer in which he asked if he could speak privately with the officer and then said that Deon Patrick was a participant in the murders. *Id.* at 6. Again, this is the police version. Mr. Gardner testified in his deposition that he did not initiate any exchange with a Chicago Police officer about the murders and that he had no idea why he was

---

[5] Alstory Simon was interviewed by Paul Ciolino, an investigator who worked with David Protess, the Northwestern journalism professor, and confessed to a murder for which Anthony Porter had been convicted and sentenced to death. As a result of Simon's confession, Porter was pardoned just hours before he was set to be executed. Years later, former State's Attorney Anita Alvarez granted Simon a certificate of innocence and Simon sued Ciolino and Protess.

moved from the police station to the Belmont and Western detective headquarters. *See* Lewis Gardner Dep. 134–137, Jan. 7, 2015.

● The lockup documentation (which shows that Plaintiff was in custody until 10 p.m. on the night of the murders) is "flawed." Welner Report Ex. A, at 30. This is disputed. *See* John Meindl Dep. 68–71, May 6, 2015; James Gillespie Dep. 48; 51–52, May 6, 2015. And, in any event, Welner certainly has no expertise in lock-ups, or lock-up records, which would enable him to offer this opinion.

● Akia Phillips and or Lewis Gardner would have testified or stated in the course of the criminal proceedings that Plaintiff was not at the Clarendon Park meeting "were [Plaintiff's] alibi to be legitimate." Welner Report Ex. A, at 34. This is pure speculation. Dr. Welner has no special powers of divination as to how Phillips or Gardner would or should have testified.

● When the Cook County State's Attorney elects not to retry a case following a vacated conviction, "a Certificate of Innocence from the court [is] inevitable." *Id.* at 37. This is false. The standard for granting a Certificate of Innocence is not the equivalent of a prosecutorial election not to retry a case after a conviction has been vacated, *See* 735 ILCS 5/2-702. Illinois claimants have lost bids for Certificates of Innocence even after charges have been dismissed; the matter is one for the circuit court's discretion. *See People v. Simon*, 415 Ill. Dec. 145, 149, 82 N.E.3d 90, 94 (2017) (reviewing denial of a COI even where the State did not object and after charges had been dropped); *Rudy v. People*, 368 Ill. Dec. 594, 596, 984 N.E.2d 540, 542 (2013) ("Whether or not a petitioner is entitled to a certificate of innocence is generally committed to the sound discretion of the court."). Cook County judicial procedures are also also well outside the scope of Dr. Welner's expertise as a forensic psychiatrist.

● The Cook County State's Attorney's decision not to retry Plaintiff's case following the vacation of the conviction was "a political decision." Welner Report Ex. A, at 36–37. There is obviously no basis for this assertion, as Dr. Welner himself admitted in his deposition. *See* Welner Dep. Ex. B, at 163–65.

● "We know from multiple sources, including [Plaintiff] himself and others with whom he was arrested that he returned to the Phillips apartment well before 10:00 PM [on the night of the murders]." Welner Report Ex. A, at 61. Dr. Welner does not "know" when Plaintiff returned to the Phillips apartment. There is evidence from Chicago Police records that it was later than 10:00 PM.

● Akia Phillips' assertion that he was physically abused during his interrogation is "logically untrue." *Id.* at 65. Mr. Phillips testified in his deposition that he was physically abused. *See* Akia Phillips Dep. Ex. O, at 172–75, Dec. 4, 2014. Dr. Welner is in no position to comment on the veracity of that testimony, and it is for the jury to decide.

This list could be extended several times over. Throughout his Report, Dr. Welner indulges a proclivity for arguing the case—sometimes on erroneous factual assumptions—for the benefit of the party who has retained him. *Cf. Giuffre v. Jefferson*, No. 14 C 3692, 2017 WL 951239, at *7 (N.D. Ill. Mar. 10, 2017) ("allowing [expert] to offer an opinion relying in primary part upon the assumption that Defendants' account is accurate would cause significant confusion regarding this issue and impermissibly usurp the jury's role.") To take one particularly egregious example, Dr. Welner asserts: "[t]here is … no credible evidence that [Plaintiff] confessed in response to abuse, threats, or promises." Welner Report Ex. A, at 28. This comment—and others like it—are unhelpful and improper. It is for the jury to assess the credibility of the evidence. *Essex Ins. Co. v. Structural Shop*, No. 15 C 2806, 2017 U.S. Dist. LEXIS 77490, at *4 (N.D. Ill. May 22, 2017) ("[E]xpert opinions that 'merely tell the jury what result to reach' are inadmissible." (quoting Fed. R. Evid. 704, 1972 advisory committee notes)).

As the court noted in its ruling in *Chatman* (excluding Dr. Welner's gratuitous and non-scientific discussion as to why an alleged rape victim did not fabricate her account), conclusory statements that relate in no discernable way to Dr. Welner's expertise as a forensic psychiatrist and that "suppl[y] nothing but a bottom line" are impermissible as expert testimony. *Chatman* Order Ex. I, at 11. The same principle applies to the argumentative assertions regarding the record in this case that Dr. Welner includes throughout his Report.

**B. Dr. Welner Should Not Be Permitted to Testify as to the Credibility of Witnesses and Parties.**

Throughout his Report, Dr. Welner does not shy from presenting his assessment of the credibility of witnesses and parties. By way of example:

- "For [Plaintiff] to make claims of officers beating him into a confession rather than offering an alibi as his best defense is logically untrue if he believed the alibi is legitimate." Welner Report Ex. A, at 64.

