# EXHIBIT B

Michael Welner, M.D. 05/17/2018

**Page 1**

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

DANIEL TAYLOR,                    )
        Plaintiff,                )
    v.                            ) Case No. 14 CV 737
CITY OF CHICAGO, et al.,          )
        Defendants.               )

The video deposition of MICHAEL WELNER, M.D., called for examination pursuant to the Rules of Civil Procedure for the United States District Courts pertaining to the taking of depositions, taken before Tracy Jones, a Certified Shorthand Reporter within and for the County of Cook and State of Illinois, at 20 South Clark Street, Suite 1700, Chicago, Illinois, on May 17, 2018, at the hour of 10:11 a.m.

Reported by:    Tracy Jones, CSR, RPR, CLR
License No.:    084-004553

**Page 3**

I N D E X

WITNESS                           EXAMINATION
MICHAEL WELNER, M.D.
    Examination By Mr. Bowman              7

E X H I B I T S

NUMBER                         IDENTIFICATION
    Exhibit No. 1                       18
    Exhibit No. 2                       65
    Exhibit No. 3                       76
    Exhibit No. 4                       83
    Exhibit No. 5                       85
    Exhibit No. 6                       93
    Exhibit No. 7                       96
    Exhibit No. 8                      114
    Exhibit No. 9                      122
    Exhibit No. 10                     124
    Exhibit No. 11                     141
    Exhibit No. 12                     141
    Exhibit No. 13                     160
    Exhibit No. 14                     238
    Exhibit No. 15                     241

**Page 2**

APPEARANCES:
        RODERICK & SOLANGE MacARTHUR
        JUSTICE CENTER, by
        MR. LOCKE E. BOWMAN
        MS. ALEXA VAN BRUNT
        NORTHWESTERN UNIVERSITY SCHOOL OF LAW
        375 East Chicago Avenue
        Chicago, Illinois 60611
        312.503.0844
        l-bowman@law.northwestern.edu
            Representing the Plaintiff;
        BORKAN & SCAHILL, Ltd., by
        MS. MISHA ITCHHAPORIA
        Two First National Plaza
        20 South Clark Street
        Suite 1700
        Chicago, Illinois 60603
        312.580.1030
        mitchhaporia@borkanscahill.com

            Representing the Defendant Chicago
        Police Officers;
        DYKEMA GOSSETT PLLC
        MR. DANIEL M. NOLAND
        10 South Wacker Drive
        Suite 2300
        Chicago, Illinois 60606
        312.876.1700
        dnoland@dykema.com
            Representing the City of Chicago.

**Page 4**

THE VIDEOGRAPHER: My name is Kelly Woods, Certified Legal Video Specialist with McCorkle Litigation Services, 200 North LaSalle, Suite 2900, Chicago, Illinois 60601. I am the videographer on May 17th, 2018, for the recording of the deposition of Dr. Michael Welner being taken at Borkan & Scahill, 20 South Clark Street, Suite 1700, Chicago, Illinois, at the time of 10:11 a.m., in the matter of Daniel Taylor, Plaintiff, v. City of Chicago, et al., Defendants, filed in the United States District Court, Northern District of Illinois, Eastern Division, Case No. 14 CV 737.

Will Counsel please identify themselves for the record, beginning with plaintiff's counsel.

MR. BOWMAN: My name is Locke Bowman. I represent Daniel Taylor, the plaintiff.

MS. ITCHHAPORIA: Misha Itchhaporia on behalf of the individual officers.

MR. NOLAND: Daniel Noland on behalf of the City of Chicago.

THE VIDEOGRAPHER: Thank you.
Could the court reporter please



Michael Welner, M.D. 05/17/2018

1 identify herself and swear in the witness.
2 THE COURT REPORTER: Tracy Jones,
3 Illinois
4 CSR No. 084-004553, with McCorkle Litigation
5 Services.
6 (Witness sworn.)
7 THE VIDEOGRAPHER: Please proceed.
8 MR. NOLAND: Just for the record, this
9 is Dan Noland. Over the past couple of weeks,
10 we have begun the process of double-checking the
11 City's compliance with some plaintiff's requests
12 for production. And some additional complaint
13 registers or complaint logs that may be
14 responsive to plaintiff's request to produce
15 have been located. And I was able to look at
16 them last -- yesterday afternoon and evening and
17 sent an e-mail to Counsel notifying them that we
18 had these, we haven't had the chance to redact
19 them of Social Security numbers and things of
20 that nature, but that I'd bring them all with me
21 to the deposition. I've now done that, and I've
22 got -- some of them are complaint logs. I'm not
23 certain if all of them are allegations. One may
24 not be an allegation; I'm not positive. But --

5

1 And obviously, this will be for the plaintiff's
2 counsel, just evaluation on behalf of their
3 client when they get them. But there were three
4 that I flagged for Mr. Bowman before the
5 deposition began this morning. 1025113 is the
6 first number; the second one is 1072768; and the
7 third is 1045460 [sic] that I just flagged for
8 him to suggest he may want to review them before
9 the deposition. And he had a few minutes to do
10 that.
11 So we are -- Those three have actually
12 been produced at about 9:30 a.m. this morning
13 via e-mail to counsel of record. And the other
14 ones, our office is working on doing the
15 appropriate redactions, and we're going to get
16 those out by the end of the week.
17 MR. BOWMAN: Right. And I obviously am
18 in the business of processing this at the
19 minute. I would just add to that that the first
20 we learned of this was in an e-mail from Dan at
21 10:30 last night. So I do agree that the e-mail
22 or that the complaint registers that were
23 flagged for me a few minutes ago and that I've
24 had a chance really just to glance at are highly

6

1 relevant in this case since each of the three
2 alleges interrogation misconduct by officers who
3 are defendants in this case. And upon quick
4 review, there appear to be similarities; that
5 is, indications of a pattern or course of
6 conduct that was employed in the other cases
7 that is similar to what is alleged in this case.
8 So we'll evaluate this situation, and I
9 appreciate the explanation.
10 WHEREUPON:
11 MICHAEL WELNER, M.D.,
12 called as a witness herein, having been first
13 duly sworn, was examined and testified as
14 follows:
15 EXAMINATION
16 BY MR. BOWMAN:
17 Q. So, Dr. Welner, will you state your
18 first and last name.
19 A. Yes. My name is Michael Welner,
20 W-E-L-N-E-R.
21 Q. Dr. Welner, you and I have been around
22 this track now multiple times. You know that
23 I'm slow of speech, and I would appreciate if
24 you could bear with me and make sure that I have

7

1 my question completely out before you begin your
2 answer. For my part, I'm going to do my best
3 not to interrupt your answers so that we're not
4 in the position, either of us, in talking over
5 the other and making life difficult for Tracy.
6 Okay?
7 A. Sure.
8 Q. You have in this deposition, as you
9 have in every deposition, as you well know, an
10 absolute right to questions that you can
11 understand. So if I have not made myself clear
12 because either my voice has dropped or you
13 haven't heard me or I've phrased something in a
14 way that doesn't make sense to you or for any
15 other reason at all, let me know. It's my
16 responsibility to attempt to clarify the
17 question before you begin your answer. Okay.
18 A. Yes.
19 Q. If you don't tell me that you don't
20 understand what I've asked you, everybody is
21 going to assume that you did understand the
22 question and that your answer is your response
23 to that question that appears in the transcript,
24 which is why this is important as a caution.

8



Michael Welner, M.D. 05/17/2018

1    A.  Correct.  The only thing that I would
2  add is that while I don't -- I don't think you
3  speak slowly, I think you speak softly.
4    Q.  Right.
5    A.  And so in order to avoid any potential
6  confusion that may not be appreciated in a
7  transcript, if you could speak a little bit
8  louder then -- then I'll probably be even less
9  likely to ask you to repeat yourself.
10    Q.  Okay.  I'm going do my best.  And
11  again, if I fail, it's on you to tell me --
12    A.  Sure.
13    Q.  -- that you haven't heard me.
14    A.  Certainly.
15    Q.  And to be clear, I am suffering from a
16  respiratory infection today.  So that may impact
17  things.  And I want you to be doubly vigilant.
18  All right?
19    A.  Sure.
20    Q.  I think that covers it.  I know you
21  know everything else.
22       Can you tell me what you did to get
23  ready to testify today, please?
24    A.  Sure.  I reviewed my report, and I

9

1  reviewed the statement of Mr. Taylor, statement
2  of Mr. Patrick.  I reviewed my report on
3  Mr. Patrick.  I reviewed some source materials
4  that I had my eye on because they were
5  referenced in this case, and I hadn't looked at
6  them in a while, and I wanted to get more
7  refreshed, in particular, the Reed Manual, as
8  it's something that's come up in this case.  And
9  met with the attorneys yesterday, Misha.  And I
10  believe that's what I did.
11    Q.  Okay.  To clarify, other than the Reed
12  Manual, is there any source material that you
13  reviewed specifically in anticipation for this
14  deposition?
15    A.  I reviewed several articles.  I don't
16  know that I could enumerate them all.  But I
17  reviewed several articles that -- that I've been
18  meaning to read.  And it's the kind of thing
19  that I put aside when I know that I'm going to
20  be addressing the issue of disputed confessions
21  in a serious way, I'll sort of put away articles
22  and say when I want to internalize that, I will.
23  And I've had the opportunity to look at some of
24  them.  And in particular, I -- And other things

10

1  just that I've been meaning to read because I
2  thought they might be helpful for me to
3  incorporate into my thinking.
4    Q.  Can you specify what articles you had a
5  look at?
6    A.  Well, there's a book that I've been
7  meaning to read for a while and haven't made
8  time for.  And I thought before you and I sat
9  down today, it would be something that I would
10  find informative and could potentially impact my
11  thinking.  And that's Code of the Street, which
12  is an ethnographic -- a book of the ethnographic
13  research of a social scientist on the inner city
14  and a variety of the related dynamics.
15       I read articles that related to some of
16  the review work of Dr. Pete Blair, who is a
17  psychologist in Texas who has given some
18  attention to confession, to disputed
19  confessions.
20       I looked over an article by -- by Dr.
21  Kassin that he published this year on the
22  perceptions of colleagues as they relate to the
23  disputed confession area.
24       Those are a few examples of articles

11

1  that I looked over.
2    Q.  Who is the author of the Code of the
3  Street volume?
4    A.  Actually, I can't say.  I have to --
5  It's a pretty well-known book, and I happen to
6  be blanking on it right now.  I want to say
7  Elijah Anderson, and I hope I'm not incorrect.
8  I may be incorrect.
9    Q.  And --
10    A.  But it's -- You know, it's a pretty --
11  It's a pretty well-cited book that I became
12  familiar with in a completely different context
13  on another forensic matter that related to an
14  inner city examinee that I was working with.
15  And I was reading it in a different context, and
16  it occurred to me that it might be informative
17  for me to read it when I was reading it through
18  the lens of some of the issues that we've been
19  talking about here, notwithstanding that it has
20  the same population.  Because there is an
21  extensive focus within that book on violence in
22  the inner city and the dynamics among the young
23  black male population.
24    Q.  I'm going to make another request of

12



Michael Welner, M.D. 05/17/2018

1 you. It's going to be a long day today. And
2 the question just called for a name. That's it.
3 And I would appreciate it, if you could, if you
4 could listen to the question and answer the
5 question. If that's not possible, I get it.
6 I'm not going to cut you off. I don't have that
7 right. But as a courtesy to me, I would
8 appreciate it if you could just focus on the
9 question, reflect on what's being asked of you,
10 and just simply answer the question.
11    A. Sure.
12    Q. Thanks.
13       You say that Pete Blair, is that
14 B-L-A-I-R?
15    A. Correct.
16    Q. He is a psychologist, you said, in
17 Texas?
18    A. Yes.
19    Q. And what works -- Is he -- Does he have
20 a terminal degree? Is his title Doctor?
21    A. I don't know.
22    Q. What --
23    A. It's of no consequence. He's published
24 a few articles, and they've encompassed some of

13

1 you're asking me questions that can be quite
2 wide-ranging, and so we'll see.
3    Q. Do they confirm any of the opinions
4 that you express in your report?
5    A. Sure.
6    Q. Okay. How much time did you spend
7 reviewing source material in preparation for
8 this deposition?
9    A. Source material? You mean everything
10 that I just detailed?
11    Q. You said that there were some source
12 materials that you reviewed --
13    A. Yeah, like my report.
14    Q. You cut off my question.
15       MS. ITCHHAPORIA: Let him get out the
16 question.
17 BY MR. BOWMAN:
18    Q. You said there were some source
19 materials that you reviewed in anticipation of
20 today's deposition. And you've listed some of
21 them, and you've just told me that the ones that
22 you've listed are all that you recall off the
23 top of your head. So my next question is, how
24 much time did you spend reviewing the source

15

1 the subject matter of this -- of this case. And
2 so I have not reviewed his work and wanted to
3 have an opportunity to read it because I was
4 aware of it and was not familiar with it.
5    Q. Thank you.
6       And Mr. or Dr. Blair's articles, were
7 the articles that you read in peer-reviewed
8 journals?
9    A. The ones that I read, yes.
10    Q. And do you recall any titles?
11    A. I don't.
12    Q. How many articles did you read?
13    A. One -- One from 2005 and one from 2007.
14    Q. And is there anything else that you can
15 recall reading in the way of source materials in
16 preparation for this deposition?
17    A. Not immediately. If something pops up,
18 I'll add it to my testimony.
19    Q. Did the articles that you just cited
20 help to inform in any way the opinions that you
21 anticipate testifying about in this case?
22    A. It depends what you ask me. They
23 don't -- They do not -- They do not alter the
24 opinions that I've expressed in my report. But

14

1 material that you've described?
2    A. I would say probably about 12 hours.
3    Q. And are you billing the City of Chicago
4 for that review?
5    A. Yes, I am.
6    Q. At $600 an hour, or is it 575?
7    A. Whatever my rate is. I'll bill at the
8 rate that's assigned for this case. I don't
9 recall my rate for this case, whether it's 575
10 or 6.
11    Q. One or the other?
12    A. It's one or the other. Whatever the
13 rate was before is the rate that I would bill
14 it.
15    Q. Got it.
16       Other than the Taylor statement and the
17 Patrick statement, have you looked at any other
18 materials from the factual record in this case
19 in anticipation specifically of testifying in
20 your deposition today?
21    A. I looked at the -- I looked at the
22 portion of the Patrick transcript, I believe,
23 that specifically addressed the testimony of
24 Faye McCoy on her encounter with Scorpio.

16



McCorkle Litigation Services, Inc.
Chicago, Illinois (312) 263-0052

Michael Welner, M.D. 05/17/2018

1    Q.  Is there anything else?
2    A.  Not that I recall right now.
3    Q.  So there may be, but you've forgotten
4  it?
5    A.  I don't recall.  I mean, everything
6  that I've enumerated is everything I remember reviewing.
7    Q.  How much time did you spend on your
8  review of the materials specifically from this
9  case?
10   A.  I just mentioned -- When I gave a
11  12-hour figure, I was accounting for everything.
12   Q.  Okay.  All right.
13   A.  The materials of this case and source
14  materials and all of that.
15   Q.  Thanks for clarifying that.
16       How much time have you spent in the
17  company of the lawyers in anticipation of your
18  testimony?
19   A.  Three hours.
20   Q.  Was that all yesterday?
21   A.  Yes.
22   Q.  Other than what you've testified about
23  so far, is there anything else that you did to
24  prepare to testify at today's deposition?

17

1  for him to do that?
2       MS. ITCHHAPORIA:  Yes.
3       MR. BOWMAN:  Thanks so much.
4  BY MR. BOWMAN:
5    Q.  Dr. Welner, have you ever published a
6  peer-reviewed article on the subject of disputed
7  confessions?
8    A.  I have not.
9    Q.  Judging from your report and from your
10  testimony in other proceedings, it's my
11  understanding -- I'm asking you if this is
12  correct or not -- that you believe the
13  publications of
14  Dr. Leo and Dr. Kassin and others in the field
15  of false confessions are silly and
16  self-referential, and you refer to it as a small
17  coterie of people who are just pumping up
18  themselves and accomplishing nothing of
19  substance or integrity.  Is that a fair summary?
20       MS. ITCHHAPORIA:  Objection:  Form.
21       THE WITNESS:  No.  I think it's a real
22  simpli- -- an oversimplification of -- of my
23  opinions and even my testimony.  I have long
24  appreciated Dr. Leo's contribution to the area

19

1    A.  No.
2    Q.  Did I place your CV in front of you?
3    A.  Yes.
4         (Whereupon, Welner Deposition
5          Exhibit No. 1 was marked for
6          identification.)
7  BY MR. BOWMAN:
8    Q.  I've marked for identification as
9  Exhibit 1 your curriculum vitae.  That was
10  provided along with your report in this case.
11       Can you confirm that this is a current
12  version of your CV?
13   A.  There are a few updates.  There are
14  some lectures in 2018.  And as I look at the
15  publications, there are a few things that say in
16  print that now have -- have since appeared in
17  publication.  So they have citations attached to
18  them.  So otherwise, it's substantively
19  up-to-date.
20   Q.  Will you undertake to provide us with
21  an updated CV?
22   A.  Sure.
23   Q.  Thank you.
24       MR. BOWMAN:  Misha, you will arrange

18

1  of disputed confession.  From as far as back as
2  when I ran a publication and invited him onto an
3  editorial board, which he joined, and remained
4  on until I took an opinion that was contrary to
5  his own.
6       I think that he has come out with some
7  important articles.  I think one of his -- his
8  most significant contributions is that he has
9  demonstrated not only the infrequency of false
10  confessions with his research, perhaps more
11  vividly than anyone else, but he has
12  demonstrated that the studies can be done and
13  that he has known that they can be done since
14  the early 1990s.  So he's known this for over 20
15  years, and he's actually been one to do it.  And
16  has -- in that regard, he's set an example for
17  one how can actually study and demonstrate the
18  great rarity of false confessions.
19       I think that he has raised issues for
20  consideration that on a theoretical level are
21  interesting, and they're good points of
22  discussion and that were they to invite further
23  research would -- would help to resolve some of
24  the unaddressed questions.  I also believe that

20



McCorkle Litigation Services, Inc.
Chicago, Illinois  (312) 263-0052

1 he has grossly exaggerated the consequence of
2 what has been researched to date in an effort to
3 cobble
4 the -- not only the extent and frequency with
5 which false confessions happen but the causal
6 attributions that one can make to specific
7 aspects of police interrogation.
8 So I think that a number of his
9 publications are theoretical in nature, and
10 certainly there's nothing wrong with a
11 theoretical publication. But a theoretical
12 publication is exactly that, something that
13 remains unproven. I think, you know, he's a --
14 he's certainly a very capable academic. I think
15 he knows he's exaggerating. So I compliment him
16 because he knows exactly what he's doing. I
17 don't disrespect his intellect. I think there
18 are other things that I take issue with. But he
19 certainly is -- has conducted research that can
20 contribute. He's called attention to this
21 phenomenon. There are cases of legitimate false
22 confession that he has worked on. And so I
23 think by virtue of experience, it is one of the
24 greatest aspects that one can qualify as

21

1 expertise.
2 A person can talk about the Sahara
3 Desert and conduct surveys of college students
4 about the Sahara Desert. But a person who's
5 been to the Sahara Desert has a certain type of
6 experiential expertise that others do not have;
7 and that while Dr. Leo's students of the coterie
8 that I have described have certainly taken up
9 his inspiration, he is one person who actually
10 can say that he's seen a false confession. And
11 he deserves credit for that, as have other
12 people whose writings I may or may not disagree
13 with. Those are important considerations.
14 He's not a clinician. I mean, he
15 doesn't interview people for their
16 vulnerabilities and their -- the things that
17 make them more vulnerable or less vulnerable.
18 But he acknowledges what he doesn't do, and he
19 hasn't written about it. So I think what he has
20 contributed in the literature and in his own
21 way, it certainly helps to contribute to the
22 discussion.
23 BY MR. BOWMAN:
24 Q. All right. Please answer this yes or

22

1 no if you can: Is it fair to say that although
2 you disagree with Dr. Leo in this case, and have
3 reservations about his -- some of his findings,
4 that you regard Dr. Leo's intellect and his
5 contributions to the study of false confessions?
6 A. Yes, I do.
7 MS. ITCHHAPORIA: Just object -- I will
8 belatedly object to form and to the preamble of
9 answering yes or no.
10 But go ahead.
11 BY MR. BOWMAN:
12 Q. You criticize Dr. Leo because you
13 believe he exaggerates, you said grossly, the
14 number of false confessions that have occurred
15 as well as the causal attribution that he makes
16 in some of his work as to those occurrences.
17 Fair statement?
18 A. Yeah. That was my testimony.
19 Q. Have you ever published a refutation of
20 Dr. Leo on either of these subjects in a
21 peer-reviewed journal?
22 A. I have not.
23 Q. Why not?
24 A. Because I am involved in many different

23

1 things. I have other -- I have other -- I have
2 a variety of different things that occupy my
3 time. And it's -- On my list of priorities,
4 it's just not a high priority.
5 There are many areas within the
6 academic universe that I interface with where I
7 might take issue with something that's there,
8 and I have not chosen to publish on it, and --
9 and so the decision to prioritize one's
10 publication is a deliberate one. And I reserve
11 my priorities on publication to things that I'm
12 originally researching. And if you want -- want
13 me to elaborate, I can. But that's -- My first
14 priority for publication is things I'm involved
15 in originally researching.
16 Q. As opposed to refutations of others?
17 A. Yeah.
18 Q. So have you ever conducted any original
19 research on the subject of disputed confessions?
20 A. I have.
21 Q. What research was that?
22 A. I reviewed cases that had been
23 identified in the reference source of the
24 Innocence Project's website, which was really

24



1 the only publicly available source at the time
2 that would delineate something as a false
3 confession, and then from there drilled down to
4 see which of these cases were actually false
5 confessions as opposed to people who pled
6 guilty, which is not a false confession, or
7 people who were -- who were identified as
8 perpetrators by someone else's testimony, which
9 is not a false confession; the cases in which
10 people have taken ownership or responsibility
11 for something and were held accountable and were
12 ultimately found to be not responsible.
13    And I isolated variety of personal
14 vulnerabilities, interrogation conditions, and
15 contexts that had been raised or considered or
16 postulated in a variety of these theoretical
17 articles to see which ones were present, which
18 ones might have been present with greater degree
19 of frequency, and attempted to gather data from
20 objective source materials. From some of the
21 cases that was possible; and from some of the
22 cases, that was more difficult.
23    **Q.  And is the research you've been**
24 **describing in your answer reflected on page 2 of**

25

1 **Exhibit 1 that you have in front of you --**
2    A.  Yes.
3    **Q.  -- under the heading Funded Research?**
4      **Specifically, the 2004, 2005 research?**
5    A.  Correct.
6    **Q.  Other than this analysis which you have**
7 **described, have you conducted any other research**
8 **into the area of disputed confessions?**
9    A.  No, I have not.
10    **Q.  And with respect to the 2004, 2005**
11 **research that you conducted, did that result in**
12 **a publication?**
13    A.  No.  I did not attempt to publish on
14 it.
15    **Q.  Do you have a draft of your work?**
16    A.  No, because the reason the research
17 aborted, for all intents and purposes, and it's
18 not something that I discarded, but it's stuff
19 that I put aside, is I was not satisfied that
20 there was a sufficient amount of data available
21 for a sufficient number of cases to draw
22 conclusions.  I could certainly write up what I
23 might have derived about the cases that I had
24 more data on or more objective data on.  But the

26

1 problem would remain that sometimes when you
2 publish about only a limited amount of data, it
3 does more harm than good because it basically
4 leads to mistaken interpretations from a limited
5 amount of data.  And so what I would prefer is
6 the opportunity that perhaps life will give me
7 one day, the chance to revisit that.  So we sort
8 of froze it in place.  And with more data
9 available to perhaps better inform, and with
10 more cases, put us in a position to identify the
11 presence or absence of factors.
12    **Q.  Well, some might say that a publication**
13 **that explained the analysis that you have just**
14 **testified about might be a helpful contribution**
15 **to the literature as a counterpoint to the**
16 **assumption that the cases from the Innocence**
17 **Project website are false confessions.  Do you**
18 **disagree with that assertion?**
19    A.  Yeah, I do.  I think that there are so
20 many easier ways to make that demonstration that
21 don't require publication and the immense
22 expenditure of time that it takes to put a
23 publication like that together.
24    Just to give you some sense of context,

27

1 I just published three articles in peer-reviewed
2 journals on the depravity standard research.
3 This is research that I pioneered that took 20
4 years before I was comfortable in submitting for
5 publication.  So just stylistically I'm not a
6 half-baked kind of person.  And I think that you
7 don't -- you don't refute things that you're
8 criticizing as half-baked by providing something
9 half-baked in turn.
10    **Q.  So as it stands now, you would**
11 **characterize the research that you did in 2004**
12 **and 2005 as half-baked?**
13    A.  I think that's a fair characterization.
14    **Q.  All right.**
15    A.  It has all the necessary ingredients,
16 and the methodology is correct.  And what made
17 it meaningful at the time was that the
18 methodology of other research that had been
19 published was utterly useless.  And so this was
20 an opportunity to actually come up with a
21 methodology that could add something meaningful
22 of a contribution to the literature.  It could
23 be done, but what it requires is a really -- no,
24 what it requires is a sort of dedicated academic

28



1  context, and that's just not my life.
2     **Q. Right.**
3     A. I am -- I am not a full-time dedicated
4  academic that has the opportunity to sort of
5  apportion that kind of time expenditure.
6     **Q. Have you ever engaged in a systematic**
7  **effort to identify and catalog the known false**
8  **confessions?**
9        MS. ITCCHAPORIA: Object to form.
10        THE WITNESS: That was the -- That was
11  the effort.
12  BY MR. BOWMAN:
13     **Q. In the 2004 and 2005 study that you**
14  **didn't complete?**
15     A. Yes. But I think that --
16     **Q. Do you have --**
17     A. Just a minute. I'm answering your
18  question.
19        What I did complete was a catalogue.
20  And what I found was that the Innocence Project
21  had grossly overestimated or grossly overstated
22  the frequency of false confessions among what
23  they listed as wrongful convictions. Now,
24  that's something I completed. What I -- What

29

1  **a copy of your working list of the known false**
2  **confessions?**
3     A. Sure.
4     **Q. Is that a complete and up-to-date list?**
5     A. It wouldn't be up-to-date because the
6  research project was aborted. So it was
7  complete as of the time I did it.
8     **Q. So that was complete as of 2005?**
9     A. That would have accounted for what was
10  listed on their website as either 2004 or
11  2005.
12     **Q. Do you --**
13     A. Because the way the research was
14  structured was we took the list, and then once
15  we identified the cases, we switched into a
16  posture of then trying to learn about each of
17  those cases, as opposed to a continual
18  monitoring of their site.
19        MR. BOWMAN: Okay. So I will note that
20  Dr. Welner has agreed, and I believe, Misha, you
21  have agreed as well, that we will be provided
22  with Dr. Welner's 2004, 2005 list, whichever it
23  is, of known false confessions. Right?
24        MS. ITCHHAPORIA: That's -- I think --

31

1  was half-baked was populating the fields of
2  different postulated or theorized risk factors
3  for false confessions to ascertain what was
4  present or what was not present in each case.
5        But as to what was a false confession
6  or what was not a false confession that had been
7  identified from that sample, yeah, that work was
8  done. That was not half-baked. It's just not
9  something -- There's no purpose in writing an
10  article to say, Hey, Innocence Project, you're
11  overstating your numbers. I could do it as
12  easily as I did to Peter Neufeld sitting across
13  the table when I was lecturing before the -- the
14  New York State appellate judges on the issue.
15  It didn't require publishing an article to make
16  that point.
17     **Q. Understood.**
18     **Do you have internally a list of the**
19  **confessions that you deem to be known false**
20  **confessions?**
21     A. Yes, from that original list.
22     **Q. Can you provide that to us?**
23     A. Sure.
24     **Q. And so will you provide through Counsel**

30

1  Just a second.
2        I think that's been produced by
3  plaintiff in this case.
4        MR. BOWMAN: I don't know whether it
5  has or not.
6        MS. ITCHHAPORIA: And I can give you
7  the Bates. It's the defendants -- It's
8  Dr. Welner Dep Exhibit No. 4 on the Bates
9  numbers, it's in the range of documents that
10  Plaintiffs produced, 05 -- 045392 through
11  046757. It was an exhibit to the Terrill Swift
12  deposition.
13        MR. BOWMAN: I see. Okay. Well, that
14  clarifies it.
15  BY MR. BOWMAN:
16     **Q. Did you -- Did you testify about your**
17  **list in the Terrill Swift deposition?**
18     A. I don't remember.
19     **Q. You don't recall?**
20     A. I think you deposed me. So I guess
21  neither of us recalls, then, right?
22     **Q. Well, I recall, Dr. Welner, that there**
23  **was -- that there was a document that described**
24  **certain confessions, including the Central Park**

32



Michael Welner, M.D. 05/17/2018

1 confessions. And I recall that in the
2 deposition, you indicated with great firmness
3 that you do not believe the Central Park
4 confessions to have been false, right?
5     A.  I don't -- I would ask that you provide
6 me with my testimony about that, because I don't
7 recall that that was my testimony.
8     Q.  Do you have an opinion that the Central
9 Park confessions are indeed false confessions?
10     A.  Right now, I'm under a gag order. I'm
11 not allowed to speak about the Central Park
12 confessions.
13     Q.  Okay. All right.
14     A.  And please understand that when that
15 research was completed, it was completed at a
16 time when I was not operating under any kind of
17 gag order.
18     Q.  Understood. So at the time --
19     A.  I was not in a position to even be
20 engaged in a court to have such a gag order.
21     Q.  At the time that you completed your
22 2004, 2005 research, did you conclude that the
23 Central Park confessions were false?
24     A.  Yes, I did.

33

1 reference point of the Innocence Project for two
2 reasons. One, because I'm not doing the
3 research; and two, because they grossly
4 overexaggerate their numbers.
5         So I can tell you that there are cases
6 which, with professional certainty, I've
7 identified that I am comfortable that they're
8 false confessions. But they are based on what
9 I've actually worked on myself.
10 BY MR. BOWMAN:
11     Q.  Have you made any attempt whatsoever to
12 systematically investigate and determine what,
13 if any, confessions, false confessions, have
14 been identified subject -- subsequent to the
15 completion of your research?
16     A.  No, I have not.
17         MS. ITCHHAPORIA: Same objection.
18 BY MR. BOWMAN:
19     Q.  So the only list that you have of false
20 confessions is the list that you created in the
21 context of your 2005 research?
22     A.  Again, my reference point is very
23 different now. My reference point is what false
24 confessions have I -- have I known by simply

35

1         MS. ITCHHAPORIA: Objection to form.
2 BY MR. BOWMAN:
3     Q.  All right. So if -- Well, we'll grab
4 that list, and I'll show it you, and we'll
5 return to this.
6         Do you have list of false confessions
7 that have been identified by the Innocence
8 Project or anyone else subsequent to 2005?
9     A.  I don't. But it's on their website, so
10 you can certainly download it quite easily.
11     Q.  You misunderstood my question. I'm
12 asking about your list of false confessions, not
13 somebody else's list. And my question is, do
14 you have a list of confessions that you have
15 determined to be false confessions which have
16 been identified subsequent to your 2005
17 research?
18         MS. ITCHHAPORIA: Objection: Form;
19 asked and answered.
20         Go ahead.
21         THE WITNESS: Well, there are cases
22 that I've worked on, and they may or may not be
23 part of an Innocence Project sample. And that's
24 my reference point. I don't operate with a

34

1 working on the case. Those I'm more familiar
2 with, and those I'm more intimately familiar
3 with the details and the antecedents.
4 They're -- With respect to the cases I have not
5 worked on, no. I'm not familiar with them; I'm
6 not -- I'm not continuing on that research track
7 right now.
8     Q.  Okay. Could you -- I think what you're
9 saying, just to see if we can get to an answer
10 here, is that apart from investigations that
11 you've done in particular cases in which you've
12 been hired to opine, you do not have any list of
13 false confessions that have been identified
14 subsequent to 2005?
15     A.  That's correct.
16     Q.  Now --
17     A.  And I would add that no such list
18 exists, notwithstanding there are published
19 lists, but they have numerous inaccuracies and
20 flaws. So --
21     Q.  So you would never rely on such a list?
22     A.  I think they're informative for the
23 purpose of inspiring closer investigation,
24 because they are cases of interest. But a case

36

Pages 33 to 36

Michael Welner, M.D. 05/17/2018

1  of interest doesn't necessarily confirm
2  something, but it gives you a running start,
3  because some of those cases may indeed be false
4  confessions, and some may not be.
5  **Q. You would never rely on such a list as**
6  **identifying false confessions?**
7  MS. ITCHHAPORIA: Objection: Form;
8  foundation.
9  THE WITNESS: Well, I think I've
10  testified earlier, you know, and this even
11  references your earlier question, look it, Dr.
12  Leo published a list of 125 cases that he
13  identifies as false confessions. Some of those
14  cases are false confessions. Some of them are
15  something else. Some of them aren't. But
16  that's not to say that there aren't a number,
17  and maybe even a large number on that list, that
18  ultimately proved to be false confessions. So I
19  think it's helpful. And would I rely on it?
20  Sure, if I could have confidence in a particular
21  case that it was -- that it was a false
22  confession. But that's really the additional
23  step that -- that I would want to have a sense
24  of confidence or assurance about.

37

1  MS. ITCHHAPORIA: I'm going to object
2  to the extent where Dr. Welner may have been
3  retained but not disclosed. And so it would not
4  be -- He would not be privy to answer that
5  question as it relates to those cases.
6  MR. BOWMAN: Okay.
7  BY MR. BOWMAN:
8  **Q. So be careful, and just answer this**
9  **question yes or no. All right?**
10  A. Sure.
11  **Q. So you don't disclose anything that you**
12  **shouldn't.**
13  **Is there any case in which you have not**
14  **been disclosed as an expert in which, upon**
15  **review of the case, you concluded that the**
16  **subject confessed falsely? That's just a yes or**
17  **no.**
18  A. Yes.
19  **Q. How many such cases?**
20  A. At least six.
21  **Q. At least six. Were any of those City**
22  **of Chicago cases?**
23  MS. ITCHHAPORIA: Same objection as to
24  work product and my same cautioning instruction.

39

1  BY MR. BOWMAN:
2  **Q. Right. And without having taken that**
3  **step, you don't have that confidence, and**
4  **therefore can't rely on those lists; right?**
5  A. Correct.
6  **Q. Thank you.**
7  MS. ITCHHAPORIA: All right. Just for
8  the record, we've been joined by Ms. Van Brunt.
9  MR. BOWMAN: Why don't we take a short
10  break.
11  THE VIDEOGRAPHER: We are going off the
12  record at 10:54.
13  (Whereupon, a short break was
14  taken.)
15  THE VIDEOGRAPHER: We are going back on
16  the record at 10:59.
17  BY MR. BOWMAN:
18  **Q. Dr. Welner, are there any cases in**
19  **which you have been retained to consider and**
20  **offer opinions in which you have concluded that**
21  **the subject at issue had confessed falsely?**
22  A. Yes.
23  **Q. Could you identify those cases for us,**
24  **please.**

38

1  And actually, I'm -- you're asking if those
2  cases where he was not disclosed if he was
3  retained by the City of Chicago?
4  MR. BOWMAN: That's my question.
5  MS. ITCHHAPORIA: I'm going to instruct
6  him not to answer that question based on work
7  product.
8  BY MR. BOWMAN:
9  **Q. Okay. And you'll adhere to that**
10  **instruction and not answer the question,**
11  **correct?**
12  A. Correct.
13  **Q. I just have to ask you that.**
14  A. Sure.
15  **Q. Has there been any case in which you**
16  **have been disclosed as an expert in which you**
17  **have reviewed the matter and concluded that the**
18  **subject did indeed confess falsely?**
19  A. Yes.
20  **Q. Can you identify that case, please?**
21  A. Sure. The Bradford Ollins case from
22  Chicago [sic].
23  **Q. And that's the so-called Roscetti --**
24  A. Roscetti four; that's correct.

40

Pages 37 to 40



Michael Welner, M.D. 05/17/2018

1  Q. So you concluded that those guys had
2  confessed falsely?
3      A. I concluded -- We concluded, I mean,
4  it's a forensic panel worked on the case. There
5  were several examiners. I concluded that Calvin
6  Ollins had confessed falsely. He was my
7  examinee.
8      Q. So just Mr. Ollins?
9      A. And ultimately -- Ultimately, others
10 were affected by Mr. Ollins, and I certainly was
11 comfortable with that opinion. But yeah.
12     Q. Okay.
13     A. I remember him most of the others
14 because he was the guy I actually examined. But
15 we -- We basically -- We basically concluded as
16 a practice that that was a false confession and
17 those were innocent suspects.
18     Q. Okay. And so your conclusion was that
19 not only Mr. Ollins, your examinee, but the
20 other Roscetti defendants --
21     A. Correct --
22     Q. -- had also confessed falsely?
23     A. Correct.
24     Q. And did you prepare a report to that

41

1  effect?
2      A. I did.
3          MR. BOWMAN: May we see a copy of that
4  report please, Misha?
5          MS. ITCHHAPORIA: I will make a request
6  to Dr. Welner. If has the report, I will --
7  BY MR. BOWMAN:
8      Q. Who was your client in relation to the
9  matter, the City of Chicago?
10     A. I believe so. I would have to look,
11 but ...
12     Q. Do you recall the name of the lawyer
13 who retained you?
14     A. I'm not sure. I do remember -- I do
15 remember Calvin Ollins. I remember interviewing
16 him in Kathleen Zelner's office. So somewhere
17 along the line, it would be easy to find out who
18 retained me in that case.
19     Q. Well, Kathleen Zelner did not retain
20 you?
21     A. No. I know. But it was Kathleen --
22 What I'm saying is she's familiar with the case,
23 and I'm sure she can answer that question pretty
24 easily.

42

1          MR. BOWMAN: Well, I'm making a request
2  for a copy of that report.
3  BY MR. BOWMAN:
4      Q. Other than the Roscetti confessions,
5  are there any other instances in which you have
6  prepared a report opining that an individual
7  confessed falsely?
8      A. Yes.
9      Q. Could you identify all other such
10 cases, please?
11         MS. ITCHHAPORIA: Where he's prepared a
12 report and been disclosed?
13 BY MR. BOWMAN:
14     Q. And been disclosed, right. Yes.
15     A. State v. Thibodeaux, Louisiana, Damon
16 Thibodeaux.
17     Q. Who retained you in that case?
18     A. The District Attorney's Office of
19 Jefferson Parish, and actually the District
20 Attorney Himself, Paul Connick.
21     Q. Do you have a copy of that report?
22     A. I do.
23     Q. May we see a copy of it, please?
24     A. Sure.

43

1          MR. BOWMAN: Okay. I'm also requesting
2  that Dr. Welner's report from the State v.
3  Thibodeaux be provided to us.
4  BY MR. BOWMAN:
5      Q. Other than what we have so far, what
6  other circumstances -- I'm sorry. Let me start
7  over.
8          Other than what we have so far, what
9  other cases have you prepared reports and been
10 disclosed in which you have opined that your
11 subject confessed falsely?
12     A. I need -- I need to go back into my
13 records and think about it. But I think that's
14 it.
15         MR. BOWMAN: If there are any other
16 reports in Dr. Welner's possession that fit
17 within the answer to my question, upon review of
18 your records, I request that you produce them to
19 us. Will you agree to do that?
20         THE WITNESS: Sure.
21         MR. BOWMAN: And that's my request of
22 you as well, Misha.
23 BY MR. BOWMAN:
24     Q. Have you been trained as a social

44



McCorkle Litigation Services, Inc.
Chicago, Illinois (312) 263-0052

1 psychologist?
2    A.  No.
3    Q.  You don't have a terminal degree in
4 that study?
5    A.  No.  I don't have a degree in social
6 psychology.
7    Q.  And you are not competent to offer
8 opinions in the area of social psychology; is
9 that a fair statement?
10    MS. ITCHHAPORIA:  Objection:  Form.
11    THE WITNESS:  I am able to offer
12 opinions in areas in which social psychology and
13 forensic psychiatry overlap.  And there are
14 overlapping areas among our disciplines that are
15 delineated by this case, for example.
16 BY MR. BOWMAN:
17    Q.  Are you offering opinions in the area
18 of social psychology in this case?
19    MS. ITCHHAPORIA:  Same objection.
20    THE WITNESS:  I'm not offering opinions
21 as a social psychologist.
22 BY MR. BOWMAN:
23    Q.  Are you offering opinions in the area
24 of social psychology in this case?

45

1    Q.  So here comes the question, and that's
2 my instruction.
3       (Whereupon, the record was read
4       as requested.)
5    MS. ITCHHAPORIA:  I'm going to
6 object -- objection to the form and the
7 instruction on how he can answer the question.
8 Asked and answered.
9    THE WITNESS:  I answered it as best I
10 can.
11 BY MR. BOWMAN:
12    Q.  So you can't answer that yes or no?
13    MS. ITCHHAPORIA:  Same objections.
14    THE WITNESS:  I can't answer it yes or
15 no.  I can only answer it as I did.
16 BY MR. BOWMAN:
17    Q.  Okay.  That's fine.
18       Is it accurate to say that you are not
19 an expert in conducting interrogations?
20    A.  That's correct.
21    Q.  It's correct that you're not --
22    A.  I am not expert in conducting
23 interrogations.
24    Q.  You're not an expert in police

47

1    A.  I'm not.
2    Q.  This may be beating a horse.  I'm going
3 to ask it anyway, just to be safe.  You are not
4 qualified to opine as an expert in the area of
5 social psychology; is that a fair statement?
6    MS. ITCHHAPORIA:  Same objections.
7    THE WITNESS:  I'm not an expert on
8 social psychology.  I am an expert in my
9 discipline, and I am an expert in the areas in
10 which my discipline covers, some of which
11 overlap with a variety of disciplines whether it
12 be social psychology, forensic psychology,
13 criminology, or criminal justice, or other
14 medical or behavioral science disciplines or
15 social science disciplines.
16 BY MR. BOWMAN:
17    Q.  Here's what we're going to do.  I'm
18 going to ask Tracy to read back to you the
19 question that I posed before your last answer,
20 and I'm going to ask you please if you can
21 answer the question yes or no or to simply to
22 state, "That's not a question I can answer yes
23 or no."  Okay?
24    A.  Yes.

46

1 interrogation or police training; is that a fair
2 statement?
3    A.  I am -- I am not an expert in police
4 interrogation and police training, per se.  I am
5 only expert in the area of police interrogation
6 as it interfaces with the discipline of disputed
7 confessions as a behavioral science issue.
8    MR. BOWMAN:  Could you read that last
9 answer back, please.
10       (Whereupon, the record was read
11       as requested.)
12 BY MR. BOWMAN:
13    Q.  Are you an expert in the issue of
14 behavioral science?
15    A.  I am.
16    Q.  Okay.  Can you tell me what -- what is
17 behavioral science?
18    A.  Behavioral science is the biological,
19 psychological, and social aspects of how we
20 interact with others around us, the choices that
21 we make; how we respond to different situations,
22 familiar and unfamiliar; what distinguishes us
23 as individuals on a biological, psychological,
24 social, and cultural level.

48



1  Q. Are you published in this area in a
2  peer-reviewed journal?
3  A. I'm not sure that I understand the
4  question.
5  Q. Have you published in the area that you
6  just described in a peer-reviewed journal?
7  A. Of the definition of the behavioral
8  sciences?
9  Q. You just said that you are an expert in
10  the area of behavioral science. My question is,
11  have you published in that area?
12  A. I would say that the overwhelming
13  majority of my publications relate in some way
14  or another to some aspect of my behavioral
15  science expertise, if not all of them.
16  Q. Okay. So to be clear, behavioral
17  science is a very broad category --
18  A. That's right, just like social
19  psychology.
20  Q. You interrupted my question. Okay?
21  Please don't do that.
22  Behavioral science, as I understand
23  your testimony, is extremely broad, encompassing
24  the medical field in which you have a degree,

49

1  It covers social psychology?
2  A. Some of social psychology, sure.
3  Q. Covers other empirical disciplines?
4  A. Yes.
5  Q. Economics?
6  A. Occasionally, sure.
7  Q. And so on.
8  And when you say that you are an expert
9  in the area of behavioral science, are you
10  intending to extend your expertise beyond the
11  medical psychiatric area in which you have a
12  terminal degree?
13  MS. ITCHHAPORIA: Objection: Form;
14  mischaracterizes testimony.
15  THE WITNESS: No. And even within the
16  behavioral sciences, there are certain areas
17  that I'm not expert in. Behavioral sciences are
18  broad enough to extend beyond my personal
19  expertise.
20  BY MR. BOWMAN:
21  Q. What publications from the list in your
22  CV are in peer-reviewed journals in the area of
23  the behavioral sciences?
24  A. Well, I would point you to page 15,

51

1  the social sciences, and possibly other sciences
2  as well. Is that what you're saying?
3  A. It's a broad field, as is social
4  psychology.
5  Q. Do you disagree with the
6  characterization I just made?
7  A. I don't know whether it's extremely
8  broad. It covers a lot of areas. And --
9  Q. Does it cover those areas?
10  MS. ITCHHAPORIA: Hold on. You cut him
11  off, Locke.
12  THE WITNESS: It covers a lot of areas.
13  BY MR. BOWMAN:
14  Q. Does it cover those areas that I
15  identified in my question?
16  MS. ITCHHAPORIA: Objection: Form.
17  BY MR. BOWMAN:
18  Q. Do you understand my question?
19  A. Yeah. I think you -- you sort of
20  recapitulated my answer. So yes, it does.
21  Q. Okay. So it covers medical science;
22  yes?
23  A. Not all of medical science, but some of
24  medical science.

50

1  European Psychiatry is a peer-reviewed journal
2  of the behavioral sciences.
3  Q. Can you give me the location on the
4  page?
5  A. It's "Gaps in Crisis Mental Health:
6  Suicide and Homicide-Suicides."
7  Journal of Forensic Psychology Practice
8  is a behavioral science publication.
9  Q. Where -- Where are you?
10  A. It's also on page 15.
11  Q. What's the piece?
12  A. It's "Peer-Reviewed Forensic
13  Consultation: Safeguarding Expert Testimony and
14  Protecting the Uninformed Court."
15  Journal -- On page 16, Journal of Child
16  Sex Abuse, "Educator [Sex] Abuse: Two Case
17  Reports."
18  The next reference, "The Justice and
19  Therapeutic Promise on Science-Based Research on
20  Criminal Evil," Journal of American Academy of
21  Psychiatry and the Law.
22  Page 17, legal "Relevance, Psychiatric,
23  Psychiatry Realities, and the Methodology for
24  Standardized Distinction of 'Heinous' and 'Evil'

52



Michael Welner, M.D. 05/17/2018

1 Crimes," Journal of the American Academy of
2 Psychiatry and the Law.
3 And I have an article that I cannot
4 find here, but it is here somewhere, because it
5 comes up from time to time in the Journal of
6 Clinical Psychopharmacology, if I can find it.
7 And it's on no antipsychotics in treatment of
8 agitation.
9 **Q. What page, please?**
10 A. I have to find it.
11 Oh. Here we go. "Risperidone for the
12 Treatment" -- It's on page 25. "Risperidone For
13 the Treatment of Acute Agitation in a Patient
14 with -- on MAO Inhibitor," Journal of Clinical
15 Psychopharmacology. That's it.
16 **Q. Have you now identified every**
17 **peer-reviewed -- peer-reviewed journal article**
18 **that you have published in the area of the**
19 **behavioral sciences?**
20 A. I think so, yeah.
21 **Q. Do you attend any meetings of any**
22 **organizations in the area of behavioral science?**
23 A. I have attended the American
24 Psychiatric Association annual meeting. That's

53

1 the -- That's the -- That's the one meeting
2 among behavioral science organizations that I
3 make it a point to take in.
4 **Q. Okay. Do you hold any position in the**
5 **American Psychiatric Association?**
6 A. I don't.
7 **Q. Is this a pay your dues, you're in kind**
8 **of situation for practicing psychiatrists?**
9 A. That's correct.
10 **Q. You don't have to be elected in or --**
11 A. No. It's a membership -- It's an
12 organization, but it also, just it's annual
13 meetings are available to anyone.
14 **Q. My question was whether there is any**
15 **process of selection among psychiatrists for**
16 **membership in the organization.**
17 A. No.
18 **Q. Other than the APA meetings, are there**
19 **any other professional meetings that you attend**
20 **in the area of behavioral sciences?**
21 A. No.
22 **Q. Have you ever made a presentation at**
23 **the American Psychiatric Association meeting?**
24 A. I've made a number of them.

54

1 **Q. Have you ever made a presentation at**
2 **the meeting of the American Psychiatric**
3 **Association that bears in any way on the study**
4 **of disputed confessions?**
5 A. I don't think so, no.
6 **Q. Do you consider yourself to be an**
7 **expert in gang culture?**
8 A. I consider myself to be professionally
9 very familiar with certain aspects of gang
10 culture.
11 **Q. Do you consider yourself --**
12 A. As they relate to my experience and
13 study.
14 **Q. Do you consider yourself to be an**
15 **expert in gang culture?**
16 MS. ITCHHAPORIA: Objection: Asked and
17 answered.
18 THE WITNESS: I answered the question
19 as best I can.
20 BY MR. BOWMAN:
21 **Q. We're going to follow the procedure**
22 **again. I'm going to ask the question, and I'm**
23 **going to respectfully ask you to answer it yes**
24 **or no or simply to state, "That's not a question**

55

1 **I can answer yes or no," and then I'll move on.**
2 **Do you consider yourself to be an**
3 **expert in gang culture; yes or no?**
4 MS. ITCHHAPORIA: Objection: Form and
5 to the preamble of how to answer the question;
6 asked and answered.
7 THE WITNESS: I've answered the
8 question as best I can.
9 BY MR. BOWMAN:
10 **Q. So it's not a question you can answer**
11 **yes or no?**
12 A. It's a question that I answered yes
13 with the qualification that I gave, that there
14 are certain areas in which I have fluency by
15 virtue of more experience, more study, and just
16 the nature of that experience. However, gang
17 culture involves many different facets and many
18 different tributaries. And I am not asserting
19 that I have an all-encompassing expertise
20 because there are certain aspects of gang
21 consult that I don't have expertise in. And
22 there are others that I have a lot of exposure
23 and fluency in.
24 **Q. Have you ever published in any**

56



Michael Welner, M.D. 05/17/2018

1  peer-reviewed journal on the subject of gangs
2  and gang culture?
3      A.  No.
4      Q.  Have you ever conducted any study of
5  gangs or gang culture?
6      A.  I have not.
7      Q.  Other than interviews of subjects who
8  may be gang affiliated and the source materials
9  that you identified at the beginning of this
10 deposition, have you any other source of
11 information for your claim to be fluent in
12 certain aspects of gang culture?
13     MS. ITCHHAPORIA:  Objection:  Form.
14     THE WITNESS:  I practice in New York
15 City, and I have for 26 years.  I've been seeing
16 patients from the inner city, from inner city
17 Manhattan, Harlem, inner city Brooklyn, Bronx,
18 for 26 years.
19     I worked on an inpatient forensic
20 psychiatry unit for three years in which I -- in
21 all of those contexts, I have had clinical
22 treatment exposure to people who are themselves
23 in gangs, who are subordinates or leaders in
24 gangs, who are -- who have family members in

57

1  number of different defendants, both as
2  prosecution retained and also as defense
3  retained, on a variety of different issues in
4  the context of their criminal charges.  People
5  who were admitted gang members or suspected gang
6  members but whose gang activity had a significant enough
7  relationship
8  for us to have lengthy discussions to get
9  acquainted with them and their world.
10     I also in the course of my experience
11 of 26 years in the forensic work that I've done
12 have had a variety of different contexts in
13 which -- for purposes of collateral sources of
14 information have had to interview witnesses who
15 are either a part of a gang, live in proximity
16 to a gang, or are family members of gangs who I
17 have to understand their experiences.  They are
18 an informant to my case, and those interviews
19 can be quite lengthy and quite involved.
20     In addition, I have had the opportunity
21 to be involved in a variety of different policy
22 making opportunities over the years, some of
23 which encompassed the social and behavioral
24 resources as they relate to the inner city based

59

1  gangs, who are impacted by gangs either by -- as
2  a victim or in some way through a personal
3  relationship, like a romantic relationship of
4  somebody who is in a gang.
5      And in the treatment context, I've had
6  a variety of different exposures, not only for
7  people who have clinical conditions but also in
8  particular in Bellevue, people were -- who were
9  special value prisoners without psychiatric
10 conditions were actually housed on our unit just
11 as a matter of procedure.  So we were to
12 interface with them as one would a patient
13 whether they had a diagnosis or not.  So these
14 are people that we would have to deal with
15 ethnographically, which means we would have to
16 -- we would -- we would have to suspend some of
17 our preconceived ideas about behavior and
18 culture and to take in what they have to say
19 about their experience, not only relative to
20 their specific culture but also how they
21 interfaced with the criminal justice system,
22 police, and the confession process in
23 particular.
24     Supplementing that, I have examined a

58

1  on my personal experience, and so from a policy
2  standpoint have had to become more acquainted
3  with problems that are unique to gang infested
4  areas and in particular as they relate to the
5  behavioral sciences and community needs.
6  BY MR. BOWMAN:
7      Q.  So you have, in the course of your
8  work, been exposed to a number of individuals
9  either with gang affiliations themselves or
10 connected to others who are gang affiliated?
11     A.  Yes.
12     Q.  Okay.  Have you at any time ever
13 attempted to synthesize the impressions and
14 information that you have gained as a result of
15 these individual encounters into any kind of
16 systematic study of gangs?
17     MS. ITCHHAPORIA:  Objection:  Form.
18     THE WITNESS:  The only synthesis that
19 I've done is on the occasions when I've been
20 asked to write a report of my findings on a
21 particular matter.
22 BY MR. BOWMAN:
23     Q.  Okay.  So outside of reports that
24 you've been hired in litigation to prepare, the

60



McCorkle Litigation Services, Inc.
Chicago, Illinois  (312) 263-0052

Michael Welner, M.D. 05/17/2018

1 answer would be no?
2     A. That's correct.
3     Q. And would this report be an example of
4 such a synthesis?
5     A. Not necessarily. You know, the -- the
6 issue of -- of gang involvement and gang
7 activity was not as central in this case as it
8 is to some of the other cases that I worked on.
9 In other cases, it was the central issue. And
10 as you spoke earlier of culture, cultures in one
11 gang may be very different from cultures in
12 another. And so there are some that I've been
13 exposed to and some that I have not.
14     So in this case, it really only related
15 more to some of the behavioral strengths and
16 vulnerabilities as they relate to -- to
17 Mr. Taylor and his relationship with the police.
18     Q. Okay. So to be clear, it is your view
19 that Mr. Taylor's gang affiliation and the gang
20 affiliations of others involved in this matter
21 is not the central issue in terms of the work
22 that you were assigned to perform?
23     MS. ITCHHAPORIA: Objection to form;
24 foundation; mischaracterizes testimony.

61

1 Go ahead.
2     THE WITNESS: No it's -- Yeah.
3     It's -- There were many issues that I
4 addressed in my report. The issues that related
5 to his gang involvement are addressed, but there
6 are many other issues. And in other reports
7 that I've written, I would probably say a much
8 more concentrated aspect of the report was on
9 the gang. And in this case, it was certainly
10 important where it was, but it was only one of a
11 number of different questions I was addressing.
12 BY MR. BOWMAN:
13     Q. You also said in your answer that the
14 culture of gangs varies from gang to gang?
15     A. Yes.
16     Q. And that's been your experience?
17     A. Yes.
18     Q. Have you ever conducted a study of the
19 Traveling Vice Lords gang in Chicago?
20     A. I have not.
21     Q. Apart from the report that you prepared
22 in this case, do you have any other source of
23 familiarity with the Traveling Vice Lords gang
24 in Chicago?

62

1     A. I don't.
2     Q. Have you ever interviewed a member of
3 the Traveling Vice Lords?
4     A. I have not. Not that I know.
5     Q. What can you say about relations
6 between the Traveling Vice Lords and the Chicago
7 Police Department in the 1990s?
8     A. Well, I can say what was provided in
9 the testimony of -- that's available in this
10 case.
11     Q. Outside of that, is there anything that
12 you can say?
13     A. Well, the source of my information is
14 not only that but what has been well documented
15 just in terms of the degraded relationship
16 within the inner city among young inner city
17 black males and the police department that's
18 been well documented and is perhaps best
19 appreciated through the "Stop Snitching,"
20 literature in which there is a great difficulty
21 in gaining cooperation in investigations between
22 the inner city community and investigating
23 police officers.
24     Q. My question was specific to the

63

1 Traveling Vice Lords. Do you know any specific
2 information about relations between that gang
3 and the Chicago Police Department in the 1990s?
4     MS. ITCHHAPORIA: Objection: Asked and
5 answered.
6     THE WITNESS: Only what I've derived
7 from the evidence in this case and what the
8 Traveling Vice Lords themselves have testified
9 to.
10 BY MR. BOWMAN:
11     Q. In this case?
12     A. In this case.
13     Q. Do you have any information about the
14 relations between the different factions of the
15 Traveling Vice Lords?
16     A. What's been provided in this case.
17     Q. Other than that, you don't?
18     A. I don't.
19     Q. Do you know anything about the --
20     A. I spoke to a police officer earlier who
21 was a gang specialist as part of my work on this
22 case and got -- and testified to that in my
23 Patrick deposition. And he was a source of
24 background information for me about Traveling

64



Michael Welner, M.D. 05/17/2018

1 Vice Lords. And so over and above what the
2 plaintiffs themselves have disclosed, that was
3 informative to me.
4 **Q. Who was that person?**
5 A. I need to just access my report, the
6 source of information, to get his name.
7 (Whereupon, Welner Deposition
8 Exhibit No. 2 was marked for
9 identification.)
10 **Q. Okay. I've placed before you as**
11 **Exhibit 2 your report in this case.**
12 MR. BOWMAN: And I understand that Dr.
13 Welner is reviewing that now.
14 THE WITNESS: Just a second.
15 Let me just -- Was it Steve Caluris?
16 No. No. It's Terrance Shields. Terrence
17 Shields.
18 **Q. What were you just looking at?**
19 A. My notes that I provided you.
20 **Q. That you provided. Got it.**
21 **Do you have any specific familiarity**
22 **with the Gangster Disciples gang here in**
23 **Chicago?**
24 A. Not in Chicago, only in Memphis.

65

1 THE WITNESS: No.
2 BY MR. BOWMAN:
3 **Q. Do you believe that to subject -- And**
4 **to be clear, the process of peer review that you**
5 **refer to when you talk about peer reviewing**
6 **reports is that you have a panel called The**
7 **Forensic Panel, or used to be called The**
8 **Forensic Panel, and you ask these folks to look**
9 **at stuff before it goes out; is that right?**
10 A. I -- I would appreciate if you would
11 just ask the question a different way. Because
12 I can -- I'll give you a very long answer, and I
13 know you don't want it. So perhaps ask the
14 question a different way, and I'll give you
15 something concise.
16 **Q. In those reports that you claim were**
17 **peer reviewed, were they peer reviewed by a**
18 **person who is either a member of The Forensic**
19 **Panel or associated with your Forensic Panel in**
20 **some way?**
21 A. When peer review is done, it is done by
22 people who may or may not have a formal
23 relationship with The Forensic Panel.
24 **Q. Okay.**

67

1 **Q. Mr.- -- I'm sorry, Dr. Welner, in the**
2 **Swift matter, we discussed your claim of**
3 **expertise in the area of a death investigation.**
4 **Is that an area of expertise that you're**
5 **employing in this case in order to opine?**
6 A. I don't think so.
7 **Q. Okay. Well, might you be, or is the**
8 **answer no?**
9 A. No. I don't believe I addressed any
10 death investigation areas in my report.
11 In fact, let me be more definitive.
12 No. The death investigations as it relates to
13 forensic psychiatry is suicide, homicide,
14 accident; and in this case, the cause of death
15 was quite obviously homicide. So there really
16 wasn't a place for it here.
17 **Q. Very good.**
18 **In earlier campaigns, Dr. Welner, we've**
19 **talked about your claim that reports you have**
20 **prepared for litigation purposes have been peer**
21 **reviewed. Is that something that you claim**
22 **occurred with respect to your report in this**
23 **case?**
24 MS. ITCHHAPORIA: Objection: Form.

66

1 A. It depends on the case, and it depends
2 on the individual.
3 **Q. Do you claim that the report in this**
4 **case was peer reviewed?**
5 A. I don't.
6 **Q. Why did you not pass this report by**
7 **other experts?**
8 A. I started on this case with Patrick and
9 had to complete the work very quickly. And
10 there really was not time to put the structure
11 in for peer review. And I made a decision not
12 to peer review other work on this case when I
13 hadn't done earlier work on this case so as to
14 give any different level of effort, any
15 different quality of effort between one and the
16 other reports.
17 **Q. So the answer is, there wasn't time?**
18 A. No. I -- I chose to apply a consistent
19 approach. Since there wasn't time with the
20 first one, I maintained that approach with the
21 others because I did not want to implicitly take
22 away from the effort of the first case.
23 **Q. Got it.**
24 **Looking at Exhibit No. 2, which has**

68



Michael Welner, M.D. 05/17/2018

1 been in front of you as I've been asking you
2 questions, you said that your report constitutes
3 a forensic psychiatric assessment of the
4 disputed confession of Mr. Taylor; that's right
5 at the beginning, right?
6    A. Yes.
7    Q. What is a forensic psychiatric
8 assessment?
9    A. It's an assessment of issues that are
10 pertinent to forensic psychiatry.
11   Q. Who other than you conducts forensic
12 psychiatric assessments of disputed confessions?
13   A. I don't know. I know Ryan Finkenbine,
14 who is a forensic psychiatrist, has a lot of
15 experience in this area. And he's someone that
16 we used as a peer reviewer when we could. And
17 then based on his academic affiliation, he could
18 no longer take outside work.
19      I have not networked into the community
20 of forensic psychiatrists who work on these
21 cases. I have been acquainted with some
22 psychologists who do, but it is a very small,
23 boutique area, a coterie of people. It's a very
24 little -- a very small area of people who are

69

1 to forensic psychologists because the tests are
2 easy enough to understand and administer that
3 psychiatrists can administer them as well and
4 do.
5    Q. I've asked you a question; you've given
6 a very long answer. And I do not believe you
7 have identified any scientific or academic
8 literature in the area of forensic psychiatric
9 assessment of a disputed confession. Could you
10 do so?
11      MS. ITCHHAPORIA: Same objection.
12 Objection: Form and to the preamble before.
13      THE WITNESS: My answer is what is a
14 forensic psychological assessment is a forensic
15 psychiatric assessment.
16 BY MR. BOWMAN:
17   Q. Can you identify any literature in the
18 area of forensic psychiatric assessment of
19 disputed confessions; yes or no?
20   A. Sure. Yeah.
21   Q. Okay. Please do so.
22   A. I think Dr. Gudjonsson's book on
23 confessions, the 2003 reference book that he
24 published, is clearly aimed for use and

71

1 familiar with this and do work in this area.
2 Ryan is one psychiatrist that I know, but I'm
3 sure there are others.
4    Q. Other than -- Is it Dr. Finkenbine?
5    A. Yes.
6    Q. Other than Dr. Finkenbine, can you
7 identify any other person who conducts forensic
8 psychiatric assessments of disputed confessions?
9    A. I can't. And I wouldn't expect to.
10   Q. Okay. Can you identify any published
11 peer-reviewed literature in the area of forensic
12 psychiatric assessment of disputed confession?
13   A. Anything that speaks to the behavioral
14 science assessment of disputed confession is
15 interchangeable between psychiatry and
16 psychology. There are no appreciable
17 differences between what a forensic psychologist
18 does in disputed confession and what a forensic
19 psychiatrist does. We both do the same things.
20 So it is in terms of insanity defenses, in terms
21 of competency examinations, there's -- there's
22 great overlap between us with the notable
23 exception of psychological testing, which, when
24 it comes to disputed confession, is not isolated

70

1 application by both psychiatrists and
2 psychologists. And certainly when I -- when I
3 taught with him, there was a cross-pollination
4 of those two disciplines and an understanding
5 that what -- what is aspired for one discipline
6 in terms of the evaluation is aspired for the
7 other.
8    Q. Is Gudjonsson's 2003 book the principal
9 treatise in the area of forensic psychiatric
10 assessment of disputed confessions?
11   A. I don't know that anyone's really
12 updated that on the assessment question. I
13 think that -- that in terms of the guidelines
14 for how to assess it and what one should assess,
15 he has laid it out in a detailed enough way that
16 there may be certain articles updating some of
17 what methodologies he writes about. But
18 otherwise, in terms of a reference book, again,
19 I wouldn't call it a treatise because there's a
20 lot in there that one could take objection with.
21 But in terms of being a reference book on
22 forensic psychiatric or forensic psychology
23 assessment, I think it's excellent.
24   Q. Other than Gudjonsson's 2003 reference

72



McCorkle Litigation Services, Inc.
Chicago, Illinois (312) 263-0052

**Page 73**

1 book, can you identify any other scientific or
2 academic literature in the area of the
3 psychiatric assessment -- I'm sorry -- in the
4 area of forensic psychiatric assessment of
5 disputed confessions?
6 A. Not offhand.
7 Q. Have you yourself ever published
8 anything a peer-reviewed journal in the area of
9 forensic psychiatric assessment of disputed
10 confessions?
11 A. No.
12 Q. Is there any association, organization,
13 that meets, professional organization that meets
14 in the area of forensic psychiatric assessment
15 of disputed confession?
16 A. I don't think there's an organization
17 of disputed confessions that meets at all save
18 for, you know, an Innocence Project cocktail
19 party. But certainly there's not a -- there's
20 not a -- there's not a professional organization
21 because it is an organization -- it's
22 essentially the -- the body of knowledge is
23 limited to the small number of people who
24 publish, the students that they inspire to do

**Page 74**

1 derivative college student or sort of dummy
2 juror research --
3 Q. Hang on just a second. You're
4 straying.
5 A. So it's just a very limited group of
6 people, a few of whom are sociologists, a few of
7 whom are psychologists, and as some might say,
8 you can barely get a minion.
9 Q. Got it.
10 Dr. Welner, I've heard this speech
11 before. Okay? And I asked you a different
12 question. You're straying from the question I
13 asked you. I'm asking about your field,
14 forensic psychiatric assessment of disputed
15 confessions like what you did in this case. Are
16 there any meetings, professional meetings?
17 MS. ITCHHAPORIA: Just to object to,
18 Locke, your interrupting him. I appreciate that
19 you may have heard it, but, you know, it's
20 testimony in this case. And so please don't
21 interrupt the deponent.
22 THE WITNESS: I've answered the
23 question. There are no such organizations in
24 any entity, be it psychiatry or even sociology.

**Page 75**

1 BY MR. BOWMAN:
2 Q. Thank you.
3 I wanted to ask about your billings in
4 this case, Doctor. You said earlier in this
5 deposition that you are billing your time either
6 at the rate of 575 or 600 per hour?
7 A. In terms of review of records and that
8 kind of thing, yes, that's correct.
9 Q. And your time for testimony, is it 600
10 an hour?
11 A. I just need to add something to an
12 earlier answer. I read over my report on
13 Gardner and Phillips also in anticipation for
14 this meeting.
15 Q. Thank you for clarifying that. So
16 that's part of the 12 hours that we talked
17 about?
18 A. Yeah. It may be more than that, but I
19 reviewed the Gardner Phillips as well.
20 Q. Okay. I'm going to mark for
21 identification as Exhibit No. 3 your billings
22 that have been provided to us related to the
23 Taylor matter.
24

**Page 76**

1 (Whereupon, Welner Deposition
2 Exhibit No. 3 was marked for
3 identification.)
4 BY MR. BOWMAN:
5 Q. Did I accurately describe Exhibit
6 No. 3?
7 A. I suppose so, yes.
8 Q. Well, either I did or I didn't. Is it
9 accurate?
10 A. Again, I -- I look at these at the time
11 they go out, and I approve them. I don't study
12 them and didn't study them in anticipation of
13 them. This looks like the kind of bill we send
14 out. It certainly appears to be formatted the
15 way we format them. And so it looks like that way.
16 MR. BOWMAN: May we have a stipulation,
17 Misha, that these are his bills in this case?
18 Or are we going to -- Is it going to be subject
19 to some surprise later on?
20 MS. ITCHHAPORIA: I think the doctor
21 has answered the question as far as what Exhibit
22 3 is, are the invoices that we submitted in
23 Daniel Taylor. I mean, the document speaks for
24 itself.



Michael Welner, M.D. 05/17/2018

1      THE WITNESS: Yeah.
2  BY MR. BOWMAN:
3      Q. Are these your invoices for Taylor?
4      A. Yeah. I believe so.
5      Q. Okay. Thanks.
6      These billings are through what date,
7  sir?
8      A. March -- March 1st, 2018.
9      Q. Before we get into the details, do you
10  have any special arrangement with the City of
11  Chicago as opposed to other clients for your
12  services?
13      A. I'm not sure what a "special
14  arrangement" means.
15      Q. Well, for example, do you give the City
16  of Chicago a discounted rate?
17      A. Well, no and yes.
18      I have -- My rates are higher than 575.
19  But when I have worked people repeatedly, I
20  don't -- I don't raise the rates with -- I don't
21  raise the rates to a level of where they are
22  now. For example, now we're billing at $700 an
23  hour. We don't raise the rates during the case,
24  so you might classify that as an arrangement.

77

1  If we were at a lower rate at another time, if
2  we increase the rate, we don't increase it an
3  appreciable amount. Whether we increase it no
4  more than 25 or $50 from one case to the next,
5  that's a general arrangement that we make with
6  anybody. But otherwise, that's -- there's
7  nothing distinctive for the City of Chicago.
8      Q. If the City of Chicago were to seek to
9  retain you today for a matter, would you agree
10  to perform services at the 575, 600 per hour
11  rate that has applied in this case?
12      MS. ITCHHAPORIA: Objection: Form;
13  calls for speculation; incomplete hypothetical.
14      THE WITNESS: Probably, or 625, again.
15  But it wouldn't be 700.
16  BY MR. BOWMAN:
17      Q. And that's just because of the
18  relationship?
19      MS. ITCHHAPORIA: Same objection.
20      THE WITNESS: It's, again, if
21  somebody's been working with us and we go into
22  another case and there hasn't been an
23  appreciable delay of time, we don't bump the
24  rate up that high that fast. And it's a

78

1  relationship, non relationship, if somebody is
2  working with us earlier on one case, we wouldn't
3  treat any different from if we were working with
4  them on several cases.
5  BY MR. BOWMAN:
6      Q. As a general matter, when a new client
7  seeks to retain you, do you request an upfront
8  retainer?
9      A. From private attorneys, yes. From
10  agency attorneys, no.
11      Q. So with respect to the City of Chicago,
12  is it your practice to seek an upfront retainer?
13      A. No.
14      Q. And to be clear, the basis for your
15  billings in Exhibit 3 and the others that we'll
16  look at later is lodestar; it's hours times
17  hourly rate?
18      A. Correct.
19      Q. So the more time you spend, the higher
20  the bill?
21      A. Correct.
22      Q. And you indicated a minute ago that the
23  bills that I handed you relating to this matter
24  and identified for the record as Exhibit 3 are

79

1  through March of this year?
2      A. That's correct.
3      Q. Other than today's activities and the
4  12 hours that you spent preparing for this
5  deposition, have you expended any time on the
6  Daniel Taylor matter that is not reflected in
7  the bill collection that is Exhibit 3?
8      A. It's possible that there were some
9  records that I had received in the interim that
10  I had an opportunity to read between March and
11  today. I don't know because we haven't sent a
12  bill out recently. I can only speak with
13  familiarity on what I did to prepare for this
14  case.
15      MR. BOWMAN: So we -- As additional
16  bills are generated, we're going to be
17  requesting that we be provided updated
18  information as to the compensation Dr. Welner is
19  receiving in the case, to be clear.
20  BY MR. BOWMAN:
21      Q. So I don't claim infallibility either
22  on my part or the part of my staff. But we
23  tried to calculate, since it's not reflected on
24  the bills, the total amount of compensation that

80



McCorkle Litigation Services, Inc.
Chicago, Illinois (312) 263-0052

Michael Welner, M.D. 05/17/2018

1 you have received from the City pursuant to
2 Exhibit 3. Do you have that number handy?
3    A. I don't.
4    Q. Is it available in your office
5 somewhere?
6    A. Sure.
7    Q. And why did you not provide us with
8 that?
9    A. My understanding was we provided you
10 with everything you asked for.
11    Q. So you understood we had not requested
12 you to provide us with your total compensation
13 in this case?
14    A. I just -- I ask -- When we get requests
15 from you, I ask my administrative staff to be
16 responsive to it. And they're responsive to it.
17 If there's something that you don't have that
18 you're entitled to, we'll give it to you.
19    MR. BOWMAN: Okay. I'm requesting that
20 Dr. Welner's office provide us with his office
21 total of billings to date in this case. Will
22 you provide that, Misha?
23    MS. ITCHHAPORIA: I have to see if
24 that's not Exhibit 3.

81

1    A. Could be.
2    Q. Does that surprise you?
3    A. No.
4    Q. Does that strike you as rather a lot?
5    A. No.
6    Q. Okay. Specifically the calculation
7 that we made, and I don't claim that we're
8 infallible, because it's not added up there, is
9 $228,347.50. Does that seem about right?
10    A. It could be. Again, I've not added it
11 up. I have different priorities than you, but I
12 certainly can add it up and confirm it.
13    Q. And that's my request.
14    And if indeed the total is $228,347.50,
15 does that strike you as rather a lot?
16    A. No.
17    Q. Sorry?
18    A. No.
19    Q. Next I'm going to mark for
20 identification as Exhibit 4 your billings in the
21 Patrick case.
22    (Whereupon, Welner Deposition
23    Exhibit No. 4 was marked for
24    identification.)

83

1    MR. BOWMAN: Well, it doesn't have a
2 number on it. It's got -- It's got running
3 charges. I don't know how to interpret it. If
4 he doesn't know --
5    THE WITNESS: So you want us to add
6 this up?
7 BY MR. BOWMAN:
8    Q. Well, if I were -- Let me ask you this.
9 If I were to add this up, would that reflect
10 your total billings through whatever date is the
11 last date on it?
12    A. I think so. I can confirm that just if
13 you want that definitive, that's easy enough to
14 do.
15    Q. I want that definitive.
16    A. Sure.
17    Q. Thanks.
18    Our calculation was that your total
19 bill so far, and what I -- Let me start the
20 question over.
21    Our calculation is that your total bill
22 through the last date on Exhibit 3, exclusive of
23 more recent charges, is over $200,000. Is that
24 your understanding?

82

1 BY MR. BOWMAN:
2    Q. Are you done billing in the Patrick
3 case?
4    A. Yes, as far I can tell.
5    Q. Are these -- Does the exhibit that I
6 handed you reflect your total billings in the
7 Patrick case?
8    A. I believe so.
9    Q. Do you need to confirm that in order to
10 be certain?
11    A. I'm sure, because it's not something
12 I've looked at our studied since 2015.
13    Q. Okay. So that's my request. Again, we
14 had to add this up because the total number
15 doesn't appear on the documents. But our
16 calculation was that the total billings in the
17 Deon Patrick matter are $87,621.25. Does that
18 sound about right to you?
19    A. Sure.
20    Q. And that doesn't strike you as high,
21 right?
22    A. No, it does not.
23    Q. And to be clear, the $87,621.25 in the
24 Patrick case is in addition to the $228,347.50

84



McCorkle Litigation Services, Inc.
Chicago, Illinois (312) 263-0052

1  in this case, right?
2      A.  That's correct.
3      Q.   Next I'll mark for identification as
4  Exhibit No. 5 your billings in the Phillips and
5  Gardner matter.
6              (Whereupon, Welner Deposition
7              Exhibit No. 5 was marked for
8              identification.)
9  BY MR. BOWMAN:
10     Q.   Is that correct?  Is this your billing
11 in the Phillips and Gardner matter through
12 October of 2017?
13     A.  I believe so, yes.
14     Q.   Are you done billing in that matter?
15     A.   The case isn't resolved yet, and
16 there's more work expected in the months ahead.
17 I don't know when it's actually scheduled, but
18 there will be more work.  So --
19     Q.   Have you given a deposition in that
20 case?
21     A.  I have not.
22     Q.   Do you anticipate giving a deposition
23 in that case?
24     A.  I guess that's up to you, right?

85

1      Q.   Do you anticipate giving a deposition
2  in that case?
3          MS. ITCHHAPORIA:  Objection: Form;
4  calls for speculation.
5          THE WITNESS:  I think I answered the
6  question.  I don't have control over that.  If
7  you're entitled to a deposition, if you choose
8  to take it, you'll take it.  If not, I'll work
9  on another matter.
10 BY MR. BOWMAN:
11     Q.   Do you anticipate testifying in the
12 trial on that case?
13     A.  I don't know.
14     Q.   If you are called to testify in
15 deposition or in trial, will you prepare prior
16 to your testimony?
17     A.  Yes, I will.
18     Q.   Again, not claiming infallibility, but
19 our calculation of the total relating to
20 Phillips and Gardner was $162,523.75.  Does that
21 sound about right to you?
22     A.  Again, it's plausible, and I'll look at
23 it and confirm it.
24     Q.   And you'll confirm and give us the

86

1  actual number of what you have --
2      A.  Sure.  If that's the number, I'll tell
3  you you're right.
4      Q.   Okay.  You're not disputing it today?
5      A.  No.
6      Q.   And to be clear, the $162,523.75 in the
7  Phillips and Gardner case is in addition to the
8  $87,621.25 in the Patrick case and the
9  $228,347.50 in the Patrick case [sic], right?
10     A.  Yes.
11     Q.   So that would make, assuming that those
12 numbers are accurate, your total bill to the
13 City of Chicago for work on these Agatite
14 confession cases something just short of half a
15 million, right?
16     A.  Well, let's add that up.
17          It would be somewhere between 4 and
18 $500,000, correct.
19     Q.   Does $478,492.50 sound right to you?
20     A.  It could be.
21     Q.   Do you dispute it?
22     A.  I don't.
23     Q.   Do you think that billing the City of
24 Chicago close to half a million dollars for your

87

1  work on the disputed confessions relating to the
2  murders of Sharon Haugabook and Jeffrey Lassiter
3  is excessive?
4      A.  No.
5      Q.   Do you think the bill could or should
6  have been cut back in any way?
7      A.  I did work that needed to be done on
8  the case.  I did work on this case instead of
9  other cases, chose to take this case instead of
10 other cases.  And so if I don't work on this
11 case, I would work on another case.  And if the
12 bill amounted to 470-odd-thousand dollars, that
13 would mean at $575 an hour, that would probably
14 mean somewhere between 800 and 900 hours of work
15 in total, which means that 800 to 900 hours of
16 my professional time was taken up on these four
17 cases as opposed to four other matters.  So it's
18 in line with the compensation that I get on
19 other cases unless of course I'm big billing at
20 600 or 650 or $700 an hour, in which case those
21 800 to 900 hours would be compensated at a
22 higher rate.
23          So the -- I would add that my entire
24 roster of cases is made up of highly sensitive

88



Michael Welner, M.D. 05/17/2018

1 cases that have absorbed the thousands of hours
2 that you've billed on this case, that you see as
3 necessary for things that you electively seek to
4 bill for, and your entire team of attorneys, and
5 I individually am responsible for what I have to
6 do. But I am -- have to be responsive to the
7 pressures of the next person with an urgent case
8 who wants me to start on their work as quickly
9 as possible. So I have an urgency to get this
10 matter out of the way so I can turn my attention
11 to someone else who wants me to spend 200, 300,
12 400 hours of time on their case. And I can't do
13 it as long as I'm working on this case.
14      So under the circumstances, in order
15 for me to devote my time to a case just as you,
16 just as Dr. Leo and his 300-odd false confession
17 cases, you would be expected to be compensated
18 for the time you provide.
19      **Q.  Okay.  So it sounds like what you're**
20 **saying is that from your standpoint, the City of**
21 **Chicago got a good deal in terms of the**
22 **470-odd-thousand bill in the Agatite murder**
23 **cases; would that be your judgment?**
24      MS. ITCHHAPORIA:  Objection:  Form;

89

1 mischaracterizes.
2      Go ahead.
3      THE WITNESS:  I think that the City of
4 Chicago got honest work from me.  That I can --
5 That I can provide.  They got an honest opinion,
6 they got a thorough opinion, and they got an
7 opinion that was reflective of the questions
8 that were brought to my attention.  And as I
9 have advised others, if they want another type
10 of opinion, there are people that I can
11 certainly recommend them to, and we've alluded
12 to them in this case.
13 BY MR. BOWMAN:
14      **Q.  Why -- I mean, on one level, the answer**
15 **is you spent more time, and I appreciate that.**
16 **Can you explain why it was necessary to devote**
17 **more time to the preparation of the Taylor**
18 **report and thereby generate higher billings**
19 **relative to the Patrick and Gardner matters**
20 **for -- as to which the billings were less?**
21      MS. ITCHHAPORIA:  Objection:  Form, and
22 assumes facts not in evidence.
23      Go ahead and answer.
24      MR. BOWMAN:  What fact did I assume

90

1 that's not in evidence?
2      MS. ITCHHAPORIA:  You're saying Taylor
3 report.  I don't think his billings are just
4 indicating a Taylor report.  It's the review of
5 a lot of documents, not necessarily the
6 preparation of the report.
7 BY MR. BOWMAN:
8      **Q.  Well, how did you allocate your time --**
9 **Your total time on the Agatite murder cases**
10 **resulted in 478-plus-thousand in -- in billings,**
11 **right?**
12      A.  Yes.
13      **Q.  And how did you allocate your hours**
14 **spent between the three individual cases?**
15      A.  I appreciate the question.  I get it.
16      I think that the Taylor questions were
17 far more complex than the ones that were raised
18 in the other cases.  The other cases had -- You
19 know, all of the cases have a considerable
20 amount of documentation that one needs to be
21 mindful of and to review and have continued to
22 generate documentation in turn through different
23 court proceedings and depositions and iterations
24 that -- some of which I haven't seen, but all of

91

1 which that related to questions for my attention
2 I did review.
3      The Taylor matter, as I've explained in
4 my report, and certainly all three reports are
5 -- they sort of coexist, has certain ambiguities
6 that have attracted a number of different
7 informants and sources of evidence that really
8 I've had to tease through.  And so I think it's
9 been a more arduous case to work on than I would
10 have expected were it to be like Gardner.
11      **Q.  Okay.  So is your answer there was just**
12 **more stuff to go through?  Or are you saying**
13 **that the issues required more thought?**
14      MS. ITCHHAPORIA:  Objection:  Form.
15      THE WITNESS:  Both.
16 BY MR. BOWMAN:
17      **Q.  Did the issues require more thought**
18 **because of the evidence that Taylor was locked**
19 **up at the time of the murders?**
20      A.  Yeah.  Sure.
21      **Q.  Now, in addition to the Agatite**
22 **murders, you also offered opinions for the City**
23 **of Chicago in other disputed confession matters,**
24 **right?**

92

Pages 89 to 92



McCorkle Litigation Services, Inc.
Chicago, Illinois  (312) 263-0052

Michael Welner, M.D. 05/17/2018

1    A.  Correct.
2    **Q.  So let me hand you what will become**
3    **Exhibit 6 to your deposition.**
4            **(Whereupon, Welner Deposition**
5            **Exhibit No. 6 was marked for**
6            **identification.)**
7    THE VIDEOGRAPHER:  We have five minutes
8    left.
9    MR. BOWMAN:  Actually, that's a good
10   idea.  Why don't we change the tape at this
11   point.  Let's take a short minute.
12   THE VIDEOGRAPHER:  We are going off the
13   record at 12:11.  This is the end of Disk 1.
14           (Whereupon, a short break was
15           taken.)
16   THE VIDEOGRAPHER:  We are going back on
17   the record at 12:26.
18   This is the beginning of Disk No. 2.
19   BY MR. BOWMAN:
20   **Q.  Dr. Welner, I'm going to hand what you**
21   **I marked during the break as Exhibit 6 to your**
22   **deposition.**
23   A.  Okay.
24   **Q.  Can you tell us what that is?**

                                        93

1    A.  It's a billing for Chapman.
2    **Q.  This is another disputed confession**
3    **case in which the City of Chicago hired you to**
4    **provide an expert opinion, correct?**
5    A.  Yes, sir.
6    MR. NOLAND:  Can I just -- I probably
7    should clarify.  You asked City of Chicago, and
8    City of Chicago of course pays it, but I think
9    he is retained by officers from the Chicago
10   Police Department, and the officer is funding
11   the
12   defense -- the City of Chicago is funding the
13   officer's defense.  I'm okay with your -- The
14   City is paying the bills, so I don't think
15   there's
16   any -- I don't think there's any disagreement
17   about that.
18   MR. BOWMAN:  I will try and ask a more
19   precise question.
20   BY MR. BOWMAN:
21   **Q.  Is -- Is Chapman another case in which**
22   **the City of Chicago is paying for an opinion**
23   **that you've provided?**
24   A.  It's a case in which the City of

                                        94

1    Chicago has retained my time to look at the
2    case.
3    **Q.  Okay.  Our calculation is that the**
4    **total bill reflected on Exhibit 6 is $96,677.**
5    **Does that sound right to you?**
6    A.  Could well be, sure.
7    **Q.  I'll make the same request with respect**
8    **to Chapman that we be provided with a total of**
9    **actual compensation that Dr. Welner has received**
10   **in the matter.**
11   **Are you done working on the Chapman**
12   **case?**
13   A.  Not necessarily.  The case is active.
14   **Q.  Have you given a deposition yet?**
15   A.  I have.
16   **Q.  And so the issue would be whether you**
17   **would be called to trial in the case?**
18   A.  Yes.  I mean, there are all kinds of
19   things that have -- that are ongoing in the
20   case, just as in every case, even in Patrick.
21   So I am not currently working on Chapman, but
22   things could pop up and may necessitate me
23   responding to a request by Misha or one of the
24   other attorneys to assist with something.

                                        95

1    **Q.  And as those issues arise and you're**
2    **obliged to expend time, you'll bill the City of**
3    **Chicago for that time, correct?**
4    A.  Sure.  If my time is involved, then I
5    bill for it.
6    **Q.  I'm going to hand you next what I'm**
7    **marking for identification as No. 7.**
8            **(Whereupon, Welner Deposition**
9            **Exhibit No. 7 was marked for**
10           **identification.)**
11   BY MR. BOWMAN:
12   **Q.  Which are billings in which the**
13   **customer name is identified as Saunders v. City**
14   **of Chicago, and this is -- Does this relate to**
15   **Terrill Swift or to Michael Saunders or both?**
16   A.  I think it relates to Swift.
17   **Q.  To Swift?**
18   A.  To Swift.  Only Swift.
19   **Q.  Have you prepared a separate report for**
20   **use in the companion federal litigation**
21   **involving Saunders and Richardson and Thames?**
22   THE WITNESS:  Is that -- Is that a
23   question I have to answer?
24

                                        96



McCorkle Litigation Services, Inc.
Chicago, Illinois (312) 263-0052

Michael Welner, M.D. 05/17/2018

1  BY MR. BOWMAN:
2    Q.  Have you disclosed a report in the
3  Saunders, Richardson, and Thames matter?
4        MS. ITCHHAPORIA:  I'll just caution
5  you, Doctor, if you've been -- in any case where
6  you've been retained but not disclosed, if you
7  can't answer, then you can just say, "I can't."
8        THE WITNESS:  Yeah.  I don't know
9  whether I can answer that I've been disclosed.
10  I just know that I've been deposed in Swift and
11  that I was involved in that aspect of the case
12  and -- and that that's what this bill reflects.
13  BY MR. BOWMAN:
14    Q.  The total billings that, according to
15  our calculation, are reflected in Exhibit No. 7
16  relating to the Terrill Swift are $147,960.
17  Does that sound right to you?
18    A.  Could be.  Could well be, sure.
19    Q.  Okay.  I will also ask that that number
20  be confirmed.  I'm not asking that the number be
21  confirmed.  I'm asking that whatever number it
22  is be provided to us so that we'll have it for
23  our use in this case.  Okay?
24    A.  Sure.

                                                  97

1    Q.  Will you do that?
2    A.  Yeah.
3    Q.  And without revealing trade secrets,
4  have you done work in the Saunders, Richardson,
5  and Thames matters beyond the billings that are
6  reflected in Exhibit 7?  And that's just a
7  yes-or-no, please.
8    A.  I can't answer the question.
9    Q.  You don't know?
10    A.  I can't answer the question.
11    Q.  Because?
12        MS. ITCHHAPORIA:  Again, Doc, the same
13  caution.  If it's a case where you've been
14  retained but not disclosed and can't answer,
15  then I'm going to instruct him not to answer.
16        MR. BOWMAN:  He can't answer whether
17  he's billed the City for it?
18        MS. ITCHHAPORIA:  Well, he's not been
19  disclosed in that case --
20        MR. BOWMAN:  I'm not asking about his
21  opinions.  I'm asking whether he's billing the
22  City for it.
23        MS. ITCHHAPORIA:  Right, but that would
24  be identifying the case.  So I'm going to

                                                  98

1  instruct him not to answer that case if it's
2  going to divulge a case where he's been retained
3  but not disclosed.
4        MR. BOWMAN:  He's already identified
5  the case that's on the billing which is Exhibit
6  7, so it's not like there's a secret here.  And
7  he's given a report --
8        MS. ITCHHAPORIA:  Well, you're asking
9  in the federal litigation.  This is for the
10  State court case.
11        MR. BOWMAN:  True.
12        MS. ITCHHAPORIA:  So I'm going to
13  instruct him not to answer.  I'm not going to
14  engage in argument on that issue.
15        MR. BOWMAN:  Okay.  Well, it's my
16  understanding, just for the record, that --
17  BY MR. BOWMAN:
18    Q.  Yes or no, have you prepared a report
19  in the Saunders, Richardson, and Thames cases?
20  Just yes or no?
21        MS. ITCHHAPORIA:  And that's the
22  federal litigation?
23        MR. BOWMAN:  That's the federal
24  litigation.

                                                  99

1        MS. ITCHHAPORIA:  Same caution.  I'm
2  going to instruct you not to answer that
3  question.
4  BY MR. BOWMAN:
5    Q.  Have you disclosed a report in the
6  federal cases?
7        MS. ITCHHAPORIA:  Same instruction.
8  I'm going to instruct you not to answer.
9        THE WITNESS:  Okay.
10        MR. BOWMAN:  Okay.  Well, do I infer
11  therefore that the answer is no?  Or is it a
12  secret?  I mean, I can call up the lawyers and
13  find out.  But my understanding is that there is
14  an expectation that Dr. Welner is going to sit
15  for a deposition in that case, and I assume that
16  he wouldn't be doing so unless there were a
17  report.
18        MS. ITCHHAPORIA:  I can't speak to any
19  other cases.  If we want to -- If you want to
20  call some other lawyers in that case, you can
21  absolutely do that.  That would be your right.
22        MR. BOWMAN:  I'm not really in a
23  position to do that now, Misha.  Maybe could you
24  confer off the record with Dr. Welner and see if

                                                 100

                                    Pages 97 to 100



Michael Welner, M.D. 05/17/2018

1  we can get some clarification to this?
2      MS. ITCHHAPORIA: Let's go off the
3  record.
4      THE VIDEOGRAPHER: We are going off the
5  record at 12:33.
6          (Whereupon, a short break was
7          taken.)
8      THE VIDEOGRAPHER: We are going back on
9  the record at 12:37.
10     MR. BOWMAN: So I understand, Misha,
11 that after speaking with Dr. Welner, you'll
12 persist in your instruction based on work
13 product?
14     MS. ITCHHAPORIA: That's correct, until
15 we seek clarification from the attorneys
16 involved, we don't feel comfortable with Dr.
17 Welner answering that question right now.
18 BY MR. BOWMAN:
19     **Q. Very well. Based on the bills that**
20 **have been disclosed, our calculation is that you**
21 **have billed the -- that the City of Chicago will**
22 **pay invoices for your work in disputed**
23 **confession cases in the total amount of over**
24 **$700,000. Is that consistent with your**

101

1  understanding?
2      A. Seems to be what this adds up to be.
3      **Q. So in any year, I mean, I guess you've**
4  **probably done your taxes for 2017 at this point,**
5  **right?**
6      A. Yeah.
7      **Q. What is your total earnings from**
8  **testifying as a retained expert?**
9      A. You understand that testimony is just a
10 pretty small part of --
11     **Q. Yeah. So let me rephrase the question**
12 **ask a better question.**
13     A. Rephrase the question.
14     **Q. Thanks.**
15     **What is your total compensation for**
16 **expert work?**
17     A. It's probably north of $1 and a half
18 million a year.
19     MR. NOLAND: Locke, can I just go on to
20 clarify something with one of your questions, a
21 question a couple of times ago of whether that
22 included any work he'd ever done on a case where
23 the City of Chicago was a defendant or its
24 police officers or just the ones you've

102

1  identified? Can I --
2      MR. BOWMAN: Just the ones I've
3  identified.
4      MR. NOLAND: Okay.
5      MR. BOWMAN: Just the ones I've
6  identified.
7  BY MR. BOWMAN:
8      **Q. So your estimate is that your personal**
9  **income for estimated -- Sorry. Let me start**
10 **over.**
11     A. Gross. Gross income.
12     **Q. Gross. Okay. So what's -- In order**
13 **to -- Is that gross subject to deductions on**
14 **your personal return?**
15     A. Subject to taxes and business expenses
16 and everything else. But in terms of gross
17 billings, I would say that it's in excess of
18 1.5 million a year.
19     **Q. Okay. So that's -- That's what goes**
20 **into -- And you are -- your organization is**
21 **called The Forensic Panel still?**
22     A. It's at the top of the letterhead. Of
23 course.
24     **Q. Right. So is The Forensic Panel an**

103

1  S corporation or --
2      A. I believe it's an S corp.
3      **Q. Okay. And so when you say 1.5 million**
4  **in earnings from expert work for 2017, that**
5  **would be reflected on The Forensic Panel's tax**
6  **return?**
7      A. Yes.
8      **Q. And then the operations of the business**
9  **would be funded in part out of that money?**
10     A. Sure.
11     **Q. And then in rough terms, for the most**
12 **recent year, what is the share of the total**
13 **earnings of The Forensic Panel that are the**
14 **result of expert work?**
15     MS. ITCHHAPORIA: Objection: Form.
16 BY MR. BOWMAN:
17     **Q. Do you understand the question?**
18     A. Oh, The Forensic Panel's -- The
19 Forensic Panel's earnings are exclusively from
20 consultation practice. It's a consultation
21 practice. I mean, it is a -- We also conduct
22 research, but the research is not for profit.
23 So that's certainly something that we expense
24 from the expert work. But we -- we are not

104



Michael Welner, M.D. 05/17/2018

1 getting revenue from the research.
2    **Q. Got it.**
3    **So all of the revenue of The Forensic**
4 **Panel is the result of expert work?**
5   A. Correct.
6    **Q. Report writing, testimony, and the**
7 **like?**
8   A. Review of records, everything.
9    **Q. Yes?**
10   A. Yes, sir.
11    **Q. In 2017, what was the share of The**
12 **Forensic Panel's earnings that is attributable**
13 **to money received from the City of Chicago?**
14   A. I don't know.
15    **Q. Approximately?**
16   A. I don't know. It's not something that
17 I -- that I gave any consideration to. So I
18 wouldn't be able to answer the question.
19    **Q. Well, in 2017, was the City of Chicago**
20 **The Forensic Panel's largest client in terms of**
21 **revenue?**
22    MS. ITCHHAPORIA: Objection: Form;
23 foundation.
24    THE WITNESS: I don't know.

105

1 BY MR. BOWMAN:
2    **Q. Is there any client of The Forensic**
3 **Panel that you can identify that generated more**
4 **earnings than the City of Chicago?**
5    MS. ITCHHAPORIA: Same objection.
6    THE WITNESS: Possibly.
7 BY MR. BOWMAN:
8    **Q. Well, either there is or there isn't.**
9 **Can you identify a client that generated more**
10 **revenue?**
11   A. I would have to check. Again, as I
12 said, it's something that possibly during 2017
13 someone generated more revenue, but I can't
14 answer that question without studying it more.
15    **Q. Okay. It would be fair to say for**
16 **2017, the City of Chicago was one of The**
17 **Forensic Panel's largest clients in terms of**
18 **revenue?**
19    MS. ITCHHAPORIA: Objection:
20 Foundation.
21    THE WITNESS: Quite possibly. Again,
22 the figure that you gave me of the 700K spans
23 2015 to 2018. I don't know what the breakdown
24 is in that year by year, what is allocated from

106

1 '15, what's allocated '18. I would have to
2 check on that. So that's -- I can't -- without
3 doing that, I wouldn't be able to.
4 BY MR. BOWMAN:
5    **Q. But, I mean, hypothetically, if**
6 **somebody wanted to do that calculation, it would**
7 **be possible --**
8   A. Actually --
9    **Q. You're interrupting my question.**
10 Sorry.
11    **Hypothetically, if someone wanted to do**
12 **that calculation, it would be possible to do**
13 **based on Exhibits 3 through 7, right? You could**
14 **just look at the dates on the charges and figure**
15 **out what's attributable to each of those three**
16 **years, right?**
17   A. Sure. It's feasible.
18    **Q. And if we look back from 2017 to 2016,**
19 **what is the total revenue of The Forensic Panel**
20 **from expert work for that tax year?**
21   A. I would say that 2015, '16, '17, all
22 three of those years would be either very close
23 to or -- or somewhere between 1.5 and 2 during
24 those years, but all in that range.

107

1    **Q. Other than money that has come to The**
2 **Forensic Panel, have you personally earned**
3 **additional income -- I'm sorry. Let me start**
4 **over.**
5    **Other than income that's come to The**
6 **Forensic Panel, have you personally earned money**
7 **from expert work in any of the years we've been**
8 **talking about, 2017, '16, and '15?**
9   A. I route all of my work through The
10 Forensic Panel. If it is -- My practice is
11 completely subsumed in it.
12    **Q. So can you tell me what is the total**
13 **amount that the City of Chicago has paid you for**
14 **providing expert work?**
15   A. No.
16    **Q. Can you approximate it?**
17   A. No.
18    **Q. Is it more than what's reflected on**
19 **Exhibits 3 through 7?**
20   A. Well, these aren't the only cases that
21 I've worked on for the City of Chicago, so yes.
22    **Q. Okay. In rough percentage terms, can**
23 **you tell me what percentage of the total**
24 **earnings from the City of Chicago that you've**

108



McCorkle Litigation Services, Inc.
Chicago, Illinois (312) 263-0052

1  **had are reflected on Exhibits 3 through 7?**
2      A.  I can't.  I think that certainly with
3  -- with this case that we're working on here
4  with four different examinees, that's been the
5  exception rather than the rule.  You know,
6  Chapman is more the rule.  Right?  And that's an
7  unusual circumstance.  So it's -- Given its
8  convergence with Chapman at the same time
9  billing-wise, I would say that this is a
10  particularly more heavy billing history in terms
11  of the practice relationship than it has been in
12  earlier years.  But there have been other cases
13  that we worked on for the City of Chicago over
14  the years.
15      **Q.  Have you ever testified for a party**
16  **adverse to the City of Chicago?**
17      A.  No.
18      **Q.  Would you do so?**
19      A.  Sure.  Call me and find out.  And, in
20  fact, Kathleen Zelner did just that.  She called
21  me to retain me, and I expressed a willingness
22  to work with her.
23          And again, as I -- just to make it
24  clear from my earlier testimony, and we've not

109

1      A.  For a lot of cases, yes.  For disputed
2  confessions, no, because there are
3  characteristically a number of opinions that are
4  provided, for example, by Dr. Leo, in which no
5  interview is done.  And because it is accepted
6  by courts, it establishes -- it may be a lower
7  threshold, but it establishes a threshold that
8  sort of defines the practice.
9          Ideally -- Ideally, interviewing is
10  helpful, and it's certainly pivotal to being
11  able to have full confidence in one's findings
12  about that individual.  In some cases, it's not
13  possible.  In this case, it's possible, but not
14  a cornerstone.
15      **Q.  Okay.  Will you agree with me that a**
16  **personal examination is an important part of the**
17  **work of a forensic psychiatrist?**
18      A.  Sure.
19      **Q.  And, for example, forensic**
20  **psychiatrists in the criminal law area may**
21  **provide opinions as to a defendant's fitness to**
22  **stand trial; yes?**
23      A.  Correct.
24      **Q.  The defendant's ability to waive**

111

1  worked together -- although I have worked with
2  attorneys who have deposed me and have later
3  worked with me -- my typical practice is to
4  spend a lot of time with the attorneys on the
5  phone before ever getting retained.  And if I
6  feel that a case can quite quickly be dispatched
7  because of lack of merit, I don't go forward.
8  And so I want to clarify that while I was not
9  retained by Kathleen Zelner, we had an extensive
10  discussion about her case.  And I certainly
11  agreed to work with her if she chose to proceed.
12  But it was only because I sat down and had a
13  lengthy discussion with her and could appreciate
14  at least the potential merit of her case.  And
15  were that to not have been the case, and I've
16  had that experience, even with the City of
17  Chicago, I have declined to take on certain
18  cases.
19      **Q.  Okay.  You are an expert in the area of**
20  **forensic psychiatry, correct?**
21      A.  Yes, sir.
22      **Q.  Will you agree with me that a personal**
23  **interview is a cornerstone of forensic**
24  **psychiatric practice?**

110

1  **Miranda knowingly and voluntarily, right?**
2      A.  Yes.
3      **Q.  Or whether the person is legally**
4  **insane?**
5      A.  Correct.
6      **Q.  And you would agree with me that**
7  **forensic psychiatrists should not offer an**
8  **opinion with respect to any of those issues**
9  **without having personally examined the**
10  **defendant, right?**
11      A.  There are certain instances in which
12  you have no choice.  There are instances
13  where -- where the Court has to make allowances
14  because an interview is not possible.  But under
15  those circumstances, one makes allowances for
16  the limitations of one's opinion and says, If I
17  had the opportunity to interview, then I could
18  perhaps have greater certainty on this.  But
19  because I do not, then this is how I'm limited.
20      **Q.  And you would agree with me that that's**
21  **the exception and not the rule?**
22      A.  That's correct.
23      **Q.  And whenever it's possible for a**
24  **forensic psychiatrist to conduct a personal**

112



Michael Welner, M.D. 05/17/2018

1 interview in those situations that we've been
2 discussing, it's imperative to do so?
3    A. True.
4    Q. The exception would be when it's just
5 literally not possible to do?
6    A. Or when a Court, such as in this case,
7 or an attorney such as yourself has the
8 wherewithal to just prevent it from happening.
9    Q. We'll get to that in a minute. I was
10 asking you a question about the general rule of
11 things. You're going to have your opportunity
12 to discuss the circumstances of this case with
13 me in a minute.
14    So my question was, as a general
15 matter, unless it's impossible to conduct a
16 forensic interview in person with the subject,
17 it's imperative for a forensic psychiatrist to
18 do so prior to rendering an opinion in the areas
19 that are typically covered in your practice,
20 right?
21    MS. ITCHHAPORIA: Objection: Form;
22 incomplete hypothetical.
23    THE WITNESS: Again, it depends on the
24 area. But as a general rule, for insanity and

113

1 Striving For Objectivity. Why don't you take a
2 look at the guideline and the commentary
3 quickly. I've just got a couple of questions.
4    MS. ITCHHAPORIA: And just for the
5 record, was this document produced?
6    MR. BOWMAN: Yes, it was.
7    MS. VAN BRUNT: It was. This is not a
8 Bates numbered copy. Apologies.
9    MS. ITCHHAPORIA: If you could just
10 tell me at some point what the Bates are.
11    MS. VAN BRUNT: I can get the Bates.
12    MS. ITCHHAPORIA: Thank you.
13 BY MR. BOWMAN:
14    Q. So the answer to my question is yes,
15 this --
16    A. I'm sorry. What's your question?
17    Can you read it back?
18    Q. No. That's not necessary. I'll just
19 reask it.
20    Guideline No. 4 as commented upon by
21 the American Academy of Psychiatry and the Law
22 does indeed reflect the importance of the
23 in-person interview in the forensic psychiatric
24 practice, right?

115

1 competency and for competency to waive Miranda,
2 sure.
3 BY MR. BOWMAN:
4    Q. Let me hand you what I've marked for
5 identification as Exhibit 8.
6       (Whereupon, Welner Deposition
7       Exhibit No. 8 was marked for
8       identification.)
9 BY MR. BOWMAN:
10    Q. You're familiar with this, right?
11    A. Yes.
12    Q. Tell us what it is.
13    A. It's the Ethical Guidelines of the
14 American Academy of Psychiatry and the Law.
15    MR. BOWMAN: Sorry. Give me just a
16 minute.
17 BY MR. BOWMAN:
18    Q. And among other things, the guidelines
19 comment on the importance of a forensic
20 interview in your work, right?
21    A. I know there's something in here, but I
22 would prefer you to just guide me to where
23 you're reading.
24    Q. Sure. Guideline No. 4, Honesty and

114

1    A. Yes. Correct.
2    Q. I'm going to read something out loud
3 that's in the paragraph just at the very bottom
4 of page 3 of the exhibit: "Honesty,
5 objectivity, and the adequacy of the clinical
6 evaluation may be called into question when an
7 expert opinion is offered without a personal
8 examination."
9    Do you agree with that statement?
10    A. I think that adequacy of the clinical
11 evaluation. You know, honesty is as honesty
12 does. You can do an evaluation and be
13 flagrantly dishonest. And what I would say is
14 that if one strives for honesty and objectivity,
15 the best way to do that is to videotape your
16 evaluation so that you have full transparency
17 about what was said in your interview and that
18 both sides have it, and you have an opportunity
19 and you're accountable to actually present in an
20 objective way what came up in the evaluation.
21    Q. Do you --
22    A. Otherwise, as a practical matter, I can
23 tell you from practice that does not accurately
24 reflect the state of practice in forensic

116

Pages 113 to 116



1  psychiatry. Honesty doesn't derive from
2  people's interviews, nor does objectivity.
3  Honesty is only guaranteed by having a -- having
4  an exact record of that interview. But in terms
5  of adequacy of effort, yes, I agree with that
6  premise.
7      **Q. Do you agree with the statement that**
8  **the adequacy of the clinical evaluation may be**
9  **called into question when an expert opinion is**
10 **offered without a personal examination?**
11     A. I do.
12     **Q. Have you made a clinical evaluation of**
13 **Daniel Taylor?**
14     A. I've evaluated certain clinical issues.
15     **Q. Have you made a clinical evaluation of**
16 **Daniel Taylor?**
17     MS. ITCHHAPORIA: Objection: Asked and
18 answered.
19     THE WITNESS: I've answered that.
20 BY MR. BOWMAN:
21     **Q. Can you answer that question yes or no?**
22     MS. ITCHHAPORIA: Object to form.
23     THE WITNESS: I've evaluated certain
24 clinical issues.

117

1  BY MR. BOWMAN:
2      **Q. So what's the answer, yes or no? Have**
3  **you made a clinical evaluation of Daniel Taylor?**
4      MS. ITCHHAPORIA: Objection: Form;
5  asked and answered.
6      THE WITNESS: I've answered the
7  question.
8  BY MR. BOWMAN:
9      **Q. You can't answer that yes or no?**
10     MS. ITCHHAPORIA: Same objections.
11     THE WITNESS: I answered it as best as
12 I can.
13     I did not perform a diagnostic
14 evaluation of him because it would have been
15 inadequate to do so without an interview. I did
16 provide an evaluation of certain of his
17 qualities based on a variety of sources of
18 information for which there was adequate data to
19 inform that, a variety of records, objective in
20 nature, spanning quite some time, which --
21 ranging from social service to others that
22 specifically addressed behaviors and symptoms,
23 things that were replicated, things that came up
24 over the years, and, in part, some evaluations

118

1  done by psychiatrists or other qualified
2  professionals. And so I addressed the issues in
3  my report that I felt I had adequate information
4  to do so.
5  BY MR. BOWMAN:
6      **Q. Do you agree with the statement that**
7  **you cannot know about a person's vulnerabilities**
8  **without ever having met and spoken to the**
9  **person? Is that an accurate statement?**
10     A. You cannot know everything about their
11 vulnerabilities without speaking to them. You
12 can know some things. Records are helpful.
13 Other input is helpful. Their own testimony
14 through their depositions and other kinds of
15 self reflections when they're speaking about
16 themselves in these kinds of settings are
17 informative. But you certainly will learn more
18 than that in an in-person interview.
19     **Q. Okay. I'll ask you again, do you agree**
20 **with the statement that you cannot know about a**
21 **person's vulnerabilities without ever having met**
22 **and spoken with the individual; yes or no?**
23     MS. ITCHHAPORIA: Objection: Asked and
24 answered.

119

1      THE WITNESS: I think the answer is you
2  can't know everything that you would know, and
3  it depends about the quality of information that
4  you have otherwise. If you have a rich database
5  otherwise, you can learn about someone's
6  vulnerabilities. You would be relying upon that
7  in addition to your interview anyway, but
8  your -- you can't have a complete understanding
9  without an interview; that's correct.
10 BY MR. BOWMAN:
11     **Q. Do you agree that it's not possible to**
12 **arrive at a scientific opinion regarding an**
13 **individual's specific vulnerabilities without**
14 **having conducted an in-person forensic**
15 **examination?**
16     A. I don't know that that's true depending
17 on the quantity and quality of information
18 available. In some instances in which there's
19 extensive documentation and redundancy of
20 observations and clinical impressions arising
21 from a variety of different informants, some
22 objective, some personal, then one can arrive at
23 opinions with greater certainty. But it's
24 dependent upon the quality and quantity of

120



Michael Welner, M.D. 05/17/2018

1  information.
2       In areas in which that's not possible,
3  no, one can't arrive at an opinion.
4       Q.  Okay.  Is it your position that if a
5  person hasn't examined an individual for his
6  specific vulnerabilities that any opinion about
7  just looking at the conduct of the police isn't
8  arriving at a scientific opinion and doesn't
9  rise to the level of science?
10      A.  I didn't hear some of what you said.
11      MR. BOWMAN:  Could you?
12      THE COURT REPORTER:  I don't think so.
13  I can try.
14      MR. BOWMAN:  That's all right.  I'll
15  just ask it again.
16  BY MR. BOWMAN:
17      Q.  Is it your position that if an
18  evaluator hasn't examined someone for his
19  specific vulnerabilities that the examiner's
20  opinion about just looking at the conduct of the
21  police isn't a scientific opinion and doesn't
22  rise to the level of science?
23      A.  Well, it depends -- in -- For all
24  intents and purposes, yes.  I think the way you

                                          121

1  asked the question, it depends on what that
2  person's opinion is about the questioning of the
3  police officers.  You know, that they -- the --
4  the opinion of the police -- about the
5  interrogation only has some level of relevance
6  and validity as it relates to one's
7  understanding of vulnerability.  So the answer
8  is yes.
9       MS. ITCHHAPORIA:  I'm going to
10  belatedly object to incomplete hypothetical;
11  calls for speculation.
12      (Whereupon, Welner Deposition
13      Exhibit No. 9 was marked for
14      identification.)
15  BY MR. BOWMAN:
16      Q.  I'm going to hand you the transcript of
17  a deposition that was taken of you in the Ronald
18  Jones case.
19      MR. BOWMAN:  And I note that this
20  exhibit was also prepared from an un-Bates
21  stamped copy, but you have received it, and
22  we'll get you the Bates range, Misha,
23  eventually.
24

                                          122

1  BY MR. BOWMAN:
2       Q.  Is this a deposition that you gave?
3       A.  It looks that way.
4       Q.  Did you give a deposition in the Ronald
5  Jones case?
6       A.  I did.
7       Q.  In August of 2003?
8       A.  I did.
9       Q.  Did you testify truthfully?
10      A.  Of course.
11      Q.  So if you look at page 19, line 12, I'm
12  going to read it into the record:
13      QUESTION:  So I know your position is
14           that if the person hasn't examined
15  the          individual for the specific
16  vulnerabilities     that any opinion about
17  just looking at the     conduct of the
18  police isn't arriving at a
19  scientific opinion; is that right?  It
20  doesn't arise -- It doesn't rise to the
21      level of science?
22      Your answer as recorded in the
23  transcript is:
24      ANSWER:  Well, sure.  Not only that, it

                                          123

1       doesn't rise to the standard of any
2  kind of      forensic examination.
3       Is that accurately transcribed?
4       A.  That's right.  That's right.  I think
5  that's why I've asked to consistently interview
6  in each of these cases and have advocated for it
7  to be part of my examinations.
8       Q.  And I'll hand you next what I'll mark
9  for identification as Exhibit 10.
10      (Whereupon, Welner Deposition
11      Exhibit No. 10 was marked for
12      identification.)
13      MR. BOWMAN:  And this is also, Misha,
14  something that we provided to you with Bates
15  stamps on it, and our system didn't -- didn't
16  provide Bates stamps on this version.  But we'll
17  get you the Bates range of what you received a
18  few weeks ago.
19      MS. ITCHHAPORIA:  Thank you.
20      THE WITNESS:  Thank you.
21  BY MR. BOWMAN:
22      Q.  And this is your testimony in a Daubert
23  hearing in State v. Edmonds; yes?
24      A.  Sure.

                                          124



Michael Welner, M.D. 05/17/2018

1  Q.  And I just want to direct you -- It's
2  going to be a little bit difficult to find
3  because we don't have the Bates numbers.  But if
4  you scan through the pages, I'm wanting to
5  direct you to page 835.  You'll see that the
6  numbers, the page numbering doesn't correlate to
7  the physical pages that I just handed you.  But
8  you'll be able to find 835 if you stick with it.
9       Did you find it?
10  A.  835?  Yeah.
11  Q.  And then you see the page number is
12  there at the bottom, then you flip the page.
13  A.  Sure.
14  Q.  I'm going to read something into the
15  record from -- beginning on line 6 through
16  line 12.  Here comes your testimony:
17      ANSWER:  That's why this kind of
18           superficial, shallow research and
19  case       reports is so illegitimate,
20  because how do      you know people don't
21  have vulnerabilities       if you don't
22  talk to them?  How do you       really know
23  what a person's vulnerabilities       are as
24  they relate to a disputed confession       if

125

1  A.  I asked that they send the letter in
2  which someone from your team deemed it
3  unacceptable, and that was -- so I wanted to
4  verify it.
5  Q.  Would it refresh your recollection if I
6  were to suggest to you that it was an e-mail
7  that you received?
8  A.  Yes.  A letter and e-mail, to me, are
9  interchangeable.
10  Q.  All right.  So after the e-mail was
11  forwarded to you and you learned this
12  information, did you request Counsel to take
13  steps in court to secure the opportunity to
14  conduct a personal examination of Mr. Taylor?
15      MS. ITCHHAPORIA:  Objection.  You're
16  inquiring of communications with counsel that
17  don't relate to, like, underlying facts or
18  compensation.  So I'm going to instruct Dr.
19  Welner not to answer that question on the basis
20  of work product.
21      Sorry.
22  BY MR. BOWMAN:
23  Q.  Are you aware of whether it is possible
24  to go to court and compel a subject to sit for

127

1  they haven't been examined?
2      Did you say that?
3  A.  Yes.
4  Q.  And were you testifying truthfully?
5  A.  Yes.
6  Q.  Now, in your report, Exhibit 2, which
7  you have there in your stack, you indicate on
8  page 6 that you requested an opportunity to meet
9  with Daniel Taylor, and that, according to your
10  report, it states, "Mr. Taylor's attorney
11  objected to this request as, 'unacceptable,'"
12  closed quote.
13  A.  Yes.
14  Q.  After you were -- you were informed at
15  some point that -- that was -- that was what
16  Counsel had learned in the case from our side,
17  right?
18  A.  Sure.
19  Q.  And after --
20  A.  Well, I got the letter, and that's
21  where I got the quote.
22  Q.  Okay.  So you actually --
23  A.  The actual letter was sent to me.
24  Q.  Well --

126

1  an examination?
2      MS. ITCHHAPORIA:  Generally speaking,
3  right?
4      MR. BOWMAN:  Generally speaking.
5      THE WITNESS:  I don't know procedurally
6  how it works in these cases.  I know that in
7  certain instances, that can be done.  But we're
8  talking about other types of cases and other
9  types of circumstances.  I don't know whether
10  that can be done in a civil disputed confession
11  matter.
12  BY MR. BOWMAN:
13  Q.  You just don't know?
14  A.  I don't know.
15  Q.  If you -- If I were to ask you to
16  assume hypothetically that it could be done,
17  would you have preferred that the counsel who
18  had retained you have gone in to court to
19  attempt to compel Mr. Taylor to sit for an
20  examination?
21      MS. ITCHHAPORIA:  Objection:  Form;
22  foundation; incomplete hypothetical; calls for
23  speculation.
24      THE WITNESS:  I mean, yeah.  But it's

128

Pages 125 to 128



1 not my case. I can't -- There are a whole --
2 BY MR. BOWMAN:
3     Q.  I'm not asking you --
4     A.  No.  But I'm answering your question,
5 and I'm doing it quite candidly, which is what
6 you want.  I'm not blowing you off.
7         Sure.  There are a lot of things I want
8 on every case, including yours.  And there are a
9 lot of requests that I made to Counsel of
10 materials that we would have wanted from you.
11 And you told her to go pound sand.  And so I
12 have to accept it.  I think it's the natural
13 experience of someone who's a consultant to say
14 yeah, I'd like this information, because it's
15 going to more fully inform my opinion.  And if
16 you can get it, hey, that would be great.  I'd
17 like to have it.  But that happens in every
18 single case.  And certainly my role, as I
19 envision it, and as I practice, you know, other
20 people may practice differently, I make it quite
21 clear to attorneys what I would like to receive.
22 And I tell them if I don't receive this, I'm
23 going to be limited in the scope of my opinions.
24 But I don't direct them to go into court and

129

1 with me as an examiner might give me more of a
2 sense of confidence about anything that he has
3 to say.  Because sometimes people react to the
4 interview setting a little bit differently from
5 being under oath at trial and may be a little
6 less inclined to lie because they're dealing
7 with a physician or a mental health
8 professional.  So naturally, the dynamic is
9 different, the experience is different, and
10 sometimes he's quite forthcoming.  I mean, you
11 and I had that experience.  You had an
12 experience with me where your client, Corethian
13 Bell, was so open with me that you came in and
14 took him out to go to the bathroom because he
15 was being that forthcoming.  So naturally I want
16 to sit down and interview someone because it may
17 be very informative and very illuminating.  And
18 you never know where the interview is going to
19 go.
20         I mean, look, I already talked about
21 interviewing Calvin Ollins.  I interviewed him;
22 I came to the conclusion he gave a false
23 confession.  So it can go in any direction.  And
24 I just want to have confidence in the accuracy

131

1 take up a spear for what I deem to be necessary
2 on a scientific level, even though, from a
3 scientific standpoint, I would absolutely prefer
4 it, and I make it clear to them.
5     Q.  Okay.  You've just testified about it,
6 so let me follow up.  Did you make it clear to
7 the counsel who had retained you that you wanted
8 them to take all possible steps to secure a
9 personal interview for you with Daniel Taylor?
10     A.  Sure.  I asked -- I asked if they could
11 do what they could to get me an interview with
12 him in person and on videotape.
13     Q.  All right.  Why did you want to
14 interview Mr. Taylor?
15     A.  Because you learn a lot more about a
16 person by sitting with them.  And you learn a
17 lot more -- Mr. Taylor's case, I mean, already
18 he's got -- he has the handicap of having
19 perjured himself and having given inconsistent
20 history and that being reinforced by the process
21 to the point that he's given such consistently
22 inconsistent statements that it certainly made
23 me wonder whether if I sat down with him in an
24 interview, whether the experience that he had

130

1 of my findings.
2     Q.  What specifically would you have done
3 if you had had the opportunity to have an
4 in-person meeting with Mr. Taylor?  I'm not
5 asking for what you might have learned.  I'm
6 asking procedurally, what would you have done in
7 your practice?
8         Do you understand that question?
9     A.  Sure.  I sit down, and I think of all
10 of the questions that I would like to have more
11 information about that I think that perhaps he
12 might give me information that I otherwise don't
13 have.  I would write up a list of questions,
14 think about when to get into certain things just
15 based on my understanding of him and what he's
16 like as a person and how he's likely to respond
17 to me as a psychiatrist.  It's different for
18 every individual.  It's not really a cookie
19 cutter thing.  Every person is different.  And I
20 will typically procedurally begin my preparation
21 for an interview just a few days ahead so that
22 my -- my feel for the experience is fresh and
23 not stale.  And then we'll sit down and go
24 through my questions, but also allow the

132



McCorkle Litigation Services, Inc.
Chicago, Illinois  (312) 263-0052

1 examinee to kind of take it where he wants to
2 take it, which is invariably what happens.
3 Someone will seize upon something that he feels
4 very animated or comfortable talking about,
5 and -- and then the path sort of repaves itself,
6 and you thought you were going to get into a
7 certain area, and you end up going in a
8 direction where the examinee takes you.
9     Q. So you'd ask questions; yes?
10     A. Sure.
11     Q. Would you do any testing if you had had
12 the opportunity to conduct an in-person --
13     A. I would have done --
14     MS. ITCHHAPORIA: Objection.
15     Wait. Sorry.
16     Objection: Form; foundation;
17 incomplete hypothetical; calls for speculation.
18     Go ahead.
19     THE WITNESS: I might have done a
20 Gudjonsson compliance scale, because that was
21 the issue being raised. And it would be more
22 informative to have that information. I might
23 also have done an MMPI, because it would provide
24 a potentially validatable instrument that could

133

1 confession have come up. And in terms of other
2 kinds of psychological tests, they are
3 self-report, and so therefore they are of
4 limited validity and application to forensic
5 settings. Or if they are not self-report,
6 they're projective in nature. And I don't know
7 that we know enough to be able to apply that
8 kind of information.
9     There's some literature on a variety of
10 different personality types of tests. But the
11 applicability to them is -- is uneven, and I
12 would be uncomfortable putting too much weight
13 in what I would derive.
14     So I think the short answer is I would
15 principally be interviewing, and I would
16 probably make a game time decision about whether
17 to do the MMPI-2. But as I sit here and reflect
18 on it all, under the circumstances, I probably
19 would have done an MMPI-2 on him. Whether to do
20 the Gudjonsson compliance scale under the
21 circumstances, I think probably, I would have
22 done it.
23     Q. And you would have assessed whether
24 you'd be in a position to make a psychiatric

135

1 provide me diagnostic information.
2     As I mentioned earlier, if I had a
3 chance to sit down and examine him in person, I
4 might have been far more able to render a
5 diagnostic opinion. Doesn't mean I could, but
6 I'd be certainly much more equipped. And I
7 think that in his case, he's got this history of
8 homicidal aggression; he's got this history of
9 impulsivity; he's got this history of
10 intemperateness. That overlaps on a variety of
11 different diagnostic areas, some of which have
12 pertinence to disputed confession. And so
13 teasing that apart would be indicated by, I
14 think, an MMPI II under the circumstances.
15 BY MR. BOWMAN:
16     Q. So you would give the Gudjonsson
17 compliance scale and an MMPI?
18     A. Sure.
19     Q. Any other psych testing that you would
20 do?
21     A. I don't think it would be necessary. I
22 mean, the Gudjonsson suggestibility scale is
23 irrelevant to this case because none of the
24 issues of suggestibility or coerced internalized

134

1 diagnosis?
2     A. Yeah. If I didn't feel I had enough
3 information, because look, if he's not
4 forthcoming, or if he just simply refuses to
5 answer a lot of questions, then I might be left
6 with just an inadequate data set and just not in
7 any kind of position to address that with
8 confidence.
9     Q. And if you did not have the opportunity
10 to interview him, then you would not be in a
11 position to diagnose, correct?
12     A. Correct.
13     Q. That would be unethical to do, right?
14     A. In this case, it would be unethical to
15 do. I think there are certain instances in
16 which you're expected, but this is not one of
17 them. And it would have been wrong in this case
18 to do so.
19     Q. What does the Gudjonsson compliance
20 scale measure?
21     A. Compliance.
22     Q. Can you be -- Can you explain?
23     A. It's a self-report measure that -- that
24 looks into just different parameters of

136



Michael Welner, M.D. 05/17/2018

1 obedience and compliance and how a person
2 relates to authority. It's a self-report. And
3 so as such, it's limited in that regard. But
4 it's additional information that either augments
5 history or contradicts it. But it's more data.
6 **Q. Did you conduct a personal evaluation**
7 **of Deon Patrick?**
8 A. No.
9 **Q. Did you conduct a personal evaluation**
10 **of Lewis Gardner?**
11 A. I did not.
12 **Q. Did you conduct a personal evaluation**
13 **of Paul Phillips?**
14 A. I didn't.
15 **Q. Did you conduct a personal evaluation**
16 **of the subject in the Chapman case?**
17 A. I don't think so, no.
18 **Q. You also worked for the City in the**
19 **James Anderson matter -- James Andrews matter?**
20 A. Yes.
21 **Q. Yes. Did you conduct a personal**
22 **evaluation Mr. Andrews?**
23 A. No.
24 **Q. You did not conduct a personal**

137

1 caution.
2 THE WITNESS: Sure. Well, we -- We
3 worked together on Bell, on Corethian Bell. And
4 I examined in Bell; I examined in Jones; I
5 examined Kittler. I'm trying to think of who
6 else. Those are three that immediately come to
7 mind.
8 BY MR. BOWMAN:
9 **Q. What's Kittler's first name?**
10 A. I believe, Eric.
11 I did not -- I mean, I interviewed in
12 person Calvin Ollins.
13 **Q. Approximately when did you examine Eric**
14 **Kitler?**
15 A. I don't know.
16 **Q. And Jones and Corethian Bell are from a**
17 **few years ago, right?**
18 A. Yes.
19 **Q. Have you in the past ten years**
20 **conducted an in-person evaluation for the City**
21 **of Chicago in a disputed confession case?**
22 MS. ITCHHAPORIA: Same caution.
23 THE WITNESS: I don't know, because
24 again, I think it's what I need to make clear is

139

1 **evaluation of Terrill Swift, right?**
2 A. No.
3 **Q. Have you conducted personal evaluations**
4 **of Michael Saunders or Harold Richardson or**
5 **Vincent Thames?**
6 MS. ITCHHAPORIA: Same caution. You
7 can't answer it.
8 THE WITNESS: I can't answer the
9 question.
10 BY MR. BOWMAN:
11 **Q. When is the last time that you**
12 **conducted an in-person examination of the**
13 **subject in a disputed confession case?**
14 A. About six weeks ago.
15 **Q. And you've not been disclosed in that**
16 **case?**
17 A. Nope.
18 **Q. When is the last time that you**
19 **conducted an in-person evaluation of a subject**
20 **in a disputed confession case in which the City**
21 **of Chicago was paying your bill?**
22 MS. ITCHHAPORIA: I'm going to caution
23 you again where you've been retained but not
24 disclosed, you can't answer it. But with that

138

1 there are some years in which I'm not at all
2 working with the City of Chicago on anything.
3 So I just -- I can't account for the last ten
4 years. I think I can just account for what's
5 right in front of us.
6 BY MR. BOWMAN:
7 **Q. Okay. Within the field of forensic**
8 **psychiatric assessment of disputed confessions,**
9 **is there a standard as to whether an in-person**
10 **forensic psychiatric interview should be**
11 **conducted?**
12 A. Depends who you talk to. And I
13 think --
14 **Q. I'm not asking who you talked to. I'm**
15 **asking is there --**
16 A. It depends who's defining --
17 **Q. You're interrupting my question, sir.**
18 MS. ITCHHAPORIA: Yeah, but Locke, I
19 think you interrupted his answer.
20 MR. BOWMAN: I wanted to clarify my
21 question.
22 BY MR. BOWMAN:
23 **Q. My question is, in this area in which**
24 **you claim expertise in the forensic psychiatric**

140

Pages 137 to 140



McCorkle Litigation Services, Inc.
Chicago, Illinois (312) 263-0052

Michael Welner, M.D. 05/17/2018

1  assessment of disputed confessions, is there a
2  written standard that you can direct me to as to
3  whether an in-person forensic psychiatric
4  interview should be conducted?
5       MS. ITCHHAPORIA: Objection: Form.
6       THE WITNESS: I would refer you to
7  Dr. Gudjonsson and his approaches.
8  BY MR. BOWMAN:
9       Q. Okay. The 2003 book that we've talked
10 about?
11      A. The 2003 book. And I think his -- he
12 consistently examines. And in cases that
13 I've -- even cases that I've worked on with him,
14 he's consistent -- or opposite him, he's
15 consistently examined.
16      Q. Thank you.
17          Okay. So I wanted to hand you next
18 what I'll mark for identification as Exhibit 11
19 and 12.
20          (Whereupon, Welner Deposition
21          Exhibit No. 11 and Exhibit No.
22          12 were marked for
23          identification.)
24

141

1  that I should advise you of. Let me just check
2  this.
3       Q. What's the ninth one, sir?
4       A. Let me just look this over and make
5  sure that it's -- No. Let's leave it at eight.
6  There are a couple of these where I examined for
7  disputed confession but did not testify on it.
8       Q. Right. This is just limited to --
9       A. What I was actually testifying about,
10 correct.
11      Q. Okay. So in Andrews v. Burge, was this
12 testimony that you gave by deposition or in
13 court?
14      A. Deposition. The parentheses D is
15 supposed to be deposition.
16      Q. Got it.
17          State v. Hernandez, therefore, was a
18 disputed confession case in which you testified
19 for the prosecution?
20      A. Correct.
21      Q. And there's --
22      A. There's two trials.
23      Q. Two trials?
24      A. And they're both listed there. There

143

1  BY MR. BOWMAN:
2       Q. And No. 11 is the --
3       A. Oh.
4       Q. -- is the testimony that you've listed
5  between March of 2014 and February of 2018.
6       A. Yeah.
7       Q. Actually, that's No. 12, what I've just
8  described.
9          And No. 11, which I'm handing you now,
10 is the earlier testimony from 2010 to 2015.
11      A. Okay.
12      Q. And you've listed -- If you look at the
13 two exhibits together, you've listed a total of,
14 I believe it's eight disputed confession matters
15 in which you've testified in the past -- in the
16 past eight years, right?
17      A. Yeah. That's -- I can double-check it,
18 but that looks -- it's pretty much laid out. So
19 yeah.
20      Q. Okay. So we have, first of all,
21 Andrews v. Burge. And what was the -- What was
22 the forum in which you provided testimony, a
23 deposition?
24      A. Actually, there's a ninth one there

142

1  was the April 15 trial, and then there was
2  the -- April 15 trial and then the July 17 -- or
3  the January 17 retrial.
4       Q. Okay. And so you've listed this once
5  on Exhibit 11, and then it comes up later on --
6       A. Yes.
7       Q. -- Exhibit 12, same case?
8       A. Mm-hmm.
9       Q. Is that a yes?
10      A. Correct.
11      Q. And then your -- In that case, the
12 thrust of your testimony was that the confession
13 was not false and not coerced?
14      MS. ITCHHAPORIA: This is State v.
15 Hernandez, right?
16      MR. BOWMAN: Right.
17      THE WITNESS: The thrust was that the
18 examinee had given a voluntary confession
19 independent of police activity that was driven
20 by powerful guilt and that that was the genesis
21 of his self-incriminating statements. And a
22 number of other things, but I also testified
23 about his diagnosis and -- and a number of
24 different psychosocial questions that came up

144



Michael Welner, M.D. 05/17/2018

1 that indirectly related to his disputed
2 confession, which was the thrust of the defense.
3 BY MR. BOWMAN:
4    **Q. And I take it based on what you've just**
5 **said that you did examine Mr. Hernandez?**
6    A. Yes, sir.
7    **Q. And in Andrews v. Burge, was the thrust**
8 **of your testimony that Mr. Andrews had not been**
9 **physically coerced into confessing?**
10    A. I don't remember. The only thing I
11 remember about Andrews is that in all
12 likelihood, he was guilty of killing someone.
13 That was -- That was sort of an overarching
14 fascination about the case. And here we were in
15 civil court with somebody who was in all
16 likelihood a murderer who, but for the graces of
17 God, was actually -- But I just -- it's too many
18 years ago. I don't remember the exact focus of
19 -- I just remembered that it was on dispute --
20 it was a disputed confession issue, and then I
21 had arrived at an opinion that defense chose to
22 use. And they put me forward for deposition.
23    **Q. Okay. And was the thrust of your**
24 **opinion that Mr. Andrews had committed murder?**

145

1    A. No. It wasn't. I said what I remember
2 about the case was that it was really quite
3 interesting that here was someone who was likely
4 a guilty murderer who was here in civil court.
5 And in a number of these disputed confession
6 questions, it's either far more ambiguous; or
7 the person may actually have been wrongfully
8 convicted, and there's a question of the
9 antecedents of that. So it's unusual to have a
10 case where the evidence for guilt is so
11 compelling, but the case is directed to civil
12 court because another agency simply chose not to
13 bring charges. And that's -- That's -- From a
14 historical perspective, that's something that
15 endures five years later as opposed to the exact
16 findings in my opinion.
17    **Q. Do you not recall the thrust of your**
18 **opinion?**
19    A. I don't.
20    **Q. Now, State v. Hernandez, and you may**
21 **have said this, actually comes up twice on**
22 **Exhibit 12, April 2015 and January 2017?**
23    A. Yes. Yes.
24    **Q. And that's in addition to -- Oh, I see.**

146

1 **It comes up -- Got it. Sorry. Withdraw the**
2 **question. You've talked about that case.**
3    **Patrick v. City of Chicago we know**
4 **about. Swift v. City of Chicago was a disputed**
5 **confession case in which the thrust of your**
6 **opinion was that Mr. Swift was not vulnerable to**
7 **making a false confession; fair summary?**
8    A. That's a fair characterization.
9    **Q. And in Chapman, when was the -- what**
10 **was the thrust of your opinion, sir?**
11    A. I've not reviewed that report or
12 testimony in really quite some time. It's a
13 good year and a half ago. I would really have
14 to go back and take a look at it.
15    **Q. In any event, you were testifying --**
16    A. At deposition.
17    **Q. -- for the defense against the**
18 **proposition that Mr. Chapman had confessed**
19 **falsely?**
20    A. No. I don't believe that I got into
21 testifying about whether he confessed falsely or
22 not. I -- I would have to really drill down
23 into seeing what my exact opinion is.
24    **Q. The last one here is -- of the disputed**

147

1 **confession cases is People v. Grigoroff?**
2    A. Yes.
3    **Q. And that was a criminal matter in which**
4 **you testified for the prosecution?**
5    A. Correct.
6    **Q. And what was the thrust of your opinion**
7 **there?**
8    A. It was an assessment that related to
9 his vulnerabilities, the nature of the
10 questioning, the context of the overall
11 interrogation, how those three things fit
12 together. And it was testimony that was offered
13 in rebuttal to a defense psychologist who was
14 testifying to a variety of assertions about
15 interrogation generally and interrogation
16 specifically and his own findings on
17 psychological testing and how they related to
18 that.
19    **Q. Your testimony favored the proposition**
20 **that Mr. Grigoroff had testified -- I'm sorry,**
21 **had confessed voluntarily and truthfully?**
22    A. I think my testimony actually just
23 spoke to the proposition that the evidence did
24 not demonstrate that Mr. Grigoroff had the

148



McCorkle Litigation Services, Inc.
Chicago, Illinois (312) 263-0052

1 conditions or maladies or limitations that the
2 psychologist said that he had. I think that the
3 confession, when all was said and done, was
4 pretty unremarkable. And so the thrust of the
5 psychologist's testimony was more along the
6 lines of a focus on vulnerability along with the
7 broad pronouncements that sort of characterized
8 the -- you know, the pat kind of coterie
9 reformulated from one examination. They tend to
10 say the same thing.
11    Q.  Did you examine Mr. Grigoroff?
12    A.  I did.
13    Q.  Okay.  These other cases on your list,
14 some of these are -- I mean, they're described
15 in different ways.  Are a number of these about
16 depravity?
17    A.  None of them.
18    Q.  None of them?
19    A.  None.
20    Q.  You haven't testified in any --
21    A.  I've not -- I've not testified on
22 depravity.  I've not approved it.  We published
23 the data this year.  And now I might be more, at
24 least, considerate of a request that comes up

149

1 depending on it.  But I've turned down every
2 request or invitation to testify about depravity
3 because I wanted the research to be completed to
4 a degree that -- at least that it has.
5    Q.  And are you now prepared to testify
6 on -- as a hypothetical matter if an appropriate
7 case were to present itself on the issue of
8 whether the subject was or was not depraved?
9    A.  I think it really depends on the nature
10 of the question.  I want to stick with what
11 we've published already, and if it relates
12 directly to the substance of those three
13 articles, then I'm much more likely to consider
14 it.  But there are other articles that we have
15 in preparation, a couple of manuscripts in
16 preparation on the same topic.  So if it
17 ventures into an area that we've not yet
18 published about, I'm going to stay away from
19 that.
20    Q.  Got it.
21        There are a number of these cases, and
22 they're off topic, and I don't want to spend a
23 lot of time on them, Doctor.  So I would
24 appreciate just a succinct answer to the extent

150

1 it's possible for you to do it.
2    A.  Sure.
3    Q.  The criminal sentencing, criminal
4 responsibility, future dangerousness cases,
5 these are all criminal matters?
6    A.  Yes.
7    Q.  And they're listed in the -- in
8 Exhibit 11?
9    A.  Yes.
10    Q.  Are these death penalty cases?
11    A.  Some were; some weren't.
12    Q.  Can you identify the death penalty
13 cases?
14    A.  Rubio is a death penalty case.  Clark,
15 Carley, and Brown were the same -- they were
16 three of a -- actually, and Edge, those four
17 were four death penalty defendants, same case.
18 Montgomery was a death penalty case.  Sampson is
19 a death penalty case.  And Renfro is a death
20 penalty case.
21    Q.  In the death penalty cases that you've
22 just identified, have you testified in support
23 of the death penalty for the defendant?
24    A.  That's not the nature of my testimony.

151

1 I'm not there to testify for the death penalty.
2    Q.  Have you been called by the
3 prosecution?
4    A.  I have.
5    Q.  And you understood when you took the
6 witness stand that the prosecution was seeking
7 death in the case?
8    A.  Sure.
9    Q.  And have --
10    A.  I would not have been able to testify
11 even as a defense witness unless I understood
12 that was a potential possibility.
13    Q.  Right.
14        And of those individuals that you
15 listed, had you personally examined all of them?
16    A.  I don't think that I examined -- I
17 don't think that I examined the Angola -- the
18 Angola defendants, the four from Louisiana.  I
19 don't think I examined any of them.
20    Q.  That's ST. Francisville, Louisiana?
21    A.  That's correct.
22        I certainly examined Montgomery;
23 Sampson, sure; Renfro, yeah.  So yeah.  I
24 examined, with the exception of the -- of the

152



1 St. Francisville defendants, I examined all the
2 other ones.
3    Q.  To your knowledge, did the prosecution
4 need to obtain a court order to enable you to
5 examine those death penalty defendants --
6    A.  It was a similar situation to yours.
7 The attorney simply refused access, and the --
8 and whether the Court officially took it up and
9 acceded to that request -- I think in that case,
10 it may well have happened -- or whether the case
11 proceeded from there.  It may just have been
12 with the first case, that the Court turned it
13 down; and with successive cases, the request was
14 made and then turned down and, you know, didn't
15 amount to a court proceeding because it was the
16 same judge presiding over the entire case.  But
17 that was -- In that instance, as I recall on a
18 -- on -- on a particular issue, which was the
19 same for all of four defendants, and the Court
20 did not feel that an examination could be
21 mandated.
22    Q.  My question was unclear, and I
23 apologize for that.  In those cases in which you
24 did conduct an examination of a death row -- of

153

1 a death penalty defendant, was it necessary for
2 the prosecution to obtain an order of court, if
3 you know, to enable you to conduct the
4 examination?
5    A.  Sure.  Absolutely.  But it was easy to
6 do so, and it was expected that the Court would
7 approve.
8        MS. ITCHHAPORIA:  Locke, whenever
9 you're ready, a good stopping point, if we can
10 take a quick lunch break 20, 25 minutes.
11        MR. BOWMAN:  Why don't we do that.
12        THE VIDEOGRAPHER:  We are going off the
13 record at 1:41.  This is the end of Disk No. 2.
14            (Whereupon, a short break was
15            taken.)
16        THE VIDEOGRAPHER:  We are going back on
17 the record at 2:25.  This is the beginning of
18 Disk No. 3.
19 BY MR. BOWMAN:
20    Q.  I want to begin our afternoon together,
21 Dr. Welner, with a couple of questions I think
22 are not controversial.
23        If Mr. Taylor in this particular case
24 was actually in police custody at the time that

154

1 Jeffrey Lassiter and Sharon Haugabook were
2 murdered, you would agree with me that his
3 confession to the murder therefore must
4 necessarily be false, right?
5    A.  That's correct.
6    Q.  And that would actually constitute a
7 proven false confession if that could be
8 ascertained, right?
9    A.  Yes.
10    Q.  He would be physically located
11 somewhere else; we would know to a moral
12 certainty he couldn't have committed the crime.
13    A.  Correct.
14    Q.  So if you would look at page 29 of your
15 report, at the bottom, you say that there are
16 two possible explanations for his confession,
17 right?
18    A.  Yeah.
19    Q.  One of them is that he was not involved
20 and that the confession is false, as we've just
21 discussed, because he was elsewhere, right?
22    A.  Mm-hmm.
23    Q.  Yes?
24    A.  Yes.

155

1    Q.  And the other is that, and I'll read
2 this: "Daniel Taylor was involved in the
3 Lassiter and Haugabook shootings in a manner
4 that entailed his leaving custody and returning
5 to Agatite and Hazel in time to enter the
6 apartment building and [take] part in the attack
7 at [around] 8:43 p.m.," right?
8    A.  Correct, shortly before.
9    Q.  Other than those two possibilities, are
10 you aware of any other possibilities?
11        MS. ITCHHAPORIA:  Wait just a second.
12 I'm just going to object to the slight
13 misreading of it.  But that's fine.  You said
14 "around"; it's "before."
15 BY MR. BOWMAN:
16    Q.  Oh.  Slightly before 8:43.  Right.
17    A.  I mean, one could come up with some
18 other variation; but I think fundamentally,
19 those are really the two potential explanations.
20    Q.  Okay.  You're saying those are the two
21 that are fundamentally in play?
22    A.  Yeah.  Either -- Either he confessed
23 falsely; or he did not, and there are certain
24 elements that just don't add up, but he was

156



Michael Welner, M.D. 05/17/2018

157

1 involved. Either he wasn't involved or he was.
2     Q. Right. Now, are you in -- in this case
3 offering an opinion as to whether Daniel Taylor
4 was or was not in custody?
5     A. Oh, I -- In my professional opinion, he
6 was in custody. The question is when he left
7 custody.
8     Q. Are you offering an opinion as to
9 whether he was or was not in custody at the time
10 of the murders?
11     A. No, I'm not.
12     Q. So you're not in a position to defend
13 or to refute the lockup records from the 23rd District
14 Chicago Police station at the time which on
15 their face reflect that he's in custody?
16     A. I'm in a position to defend or refute
17 because I have to look at the records and
18 consider them. And what I ultimately wrote in
19 my report was there's evidence that -- that
20 supports him being locked up for an extended
21 period, and there's evidence that -- that puts
22 him at different times. So it's just both of
23 these -- Both aspects of evidence coexist in the
24 case.

158

1     Q. Right. And my point is, and I assume
2 this is noncontroversial, from a scientific
3 perspective, you can't resolve the question?
4     A. No. But that's actually from a
5 scientific perspective, it's important. It's
6 important scientifically to say you can't
7 resolve it.
8     Q. Right.
9     A. Which is very different from saying,
10 "I'm not involved." It's an -- It's
11 irresolvable question for which there's a lot of
12 evidence that's available, but nothing that can
13 tip it into scientific certainty.
14     Q. Right. And to be clear, you are not an
15 expert in differentiating guilty from innocent
16 accused people, right?
17     A. No. And what I refer to, just to make
18 clear, the -- when I referred before to Andrews
19 as guilty, that was because independent of my
20 evaluation, there was just very compelling
21 evidence of his guilt independent of the
22 assessment of his confession.
23     Q. In this case, you are not attempting to
24 differentiate between Taylor's possible guilt or

159

1 possible innocence?
2     A. No. But I was obliged to look at the
3 evidence and to consider the basis for -- for
4 where such a false confession claim arises,
5 because I have to base my opinion not on a
6 hypothetical of if, then. Because if there's no
7 chance that a person could possibly have
8 confessed, then it becomes a moot issue. But in
9 this case, yeah, there's a possibility that this
10 is a false confession. And it just can't be
11 resolved by the available data one way or the
12 other.
13     Q. Right. Let me ask you whether this is
14 a true statement or not: Differentiating
15 between guilty and innocent defendants is
16 obviously well beyond the ken of what anyone's
17 been trained to do. It's a judge's
18 responsibility; it's a jury's responsibility.
19     A. Sure.
20     Q. That's true, right?
21     A. That's my opinion.
22     Q. Are you aware that -- You surely are
23 aware that Daniel Taylor has been awarded a
24 Certificate of Innocence, right?

160

1     A. Yes.
2     Q. You refer to it in your report?
3     A. Yes.
4     Q. Have you reviewed the Certificate of
5 Innocence?
6     A. I may have; I may not have.
7     Q. I didn't see it in the list of
8 materials that you --
9     A. Then I probably didn't review it.
10     Q. I didn't see it in the list of
11 materials that you provided at the beginning of
12 your report. Could you review that list and
13 determine for me whether you have examined
14 Mr. Taylor's Certificate of Innocence?
15     A. What's the date on it?
16     Q. It is January 23, 2014.
17         (Whereupon, Welner Deposition
18         Exhibit No. 13 was marked for
19         identification.)
20     THE WITNESS: I may well have reviewed
21 it but have not included it in this -- in this
22 inventory of records. I don't remember having
23 reviewed it, but I think, as you have identified
24 from the billing records, I worked on this case



McCorkle Litigation Services, Inc.
Chicago, Illinois (312) 263-0052

Michael Welner, M.D. 05/17/2018

1  in spurts spanning a few years. I certainly
2  didn't review it just prior to releasing my
3  report earlier this year. I may have reviewed
4  it at a very early stage of the case.
5      Q. I'll hand you what I'm marking for
6  identification as Exhibit 13, which is an order
7  granting Certificate of Innocence to Daniel
8  Taylor, correct?
9      A. Yes.
10     Q. Does examining that order assist you in
11 recalling whether this is something you saw in
12 connection with this case?
13     A. I can't remember.
14     Q. Do you know who Paul Biebel is?
15     A. The judge.
16     Q. Do you know anything about Judge
17 Biebel?
18     A. No.
19     Q. Do you know what his responsibilities
20 were in January of 2014, what his judicial
21 assignment was?
22     A. I don't -- I don't -- I don't know, and
23 it's not typically something that I get involved
24 in. Not my expertise.

161

1      Q. Do you know whether -- what level of
2  experience he had as a judge, how long he had
3  been a judge in 2014?
4      A. I don't know.
5      Q. Do you know whether he was
6  well-regarded by practitioners in the legal
7  community and by other judges?
8      A. I don't know. But I can tell you that
9  I've -- I've practiced for 26 years and have
10 been in front of many courts. And I've -- My
11 impression of reputation among judges is that
12 it's kind of like a car ad: Your actual results
13 may vary. The way I formulate opinions about
14 judges is just based on my own experiences and
15 observations as opposed to what people say. You
16 know, naturally one side is going to feel one
17 way about someone's reputation, and another side
18 may feel different according to their general
19 feeling about a particular opinion, especially
20 in an emotional case. But the way I react to
21 that kind of thing is really more just what
22 experience have I had and what have I seen with
23 my own eyes. People talk about all kinds of
24 stuff.

162

1      Q. Right. So the answer to my question is
2  no, you don't know?
3      A. No. I don't know.
4      Q. What can you tell me based on your
5  review of the records about the process that led
6  to Mr. Taylor receiving a Certificate of
7  Innocence?
8          MS. ITCHHAPORIA: Objection: Form;
9  foundation.
10         THE WITNESS: Well, his conviction was
11 vacated, and -- and his attorney sought a
12 Certificate of Innocence, and the State did not
13 oppose it.
14 BY MR. BOWMAN:
15     Q. And what do you know about the
16 decisionmaking process within the Cook County
17 State's Attorney's Office not to oppose the
18 Certificate of Innocence?
19         MS. ITCHHAPORIA: Same objection.
20         THE WITNESS: I don't know. I don't
21 know anything about it, just -- just the only
22 thing that I would say is that based on my own
23 experience as a forensic psychiatrist in highly
24 sensitive cases, the decisions that are made at

163

1  the political level are completely disconnected
2  from the practitioner lev- -- no, are sometimes
3  disconnected to varying degrees from what's
4  happening at the practitioner level.
5  BY MR. BOWMAN:
6      Q. Are you saying that happened here?
7      A. I don't know. I'm saying I don't know.
8  But what I am saying is experience has taught me
9  that sometimes they may be responsive to
10 considerations that are wholly independent of
11 the substance of the matter.
12     Q. Sometimes?
13     A. Sometimes. You just don't know unless
14 you're -- you've fully inhabited a case.
15     Q. Is it your opinion that the decision
16 not to oppose Daniel Taylor's Certificate of
17 Innocence was a political decision?
18         MS. ITCHHAPORIA: Objection: Form;
19 foundation; beyond the scope.
20         THE WITNESS: I don't know.
21 BY MR. BOWMAN:
22     Q. You wouldn't have any basis to say such
23 a thing; is that correct?
24     A. I don't know -- I don't know enough

164

Pages 161 to 164



Michael Welner, M.D. 05/17/2018

1 about the case. I'm not privy to it, and so I
2 -- I just wouldn't know.
3 **Q. Do you have --**
4 A. I'm sorry. Let me just clarify. Once
5 in a while, I'll have enough proximity and
6 exposure to that within a case. But that was
7 not the case here.
8 **Q. Understood. Thank you.**
9 **Do you have any reason to -- to**
10 **dispute, to weigh in against the proposition**
11 **that the state's attorney's office elected not**
12 **to contest Mr. Taylor's Certificate of Innocence**
13 **based on a considered evaluation of the evidence**
14 **and a determination that the certificate was --**
15 **would be fairly awarded in this case?**
16 MS. ITCHHAPORIA: Objection: Form;
17 foundation.
18 THE WITNESS: I don't know the entirety
19 of their considerations and what -- what
20 considerations they document and what
21 considerations they don't document but they're
22 clearly thinking about. And so that's -- They
23 have many different kinds of things to weigh as
24 a matter of their responsibility, and I respect

165

1 vulnerability or interrogation conduct of the
2 detectives, or is the evidence derived from
3 elsewhere.
4 BY MR. BOWMAN:
5 **Q. Well, let me ask you -- Let me ask you**
6 **this: On page 31 of your report, there's a**
7 **paragraph that follows a lengthy quotation from**
8 **the deposition testimony --**
9 A. Yes.
10 **Q. -- of Akia Phillips. And**
11 **Mr. Phillips's testimony is memorable because he**
12 **loses his composure and is threatening to leave**
13 **the deposition room, right?**
14 A. Well, that's one of the reasons it's
15 memorable.
16 **Q. Right. I was trying to be neutral.**
17 **You characterize it as an indication**
18 **that Mr. Phillips is reluctant to testify**
19 **because the Vice Lords have been threatening**
20 **him, right?**
21 MS. ITCHHAPORIA: Objection: Form;
22 misstates the record.
23 Go ahead.
24

167

1 it. They just walk in a different set of shoes.
2 So I don't have an opinion.
3 BY MR. BOWMAN:
4 **Q. So we don't have the time today to go**
5 **through the details. But as I read pages 29**
6 **through 38 of your report, it appears to me that**
7 **you're making some observations about the**
8 **likelihood that Mr. Taylor is guilty. Is that a**
9 **fair characterization?**
10 A. No.
11 MS. ITCHHAPORIA: Objection: Form.
12 BY MR. BOWMAN:
13 **Q. What would you say that you're doing in**
14 **terms of your process in those pages of your**
15 **report?**
16 MS. ITCHHAPORIA: Object to the form.
17 THE WITNESS: I really need for you to
18 drill down on something specific, and then I can
19 tell you how it relates to the question.
20 Because the question there is what is the basis
21 for
22 asserting -- what is the basis -- what is the
23 basis of asserting Mr. Taylor's confession is
24 false; is there data that reflects upon the

166

1 BY MR. BOWMAN:
2 **Q. Well, you, you can clear it up for me if**
3 **I've misstated it --**
4 A. No. I think that's -- I don't think
5 you've misstated it.
6 **Q. Right.**
7 A. I think he's very afraid of the Vice
8 Lords, and he experiences himself as having been
9 intimidated. And that speaks to the level of
10 agitation of his -- of his reaction even as he
11 doesn't dispute saying what he said.
12 **Q. Okay. Now, do you plan in this case to**
13 **offer an expert opinion that Akia Phillips was**
14 **under threat by the Vice Lords, and that is the**
15 **reason for his behavior in his deposition?**
16 A. It depends what Dr. Leo testifies to.
17 I'm a rebuttal witness. If Dr. Leo -- You know,
18 there is -- There is a universe of disputed
19 confession science that if Dr. Leo just stuck
20 with that, there would probably be very little
21 variance between my and his opinion on this
22 case. So by virtue of the indulgence with which
23 he takes his opinions, I don't know what he's
24 going to say. I think that it's pertinent to

168



Michael Welner, M.D. 05/17/2018

1 point out that there are multiple people in this
2 case who demonstrated how they act when they
3 feel intimidated, and that the -- and that the
4 -- the threat within the gang of the influence
5 of the gang is real, and that it's something
6 that one has to take into account among all
7 considerations when it comes to
8 self-incriminating statements that people made,
9 as opposed to just exclusively focusing on
10 assertions about the police, which may or may
11 not be founded.
12      This is a deposition and a transcript
13 in a record which nobody disputes exists and
14 that coexists within the case with records that
15 are -- that police say that they handled
16 Mr. Taylor unremarkably. And Mr. Taylor has
17 given varying accounts of being physically
18 attacked and otherwise intimidated. So the idea
19 of Mr. Taylor making these comments in a
20 backdrop of him acknowledging that he's been --
21 that he's had anywhere from five to ten
22 beatdowns, and other people who have had
23 associations with the gang -- and again, beyond
24 my report, other testimony that exists in this

169

1 other aspects of when people demonstrate in
2 their behavior, in their comportment, in their
3 manner, in their communication that they are
4 indeed responding to some sense in themselves of
5 a threat, and Akia Phillips being one of those
6 people.
7      So if the subject comes up about the
8 nature of reacting to a threat or something like
9 that, then I'm going to base my answer on the
10 available evidence and data and how I would have
11 interpreted it.
12 BY MR. BOWMAN:
13      **Q. Okay. Based on what research or
14 published scientific analysis are you intending
15 to base your opinion that Akia Phillips was
16 under threat by the Vice Lords at the time of
17 his deposition?**
18      A. I didn't say that. What I said is
19 based on my expertise as a behavioral scientist
20 where I have to review transcripts and evaluate
21 behavior and to assess whether someone is
22 demonstrating signs of fear as -- and whether
23 someone demonstrates an acute change in their
24 mental status and change in their behavior,

171

1 case -- I think that the notion of what -- what
2 is intimidation and how it reflects through the
3 evidence of this case in undisputed ways becomes
4 more pertinent.
5      **Q. Let me ask it this way. Do you -- And
6 if you could do this yes or no, I would
7 appreciate it. Do you believe that you have the
8 scientific ability to testify in this case if
9 you're called upon to do so that Akia Phillips
10 was under threat by the Vice Lords at the time
11 of his deposition? I'm hopeful you might answer
12 that yes or no if you're able to do so.**
13      A. Well --
14      MS. ITCHHAPORIA: Objection to the
15 form.
16      Sorry. Wait just a second. Objection
17 to the form and to the preamble before it.
18      But go ahead.
19      THE WITNESS: The evidence reflects
20 that he was admonished by someone representing a
21 Vice Lord, and the evidence reflects in the
22 totality of his deposition and how he responded
23 that he became highly animated and agitated on
24 this particular issue. And that coexists with

170

1 which is something certainly distinctive to --
2 and familiar to one's clinical responsibilities,
3 I can speak to that.
4      Whether -- Whether I would -- Whether I
5 would say that they made an active threat to him
6 before the deposition, no. That's not what he
7 said. What he did say was that he was contacted
8 and that he was admonished after his remarks in
9 the affidavit became known.
10      **Q. Who contacted him, sir?**
11      A. Pardon?
12      **Q. Who contacted him?**
13      A. I made reference to it in my report.
14 If you just give me a moment or refer me to the
15 page.
16      **Q. I'm not going to be able to help you
17 with where in your report it says that
18 Mr. Phillips was admonished and contacted by the
19 Vice Lords. I'm sorry.**
20      A. All right. I'll find it, then.
21      Okay. I would refer you to page 67.
22 "In Akia Phillips's deposition, he noted that
23 after he wrote his 2014 affidavit, Paul
24 Phillips's attorney contacted him and told Akia

172



Michael Welner, M.D. 05/17/2018

1  that he was, quote, ruining Paul's case, closed
2  quote; and, quote, not to talk to anyone else."
3      Q.  Is it your information that Paul
4  Phillips's attorney is a member of the Vice
5  Lords?
6      A.  No.  It's my impression that he was
7  representing someone who was part of the Vice
8  Lords, who is in a case with other Vice Lords,
9  and who had a vested interest.
10     I mean, Akia Phillips --
11     Q.  Who was Paul Phillips's attorney?
12 Somebody you know?
13     MS. ITCHHAPORIA:  Wait.
14     THE WITNESS:  I'm answering your
15 question.
16     Akia Phillips -- Akia Phillips's
17 remarks affect everybody's case, including
18 Daniel Taylor's, including Deon Patrick,
19 everybody.
20 BY MR. BOWMAN:
21     Q.  Are you saying that Akia Phillips's
22 attorney is an agent of the Vice Lords who was
23 communicating threats to Akia Phillips; yes or
24 no?

173

1      MS. ITCHHAPORIA:  Objection:  Asked and
2  answered.
3      THE WITNESS:  I want the question
4  before it.
5          (Whereupon, the record was read
6           as requested.)
7      THE WITNESS:  So my answer is yes.
8  He's their attorney.
9      And then the next question was.
10     MR. BOWMAN:  What's the answer before?
11     THE COURT REPORTER:  It was all kind
12 of -- everybody was talking together.
13     MR. BOWMAN:  Oh, you didn't get it.
14 Okay.
15 BY MR. BOWMAN:
16     Q.  So your position is that Paul
17 Phillips's attorney is an agent of the Vice
18 Lords?
19     A.  He's representing them.
20     Q.  Okay.
21     A.  Whether he's an agent of them, he's --
22 he is representing them and communicating their
23 interests to another person.
24     Q.  Okay.  And other than the fact that

175

1      A.  No.
2      Q.  Okay.
3      A.  What I'm saying --
4      MS. ITCHHAPORIA:  Locke, I'm going to
5  object to you continuing to interrupt him.
6  BY MR. BOWMAN:
7      Q.  If that's not the case, what is the
8  basis for you to say that Akia Phillips was --
9  was threatened by the Vice Lords?
10     MS. ITCHHAPORIA:  Well, I'm going to
11 object to the continuous and repeated
12 interrupting of
13 Dr. Welner when he's testifying.  So please stop
14 doing it.
15     MR. BOWMAN:  I'm going to object to the
16 repeated nonresponsive answers that are beyond
17 frustrating, honestly.
18     There's a question pending.  Why don't
19 you read it, Tracy --
20     THE WITNESS:  And the question was --
21     MS. ITCHHAPORIA:  She's going to read
22 the question.
23          (Whereupon, the record was read
24           as requested.)

174

1  Paul Phillips's attorney represents Paul
2  Phillips, what is the basis for you to testify
3  under oath that Paul Phillips's attorney is an
4  agent of the Vice Lords?
5      MS. ITCHHAPORIA:  Objection --
6  BY MR. BOWMAN:
7      Q.  Anything else?
8      MS. ITCHHAPORIA:  Objection:  Form;
9  foundation; calls for a legal conclusion.
10     THE WITNESS:  My testimony is this,
11 which I'll repeat.
12 BY MR. BOWMAN:
13     Q.  My question is --
14     A.  I'm trying to answer your question.
15     Q.  -- not asking you to repeat your
16 testimony.
17     MS. ITCHHAPORIA:  Locke, you did it
18 again.
19 BY MR. BOWMAN:
20     Q.  My question is asking you to state what
21 basis you have for saying under oath in this
22 deposition that Paul Phillips's attorney is an
23 agent of the Vice Lords street gang other than
24 the fact that he represents Paul Phillips?

176



Michael Welner, M.D. 05/17/2018

1    MS. ITCHHAPORIA: Objection.
2  BY MR. BOWMAN:
3    **Q. If you can do that, please answer the**
4  **question.**
5    MS. ITCHHAPORIA: Locke, you're doing
6  it again. This is, like, the hundredth time
7  now.
8    MR. BOWMAN: He hasn't said a thing.
9  I'm not interrupting.
10   THE WITNESS: I'm answering your
11 question. I'm answering your question.
12   MS. ITCHHAPORIA: You know that's
13 unacceptable at a deposition.
14   Hold on, Dr. Welner.
15   You know that's unacceptable at a
16 deposition to interrupt the witness. Please
17 stop doing that. If you do it again, I'm going
18 to have to, like, suspend the deposition,
19 because you're doing it constantly. It's got to
20 stop. You don't like the response, that's too
21 bad.
22   THE WITNESS: Yeah. Okay. Let me make
23 something clear. I'm not calling him an agent.
24 That's your word. I'm not calling him a member

177

1  of the gang. That's your word. I'm not calling
2  him a Vice Lord. That's your characterization.
3  What I'm saying is he is representing a Vice
4  Lord who has a common interest with other Vice
5  Lords who collectively would be severely damaged
6  by what -- if not obliterated by the credence of
7  Akia Phillips, of all people, of all people,
8  essentially not only denoting that Taylor was
9  there but that Faye McCoy lied to police to
10 protect them.
11   It is a devastating impact on all of
12 their cases. Just a moment. So the idea that
13 Paul Phillips's representative conveys that to
14 him doesn't disambiguate him from the interests
15 of other Vice Lords. That's all I'm saying.
16 BY MR. BOWMAN:
17   **Q. So are you --**
18   A. I'm not saying -- I'm only saying that
19 he conveyed the impact and the significance,
20 that Akia Phillips registered it, and that I
21 found it to be consistent with the change in his
22 temperament and his comportment when that arose
23 in his deposition.
24   **Q. Okay. So you're now withdrawing any**

178

1  **testimony that you might previously have given**
2  **to the effect that Paul Phillips's attorney was**
3  **an agent of the Vice Lords?**
4    MS. ITCHHAPORIA: Objection to form;
5  mischaracterizes testimony, and calls for a
6  legal conclusion.
7    THE WITNESS: You can withdraw your own
8  mischaracterizations of my testimony. What I
9  said was very consistent. He is his attorney.
10 He is his representative. If you want to use
11 the word "agent," that's your word. He is a
12 representative contacting him on behalf of his
13 client. That's all I communicated.
14 BY MR. BOWMAN:
15   **Q. Okay. That's fine.**
16   **So other than that, what basis do you**
17 **have to say that the Vice Lords are threatening**
18 **Akia Phillips?**
19   A. I didn't say that.
20   **Q. You're not saying that the Vice Lords**
21 **are threatening Akia Phillips?**
22   A. I've said only what I said in the
23 report. That's all I said.
24   **Q. Right. So let's read what you said in**

179

1  **the report so we all have it in front of us.**
2    Referring to the excerpted deposition,
3  **you state as follows: "The above exchange in**
4  **the deposition transcript demonstrates that the**
5  **Vice Lords have been dealing with Mr. Phillips**
6  **in a manner that reflects how people actually do**
7  **communicate when they are threatened and**
8  **terrified."**
9    **So is it your scientific opinion that**
10 **the Vice Lords have been dealing with**
11 **Mr. Phillips?**
12   A. It's my -- It's my scien- -- No. It's
13 a fact that they were dealing with Mr. Phillips.
14 Or it's a representation by Mr. Phillips that
15 they have been dealing with him.
16   **Q. Okay. So Mr. Phillips --**
17   A. Telling him not to testify, not to
18 speak to what he's speaking on.
19   **Q. Do you make a distinction between the**
20 **Vice Lords and an officer of the court?**
21   A. Mr. Phillips's attorney is his
22 representative.
23   **Q. Okay. All right. What -- What body of**
24 **literature, what -- what scientific research**

180

Pages 177 to 180



Michael Welner, M.D. 05/17/2018

1  provides you with the ability to say that
2  Mr. Phillips testified as he did in the
3  deposition excerpt you quote because he was
4  under threat from the Vice Lords?  Can you cite
5  a scientific study or a principle from your area
6  of expertise?
7      A.  Okay.  It is my professional judgment
8  based on experience and training that his
9  comportment in the interview remarkably changed
10  and became highly agitated, and the
11  circumstances under which, and the subject
12  matter in which he was communicating about
13  specifically localized itself to an area in
14  which he had received communication from an
15  attorney that was tampering with his testimony.
16  Now, be that as it may, as I said to you in
17  Swift, it recalls the testimony of the noted
18  forensic scientist Henry Lee, who was asked to
19  examine a scene where someone was found dead by
20  the side of the road.  And they looked at car
21  after car after car to see who had run into him
22  at roadblock.  And eventually, he happened upon
23  a truck that had a smudge.  And he wiped the
24  smudge away.  And he saw Connecticut State

181

1      (Whereupon, the record was read
2          as requested.)
3      MS. ITCHHAPORIA:  I'll belated object
4  that it mischaracterizes his testimony.
5      THE WITNESS:  No.  No.  My clinical
6  judgment is that his comportment and his
7  behavior remarkably changed in the interview.
8  And my clinical experience is such that when a
9  person's behavior does that, and he is not
10  suffering from a psychotic disorder or something
11  that would have manifested itself earlier in the
12  experience because he's just completely off the
13  wall, that it relates to a conflict that is born
14  out of the subject matter being discussed.  And
15  that's based on clinical experience and training
16  and actually seeing live patients.
17      Q.  I see.  Anything else?
18      A.  Perhaps depends on the next question
19  you ask.
20      Q.  No.  Is there anything else on which
21  you base that opinion, sir?
22      MS. ITCHHAPORIA:  Objection:  Form.
23      THE WITNESS:  Yeah.  Since you asked, a
24  threat as it relates to the gang doesn't have to

183

1  Police on the truck.  And his interpretation was
2  based on experience and training, "I don't need
3  a research study to tell me that the truck hit
4  that State Trooper."
5      I don't need a research study to tell
6  me that his comportment in this interview, in
7  this deposition, remarkably changed on the very
8  topic of what he communicated to -- or what Faye
9  comm- -- what he communicated in his affidavit
10  about Faye McCoy.  And I cannot separate him --
11  separate that from his recollection that after
12  the fact, he happened to have been contacted by
13  an attorney representing one of the Vice Lords,
14  and yet that Vice Lord would have been affected
15  just as much as all of the Vice Lords in the
16  context of this litigation by what he said, and
17  may yet be.
18      Q.  So in other words, you're citing to the
19  Henry Lee example because this is, in your
20  judgment, just common sense.
21      A.  No.
22      MS. ITCHHAPORIA:  Can I just have that
23  read back.  I didn't hear the question.
24

182

1  be explicitly threat -- expressed.  I don't
2  think, for example, that when Scorpio showed up
3  on Faye McCoy's doorstep that her reaction was
4  that he was simply coming by to see if she
5  needed him to go shop for groceries.  And he
6  didn't need to say anything.  And the level of
7  sophistication at which people operate in which
8  they are simply reminded of what universe they
9  live in was not only manifested through Faye
10  McCoy, but it was even manifested through Lemuel
11  Hardy.  Mixon didn't do anything to Lemuel
12  Hardy.  He merely approached him.  He didn't
13  threaten him.  But his approach was such that
14  Lemuel Hardy was motivated to then go into
15  protective custody because he was that afraid.
16  And he's a convicted killer.
17      So the point that I'm making is a
18  person -- a person doesn't have to express what
19  they express in order to have an intended
20  effect.  And the effect here was that he was
21  absolutely reluctant to go beyond confirming
22  that he had had that conversation, that he had
23  given names.  But he said, "Absolutely, I will
24  not talk, even to the point that you can call

184

Pages 181 to 184



Michael Welner, M.D. 05/17/2018

1 police and arrest me." And that to me suggested
2 that he was terrified, because he said, "I would
3 rather be arrested, I would rather you call the
4 police than -- than to continue to put myself in
5 this ongoing position of whatever I imagine it
6 to be."
7 So what I'm conveying here is its
8 effect on him. I'm not conveying anything more
9 than that.
10 BY MR. BOWMAN:
11 **Q. Okay. So you are -- You are in a**
12 **position, based on your expertise as a**
13 **psychiatrist, to divine what was in Akia**
14 **Phillips's mind at the point of this testimony;**
15 **is that what you're telling us?**
16 A. I'm not -- No. That's not what I'm
17 telling you.
18 MS. ITCHHAPORIA: Objection to form;
19 foundation; mischaracterizes testimony.
20 BY MR. BOWMAN:
21 **Q. Because you're not in that position,**
22 **right?**
23 A. I'm not. I am in the sense that he's
24 very clear of what's in his mind. He's very

185

1 MS. ITCHHAPORIA: Calls for
2 speculation, and mischaracterizes prior
3 testimony, and asked and answered now.
4 THE WITNESS: I have the training and
5 expertise to review an exchange and, at times,
6 at times to arrive at an opinion with a
7 reasonable degree of certainty of what emotion
8 is being expressed in that exchange.
9 BY MR. BOWMAN:
10 **Q. Okay. So it is your opinion --**
11 A. Depends on the situation and the
12 exchange.
13 **Q. So it is your opinion to a reasonable**
14 **degree of scientific certainty that at the time**
15 **Mr. Phillips provided the deposition testimony**
16 **in question, he was afraid?**
17 A. Yes.
18 **Q. Okay. Had --**
19 A. That deposition testimony.
20 **Q. Right. That's what we're talking**
21 **about.**
22 A. Yes.
23 **Q. And you weren't there at the**
24 **deposition?**

187

1 clear. He expresses -- I'm not clear to divine
2 what he doesn't say. But I'm certainly clear to
3 divine what's in his mind based on what he says,
4 "I'd rather go to jail than sit here and talk
5 about this."
6 **Q. That's my only point. You have the**
7 **ability to review the facts as to what he said;**
8 **but you do not have the ability to divine what's**
9 **in his mind beyond what he says, right?**
10 A. I have the ability to interpret that as
11 fear. Okay? In my professional opinion, he was
12 frightened. And that's what I saw. He wasn't
13 malevolent. He was afraid. And that is my
14 professional opinion.
15 **Q. Okay. So what you're saying is that**
16 **you, as a psychiatrist, have the ability to**
17 **evaluate testimony from a witness and determine**
18 **whether when the witness gave the testimony he**
19 **was or was not afraid? Is that what you're**
20 **saying?**
21 MS. ITCHHAPORIA: Objection: Form;
22 foundation; incomplete hypothetical.
23 BY MR. BOWMAN:
24 **Q. Do you have that ability?**

186

1 A. That's correct.
2 **Q. Have you reviewed a videotape of the**
3 **deposition?**
4 A. Not yet, but --
5 **Q. Have you asked to do so?**
6 A. Not yet.
7 **Q. You've looked at the transcript?**
8 A. Yes.
9 **Q. How did Mr. Phillips appear? What was**
10 **his demeanor at that time?**
11 A. I haven't reviewed the videotape, so I
12 couldn't answer the question yet.
13 **Q. You couldn't answer that question?**
14 A. No, I cannot.
15 **Q. You couldn't -- You couldn't determine**
16 **whether he was -- Do you know if he was shaking**
17 **his fist or if he was pointing his finger, what**
18 **he was doing as he was saying any of this stuff?**
19 **Do you know?**
20 MS. ITCHHAPORIA: Objection: Form;
21 compound.
22 THE WITNESS: I didn't review the
23 videotape, so I can't answer anything more than
24 what I've conveyed.

188

Pages 185 to 188



1  BY MR. BOWMAN:
2      Q.  Okay.  You don't have any idea?
3      A.  I can't answer that question beyond
4  what I've already conveyed.
5      Q.  Let's turn to page 26.  There's a
6  paragraph that begins "Still more dramatic and
7  therefore dubious."  Do you see that?
8      A.  Yes.
9      Q.  I'm going to read the entire sentence.
10  "Still more dramatic and therefore dubious is
11  Mr. Taylor's recent recounting, including at the
12  Patrick civil trial, that Detective Killacky,
13  quote, unquote, loved beating his, quote,
14  unquote, dark skin."
15          And I read that accurately?
16      A.  Yes.
17      Q.  And is it your scientific opinion to a
18  reasonable degree of medical certainty that
19  Mr. Taylor's recent recounting of what Detective
20  Killacky said is false?
21      A.  Yes.  Actually, it's my forensic
22  science opinion based on 26 years of working in
23  legal cases, based on my understanding of his
24  psychiatric records as someone who was -- was

189

1  two months before his arrest was denoted by a
2  psychiatrist, who sees a population of all his
3  peers, as being extremely street smart.  He's
4  not going to forget that for 20 years; under the
5  circumstances of communicating with an attorney,
6  and an attorney, Mr. Berman -- I'm sorry.
7  Mr. Berman was Gardner's attorney.  And he --
8  And not only an attorney, but everybody else who
9  had contact with him, including attorneys for
10  other defendants.  That's not the kind of thing
11  that gets lost for 20 years.
12      Q.  Okay.  So as a medical doctor and a
13  scientist, you are able to determine that this
14  is a lie?
15          MS. ITCHHAPORIA:  Objection:  Form;
16  mischaracterizes testimony.
17          THE WITNESS:  I characterized it as
18  dubious.  You know, I'm not a lie detector.
19  It's just it's really dubious and farfetched.
20  But I'm not saying it with absolute.  I'm saying
21  it with a reasonable degree of medical
22  certainty.  Just as I can't say -- Just as I
23  have been very clear to say I can't say with
24  certainty whether Mr. Taylor, whether the facts

190

1  would demonstrate that Mr. Taylor was there or
2  not.  I can say that more likely than not that
3  this is a fanciful fabrication.  But I'm not
4  saying it absolutely, just more likely than not
5  based upon my professional experience and
6  training.
7  BY MR. BOWMAN:
8      Q.  You're saying that you have scientific
9  certainty, the ability to opine scientifically,
10  that Mr. Taylor's recounting of what Killacky
11  said in this sentence is false, correct?
12      A.  Yes.
13          MS. ITCHHAPORIA:  Objection:  Asked and
14  answered.
15  BY MR. BOWMAN:
16      Q.  And on what literature or studies are
17  you relying for this assertion?
18      A.  Malingering literature encompasses a
19  variety of different subtopics, and one of which
20  is the individual that makes absurd
21  characterizations.  And the characterization
22  that he just conjured this up 20 years after the
23  fact and it occurred to him that this is
24  something that Killacky said is an absurd

191

1  representation.
2      Q.  Do you deem that to be common sense?
3      A.  No.  It's absurd.  It's absurd to me.
4      Q.  Is it obvious that it's --
5      A.  It's obvious to me as a forensic
6  scientist working in cases, working in cases
7  with urban defendants in a sensitive environment
8  with a variety of attorneys who are very keyed
9  up to make sure that they underscore any aspect
10  of abuse for many years with many different
11  people trying to assist his case, who goes
12  through appeals, who's had a number of different
13  interviews with a variety of people, who was
14  characterized in earlier evaluations,
15  psychiatric evaluation, as extremely street
16  smart, the totality of circumstances is such
17  that the extremely street smart is an extension
18  of him coming up with this 20 years later.
19      Q.  Should it be obvious to anyone that
20  this is a recent fabrication?
21      A.  No.  Because if -- It should be -- It
22  should be -- There are people who may choose to
23  take it at face value and who, either by virtue
24  of their lack of experience or lack of

192



Michael Welner, M.D. 05/17/2018

1 consideration of the totality of issue, just
2 basically takes -- take what he has to say at
3 face value, including, for example, when he
4 perjures himself. So those individuals, not in
5 accordance with accepted forensic science
6 practice, don't reconcile those inconsistencies.
7 There are certain things and
8 representations that he makes that are
9 ambiguous. And I don't know, and I don't know
10 what to make of them. But I think that based on
11 the totality of information available to me,
12 that's a statement that I can -- that I can say
13 my -- I find to be dubious. That's the --
14 That's the -- That's how I characterize it. In
15 my professional opinion, it's dubious.
16 **Q. Okay. Let's look on page 27. You**
17 **write a little beyond the middle of the page,**
18 **the beginning of the paragraph, "The proposition**
19 **that Mr. Taylor confessed to avoid the prospect**
20 **of being beaten is therefore not credible."**
21 A. Can you just direct me to the --
22 **Q. If you look about five paragraphs down.**
23 A. One, two, three, four, five.
24 **Q. Do you see the words "The proposition"?**

193

1 A. Yes.
2 **Q. I'll read it again so you have it in**
3 **mind. "The proposition that Mr. Taylor**
4 **confessed to avoid the prospect of being beaten**
5 **is therefore not credible."**
6 A. Correct.
7 **Q. Okay. So you're making a credibility**
8 **determination?**
9 A. I'm saying the proposition --
10 MS. ITCHHAPORIA: Object to form.
11 THE WITNESS: I'm making that
12 proposition as a credibility determination of
13 your expert witness. I think that in terms of
14 Mr. Taylor's representations, he's made a
15 variety of different representations. And I
16 think that's kind of the challenge that he's
17 a bit all over the place. And so he's also
18 asserted that he was promised that he could go.
19 I mean, he's made a number of different things.
20 What I have said is that the idea that
21 he had some kind of fear of the police by virtue
22 of the totality of information about his
23 background and his -- and his behavior and how
24 he related to others and how he related to

194

1 authority, the oppositional nature in which he
2 consistently related to authority, so much so
3 that he got a diagnosis of oppositional defiance
4 disorder, his inclination to engage in physical
5 fighting, which is exactly why he got locked up
6 in the first place, and it wasn't even his
7 fight. He took on someone else's fight. The
8 idea that somebody hitting him with a flashlight
9 and that causing a false confession, what,
10 because he's afraid to get hit by a flashlight
11 again? It's not compatible with the available
12 documentation. And the only way someone can
13 make it compatible is if they ignore his
14 personal documented history.
15 BY MR. BOWMAN:
16 **Q. Mr. Taylor has stated that he confessed**
17 **to avoid the prospect of being beaten, right?**
18 A. That's one of the things he said.
19 **Q. That's all I'm asking. That's**
20 **something he said, right?**
21 A. Yes.
22 **Q. Okay. And you are determining that**
23 **that assertion by Mr. Taylor is not credible,**
24 **right?**

195

1 MS. ITCHHAPORIA: Objection: Form;
2 mischaracterizes testimony.
3 BY MR. BOWMAN:
4 **Q. That's what you just said?**
5 A. It's not my -- It's not my
6 determination; it's my analysis.
7 **Q. You can't make the determination**
8 **whether it's a truthful or untruthful assertion,**
9 **right?**
10 MS. ITCHHAPORIA: Same objection, and
11 form.
12 BY MR. BOWMAN:
13 **Q. You understand that you're not here to**
14 **opine on the credibility of other witnesses,**
15 **right?**
16 A. No. What I'm opining on is the
17 likelihood, in the context of this very
18 question, of if -- hang on just a moment -- of
19 how he came to self-incriminate. And I
20 considered all the various possibilities, and I
21 considered what would be more likely, in my
22 opinion, and what would be less likely, in my
23 opinion.
24 **Q. Do you regret your choice of the word**

196

Pages 193 to 196



McCorkle Litigation Services, Inc.
Chicago, Illinois (312) 263-0052

Michael Welner, M.D. 05/17/2018

1  "credible," or do you think that was the right
2  word to use in this sentence?
3      MS. ITCHHAPORIA:  Objection:  Form.
4      THE WITNESS:  I could -- I could dance
5  around and come up with similes like Dr. Ofshe
6  and
7  Dr. Leo do where they say, "I'm not really going
8  to talk about credibility, but I'm going to
9  spend the next two pages talking about
10  credibility."  All right?  So I could be
11  disingenuous about what I'm doing.  But what I'm
12  saying is that we -- we invariably have to make
13  assessments about evidence that we're working
14  with and to say okay, what evidence am I
15  considering, how am I going to weigh it based on
16  evidence, and what am I going to value and why.
17  For example, Dr. Leo made the assertion, whether
18  he used the word "credible" or not, he said
19  substantively the same thing:  Well, their
20  account was robust.  And the detectives' account
21  was sparse.  Okay.  He has an opinion.  I don't
22  agree with that, but that's his representation
23  of how he chose to apply credibility based on
24  verbiage, how much verbiage versus how little

197

1  truthful when he says that he was beaten into
2  confessing, right?
3      A.  I'm not so sure that I agree with that.
4      Q.  So you think you can do that?
5      A.  I think that it's a fairly incredible
6  statement based on his history.  But I can't --
7  I can't say that as an absolute truth.
8      Q.  Okay.  Can you --
9      A.  I think based on his history of --
10  based on his history of regular physical combat
11  that
12  is -- and beatings that in part of their own
13  ritual are designed to toughen him up, and the
14  positions that he was put in to confront and
15  physically be involved with people who could be
16  armed, who are just completely ambiguous, and
17  the persistence of his aggression as documented
18  all the way through numerous records, again, the
19  idea of his confessing in less than 20 minutes
20  of interrogation because he got punched once or
21  twice and got hit by a flashlight is, by virtue
22  of the available evidence to me as a forensic
23  psychiatrist, it's not credible.  And yes, I can
24  say that and am prepared to say that.

199

1  verbiage.
2      I'm merely saying if he offered a
3  self-incriminating statement, be it true or
4  false, this is what I think the evidence
5  supports, and this is what I think the evidence
6  does not support.
7      Is it more artful?  Would you -- Would
8  you -- Would I be willing to change the
9  characterization of that for trial to say the
10  evidence is far more supportive of -- of his
11  being confronted with others offering
12  self-incriminating statements than the notion
13  that he was afraid of being assaulted?  Sure.
14  That's fine.  I mean, I don't have -- I'm not
15  wedded to the semantics of this.  And I'm happy
16  to characterize it that way.  But I have to look
17  at all the evidence and decide what am I going
18  to rely on, and be prepared to explain it.  And
19  this just certainly serves -- This just serves
20  to explain the basis for my analysis.
21  BY MR. BOWMAN:
22      Q.  You will agree with me, therefore, that
23  you are not in a position to testify in this
24  trial whether Mr. Taylor is or is not being

198

1      Q.  What was Mr. Taylor's reaction by his
2  report in the interrogation room in response to
3  the beating?  What did he do?
4      A.  He offered a self-incriminating
5  statement.
6      Q.  Are you aware --
7      A.  And then he went out to -- And then he
8  went out to show them where the gun was.
9      Q.  Are you aware of anything else that he
10  did in response to the beating.
11      MS. ITCHHAPORIA:  I'm sorry.  I'm going
12  to need that question back.  I didn't hear it at
13  all.
14      (Whereupon, the record was read
15      as requested.)
16      MS. ITCHHAPORIA:  Objection:  Form;
17  vague as to time frame.
18      THE WITNESS:  I think in one of his
19  statements, he said that he challenged the
20  detective to uncuff him, and then he would --
21  they could have a fair fight.
22  BY MR. BOWMAN:
23      Q.  And what else did he say?
24      A.  You would have to direct me to it, but

200



Michael Welner, M.D. 05/17/2018

1  I don't immediately recall.
2    Q.  Okay.
3    A.  He probably used some profanity in his
4  statement.
5    Q.  Do you view that to be consistent with
6  his background?
7    A.  What, to use profanity?
8    Q.  Yeah.
9    A.  He used profanity.
10   Q.  And to demand a fair fight, do you view
11 that as consistent with his background?
12      MS. ITCHHAPORIA:  Objection:  Form;
13 foundation.
14 BY MR. BOWMAN:
15   Q.  Consistent with his character?
16      MS. ITCHHAPORIA:  Same objection.
17      THE WITNESS:  I don't know that there's
18 anything -- I don't know that there's anything
19 in his record that looked to have fair fights.
20 I think that what's in his background is for him
21 to have fights in which he was the victor.
22 BY MR. BOWMAN:
23   Q.  I see.
24      So this -- For him to be hit while in

201

1  he may have been hit twice; he may have been hit
2  by a flashlight.  I don't know.  I can't resolve
3  that.  My opinion is limited to this one area
4  that's based really very much on his history.
5  BY MR. BOWMAN:
6    Q.  So you've testified just a minute ago
7  that the interrogation lasted 20 minutes.  On
8  what do you base that?
9    A.  Just the available record that he was
10 brought -- that he was first brought to the
11 police station at about 2:15; that -- that he --
12 the interrogation started some minutes later;
13 and that after about 20 minutes, he gave a
14 self-incriminating statement; and that by
15 3:00 o'clock, he had gone off to -- to -- to the
16 Agatite area to look for the weapon.
17   Q.  Who other than the detectives testifies
18 that it was a 20-minute interrogation in this
19 record?
20   A.  I don't know.  I can't --
21   Q.  Anyone, to your knowledge?
22   A.  I can't think of anybody.
23   Q.  What about Mr. Taylor, what does he say
24 about the time of the interrogation?

203

1  handcuffs would be inconsistent with anything
2  that had happened in his background?
3    A.  I didn't hear you.
4      MR. BOWMAN:  Read it back for him,
5  Tracy.
6        (Whereupon, the record was read
7         as requested.)
8    THE WITNESS:  No.  Not at all.
9    MS. ITCHHAPORIA:  Objection.
10   Sorry.
11   Objection:  Form; foundation.
12   Go ahead.
13   THE WITNESS:  No.  Look, I'm not -- I'm
14 not asserting that he was not struck.  I don't
15 know whether he was struck or whether he was
16 not.  What I'm saying is that it's not credible
17 that he would make a self-incriminating
18 statement to murder because he didn't want to
19 get hit again by a flashlight.  That's what I'm
20 saying.  That -- For another person of a much
21 more brittle physical, emotional, and personal
22 constitution, it might be more realistic.
23      I don't have an opinion about whether
24 he was hit at all.  He may have been hit once;

202

1    A.  I don't know that he disputed that he
2  was out at 3:00 o'clock looking for that gun.
3    Q.  What does Mr. Taylor say about the
4  length of the interrogation, if you know?
5      MS. ITCHHAPORIA:  Objection:  Asked and
6  answered.
7      THE WITNESS:  He confirms that he went
8  out to look for the gun before he gave a written
9  statement.
10 BY MR. BOWMAN:
11   Q.  Right.
12   A.  And the written statement was made --
13 The written statement was made about 5:30.
14   Q.  Right.
15   A.  All right?  And that much he confirms.
16   Q.  Do you know what Mr. Taylor says about
17 the length of the confession?
18   A.  I don't recall.
19   Q.  Okay.  Other than relying on the
20 detectives' testimony, is there anything else
21 that -- in this record that you have reference
22 to to say that the interrogation was 20 minutes
23 in length?
24   A.  I don't know that there's another

204



McCorkle Litigation Services, Inc.
Chicago, Illinois  (312) 263-0052

Michael Welner, M.D. 05/17/2018

1 competing figure that's out there that's been
2 consistent.
3     **Q. So what you did was to adopt the**
4 **detectives' account that it was a 20-minute**
5 **interrogation for purposes of your analysis; is**
6 **that fair?**
7     MS. ITCHHAPORIA: Objection: Form;
8 mischaracterizes testimony.
9     THE WITNESS: I adopted the only
10 available information that was consistent with
11 the available timeline of him leaving the
12 station at 3:00 o'clock.
13 BY MR. BOWMAN:
14     **Q. Is it accurate that you adopted the**
15 **detectives' testimony that the interrogation was**
16 **20 minutes in length for purposes of your**
17 **analysis?**
18     MS. ITCHHAPORIA: Same objections, and
19 asked and answered.
20     THE WITNESS: I adopted the available
21 information about his movements, some of which
22 was from the detectives, when he came in and
23 when he left the station and when he came back
24 and when the questioning started.

205

1 BY MR. BOWMAN:
2     **Q. Is there any other information as to**
3 **the length of his interrogation that you rely**
4 **upon other than the detectives' testimony for**
5 **your conclusion that the interrogation was 20**
6 **minutes in length?**
7     MS. ITCHHAPORIA: Objection.
8     THE WITNESS: Possibly. I would have
9 to go back and take a look at the actual records
10 of his processing to see whether that's
11 something that I incorporated.
12 BY MR. BOWMAN:
13     **Q. Okay.**
14     A. I felt comfortable arriving at the idea
15 that he first came into the station at 2:15 and
16 that he had already confessed and was out
17 looking for the gun by 3:00 o'clock.
18     **Q. As you sit here now, recognizing that**
19 **there are a lot of records in the case, is there**
20 **anything that you can point to that you are**
21 **relying on other than the detectives' testimony**
22 **for your assertion that Mr. Taylor's**
23 **interrogation was 20 minutes?**
24     A. Not that I can recall.

206

1     MS. ITCHHAPORIA: Same objections.
2 BY MR. BOWMAN:
3     **Q. Let's look at page 28.**
4     **Looking at the last paragraph before**
5 **the second heading, and I -- there's a sentence**
6 **that's three lines down over toward the right**
7 **side. It begins "As a result." Do you see**
8 **where I am?**
9     A. "As a result of his perception"?
10     **Q. Right.**
11     A. Yes.
12     **Q. I'll read it in its entirety so we have**
13 **it in front of us. "As a result of his**
14 **perception of the proof against him, Daniel**
15 **Taylor provided a self-incriminating statement."**
16     **Are you in a position to read Daniel**
17 **Taylor's mind?**
18     A. No.
19     MS. ITCHHAPORIA: Objection: Form;
20 misstates and the record and didn't read it
21 completely either.
22 BY MR. BOWMAN:
23     **Q. You believe you have a scientific basis**
24 **for saying this?**

207

1     A. Yeah.
2     **Q. And what is the scientific basis on**
3 **which this assertion is based?**
4     A. That he was aware that other people had
5 testified against him; that his -- that people
6 in his gang had implicated him as a principal
7 that had entered the apartment where the fatal
8 shots had been fired.
9     **Q. Right. You're stating a fact. My**
10 **question is, how do you form the scientific**
11 **proposition that Daniel Taylor was motivated to**
12 **confess as a result of his perception of the**
13 **proof against him?**
14     MS. ITCHHAPORIA: Objection: Form.
15 BY MR. BOWMAN:
16     **Q. Can you answer that question?**
17     A. As -- As a byproduct of the analysis of
18 all the available evidence. He wasn't a person
19 who had any guilt at all for any of the crimes
20 that he committed, so he would not have been
21 driven by internal pressures. He was not a
22 person who was driven by shame. He was not a
23 person who was psychotic. So there was no --
24 You know, there were no -- There was no

208



Michael Welner, M.D. 05/17/2018

209

1 psychotic motivation to -- or psychotic
2 inspiration, either from delusion or
3 hallucination; there was nothing about his
4 behavior that was attention seeking in any way.
5 He -- In terms of available external pressures,
6 there is the potential, the possibility that he
7 was promised release, which is something that I
8 considered. However, that is inconsistent with
9 his expression that he went out with police to
10 look for the gun because this way, he would have
11 an opportunity to escape. And so if he were
12 looking to escape and run away from armed
13 officers and take that level of risk with his
14 life, if he would take seriously any idea that
15 he might have been promised to go home would be
16 incompatible with that idea.
17       Furthermore, his experience in the
18 criminal justice system, his familiarity, and
19 certainly his awareness of the seriousness of
20 murder is such that it would be -- it would be
21 difficult for -- to accept the proposition that
22 he would think that he would go home after
23 admitting to murder if in fact that were the
24 case.

210

1       I'm not saying that something like that
2 didn't occur. But what I am saying is his
3 background, his familiarity with the system, his
4 alienation from attorneys, which is certainly
5 well-documented in the interrogation literature,
6 that when attorneys get aggressive -- when
7 questioners, interrogators get aggressive and
8 get physical, it interferes with a person's
9 disclosure; and principally, it interferes with
10 trust. And so if people are going to make some
11 kind of representations to rely on this trust,
12 if he felt them to be physical, then being
13 physical is not how they would cultivate that
14 trust. But being amiable is something that
15 would be more in line with when promises are
16 made and promises are taken seriously.
17       So these incompatibilities were there.
18 The only factual information that explains a
19 relatively rapid confession, especially as it
20 relates to some of the other people, like
21 Patrick, who didn't confess until far later in
22 the day, is that he was quite aware that someone
23 had given a self-incriminating statement, and
24 that someone being in his own gang.

211

1       So it was -- It's a statement that's
2 made based on the totality of circumstances
3 available.
4       Q. Other than what you've said, is there
5 any other literature or principle of science
6 that you can cite for me to support that
7 proposition?
8       A. Well, yes. In multiple defendant
9 cases, there have been cases in which -- not
10 even multiple defendants. In many multiple
11 defendant cases, questions are -- confessions
12 are quickly delivered by one person confessing,
13 pointing the finger at another person, and that
14 confession is then leveraged and dominoed to
15 another -- another suspect, who quickly
16 confesses.
17       There are also cases, as I've noted in
18 my report, of false confessions in which that
19 has happened. So it doesn't bear on the idea of
20 true versus false. Sure, the overwhelming
21 majority of confessions are true. Sure, false
22 confessions are very rare. However, because
23 there's evidence that this may have been a false
24 confession, there's evidence that this may not

212

1 have been. The idea that he confessed as a
2 result of being leveraged by someone else's
3 confession is commonplace in multiple suspect
4 cases, and -- and it is -- and the available
5 facts, as well as the available literature, even
6 from confirmed false confession cases, is
7 something that I had to take into account in my
8 opinion in cases of confirmed false confessions,
9 which ingredients replicated themselves here.
10 And I considered that here.
11       THE VIDEOGRAPHER: Counsel, I need to
12 take a moment and fix his microphone.
13       We are going off the record at 3:29.
14       (Whereupon, a short break was
15       taken.)
16       THE VIDEOGRAPHER: We are going back on
17 the record at 3:40. This is the beginning of
18 Disk No. 4.
19 BY MR. BOWMAN:
20       Q. I neglected to ask you this, Dr.
21 Welner. You don't have any expertise in
22 homicide investigation, do you?
23       A. Sure. I have to do it all the time.
24 It's just -- It's the nature of the

Pages 209 to 212



McCorkle Litigation Services, Inc.
Chicago, Illinois (312) 263-0052

investigation. There are certain aspects of
homicide investigation I have absolutely no
expertise, but there are certain -- I've worked
on probably 2- or 300 homicides in my lifetime.
And you get a certain amount of expertise from
that. But when you say homicide investigation,
it's kind of like saying behavioral sciences.
With respect to what? Do I have expertise in
child psychiatry? No. I wouldn't -- But do I
have expertise in behavioral sciences? Yes. Do
I have expertise in homicide investigation?
Depends what you're asking about. So some
aspects of it, I do.

**Q. Do you have any expertise in how police
should conduct a homicide investigation?**

A. No. No.

**Q. Okay. Do you have any expertise in the
steps that police should or should not take and
the sequence in which police should act --**

A. No.

**Q. -- in a homicide investigation?**

A. I have no expertise as it relates to
police expectations in a homicide. The
expertise that I have only relates and revolves

213

around victim and perpetrator but not the
process itself of what police responsibilities
are.

**Q. Okay. Let's turn to page 40, second
paragraph from the bottom. I'm interested in
talking with you about the first sentence. You
state: "Mr. Gardner volunteered what he had
seen and knew. He did so in a hallway to
Officer Forrest," and so on. What is the basis
for you to find that Lewis Gardner volunteered
something that he had actually seen and knew?**

A. All of the available evidence is that
he initiated the discussion with Officer
Forrest, and he told him that he knew about the
homicides; that he waited to eventually sit down
with -- and he volunteered this by taking
Officer Forrest aside, he didn't even wait to
get to the next point. He stopped mid transport
and took him to some quiet place where they
could be alone and initiated that, unexpected to
Officer Forrest.

**Q. Great.**

A. And -- And that when he continued from
there, he conveyed to detectives who sat down to

214

interview him, consistent with what he had
communicated to Officer Forrest and merely
elaborated on it.

**Q. Okay. Do you know of any information
in this case that might be cited in opposition
to the account that you just provided, or is
this really what the entirety of the file
reflects?**

MS. ITCHHAPORIA: Objection: Form;
compound.

THE WITNESS: Well, Mr. Gardner's
account changes over time, as have others. And
it is -- It is standard forensic science
practice, and certainly standard behavioral
science practice, and that includes social
scientists who -- who take on the role of acting
in a forensic science capacity that when you're
dealing with history from an informant, that the
most valid information comes from the
information provided contemporaneous
with the time in question. That's not a
principle to forensic psychiatry. Psychologists
use it, psychiatrists use it. And so one has to
account for it that way.

215

So there is some variance from the
point of his representation in suppression and
his representation in trial about some details,
but there's nothing to suggest that he was
physically set up in such a way that evolved
with the later iterations that Dr. Leo relied
upon in -- in contravention with accepted
behavioral science practice of what are the most
valid accounts.

BY MR. BOWMAN:

**Q. Okay. So you're going with -- with the
accounts closest into time to the events as
opposed to the later accounts?**

A. I am unless they're grossly contradictory,
in which case, I'm sort of left, as I was with
the fundamental question of Taylor, of you kind
of can't figure this out. It's hard to tell.
But yes.

MR. BOWMAN: Give me just a minute,
Doctor.

(Whereupon, a short break was
taken.)

BY MR. BOWMAN:

**Q. One of your opinions in this case, as I**

216



Michael Welner, M.D. 05/17/2018

1 read your report, sir, is that members of gangs
2 are not vulnerable, generally speaking, to
3 making false confessions. Is that your opinion?
4    A. Yes.
5    Q. You write on page --
6    A. Are less vulnerable as opposed to not
7 vulnerable, I don't believe I spoke in
8 absolutes.
9    Q. Right. Because there are cases of
10 proven false confessions that have been given by
11 gang members, right?
12    A. There may have been. I have to
13 struggle to identify what they are.
14    Q. Well, let's begin with the -- with the
15 Roscetti defendants.
16    A. They were not in a gang. They were
17 people who hung out together. They weren't in a
18 formal gang.
19    Q. Okay. So you say they were not gang
20 members?
21    A. No. They were just kind of guys who
22 hung out together.
23    Q. Okay. That's fine.
24      What about the defendants in the murder

217

1 those were false confessions or not?
2    A. I didn't make -- I didn't render an
3 opinion in that; that would be correct.
4    Q. But we can agree that those are cases
5 in which --
6    A. It's a gang.
7    Q. We can agree that those are cases in
8 which the DNA from the female victim traced back
9 to a known serial sex offender, right?
10    A. That's correct.
11      MS. ITCHHAPORIA: Objection: Form;
12 foundation.
13 BY MR. BOWMAN:
14    Q. And not to the four young men who had
15 confessed, right?
16    A. That's correct.
17    Q. And what about Rolando Cruz, are you
18 familiar with that case?
19    A. I am. And I -- The name register.
20    Q. Okay. Does that count as a proven
21 false confession?
22    A. Don't know.
23    Q. You don't know?
24    A. I remember -- I remember the name. It

219

1 of Cateresa Mathews, the Dixmoor cases. Are you
2 familiar with those cases?
3    A. Of the?
4    Q. Dixmoor cases, the murderers -- the
5 alleged murderers of Cateresa Mathews.
6    A. I don't know the case.
7    Q. Okay. So you wouldn't know whether
8 they do or don't fit as a proven false
9 confession?
10      THE WITNESS: No. I don't know -- I
11 don't know whether they're in a gang.
12 BY MR. BOWMAN:
13    Q. And you don't know whether they're in a
14 gang?
15    A. I don't know the case to say.
16    Q. Okay. And you and I have talked at
17 some length on a previous occasion about the
18 Englewood --
19    A. Yes.
20    Q. -- defendants. And there's no doubt
21 that they were in a gang, right?
22    A. Yes.
23    Q. And it would be fair to say that you
24 weren't able to determine in your mind whether

218

1 may be a case that I know, I may have worked on
2 the case. But it's not a case that I remember
3 details of.
4    Q. Here's what you write on page 42 of
5 your opinion, of your report --
6    A. You mean Cruz?
7    Q. No. I'm back to your report --
8    A. Okay.
9    Q. -- in this case.
10      In your report, you write, "Police
11 driven false confessions among gang members are
12 not described among the proven case histories
13 that inform our understanding."
14      Have you made -- When you refer to the
15 "proven case histories that inform our
16 understanding," what are you talking about?
17    A. I'm talking about the samples that have
18 been written about in the review articles that
19 appear and that populate our literature from
20 time to time. And again, let me qualify this by
21 saying I'm not saying that as an absolute. It
22 is possible that it has happened before. But
23 I'm not trying to say that it is unprecedented. But
24 I did say in the next sentence, I spoke about

220



Michael Welner, M.D. 05/17/2018

1 how there is a disproportionate amount of
2 contact, police contact with gangs and gang
3 leaders that the relative underrepresentation is
4 wholly disproportional in terms of the -- the
5 representation of gang members and gang leaders
6 among police contacts and frequency of police
7 contacts.
8     Q.  Well, not every police gang contact
9 results in a confession, right?
10     A.  A lot of police contacts result in
11 interrogation because there's a lot of violent
12 crime that's attached to gang life.  And it's
13 certainly very different from the range of cases
14 for which interrogation would not be expected,
15 like shoplifting or something else; that the
16 gangs that we're speaking of are gangs for which
17 violent behavior is common enough for it to be
18 recidivistic.  And in some -- some of the
19 plaintiffs of this case, Patrick being an
20 example, there were repeated violent arrests
21 which were unusual and concentrated among gang
22 members in a way that distinguishes itself from
23 your typical adolescents.
24     Q.  Are you saying that gang members are

221

1     Q.  Okay.  Have you done any analysis of
2 this list, any study yourself?
3     A.  Well, there may -- In recent years,
4 there may have been a case that materialized.
5 But prior, the underrepresentation in studying
6 the list was glaring up until that point.  I
7 have not looked at that list in the last couple
8 of years to say that a gang related case may
9 have popped up on it, and that may have
10 happened.  But prior to that point, I wasn't
11 aware of gang, formal gangs being represented
12 within that list.
13     Q.  Have you studied this in any formal
14 way?
15     A.  Yeah.  Yeah.
16     Q.  Okay.  Have you published anything
17 about it?
18     A.  No.  We've -- I've asked and answered
19 that question.
20     Q.  So, I mean, your formal study was
21 limited to that 2004, 2005 --
22     A.  No.  I've looked at this list --
23     Q.  You're interrupting my question.  Don't
24 do it, please.

223

1 underrepresented in the universe of people who
2 have been proven to confess falsely?
3     A.  Yes.
4     Q.  And what is the universe of people who
5 have been proven to confess falsely?  Tell me
6 what that universe is.
7     A.  It is cases in which there is no
8 dispute between prosecution and defense that it
9 was a false confession.
10     Q.  Okay.  So do you have that list?
11     A.  I don't have it here.
12     Q.  Do you have it somewhere?
13     A.  No.  It's readily available.  We can go
14 online and take look at it.
15     Q.  Where would we look for it online, sir?
16     A.  There are a variety of lists available.
17 There's one -- There's one that's compiled by
18 Northwestern University.  There's one that's
19 compiled by the Innocence Project.  There's some
20 overlap.  Leo had his list of 125.  Ofshe and
21 Leo wrote up a list of about 60.  Leo's got a
22 book coming out, and I know that those are --
23 those are at least potential sources from which
24 one can derive this information.

222

1     Your formal study was limited to the
2 2004, 2005 analysis that you did, right?
3     MS. ITCHHAPORIA:  Objection:  Form;
4 asked and answered.
5     THE WITNESS:  Okay.  No.  That's
6 incorrect.  My formal research on this issue was
7 limited to the 2004, 2005.  However,
8 periodically, I have revisited that list because
9 some question or other has popped up where I
10 felt, hey, I'd like to go back and look at this
11 list and see what's happening.
12 BY MR. BOWMAN:
13     Q.  Have you have you got somewhere in your
14 working papers at The Forensic Panel an analysis
15 on which you rely to make this statement of
16 underrepresentation?
17     MS. ITCHHAPORIA:  Object to form.
18     THE WITNESS:  No.
19 BY MR. BOWMAN:
20     Q.  Do you have some written study that you
21 have reference to to make that assertion?
22     MS. ITCHHAPORIA:  Same objections.
23     THE WITNESS:  The --
24

224



Michael Welner, M.D. 05/17/2018

1  BY MR. BOWMAN:
2      Q. That actually calls for a yes or no if
3  you can do it.
4      A. Yeah.
5      MS. ITCHHAPORIA: Objection to the --
6  Objection to the preamble and the instruction on
7  how to answer the question.
8      THE WITNESS: I reviewed the databases
9  themselves as I would any source. I don't -- I
10  don't write up a study of every single source or
11  article I'm looking at. In one instance, it's a
12  website. You know, the website is very
13  detailed. In certain instances some of that
14  information may be missing. But the -- Every
15  time that I have looked at it over the years,
16  that trend has been consistent.
17  BY MR. BOWMAN:
18      Q. Okay. What website or data compilation
19  are you referring to? Just state it for the
20  record so --
21      A. I'm referring to --
22      Q. Hang on. You're interrupting my
23  question. Please don't do that.
24      Here it comes: What data source or

225

1  website are you relying upon to make the
2  assertion that gang members are underrepresented
3  in the universe of individuals who are known to
4  have confessed falsely? And just state a
5  citation for Ms. Jones so that we can have it
6  and all go look at it.
7      MS. ITCHHAPORIA: Objection: Form.
8      THE WITNESS: The Innocence Project
9  website.
10  BY MR. BOWMAN:
11      Q. Anything else?
12      A. Not more currently.
13      Q. In your report, and from time to time
14  in your testimony today, you have alluded to
15  negative psychiatric reports about Daniel
16  Taylor, oppositional, defiant, prone to
17  violence, and so forth. Do you have that in
18  mind?
19      A. I wouldn't characterize them as
20  negative. They may have been positive.
21      There are some people that when they're
22  examined as an adolescent, they may be
23  psychopaths, but the examiner doesn't want to
24  call someone a psychopath, so they come up with

226

1  something more euphemistic like oppositional
2  defiant disorder.
3      Q. Got it.
4      A. So that's one of the reasons why I
5  would be circumspect in diagnosing him because
6  his diagnosis could be something that's far more
7  dramatic.
8      Q. So you're not planning to diagnose
9  Daniel Taylor in this trial --
10      A. It's not what I did here because you
11  didn't allow my examination.
12      Q. Is it possible that the diagnoses
13  reflected in the records that you reviewed are
14  negative in the sense that Daniel is a more
15  complex, more vulnerable individual than those
16  assessments reflect? Is that a possibility?
17      MS. ITCHHAPORIA: Objection: Form;
18  foundation; incomplete hypothetical; calls for
19  speculation.
20      THE WITNESS: I think that people with
21  oppositional defiance disorder are complex. I
22  don't think that the diagnoses reflects upon him
23  as a simple person. Oppositional defiance
24  disorder is a complicated issue, and it's a

227

1  complicated diagnosis that's -- that's given
2  with some level of deliberation. So is
3  antisocial personality. So is conduct disorder.
4      Conduct disorder is certainly
5  appreciated as a complex condition and not
6  necessarily negative. It is very destructive to
7  anyone that gets in its way, but it doesn't
8  mean -- it doesn't mean that that is not a
9  person who at some point later in his life will
10  not interact with his world as a psychopath
11  would. Some do, and some do not.
12  BY MR. BOWMAN:
13      Q. Right. Is it your opinion -- I just
14  want to understand for the minute what your
15  opinion is. Is it your opinion that based on
16  the available psychiatric records, including the
17  diagnoses that exist in those records, that
18  Daniel Taylor is a person with a constitution
19  and a history to render him less vulnerable than
20  others to confessing falsely?
21      MS. ITCHHAPORIA: Same objection.
22      THE WITNESS: To a police officer, yes.
23  BY MR. BOWMAN:
24      Q. To confessing falsely to a police

228



McCorkle Litigation Services, Inc.
Chicago, Illinois (312) 263-0052

Michael Welner, M.D. 05/17/2018

1 officer?
2 A. Yes.
3 Q. Yes.
4 And that, I take it, is an opinion that
5 you make from your expertise as a forensic
6 psychiatric assessor of disputed confessions,
7 right?
8 A. It's on the basis of my expertise as a
9 forensic psychiatrist, as someone who's worked
10 in corrections psychiatry, who's examined people
11 and communicated with them about their
12 interrogations when they have confessed and when
13 they have not, who's interfaced with enough gang
14 members to know that they view police in an
15 adversarial way and are not inclined to
16 cooperate with them. It's based on the
17 available record in this case in which people
18 like Patrick made it very clear that someone
19 would get a beating if they -- if they provided
20 incriminating information to police. So it's
21 the totality of information that's available
22 imbedded in my experience as a forensic
23 psychiatrist and my experiences as a clinician
24 interviewing and listening to people, as well as

229

1 evaluating the records that are available and
2 his own history of encounters with police and
3 questioning.
4 Q. Can you please cite to any scientific
5 literature that you have referred to for
6 purposes of your opinion that a person with
7 Mr. Taylor's constitution and history is less
8 likely than others to confess falsely to a
9 police officer?
10 A. Well, his -- His diagnosis of
11 oppositional defiant disorder, his consistent
12 lack of compliance with authority, if it follows
13 that a person who is compliant is behaviorally
14 more at risk of confessing to the pressure of
15 law enforcement, whether it be true or false, it
16 also follows that a person who is far less
17 compliant would be the exact opposite. And that
18 is also afforded by, allowed for interrogation
19 training manuals that make it quite clear that
20 when you're dealing with someone who is hostile
21 and oppositional, that the way to relate to that
22 individual is in a friendly way, to build a
23 rapport. Because otherwise, their lack of
24 compliance and their fundamental oppositional

230

1 nature will only be reinforced by a hostile
2 interaction.
3 Q. Okay. This is my only opportunity to
4 question you before we have a Daubert hearing
5 about you and a trial. So I'm going to ask you
6 the question again, and I would appreciate it if
7 you could answer it to the best of your ability.
8 If you can't cite to anything, that's fine. But
9 I'm asking you for my benefit and for everyone's
10 benefit in this case if you can provide me with
11 a citation to any scientific literature in the
12 area of forensic psychiatric assessment of
13 disputed confessions to support the proposition
14 that a person with Mr. Taylor's constitution and
15 history is less likely than others to confess
16 falsely to a police officer.
17 MS. ITCHHAPORIA: Objection to the
18 form; objection to the preamble; and asked and
19 answered.
20 MR. BOWMAN: What's wrong with the form
21 of that question?
22 MS. ITCHHAPORIA: I'm sorry?
23 MR. BOWMAN: What's wrong with the form
24 of that question?

231

1 MS. ITCHHAPORIA: The rambling preamble
2 and instructions on how to answer it, what's
3 good for the case, what's good for everybody
4 here.
5 MR. BOWMAN: Sure. Apart from that, do
6 you have any objection to the form of the
7 question?
8 MS. ITCHHAPORIA: I don't.
9 THE WITNESS: I would refer to the
10 literature on compliance, the extensive
11 literature on compliance in the disputed
12 confession literature and the importance of
13 compliance as it relates to confession, both
14 true and false.
15 BY MR. BOWMAN:
16 Q. Can you be any more specific than that?
17 Is there anything that you can say?
18 A. There's a lot that's been written.
19 Dr. Gudjonsson is a person who's written a lot
20 about this, but he's not the only person who's
21 written about the importance of compliance.
22 Q. Could you -- Could you do this for me,
23 could you provide us with copies of any
24 scientific literature that you're relying on to

232



McCorkle Litigation Services, Inc.
Chicago, Illinois (312) 263-0052

Michael Welner, M.D. 05/17/2018

1 support this proposition that we've been talking
2 about?
3     A. I think you probably already have
4 Gudjonsson's book.
5     Q. So again, the reference would be to
6 Gudjonsson's 2003 book?
7     A. I think -- I think you'll find some
8 things in there that will be informative.
9     Q. Is there anything else?
10     A. There may be. And if there is, I'll be
11 happy to provide that to you.
12         MR. BOWMAN: Will you undertake, Misha,
13 to ensure that we have anything that -- we are
14 going to file a Daubert motion here -- that we
15 have anything that's being relied upon that Dr.
16 Welner thinks of after this deposition?
17         MS. ITCHHAPORIA: Sure.
18         MR. BOWMAN: Thanks.
19 BY MR. BOWMAN:
20     Q. We may have already covered this, okay,
21 but just in the interest of not missing
22 anything, I'm going to ask you this question.
23 Is there any scientific literature in the field
24 of forensic psychiatric assessment of disputed

233

1     Q. Can you cite any literature that
2 supports the proposition that an oppositional
3 defiant violence-prone juvenile is not
4 susceptible to falsely confessing?
5     A. I think I've already answered that
6 question.
7     Q. You've given me anything that you can
8 provide in the way of a citation to literature?
9     A. Yeah.
10     Q. On page 43 of your report, you say
11 this: "The youth of those who confess falsely
12 are youth whose age reflects their naïveté,
13 suggestibility, and compliance, none of which
14 has been demonstrated in Mr. Taylor."
15         Who are the youth who confess falsely?
16 Is this another instance in which we would be
17 going to the Innocence Project website?
18     A. There's a lot of literature, actually,
19 scientific literature about the importance of
20 naïveté as it relates to suggestibility and the
21 importance of compliance in youth, particularly
22 younger children or younger adolescents.
23     Q. I think what you're saying here, maybe
24 I misunderstand you, is that -- I mean, you

235

1 confessions to support the proposition that an
2 oppositional defiant violence-prone juvenile is
3 not susceptible to falsely confessing?
4     A. Violence proneness is not an issue that
5 relates to disputed confession. In a person
6 who's oppositional defiant, the significance of
7 that is the lack of compliance and the
8 resistance to authority, which I noted in my
9 earlier answer. The significance of violence as
10 it relates to this is not just the violence
11 itself but the nature of the violence and the
12 person's relatedness to his own violence. And
13 that I specifically referenced in my report that
14 the idea of a threat of being struck by a
15 flashlight or being punched would be so
16 persuasive that a person who's denoted as
17 extremely street smart and had quite enough
18 familiarity to know the significance of
19 admitting to murder charges would then be moved
20 to make such an admission given that level of --
21 of fighting and violent history.
22         That's the significance only as it
23 relates to his personal history, not as it
24 relates to compliance.

234

1 agree that young people are represented among
2 the cases of proven false confessions, right?
3         MS. ITCHHAPORIA: Objection. Form.
4         THE WITNESS: They are overrepresented
5 in certain respects.
6 BY MR. BOWMAN:
7     Q. Overrepresented. And Mr. Taylor was
8 17 at the time?
9     A. Correct.
10     Q. And your point is that his youth is
11 trumped by his lack of naïveté, suggestibility,
12 and compliance, right?
13     A. Yeah. What I'm saying, and just to
14 extend my last answer, they are -- they are
15 overrepresented in certain contexts. In other
16 words, naïve youth are overrepresented. Street
17 smart youth are not overrepresented among
18 demonstrated proven false confessions.
19     Q. Okay. And other than going to the
20 Innocence Project website, is there any other
21 source of information that you have for that
22 assertion?
23     A. The Northwestern website. But whoever
24 has put together these data sets, although I

236



Michael Welner, M.D. 05/17/2018

1  realize that Dr. Leo was big on the news
2  sources, and so a lot of that is really not
3  credible.  But he did give some attention to the
4  representation of adolescents.  I don't know
5  whether he was interested in pursuing it enough
6  to explore enough of the personal
7  characteristics to delineate whether people were
8  unsophisticated and naïve or whether they were
9  not.
10     Q.   Well --
11     A.   There is a lot of information that is
12  available on some of these adolescents on the
13  Innocence Project website.  And because it is
14  more -- more informative as to specifics, then
15  that information may provide better source
16  material for you.
17     Q.   Okay.  Well, what about for you?  What
18  source material did you use to study the
19  characteristics of those youth who confessed
20  falsely?
21     A.   My professional experience in working
22  in cases.  And I've probably had, you know, at
23  this point, somewhere around 50 disputed
24  confessions that have come to me.  And

237

1  They are Kassin, Drizin, Grisso, Gudjonsson,
2  Leo, and Redlich.  And the exhibit also includes
3  an introduction to the paper that appeared just
4  in front of the paper when it was published in
5  the journal.
6     A.   Thank you.
7     Q.   Are you familiar with this?
8     A.   I've read it.
9     Q.   And have you read the introduction?
10     A.   I may have read it once, but I've read
11  this article multiple times over the years.  And
12  if I've read the introduction once, it was
13  probably only once.
14     Q.   Okay.  The introduction describes the
15  paper as -- as a scientific review paper of the
16  American Psychology-Law Society, which is a
17  division of the American Psychological
18  Association, and describes it as only the second
19  such paper to be authorized and approved by that
20  body in its 42-year history, and that the paper
21  is a summary of the consensus views of the
22  members of the organization.
23         Is that a fair characterization of the
24  --

239

1  occasionally, there have been cases where I've
2  come to the conclusion that a confession is
3  false.
4         I have reviewed the available
5  literature about extensively documented cases,
6  some of which are highly documented and the
7  importance of naïveté as it relates to youth is
8  something that's been demonstrated in cases, and
9  it's been written about in actual publication
10  literature about the importance of naïveté as it
11  relates to youth.
12         (Whereupon, Welner Deposition
13          Exhibit No. 14 was marked for
14          identification.)
15  BY MR. BOWMAN:
16     Q.   I'm going to hand you next what I'm
17  marking for identification as Exhibit 14 to your
18  deposition.  It's a publication from the Journal
19  of Law and Human Behavior entitled "Police
20  Induced False Confessions, Risk Factors and
21  Recommendations."  It's authored by a group of
22  folks.
23     A.   A coterie.
24     Q.   Yes.  You refer to them as a coterie.

238

1     A.   Of what he says.
2     Q.   -- of the introduction?
3     A.   Yes.
4     Q.   Yes.
5         And I'm not the least bit interested in
6  debating with you this afternoon --
7     A.   I'll bet.
8     Q.   -- any of the details of this.  Do you
9  -- What did you just say?
10     A.   I said, I'll bet.
11     Q.   And that's because you perceive
12  yourself to be a very good debater and fear that
13  I might --
14     A.   No, because I think this article is one
15  that is so full of flaws that if -- if the
16  organization itself had to account for those
17  flaws, it would be a humiliating exercise.  And
18  we truly could be here talking about the flaws
19  of this rep- -- of this individual article for
20  probably the next four or five hours.  And
21  that's why I said, I'll bet.  Because if you
22  would like us to walk through that, I'll be more
23  than happy to do it.  But I don't think you're
24  interested in doing that.  That's why I said,

240



McCorkle Litigation Services, Inc.
Chicago, Illinois  (312) 263-0052

Michael Welner, M.D. 05/17/2018

1  I'll bet. It has nothing to do with my debating
2  skills. It has to do with the disingenuousness
3  of a number of the points in this article, and
4  the paucity of scientific foundation for the
5  assertions, and the blind loyalty of those who
6  signed off on it in a peer review process that
7  overlooked the lack of foundation for a number
8  of the assertions within the references that
9  they cite.
10  **Q.  That answers my question. Thank you.**
11       **(Whereupon, Welner Deposition**
12       **Exhibit No. 15 was marked for**
13       **identification.)**
14  BY MR. BOWMAN:
15  **Q.  Let me hand you next what I've marked**
16  **for identification as Exhibit 15.**
17       **Are you familiar with this?**
18  A.  I've seen the article. I haven't read
19  it closely, but I've seen it.
20  **Q.  Okay. This is a publication from the**
21  **American Psychological Association. Actually,**
22  **it's -- The entity is the American Psychological**
23  **Association, and the journal of that**
24  **organization, American Psychologist. The**

241

1       A.  Well, it's sort of nice when they make
2  a self-serving judgment that basically they
3  include everybody in their coterie, and they
4  specifically excluded M.D.; they specifically
5  excluded people who were active in law
6  enforcement. So to say in all pomposity that
7  you can't be an expert unless you have a Ph.D.
8  and you're doing laboratory experiments on
9  students and extrapolating on that, to suggest
10  that that mimics the conditions of
11  interrogation. So it is emblematic in two ways
12  of exactly how I characterized the coterie.
13  One, they feel the need to publish these
14  articles to basically say, You see? We all
15  agree with one another. And then they
16  self-select the group in order to ensure that
17  they'll have this sort of consensus, and then
18  they get it peer reviewed by people who are
19  basically part of their coterie so they can
20  exclude any kind of contrary opinion to say, You
21  don't agree with us, so therefore, you don't
22  have any kind of expertise in this area.
23       So I think the notion of saying that
24  you have to have a Ph.D., but they deliberately

243

1  **authors of this piece are Saul Kassin, Allison**
2  **Redlich, Fabiana Alceste, and Timothy Luke. And**
3  **it's entitled, "On the General Acceptance of**
4  **Confessions Research: Opinions of the**
5  **Scientific Community."**
6  A.  Yes.
7  **Q.  And it would be accurate to say that**
8  **this is a study that Saul Kassin did on whether**
9  **opinions are held in common by people who have**
10  **published and studied in this particular field,**
11  **right?**
12  A.  It is -- It is a -- It is -- It is fair
13  to say that it is -- I think that's a fair
14  characterization. That's not a full
15  characterization, but there's nothing inaccurate
16  in what you've represented.
17  **Q.  Right. And if you look on page 67 in**
18  **the exhibit, Dr. Kassin and his coauthors**
19  **provide an explanation of the method that they**
20  **used to conduct this study, right?**
21  A.  Yes.
22  **Q.  And what they did was they tried to**
23  **locate everyone who in their judgment qualified**
24  **as an expert in the field, right?**

242

1  don't seek out anyone who's an M.D., the notion
2  that they don't include anyone who is a law
3  enforcement professional, who may or may not be
4  degreed and yet who may be part of training and
5  who may be part of experience, again, it's an
6  exercise to basically affirm the result that
7  they're looking for and embed it in a hospitable
8  journal with which Dr. Kassin has experience.
9  **Q.  Okay. Thanks.**
10       **So you would not -- I just want to make**
11  **sure we agree on the method. I don't need any**
12  **commentary in answer to this question. They**
13  **define an expert as a person who satisfies three**
14  **criteria, right?**
15  A.  Yeah, the criteria that Dr. Kassin has.
16  **Q.  Right.**
17  A.  "They're like me, so they're experts."
18  Gee, that works.
19  **Q.  I was actually specifically asking you**
20  **to exclude from your answer commentary on the**
21  **methodology and just see if we could agree on**
22  **what it is.**
23  A.  Yeah. They agreed to a methodology
24  that approximates Dr. Kassin looking in the

244

Pages 241 to 244



McCorkle Litigation Services, Inc.
Chicago, Illinois  (312) 263-0052

1 mirror.
2    Q. Okay. And specifically, that would be
3 a person holding a Ph.D. in psychology,
4 sociology, criminology, criminal justice, or
5 other empirical social science; that would be
6 criteria number one, right?
7    A. Correct.
8    Q. And you don't qualify?
9    A. No. I'm not a Ph.D.
10    Q. And the second criterion would be
11 someone who has published during the previous 15
12 years in a peer-reviewed journal with the
13 subject "Interrogations" and/or "Confessions" in
14 the title, right?
15    A. Correct.
16    Q. And you don't qualify, right?
17    A. No, I have not.
18    Q. Okay. And somebody who's testified as
19 an expert witness on the issue of police interrogations
20 and confession, and you do qualify on that,
21 right?
22    A. I'm sure if they had a way to jin that
23 qualification, they probably would too. But I
24 do meet that criteria.

245

1    Q. You do meet that one?
2    A. For their -- For the mirror.
3    Q. Right.
4       And how many people did qualify?
5    A. 130 -- Hold on.
6    Q. 131?
7    A. 123.
8    Q. 123. And then they got responses to
9 this questionnaire from -- from --
10    A. 70 -- They got sconces from 87 people.
11    Q. 70.73 percent responses?
12    A. From 87 people, yes.
13    Q. Do you believe as a general matter that
14 in science, it is important for there to be
15 agreed standards and agreed baseline analysis of
16 a subject matter?
17       MS. ITCHHAPORIA: Objection: Form;
18 overly broad.
19       THE WITNESS: It is overly broad. I'd
20 like to answer the question, but you need to ask
21 it a different way.
22 BY MR. BOWMAN:
23    Q. Do you agree with the proposition that
24 scientific opinions, to be credible, should be

246

1 generally accepted within the scientific
2 community that's in play?
3    A. I think -- I think as a general
4 proposition, yes, I agree with that.
5    Q. Okay.
6    A. I think that the -- I think the process
7 of arriving at that is something that is
8 typically systematic and incorporates people
9 from a divergent perspective.
10    Q. Right. And then out of that process,
11 when there's some general acceptance, that's
12 when we can be confident about the scientific
13 legitimacy of the opinion, right?
14    A. Or just even of the discipline itself.
15       MS. ITCHHAPORIA: Object to form.
16 BY MR. BOWMAN:
17    Q. There you go.
18       Now, I want to ask you some questions
19 about gangs. You make some assertions in your
20 report about gang attitudes toward police,
21 right?
22    A. I have. But let's refer to the
23 specifics.
24    Q. Well --

247

1    A. Do you want this back, by the way?
2    Q. No, no. You can keep them. I think
3 Tracy is going to want them at the end of the
4 deposition.
5       Let's look for a specific ...
6       You describe Daniel Taylor as an
7 African-American gang conscript on page 29 of
8 your opinion, correct?
9    A. Yes.
10    Q. And then you state, "That population,
11 the population of African-American gang
12 conscripts, is already well-recognized to be
13 particularly uncooperative and skeptical of
14 police."
15       So that's an assertion that you make
16 about gang attitudes toward police in your
17 report. All right?
18    A. Gang attitudes, in particular
19 African-American attitudes. But I don't know
20 that it's -- that would demonstrably be
21 different in all other or which other
22 ethnicities. But yes.
23    Q. All right. So can you tell me what
24 published literature you're relying on for the

248



Michael Welner, M.D. 05/17/2018

1 **assertion that gang -- African-American gang**
2 **population is recognized to be particularly**
3 **uncooperative and skeptical of police?**
4     A.  Well, I cited to a few articles in my
5 report and a few references.
6     **Q.  Well, actually, I see one.  It's**
7 **footnote No. 9 right at the end of that sentence**
8 **we've been looking at.**
9     A.  Footnote 9, there's footnote 8, "Police
10 Response to Gangs:  A Multi-Site Study."
11 There's footnote 11.  And there is -- There is a
12 lot of documentation about the Stop Snitching
13 phenomenon that has -- that -- that is available
14 from the early part of the last decade, the
15 early 2000s.  A lot of literature began
16 appearing about that specifically.  There is a
17 law in psychology, or I should say a psychology
18 professor, academic in Philadelphia, who has
19 surveyed people from the inner city and has
20 found that people who are -- who are of college
21 age who are involved in criminal activity say
22 that they're less likely to cooperate with
23 police.  There -- And he has testified before
24 the Senate as to his findings.  So there are

249

1 just a variety of sources available to speak to
2 that, and I cited to three in my report.
3     **Q.  Okay.  Do you agree with the**
4 **proposition that actually, there's a wide**
5 **variation in when and whether gang members will**
6 **cooperate with police?**
7     A.  I think there are certain instances in
8 which gang members may be more inclined to
9 cooperate.  If a child dies, you know, a small
10 child dies under the circumstances, there may be
11 a scenario in which someone who is not
12 oppositional and who's not antiauthority may be
13 more inclined to cooperate.  Some of it may
14 relate to just the prevailing attitude within a
15 gang.  Some of it may relate to one's own
16 personality.  And some of it may be a cumulative
17 combination of both.  But people are more
18 inclined to cooperate with police under the
19 exceptional circumstance of, for example, when a
20 baby dies.
21     **Q.  Okay.  Do you agree with the**
22 **proposition that there's not one code of**
23 **snitching among gang members?**
24     A.  I'm not sure that I understand the

250

1 question.
2     **Q.  Do you agree with the proposition that**
3 **it is impossible to identify a so-called code of**
4 **snitching among --**
5     A.  You mean a singular universal code that
6 applies to all gangs?
7     **Q.  Right.**
8     A.  I mean, there's -- The idea of "Stop
9 Snitching" is something that different people
10 have adopted in their own way.  And the most
11 common application of it is as it relates to
12 communicating to the police about a crime that
13 they are investigating.
14     **Q.  Do you agree with the proposition that**
15 **there is not one code of snitching that applies**
16 **-- code against snitching that applies to all**
17 **gang members?**
18     MS. ITCHHAPORIA:  Objection:  Form.
19     THE WITNESS:  I -- Every gang sort of
20 has its own policy.  I think that Deon Patrick
21 in his testimony made it clear about his own
22 experience that somebody might be thrown out of
23 the gang as opposed to being beaten.  Whether
24 some people are beaten as opposed to just merely

251

1 excluded from the group and cut off from other
2 financial opportunities of dealing drugs,
3 that's -- whether it's different for Gangster
4 Disciples than it would be for Traveling Vice
5 Lords is -- I don't know one way or the other.
6 I can only point to what his testimony was.
7 BY MR. BOWMAN:
8     **Q.  Okay.  I may have asked you this**
9 **already, but just to be safe, it is accurate**
10 **that you have never made, yourself, any formal**
11 **study of gang attitudes toward police?**
12     A.  That's accurate.
13     **Q.  And you've obviously never published**
14 **anything in that area, correct?**
15     A.  Well, you know, just to clarify, I've
16 not published.  But the idea of informal study,
17 please understand we've already been on the
18 record that I've spent hundreds of hours on this
19 case.  And in the research that people do, even
20 ethnographically, they'll do interviews that
21 last an hour or two.  Some of the interviews
22 that I've done, even interviews that you've
23 pointed to in some of these cases are 18 hours,
24 15 hours,

252



McCorkle Litigation Services, Inc.
Chicago, Illinois  (312) 263-0052

Michael Welner, M.D. 05/17/2018

1 14 hours. So the interviews that one conducts
2 as a forensic psychiatrist are a form of
3 informal study. And they're -- They're very,
4 very detailed and very particularized. And you
5 learn a lot along the way about the topics
6 you're focusing on. And insofar as some of
7 these interviews, whether they be in the
8 evaluative setting or people that I treated
9 clinically and were with time after time for a
10 half hour at a time, 15 minutes at a time, 45
11 minutes at a time, I would be informally
12 studying that experience that they have with far
13 greater detail and access than would be afforded
14 a researcher who is on a much more regimented
15 system of how they can treat study subjects.
16 BY MR. BOWMAN:
17     Q. I want to go back to page 26 now and
18 read another sentence from your report. You
19 say, "It is well-established police practice" --
20 It's in the same paragraph we were looking at
21 before. Here comes the quote again. "It is
22 well-established police practice to attempt
23 rapport building with suspects, especially
24 suspects known to be African-American gang

253

1 conscripts," and then you cite an authority for
2 that.
3     So are you saying that -- that it is
4 unlikely that the police were aggressive or
5 violent or threatening toward Mr. Taylor because
6 that would be inconsistent with the established
7 practice to build rapport with young
8 African-American kids who are known to be in
9 gangs?
10     A. Not exactly. I think that what I'm
11 more responsive is because -- seeing that this
12 is in question 1, one of the things I've alluded
13 to, and now I'll kind of speak to more candidly
14 is this sort of like one-size-fits-all analysis
15 by Leo. And Ofshe does it too of, like, Let me
16 tell you how it goes in interrogation. And it's
17 just not so. That's now how it is.
18     With certain individuals, police are
19 trained to build rapport as opposed to their
20 broad representations that here's what police
21 do, they're aggressive, they're confrontational,
22 they're this, they want to make sure that people
23 think the situation is hopeless, you know, the
24 usual stuff that gets grafted from report to

254

1 report in this homogenized way.
2     So again, this being a rebuttal report,
3 and this speaking about things in general terms,
4 in general terms, that's how police are trained.
5 It doesn't mean in this case they did something
6 different. But if they did it different, it was
7 a deviation from how they were trained and how
8 police are expected to customarily practice, as
9 opposed to the Leo representation of
10 essentially, here's how police practice
11 generally, they're antagonistic and aggressive,
12 which just is not borne out in police training
13 materials.
14     Q. Okay. Is it your opinion that in the
15 city of Chicago in 1992 that it was the practice
16 of police detectives when they were in
17 interrogation rooms with African-American gang
18 members to build rapport?
19     MS. ITCHHAPORIA: Form; foundation;
20 calls for speculation.
21     THE WITNESS: Depends on the
22 individual. Depends on the individual case. I
23 mean, there's a lot of police officers doing a
24 lot of interrogations of a lot of

255

1 African-American males. And it's really a
2 case-by-case basis. But they were certainly
3 trained to build rapport. They were not trained
4 to be antagonistic and hostile.
5     Q. Who trained Chicago Police detectives
6 to build rapport with African-American gang
7 members in interrogation rooms?
8     A. I don't know.
9     Q. Well, generically, who would have
10 provided that training to Chicago Police
11 officers?
12     A. Again, I don't know.
13     MS. ITCHHAPORIA: Object to form;
14 foundation.
15     THE WITNESS: I mean, training comes
16 from mentorship; training comes from formal
17 classes. It comes from the police academy. And
18 so I -- I'm only speaking to my familiarity just
19 based on a review and familiarity with the Reed
20 Manual, which gets cited here and critiqued such
21 as it is.
22 BY MR. BOWMAN:
23     Q. Okay. Did Jon -- Do you know what rank
24 Jon Burge held on the Chicago Police Department

256



Michael Welner, M.D. 05/17/2018

1 in 1990?
2     A.  No.  He was a senior -- He was a senior
3 person supervising many people.
4     Q.  Okay.  Did Jon Burge train detectives
5 working under his command to engage in rapport
6 building with African-American suspects in
7 interrogation rooms in 1990 and 1992?
8         MS. ITCHHAPORIA:  Objection:  Form;
9 foundation; and relevance.
10         MR. NOLAND:  Just for the record, I
11 would -- Yeah.  Just I think it's beyond any
12 potential relevance, and I would just like a
13 standing objection.
14         MR. BOWMAN:  Sure.  You got it.
15         MS. ITCHHAPORIA:  Join.
16         THE WITNESS:  I didn't study the Burge
17 matter.  I'm aware that he's been -- he's been
18 held accountable for a number of highly
19 aggressive questioning and interrogations.  But
20 that's really the extent of my awareness.  It's
21 almost like Leo citing a media article.  It's of
22 limited consequence.
23 BY MR. BOWMAN:
24     Q.  Are you aware generally that there are

257

1 Have you had an opportunity to review those?
2     A.  I just found out this morning that they
3 were available.  I haven't even been given them
4 as you have.  So I just learned of them this
5 morning.
6     Q.  Do you intend to review them?
7     A.  I'd like to, sure.
8     Q.  Do you accept the proposition that
9 whatever the formal training might have been,
10 that there was, in the City of Chicago in the
11 1990s, the early 1990s, widespread deviation
12 from a technique of rapport building with
13 African-American gang members in interrogation
14 rooms?
15         MS. ITCHHAPORIA:  Objection:  Form;
16 foundation.
17         THE WITNESS:  I don't know how -- I
18 don't know how widespread it was.  I think there
19 were certain instances in which it was
20 demonstrably proven.  There are other instance
21 in which it's questionable.  You know, it's not
22 unlike many other situations in which highly
23 public allegations are made.  Some of them are
24 genuine, and some of them are opportunistic.

259

1 many allegations of police detectives in and
2 around the time of this interrogation engaging
3 in aggressive and physically inappropriate
4 interrogation tactics against African-American
5 gang members?
6         MS. ITCHHAPORIA:  Same objection.
7         THE WITNESS:  Am I aware that many
8 detectives are alleging it or that there are ...
9         MR. BOWMAN:  Could you read it for him.
10         (Whereupon, the record was read
11             as requested.)
12         THE WITNESS:  I'm aware that there are
13 a number of allegations against specific police
14 detectives for inappropriate, aggressive, and,
15 at times, violent behavior.
16 BY MR. BOWMAN:
17     Q.  Okay.  In this time frame?
18     A.  In that time frame, yes.
19     Q.  In this city?
20     A.  In this city.
21     Q.  And have you -- We were provided this
22 morning with some allegations against some of
23 the detectives in this particular case in
24 addition to the ones that bring us here today.

258

1 And it's one that one would take -- I'm
2 certainly aware that a number of those
3 allegations have been made, and I'm certainly
4 aware that a number of those allegations have
5 been made in conjunction with plaintiff counsel
6 that's seeking personal injury damages.
7 BY MR. BOWMAN:
8     Q.  Okay.
9     A.  So, you know, it's -- It is what it is.
10     Q.  So are you offering an opinion that
11 because Daniel Taylor was an African-American
12 kid who was a member of a gang that it is
13 therefore less likely that he would have been
14 subject to physical abuse in an interrogation
15 room?
16         MS. ITCHHAPORIA:  Objection:  Form.
17         THE WITNESS:  What I'm offering an
18 opinion about is in rebuttal to the proposition
19 of Dr. Leo with a, Let me tell you how
20 interrogations go, and this is how it's done
21 with young people, to offer the proposition that
22 that is not how police are generally trained.
23 And what has happened in a specific instance
24 with Mr. Taylor and police officers

260

Pages 257 to 260



Michael Welner, M.D. 05/17/2018

1  interrogating him may or may not have deviated
2  from their training.  That's what I'm saying.
3  BY MR. BOWMAN:
4      **Q.  Okay.  Do you know whether the City**
5  **Council of the City of Chicago has taken any**
6  **action to address the reality of police**
7  **brutality against African-American suspects in**
8  **interrogation rooms in this city in the time**
9  **period that we're talking about in this case?**
10     MS. ITCHHAPORIA:  Just refer back to
11  the standing objection on this.
12     MR. BOWMAN:  Sure.
13     THE WITNESS:  The only legislative
14  issues I'm familiar with are the videotaping of
15  interrogations, which is not only something that
16  I supported but, as you probably know from your
17  own efforts, was instrumental in having
18  videotaping of psychiatric examinations put into
19  Illinois law for -- for particular types of
20  exams.  So that was a remedy that I would
21  imagine was put into place in response to
22  allegations of things of -- that impropriety
23  that was happening in interrogations.  I don't
24  know about other interventions, whether they

261

1  is damaged, that's why we have a justice system
2  for civil damages.  And anything that expedites
3  the opportunity for a person who's not whole to
4  be made whole is a good thing.
5      MR. BOWMAN:  Let's take a break at this
6  time.
7      THE VIDEOGRAPHER:  We are going off the
8  record at 4:45.  This is the end of Disk No. 4.
9      (Whereupon, a short break was
10     taken.)
11     MR. BOWMAN:  Okay.  So, Dr. Welner, I
12  appreciate your patience with me and your
13  cooperation in the process.  I have no further
14  questions for you at this time.
15     MS. ITCHHAPORIA:  No questions.
16     MR. NOLAND:  No questions.
17     MS. ITCHHAPORIA:  Reserve signature.
18     (Off the record at 5:00 p.m.)
19
20
21
22
23
24

263

1  were done by City Council or State assembly or
2  whomever.
3  BY MR. BOWMAN:
4      **Q.  Are you aware that the City Council of**
5  **the City of Chicago has enacted something that's**
6  **referred to as a Reparations Ordinance to**
7  **provide compensation to the victims of police**
8  **abuse, all of them African-American, at the**
9  **hands of Jon Burge and the men who worked for**
10  **him in the 1970s and the 1980s and the 1990s?**
11     A.  I'm not aware of it.
12     **Q.  Okay.  Would that surprise you to learn**
13  **that?**
14     A.  Nothing -- Based on my proximity to
15  politicians, nothing surprises me of what
16  politicians do, good or bad.  Sometimes they do
17  good things, and sometimes they do bad things.
18  But they are who they are.
19     **Q.  If there were such --**
20     A.  So I have no idea.
21     **Q.  If there were such an ordinance, would**
22  **you perceive that as a good thing or a bad**
23  **thing?**
24     A.  Well, I think anyone who is abused and

262

1        IN THE UNITED STATES DISTRICT COURT
2          NORTHERN DISTRICT OF ILLINOIS
3                EASTERN DIVISION
4
5  DANIEL TAYLOR,              )
6      Plaintiff,             )
7  v.                          )Case No. 14 CV 737
8  CITY OF CHICAGO, et al.,,   )
9      Defendants.            )
10     I, MICHAEL WELNER, M.D., being first duly
11  sworn, on oath say that I am the deponent in the
12  aforesaid deposition taken on May 17, 2018; that
13  I have read the foregoing transcript of my
14  deposition, consisting of pages 1 through 264
15  inclusive, and affix my signature to same.
16
17
18     _____
          MICHAEL WELNER, M.D.
19
20  Subscribed and sworn to
    before me this       day
21  of              , 2018
22
23  Notary Public
24

264



Michael Welner, M.D. 05/17/2018

1  STATE OF ILLINOIS    )
2                       ) SS:
3  COUNTY OF C O O K    )
4       I, TRACY JONES, a notary public within
5  and for the County of Cook County and State of
6  Illinois, do hereby certify that on
7  May 17, 2018, there personally appeared before
8  me, at 20 South Clark Street, Chicago, Illinois,
9  MICHAEL WELNER, M.D., in a cause now pending and
10 undetermined in the United States District Court
11 for the Northern District of Illinois, Eastern
12 Division, wherein DANIEL TAYLOR is the
13 Plaintiff, and THE CITY OF CHICAGO, et al., are
14 the Defendants.
15      I further certify that the said MICHAEL
16 WELNER, M.D. was first duly sworn to testify the
17 truth, the whole truth and nothing but the truth
18 in the cause aforesaid; that the testimony then
19 given by said witness was reported
20 stenographically by me in the presence of the
21 said witness, and afterwards reduced to
22 typewriting by Computer-Aided Transcription, and
23 the foregoing is a true and correct transcript
24 of the testimony so given by said witness as

265

1       McCorkle Court Reporters, Inc.
        200 N. LaSalle Street Suite 2900
2          Chicago, Illinois 60601-1014
3
        June 6, 2018
4
        BORKAN & SCAHILL, Ltd.
5       MS. MISHA ITCHHAPORIA
        Two First National Plaza
6       20 South Clark Street
        Suite 1700
7       Chicago, Illinois 60603
8       IN RE: Taylor v. City, et al.
        COURT NUMBER: 14 CV 737
9       DATE TAKEN: May 17, 2018
        DEPONENT: MICHAEL WELNER, M.D.
10
        Dear Ms. Itchhaporia:
11
        Enclosed is the deposition transcript for the
12      aforementioned deponent in the above-entitled
        cause. Also enclosed are additional signature
13      pages, if applicable, and errata sheets.
14      Per your agreement to secure signature, please
        submit the transcript to the deponent for review
15      and signature. All changes or corrections must
        be made on the errata sheets, not on the
16      transcript itself. All errata sheets should be
        signed and all signature pages need to be signed
17      and notarized.
18      After the deponent has completed the above,
        please return all signature pages and errata
19      sheets to me at the above address, and I will
        handle distribution to the respective parties.
20
        If you have any questions, please call me at the
21      phone number below.
22      Sincerely,
        Cynthia Alicea      TRACY JONES, CSR, RPR, CLR
23      Signature Department  Certified Shorthand Reporter
                (312)263-0052
24      cc: ALL COUNSEL OF RECORD

267

1  aforesaid.
2       I further certify that the signature to
3  the foregoing deposition was reserved by counsel
4  for the respective parties.
5       I further certify that the taking of this
6  deposition was pursuant to notice and that there
7  were present at the deposition the attorneys
8  hereinbefore mentioned.
9       I further certify that I am not counsel
10 for nor in any way related to the parties to
11 this suit, nor am I in any way interested in the
12 outcome thereof.
13      IN TESTIMONY WHEREOF:  I have hereunto
14 set my hand and affixed my notarial seal this
15 6th day of June 2018.
16
17
18      _Tracy Jones_
19      _____
20      TRACY JONES, CSR, RPR, CLR
21      LIC. NO. 084-004553
22
23
24

266

Pages 265 to 267



McCorkle Litigation Services, Inc.
Chicago, Illinois (312) 263-0052

**A**

**a.m**
1:20 4:9 6:12
**ability**
111:24 170:8 181:1
186:7,8,10,16,24
191:9 231:7
**able**
5:15 45:11 105:18
107:3 111:11 125:8
134:4 135:7 152:10
170:12 172:16
190:13 218:24
**aborted**
26:17 31:6
**above-entitled**
267:12
**absence**
27:11
**absolute**
8:10 190:20 199:7
220:21
**absolutely**
100:21 130:3 154:5
184:21,23 191:4
213:2
**absolutes**
217:8
**absorbed**
89:1
**absurd**
191:20,24 192:3,3
**abuse**
52:16,16 192:10
260:14 262:8
**abused**
262:24
**academic**
21:14 24:6 28:24 29:4
69:17 71:7 73:2
249:18
**academy**
52:20 53:1 114:14
115:21 256:17
**acceded**
153:9
**accept**
129:12 209:21 259:8
**acceptance**
242:3 247:11
**accepted**
111:5 193:5 216:7
247:1
**access**
65:5 153:7 253:13
**accident**
66:14
**accomplishing**
19:18
**account**
140:3,4 169:6 197:20
197:20 205:4 212:7
215:6,12,24 240:16
**accountable**
25:11 116:19 257:18
**accounted**
31:9
**accounting**
17:11
**accounts**
169:17 216:9,12,13

**accuracy**
131:24
**accurate**
47:18 76:9 87:12 119:9
205:14 242:7 252:9
252:12
**accurately**
76:5 116:23 124:3
189:15
**accused**
158:16
**acknowledges**
22:18
**acknowledging**
169:20
**acquainted**
59:9 60:2 69:21
**act**
169:2 213:19
**acting**
215:16
**action**
261:6
**active**
95:13 172:5 243:5
**activities**
80:3
**activity**
59:6 61:7 144:19
249:21
**actual**
87:1 95:9 126:23
162:12 206:9 238:9
**acute**
53:13 171:23
**ad**
162:12
**add**
6:19 9:2 14:18 28:21
36:17 75:11 82:5,9
83:12 84:14 87:16
88:23 156:24
**added**
83:8,10
**addition**
59:20 84:24 87:7 92:21
120:7 146:24 258:24
**additional**
5:12 37:22 80:15 108:3
137:4 267:12
**address**
136:7 261:6 267:19
**addressed**
16:23 62:4,5 66:9
118:22 119:2
**addressing**
10:20 62:11
**adds**
102:2
**adequacy**
116:5,10 117:5,8
**adequate**
118:18 119:3
**adhere**
40:9
**administer**
71:2,3
**administrative**
81:15
**admission**
234:20

**admitted**
59:5
**admitting**
209:23 234:19
**admonished**
170:20 172:8,18
**adolescent**
226:22
**adolescents**
221:23 235:22 237:4
237:12
**adopt**
205:3
**adopted**
205:9,14,20 251:10
**adversarial**
229:15
**adverse**
109:16
**advise**
143:1
**advised**
90:9
**advocated**
124:6
**affect**
173:17
**affidavit**
172:9,23 182:9
**affiliated**
57:8 60:10
**affiliation**
61:19 69:17
**affiliations**
60:9 61:20
**affirm**
244:6
**affix**
264:15
**affixed**
266:14
**afforded**
230:18 253:13
**aforementioned**
267:12
**aforesaid**
264:12 265:18 266:1
**afraid**
168:7 184:15 186:13
186:19 187:16
195:10 198:13
**African-American**
248:7,11,19 249:1
253:24 254:8 255:17
256:1,6 257:6 258:4
259:13 260:11 261:7
262:8
**afternoon**
5:16 154:20 240:6
**Agatite**
87:13 89:22 91:9 92:21
156:5 203:16
**age**
235:12 249:21
**agency**
79:10 146:12
**agent**
173:22 175:17,21
176:4,23 177:23
179:3,11
**aggression**

**134:8 199:17**
**aggressive**
210:6,7 254:4,21
255:11 257:19 258:3
258:14
**agitated**
170:23 181:10
**agitation**
53:8,13 168:10
**ago**
6:23 79:22 102:21
124:18 138:14
139:17 145:18
147:13 203:6
**agree**
6:21 44:19 78:9 110:22
111:15 112:6,20
116:9 117:5,7 119:6
119:19 120:11 155:2
197:22 198:22 199:3
219:4,7 236:1 243:15
243:21 244:11,21
246:23 247:4 250:3
250:21 251:2,14
**agreed**
31:20,21 110:11
244:23 246:15,15
**agreement**
267:14
**ahead**
23:10 34:20 62:1 85:16
90:2,23 132:21
133:18 167:23
170:18 202:12
**aimed**
71:24
**Akia**
167:10 168:13 170:9
171:5,15 172:22,24
173:10,16,16,21,23
174:8 178:7,20
179:18,21 185:13
**al**
1:8 4:10 264:8 265:13
267:8
**Alceste**
242:2
**ALEXA**
2:3
**Alicea**
267:22
**alienation**
210:4
**all-encompassing**
56:19
**allegation**
5:24
**allegations**
5:23 258:1,13,22
259:23 260:3,4
261:22
**alleged**
7:7 218:5
**alleges**
7:2
**alleging**
258:8
**Allison**
242:1
**allocate**
91:8,13

**allocated**
106:24 107:1
**allow**
132:24 227:11
**allowances**
112:13,15
**allowed**
33:11 230:18
**alluded**
90:11 226:14 254:12
**alter**
14:23
**ambiguities**
92:5
**ambiguous**
146:6 193:9 199:16
**American**
52:20 53:1,23 54:5,23
55:2 114:14 115:21
239:16,17 241:21,22
241:24
**amiable**
210:14
**amount**
26:20 27:2,5 78:3
80:24 91:20 101:23
108:13 153:15 213:5
221:1
**amounted**
88:12
**analysis**
26:6 27:13 171:14
196:6 198:20 205:5
205:17 208:17 223:1
224:2,14 246:15
254:14
**and/or**
245:13
**Anderson**
12:7 137:19
**Andrews**
137:19,22 142:21
143:11 145:7,8,11,24
158:18
**Angola**
152:17,18
**animated**
133:4 170:23
**annual**
53:24 54:12
**answer**
8:2,17,22 13:4,10
22:24 25:24 36:9
39:4,8 40:6,10 42:23
44:17 46:19,21,22
47:7,12,14,15 48:9
50:20 55:23 56:1,5
56:10 61:1 62:13
66:8 67:12 68:17
71:6,13 75:12 90:14
90:23 92:11 96:23
97:7,9 98:8,10,14,15
98:16 99:1,13 100:2
100:8,11 105:18
106:14 115:14
117:21 118:2,9 120:1
122:7 123:22,24
125:17 127:19
135:14 136:5 138:7,8
138:24 140:19
150:24 163:1 170:11

**allocated** 171:9 175:7,10
176:14 177:3 188:12
188:13,23 189:3
208:16 225:7 231:7
232:2 234:9 236:14
244:12,20 246:20
**answered**
34:19 47:8,9 55:17,18
56:6,7,12 64:5 74:22
76:21 86:5 117:18,19
118:5,6,11 119:24
175:2 187:3 191:14
204:6 205:19 223:18
224:4 231:19 235:5
**answering**
23:9 29:17 101:17
129:4 173:14 177:10
177:11
**answers**
8:3 174:16 241:10
**antagonistic**
255:11 256:4
**antecedents**
36:3 146:9
**antiauthority**
250:12
**anticipate**
14:21 85:22 86:1,11
**anticipation**
10:13 15:19 16:19
17:17 75:13 76:12
**antipsychotics**
53:7
**antisocial**
228:3
**anybody**
78:6 203:22
**anyone's**
72:11 159:16
**anyway**
46:3 120:7
**APA**
54:18
**apart**
36:10 62:21 134:13
232:5
**apartment**
156:6 208:7
**Apologies**
115:8
**apologize**
153:23
**appeals**
192:12
**appear**
7:4 84:15 188:9 220:19
**APPEARANCES**
2:1
**appeared**
18:16 239:3 265:7
**appearing**
249:16
**appears**
8:23 76:14 166:6
**appellate**
30:14
**applicability**
135:11
**applicable**
267:13
**application**



Michael Welner, M.D. 05/17/2018

72:1 135:4 251:11
**applied**
78:11
**applies**
251:6,15,16
**apply**
68:18 135:7 197:23
**apportion**
29:5
**appreciable**
70:16 78:3,23
**appreciate**
7:9,23 13:3,8 67:10
74:18 90:15 91:15
110:13 150:24 170:7
231:6 263:12
**appreciated**
9:6 19:24 63:19 228:5
**approach**
68:19,20 184:13
**approached**
184:12
**approaches**
141:7
**appropriate**
6:15 150:6
**approve**
76:11 154:7
**approved**
149:22 239:19
**approximate**
108:16
**Approximately**
105:15 139:13
**approximates**
244:24
**April**
144:1,2 146:22
**arduous**
92:9
**area**
11:23 19:24 26:8 45:8
45:17,23 46:4 48:5
49:1,5,10,11 51:9,11
51:22 53:18,22 54:20
66:3,4 69:15,23,24
70:1,11 71:8,18 72:9
73:2,4,8,14 110:19
111:20 113:24 133:7
140:23 150:17 181:5
181:13 203:3,16
231:12 243:22
252:14
**areas**
24:5 45:12,14 46:9
50:8,9,12,14 51:16
56:14 60:4 66:10
113:18 121:2 134:11
**argument**
99:14
**arises**
159:4
**arising**
120:20
**armed**
199:16 209:12
**arose**
178:22
**arrange**
18:24
**arrangement**

77:10,14,24 78:5
**arrest**
185:1 190:1
**arrested**
185:3
**arrests**
221:20
**arrive**
120:12,22 121:3 187:6
**arrived**
145:21
**arriving**
121:8 123:18 206:14
247:7
**artful**
198:7
**article**
11:20 19:6 30:10,15
53:3,17 225:11
239:11 240:14,19
241:3,18 257:21
**articles**
10:15,17,21 11:4,15,24
13:24 14:6,7,12,19
20:7 25:17 28:1
72:16 150:13,14
220:18 243:14 249:4
**ascertain**
30:3
**ascertained**
155:8
**aside**
10:19 26:19 214:17
**asked**
8:20 13:9 34:19 47:8
55:16 56:6 60:20
64:4 71:5 74:11,13
81:10 94:7 117:17
118:5 119:23 122:1
124:5 127:1 130:10
130:10 175:1 181:18
183:23 187:3 188:5
191:13 204:5 205:19
223:18 224:4 231:18
252:8
**asking**
15:1 19:11 34:12 40:1
69:1 74:13 97:20,21
98:20,21 99:8 113:10
129:3 132:5,6 140:14
140:15 176:15,20
195:19 213:12 231:9
244:19
**aspect**
49:14 62:8 97:11 192:9
**aspects**
21:7,24 48:19 55:9
56:20 57:12 157:23
171:1 213:1,13
**aspired**
72:5,6
**assaulted**
198:13
**assembly**
262:1
**asserted**
194:18
**asserting**
56:18 166:22,23
202:14
**assertion**

27:18 191:17 195:23
196:8 197:17 206:22
208:3 224:21 226:2
236:22 248:15 249:1
**assertions**
148:14 169:10 241:8,8
247:19
**assess**
72:14,14 171:21
**assessed**
135:23
**assessment**
69:3,8,9 70:12,14 71:9
71:14,15,18 72:10,12
72:23 73:3,4,9,14
74:14 140:8 141:1
148:8 158:22 231:12
233:24
**assessments**
69:12 70:8 197:13
227:16
**assessor**
229:6
**assigned**
16:8 61:22
**assignment**
161:21
**assist**
95:24 161:10 192:11
**associated**
67:19
**association**
53:24 54:5,23 55:3
73:12 239:18 241:21
241:23
**associations**
169:23
**assume**
8:21 90:24 100:15
128:16 158:1
**assumes**
90:22
**assuming**
87:11
**assumption**
27:16
**assurance**
37:24
**attached**
18:17 221:12
**attack**
156:6
**attacked**
169:18
**attempt**
8:16 26:13 35:11
128:19 253:22
**attempted**
25:19 60:13
**attempting**
158:23
**attend**
53:21 54:19
**attended**
53:23
**attention**
11:18 21:20 89:10 90:8
92:1 209:4 237:3
**attitude**
250:14
**attitudes**

247:20 248:16,18,19
252:11
**attorney**
43:20 113:7 126:10
153:7 163:11 172:24
173:4,11,22 175:8,17
176:1,3,22 179:2,9
180:21 181:15
182:13 190:5,6,7,8
**attorney's**
43:18 163:17 165:11
**attorneys**
10:9 79:9,10 89:4
95:24 101:15 110:2,4
129:21 190:9 192:8
210:4,6 266:7
**attracted**
92:6
**attributable**
105:12 107:15
**attribution**
23:15
**attributions**
21:6
**augments**
137:4
**August**
123:7
**author**
12:2
**authored**
238:21
**authority**
137:2 195:1,2 230:12
234:8 254:1
**authorized**
239:19
**authors**
242:1
**available**
25:1 26:20 27:9 54:13
63:9 81:4 120:18
158:12 159:11
171:10 193:11
195:11 199:22 203:9
205:10,11,20 208:18
209:5 211:3 212:4,5
214:12 222:13,16
228:16 229:17,21
230:1 237:12 238:4
249:13 250:1 259:3
**Avenue**
2:4
**avoid**
9:5 193:19 194:4
195:17
**awarded**
159:23 165:15
**aware**
14:4 127:23 156:10
159:22,23 200:6,9
208:4 210:22 223:11
257:17,24 258:7,12
260:2,4 262:4,11
**awareness**
209:19 257:20

——————————
**B**
——————————
**B**
3:7
**B-L-A-I-R**

13:14
**baby**
250:20
**back**
20:1 38:15 44:12 46:18
48:9 88:6 93:16
101:8 107:18 115:17
147:14 154:16
182:23 200:12 202:4
205:23 206:9 212:16
219:8 220:7 224:10
248:1 253:17 261:10
**backdrop**
169:20
**background**
64:24 194:23 201:6,11
201:20 202:2 210:3
**bad**
177:21 262:16,17,22
**barely**
74:8
**base**
159:5 171:9,15 183:21
203:8
**based**
35:8 40:6 59:24 69:17
101:12,19 107:13
118:17 132:15 145:4
162:14 163:4,22
165:13 171:13,19
181:8 182:2 183:15
185:12 186:3 189:22
189:23 191:5 193:10
197:15,23 199:6,9,10
203:4 208:3 211:2
228:15 229:16
256:19 262:14
**baseline**
246:15
**basically**
27:3 41:15,15 193:2
243:2,14,19 244:6
**basis**
79:14 127:19 159:3
164:22 166:20,22,23
174:8 176:2,21
179:16 198:20
207:23 208:2 214:9
229:8 256:2
**Bates**
32:7,8 115:8,10,11
122:22 124:14,16,17
125:3
**bathroom**
131:14
**bear**
7:24 211:19
**bears**
55:3
**beatdowns**
169:22
**beaten**
193:20 194:4 195:17
199:1 251:23,24
**beating**
46:2 189:13 200:3,10
229:19
**beatings**
199:12
**began**
6:5 249:15

**beginning**
4:15 57:9 69:5 93:18
125:15 154:17
160:11 193:18
212:17
**begins**
189:6 207:7
**begun**
5:10
**behalf**
4:20,21 6:2 179:12
**behavior**
58:17 168:15 171:2,21
171:24 183:7,9
194:23 209:4 221:17
238:19 258:15
**behavioral**
46:14 48:7,14,17,18
49:7,10,14,16,22
51:9,16,17,23 52:2,8
53:19,22 54:2,20
59:23 60:5 61:15
70:13 171:19 213:7
213:10 215:14 216:8
**behaviorally**
230:13
**behaviors**
118:22
**belated**
183:3
**belatedly**
23:8 122:10
**believe**
10:10 16:22 19:12
20:24 23:13 31:20
33:3 42:10 66:9 67:3
71:6 77:4 84:8 85:13
104:2 139:10 142:14
147:20 170:7 207:23
217:7 246:13
**Bell**
131:13 139:3,3,4,16
**Bellevue**
58:8
**benefit**
231:9,10
**Berman**
190:6,7
**best**
8:2 9:10 47:9 55:19
56:8 63:18 116:15
118:11 231:7
**bet**
240:7,10,21 241:1
**better**
27:9 102:12 237:15
**beyond**
51:10,18 98:5 159:16
164:19 169:23
174:16 184:21 186:9
189:3 193:17 257:11
**Biebel**
161:14,17
**big**
88:19 237:1
**bill**
16:7,13 76:13 79:20
80:7,12 82:19,21
87:12 88:5,12 89:4
89:22 95:4 96:2,5
97:12 138:21



billed
89:2 98:17 101:21
billing
16:3 75:5 77:22 84:2
85:10,14 87:23 88:19
94:1 98:21 99:5
109:10 160:24
billing-wise
109:9
billings
75:3,21 77:6 79:15
81:21 82:10 83:20
84:6,16 85:4 90:18
90:20 91:3,10 96:12
97:14 98:5 103:17
bills
76:17 79:23 80:16,24
94:14 101:19
biological
48:18,23
bit
9:7 125:12 131:4 194:17
240:5
black
12:23 63:17
Blair
11:16 13:13
Blair's
14:6
blanking
12:6
blind
241:5
blowing
129:6
board
20:3
body
73:22 180:23 239:20
book
11:6,12 12:5,11,21
71:22,23 72:8,18,21
73:1 141:9,11 222:22
233:4,6
Borkan
2:8 4:7 267:4
born
183:13
borne
255:12
bottom
116:3 125:12 155:15
214:5
boutique
69:23
Bowman
2:3 3:5 4:17,17 6:4,17
7:16 15:17 18:7,24
19:3,4 22:23 23:11
29:12 31:19 32:4,13
32:15 34:2 35:10,18
38:1,9,17 39:6,7 40:4
40:8 42:3,7 43:1,3,13
44:1,4,15,21,23
45:16,22 46:16 47:11
47:16 48:8,12 50:13
50:17 51:20 55:20
56:9 60:6,22 62:12
64:10 65:12 67:2
71:16 75:1 76:4,16
77:2 78:16 79:5

80:15,20 81:19 82:1
82:7 84:1 85:9 86:10
90:13,24 91:7 92:16
93:9,19 94:18,20
96:11 97:1,13 98:16
98:20 99:4,11,15,17
99:23 100:4,10,22
101:10,18 103:2,5,7
104:16 106:1,7 107:4
114:3,9,15,17 115:6
115:13 117:20 118:1
118:8 119:5 120:10
121:11,14,16 122:15
122:19 123:1 124:13
124:21 127:22 128:4
128:12 129:2 134:15
138:10 139:8 140:6
140:20,22 141:8
142:1 144:16 145:3
154:11,19 156:15
163:14 164:5,21
166:3,12 167:4 168:1
171:12 173:20 174:6
174:15 175:10,13,15
176:6,12,19 177:2,8
178:16 179:14
185:10,20 186:23
187:9 189:1 191:7,15
195:15 196:3,12
198:21 200:22
201:14,22 202:4
203:5 204:10 205:13
206:1,12 207:2,22
208:15 212:19
216:10,19,23 218:12
219:13 224:12,19
225:1,17 226:10
228:12,23 231:20,23
232:5,15 233:12,18
233:19 236:6 238:15
241:14 246:22
247:16 252:7 253:16
256:22 257:14,23
258:9,16 260:7 261:3
261:12 262:3 263:5
263:11
Bradford
40:21
break
38:10,13 93:14,21
101:6 154:10,14
212:14 216:21 263:5
263:9
breakdown
106:23
bring
5:20 146:13 258:24
brittle
202:21
broad
49:17,23 50:3,8 51:18
149:7 246:18,19
254:20
Bronx
57:17
Brooklyn
57:17
brought
90:8 203:10,10
Brown
151:15

Brunt
2:3 38:8 115:7,11
brutality
261:7
build
230:22 254:7,19
255:18 256:3,6
building
156:6 253:23 257:6
259:12
bump
78:23
Burge
142:21 143:11 145:7
256:24 257:4,16
262:9
business
6:18 103:15 104:8
byproduct
208:17

─────────── C ───────────

C
265:3
calculate
80:23
calculation
82:18,21 83:6 84:16
86:19 95:3 97:15
101:20 107:6,12
call
72:19 100:12,20
109:19 184:24 185:3
226:24 267:20
called
1:12 7:12 13:2 21:20
67:6,7 86:14 95:17
103:21 109:20 116:6
117:9 152:2 170:9
calling
177:23,24 178:1
calls
78:13 86:4 122:11
128:22 133:17 176:9
179:5 187:1 225:2
227:18 255:20
Caluris
65:15
Calvin
41:5 42:15 131:21
139:12
campaigns
66:18
candidly
129:5 254:13
capable
21:14
capacity
215:17
car
162:12 181:20,21,21
careful
39:8
Carley
151:15
case
1:7 4:13 7:1,3,7 10:5,8
14:1,21 16:8,9,18
17:9,13 18:10 23:2
30:4 32:3 36:1,24
37:21 39:13,15 40:15

40:20,21 41:4 42:18
42:22 43:17 45:15,18
45:24 52:16 59:18
61:7,14 62:9,22
63:10 64:7,11,12,16
64:22 65:11 66:5,14
66:23 68:1,4,8,12,13
68:22 74:15,20 75:4
76:17 77:23 78:4,11
78:22 79:2 80:14,19
81:13,21 83:21 84:3
84:7,24 85:1,15,20
85:23 86:2,22 87:7,8
87:9 88:8,8,9,11,11
88:20 89:2,7,12,13
89:15 90:12 92:9
94:3,21,24 95:2,12
95:13,17,20,20 97:5
97:11,23 98:13,19,24
99:1,2,5,10 100:15
100:20 102:22 109:3
110:6,10,14,15
111:13 113:6,12
122:18 123:5 125:19
126:16 129:1,8,18
130:17 134:7,23
136:14,17 137:16
138:13,16,20 139:21
143:18 144:7,11
145:14 146:2,10,11
147:2,5 150:7 151:14
151:17,18,19,20
152:7 153:9,10,12,16
154:23 157:2,24
158:23 159:9 160:24
161:4,12 162:20
164:14 165:1,6,7,15
168:12,22 169:2,14
170:1,3,8 173:1,8,17
174:7 192:11 206:19
209:24 215:5 216:15
216:24 218:6,15
219:18 220:1,2,2,9
220:12,15 221:19
223:4,8 229:17
231:10 232:3 252:19
255:5,22 258:23
261:9 264:7
case-by-case
256:2
cases
7:6 21:21 24:22 25:4,9
25:21,22 26:21,23
27:10,16 31:15,17
34:21 35:5 36:4,11
36:24 37:3,12,14
38:18,23 39:5,19,22
40:2 43:10 44:9 61:8
61:9 69:21 79:4
87:14 88:9,10,17,19
88:24 89:1,17,23
91:9,14,18,18,19
99:19 100:6,19
101:23 108:20
109:12 110:18 111:1
111:12 124:6 128:6,8
141:12,13 148:1
149:13 150:21 151:4
151:10,13,21 153:13
153:23 163:24
178:12 189:23 192:6

192:6 211:9,9,11,17
212:4,6,8 217:9
218:1,2,4 219:4,7
221:13 222:7 236:2
237:22 238:1,5,8
252:23
catalog
29:7
catalogue
29:19
category
49:17
Cateresa
218:1,5
causal
21:5 23:15
cause
66:14 265:9,18 267:12
causing
195:9
caution
8:24 97:4 98:13 100:1
138:6,22 139:1,22
cautioning
39:24
cc
267:24
CENTER
2:2
central
32:24 33:3,8,11,23
61:7,9,21
certain
5:23 22:5 32:24 51:16
55:9 56:14,20 57:12
72:16 84:10 92:5
110:17 112:11
117:14,23 118:16
128:7 132:14 133:7
136:15 156:23 193:7
213:1,3,5 225:13
236:5,15 250:7
254:18 259:19
certainly
9:14 21:10,14,19 22:8
22:21 26:22 34:10
41:10 62:9 72:22
73:19 76:14 83:12
90:11 92:4 104:23
109:2 110:10 111:10
119:17 129:18
130:22 134:6 152:22
161:1 172:1 186:2
198:19 209:19 210:4
215:14 221:13 228:4
256:2 260:2,3
certainty
35:6 112:18 120:23
155:12 158:13 187:7
187:14 189:18
190:22,24 191:9
certificate
159:24 160:4,14 161:7
163:6,12,18 164:16
165:12,14
Certified
1:16 4:2 267:23
certify
265:6,15 266:2,5,9
challenge
194:16

challenged
200:19
chance
5:18 6:24 27:7 134:3
159:7
change
93:10 171:23,24
178:21 198:8
changed
181:9 182:7 183:7
changes
215:12 267:15
Chapman
94:1,21 95:8,11,21
109:6,8 137:16 147:9
147:18
character
201:15
characteristically
111:3
characteristics
237:7,19
characterization
28:13 50:6 147:8 166:9
178:2 191:21 198:9
239:23 242:14,15
characterizations
191:21
characterize
28:11 167:17 193:14
198:16 226:19
characterized
149:7 190:17 192:14
243:12
charges
59:4 82:3,23 107:14
146:13 234:19
check
106:11 107:2 143:1
Chicago
1:8,18 2:4,5,10,12,16
2:18 4:4,8,10,22 16:3
39:22 40:3,22 42:9
62:19,24 63:6 64:3
65:23,24 77:11,16
78:7,8 79:11 87:13
87:24 89:21 90:4
92:23 94:3,7,8,9,12
94:22 95:1 96:3,14
101:21 102:23
105:13,19 106:4,16
108:13,21,24 109:13
109:16 110:17
138:21 139:21 140:2
147:3,4 157:14
255:15 256:5,10,24
259:10 261:5 262:5
264:8 265:8,13 267:2
267:7
child
52:15 213:9 250:9,10
children
235:22
choice
112:12 196:24
choices
48:20
choose
86:7 192:22
chose
68:18 88:9 110:11



145:21 146:12
197:23
**chosen**
24:8
**circumspect**
227:5
**circumstance**
109:7 250:19
**circumstances**
44:6 89:14 112:15
113:12 128:9 134:14
135:18,21 181:11
190:5 192:16 211:2
250:10
**citation**
226:5 231:11 235:8
**citations**
18:17
**cite**
181:4 211:6 230:4
231:8 235:1 241:9
254:1
**cited**
14:19 215:5 249:4
250:2 256:20
**citing**
182:18 257:21
**city**
1:8 2:18 4:10,22 11:13
12:14,22 16:3 39:21
40:3 42:9 57:15,16
57:16,17 59:24 63:16
63:16,22 77:10,15
78:7,8 79:11 81:1
87:13,23 89:20 90:3
92:22 94:3,7,8,12,14
94:22,24 96:2,13
98:17,22 101:21
102:23 105:13,19
106:4,16 108:13,21
108:24 109:13,16
110:16 137:18
138:20 139:20 140:2
147:3,4 249:19
255:15 258:19,20
259:10 261:4,5,8
262:1,4,5 264:8
265:13 267:8
**City's**
5:11
**civil**
1:13 128:10 145:15
146:4,11 189:12
263:2
**claim**
57:11 66:2,19,21 67:16
68:3 80:21 83:7
140:24 159:4
**claiming**
86:18
**clarification**
101:1,15
**clarifies**
32:14
**clarify**
8:16 10:11 94:7 102:20
110:8 140:20 165:4
252:15
**clarifying**
17:15 75:15
**Clark**

1:18 2:9 4:8 151:14
265:8 267:6
**classes**
256:17
**classify**
77:24
**clear**
8:11 9:15 49:16 61:18
67:4 79:14 80:19
84:23 87:6 109:24
129:21 130:4,6
139:24 158:14,18
168:2 177:23 185:24
186:1,1,2 190:23
229:18 230:19
251:21
**clearly**
71:24 165:22
**client**
6:3 42:8 79:6 105:20
106:2,9 131:12
179:13
**clients**
77:11 106:17
**clinical**
53:6,14 57:21 58:7
116:5,10 117:8,12,14
117:15,24 118:3
120:20 172:2 183:5,8
183:15
**clinically**
253:9
**clinician**
22:14 229:23
**close**
87:24 107:22
**closed**
126:12 173:1
**closely**
241:19
**closer**
36:23
**closest**
216:12
**CLR**
1:23 266:20 267:22
**coauthors**
242:18
**cobble**
21:3
**cocktail**
73:18
**code**
11:11 12:2 250:22
251:3,5,15,16
**coerced**
134:24 144:13 145:9
**coexist**
92:5 157:23
**coexists**
169:14 170:24
**collateral**
59:13
**colleagues**
11:22
**collection**
80:7
**collectively**
178:5
**college**
22:3 74:1 249:20

**combat**
199:10
**combination**
250:17
**come**
10:8 20:6 28:20 108:1
108:5 135:1 139:6
156:17 197:5 226:24
237:24 238:2
**comes**
47:1 53:5 70:24 125:16
144:5 146:21 147:1
149:24 169:7 171:7
215:19 225:24
253:21 256:15,16,17
**comfortable**
28:4 35:7 41:11 101:16
133:4 206:14
**coming**
184:4 192:18 222:22
**comm-**
182:9
**command**
257:5
**comment**
114:19
**commentary**
115:2 244:12,20
**commented**
115:20
**comments**
169:19
**committed**
145:24 155:12 208:20
**common**
178:4 182:20 192:2
221:17 242:9 251:11
**commonplace**
212:3
**communicate**
180:7
**communicated**
179:13 182:8,9 215:2
229:11
**communicating**
173:23 175:22 181:12
190:5 251:12
**communication**
171:3 181:14
**communications**
127:16
**community**
60:5 63:22 69:19 162:7
242:5 247:2
**companion**
96:20
**company**
17:17
**compatible**
195:11,13
**compel**
127:24 128:19
**compelling**
146:11 158:20
**compensated**
88:21 89:17
**compensation**
80:18,24 81:12 88:18
95:9 102:15 127:18
262:7
**competency**

70:21 114:1,1
**competent**
45:7
**competing**
205:1
**compilation**
225:18
**compiled**
222:17,19
**complaint**
5:12,13,22 6:22
**complete**
29:14,19 31:4,7,8 68:9
120:8
**completed**
29:24 33:15,15,21
150:3 267:18
**completely**
8:1 12:12 108:11 164:1
183:12 199:16
207:21
**completion**
35:15
**complex**
91:7 227:15,21 228:5
**compliance**
5:11 133:20 134:17
135:20 136:19,21
137:1 230:12,24
232:10,11,13,21
234:7,24 235:13,21
236:12
**compliant**
230:13,17
**complicated**
227:24 228:1
**compliment**
21:15
**comportment**
171:2 178:22 181:9
182:6 183:6
**composure**
167:12
**compound**
188:21 215:10
**Computer-Aided**
265:22
**concentrated**
62:8 221:21
**concise**
67:15
**conclude**
33:22
**concluded**
38:20 39:15 40:17 41:1
41:3,3,5,15
**conclusion**
41:18 131:22 176:9
179:6 206:5 238:2
**conclusions**
26:22
**condition**
228:5
**conditions**
25:14 58:7,10 149:1
243:10
**conduct**
7:6 22:3 104:21 112:24
113:15 121:7,20
123:17 127:14
133:12 137:6,9,12,15

70:21 114:1,1
**conducted**
21:19 24:18 26:7,11
57:4 62:18 120:14
138:3,12,19 139:20
140:11 141:4
**conducting**
47:19,22
**conducts**
69:11 70:7 253:1
**confer**
100:24
**confess**
40:18 208:12 210:21
222:2,5 230:8 231:15
235:11,15
**confessed**
38:21 39:16 41:2,6,22
43:7 44:11 147:18,21
148:21 156:22 159:8
193:19 194:4 195:16
206:16 212:1 219:15
224:6 229:12 237:19
**confesses**
211:16
**confessing**
145:9 199:2,19 211:12
228:20,24 230:14
234:3 235:4
**confession**
11:18,23 20:1 21:22
22:10 25:3,6,9 30:5,6
37:22 41:16 58:22
69:4 70:12,14,18,24
71:9 73:15 87:14
89:16 92:23 94:2
101:23 125:24
128:10 131:23
134:12 135:1 138:13
138:20 139:21
142:14 143:7,18
144:12,18 145:2,20
146:5 147:5,7 148:1
149:3 155:3,7,16,20
158:22 159:4,10
166:23 168:19 195:9
204:17 210:19
211:14,24 212:3,6
218:9 219:21 221:9
222:9 232:12,13
234:5 238:2 245:20
**confessions**
10:20 11:19 19:7,15
20:10,18 21:5 23:5
23:14 24:19 25:5
26:8 27:17 29:8,22
30:3,19,20 31:2,23
32:24 33:1,4,9,9,12
33:23 34:6,12,14,15
35:8,13,13,20,24
36:13 37:4,6,13,14
37:18 43:4 48:7 55:4
69:12 70:8 71:19,23
72:10 73:5,10,17
74:15 88:1 111:2
140:8 141:1 211:11
211:18,21,22 212:8
217:3,10 219:1
220:11 229:6 231:13

234:1 236:2,18
237:24 238:20 242:4
245:13
**confidence**
37:20,24 38:3 111:11
131:2,24 136:8
**confident**
247:12
**confirm**
15:3 18:11 37:1 82:12
83:12 84:9 86:23,24
**confirmed**
97:20,21 212:6,8
**confirming**
184:21
**confirms**
204:7,15
**conflict**
183:13
**confront**
199:14
**confrontational**
254:21
**confronted**
198:11
**confusion**
9:6
**conjunction**
260:5
**conjured**
191:22
**connected**
60:10
**Connecticut**
181:24
**connection**
161:12
**Connick**
43:20
**conscript**
248:7
**conscripts**
248:12 254:1
**consensus**
239:21 243:17
**consequence**
13:23 21:1 257:22
**consider**
38:19 55:6,8,11,14
56:2 150:13 157:18
159:3
**considerable**
91:19
**considerate**
149:24
**consideration**
20:20 105:17 193:1
**considerations**
22:13 164:10 165:19
165:20,21 169:7
**considered**
25:15 165:13 196:20
196:21 209:8 212:10
**considering**
197:15
**consistent**
68:18 101:24 141:14
178:21 179:9 201:5
201:11,15 205:2,10
215:1 225:16 230:11
**consistently**



124:5 130:21 141:12
141:15 195:2
**consisting**
264:14
**constantly**
177:19
**constitute**
155:6
**constitutes**
69:2
**constitution**
202:22 228:18 230:7
231:14
**consult**
56:21
**consultant**
129:13
**consultation**
52:13 104:20,20
**contact**
190:9 221:2,2,8
**contacted**
172:7,10,12,18,24
182:12
**contacting**
179:12
**contacts**
221:6,7,10
**contemporaneous**
215:20
**contest**
165:12
**context**
12:12,15 27:24 29:1
35:21 58:5 59:4
148:10 182:16
196:17
**contexts**
25:15 57:21 59:12
236:15
**continual**
31:17
**continue**
185:4
**continued**
91:21 214:23
**continuing**
36:6 174:5
**continuous**
174:11
**contradictory**
216:14
**contradicts**
137:5
**contrary**
20:4 243:20
**contravention**
216:7
**contribute**
21:20 22:21
**contributed**
22:20
**contribution**
19:24 27:14 28:22
**contributions**
20:8 23:5
**control**
86:6
**controversial**
154:22
**convergence**

109:8
**conversation**
184:22
**conveyed**
178:19 188:24 189:4
214:24
**conveying**
185:7,8
**conveys**
178:13
**convicted**
146:8 184:16
**conviction**
163:10
**convictions**
29:23
**Cook**
1:17 163:16 265:5
**cookie**
132:18
**cooperate**
229:16 249:22 250:6,9
250:13,18
**cooperation**
63:21 263:13
**copies**
232:23
**copy**
31:1 42:3 43:2,21,23
115:8 122:21
**Corethian**
131:12 139:3,16
**cornerstone**
110:23 111:14
**corp**
104:2
**corporation**
104:1
**correct**
9:1 13:15 19:12 26:5
28:16 36:15 38:5
40:11,12,24 41:21,23
47:20,21 54:9 61:2
75:8 79:18,21 80:2
85:2,10 87:18 93:1
94:4 96:3 101:14
105:5 110:20 111:23
112:5,22 116:1 120:9
136:11,12 143:10,20
144:10 148:5 152:21
155:5,13 156:8 161:8
164:23 188:1 191:11
194:6 219:3,10,16
236:9 245:7,15 248:8
252:14 265:23
**corrections**
229:10 267:15
**correlate**
125:6
**coterie**
19:17 22:7 69:23 149:8
238:23,24 243:3,12
243:19
**Council**
261:5 262:1,4
**counsel**
4:14,16 5:17 6:2,13
30:24 126:16 127:12
127:16 128:17 129:9
130:7 212:11 260:5
266:3,9 267:24

**count**
219:20
**counterpoint**
27:15
**County**
1:17 163:16 265:3,5,5
**couple**
5:9 102:21 115:3 143:6
150:15 154:21 223:7
**course**
7:5 59:10 60:7 88:19
94:8 103:23 123:10
**court**
1:1 4:12,24 5:2 33:20
52:14 91:23 99:10
112:13 113:6 121:12
127:13,24 128:18
129:24 143:13
145:15 146:4,12
153:4,8,12,15,19
154:2,6 175:11
180:20 264:1 265:10
267:1,8
**courtesy**
13:7
**courts**
1:14 111:6 162:10
**cover**
50:9,14
**covered**
113:19 233:20
**covers**
9:20 46:10 50:8,12,21
51:1,3
**created**
35:20
**credence**
178:6
**credibility**
194:7,12 196:14 197:8
197:10,23
**credible**
193:20 194:5 195:23
197:1,18 199:23
202:16 237:3 246:24
**credit**
22:11
**crime**
155:12 221:12 251:12
**crimes**
53:1 208:19
**criminal**
46:13 52:20 58:21 59:4
111:20 148:3 151:3,3
151:5 209:18 245:4
249:21
**criminology**
46:13 245:4
**Crisis**
52:5
**criteria**
244:14,15 245:6,24
**criterion**
245:10
**criticize**
23:12
**criticizing**
28:8
**critiqued**
256:20
**cross-pollination**

72:3
**Cruz**
219:17 220:6
**CSR**
1:23 5:4 266:20 267:22
**cultivate**
210:13
**cultural**
48:24
**culture**
55:7,10,15 56:3,17
57:2,5,12 58:18,20
61:10 62:14
**cultures**
61:10,11
**cumulative**
250:16
**current**
18:11
**currently**
95:21 226:12
**curriculum**
18:9
**custody**
154:24 156:4 157:4,6,7
157:9,15 184:15
**customarily**
255:8
**customer**
96:13
**cut**
13:6 15:14 50:10 88:6
252:1
**cutter**
132:19
**CV**
1:7 4:13 18:2,12,21
51:22 264:7 267:8
**Cynthia**
267:22

---

**D**

**D**
3:1 143:14
**damaged**
178:5 263:1
**damages**
260:6 263:2
**Damon**
43:15
**Dan**
5:9 6:20
**dance**
197:4
**dangerousness**
151:4
**Daniel**
1:5 2:14 4:9,18,21
76:23 80:6 117:13,16
118:3 126:9 130:9
156:2 157:3 159:23
161:7 164:16 173:18
207:14,16 208:11
226:15 227:9,14
228:18 248:6 260:11
264:5 265:12
**dark**
189:14
**data**
25:19 26:20,24,24 27:2
27:5,8 118:18 136:6

137:5 149:23 159:11
166:24 171:10
225:18,24 236:24
**database**
120:4
**databases**
225:8
**date**
21:2 77:6 81:21 82:10
82:11,22 160:15
267:9
**dates**
107:14
**Daubert**
124:22 231:4 233:14
**day**
13:1 27:7 210:22
264:20 266:15
**days**
132:21
**dead**
181:19
**deal**
58:14 89:21
**dealing**
131:6 180:5,10,13,15
215:18 230:20 252:2
**Dear**
267:10
**death**
66:3,10,12,14 151:10
151:12,14,17,18,19
151:19,21,23 152:1,7
153:5,24 154:1
**debater**
240:12
**debating**
240:6 241:1
**decade**
249:14
**decide**
198:17
**decision**
24:9 68:11 135:16
164:15,17
**decisionmaking**
163:16
**decisions**
163:24
**declined**
110:17
**dedicated**
28:24 29:3
**deductions**
103:13
**deem**
30:19 130:1 192:2
**deemed**
127:2
**defend**
157:12,16
**defendant**
2:12 102:23 112:10
151:23 154:1 211:8
211:11
**defendant's**
111:21,24
**defendants**
1:9 4:11 7:3 32:7 41:20
59:1 151:17 152:18
153:1,5,19 159:15

190:10 192:7 211:10
217:15,24 218:20
264:9 265:14
**defense**
59:2 94:12,13 145:2,21
147:17 148:13
152:11 222:8
**defenses**
70:20
**defiance**
195:3 227:21,23
**defiant**
226:16 227:2 230:11
234:2,6 235:3
**define**
244:13
**defines**
111:8
**defining**
140:16
**definition**
49:7
**definitive**
66:11 82:13,15
**degraded**
63:15
**degree**
13:20 25:18 45:3,5
49:24 51:12 150:4
187:7,14 189:18
190:21
**degreed**
244:4
**degrees**
164:3
**delay**
78:23
**deliberate**
24:10
**deliberately**
243:24
**deliberation**
228:2
**delineate**
25:2 237:7
**delineated**
45:15
**delivered**
211:12
**delusion**
209:2
**demand**
201:10
**demeanor**
188:10
**demonstrably**
248:20 259:20
**demonstrate**
20:17 148:24 171:1
191:1
**demonstrated**
20:9,12 169:2 235:14
236:18 238:8
**demonstrates**
171:23 180:4
**demonstrating**
171:22
**demonstration**
27:20
**denoted**
190:1 234:16



Michael Welner, M.D. 05/17/2018

denoting
178:8
Deon
84:17 137:7 173:18
251:20
Dep
32:8
department
63:7,17 64:3 94:10
256:24 267:23
dependent
120:24
depending
120:16 150:1
depends
14:22 68:1,1 113:23
120:3 121:23 122:1
140:12,16 150:9
168:16 183:18
187:11 213:12
255:21,22
deponent
74:21 264:11 267:9,12
267:14,18
deposed
32:20 97:10 110:2
deposition
1:11 4:6 5:21 6:5,9 8:8
8:9 10:14 14:16 15:8
15:20 16:20 17:24
18:4 32:12,17 33:2
57:10 64:23 65:7
75:5 76:1 80:5 83:22
85:6,19,22 86:1,7,15
93:3,4,22 95:14 96:8
100:15 114:6 122:12
122:17 123:2,4
124:10 141:20
142:23 143:12,14,15
145:22 147:16
160:17 167:8,13
168:15 169:12
170:11,22 171:17
172:6,22 176:22
177:13,16,18 178:23
180:2,4 181:3 182:7
187:15,19,24 188:3
233:16 238:12,18
241:11 248:4 264:12
264:14 266:3,6,7
267:11
depositions
1:15 91:23 119:14
depraved
150:8
depravity
28:2 149:16,22 150:2
derivative
74:1
derive
117:1 135:13 222:24
derived
26:23 64:6 167:2
describe
76:5 248:6
described
16:1 22:8 26:7 32:23
49:6 142:8 149:14
220:12
describes
239:14,18

describing
25:24
Desert
22:3,4,5
deserves
22:11
designed
199:13
destructive
228:6
detail
253:13
detailed
15:10 72:15 225:13
253:4
details
36:3 77:9 166:5 216:3
220:3 240:8
detective
189:12,19 200:20
detectives
167:2 203:17 205:22
214:24 255:16 256:5
257:4 258:1,8,14,23
detectives'
197:20 204:20 205:4
205:15 206:4,21
detector
190:18
determination
165:14 194:8,12 196:6
196:7
determine
35:12 160:13 186:17
188:15 190:13
218:24
determined
34:15
determining
195:22
devastating
178:11
deviated
261:1
deviation
255:7 259:11
devote
89:15 90:16
diagnose
136:11 227:8
diagnoses
227:12,22 228:17
diagnosing
227:5
diagnosis
58:13 136:1 144:23
195:3 227:6 228:1
230:10
diagnostic
118:13 134:1,5,11
dies
250:9,10,20
differences
70:17
different
12:12,15 23:24 24:2
30:2 35:23 48:21
56:17,18 58:6 59:1,3
59:12,21 61:11 62:11
64:14 67:11,14 68:14
68:15 74:11 79:3

83:11 91:22 92:6
109:4 120:21 131:9,9
132:17,19 134:11
135:10 136:24
144:24 149:15
157:22 158:9 162:18
165:23 166:1 191:19
192:10,12 194:15,19
221:13 246:21
248:21 251:9 252:3
255:6,6
differentiate
158:24
differentiating
158:15 159:14
differently
129:20 131:4
difficult
8:5 25:22 125:2 209:21
difficulty
63:20
direct
125:1,5 129:24 141:2
193:21 200:24
directed
146:11
direction
131:23 133:8
directly
150:12
disagree
22:12 23:2 27:18 50:5
disagreement
94:16
disambiguate
178:14
discarded
26:18
Disciples
65:22 252:4
discipline
46:9,10 48:6 72:5
247:14
disciplines
45:14 46:11,14,15 51:3
72:4
disclose
39:11
disclosed
39:3,14 40:2,16 43:12
43:14 44:10 65:2
97:2,6,9 98:14,19
99:3 100:5 101:20
138:15,24
disclosure
210:9
disconnected
164:1,3
discounted
77:16
discuss
113:12
discussed
66:2 155:21 183:14
discussing
113:2
discussion
20:22 22:22 110:10,13
214:13
discussions
59:8

dishonest
116:13
disingenuous
197:11
disingenuousness
241:2
Disk
93:13,18 154:13,18
212:18 263:8
disorder
183:10 195:4 227:2,21
227:24 228:3,4
230:11
dispatched
110:6
disproportional
221:4
disproportionate
221:1
dispute
87:21 145:19 165:10
168:11 222:8
disputed
10:20 11:18,23 19:6
20:1 24:19 26:8 48:6
55:4 69:4,12 70:8,12
70:14,18,24 71:9,19
72:10 73:5,9,15,17
74:14 88:1 92:23
94:2 101:22 111:1
125:24 128:10
134:12 138:13,20
139:21 140:8 141:1
142:14 143:7,18
145:1,20 146:5 147:4
147:24 168:18 204:1
229:6 231:13 232:11
233:24 234:5 237:23
disputes
169:13
disputing
87:4
disrespect
21:17
distinction
52:24 180:19
distinctive
78:7 172:1
distinguishes
48:22 221:22
distribution
267:19
District
1:1,2,14 4:11,12 43:18
43:19 157:13 264:1,2
265:10,11
divergent
247:9
divine
185:13 186:1,3,8
division
1:3 4:13 239:17 264:3
265:12
divulge
99:2
Dixmoor
218:1,4
DNA
219:8
dnoland@dykema.co...
2:17

Doc
98:12
doctor
13:20 75:4 76:20 97:5
150:23 190:12
216:20
document
32:23 76:23 115:5
165:20,21
documentation
91:20,22 120:19
195:12 249:12
documented
63:14,18 195:14
199:17 238:5,6
documents
32:9 84:15 91:5
doing
6:14 21:16 35:2 100:16
107:3 129:5 166:13
174:14 177:5,17,19
188:18 197:11
240:24 243:8 255:23
dollars
87:24 88:12
dominoed
211:14
doorstep
184:3
double-check
142:17
double-checking
5:10
doubly
9:17
doubt
218:20
download
34:10
Dr
4:6 7:17,21 11:16,20
14:6 19:5,14,14,24
22:7 23:2,4,12,20
31:20,22 32:8,22
37:11 38:18 39:2
42:6 44:2,16 65:12
66:1,18 70:4,6 71:22
74:10 80:18 81:20
89:16 93:20 95:9
100:14,24 101:11,16
111:4 127:18 141:7
154:21 168:16,17,19
174:13 177:14 197:5
197:7,17 212:20
216:6 232:19 233:15
237:1 242:18 244:8
244:15,24 260:19
263:11
draft
26:15
dramatic
189:6,10 227:7
draw
26:21
drill
147:22 166:18
drilled
25:3
Drive
2:15
driven

144:19 208:21,22
220:11
Drizin
239:1
dropped
8:12
drugs
252:2
dubious
189:7,10 190:18,19
193:13,15
dues
54:7
duly
7:13 264:10 265:16
dummy
74:1
DYKEMA
2:14
dynamic
131:8
dynamics
11:14 12:22

E

E
2:3 3:1,7
e-mail
5:17 6:13,20,21 127:6
127:8,10
earlier
37:10,11 61:10 64:20
66:18 68:13 75:4,12
79:2 109:12,24 134:2
142:10 161:3 183:11
192:14 234:9
early
20:14 161:4 249:14,15
259:11
earned
108:2,6
earnings
102:7 104:4,13,19
105:12 106:4 108:24
easier
27:20
easily
30:12 34:10 42:24
East
2:4
Eastern
1:3 4:12 264:3 265:11
easy
42:17 71:2 82:13 154:5
Economics
51:5
Edge
151:16
editorial
20:3
Edmonds
124:23
Educator
52:16
effect
42:1 179:2 184:20,20
185:8
effort
21:2 29:7,11 68:14,15
68:22 117:5
efforts



261:17
eight
142:14,16 143:5
either
8:4,12 23:20 31:10
58:1 59:15 60:9
67:18 75:5 76:8
80:21 106:8 107:22
137:4 146:6 156:22
156:22 157:1 192:23
207:21 209:2
elaborate
24:13
elaborated
215:3
elected
54:10 165:11
electively
89:3
elements
156:24
Elijah
12:7
else's
25:8 34:13 195:7 212:2
embed
244:7
emblematic
243:11
emotion
187:7
emotional
162:20 202:21
empirical
51:3 245:5
employed
7:6
employing
66:5
enable
153:4 154:3
enacted
262:5
enclosed
267:11,12
encompassed
13:24 59:23
encompasses
191:18
encompassing
49:23
encounter
16:24
encounters
60:15 230:2
endures
146:15
enforcement
230:15 243:6 244:3
engage
99:14 195:4 257:5
engaged
29:6 33:20
engaging
258:2
Englewood
218:18
ensure
233:13 243:16
entailed
156:4

enter
156:5
entered
208:7
entire
88:23 89:4 153:16
189:9
entirety
165:18 207:12 215:7
entitled
81:18 86:7 238:19
242:3
entity
74:24 241:22
enumerate
10:16
enumerated
17:6
environment
192:7
envision
129:19
equipped
134:6
Eric
139:10,13
errata
267:13,15,16,18
escape
209:11,12
especially
162:19 210:19 253:23
essentially
73:22 178:8 255:10
established
254:6
establishes
111:6,7
estimate
103:8
estimated
103:9
et
1:8 4:10 264:8 265:13
267:8
Ethical
114:13
ethnicities
248:22
ethnographic
11:12,12
ethnographically
58:15 252:20
euphemistic
227:1
European
52:1
evaluate
7:8 171:20 186:17
evaluated
117:14,23
evaluating
230:1
evaluation
6:2 72:6 116:6,11,12
116:16,20 117:8,12
117:15 118:3,14,16
137:6,9,12,15,22
138:1,19 139:20
158:20 165:13
192:15

evaluations
118:24 138:3 192:14
evaluative
253:8
evaluator
121:18
evening
5:16
event
147:15
events
216:12
eventually
122:23 181:22 214:15
everybody
8:20 173:19 175:12
190:8 232:3 243:3
everybody's
173:17
everyone's
231:9
evidence
64:7 90:22 91:1 92:7
92:18 146:10 148:23
157:19,21,23 158:12
158:21 159:3 165:13
167:2 170:3,19,21
171:10 197:13,14,16
198:4,5,10,17 199:22
208:18 211:23,24
214:12
Evil
52:20
Evil'
52:24
evolved
216:5
exact
117:4 145:18 146:15
147:23 230:17
exactly
21:12,16 195:5 243:12
254:10
exaggerated
21:1
exaggerates
23:13
exaggerating
21:15
examination
1:12 3:3,5 7:15 111:16
116:8 117:10 120:15
124:2 127:14 128:1
128:20 138:12 149:9
153:20,24 154:4
227:11
examinations
70:21 124:7 261:18
examine
134:3 139:13 145:5
149:11 153:5 181:19
examined
7:13 41:14 58:24 112:9
121:5,18 123:14
126:1 139:4,4,5
141:15 143:6 152:15
152:16,17,19,22 153:1
153:1 160:13 226:22
229:10
examinee
12:14 41:7,19 133:1,8

144:18
examinees
109:4
examiner
131:1 226:23
examiner's
121:19
examiners
41:5
examines
141:12
examining
161:10
example
20:16 45:15 61:3 77:15
77:22 111:4,19
182:19 184:2 193:3
197:17 221:20
250:19
examples
11:24
exams
261:20
excellent
72:23
exception
70:23 109:5 112:21
113:4 152:24
exceptional
250:19
excerpt
181:3
excerpted
180:2
excess
103:17
excessive
88:3
exchange
180:3 187:5,8,12
exclude
243:20 244:20
excluded
243:4,5 252:1
exclusive
82:22
exclusively
104:19 169:9
exercise
240:17 244:6
exhibit
3:9,10,11,12,13,14,15
3:16,17,18,19,20,21
3:22,23 18:5,9 26:1
32:8,11 65:8,11
68:24 75:21 76:2,5
76:21 79:15,24 80:7
81:2,24 82:22 83:20
83:23 84:5 85:4,7
93:3,5,21 95:4 96:9
97:15 98:6 99:5
114:5,7 116:4 122:13
122:20 124:9,11
126:6 141:18,21,21
144:5,7 146:22 151:8
160:18 161:6 238:13
238:17 239:2 241:12
241:16 242:18
exhibits
107:13 108:19 109:1
142:13

exist
228:17
exists
36:18 169:13,24
expect
70:9
expectation
100:14
expectations
213:23
expected
85:16 89:17 92:10
136:16 154:6 221:14
255:8
expedites
263:2
expend
96:2
expended
80:5
expenditure
27:22 29:5
expense
104:23
expenses
103:15
experience
21:23 55:12 56:15,16
58:19 59:10 60:1
62:16 69:15 110:16
129:13 130:24 131:9
131:11,12 132:22
162:2,22 163:23
164:8 181:8 182:2
183:8,12,15 191:5
192:24 209:17
229:22 237:21 244:5
244:8 251:22 253:12
experiences
59:17 162:14 168:8
229:23
experiential
22:6
experiments
243:8
expert
39:14 40:16 46:4,7,8,9
47:19,22,24 48:3,5
48:13 49:9 51:8,17
52:13 55:7,15 56:3
94:4 102:8,16 104:4
104:14,24 105:4
107:20 108:7,14
110:19 116:7 117:9
158:15 168:13
194:13 242:24 243:7
244:13 245:19
expertise
22:1,6 49:15 51:10,19
56:19,21 66:3,4
140:24 161:24
171:19 181:6 185:12
187:5 212:21 213:3,5
213:8,10,11,14,17,22
213:24 229:5,8
243:22
experts
67:2 244:17
explain
90:16 136:22 198:18
198:20

explained
27:13 92:3
explains
210:18
explanation
7:9 242:19
explanations
155:16 156:19
explicitly
184:1
explore
237:6
exposed
60:8 61:13
exposure
56:22 57:22 165:6
exposures
58:6
express
15:4 184:18,19
expressed
14:24 109:21 184:1
187:8
expresses
186:1
expression
209:9
extend
51:10,18 236:14
extended
157:20
extension
192:17
extensive
12:21 110:9 120:19
232:10
extensively
238:5
extent
21:4 39:2 150:24
257:20
external
209:5
extrapolating
243:9
extremely
49:23 50:7 190:3
192:15,17 234:17
eye
10:4
eyes
162:23

F

Fabiana
242:2
fabrication
191:3 192:20
face
157:15 192:23 193:3
facets
56:17
fact
66:11 90:24 109:20
175:24 176:24
180:13 182:12
191:23 208:9 209:23
factions
64:14
factors
27:11 30:2 238:20



**facts**
90:22 127:17 186:7
190:24 212:5
**factual**
16:18 210:18
**fail**
9:11
**fair**
19:19 23:1,17 28:13
45:9 46:5 48:1
106:15 147:7,8 166:9
200:21 201:10,19
205:6 218:23 239:23
242:12,13
**fairly**
165:15 199:5
**false**
19:15 20:9,18 21:5,21
22:10 23:5,14 25:2,4
25:6,9 27:17 29:7,22
30:3,5,6,19 31:1,23
33:4,9,23 34:6,12,15
35:8,13,19,23 36:13
37:3,6,13,14,18,21
41:16 89:16 131:22
144:13 147:7 155:4,7
155:20 159:4,10
166:24 189:20
191:11 195:9 198:4
211:18,20,21,23
212:6,8 217:3,10
218:8 219:1,21
220:11 222:9 230:15
232:14 236:2,18
238:3,20
**falsely**
38:21 39:16 40:18 41:2
41:6,22 43:7 44:11
147:19,21 156:23
222:2,5 226:4 228:20
228:24 230:8 231:16
234:3 235:4,11,15
237:20
**familiar**
12:12 14:4 36:1,2,5
42:22 48:22 55:9
70:1 114:10 172:2
218:2 219:18 239:7
241:17 261:14
**familiarity**
62:23 65:21 80:13
209:18 210:3 234:18
256:18,19
**family**
57:24 59:16
**fanciful**
191:3
**far**
17:23 20:1 44:5,8
76:21 82:19 84:4
91:17 134:4 146:6
198:10 210:21 227:6
230:16 253:12
**farfetched**
190:19
**fascination**
145:14
**fast**
78:24
**fatal**
208:7

**favored**
148:19
**Faye**
16:24 178:9 182:8,10
184:3,9
**fear**
171:22 186:11 194:21
240:12
**feasible**
107:17
**February**
142:5
**federal**
96:20 99:9,22,23 100:6
**feel**
101:16 110:6 132:22
136:2 153:20 162:16
162:18 169:3 243:13
**feeling**
162:19
**feels**
133:3
**felt**
119:3 206:14 210:12
224:10
**female**
219:8
**field**
19:14 49:24 50:3 74:13
140:7 233:23 242:10
242:24
**fields**
30:1
**fight**
195:7,7 200:21 201:10
**fighting**
195:5 234:21
**fights**
201:19,21
**figure**
17:11 106:22 107:14
205:1 216:17
**file**
215:7 233:14
**filed**
4:11
**financial**
252:2
**find**
11:10 42:17 53:4,6,10
100:13 109:19 125:2
125:8,9 172:20
193:13 214:10 233:7
**findings**
23:3 60:20 111:11
132:1 146:16 148:16
249:24
**fine**
47:17 156:13 179:15
198:14 217:23 231:8
**finger**
188:17 211:13
**Finkenbine**
69:13 70:4,6
**fired**
208:8
**firmness**
33:2
**first**
2:9 6:6,19 7:12,18
24:13 68:20,22 139:9

142:20 153:12 195:6
203:10 206:15 214:6
264:10 265:16 267:5
**fist**
188:17
**fit**
44:16 148:11 218:8
**fitness**
111:21
**five**
93:7 146:15 169:21
193:22,23 240:20
**fix**
212:12
**flagged**
6:4,7,23
**flagrantly**
116:13
**flashlight**
195:8,10 199:21
202:19 203:2 234:15
**flaws**
36:20 240:15,17,18
**flip**
125:12
**fluency**
56:14,23
**fluent**
57:11
**focus**
12:21 13:8 145:18
149:6
**focusing**
169:9 253:6
**folks**
67:8 238:22
**follow**
55:21 130:6
**follows**
7:14 167:7 180:3
230:12,16
**footnote**
249:7,9,9,11
**foregoing**
264:13 265:23 266:3
**forensic**
12:13 41:4 45:13 46:12
52:7,12 57:19 59:11
66:13 67:7,8,18,19
67:23 69:3,7,10,11
69:14,20 70:7,11,17
70:18 71:1,8,14,14
71:18 72:9,22,22
73:4,9,14 74:14
103:21,24 104:5,13
104:18,19 105:3,12
105:20 106:2,17
107:19 108:2,6,10
110:20,23 111:17,19
112:7,24 113:16,17
114:19 115:23
116:24 120:14 124:2
135:4 140:7,10,24
141:3 163:23 181:18
189:21 192:5 193:5
199:22 215:13,17,22
224:14 229:5,9,22
231:12 233:24 253:2
**forget**
190:4
**forgotten**

17:3
**form**
19:20 23:8 29:9 34:1
34:18 37:7 45:10
47:6 50:16 51:13
56:4 57:13 60:17
61:23 66:24 71:12
78:12 86:3 89:24
90:21 92:14 104:15
105:22 113:21
117:22 118:4 128:21
133:16 141:5 163:8
164:18 165:16
166:11,16 167:21
170:15,17 176:8
179:4 183:22 185:18
186:21 188:20
190:15 194:10 196:1
196:11 197:3 200:16
201:12 202:11 205:7
207:19 208:10,14
215:9 219:11 224:3
224:17 226:7 227:17
231:18,20,23 232:6
236:3 246:17 247:15
251:18 253:2 255:19
256:13 257:8 259:15
260:16
**formal**
67:22 217:18 223:11
223:13,20 224:1,6
252:10 256:16 259:9
**format**
76:15
**formatted**
76:14
**formulate**
162:13
**Forrest**
214:9,14,17,21 215:2
**forth**
226:17
**forthcoming**
131:10,15 136:4
**forum**
142:22
**forward**
110:7 145:22
**forwarded**
127:11
**found**
25:12 29:20 178:21
181:19 249:20 259:2
**foundation**
37:8 61:24 105:23
106:20 128:22
133:16 163:9 164:19
165:17 176:9 185:19
186:22 201:13
202:11 219:12
227:18 241:4,7
255:19 256:14 257:9
259:16
**founded**
169:11
**four**
40:24 88:16,17 109:4
151:16,17 152:18
153:19 193:23
219:14 240:20
**frame**

200:17 258:17,18
**Francisville**
152:20 153:1
**frequency**
21:4 25:19 29:22 221:6
**fresh**
132:22
**friendly**
230:22
**frightened**
186:12
**front**
18:2 26:1 69:1 140:5
162:10 180:1 207:13
239:4
**froze**
27:8
**frustrating**
174:17
**full**
111:11 116:16 240:15
242:14
**full-time**
29:3
**fully**
129:15 164:14
**fundamental**
216:16 230:24
**fundamentally**
156:18,21
**funded**
26:3 104:9
**funding**
94:10,12
**further**
20:22 263:13 265:15
266:2,5,9
**Furthermore**
209:17
**future**
151:4

---
G
---

**gag**
33:10,17,20
**gained**
60:14
**gaining**
63:21
**game**
135:16
**gang**
55:7,9,15 56:3,16,20
57:2,5,8,12 58:4 59:5
59:5,6,15,16 60:3,9
60:10 61:6,6,11,19
61:19 62:5,9,14,14
62:19,23 64:2,21
65:22 169:4,5,23
176:23 178:1 183:24
208:6 210:24 217:11
217:16,18,19 218:11
218:14,21 219:6
220:11 221:2,5,5,8
221:12,21,24 223:8
223:11 226:2 229:13
247:20 248:7,11,16
248:18 249:1,1 250:5
250:8,15,23 251:17
251:19,23 252:11
253:24 255:17 256:6

258:5 259:13 260:12
**gangs**
57:1,5,23,24 58:1,1
59:16 60:16 62:14
217:1 221:2,16,16
223:11 247:19
249:10 251:6 254:9
**Gangster**
65:22 252:3
**Gaps**
52:5
**Gardner**
75:13,19 85:5,11 86:20
87:7 90:19 92:10
137:10 214:7,10
**Gardner's**
190:7 215:11
**gather**
25:19
**Gee**
244:18
**general**
78:5 79:6 113:10,14,24
162:18 242:3 246:13
247:3,11 255:3,4
**generally**
128:2,4 148:15 217:2
247:1 255:11 257:24
260:22
**generate**
90:18 91:22
**generated**
80:16 106:3,9,13
**generically**
256:9
**genesis**
144:20
**genuine**
259:24
**getting**
105:1 110:5
**give**
27:6,24 32:6 52:3
67:12,14 68:14 77:15
81:18 86:24 114:15
123:4 131:1 132:12
134:16 172:14
216:19 237:3
**given**
11:17 71:5 85:19 95:14
99:7 109:7 130:19,21
144:18 169:17 179:1
184:23 210:23
217:10 228:1 234:20
235:7 259:3 265:19
265:24
**gives**
37:2
**giving**
85:22 86:1
**glance**
6:24
**glaring**
223:6
**go**
23:10 34:20 44:12
53:11 62:1 76:11
78:21 90:2,23 92:12
101:2 102:19 110:7
127:24 129:11,24
131:14,19,23 132:23



133:18 147:14 166:4
167:23 170:18 184:5
184:14,21 186:4
194:18 202:12 206:9
209:15,22 222:13
224:10 226:6 247:17
253:17 260:20
**God**
145:17
**goes**
67:9 103:19 192:11
254:16
**going**
6:15 8:2,21 9:10 10:19
12:24 13:1,6 38:11
38:15 39:1 40:5 46:2
46:17,18,20 47:5
55:21,22,23 75:20
76:18,18 80:16 83:19
93:12,16,20 96:6
98:15,24 99:2,12,13
100:2,8,14 101:4,8
113:11 116:2 122:9
122:16 123:12 125:2
125:14 127:18
129:15,23 131:18
133:6,7 138:22
150:18 154:12,16
156:12 162:16
168:24 171:9 172:16
174:4,10,15,21
177:17 189:9 190:4
197:7,8,15,16 198:17
200:11 210:10
212:13,16 216:11
231:5 233:14,22
235:17 236:19
238:16 248:3 263:7
**good**
20:21 27:3 66:17 89:21
93:9 147:13 154:9
232:3,3 240:12
262:16,17,22 263:4
**GOSSETT**
2:14
**grab**
34:3
**graces**
145:16
**grafted**
254:24
**granting**
161:7
**great**
20:18 33:2 63:20 70:22
129:16 214:22
**greater**
25:18 112:18 120:23
253:13
**greatest**
21:24
**Grigoroff**
148:1,20,24 149:11
**Grisso**
239:1
**groceries**
184:5
**gross**
103:11,11,12,13,16
**grossly**
21:1 23:13 29:21,21

35:3 216:14
**group**
74:5 238:21 243:16
252:1
**guaranteed**
117:3
**Gudjonsson**
133:20 134:16,22
135:20 136:19 141:7
232:19 239:1
**Gudjonsson's**
71:22 72:8,24 233:4,6
**guess**
32:20 85:24 102:3
**guide**
114:22
**guideline**
114:24 115:2,20
**guidelines**
72:13 114:13,18
**guilt**
144:20 146:10 158:21
158:24 208:19
**guilty**
25:6 145:12 146:4
158:15,19 159:15
166:8
**gun**
200:8 204:2,8 206:17
209:10
**guy**
41:14
**guys**
41:1 217:21

### H

**H**
3:7
**half**
87:14,24 102:17
147:13 253:10
**half-baked**
28:6,8,9,12 30:1,8
**hallucination**
209:3
**hallway**
214:8
**hand**
93:2,20 96:6 114:4
122:16 124:8 141:17
161:5 238:16 241:15
266:14
**handcuffs**
202:1
**handed**
79:23 84:6 125:7
**handicap**
130:18
**handing**
142:9
**handle**
267:19
**handled**
169:15
**hands**
262:9
**handy**
81:2
**hang**
74:3 196:18 225:22
**happen**

12:5 21:5
**happened**
153:10 164:6 181:22
182:12 202:2 211:19
220:22 223:10
260:23
**happening**
113:8 164:4 224:11
261:23
**happens**
129:17 133:2
**happy**
198:15 233:11 240:23
**hard**
216:17
**Hardy**
184:11,12,14
**Harlem**
57:17
**harm**
27:3
**Harold**
138:4
**Haugabook**
88:2 155:1 156:3
**Hazel**
156:5
**head**
15:23
**heading**
26:3 207:5
**health**
52:5 131:7
**hear**
121:10 182:23 200:12
202:3
**heard**
8:13 9:13 74:10,19
**hearing**
124:23 231:4
**heavy**
109:10
**Heinous'**
52:24
**held**
25:11 242:9 256:24
257:18
**help**
14:20 20:23 172:16
**helpful**
11:2 27:14 37:19
111:10 119:12,13
**helps**
22:21
**Henry**
181:18 182:19
**hereinbefore**
266:8
**hereunto**
266:13
**Hernandez**
143:17 144:15 145:5
146:20
**hey**
30:10 129:16 224:10
**high**
24:4 78:24 84:20
**higher**
77:18 79:19 88:22
90:18
**highly**

6:24 88:24 163:23
170:23 181:10 238:6
257:18 259:22
**hired**
36:12 60:24 94:3
**historical**
146:14
**histories**
220:12,15
**history**
109:10 130:20 134:7,8
134:9 137:5 195:14
199:6,9,10 203:4
215:18 228:19 230:2
230:7 231:15 234:21
234:23 239:20
**hit**
182:3 195:10 199:21
201:24 202:19,24,24
203:1,1
**hitting**
195:8
**hold**
50:10 54:4 177:14
246:5
**holding**
245:3
**home**
209:15,22
**homicidal**
134:8
**homicide**
66:13,15 212:22 213:2
213:6,11,15,21,23
**Homicide-Suicides**
52:6
**homicides**
213:4 214:15
**homogenized**
255:1
**honest**
90:4,5
**honestly**
174:17
**honesty**
114:24 116:4,11,11,14
117:1,3
**hope**
12:7
**hopeful**
170:11
**hopeless**
254:23
**horse**
46:2
**hospitable**
244:7
**hostile**
230:20 231:1 256:4
**hour**
1:19 16:6 75:6,10
77:23 78:10 88:13,20
252:21 253:10
**hourly**
79:17
**hours**
16:2 17:19 75:16 79:16
80:4 88:14,15,21
89:1,12 91:13 240:20
252:18,23,24 253:1
**housed**

58:10
**Human**
238:19
**humiliating**
240:17
**hundreds**
252:18
**hundredth**
177:6
**hung**
217:17,22
**hypothetical**
78:13 113:22 122:10
128:22 133:17 150:6
159:6 186:22 227:18
**hypothetically**
107:5,11 128:16

### I

**idea**
93:10 169:18 178:12
189:2 194:20 195:8
199:19 206:14
209:14,16 211:19
212:1 234:14 251:8
252:16 262:20
**Ideally**
111:9,9
**ideas**
58:17
**identification**
3:8 18:6,8 65:9 75:21
76:3 83:20,24 85:3,8
93:6 96:7,10 114:5,8
122:14 124:9,12
141:18,23 160:19
161:6 238:14,17
241:13,16
**identified**
24:23 25:7 30:7 31:15
34:7,16 35:7,14
36:13 50:15 53:16
57:9 71:7 79:24
96:13 99:4 103:1,3,6
151:22 160:23
**identifies**
37:13
**identify**
4:14 5:1 27:10 29:7
38:23 40:20 43:9
70:7,10 71:17 73:1
106:3,9 151:12
217:13 251:3
**identifying**
37:6 98:24
**ignore**
195:13
**II**
134:14
**illegitimate**
125:19
**Illinois**
1:2,17,19 2:5,10,16 4:4
4:8,12 5:3 261:19
264:2 265:1,6,8,11
267:2,7
**illuminating**
131:17
**imagine**
185:5 261:21
**imbedded**

229:22
**immediately**
14:17 139:6 201:1
**immense**
27:21
**impact**
9:16 11:10 178:11,19
**impacted**
58:1
**imperative**
113:2,17
**implicated**
208:6
**implicitly**
68:21
**importance**
114:19 115:22 232:12
232:21 235:19,21
238:7,10
**important**
8:24 20:7 22:13 62:10
111:16 158:5,6
246:14
**impossible**
113:15 251:3
**impression**
162:11 173:6
**impressions**
60:13 120:20
**impropriety**
261:22
**impulsivity**
134:9
**in-person**
115:23 119:18 120:14
132:4 133:12 138:12
138:19 139:20 140:9
141:3
**inaccuracies**
36:19
**inaccurate**
242:15
**inadequate**
118:15 136:6
**inappropriate**
258:3,14
**inclination**
195:4
**inclined**
131:6 229:15 250:8,13
250:18
**include**
243:3 244:2
**included**
102:22 160:21
**includes**
215:15 239:2
**including**
32:24 129:8 173:17,18
189:11 190:9 193:3
228:16
**inclusive**
264:15
**income**
103:9,11 108:3,5
**incompatibilities**
210:17
**incompatible**
209:16
**incomplete**
78:13 113:22 122:10



128:22 133:17
186:22 227:18
**inconsistencies**
193:6
**inconsistent**
130:19,22 202:1 209:8
254:6
**incorporate**
11:3
**incorporated**
206:11
**incorporates**
247:8
**incorrect**
12:7,8 224:6
**increase**
78:2,2,3
**incredible**
199:5
**incriminating**
229:20
**independent**
144:19 158:19,21
164:10
**indicate**
126:7
**indicated**
33:2 79:22 134:13
**indicating**
91:4
**indication**
167:17
**indications**
7:5
**indirectly**
145:1
**individual**
4:20 43:6 60:15 68:2
91:14 111:12 119:22
121:5 123:15 132:18
191:20 227:15
230:22 240:19
255:22,22
**individual's**
120:13
**individually**
89:5
**individuals**
48:23 60:8 152:14
193:4 226:3 254:18
**Induced**
238:20
**indulgence**
168:22
**infallibility**
80:21 86:18
**infallible**
83:8
**infection**
9:16
**infer**
100:10
**infested**
60:3
**influence**
169:4
**inform**
14:20 27:9 118:19
129:15 220:13,15
**informal**
252:16 253:3

**informally**
253:11
**informant**
59:18 215:18
**informants**
92:7 120:21
**information**
57:11 59:14 60:14
63:13 64:2,13,24
65:6 80:18 118:18
119:3 120:3,17 121:1
127:12 129:14
132:11,12 133:22
134:1 135:8 136:3
137:4 173:3 193:11
194:22 205:10,21
206:2 210:18 215:4
215:19,20 222:24
225:14 229:20,21
236:21 237:11,15
**informative**
11:10 12:16 36:22 65:3
119:17 131:17
133:22 233:8 237:14
**informed**
126:14
**infrequency**
20:9
**ingredients**
28:15 212:9
**inhabited**
164:14
**Inhibitor**
53:14
**initiated**
214:13,20
**injury**
260:6
**inner**
11:13 12:14,22 57:16
57:16,17 59:24 63:16
63:16,22 249:19
**innocence**
24:24 27:16 29:20
30:10 34:7,23 35:1
73:18 159:1,24 160:5
160:14 161:7 163:7
163:12,18 164:17
165:12 222:19 226:8
235:17 236:20
237:13
**innocent**
41:17 158:15 159:15
**inpatient**
57:19
**input**
119:13
**inquiring**
127:16
**insane**
112:4
**insanity**
70:20 113:24
**insofar**
253:6
**inspiration**
22:9 209:2
**inspire**
73:24
**inspiring**
36:23

**instance**
153:17 225:11 235:16
259:20 260:23
**instances**
43:5 112:11,12 120:18
128:7 136:15 225:13
250:7 259:19
**instruct**
40:5 98:15 99:1,13
100:2,8 127:18
**instruction**
39:24 40:10 47:2,7
100:7 101:12 225:6
**instructions**
232:2
**instrument**
133:24
**instrumental**
261:17
**integrity**
19:19
**intellect**
21:17 23:4
**intemperateness**
134:10
**intend**
259:6
**intended**
184:19
**intending**
51:10 171:14
**intents**
26:17 121:24
**interact**
48:20 228:10
**interaction**
231:2
**interchangeable**
70:15 127:9
**interest**
36:24 37:1 173:9 178:4
233:21
**interested**
214:5 237:5 240:5,24
266:11
**interesting**
20:21 146:3
**interests**
175:23 178:14
**interface**
24:6 58:12
**interfaced**
58:21 229:13
**interfaces**
48:6
**interferes**
210:8,9
**interim**
80:9
**internal**
208:21
**internalize**
10:22
**internalized**
134:24
**internally**
30:18
**interpret**
82:3 186:10
**interpretation**
182:1

**interpretations**
27:4
**interpreted**
171:11
**interrogating**
261:1
**interrogation**
7:2 21:7 25:14 48:1,4,5
122:5 148:11,15,15
167:1 199:20 200:2
203:7,12,18,24 204:4
204:22 205:5,15
206:3,5,23 210:5
221:11,14 230:18
243:11 254:16
255:17 256:7 257:7
258:2,4 259:13
260:14 261:8
**interrogations**
47:19,23 229:12
245:13,19 255:24
257:19 260:20
261:15,23
**interrogators**
210:7
**interrupt**
8:3 74:21 174:5 177:16
**interrupted**
49:20 140:19
**interrupting**
74:18 107:9 140:17
174:12 177:9 223:23
225:22
**interventions**
261:24
**interview**
22:15 59:14 110:23
111:5 112:14,17
113:1,16 114:20
115:23 116:17 117:4
118:15 119:18 120:7
120:9 124:5 130:9,11
130:14,24 131:4,16
131:18 132:21
136:10 140:10 141:4
181:9 182:6 183:7
215:1
**interviewed**
63:2 131:21 139:11
**interviewing**
42:15 111:9 131:21
135:15 229:24
**interviews**
57:7 59:18 117:2
192:13 252:20,21,22
253:1,7
**intimately**
36:2
**intimidated**
168:9 169:3,18
**intimidation**
170:2
**introduction**
239:3,9,12,14 240:2
**invariably**
133:2 197:12
**inventory**
160:22
**investigate**
35:12
**investigating**

63:22 251:13
**investigation**
36:23 66:3,10 212:22
213:1,2,6,11,15,21
**investigations**
36:10 63:21 66:12
**invitation**
150:2
**invite**
20:22
**invited**
20:2
**invoices**
76:22 77:3 101:22
**involved**
23:24 24:14 59:19,21
61:20 96:4 97:11
101:16 155:19 156:2
157:1,1 158:10
161:23 199:15
249:21
**involvement**
61:6 62:5
**involves**
56:17
**involving**
96:21
**irrelevant**
134:23
**irresolvable**
158:11
**isolated**
25:13 70:24
**issue**
10:20 21:18 24:7 30:14
38:21 48:7,13 61:6,9
61:21 95:16 99:14
133:21 145:20 150:7
153:18 159:8 170:24
193:1 224:6 227:24
234:4 245:19
**issues**
12:18 20:19 59:3 62:3
62:4,6 69:9 92:13,17
96:1 112:18 117:14,24
119:2 134:24 261:14
**Itchhaporia**
2:8 4:19,19 15:15 19:2
19:20 23:7 29:9
31:24 32:6 34:1,18
35:17 37:7 38:7 39:1
39:23 40:5 42:5
43:11 45:10,19 46:6
47:5,13 50:10,16
51:13 55:16 56:4
57:13 60:17 61:23
64:4 66:24 71:11
74:17 76:20 78:12,19
81:23 86:3 89:24
90:21 91:2 92:14
97:4 98:12,18,23
99:8,12,21 100:1,7
100:18 101:2,14
104:15 105:22 106:5
106:19 113:21 115:4
115:9,12 117:17,22
118:4,10 119:23
122:9 124:19 127:15
128:2,21 133:14
138:6,22 139:22
140:18 141:5 144:14

154:8 156:11 163:8
163:19 164:18
165:16 166:11,16
167:21 170:14
173:13 174:4,10,21
175:1 176:5,8,17
177:1,5,12 179:4
182:22 183:3,22
185:18 186:21 187:1
188:20 190:15
191:13 194:10 196:1
196:10 197:3 200:11
200:16 201:12,16
202:9 204:5 205:7,18
206:7 207:1,19
208:14 215:9 219:11
224:3,17,22 225:5
226:7 227:17 228:21
231:17,22 232:1,8
233:17 236:3 246:17
247:15 251:18
255:19 256:13 257:8
257:15 258:6 259:15
260:16 261:10
263:15,17 267:5,10
**iterations**
91:23 216:6

---

**J**

**jail**
186:4
**James**
137:19,19
**January**
144:3 146:22 160:16
161:20
**Jefferson**
43:19
**Jeffrey**
88:2 155:1
**jin**
245:22
**Join**
257:15
**joined**
20:3 38:8
**Jon**
256:23,24 257:4 262:9
**Jones**
1:15,23 5:2 122:18
123:5 139:4,16 226:5
265:4 266:20 267:22
**journal**
23:21 49:2,6 52:1,7,15
52:15,20 53:1,5,14
53:17 57:1 73:8
238:18 239:5 241:23
244:8 245:12
**journals**
14:8 28:2 51:22
**judge**
153:16 161:15,16
162:2,3
**judge's**
159:17
**judges**
30:14 162:7,11,14
**Judging**
19:9
**judgment**
89:23 181:7 182:20



183:6 242:23 243:2
**judicial**
161:20
**July**
144:2
**June**
266:15 267:3
**juror**
74:2
**jury's**
159:18
**justice**
2:2 46:13 52:18 58:21
209:18 245:4 263:1
**juvenile**
234:2 235:3

**K**

**K**
265:3
**Kassin**
11:21 19:14 239:1
242:1,8,18 244:8,15
244:24
**Kathleen**
42:16,19,21 109:20
110:9
**keep**
248:2
**Kelly**
4:1
**ken**
159:16
**keyed**
192:8
**kid**
260:12
**kids**
254:8
**Killacky**
189:12,20 191:10,24
**killer**
184:16
**killing**
145:12
**kind**
10:18 28:6 29:5 33:16
54:7 60:15 75:8
76:13 124:2 125:17
133:1 135:8 136:7
149:8 162:12,21
175:11 190:10
194:16,21 210:11
213:7 216:16 217:21
243:20,22 254:13
**kinds**
95:18 119:14,16 135:2
162:23 165:23
**Kitler**
139:14
**Kittler**
139:5
**Kittler's**
139:9
**knew**
214:8,11,14
**know**
7:22 8:9,15 9:20,21
10:16,19 12:10 13:21
21:13 32:4 37:10
42:21 50:7 61:5 63:4

64:1,19 67:13 69:13
69:13 70:2 72:11
73:18 74:19 80:11
82:3,4 85:17 86:13
91:19 97:8,10 98:9
105:14,16,24 106:23
109:5 114:21 116:11
119:7,10,12,20 120:2
120:2,16 122:3
123:13 125:20,22
128:5,6,9,13,14
129:19 131:18 135:6
135:7 139:15,23
147:3 149:8 153:14
154:3 155:11 161:14
161:16,19,22 162:1,4
162:5,8,16 163:2,3
163:15,20,21 164:7,7
164:13,20,24,24
165:2,18 168:17,23
173:12 177:12,15
188:16,19 190:18
193:9,9 201:17,18
202:15 203:2,20
204:1,4,16,24 208:24
215:4 218:6,7,10,11
218:13,15 219:22,23
220:1 222:22 225:12
229:14 234:18 237:4
237:22 248:19 250:9
252:5,15 254:23
256:8,12,23 259:17
259:18,21 260:9
261:4,16,24
**knowingly**
112:1
**knowledge**
73:22 153:3 203:21
**known**
20:13,14 29:7 30:19
31:1,23 35:24 172:9
219:9 226:3 253:24
254:8
**knows**
21:15,16

**L**

**l-bowman@law.nort...**
2:6
**laboratory**
243:8
**lack**
110:7 192:24,24
230:12,23 234:7
236:11 241:7
**laid**
72:15 142:18
**large**
37:17
**largest**
105:20 106:17
**LaSalle**
4:3 267:1
**Lassiter**
88:2 155:1 156:3
**lasted**
203:7
**law**
2:4 52:21 53:2 111:20
114:14 115:21
230:15 238:19 243:5

244:2 249:17 261:19
**lawyer**
42:12
**lawyers**
17:17 100:12,20
**leaders**
57:23 221:3,5
**leads**
27:4
**learn**
31:16 119:17 120:5
130:15,16 253:5
262:12
**learned**
6:20 126:16 127:11
132:5 259:4
**leave**
143:5 167:12
**leaving**
156:4 205:11
**lectures**
18:14
**lecturing**
30:13
**led**
163:5
**Lee**
181:18 182:19
**left**
93:8 136:5 157:6
205:23 216:15
**legal**
4:2 52:22 162:6 176:9
179:6 189:23
**legally**
112:3
**legislative**
261:13
**legitimacy**
247:13
**legitimate**
21:21
**Lemuel**
184:10,11,14
**length**
204:4,17,23 205:16
206:3,6 218:17
**lengthy**
59:8,19 110:13 167:7
**lens**
12:18
**Leo**
19:14 23:2,12,20 37:12
89:16 111:4 168:16
168:17,19 197:7,17
216:6 222:20,21
237:1 239:2 254:15
255:9 257:21 260:19
**Leo's**
19:24 22:7 23:4 222:21
**let's**
87:16 93:11 101:2
143:5 179:24 189:5
193:16 207:3 214:4
217:14 247:22 248:5
263:5
**letter**
126:20,23 127:1,8
**letterhead**
103:22
**lev-**

164:2
**level**
20:20 48:24 68:14
77:21 90:14 121:9,22
122:5 123:21 130:2
162:1 164:1,4 168:9
184:6 209:13 228:2
234:20
**leveraged**
211:14 212:2
**Lewis**
137:10 214:10
**LIC**
266:21
**License**
1:24
**lie**
131:6 190:14,18
**lied**
178:9
**life**
8:5 27:6 29:1 209:14
221:12 228:9
**lifetime**
213:4
**likelihood**
145:12,16 166:8
196:17
**limitations**
112:16 149:1
**limited**
27:2,4 73:23 74:5
112:19 129:23 135:4
137:3 143:8 203:3
223:21 224:1,7
257:22
**line**
42:17 88:18 123:11
125:15,16 210:15
**lines**
149:6 207:6
**list**
24:3 30:18,21 31:1,4
31:14,22 32:17 34:4
34:6,12,13,14 35:19
35:20 36:12,17,21
37:5,12,17 51:21
132:13 149:13 160:7
160:10,12 222:10,20
222:21 223:2,6,7,12
223:22 224:8,11
**listed**
15:20,22 29:23 31:10
142:4,12,13 143:24
144:4 151:7 152:15
**listen**
13:4
**listening**
229:24
**lists**
36:19 38:4 222:16
**literally**
113:5
**literature**
22:20 27:15 28:22
63:20 70:11 71:8,17
73:2 135:9 180:24
191:16,18 210:5
211:5 212:5 229:10
230:5 231:11 232:10
232:11,12,24 233:23

235:1,8,18,19 238:5
238:10 248:24
249:15
**litigation**
4:3 5:4 60:24 66:20
96:20 99:9,22,24
182:16
**little**
9:7 69:24 125:2 131:4
131:5 168:20 193:17
197:24
**live**
59:15 183:16 184:9
**localized**
181:13
**locate**
242:23
**located**
5:15 155:10
**location**
52:3
**Locke**
2:3 4:17 50:11 74:18
102:19 140:18 154:8
174:4 176:17 177:5
**locked**
92:18 157:20 195:5
**lockup**
157:13
**lodestar**
79:16
**logs**
5:13,22
**long**
13:1 19:23 67:12 71:6
89:13 162:2
**longer**
69:18
**look**
5:15 10:23 11:5 18:14
37:11 42:10 67:8
76:10 79:16 86:22
95:1 107:14,18 115:2
123:11 131:20 136:3
142:12 143:4 147:14
155:14 157:17 159:2
193:16,22 198:16
202:13 203:16 204:8
206:9 207:3 209:10
222:14,15 224:10
226:6 242:17 248:5
**looked**
10:5 11:20 12:1 16:17
16:21,21 84:12
181:20 188:7 201:19
223:7,22 225:15
**looking**
65:18 68:24 121:7,20
123:17 204:2 206:17
207:4 209:12 225:11
244:7,24 249:8
253:20
**looks**
76:13,15 123:3 136:24
142:18
**Lord**
170:21 178:2,4 182:14
**Lords**
62:19,23 63:3,6 64:1,8
64:15 65:1 167:19
168:8,14 170:10

235:1,8,18,19 238:5
238:10 248:24
249:15
**loses**
167:12
**lost**
190:11
**lot**
50:8,12 56:22 69:14
72:20 83:4,15 91:5
110:4 111:1 129:7,9
130:15,17 136:5
150:23 158:11
206:19 221:10,11
232:18,19 235:18
237:2,11 249:12,15
253:5 255:23,24,24
**loud**
116:2
**louder**
9:8
**Louisiana**
43:15 152:18,20
**loved**
189:13
**lower**
78:1 111:6
**loyalty**
241:5
**Luke**
242:2
**lunch**
154:10

**M**

**M**
2:14
**M.D**
1:12 3:4 7:11 243:4
244:1 264:10,18
265:9,16 267:9
**MacARTHUR**
2:2
**maintained**
68:20
**majority**
49:13 211:21
**making**
8:5 43:1 59:22 147:7
166:7 169:19 184:17
194:7,11 217:3
**maladies**
149:1
**male**
12:23
**males**
63:17 256:1
**malevolent**
186:13
**Malingering**
191:18
**mandated**
153:21
**Manhattan**
57:17
**manifested**
183:11 184:9,10
**manner**



156:3 171:3 180:6
**Manual**
10:7,12 256:20
**manuals**
230:19
**manuscripts**
150:15
**MAO**
53:14
**March**
77:8,8 80:1,10 142:5
**mark**
75:20 83:19 85:3 124:8
141:18
**marked**
18:5,8 65:8 76:2 83:23
85:7 93:5,21 96:9
114:4,7 122:13
124:11 141:22
160:18 238:13
241:12,15
**marking**
96:7 161:5 238:17
**material**
10:12 15:7,9 16:1
237:16,18
**materialized**
223:4
**materials**
10:3 14:15 15:12,19
16:18 17:8,13,14
25:20 57:8 129:10
160:8,11 255:13
**Mathews**
218:1,5
**matter**
4:9 12:13 14:1 40:17
42:9 58:11 60:21
61:20 66:2 75:23
78:9 79:6,23 80:6
84:17 85:5,11,14
86:9 89:10 92:3
95:10 97:3 113:15
116:22 128:11
137:19,19 148:3
150:6 164:11 165:24
181:12 183:14
246:13,16 257:17
**matters**
88:17 90:19 92:23 98:5
142:14 151:5
**McCorkle**
4:3 5:4 267:1
**McCoy**
16:24 178:9 182:10
184:10
**McCoy's**
184:3
**mean**
15:9 17:5 22:14 41:3
76:23 88:13,14 90:14
95:18 100:12 102:3
104:21 107:5 128:24
130:17 131:10,20
134:5,22 139:11
149:14 156:17
173:10 194:19
198:14 220:6 223:20
228:8,8 235:24 251:5
251:8 255:5,23
256:15

**meaning**
10:18 11:1,7
**meaningful**
28:17,21
**means**
58:15 77:14 88:15
**measure**
136:20,23
**media**
257:21
**medical**
46:14 49:24 50:21,23
50:24 51:11 189:18
190:12,21
**meet**
126:8 245:24 246:1
**meeting**
53:24 54:1,23 55:2
75:14 132:4
**meetings**
53:21 54:13,18,19
74:16,16
**meets**
73:13,13,17
**member**
63:2 67:18 173:4
177:24 260:12
**members**
57:24 59:5,6,16 217:1
217:11,20 220:11
221:5,22,24 226:2
229:14 239:22 250:5
250:8,23 251:17
255:18 256:7 258:5
259:13
**membership**
54:11,16
**memorable**
167:11,15
**Memphis**
65:24
**men**
219:14 262:9
**mental**
52:5 131:7 171:24
**mentioned**
17:10 134:2 266:8
**mentorship**
256:16
**merely**
184:12 198:2 215:2
251:24
**merit**
110:7,14
**met**
10:9 119:8,21
**method**
242:19 244:11
**methodologies**
72:17
**methodology**
28:16,18,21 52:23
244:21,23
**Michael**
1:11 3:4 4:6 7:11,19
96:15 138:4 264:10
264:18 265:9,15
267:9
**microphone**
212:12
**mid**

214:18
**middle**
193:17
**million**
87:15,24 102:18
103:18 104:3
**mimics**
243:10
**mind**
139:7 185:14,24 186:3
186:9 194:3 207:17
218:24 226:18
**mindful**
91:21
**minion**
74:8
**minute**
6:19 29:17 79:22 93:11
113:9,13 114:16
203:6 216:19 228:14
**minutes**
6:9,23 93:7 154:10
199:19 203:7,12,13
204:22 205:16 206:6
206:23 253:10,11
**Miranda**
112:1 114:1
**mirror**
245:1 246:2
**mischaracterizations**
179:8
**mischaracterizes**
51:14 61:24 90:1 179:5
183:4 185:19 187:2
190:16 196:2 205:8
**misconduct**
7:2
**Misha**
2:8 4:19 10:9 18:24
31:20 42:4 44:22
76:17 81:22 95:23
100:23 101:10
122:22 124:13
233:12 267:5
**misreading**
156:13
**missing**
225:14 233:21
**misstated**
168:3,5
**misstates**
167:22 207:20
**mistaken**
27:4
**misunderstand**
235:24
**misunderstood**
34:11
**mitchhaporia@bork...**
2:11
**Mixon**
184:11
**Mm-hmm**
144:8 155:22
**MMPI**
133:23 134:14,17
**MMPI-2**
135:17,19
**moment**
172:14 178:12 196:18
212:12

**money**
104:9 105:13 108:1,6
**monitoring**
31:18
**Montgomery**
151:18 152:22
**months**
85:16 190:1
**moot**
159:8
**moral**
155:11
**morning**
6:5,12 258:22 259:2,5
**motion**
233:14
**motivated**
184:14 208:11
**motivation**
209:1
**move**
56:1
**moved**
234:19
**movements**
205:21
**Mr.–**
66:1
**Multi-Site**
249:10
**multiple**
7:22 169:1 211:8,10,10
212:3 239:11
**murder**
89:22 91:9 145:24
155:3 202:18 209:20
209:23 217:24
234:19
**murdered**
155:2
**murderer**
145:16 146:4
**murderers**
218:4,5
**murders**
88:2 92:19,22 157:10

———————————
**N**
———————————
**N**
3:1 267:1
**naïve**
236:16 237:8
**naïveté**
235:15,20 236:11
238:7,10
**name**
4:1,17 7:18,19 13:2
42:12 65:6 96:13
139:9 219:19,24
**names**
184:23
**National**
2:9 267:5
**natural**
129:12
**naturally**
131:8,15 162:16
**nature**
5:20 21:9 56:16 118:20
135:6 148:9 150:9
151:24 171:8 195:1

212:24 231:1 234:11
**necessarily**
37:1 61:5 91:5 95:13
155:4 228:6
**necessary**
28:15 89:3 90:16
115:18 130:1 134:21
154:1
**necessitate**
95:22
**need**
44:12,12 65:5 75:11
84:9 139:24 153:4
166:17 182:2,5 184:6
200:12 212:11
243:13 244:11
246:20 267:16
**needed**
88:7 184:5
**needs**
60:5 91:20
**negative**
226:15,20 227:14
228:6
**neglected**
212:20
**neither**
32:21
**networked**
69:19
**Neufeld**
30:12
**neutral**
167:16
**never**
36:21 37:5 131:18
252:10,13
**new**
30:14 57:14 79:6
**news**
237:1
**nice**
243:1
**night**
6:21
**ninth**
142:24 143:3
**Noland**
2:14 4:21,21 5:8,9 94:6
102:19 103:4 257:10
263:16
**non**
79:1
**noncontroversial**
158:2
**nonresponsive**
174:16
**Nope**
138:17
**north**
4:3 102:17
**Northern**
1:2 4:12 264:2 265:11
**Northwestern**
2:4 222:18 236:23
**notable**
70:22
**notarial**
266:14
**notarized**
267:17

**notary**
264:23 265:4
**note**
31:19 122:19
**noted**
172:22 181:17 211:17
234:8
**notes**
65:19
**notice**
266:6
**notifying**
5:17
**notion**
170:1 198:12 243:23
244:1
**notwithstanding**
12:19 36:18
**number**
3:8 6:6 21:8 23:14
26:21 37:16,17 54:24
59:1 60:8 62:11
73:23 81:2 82:2
84:14 87:1,2 92:6
97:19,20,21 111:3
125:11 144:22,23
146:5 149:15 150:21
192:12 194:19 241:3
241:7 245:6 257:18
258:13 260:2,4 267:8
267:21
**numbered**
115:8
**numbering**
125:6
**numbers**
5:19 30:11 32:9 35:4
87:12 125:3,6
**numerous**
36:19 199:18

———————————
**O**
———————————
**O**
265:3,3
**o'clock**
203:15 204:2 205:12
265:17
**oath**
131:5 176:3,21 264:11
**obedience**
137:1
**object**
23:7,8 29:9 39:1 47:6
74:17 117:22 122:10
156:12 166:16 174:5
174:11,15 183:3
194:10 224:17
247:15 256:13
**objected**
126:11
**objection**
19:20 34:1,18 35:17
37:7 39:23 45:10,19
47:6 50:16 51:13
55:16 56:4 57:13
60:17 61:23 64:4
66:24 71:11,12 72:20
78:12,19 86:3 89:24
90:21 92:14 104:15
105:22 106:5,19
113:21 117:17 118:4


McCorkle Litigation Services, Inc.
Chicago, Illinois (312) 263-0052

119:23 127:15
128:21 133:14,16
141:5 163:8,19
164:18 165:16
166:11 167:21
170:14,16 175:1
176:5,8 177:1 179:4
183:22 185:18
186:21 188:20
190:15 191:13 196:1
196:10 197:3 200:16
201:12,16 202:9,11
204:5 205:7 206:7
207:19 208:14 215:9
219:11 224:3 225:5,6
226:7 227:17 228:21
231:17,18 232:6
236:3 246:17 251:18
257:8,13 258:6
259:15 260:16
261:11
**objections**
46:6 47:13 118:10
205:18 207:1 224:22
**objective**
25:20 26:24 116:20
118:19 120:22
**objectivity**
115:1 116:5,14 117:2
**obliged**
96:2 159:2
**obliterated**
178:6
**observations**
120:20 162:15 166:7
**obtain**
153:4 154:2
**obvious**
192:4,5,19
**obviously**
6:1,17 66:15 159:16
252:13
**occasion**
218:17
**occasionally**
51:6 238:1
**occasions**
60:19
**occupy**
24:2
**occur**
210:2
**occurred**
12:16 23:14 66:22
191:23
**occurrences**
23:16
**October**
85:12
**offender**
219:9
**offer**
38:20 45:7,11 112:7
168:13 260:21
**offered**
92:22 116:7 117:10
148:12 198:2 200:4
**offering**
45:17,20,23 157:3,8
198:11 260:10,17
**offhand**

73:6
**office**
6:14 42:16 43:18 81:4
81:20,20 163:17
165:11
**officer**
64:20 94:10 180:20
214:9,13,17,21 215:2
228:22 229:1 230:9
231:16
**officer's**
94:13
**officers**
2:13 4:20 7:2 63:23
94:9 102:24 122:3
209:13 255:23
256:11 260:24
**officially**
153:8
**Ofshe**
197:5 222:20 254:15
**Oh**
53:11 104:18 142:3
146:24 156:16 157:5
175:13
**okay**
8:6,17 9:10 10:11 15:6
17:12 31:19 32:13
33:13 36:8 39:6 40:9
41:12,18 44:1 46:23
47:17 48:16 49:16,20
50:21 54:4 60:12,23
61:18 65:10 66:7
67:24 70:10 71:21
74:11 75:20 77:5
81:19 83:6 84:13
87:4 89:19 92:11
93:23 94:13 95:3
97:19,23 99:15 100:9
100:10 103:4,12,19
104:3 106:15 108:22
110:19 111:15
119:19 121:4 126:22
130:5 140:7 141:9,17
142:11,20 143:11
144:4 145:23 149:13
156:20 168:12
171:13 172:21 174:2
175:14,20,24 177:22
178:24 179:15
180:16,23 181:7
185:11 186:11,15
187:10,18 189:2
190:12 193:16 194:7
195:22 197:14,21
199:8 201:2 204:19
206:13 213:17 214:4
215:4 216:11 217:19
217:23 218:7,16
219:20 220:8 222:10
223:1,16 224:5
225:18 231:3 233:20
236:19 237:17
239:14 241:20 244:9
245:2,18 247:5 250:3
250:21 252:8 255:14
256:23 257:4 258:17
260:8 261:4 262:12
263:11
**Ollins**
40:21 41:6,8,10,19

42:15 131:21 139:12
**once**
31:14 144:4 165:4
199:20 202:24
239:10,12,13
**one's**
24:9 111:11 112:16
122:6 172:2 250:15
**one-size-fits-all**
254:14
**ones**
6:14 14:9 15:21 25:17
25:18 91:17 102:24
103:2,5 153:2 258:24
**ongoing**
95:19 185:5
**online**
222:14,15
**open**
131:13
**operate**
34:24 184:7
**operating**
33:16
**operations**
104:8
**opine**
36:12 46:4 66:5 191:9
196:14
**opined**
44:10
**opining**
43:6 196:16
**opinion**
20:4 33:8 41:11 90:5,6
90:7,10 94:4,22
112:8,16 113:18
116:7 117:9 120:12
121:3,6,8,20,21
122:2,4 123:16,19
129:15 134:5 145:21
145:24 146:16,18
147:6,10,23 148:6
157:3,5,8 159:5,21
162:19 164:15 166:2
168:13,21 171:15
180:9 183:21 186:11
186:14 187:6,10,13
189:17,22 193:15
196:22,23 197:21
202:23 203:3 212:8
217:3 219:3 220:5
228:13,15,15 229:4
230:6 243:20 247:13
248:8 255:14 260:10
260:18
**opinions**
14:20,24 15:3 19:23
38:20 45:8,12,17,20
45:23 92:22 98:21
111:3,21 120:23
129:23 162:13
168:23 216:24 242:4
242:9 246:24
**opportunistic**
259:24
**opportunities**
59:22 252:2
**opportunity**
10:23 14:3 27:6 28:20
29:4 59:20 80:10

112:17 113:11
116:18 126:8 127:13
132:3 133:12 136:9
209:11 231:3 259:1
263:3
**oppose**
163:13,17 164:16
**opposed**
24:16 25:5 31:17 77:11
88:17 146:15 162:15
169:9 216:13 217:6
251:23,24 254:19
255:9
**opposite**
141:14 230:17
**opposition**
215:5
**oppositional**
195:1,3 226:16 227:1
227:21,23 230:11,21
230:24 234:2,6 235:2
250:12
**order**
9:5 33:10,17,20 66:5
84:9 89:14 103:12
153:4 154:2 161:6,10
184:19 243:16
**ordinance**
262:6,21
**organization**
54:12,16 73:12,13,16
73:20,21 103:20
239:22 240:16
241:24
**organizations**
53:22 54:2 74:23
**original**
24:18 30:21
**originally**
24:12,15
**outcome**
266:12
**outside**
60:23 63:11 69:18
**overall**
148:10
**overarching**
145:13
**overestimated**
29:21
**overexaggerate**
35:4
**overlap**
45:13 46:11 70:22
222:20
**overlapping**
45:14
**overlaps**
134:10
**overlooked**
241:7
**overly**
246:18,19
**overrepresented**
236:4,7,15,16,17
**oversimplification**
19:22
**overstated**
29:21
**overstating**
30:11

**overwhelming**
49:12 211:20
**ownership**
25:10

### P

**p.m**
156:7 263:18
**page**
25:24 51:24 52:4,10,15
52:22 53:9,12 116:4
123:11 125:5,6,11,12
126:8 155:14 167:6
172:15,21 189:5
193:16,17 207:3
214:4 217:5 220:4
235:10 242:17 248:7
253:17
**pages**
125:4,7 166:5,14 197:9
264:14 267:13,16,18
**paid**
108:13
**panel**
41:4 67:6,7,8,19,19,23
103:21,24 104:13
105:4 106:3 107:19
108:2,6,10 224:14
**Panel's**
104:5,18,19 105:12,20
106:17
**paper**
239:3,4,15,15,19,20
**papers**
224:14
**paragraph**
116:3 167:7 189:6
193:18 207:4 214:5
253:20
**paragraphs**
193:22
**parameters**
136:24
**Pardon**
172:11
**parentheses**
143:14
**Parish**
43:19
**Park**
32:24 33:3,9,11,23
**part**
8:2 34:23 59:15 64:21
75:16 80:22,22
102:10 104:9 111:16
118:24 124:7 156:6
173:7 199:12 243:19
244:4,5 249:14
**particular**
10:7,24 36:11 37:20
58:8,23 60:4,21
153:18 154:23
162:19 170:24
242:10 248:18
258:23 261:19
**particularized**
253:4
**particularly**
109:10 235:21 248:13
249:2
**parties**

266:4,10 267:19
**party**
73:19 109:15
**pass**
68:6
**pat**
149:8
**path**
133:5
**patience**
263:12
**patient**
53:13 58:12
**patients**
57:16 183:16
**Patrick**
10:2,3 16:17,22 64:23
68:8 83:21 84:2,7,17
84:24 87:8,9 90:19
95:20 137:7 147:3
173:18 189:12
210:21 221:19
229:18 251:20
**pattern**
7:5
**paucity**
241:4
**Paul**
43:20 137:13 161:14
172:23 173:3,11
175:16 176:1,1,3,22
176:24 178:13 179:2
**Paul's**
173:1
**pay**
54:7 101:22
**paying**
94:14,22 138:21
**pays**
94:8
**peer**
66:20 67:4,5,17,17,21
68:4,11,12 69:16
241:6 243:18
**peer-reviewed**
14:7 19:6 23:21 28:1
49:2,6 51:22 52:1,12
53:17,17 57:1 70:11
73:8 245:12
**peers**
190:3
**penalty**
151:10,12,14,17,18,19
151:20,21,23 152:1
153:5 154:1
**pending**
174:18 265:9
**people**
19:17 22:12,15 25:5,7
25:10 57:22 58:7,8
58:14 59:4 67:22
69:23,24 73:23 74:6
77:19 90:10 125:20
129:20 131:3 148:1
158:16 162:15,23
169:1,8,22 171:1,6
178:7,7 180:6 184:7
192:11,13,22 199:15
208:4,5 210:10,20
217:17 222:1,4
226:21 227:20



229:10,17,24 236:1
237:7 242:9 243:5,18
246:4,10,12 247:8
249:19,20 250:17
251:9,24 252:19
253:8 254:22 257:3
260:21
people's
117:2
perceive
240:11 262:22
percent
246:11
percentage
108:22,23
perception
207:9,14 208:12
perceptions
11:22
perform
61:22 78:10 118:13
period
157:21 261:9
periodically
224:8
perjured
130:19
perjures
193:4
perpetrator
214:1
perpetrators
25:8
persist
101:12
persistence
199:17
person
22:2,4,9 28:6 65:4
67:18 70:7 89:7
112:3 113:16 119:9
121:5 123:14 130:12
130:16 132:16,19
134:3 137:1 139:12
146:7 159:7 175:23
184:18,18 202:20
208:18,22,23 211:12
211:13 227:23 228:9
228:18 230:6,13,16
231:14 232:19,20
234:5,16 244:13
245:3 257:3 263:3
person's
119:7,21 122:2 125:23
183:9 210:8 234:12
personal
25:13 51:18 58:2 60:1
103:8,14 110:22
111:16 112:24 116:7
117:10 120:22
127:14 130:9 137:6,9
137:12,15,21,24
138:3 195:14 202:21
234:23 237:6 260:6
personality
135:10 228:3 250:16
personally
108:2,6 112:9 152:15
265:7
perspective
146:14 158:3,5 247:9

persuasive
234:16
pertaining
1:14
pertinence
134:12
pertinent
69:10 168:24 170:4
Pete
11:16 13:13
Peter
30:12
Ph.D
243:7,24 245:3,9
phenomenon
21:21 249:13
Philadelphia
249:18
Phillips
75:13,19 85:4,11 86:20
87:7 137:13 167:10
167:18 168:13 170:9
171:5,15 172:18
173:10,16,23 174:8
176:2,24 178:7,20
179:18,21 180:5,11
180:13,14,16 181:2
187:15 188:9
Phillips's
167:11 172:22,24
173:4,11,16,21
175:17 176:1,3,22
178:13 179:2 180:21
185:14
phone
110:5 267:21
phrased
8:13
physical
125:7 195:4 199:10
202:21 210:8,12,13
260:14
physically
145:9 155:10 169:17
199:15 216:5 258:3
physician
131:7
piece
52:11 242:1
pioneered
28:3
pivotal
111:10
place
18:2 27:8 66:16 194:17
195:6 214:19 261:21
placed
65:10
plaintiff
1:6 2:7 4:10,18 32:3
260:5 264:6 265:13
plaintiff's
4:15 5:11,14 6:1
plaintiffs
32:10 65:2 221:19
plan
168:12
planning
227:8
plausible
86:22

play
156:21 247:2
Plaza
2:9 267:5
please
4:14,24 5:7 9:23 22:24
33:14 38:24 40:20
42:4 43:10,23 46:20
48:9 49:21 53:9
71:21 74:20 98:7
174:13 177:3,16
223:24 225:23 230:4
252:17 267:14,18,20
pled
25:5
PLLC
2:14
point
30:16 34:24 35:1,22,23
51:24 54:3 93:11
102:4 115:10 126:15
130:21 154:9 158:1
169:1 184:17,24
185:14 186:6 206:20
214:18 216:2 223:6
223:10 228:9 236:10
237:23 252:6
pointed
252:23
pointing
188:17 211:13
points
20:21 241:3
police
2:13 21:7 47:24 48:1,3
48:4,5 58:22 61:17
63:7,17,23 64:3,20
94:10 102:24 121:7
121:21 122:3,4
123:18 144:19
154:24 157:14
169:10,15 178:9
182:1 185:1,4 194:21
203:11 209:9 213:14
213:18,19,23 214:2
220:10 221:2,6,6,8
221:10 228:22,24
229:14,20 230:2,9
231:16 238:19
245:19 247:20
248:14,16 249:3,9,23
250:6,18 251:12
252:11 253:19,22
254:4,18,20 255:4,8
255:10,12,16,23
256:5,10,17,24 258:1
258:13 260:22,24
261:6 262:7
policy
59:21 60:1 251:20
political
164:1,17
politicians
262:15,16
pomposity
243:6
pop
95:22
popped
223:9 224:9
pops

14:17
populate
220:19
populating
30:1
population
12:20,23 190:2 248:10
248:11 249:2
portion
16:22
posed
46:19
position
8:4 27:10 33:19 54:4
100:23 121:4,17
123:13 135:24 136:7
136:11 157:12,16
175:16 185:5,12,21
198:23 207:16
positions
199:14
positive
5:24 226:20
possession
44:16
possibilities
156:9,10 196:20
possibility
152:12 159:9 209:6
227:16
possible
13:5 25:21 80:8 89:9
107:7,12 111:13,13
112:14,23 113:5
120:11 121:2 127:23
130:8 151:1 155:16
158:24 159:1 220:22
227:12
possibly
50:1 106:6,12,21 159:7
206:8
postulated
25:16 30:2
posture
31:16
potential
9:5 110:14 152:12
156:19 209:6 222:23
257:12
potentially
11:10 133:24
pound
129:11
powerful
144:20
practical
116:22
practice
41:16 52:7 57:14 79:12
104:20,21 108:10
109:11 110:3,24
111:8 113:19 115:24
116:23,24 129:19,20
132:7 193:6 215:14
215:15 216:8 253:19
253:22 254:7 255:8
255:10,15
practiced
162:9
practicing
54:8

practitioner
164:2,4
practitioners
162:6
preamble
23:8 56:5 71:12 170:17
225:6 231:18 232:1
precise
94:19
preconceived
58:17
prefer
27:5 114:22 130:3
preferred
128:17
premise
117:6
preparation
14:16 15:7 90:17 91:6
132:20 150:15,16
prepare
17:24 41:24 60:24
80:13 86:15
prepared
43:6,11 44:9 62:21
66:20 96:19 99:18
122:20 150:5 198:18
199:24
preparing
80:4
presence
27:11 265:20
present
25:17,18 30:4,4 116:19
150:7 266:7
presentation
54:22 55:1
presiding
153:16
pressure
230:14
pressures
89:7 208:21 209:5
pretty
12:5,10,11 42:23
102:10 142:18 149:4
prevailing
250:14
prevent
113:8
previous
218:17 245:11
previously
179:1
principal
72:8 208:6
principally
135:15 210:9
principle
181:5 211:5 215:22
print
18:16
prior
86:15 113:18 161:2
187:2 223:5,10
priorities
24:3,11 83:11
prioritize
24:9
priority
24:4,14

prisoners
58:9
private
79:9
privy
39:4 165:1
probably
9:8 16:2 62:7 78:14
88:13 94:6 102:4,17
135:16,18,21 160:9
168:20 201:3 213:4
233:3 237:22 239:13
240:20 245:23
261:16
problem
27:1
problems
60:3
procedurally
128:5 132:6,20
procedure
1:13 55:21 58:11
proceed
5:7 110:11
proceeded
153:11
proceeding
153:15
proceedings
19:10 91:23
process
5:10 54:15 58:22 67:4
130:20 163:5,16
166:14 214:2 241:6
247:6,10 263:13
processing
6:18 206:10
produce
5:14 44:18
produced
6:12 32:2,10 115:5
product
39:24 40:7 101:13
127:20
production
5:12
profanity
201:3,7,9
professional
35:6 54:19 73:13,20
74:16 88:16 131:8
157:5 181:7 186:11
186:14 191:5 193:15
237:21 244:3
professionally
55:8
professionals
119:2
professor
249:18
profit
104:22
project
27:17 29:20 30:10 31:6
34:8,23 35:1 73:18
222:19 226:8 235:17
236:20 237:13
Project's
24:24
projective
135:6



Michael Welner, M.D. 05/17/2018

**Promise**
52:19
**promised**
194:18 209:7,15
**promises**
210:15,16
**prone**
226:16
**proneness**
234:4
**pronouncements**
149:7
**proof**
207:14 208:13
**proposition**
147:18 148:19,23
165:10 193:18,24
194:3,9,12 208:11
209:21 211:7 231:13
233:1 234:1 235:2
246:23 247:4 250:4
250:22 251:2,14
259:8 260:18,21
**prosecution**
59:2 143:19 148:4
152:3,6 153:3 154:2
222:8
**prospect**
193:19 194:4 195:17
**protect**
178:10
**Protecting**
52:14
**protective**
184:15
**proved**
37:18
**proven**
155:7 217:10 218:8
219:20 220:12,15
222:2,5 236:2,18
259:20
**provide**
18:20 30:22,24 33:5
81:7,12,20,22 89:18
90:5 94:4 111:21
118:16 124:16
133:23 134:1 231:10
232:23 233:11 235:8
237:15 242:19 262:7
**provided**
18:10 31:21 44:3 63:8
64:16 65:19,20 75:22
80:17 81:9 94:23
95:8 97:22 111:4
124:14 142:22
160:11 187:15
207:15 215:6,20
229:19 256:10
258:21
**provides**
181:1
**providing**
28:8 108:14
**proximity**
59:15 165:5 262:14
**psych**
134:19
**psychiatric**
51:11 52:22 53:24 54:5
54:23 55:2 58:9 69:3

69:7,12 70:8,12 71:8
71:15,18 72:9,22
73:3,4,9,14 74:14
110:24 115:23
135:24 140:8,10,24
141:3 189:24 192:15
226:15 228:16 229:6
231:12 233:24
261:18
**psychiatrist**
69:14 70:2,19 111:17
112:24 113:17
132:17 163:23
185:13 186:16 190:2
199:23 229:9,23
253:2
**psychiatrists**
54:8,15 69:20 71:3
72:1 111:20 112:7
119:1 215:23
**psychiatry**
45:13 52:1,21,23 53:2
57:20 66:13 69:10
70:15 74:24 110:20
114:14 115:21 117:1
213:9 215:22 229:10
**psychological**
48:19,23 70:23 71:14
135:2 148:17 239:17
241:21,22
**psychologist**
11:17 13:16 45:1,21
70:17 148:13 149:2
241:24
**psychologist's**
149:5
**psychologists**
69:22 71:1 72:2 74:7
215:22
**psychology**
45:6,8,12,18,24 46:5,8
46:12,12 49:19 50:4
51:1,2 52:7 70:16
72:22 245:3 249:17
249:17
**Psychology-Law**
239:16
**psychopath**
226:24 228:16
**psychopaths**
226:23
**Psychopharmacology**
53:6,15
**psychosocial**
144:24
**psychotic**
183:10 208:23 209:1,1
**public**
259:23 264:23 265:4
**publication**
18:17 20:2 21:11,12
24:10,11,14 26:12
27:12,21,23 28:5
52:8 238:9,18 241:20
**publications**
18:15 19:13 21:9 49:13
51:21
**publicly**
25:1
**publish**
24:8 26:13 27:2 73:24

243:13
**published**
11:21 13:23 19:5 23:19
28:1,19 36:18 37:12
49:1,5,11 53:18
56:24 70:10 71:24
73:7 149:22 150:11
150:18 171:14
223:16 239:4 242:10
245:11 248:24
252:13,16
**publishing**
30:15
**pumping**
19:17
**punched**
199:20 234:15
**purpose**
30:9 36:23
**purposes**
26:17 59:13 66:20
121:24 205:5,16
230:6
**pursuant**
1:12 81:1 266:6
**pursuing**
237:5
**put**
10:19,21 26:19 27:10
27:22 68:10 145:22
185:4 199:14 236:24
261:18,21
**puts**
157:21
**putting**
135:12

---

**Q**

**qualification**
56:13 245:23
**qualified**
46:4 119:1 242:23
**qualify**
21:24 220:20 245:8,16
245:20 246:4
**qualities**
118:17
**quality**
68:15 120:3,17,24
**quantity**
120:17,24
**question**
8:1,17,22,23 13:2,4,5,9
13:10 15:14,16,23
29:18 34:11,13 37:11
39:5,9 40:4,6,10
42:23 44:17 46:19,21
46:22 47:1,7 49:4,10
49:20 50:15,18 54:14
55:18,22,24 56:5,8
56:10,12 63:24 67:11
67:14 71:5 72:12
74:12,12,23 76:21
82:20 86:6 91:15
94:19 96:23 98:8,10
100:3 101:17 102:11
102:12,13,21 104:17
105:18 106:14 107:9
113:10,14 115:14,16
116:6 117:9,21 118:7
122:1 123:13 127:19

129:4 132:8 138:9
140:17,21,23 146:8
147:2 150:10 153:22
157:6 158:3,11 163:1
166:19,20 173:15
174:18,20,22 175:3,9
176:13,14,20 177:4
177:11,11 182:23
183:18 187:16
188:12,13 189:3
196:18 200:12
208:10,16 215:21
216:16 223:19,23
224:9 225:7,23 231:4
231:6,21,24 232:7
233:22 235:6 241:10
244:12 246:20 251:1
254:12
**questionable**
259:21
**questioners**
210:7
**questioning**
122:2 148:10 205:24
230:3 257:19
**questionnaire**
246:9
**questions**
8:10 15:1 20:24 62:11
69:2 90:7 91:16 92:1
102:20 115:3 132:10
132:13,24 133:9
136:5 144:24 146:6
154:21 211:11
247:18 263:14,15,16
267:20
**quick**
7:3 154:10
**quickly**
68:9 89:8 110:6 115:3
211:12,15
**quiet**
214:19
**quite**
15:1 34:10 59:19,19
66:15 106:21 110:6
118:20 129:5,20
131:10 146:2 147:12
210:22 230:19
234:17
**quotation**
167:7
**quote**
126:12,21 173:1,2,2
181:3 189:13,13
253:21

---

**R**

**raise**
77:20,21,23
**raised**
20:19 25:15 91:17
133:21
**rambling**
232:1
**ran**
20:2
**range**
32:9 107:24 122:22
124:17 221:13
**ranging**

118:21
**rank**
256:23
**rapid**
210:19
**rapport**
230:23 253:23 254:7
254:19 255:18 256:3
256:6 257:5 259:12
**rare**
211:22
**rarity**
20:18
**rate**
16:7,8,9,13,13 75:6
77:16 78:1,2,11,24
79:17 88:22
**rates**
77:18,20,21,23
**react**
131:3 162:20
**reacting**
171:8
**reaction**
168:10 184:3 200:1
**read**
10:18 11:1,7,15 12:17
14:3,7,9,12 46:18
47:3 48:8,10 75:12
80:10 115:17 116:2
123:12 125:14 156:1
166:5 174:19,21,23
175:5 179:24 182:23
183:1 189:9,15 194:2
200:14 202:4,6
207:12,16,20 217:1
239:8,9,10,10,12
241:18 253:18 258:9
258:10 264:13
**readily**
222:13
**reading**
12:15,17 14:15 14:23
**ready**
9:23 154:9
**real**
19:21 169:5
**realistic**
202:22
**Realities**
52:23
**reality**
261:6
**realize**
237:1
**really**
6:24 24:24 28:23 37:22
61:14 66:15 68:10
72:11 92:7 100:22
125:22 132:18 146:2
147:12,13,22 150:9
156:19 162:21
166:17 190:19 197:7
203:4 215:7 237:2
256:1 257:20
**reask**
115:19
**reason**
8:15 26:16 165:9
168:15
**reasonable**

187:7,13 189:18
190:21
**reasons**
35:2 167:14 227:4
**rebuttal**
148:13 168:17 255:2
260:18
**recall**
14:10,15 15:22 16:9
17:2,5 32:19,22 33:1
33:7 42:12 146:17
153:17 201:1 204:18
206:24
**recalling**
161:11
**recalls**
32:21 181:17
**recapitulated**
50:20
**receive**
129:21,22
**received**
80:9 81:1 95:9 105:13
122:11 124:17 127:7
181:14
**receiving**
80:19 163:6
**recidivistic**
221:18
**recognized**
249:2
**recognizing**
206:18
**recollection**
127:5 182:11
**recommend**
90:11
**Recommendations**
238:21
**reconcile**
193:6
**record**
4:15 5:8 6:13 16:18
38:8,12,16 47:3
48:10 79:24 93:13,17
99:16 100:24 101:3,5
101:9 115:5 117:4
123:12 125:15
154:13,17 167:22
169:13 174:23 175:5
183:1 200:14 201:19
202:6 203:9,19
204:21 207:20
212:13,17 225:20
229:17 252:18
257:10 258:10 263:8
263:18 267:24
**recorded**
123:22
**recording**
4:6
**records**
44:13,18 75:7 80:9
105:8 118:19 119:12
157:13,17 160:22,24
163:5 169:14 189:24
199:18 206:9,19
227:13 228:16,17
230:1
**recounting**
189:11,19 191:10


McCorkle Litigation Services, Inc.
Chicago, Illinois (312) 263-0052

redact
 5:18
redactions
 6:15
Redlich
 239:2 242:2
reduced
 265:21
redundancy
 120:19
Reed
 10:7,11 256:19
refer
 19:16 67:5 141:6
 158:17 160:2 172:14
 172:21 220:14 232:9
 238:24 247:22
 261:10
reference
 24:23 34:24 35:1,22,23
 52:18 71:23 72:18,21
 72:24 172:13 204:21
 224:21 233:5
referenced
 10:5 234:13
references
 37:11 241:8 249:5
referred
 158:18 230:5 262:6
referring
 180:2 225:19,21
reflect
 13:9 82:9 84:6 115:22
 116:24 135:17
 157:15 227:16
reflected
 25:24 80:6,23 95:4
 97:15 98:6 104:5
 108:18 109:1 227:13
reflections
 119:15
reflective
 90:7
reflects
 97:12 166:24 170:2,19
 170:21 180:6 215:8
 227:22 235:12
reformulated
 149:9
refresh
 127:5
refreshed
 10:7
refused
 153:7
refuses
 136:4
refutation
 23:19
refutations
 24:16
refute
 28:7 157:13,16
regard
 20:16 23:4 137:3
regarding
 120:12
regimented
 253:14
register
 219:19

registered
 178:20
registers
 5:13 6:22
regret
 196:24
regular
 199:10
reinforced
 130:20 231:1
relate
 11:22 49:13 55:12
 59:24 60:4 61:16
 96:14 125:24 127:17
 230:21 250:14,15
related
 11:14,15 12:13 61:14
 62:4 75:22 92:1
 145:1 148:8,17
 194:24,24 195:2
 223:8 266:10
relatedness
 234:12
relates
 39:5 66:12 96:16 122:6
 137:2 150:11 166:19
 183:13,24 210:20
 213:22,24 232:13
 234:5,10,23,24
 235:20 238:7,11
 251:11
relating
 79:23 86:19 88:1 97:16
relation
 42:8
relations
 63:5 64:2,14
relationship
 58:3,3 59:7 61:17
 63:15 67:23 78:18
 79:1,1 109:11
relative
 58:19 90:19 221:3
relatively
 210:19
release
 209:7
releasing
 161:2
relevance
 52:22 122:5 257:9,12
relevant
 7:1
relied
 216:6 233:15
reluctant
 167:18 184:21
rely
 36:21 37:5,19 38:4
 198:18 206:3 210:11
 224:15
relying
 120:6 191:17 204:19
 206:21 226:1 232:24
 248:24
remain
 27:1
remained
 20:3
remains
 21:13

remarkably
 181:9 182:7 183:7
remarks
 172:8 173:17
remedy
 261:20
remember
 17:6 32:18 41:13 42:14
 42:15,15 145:10,11
 145:18 146:1 160:22
 161:13 219:24,24
 220:2
remembered
 145:19
reminded
 184:8
render
 134:4 219:2 228:19
rendering
 113:18
Renfro
 151:19 152:23
rep-
 240:19
Reparations
 262:6
repaves
 133:5
repeat
 9:9 176:11,15
repeated
 174:11,16 221:20
repeatedly
 77:19
rephrase
 102:11,13
replicated
 118:23 212:9
report
 9:24 10:2 14:24 15:4
 15:13 18:10 19:9
 41:24 42:4,6 43:2,6
 43:12,21 44:2 60:20
 61:3 62:4,8,21 65:5
 65:11 66:10,22 68:3
 68:6 69:2 75:12
 90:18 91:3,4,6 92:4
 96:19 97:2 99:7,18
 100:5,17 105:6 119:3
 126:6,10 147:11
 155:15 157:19 160:2
 160:12 161:3 166:6
 166:15 167:6 169:24
 172:13,17 179:23
 180:1 200:2 211:18
 217:1 220:5,7,10
 226:13 234:13
 235:10 247:20
 248:17 249:5 250:2
 253:18 254:24 255:1
 255:2
reported
 1:23 265:19
reporter
 1:16 4:24 5:2 121:12
 175:11 267:23
Reporters
 267:1
reports
 44:9,16 52:17 60:23
 62:6 66:19 67:6,16

68:16 92:4 125:19
 226:15
represent
 4:18
representation
 180:14 192:1 197:22
 216:2,3 221:5 237:4
 255:9
representations
 193:8 194:14,15
 210:11 254:20
representative
 178:13 179:10,12
 180:22
represented
 223:11 236:1 242:16
representing
 2:7,12,18 170:20 173:7
 175:19,22 178:3
 182:13
represents
 176:1,24
reputation
 162:11,17
request
 5:14 12:24 42:5 43:1
 44:18,21 79:7 83:13
 84:13 95:7,23 126:11
 127:12 149:24 150:2
 153:9,13
requested
 47:4 48:11 81:11 126:8
 174:24 175:6 183:2
 200:15 202:7 258:11
requesting
 44:1 80:17 81:19
requests
 5:11 81:14 129:9
require
 27:21 30:15 92:17
required
 92:13
requires
 28:23,24
research
 11:13 20:10,23 21:19
 24:19,21 25:23 26:3
 26:4,7,11,16 28:2,3
 28:11,18 31:6,13
 33:15,22 34:17 35:3
 35:15,21 36:6 52:19
 74:2 104:22,22 105:1
 125:18 150:3 171:13
 180:24 182:3,5 224:6
 242:4 252:19
researched
 21:2
researcher
 253:14
researching
 24:12,15
reservations
 23:3
reserve
 24:10 263:17
reserved
 266:3
resistance
 234:8
resolve
 20:23 158:3,7 203:2

resolved
 85:15 159:11
resources
 59:24
respect
 26:10 36:4 66:22 79:11
 95:7 112:8 165:24
 213:8
respectfully
 55:23
respective
 266:4 267:19
respects
 236:5
respiratory
 9:16
respond
 48:21 132:16
responded
 170:22
responding
 95:23 171:4
response
 8:22 177:20 200:2,10
 249:10 261:21
responses
 246:8,11
responsibilities
 161:19 172:2 214:2
responsibility
 8:16 25:10 151:4
 159:18,18 165:24
responsible
 25:12 89:5
responsive
 5:14 81:16,16 89:6
 164:9 254:11
result
 26:11 60:14 104:14
 105:4 207:7,9,13
 208:12 212:2 221:10
 244:6
resulted
 91:10
results
 162:12 221:9
retain
 42:19 78:9 79:7 109:21
retained
 38:19 39:3 40:3 42:13
 42:18 43:17 59:2,3
 94:9 95:1 97:6 98:14
 99:2 102:8 110:5,9
 128:18 130:7 138:23
retainer
 79:8,12
retrial
 144:3
return
 34:5 103:14 104:6
 267:18
returning
 156:4
revealing
 98:3
revenue
 105:1,3,21 106:10,13
 106:18 107:19
review
 6:8 7:4 11:16 16:4 17:8
 39:15 44:17 67:4,21

68:11,12 75:7 91:4
 91:21 92:2 105:8
 160:9,12 161:2 163:5
 171:20 186:7 187:5
 188:22 220:18
 239:15 241:6 256:19
 259:1,6 267:14
reviewed
 9:24 10:1,2,3,13,15,17
 14:2 15:12,19 24:22
 40:17 66:21 67:17,17
 68:4 75:19 147:11
 160:4,20,23 161:3
 188:2,11 225:8
 227:13 238:4 243:18
reviewer
 69:16
reviewing
 15:7,24 17:6 65:13
 67:5
revisit
 27:7
revisited
 224:8
revolves
 213:24
rich
 120:4
Richardson
 96:21 97:3 98:4 99:19
 138:4
right
 6:17 8:10 9:4,18 12:6
 13:7 17:2,12 22:24
 28:14 29:2 31:23
 32:21 33:4,10,13
 34:3 36:7 38:2,4,7
 39:9 43:14 49:18
 67:9 69:4,5 83:9
 84:18,21 85:1,24
 86:21 87:3,9,15,19
 91:11 92:24 95:5
 97:17 98:23 100:21
 101:17 102:5 103:24
 107:13,16 109:6
 112:1,10 113:20
 114:10,20 115:24
 121:14 123:19 124:4
 124:4 126:17 127:10
 128:3 130:13 136:13
 138:1 139:17 140:5
 142:16 143:8 144:15
 144:16 152:13 155:4
 155:8,17,21 156:7,16
 157:2 158:1,8,14,16
 159:13,20,24 163:1
 167:13,16,20 168:6
 172:20 179:24
 180:23 185:22 186:9
 187:20 195:17,20,24
 196:9,15 197:1,10
 199:2 204:11,14,15
 207:6,10 208:9 217:9
 217:11 218:21 219:9
 219:15 221:9 224:2
 228:13 229:7 236:2
 236:12 242:11,17,20
 242:24 244:14,16
 245:6,14,16,21 246:3
 247:10,13,21 248:17
 248:23 249:7 251:7

16



Michael Welner, M.D. 05/17/2018

rise
121:9,22 123:20 124:1
risk
30:2 209:13 230:14
238:20
Risperidone
53:11,12
ritual
199:13
road
181:20
roadblock
181:22
robust
197:20
RODERICK
2:2
Rolando
219:17
role
129:18 215:16
romantic
58:3
Ronald
122:17 123:4
room
167:13 200:2 260:15
rooms
255:17 256:7 257:7
259:14 261:8
Roscetti
40:23,24 41:20 43:4
217:15
roster
88:24
rough
104:11 108:22
route
108:9
row
153:24
RPR
1:23 266:20 267:22
Rubio
151:14
ruining
173:1
rule
109:5,6 112:21 113:10
113:24
Rules
1:13
run
181:21 209:12
running
37:2 82:2
Ryan
69:13 70:2

**S**

S
3:7 104:1,2
safe
46:3 252:9
Safeguarding
52:13
Sahara
22:2,4,5
sample
30:7 34:23
samples

220:17
Sampson
151:18 152:23
sand
129:11
sat
11:8 110:12 130:23
214:24
satisfied
26:19
satisfies
244:13
Saul
242:1,8
Saunders
96:13,15,21 97:3 98:4
99:19 138:4
save
73:17
saw
161:11 181:24 186:12
saying
36:9 42:22 50:2 89:20
91:2 92:12 156:20
158:9 164:6,7,8
168:11 173:21 174:3
176:21 178:3,15,18
178:18 179:20
186:15,20 188:18
190:20,20 191:4,8
194:9 197:12 198:2
202:16,20 207:24
210:1,2 213:7 220:21
220:21 221:24
235:23 236:13
243:23 254:3 261:2
says
112:16 172:17 186:3,9
199:1 204:16 240:1
Scahill
2:8 4:7 267:4
scale
133:20 134:17,22
135:20 136:20
scan
125:4
scenario
250:11
scene
181:19
scheduled
85:17
SCHOOL
2:4
scien-
180:12
science
46:14,15 48:7,14,17,18
49:10,15,17,22 50:21
50:23,24 51:9 52:8
53:22 54:2 70:14
121:9,22 123:21
168:19 189:22 193:5
211:5 215:13,15,17
216:8 245:5 246:14
Science-Based
52:19
sciences
49:8 50:1,1 51:16,17
51:23 52:2 53:19
54:20 60:5 213:7,10

scientific
71:7 73:1 120:12 121:8
121:21 123:19 130:2
130:3 158:2,5,13
170:8 171:14 180:9
180:24 181:5 187:14
189:17 191:8 207:23
208:2,10 230:4
231:11 232:24
233:23 235:19
239:15 241:4 242:5
246:24 247:1,12
scientifically
158:6 191:9
scientist
11:13 171:19 181:18
190:13 192:6
scientists
215:16
sconces
246:10
scope
129:23 164:19
Scorpio
16:24 184:2
se
48:4
seal
266:14
second
6:6 32:1 65:14 74:3
156:11 170:16 207:5
214:4 239:18 245:10
secret
99:6 100:12
secrets
98:3
secure
127:13 130:8 267:14
Security
5:19
see
15:2 25:4,17 32:13
36:9 42:3 43:23
81:23 89:2 100:24
125:5,11 146:24
160:7,10 181:21
183:17 184:4 189:7
193:24 201:23
206:10 207:7 224:11
243:14 244:21 249:6
seeing
57:15 147:23 183:16
254:11
seek
78:8 79:12 89:3 101:15
244:1
seeking
152:6 209:4 260:6
seeks
79:7
seen
22:10 91:24 162:22
214:8,11 241:18,19
sees
190:2
seize
133:3
selection
54:15
self

119:15
self-incriminate
196:19
self-incriminating
144:21 169:8 198:3,12
200:4 202:17 203:14
207:15 210:23
self-referential
19:16
self-report
135:3,5 136:23 137:2
self-select
243:16
self-serving
243:2
semantics
198:15
Senate
249:24
send
76:13 127:1
senior
257:2,2
sense
8:14 27:24 37:23 131:2
171:4 182:20 185:23
192:2 227:14
sensitive
88:24 163:24 192:7
sent
5:17 80:11 126:23
sentence
189:9 191:11 197:2
207:5 214:6 220:24
249:7 253:18
sentencing
151:3
separate
96:19 182:10,11
sequence
213:19
serial
219:9
serious
10:21
seriously
209:14 210:16
seriousness
209:19
serves
198:19,19
service
118:21
services
4:3 5:5 77:12 78:10
set
20:16 136:6 166:1
216:5 266:14
sets
236:24
setting
131:4 253:8
settings
119:16 135:5
severely
178:5
sex
52:16,16 219:9
shaking
188:16
shallow

125:18
shame
208:22
share
104:12 105:11
Sharon
88:2 155:1
sheets
267:13,15,16,19
Shields
65:16,17
shoes
166:1
shootings
156:3
shop
184:5
shoplifting
221:15
short
38:9,13 87:14 93:11,14
101:6 135:14 154:14
212:14 216:21 263:9
Shorthand
1:16 267:23
shortly
156:8
shots
208:8
show
34:4 200:8
showed
184:2
sic
6:7 40:22 87:9
side
126:16 162:16,17
181:20 207:7
sides
116:18
signature
263:17 264:15 266:2
267:12,14,15,16,18
267:23
signed
241:6 267:16,16
significance
178:19 234:6,9,18,22
significant
20:8 59:6
signs
171:22
silly
19:15
similar
7:7 153:6
similarities
7:4
similes
197:5
simple
227:23
simpli-
19:22
simply
13:10 35:24 46:21
55:24 136:4 146:12
153:7 184:4,8
Sincerely
267:22
single

129:18 225:10
singular
251:5
sir
77:7 94:5 105:10
110:21 140:17 143:3
145:6 147:10 172:10
183:21 217:1 222:15
sit
100:14 127:24 128:19
131:16 132:9,23
134:3 135:17 186:4
206:18 214:15
site
31:18
sitting
30:12 130:16
situation
7:8 54:8 153:6 187:11
254:23
situations
48:21 113:1 259:22
six
39:20,21 138:14
skeptical
248:13 249:3
skills
241:2
skin
189:14
slight
156:12
Slightly
156:16
slow
7:23
slowly
9:3
small
19:16 69:22,24 73:23
102:10 250:9
smart
190:3 192:16,17
234:17 236:17
smudge
181:23,24
snitching
63:19 249:12 250:23
251:4,9,15,16
so-called
40:23 251:3
social
5:19 11:13 44:24 45:5
45:8,12,18,21,24
46:5,8,12,15 48:19
48:24 49:18 50:1,3
51:1,2 59:23 118:21
215:15 245:5
Society
239:16
sociologists
74:6
sociology
74:24 245:4
softly
9:3
SOLANGE
2:2
somebody
34:13 58:4 79:1 107:6
145:15 173:12 195:8

17



245:18 251:22
somebody's
  78:21
someone's
  120:5 162:17
sophistication
  184:7
sorry
  44:6 66:1 73:3 83:17
  103:9 107:10 108:3
  114:15 115:16
  127:21 133:15 147:1
  148:20 165:4 170:16
  172:19 190:6 200:11
  202:10 231:22
sort
  10:21 27:7 28:24 29:4
  50:19 74:1 92:5
  111:8 133:5 145:13
  149:7 216:15 243:1
  243:17 251:19
  254:14
sought
  163:11
sound
  84:18 86:21 87:19 95:5
  97:17
sounds
  89:19
source
  10:3,12 14:15 15:7,9
  15:11,18,24 17:13
  24:23 25:1,20 57:8
  57:10 62:22 63:13
  64:23 65:6 225:9,10
  225:24 236:21
  237:15,18
sources
  59:13 92:7 118:17
  222:23 237:2 250:1
South
  1:18 2:9,15 4:7 265:8
  267:6
spanning
  118:20 161:1
spans
  106:22
sparse
  197:21
speak
  9:3,3,7 33:11 80:12
  100:18 172:3 180:18
  250:1 254:13
speaking
  101:11 119:11,15
  128:2,4 180:18 217:2
  221:16 255:3 256:18
speaks
  70:13 76:23 168:9
spear
  130:1
special
  58:9 77:10,13
specialist
  4:2 64:21
specific
  21:6 58:20 63:24 64:1
  65:21 120:13 121:6
  121:19 123:15
  166:18 232:16 248:5
  258:13 260:23

specifically
  10:13 16:19,23 17:8
  26:4 83:6 118:22
  132:2 148:16 181:13
  234:13 243:4,4
  244:19 245:2 249:16
specifics
  237:14 247:23
specify
  11:4
speculation
  78:13 86:4 122:11
  128:23 133:17 187:2
  227:19 255:20
speech
  7:23 74:10
spend
  15:6,24 17:7 79:19
  89:11 110:4 150:22
  197:9
spent
  17:16 80:4 90:15 91:14
  252:18
spoke
  11:10 64:20 148:23
  217:7 220:24
spoken
  119:8,22
spurts
  161:1
SS
  265:2
St
  152:20 153:1
stack
  126:7
staff
  80:22 81:15
stage
  161:4
stale
  132:23
stamped
  122:21
stamps
  124:15,16
stand
  111:22 152:6
standard
  28:2 124:1 140:9 141:2
  215:13,14
Standardized
  52:24
standards
  246:15
standing
  257:13 261:11
standpoint
  60:2 89:20 130:3
stands
  28:10
start
  37:2 44:6 82:19 89:8
  103:9 108:3
started
  68:8 203:12 205:24
state
  1:17 7:17 30:14 43:15
  44:2 46:22 55:24
  99:10 116:24 124:23
  143:17 144:14

146:20 163:12
  176:20 180:3 181:24
  182:4 214:7 225:19
  226:4 248:10 262:1
  265:1,5
state's
  163:17 165:11
stated
  195:16
statement
  10:1,1 16:16,17 23:17
  45:9 46:5 48:2 116:9
  117:7 119:6,9,20
  159:14 193:12 198:3
  199:6 200:5 201:4
  202:18 203:14 204:9
  204:12,13 207:15
  210:23 211:1 224:15
statements
  130:22 144:21 169:8
  198:12 200:19
states
  1:1,13 4:11 126:10
  264:1 265:10
stating
  208:9
station
  157:14 203:11 205:12
  205:23 206:15
status
  171:24
stay
  150:18
stenographically
  265:20
step
  37:23 38:3
steps
  127:13 130:8 213:18
Steve
  65:15
stick
  125:8 150:10
stipulation
  76:16
stop
  63:19 174:13 177:17
  177:20 249:12 251:8
stopped
  214:18
stopping
  154:9
straying
  74:4,12
street
  1:18 2:9 4:8 11:11 12:3
  176:23 190:3 192:15
  192:17 234:17
  236:16 265:8 267:1,6
strengths
  61:15
strike
  83:4,15 84:20
strives
  116:14
Striving
  115:1
struck
  202:14,15 234:14
structure
  68:10

structured
  31:14
struggle
  217:13
stuck
  168:19
student
  74:1
students
  22:3,7 73:24 243:9
studied
  84:12 223:13 242:10
studies
  20:12 191:16
study
  20:17 23:5 29:13 45:4
  55:3,13 56:15 57:4
  60:16 62:18 76:11,12
  181:5 182:3,5 223:2
  223:20 224:1,20
  225:10 237:18 242:8
  242:20 249:10
  252:11,16 253:3,15
  257:16
studying
  106:14 223:5 253:12
stuff
  26:18 67:9 92:12
  162:24 188:18
  254:24
stylistically
  28:5
subject
  14:1 19:6 24:19 35:14
  38:21 39:16 40:18
  44:11 57:1 67:3
  76:18 103:13,15
  113:16 127:24
  137:16 138:13,19
  150:8 171:7 181:11
  183:14 245:13
  246:16 260:14
subjects
  23:20 57:7 253:15
submit
  267:14
submitted
  76:22
submitting
  28:4
subordinates
  57:23
Subscribed
  264:20
subsequent
  34:8,16 35:14 36:14
substance
  19:19 150:12 164:11
substantively
  18:18 197:19
subsumed
  108:11
subtopics
  191:19
successive
  153:13
succinct
  150:24
suffering
  9:15 183:10
sufficient

26:20,21
suggest
  6:8 127:6 216:4 243:9
suggested
  185:1
suggestibility
  134:22,24 235:13,20
  236:11
suicide
  52:6 66:13
suit
  266:11
Suite
  1:18 2:10,15 4:4,8
  267:1,6
summary
  19:19 147:7 239:21
superficial
  125:18
supervising
  257:3
Supplementing
  58:24
support
  151:22 198:6 211:6
  231:13 233:1 234:1
supported
  261:16
supportive
  198:10
supports
  157:20 198:5 235:2
suppose
  76:7
supposed
  143:15
suppression
  216:2
sure
  7:24 8:7 9:12,19,24
  13:11 15:5 18:22
  30:23 31:3 37:20
  39:10 40:14,21 42:14
  42:23 43:24 44:20
  49:3 51:2,6 70:3
  71:20 77:13 81:6
  82:6 84:11,19 87:2
  92:20 95:6 96:4
  97:18,24 104:10
  107:17 109:19
  111:18 114:2,24
  123:24 124:24
  125:13 126:18 129:7
  130:10 132:9 133:10
  134:18 139:2 143:5
  151:2 152:8,23 154:5
  159:19 192:9 198:13
  199:3 211:20,21
  212:23 232:5 233:17
  244:11 245:22
  250:24 254:22
  257:14 259:7 261:12
surely
  159:22
surprise
  76:19 83:2 262:12
surprises
  262:15
surveyed
  249:19
surveys

22:3
susceptible
  234:3 235:4
suspect
  211:15 212:3
suspected
  59:5
suspects
  41:17 253:23,24 257:6
  261:7
suspend
  58:16 177:18
swear
  5:1
Swift
  32:11,17 66:2 96:15,16
  96:17,18,18 97:10,16
  138:1 147:4,6 181:17
switched
  31:15
sworn
  5:6 7:13 264:11,20
  265:16
symptoms
  118:22
synthesis
  60:18 61:4
synthesize
  60:13
system
  58:21 124:15 209:18
  210:3 253:15 263:1
systematic
  29:6 60:16 247:8
systematically
  35:12

T

T
  3:7
table
  30:13
tactics
  258:4
take
  21:18 24:7 38:9 54:3
  58:18 68:21 69:18
  72:20 86:8,8 88:9
  93:11 110:17 115:1
  127:12 130:1,8 133:1
  133:2 145:4 147:14
  154:10 156:6 169:6
  192:23 193:2 206:9
  209:13,14 212:7,12
  213:18 215:16
  222:14 229:4 260:1
  263:5
taken
  1:15 4:7 22:8 25:10
  38:2,14 88:16 93:15
  101:7 122:17 154:15
  210:16 212:15
  216:22 261:5 263:10
  264:12 267:9
takes
  27:22 133:8 168:23
  193:2
talk
  22:2 67:5 125:22
  140:12 162:23 173:2
  184:24 186:4 197:8



talked
66:19 75:16 131:20
140:14 141:9 147:2
218:16
talking
8:4 12:19 108:8 128:8
133:4 175:12 187:20
197:9 214:6 220:16
220:17 233:1 240:18
261:9
tampering
181:15
tape
93:10
taught
72:3 164:8
tax
104:5 107:20
taxes
102:4 103:15
Taylor
1:5 4:10,18 10:1 16:16
61:17 69:4 75:23
76:23 77:3 80:6
90:17 91:2,4,16 92:3
92:18 117:13,16
118:3 126:9 127:14
128:19 130:9,14
132:4 154:23 156:2
157:3 159:23 161:8
163:6 166:8 169:16
169:16,19 178:8
190:24 191:1 193:19
194:3 195:16,23
198:24 203:23 204:3
204:16 207:15
208:11 216:16
226:16 227:9 228:18
235:14 236:7 248:6
254:5 260:11,24
264:5 265:12 267:8
Taylor's
61:19 126:10 130:17
158:24 160:14
164:16 165:12
166:23 173:18
189:11,19 191:10
194:14 200:1 206:22
207:17 230:7 231:14
team
89:4 127:2
tease
92:8
teasing
134:13
technique
259:12
tell
8:19 9:11,22 35:5
48:16 84:4 87:2
93:24 108:12,23
114:12 115:10
116:23 129:22 162:8
163:4 166:19 182:3,5
216:17 222:5 248:23
254:16 260:19
telling
180:17 185:15,17
temperament
178:22
ten

tend
149:9
terminal
13:20 45:3 51:12
terms
61:21 63:15 70:20,20
72:6,13,18,21 75:7
89:21 103:16 104:11
105:20 106:17
108:22 109:10 117:4
135:1 166:14 194:13
209:5 221:4 255:3,4
Terrance
65:16
Terrence
65:16
terrified
180:8 185:2
Terrill
32:11,17 96:15 97:16
138:1
testified
7:13 17:22 27:14 37:10
64:8,22 109:15 130:5
142:15 143:18
144:22 148:4,20
149:20,21 151:22
181:2 203:6 208:5
245:18 249:23
testifies
168:16 203:17
testify
9:23 17:24 32:16 86:14
123:9 143:7 150:2,5
152:1,10 167:18
170:8 176:2 180:17
198:23 265:16
testifying
14:21 16:19 86:11
102:8 126:4 143:9
147:15,21 148:14
174:13
testimony
14:18 16:23 17:18
19:10,23 23:18 25:8
33:6,7 49:23 51:14
52:13 61:24 63:9
74:20 75:9 86:16
102:9 105:6 109:24
119:13 124:22
125:16 142:4,10,22
143:12 144:12 145:8
147:12 148:12,19,22
149:5 151:24 167:8
167:11 169:24
176:10,16 179:1,5,8
181:15,17 183:4
185:14,19 186:17,18
187:3,15,19 190:16
196:2 204:20 205:8
205:15 206:4,21
226:14 251:21 252:6
265:18,24 266:13
testing
70:23 133:11 134:19
148:17
tests
71:1 135:2,10
Texas
11:17 13:17

Thames
96:21 97:3 98:5 99:19
138:5
Thank
4:23 14:5 18:23 38:6
75:2,15 115:12
124:19,20 141:16
165:8 239:6 241:10
Thanks
13:12 17:15 19:3 77:5
82:17 102:14 233:18
244:9
theoretical
20:20 21:9,11,11 25:16
theorized
30:2
Therapeutic
52:19
thereof
266:12
Thibodeaux
43:15,16 44:3
thing
9:1 10:18 75:8 132:19
145:10 149:10
162:21 163:22
164:23 177:8 190:10
197:19 262:22,23
263:4
things
5:19 9:17 10:24 18:15
21:18 22:16 24:1,2
24:11,14 28:7 70:19
89:3 95:19,22 113:11
114:18 118:23,23
119:12 129:7 132:14
144:22 148:11
165:23 193:7 194:19
195:18 233:8 254:12
255:3 261:22 262:17
262:17
think
9:2,3,20 19:21 20:6,7
20:19 21:8,13,14,17
21:23 22:19 27:19
28:6,13 29:15 31:24
32:2,20 36:8,22 37:9
37:19 44:13,13 50:19
53:20 55:5 66:6
71:22 72:13,23 73:16
76:20 82:12 86:5
87:23 88:5 90:3 91:3
91:16 92:8 94:8,14
94:16 96:16 109:2
116:10 120:1 121:12
121:24 124:4 129:12
132:9,11,14 134:7,14
134:21 135:14,21
136:15 137:17 139:5
139:24 140:4,13,19
141:11 148:22 149:2
150:9 152:16,17,19
153:9 154:21 156:18
160:23 168:4,4,7,24
170:1 184:2 193:10
194:13,16 197:1
198:4,5 199:4,5,9
200:18 201:20
203:22 209:22
227:20,22 233:3,7,7
235:5,23 240:14,23

thinking
11:3,11 165:22
thinks
233:16
third
6:7
thorough
90:6
thought
11:2,8 92:13,17 133:6
thousands
89:1
threat
168:14 169:4 170:10
171:5,8,16 172:5
181:4 183:24 184:1
234:14
threaten
184:13
threatened
174:9 180:7
threatening
167:12,19 179:17,21
254:5
threats
173:23
three
6:3,11 7:1 17:19 28:1
57:20 91:14 92:4
107:15,22 139:6
148:11 150:12
151:16 193:23 207:6
244:13 250:2
threshold
111:7,7
thrown
251:22
thrust
144:12,17 145:2,7,23
146:17 147:5,10
148:6 149:4
time
4:9 11:8 15:6,24 17:7
17:16 24:3 25:1
27:22 28:17 29:5
31:7 33:16,18,21
53:5,5 60:12 68:10
68:17,19 75:5,9
76:10 78:1,23 79:19
80:5 88:16 89:12,15
89:18 90:15,17 91:8
91:9 92:19 95:1 96:2
96:3,4 109:8 110:4
118:20 135:16
138:11,18 147:12
150:23 154:24 156:5
157:9,14 166:4
170:10 171:16 177:6
187:14 188:10
200:17 203:24
212:23 215:12,21
216:12 220:20,20
225:15 226:13,13
236:8 253:9,9,10,10
253:11 258:2,17,18
261:8 263:6,14

timeline
205:11
times
7:22 79:16 102:21
157:22 187:5,6
239:11 258:15
Timothy
242:2
tip
158:13
title
13:20 245:14
titles
14:10
today
9:16,23 11:9 13:1
16:20 78:9 80:11
87:4 166:4 226:14
258:24
today's
15:20 17:24 80:3
told
15:21 129:11 172:24
214:14
top
15:23 103:22
topic
150:16,22 182:8
topics
253:5
total
80:24 81:12,21 82:10
82:18,21 83:14 84:6
84:14,16 86:19 87:12
88:15 91:9 95:4,8
97:14 101:23 102:7
102:15 104:12
107:19 108:12,23
142:13
totality
170:22 192:16 193:1
193:11 194:22 211:2
229:21
toughen
199:13
traced
219:8
track
7:22 36:6
Tracy
1:15,23 5:2 8:5 46:18
174:19 202:5 248:3
265:4 266:20 267:22
trade
98:3
train
257:4
trained
44:24 159:17 254:19
255:4,7 256:3,3,5
260:22
training
48:1,4 181:8 182:2
183:15 187:4 191:6
230:19 244:4 255:12
256:10,15,16 259:9
261:2
transcribed
124:3
transcript
8:23 9:7 16:22 122:16

123:23 169:12 180:4
188:7 264:13 265:23
267:11,14,16
Transcription
265:22
transcripts
171:20
transparency
116:16
transport
214:18
Traveling
62:19,23 63:3,6 64:1,8
64:15,24 252:4
treat
79:3 253:15
treated
253:8
treatise
72:9,19
treatment
53:7,12,13 57:22 58:5
trend
225:16
trial
86:12,15 95:17 111:22
131:5 144:1,2 189:12
198:9,24 216:3 227:9
231:5
trials
143:22,23
tributaries
56:18
tried
80:23 242:22
Trooper
182:4
truck
181:23 182:1,3
true
99:11 113:3 120:16
159:14,20 198:3
211:20,21 230:15
232:14 265:23
truly
240:18
trumped
236:11
trust
210:10,11,14
truth
199:7 265:17,17,17
truthful
196:8 199:1
truthfully
123:9 126:4 148:21
try
94:18 121:13
trying
31:16 139:5 167:16
176:14 192:11
220:23
turn
28:9 89:10 91:22 189:5
214:4
turned
150:1 153:12,14
twice
146:21 199:21 203:1
two
2:9 35:1,3 52:16 72:4



142:13 143:22,23
155:16 156:9,19,20
190:1 193:23 197:9
243:11 252:21 267:5
**type**
22:5 90:9
**types**
128:8,9 135:10 261:19
**typewriting**
265:22
**typical**
110:3 221:23
**typically**
113:19 132:20 161:23
247:8

_____ U _____
**ultimately**
25:12 37:18 41:9,9
157:18
**un-Bates**
122:20
**unacceptable**
127:3 177:13,15
**unacceptable,'**
126:11
**unaddressed**
20:24
**unclear**
153:22
**uncomfortable**
135:12
**uncooperative**
248:13 249:3
**uncuff**
200:20
**underlying**
127:17
**underrepresentation**
221:3 223:5 224:16
**underrepresented**
222:1 226:2
**underscore**
192:9
**understand**
8:11,20,21 33:14 49:3
49:22 50:18 59:17
65:12 71:2 101:10
102:9 104:17 132:8
196:13 228:14
250:24 252:17
**understanding**
19:11 72:4 81:9 82:24
99:16 100:13 102:1
120:8 122:7 132:15
189:23 220:13,16
**understood**
30:17 33:18 81:11
152:5,11 165:8
**undertake**
18:20 233:12
**undetermined**
265:10
**undisputed**
170:3
**unethical**
136:13,14
**uneven**
135:11
**unexpected**
214:20

**unfamiliar**
48:22
**Uninformed**
52:14
**unique**
60:3
**unit**
57:20 58:10
**United**
1:1,13 4:11 264:1
265:10
**universal**
251:5
**universe**
24:6 168:18 184:8
222:1,4,6 226:3
**University**
2:4 222:18
**unprecedented**
220:23
**unproven**
21:13
**unquote**
189:13,14
**unremarkable**
149:4
**unremarkably**
169:16
**unsophisticated**
237:8
**untruthful**
196:8
**unusual**
109:7 146:9 221:21
**up-to-date**
18:19 31:4,5
**updated**
18:21 72:12 80:17
**updates**
18:13
**updating**
72:16
**upfront**
79:7,12
**urban**
192:7
**urgency**
89:9
**urgent**
89:7
**use**
71:24 96:20 97:23
145:22 179:10 197:2
201:7 215:23,23
237:18
**useless**
28:19
**usual**
254:24
**utterly**
28:19

_____ V _____
**v**
1:7 4:10 43:15 44:2
96:13 124:23 142:21
143:11,17 144:14
145:7 146:20 147:3,4
148:1 264:7 267:8
**vacated**
163:11

**vague**
200:17
**valid**
215:19 216:9
**validatable**
133:24
**validity**
122:6 135:4
**value**
58:9 192:23 193:3
197:16
**Van**
2:3 38:8 115:7,11
**variance**
168:21 216:1
**variation**
156:18 250:5
**varies**
62:14
**variety**
11:14 24:2 25:13,16
46:11 58:6 59:3,12
59:21 118:17,19
120:21 134:10 135:9
148:14 191:19 192:8
192:13 194:15
222:16 250:1
**various**
196:20
**vary**
162:13
**varying**
164:3 169:17
**ventures**
150:17
**verbiage**
197:24,24 198:1
**verify**
127:4
**version**
18:12 124:16
**versus**
197:24 211:20
**vested**
173:9
**Vice**
62:19,23 63:3,6 64:1,8
64:15 65:1 167:19
168:7,14 170:10,21
171:16 172:19 173:4
173:7,8,22 174:9
175:17 176:4,23
178:2,3,4,15 179:3
179:17,20 180:5,10
180:20 181:4 182:13
182:14,15 252:4
**victim**
58:2 214:1 219:8
**victims**
262:7
**victor**
201:21
**video**
1:11 4:2
**videographer**
4:1,5,23 5:7 38:11,15
93:7,12,16 101:4,8
154:12,16 212:11,16
263:7
**videotape**
116:15 130:12 188:2

**188:11,23**
**videotaping**
261:14,18
**view**
61:18 201:5,10 229:14
**views**
239:21
**vigilant**
9:17
**Vincent**
138:5
**violence**
12:21 226:17 234:4,9
234:10,11,12
**violence-prone**
234:2 235:3
**violent**
221:11,17,20 234:21
254:5 258:15
**virtue**
21:23 56:15 168:22
192:23 194:21
199:21
**vitae**
18:9
**vividly**
20:11
**voice**
8:12
**volume**
12:3
**voluntarily**
112:1 148:21
**voluntary**
144:18
**volunteered**
214:7,10,16
**vulnerabilities**
22:16 25:14 61:16
119:7,11,21 120:6,13
121:6,19 123:16
125:21,23 148:9
**vulnerability**
122:7 149:6 167:1
**vulnerable**
22:17,17 147:6 217:2,6
217:7 227:15 228:19

_____ W _____
**W-E-L-N-E-R**
7:20
**Wacker**
2:15
**wait**
133:15 156:11 170:16
173:13 214:17
**waited**
214:15
**waive**
111:24 114:1
**walk**
166:1 240:22
**wall**
183:13
**want**
6:8 9:17 10:22 12:6
24:12,12 37:23 67:13
68:21 82:5,13,15
90:9 100:19,19 110:8
125:1 129:6,7 130:13
131:15,24 150:10,22

**154:20 175:3 179:10**
202:18 226:23
228:14 244:10
247:18 248:1,3
253:17 254:22
**wanted**
10:6 14:2 75:3 107:6
107:11 127:3 129:10
130:7 140:20 141:17
150:3
**wanting**
125:4
**wants**
89:8,11 133:1
**wasn't**
66:16 68:17,19 146:1
157:1 186:12 195:6
208:18 223:10
**way**
8:14 10:21 14:15,20
22:21 31:13 49:13
55:3 58:2 67:11,14
67:20 72:15 76:15,15
88:6 89:10 116:15,20
121:24 123:3 159:11
162:13,17,20 170:5
195:12 198:16
199:18 209:4,10
215:24 216:5 221:22
223:14 228:7 229:15
230:21,22 235:8
245:22 246:21 248:1
251:10 252:5 253:5
255:1 266:10,11
**ways**
27:20 149:15 170:3
243:11
**we'll**
7:8 15:12 34:3,4 79:15
81:18 97:22 113:9
122:22 124:16
132:23
**we're**
6:15 8:3 46:17 55:21
77:22 80:16 83:7
109:3 128:7 187:20
197:13 221:16 261:9
**we've**
12:18 38:8 66:18 90:11
108:7 109:24 113:1
141:9 150:11,17
155:20 223:18 233:1
249:8 252:17
**weapon**
203:16
**website**
24:24 27:17 31:10 34:9
225:12,12,18 226:1,9
235:17 236:20,23
237:13
**wedded**
198:15
**week**
6:16
**weeks**
5:9 124:18 138:14
**weigh**
165:10,23 197:15
**weight**
135:12
**well-cited**

12:11
**well-documented**
210:5
**well-established**
253:19,22
**well-known**
12:5
**well-recognized**
248:12
**well-regarded**
162:6
**Welner**
1:11 3:4 4:7 7:11,17,19
7:21 18:4 19:5 31:20
32:8,22 38:18 39:2
42:6 65:7,13 66:1,18
74:10 76:1 80:18
83:22 85:6 93:4,20
95:9 96:8 100:14,24
101:11,17 114:6
122:12 124:10
127:19 141:20
154:21 160:17
174:13 177:14
212:21 233:16
238:12 241:11
263:11 264:10,18
265:9,16 267:9
**Welner's**
31:22 44:2,16 81:20
**went**
200:7,8 204:7 209:9
**weren't**
151:11 187:23 217:17
218:24
**whatsoever**
35:11
**WHEREOF**
266:13
**wherewithal**
113:8
**whichever**
31:22
**wholly**
164:10 221:4
**wide**
250:4
**wide-ranging**
15:2
**widespread**
259:11,18
**willing**
198:8
**willingness**
109:21
**wiped**
181:23
**withdraw**
147:1 179:7
**withdrawing**
178:24
**witness**
3:3 5:1,6 7:12 19:21
29:10 34:21 37:9
44:20 45:11,20 46:7
47:9,14 50:12 51:15
55:18 56:7 57:14
60:18 62:2 64:6
65:14 67:1 71:13
74:22 77:1 78:14,20
82:5 86:5 90:3 92:15



| | | | | | |
|---|---|---|---|---|---|
| 96:22 97:8 100:9 | works | yes-or-no | 12:26 | 213:4 | 264:14 |
| 105:24 106:6,21 | 13:19 128:6 244:18 | 98:7 | 93:17 | **2:15** | **27** |
| 113:23 117:19,23 | world | yesterday | **12:33** | 203:11 206:15 | 193:16 |
| 118:6,11 120:1 | 59:9 228:10 | 5:16 10:9 17:20 | 101:5 | **2:25** | **28** |
| 124:20 128:5,24 | wouldn't | York | **12:37** | 154:17 | 207:3 |
| 133:19 138:8 139:2 | 31:5 70:9 72:19 78:15 | 30:14 57:14 | 101:9 | **20** | **29** |
| 139:23 141:6 144:17 | 79:2 100:16 105:18 | young | **122** | 1:17 2:9 4:7 20:14 28:3 | 155:14 166:5 248:7 |
| 152:6,11 160:20 | 107:3 164:22 165:2 | 12:22 63:16 219:14 | 3:17 | 154:10 190:4,11 | **2900** |
| 163:10,20 164:20 | 213:9 218:7 226:19 | 236:1 254:7 260:21 | **123** | 191:22 192:18 | 4:4 267:1 |
| 165:18 166:17 | write | younger | 246:7,8 | 199:19 203:7,13 | |
| 168:17 170:19 | 26:22 60:20 132:13 | 235:22,22 | **124** | 204:22 205:16 206:5 | **3** |
| 173:14 174:20 175:3 | 193:17 217:5 220:4 | youth | 3:18 | 206:23 265:8 267:6 | **3** |
| 175:7 176:10 177:10 | 220:10 225:10 | 235:11,12,15,21 | **125** | **20-minute** | 3:11 75:21 76:2,6,22 |
| 177:16,22 179:7 | writes | 236:10,16,17 237:19 | 37:12 222:20 | 203:18 205:4 | 79:15,24 80:7 81:2 |
| 183:5,23 186:17,18 | 72:17 | 238:7,11 | **13** | **200** | 81:24 82:22 107:13 |
| 187:4 188:22 190:17 | writing | | 3:21 160:18 161:6 | 4:3 89:11 267:1 | 108:19 109:1 116:4 |
| 194:11,13 197:4 | 30:9 105:6 | **Z** | **130** | **200,000** | 154:18 |
| 200:18 201:17 202:8 | writings | Zelner | 246:5 | 82:23 | **3:00** |
| 202:13 204:7 205:9 | 22:12 | 42:19 109:20 110:9 | **131** | **2000s** | 203:15 204:2 205:12 |
| 205:20 206:8 215:11 | written | Zelner's | 246:6 | 249:15 | 206:17 |
| 218:10 224:5,18,23 | 22:19 62:7 141:2 204:8 | 42:16 | **14** | **2003** | **3:29** |
| 225:8 226:8 227:20 | 204:12,13 220:18 | | 1:7 3:22 4:13 238:13 | 71:23 72:8,24 123:7 | 212:13 |
| 228:22 232:9 236:4 | 224:20 232:18,19,21 | **0** | 238:17 253:1 264:7 | 141:9,11 233:6 | **3:40** |
| 245:19 246:19 | 238:9 | **045392** | 267:8 | **2004** | 212:17 |
| 251:19 255:21 | wrong | 32:10 | **141** | 26:4,10 28:11 29:13 | **300** |
| 256:15 257:16 258:7 | 21:10 136:17 231:20 | **046757** | 3:19,20 | 31:10,22 33:22 | 89:11 213:4 |
| 258:12 259:17 | 231:23 | 32:11 | **147,960** | 223:21 224:2,7 | **300-odd** |
| 260:17 261:13 | wrongful | **05** | 97:16 | **2005** | 89:16 |
| 265:19,21,24 | 29:23 | 32:10 | **15** | 14:13 26:4,10 28:12 | **31** |
| witnesses | wrongfully | **084-004553** | 3:23 51:24 52:10 107:1 | 29:13 31:8,11,22 | 167:6 |
| 59:14 196:14 | 146:7 | 1:24 5:4 266:21 | 108:8 144:1,2 241:12 | 33:22 34:8,16 35:21 | **312)263-0052** |
| wonder | wrote | | 241:16 245:11 | 36:14 223:21 224:2,7 | 267:23 |
| 130:23 | 157:18 172:23 222:21 | **1** | 252:24 253:10 | **2007** | **312.503.0844** |
| Woods | | **1** | **16** | 14:13 | 2:5 |
| 4:2 | **X** | 3:9 18:5,9 26:1 93:13 | 52:15 107:21 108:8 | **2010** | **312.580.1030** |
| word | **X** | 102:17 254:12 | **160** | 142:10 | 2:11 |
| 177:24 178:1 179:11 | 3:1,7 | 264:14 | 3:21 | **2014** | **312.876.1700** |
| 179:11 196:24 197:2 | | **1.5** | **162,523.75** | 142:5 160:16 161:20 | 2:16 |
| 197:18 | **Y** | 103:18 104:3 107:23 | 86:20 87:6 | 162:3 172:23 | **375** |
| words | **Y** | **1:41** | **17** | **2015** | 2:4 |
| 182:18 193:24 236:16 | yeah | 154:13 | 1:19 52:22 107:21 | 84:12 106:23 107:21 | **38** |
| work | 15:13 23:18 24:17 | **10** | 144:2,3 236:8 264:12 | 142:10 146:22 | 166:6 |
| 11:16 14:2 23:16 26:15 | 27:19 30:7 41:11 | 2:15 3:18 124:9,11 | 265:7 267:9 | **2016** | |
| 30:7 39:24 40:6 | 50:19 53:20 62:2 | **10:11** | **1700** | 107:18 | **4** |
| 59:11 60:8 61:21 | 71:20 75:18 77:1,4 | 1:20 4:9 | 1:18 2:10 4:8 267:6 | **2017** | **4** |
| 64:21 68:9,12,13 | 92:20 97:8 98:2 | **10:30** | **17th** | 85:12 102:4 104:4 | 3:12 32:8 83:20,23 |
| 69:18,20 70:1 85:16 | 102:6,11 125:10 | 6:21 | 4:5 | 105:11,19 106:12,16 | 87:17 114:24 115:20 |
| 85:18 86:8 87:13 | 128:24 129:14 136:2 | **10:54** | **18** | 107:18 108:8 146:22 | 212:18 263:8 |
| 88:1,7,8,10,11,14 | 140:18 142:6,17,19 | 38:12 | 3:9 107:1 252:23 | **2018** | **4:45** |
| 89:8 90:4 92:9 98:4 | 152:23,23 155:18 | **10:59** | **19** | 1:19 4:5 18:14 77:8 | 263:8 |
| 101:12,22 102:16,22 | 156:22 159:9 177:22 | 38:16 | 123:11 | 106:23 142:5 264:12 | **40** |
| 104:4,14,24 105:4 | 183:23 201:8 208:1 | **1025113** | **1970s** | 264:21 265:7 266:15 | 214:4 |
| 107:20 108:7,9,14 | 223:15,15 225:4 | 6:5 | 262:10 | 267:3,9 | **400** |
| 109:22 110:11 | 235:9 236:13 244:15 | **1045460** | **1980s** | **228,347.50** | 89:12 |
| 111:17 114:20 | 244:23 257:11 | 6:7 | 262:10 | 83:9,14 84:24 87:9 | **42** |
| 127:20 | year | **1072768** | **1990** | **23** | 220:4 |
| worked | 11:21 80:1 102:3,18 | 6:6 | 257:1,7 | 160:16 | **42-year** |
| 21:22 34:22 35:9 36:5 | 103:18 104:12 | **11** | **1990s** | **2300** | 239:20 |
| 41:4 57:19 61:8 | 106:24,24 107:20 | 3:19 141:18,21 142:2,9 | 20:14 63:7 64:3 259:11 | 2:15 | **43** |
| 77:19 108:21 109:13 | 147:13 149:23 161:3 | 144:5 151:8 249:11 | 259:11 262:10 | **238** | 235:10 |
| 110:1,1,3 137:18 | years | **114** | **1992** | 3:22 | **45** |
| 139:3 141:13 160:24 | 20:15 28:4 57:15,18,20 | 3:16 | 255:15 257:7 | **23rd** | 253:10 |
| 213:3 220:1 229:9 | 59:11,22 107:16,22 | **12** | **1st** | 157:13 | **470-odd-thousand** |
| 262:9 | 107:24 108:7 109:12 | 3:20 16:2 75:16 80:4 | 77:8 | **241** | 88:12 89:22 |
| working | 109:14 118:24 | 123:11 125:16 | | 3:23 | **478-plus-thousand** |
| 6:14 12:14 31:1 36:1 | 139:17,19 140:1,4 | 141:19,22 142:7 | **2** | **25** | 91:10 |
| 78:21 79:2,3 89:13 | 142:16 145:18 | 144:7 146:22 | **2** | 53:12 78:4 154:10 | **478,492.50** |
| 95:11,21 109:3 140:2 | 146:15 161:1 162:9 | **12-hour** | 3:10 25:24 65:8,11 | **26** | 87:19 |
| 189:22 192:6,6 | 189:22 190:4,11 | 17:11 | 68:24 93:18 107:23 | 57:15,18 59:11 162:9 | |
| 197:13 224:14 | 191:22 192:10,18 | **12:11** | 126:6 154:13 | 189:5,22 253:17 | **5** |
| 237:21 257:5 | 223:3,8 225:15 | 93:13 | 2- | **264** | **5** |
| | 239:11 245:12 | | | | |



Michael Welner, M.D. 05/17/2018

3:13 85:4,7
**5:00**
263:18
**5:30**
204:13
**50**
78:4 237:23
**500,000**
87:18
**575**
16:6,9 75:6 77:18
78:10 88:13

---
**6**
---
**6**
3:14 16:10 93:3,5,21
95:4 125:15 126:8
267:3
**60**
222:21
**600**
16:6 75:6,9 78:10
88:20
**60601**
4:4
**60601-1014**
267:2
**60603**
2:10 267:7
**60606**
2:16
**60611**
2:5
**625**
78:14
**65**
3:10
**650**
88:20
**67**
172:21 242:17
**6th**
266:15

---
**7**
---
**7**
3:5,15 96:7,9 97:15
98:6 99:6 107:13
108:19 109:1
**70**
246:10
**70.73**
246:11
**700**
77:22 78:15 88:20
**700,000**
101:24
**700K**
106:22
**737**
1:7 4:13 264:7 267:8
**76**
3:11

---
**8**
---
**8**
3:16 114:5,7 249:9
**8:43**
156:7,16
**800**
88:14,15,21

**83**
3:12
**835**
125:5,8,10
**85**
3:13
**87**
246:10,12
**87,621.25**
84:17,23 87:8

---
**9**
---
**9**
3:17 122:13 249:7,9
**9:30**
6:12
**900**
88:14,15,21
**93**
3:14
**96**
3:15
**96,677**
95:4

22

