# EXHIBIT C

Dr. Richard A. Leo, Ph.D., J.D.
**JUSTICE RESEARCH & CONSULTING, INC.**
15 Ashbury Terrace
San Francisco, CA 94117

_____

(415) 661-0162 (Phone)
(415) 422-6433 (FAX)
Email: rleo@usfca.edu


December 7, 2017

Locke E. Bowman, Esq.
Executive Director
Roderick and Solange MacArthur Justice Center
Northwestern University School of Law
357 East Chicago Avenue
Chicago, Illinois 60611-3069

Re:     Daniel Taylor *v. City of Chicago, et al*.
        Case No. 14-CV-0737
        United States District Court, Northern District of Illinois

Dear Mr. Bowman,

        This report is per your request in the above-referenced case of *Daniel Taylor v. City of Chicago et al*.

## I. Qualifications

        I am the Hamill Family Professor of Law and Psychology at the University of San Francisco, and formerly an Associate Professor of Psychology and an Associate Professor of Criminology at the University of California, Irvine.  My areas of research, training, and specialization include social psychology, criminology, sociology, and law.  For more than two decades, I have conducted extensive empirical research on police interrogation practices, the psychology of interrogation and confessions, psychological coercion, police-induced false confessions, and erroneous convictions.  In 1992 and 1993, I spent nine months doing field research inside the Oakland Police Department, which included sitting in on and contemporaneously observing one-hundred twenty-two (122) felony interrogations; in 1993, I also observed sixty (60) fully videotaped interrogations in the Vallejo and Hayward Police Departments in northern California.   Since then, I have analyzed thousands of cases involving interrogations and confessions; I have researched, written, and published numerous peer-reviewed articles on these subjects in scientific and legal journals; and I have written several books on these subjects, including *Police Interrogation and American Justice* (Harvard

Locke E. Bowman, Esq.
Legal Director, The MacArthur Justice Center
December 6, 2017
Page 2

University Press, 2008) and *Confessions of Guilt: From Torture to Miranda and Beyond* (Oxford University Press, 2012).

I am regarded as a national and leading expert on these topics, and I have won numerous individual and career achievement awards for my scholarship and publications. My scholarship has often been featured in the news media and cited by appellate courts, including the United States Supreme Court on multiple occasions. To date, I have consulted with criminal and civil attorneys on over nineteen-hundred (1,900) cases involving disputed interrogations and/or confessions, and I have been qualified and testified as an expert witness three-hundred and forty (340) times in state, federal, and military courts in thirty-three (34) states plus the District of Columbia, including sixteen times in federal courts and seven times in military courts. I have given many lectures to judges, defense attorneys, prosecutors, and other criminal justice professionals, and I have taught interrogation training courses and/or given lectures to police departments in the United States, China, and the Republic of Cyprus.

My qualifications are summarized in greater detail in my curriculum vitae, which is attached to this report as Appendix A. A list of my court and deposition testimony in the last four years is attached to this report as Appendix B. I am being compensated for my time at the rate of $375 per hour. My compensation is not contingent on the outcome of this litigation nor on the opinions I express in this report or in subsequent court testimony.

## II. Materials Reviewed

In conjunction with my preparation of this report, I have reviewed the materials listed in Appendix C to this report.

## III. Overview

In this report, I will first provide an overview of the relevant social science research on the psychology of police interrogation practices and techniques, police-induced false confessions, risk factors for false confession, psychological coercion, police interrogation contamination, and indicia of unreliability. I will then discuss these issues as they relate to the investigation, interrogations and confession statement of Daniel Taylor, as well as the interrogations and confession statements of Mr. Taylor's seven original co-defendants. [1]

More specifically, as pertains specifically to Mr. Taylor, in my professional opinion:

1) It has been well-documented in the empirical social science research literature that hundreds of innocent suspects have confessed during police interrogation to crimes (often very serious crimes such as murder and rape) that it was later objectively proven they did not commit;

---

[1]    Because police investigators failed to electronically record detective Villardita's and Killacky's interrogation of Daniel Taylor, we are forever deprived of an objective record of what occurred during these interrogations.

Locke E. Bowman, Esq.
Legal Director, The MacArthur Justice Center
December 6, 2017
Page 3

2)  Daniel Tayler's account of his interrogation at Area 6 on December 3, 1992 is consistent with the social science empirical research literature on the types of interrogation techniques and investigative practices that are associated with, increase the risk of and are known to cause innocent individuals to falsely confess;

3) The accounts of the Chicago police investigators who detained and interrogated Daniel Tayler during his interrogation at Area 6 are not consistent with the empirical findings of the social science research literature on the factors associated with and known to increase the risk of and/or cause false and unreliable confessions;

4) In his account of what occurred during his police custody and interrogation on December 3, 1992, Daniel Taylor describes the use of interrogation techniques and practices that were guilt-presumptive, accusatory and theory-driven.  Daniel describes interrogation procedures whose goal was not to find the truth but to break down his denials of guilt and elicit from him a confession to participating in a gang-based conspiracy to kill Jeffrey Lassiter and Sharon Haugabook;

5) The interrogation described by Daniel Taylor was both physically and psychologically coercive:  Daniel Taylor's account of what occurred during his interrogation contains interrogation techniques that are known to cause a suspect to perceive that he or she has no choice but to comply with their demands and that are known to increase the risk of eliciting involuntary statements, admissions and/or confessions;

6) Daniel Taylor's account of what occurred during his interrogation contains interrogation techniques, methods, and strategies that have been shown by social science research to increase the risks of eliciting false and unreliable statements, admissions and/or confessions (i.e., *situational* risk factors) when misapplied to the innocent.  These included false evidence ploys, sleep deprivation, threats and promises, and the use of physical violence;

7) Daniel Taylor was also at a heightened risk during his interrogations of making and/or agreeing to a false and unreliable confession because of his general personality traits (i.e., *personal* risk factors), specifically his youth and psychosocial immaturity;

8) The interrogation described by Daniel Taylor involved documented instances of police interrogation contamination (i.e., leaking and disclosing non-public case facts) and scripting that contravene universally accepted police interrogation training standards and best practices, and which increased the risk that Daniel Taylor's confession statement would, misleadingly, appear to be detailed and self-corroborating.

9)  The confession statement of Daniel Taylor contains factual and logical errors, inconsistencies, and other indicia of unreliability that are the hallmarks of false and/or unreliable confessions.

Locke E. Bowman, Esq.
Legal Director, The MacArthur Justice Center
December 6, 2017
Page 4

## IV. The Scientific Study of Police Interrogation and False Confessions

There is a well-established empirical field of research in the academic disciplines of psychology, criminology, and sociology on the subjects of police interrogation practices, psychological coercion, and false confessions. This research dates back to 1908; has been the subject of extensive publication (hundreds of academic journal articles, stand-alone books, and book chapters in edited volumes); has been subjected to peer review and testing; is based on recognized scientific principles, methods, and findings; and is generally accepted in the social scientific community. Significantly, numerous courts have held repeatedly that these principles, methods, and findings are generally accepted in the social science community and therefore accepted expert testimony in criminal and civil rights litigation.[2]

This research has analyzed numerous police-induced false confessions and identified the personal and situational factors associated with, and believed to cause, false confessions.[3] The

---

[2] *See Harris v. City of Chicago*, 2017 WL 2436316, at (N.D. Ill. June 5, 2017) (finding false confession expert Richard Leo's methodology to be "sound, accepted and reliable" and that he could testify as to the reliability of the plaintiff's confession); *Kluppelberg v. Burge*, 2016 WL 6821138, at *4-*5 (N.D. Ill. Sept. 16, 2016) (denying defendants' motion to bar the testimony of plaintiff's false confession expert Richard Ofshe as his methodology is "sound" and could be applied to the facts of the case); *Caine v. Burge*, 11 C 8996, 2013 WL 1966381, at *3 (N.D. Ill. May 10, 2013) (denying defendants' motion to bar the testimony of Richard Leo); *Scott v. City of Chicago*, 07 C 3684, 2010 WL 3034254, at *5 (N.D. Ill. Aug. 3, 2010) (denying defendants' motion to bar the testimony of Richard Ofshe); *United States v. Hall*, 974 F. Supp. 1198, 1206 (C.D. Ill. 1997) *aff'd,* 165 F.3d 1095 (7th Cir. 1999) (denying the Government's motion to bar the testimony of a criminal defendant's expert, Dr. Richard Ofshe). *See also* Saul M. Kassin et al., *Police–Induced Confessions: Risk Factors and Recommendations,* 34 L. & Hum. Behav. 3, 16 (2010) (noting that "false confessions tend to occur after long periods of time" and "sleep deprivation is historically one of the most potent methods used to ... extract confessions"); Gisli H. Gudjonsson et al., *Custodial Interrogation, False Confession and Individual Differences: A National Study Among Icelandic Youth,* 41 Personality & Individual Differences 49, 56 (2006) (finding that depressed mood is linked to a susceptibility to provide false confession to police); Brandon L. Garrett, *The Substance of False Confessions,* 62 Stan. L. Rev. 1051, 1087 (2010) ("The vast majority of these exonerees made statements in their interrogations that were contradicted by crime scene evidence, victim accounts, or other evidence known to police during their investigation."); Richard A. Leo, *False Confessions: Causes, Consequences, and Implications,* 37 J. Am. Acad. Psychiatry & L. 332, 337 (2009) ("Interrogators help create the false confession by pressuring the suspect to accept a particular account and by suggesting facts of the crime to him, thereby contaminating the suspect's postadmission narrative.... If the entire interrogation is captured on audio or video recording, then it may be possible to trace, step by step, how and when the interrogator implied or suggested the correct answers for the suspect to incorporate into his postadmission narrative."); Steven A. Drizin & Beth A. Colgan, *Let the Cameras Roll: Mandatory Videotaping of Interrogations Is the Solution to Illinois' Problem of False Confessions,* 32 Loy. U. Chi. L.J. 337, 339–41 (2001) (*accord*).

[3] *See* Saul Kassin, Steven Drizin, Thomas Grisso, Gisli Gudjonsson, Richard A. Leo and Allison Redlich (2010). "Police-Induced Confessions: Risk Factors and Recommendations" in *Law and Human Behavior*, 34, 3-38; Richard A. Leo (2008), POLICE INTERROGATION AND AMERICAN JUSTICE (Harvard University Press); and Gisli Gudjonsson (2003), THE PSYCHOLOGY OF INTERROGATIONS AND CONFESSIONS: A HANDBOOK (John Wiley & Sons Inc).

Locke E. Bowman, Esq.
Legal Director, The MacArthur Justice Center
December 6, 2017
Page 5

fact that police-induced false confessions can and do occur has been well-documented and is not disputed by anyone in the law enforcement or academic community. Indeed, leading police interrogation training manuals have, at least since 2001, contained entire chapters and sections on the problem of police-induced false confessions and what investigators need to know to better understand and avoid eliciting false confessions from innocent suspects.[4] Social scientists have documented approximately four-hundred and fifty to five-hundred proven false confessions in America since the early 1970s,[5] but this is surely an underestimate and thus the tip of a much larger iceberg for several reasons. First, false confessions are difficult for researchers to discover because neither the state nor any organization keeps records of the interrogations producing them. Second, even when they are discovered, false confessions are notoriously hard to establish because of the factual and logical difficulties of proving the confessor's *absolute* innocence. As a result, Richard Ofshe and I coined the term "proven false confession" in 1998,[6] showing that there are only four ways in which a disputed confession can be classified as proven beyond any doubt to be false:

1) When it can be objectively established that the suspect confessed to a crime that did not happen;
2) When it can be objectively established that it would have been physically impossible for the confessor to have committed the crime;
3) When the true perpetrator is identified and his guilt is objectively established; and/or
4) When scientific evidence dispositively establishes the confessor's innocence.

However, only a small number of cases involving a disputed confession will ever come with independent case evidence that allows the suspect to prove his innocence beyond dispute because doing so is akin to proving the negative. The documented number of proven false confessions in the scientific research literature is, therefore, a dramatic undercount of the actual false confessions that police have elicited in the United States in recent decades. There have almost certainly been thousands (if not tens or hundreds of thousands) more police-induced false confessions than researchers have been able to discover and classify as proven false. Indeed, in a

---

[4]    *See, e.g.,* Fred Inbau, John Reid, Joseph Buckley and Brian Jayne (2001). CRIMINAL INTERROGATION AND CONFESSIONS, 4th Edition (Aspen Publishers, Inc.) at 411-448; and David Zulawski and Douglas Wicklander (2002). PRACTICALASPECTS OF INTERVIEWING AND INTERROGATION, 2nd Edition (CRC Press) at 73-104.

[5]    The largest published study of proven false confessions to date is Steven Drizin and Richard A. Leo (2004). "The Problem of False Confessions in the Post-DNA World." *North Carolina Law Review*, 82, 891-1007. For a review of the literature documenting proven false confessions, see Richard A. Leo (2008), POLICE INTERROGATION AND AMERICAN JUSTICE. At that time, there were approximately two-hundred and fifty to three-hundred proven false confessions in the documented literature. Since 2004, Steve Drizin, Gillian Emmerich and I have collected an additional two-hundred proven false confessions that are the subject of an academic article we are currently drafting but have not yet submitted for publication.

[6]    Richard A. Leo and Richard Ofshe (1998). "The Consequences of False Confessions: Deprivations of Liberty and Miscarriages of Justice in the Age of Psychological Interrogation." *The Journal of Criminal Law and Criminology*. Vol. 88, No. 2. Pp. 429-496.

Locke E. Bowman, Esq.
Legal Director, The MacArthur Justice Center
December 6, 2017
Page 6

survey of police that my colleagues and I published in 2007, police investigators themselves estimated that they elicited false confessions in 4.78% of their interrogations.[7]

The subject of police interrogation and false confessions is beyond common knowledge and highly counter-intuitive.[8] Police detectives receive specialized training in psychological interrogation techniques; most people, including most jurors, do not know what these techniques are or how the techniques are designed to work (*i.e.*, move a suspect from denial to admission). In addition, most people also do not know what psychological coercion is, why some techniques are regarded as psychologically coercive, and what their likely effects are. Moreover, most people do not know which interrogation techniques create a risk of eliciting false confessions or how and why the psychological process of police interrogation can, and sometimes does, lead suspects to falsely confess. This unfamiliarity causes most people to assume that virtually all confessions are true.

## V. The Social Psychology of Police Interrogation[9]

Police interrogation is a cumulative, structured, and time-sequenced process in which detectives draw on an arsenal of psychological techniques in order to overcome a suspect's denials and elicit incriminating statements, admissions, and/or confessions. This is the sole purpose of custodial interrogation. To achieve this purpose, interrogators use techniques that seek to influence, persuade, manipulate, and deceive suspects into believing that their situation is hopeless and that their best interest lies in confessing.[10] Sometimes, however, interrogators cross the line and employ techniques and methods of interrogation that are coercive and increase the likelihood of eliciting unreliable confessions or statements.

---

[7]   Saul Kassin, Richard Leo, Christian Meissner, Kimberly Richman, Lori Colwell, Amy-May Leach, and Dana La Fon (2007). "Police Interviewing and Interrogation: A Self-Report Survey of Police Practices and Beliefs," Law and Human Behavior, 31, 381-400.

[8]   *See* Danielle Chojnacki, Michael Cicchini and Lawrence White (2008), "An Empirical Basis for the Admission of Expert Testimony on False Confessions," *Arizona State Law Journal*, 40, 1-45; Richard A. Leo and Brittany Liu (2009). "What Do Potential Jurors Know About Police Interrogation and False Confessions?" *Behavioral Sciences and the Law*, 27, 381-399; Linda Henkel, Kimberly Coffman, and Elizabeth Dailey (2008). "A Survey of People's Attitudes and Beliefs About False Confessions," *Behavioral Sciences and the Law*, 26, 555-584; Iris Blandon-Gitlin, Kathryn Sperry, and Richard A. Leo (2011) "Jurors Believe Interrogation Tactics Are Not Likely to Elicit False Confessions: Will Expert Witness Testimony Inform Them Otherwise?" in *Psychology, Crime and Law*, 17, 239-260; and Mark Costanzo, Netta Shaked-Schroer and Katherine Vinson (2010), "Juror Beliefs About Police Interrogation, False Confession and Expert Testimony" in *The Journal of Legal Empirical Studies,* 7, 231-247.

[9]   See Richard A. Leo (2009). "False Confessions: Causes, Consequences and Implications." *Journal of the American Academy of Psychiatry and Law*, 37, 332-343.

[10]  Deborah Davis and William O'Donohue (2004). "The road to perdition: Extreme influence tactics in the interrogation room," In William O'Donohue, ED (2004), *Handbook of Forensic Psychology* (San Diego: Academic Press). Pp. 897-996.

Locke E. Bowman, Esq.
Legal Director, The MacArthur Justice Center
December 6, 2017
Page 7

Contemporary American interrogation methods are structured to persuade a rational guilty person who knows he is guilty to rethink his initial decision to deny culpability and choose instead to confess. Police interrogators know that it is not in any suspect's rational self-interest to confess. They expect to encounter resistance and denials to their allegations, and they know that they must apply a certain amount of interpersonal pressure and persuasion to convince a reluctant suspect to confess. As a result, interrogators have, over the years, developed a set of subtle and sophisticated interrogation techniques whose purpose is to alter a guilty suspect's perceptions so that he will see the act of confessing as being in his self-interest.

These interrogation techniques were developed for the purpose of inducing guilty individuals to confess to their crimes, and police are admonished in their training to use them only on suspects believed to be guilty.[11] When these same techniques are used on innocent suspects, they carry the risk that they will elicit false statements, admissions and/or confessions.

The goal of an interrogator is to persuade a suspect to view his immediate situation differently by focusing the suspect's attention on a limited set of choices and alternatives, and by convincing him of the likely consequences that attach to each of these choices. The process often unfolds in two steps: first, the interrogator causes the suspect to view his situation as hopeless; and, second, the interrogator persuades the suspect that only by confessing will the suspect be able to improve his otherwise hopeless situation. The interrogator makes it clear what information he is seeking and attempts to convince the suspect that his only rational option is to confirm the information the interrogator purports to already know.

