# EXHIBIT H

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

———————————————————

UNITED STATES OF AMERICA ) )
)
v. ) Criminal Action No. 01-10384-LTS
)
GARY LEE SAMPSON )
———————————————————)

<u>SEALED MEMORANDUM AND ORDER ON RULE 12.2 MOTIONS</u>

September 2, 2016

SOROKIN, J.

Gary Lee Sampson pled guilty to two counts of carjacking resulting in death and was sentenced to death in 2004. The First Circuit affirmed the judgment. <u>United States v. Sampson</u>, 486 F.3d 13 (1st Cir. 2007). In 2011, the Court (Wolf, J.) vacated the death sentence in light of juror misconduct, and the First Circuit affirmed, ruling that Sampson is entitled to a new penalty phase trial pursuant to 28 U.S.C. § 2255. <u>Sampson v. United States</u>, 724 F.3d 150, 170 (1st Cir. 2013). The case was reassigned to this session of the Court on January 6, 2016.

This Order resolves eight motions in limine raising issues related to expert testimony on the subject of Sampson's mental condition, which the parties anticipate offering at trial during the defense's mitigation case and the government's rebuttal case pursuant to Federal Rule of Criminal Procedure 12.2. The motions are fully briefed and supported by voluminous exhibits as described below. Certain motions were the subject of a sealed evidentiary hearing during the week of July 25, 2016, and the Court heard oral argument on all motions at the conclusion of the hearing. The Court will address each pending motion in turn, after providing a brief summary of the relevant facts and legal standards, in the sections that follow.

## TABLE OF CONTENTS

I.    BACKGROUND .................................................................................3

II.   RELEVANT LEGAL STANDARDS ..................................................7

III.  DISCUSSION .................................................................................11

      A. Dr. Ruben Gur...........................................................................11

      B. Dr. Geoffrey Aguirre ................................................................17

      C. Dr. Thomas Guilmette ..............................................................22

          1. Malingering and SVTs...........................................................23
          2. Other Challenges....................................................................30
          3. Final Observations .................................................................31

      D. Dr. Michael Welner ..................................................................32

          1. Background and Issues Raised.................................................33
          2. Disqualification.......................................................................35
          3. Psychopathy ............................................................................36
          4. Antisocial Personality Disorder .............................................41
          5. Hearsay ...................................................................................47
          6. Excluded or Withdrawn Evidence ..........................................49
          7. Malingering.............................................................................52
          8. Defense Experts ......................................................................54
          9. Other Matters..........................................................................56
          10. Revision of Expert Report ....................................................59

      E. Other Motions ...........................................................................61

          1. The Parameters Motion...........................................................61
          2. The Judicial Determinations Motion ......................................63
          3. The Expert Designation Motion..............................................65
          4. The "Peer Review" Motion.....................................................66

IV.   CONCLUSION...............................................................................67

APPENDIX A ...........................................................................................69

I.    BACKGROUND

During his 2003 penalty phase trial, Sampson's evidence in mitigation included expert testimony regarding his mental condition.  Specifically, neuropsychologist Thomas Deters described his examination and testing of Sampson and his conclusion that Sampson suffered from certain brain impairments, see generally Tr. of Trial Day 13 (Dec. 9, 2003) at 93-240, and forensic neuropsychiatrist Angela Hegarty described her interviews and assessment of Sampson and her conclusion that Sampson suffered from, among other things, bipolar disorder and borderline personality disorder, see generally Trs. of Trial Days 14 & 15 (Dec. 10 & 11, 2003).  The government presented rebuttal testimony by forensic psychiatrist Michael Welner, who disagreed with the defense experts' opinions, described his assessment of Sampson, and explained his diagnoses of antisocial personality disorder, alcohol dependence, and cocaine abuse.  See generally Tr. of Trial Day 16 (Dec. 12, 2003) at 62-178.  The development, disclosure, and admission of this evidence was governed by Rule 12.2.  See United States v. Sampson, 82 F. Supp. 3d 502, 506-07 (D. Mass. 2014) (Wolf, J.). Ultimately, the jury rejected the defense's mental condition mitigators and sentenced Sampson to death.  Doc. No. 654 at 8, 11; Doc. No. 654-2 at 8, 11.

After the original death sentence was vacated, Sampson filed a preliminary notice pursuant to Rule 12.2 of his intent to offer expert evidence regarding his mental condition during his penalty phase retrial.  Doc. No. 1619; see also Doc. No. 2043 (confirming preliminary notice); Doc. No. 2168 (re-confirming prior notices).  The Court subsequently implemented procedures consistent with Rule 12.2 governing the parties' retention of necessary expert witnesses, the examination and testing of Sampson by those experts, and the generation and disclosure of expert reports.  See Sampson, 82 F. Supp. 3d at 515-18; Doc. Nos. 2146, 2291.  As

3

a result of that process, in early April and late June 2016 the parties exchanged initial and revised expert reports containing opinions regarding Sampson's mental condition. The government provided reports of three experts – Drs. Geoffrey Aguirre, Thomas Guilmette, and Michael Welner – and the defense provided reports of ten experts – Drs. Erin Bigler, John Edens, James Gilligan, Ruben Gur, Leslie Lebowitz, Michael Lipton, James Merikangas, Paul Moberg, Charles Sanislow, and George Woods. Certain of these reports will be described in more depth in the discussion sections below regarding pending motions to which they are relevant.

Following the exchange of reports, the parties filed a number of motions in limine challenging all or portions of certain reports and seeking other pretrial rulings governing the admission of expert mental condition testimony at trial. Those motions, which are the subject of this Order, are:

1) The Government's Motion to Preclude the Testimony of Dr. Ruben Gur (Doc. No. 2325) ("the Gur Motion"), which challenges the reliability of the methods Dr. Gur used to assess Sampson and conclude he suffers from brain impairments;

2) The Defendant's Motion in Limine to Exclude Certain Testimony of Dr. Geoffrey Aguirre (Doc. No. 2331) ("the Aguirre Motion"), which challenges four specific aspects of Dr. Aguirre's report and its conclusion that Sampson does not suffer from brain damage;

3) The Defendant's Motion in Limine to Exclude Any Testimony by Government Mental Health Experts that Mr. Sampson Is Malingering, Has Intentionally Lied, or Has Intentionally Not Used His Best Efforts in Performing Mental Health Testing, and to Exclude Any Testimony that the Defense Mental Health Experts Are Intentionally Lying or Intentionally Trying to Manufacture False Evidence (Doc. No.

2339) ("the Malingering Motion"), which challenges portions of the reports authored

by Drs. Guilmette and Welner which opine on Sampson's truthfulness, the validity of

the results of various neuropsychological tests administered to Sampson, and the

credibility of various defense experts;

4) The Defendant's Renewed Motion to Disqualify Dr. Michael Welner and the Forensic

Panel, or, in the Alternative, for in Limine Relief Concerning the Scope of

Anticipated and Past Testimony by These Experts (Doc. No. 2333) ("the Welner

Motion"), which challenges Dr. Welner's anticipated testimony on a number of

grounds, including his conduct in connection with the original trial of this matter, the

nature of the information and opinions contained in his reports, and the reliability of

the diagnoses he ascribed to Sampson;

5) The Government's Motion in Limine to Set General Parameters of Fed. R. Crim. P.

12.2 Mental Status Evidence (Doc. No. 2322) ("the Parameters Motion"), which

seeks an order precluding Sampson from offering "cumulative or repetitive" expert

evidence, preventing Sampson from impeaching during his mitigation case the

government's anticipated rebuttal experts, and permitting the government to elicit

testimony regarding alternate diagnoses as a means of rebutting Sampson's mental

condition evidence;

6) The Defendant's Motion in Limine to Exclude Any Evidence of Credibility or

Qualification Determinations by Other Courts to Support or Impeach Expert

Witnesses for Either Side (Doc. No. 2328) ("the Judicial Determinations Motion");

7) The Defendant's Motion in Limine for an Order Prohibiting the Parties from

Tendering Witnesses as Experts and Indicating that the Court Will Refrain from

Declaring Witnesses to Be Experts in the Presence of the Jury (Doc. No. 2334) ("the Expert Designation Motion"); and

8) The Defendant's Motion in Limine to Exclude Any Hearsay Evidence that a Mental Health or Other Expert's Conclusions Were Verified by Another Non-Testifying Expert (Doc. No. 2336) ("the 'Peer Review' Motion"), which essentially challenges a "peer review" practice often used by the organization with which Drs. Welner and Guilmette are associated.

As to each of these motions, the Court received briefs in support and opposition from the parties. Several of the briefs also were accompanied by relevant exhibits, including expert reports, scientific journal articles, and transcripts from proceedings in other cases. The Court held a sealed three-day evidentiary hearing on the Welner Motion, the Malingering Motion, and one of the issues raised by the Parameters Motion during the week of July 25, 2016.[1] During the hearing, seven expert witnesses testified,[2] and the parties submitted additional documents as exhibits in support of their positions as to the relevant motions. The day after the witness testimony was complete, counsel appeared before the Court for oral argument on all of the pending motions. Counsel also submitted post-hearing letters addressing an issue that arose during the testimony of Dr. Welner. All of the exhibits offered by the parties in connection with these motions were reviewed and considered by the Court, and are listed in Appendix A to this Memorandum and Order.

---

[1] Sampson attended the first and second days of the hearing. Just before the lunch break on the second day, he expressed a desire to waive his appearance for the remainder of the hearing. Doc. No. 2428 at 182. After a colloquy by the Court, and with no objection by either party, the Court accepted Sampson's waiver. Id. at 182-93.

[2] The witnesses were Drs. Guilmette, Bigler, Welner, Sanislow, Woods, Moberg, and Edens.

## II.  RELEVANT LEGAL STANDARDS

The legal standards that control the bulk of the questions raised by the pending motions are found in Federal Rules of Evidence 702 and 703, the Supreme Court's decisions in <u>Daubert v. Merrell Dow Pharmaceuticals, Inc.</u>, 509 U.S. 479 (1993), and its progeny, the Sixth Amendment's Confrontation Clause, Rule 12.2, 18 U.S.C. § 3593, and 28 U.S.C. § 2255.  The Court will summarize briefly the principles embodied in each of these oft-cited sources.

The Federal Rules of Evidence permit opinion testimony by a witness "qualified as an expert by knowledge, skill, experience, training, or education," if:

> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> (b) the testimony is based on sufficient facts or data;
>
> (c) the testimony is the product of reliable principles and methods; and
>
> (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702.[3]  The preliminary question of "whether a witness is qualified" to testify as an expert pursuant to Rule 702 is one reserved for the Court.  Fed. R. Evid. 104(a); <u>see</u> <u>Daubert</u>, 509 U.S. at 592-93 (requiring a trial judge to "determine at the outset . . . whether the expert is proposing to testify to (1) scientific knowledge that (2) will assist the trier of fact to understand or determine a fact in issue").

Rule 702 reflects standards first enunciated by the Supreme Court in <u>Daubert</u>, then refined in <u>Kumho Tire Co. v. Carmichael</u>, 526 U.S. 137 (1999).  In <u>Daubert</u>, the Court found the "austere standard" of "general acceptance," which had come to govern admissibility of expert

---

[3] Although the Rules of Evidence do not control penalty phase trials under the FDPA, § 3593(c), the Court is guided by the principles embodied in the Rules to the extent they are not inconsistent with provisions of the FDPA.

evidence in federal court, to be "at odds with the 'liberal thrust' of the Federal Rules [of Evidence]." 509 U.S. at 588-89. Instead, it held that the Rules "assign to the trial judge the task of ensuring that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand," and noted that "[p]ertinent evidence based on scientifically valid principles will satisfy those demands." Id. at 597. The "flexible" inquiry "envisioned by Rule 702" has as its focus "the scientific validity and thus the evidentiary relevance and reliability" of the concepts "that underlie a proposed submission." Id. at 594-95. As such, a trial court's assessment is not primarily concerned with a proposed expert's conclusions. Id. at 595; but see Gen. Elec. Co. v. Joiner, 522 U.S. 136, 146 (1997) (noting relationship between conclusions and methodology, and permitting trial courts to assess whether "there is simply too great an analytical gap between the data and the opinion proffered"). Rather, the trial court is tasked with making a "preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and of whether that reasoning or methodology properly can be applied to the facts in issue." Daubert, 509 U.S. at 592-93.

Factors bearing on this determination include, but are not limited to: whether the theory or technique at issue "can be (and has been) tested"; whether it "has been subjected to peer review and publication"; "the known or potential rate of error"; "the existence and maintenance of standards controlling the technique's operation"; and the degree of acceptance within a relevant scientific community. Id. at 593-94; see Ruiz-Troche v. Pepsi Cola of P.R. Bottling Co., 161 F.3d 77, 81 (1st Cir. 1998) (describing the factors listed in Daubert as "form[ing] the basis for a flexible inquiry into the overall reliability of a proffered expert's methodology"). A party offering expert testimony need not demonstrate that its expert's conclusions are correct. Ruiz-Troche, 161 F.3d at 85. "Daubert neither requires nor empowers trial courts to determine which

of several competing scientific theories has the best provenance. It demands only that the proponent of the evidence show that the expert's conclusion has been arrived at in a scientifically sound and methodologically reliable fashion." Id.

If qualified to testify as an expert, a witness generally "may base an opinion on facts or data in the case that the expert has been made aware of or personally observed," including "those kinds of facts or data" upon which "experts in the particular field would reasonably rely . . . in forming an opinion," regardless whether such facts or data are otherwise admissible. Fed. R. Evid. 703. If, however, the expert relies on facts or data which are inadmissible, "the proponent of the opinion may disclose them to the jury only if their probative value in helping the jury evaluate the opinion substantially outweighs their prejudicial effect." Id.; see Williams v. Illinois, 132 S. Ct. 2221, 2241 (2012) (plurality opinion) (noting "experts are generally precluded from disclosing inadmissible evidence to a jury").

Beyond Rule 703, the Sixth Amendment's Confrontation Clause – a "bedrock procedural guarantee" that the accused in a criminal trial "shall enjoy the right . . . to be confronted with the witnesses against him," Crawford v. Washington, 541 U.S. 36, 42 (2004) (quoting U.S. Const. amend. VI) – limits the extent to which a government expert in a criminal case may use hearsay statements to explain or support his opinion. The Sixth Amendment bars admission of "[t]estimonial statements of witnesses absent from trial" unless "the declarant is unavailable" *and* "the defendant has had a prior opportunity to cross-examine." Id. at 59. To the extent Rule 703 suggests – inconsistently with Crawford – that certain hearsay testimony is permitted by an expert witness, the Confrontation Clause controls. See id. at 61.

The general principles applicable to expert evidence in federal court are not the only legal standards in play here. Rule 12.2 "represents an effort to strike an appropriate balance between

protecting a capital defendant's Fifth Amendment rights and assuring that the government is able to prepare to rebut, fairly and efficiently, any expert evidence the defendant introduces concerning his mental condition." Sampson, 82 F. Supp. 3d at 513. As relevant here, "[n]o statement made by a defendant in the course of any examination conducted under [Rule 12.2] . . . , no testimony by the expert based on the statement, and no other fruits of the statement may be admitted into evidence against the defendant in [a capital sentencing] proceeding **except on an issue regarding mental condition on which the defendant . . . has introduced expert evidence**." Fed. R. Crim. P. 12.2(c)(4) (emphasis added); accord Sampson, 82 F. Supp. 3d at 514. In other words, the scope of any expert testimony on mental condition offered by the government in rebuttal is dictated by the scope of the capital defendant's presentation of such evidence in mitigation.

Additionally, the Court serves as a gatekeeper and must assess expert evidence, like all other evidence offered during a capital penalty phase trial, by applying the balancing test set forth in the Federal Death Penalty Act ("FDPA"). That test authorizes the Court to exclude otherwise admissible evidence "if its probative value is outweighed by the danger of creating unfair prejudice, confusing the issues, or misleading the jury." 18 U.S.C. § 3593(c); see Sampson, 82 F. Supp. 3d at 513 (describing this provision as permitting exclusion of evidence "if appropriate to promote the fairness of the resentencing").

As this Court has noted more than once, proceedings such as these, undertaken pursuant to 28 U.S.C. § 2255, are equitable in nature. E.g., Sampson, 82 F. Supp. 3d at 512. The Court, thus, has "considerable" discretion to ensure that Sampson's new penalty phase trial "as much as possible restores [him] to the circumstances that would have existed had there been no constitutional error." Id. (internal quotation and citation omitted). This guiding principle

informs the Court's resolution of all contested questions presented to it in this case, including the pending expert motions.

III.   DISCUSSION

    A.  Dr. Ruben Gur

The government's only Daubert challenge to any of Sampson's mental health experts is aimed at Dr. Gur, a clinical neuropsychologist and Professor of Psychology with appointments in psychiatry, neurology, and radiology at the Perelman School of Medicine at the University of Pennsylvania.  See Doc. No. 2356-1 at 3; Doc. No. 2325-7 at 136-37.  In this case, Dr. Gur prepared a report in which he analyzed Sampson's brain using a series of methods and concluded that Sampson has "abnormalities indicating brain damage," and that such "abnormalities would portend difficulty for a person in responding appropriately to emotional stimuli or stressful events or in controlling emotional impulses."  Doc. No. 2322-2 at 51-55.