20

- Akia Phillips' assertion of physical abuse is "logically untrue." *Id.* at 65.

- Plaintiff is not credible because his memory has been colored by the "test piloted" accounts of co-plaintiffs and the "secondary gain of litigation." *Id.* at 26.

- Plaintiff's assertion that Defendant Killacky told him he loved beating Plaintiff's "dark skin" is "dramatic and therefore dubious." *Id.*

- "The proposition that [Plaintiff] confessed to avoid the prospect of being beaten is … not credible." *Id.* at 27.

- It is "logically untrue" that Plaintiff could have been successfully fed the facts that were included in his confession within the period of time he was in police custody. *Id.* at 64.

This list could also be extended. Indeed, Welner's Opinion 8 is no more than an extended argument against the credibility of the accounts Plaintiff and his co-defendants have provided of their interrogations. There, Welner contends, without basis in the record, that those accounts are rehearsed, internally inconsistent and therefore not to be believed. *See* Welner Report Ex. A, 66–68 (He concludes, "Truth and one's effort to be sincere needs no rehearsal"—implying that all are lying. There can be no doubt that any such testimony from Dr. Welner would be improper. "[A]n expert cannot testify as to credibility issues." *Goodwin v. MTD Prods.*, 232 F.3d 600, 609 (7th Cir. 2000).

There is simply no way to disentangle from the balance of Dr. Welner's analysis his taking of sides on the facts, his assumptions—many of them false—about what the record shows, and his credibility determinations. Therefore, the improprieties that are flagged in this section warrant an order barring the entirety of Opinions 1-8.

## V. DR. WELNER SHOULD BE BARRED BECAUSE HIS PROPOSED TESTIMONY IS UNDULY PREJUDICIAL.

The real reason the defendants want Dr. Welner to testify is so that he can reveal to the jury the contents of otherwise inadmissible juvenile mental health records regarding Plaintiff's

extraordinarily difficult childhood, including the circumstances of Plaintiff's placement in foster

care at a very early age.  Dr. Welner describes these records in the "Relevant Personal History"

section of his report. Welner Report Ex. A, at 21–24.  They include, by way of example:



It is difficult to conceive of the relevance of this information and the other mental health,

school and juvenile arrest records that Dr. Welner summarizes in the personal history section of

his report and refers to throughout.  But it is clear, on the other hand, that the admission of any

testimony about the records risks inflaming the jury and prejudicing them against Plaintiff.  Any

testimony about these long-ago mental health records should be barred under Rule 403 because it

would be unduly prejudicial.  *See, e.g., Schmude v. Tricam Indus.*, 556 F.3d 624, 628–29 (7th

Cir. 2009) (upholding the exclusion of a therapist's report that quoted the plaintiff as saying he would "walk right over" a person lying on the ground and bleeding to death).

Not only are these records extraordinarily prejudicial, their admission would distract the jury from the issues, suggesting that Plaintiff's testimony, his possible guilt of the murders and his actions in this case should be judged from the perspective of his childhood traumas, even though Plaintiff has not put this trauma at issue in the case. Thus, Dr. Welner's proposed testimony about the mental health records should also be barred under Rule 403 because of the risk of juror confusion. *See Fitzpatrick v. City of Fort Wayne*, 259 F.R.D. 357, 363 (N.D. Ind. 2009) (barring the admission of school disciplinary records in a civil rights case where their admission would create a "trial within a trial" and confuse the jury).

Apart from the unfair prejudice of the mental health records, Dr. Welner should be barred entirely from testifying for an additional reason. Perusal of his report leads inescapably to the conclusion that Dr. Welner is an advocate who plans to argue the defense case and who cannot be trusted to limit his testimony to the science of forensic psychiatry. In his deposition, he repeatedly provided long, rambling answers that included irrelevant and non-responsive information. *See, e.g.,* Welner Dep. Ex. B, at 130–32 (in which Dr. Welner larded his answer to the question "Why did you want to interview Daniel Taylor?" with an unfounded allegation that one of Plaintiff's counsel had interfered with his interview of a different examinee many years prior). Any legitimate opinions grounded in the practice of forensic psychiatry that Dr. Welner might have to offer cannot be extracted from the improper, baseless and inflammatory material on virtually every page of the Report. Dr. Welner's testimony, to whatever limited extent it might be relevant and admissible, risks becoming inflammatory and unduly prejudicial.

## CONCLUSION

For the foregoing reasons, this court should enter an order barring any testimony by Dr. Michael Welner.

Respectfully submitted

**DANIEL TAYLOR**

By:   /s/   Locke E. Bowman
      One of his attorneys

Locke E. Bowman
Alexa Van Brunt
Maggie Filler
Vanessa del Valle
Roderick and Solange MacArthur Justice Center
Northwestern University Pritzker School of Law
375 E. Chicago Ave.
Chicago, IL 60611
312 503 0844

Arthur Loevy
Jon Loevy
David B. Owens
Loevy & Loevy
311 N. Aberdeen St. #3
Chicago, IL 60607
312 254 5900

**CERTIFICATE OF SERVICE**

Locke E. Bowman, an attorney, certifies that he caused the foregoing document to be served on all counsel of record on September 21, 2020, by filing the same using the court's CM/ECF system, which automatically effected service on all counsel of record.