The first step or stage of an interrogation consists of causing a suspect to view his situation as hopeless. If the interrogator is successful at this stage, he will undermine the suspect's self-confidence and cause the suspect to reason that there is no way to escape the interrogation without incriminating himself. To accomplish this, interrogators accuse the suspect of having committed the crime; they attack and try to undermine a suspect's assertion of an alibi, alternate sequence of events, or verbalization of innocence (pointing out or inventing logical and factual inconsistencies, implausibilities, and/or impossibilities); they exude unwavering confidence in their assertions of the suspect's and his accomplices' guilt; they refuse to accept the possibility of the suspect's denials; and, most importantly, they confront the suspect with incontrovertible evidence of his guilt, whether real or non-existent. Because interrogation is a cumulative and time-sequenced process, interrogators often draw on these techniques repeatedly and/or in succession, building on their earlier accusations, challenges and representations at each step in the interrogation process.

---

[11]  *See* Fred Inbau, John Reid, Joseph Buckley and Brian Jayne (2013). CRIMINAL INTERROGATION AND CONFESSIONS, 5th Edition (Burlington, MA: Jones & Bartlett Learning) at 187 ("These nine steps are presented in the context of the interrogation of suspects whose guilt seems definite or reasonably certain"). For empirical support for this observation, see Richard A. Leo (2008). POLICE INTERROGATION AND AMERICAN JUSTICE (Harvard University Press).

Locke E. Bowman, Esq.
Legal Director, The MacArthur Justice Center
December 6, 2017
Page 8

Through the use of these techniques, the interrogator communicates to the suspect that he has been caught, that there is no way he will escape the interrogation without incriminating himself and other suspects, and that his future is determined—that regardless of the suspect's denials or protestations of innocence, he is going to be arrested, prosecuted, convicted, and punished. The interrogator seeks to convince the suspect that this is a fact that has been established beyond any doubt, and thus that any objective person must necessarily reason to this conclusion. By persuading the suspect that he has been caught, that the existing evidence or case facts objectively prove his guilt, and that it is only a matter of time before he will be prosecuted and convicted, the interrogator seeks to alter the suspect's perceptions, such that he comes to view his situation as hopeless and to perceive that resisting the interrogator's demands is futile.

Once the interrogator has caused the suspect to understand that he has been caught and that there is no way out of this predicament, the interrogator seeks to convince the suspect that the only way to improve his otherwise hopeless situation is by confessing to the offense(s) of which he is accused and confirming the information the interrogator is seeking to extract from the suspect. The second step of the interrogation thus consists of offering the suspect inducements to confess—reasons or scenarios that suggest the suspect will receive some personal, moral, communal, procedural, material, legal or other benefit if he confesses to the interrogator's version of the offense. One goal of these scenarios or inducements is to downplay both the seriousness of the alleged crime as well as the consequences of confessing, leading the suspect to perceive that the consequences of continuing to deny the accusations will be worse than the consequences of admitting to participation in the crime. The interrogator's attempt to diminish the suspect's perception of the consequences of confessing is combined with techniques that are designed to increase the suspect's anxiety in order to create the perceived need for release from the stress of prolonged interrogation. [12] Investigators also use scenarios to plant ideas or suggestions about how or why the suspect may have committed the crime which they may later pressure the suspect to accept and repeat.

Researchers have classified the types of inducements investigators use during the second step of interrogation into three categories: *low-end* inducements, *systemic* inducements, and *high-end* inducements.

*Low-end* inducements refer to interpersonal or moral appeals the interrogator uses to convince a suspect that he will feel better if he confesses. For example, an interrogator may tell a suspect that the truth will set him free if he confesses, that confessing will relieve his anxiety or guilt, that confessing is the moral or Christian thing to do, or that confessing will improve his standing in the eyes of the victim or the eyes of the community.

---

[12]   See Brian Jayne (1986). "The Psychological Principles of Criminal Interrogation," in Fred Inbau, John Reid and Joseph Buckley (1986). CRIMINAL INTERROGATION AND CONFESSIONS, Third Edition (Baltimore, MD: Williams & Wilkins) at 332.( "The goal of interrogation is therefore to decrease the suspect's perception of the consequences of confessing, while at the same time increasing the suspect's internal anxiety associated with his deception.").

Locke E. Bowman, Esq.
Legal Director, The MacArthur Justice Center
December 6, 2017
Page 9

*Systemic* inducements refer to appeals that the interrogator uses to focus the suspect's attention on the processes and outcomes of the criminal justice system in order to get the suspect to come to the conclusion that his case is likely to be processed more favorably by all actors in the criminal justice system if he confesses. For example, an interrogator may tell a suspect that he is the suspect's ally and will try to help him out—both in his discussions with the prosecutor as well as in his role as a professional witness at trial—but can only do so if the suspect first admits his guilt. Or the interrogator may ask the suspect how he expects the prosecutor to look favorably on the suspect's case if the suspect does not cooperate with authorities. Or the interrogator may ask the suspect what a judge and jury are really going to think, and how they are likely to react, if he does not demonstrate remorse and admit his guilt to authorities. Interrogators often couple the use of *systemic* incentives with the assertion that this is the suspect's one and only chance—now or never—to tell his side of the story; if he passes up this opportunity, all the relevant actors in the system (police, prosecutor, judge and jury) will no longer be open to the possibility of viewing his actions in their most favorable light. This tactic may incentivize a suspect to either falsely confess or confirm an incorrect story for the interrogator based on the belief that the suspect will not have the same opportunity to help himself again in the future. Interrogators rely on *systemic* inducements to persuade the suspect to reason to the conclusion that the justice system naturally confers rewards for those who admit guilt, demonstrate remorse, and cooperate with authorities, whereas it inevitably metes out punishment for those who do not.

Finally, *high-end* inducements refer to appeals that directly communicate the message that the suspect will receive less punishment, a lower prison sentence and/or some form of police, prosecutorial, judicial or juror leniency if he complies with the interrogator's demand that he confess, but that the suspect will receive a higher sentence or greater punishment if he does not comply with the interrogator's demand that he confess. High-end inducements may either be implicit or explicit: the important question is whether the interrogation technique communicates the message, or is understood to communicate the message, that the suspect will receive a lower criminal charge and/or lesser punishment if he confesses as opposed to a higher criminal charge and/or greater amount of punishment if he does not.

Explicit *high-end* incentives can include telling a suspect that there are several degrees of the alleged offense, each of which carry different amounts of punishment, and asking the suspect which version he would like to confess to. Or the interrogator may explicitly tell the suspect that he will receive a long prison sentence—or perhaps even the death penalty—if he does not confess to the interrogator's version of events. The interrogator may also point out what happens to men of the suspect's age, or men accused of crime, in prison if the suspect does not confess to the interrogator's minimized account. Sometimes interrogators who rely on *high-end* inducements will present the suspect with a simple two-choice situation (good vs. bad): if the suspect agrees to the good choice (a minimized version of the offense, such as involuntary manslaughter or self-defense, or the implication of another person), he will receive a lower amount of punishment or no punishment at all; but if he does not confess right then, criminal

Locke E. Bowman, Esq.
Legal Director, The MacArthur Justice Center
December 6, 2017
Page 10

justice officials will impute to him the bad choice (a maximized version of the offense, such as pre-meditated first degree murder, or that the suspect was acting alone), and he will receive a higher level of punishment, or perhaps the harshest possible punishment.[13]  The purpose of *high-end* inducements is to communicate to a suspect that it is in his rational self-interest to confess to the minimized or less-incriminating version of events that the interrogator is suggesting because if the suspect does so, he will receive a lower charge, a lesser amount of punishment and/or no time in prison, but if he fails to do so, he will receive a higher charge, a greater amount of punishment and more time in prison, perhaps even the death penalty.

To evaluate whether a particular interrogation was psychologically coercive, an expert must evaluate the interrogator's techniques, methods, and strategies in the light of the generally accepted findings of the social science research literature on the subjects of interrogation, coercive influence techniques, and confessions.

Social science research has repeatedly demonstrated that some *systemic* inducements (depending on the content of the inducement, how explicitly or vaguely it is stated, and the message that it communicates) and all *high-end* inducements are coercive because they rely on implicit and/or explicit promises of leniency and threats of harm to induce compliance.  *Systemic* and *high-end* inducements increase the likelihood of eliciting false confessions and false statements from suspects because of the *quid pro quo* arrangement and the benefit a suspect expects to receive in exchange for the information the interrogator is seeking, regardless of whether the suspect knows that information to be true or not.  Such promises of leniency and threats of harm are regarded as coercive in the social science literature because of the messages they convey and their demonstrated impact on the decision-making of individuals.  The expert may also evaluate whether the interrogation techniques, either individually or cumulatively, had the effect of causing a suspect to perceive that he had no choice but to comply with the demands of the interrogator, and thus, the interrogation, in effect, overbore the suspect's will.

## VI. The Three Types of False Confessions

False confessions and false statements, of course, will occur in response to traditionally-coercive methods of interrogation such as the use of physical violence, threats of immediate physical harm, excessively long or incommunicado interrogation, or deprivation of essential necessities such as food, water, and/or sleep.  However, these types of traditionally coercive techniques no longer appear to be common in the United States.  The psychological techniques of interrogation that cross the line and sometimes cause false confessions typically involve one of two patterns: (1) the interrogator communicates to the suspect, implicitly or explicitly, that he will receive a higher charge and harsher sentence or punishment if he does not provide a

---

[13]  This technique is sometimes referred to in the academic literature as the maximization/minimization technique. *See* Saul Kassin, Steven Drizin, Thomas Grisso, Gisli Gudjonsson, Richard A. Leo and Allison Redlich (2010). "Police-Induced Confessions: Risk Factors and Recommendations" in *Law and Human Behavior*, 34, 3-38; Richard A. Leo (2008), POLICE INTERROGATION AND AMERICAN JUSTICE (Harvard University Press).

Locke E. Bowman, Esq.
Legal Director, The MacArthur Justice Center
December 6, 2017
Page 11

satisfactory statement, but that he will receive a lesser charge or sentence, or perhaps no punishment at all, if he does; or (2) the interrogator wears down and distresses the suspect to the point that the suspect subjectively feels that he has no choice but to comply with the interrogator's demands if he is to put an end to the intolerable stress of continued interrogation and/or escape the oppressive interrogation environment.

Whether a police-induced false confession or statement is caused primarily by coercive interrogation techniques or by a suspect's pre-existing vulnerabilities to interrogation, or some combination of both, there are three fundamental types of false confessions and statements: a *voluntary* false confession or statement (*i.e.*, a false confession knowingly given in response to little or no police pressure); a *coerced-* or *stress-compliant* false confession or statement (*i.e.*, a false confession knowingly given to put an end to the interrogation or to receive an anticipated benefit or reward in exchange for confession); and a *coerced-* or *non-coerced-persuaded* false confession or statement (*i.e.*, a confession given by a suspect who comes to doubt the reliability of his memory and thus comes to believe that he may have committed the crime, despite no actual memory of having done so).[14]  These different types of false confession typically involve different levels of police pressure, a different psychology of influence and decision-making, and different beliefs about the likelihood of one's guilt.  Regardless of type, false confessors typically recant their confessions shortly after they are removed from the pressures and reinforcements of the interrogation environment.

## VII. The Three Sequential Police Errors
## That Can Lead to False (But Sometimes Detailed) Confessions

There are three important decision points in the interrogation process that are known to be linked to false confessions or statements. The first decision point is the police decision to classify someone as a suspect.  This is important because police only *interrogate* individuals whom they first classify as suspects; police *interview* witnesses and victims.  There is a big difference between interrogation and interviewing:  unlike interviewing, an interrogation is accusatory, involves the application of specialized psychological interrogation techniques, and the ultimate purpose of an interrogation is to get an incriminating statement from someone whom police believe to be guilty of the crime.  False confessions or statements occur when police misclassify an innocent suspect as guilty and then subject him to a custodial interrogation, and are satisfied with elicitation of a version of events that, in fact, is not true.  This is one reason why interrogation training manuals implore detectives to investigate their cases before subjecting any potential suspect to an accusatorial interrogation.[15]

---

[14]  *See* Richard Ofshe and Richard A. Leo (1997) "The Social Psychology of Police Interrogation: The Theory and Classification of True and False Confessions."  *Studies in Law, Politics & Society*, Vol. 16. Pp. 189-251.

[15]  Fred Inbau, John Reid and Joseph Buckley (1986).  CRIMINAL INTERROGATION AND CONFESSIONS, Third Edition (Baltimore, MD: Williams & Wilkins) at 3 ("Prior to the interrogation, and preferably before any contact with the suspect, become thoroughly familiar with all the known facts and circumstances of the case."). See also Fred Inbau, John Reid, Joseph Buckley and Brian Jayne (2013).  CRIMINAL INTERROGATION

Locke E. Bowman, Esq.
Legal Director, The MacArthur Justice Center
December 6, 2017
Page 12

      The second important decision point in the process occurs when the police interrogate the suspect. Again, the goal of police interrogation is to elicit an incriminating statement from the suspect by moving him from denial to admission. To accomplish this, police use psychologically-persuasive, manipulative, and deceptive interrogation techniques. As described in detail in the previous sections, police interrogators use these techniques to accuse the suspect of committing the crime, to persuade him that he is caught and that the case evidence overwhelmingly establishes his guilt, and then to induce him to confess by suggesting it is the best course of action for him. However, properly trained police interrogators do not use physically- or psychologically-coercive techniques because they may result in involuntary and/or unreliable incriminating statements, admissions, and/or confessions.

      The third important decision point in the interrogation process occurs after the police have elicited an admission—an "I did it" statement—from the suspect. This is referred to as the post-admission phase of the interrogation. The post-admission phase of the interrogation is important because it is here that the police can acquire information and evidence that will either support or not support the accuracy of the suspect's admission. Properly-trained police interrogators should know that innocent people sometimes falsely confess to crimes they did not commit.[16] Properly-trained police interrogators also know that guilty suspects sometimes implicate others for crimes they themselves committed in order to diminish their role in the crime. Interrogators therefore will seek to elicit information (that is not generally known and cannot likely be guessed by chance) from the suspect that either demonstrates, or fails to demonstrate, independent knowledge of the crime scene details and case facts. Properly-trained police interrogators, therefore, will not ask leading or suggestive questions and will not educate the suspect about details of the victim's allegations or of the alleged crime. Instead, they will let the suspect supply the details of the case independently. Properly-trained police interrogators will also seek to test the suspect's post-admission account against the physical and other credible evidence. Truthful confessions and statements are typically corroborated by solid physical evidence and independent knowledge of underlying case facts that have not been suggested to the suspect; false confessions and false statements are not.[17]

---

      AND CONFESSIONS, 5th Edition (Burlington, MA: Jones & Bartlett Learning) at 18 ("One basic principle to which there must be full adherence is that the interrogation of suspects should follow, and not precede, an investigation conducted to the full extent permissible by the allowable time and circumstances of the particular case. The authors suggest, therefore, that a good guideline to follow is "investigate before you interrogate").

[16]  Although the "Reid" Manual (CRIMINAL INTERROGATION AND CONFESSIONS by Fred Inbau et al.) did not include a full chapter on false confessions until the Fourth Edition in 2001, the need for police interrogators to be diligent to avoid false confessions has been present for decades. From the very first manual in 1942 and in all subsequent editions (1948, 1953, 1962, 1967, 1986, 2001 and 2013), it has repeatedly implored interrogators not to use any methods that are "apt to make an innocent person confess to a crime he did not commit," implicitly, if not explicitly, suggesting that police interrogator do know that suspects can be made to falsely confess to crimes they did not commit.

[17]  Richard A. Leo and Richard Ofshe (1998). "The Consequences of False Confessions: Deprivations of Liberty and Miscarriages of Justice in the Age of Psychological Interrogation" *The Journal of Criminal Law and*

Locke E. Bowman, Esq.
Legal Director, The MacArthur Justice Center
December 6, 2017
Page 13

## VIII. Populations with Particular Vulnerability in the Interrogation Room

While coercive and/or improper interrogation techniques are often the primary cause of false confessions, certain types or groups of individuals are far more vulnerable to the pressures of interrogation, having their will overborne and/or making a false confession, particularly when subjected to the coercive interrogation techniques described above  These include individuals who are mentally ill, and therefore may confess falsely because they are easily confused, disoriented, delusional or experiencing a non-rational emotional or mental state. These also include juveniles (meaning individuals under age 18) and individuals with a low IQ or low-level cognitive functioning, who may be more vulnerable to interrogators because of their inability to understand the nature or gravity of their situation, their inability to foresee the consequences of their actions, their inability to cope with stressful situations and/or their eagerness to please others, especially authority figures.  Juveniles may also be more easily intimidated than adults and may lack the maturity, knowledge, or sense of authority needed to resist simple police pressures and manipulations.  Finally, these also include individuals who, by their nature and personality, are naive, excessively trusting of authority, highly suggestible and/or highly compliant and who are therefore predisposed to believe that they have no choice but to comply with the demands of authorities or who simply lack the psychological resources to resist the escalating pressures of accusatorial interrogation.

## IX. Evaluating the Reliability of Incriminating
## Statements, Admissions and Confessions

In addition to studying the psychology of police interrogation and the correlates and causes of false confessions from the innocent, scientific researchers have also analyzed the patterns, characteristics and indicia of reliability in true and false confession cases.  To evaluate the likely reliability or unreliability of an incriminating statement, admission or full confession from a suspect, scientific researchers analyze the fit between the suspect's post-admission narrative and the crime facts and/or corroborating evidence derived from the confession (*e.g.*, location of the missing murder weapon, loot from a robbery, the victim's missing clothing, etc.).[18]

The purpose of evaluating the fit between a suspect's post-admission narrative and the underlying crime facts and derivative crime evidence is to test the suspect's actual knowledge of

---

*Criminology.*  Vol. 88, No. 2.  Pp. 429-496.  This observation has been made in the police interrogation training literature as well.  See also Fred Inbau, John Reid, Joseph Buckley and Brian Jayne (2013).  CRIMINAL INTERROGATION AND CONFESSIONS, 5th Edition (Burlington, MA: Jones & Bartlett Learning) at 354-360.