In the Gur Motion, the government levies specific challenges to a "behavioral imaging" ("BI") quantitative analysis Dr. Gur applied to the results of various neuropsychological tests administered to Sampson by other experts, and to a volumetric analysis Dr. Gur performed with respect to MRIs of Sampson's brain.[4]  See generally Doc. No. 2325.  The government contends Dr. Gur's BI analysis "is not generally accepted in the fields of neuropsychology and neuroimaging, is not subject to verification, and has no known error rate," and is therefore inadmissible under Rule 702 and Daubert.  Id. at 6.  According to the government, the BI analysis is unreliable because: (1) it is based on a method devised by Dr. Gur but "immediately

_____

[4] In broad strokes, the BI analysis uses an algorithm developed by Dr. Gur which associates results of various neuropsychological tests with the performance of specific areas of the brain in order to "establish the localization of brain damage."  Doc. No. 2322-2 at 51-52.  Dr. Gur's volumetric analysis uses series of brain scans in order to measure the volume of specific areas of the brain in order to identify abnormalities compared to a control group.  Id. at 52-54.

criticized" after only "limited peer review and publication"; (2) it is outdated and is not used by clinicians in the treatment of patients; and (3) it has been "sharply criticized, if not squarely rejected by other experts in his field." Id. at 7-15. The motion includes similar attacks on Dr. Gur's volumetric MRI analysis, citing various other experts who reject Dr. Gur's approach and/or the conclusions he draws therefrom, and pointing to two other criminal cases in which Dr. Gur was precluded from testifying about this sort of analysis. Id. at 15-24.

Sampson opposes the government's motion and disputes its characterization of Dr. Gur's work. See generally Doc. No. 2356. He emphasizes Dr. Gur's professional qualifications, notes numerous occasions on which Dr. Gur's testimony has been permitted by other courts and subjected to adversarial examinations, and argues the existence of contrary expert opinions does not render Dr. Gur's opinion unreliable. Id. In addition, Sampson has submitted supplemental letters from Dr. Gur responding to the specific criticisms of his work advanced by the government's experts. Doc. No. 2322-2 at 57-63; Doc. No. 2322-3 at 6-12, 14-16; Doc. No. 2356-9; Doc. No. 2356-10.[5]

---

[5] In some instances, Dr. Gur's responses contain commentary that would not be appropriate in testimony before a jury. E.g., Doc. No. 2322-2 at 57 (stating Dr. Gur "hope[s] and pray[s] for [Dr. Aguirre's] patients' sake" that Dr. Aguirre avoids conduct in a clinical setting which Dr. Gur deems "medical malpractice"); Doc. No. 2322-3 at 12 (referring to Dr. Guilmette's responses to Dr. Gur's reports as "sloppy or reflecting inept scholarship," and stating that if a student produced the same analysis, Dr. Gur "would . . . kindly steer[] that student to pursue a career in areas other than science"). The same can be said of certain other experts, including Dr. Aguirre, though to a lesser extent. E.g., Doc. No. 2322-1 at 9-10 (calling Dr. Gur's methods "fishing expeditions" and accusing Dr. Gur of using a "random claim generator" premised on a "flimsy and vague notion"). As counsel should emphasize when preparing their witnesses for trial, this sort of sniping among disagreeing experts may be commonplace in an academic setting, but it has no place in a courtroom, and particularly not during a capital penalty phase trial. One expert in this case – Dr. Welner – goes further than the rest; his unique commentary will be discussed later in this Memorandum. See Discussion § III(D), infra.

The parties supported their briefs with numerous exhibits, including scientific journal articles related to Dr. Gur's methodology and transcripts of expert testimony from several other criminal cases involving reports by Dr. Gur. After carefully reviewing the pleadings and all supporting documents, the Court determined that no evidentiary hearing was required with respect to the Gur Motion. See Kumho Tire, 526 U.S. at 152 (acknowledging a trial court's broad discretion to decide to what extent additional briefing or evidentiary hearings are necessary to investigate the reliability of a proposed expert's testimony). The record before the Court establishes that the government's Daubert challenge to Dr. Gur's testimony falls short.[6] This is so for several reasons.

First, the government overstates Daubert's reliability standard, which it describes as "exacting." Doc. No. 2325 at 5. This view ignores the Daubert Court's focus on the "permissive" nature of the Rules of Evidence, 509 U.S. at 589, its rejection of an "austere" standard of admissibility as "incompatible with" the Rules, id., and its emphasis of the "flexible" nature of the reliability "inquiry envisioned by Rule 702," id. at 594; accord Ruiz-Troche, 161 F.3d at 81. Moreover, the government's motion primarily relies on citations to the testimony and written opinions of other experts who disagree with Dr. Gur's methods or conclusions. Daubert, however, does not "demand unassailable expert testimony," United States v. Mooney, 315 F.3d 54, 63 (1st Cir. 2002), nor does it "empower[] trial courts to determine which of several competing scientific theories has the best provenance," Ruiz-Troche, 161 F.3d at 85. The fact that other neuropsychologists or neuropsychiatrists have offered differing opinions or criticized

---

[6] Sampson notes that a question exists as to whether the Daubert standard applies to a defendant's mitigation evidence in a capital sentencing proceeding, or to any expert testimony offered by either party in such a proceeding. See Doc. No. 2356 at 4 & n.2. The Court need not resolve this question, as it finds the relevant testimony satisfies that standard in any event.

Dr. Gur's methods does not, on this record, render Dr. Gur's proffered testimony unreliable or provide a legitimate basis for excluding it.

Second, the government has not advanced any meaningful basis upon which to question Dr. Gur's extensive experience or substantial qualifications as a noted expert in the field of neuropsychology and neuroimaging. Dr. Gur is a tenured member of the faculty at a highly regarded medical school. Doc. No. 2356-1 at 3. He is the Director of Neuropsychology and the Brain Behavior Laboratory, as well as the Center for Neuroimaging in Psychiatry, at the Hospital of the University of Pennsylvania. Id. He is a licensed psychologist in Pennsylvania, is board-certified in clinical neuropsychology, and has a variety of teaching, supervisory, and clinical responsibilities at his academic institution. Id. at 3, 5. Dr. Gur has authored nearly 500 peer-reviewed articles over the past forty years. Id. at 7-46. He is recognized by his peers as a respected authority in his field, Doc. No. 2356-2, and his work has been endorsed by other experts in this case, e.g., Doc. No. 2322-2 at 13-14 (stating, in report by Dr. Bigler, who co-authored a critique of Dr. Gur's BI method soon after it was developed, "Dr. Gur provides ample scientific and clinical justification for the points he makes in his initial report"); Doc. No. 2322-4 at 112 (stating, in report by Dr. Woods, that Dr. Lipton's conclusion "is corroborated by Dr. Gur's extensive neuroimaging and quantitative neuropsychological evidence" and other experts' testing); see also Doc. No. 2325-7 at 13 (describing Dr. Gur as "a pioneer" in "the field of brain researchers," in testimony by Dr. Merikangas during another capital penalty phase trial). Plainly, Dr. Gur is "qualified as an expert" in neuropsychology and neuroimaging "by knowledge, skill, experience, training, or education." Fed. R. Evid. 702.

Third, as the government's own submissions demonstrate, a number of other courts have permitted Dr. Gur to testify as an expert and to offer opinions based on the same methods he has

applied in this case.  E.g., Doc. No. 2325-7 at 136-247 (reflecting testimony by Dr. Gur in the penalty phase trial in United States v. McCluskey, No. 10-cr-2734 (D.N.M. Oct. 24, 2013), including that at the time he had testified as an expert witness in more than two dozen criminal cases); Doc. No. 2325-14 (reflecting rebuttal expert testimony offered after Dr. Gur testified as a defense witness in United States v. Green, 06-cr-19 (W.D. Ky. 2009)); see also Doc. No. 2325 at 6 (admitting Sampson will offer Dr. Gur to testify "in similar fashion to his testimony in other capital cases"); id. at 14 (referencing Dr. Gur's testimony "in other relatively recent capital trials").  Whether because his testimony was not subject to Daubert challenges or because it was deemed to satisfy the Daubert standard, this fact is persuasive evidence that Dr. Gur's methods are reliable and have been subjected to scrutiny and testing through the adversary process.

The Court is aware of only two instances in which other courts have not permitted Dr. Gur to testify, and both of those cases are materially distinguishable.  In United States v. Montgomery, the trial court excluded Dr. Gur's analysis of PET and MRI scans of the defendant's brain from both the guilt and penalty phases of a capital trial.  635 F.3d 1074, 1088-93 (8th Cir. 2011).  After noting the PET evidence was "arguably admissible" during the penalty phase of the trial, the Eighth Circuit deemed any error harmless, and further found no abuse of discretion by the trial court in excluding the MRI evidence.  Id.  The questions that troubled the Montgomery court, though, are not present here.  Dr. Gur does not attempt to extend his analysis of Sampson to link the abnormalities he identifies to a specific diagnosis (let alone an "extremely rare disorder," like the one at issue in Montgomery, id. at 1091).  And although Dr. Aguirre does not accept Dr. Gur's method of assessing brain volume (Dr. Aguirre would compare total brain volume, while Dr. Gur compares volume of individual parts of the brain), the government's challenge here does not present a dispute among experts about whether the magnitude of the

deviations Dr. Gur has identified using his MRI analysis, if accurate, are statistically significant.

Compare id. at 1092-93 (describing measurements one standard deviation or less away from

"normal" and differing expert views on the clinical significance thereof), with Doc. No. 2322-2

at 52 (identifying "widespread structural deficits" in Sampson's brain, including "multiple

regions" measuring more than two standard deviations below normal).

Dr. Gur also was precluded from testifying during the non-capital state-court trial in

Commonwealth v. Chism. There, however, concerns existed similar to those raised in

Montgomery – and not present here – about the propriety of using Dr. Gur's conclusions as

evidence of the existence of a specific mental illness (schizophrenia). Doc. No. 2325-17 at 88-

92. In addition, the presiding judge cited other problems – also not present here – regarding the

rapid brain development experienced by adolescents, which he viewed as a factor undermining

the reliability of Dr. Gur's analysis where the defendant was a teenager. See id. at 56, 88-92,

150-54. As such, the specific concerns that led the Montgomery and Chism courts to preclude

Dr. Gur's testimony do not justify reaching the same result here.[7]

Finally, contrary to the government's suggestion, the record provides ample support for a

finding that Dr. Gur's methods and conclusions are reliable and admissible under the criteria set

forth in Rule 702 and Daubert. Dr. Gur has submitted numerous declarations, reports, and letters

---

[7] Insofar as the trial judge in Chism found Dr. Gur to be incredible, see Doc. No. 2325-17 at 104, this Court neither adopts that determination nor views it as material here. Witness credibility ordinarily is a question for the jury. The Chism court made its finding when confronted with a very different set of facts, as described above. In the present context, the Court's focus is on whether Dr. Gur is qualified to render an expert opinion (he is), and whether the opinion he will render is reliable and relevant to this case based on the record before the Court (it is). The trial judge in Chism was operating under different circumstances. See id. at 88 (noting the motion in limine related to Dr. Gur in that case was heard and decided within a day of its filing, after brief and interrupted video-conferenced testimony by Dr. Gur, and with deliberation by the judge occurring in "fifteen minutes . . . rather than fifteen pages" as he "would have preferred").

related to this case in which the analysis he performed and the facts and data upon which he relied are thoroughly described.  E.g., Doc. Nos. 2322-2 at 51-63, 2322-3 at 6-16, 2356-9, 2356-10.  He applied processes which have been used and tested in his own research and in the context of numerous criminal proceedings.  E.g., Doc. Nos. 2325-4, 2325-7 at 136-247.  His methods have been the subject of published, peer-reviewed articles which have explained the processes involved in the relevant analyses, described how those processes were developed, and addressed the applicable error rate and standards.  E.g., Doc. Nos. 2325-5, 2325-6.  He has considered and responded to criticisms levied against his methods by other experts, including refuting claims about the nature of the control groups he uses for comparison purposes.  E.g., Doc. No. 2322-2 at 53, 59-60; see also Doc. Nos. 2356-6, 2356-7.  His methods appear to have substantial use and acceptance by researchers in Dr. Gur's field, although the evidence suggests they are not widely used in clinical settings at this time.[8]  Doc. No. 2325-7 at 13-15, 131; see Doc. No. 2325-17 at 47-48 (reflecting testimony by Dr. Gur's colleague, Dr. Satterthwaite, that "research studies . . . suggest that maybe in the near future" volumetric analysis of the brain "will be used as a clinical tool").  The testimony he would offer regarding his assessment of Sampson and his conclusions related to brain abnormalities and impairments is relevant and would assist the jury in evaluating Sampson's mitigating evidence related to his mental condition.  It will be for the jury – not the Court under Daubert – to assess whether Dr. Gur's opinions are persuasive or should be credited in the face of the factual evidence, cross-examination, and differing opinions of government experts.

Accordingly, the Gur Motion (Doc. No. 2325) is DENIED.

---

[8] It bears noting that the present context – the forensic evaluation of a capital defendant – is distinct from a typical research or clinical setting.

B. <u>Dr. Geoffrey Aguirre</u>

Sampson moves to preclude or limit the testimony of each of the government's three proposed rebuttal 12.2 expert witnesses. As to Dr. Aguirre – who, coincidentally (or perhaps not)[9] is Dr. Gur's colleague – Sampson seeks to preclude four specific aspects of the opinions and statements contained in the relevant expert reports. Dr. Aguirre is an Associate Professor of Neurology at the University of Pennsylvania and a practicing cognitive neurologist. Doc. No. 2322-1 at 3. Here, he has reviewed brain scan images and other records and reports related to Sampson, and has authored reports in which he states that Sampson's scans reveal "no evidence of brain damage." <u>Id.</u> at 3-16, 18-27. He disputes Dr. Gur's analysis, and concludes that Sampson's brain "is remarkable only for its completely average appearance." <u>Id.</u> Dr. Aguirre has neither met nor personally examined Sampson. The Court will address each of Sampson's challenges to Dr. Aguirre's report in turn.

<u>First</u>, Sampson asks the Court to strike Dr. Aguirre's conclusion "that there is no history of illness or injury consistent with clinically significant brain damage," arguing it is incorrect and "based on a limited set of data." Doc. No. 2332 at 1. The government disagrees, arguing that Dr. Aguirre reviewed various defense expert reports containing all relevant facts regarding Sampson's history of alleged brain injury. Doc. No. 2354 at 6; <u>see</u> Doc. No. 2322-1 at 4 (listing materials reviewed, including PET and MRI scans of Sampson's brain, affidavits by Drs. Gur, Lebowitz, and Woods, and medical records related to at least one of Sampson's alleged head

---

[9] <u>See</u> Geoffrey K. Aguirre, <u>Neuroimaging in the Courtroom: a Perspective From the Witness Stand</u>, Center for Neuroscience & Society, U. Pa. (Mar. 3, 2016), <u>available at</u> http://neuroethics.upenn.edu/portfolio-items/neuroimaging-in-the-courtroom-a-perspective-from-the-witness-stand-geoffrey-k-aguirre/ (last visited Sept. 1, 2016) (suggesting the government solicited Dr. Aguirre's involvement in this and other current federal capital cases in order to counter his colleague Dr. Gur's testimony).

injuries).  In other words, Dr. Aguirre was informed of the injuries enumerated by Sampson's

experts in affidavits submitted along with his § 2255 petition, described some of them in his

report, Doc. No. 2322-1 at 4, and still concluded that none of the injuries resulted in significant

damage to Sampson's brain.  This is not the stuff of a <u>Daubert</u> challenge.  To the extent Sampson

believes Dr. Aguirre has not appropriately considered or accounted for certain information in

rendering his opinions, those perceived inadequacies are fodder for cross-examination.  <u>Cf.</u> <u>Ruiz-</u>

<u>Troche</u>, 161 F.3d at 85 (warning that trial courts are not empowered to choose among

disagreeing expert witnesses).

  <u>Second</u>, Sampson suggests Dr. Aguirre should not be permitted to opine that Sampson's

brain scans do not show damage, arguing he is not qualified to interpret the scans.  Doc. No.

2332 at 4.  The government vigorously disagrees, citing Dr. Aguirre's more than twenty years of

experience "reading brain images in a clinical, research, and professional capacity."  Doc. No.

2354 at 9.  This challenge is borderline frivolous.  Sampson has not suggested – and, it seems,

could not credibly suggest – that neurologists are per se unqualified to interpret MRIs.  The only

support offered for Sampson's attack on Dr. Aguirre's qualifications to do so is a series of block-

quoted statements by Drs. Lipton and Gur criticizing Dr. Aguirre's interpretation of the scans.

<u>Id.</u> at 4-6.  The other experts, however, stop far short of accusing Dr. Aguirre of being wholly

unqualified to interpret MRI or PET scans.  <u>E.g.</u>, <u>id.</u> at 4 (quoting Dr. Lipton's statement that Dr.