[18]  *See* Richard Ofshe and Richard A. Leo (1997) "The Social Psychology of Police Interrogation: The Theory and Classification of True and False Confessions."  *Studies in Law, Politics & Society*, Vol. 16. Pp. 189-251; and Richard A. Leo and Richard Ofshe (1998).  "The Consequences of False Confessions: Deprivations of Liberty and Miscarriages of Justice in the Age of Psychological Interrogation" *The Journal of Criminal Law and Criminology.*  Vol. 88, No. 2.  Pp. 429-496.

Locke E. Bowman, Esq.
Legal Director, The MacArthur Justice Center
December 6, 2017
Page 14

the crime. If the suspect's post-admission narrative corroborates details only the police know, leads to new or previously undiscovered evidence of guilt, explains apparent crime fact anomalies and is corroborated by independent facts and evidence, then the suspect's post-admission narrative objectively demonstrates that he possesses the actual knowledge that would be known only by the true perpetrator and therefore is strong evidence of guilt.  If the suspect cannot provide police with the actual details of the crime, fails to accurately describe the crime scene facts, cannot lead the police to new or derivative crime evidence, and/or provides an account that is full of gross errors and disconfirmed by the independent case evidence, then the suspect's post-admission narrative demonstrates that he fails to possess the actual knowledge that would be known only by the true perpetrator and is therefore strongly consistent with innocence. Indeed, absent contamination, the fit between the suspect's post-admission narrative and both the crime scene facts and the derivative crime evidence therefore provides an objective basis for evaluating the likely reliability of the suspect's incriminating statements.

The well-established and widely accepted social science research principle of using the fit standard to evaluate the validity of a confession statement is also a bedrock principle of criminal investigation within law enforcement.  Properly trained police detectives realize that an "I did it" statement is not necessarily evidence of guilt and may, instead, turn out to be evidence of innocence.  For example, in high-profile murder cases, police regularly screen out volunteered confessions by seeing whether or not the person can tell the police details known only to the perpetrator or lead the police to derivative crime evidence that either corroborates, or fails to demonstrate, the person's guilty knowledge.  Police often keep particularly heinous or novel aspects of the crime from the press so that they can be used to demonstrate a confessor's guilty knowledge.  Police sometimes deliberately include an error in media releases or allow incorrect statements to go uncorrected so that a true perpetrator will be able to demonstrate his personal knowledge of the crime.  In other types of cases, police detectives regularly rely upon the fit standard to identify a true admission that might be mixed in with a collection of volunteered statements.

Using the fit standard to evaluate the validity of a suspect's incriminating statements, admissions or confessions is a bedrock principle of law enforcement because police detectives realize that seeking corroboration during the post-admission phase of interrogation is essential to proper investigative work.[19]  This is because it is a fundamental principle of police investigation that true explanations can be supported and false explanations cannot be supported (assuming no contamination has occurred), and because false explanations will not fit the facts of the crime, lead to derivative evidence or be corroborated by independent evidence.

Moreover, post-admission narrative analysis and the fit standard are central to proper criminal investigation because properly-trained detectives should realize that the purpose of detective work is not to clear a crime or get a conviction, but to carefully collect evidence in a

---

[19]  Fred Inbau, John Reid, Joseph Buckley and Brian Jayne (2013).  CRIMINAL INTERROGATION AND CONFESSIONS, 5th Edition (Burlington, MA: Jones & Bartlett Learning) at 354-360.

Locke E. Bowman, Esq.
Legal Director, The MacArthur Justice Center
December 6, 2017
Page 15

way that will lead to the arrest, prosecution and conviction of the guilty while at the same time ensuring that no innocent individual is wrongly arrested, prosecuted or convicted.

A suspect's post-admission narrative therefore provides a gold mine of potential evidence to the unbiased, properly-trained detective who is seeking to ferret out the truth. If the suspect is guilty, the collection of a detailed post-admission narrative will allow the detective to establish the suspect's guilt beyond question, both by demonstrating the suspect's actual knowledge and by corroborating the suspect's statements with derivative evidence. Properly-trained detectives realize that the strongest form of corroboration comes through the development of new evidence using a suspect's post-admission narrative. While it is not possible to verify every post-admission narrative with the crime facts, a skillful interrogator will seek as much verifiable information about the crime as he can elicit. The more verifiable information elicited from a suspect during the post-admission period and the better it fits with the crime facts, the more clearly the suspect demonstrates his responsibility for the crime.

If the suspect is innocent, the detective can use the suspect's post-admission narrative to establish his lack of knowledge and thus demonstrate his likely or certain innocence. Whereas a guilty suspect can corroborate his admission because of his actual knowledge of the crime, the innocent suspect cannot. The more information the interrogator seeks, the more frequently and clearly an innocent suspect will demonstrate his ignorance of the crime. His answers will turn out either to be wrong, to defy evaluation, or to be of no value for discriminating between guilt and innocence. Assuming that neither the investigator nor the media have contaminated the suspect by transferring information about the crime facts, or that the extent of contamination is known, the likelihood that his answers will be correct should be no better than chance. Absent contamination, the only time an innocent person will contribute correct information is when he makes an unlucky guess. The likelihood of an unlucky guess diminishes as the number of possible answers to an investigator's questions grows large. If, however, his answers about missing evidence are proven wrong, he cannot supply verifiable information that should be known to the perpetrator, and he inaccurately describes verifiable crime facts, then the post-admission narrative provides evidence of innocence.

This, of course, assumes that the suspect's knowledge of the crime has not been contaminated by the media, community gossip, the police or some other source with inside knowledge about crime details. If a suspect has learned unique or non-public crime facts from one of these sources, then the fact that his confession contains these details is, of course, not indicative of pre-existing knowledge or probative of guilt. This problem is discussed in detail in the following section.

## X. The Problem of Contamination

The post-admission narrative process is about more than merely eliciting information from the suspect. Investigators in practice have been observed to shape the suspect's narrative to

Locke E. Bowman, Esq.
Legal Director, The MacArthur Justice Center
December 6, 2017
Page 16

make the confession as persuasive as possible and to enhance the chances of conviction.[20]  In this way, confessions are scripted or constructed by interrogators.  A persuasive crime narrative requires an explanation of why the crime happened— the motives and explanations of the suspect for committing the crime.  It also should contain a statement of the suspect's emotions, not only his or her emotions at the time of committing the crime, but also the shame, regret, or remorse the suspect now feels for having committed the crime.  Interrogators are also trained to get the suspect to cleanse the interrogation process, usually by providing statements to the effect that the confession was voluntary.  Interrogators will ask the suspect, usually after the suspect's resistance has been broken down and he has been made to believe that it is in his best interests to confess, whether the suspect was treated well, given food and drink, bathroom breaks, and other comforts, and whether any promises or threats were made to the suspect.  Finally, and perhaps most importantly, interrogators seek to ensure that the confession contains both general and specific crime knowledge—the details of the crime that only the true perpetrator should know.

The problem of contamination in false confession cases arises when the interrogator pressures a suspect during the post-admission narrative phase to accept a particular account of the crime story—one that usually squares with the interrogator's theory of how the crime occurred—and then suggests crime facts to the suspect, leads or directs the suspect to infer correct answers, and sometimes even suggests plausible motives for committing the crime.[21]  . Because they are trained to presume the guilt of those whom they interrogate, American police assume that they are interrogating suspects who already know the correct crime facts.  But this is not true when they are mistakenly interrogating an innocent person.

Instead, the innocent suspect is pressured to use facts disclosed to him by his interrogators in order to construct a plausible-sounding confession and post-admission narrative.  Indeed, the presence of these details in the suspect's confession falsely gives the suspect's narrative credibility and the appearance of corroboration.  After police interrogators have contaminated the suspect with non-public crime facts, they often attribute "guilty knowledge" to the suspect when he repeats back and incorporates into his confession the very facts that they first educated him about.  One researcher has called these contaminated details "misleading specialized knowledge."[22]  In many false confession cases, police and prosecutors argue that the suspect's confession corroborates his guilt because he "knows facts only the true perpetrator would know," even though the suspect first learned these facts from his interrogators.  Of course, if the interrogation process is not electronically recorded, the interrogator is free to assert that these crime facts were volunteered by the suspect and the trial devolves into a swearing contest between the suspect and the interrogators over who was the source of the details in the confession.  If the entire process is recorded, however, then it may be possible to trace the contamination.

---

[20]   Richard A. Leo (2008).  POLICE INTERROGATION AND AMERICAN JUSTICE (Harvard University Press) at 165-194.
[21]   Richard A. Leo (2008), POLICE INTERROGATION AND AMERICAN JUSTICE (Harvard University Press).
[22]   Gisli Gudjonsson (2003), THE PSYCHOLOGY OF INTERROGATIONS AND CONFESSIONS: A HANDBOOK (John Wiley & Sons Inc).

Locke E. Bowman, Esq.
Legal Director, The MacArthur Justice Center
December 6, 2017
Page 17


Researchers have found that contamination by police regularly occurs in interrogation-induced false confession cases. In a study of the first two-hundred and fifty (250) post-conviction DNA exonerations of innocent prisoners in the American criminal justice system, Professor Brandon Garrett of the University of Virginia Law School showed that this pattern was present in 95% of the false confession cases in this data set (38 of 40 cases). In other words, in the overwhelming majority of these proven false confession cases, police interrogators fed the suspect unique non-public facts that "only the true perpetrator would know," but the prosecutor erroneously alleged that the suspect volunteered these facts and that the suspect thereby corroborated the reliability of his confession. But because the jury in each case mistakenly believed the prosecutor rather than the defense, each of the confessors was convicted, and in each of these cases the defendant's innocence (and the falsity of the confession) was only proven many years later by DNA.[23] In a recent follow-up study more recent false confession DNA exonerations, Garrett found that another 21 of 23 (91%) were contaminated.[24]

In sum, the problem of contamination means that when applying the fit test to assess the reliability of the confession, it is essential to separate out the contaminated facts from the facts that unquestionably were provided by the defendant.

## Professional Opinions

Because only 29 minutes of Daniel Taylor's questioning on December 3, 1992 were transcribed, there is no complete objective record of what occurred during his full interrogation session. Prior to the transcription of Mr. Taylor's confession (a process that lasted less than half an hour, beginning at approximately 5:23 a.m. on December 3, 1992), the only (highly imperfect) record that exists of Mr. Taylor's interrogation is the recollections of the various participants: Daniel Taylor and detectives Villardita and Killacky, all of whom testified about their recollections, or absence of recollections, of what occurred during Daniel Taylor's interrogation at his pre-trial hearings, at trial, and/or subsequently in deposition testimony in this case. Not surprisingly, this case therefore presents a classic swearing contest: the accounts provided by Daniel Taylor and detectives Villardita and Killacky of what occurred during this interrogation are dramatically different. The same holds true for each of Mr. Taylor's co-defendants who were also interrogated and who also confessed to participating in the murders of Lassiter and Haugabook.

I am neither a fact witness nor a finder of fact, and therefore it is not my role in this case to decide whose version of the facts is more accurate. I therefore cannot opine about whose account of what occurred during the off-tape interrogation session is more factually accurate nor is it my role to do so. I can only evaluate the accounts provided by the various participants of

---

[23]  Brandon Garrett (2011). CONVICTING THE INNOCENT (Harvard University Press)
[24]  Brandon Garrett (2015). "Contaminated Confessions Revisited," Forthcoming in *University of Virginia Law Review*.

Locke E. Bowman, Esq.
Legal Director, The MacArthur Justice Center
December 6, 2017
Page 18

these off-tape interrogations in light of decades of empirical social science research on the psychology, practice, and effects of American police interrogation and the elicitation of confession evidence. In the remainder of this section of the report, I will apply the findings of this empirical social science literature to each set of accounts of Daniel Taylor's interrogation, discuss the implications and concerns that they raise for each set of accounts and offer my professional expert opinions. I will then use the same methodology to analyze each of his original co-defendants' interrogations and confessions.

## XI. The Interrogation and Confession Statement of Daniel Taylor

A) Daniel Taylor's Description of His Interrogations on December 3, 1992

According to Daniel Taylor, on December 3, 1992 at approximately 2:15 a.m., he was awoken from sleep at the Maryville Shelter by Chicago Police and brought in for interrogation at Area 6. Daniel Taylor describes being handcuffed and punched in the car ride from the Maryville Shelter to Area 6. Once he arrived at Area 6, he was placed in an interrogation room, sat down in a chair and cuffed to a ring with one wrist. Investigators Villardita and Killacky then interrogated him. Daniel Taylor describes being repeatedly accused of participating in the double murder of Jeffrey Lassiter and Sharon Haugabook and being told about the details of the crime, as well as the investigators' theory of why it occurred. Daniel Taylor describes repeatedly denying the detectives' accusations – including at one point becoming angry and using obscenities – that he knew of and participated in the double murder, but he reports that Villardita and Killacky told him that he was going to talk to them. Daniel Taylor reports that the investigators were yelling at him, getting in his face and generally aggressive in their interrogation. He also reports that both detectives Villardita and Killacky physically beat him, with one hitting him with a flashlight to the side of his body and the other punching him several times to his body and lower back.

According to Daniel Taylor, the investigators then told him that he was going to tell them what they wanted to know, and they told him what they believed had happened. They told him that there were people who said he was present at the crime scene (Lassiter and Haugabook's apartment), that there was a gang meeting that he participated in prior to the double murder, and that there were four lookouts and four people who went into the apartment to murder Lassiter and Haugabook. According to Daniel Taylor, the investigators told him that his role was as one of the people who went inside the apartment, and they told him that he kicked down the door and held down Sharon Haugabook while she was shot. The investigators showed Daniel Taylor paperwork that had his name on it, including a statement by Akia Phillips implicating Daniel Taylor in the double murder. They also showed him Lewis Gardner's typed court-reported statement implicating him in the Lassiter and Haugabook murders. Daniel Taylor reports that he told investigators Villardita and Killacky that he could not have murdered Lassiter and Haugabook because he was in jail on the date and time that they were killed, but that they accused him of lying.

Locke E. Bowman, Esq.
Legal Director, The MacArthur Justice Center
December 6, 2017
Page 19

According to Daniel Taylor, he falsely confessed because he became tired of the physical beatings, just wanted to get away, and felt alone and helpless; and investigators Villardita and Killacky had threatened that if he did not confess his role to the murders, they would continue to beat him, but they promised that they would let him go home if he did confess to what they told him was his participation in the double homicide. Daniel Taylor reports that the investigators then provided him with the details of the crime. These included where the crime occurred, how Lassiter and Haugabook initially reacted, which gang members allegedly had what role in the double murder (including who went inside with Taylor and who stayed on the outside as lookouts), the motive for the double homicide, how the victims died, the number of shots fired and Daniel Taylor's alleged role in the double homicide. Daniel Taylor reports that after the investigators fed him the crime details and their theory of how the crime occurred, which included showing him a diagram of the crime scene, he and they rehearsed his confession narrative by going over the details of his alleged involvement in the double homicide. The investigators had also told him that an Assistant State's Attorney would be coming to the stationhouse to take his statement. From 5:23 a.m. to 5:52 a.m., Assistant State's Attorney Joseph Magats, along with Detective Brian Killacky, took a statement from Daniel Taylor that was recorded by a stenographer. Following the interrogation, Daniel Taylor took the investigators to a location where he had told them, under duress, the murder weapon had been disposed of, but it was not there.[25] Daniel Taylor describes that he thought he would be able to go home after agreeing to the detectives' statement, as he had been promised, but was arrested for the double homicide to his surprise.

(1) Risk Factors for False Confession

In his deposition testimony, Daniel Taylor provides a robust account of what he recalls occurring during his off-tape interrogation session by detectives Villardita and Killacky and how and why the Chicago police investigators moved him from denial to admission and then a full confession to his alleged role in the double murder of Jeffrey Lassiter and Sharon Haugabook, of which he has now been declared factually innocent. In his account of the interrogation by detectives Villardita and Killacky, Daniel Taylor described numerous techniques that the empirical social science research has shown significantly increase the risk of eliciting unreliable and false confessions when applied to innocent suspects. These include:

(1) *Sleep Deprivation*. Sleep deprivation is a *situational* risk factor for making or agreeing to a false confession during police interrogation.[26] Sleep deprivation heightens interrogative suggestibility by markedly impairing decision-making abilities, such as the ability

---

[25] Daniel Taylor testified that he took the detectives to that location (an alley behind Agatite where he had previously hidden items) because he intended to use the opportunity to escape the detectives' custody. The record does not indicate that the detectives ever developed any evidence as to the actual location of the murder weapon. Deposition of Daniel Taylor at 296 (September 4, 2014).

[26] *See* Saul Kassin, Steven Drizin, Thomas Grisso, Gisli Gudjonsson, Richard A. Leo and Allison Redlich (2010). "Police-Induced Confessions: Risk Factors and Recommendations" in *Law and Human Behavior*, 34, 3-38.

Locke E. Bowman, Esq.
Legal Director, The MacArthur Justice Center
December 6, 2017
Page 20

to anticipate risks and consequences, inhibit behavioral impulses and resist suggestive questioning.[27] Sleep deprivation also impairs the ability to sustain attention and flexibility in thinking and, more generally, it diminishes a suspect's ability to resist suggestive and or coercive influences, especially the longer an interrogation lasts. According to Daniel Taylor, he was awoken up, suddenly and without warning, by Chicago police investigators at approximately 2:15 a.m. on December 3rd, and subsequently interrogated and/or in custody for the next three and a half hours. Daniel Taylor was sleep deprived during this early morning interrogation, and this became a potent risk factor for false confession.

2) *False evidence ploys.* Police interrogators routinely tell criminal suspects that the evidence establishes their guilt. If police possess real evidence, this is called a true evidence ploy. If police are making up, lying about, or exaggerating non-existent evidence, this is called a false evidence ploy. The social science research literature has demonstrated that false evidence ploys are virtually always present in false statements, admissions and/or confessions, and substantially likely to increase their occurrence. False evidence ploys are among the most well-documented situational risk factors for eliciting false and unreliable statements, admissions, and/or confessions, as described in the social science research literature.[28] Many people do not know that police detectives can legally lie by pretending to have incriminating evidence that does not exist, is fabricated or is exaggerated; even those who suspect that the police may be bluffing about the evidence are likely to fear that police will manipulate evidence to prosecute them. The use of false evidence ploys can create or contribute to the suspect's perception that he or she is trapped, there is no way out, and/or that his conviction will be inevitable, thus leading to the perception that he or she is in a hopeless situation and has little choice but to agree to or negotiate the best available outcome or mitigation of punishment given the perceived, subjective reality of the suspect's situation.