Aguirre's lack of "specific training and experience in clinical neuroradiology" may prevent him

from "recogniz[ing] important findings," but not deeming him entirely unqualified to interpret

scans).  Indeed, Dr. Gur explicitly acknowledges that neurologists (like Dr. Aguirre), though

lacking the special expertise of board-certified neuroradiologists, are not only qualified to

perform such tasks, but also can be "excellent readers of MRIs."  <u>Id.</u> at 5 (quoting Dr. Gur's May

17, 2016 letter responding to Dr. Aguirre's report). Neither the passages recited in Sampson's motion nor anything else in the record would remotely support a finding that Dr. Aguirre is not qualified to render the opinions he has offered.[10] What the excerpted passages demonstrate is that there will be disagreement among the experts at trial, providing fertile ground for cross-examination on these points; it will be the jury's role to determine which expert is best suited to interpret MRIs, and whose interpretation of Sampson's scans is the soundest.

Third, Sampson seeks to preclude Dr. Aguirre from testifying that the MRI scans upon which Dr. Lipton relied were "degraded by subject motion," again excerpting passages from reports in which defense experts essentially explain that not every image taken was so degraded that interpretation was not possible. Id. at 6-8. The government suggests that, in the end, both Drs. Lipton and Aguirre focused their analyses on the same set of MRI images – those that were the least impacted by motion – and, thus, there is no basis for any limitation on Dr. Aguirre's testimony in this respect. See Doc. No. 2354 at 7-8. Once again, this represents a classic example of disagreement among qualified experts, and will present a question appropriately left for the jury to resolve. For the reasons articulated by the government, Sampson has provided no justification for transforming this dispute into a Daubert challenge.

Finally, Sampson accuses Dr. Aguirre of "rel[ying] upon a novel ventricular volume quantitative analysis to rule out brain abnormality in general," and argues that analysis fails to

---

[10] In addition to being an associate professor at a highly regarded medical school, Dr. Aguirre is licensed in neurology, and is certified by the American Board of Neurology. Doc. No. 2354-5 at 2. He is the Associate Director of the Center for Neuroscience and Society, a Senior Consultant to the MacArthur Foundation Research Network on Law and Neuroscience, and the Associate Director of the Neurology Residency Program at the Hospital of the University of Pennsylvania. Id. The list of peer-reviewed publications authored by Dr. Aguirre reflects more than eighty articles in a twenty-year span, at least several of which appear by their titles to involve analyses of either PET or MRI scans. Id. at 6-11. As with Dr. Gur, the Court perceives no legitimate basis to challenge Dr. Aguirre's qualifications.

satisfy the <u>Daubert</u> standard. Doc. No. 2332 at 8, 13-14. This challenge is not as patently meritless as those that preceded it. The government responds by arguing that Dr. Aguirre "reviewed the same raw data generated from Sampson's brain imaging" as the defense experts reviewed, "applied concepts from peer reviewed publications in the field," and "used similar software tools [to those] used by his defense counterparts and similar techniques in comparing Sampson's volumetric brain measurements to an age/gender adjusted control group." Doc. No. 2354 at 11.

      With his final challenge, Sampson seeks a ruling that would permit his own experts to offer testimony about quantitative volumetric analyses of Sampson's brain scans while preventing the government's experts from directly testing or refuting those analyses. Although the specific steps taken by Dr. Aguirre here may not be part of a published or generally applied protocol, <u>see</u> Doc. No. 2332 at 13-14 (noting the lack of "a manual describing Dr. Aguirre's protocol" and the need for an explanation of what Dr. Aguirre's "model is, how it was created and implemented, and that it is a reliable methodology"), the more general practice of measuring and comparing brain volumes in order to discern information about the presence or absence of abnormalities appears to be widely accepted, <u>see</u> Doc. No. 2322-1 at 10, 13. Moreover, Dr. Aguirre described in detail the process he applied in making such measurements and comparisons here, <u>id.</u> at 10-12, 14, even providing the relevant code language he used, <u>id.</u> at 15, thus permitting the defense experts to review and critique it, <u>see</u> Doc. No. 2322-2 at 62 (reflecting Dr. Gur did review it and identified a purported mistake). Under these circumstances,

the Court is satisfied that Dr. Aguirre's proposed testimony falls within the scope of permissible

expert evidence envisioned by Rule 702 and <u>Daubert</u>.[11]

Accordingly, the Aguirre Motion (Doc. No. 2331) is DENIED.[12]

C.  <u>Dr. Thomas Guilmette</u>

In two of his 12.2 motions, Sampson challenges aspects of expert reports submitted by

Dr. Guilmette, a board-certified clinical neuropsychologist, a Professor of Psychology at

Providence College, and the Director of Neuropsychology at the Southern New England

Rehabilitation Center.  Doc. No. 2355-4 at 2.  Dr. Guilmette reviewed voluminous records

related to Sampson and this case, conducted extensive neuropsychological testing during a series

of meetings with Sampson, and prepared lengthy reports explaining the results of his evaluation

and disputing defense expert claims of brain damage and other neuropsychological impairments.

Doc. No. 2322-1 at 29-140, 142-86.

In the Malingering Motion, Sampson specifically challenges Dr. Guilmette's use of

symptom validity tests ("SVTs"), and his conclusion that Sampson's performance on them

"revealed a high degree of atypical responses and a tendency to exaggerate negative emotions

and experiences."  Doc. No. 2322-2 at 111; <u>see generally</u> Doc. No. 2341.  According to

Sampson, Dr. Guilmette's "administration and interpretation of each of [the SVTs]" is rendered

unreliable due to "methodological flaws in his analysis."  Doc. No. 2341 at 4.  Sampson supports

---

[11] To the extent Sampson argues that Dr. Aguirre's testimony in the challenged areas should be precluded based on a finding that it fails the balancing test set forth in § 3593(c) even if it satisfies the <u>Daubert</u> standard, <u>see</u> Doc. No. 2332 at 12-13, he has identified no grounds for finding that the relevant testimony – which the Court views as plainly probative on the issue of Sampson's proposed mitigating factors related to brain damage and related mental conditions – would be so unfairly prejudicial, confusing, or misleading that exclusion is justified.

[12] The Aguirre Motion was explored by both parties in detailed briefs and exhibits that were sufficient to render an evidentiary hearing unnecessary.  <u>See</u> <u>Kumho Tire</u>, 526 U.S. at 152.

this assertion with a series of excerpts from the reports of various defense experts who criticize this aspect of Dr. Guilmette's opinion. See id. at 5-13 (block quoting Drs. Lebowitz, Moberg, and Sanislow). He argues that tests aimed at assessing malingering are unreliable, and that expert testimony that Sampson is a liar would be more prejudicial than probative. Id. at 17-27. In the Welner Motion, Sampson raises general issues related to Dr. Guilmette's membership in the Forensic Panel, a for-profit association of mental health experts created by Dr. Welner, Doc. No. 2345, although the bulk of that motion is aimed at Dr. Welner himself.

The government opposes both motions, arguing Dr. Guilmette used generally accepted tests to evaluate whether Sampson is malingering, applied those tests correctly, and considered and rejected alternative explanations for Sampson's apparent symptom exaggeration. It further urges that expert testimony about malingering is relevant to rebut claims by Sampson that his neuropsychological test results reveal brain injury, and that various statements he has made to experts assessing him (and to others) are examples of confabulation (i.e., "generating erroneous information because he is unable to recall facts accurately," Doc. No. 2322-1 at 138) rather than lies. Doc. No. 2355 at 32-34. The Court heard evidence related to these issues, including testimony by Dr. Guilmette, during the July 2016 evidentiary hearing.

    1.  *Malingering and SVTs*

Because Sampson's main objection to Dr. Guilmette's proposed testimony is set forth in the Malingering Motion, the Court will address that motion first.[13] Three SVTs are at issue. The

---

[13] Certain of the arguments raised in the Malingering Motion are not aimed at Dr. Guilmette. Specifically, Dr. Guilmette's reports do not contain accusations that defense experts are lying, nor does Dr. Guilmette hold himself out to be "a human lie detector." Those assertions are levied against Dr. Welner, e.g., Doc. No. 2341 at 1, 27-28, and they will be addressed more fully below. Dr. Guilmette limits his analysis to professional critiques of the methods and conclusions of experts with whom he disagrees, e.g., Doc. No. 2322-1 at 87-88 (explaining his view that Dr. Gur's test battery is "not the standard of practice in the clinical assessment of neurocognitive

first is the Trauma Symptom Inventory-2 ("TSI-2"), which is a test intended to evaluate "trauma-related symptoms and behaviors," including "the effects of sexual and physical assault, . . . motor vehicle accidents, . . . witnessing violence or other trauma, traumatic losses, and early experiences of child abuse or neglect." John Briere, Trauma Symptom Inventory-2 Professional Manual 1 (2011) [hereinafter TSI-2 Manual]. The TSI-2 is scored, in part, using an "atypical response" ("ATR") scale, which "evaluates the tendency of the respondent to overendorse trauma-related symptoms." Id. at 14. On this scale, the test materials instruct that raw scores of 15 and higher "indicate[] invalidity" in clinical and forensic contexts. Id.; accord id. at 28. An alternate cutoff of 8 is recommended for research and screening of "normal" individuals. Id. at 14. The scoring tables appended to the test materials contain conversion charts tailored to gender and age (for 18-to-54 year olds, and 55-to-90 year olds). Id. at 72-79. Sampson's raw score on the ATR scale was 7. Doc. No. 2322-1 at 112.

The second SVT Dr. Guilmette administered is the Personality Assessment Inventory ("PAI"), which is an "objective test of personality designed to provide information on critical client variables in professional settings." Doc. No. 2322-1 at 114 (quoting an interpretive manual for the PAI). It allows comparison of an examinee with normative samples from a variety of settings, including individuals in a corrections setting. Id. Sampson's interpretive report revealed "inconsistent evidence that pointed to the possibility of symptom exaggeration,"

---

disorders"), and descriptions of Sampson's results on measures of effort and symptom reporting validity, e.g., id. at 111-15 (explaining Sampson's test results and concluding they show "the likelihood of some exaggeration and atypical reporting of symptoms"). This is perfectly appropriate and well within the scope of relevant rebuttal evidence in light of Sampson's various proffered expert reports regarding his mental condition, which include several findings of confabulation. E.g., Doc. No. 2322-4 at 65 (noting "Mr. Sampson exhibits confabulation, in accurate reporting of events secondary to his cognitive dysfunction").

but "his profile did not reflect characteristics suggestive of overt malingering or the simulation of psychiatric disturbance." Id. at 115.

The third relevant test is the Minnesota Multiphasic Personality Inventory-2 ("MMPI-2"), which is a widely used "true/false" questionnaire "designed to assess a broad range of psychological disorders and characterological pathologies." Id. at 113. The MMPI-2 has built-in validity measures. See id. at 114 (discussing scales aimed at detecting symptom over-endorsement and defensiveness). An examinee's responses are entered into a computer program, which then produces interpretive reports comparing those responses to those of normative groups for various settings. Id.; see Doc. No. 2428 at 260.[14] Both the "Forensic Interpretive Report" and the "Outpatient Mental Health Interpretive Report" automatically generated for Sampson reflected an "invalid profile." Doc. No. 2322-1 at 114. Both reports noted his responses suggested symptom exaggeration. Id.

Besides Dr. Guilmette, whom the Court found to be a credible witness, three other experts testified about the relevant SVTs during the evidentiary hearing on the 12.2 motions. Dr. Edens testified that he would be cautious about using the results of any personality test as proof of malingering, that he viewed Sampson's PAI results as indicative of possible exaggeration of symptoms to get attention (rather than of faking mental impairments), and that he understood the cutoff score set forth in the TSI-2 Manual as applying irrespective of age.[15] Doc. No. 2436 at 159-64.[16] Dr. Moberg testified that Sampson's scores on the TSI-2 and PAI were valid, and did

---

[14] Docket number 2428 is the transcript from the July 26, 2016 evidentiary hearing.

[15] Dr. Edens developed a computerized report used to interpret the PAI in correctional settings, and his understanding of the TSI-2 cutoff score is based on an inquiry he made of that test's creator. Doc. No. 2436 at 93, 164.

[16] Docket number 2436 is the transcript from the July 27, 2016 evidentiary hearing.

not indicate symptom exaggeration.  Doc. No. 2436 at 65-66.  And Dr. Sanislow testified that

Sampson's 2015 MMPI-2 results should not be viewed in isolation or deemed "invalid" based on

the automated computerized result alone; rather, other explanations for his scores must be

considered, and the 2015 results should be compared to the reports of valid MMPI results from

tests of Sampson in 1977 and 1992, both of which are reflected in the available medical

records.[17]  Doc. No. 2428 at 246-54.

As to the TSI-2, Sampson argues Dr. Guilmette disregarded the ATR scale cutoff

specified in the test's manual and applied his own view of an appropriate cutoff, without support,

in order to deem Sampson's test results "invalid."  Doc. No. 2341 at 4-7.  Several defense

experts view Dr. Guilmette's departure from the test's manual in this way as unjustified.  See,

e.g., id. (quoting Drs. Lebowitz and Moberg).  Dr. Guilmette's report explains his belief that "to

apply the same raw score cutoff for invalidity for people in Mr. Sampson's age group as those in

the younger age group, is not defensible."  Doc. No. 2322-1 at 112.  Sampson was fifty-five

years old at the time of the test; Dr. Guilmette views the suggested cutoff as applicable to

individuals between eighteen and fifty-four years of age.  Id.  As support, Dr. Guilmette cites a

study from the TSI-2 manual in which a different raw score cutoff was suggested, and notes that

Sampson's responses reflect more extreme atypical responses than sample groups of individuals

exposed to more extreme trauma (e.g., combat veterans and sexual abuse victims).  Id. at 112-13.

In response to the Malingering Motion, Dr. Guilmette also explains that his "observations of

[Sampson's] behavior did not match his self-report of extreme distress."  Doc. No. 2355-3 at ¶

37.

---

[17] Dr. Sanislow teaches courses on the administration and interpretation of the MMPI-2.  Doc.
No. 2428 at 202.

The issues raised regarding Dr. Guilmette's interpretation of the TSI-2 provide ample fodder for cross-examination,[18] but do not justify exclusion of information about the test at trial. There is no question that Dr. Guilmette is qualified to administer tests of this nature,[19] and no suggestion that he administered the test incorrectly. Although his interpretation of Sampson's TSI-2 results appears to deviate from the instructions provided in the manual, Dr. Guilmette thoroughly and openly explained his decision to invoke a lower ATR score cutoff, provided citations to published studies and statistics found elsewhere in the manual that he viewed as supporting his interpretation, and described the ways in which his professional observations of Sampson bolstered his conclusion. In other words, he identified the facts and data supporting his interpretation, and he applied defensible reasoning and methodology in reaching his conclusions. That is all Rule 702 and Daubert require.

As to the PAI, Sampson's attack is feeble at best. Although he accuses Dr. Guilmette of "overinterpret[ing] the test results," Doc. No. 2341 at 7, neither his brief nor the record provide

---

[18] For example, multiple defense experts forcefully dispute Dr. Guilmette's alternate cutoff score, Sampson's age was only one year beyond the upper end of the age group to which Dr. Guilmette viewed the usual cutoff score as applicable, this was Dr. Guilmette's first time administering the TSI-2, and the plain language of the relevant sections of the TSI-2 Manual does not suggest the ATR scale's cutoff score for validity is age-dependent. See TSI-2 Manual at 14 ("A raw score of 15 on the ATR scale indicates invalidity and is the recommended cutoff . . . . The cutoff score is to be used only when assessing individuals presenting in clinical or forensic contexts."); id. at 28 ("For this reason, the raw score cutoff for the ATR in clinical/forensic contexts was set at 15, in general agreement with other symptom inventories."); but see id. at 82-93 (providing four separate charts for converting raw scores to percentiles dependent on gender and age).

[19] Like Drs. Gur and Aguirre, Dr. Guilmette's qualifications are not subject to reasonable dispute. He has thirty years of experience in the field of neuropsychology, including leadership positions in the neuropsychology departments of at least three hospitals and teaching positions at the undergraduate, graduate, and medical school levels. Doc. No. 2355-4 at 2-3. He has served as a peer reviewer and board member on numerous professional journals, and has authored more than sixty peer-reviewed articles (about a third of which appear related to topics at issue in this case, such as malingering and brain injury). Id. at 9-14.

even a shred of support for precluding this aspect of Dr. Guilmette's analysis. In fact, the Court perceives no meaningful disagreement between Dr. Guilmette's analysis of Sampson's PAI results and those suggested by Drs. Edens and Moberg. Compare Doc. No. 2322-1 at 114-15 (reflecting Dr. Guilmette's acknowledgement that Sampson's PAI results showed "that he did not endorse highly unusual behaviors or experiences," that "inconsistent evidence . . . pointed to the possibility of symptom exaggeration," and that the results were not "suggestive of overt malingering or the simulation of psychiatric disturbance"), with Doc. No. 2322-4 at (reflecting Dr. Moberg's opinion that Sampson's PAI results were "not deemed invalid by the test developers," but that they showed "two moderate elevations on validity indicators" and showed "inconsistency in the evidence that pointed to the possibility of negative distortion and symptom exaggeration" without indicating malingering), and Doc. No. 2436 at 160 (reflecting Dr. Edens's testimony that Sampson's PAI results reflected "one indicator suggesting some level of extreme symptom endorsement, but two other indicators [which] didn't show signs of that," and noting that Dr. Guilmette's report "in general . . . described the PAI results" the same way). Under these circumstances, Sampson has not made – and could not make – a meaningful Daubert or Rule 702 challenge to the PAI evidence.