According to Daniel Taylor, during his interrogation, detectives Villardita and Killacky told him that others had identified him as participating in the murder of Jeffrey Lassiter and Sharon Haugabook, and they presented him with paperwork showing that Lewis Gardner and Akia Phillips specifically implicated him in the double murder. In addition, detectives Villardita and Killacky brought Paul Phillips into his interrogation room. While it is true that, in response to their own unrecorded and allegedly coercive interrogations, both Lewis Gardner and Akia Phillips ultimately agreed with their interrogators that Daniel Taylor had been involved in the Lassiter/Haugabook double murder, Akia's and Lewis' statements to the extent they implicated Daniel Taylor could not have been true if police records indicating that Daniel Taylor was in

---

[27] Mark Blagrove (1996). "Effects of length of sleep deprivation on interrogative suggestibility. *Journal of Experimental Psychology: Applied*, 2, 48-59. See also Stephen Frenda, Shari R. Berkowitz, Elizabeth F. Loftus, and Kimberly M. Fenn (2016). "Sleep Deprivation and False Confessions." Forthcoming in the *Proceedings of the National Academy of Sciences.*

[28] Saul Kassin, Steven Drizin, Thomas Grisso, Gisli Gudjonsson, Richard A. Leo and Allison Redlich (2010). "Police-Induced Confessions: Risk Factors and Recommendations" in *Law and Human Behavior*, 34, 3-38.

Locke E. Bowman, Esq.
Legal Director, The MacArthur Justice Center
December 6, 2017
Page 21

lockup at the time of the murders are credited. Thus, presenting Daniel Taylor with Akia's and Lewis' fabricated statements appears to have been a false evidence ploy.

As shown by a century of basic psychological research on misinformation effects,[29] as well as decades of psychological research on police lying to suspects during interrogation,[30] false evidence ploys are effective at eliciting compliance,[31] confusing some suspects into believing that they have been framed or that such evidence really does exist,[32] causing some suspects to doubt themselves (deferring to interrogators' authoritative assertions of irrefutable evidence despite knowing they did not commit a crime),[33] and even causing some suspects to develop false beliefs and/or memories of committing crimes.[34] Based on well-established basic and applied social scientific research going back decades, if Daniel Taylor's description of these events is credited, the false evidence ploys that the Chicago police investigators used in his interrogation increased the risk of eliciting a false and unreliable confession from him, especially the longer his interrogation lasted and the more sleep deprived and frightened he became.

3) *Physical Intimidation and Coercion*. Once common, the historical use of physical coercion by American police detectives to extract confessions has been well-documented,[35] as has both the historical[36] and more recent use of physical force by the Chicago Police in particular to extract confessions of guilt from accused criminal suspects.[37] The fact that physical coercion leads to false and unreliable statements, admissions, and confessions is so well-established that no one – neither police nor social scientists – any longer disputes it, and it has been prohibited by federal constitutional law that applies to the States for more than 80 years. Police interrogation training manuals stridently advise police never to use any physical force or intimidation whatsoever during interrogation because it is recognized as apt to make an innocent person falsely confess. From my experience, it is rare outside of Chicago for interrogated suspects to

---

[29]   Elizabeth Loftus (2005). "Planting Misinformation in the Human Mind: A 30 Year Investigation of the Malleability of Memory, *Learning & Memory*, 12, 361-366.

[30]   Saul Kassin, Steven Drizin, Thomas Grisso, Gisli Gudjonsson, Richard A. Leo and Allison Redlich (2010). "Police Induced Confessions: Risk Factors and Recommendations" in *Law and Human Behavior*, 34, 3-38.

[31]   Richard A. Leo (2008), POLICE INTERROGATION AND AMERICAN JUSTICE (Harvard University Press)

[32]   Richard Ofshe and Richard A. Leo (1997) "The Social Psychology of Police Interrogation: The Theory and Classification of True and False Confessions." *Studies in Law, Politics & Society*, Vol. 16. Pp. 189-251.

[33]   Richard Ofshe and Richard A. Leo (1997) "The Social Psychology of Police Interrogation: The Theory and Classification of True and False Confessions." *Studies in Law, Politics & Society*, Vol. 16. Pp. 189-251.

[34]   Richard A. Leo (2008), POLICE INTERROGATION AND AMERICAN JUSTICE (Harvard University Press) See also Deborah Wright, Kimberly Wade and Derrick Watson (2013). "Delay and Déjà Vu: Timing and Repetition Increase the Power of False Evidence," *Psychonomic Bulletin Review*, 20, 812-818; Julia Shaw and Don Read (2014). "Constructing Rich False Memories of Committing Crime," *Psychological Science*, Pp. 1-11. Published online, January 14, 2015.

[35]   See Richard A. Leo (2008). POLICE INTERROGATION AND AMERICAN JUSTICE (Harvard University Press).

[36]   National Commission on Law Observance and Law Enforcement (1931). REPORT ON LAWLESSNESS IN LAW ENFORCEMENT, Volume 11. (Washington D.C.: U.S. Government Printing Office).

[37]   John Conroy (2000). Unspeakable Acts, Ordinary People: The Dynamics of Torture (Alfred Knopf).

Locke E. Bowman, Esq.
Legal Director, The MacArthur Justice Center
December 6, 2017
Page 22

allege that police interrogators used physical force or coercion to elicit their interrogation statements.

Mr. Taylor describes that being hit during the car ride to the Area 6 police station. Mr. Taylor describes being hit with a flashlight, and punched in the body several times while at the police station as one of his hands was cuffed to a ring while he was sitting in a chair. Mr. Taylor says that men matching the descriptions of both detective Villardita and detective Killacky hit him, and that he falsely confessed because he feared further physical beatings, felt alone and helpless, and desperately wanted to get away from the detectives. Physical coercion works to terrorize individuals into compliance and confession by instilling fear of additional physical abuse, especially in combination with other threatening and overbearing interrogation techniques. If Mr. Taylor's account about the use of this kind of abuse and intimidation is accurate, it is my professional opinion that such the physical interrogation coercion increased the risk of eliciting a false and unreliable confession from him.

4) *Threats and Promises.* The use of explicit promises of leniency, immunity and/or a tangible benefit, as well as the use of explicit threats of harm, significantly increases the risk of eliciting an involuntary false statement, admission, and/or confession when applied to the innocent. Indeed, as empirical social science research has repeatedly demonstrated, promises of leniency—like threats of harm or harsher punishment, whether explicit or implicit—are widely associated with police-induced false confession in the modern era and are believed to be among the leading causes. Promises and threats (whether implied or express) are inherently coercive because they exert substantial pressure on a suspect to comply and thus can easily overbear the will or ability of a suspect to resist an interrogator's demands or requests. Like other *high-end* inducements, promises and threats contribute to creating a sense of despair and hopelessness about a suspect's perceptions of his available options during interrogation. There may be no psychological interrogation technique more potent than the use of threats and promises.

According to Daniel Taylor, the detectives repeatedly threatened that if he continued to deny their accusations about his alleged involvement in the Lassiter and Haugabook murders, they would continue to beat him, but that if he agreed with their accusations, they would let him go home. According to Mr. Taylor, he came to perceive that the only way to escape what had become an intolerably coercive experience was if he confessed to what the detectives wanted to hear. In his deposition, Mr. Taylor describes why he believed the detectives' promise of immunity and that he would be able to go home if he confessed to being involved in the double homicide:

"Because that's what they said. And my experience with the police, not detectives like they were, I'm assuming, when they said they would let you go, they would. That's from being in the neighborhood. I know guys that got caught with guns. And the police would tell them, well, you bring me this, I will let you go. Where there could be another gun or where some drugs could possibly be, they would definitely let those guys go. And I seen

Locke E. Bowman, Esq.
Legal Director, The MacArthur Justice Center
December 6, 2017
Page 23

> where guys got caught with drugs, and you had officers say, if you get me a gun, I will let you go. And they let them go."[38]

     5)    *Psychological Coercion.*  As discussed earlier, it is well-established that psychologically coercive interrogation techniques increase the risk of eliciting false and/or involuntary incriminating statements, admissions and/or confessions.  If the interrogation account that Daniel Taylor describes is credited, in my professional opinion it was psychologically coercive because it caused him to perceive that he had no meaningful choice but to comply with detective Villardita's and Killacky's demands that he confess in order to escape a psychologically intolerable situation.  As just mentioned, Daniel Taylor describes an interrogation that was physically coercive to the point that he was made to feel helpless and that led him to believe that the only way to end the physical abuse was to agree to the investigators' demand that he fabricate a false confession.  Daniel Taylor describes repeatedly protesting the physical abuse, but to no avail. Mr. Taylor reports that he told the detectives that he was in custody at the time of the crime and therefore could not have participated in or committed it, but they rejected his attempt to prove his innocence.  Instead, according to Mr. Taylor, the detectives threatened him with additional physical abuse if he did not confess to their theory of his role in the double murder and promised that he could go home if he did. Mr. Taylor describes an interrogation that is replete with explicit promises and threats, techniques that are regarded as inherently psychologically coercive because they are so likely to overbear a suspect's will and lead to involuntary statements.  In short, if Mr. Taylor's description of the interrogation is credited, it is clear that he was made to perceive that he had no meaningful control over the conditions of his custodial confinement and interrogation, and ultimately that he had no meaningful choice but to comply with the demands of his interrogators (*i.e.*, that he was going to tell them what they wanted know or else the coercion would continue).

     6)    *Personality Traits as Risk Factors for False Confession.*  In addition to the many situational risk factors present in his account – sleep deprivation, promises and threats, and physical and psychological coercion – Daniel Taylor was at a heightened risk of making and agreeing to a false and unreliable confession because of his personality characteristics, *i.e.*, *personal risk factors*. Specifically, Daniel Taylor was, from a social science perspective, a juvenile (*i.e.*, under 18) at the time of his interrogation by detectives Villardita and Killacky. Empirical studies have shown that juveniles are at greater risk for making or agreeing to false confessions because of their psychosocial immaturity and its effect on their decision-making abilities.  As a result, juveniles tend to be more easily led and manipulated than adults; more gullible and suggestible; more compliant, submissive and obedient to authority; more conflict averse; more impulsive; more likely to engage in risky behaviors; less capable of considering long time consequences; and more volatile.[39]  For all of these reasons, juveniles are overrepresented in the proven false confession cases and at greater risk for involuntary and false

---

[38]  Deposition of Daniel Taylor (September 14, 2013) at P. 293.

[39]  Saul Kassin, Steven Drizin, Thomas Grisso, Gisli Gudjonsson, Richard A. Leo and Allison Redlich (2010). "Police Induced Confessions: Risk Factors and Recommendations" in *Law and Human Behavior*, 34, 3-38.

Locke E. Bowman, Esq.
Legal Director, The MacArthur Justice Center
December 6, 2017
Page 24

confession.[40]  All other things being equal, the empirical social science research would predict that it would take far less time for police interrogators to break an innocent juvenile suspect and move him from denial to admission than an adult.  Daniel Taylor was, as a result of his youth and immaturity, at a greater risk for making or agreeing to a false confession.

(2) Police Contamination and Scripting.

As mentioned earlier, police interrogators are universally trained not to contaminate a suspect by leaking or disclosing non-public case facts to him or her but, instead, to hold back unique case information and let the suspect volunteer case details in order to demonstrate inside knowledge of the crime details to corroborate the accuracy of any incriminating statements.  The absence of contamination allows police to verify the accuracy of reliable confessions, but the presence of contamination prevents police from corroborating confessions that are true and makes confessions that are false misleadingly appear true (because they contain non-public crime scene details suggested by the interrogators, and repeated by the suspect, but the claim is made that they were volunteered by the suspect).  Related to contamination, police investigators sometimes "script" a suspect's confessions when they not only provide the suspect with details of the crime, but coach or lead the suspect to adopt a narrative of how and why he committed the crime.  Like contamination, scripting can make otherwise completely false confessions appear not only to be true but persuasively so.[41]

According to Mr. Taylor, the detectives repeatedly supplied him with details of the crime scene so that he would parrot back a version of events that fit their preconceived theory of the crime; they later scripted his confession by rehearsing it with him before ASA Magats arrived and a court reporter transcribed the confession that followed his prior interrogation and custody at Area 6.

Mr. Taylor reports that he did not know any of the details of the Lassiter and Haugabook murders, but from the time investigators Villardita and Killacky started accusing him of participating in it they began to educate him about the details of how it occurred, which he would later incorporate into his confession narrative.  Mr. Taylor reports that investigators Villardita and Killacky told him that there was a gang meeting prior to the homicide, where it took place, who participated as lookouts and who participated as perpetrators of the murders, that the door to the apartment got kicked in, how the apartment was laid out, how the murders occurred, the role that he allegedly played, how the victims responded, where the bodies were found, what weapons were used, how many shots were fired, where one of the victims was shot, and the location of the killings within the house among other things. In addition to being told crime scene details, Mr. Taylor reports that he was shown Lewis Gardner's and Akia Phillips' written statements confessing to their alleged role in the crime, which would have been a fertile source of police contamination.  And on the final 29 minute recapped transcribed confession

[40]  Drizin and Leo, "The Problem of False Confessions in the Post-DNA World.  *North Carolina Law Review*, 82, 891-1007.

[41]  Richard A. Leo (2008).  *Police Interrogation and American Justice* (Harvard University Press).

Locke E. Bowman, Esq.
Legal Director, The MacArthur Justice Center
December 6, 2017
Page 25

statement with ASA Magats and detective Killacky, Mr. Taylor discusses a drawing of the crime scene, which he alleged the investigators provided for him and helped educate him about the details of the crime.  Mr. Taylor also reports that investigators Villardita and Killacky pressured him to accept a motive for his alleged role in the double homicide, i.e., that he was helping his gang collect on a drug debt, thereby making his fabricated false confession appear more believable to others.  As Mr. Taylor indicated in his deposition, he would "just feed off that story line"[42] the investigators provided him when scripting his confession narrative.

Police contamination and scripting is not so much a risk factor for eliciting a confession – since it often occurs after an admission has already been made – as ways to make an otherwise false confession appear true.  Police contamination and scripting make false confessions appear true, and persuasively true, because the innocent suspect's confession is said to contain "details that only the true perpetrator would know" (erroneously since the details were supplied by the police), and it contains characteristics that most people associate with a true confession (e.g., a story line, motive, explanation, emotions and an attribution of voluntariness), even though it is completely false.[43]  Contamination and scripting therefore increase the risk that once a suspect has falsely confessed to a crime he or she did not commit, third parties – such as prosecutors, judges, juries, the media and outside observers – will mistakenly believe that the confession is true.  The Chicago police investigators' contamination and scripting did not increase the risk that he would falsely confess as much it increased the risk that his false confession, once given, would cause third parties to erroneously believe that in contained indicia of reliability and erroneously convict him.

(3) Indicia of Unreliability

The confession statement of Daniel Taylor contained numerous factual and logical errors, inconsistencies, omissions, and indicia of unreliability that are the hallmarks of false confessions. To begin with, as mentioned earlier, according to official police records it was physically impossible for Daniel Taylor to have participated in the murders of Jeffrey Lassiter and Sharon Haugabook, if credit is given to police records documenting that he had been arrested on a disorderly conduct charge at 6:45 p.m. on the night of the murders (November 16, 1992), was subsequently transported to the 23rd District for processing and did not bond out until 10 p.m., more than an hour after the murders were committed that same night. Mr. Taylor also demonstrated to the investigators that he lacked the personal knowledge of the non-public crime facts – absent police contamination – that the true perpetrator would have known when he tried to lead them to the murder weapon but could not.  In addition, there was no physical evidence linking Mr. Taylor to a crime scene, and his fingerprints did not match fingerprints found at the crime scene.  Similarly, the detectives did not gather any evidence beyond the confessions linking Mr. Taylor to the victims. Finally, eyewitness Faye McCoy failed to identify Mr. Taylor

---

[42]   Deposition of Daniel Taylor, p. 288
[43]   Richard A. Leo (2008).  *Police Interrogation and American Justice* (Harvard University Press).

Locke E. Bowman, Esq.
Legal Director, The MacArthur Justice Center
December 6, 2017
Page 26

as one of the individuals leaving the crime scene, and another eyewitness, Willie Triplett, has provided affidavits indicating that Daniel Taylor was not one of the men he saw entering the crime scene on Agatite the night of the murders.

(B) The Chicago Police Investigators' Account of
Daniel Taylor's Custody and Interrogation on December 3, 1992

According to the Chicago police detectives Villardita and Killacky, they arrested Daniel Taylor in the early morning of December 3, 1992 at the Maryville Shelter sometime between 2:00 a.m. and 2:40 a.m., transported him to Area 6, placed him in an interrogation room, and began interrogating him sometime between 3:00 a.m. and 3:15 a.m. According to detectives Villardita and Killacky, they told Daniel Taylor that he was being arrested for a double homicide and that they needed to read his rights, which he waived. They asked him if he was involved in the double murder and he initially denied it. Then they told him that several individuals had told them of his involvement in the crime, and Daniel Taylor immediately and spontaneously confessed to his role in the double murder. According to Detectives Villardita and Killacky, this entire interrogation was very brief and lasted somewhere between 5 and 15 minutes, with Daniel Taylor telling them that he wanted to talk to them about his alleged participation in the double murder. After making the oral admissions to Detectives Villardita and Killacky, Daniel Taylor subsequently gave a court-reported confession to ASA Magats and Detective Killacky. According to the detectives, Daniel Taylor then volunteered to lead them to the murder weapon, but it was not at the location to which he directed them.

Detectives Villardita and Killacky deny physically beating Daniel Taylor, handcuffing him to the wall during the interrogation, yelling at him, threatening him, promising him he could go home if he confessed, or feeding him case facts. According to Detective Villardita, Daniel Taylor did not tell him that he had been arrested on the date of the double murder until the day after his interrogation, on December 4, 1992. At that point, Daniel Taylor allegedly told Detective Villardita that he had been locked up the day of the double murder, but not the evening of the double murder. According to Detective Killacky, he does not recall whether Daniel Taylor told him he was in custody during the double murder, but he learned several days after his interrogation of Daniel Taylor that Daniel Taylor was claiming he had been in custody when the double murder was committed.