Finally, Sampson criticizes Dr. Guilmette's interpretation of his MMPI-2 results. He essentially contends that Dr. Guilmette applied improper and unreliable methodology when he relied on computerized interpretive reports produced by the publishers of the test, rather than looking to other sources for alternative profile validity cutoff scores.[20] Doc. No. 2341 at 8-13. But Dr. Guilmette answered the main methodological flaw identified by Dr. Sanislow, the

---

[20] In other words, after faulting Dr. Guilmette for looking beyond the TSI-2's recommended validity threshold, Sampson faults him for **not** doing that with respect to the MMPI-2.

primary defense expert reviewing Dr. Guilmette's use of the MMPI-2. See Doc. No. 2428 at

246-49 (expressing concern about Dr. Guilmette's failure to account for explanations for F-scale

elevation on the MMPI-2 besides symptom exaggeration); Doc. No. 2355-3 at ¶¶ 30-31

(explaining Dr. Guilmette ruled out alternative explanations for F-scale elevation). This

response, it seems, would have satisfied Dr. Sanislow, had it been included explicitly in Dr.

Guilmette's original report, rather than presented in a subsequent declaration as it was here.

Doc. No. 2428 at 271-72. Even if other sources exist which would support different

interpretations of Sampson's MMPI-2 results, the Court would be hard-pressed to sustain a

Daubert challenge where an expert administered a widely used test consistently with that test's

instructions, scored the test appropriately, and then relied upon an interpretive report generated

via a widely used program endorsed by the test's creators.[21] See id. at 260-61 (reflecting Dr.

Sanislow agreed Dr. Guilmette administered and scored the test correctly, and accurately entered

the scores into a system for interpretation pursuant to "the proprietary and highest standard"

practice).

    In all, Dr. Guilmette's administration and interpretation of the three SVTs satisfied Rule

702 and Daubert. The Court finds no basis to conclude that testimony about Dr. Guilmette's use

of the tests would confuse or mislead the jury, nor would presentation of testimony about the

---

[21] Other specific questions surrounding Dr. Guilmette's interpretation of the MMPI-2 – for
example, his failure to request an interpretive report comparing Sampson to an available
correctional sample, or the manner in which he did or did not compare Sampson's 2015 results to
previous MMPI-2 results – are appropriately explored on cross-examination. Where Dr.
Guilmette was aware of the correctional sample and the prior test results, but applied his
judgment and did not use them in the manner Sampson urges, these questions do not provide a
basis for finding his administration or interpretation of the test unreliable.

tests be more prejudicial than probative of the issues to be decided by the jury. As such, the

Malingering Motion is DENIED insofar as it relates to Dr. Guilmette.[22]

     2. *Other Challenges*

     The Welner Motion also contains certain challenges that touch upon Dr. Guilmette's

proposed testimony and warrant brief discussion. Dr. Guilmette's reports refer to, and appear to

rely upon, certain categories of information that the Court has deemed inadmissible, either in

previous orders or in the section discussing Dr. Welner's testimony below. Doc. No. 2322-1 at

55, 60, 135 (discussing allegations of rape and gang membership, and mentioning "death row");

see Discussion § III(D)(3), (5)-(9), infra (discussing such categories, including certain prior bad

acts and the verdict in the first trial). Dr. Guilmette may not reference such information in his

testimony at trial, nor may he base the opinions he offers at trial upon consideration of such

information. Insofar as the Welner Motion seeks an order precluding Dr. Guilmette from

including such information in his testimony, the motion is ALLOWED.[23]

---

[22] Although Sampson cites a handful of articles from professional journals taking issue with the practice of assessing a patient's motivations and intentions, Doc. No. 2345 at 20-22, there is absolutely no evidence before the Court that would justify a finding that the three SVTs, if properly administered and scored, are unreliable for <u>Daubert</u> purposes. Indeed, several defense experts testified about use and interpretation of the tests, and none suggested the tests themselves are inherently unreliable. Moreover, Dr. Guilmette's administration of these SVTs did not cause him to conclude that Sampson was malingering (i.e., intentionally faking); rather, he viewed the tests as evidencing a tendency to over-report or exaggerate his symptoms, which he explained can reflect "dramatic" or "catastrophic" thinking without an intent to fake a disorder. Doc. No. 2419 at 52 (transcript of July 25, 2016 evidentiary hearing). Although his report does contain a short section referencing "ample evidence that Gary Sampson has presented himself falsely to others" and concluding that certain claims Sampson has made "are just lies," Dr. Guilmette's comments in this regard are fair rebuttal to the opinions of various defense experts that the same sorts of claims by Sampson are evidence of confabulation. Doc. No. 2322-1 at 138.

[23] If Dr. Guilmette has relied in any material respect upon Dr. Welner's opinions, Dr. Guilmette's trial testimony must limit such reliance to the revised report Dr. Welner will produce in accordance with this decision. See Discussion § III(D)(10), infra.

In all other respects, though, the Welner Motion is DENIED as to Dr. Guilmette. To the extent Sampson seeks disqualification of Dr. Guilmette due to his affiliation with the Forensic Panel, or alleged misconduct by Dr. Welner and other experts in other cases, Doc. No. 2345 at 13-20, Sampson has failed to suggest any reasonable basis for viewing Dr. Guilmette's work in this case as tainted. Dr. Guilmette offers no diagnosis of Sampson, he did not employ the Forensic Panel's prospective "peer review" process here, see Discussion § III(E)(4), infra, and nothing about his report suggests he will amount to an improper summary witness masquerading as a mental condition expert. See Doc. No. 2345 at 20-29, 43-47. The remainder of the Welner Motion is directed at Dr. Welner himself, Doc. No. 2345 at 29-42, and will be discussed in the next section.

Accordingly, with respect to Dr. Guilmette: the Malingering Motion (Doc. No. 2339) is DENIED; and the Welner Motion (Doc. No. 2333) is ALLOWED only insofar as Dr. Guilmette may not rely on or testify to any category of facts identified as excluded or impermissible below, see Discussion § III(D)(3), (5)-(9), infra, but is otherwise DENIED.

### 3. *Final Observations*

The specific experts discussed so far – Drs. Gur, Aguirre, and Guilmette – each are plainly qualified to render opinions as representatives of the scientific fields in which they are offered. The opinions they have rendered in this case all are within the scope of their respective areas of expertise, and fit within the bounds of the specific roles their testimony will play in this trial. None of them have ventured beyond their experience and training.

At trial, an expert's testimony, not his report, is the evidence to be considered by the jury. Yet expert witnesses do produce written reports, and those reports serve two main purposes. First, they disclose to the opposing party the nature of the expert testimony involved, the

opinions rendered by the experts, and the bases for those opinions.  Second, they set metes and

bounds that the Court can apply in evaluating the testimony offered at trial and in ruling on any

objections thereto.  The reports of Drs. Gur, Aguirre, and Guilmette in this case appropriately

discharge both of those functions.

Although the Court has precluded testimony and reliance by Dr. Guilmette on certain

limited aspects of his reports, nothing about that ruling calls into question, in the Court's mind,

Dr. Guilmette's ability to render the proposed opinions.  Similarly, nothing about his

presentation at the evidentiary hearing gave the Court reason to doubt whether Dr. Guilmette will

be willing and able to abide by the rulings set forth herein when he testifies at trial.  As such, the

Court sees no reason to require Dr. Guilmette to revise his written report in light of this Order.

D.  Dr. Michael Welner

The proffered expert against whom Sampson mounts the most formidable attack is Dr.

Welner, a board-certified forensic psychiatrist who testified as the government's sole expert

rebuttal witness during Sampson's first penalty phase trial.  See generally Doc. No. 2345.

In a 2014 article published in the Journal of Forensic Sciences, Dr. Welner wrote:

> The expert who stops cold at the border of one's expertise is
> commendable for adhering to boundaries of their professional
> contribution and scientific integrity.  But when a pivotal question
> remains unanswered, and that expert could clearly have
> contributed more than a layman, the result is that the jury is less
> informed than it needs to be.

Michael Welner, Peer-Reviewed Forensic Consultation in Practice: Multidisciplinary Oversight

in Common Expertise, 59 J. Forensic Sci. 1254, 1255 (2014).  Perhaps unsurprisingly in light of

that sentiment, Dr. Welner's reports in this case are marred by instances in which he exceeded

the "boundaries of [his] professional contribution and scientific integrity."  Perhaps he

(incorrectly) considered it his obligation to ensure that no "pivotal question remain[ed]

unanswered." But he would have been better served by adhering to his own warning, expressed in the very same article:

> [P]eripheral scientific exploration, no matter how well-intentioned, cannot replicate the contribution of a fully knowledgeable expert in the relevant field. . . . An expert exploring uncharted territory on their own may not know what he does not yet know.

Id.

Put simply, Daubert protects against exactly what Dr. Welner has done here. It confines opinion testimony by witnesses with specialized knowledge to the areas within which their experience and training has endowed them with expertise. Dr. Welner is not an expert in all things. No expert witness is. His testimony in this proceeding – as in any other – must be confined to those topics on which a forensic psychiatrist is qualified to opine. For example, he may not, consistent with Daubert and Rule 702, offer opinions on the evidentiary standards governing these proceedings or on how to resolve purely factual questions at issue here. He also may not include in his testimony information or topics that this Court has ruled inadmissible as a matter of law.

With these general observations in mind, the Court turns to Sampson's various challenges to Dr. Welner's anticipated testimony.

### 1. *Background and Issues Raised*

Dr. Welner interviewed Sampson in July 2015 (as he did in 2003), reviewed extensive records related to Sampson and this case, and produced lengthy reports.[24] Doc. No. 2322-1 at

---

[24] Dr. Welner's April 2016 report is ninety single-spaced pages long, and his July 2016 revised report spans fifty-five single-spaced pages. They are twice as long as the reports of every other expert in this case, except for his Forensic Panel colleague Dr. Guilmette. In Dr. Guilmette's case, though, the lengthy reports list and describe results from hundreds of neuropsychological tests administered to Sampson by Dr. Guilmette and several other experts. See Doc. No. 2322-1 at 43-87. Remarkably, Dr. Welner testified that he considered his earlier report – the second-

188-277, 279-333.  In those reports, Dr. Welner opines (as he did in 2003) that Sampson is a

psychopath with antisocial personality disorder ("ASPD") and does not suffer from brain

damage.  Id.

In two separate motions, Sampson levies a series of attacks against Dr. Welner's

involvement in this case and various aspects of his proposed testimony.  In the Welner Motion,

Sampson takes issue with Dr. Welner's alleged failure to adhere to court orders in this and other

cases, the reliability of psychopathy and ASPD diagnoses, the admissibility of such diagnoses in

rebuttal, Dr. Welner's recitation and/or characterization of out-of-court statements made by third

parties, and the inclusion in Dr. Welner's report of certain facts previously ruled inadmissible.[25]

Doc. No. 2345.  In the Malingering Motion, Sampson accuses Dr. Welner of holding himself out

as "a human lie detector," and objects to his characterization of various defense experts as liars

or manufacturers of evidence.  Doc. No. 2341 at 1, 27-28.

The government generally opposes Sampson's motions.  It urges that Dr. Welner's

diagnoses, as well as his opinions related to lying and malingering, are admissible under Daubert

and § 3593(c) and are relevant for rebuttal purposes.  Doc. No. 2355 at 18-33.  Further, the

government characterizes as "frivolous" the request to disqualify Dr. Welner, suggesting Judge

Wolf rejected the same request shortly before the case was reassigned to this session.  Id. at 17-

18, 35.  Beyond these issues, the government implies that many of Sampson's other complaints

---

longest report submitted in this case by anyone – to contain merely "some provisional findings."
Doc. No. 2428 at 52.

[25] Sampson also advances two arguments that the Court need not address in detail.  He complains
that a collaborative, peer-reviewed evaluation involving multiple mental health experts "exceeds
the scope of a rebuttal evaluation," Doc. No. 2345 at 2, but the government has made clear that
no such process was used here, Doc. No. 2355 at 34.  Similarly, Sampson seeks to preclude the
government from using Dr. Welner's 2003 trial testimony, citing ineffectiveness of counsel, Doc.
No. 2345 at 38-42, but the government has stated it does not intend to offer the prior testimony.

are moot, narrowly defining the portions of Dr. Welner's voluminous reports that it expects to explore in its rebuttal case. Doc. No. 2441 at 37, 39-41[26]; Doc. No. 2355 at 34 n.12.

As discussed in the following subsections, several, but not all, of Sampson's challenges related to Dr. Welner are meritorious.

### 2. *Disqualification*

As a prelude to challenging specific aspects of Dr. Welner's reports, Sampson seeks an order disqualifying him from testifying at all at the new penalty phase trial. Doc. No. 2345 at 13-20. He bases this request on arguments that Dr. Welner knowingly circumvented Court orders in this case, first by administering a test for psychopathy without required notice, and then by including in his reports various facts and topics which he was ordered by Judge Wolf not to consider. Id. Although the Court agrees that Sampson has raised serious questions about Dr. Welner's reliance on information previously ruled inadmissible, those problems do not justify outright disqualification. Moreover, Judge Wolf previously found that Dr. Welner did not violate orders governing Rule 12.2 examinations by administering a test without providing notice to the defense. See Doc. No. 1873 at 75, 82-83. The relevant test, even if improperly administered in 2003,[27] was ruled inadmissible during the first trial and, as discussed in the subsection immediately following this one, remains inadmissible.

---

[26] Docket number 2441 is the transcript from the July 28, 2016 oral argument.

[27] The Court notes that there does appear to be a question as to whether Judge Wolf was accurately appraised of the facts surrounding Dr. Welner's use of the psychopathy checklist. Notwithstanding assurances provided to Judge Wolf that Dr. Welner used the checklist only as a guide but did not score the test, and that he did not give the test because he was not qualified to do so, Tr. of Dec. 1, 2003 Sealed Lobby Conf. at 109, the record at this time suggests that Dr. Welner did score the test in 2003, Doc. No. 2322-1 at 223 (referencing Sampson's "total score of 38" in 2003), does view himself as qualified to do so, and administers the test quite often, Doc. No. 2428 at 49. Nevertheless, the Court need not resolve whether misrepresentations were made in prior hearings, whether the government or Dr. Welner is responsible for them, or whether they were bases for Judge Wolf's decision not to disqualify Dr.Welner. The relevant test will not be

Insofar as Dr. Welner's report includes facts deemed inadmissible by prior orders of Judge Wolf or this Court, the appropriate remedy is to eliminate references to and reliance upon such facts as discussed below. Although the Court does not find them to be grounds for disqualification, the prior cases Sampson identifies in which questions have arisen surrounding Dr. Welner's compliance with court orders do provide a troubling lens through which the Court has assessed the other issues raised in Sampson's motions.[28] See Doc. No. 2345 at 16-19 (summarizing instances in which other federal trial courts, in three capital cases, have explored allegations that Dr. Welner violated orders issued pursuant to Rule 12.2).

Under these circumstances, the request for disqualification is DENIED.

### 3. *Psychopathy*[29]

Sampson asks the Court to preclude testimony by Dr. Welner that Sampson is a psychopath, alleging unreliability and significant prejudicial effect. Doc. No. 2345 at 20-37. In both of his 2016 reports, Dr. Welner diagnoses Sampson with psychopathy, applying the twenty criteria contained in the Hare Psychopathy Checklist-Revised ("PCL-R"), the so-called "gold standard" for making such a diagnosis. PCL-R Manual at 1; Doc. No. 2428 at 49. Dr. Welner made the same diagnosis of Sampson in 2003, and Judge Wolf precluded him from testifying about it then based on concerns about the risk of jurors considering such evidence as proof of

---

[part of the government's rebuttal evidence at trial, and Dr. Welner's testimony will be circumscribed to conform with all relevant Court orders as discussed below.]

[28] It is not accurate, as the government suggests, that Judge Wolf "rejected Sampson's additional arguments regarding purported 'violations' by Dr. Welner in . . . other cases." Doc. No. 2355 at 17. Rather, the transcript of the relevant hearing reveals that Judge Wolf did not view those allegations as a reason to disqualify Dr. Welner at that time, but did not rule on the merits of Sampson's assertions related to those prior incidents. Doc. No. 1873 at 83.

[29] Although Sampson discusses psychopathy and ASPD together, the record before the Court reveals material differences that warrant separate analysis of each diagnosis.

future dangerousness – a nonstatutory aggravator alleged by the government in 2003 and

realleged now.  United States v. Sampson, 335 F. Supp. 2d 166, 222 n.27 (D. Mass. 2004).  After

careful consideration, Sampson's request to bar testimony about psychopathy is ALLOWED for

two reasons.

    First, as this Court has said before, it generally intends to adhere to Judge Wolf's rulings

from the first penalty phase trial regarding the exclusion of evidence.  Doc. No. 2189 at 35-36.

The government appropriately argues that the Court should not view as binding Judge Wolf's

prior ruling in this regard, as the relevant evidence will be part of the government's rebuttal case,

the scope of which depends on Sampson's mitigation presentation and, thus, is not the same as it

was during the first trial.  Doc. No. 2355 at 23.  The Court agrees with this framework.

However, the primary concern Judge Wolf expressed regarding evidence of psychopathy – i.e.,

the danger of "injecting expert comment on future dangerousness into [jurors'] discussion," Tr.

of Dec. 4, 2003 Sealed Lobby Conf. at 6 – remains unchanged.  Pursuant to Rule 12.2(c)(4), Dr.