Contrary to Daniel Taylor's more robust and detailed account of what occurred during his custody and interrogation, which he describes as moving him from denial to falsely confessing to participating in an orchestrated, multi-defendant double murder, the investigators' accounts of what occurred during this time are relatively sparse. Even if the investigators' testimony about what occurred during Daniel Taylor's interrogation and custody are credited, many of the professional opinions and concerns I have expressed above remain for the following reasons:

First, based on the social science research, it is my professional opinion that the investigators' account of what occurred during Daniel Taylor's custody and interrogation are

Locke E. Bowman, Esq.
Legal Director, The MacArthur Justice Center
December 6, 2017
Page 27

highly incomplete.  Detective Villardita and Killacky's descriptions of what happened to move
Daniel Taylor from repeated denials to a confession fail to fit with what we would expect from
decades of empirical social science research on how police interrogation works to break down a
suspect's denials and elicit a confession of guilt. If the investigators' accounts are to be credited,
the only interrogation technique they used was telling Mr. Taylor one time that people had
placed him at the crime scene, after which he spontaneously confessed to participating in the
double murder in a free flowing narrative while providing details about everyone else's
involvement as well.

     We know from empirical social science research that police interrogations involve the
use of far more interrogation techniques than the investigators describe in this case, and that
suspects rarely give near spontaneous false or unreliable confessions during police
interrogation.[44] Put differently, while I cannot judge the veracity of the interrogators' accounts,
they are contrary to everything one would expect both from the social science research on police
interrogation and confessions, as well as the police training manuals on the subject.  At best,
detectives Villardita's and Killacky's accounts of what moved Daniel Taylor from denial to
confession during his custody and interrogation are simply incomplete; at worse they failed to
disclose much of what actually occurred during their interrogation of Daniel Taylor on
December 3, 1992, which led him to stop denying and start confessing to an alleged role as a
conspirator and participant in a gang-related double homicide and to inform on all his alleged
gang-member accomplices.

     Second, even if we credit the investigators' accounts, at least two risk factors for false
confession remain – sleep deprivation and Daniel Taylor's youth – which significantly increased
the risk of his making or agreeing to a false confession.

     Third, even if we credit the investigators' accounts, the indicia of unreliability mentioned
above remain.  Since it was physically impossible for Daniel Taylor to have participated in the
Lassiter and Haugabook murders, it makes absolutely no sense from a social science perspective
that he would near spontaneously falsely confess to the crimes, provide elaborate non-public
details in his confession that only the police and the true perpetrators would know, and then
incriminate his fellow gang members.

     There is an additional inconsistency that is significant in my opinion.  Suspects in police
interrogations do not confess spontaneously to murder.  Rather police interrogation-induced false
confessions typically occur after coercive pressure and persuasion.  Once an innocent suspect has
been moved to falsely confess, he or she is motivated to agree to, parrot back or speculate about
whatever details the police are seeking in order to please his or her interrogators, because false
confessors typically wish to put an end to the aversive interrogation.  The suggestion that Mr.
Taylor spontaneously provided a confession to conspiring to and participating in the Lassiter and

---

[44]    Drizin and Leo, "The Problem of False Confessions in the Post-DNA World. *North Carolina Law Review*, 82,
891-1007.

Locke E. Bowman, Esq.
Legal Director, The MacArthur Justice Center
December 6, 2017
Page 28

Haugabook murders – and then proceeded to snitch on all of his fellow gang members without any further prompting, pressure or persuasion – is inconsistent with the empirical social science research literature on police interrogation and false confessions, another likely indicia of reliability.

## XII. The Interrogation and Confession of Lewis Gardner

On the morning of December 2, 1992, Lewis Gardner was arrested along with Akia and Paul Phillips by Chicago Police for possession of drugs. He was transported to the 23rd District station, where he arrived at around 10:30 a.m., and he was subsequently taken to the Area 6 police station at Belmont and Western at approximately 11:30 a.m. Lewis Gardner was subsequently interrogated at the Area 6 police station and ultimately made a statement at approximately 3:20 a.m. on the morning of December 3rd, incriminating himself, Akia Phillips, Paul Phillips, Daniel Taylor, Deon Patrick, Joseph Brown, Rodney Matthews, and Dennis Mixon in the murders of Jeffrey Lassiter and Sharon Haugabook. The interrogations of Lewis Gardner were not electronically recorded, though he briefly re-capped his statement on the morning of December 3rd and this was memorialized. As with all of the other individuals mentioned in this report, Lewis Gardner's account of what he recalls occurring during his many hours of custody and interrogation varies dramatically with the investigating officers' accounts. As with my analysis above, it is not my role to offer an opinion about which account is more accurate but to analyze how the social science research applies to the disparate accounts and what light it sheds on them.

### (A) Lewis Gardner's Account of What Occurred During His Interrogation and Custody on December 2-3, 1992

Lewis Gardner's describes an account of what occurred during his many hours of custody and interrogation that, based on the social scientific research, is replete with risk factors for false confession and that is fraught with police contamination. Lewis Gardner's confession contains few independent indicia of reliability.

### (1) Risk Factors for False Confession

1)    *Length of Interrogation*. Lewis Gardner was interrogated and/or in the custody of the Chicago Police Department on December 2-3, 1992 for approximately 15 hours before he confessed at 3:53 a.m. on December 3rd to participating in the Lassiter and Haugabook murders. He describes that he had been up since the early morning of December 2nd, and that he had not only grown tired but exhausted into the early morning hours of December 3rd. He describes trying to fall asleep on the floor of the conference room into which he had been placed, but not getting much rest. In addition, Lewis Gardner reports that he was not allowed to use the restroom and, as a result, ended up urinating in the conference room. Lewis Gardner had only been given soda and two bags of potato chips to eat during this time period. As described above,

Locke E. Bowman, Esq.
Legal Director, The MacArthur Justice Center
December 6, 2017
Page 29

lengthy interrogation, sleep deprivation and deprivation of other essential necessities significantly increase the risk that an innocent personal will make or agree to a false confession.

      2)      *Minimization*.  A common interrogation strategy is for investigators to portray the offense in a way that minimizes its moral, psychological and/or legal seriousness, thus lowering the perceived cost of confessing by communicating that the consequences of confessing will not be that serious.  Interrogation techniques and strategies that minimize the legal seriousness of the crime, in particular, are associated with and known to increase the risk of eliciting false confessions. Such minimization strategies can imply leniency, reduced punishment, or even no punishment at all if the suspect perceives that there is no consequence to confessing (*i.e.*, either that the act to which the suspect is confessing is not a crime or that it carries little or no penalty).[45]  According to Lewis Gardner, the investigators minimized his culpability by portraying him merely as a lookout to the murder.

      3)      *Promises and Threats*.  Lewis Gardner states that the investigators, as well as the assistant state's attorney, promised that he would be released and could go home if he told the detectives what they wanted to hear, implicating himself and the six others whom they believed were responsible for participating in the Lassiter and Haugabook double murders.  Lewis Gardner also states that the investigators threatened that if he did not confess they would "put everything" on him.  In an earlier affidavit, Lewis Gardner stated that he so desperately wanted to put an end to the interrogation and go free that he falsely confessed to participating in the murders and falsely implicated the others.  He also reports that, as a result of what the investigators had told him, he thought he would only be charged with a drug crime, not a homicide.  As described earlier, promises and threats have been shown to be one of the most significant risk factors for eliciting false and unreliable confessions, especially from individuals with psychological vulnerabilities.

      4)      *Physical and Psychological Coercion*. Lewis Gardner describes being kicked by one of the detectives who interrogated him.  He also describes repeatedly denying the investigators' aggressive accusations that he knew who committed the double murder.  And he describes never being told he was free to leave and thinking he was already under arrest while in police custody.  He describes ultimately coming to perceive that he had no choice but to cooperate with the investigators, and their demands for false confession, if he wished to put an end to his custody and interrogation.  In addition, Lewis Gardner describes being handcuffed to a bench and unable to move in the interrogation room during some of his time in custody, and denied access to his mother despite his youth and vulnerability.  As discussed earlier, both physical and psychological coercion are risk factors for eliciting police-induced false confessions, especially from individuals with weak wills to resist.

---

[45]    Saul Kassin, Steven Drizin, Thomas Grisso, Gisli Gudjonsson, Richard A. Leo and Allison Redlich (2010). "Police-Induced Confessions: Risk Factors and Recommendations" in *Law and Human Behavior*, 34, 3-38.

Locke E. Bowman, Esq.
Legal Director, The MacArthur Justice Center
December 6, 2017
Page 30

     5)     *Youth*. Lewis Gardner was 15 years old at the time of his interrogation. As described earlier, juveniles – especially those aged 15 and younger – are at higher risk for making and/or agreeing to a false confession because of their psychosocial immaturity, heightened suggestibility and compliance, greater tendency to impulsiveness and risky behavior, and less developed decision-making capacities. Lewis Gardner's former attorney Andrew Berman describes him as compliant, passive and malleable – and as going along with everything Berman suggested.

     6)     *Subnormal Intellectual Functioning*. Lewis Gardner had an overall IQ of 70 and a verbal IQ of 65, and thus was mentally retarded. He was in special education as child, has always had learning disabilities, and did not advance beyond the 8th grade. As described earlier, individuals with mental disabilities are at a substantially greater risk for making and/or agreeing to a false confession for many of the same reasons that juveniles are.

### (2) Police Contamination

     According to Lewis Gardner, he did not know about the double murder of Jeffrey Lassiter and Sharon Haugabook or how they were killed until he was educated about the double murder by the investigators who interrogated him. Lewis Gardner describes being told about the details of the double murder (*e.g.*, the names of the victims, the location of the crime, how they died, etc.); being shown pictures of his alleged co-conspirators, whom, at the direction of his investigators, he subsequently incorporated into his confession statement (Deon Patrick, Paul Phillips, Akia Phillips, Rodney Matthews, Jose Brown, and Dennis Mixon, among others); and being handed a pad with a statement on it, which was read to him twice and then being told to put the confession in his own words. Lewis Gardner says he did so, after studied recollection, when the court reporter arrived. As described earlier, police interrogation contamination is strongly discouraged as an investigative practice because it taints confessions and other case evidence, and the social science research demonstrates that contaminated confessions mislead criminal justice officials, triers of fact, and other third parties to mistakenly perceive false confessions not only as true, but also as corroborated and believable.

### (3) Indicia of Unreliability

     As with all confessions discussed in this report, the fact that Daniel Taylor was in police lock-up at the time of the double murder indicates that Lewis Gardner's confession statement is, to the extent it names Mr. Taylor as a participant in the crime, false and unreliable. Additional indicia of unreliability include that there was no physical or other evidence left at the crime scene that links to or in any way implicates Mr. Gardner and the detectives did not gather any evidence beyond the confessions linking Mr. Gardner to the victims.

     I have considered the fact that Lewis Gardner testified at trial that he participated in the murders as a look-out. Gardner asserted in his deposition that he told his defense counsel,

Locke E. Bowman, Esq.
Legal Director, The MacArthur Justice Center
December 6, 2017
Page 31

Andrew Berman, that the confession was false but that Berman told him to testify in accordance with his statement. Berman denies counseling Gardner to testify falsely. But Berman explained in his deposition that throughout his trial preparation and during his interactions with Gardner he was "petrified" by the potential of a natural life sentence for his juvenile client given Gardner's confession. Because of this potential, Berman was extremely reluctant to directly challenge the veracity of the statement at trial. Berman believed that a defense crafted around the proposition that the Gardner's role in the offense was minimal would eliminate the risk of a natural life sentence. On the other hand, Berman feared that a direct attack on the confession, if disbelieved by the trier of fact, could well prompt the judge to sentence Gardner to prison for life.

The social science literature confirms that a defendant's confession is [one of] the most difficult kinds of evidence for a criminal defendant to overcome. Both judges and juries have a hard time understanding that self-incriminating statements can be false and coerced. Berman was obviously well aware of this reality. As further evidence of this trend, national statistics reveal that significant numbers of innocent individuals who falsely confess go on to plead guilty when faced with a criminal trial in which their confession will be used against them. Of the 125 cases analyzed in my co-authored study of false confessions, 14 innocent defendants eventually pled guilty to crimes they did not commit (11%).[46] Of the first 289 DNA exonerations, similarly, 28 defendants pled guilty (10%). The rates of false guilty pleas are in all likelihood much higher than these statistics reflect, since today 97% of federal convictions and approximately 94% of state convictions are the result of guilty pleas.[47]

Thus, while Gardner's trial testimony lends some indicia of reliability to his statement, I cannot conclude that that testimony by itself renders the statement reliable. Even though Gardner was represented by counsel in his trial proceedings, the environment—including the potential for a long sentence—remained highly coercive.

(B) The Investigators' Account of the
Interrogation and Confession Statement of Lewis Gardner

According to Chicago police detectives Villardita and Johnson, they interrogated Lewis Gardner for approximately 20 minutes, in a manner they describe as a conversation, before he confessed to participating as a lookout in the Lassiter/Haugabook double murder and naming the others (Deon Patrick, Daniel Taylor, Paul Phillips, Akia Phillips, Rodney Matthews, Joseph Brown, and Dennis Mixon). According to detectives Villardita and Johnson, Lewis Gardner said he felt guilty about his role as lookout in the double murder. They describe their questioning of Lewis Gardner as lasting 15-20 minutes and as consisting of merely asking him to tell them what he knew about the double murder on Agatite, after which Lewis Gardner spontaneously

---

[46] Drizin and Leo, "The Problem of False Confessions in the Post-DNA World." *North Carolina Law Review*, 82, 957.

[47] *See* Dept. of Justice, Bureau of Justice Statistics, Sourcebook of Criminal Justice Statistics Online, Table, May 22, 2010, http://www.albany.edu/sourcebook/pdf/t5222010.pdf (last visited July 25, 2016); Rakoff, J. (2014). *Why innocent people plead guilty. The New York Review of Books*, Nov. 20, 2014.

Locke E. Bowman, Esq.
Legal Director, The MacArthur Justice Center
December 6, 2017
Page 32

confessed to being a lookout. After that the detectives Mirandized him, elicited a waiver, told him that he could be charged as an adult, notified the Youth Division that he was implicating himself in this double murder, and attempted to contact his mother. They then allowed Lewis Gardner to spontaneously volunteer a confession about his alleged involvement and that of his many fellow gang members. According to detective Villardita, Lewis Gardner was eager to provide this information, because he said he felt guilty. By around 7:20 p.m. on December 3rd, approximately five to eight hours after he had been taken to Area 6, Lewis Gardner gave his confession. Approximately eight hours later at 3:20 a.m., while Lewis Gardner remained isolated and under arrest in an interrogation room, ASA Martin Fogarty and a court reporter arrived to take a stenographically transcribed statement, which concluded at 3:53 a.m.

Detectives Villardita and Johnson steadfastly deny that either of them kicked or physically or psychologically coerced Lewis Gardner; threatened he would be charged with murder, or take all the blame, if he did not confess; or promised him release and immunity or leniency from a murder prosecution if he did not confess. Detectives Villardita and Johnson steadfastly deny that they pressured or contaminated Lewis Gardner. They even deny accusing him of committing the crime or challenging any of his denials, as they describe him as spontaneously confessing to his alleged role in the double murder without any prompting or denials, due to a guilty conscience, after which he proceeded to name and describe the alleged role of many fellow gang members in the double murder. Detectives Villardita and Johnson have no persuasive explanation for why it took six hours from the time assert they took Lewis Gardner's confession to tape record it with ASA Fogarty.

Detective Villardita and Detective Johnson's account is not consistent with the empirical social science research on police interrogation and confessions, for it fails to provide any explanation of how or why Lewis Gardner, even if guilty, would have confessed to participating in a multi-defendant gang-related double murder and, further, go on implicate many fellow gang members in the crime, even if he was guilty. It also fails to account for the indicia of unreliability in Lewis Gardner's confession statement.

### XIII. The Interrogation and Confession of Akia Phillips

On December 2, 1992, Akia Phillips was arrested along with Lewis Gardner for a drug offense, after which he too was taken to the Belmont and Western police station and interrogated about his role the Lassiter and Haugabook double murder, to which he also confessed to participating as a lookout, and then named other fellow gang members as also being allegedly involved.

#### (A) Akia Phillip's Account of What Occurred During His
#### Interrogation and Custody on December 2-3, 1992

Akia Phillips describes an account of what occurred during his many hours of custody and interrogation that, based on the social scientific research, contains numerous risk factors for

Locke E. Bowman, Esq.
Legal Director, The MacArthur Justice Center
December 6, 2017
Page 33

false confession and is fraught with police contamination.  Akia Phillips's statement contains no independent indicia of reliability and substantial indicia of unreliability.

(1) Risk Factors for False Confession

1)       *Sleep deprivation and Lengthy Interrogation*.  Akia Phillips was arrested at approximately 10:30 a.m. on December 2, 1992, transported to the 23rd District police station, and then transported to Area 6 at Belmont and Western by approximately 7:00 p.m., where he ultimately made a court-reported statement from 6:09 a.m. to 6:53 a.m. on December 3rd in the presence of ASA Martin Fogarty and Detective Terry O'Connor.  According to Akia Phillips, he was in continuous police custody, and not free to leave, for approximately twenty straight hours prior to the taking of the re-capped tape recorded statement, which, according to the social science research, is an extraordinary length of interrogation time and far more likely to be associated with false than true confessions.  During this time, Akia Phillips reports that he tried to, and desperately wanted to, go to sleep, but that the detectives would not let him sleep.  He states that every time he tried to go to sleep, an investigator would come into the interrogation room and wake him up, making him even more desperate for some sleep and causing him to lose his sense of time.  In his deposition, he stated that, "so at a point in time a kid break and say fuck it. I tell you what you want, just let me go to sleep."[48]  In addition, Akia Phillips reports that he was hungry from not being fed, and hot from not being allowed to take his coat off.  Lengthy interrogation and custody, the sleep deprivation to which it almost inevitably gives rise, and other physical discomforts and deprivations of essential necessities substantially increase the risk that an innocent person will make and/or agree to a false and unreliable confession.