Welner's testimony in this case is admissible only insofar as it rebuts evidence of mental

condition Sampson offers in mitigation.  It may not be offered in support of the government's

aggravating factors.  This is true regardless how Sampson may reformulate his mental condition

mitigators at his new penalty phase trial.  Thus, there is no reason to believe that the

circumstances of the retrial will somehow eliminate Judge Wolf's worry that jurors, even with

appropriate limiting instructions, would be tempted to consider testimony that Sampson is a

psychopath as evidence probative of future dangerousness, a topic upon which Dr. Welner would

not be permitted to opine directly.  This is especially so where evidence supporting a diagnosis

of psychopathy would include specific testimony about how Sampson satisfies the PCL-R

criteria, such as "lack of remorse or guilt," "lack of empathy," and "criminal versatility." PCL-R

Manual at 1.

      Although Dr. Welner testified he did not use the PCL-R "as a prospective instrument"

intended to predict future danger, Doc. No. 2428 at 155, the very first page of the PCL-R Manual

touts the test as having an "unparalleled" and "unprecedented" ability "to predict violence." See

Doc. No. 2436 at 146 (reflecting testimony by Dr. Edens about contexts in which the PCL-R is

used to assess risk of reoffending). Studies have shown that jurors connect information about

psychopathy and its criteria with concepts of future dangerousness.[30] Id. at 144. Not only would

such a connection be impermissible within the bounds of Rule 12.2, it also would be misleading.

Dr. Edens testified that the PCL-R is widely used as "a risk assessment tool" in contexts

requiring decisions about whether to release certain offenders. See id. at 146 (referencing use in

"civil commitment cases" and in California parole decisions). In such contexts, where

decisionmakers are assessing the chance of "community recidivism," Dr. Edens said there is

evidence of some relationship between high scores on the PCL-R and likelihood of rearrest

following release. Id. at 144-45. But release is not an option for Sampson; the only two

sentences available for the jury's consideration are death, or life in prison without the possibility

of parole. See United States v. Sampson, 275 F. Supp. 2d 49, 108 (D. Mass. 2003) (Wolf, J.).

According to Dr. Edens, a high PCL-R score does not meaningfully predict aggressive behavior

---

[30] Again, Dr. Welner's own words are revealing on this subject. He has written that "call[ing] someone a psychopath in a forensic examination" is "really like putting the mark of Cain on his or her forehead," and has described the diagnosis as "damning." Michael Welner, Hidden Diagnosis & Misleading Testimony: How Courts Get Shortchanged, 24 Pace L. Rev. 193, 203 (2003); see also Doc. No. 2345 at 31-33 (citing an article by the PCL-R checklist's creator, in which he discusses common assumptions about "psychopaths," and studies suggesting jurors are more likely to view defendants as dangerousness after hearing information about psychopathy and its criteria).

in prison – the only relevant context in which future dangerousness is at issue here.  Id.  Under

these circumstances, Judge Wolf's reasoning remains persuasive.  The Court concurs with his

finding that evidence of psychopathy would fail the § 3593(c) balancing test, and further believes

that the principles underlying § 2255 support applying that finding in the context of Sampson's

retrial.

      Second, based on the evidence offered by the parties in support of their briefs and during

the evidentiary hearing on these motions, the Court concludes that testimony about psychopathy

is inadmissible as rebuttal evidence under Daubert and Rule 702.  Psychopathy is not a disorder

listed in the Diagnostic and Statistical Manual of Mental Disorders, Fifth Edition ("DSM-5").

See Doc. No. 2428 at 257 (reflecting testimony by Dr. Sanislow that "[e]very psychiatric

diagnosis recognized by the field is in the DSM"); see also id. at 102-03 (noting the PCL-R

creator has tried and, so far, failed to secure a place in the DSM for psychopathy).  Published by

the American Psychiatric Association, the DSM-5 "is a classification of mental disorders with

associated criteria designed to facilitate more reliable diagnoses of these disorders."  DSM-5 at

xli.  Psychopathy's absence from the DSM underscores its status as a "construct," as distinct

from a "disorder."  See Doc. No. 2436 at 6-7 (reflecting testimony by Dr. Woods that a

"construct . . . hasn't really gained the number of consistent symptoms" to be considered a

syndrome or disorder).

      Despite its increased popularity among psychiatrists over the past decade or so,[31] the

record before the Court demonstrates that substantial questions exist as to the reliability and

validity of psychopathy as a diagnosis.  Dr. Edens – a Professor of Psychology at Texas A&M

---

[31] To the extent the test has gained popularity due to growing use as a tool to assess likelihood of recidivism as part of parole decisions and in other similar contexts, such increased popularity does not establish reliability or general acceptance for present purposes.

University whose research and writing largely focus on psychopathy and related disorders, <u>see</u>

Curriculum Vitae of John F. Edens, Ph.D., Edens Binder ("Edens CV") – described his own

studies and the evolution of his thinking on the subject, citing problems with inter-rater

reliability (i.e., the chance that two separate doctors will score the PCL-R the same when

assessing the same examinee) and a ***large*** standard error measurement (i.e., the range around a

single rater's score within which an examinee's true score falls).  Doc. No. 2436 at 95-112.

Other witnesses testified about similar concerns with the diagnosis.  <u>E.g.</u>, <u>id.</u> at 26-29 (reflecting

testimony by Dr. Woods about concerns including lack of exclusion criteria, confirmatory bias,

and lack of guidance defining criteria).  The Court credits the defense experts' testimony in this

regard.

Dr. Welner was the only testifying expert to endorse use of the PCL-R without

reservation.  His testimony, however, did not answer the concerns identified by the defense

experts, at least one of whom has studied the test over two decades and published numerous

peer-reviewed articles about its strengths and limitations.  <u>See</u> Edens CV at 3-20.  Furthermore,

his application of the PCL-R in this case did not incorporate at least two techniques

recommended in the test's manual for avoiding biases and enhancing reliability.  <u>See</u> PCL-R

Manual at 18, 20 (recommending "strongly" the "averaging [of] PCL-R scores of two or more

independent raters" in order to increase test reliability and reduce measurement error,[32] and

advising raters to score each item separately and "make written notes on a separate sheet of paper

to justify [each] rating"[33]).  That other courts have permitted experts (including Dr. Welner) to

---

[32] Here, not only was Dr. Welner the ***only*** rater, he also scored Sampson using the PCL-R three separate times.  <u>See</u> Doc. No. 2322-1 at 223-24, 293.  This practice, it seems to the Court, would tend to magnify any biases and decrease reliability, rather than protecting against such problems.

[33] The PCL-R Manual acknowledges "two common rating biases" – a "halo effect (basing each item score on a global impression of the individual, perhaps unduly influenced by the nature of

opine on the subject of psychopathy in other cases does not overcome this Court's concerns

about the reliability of such testimony in this case. See Doc. No. 2355 at 20-21 (citing cases in

which courts permitted psychopathy evidence).[34]

In sum, psychopathy evidence – including testimony by Dr. Welner as to his

administration and scoring of the PCL-R and his diagnosis of Sampson as a psychopath – will

not be admitted at Sampson's retrial. The Court precludes such evidence (a) under the § 3593(c)

balancing test due to an overwhelming risk of prejudice and of misleading the jury as to the

purpose of the evidence; (b) in its § 2255 discretion, based on Judge Wolf's decision to exclude

such evidence in Sampson's first trial for reasons that apply with equal force now; and (c) as

unreliable under Daubert and Rule 702, based primarily on the concerns identified by Dr. Edens

in his testimony and expert declaration.[35]

### 4. *Antisocial Personality Disorder*

Sampson also seeks to preclude testimony by Dr. Welner that Sampson suffers from

ASPD. Doc. No. 2345 at 20-37. He makes the same claims of unreliability and prejudice as to

---

the offenses)," and a "'nice- or bad-guy' bias (rating all items low or high)." As far as the Court
is aware, no contemporaneous notes exist showing Dr. Welner's justifications for his scoring. In
fact, although his reports suggest he scored Sampson three separate times, it appears he
completed the scoring form that is to be used when administering the test only once – on July 20,
2016, the date of his revised report, and a year after his most recent examination of Sampson.
See Doc. No. 2355-5.

[34] In at least one case cited by the government, psychopathy evidence was treated as "probative
of . . . future dangerousness." United States v. Lee, 274 F.3d 485, 495 (8th Cir. 2001).

[35] The Court notes – but does not rely upon as a basis for this decision – a discrepancy in the
record as to whether Dr. Welner has received training in administering the PCL-R. Compare
Doc. No. 2428 at 49, 143-44 (reflecting testimony before this Court that Dr. Welner is "trained
specifically on the PCL-R" and took "the training program . . . tout[ed by the test's creator] as
being necessary in order to properly administer th[e] test" in 2000 or 2001), with Doc. No. 2383-
1 at 3, 6 (reflecting testimony from another case in which Dr. Welner denied having received
training in scoring the PCL-R); see also Doc. No. 2383 (providing Dr. Welner's explanation for
the differing testimony).

this diagnosis, essentially lumping it together with psychopathy and mounting one broad attack against both diagnoses.  E.g., id. at 31 (arguing "the prejudicial effect of permitting the government to label Mr. Sampson as a psychopath or as an antisocial personality disordered person would be devastating").  In his 2016 reports, Dr. Welner diagnoses Sampson with ASPD, finding he satisfies the criteria set forth in DSM-5.  Doc. No. 2322-1 at 233-35, 284.  Once again, Dr. Welner made the same diagnosis of Sampson in 2003, although at that time he believed Sampson met a greater number of the relevant criteria.  See id. at 233.  Judge Wolf permitted rebuttal testimony from Dr. Welner as to ASPD during the first trial.  Tr. of Trial Day 16 (Dec. 12, 2003) at 62-178.  After careful consideration, Sampson's request to bar testimony about ASPD is DENIED.

As a preliminary matter, Sampson does not suggest Dr. Welner is unqualified to give an opinion with respect to ASPD.  Dr. Welner is a licensed, board-certified psychiatrist; he sees patients in his own clinical practice, teaches forensic psychiatry at Mount Sinai School of Medicine, and serves as Chairman of the Forensic Panel.  Doc. No. 2355-2 at 2-3, 27.  The Court is satisfied that his training and experience demonstrate he is amply qualified to diagnose commonly recognized mental disorders, including ASPD.  As such, if evidence related to ASPD is reliable and relevant, the Court must admit it (as long as it passes the § 3593 balancing test).  Daubert, 509 U.S. at 597; accord Bogosian v. Mercedes-Benz of N. Am., Inc., 104 F.3d 472, 476 (1st Cir. 1997).

Although the record reveals some controversy among mental health professionals as to the reliability of ASPD and other "personality disorders," e.g., Doc. No. 2436 at 6-10, ASPD continues to be listed in the DSM-5.  The DSM has been published in successive editions over decades and "has become a standard reference for clinical practice in the mental health field."

DSM-5 at xli.  As the Introduction to the DSM-5 explains, the most recent edition of the

compendium, published in 2013, "was a massive undertaking that involved hundreds of people"

and "[m]uch thought and deliberation" ultimately directed toward ensuring the reliability and

usefulness of the manual "as a guide in the diagnosis of mental disorders."  DSM-5 at 5.

The end result of that process was a manual which identifies ASPD among the

recognized diagnoses.  DSM-5 at 659; see also id. at 764 (also including ASPD in a section

entitled "Alternative DSM-5 Model for Personality Disorders," but with modified criteria); cf.

Doc. No. 2436 at 8-10 (noting historical presence of ASPD and difficulty in reaching consensus

over whether or how to replace it); DSM-5 at xiii, xli (explaining each disorder listed in the

DSM, including ASPD, has an associated code reflecting it is also included in the World Health

Organization's International Classification of Diseases manual).  At least one defense expert

recognized that inclusion of a disorder in the DSM-5 is "some indication of [its] reliability" for

use in forensic and clinical settings.  Doc. No. 2428 at 99; cf. Doc. No. 2436 at 10 (agreeing the

DSM "is a classification system that we currently use" which "is unique to the United States").

If experts tasked with reviewing and revising the manual setting forth a classification

system widely used by mental health professionals in this country elected not to strike ASPD

from the universe of accepted diagnoses contained in that manual, even after having considered

the problems alleged by Sampson, the Court is not inclined to make that leap here.  Although the

current record reflects concerns surrounding the usefulness and reliability of ASPD, as compared

to other mental disorders, those concerns are not sufficient to render testimony about ASPD

scientifically invalid or otherwise inadmissible under the "liberal thrust" of Daubert and Rule

702.  509 U.S. at 588-89, 592-95.  ASPD and its current criteria plainly have been the focus of

scrutiny, including field trials measuring its reliability rating.  The DSM-5 includes criteria

which control its application, and it remains a disorder that is commonly diagnosed within the

relevant scientific community.  Therefore, it satisfies the reliability component of the Daubert

analysis.  509 U.S. at 593-94.

The relevance of ASPD testimony by Dr. Welner will depend on how the Court defines

the scope of rebuttal evidence which, in turn, will depend on the nature of the evidence Sampson

offers in mitigation.  The Court is not in a position to make a final determination in this regard

now.  A few principles bear noting, though.  Testimony that Sampson suffered from ASPD was

admitted at the first trial to rebut evidence that defense experts diagnosed him with bipolar

disorder and a different personality disorder.  See Sampson, 486 F.3d at 50.  According to

Sampson, his mental condition evidence at the retrial will be limited to testimony regarding brain

impairment and the general symptoms his experts opine are the result thereof; he says he does

not intend to offer expert testimony regarding other specific diagnoses.  Doc. No. 2345 at 44-45;

Doc. No. 2357 at 5; see Doc. No. 2436 at 60.  In Sampson's view, this method of framing of his

mitigation case limits the government's rebuttal case to evidence that Sampson has not suffered

brain damage, and renders irrelevant evidence that other diagnoses better explain his conduct.

See Doc. No. 2345 at 44-45 (citing United States v. Williams, 731 F. Supp. 2d 1012, 1017 (D.

Haw. 2010)).

This view elevates semantics over substance, and it appears inconsistent with the

Supreme Court's view of rebuttal mental health evidence.[36]  See Kansas v. Cheever, 134 S. Ct.

---

[36] Sampson cites cases in which courts, including the Supreme Court, have viewed testimony
about ASPD as improper rebuttal where a defendant is claiming intellectual disability.  E.g.,
Brumfield v. Cain, 135 S. Ct. 2269, 2280 (2015).  In such cases, the sole issue is whether a
condemned prisoner is intellectually disabled and, thus, cannot be executed consistent with the
Eighth Amendment.  The scope of rebuttal evidence in the penalty phase of a capital trial, where
the universe of relevant information is much broader, presents a very different question.

596, 601-02 (2013) (holding that a defendant who offers testimony by a mental health expert

"about his inability to form the requisite mens rea" due to voluntary intoxication opens the door

to rebuttal by a government mental health expert who testifies as to the defendant's ability to do

so); cf. State v. Cheever, 375 P.3d 979, 987 (Kan. 2016) (holding on remand that government

expert's testimony did not exceed permissible scope of rebuttal where he implied but did not

explicitly render a diagnosis of ASPD).[37]  Although an ASPD diagnosis does not necessarily rule

out the possibility of brain damage, it is not clear that rebuttal evidence is properly subject to

such a rigid limitation.  Cf. Cheever, 134 S. Ct. at 602 (contemplating admission of testimony

that a defendant with a history of drug use had not been so impaired by intoxication that he could

not premeditate, but rather had intentionally shot the victim due to features of ASPD).  The

specific relevance however, of the proffered testimony here is a question best answered after

Sampson's presentation to the jury is complete.

     Unlike evidence of psychopathy, the Court is not persuaded that testimony about ASPD,

as a general matter, is unduly prejudicial, confusing, or misleading in a manner that would run

afoul of § 3593(c)'s balancing test.  Sampson's argument in this regard links ASPD to

psychopathy and ignores important distinctions, such as ASPD's inclusion in the DSM and the

fact that mock juror studies showing prejudice relate to psychopathy only.  See Doc. No. 2345 at

29-35.  As a general matter, the Court does not view evidence about ASPD as properly stricken

---

[37] The government's expert in Cheever was Dr. Welner.  There, his trial testimony, according to
the Supreme Court, included "an extended soliloquy" in which he "narrated the crime from [the
defendant's] perspective."  134 S. Ct. at 603 n.3.  On remand, the Kansas Supreme Court
admonished Dr. Welner not to use "first-person narrative form" when testifying in future cases,
as doing so "implied that he knew what [the defendant] was actually thinking as the events
unfolded, a fact for which there was inadequate supporting evidence."  375 P.3d at 987.  Dr.
Welner should be advised to avoid "soliloquies" and "first-person narratives" when testifying in
this case.

on this basis.[38]  One specific aspect of Dr. Welner's proffered testimony, though, does present a particular problem under § 3593(c).  During the first trial, Dr. Welner suggested individuals with ASPD and other personality disorders are not mentally ill and do not seek treatment.  Tr. of Trial Day 16 (Dec. 12, 2003) at 88-90.  He again distinguished between ASPD and mental illness during the recent evidentiary hearing.  Doc. No. 2428 at 128-31.  Dr. Welner's view is inconsistent with the DSM-5's definition of "mental disorder"[39] and is not supported by the record before the Court.[40]  Testimony that ASPD is not a mental illness would mislead the jury and, thus, will not be permitted.[41]  With that caveat, testimony about ASPD will be admissible at Sampson's retrial, assuming it is relevant to rebut expert mental condition evidence offered in mitigation.