2)       *Physical coercion*.  According to Akia Phillips, Chicago police investigators repeatedly physically hit and assaulted him, as well as others (Daniel Taylor) whose "ass whoopings" he could hear, in order to extract a confession to participating in the double murder.  Akia Phillips reports that the investigators repeatedly and continuously hit him in the head with flashlights, first putting phonebooks on his head and then administering the blow.  Akia Phillips asserts that he was also punched, hit on the ribs (also cushioned by a phonebook), bottom of the feet, ankles and wrists and that he was kicked while handcuffed, all of which was very painful and made him feel like a "slave."  Akia Phillips reports that he told the ASA Martin Fogarty that he had been beaten by detectives.  As mentioned earlier, physical coercion is a substantial risk factor for eliciting false and unreliable statements, admissions and/or confessions.

3)       *Minimization*.  As discussed above, minimization has been shown to increase the risk of eliciting false and unreliable confessions when misapplied to the innocent.  According to Akia Phillips, the investigators minimized his culpability by portraying him merely as a lookout to the murder.  Minimization techniques often implicitly communicate leniency, immunity and/or the potential for escape in exchange for confession.  Akia Phillips reports that he was led

---

[48] Deposition of Akia Dion Phillips at P. 152 (December 4, 2014).

Locke E. Bowman, Esq.
Legal Director, The MacArthur Justice Center
December 6, 2017
Page 34

to believe he would be able to leave the police station after falsely confessing to being a lookout to the Lassiter and Haugabook homicide.

4) *Threats and Promises*. According to Akia Phillips, the investigators promised that they would drop drug charges against him if he admitted to the minimized role of being a lookout to the double murder and told him that he could get it over with as soon as possible by doing so, implying leniency. This account is verified by the transcript of Akia Phillips' statement, which states "The police officer promised me if I told him what happened they would get my drug case throwed out."[49] Also according to Akia Phillips, he was non-verbally threatened with physical violence (a balled fist) by a detective when he told the ASA that he had been promised leniency on his drug case by the detectives. In addition, Akia Phillips reports that the ASA told him he would only receive 2-5 years for the homicide if he made a statement, implying the threat that he would get a much more severe sentence if he failed to confess.

5) *Psychological coercion*. Like the others, Akia Phillips reports that the was psychologically coerced into confessing – that, after being intentionally sleep deprived during lengthy custody interrogation, repeatedly beaten physically, threatened and promised leniency, he came to perceive that the only way to escape this intolerably stressful and, physically and psychologically, painful interrogation was to provide the investigators with the account they were seeking. Akia Phillips reports that he asked to use the phone, but that request was denied and that he was never told he had the right to talk with a lawyer before being questioned. All of this contributed to Akia Phillips' perception that he had no meaningful choice during, or control over, his interrogation and that the only way to put an end to it was to comply with the investigators' demands that he falsely confess.

(2) Police Contamination

Akia Phillips reports that the investigators fed him crime facts about the double murder, educated him about the double homicide more generally, showed him statements made by some of his alleged accomplices (e.g., Lewis Gardner, Joseph Brown), rehearsed the confession they were seeking from him, and then wrote it out for him prior to his signing it. Akia Phillips reports that all of the information contained in his confession statement came from the Chicago police detectives who interrogated him. Akia Phillips describes an interrogation process that led to a completely contaminated confession, creating the impression that an otherwise false confession may appear to be both true and corroborated.

(3) Indicia of Unreliability

As mentioned above, and as with all confessions discussed in this report, the fact, by police records, that Daniel Taylor was in police lock-up at the time of the double murder

---

[49] This statement was later amended by the ASA to read "The police officer promised me if I told him what happened on my drug case they would get my drug case throwed out."

Locke E. Bowman, Esq.
Legal Director, The MacArthur Justice Center
December 6, 2017
Page 35

indicates that Akia Phillips's confession statement is false and unreliable to the extent it names Taylor as a participant in the crime. Additional indicia of unreliability include that there was no physical or other evidence left at the crime scene that links to or in any way implicates Phillips, and the detectives did not gather any evidence beyond the confessions linking Mr. Phillips to the victims..

(B) The Investigators' Account of the
Interrogation and Confession Statement of Akia Phillips

According to Chicago police investigators, Akia Phillips, who was arrested along with Lewis Gardner and Paul Phillips for dealing drugs in the morning of December 2, 1992, was brought to Area 6 at Belmont and Western at approximately 2:30 p.m. for questioning because it was believed he had information about the double homicide on Agatite Street. According to investigators Abreu and O'Connor, they advised Akia Phillips of his Miranda rights, elicited a waiver, told him that Lewis Gardner had implicated him in the Lassiter and Haugabook double murder and asked him what had happened. With minimal, if any, prompting according to the detectives, Akia Phillips then provided a spontaneous free flowing narrative account of his own alleged role as a lookout, and the alleged roles of various fellow gang members, in the Lassiter and Haugabook murders. According to detectives Abreu and O'Connor, the entire interview lasted for twenty minutes at most, ending at approximately 3 p.m. on December 2, 1992, though Akia Phillips' recapped, court reported statement, was not taken until more than sixteen hours later, on December 3rd from 6:09 a.m. to 6:31 a.m. It was eventually suppressed as involuntary by the criminal court.

Detectives Abreu and O'Connor deny that either of them physically assaulted, punched, beat or hit Akia Phillips (or Daniel Taylor); that they made any threats or promises to him; or that they fed him case facts or contaminated his confession statement or rehearsed it with him prior to the arrival of ASA Martin Fogarty for the court-reported statement many hours later.

Detective Abreu's and Detective O'Connor's account is not consistent with the empirical social science research on police interrogation and confessions, for it too fails to provide any explanation of how or why Akia Phillips, even if guilty, would have confessed to participating in a multi-defendant gang-related double murder and, further, implicated many fellow gang members in the crime. It also fails to account for the substantial indicia of unreliability in Akia Phillips' confession.

## XIV. The Interrogation and Confession Statement of Paul Phillips

Paul Phillips was arrested at his house around midnight on December 2, 1992 by Chicago Police, transported to Area 6 for interrogation and ultimately gave a re-capped court reported confession statement to his alleged role in the Lassiter and Haugabook murders more than twenty-four hours later on December 4, 1992, from 1:33 a.m. to 1:52 a.m. In addition to his self-incriminating statement, like the others, Paul Phillips described the alleged roles of his fellow

Locke E. Bowman, Esq.
Legal Director, The MacArthur Justice Center
December 6, 2017
Page 36

gang member accomplices (Daniel Taylor, Akia Phillips, Lewis Gardner, Deon Patrick, Joseph Brown, Rodney Matthews, and Dennis Mixon).

(A) Paul Phillips' Account of What Occurred During His
Interrogation and Custody on December 3-4, 1992

(1) Risk Factors for False Confession

1)      *Lengthy Interrogation/Custody*.  Paul Phillips reports that he was interrogated and/or detained in custody for more than twenty-four hours.  As mentioned above, according to well-established social science research, this is an extraordinary amount of time for an interrogation to last and substantially increases the risk of eliciting a false and unreliable confession from an innocent suspect.

2)      *Sleep and Food Deprivation*.  Paul Phillips further reports that during this time he was deprived of sleep, not surprisingly, since he was woken up by the investigators on December 2nd close to midnight and gave his re-capped confession statement in the early morning hours of December 4th.  Paul Phillips reports that he was so tired that he tried to sleep on the floor of the interrogation room, but he did not get any sleep during this 24+ hour period because every time he tried to get some sleep an investigator would seem to come in and wake him up.  Paul Phillips also reports that he was deprived of food, having only been provided some soda and a bag of chips over the more than twenty-four hours from his arrest to his recapped confession statement.

3)      *False evidence ploys*.  According to Paul Phillips, he was placed in a line-up (with Deon Patrick, Rodney Matthews, Daniel Taylor and Joseph Brown) and told by investigators following the line-up that the witness had picked him out.  This was false and a lie, yet Paul Phillips did not know that and came to believe that he was being identified and blamed for the participating in the Lassiter and Haugabook double murder.

As a century of basic psychological research on misinformation effects has shown[50] (as well as decades of psychological research on police lying to suspects during interrogation[51]), false evidence ploys are effective at eliciting compliance,[52] confusing some suspects into believing that they have been framed or that such evidence really does exist,[53] causing some suspects to doubt themselves (deferring to interrogators' authoritative assertions of irrefutable

---

[50]  Elizabeth Loftus (2005). "Planting Misinformation in the Human Mind: A 30 Year Investigation of the Malleability of Memory, *Learning & Memory*, 12, 361-366.

[51]  Saul Kassin, Steven Drizin, Thomas Grisso, Gisli Gudjonsson, Richard A. Leo and Allison Redlich (2010). "Police Induced Confessions: Risk Factors and Recommendations" in *Law and Human Behavior*, 34, 3-38.

[52]  Richard A. Leo (2008), POLICE INTERROGATION AND AMERICAN JUSTICE (Harvard University Press)

[53]  Richard Ofshe and Richard A. Leo (1997) "The Social Psychology of Police Interrogation: The Theory and Classification of True and False Confessions." *Studies in Law, Politics & Society*, Vol. 16. Pp. 189-251.

Locke E. Bowman, Esq.
Legal Director, The MacArthur Justice Center
December 6, 2017
Page 37

evidence despite knowing they did not commit a crime),[54] and even causing some suspects to develop false beliefs and/or memories of committing crimes.[55]  Based on well-established basic and applied social scientific research going back decades, if Paul Phillips' description of these events is credited, the false evidence ploys that the Chicago police investigators used in their multiple interrogations of him significantly increased the risk of eliciting a false and unreliable confession, especially the longer his interrogation lasted and the more sleep deprived and frightened he became.

   4) *Minimization*.  As discussed above, minimization has been shown to increase the risk of eliciting false and unreliable confessions when misapplied to the innocent.  According to Paul Phillips, the investigators minimized his culpability by portraying him merely as a lookout to the murder.  Minimization techniques often implicitly communicate leniency, immunity and/or the potential for escape in exchange for confession.  Paul Phillips reports that he was led to believe he would be able to leave the police station after falsely confessing to being a lookout to the Lassiter and Haugabook homicide.

   5) *Promises and Threats*. Paul Phillips reports that the investigators repeatedly told him that he could go home if he cooperated and confessed to his alleged role, and the alleged role of fellow gang members, that the investigators were pressuring him to accept and parrot back.  In addition, he was promised that, if he confessed (and initialed the pages of the confession statement), he would be able to see his mother, and that he would be able to go home.  However, the investigators threatened that if he did not confess, he would not be able to see his mother again or go home (according to Phillips, the State's Attorney, out of the presence of the court reporter, also implied he could go home if he confessed to being a lookout).  Paul Phillips also reports that detective Johnson threatened that he would go to prison for the rest of his life or that he would receive the death penalty if he did not confess (and everyone else would get to go home).  These threats and promises left Paul Phillips, a juvenile, nervous and scared, but ultimately he complied and confessed.  As discussed earlier, threats and promises are one of the most significant factors that elevate the risk of eliciting false and unreliable confessions when interrogating the innocent.

   6) *Psychological Coercion*. Paul Phillips describes a mentally abusive interrogation that was psychologically coercive.  According to Phillips, he was handcuffed to the wall, and the investigators were yelling at him and pointing fingers in his face, standing inches away.  He was told that he had been picked out of a line-up by a crime scene witness, and that Daniel Taylor had identified him as participating in the double homicide. He was not allowed to see his mother,

---

[54] Richard Ofshe and Richard A. Leo (1997) "The Social Psychology of Police Interrogation: The Theory and Classification of True and False Confessions."  *Studies in Law, Politics & Society*, Vol. 16. Pp. 189-251.

[55] Richard A. Leo (2008), POLICE INTERROGATION AND AMERICAN JUSTICE (Harvard University Press) See also Deborah Wright, Kimberly Wade and Derrick Watson (2013). "Delay and Déjà Vu: Timing and Repetition Increase the Power of False Evidence," *Psychonomic Bulletin Review*, 20, 812-818; Julia Shaw and Don Read (2014).  "Constructing Rich False Memories of Committing Crime," *Psychological Science*, Pp. 1-11. Published online, January 14, 2015.

Locke E. Bowman, Esq.
Legal Director, The MacArthur Justice Center
December 6, 2017
Page 38

not allowed to use a phone, told he would never get to see her again and he was threatened with
life imprisonment or the death penalty if he did not confess.  But he was told that he would be
able to go home if he did, and the implication was that he would not be charged with any crime.
He was also in a sleep-deprived state, and repeatedly awakened while trying to get sleep. All of
this caused Paul Phillips to become nervous, scared and ultimately perceive that he had no
meaningful choice but to stop denying and start confessing, falsely, about his alleged role in the
double murder, as well as that of fellow gang members, in order to escape the continued torment
of the lengthy interrogation.

7)     *Age*.  Having just turned 17, Paul Phillips possessed the psychosocial immaturity,
suggestibility, and underdeveloped decision-making abilities that make juveniles more easily led
and manipulated during police interrogation – especially lengthy and/or coercive interrogation –
and more vulnerable to making and/or agreeing to a false and unreliable confession.

## (2) Police Contamination

According to Paul Phillips, the investigators who interrogated him repeatedly educated
him about both the significant and small details of the Lassiter and Haugabook murders. They
educated him about the elementary basic crime facts of which he had not been aware (e.g., who
was at Clarendon Park and what they had done), they showed him a diagram telling him where
he was at the crime scene, told him his alleged role in the crime (one of the lookouts), and they
told him about the statements of his alleged accomplices, even reading him case documents and
showing him alleged statements of others who had supposedly implicated him in the crime.

## (3) Indicia of Unreliability

As mentioned above, and as with all confessions discussed in this report, the fact that
Daniel Taylor was in police lock-up at the time of the double murder indicates that Paul Phillips'
confession statement is necessarily false and unreliable to the extent it names Daniel Taylor as a
participant in the crime.  Additional indicia of unreliability include that there was no physical or
other evidence left at the crime scene that links to or in any way implicates Phillips, and the
detectives did not gather any evidence beyond the confessions linking Mr. Phillips to the victims.

## (B) The Investigators' Account of the
## Interrogation and Confession Statement of Paul Phillips

According to investigators, they arrived with Paul Phillips at approximately 1:45 a.m. on
December 3rd, put him in an interrogation room at Belmont and Western, removed his handcuffs
and closed the door. When approximately 12 hours later the detectives eventually questioned
Paul Phillips about his knowledge of the double murder on Agatite, he initially denied
participating in or knowing about the crime.  But once he was told that fellow gang members had
identified him as participating with them in the crime, Paul Phillips provided a near spontaneous
confession, describing his role as a lookout and then implicating the others.  The interrogation

Locke E. Bowman, Esq.
Legal Director, The MacArthur Justice Center
December 6, 2017
Page 39

lasted approximately 15-20 minutes, though it would take approximately another 12 hours before Paul Phillips' confession statement was memorialized by a court reporter in a recapped interview by ASA Martin Fogarty and Detective Johnson.

Detectives Johnson and Villardita, as well as ASA Forgarty, all denied that any of them had deprived Paul Phillips of food or sleep; that they had handcuffed him to the wall; that they had psychologically harassed, abused or coerced him; or that they had made any implicit or explicit promises of leniency (in exchange for confessing) or threats of harm (in the absence of confessing).

Detective Johnson's and Detective Villardita's account of the interrogation(s) of Paul Phillips is not consistent with the empirical social science research on police interrogation and confessions, for it too fails to provide any explanation of how or why Paul Phillips would have confessed to participating in a multi-defendant gang-related double murder and, further, go on to implicate many fellow gang members in the crime. It also fails to account for the substantial indicia of unreliability in Paul Phillips' confession.

## XV. The Interrogation and Confession of Joseph Brown

(A) Joseph Brown's Account of What Occurred During His
Interrogation and Custody on December 3-5, 1992

According to police reports, Joseph Brown was arrested on December 3, 1992 at 10:20 p.m. and transported to Area 6 for questioning about the Lassiter and Haugabook murders and signed a police-written confession statement at 3:50 a.m. on December 5, 1992, approximately 30 hours later. Joseph Brown ultimately confessed to participating as a lookout in the double murder. Joseph Brown had alleged that he falsely confessed, and his confession statement was ultimately judicially suppressed.[56]

(1) Risk Factors for False Confession

1)  *Lengthy Interrogation*. Joseph Brown was detained in custody and/or interrogated for approximately 30 hours between the time of his arrest and his police-written confession statement, an extraordinary length of time that is associated with, and has been shown to increase the risk of, eliciting false confessions.

2)  *Deprivation of Essential Necessities*. The duration of Joseph Brown's custody and interrogation suggests that he was sleep deprived during the interrogation, another significant risk factor as well have seen. In addition, Joseph Brown asserted that he had not been allowed to go to the bathroom during his interrogation, and there is no record (in the materials I reviewed)

---

[56]  Joseph Brown is deceased and thus has not been deposed in this matter. My analysis of his confession is based in part on his prior affidavit, court documents and official interview reports.

Locke E. Bowman, Esq.
Legal Director, The MacArthur Justice Center
December 6, 2017
Page 40

that he was provided significant food or water during the two-night period in which he was in custody and being interrogated on December 3 and 4, 1992.

3) *Minimization.*  As discussed earlier, minimization has been shown to increase the risk of eliciting false and unreliable confessions when misapplied to the innocent.  According to Joseph Brown, the investigators minimized his culpability by portraying him merely as a lookout to the murder.  Minimization techniques often implicitly communicate leniency, immunity and/or the potential for escape in exchange for confession.  Joseph Brown reports that he was led to believe he would be able to go home after falsely confessing because he was admitting only to being a lookout (as opposed to a shooter) in the Lassiter and Haugabook homicide.

4) *Threats and promises.*  Joseph Brown had reported that he was threatened with physical violence if he did not confess.  According to Brown, during his interrogation he could hear Rodney Matthews on the other side of the wall screaming and crying, as if being tortured, and was told by investigator Villardita that he (Villardita) would do the same thing to Brown – pulling out his gun and pointing it at Brown's head – if he (Brown) did not admit to participating in the Lassiter/Haugabook double murder and implicate the others.  According to Brown, Villardita then reached into his hip holster, pulled out his gun, pointed it at Brown's head and said, "I will kill you."  In addition, Brown reported that investigator Villardita threatened that Brown would spend the rest of his life in prison if he did not confess, but that if he confessed to only being a lookout he would be able to go home (that signing the confession statement would not mean anything).  The threats reported by Brown are extreme and, as empirical social science research has shown, substantially increase the risk of eliciting false confessions when used on innocent suspects.