---

[38] To the extent Sampson challenges ASPD evidence under § 3593(c) because "the statistical and methodological concepts involved . . . are highly technical and complex, and are unlikely to be familiar or fully comprehensible to the average juror," Doc. No. 2345 at 30, he ignores the fact that his own evidence of brain damage will include highly technical scans and procedures for interpreting them, as well as complex information about regions and functions of the brain.  The Court is confident that both parties' experts, many of whom teach for a living, will be able to assist jurors in navigating these topics and their application in this case.

[39] The DSM-5 defines "mental disorder" as "a syndrome characterized by clinically significant disturbance in an individual's cognition, emotion regulation, or behavior that reflects a dysfunction in the psychological, biological, or developmental processes underlying mental functioning," and states that such disorders "are usually associated with significant distress or disability in social, occupational, or other important activities."  DSM-5 at 20.  All disorders appearing in Section II of the DSM-5 – including ASPD – "must meet the definition of a mental disorder."  Id.

[40] Drs. Sanislow and Woods each testified that ASPD is viewed as a mental illness by psychologists and psychiatrists.  Doc. No. 2428 at 218; Doc. No. 2436 at 7, 11.

[41] By suggesting a distinction between ASPD and "mental illness," Dr. Welner implies that a diagnosis of ASPD is not something that would mitigate against imposition of the death penalty (or even that it might be seen as aggravating).  Sampson does not intend to include ASPD among his proposed list of mitigating factors in this case.  See Doc. No. 2345 at 34-35.  But the Supreme Court's decision in Eddings v. Oklahoma, 455 U.S. 104-15 (1982), appears to permit (if not require) jurors to view ASPD, if found, as a mitigator.  The Court will explore whether and how to instruct the jury in this regard at a later date.

5. *Hearsay*

Next, Sampson argues that Dr. Welner's testimony presents Confrontation Clause problems. Doc. No. 2345 at 36-37. In part, this argument relates to the Forensic Panel's "peer review" process, which was not used in this case and provides no basis for precluding all or part of Dr. Welner's testimony. See Discussion § III(E)(4), infra. A closer question is whether and to what extent Dr. Welner may relate to the jury hearsay statements derived from interviews with and declarations of individuals not testifying at trial. As Sampson notes, Dr. Welner's reports are replete with quotes and characterizations of third parties' statements. E.g., Doc. No. 2322-1 at 271 (quoting John Flanagan and Kevin Kelleher); id. at 305 (relating information about Sampson's "predatory behavior from early in life," as provided by a local police chief, a neighbor, and a friend of Sampson); see id. at 195-98, 280-84 (listing sources reviewed, including reports of witness interviews conducted by Dr. Welner and others).

As a general matter, expert witnesses "may base an opinion on facts or data" upon which "experts in the particular field would reasonably rely," regardless of admissibility. Fed. R. Evid. 703. Forensic psychiatrists like Dr. Welner ordinarily rely on a variety of sources providing relevant information about an examinee, including medical and educational records, police reports and court documents, and statements of or interviews with individuals who have known the examinee. Several of Sampson's own expert witnesses relied on such information here. E.g., Doc. No. 2322-4 at 76-77 (reflecting summary by Dr. Woods of "Anecdotal Accounts of Head Trauma in Witness Statements"). Rule 703, then, would permit reliance on (and testimony about) such information, subject to a balancing of its probative value against its prejudicial effect. Cf. § 3593(c) (requiring such balancing under the FDPA, but requiring exclusion if the prejudicial effect "outweighs" any probative value, rather than "substantially outweighs" it).

The Sixth Amendment, however, is not so permissive. The Confrontation Clause protects criminal defendants and, thus, places limits on testimony by government witnesses that do not apply with respect to witnesses testifying for the defense. It guards against admission of testimonial statements by individuals not appearing at trial, unless those individuals are "unavailable" *and* have been subjected to cross-examination by the defendant on a prior occasion. Crawford, 541 U.S. at 59. The various opinions in Williams v. Illinois, 132 S. Ct. 2221 (2012), suggest that a majority of current Supreme Court justices – and perhaps all of them – would construe Crawford as prohibiting Dr. Welner from disclosing testimonial, out-of-court statements made by individuals who are not appearing as witnesses in Sampson's retrial, are not "unavailable" for purposes of the hearsay rules, and have not undergone cross-examination by Sampson's representatives.[42]

Accordingly, Dr. Welner may not testify about or rely upon statements or information provided to him by other individuals who have firsthand knowledge of the relevant facts, but who are not called as witnesses to disclose such facts themselves. Such testimony would run

---

[42] See 132 S. Ct. at 2241 (Alito, J.) (plurality) (endorsing preclusion of such testimony in jury trials, as well as rulings that opinions unsupported by "independent admissible evidence to prove the foundational facts that are essential to the relevance of the expert's testimony" must be given no weight); id. at 2257 (Thomas, J., concurring in judgment) (perceiving "no meaningful distinction between disclosing an out-of-court statement so that the factfinder may evaluate the expert's opinion and disclosing that statement for its truth," and viewing the safeguards identified by the plurality and the Rule 703 balancing test as "no substitute for a constitutional provision that has already struck the balance in favor of the accused"); id. at (Kagan, J., dissenting) (concluding the "utility" of basis testimony by experts is "dependent on [the] truth" of the underlying statements, and stating that permitting such testimony "would countenance the Constitution's circumvention" by allowing the government to "sneak . . . in through the back [door]" what the Confrontation Clause "prevents [it] from getting . . . in through the front door").

afoul of Sampson's right to confront the witnesses against him.  Thus, in this respect, Sampson's

motion is ALLOWED.[43]

This ruling is consistent with the principles underlying § 2255, as Judge Wolf imposed

the same limitation on Dr. Welner's testimony during the first trial.  Tr. of Dec. 11, 2003 Sealed

Lobby Conf. at 38, 41.  It also finds support in Rule 703 and the FDPA.  The government has not

responded to this portion of Sampson's motion, let alone demonstrated that the balancing tests

contemplated by Rule 703 and § 3593(c) favor admission.  Cf. Tr. of Dec. 11, 2003 Sealed

Lobby Conf. at 43 (discussing this test in a nearly identical context and reflecting Judge Wolf's

view that "given the voluminous information about Sampson's history and misconduct that's in

the case," he wondered "how any other incident . . . can be material to [Dr. Welner's] analysis").

### 6.  *Excluded or Withdrawn Evidence*

As another basis for challenging Dr. Welner's opinion, Sampson asks the Court to invoke

the law-of-the-case doctrine to prevent testimony about various topics previously excluded by

Judge Wolf or by this Court – topics which Dr. Welner has once again included in his reports.

Doc. No. 2345 at 2, 12.  The government has not specifically addressed this challenge.  The

Court has discussed application of law-of-the-case principles in a previous decision, Doc. No.

2189 at 13-14, and has applied those principles consistently since that time.  Judge Wolf's

decisions to exclude certain evidence – and to prohibit Dr. Welner from relying on such evidence

– during the first trial were neither modified nor overruled by the First Circuit when Sampson

appealed following his first trial.  Because no party has identified a change in controlling law,

---

[43] It is not possible to discern from his reports to what extent, if at all, Dr. Welner relied upon inadmissible hearsay to support his diagnosis of psychopathy (to which he may not testify at trial), his diagnosis of ASPD (to which he likely will testify at trial), or both.  This question will be answered by his submission of a revised report in light of today's rulings, as discussed below, and by the trial testimony.

significant new evidence, or a basis for believing a miscarriage of justice will result from

adhering to such rulings in the new penalty phase trial, this Court will adopt the same limitations

on the universe of evidence upon which Dr. Welner may rely. See United States v. Matthews,

643 F.3d 9, 12, 14 (1st Cir. 2011). Thus, the following items shall be excluded from Dr.

Welner's testimony and eliminated as bases for his opinions:

- Predictions about whether Sampson will take medications or speculation about why he stopped taking medications;

- Statements of inmate witnesses not called at trial;

- Facts related to Sampson's 1977 rape arrest and his subsequent acquittal;

- Allegations that Sampson threw feces and urine while in state prison;

- Allegations about a prison journal and Sampson taking hostages;

- References to or implications of Sampson having killed before[44];

- References to Sampson's alleged gang membership;

- Sampson's statements about an attempted escape from a New Hampshire prison by another inmate;

- References to Sampson's alleged debt list in prison;

- Statements by John Flanagan that Sampson robbed an older woman and tied up a shop owner;

- Statements by Wayne Sampson that Sampson used a work truck to commit a robbery;

---

[44] Nothing that the Court has reviewed since reassignment of this case in January 2016 has suggested that Sampson has killed, or taken as hostage, any individuals besides the three victims in this case, and the government has made no argument that it should be permitted to offer (or even possesses) such evidence.

- Allegations of Sampson breaking into an ex-wife's party store; and

- Allegations of Sampson being violent toward Karen Anderson and/or Ricky Carter in North Carolina.

Tr. of Dec. 11, 2003 Sealed Lobby Conf. at 36-45.

Dr. Welner's testimony also will be limited by more recent rulings in which this Court has excluded additional evidence related to Sampson's time at USP-Terre Haute. Nor may Dr. Welner relate or consider categories of information which the government's trial attorneys have withdrawn from their proposed trial evidence. Specifically, he may not reference or rely upon:

- Recorded telephone calls between Sampson and trial counsel or other representatives of the defense team, Doc. No. 2190;

- Sampson's letters and telephone calls written and made from the Plymouth County House of Corrections, Doc. No. 2304;

- Incidents of Sampson's alleged misconduct at USP-Terre Haute excluded in this Court's June 17, 2016 Order, Doc. No. 2305;

- Information about other defendants or inmates, including other capital defendants, other death row inmates, and other individuals Dr. Welner has assessed in a forensic or clinical capacity,[45] Doc. No. 2432; and

---

[45] Dr. Welner's reports include numerous references to information that falls within this category, including comparisons between Sampson and other high-profile criminal defendants, generalizations about capital defendants, and comments about the conduct of other inmates. See Doc. No. 2322-1 at 255, 292 (speculating that "there were probably multiple inmates . . . throwing their semen at passersby" near where Dr. Gur met with Sampson, and opining that capital defendants have a "uniquely successful pheromone to many females" which the "medical community" does not yet understand).

- Sampson's USP-Terre Haute educational records, commissary records, recorded
  jail calls, and jail correspondence, Doc. No. 2201.

Insofar as these categories of information are concerned, the Welner Motion is

ALLOWED.[46]  However, should Sampson open the door to any specific category of evidence

through his mitigation presentation, including through the testimony of his own experts (many of

whom, for example, do reference the 1977 rape charges), the government then will be permitted

to respond accordingly.  Finally, should other rulings by the Court deem inadmissible additional

information upon which Dr. Welner has relied, the government shall advise Dr. Welner of the

relevant information and ensure he does not include it in his testimony or consideration when

rendering opinions at trial.

       7.  *Malingering*

In the Malingering Motion, Sampson accuses Dr. Welner of holding himself out as

having "expertise as a human lie detector," and improperly opining that Sampson's "inaccuracies

as a historian" are evidence of "motivated lying."  Doc. No. 2345 at 1 (quoting April 2016

report).  Sampson notes that, unlike Dr. Guilmette, "Dr. Welner does not appear to rely on *any*

tests in support of his claimed superhuman ability to be able to distinguish between malingering .

. . and confabulation."  Id. at 18.  Sampson argues Dr. Welner's opinions about whether Sampson

is malingering are not supported by reliable science, would usurp a function reserved for the jury

---

[46] To the extent Sampson seeks to prevent Dr. Welner from opining that Sampson demonstrates a lack of remorse, see Doc. No. 2345 at 12; Doc. No. 2390 at 1, the motion is DENIED.  Although the Court has eliminated lack of remorse as an aggravating factor, Doc. No. 2189, it remains a relevant criteria for diagnosing ASPD.  Assuming testimony about ASPD is ultimately deemed relevant rebuttal evidence, Dr. Welner will be permitted to address that criteria.  The Court will then give an appropriate limiting instruction cautioning the jury that lack of remorse cannot be viewed or weighed as an aggravating factor.  Additionally, to the extent Sampson alleges remorse as a mitigating factor, and seeks to prove it through his own 12.2 experts, Dr. Welner's testimony as to lack of remorse might appropriately rebut such evidence.

(i.e., determining facts and credibility), and are the sort of testimony that other courts have excluded. Id. at 17-27.

During the evidentiary hearing, Dr. Welner unambiguously conceded that he did not employ any particular medical expertise in arriving at his conclusion that Sampson lies and has done so intentionally or for personal gain; rather, he merely evaluated the facts and evidence known to him: "It was not a special skill, it was merely a reflection of the evidence that I had available to me." Doc. No. 2428 at 81; see also id. at 67-70 (describing his conclusion as based on the "evidence" and "a synthesis of information," agreeing that a jury "has to" evaluate the evidence, and describing his "ability to assess motivation" as dependent on "factual evidence" rather than expertise); id. at 78 (clarifying that he was "not making any representations about [his] ability to tell whether someone's lying," or claiming to have a "special ability, other than synthesizing [the evidence]"). Moreover, Dr. Welner agreed "to some extent" that "an assessment of conscious intention [to lie] is unreliable," noting it depends on the amount of information available. Id. at 67.

Thus, based on his own concessions, as well as the sources cited by Sampson, the Court concludes that Dr. Welner's opinions regarding Sampson's intentional or motivated lying do not satisfy the standards set forth in Daubert and Rule 702 and are not within the scope of admissible expert opinion testimony. As such, the Malingering Motion is generally ALLOWED as to such opinions by Dr. Welner. However, if ASPD evidence is admitted in rebuttal, Dr. Welner may give limited testimony as to whether and how Sampson satisfies the "deceitfulness" criteria of that diagnosis. In doing so, he is restricted (as he was during the first trial) to facts demonstrating deceitful behavior that are within the scope of information that will be presented to the jury regarding the circumstances of the criminal conduct at issue in this trial. This

restriction leaves Dr. Welner plenty of facts from which to choose (e.g., Sampson's assurances to Jonathan Rizzo and his use of OFF to suggest Mr. Rizzo would not be killed, his boasts to various individuals about working for government or military agencies, his promise to a gas station attendant that he would return to pay his bill, and his statement to Mary Boucher that he was a friend of caretaker Robert Whitney, whom he already had killed). Other statements Dr. Welner deems lies (such as Sampson's claim to have read the Bible several times) are of such limited probative value in this context that they fail the § 3593(c) balancing test.[47]

    8. *Defense Experts*

The Malingering Motion contains one additional challenge uniquely aimed at what Sampson calls Dr. Welner's "bold and outrageous accusation[s]" that various defense experts are "guilty of intentionally fabricating evidence" in this case. Doc. No. 2345 at 2. Indeed, Dr. Welner's reports contain numerous accusations of varying degrees of extreme or unethical conduct by Drs. Gur, Lebowitz, and Woods, among others. For example, after (incorrectly) claiming that Dr. Gur's testimony "has been repeatedly excluded in <u>Daubert</u> proceedings" (a subject on which Dr. Welner is not a competent witness), Doc. No. 2322-1 at 212, he makes the following accusation:

> Seeing the unseen is no longer science, and ventures into Dr. Gur's individual belief system or ability to sell a contraption to motivated consumers. In that regard, it is no different from the cosmetology of a miracle drug that one claims, through one's own research, to have demonstrated will aid the aging and desperate to look years younger. Such a gesture is not psychiatry or psychology, or forensic science – it is sales.

---

[47] Subject to the same restrictions (unless Sampson opens the door to a broader range of information), Dr. Welner may testify in rebuttal to defense experts who construe Sampson's inaccuracies as the product of confabulation. For example, his opinion that Sampson "is capable" of "giv[ing] accurate information" and "giving a history." Doc. No. 2428 at 66, 80, and the reasons for that opinion, would fairly rebut claims of confabulation.

Id.  Before accusing Dr. Lebowitz of "gobbling the examinee's stories lock, stock, and barrel,"

id. at 220, Dr. Welner says:

> Dr. Leibowitz' [sic] parroting of Mr. Sampson's accounts and her
> attributing fact to what has no basis in reality reflects not only Mr.
> Sampson's longstanding history of motivated lying, but Dr.
> Leibowitz' [sic] own reinventions of false history.  False history is
> far more impactful when a credentialed expert witness chooses to
> call it fact.

Id.  And when expressing disagreement with one of Dr. Woods's findings, he ascribes to Dr.

Woods:

> a brazen departure from fact that not even Mr. Sampson would
> have the shamelessness to claim.  Such is the need for true reform
> in forensic mental health in death penalty litigation today.  A
> defendant need not assert the ridiculous when a respectably
> degreed professional will do it for him.

Id. at 274.

In its papers, the government did not disavow any of these statements.  Instead, the

government simply assured that it "does not intend to elicit such testimony, ***unless of course***

***Sampson somehow opens the door***."  Doc. No. 2355 at 34 n.12 (emphasis added).  It is difficult

to imagine how Sampson ever could "open the door" to the sort of commentary and accusations

at issue here.  Further, there is no evidence in the record even remotely suggesting that any

defense expert has lied or manufactured evidence.