5) *Physical and Psychological Coercion.*  After he was arrested, Brown was placed in a small room and left there for many hours.  He was handcuffed and at one point detective Villardita tightened Brown's handcuffs, causing him pain.  The investigators repeatedly accused Joseph Brown of being involved in the Lassiter and Haugabook murders, attacked his denials and telling him that the others had implicated him.  They brought Lewis Gardner, Akia Phillips and Paul Phillips individually in to see Joseph Brown and say that he had been involved in the double murder. He reported that he really came to believe that he would be able to go home based on the investigators' representations that he had merely been a lookout.  Deon Patrick, who was placed in the bullpen with Joseph Brown, relates that Brown was a broken man and that he had been the most terrified of all the individuals who had been coerced into falsely confessing to participating in the allegedly gang-related double murder of Lassiter and Haugabook.  Deon Patrick further reported that Joseph Brown had told him shortly after his marathon interrogation that one of the Chicago police investigators had placed a gun in his mouth and told him they could make it look like an accident if they had wanted to.  Rodney Matthews, during his interrogation, had described Joseph Brown crying and hollering.  In short, physical and psychological coercion, when applied to an innocent suspect, substantially increases the risk of eliciting a false and unreliable confession.

Locke E. Bowman, Esq.
Legal Director, The MacArthur Justice Center
December 6, 2017
Page 41

(2) Police Contamination

Like the others, Joseph Brown reports that police educated him about the nature of the crime, fed him specific crime facts and contaminated his confession. According to Brown, the investigators showed him pictures of the dead victims, told him what they wanted him to say in his confession and went over it with him many times. Brown reports that it was the police theory that he had been a lookout, and that to satisfy the police he named as accomplices all the individuals whom the investigators had told him were involved in the crime. In addition, Brown reports that he drew a diagram of the streets in the neighborhood, placing markings on it to indicate where each individual was standing based on what the investigators had told him.

(3) Indicia of Unreliability

As mentioned above, and as with all confessions discussed in this report, the fact that Daniel Taylor was in police lock-up at the time of the double murder indicates that Joseph Brown's confession statement is false and unreliable to the extent it names Daniel Taylor as a participant in the crime. Additional indicia of unreliability include that there was no physical or other evidence left at the crime scene that links to or in any way implicates Brown and the detectives did not gather any evidence beyond the confessions linking Mr. Brown to the victims.

(B) The Investigators' Account of the<br>Interrogation and Confession Statement of Joseph Brown

According to investigators Johnson and Villardita, when they began questioning Joseph Brown he initially denied any involvement in the double murder. But as soon as they advised him that several of his alleged accomplices had identified him as participating in the murders, he immediately stopped denying and instead started admitting his alleged involvement as a lookout in the crime as well as the alleged involvement of his fellow gang members. According to the investigators, at that point Joseph Brown spontaneously confessed, and the entire interrogation and taking of the confession lasted no more than 20 minutes. According to the investigators, Joseph Brown subsequently repeated his statement to ASA Magats, and his statement was written by Detective Johnson and signed in his and ASA Magats' presence.

Detectives Johnson and Villardita steadfastly deny that either one of them interrogated Joseph Brown for a lengthy amount of time; that either one of them aggressively interrogated him; that either one of them tightened his handcuffs or sought to cause him pain; that they issued any threats of physical violence if he failed to confess or promised him leniency and that he would be allowed to go home if he did confess; or that they fed him the Lassiter/Haugabook crime facts or pressured him to identify other alleged gang members, and their alleged role, in the double homicide.

Detective Villardita's and Detective Johnson's account of the interrogation(s) of Joseph Brown is not consistent the empirical social science research on police interrogation and

Locke E. Bowman, Esq.
Legal Director, The MacArthur Justice Center
December 6, 2017
Page 42

confessions, for it fails to provide any explanation of how or why Joseph Brown, even if guilty, would have confessed to participating in a multi-defendant gang-related double murder and, further, go on to implicate many fellow gang members in the crime. It also fails to account for the indicia of unreliability in Joseph Brown's confession.

### XVI. The Interrogation and Confession of Deon Patrick

Deon Patrick was arrested at his house at approximately 11:30 p.m. on December 2, 1992, taken to the police station at Belmont and Western, placed in an interrogation room, and ultimately signed a prosecution-written confession statement (by ASA Magats, out of Deon Patrick's presence) at 3:35 a.m. on December 4, more than 30 hours later.

#### (A) Deon Patrick's Account of What Occurred During His Interrogation and Custody on December 2-4, 1992

#### (1) Risk Factors for False Confession

1) *Lengthy Interrogation/Custody.* Deon Patrick was isolated, placed in an interrogation room and interrogated for approximately 30 hours, over much of two nights and one day. This is an extraordinary amount of time for a guilt-presumptive accusatory interrogation (as Deon Patrick has described it to be), and one that substantially increases the risk of eliciting false and unreliable statements for the reasons mentioned earlier. For part of this time, Deon Patrick states that his arm was handcuffed to a ring in the wall above his head and the detectives had removed the chairs, forcing him to stand in a painful position and causing him to be even more physically fatigued.

2) *Sleep Deprivation and Deprivation of Food.* Deon Patrick reports that, as uncomfortable as he was, he tried to sleep as he was extremely tired. He had been up all day on December 2nd and was then arrested in the late night of December 2nd and interrogated and/or in custody through the day of December 3rd, as well as into the evening of December 3rd and then into the early morning hours of December 4th. According to Deon Patrick, as he would start to fall asleep, the detectives would enter the room and wake him up, preventing him from getting any meaningful rest and causing him to feel even more exhausted, fatigued, and deprived of sleep. This happened several times. Deon Patrick also reports that he was not provided with any food or drink during his approximately thirty hours of arrest, interrogation and custody from December 2-4, 1992 (he had not eaten since 2-3 o'clock on December 2nd). These deprivations, as discussed in more depth earlier, substantially increased the risk of eliciting a false confession.

3) *Physical Coercion.* Deon Patrick reports that when he was taken to the interrogation room one of the police investigators handcuffed one of his arms to a ring on the wall and then kicked the chair underneath the ring away so that Deon Patrick could not sit down. After standing for hours, Deon Patrick needed to sit in a position on the floor that necessarily caused him considerable pain and discomfort due to the need to keep his arm, which was still

Locke E. Bowman, Esq.
Legal Director, The MacArthur Justice Center
December 6, 2017
Page 43

handcuffed to the wall, outstretched. According to Deon Patrick, he remained locked to the wall for most of the 30 hours that he was interrogated/detained. Deon Patrick also reports that one of the police investigators at one point even tightened the handcuffs, which increased the pain and discomfort he was experiencing.  The infliction of physical pain and coercion increases the risk of eliciting false and unreliable confessions.

4)  *False Evidence Ploy*.  According to Deon Patrick, the investigators put him in a line-up, but he was the only one who was instructed to walk up close to the window multiple times, and the investigators subsequently told him that he had been identified in the line-up by the eyewitness as coming out of the Agatite apartment and thus participating in the double murder.  This was false.  As discussed earlier, false evidence ploys specifically, and misinformation effects more generally, substantially increase the risk of eliciting false statements and confessions when used on the innocent.  The investigators confronted Deon Patrick with additional evidence that they alleged conclusively demonstrated that he had participated in the double murder, including showing him copies of some of his co-defendants' confession statements (those of Lewis Gardner, Akia Phillips, Paul Phillips, and Daniel Taylor), which implicated him, and bringing Daniel Taylor to the door of Deon Patrick's interrogation room, and having Taylor point at Patrick, and say "yes, that's Deon Patrick. He's the one who killed those two people," and then taking him away before Deon Patrick could respond.

5)  *Threats and Promises*.  According to Deon Patrick, the Chicago police investigators who interrogated him repeatedly threatened him with physical violence if he did not confess to participating in the Lassiter/Haugabook double murder (when Deon Patrick heard Rodney Matthews screaming from another interrogation room, the investigators told Deon Patrick that if he did not cooperate, they would do to him what was being done to Mr. Matthews).  According to Deon Patrick, the Chicago police investigators told him that they were going to make him talk, that they were not going to keep playing with him but that he was going to have to sign the statement or they would force him to.  They also threatened that he would never see his children again if he did not cooperate, confess, and sign the prosecution-written statement assigning and describing his role in the Lassiter/Haugabook double murder.  And, according to Deon Patrick, the investigators threatened that he would receive the death penalty if he did not confess to his assigned role in the double murder, taking all the blame and punishment himself for the multi-perpetrator double murder.  These threats were extreme by any standard and substantially increased the risk of eliciting a false confession. They also implied extreme promises of leniency – that he would not be subject to physical violence, would not receive the death penalty, and would be able to see his children again – if he cooperated and falsely confessed.  These implied promises of leniency also substantially increased the risk of eliciting a false confession from Deon Patrick.  The investigators repeatedly told Deon Patrick that the only way to help himself would be by admitting that he participated in the double murder and showing remorse.

6)  *Psychological Coercion*.  After many hours of accusatory and aggressive guilt-presumptive interrogation – during which Deon Patrick had attempted to invoke his Miranda

Locke E. Bowman, Esq.
Legal Director, The MacArthur Justice Center
December 6, 2017
Page 44

right to counsel and specifically requested attorney Sheila Kalish, who had previously represented him – Deon Patrick concluded that the only way to end the ongoing torment and abuse of his interrogation was to falsely confess and place his faith in the courts to exonerate him.  As he stated in his deposition:

> "I think I had come to the realization that I wasn't leaving that room, at least I wasn't going home  from that room, and it started to like wear on me where I started to think back to not ever seeing my kids, going to death row, and I actually wanted to again be placed in a setting that was unbiased, so I come – I had been worn to the point where I felt like I would let a judge hear it because I felt like I knew I was innocent and I didn't have nothing to do with it…but I got to the point where I was just ready to get out of that room and I wan – I was willing to sign anything to get out of there."[57]

### (2) Police Contamination

Like the others, Deon Patrick reports that he did not know anything about the crime until Chicago police investigators educated him about it, fed him specific crime facts and contaminated his confession.  According to Deon Patrick, the investigators repeatedly told him their version of what he and the six other co-defendants allegedly did.  They provided him numerous crime scene details – such as that the victims were a man and a woman, that the door had been kicked in, the location of the murders within the apartment, that both of the victims had been shot in the head, the type of weapon used, that Jeffrey Lassiter had been robbed, and that Sharon Haugabook did not die immediately – and showed Deon Patrick his co-defendants' statements, further educating him about their theory of how the crime had occurred, who was allegedly involved and what role they allegedly played.  Deon Patrick also reports that the investigators not only educated him about the crime but corrected any misstatements he made. As discussed earlier, police interrogation contamination makes false confessions misleadingly appear to be true, and verifiably accurate, to third parties and thus increases the risk that a false confession will lead to a wrongful conviction.

### (3) Indicia of Unreliability

As mentioned above, and as with all confessions discussed in this report, the documentation that Daniel Taylor was in police lock-up at the time of the double murder indicates that Deon Patrick's confession statement is false and unreliable to the extent it names Daniel Taylor as a participant in the crime.  Additional indicia of unreliability include that there was no physical or other evidence left at the crime scene that links to or in any way implicates Deon Patrick and the detectives did not gather any evidence beyond the confessions linking Mr. Gardner to the victims. In addition, Faye McCoy did not identify Deon Patrick as one of the four individuals she saw leaving Mr. Lassiter's apartment building shortly before the double homicide

---

[57] Deposition of Deon Patrick at pp. 394 and 395 (November 20, 2014)

Locke E. Bowman, Esq.
Legal Director, The MacArthur Justice Center
December 6, 2017
Page 45

and Willie Triplett has provided affidavits indicating that neither Deon Patrick nor Taylor nor Matthews were at the crime scene.

(B) The Investigators' Account of the
Interrogation and Confession Statement of Deon Patrick

Chicago police officer Kosz indicates that after Deon Patrick was arrested and taken to Area 6, he was chained to a ring. He was subsequently questioned by investigators, who assert that they took his handcuffs off once he was placed in the interrogation room. Sometime during the day of December 3rd, investigators questioned Deon Patrick for approximately 5 minutes and he denied any involvement in the double murder. Later on the evening of December 3rd Deon Patrick was placed in a line-up, but not identified by the eyewitness. Shortly after that, investigators spoke to Deon Patrick again, provided him Miranda rights, elicited a waiver, and then told Deon Patrick that he had been identified by several accomplices as participating in the Agatite double murder (telling him the names of his accomplices who had identified him as the shooter). According to the investigators, immediately after this, Deon Patrick stopped denying any knowledge about the crime and started admitting his alleged role (shooting Mr. Lassiter, but not Ms. Haugabook) in the double murder and provided a narrative confession. All of this took approximately 20 minutes according to the investigators (from roughly 10 p.m. to 10:20 p.m.). Eventually ASA Magats reduced Deon Patrick's alleged confession statement to writing and had him allegedly proofread and edit it before signing at 3:35 a.m. There was 4 hour gap between Deon Patrick's alleged oral confession and his signed prosecutor-written statement.

The investigators steadfastly deny that they physically or psychologically abused Deon Patrick; that he was chained to the wall, let alone for many hours; that they deprived him of sleep, intentionally or unintentionally; that they denied his request for counsel or even that he made a request for counsel; that they threatened him with physical violence, the death penalty or never being able to see his children again if he did not confess; that they promised him leniency, immunity or the ability to go home if he did confess; or that they told him that they would make him confess or otherwise forced him to sign the prosecution-written confession statement approximately thirty hours after he had first been arrested and deposited at the Area 6 police station.

The investigators' account of the interrogation(s) of Deon Patrick is not consistent the empirical social science research on police interrogation and confessions, for it too fails to provide any explanation of how or why Deon Patrick, even if guilty, would have confessed to participating in a multi-defendant gang-related double murder and, further, go on implicate many fellow gang members in the crime. It also fails to account for the substantial indicia of unreliability in Deon Patrick's confession.

## XVII. The Interrogation and Confession of Rodney Matthews

(A) Rodney Matthew's Account of What Occurred During His

Locke E. Bowman, Esq.
Legal Director, The MacArthur Justice Center
December 6, 2017
Page 46

Interrogation and Custody on December 3-5, 1992

Rodney Matthews was arrested at approximately 10:00 p.m. on December 3, 1992, transported to Area 6 and interrogated about his alleged role in the Lassiter and Haugabook murders. He signed a prosecution-written statement to his alleged role in the crime, in the presence of ASA Joe Magats (who wrote the statement) and investigator Villardita, on December 5 at 1:00 a.m., approximately 27 hours after his arrest. Matthews was eventually acquitted of murder charges at trial.

(1) Risk Factors for False Confession

1)    *Lengthy Interrogation/Custody.*  Rodney Matthews was interrogated and/or in custody for approximately 27 hours according to police records, an extraordinary amount of time and one that, again, the social science research has shown substantially increases the risk of eliciting false and unreliable confessions for a variety of well-understood and well-documented reasons.

2)    *Sleep Deprivation and Deprivation of Other Physical Necessities.*  During his 27 hours of interrogation and detention over two evening, Rodney Matthews grew increasingly tired, exhausted, fatigued – from being made to stand so long in the interrogation room -- and sleep-deprived. He had been awake for the 12 hours prior to his arrest in addition to his entire time at the police station – he reports that he was not able to sleep during these 27 hours. He reports that the last time he had slept was at 8 am or 9 am on December 3rd, and so he had not slept for almost two full days when he signed the prosecution-written statement at 1 a.m. on December 5th. Rodney Matthews states that he told the investigators that he was extremely tired from being made to stand up, with hands chained to the wall behind his back, during his detention

In addition to being deprived of sleep, Rodney Matthews was provided no food during his entire 27 hour detention in the interrogation room. He reports that he had not eaten for most of two full days (December 3rd and 4th), and was only provided with food (a Snickers Bar) after he signed the prosecution-written confession statement on December 5th.

Rodney Matthews also reports that the investigators did not remove his handcuffs or allow him to use the bathroom (despite his making multiple requests to multiple investigators) and, as a result of his lengthy custody/detention between interrogation sessions, he was forced to urinate on himself.

All of these deprivations – sleep, food, ability to use the restroom – significantly increase the risk that an innocent person will make or agree to a false confession.

3)    *Physical and Psychological Coercion.*  Rodney Matthews reports that he was chained tightly to a wall, with his hands behind his back, for most of the time he was detained at

Locke E. Bowman, Esq.
Legal Director, The MacArthur Justice Center
December 6, 2017
Page 47

Area 6. As a result, his hands became swollen and hurt, and his wrists began to painfully ache. After he urinated on himself he was both in pain and wet and could neither sit down nor change. According to Rodney Matthews he could no longer take the pain and discomfort and so decided to cooperate with the investigators and falsely confess. In addition to being physically coerced, he also describes being psychologically coerced as he came to perceive that he had no choice but to sign the prosecution-written confession – which had been written outside his presence – in order to get out of the interrogation room and escape the ongoing torment. According to Matthews, the investigators only brought chairs back into his interrogation room once he agreed to make a statement.

        4)    *False Evidence Ploy*. Rodney Matthews was put in a line-up and told, falsely, that he had been identified by an eyewitness as participating in the double murder. As described earlier, false evidence ploys when used on innocent suspects substantially increase the risk of eliciting false confessions. In addition, the investigators eventually brought both Daniel Taylor and Deon Patrick to Rodney Matthews' interrogation room, and had them say that he was involved in the shooting.

        5)    *Promise of Leniency and Release*. Rodney Matthews reports, as did many of the others whose accounts are described above, that the investigators told him he would be able to go home after signing the prosecution-written statement. Promises of leniency – whether implicit or explicit – when used with innocent suspects substantially increase the risk of eliciting a false confession.

(2) Police Contamination

Rodney Matthews states that he did not know any of the facts of the Lassiter/Haugabook double murder until police first told him them, including the names of all the accomplices with whom police alleged he participated, even reading to him how the crime occurred. Rodney Matthews asserts that the investigators not only fed him the crime facts and crime scenario, but pressured him to go along with their account and then rehearsed the story three to four times so he could learn the story for when the ASA arrived. Rodney Matthews states that he was never given an opportunity to write out a confession, but instead it was already written up for him, and he was never left alone with the State's Attorney to discuss it. According to Rodney Matthews, when the ASA arrived Matthews gave the rehearsed statements but kept making mistakes, incurring the anger of the detectives.