Dr. Welner essentially defended including in his reports statements like those excerpted

above, confirming that they do reflect "accurate representation[s] of [his] opinion" but assuring

that he did not intend to make them part of his trial testimony.  Doc. No. 2428 at 65.

Unbelievably, he further maintained that he made such statements "[o]ut of an abundance of

respect to Mr. Sampson . . . so as not to unnecessarily damage" him by attributing to him the

supposed manufacturing of evidence.  Id. at 62.

To put it mildly, these comments by Dr. Welner are beyond the pale. They represent a complete departure from the sort of professional disagreement and criticism that is appropriate among experts with differing views, and they have no place in these or any other legal proceedings. The Malingering Motion is ALLOWED with respect to Dr. Welner's accusations of lying and/or evidence manufacturing by defense experts.

9. *Other Matters*

In reviewing Sampson's challenges to Dr. Welner's reports, the Court noticed four additional categories of information which are neither admissible via his trial testimony nor appropriate as bases for his opinions. The first is the fact that Sampson received a death sentence during the first trial. Although the Court and counsel will engage in further consideration and discussion of whether and how to inform jurors of the fact that this case was tried previously, in no event will it be Dr. Welner's role to convey such information.

The second is commentary that amounts to an opinion on or critique of the law. Despite acknowledging in his testimony that he is not a lawyer, nor is he qualified to render legal opinions, Doc. No. 2428 at 57, Dr. Welner's report contains such opinions. For example, he references: the "more permissive" standards he believes apply "in capital litigation" and operate to "allow[] for more creative interpretations of science"; laments "the need for true reform in forensic mental health in death penalty litigation today"; and characterizes Sampson as "a cause celebre in the abolitionist circle" who receives "devoted resources from the best of law firms and specialists." Doc. No. 2322-1 at 212, 274, 327; see also id. at 256, 288 (commenting on Sampson's purported use of Judge Wolf "to get his requests for privileges met"); id. at 274 (claiming Sampson "has access to a new generation of expert witnesses who can imagine all sorts of fiction to bamboozle jurors"); id. at 323-24 (positing that "a post-sentencing claim for

56

intellectual disability and 'ineffective assistance' has been hard-wired into the defense

submissions so that more resources can be expended with the goal that Mr. Sampson . . . outlives

the other participants in this matter"). These statements are neither within the scope of Dr.

Welner's expertise, nor of Rule 12.2 rebuttal evidence.

The third category is statements that constitute "non-expert" or irrelevant opinions, i.e.,

Dr. Welner's personal view of the conclusions he believes jurors should draw from certain facts,

or his personal opinions regarding questions that are not his to answer. For example, although he

is not offered as an expert on future dangerousness,[48] Dr. Welner opines at some length about

"qualities [which] impact upon Mr. Sampson's risk to others in custody." See Doc. No. 2322-1

at 280, 331-33 (asking "how . . . a corrections officer who has to set limits with" Sampson could

"confidently guarantee their security with him" in light of the fact that "professionals

hyperbolically advocating his interests," i.e., defense experts, "did not ask for his being

unrestrained in their encounters" with him).[49] He similarly opines on Sampson's competency

and his ability to sit through full trial days, two more subjects that are well outside the limited

role he plays in these proceedings.[50] Id. at 280, 318-20, 329-31. In several other instances, the

questions guiding his reports, by their own terms, solicit determinations that only the jury may

---

[48] Nor could he be, consistent with Rule 12.2, even assuming that his experience and training render him qualified in this area.

[49] In any event, this assertion miscomprehends the legal standards and means for evaluating future dangerousness in prison.

[50] In gratuitously commenting on Sampson's ability to endure the trial, Dr. Welner in one breath casts implicit aspersions on defense experts and defense counsel: "One is reminded that if the examinee is so preoccupied with the females on his defense team, as we have been repeatedly reminded by defense experts who witness these prison pageants, surely Mr. Sampson will find they can keep him more engaged than Dr. Agharkar or Dr. Guilmette or myself." Doc. No. 2322-1 at 330-31.

make.[51]  E.g., id. at 280 (asking whether "the totality of evidence" reflects certain conclusions

about what the facts are, such as whether Sampson was raped, whether he suffered from abuse

and neglect as a child, and what occurred on his July 23, 2001 call to the FBI).[52]  These subjects

exceed the proper scope of Dr. Welner's expertise and the limited nature of Rule 12.2 rebuttal

evidence.

And, the fourth category includes a number of overtly inaccurate or inflammatory

characterizations of the facts.  As an example of blatant inaccuracy, in describing a "distinctive

feature" of Sampson's crime spree, Dr. Welner incorrectly recounts the state of the facts at the

time of Sampson's surrender on July 31, 2001.  Compare id. at 213 (stating no one yet knew that

Sampson had robbed banks in North Carolina, or that Philip McCloskey had been murdered),

with Doc. No. 2401-1 at 23 (reflecting stipulation that Sampson was charged with bank robbery

and entered into a national law enforcement database for that crime on July 14, 2001),[53] and Tr.

of Trial Day 2 (Nov. 6, 2003) at 60-62 (reflecting Mr. McCloskey's body was discovered on July

26, 2011).  And as an example of an inflammatory characterization, in discussing Sampson's

---

[51] Dr. Welner's reports are drafted as a series of responses to specific questions (twenty-two in the first, and twelve in the second) he describes as having been "presented for [his] review." Doc. No. 2322-1 at 194-95, 279-80.  According to his testimony, though, those questions were presented *to* Dr. Welner *by* Dr. Welner.  Doc. No. 2428 at 37-38.

[52] With respect to these questions, the Court agrees with Dr. Welner's refrain that "an ounce of fact is worth a pound of expertise."  Doc. No. 2428 at 31, 70.  It is the jury's role, not Dr. Welner's, to discern that "ounce of fact" based on admissible evidence at trial.

[53] Dr. Welner's reports contain other passages that are contradicted by the parties' stipulations. Compare Doc. No. 2322-1 at 284 n.1 (claiming uncertainty persists regarding whether Sampson used a real gun during the North Carolina bank robberies), with Doc. No. 2401-1 at 24 (stipulating a pellet gun was used in the bank robberies); compare also Doc. No. 2322-1 at 316-17 (questioning Sampson's motive for calling the FBI and opining that the length of the call would not have permitted time for him to identify himself, explain why he was wanted, and identify a location for surrender), with Doc. No. 2401-1 at 3-4 (stipulating Sampson "launched into a one-way conversation about wanting to turn himself in to the FBI for robberies" when the FBI operator got on the line).

relationships with members of his family, Dr. Welner dramatically accuses Sampson of being

"content to allow his mother to slowly rot into dementia without so much as a peep from the son

for whom she did everything he ever wanted."  Doc. No. 2322-1 at 271.  Rhetorical flourishes of

this nature by an expert witness – who is not an advocate – are inappropriate.[54]

        10. *Revision of Expert Report*

        In all, Dr. Welner's reports are not only sprawling and unwieldy, but also are riddled with

comments he may not make and permeated by information upon which he may not rely.[55]  His

inclusion of the sorts of statements discussed and quoted throughout the foregoing subsections –

a departure from the boundaries that other expert witnesses typically observe – renders his

reports less, not more, helpful in the present context.  Accordingly, with respect to Dr. Welner,

both the Welner Motion (Doc. No. 2333) and the Malingering Motion (Doc. No. 2339) are

---

[54] The Court is particularly troubled by Dr. Welner's depiction of Sampson's mother as "slowly rot[ting] into dementia."  Doc. No. 2322-1 at 271.  No purpose is served by invoking such offensive language to describe a woman who is not personally involved in these proceedings.  Moreover, the characterization was not even true at the time of Dr. Welner's report, as Mrs. Sampson had passed away months earlier.  See Obituary, Charlotte A. Sampson, The Patriot Ledger, Jan. 15, 2016 (available at http://www.legacy.com/obituaries/southofboston-ledger/obituary.aspx?pid=177298223) (last visited Aug. 29, 2016).

[55] Dr. Welner's reports are unique in both length and content, not only among the dozens of expert reports presented by the parties in this case, but also in the universe of expert reports that this Court is accustomed to receiving in general.  Cf. Tr. of Dec. 11, 2003 Sealed Lobby Conf. at 46 (reflecting Judge Wolf's perception that Dr. Welner's "report had an unusual tone for an expert," and observing "there was kind of a sneer to it").  Dr. Welner's curriculum vitae is distinct as well.  Where other experts set forth their contributions to peer-reviewed professional journals, Dr. Welner lists more than 180 articles, a majority of which appear to have been published in non-peer-reviewed, non-scientific publications such as legal newspapers and magazines and his own website and newsletter.  Doc. No. 2355-2 at 14-25 (including 118 items from Forensic Panel publications and at least 32 items from legal sources); but see Doc. No. 2428 at 18 (reflecting testimony by Dr. Welner that, since about 2001, he has published "primarily, if not exclusively" in peer-reviewed journals).

ALLOWED IN PART and DENIED IN PART as described above.  See Discussion §§ III(D)(2)-

(9), supra.

Insofar as Sampson seeks Dr. Welner's disqualification due to the nature and extent of

the information which the Court has precluded from his testimony and consideration, and based

on a "collective" or "cumulative error" theory, that request is DENIED.  The Court assumes Dr.

Welner will remain willing and able to give an opinion on whether Sampson suffers from brain

damage and/or ASPD, as he did during the first trial following the narrowing of his report at that

time.  Moreover, the government at oral argument disavowed many of the relevant portions of

Dr. Welner's reports, and assured the Court that Dr. Welner would abide by the Court's rulings

as to the scope of his testimony.  Doc. No. 2441 at 39-41, 44.  Based on those assurances, the

Court will not preclude Dr. Welner from testifying.  He may testify in the government's rebuttal

case, subject to the limitations set forth in this Memorandum.

However, Dr. Welner's reports in their present form will do little to guide Sampson's

counsel or to assist the Court in preparing for trial.  Given the extent of the information that Dr.

Welner must eliminate from his consideration and testimony – information which saturates both

of his 2016 reports – it would be difficult (if not impossible) for the Court to effectively excise

the offending references.  Sampson has submitted a chart listing excerpts from Dr. Welner's

report that he views as having incorporated these categories of evidence, Doc. No. 2390, which

the Court views as helpful but far from definitive.

Therefore, the government shall, within three weeks of the date of this Memorandum and

Order, provide to the defense and to the Court a revised expert report authored by Dr. Welner in

which all references to and reliance upon the categories of information enumerated herein, see

Discussion §§ III(D)(3)-(9), supra, are eliminated.  The revised report may not incorporate any

sources of information, or render any diagnoses or opinions, not included in the previous reports. This process will ensure fairness by providing notice to the defense about what Dr. Welner's testimony will be, and by providing a manageable and reasonable framework for the Court to apply in overseeing his testimony and ruling on objections at trial.

### E.  Other Motions

#### 1.  *The Parameters Motion*

The government seeks an order setting three basic ground rules that it believes should control the admission of expert mental health testimony at Sampson's trial.  First, the government requests a preemptive ruling preventing Sampson from "call[ing] 12 experts to the stand to testify that he has a brain injury, especially multiple mental health experts with the same specialties."  Doc. No. 2322 at 1, 8.  As examples of the sort of "cumulative or repetitive evidence" at issue, the government cites the reports of Drs. Moberg and Bigler (both clinical neuropsychologists), and Drs. Woods and Merikangas (both neuropsychiatrists).  Id. at 8-9.  The government suggests that certain of Sampson's proposed experts would merely "parrot each other's conclusions."  Id.

The government's request is premature.  The Court cannot discern at this time whether or to what extent Sampson's experts would offer repetitive testimony.  Moreover, the Court is aware of no basis for imposing a numerical limitation on a capital defendant's presentation of expert witnesses whose testimony is relevant to mitigating factors the jury will be asked to consider.[56]  Any concern about the jury's ability to weigh the substance of such testimony rather than simply counting and comparing the number of witnesses offered by each side will be

---

[56] The Court assumes that the defense will offer testimony from experts who can contribute relevant opinions, based on their own independent evaluations, and will assist jurors in resolving questions at issue in this case.

ameliorated with an appropriate limiting instruction. Accordingly, this portion of the Parameters

Motion is DENIED WITHOUT PREJUDICE to the government raising specific concerns as

appropriate during the trial.

Second, the government asks the Court to preclude Sampson from impeaching, during his

mitigation case, the anticipated testimony of the government's rebuttal experts. Sampson agrees

he may not do so. See Doc. No. 2357 at 5. Thus, this portion of the Parameters Motion is

DENIED AS MOOT. Should Sampson change his position, he must request in writing

permission from the Court at least one full day before he seeks to offer in his mitigation case

testimony or evidence aimed at impeaching the government's rebuttal experts.

Third, the government seeks a ruling that its right to rebut any mental condition evidence

offered by Sampson "is not limited to testimony that the defense diagnoses are wrong, but

necessarily includes testimony and evidence that . . . there is another diagnostic explanation for

Sampson's behavior." Doc. No. 2322 at 1. Sampson opposes this request, arguing the particular

diagnoses identified by the government's experts are not proper rebuttal to the sort of mental

condition evidence Sampson intends to offer through his own experts. See Doc. No. 2357 at 5.

To the extent the government seeks an order defining, in the abstract, the scope of

rebuttal evidence pursuant to Rule 12.2 in the penalty phase of a capital case, this portion of the

Parameters Motion is DENIED. Such an order, unmoored from the specific circumstances

presented here, would amount to an advisory opinion. To the extent the government seeks a

ruling that a diagnosis of psychopathy would properly rebut the anticipated mental condition

mitigation evidence in this case, the Parameters Motion is DENIED AS MOOT in light of the

Court's exclusion of testimony regarding psychopathy. See Discussion § III(D)(3), supra. To

the extent the government seeks a ruling that diagnoses of antisocial personality disorder and/or

disorders related to substance abuse would rebut the anticipated mental condition mitigators in this case, the Parameters Motion is DENIED WITHOUT PREJUDICE. Until the precise contours of the defense case are known, such a ruling is premature. See Discussion § III(D)(4), supra. The Court anticipates meeting with the parties at the conclusion of the defense's mitigation case to define the appropriate scope of the government's rebuttal evidence, taking into consideration the evidence adduced by Sampson in mitigation.

2. *The Judicial Determinations Motion*

Sampson asks the Court to resolve at the outset "whether a party is permitted to support or impeach the credibility of an expert by cross examination designed to show that some other court made credibility or qualification determinations with respect to that witness." Doc. No. 2329 at 1. Sampson argues generally that such use of prior judicial determinations would be contrary to a position taken by the government previously in another criminal case, would violate evidentiary rules related to hearsay and use of extrinsic evidence for impeachment purposes, and would run afoul of the balancing tests set forth in Rule 403 and § 3593(c). Id. at 2-7.

The government opposes the motion, citing Sampson's failure to identify the prior designations he wishes to challenge and noting the benefits of waiting to decide questions like this until the relevant witnesses are called at trial (rather than ruling "in a vacuum"). See Doc. No. 2352 at 1-2. The Court agrees that Sampson's request is both premature and not susceptible to resolution in the abstract. But on the present record, there are certain guidelines the Court can establish at this time.

The Court has serious concerns about the propriety of permitting either party to use prior determinations by any court related to the credibility or qualifications of any expert witness in this case, particularly in light of the substantial risk that the jury might abdicate its role as the

sole determiner of the credibility of all witnesses in favor of reliance on "official" pronouncements made by judges regarding the same witnesses.[57]  The use of prior judicial determinations also would carry with it the risk of confusing the jurors by requiring "mini-trials" into the circumstances surrounding each such determination.

        As such, if either party wishes to use at trial any prior judicial determination related to an expert witness's credibility or qualifications, that party must make a written motion seeking permission to do so at least two days before the relevant witness is expected to begin testifying. The written motion must identify the specific prior determination the moving party proposes to use, address the application of the § 3593(c) balancing test, and specify what (if any) limiting instruction the Court should give at the time of the testimony to protect against the concerns identified herein.  Absent an express order by the Court allowing such a motion and permitting reference to a specific prior judicial determination, no party may mention such determinations before the jury in any statement or argument by counsel or in any question put to a testifying witness.

        Otherwise, the Judicial Determinations Motion (Doc. No. 2328) is DENIED WITHOUT PREJUDICE.

---

[57] The cases cited by both sides related to this motion tend to involve prior determinations regarding the credibility of police officers testifying as fact witnesses in criminal trials, which do not present the same considerations as the opinion testimony of mental health expert witnesses in a federal capital penalty phase trial.  The only other case identified by the parties in which the issue arose in a comparable context resulted in a trial judge first allowing such questions then reversing course based, at least in part, on concerns about juror confusion.  See Tr. of Proceedings Vol. 44 at 9195, ECF No. 1535, United States v. McCluskey, No. 10-cr-2734-JCH (D.N.M. Oct. 29, 2013).

### 3. *The Expert Designation Motion*

Citing an American Bar Association resolution, Sampson seeks an order prohibiting both sides from tendering witnesses as "experts" and an assurance from the Court that it will not declare witnesses "experts" in front of the jury. See generally Doc. Nos. 2334, 2335. The government opposes the motion, arguing it ignores the usual practice in this District, lacks legal support, overstates the significance of the "expert" designation, and might confuse the jury. Doc. No. 2353.