(3) Indicia of Unreliability

As mentioned above, and as with all confessions discussed in this report, the documentation that Daniel Taylor was in police lock-up at the time of the double murder indicates that Rodney Matthews' confession statement is false and unreliable to the extent it names Daniel Taylor as a participant in the crime. Additional indicia of unreliability include that there was no physical or other evidence left at the crime scene that links to or in any way

Locke E. Bowman, Esq.
Legal Director, The MacArthur Justice Center
December 6, 2017
Page 48

implicates Rodney Matthews, who had a verifiable alibi at the time for the time of the crime, and the detectives did not gather any evidence beyond the confessions linking Mr. Gardner to the victims. In addition, Faye McCoy did not identify Rodney Matthews as one of the four individuals she saw leaving Mr. Lassiter's apartment building shortly before the double homicide, and Willie Triplett has provided affidavits indicating that Rodney Matthews was not at the crime scene.

(B) The Investigators' Account of the
Interrogation and Confession Statement of Rodney Matthews

According to the detective Villardita, they first spoke to Rodney Matthews around midnight on December 3rd, at which point he denied any involvement in the homicide. It is not clear to me how long detective Villardita spoke to Rodney Matthews on the 3rd or why he allegedly stopped interrogating Matthews, but detective Villardita reports that he, along with detective O'Connor, interrogated Rodney Matthews again at approximately 5 p.m. on December 4th. The investigators assert that Matthews initially denied any knowledge of, or participation in, the double homicide, but then the investigators told him that four of his accomplices (Lewis Gardner, Paul Phillips, Akia Phillips, and Daniel Taylor) had already given them an account of what had happened and had implicated him. Shortly after that, according to the investigators, Matthews confessed to allegedly being present during the murders, admitted his alleged role, and described the alleged roles of his alleged fellow accomplices. According to the investigators, this interrogation took no more than 30 minutes (if that), though they do not have an explanation for the approximately 7 hour gap between the end of this interrogation and the signing of his prosecutor-written statement.

The investigators deny depriving Matthews of food (claiming he was offered food twice and fed a baloney and turkey sandwich) or sleep or the ability to use the restroom; deny being aware of or smelling urine or seeing a stain on Rodney Matthews' pants; deny handcuffing him to the wall; deny making any promises of leniency; and deny physically or psychologically coercing him to confess to his alleged role in the double murder.

The investigators' account of the interrogation(s) of Rodney Matthews is not consistent with the empirical social science research on police interrogation and confessions, for it too fails to provide any explanation of how or why Rodney Matthews, even if guilty, would have confessed to participating in a multi-defendant gang-related double murder and, further, go on implicate many fellow gang members in the crime. It also fails to account for the substantial indicia of unreliability in Rodney Matthews's confession statement.

## XVIII. Patterns Across the Interrogations Conducted in December 1992

The patterns across the accounts of the former co-defendants, and the Chicago police detectives who elicited their confession statements and narratives, are apparent.

Locke E. Bowman, Esq.
Legal Director, The MacArthur Justice Center
December 6, 2017
Page 49


If it was physically impossible for Daniel Taylor to have participated in the double murder of Jeffrey Lassiter and Sharon Haugabook since, by police documentation, he was in police custody at the time the crime occurred, then Daniel Taylor's confession must be false. The confessions of Lewis Gardner, Akia Phillips, Paul Phillips, Joseph Brown, Deon Patrick and Rodney Matthews must also be false to the extent that they name Daniel Taylor as an integral part of the planning and execution of the crime.

All seven men provide accounts of their unrecorded interrogations that are consistent with the empirical social science research about how and why people can be moved during police interrogation to make or agree to a false confession, including the use of numerous police techniques and other factors that significantly increase the risk of eliciting a false confession. These include:

1) *Lengthy Interrogation*.  Lewis Gardner, Akia Phillips, Paul Phillips, Joseph Brown, Deon Patrick, and Rodney Matthews.

2) *Sleep Deprivation and Other Physical Deprivations*.  Daniel Taylor, Akia Phillips, Paul Phillips, Joseph Brown, Deon Patrick, and Rodney Matthews.

3) *False Evidence Ploys*. Daniel Taylor, Paul Phillips, Deon Patrick, and Rodney Matthews.

4) *Minimization*.  Lewis Gardner, Akia Phillips, Paul Phillips, and Joseph Brown

5) *Promises of Leniency*.  Daniel Taylor, Lewis Gardner, Akia Phillips, Paul Phillips, Joseph Brown, Deon Patrick, and Rodney Matthews.

6) *Threats of Harm*.  Daniel Taylor, Lewis Gardner, Akia Phillips, Paul Phillips, Joseph Brown, and Deon Patrick.

7) *Physical Coercion*.  Daniel Taylor, Akia Phillips, Joseph Brown, Deon Patrick, and Rodney Matthews.

8) *Psychological Coercion*. Daniel Taylor, Lewis Gardner, Akia Phillips, Paul Phillips, Joseph Brown, Deon Patrick, and Rodney Matthews.

9) *Personal Risk Factors* (Age or Low Intellectual Functioning).  Daniel Taylor, Lewis Gardner, and Paul Phillips.

In addition, all seven individuals allege that the various Chicago police investigators who interrogated them fed them crime scene facts and details, showed them case documents and the statements of their co-defendants, educated them about how and why the double murder allegedly occurred, pressured them to provide an account consistent with the police-scripted

Locke E. Bowman, Esq.
Legal Director, The MacArthur Justice Center
December 6, 2017
Page 50

scenario and rehearsed their confession narratives prior to either having them stenographically transcribed by a court reporter, in the presence of an ASA and detective, or having them sign a pre-written (either by the investigators or by the ASA) confession statement.

There are significant inconsistencies between the confessions concerning details that were not known to the detectives at the time of the interrogations, which are indicative of such police contamination. The seven confessions vary on key details that only the perpetrators would know, including who had the weapon during the crime; who grabbed Sharon Haugabook in the victims' apartment; who asked Lassiter for money; and who actually shot Lassiter and Haugabook. Each of the confessions contain false facts that are also suggestive of police contamination. The co-defendants' confessions state that each participated in a gang meeting in which Daniel Taylor was present at about 7 p.m. on November 16th, after which they traveled to Lassiter's apartment and committed the murders. But if the police records are credited, Daniel Taylor was in police custody beginning at 6:45 p.m. – a fact that was not discovered by investigators until after they had interrogated each of the seven suspects.

The various Chicago police detectives, in all seven cases, give the same exact description of how they elicited all seven confessions: They Mirandized each suspect, elicited a waiver and then asked each suspect if he had any knowledge of the Agatite double murder; each suspect denied his involvement; the investigators then told the suspect that his accomplices had already identified and implicated him in the crime; each suspect then immediately and spontaneously confessed, usually in an unprompted and free-flowing narrative that not only implicated himself, but also fully implicated each of his fellow gang member colleagues in this multi-defendant conspiracy and double murder. In all of these interrogations, according to the various Chicago police investigators, it took no more than between 2 and 30 minutes to elicit the murder and conspiracy confessions.

The various investigators' accounts of the interrogations of Daniel Taylor, Lewis Gardner, Akia Phillips, Paul Phillips, Joseph Brown, Deon Patrick, and Rodney Matthews are not consistent with the empirical social science research on police interrogation and confessions, for they all fail to provide any explanation of how or why these individuals – even if guilty – would have falsely confessed to participating in a multi-defendant gang-related double murder and then go on implicate many alleged fellow gang members in the crime. The various investigators' accounts also fail to account for the length of time each individual was in custody and/or being interrogated, and they fail to account for substantial indicia of unreliability in each individuals' confession statement, and in particular, the lockup records indicating Daniel Taylor was in police custody during the alleged meeting at Clarendon Park that preceded the murders and during the crime itself.

### XIX. The Interrogation and Confession of Dennis Mixon

(A) Dennis Mixon's Account of What Occurred during His
Interrogation and Custody from March 1 and 2, 1993

Locke E. Bowman, Esq.
Legal Director, The MacArthur Justice Center
December 6, 2017
Page 51

(1) Risk Factors for False Confession

1)  *Lengthy Interrogation/Custody*.  According to police records, Dennis Mixon was arrested on the street at around noon on March 1, 1993 and interviewed by Area 6 detectives beginning at 4:30 p.m. that same day. However, he did not give a recapped, transcribed statement until 9:47 a.m. on March 2nd – almost 22 hours after he was first arrested and 17 hours after he was first interrogated. There is no indication in the record as to what caused the significant delay between Mixon's first interrogation and his subsequent court-reported statement. Social science research has shown that such long periods of interrogation and custody substantially increases the risk of eliciting false and unreliable confessions for a variety of well-understood and well-documented reasons.

2)  *Sleep Deprivation and Deprivation of Other Physical Necessities*.  According to Dennis Mixon,[58] prior to his interrogation in March 1993, he had swallowed several bags of drugs, and thus was "very sick" and not in his "right mind" at the time he was interrogated. Mixon informed investigators that he was sick and needed to sleep. Mixon reports that the detectives did not allow him to sleep for 27 hours and there is no indication in the record that they sought medical help for him for his ingestion of drugs. Mixon has stated that he was so out of it that he did not know what he was saying to detectives. Such drug use and sleep deprivation, both of which have the potential to impair a suspect's decision-making and reasoning ability, as well as his ability to resist suggestive questioning, significantly increase the risk that a suspect would make or agree to a false confession.

3)  *Threats and promises*.  Dennis Mixon reports that he was told by police that if he failed to cooperate by confessing to the crime he would never see the streets again and would perhaps face the death penalty. The insinuation was that if he did cooperate he would not face such harsh punishment. The threats reported by Mixon, including threats of death, are extreme and, as empirical social science research has shown, substantially increase the risk of eliciting false confessions.

(1) Police Contamination

Dennis Mixon reports that the investigators fed him case facts by showing him the seven prior statements, with which he went along.  These statements included all the details of the detectives' theory of the crime, including the identities of the co-participants in the crime, the motivation for the crime, the meeting that preceded the attack, and the manner in which the murder occurred.  Thus, the provision of these statements to Mixon clearly contaminated his recital of the murders. Of particular importance, Mixon's confession is the only one that

---

[58] Dennis Mixon has been deposed in this matter but pled his Fifth Amendment right to remain silent in response to all questioning. Consequently I have relied on his prior affidavits and State's Attorney interviews in analyzing his interrogation and confession.

Locke E. Bowman, Esq.
Legal Director, The MacArthur Justice Center
December 6, 2017
Page 52

mentions Daniel Taylor being in jail near the time of the murders. This is further evidence of contamination as Mixon was the only suspect who was interrogated *after* the detectives' uncovered police record evidence of Daniel Taylor being in lockup on November 16th.

(2) Indicia of Unreliability

Unlike the other confessions, Dennis Mixon's confession statement does contain indicia of reliability to the extent it implicates him in the double homicide. Faye McCoy, the primary eyewitness, identified him as being one of the individuals she saw leaving the crime scene immediately after the double murder and prior to the police arriving. Willie Triplett, another eyewitness, has also identified Mixon (whom he knew personally) as entering the crime scene prior to the shooting. Most significantly, years following his conviction, Dennis Mixon recanted his earlier claims of innocence and affirmed that he was inside Lassiter's apartment with three other men shortly before the double murder, that he had previously sold drugs to Jeffrey Lassiter and Sharon Haugabook in the past, and that he had previously kept clothing in Lassiter's apartment. Sources interviewed by police officer Renard Foote verified this information at the time of the initial investigation.

However, as mentioned above, and as with all confessions discussed in this report, the documentation that Daniel Taylor was in police lock-up at the time of the double murder indicates that Dennis Mixon's confession statement is false and unreliable to the extent it names Daniel Taylor as a participant in the crime. Additional indicia of unreliability include that Dennis Mixon has recanted his initial confession implicating the seven other co-defendants described in this report (Daniel Taylor, Lewis Gardner, Akia Phillips, Paul Phillips, Joseph Brown, Deon Patrick and Rodney Matthews), stating that none of these individuals were present at the crime scene or participated in the double murder. He has also affirmed that he did not "hang out" with any of those individuals prior to the murder and that prior to the shooting he had never even met Daniel Taylor. Dennis Mixon has also specifically recanted the portion of his statement – that he alleged police investigators had pressured him to make – in which he reported that Daniel Taylor had told him that he got out of jail on the night of the murders. Finally, records of the police detectives' investigation fail to show any connection between the seven co-defendants and Dennis Mixon – who was a decade or more older than the other seven – prior to the night of the murder

(B) The Investigators' Account of the<br>Interrogation and Confession Statement of Dennis Mixon

Chicago police detective Johnson has stated that he interrogated Dennis Mixon for 20-25 minutes but that Mixon admitted his involvement in the first two or three minutes of the interrogation. Johnson also stated that at the beginning of the interrogation he and detective Villardita told Mixon that he was implicated by other unnamed offenders in the double murder, and that Mixon then immediately and spontaneously confessed.

Locke E. Bowman, Esq.
Legal Director, The MacArthur Justice Center
December 6, 2017
Page 53

The investigators' account of the interrogation of Dennis Mixon is not consistent with the empirical social science research on police interrogation and confessions, for it fails to provide any explanation of how or why Dennis Mixon would have confessed to participating in a multi-defendant gang-related double murder and, further, go on implicate many fellow gang members in the crime in such a short period of time and without any interrogation or prompting.  The investigators' also fail to account for substantial indicia of unreliability in Mixon's confession statement, and in particular, the lockup records indicating Daniel Taylor was in police custody at the time of the murders

## XX. Conclusion

In conclusion, based on my detailed analysis above, it is my professional opinion that:

1) It has been well-documented in the empirical social science research literature that hundreds of innocent suspects have confessed during police interrogation to crimes (often very serious crimes such as murder and rape) that it was later objectively proven they did not commit;

2)  Daniel Tayler's account of his interrogation at Area 6 on December 3, 1992 is consistent with the social science empirical research literature on the types of interrogation techniques and investigative practices that are associated with, increase the risk of and are known to cause innocent individuals to falsely confess;[59]

3) The accounts of the Chicago police investigators who detained and interrogated Daniel Tayler during his interrogation at Area 6 are not consistent with the empirical findings of the social science research literature on the factors associated with and known to increase the risk of and/or cause false and unreliable confessions;

4) In his account of what occurred during his police custody and interrogation on December 3, 1992, Daniel Taylor describes the use of interrogation techniques and practices that were guilt-presumptive, accusatory and theory-driven.  Daniel describes interrogation procedures whose goal was not to find the truth but to break down his denials of guilt and elicit from his a confession to participate in a gang-based conspiracy to kill Jeffrey Lassiter and Sharon Haugabook;

5) The interrogation described by Daniel Taylor was both physically and psychologically coercive:  Daniel Taylor's account of what occurred during his interrogation contains

---

[59]  I have reviewed Daniel Taylor 2017 testimony in the civil rights trial of Deon Patrick, and specifically the part in which he admitted that he did not tell the truth in his deposition testimony when he denied going with Chicago police officers to go find Akia Phillips after being released from the 23rd district lockup on November 16, 1992. That testimony, which concerns events that occurred after the murders took place and after Taylor was released from lockup at 10 p.m. that night, does not undermine my analysis concerning the reliability of Daniel Taylor's confession in December 1992. That analysis is based on the empirical findings set forth in this report.

Locke E. Bowman, Esq.
Legal Director, The MacArthur Justice Center
December 6, 2017
Page 54

interrogation techniques that are known to cause a suspect to perceive that he or she has no choice but to comply with their demands and that are known to increase the risk of eliciting involuntary statements, admissions and/or confessions;

6) Daniel Taylor's account of what occurred during his interrogation contains interrogation techniques, methods, and strategies that have been shown by social science research to increase the risks of eliciting false and unreliable statements, admissions and/or confessions (i.e., *situational* risk factors) when misapplied to the innocent. These included false evidence ploys, sleep deprivation, threats and promises, and the use of physical violence;

7) Daniel Taylor was also at a heightened risk during his interrogation of making and/or agreeing to a false and unreliable confession because of his general personality traits (i.e., *personal* risk factors), specifically his youth and psychosocial immaturity;

8) The interrogation described by Daniel Taylor involved documented instances of police interrogation contamination (i.e., leaking and disclosing non-public case facts) and scripting that contravene universally accepted police interrogation training standards and best practices, and which increased the risk that Daniel Taylor's confession statement would, misleadingly, appear to be detailed and self-corroborating;

9) The confession statement of Daniel Taylor contains factual and logical errors, inconsistencies, and other indicia of unreliability that are the hallmarks of false and/or unreliable confessions.

10) Like Daniel Taylor, Lewis Gardner, Akia Phillips, Paul Phillips, Joseph Brown, Deon Patrick, and Rodney Matthews all provide accounts of their unrecorded interrogations and custody that are consistent with the empirical social science research about how and why innocent people can be moved during police interrogation to make or agree to a false confession, including the use of numerous police techniques and other factors that significantly increase the risk of eliciting a false confession.

11) By contrast, the various accounts of the unrecorded interrogations of Daniel Taylor, Lewis Gardner, Akia Phillips, Paul Phillips, Joseph Brown, Deon Patrick and Rodney Matthews by the various Chicago police investigators all fail to provide any explanation of how or why these individuals would have falsely confessed to participating in a multi-defendant gang-related double murder and then go on implicate many alleged fellow gang members in the crime. The various investigators' account(s) also fail to account for the length of time each individual was in custody and/or being interrogated, and they fail to account for substantial indicia of unreliability in seven individuals' confession statements.

The opinions I express in this report are based on my own knowledge, research, and publications; research and publications in the field; and the case-specific information and

Locke E. Bowman, Esq.
Legal Director, The MacArthur Justice Center
December 6, 2017
Page 55


evidence that has been provided to me.  Should any additional information or testimony come to my attention, I reserve the right to modify any opinions expressed herein accordingly.

If you have any questions, please do not hesitate to contact me.

Sincerely yours,

Richard A. Leo, Ph.D., J.D.
Hamill Family Professor of Law and
Social Psychology
University of San Francisco