The motion is DENIED. It is this Court's practice, in both civil and criminal cases, to permit the parties to offer witnesses as experts and to designate witnesses as such when appropriate. In the Court's view, this practice helps jurors to understand the nature of an expert's specialized knowledge and the reason why such a witness is permitted to give opinion testimony. The Court sees no reason to change its customary practice in this case. Moreover, expert witnesses were tendered by the parties and designated by the Court as such during the first trial in this case. Proceeding in the same manner during the new trial is in line with the Court's general practice of adopting rulings made by Judge Wolf during the first trial, and in keeping with the objectives of § 2255.

Sampson's concerns about the impact of the tendering/designation of experts on jurors' consideration of expert testimony will be mitigated by: 1) minimizing the designation process during trial, especially to the extent that many of the experts' qualifications will not be subject to dispute during trial (whether because the parties agree to them, or because the Court has resolved disputes about them herein); and 2) a brief instruction, to be given as needed when witnesses are designated "experts," explaining the role of expert testimony and reminding jurors that they possess the sole responsibility to evaluate the testimony of all witnesses, including experts. To

the extent the proposed jury instructions previously submitted by the parties do not contain an instruction of this nature, the parties may jointly or separately submit proposed language for the Court's consideration no later than the conclusion of jury selection.

4. *The "Peer Review" Motion*

Citing testimony and procedures used in other cases (and in the first trial in this case) by Dr. Welner and other experts affiliated with the Forensic Panel, Sampson asks the Court to prohibit testimony by any expert witness stating or implying that his or her conclusions were verified by other, non-testifying experts. See generally Doc. No. 2337. The government asserts that no expert has used the Forensic Panel's internal "peer review" process in this case.[58] Doc. No. 2355 at 34. Thus, to the extent the "Peer Review" Motion (Doc. No. 2336) challenges testimony about the application of a "peer review" process to the government experts' assessments of Sampson, or testimony by any government expert that his conclusions have been confirmed or validated by another expert who will not appear at trial, the motion is DENIED AS MOOT. Should the government change its position, it must request in writing permission from the Court at least one full day before it seeks to present "peer review" testimony or evidence.

The government argues further that "there is no legal basis" to preclude Dr. Welner from describing the Forensic Panel and its "peer review" process when reciting his professional background. Doc. No. 2355 at 34-35; see Doc. No. 2337 at 1-2 (quoting the pertinent excerpt

---

[58] Dr. Welner has described the Forensic Panel and its "peer review" process as follows: "I started the Forensic Panel with the idea of creating the first psychiatric practice which would be able to have an internal oversight and peer review in which colleagues would be independently looking over one another's work in the course of an examination being done to the court. . . . I invited people . . . whom I felt had excellent judgment, people who were solid independent thinkers, people who could accept criticism . . . , people who were intellectually alive and who were keeping themselves on the cutting edge. . . . [W]e did come up with a group . . . [of] people whom we feel are able to offer an opinion with a certain sense of independence . . . ." Tr. of Trial Day 16 (Dec. 12, 2003) at 68.

from Dr. Welner's testimony at Sampson's first trial). However, where the allegedly independent "peer review" process concededly was not used here, any description of that process (even in describing Dr. Welner's qualifications) would be irrelevant and misleading in this case. Accordingly, to the extent the "Peer Review" Motion (Doc. No. 2336) seeks to preclude testimony characterizing the Forensic Panel generally or its members specifically as "independent" and/or as utilizing "internal oversight and peer review," the motion is ALLOWED.

IV.    CONCLUSION

For the foregoing reasons, the Court ORDERS as follows:

1) the Gur Motion (Doc. No. 2325) is DENIED;

2) the Aguirre Motion (Doc. No. 2331) is DENIED;

3) the Malingering Motion (Doc. No. 2339) is ALLOWED IN PART and DENIED IN PART as described above;

4) the Welner Motion (Doc. No. 2333) is ALLOWED IN PART and DENIED IN PART as described above, and on or before September 23, 2016, the government shall provide to the defense and the Court a revised expert report prepared by Dr. Welner in conformance with the rulings set forth in Discussion § III(D) above;

5) the Parameters Motion (Doc. No. 2322) is DENIED;

6) the Judicial Determinations Motion (Doc. No. 2328) is DENIED;

7) The Expert Designation Motion (Doc. No. 2334) is DENIED; and

8) the "Peer Review" Motion (Doc. No. 2336) is ALLOWED IN PART and DENIED IN PART.

The motion papers and supporting documents as to each of these motions are sealed, as is this Memorandum and Order.[59]  These items will remain sealed until the conclusion of the trial for two reasons.  First, all of the relevant motions arise from evidence that is within the scope of Rule 12.2, which is aimed at protecting a defendant's Fifth Amendment rights.  If Sampson elects not to offer evidence of mental condition at trial, none of the issues raised in these motions or the information underlying them will be admitted at trial.  His Fifth Amendment protections in this regard are only completely waived when he offers his own expert mental condition evidence at trial.  Until then, sealing is required consistent with Rule 12.2.  Second, the motions, the supporting documents, and this Memorandum and Order contain certain information that will not be admissible during the trial in this matter, as well as other information the admissibility of which will depend on how the defense elects to shape its mitigation presentation at trial.  As such, continued sealing is appropriate.  See In re Globe Newspaper Co., 729 F.2d 47, 55 (1st Cir. 1984).  If mental condition evidence is offered at trial, the Court anticipates unsealing all motions, briefs, and exhibits related to these motions, as well as this Memorandum and Order, after the conclusion of the trial.

SO ORDERED.

 /s/ Leo T. Sorokin
Leo T. Sorokin
United States District Judge

---

[59] The parties may share copies of this Memorandum and Order with the relevant expert witnesses to assist in preparations for trial.  Those experts who receive or review this Memorandum and Order may not disseminate it and are bound by the sealing order.

APPENDIX A

*Expert Reports & Declarations*
1. Michael Welner, October 31, 2003 Report (Doc. No. 2333-2)
2. Michael Welner, April 4, 2016 Report (Doc. No. 2322-1, pp. 188-277)
3. Michael Welner, June 20, 2016 Report (Doc. No. 2322-1, pp. 279-333)
4. Michael Welner, July 13, 2016 Declaration, (Doc. No. 2355-1)
5. Thomas Guilmette, April 3, 2016 Report (Doc. No. 2322-1, pp. 29-140)
6. Thomas Guilmette, June 20, 2016 Report (Doc. No. 2322-1, pp. 142-186)
7. Thomas Guilmette, July 13, 2016 Declaration (Doc. No. 2355-3)
8. Geoffrey Aguirre, August 4, 2015 Report (Doc. No. 2322-1, pp. 3-16)
9. Geoffrey Aguirre, June 20, 2016 Report (Doc. No. 2322-1, pp. 18-27)
10. Erin Bigler, April 6, 2016 Report (Doc. No. 2322-2, pp. 8-9)
11. Erin Bigler, June 20, 2016 Report (Doc. No. 2322-2, pp. 11-17)
12. Erin Bigler, July 22, 2016 Letter (Doc. No. 2369-1)
13. John Edens, June 17, 2016 Declaration (Doc. No. 2322-2, pp. 19-35)
14. James Gilligan, March 22, 2010 Declaration (Doc. No. 1041-194, pp. 2-30)
15. James Gilligan, April 8, 2016 Report (Doc. No. 2322-2, pp. 37-49)
16. Ruben Gur, May 8, 2009 Report (Doc. No. 2325-2)
17. Ruben Gur, November 11, 2009 Report (Doc. No. 2354-3, pp. 26-28)
18. Ruben Gur, § 2255 Declaration (Doc. No. 2325-1)
19. Ruben Gur, March 5, 2010 Supplemental Declaration (Doc. No. 2354-4)
20. Ruben Gur, April 7, 2016 Report (Doc. No. 2322-2, pp. 51-55)
21. Ruben Gur, May 17, 2016 Letter (Doc. No. 2322-2, pp. 57-82; Doc. No. 2322-3, pp.1-5)
22. Ruben Gur, June 6, 2016 Letter (Doc. No. 2322-3, pp. 14-16)
23. Ruben Gur, June 19, 2016 Letter (Doc. No. 2322-3, pp. 6-12)
24. Ruben Gur, July 15, 2016 Letter (Doc. No. 2356-9)
25. Ruben Gur, July 15, 2016 Response (Doc. No. 2356-10)
26. Leslie Lebowitz, March 28, 2010 Declaration (Doc. Nos. 1041-201, -202)
27. Leslie Lebowitz, April 8, 2016 Report (Doc. No. 2322-3, pp. 18-19)
28. Leslie Lebowitz, June 20, 2016 Report (Doc. No. 2322-3, pp. 21-30)
29. Michael Lipton, July 20, 2015 Report (Doc. No. 2322-3, pp. 32-34)
30. Michael Lipton, May 30, 2016 Report (Doc. No. 2322-3, pp. 36-39)
31. James Merikangas, April 8, 2016 Report (Doc. No. 2322-4, pp. 1-3)
32. Paul Moberg, April 7, 2016 Report (Doc. No. 2322-4, pp. 5-16)
33. Paul Moberg, June 20, 2016 Report (Doc. No. 2322-4, pp. 18-22)
34. Charles Sanislow, June 20, 2016 Report (Doc. No. 2322-4, pp. 30-59)
35. George Woods, March 24, 2010 Declaration (Doc. No. 1041-203, -204, -205)
36. George Woods, April 8, 2016 Report (Doc. No. 2322-4, pp. 61-101)
37. George Woods, June 20, 2016 Report (Doc. No. 2322-4, pp. 103-133)

*Other Exhibits to Briefs*
38. Ruben C. Gur et al., "Behavioral Imaging" – A Procedure for Analysis and Display of Neuropsychological Test Scores: I. Construction of Algorithm and Initial Clinical Evaluation, <u>Neuropsychiatry, Neuropsychology, & Behavior Neurology</u>, Vol. 1, No. 1, p. 53 (1988) (Doc. No. 2325-4)

39. Ruben C. Gur et al., "Behavioral Imaging" – II. Application of the Quantitative Alogrithm to Hypothesis Testing in a Population of Hemiparkinsonian Patients, Neuropsychiatry, Neuropsychology, & Behavior Neurology, Vol. 1, No. 2, p. 87 (1988) (Doc. No. 2325-5)

40. Ruben C. Gur et al., "Behavioral Imaging" – III. Interexpert Agreement and Reliability of Weightings, Neuropsychiatry, Neuropsychology, & Behavior Neurology, Vol. 3, No. 2, p. 113 (1990) (Doc. No. 2325-6)

41. Trial Transcript, Vol. 43, United States v. McCluskey, No. 10-cr-2734-JCH (D.N.M. Oct. 24, 2013) (Doc. No. 2325-7)

42. Hearing Transcript, United States v. Northington, No. 07-cr-550-RBS (E.D. Pa. Oct. 17, 2012) (Doc. No. 2325-8)

43. Ronald A. Yeo et al., Neuropsychological Methods of Localizing Brain Dysfunction: Clinical Versus Empirical Approaches, Neuropsychiatry, Neuropsychology, & Behavior Neurology, Vol. 3, No. 4, p. 290 (1990) (Doc. No. 2325-9)

44. William J. Lynch, Letter to Assistant District Attorney Martin Murray (Jan. 6, 2005) (Doc. No. 2325-11)

45. Deposition Transcript, United States v. Duong, No. 01-cr-20154-JF (N.D. Cal. Dec. 3, 2010) (Doc. No. 2325-13)

46. Partial Jury Trial Transcript, United States v. Green, No. 06-cr-19-TBR (W.D. Ky. May 19, 2009) (Doc. No. 2325-14)

47. Partial Hearing Transcript, United States v. Montgomery, No. 05-cr-6002-GAF (W.D. Mo. Sept. 4-5, 2007) (Doc. Nos. 2325-15, -16)

48. Partial Trial Transcripts, Commonwealth v. Chism, Nos. 2013-1446, 2013-1447, 2014-0109 (Mass. Super. Ct. Essex Cty. Dec. 3 & 10, 2015) (Doc. No. 2325-17)

49. Ruben C. Gur Curriculum Vitae (Doc. No. 2356-1)

50. Letters of Reference re: Gur (Doc. No. 2356-2)

51. Ruben C. Gur et al., Response to Yeo et al.'s Critique of Behavioral Imaging, Neuropsychiatry, Neuropsychology, & Behavior Neurology, Vol. 3, No. 4, p. 304 (1990) (Doc. No. 2356-6)

52. Exhibit 63-65 in Support of Petition for Executive Clemency – Donald Jay Beardslee (Doc. No. 2356-7)

53. David R. Roalf Letter, July 8, 2016 (Doc. No. 2356-8)

54. Geoffrey K. Aguirre Curriculum Vitae (Doc. No. 2354-5)

55. Medical Records re 2003 MRI of Gary Sampson (Doc. No. 2354-6)

56. Medical Records re 2009 MRI of Gary Sampson (Doc. No. 2354-7)

57. Transcript of Interview of Gary Sampson by Michael Welner, October 29, 2003 (Doc. No. 2333-1)

58. Cory S. Flashner Letter to William E. McDaniels (June 25, 2015) (Doc. No. 2333-4)

59. Transcript of Interview of Gary Sampson by Michael Welner, July 16, 2015 (Doc. No. 2333-5)

60. Transcript of Interview of Gary Sampson by Michael Welner, July 17, 2015 (Doc. No. 2333-6)

61. E-mails between Zachary Hafer and Michael Burt (May 2016) (Doc. No. 2333-8)

62. Leigh D. Hagan and Thomas J. Guilmette, DSM-5: Challenging Diagnostic Testimony, International Journal of Law & Psychiatry 42-43 (2015) 128-134 (Doc. No. 2333-13)

63. Sanford L. Drob et al., Clinical and Conceptual Problems in the Attribution of Malingering in Forensic Evaluations, J. Am. Acad. Psychiatry Law 37:98-106 (2009) (Doc. No. 2341-7)

64. Michael F. Martelli et al., Masquerades of Brain Injury Part III: Critical Evaluation of Symptom Validity Testing and Diagnostic Realities in Assessment, Journal of Controversial Medical Claims, Vol. 9 No. 2 p.19 (2002) (Doc. No. 2341-8)

65. Richard Rogers et al., Assessment of Malingering with Repeat Forensic Evaluations: Patient Variability and Possible Misclassification on the SIRS and Other Feigning Measures, J. Am. Acad. Psychiatry Law 38:109-14 (2010) (Doc. No. 2341-9)

66. Michael Welner Curriculum Vitae (Doc. No. 2355-2)

67. Thomas J. Guilmette Curriculum Vitae (Doc. No. 2355-4)

68. Hare PCL-R: 2nd Edition Score Sheets of Gary Sampson by Michael Welner (June 20, 2016) (Doc. No. 2355-5)

69. Jennifer Cox et al., The Effect of the Psychopathy Checklist – Revised in Capital Cases: Mock Jurors' Responses to the Label of Psychopathy, Behav. Sci. Law 28: 878-891 (2010) (Doc. No. 2355-6)

70. John F. Edens Curriculum Vitae (Doc. No. 2355-7)

71. Mark D. Cunningham and Thomas J. Reidy, Antisocial Personality Disorder Versus Psychopathy as Diagnostic Tools (1998) (Doc. Non. 2355-8)

*Evidentiary Hearing Exhibits*

72. Thomas J. Guilmette 12.2 Witness Binder ("Guilmette Binder")

73. Dr. Michael Welner 12.2 Witness Binder ("Welner Binder")

74. Charles A. Sanislow 12.2 Witness Binder ("Sanislow Binder")

75. Dr. George Woods 12.2 Witness Binder ("Woods Binder")

76. Dr. John F. Edens 12.2 Witness Binder ("Edens Binder")

77. Hare Psychopathy Checklist – Revised (PCL-R): 2nd Edition, Technical Manual ("PCL-R Manual")

78. David DeMatteo et al., Investigating the Role of the Psychopathy Checklist-Revised in United States Case Law, 20 Psychol., Pub. Pol'y & L. 96 (2014)

79. M.E. Thomas, Confessions of a Sociopath: A Life Spent Hiding in Plain Sight (2014) (excerpts)

80. John F. Edens et al., Bold, Smart, Dangerous & Evil: Perceived Correlates of Core Psychopathic Traits Among Jury Panel Members, 7 Personality & Mental Health 143 (2013)

81. John F. Edens et al., Use of the Personality Assessment Inventory to Assess Psychopathy in Offender Populations, 12 Psychol. Assessment 132 (2000)

82. Darrel B. Turner et al., Jurors Report that Risk Measure Scores Matter in Sexually Violent Predator Trials, but that Other Factors Matter More, 33 Behav. Sci. & L. 56 (2015)

83. Jennifer Cox et al., The Effect of the Psychopathy Checklist – Revised in Capital Cases: Mock Jurors' Responses to the Label of Psychopathy, 28 Behav. Sci. & L. 878 (2010)

84. Welner Excluded Evidence Tracking Chart (Doc. No. 2390)

85. Zachary Hafer Post-Hearing Letter and attachments, Aug. 1, 2016 (Doc. No. 2383)

86. Michael Burt Post-Hearing Letter, Aug. 2, 2016 (Doc. No. 2387)